UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------ x

KATHALEEN FREEMAN, ALBERT SNYDER,　　:
RICHARD LEE, MARSHA KIRBY, STEVEN　　　:
KIRBY, MAXINE E. CROCKETT, *individually and* :
*on behalf of the* ESTATE OF RICKY LEON　　　:
CROCKETT, MARVISE L. CROCKETT, TRACIE　:
ARSIAGA *on behalf of the* ESTATE OF ROBERT　:
R. ARSIAGA, STEVEN GREENWOOD,　　　　:
STEPHEN W. HILLER, *individually and on behalf* :
*of the* ESTATE OF STEPHEN DUSTIN HILLER,　:
JEREMY CHURCH, SANDRA HANKINS,　　　:
INGRID FISHER, *individually and on behalf of the* :
ESTATE OF STEVEN SCOTT FISHER, KRISTIN　:
WALKER, STEVEN T. FISHER, KATHLEEN　　:
GRAMKOWSKI, MARY CARVILL, PEGGY　　　:
CARVILL-LIGUORI, *individually and on behalf of* :
*the* ESTATE OF FRANK T. CARVILL, DANIEL　:
CARVILL, PAMELA ADLE-WATTS, *individually* :
*and on behalf of the* ESTATE OF PATRICK ADLE, :
JOHN WATTS, GLORIA NESBITT, *individually*　:
*and on behalf of the* ESTATE OF DEFOREST L.　:
TALBERT, D.J.H., *a minor*, CHIQUITA　　　　:
TALBERT, TAWANNA TALBERT DARRING,　　:
LATASHA MARBLE, JAMES TALBERT,　　　　:
MIRANDA PRUITT, VELINA SANCHEZ,　　　　:
ALOYSIUS SANCHEZ, SR., ROMMEL ROCHA,　:
PHILLIP SANCHEZ, ALOYSIUS SANCHEZ, JR., :
GLORIA P. REYNOSO, *individually and on behalf* :
*of the* ESTATE OF YADIR G. REYNOSO,　　　:
JASMIN REYNOSO, PATRICIA REYNOSO,　　:
JOSE REYNOSO, ASHLEY WELLS SIMPSON,　:
*individually and on behalf of the* ESTATE OF　　:
LARRY LLOYD WELLS, CHAD WELLS,　　　　:
CRYSTAL STEWART, CHASITY WELLS-　　　:
GEORGE, CANDICE MACHELLA, BILLY DOAL :
WELLS, HOPE ELIZABETH VEVERKA,　　　:
DONNA JEAN HEATH, *individually and on behalf* :
*of the* ESTATE OF DAVID MICHAEL HEATH,　:
LOLA JEAN MODJESKA, JOHN DAVID　　　:
HEATH, OLGA LYDIA GUTIERREZ, *individually* :
*and on behalf of the* ESTATE OF JACOB DAVID　:
MARTIR, ISMAEL MARTIR, VICTORIA M.　　:
FOLEY, *individually and on behalf of the* ESTATE　:
OF ALEXANDER SCOTT ARREDONDO,　　　:

**COMPLAINT**
**JURY TRIAL DEMANDED**

**Case No. 18-cv-7359**

NATHANIEL FOLEY, MICHAEL SCOTT          :
DEWILDE, STEVEN MORRIS, DANIELLE        :
DECHAINE-MORRIS, NICHOLAS MORRIS,       :
K.M., *a minor*, MONICA ARIZOLA, ROBERTO :
AARON ARIZOLA, ROBERTO ARIZOLA, SR.,    :
CECILIA ARIZOLA, DANNY ARIZOLA,         :
RICARDO ARIZOLA, GREG KLECKER, MARIA    :
VIDAL, TAMARA HASSLER, RICHARD E.       :
HASSLER, JOANNE SUE HASSLER, SCOTT      :
HUCKFELDT, KATHRYN HUCKFELDT,           :
ALISHA HUCKFELDT, MATTHEW               :
HUCKFELDT, TIMOTHY NEWMAN, PADRAIC      :
J. NEWMAN, AMENIA JONAUS, *individually and* :
*on behalf of the* ESTATE OF JUDE JONAUS, :
GERNESSOIT JONAUS, DAPHNIE JONAUS       :
MARTIN, RICKY JONAUS, MARCKENDY         :
JONAUS, CLAIRE JONAUS, SHAREN JONAUS    :
MARTIN, MASINA TULIAU, BRIANNA RENEE    :
NAVEJAS, MARGARITO A. MARTINEZ, JR.,    :
ALVIS BURNS, JODEE JOHNSON, JAMES       :
HIGGINS, WENDY COLEMAN, BRIAN RADKE,    :
NOVA RADKE, STEVEN VERNIER, JR.,        :
CLIFFORD L. SMITH, JR., *individually and on* :
*behalf of the* ESTATE OF KEVIN J. SMITH, :
GEORGIANNA STEPHENS-SMITH, CORENA       :
MARTIN, ADAM MATTIS, TERRANCE           :
PETERSON, III, PETRA SPIALEK, DAVID G.  :
CARDINAL, JR., *individually and on behalf of the* :
ESTATE OF ANTHONY CARDINAL, RICHELLE    :
HECKER, *individually and on behalf of the*   :
ESTATE OF WILLIAM F. HECKER, III,       :
VICTORIA HECKER, W.H., *a minor*, C.H., *a* :
*minor*, WILLIAM F. HECKER, JR., NANCY  :
HECKER, JOHN D. HECKER, ROBERT F.       :
MARIANO, *individually and on behalf of the*  :
ESTATE OF ROBBIE M. MARIANO, DEBRA      :
MARIANO, BOBBIE D. MARIANO, VICKIE      :
MICHAY WHITE, *individually and on behalf of the* :
ESTATE OF STEPHEN J. WHITE, GLADYS E.   :
REYES CENTENO, VERONICA LOPEZ REYES,    :
ZORAIMA LOPEZ, JENNIFER LINK, SHARON    :
JOHNSTON, KENNY LEE, TOM B. LEE, LING P. :
LEE, JUDY COLLADO, KAIYA COLLADO,       :
JUSTIN WALDECK, TANJA KUHLMEIER,        :
*individually and on behalf of the* ESTATE OF :
DANIEL KUHLMEIER, K.K., *a minor*, ROBERT J. :

ii

KUHLMEIER, THERESA A. KUHLMEIER,      :
THERESA ANN KUHLMEIER, EDWARD         :
KUHLMEIER, THOMAS KUHLMEIER, JOHN     :
KUHLMEIER, ROBERT W. KUHLMEIER,       :
CHRISTOPHER ANTHONY BERSHEFSKY,       :
ADRIAN SANDOVAL, ROSA ESTHER          :
SANDOVAL, HENRY J. BANDHOLD, SR.,     :
*individually and on behalf of the* ESTATE OF   :
SCOTT BANDHOLD, AFONSO BANDHOLD,      :
MARIANA BANDHOLD, JOSHUA P. STEIN,    :
NICOLE B. STEIN, R.M.S., *a minor*, J.S.S., *a*   :
*minor*, JESSE P. STEIN, MICHAEL PAUL ALAN   :
SHELSWELL, LUKE MURPHY, WILLETTE      :
MURPHY, SHANE IRWIN, T.R., *a minor*, HELEN   :
MARGUERITE IRWIN, NICOLE IRWIN, MARIA   :
GOMEZ, *individually and on behalf of the* ESTATE   :
OF JOSE GOMEZ, JOHN DANA GREER,       :
STEPHANIE C. SANDER, CHRISTOPHER D.   :
GREER, JOSEPH L. GREER, CARL K. GREER,   :
CHRISTOPHER JOYNER, ANNE P. JOYNER,   :
NECOLE DUNLOW SMITH, MICHAEL R.       :
MILLS, M.R.M., *a minor*, M.R.M., *a minor*, EDDIE   :
JO PALINSKY, *individually and on behalf of the*   :
ESTATE OF JERRY A. PALINSKY, JR., JERRY   :
A. PALINSKY, II, ADINA PALINSKY, JERRY A.   :
PALINSKY, SR., KATHLEEN HOKE, JOEL    :
PALINSKY, KARALEEN HERB, ERIC         :
BRANDON STONEKING, CARRIE SUE         :
STONEKING, FAITH RENEE STONEKING,     :
JOAQINA SAENZ CHORENS, LUZ MARIA      :
ESTRADA-PULIDO, FRANCES CATHERINE     :
CASTRO, ELVA ESPINOZA, E.V., *a minor*,   :
BAYLI VACHO, RONALD VEVERKA, CAROL    :
POLLEY, KEITH VEVERKA, DOUGLAS        :
VEVERKA, SANDRA SOLIDAY, SHANNON      :
SHUMATE, LAUREN SHUMATE, L.S., *a minor*,   :
L.S., *a minor*, NICOLE DICENZO, *individually and*   :
*on behalf of the* ESTATE OF DOUGLAS       :
ANDREW DICENZO, D.D., *a minor*, LARRY   :
DICENZO, KATHY CRANE, JOHNNY ALLEN    :
BLAIR, *individually and on behalf of the* ESTATE   :
OF ROBERT EDWARD BLAIR, CHARLEE       :
BLAIR WEBB, ARNE EASTLUND, TINA       :
EASTLUND, SVEN EASTLUND, TAYLOR       :
EASTLUND, ELIZABETH JO EASTLUND,      :
MATTHEW ADAMSON, R.A., *a minor*, KATHY   :

ADAMSON, RICHARD ADAMSON,                    :
CHRISTOPHER ADAMSON, JEFFREY                 :
ADAMSON, JUSTIN ADAMSON, JAMES               :
SHEPARD, JOHN P. SKLANEY, III, STEVEN J.     :
FRIEDRICH, A.F., *a minor*, PHILIP ALAN      :
DERISE, NORMA ALICIA CONTRERAS,              :
JONATHAN CONTRERAS, SR., CARLOS              :
CONTRERAS, CESAR CONTRERAS, HERNAN           :
CONTRERAS, NOEL CONTRERAS, DANNYEL           :
CONTRERAS, SHARON M. PUGH, *individually*    :
*and on behalf of the* ESTATE OF KENNETH     :
IRVING PUGH, BRITNEY E. CARTER, ALICIA       :
PEARSON, DANIEL J. EVANS, JUSTIN EVANS,      :
KEVIN GRAVES, NICHOLAS GENE                  :
KOULCHAR, MICHAEL KOULCHAR, SUHEIL           :
CAMPBELL, ALEXANDER ZAYAS, A.Z., *a*         :
*minor*, CATHY ANDINO, *individually and on* :
*behalf of the* ESTATE OF EDWIN A. ANDINO,   :
JR., LUIS JUNIOR PUERTAS, LIDIA SULLIVAN,    :
GABRIELA D. PUERTAS VERGARA-DONOSO,          :
CHRISTOPHER MICHAEL MELENDEZ,                :
NARCISO MELENDEZ, CHRISTINA                  :
MELENDEZ, LAUREL BARATTIERI,                 :
*individually and on behalf of the* ESTATE OF GUY :
BARATTIERI, PATRICIA WHEATLEY,               :
REBECCA BARATTIERI, NICOLE                   :
BARATTIERI, GINA TESNAR, GLORIA L.           :
MAGANA, *individually and on behalf of the*  :
ESTATE OF KENNY FRANCES STANTON, JR.,        :
MARIO STANTON, BRANDIE STANTON,              :
TERRYMARIE STANTON, NANNETTE BRYNE-          :
HAUPT, LYNN FOREHAND *on behalf of the*      :
ESTATE OF RYAN HAUPT, WILLIAM WITTE,         :
*individually and on behalf of the* ESTATE OF :
KEVIN M. WITTE, MICHAEL MOCK, TAMMY          :
DORSEY, ERIC PHYE, JAMES GMACHOWSKI,         :
CONSTANCE BRIAN, *individually and on behalf* :
*of the* ESTATE OF BRIAN BRIAN, AMBER        :
HENSLEY, KARAR ALABSAWI, MICHELLE            :
TAYLOR, *individually and on behalf of the*  :
ESTATE OF DAVID G. TAYLOR, J.T., *a minor*,  :
PHYLLIS TAYLOR, JOHN TAYLOR, BRIAN G.        :
TAYLOR, JUDAS RECENDEZ, TYLER                :
NORAGER, SHALEE NORAGER, M.N., *a minor*,    :
LAWRENCE KRUGER *on behalf of the* ESTATE    :
OF ERIC KRUGER, C.K., *a minor*, E.K., *a minor*, :

JACKIE FARRAR-FINKEN, *individually and on* :
*behalf of the* ESTATE OF PAUL FINKEN, EMILIE :
FINKEN, C.F., *a minor*, J.F., *a minor*, STEPHEN :
FINKEN, ALAN FINKEN, RICHARD FINKEN, :
DAVID FINKEN, MARK FINKEN, PETER :
FINKEN, JEAN PRUITT, JOAN HENSCHEID, :
LORI ANN MCCOY, *individually and on behalf of* :
*the* ESTATE OF GREGORY MCCOY, L.M., *a* :
*minor*, T.M., *a minor*, GLENN MICHAEL COX, :
KURTISS LAMB, FRANCIS L. COTÉ, NANCY :
COTÉ, CHRISTOPHER COTÉ, SAMANTHA :
DUNFORD, MAXIMILLIAN SHROYER, CASEY :
REUBEN, BREE REUBEN, PATRICK REUBEN, :
JACKIE STEWART, MARK MUNNS, CRISTA :
MUNNS, SHARON DEBRABANDER, DENNIS :
DEBRABANDER, NICOLE DEBRABANDER, :
JOELLA PRATT, JOSHUA STARKEY, BRENT :
HINSON, WILLIAM HINSON, FRAN HINSON, :
HILARY WESTERBERG, WILLIAM RONALD :
LITTLE, BRENDA LITTLE, KIRA SIKES, :
WILLIAM RONALD LITTLE, JR., JOSHUA :
DENMAN, RANDOLPH DELBERT NANTZ, :
JOSHUA RYAN NANTZ, LORI ANN :
MCCORMICK, *individually and on behalf of the* :
ESTATE OF CLINTON MCCORMICK, DENISE :
VENNIX *on behalf of the* ESTATE OF ALAN R. :
BLOHM, ROBERT VACCARO, ANDREW :
JEFFREY ANDERSON, SAMANTHA BALSLEY, :
*individually and on behalf of the* ESTATE OF :
MICHAEL C. BALSLEY, L.R.-W., *a minor*, :
HEATH DAMON HOBSON, JODI MICHELLE :
HOBSON, M.D.H., DEADRA GARRIGUS, :
*individually and on behalf of the* ESTATE OF :
MICKEL D. GARRIGUS, DAVID GARRIGUS, :
NICHOLE GARRIGUS, KYLA OSTENSON, :
MATTHEW GARRIGUS, SHAWN RYAN, :
SHARON Y. DUNN SMITH, *individually and on* :
*behalf of the* ESTATE OF TERRENCE DUNN, :
DENNIS DUNN, RICHARD LANDECK, :
VICTORIA LANDECK, LAVONNA HARPER, :
HYUNJUNG GLAWSON *on behalf of the* ESTATE :
OF CURTIS E. GLAWSON, JAZMON REYNA, :
CARRIE THOMPSON, *individually and on behalf* :
*of the* ESTATE OF SEAN M. THOMAS, A.T., *a* :
*minor*, DANIEL THOMAS, SR., DIANA :
THOMAS, DANIEL THOMAS, JR., KELLY :

v

GILLIS, MELINDA FLICK, RYAN SABINISH,                              :
R.J.S., *a minor*, S.J.S., *a minor*, EMMA                        :
MCGARRY, JOHN KIRBY, MICHAEL                                      :
MURPHY-SWEET, ELIZABETH MURPHY-                                   :
SWEET, ANONA GONELLI, LINDSAY YOUNG,   :
*individually and on behalf of the* ESTATE OF                     :
BRETT A. WALTON, S.W., *a minor*, LEASA                           :
DOLLAR, EUGENE DELOZIER, JARED S.                                 :
STEVENS, SUSAN MARIA DOSKOCIL HICKS,                              :
*individually and on behalf of the* ESTATE OF                     :
GLENN DALE HICKS, JR., GLENN DALE                                 :
HICKS, SR., DAVID JAMES HICKS, JOHN                               :
CHRISTOPHER HICKS, S.L.H., *a minor*,                             :
DWIGHT MARTIN, *individually and on behalf of*                    :
*the* ESTATE OF JAY E. MARTIN, DOVE                               :
DEANNA ADAMS, RAVEN ADAMS, LARK                                   :
ADAMS, CASEY BOEHMER, JEREMY D.                                   :
SMITH, M.R., *a minor*, L.R., *a minor*, DAVID                    :
DIXON, DANIEL AUSTIN DIXON, GRETCHEN                              :
LANG, CYNTHIA CONNER, JOSHUA BROOKS,   :
JOYCE BROOKS, DANNY BROOKS, DANIEL                                :
TYLER BROOKS, DELILAH BROWN,                                      :
*individually and on behalf of the* ESTATE OF                     :
SCOTT J. BROWN, TANYA SUZZETTE                                    :
DRESSLER, DANIEL DRESSLER, JAMES                                  :
DRESSLER, DEREK GAJDOS, TAMMY                                     :
DENBOER, BRANDEAUX CAMPBELL, RYAN                                 :
WILSON, JAMI LIN WILSON, MATTHEW                                  :
LAMMERS, ALICIA LAMMERS, BARBARA                                  :
LAMMERS, GARY LAMMERS, STACY PATE,                                :
ANGEL GOMEZ, DENISE JACKSON, ANDREW                              :
MOORES, SHEILA TRACY, *individually and on*                       :
*behalf of the* ESTATE OF JACOB TRACY,                            :
DONALD TRACY, NICHOLE SWEENEY,                                    :
CHRISTINA SHERIDAN, MATTHEW BENSON,                              :
MELISSA BENSON, C.B., *a minor*, B.B., *a minor*,                 :
DANIEL P. BENSON, CAROL BENSON,                                   :
DANIEL R. BENSON, MICHAEL DEAN                                    :
MOODY, SR., *individually and on behalf of the*                   :
ESTATE OF MICHAEL DEAN MOODY, JR.,                               :
CONNIE MOODY, KEDRICK DANTE MOODY,                               :
DREW EDWARDS, ARIFAH HARDY, T.C., *a*                             :
*minor*, AUNDRA CRAIG, JOYCE CRAIG,                               :
DEBRA COOK-RUSSELL, NASHIMA                                       :
WILLIAMS CRAIG, MATTHEW CRAIG,                                    :
JONATHAN CRAIG, ANDREW BROWN,                                    :

MICHAEL COOK, VALENCIA COOK,                  :
KATHERINE M. CROW, *individually and on*      :
*behalf of the* ESTATE OF WILLIAM J. CROW,    :
K.A.C., *a minor*, K.E.C., *a minor*, CANDACE :
CATHRYN HUDSON, *individually and on behalf*  :
*of the* ESTATE OF KATHRYN ANN MONDINI,       :
PATRICK TUTWILER, CRYSTAL TUTWILER,           :
SHIRLEY STEARNS and JOHN STEARNS,             :
*individually and on behalf of the* ESTATE OF :
MICHELLE R. RING, KAREN HALL, MARILYN         :
HAYBECK, MARC STEARNS, JAMES COLE *on*        :
*behalf of* B.C., *a minor*, KATHERINE MCRILL- :
FELLINI, *individually and on behalf of the* ESTATE :
OF ROBERT MCRILL, RONALD MCRILL,              :
MATTHEW L. MERGELE, RENE POOL, DEREK          :
ALLEN HOLLCROFT, URSULA ANN JOSHUA            :
*on behalf of the* ESTATE OF RON J. JOSHUA, JR., :
TAMMY KINNEY, DANIEL PRICE, STEVEN            :
PRICE, TAUSOLO AIETI, IMO AIETI, LISI         :
AIETI, POLOKA AIETI, CHRISTOPHER              :
BOUTEN, ERIN BOUTEN, DANIEL DUDEK,            :
MARGARET DUDEK, KATIE WOODARD,                :
SARAH DUDEK, ANDREW DUDEK,                    :
EMANUELA FLOREXIL, *individually and on*      :
*behalf of the* ESTATE OF CAMY FLOREXIL,      :
JOSEPH T. MILLER, SEAN HARRINGTON,            :
JESSICA HEINLEIN, *individually and on behalf of* :
*the* ESTATE OF CHARLES T. HEINLEIN, JR.,     :
CHARLES HEINLEIN, SR., JODY LYN               :
HEINLEIN, MARGARITA ARISTIZABAL,              :
*individually and on behalf of the* ESTATE OF :
ALFRED H. JAIRALA, J.J., *a minor*, SEBASTIAN :
NIUMAN, BRIAN J. CASEY, BRITTANY              :
HOGAN, SHELLEY ANN CASEY, RICHARD             :
CASEY, SALLY CHAND, *individually and on*     :
*behalf of the* ESTATE OF MICHAEL CHAND,      :
SR., MICHAEL CHAND, JR., RYAN CHAND,          :
BRENDA CHAND, MARIO BOWEN, JAMES              :
DAVID HOCHSTETLER, LEANNE LIZABETH            :
HOCHSTETLER, J.H., *a minor*, P.H., *a minor*, :
KYLE AUSTIN MARSHALL, JOHN RICHARD            :
TULLY, *individually and on behalf of the* ESTATE :
OF MICHAEL TULLY, MARILYN LOUISE              :
TULLY, SLADE VICTOR TULLY, JOHN               :
RICHARD TULLY II, HEATHER ANN FARKAS,         :
ROBERT JAMES HUNT, M.A.H., *a minor*,         :

A.M.H., *a minor*, BOONCHOB PRUDHOME,    :
MICHELE WHITE, *individually and on behalf of*  :
*the* ESTATE OF DELMAR WHITE, S.W., *a minor*,  :
SHELBY WHITE, PERRY WHITE, ROBERT    :
WHITE, JOSHUA P.G. WOLD, E.W. *a minor*,    :
P.A., *a minor*, CELESTE YANTIS, MARICEL  :
MURRAY, *individually and on behalf of the*  :
ESTATE OF JOEL L. MURRAY, J.M., *a minor*,  :
BRYAN S. SHELTON, *individually and on behalf* :
*of the* ESTATE OF RANDOL S. SHELTON,  :
DARLENE SHELTON, AMANDA SHELTON,  :
BRIAN T. SHELTON, DAN LAIRD, ANGELA M.  :
LAIRD, JORDAN M. LAIRD, HUNTER L.    :
LAIRD, C.L., *a minor*, WILLIAM LEE,  :
ALEXANDRIA L. LEE, WILLIAM J. LEE, LILLIE :
LAI LEE, JENNIFER LYNN HUNT,    :
CHRISTOPHER GOLEMBE, KATHRYN HEAD,  :
CHRISTOPHER WATTS, JANET L. RIOS,  :
ANITA BAKER, JENNIE L. MORIN, RANDALL  :
GEIGER, *individually and on behalf of the* ESTATE :
OF WAYNE M. GEIGER, KIMBERLY GEIGER,  :
JESSECA LYN TSOSIE, ERIC DONOHO, TYLER  :
GINAVAN, TIMOTHY TIFFNER, *individually and* :
*on behalf of the* ESTATE OF BENJAMIN DAVID :
TIFFNER, JUDITH TIFFNER, JOSHUA TIFFNER, :
SETH TIFFNER, SARAH CROSBY, ALAN  :
BURKS, *individually and on behalf of the* ESTATE :
OF PETER BURKS, JACKIE MERK HLASTAN,  :
G.B., *a minor*, ALISON BURKS MCRUIZ,  :
SARAH PHILLIPS, ZACHARY BURKS,  :
BRIDGET JUNEAU, *individually and on behalf of* :
*the* ESTATE OF WILLIAM JUNEAU,  :
STEPHANIE JUNEAU, ELENA SHAW, C.S., *a* :
*minor*, L.S., *a minor*, EMILY SHAW, MELISSA :
DOHENY, *individually and on behalf of the*  :
ESTATE OF MICHAEL DOHENY, KATHY  :
KUGLER, ROBERT KUGLER, TANYA  :
EVRARD, BILLY JOHNSON, JUDY HOFFMAN, :
JOSHUA SCHICHTL, MARK SCHICHTL,  :
KATHERINE PROWSE, NICHOLAS PROWSE,  :
H.S., *a minor*, S.S., *a minor*, C.S., *a minor*, A.S., *a* :
*minor*, STEVE WADLEIGH, LEA-ANN  :
WADLEIGH, MICHAEL LUKOW, RIKKI  :
LUKOW, BRUCE LUKOW, JOSEPH LUKOW,  :
ANDREW LUKOW, KRISTEN KELLEY, MAIRA :
ALVAREZ, K.A., *a minor*, ANGELA ALVAREZ  :

*on behalf of* A.A. and C.A., *minors*, BELINDA                :
GARCIA, JASON WHITEHORSE, JEFFREY C.                           :
MANN, MICHELLE WEST, REBECCA L.                                :
SAMTEN-FINCH, *individually and on behalf of the*              :
ESTATE OF TENZIN LOBSANG SAMTEN,                               :
D.A.S., *a minor*, M.B.S., *a minor*, AVA LANETTE              :
BRADLEY, *individually and on behalf of the*                  :
ESTATE OF JUANTREA TYRONE BRADLEY,                             :
A.D.B., *a minor*, T.T.B., *a minor*, J.T.B., *a minor*,       :
ANTHONY HUDSON, AUSTIN BEWLEY,                                 :
MARY CATHERINE MCLAUGHLIN, BRENDA                             :
HABSIEGER *on behalf of the* ESTATE OF                         :
ANDREW J. HABSIEGER, JENNIFER RENEE                           :
YORK, JASON YORK, MATTHEW FIESER,                             :
BENJAMIN DANIEL CARRINGTON,                                    :
JONATHAN HESLOP, RUSSELL MASON,                                :
ANDY POOL, FRANK L. CONVERSE,                                  :
*individually and on behalf of the* ESTATE OF                 :
PAUL R. CONVERSE, ANTHONY M. GERBER,                           :
CHARLES B. GREGSTON, CARL REIHER,                             :
JASON ROBINSON, FRANCES ROBINSON,                             :
E.R., *a minor*, WILLIAM JUSTIN WEATHERLY,                    :
MICHAEL WEATHERLY, LEE WOLFER,                                 :
*individually and on behalf of the* ESTATE OF                 :
SCOTT WOLFER, L.W., *a minor*, M.W., *a minor*,               :
I.W., *a minor*, BEVERLEY WOLFER, RACHELLE                    :
IDOL, JAMES VAUGHN, JEANNINE VAUGHN,                          :
CLIFFORD VAUGHN, DAVID WAYNE                                  :
HARTLEY, KAYLIE HARTLEY, LISA                                 :
DUNCAN, VIRGINIA BILLITER, ERIC                               :
BILLITER, ADRIANNE KIDD, WILLIAM                              :
ALLMON, WILLIAM ALLMON, *individually and*                   :
*on behalf of the* ESTATE OF WILLIAM E.                       :
ALLMON, RONALD SLOAN, MARK E.                                 :
THOMSEN, ARDELL THOMSEN, RALPH                                :
THOMSEN, EVAN D. BOGART, LANI D.                              :
BOGART, DOUGLAS R. BOGART,                                     :
CHRISTOPHER BOGART, CANA HICKMAN,                             :
LUIS ROSA-VALENTIN, M.R., *a minor*, ILIANA                   :
M. ROSA-VALENTIN, RONALD SLOAN,                               :
CHARLES KAPLAN, NICOLE A. KAPLAN,                            :
NONI KAPLAN, DAVID KAPLAN, JAIME                              :
ZARCONE, JESSALYN HOLT, DAVID                                 :
WOODARD, D.M.W., *a minor*, ADAM MAGERS,                     :
LUIS GARZA, SUSAN ARNOLD, *individually and*                 :
*on behalf of the* ESTATE OF RONALD J.                        :

TUCKER, DAVID ARNOLD, SAMANTHA                    :
TUCKER, BRANDON ARNOLD, DAISY                     :
TUCKER, JOHN DAGGETT, COLLEEN                     :
CZAPLICKI, RUSSEL HICKS, SR., RUSSEL              :
HICKS, JR., PATRICK O'NEILL, JOHN O'NEILL,        :
DIANNE O'NEILL, DANIEL LUCKETT,                   :
BREANNA LYNN GASPER, *individually and on*       :
*behalf of the* ESTATE OF FRANK J. GASPER,        :
JAMIE BARNES, MAX W. HURST, *individually*       :
*and on behalf of the* ESTATE OF DAVID R.         :
HURST, LILLIAN HURST, CHRISTOPHER                 :
HURST, MARK HURST, DONNA FARLEY,                  :
NOEL J. FARLEY, SR, BARBARA FARLEY,               :
BRETT FARLEY, CAMERON FARLEY, CHRIS               :
FARLEY, VICKIE MCHONE, NOEL S. FARLEY,            :
DAVID C. IVERSON, DANIEL MENKE *on behalf*       :
*of the* ESTATE OF JONATHAN D. MENKE,             :
JESSICA H. WILLIAMS, *individually and on*       :
*behalf of the* ESTATE OF JAMES M. HALE,          :
J.M.H., *a minor*, J.J.H., *a minor*, J.H., *a minor*,  :
TYLER LATHAM, BRYANT BEARFIELD,                   :
CARLLIE PAUL, KARI CAROSELLA *on behalf of*      :
*the* ESTATE OF JUSTIN BAUER, CONNIE             :
HADDOCK, JACOB BAUER, JEREMY BAUER,               :
ANDREW BRADLEY, JULIE SALHUS,                     :
KRISTEN GALEN, PATRICK WARD, JARRETT             :
WARD, ROBERTO ANDRADE, SR. *on behalf of*        :
*the* ESTATE OF ROBERTO ANDRADE, JR.,             :
SANDRA VALENCIA, KARA CONNELLY,                   :
JEAN DAMMANN, MARK DAMMANN, KEVIN                 :
CONNELLY, RHONDA KEMPER, ROBERT                   :
CANINE, S.C., *a minor*, JENNIFER ROOSE,          :
RHETT MURPHY, ROADY LANDTISER,                    :
NATHAN RICHARDS, CHRISTOPHER                      :
SONGER, KIMBERLY SONGER, C.S., *a minor*,        :
JOSEPH HELTON, SR., *individually and on behalf*  :
*of the* ESTATE OF JOSEPH HELTON, JR.,            :
JESSICA CABOT, JEANNE RHEA MCMANU,                :
VICTOR RAY WISE, II, THEODORE LESTER,             :
KATRINA COE, *individually and on behalf of the*  :
ESTATE OF KEITH COE, K.A.C., *a minor*,          :
K.A.C., *a minor*, K.A.C., *a minor*, RHONDA      :
SMITH, MATTHEW COE, SABRINA                       :
CHAPMAN, JAMES KINSEY, ANGEL MAYES,               :
*individually and on behalf of the* ESTATE OF     :
ANTONIO STIGGINS, LUKE STIGGINS,                  :

x

DONALD MAYES, RHONDA BEATTIE,            :
*individually and on behalf of the* ESTATE OF   :
CLIFFORD BEATTIE, JAYDEAN HAMILTON,      :
STEPHANIE KIDDER, DONALD FIELD,          :
ANGELICA FIELD, SENOVIA FIELD, SELICIA   :
FIELD, and ED ELLIOTT,                   :
                                         :
            Plaintiffs,                      :
                                         :
-against-                                :
                                         :
HSBC HOLDINGS PLC, HSBC BANK PLC,        :
HSBC BANK MIDDLE EAST LIMITED,           :
HSBC BANK USA, N.A., BARCLAYS BANK,      :
PLC, STANDARD CHARTERED BANK,            :
NATWEST MARKETS, N.V., CREDIT SUISSE     :
AG, BANK SADERAT PLC,                    :
COMMERZBANK AG, and JOHN DOES 1-50,      :
                                         :
            Defendants.                      :
-----------------------------------------------------------------x

xi

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ i

I.  NATURE OF THE ACTION ...................................................................... 1

II.  JURISDICTION AND VENUE ................................................................ 17

III.  THE DEFENDANTS .............................................................................. 17

   A.  THE HSBC DEFENDANTS .............................................................. 17

   B.  DEFENDANT BARCLAYS BANK PLC ............................................ 19

   C.  DEFENDANT STANDARD CHARTERED BANK ........................... 19

   D.  DEFENDANT ROYAL BANK OF SCOTLAND N.V. ...................... 20

   E.  DEFENDANT CREDIT SUISSE AG ................................................ 21

   F.  DEFENDANT BANK SADERAT PLC ............................................. 22

   G.  DEFENDANT COMMERZBANK AG ............................................. 22

IV.  FACTUAL ALLEGATIONS ................................................................... 23

   A.  IRAN'S LONG HISTORY OF SUPPORTING AND FINANCING
       TERRORISM ..................................................................................... 23

   B.  U.S. SANCTIONS AND IRAN'S RELIANCE ON U.S. DOLLARS ......... 24

   C.  IRAN CONTINUOUSLY EVADED U.S., EUROPEAN UNION AND UNITED
       NATIONS SANCTIONS ..................................................................... 26

   D.  THE EURODOLLAR MARKET – IRAN'S MONEY LAUNDERING AND
       ILLICIT EXPORT NEXUS WITH DEFENDANT BANKS .................... 28

       1.  The Conspiracy's Shared Goals ................................................. 29

       2.  Eurodollar Market Operations ................................................. 30

   E.  THE IRANIAN U-TURN EXEMPTION AND ITS REVOCATION ......... 31

   F.  LETTERS OF CREDIT – AN ALTERNATIVE METHOD OF UNDERMINING
       THE IRANIAN SANCTIONS PROGRAM .......................................... 37

       1.  Terminology ............................................................................... 37

2. The U.S. Trade Embargo – United States Munitions List (USML) and Commerce Control List (CCL)....................................................................... 39

G. IRAN'S ILLEGAL ARMS SHIPMENTS THROUGH ISLAMIC REPUBLIC OF IRAN SHIPPING LINES (IRISL) .............................................................. 41

H. THE IRGC AND HEZBOLLAH COMMITTED ACTS OF INTERNATIONAL TERRORISM AT IRAN'S DIRECTION IN WHICH PLAINTIFFS WERE FORESEEABLY INJURED ........................................................................ 45

1. The IRGC ...................................................................................... 48

2. IRGC-QF ...................................................................................... 51

3. Lebanese Hezbollah and Unit 3800 .......................................... 53

V. THE IRGC-QF'S AND HEZBOLLAH'S DEVELOPMENT AND DIRECTION OF SHI'A TERRORIST GROUPS AND CELLS IN IRAQ TO ATTACK COALITION FORCES. ............................................................................................... 57

A. THE BADR CORPS/BADR ORGANIZATION ...................................... 57

B. JAYSH AL-MAHDI ("JAM" OR THE "MAHDI ARMY") .................... 62

C. THE DEVELOPMENT OF THE JAM SPECIAL GROUPS AND THE PROMISED DAY BRIGADES ............................................................. 65

D. ASA'IB AHL AL-HAQ ....................................................................... 70

E. KATA'IB HEZBOLLAH ("KH") ......................................................... 73

F. CASE IN POINT: SENIOR HEZBOLLAH COMMANDER ALI MUSA DAQDUQ'S DIRECTION OF TERRORIST ATTACKS ON COALITION FORCES IN IRAQ ............................................................................. 79

G. IRAN FUNDED THE DESIGN AND PRODUCTION OF EXPLOSIVELY FORMED PENETRATORS ("EFPS") USED TO KILL OR MAIM COALITION FORCES, INCLUDING THE PLAINTIFFS.............................................. 83

H. ALL OF THE ATTACKS AT ISSUE IN THIS COMPLAINT WERE ACTS OF INTERNATIONAL TERRORISM............................................................ 89

VI. OVERVIEW OF THE CONSPIRACY ....................................................... 90

A. AGREEMENT AND KNOWLEDGE................................................... 90

B. ACTS AND EFFECTS ....................................................................... 94

**C.   BANK SADERAT PLC's AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY** ................................................................ 97

**D.   THE CENTRAL BANK OF IRAN'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY** ....................................... 102

**E.   BANK MELLI IRAN AND MELLI BANK PLC'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY** .................... 106

**F.   BANK MELLAT'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY** .......................................................... 113

**G.   BANK SEPAH'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY** .......................................................... 114

**H.   JOHN DOE DEFENDANTS' 1-50 AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY** ............................... 116

**I.   THE HSBC DEFENDANTS' AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY** ...................................... 117

   **1.   HSBC-Europe's 2001 "Bank Melli Proposal"** ................... 121

   **2.   Defendant HSBC-US's Agreement to, and Participation in, the Conspiracy in Violation of 18 U.S.C. § 2332d** ............... 128

**J.   DEFENDANT BARCLAYS' AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY** ...................................... 137

**K.   DEFENDANT STANDARD CHARTERED BANK'S AGREEMENT TO AND PARTICIPATION IN THE CONSPIRACY** ............... 145

   **1.   Standard Chartered Bank ("SCB") Conspired to Conceal Iran's Financial Activities and Transactions From Detection, Scrutiny, and Monitoring By U.S. Regulators, Law Enforcement, and/or Depository Institutions.** ...................... 145

   **2.   SCB Facilitated Transactions On Behalf of MODAFL, Mahan Air and Other Instrumentalities of Iranian State-Sponsored Terror (Including a Hezbollah Affiliated Entity) in Furtherance of Numerous Violations of the U.S. Trade Embargo, Thereby Substantially Contributing to the Plaintiffs' Injuries.** ........ 154

     **a.   Standard Chartered Knowingly Provided Illegal Financing to Mahan Air.** .... 156

     **b.   Standard Chartered Knowingly Provided Illegal Financing to MODAFL Companies: AIO, IACI, IHRSC and HESA.** ...................... 160

       **i.   SCB Trade-Finance Transactions with MODAFL's Aerospace Industries Organization (AIO)** ........................ 162

ii.    **SCB Trade-Finance Transactions with MODAFL's [Iran] Aviation Industries Organization (IAIO)** ...................................................................... 162

    (A)    **SCB's Trade-Finance Transactions with MODAFL-IAIO Front Company Downtown Trading Ltd.** ................................................................ 163

    (B)    **SCB's Trade-Finance Transactions with MODAFL-IAIO Front Company Mac Aviation** ................................................................................ 164

    (C)    **SCB's Trade-Finance Transactions with MODAFL-IAIO Front Company Monarch Aviation (Singapore)** .................................................... 168

    (D)    **SCB's Trade Finance Transactions with MODAFL-IAIO Front Company Jetpower Industrial Ltd (Hong Kong)** ........................................ 173

c.    **SCB's Trade-Finance Transactions Iran Power Development Company ("IPDC"), MAPNA and Zener Electronics Services (an Agent of Hezbollah)** .. 175

d.    **SCB's Trade-Finance Transactions with National Iranian Oil Company (NIOC) Subsidiaries** ................................................................................ 178

e.    **SCB's Trade-Finance Transactions with Iranian Front Company Khoram Sanat Producing Co. - Iran** .......................................................... 180

3.    **Regulatory Actions and Criminal Investigations Against Standard Chartered Bank, 2012 – Present** ........................................................................ 182

L.  **DEFENDANT ROYAL BANK OF SCOTLAND N.V.'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY** ............................................ 189

M.  **DEFENDANT CREDIT SUISSE'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY** ...................................................................... 199

N.  **DEFENDANT COMMERZBANK AG'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY** ............................................ 211

O.  **DEFENDANT COMMERZBANK AG'S DIRECT FUNDING OF HEZBOLLAH THROUGH ITS CUSTOMER, ORPHANS PROJECT LEBANON e.V.** ............. 219

VII.  **THE PLAINTIFFS** ............................................................................ 220

1.   **THE JANUARY 20, 2007 ATTACK – KARBALA** .................................... 220

2.   **THE JANUARY 12, 2004 ATTACK – BAGHDAD** .................................... 227

3.   **THE APRIL 4, 2004 ATTACK – BAGHDAD** .......................................... 228

4.   **THE APRIL 9, 2004 ATTACK – BAGHDAD** .......................................... 230

5.    THE JUNE 4, 2004 ATTACK – BAGHDAD ............................................................ 232

6.    THE JUNE 29, 2004 ATTACK – BAGHDAD .......................................................... 233

7.    THE JULY 27, 2004 ATTACK – BALAD RUZ ....................................................... 234

8.    THE AUGUST 5, 2004 ATTACK – NAJAF ........................................................... 235

9.    THE AUGUST 6, 2004 ATTACK – NAJAF ........................................................... 237

10.  THE AUGUST 15, 2004 ATTACK – NAJAF ......................................................... 238

11.  THE AUGUST 16, 2004 ATTACK – SADR CITY .................................................. 239

12.  THE AUGUST 18, 2004 ATTACK – SADR CITY .................................................. 240

13.  THE AUGUST 25, 2004 ATTACK – NAJAF ......................................................... 241

14.  THE AUGUST 26, 2004 ATTACK – NAJAF ......................................................... 242

15.  THE FEBRUARY 10, 2005 ATTACK – BAGHDAD ............................................. 242

16.  THE JUNE 8, 2005 ATTACK – BAGHDAD .......................................................... 243

17.  THE JUNE 27, 2005 ATTACK – BAGHDAD ........................................................ 245

18.  THE AUGUST 7, 2005 ATTACK – BAGHDAD .................................................... 245

19.  THE SEPTEMBER 2, 2005 ATTACK – BAGHDAD ............................................. 246

20.  THE SEPTEMBER 6, 2005 ATTACK – BAGHDAD ............................................. 249

21.  THE SEPTEMBER 26, 2005 ATTACK – BAGHDAD ........................................... 250

22.  THE SEPTEMBER 28, 2005 ATTACK – UMM QASR ......................................... 251

23.  THE OCTOBER 6, 2005 ATTACK – BAGHDAD.................................................. 253

24.  THE DECEMBER 8, 2005 ATTACK – BAGHDAD .............................................. 256

25.  THE DECEMBER 25, 2005 ATTACK – BAGHDAD ............................................ 259

26.  THE JANUARY 5, 2006 ATTACK – NAJAF ........................................................ 260

27.  THE JANUARY 5, 2006 ATTACK – BAGHDAD ................................................. 263

28.  THE JANUARY 18, 2006 ATTACK – BASRA ...................................................... 264

29.  THE FEBRUARY 17, 2006 ATTACK – BAGHDAD ............................................. 265

30. THE FEBRUARY 20, 2006 ATTACK –HINDIYAH .................................................. 266

31. THE FEBRUARY 20, 2006 ATTACK – BAGHDAD ................................................. 267

32. THE MARCH 26, 2006 ATTACK – BAGHDAD .................................................... 269

33. THE APRIL 1, 2006 ATTACK – BAGHDAD ........................................................ 270

34. THE APRIL 12, 2006 ATTACK – MISIAB ......................................................... 271

35. THE APRIL 16, 2006 ATTACK – BAWB ASH-SHAM ........................................... 272

36. THE APRIL 25, 2006 ATTACK – SADR CITY .................................................... 274

37. THE APRIL 28, 2006 ATTACK – BAGHDAD ...................................................... 276

38. THE MAY 2, 2006 ATTACK – BAGHDAD ......................................................... 277

39. THE MAY 3, 2006 ATTACK – NASIRIYAH ....................................................... 281

40. THE MAY 5, 2006 ATTACK – BAGHDAD ......................................................... 284

41. THE MAY 6, 2006 ATTACK – DIWANIYAH ...................................................... 286

42. THE MAY 21, 2006 ATTACK – MOSUL ........................................................... 287

43. THE MAY 25, 2006 ATTACK – BAGHDAD ....................................................... 288

44. THE JUNE 5, 2006 ATTACK – BAGHDAD ....................................................... 290

45. THE JUNE 10, 2006 ATTACK – RUSTAMIYAH .................................................. 295

46. THE JULY 11, 2006 ATTACK – KARBALA ....................................................... 296

47. THE JULY 15, 2006 ATTACK – BAGHDAD ...................................................... 296

48. THE JULY 17, 2006 ATTACK – BAGHDAD ...................................................... 298

49. THE JULY 22, 2006 ATTACK – SADR CITY ..................................................... 299

50. THE JULY 25, 2006 ATTACK – BAGHDAD ...................................................... 300

51. THE AUGUST 26, 2008 ATTACK – SADR CITY ................................................ 300

52. THE AUGUST 26, 2006 ATTACK – JISR DIYALA .............................................. 302

53. THE SEPTEMBER 3, 2006 ATTACK – BAGHDAD .............................................. 303

54. THE SEPTEMBER 20, 2006 ATTACK – BAGHDAD ............................................ 303

55. THE SEPTEMBER 30, 2006 ATTACK – BAGHDAD ................................................. 305

56. THE OCTOBER 4, 2006 ATTACK – BAGHDAD .................................................... 306

57. THE OCTOBER 13, 2006 ATTACK – BAGHDAD .................................................. 307

58. THE OCTOBER 17, 2006 ATTACK – BAQUBAH ................................................. 308

59. THE OCTOBER 20, 2006 ATTACK – BAGHDAD .................................................. 309

60. THE OCTOBER 22, 2006 ATTACK – BAGHDAD .................................................. 310

61. THE OCTOBER 22, 2006 ATTACK – BAGHDAD .................................................. 311

62. THE OCTOBER 22, 2006 ATTACK – BAGHDAD .................................................. 312

63. THE OCTOBER 22, 2006 ATTACK – SADR CITY ................................................ 315

64. THE NOVEMBER 2, 2006 ATTACK – BAGHDAD ................................................ 316

65. THE NOVEMBER 9, 2006 ATTACK – BAGHDAD ................................................ 319

66. THE NOVEMBER 13, 2006 ATTACK – BAGHDAD .............................................. 320

67. THE NOVEMBER 16, 2006 ATTACK – BASRA ................................................... 321

68. THE DECEMBER 3, 2006 ATTACK – BAGHDAD ................................................ 325

69. THE DECEMBER 4, 2006 ATTACK – BAGHDAD ................................................ 325

70. THE DECEMBER 20, 2006 ATTACK – BAGHDAD .............................................. 326

71. THE DECEMBER 22, 2006 ATTACK – BAGHDAD .............................................. 328

72. THE DECEMBER 27, 2006 ATTACK – BAGHDAD .............................................. 329

73. THE DECEMBER 31, 2006 ATTACK – BAGHDAD .............................................. 330

74. THE JANUARY 14, 2007 ATTACK – BAGHDAD ................................................. 331

75. THE JANUARY 22, 2007 ATTACK – BAGHDAD ................................................. 332

76. THE JANUARY 25, 2007 ATTACK – BAGHDAD ................................................. 332

77. THE JANUARY 27, 2007 ATTACK – BAGHDAD ................................................. 333

78. THE JANUARY 27, 2007 ATTACK – TAJI............................................................ 335

79. THE FEBRUARY 1, 2007 ATTACK – BAGHDAD ................................................ 336

80. **THE FEBRUARY 2, 2007 ATTACK – MAHMUDIYAH** ........................................ **336**

81. **THE FEBRUARY 26, 2007 ATTACK – DIWANIYAH** ........................................ **338**

82. **THE MARCH 20, 2007 ATTACK – BAGHDAD** ........................................ **339**

83. **THE MARCH 27, 2007 ATTACK – BAGHDAD** ........................................ **339**

84. **THE APRIL 4, 2007 ATTACK – NASIRIYAH** ........................................ **341**

85. **THE APRIL 6, 2007 ATTACK – BAGHDAD** ........................................ **342**

86. **THE APRIL 6, 2007 ATTACK – SADR CITY** ........................................ **343**

87. **THE APRIL 7, 2007 ATTACK – BAGHDAD** ........................................ **343**

88. **THE APRIL 9, 2007 ATTACK – BAGHDAD** ........................................ **344**

89. **THE APRIL 28, 2007 ATTACK – BAGHDAD** ........................................ **346**

90. **THE APRIL 28, 2007 ATTACK – SALMAN PAK** ........................................ **346**

91. **THE APRIL 29, 2007 ATTACK – BAGHDAD** ........................................ **348**

92. **THE MAY 3, 2007 ATTACK – MUSAYYIB** ........................................ **349**

93. **THE MAY 5, 2007 ATTACK – KAMALIYAH** ........................................ **349**

94. **THE MAY 6, 2007 ATTACK – BAGHDAD** ........................................ **350**

95. **THE MAY 9, 2007 ATTACK – AL-HILLAH** ........................................ **351**

96. **THE MAY 14, 2007 ATTACK – BAGHDAD** ........................................ **352**

97. **THE MAY 18, 2007 ATTACK – BAGHDAD** ........................................ **353**

98. **THE MAY 29, 2007 ATTACK – SADR CITY** ........................................ **354**

99. **THE JUNE 2, 2007 ATTACK – BAGHDAD** ........................................ **354**

100. **THE JUNE 6, 2007 ATTACK – BAGHDAD** ........................................ **355**

101. **THE JUNE 8, 2007 ATTACK – BAGHDAD** ........................................ **356**

102. **THE JUNE 10, 2007 ATTACK – BAGHDAD** ........................................ **357**

103. **THE JUNE 11, 2007 ATTACK – BAGHDAD** ........................................ **360**

104. **THE JUNE 14, 2007 ATTACK – SCANIA** ........................................ **361**

**105. THE JUNE 17, 2007 ATTACK – BAGHDAD** .......................................................... 362

**106. THE JUNE 23, 2007 ATTACK – BAGHDAD** .......................................................... 364

**107. THE JUNE 25, 2007 ATTACK – BAGHDAD** .......................................................... 365

**108. THE JUNE 28, 2007 ATTACK – BAGHDAD** .......................................................... 368

**109. THE JUNE 30, 2007 ATTACK – BAGHDAD** .......................................................... 369

**110. THE JULY 5, 2007 ATTACK – BAGHDAD** ............................................................. 370

**111. THE JULY 6, 2007 ATTACK – BAGHDAD** ............................................................. 371

**112. THE JULY 6, 2007 ATTACK – BAGHDAD** ............................................................. 372

**113. THE JULY 7, 2007 ATTACK – BAGHDAD** ............................................................. 373

**114. THE JULY 11, 2007 ATTACK – BAGHDAD** ........................................................... 374

**115. THE JULY 17, 2007 ATTACK – BAGHDAD** ........................................................... 374

**116. THE JULY 17, 2007 ATTACK – SADR CITY** ......................................................... 375

**117. THE JULY 17, 2007 ATTACK – BAGHDAD** ........................................................... 377

**118. THE JULY 19, 2007 ATTACK – HUSSEINYAH** ...................................................... 378

**119. THE JULY 23, 2007 ATTACK – BAGHDAD** ........................................................... 379

**120. THE JULY 24, 2007 ATTACK – BAGHDAD** ........................................................... 380

**121. THE JULY 24, 2007 ATTACK – UMM QASR** ......................................................... 380

**122. THE JULY 31, 2007 ATTACK – BAGHDAD** ........................................................... 381

**123. THE AUGUST 14, 2007 ATTACK – BAGHDAD** ..................................................... 383

**124. THE AUGUST 17, 2007 ATTACK – BASRA** ........................................................... 384

**125. THE AUGUST 23, 2007 ATTACK – BAGHDAD** ..................................................... 386

**126. THE AUGUST 23, 2007 ATTACK – AZIZIYAH** ..................................................... 387

**127. THE SEPTEMBER 2, 2007 ATTACK – BAGHDAD** ................................................ 390

**128. THE SEPTEMBER 2, 2007 – RUSTAMIYAH** ......................................................... 391

**129. THE SEPTEMBER 4, 2007 ATTACK – BAGHDAD** ................................................ 392

**130. THE SEPTEMBER 12, 2007 ATTACK- BAGHDAD** ................................................... **394**

**131. THE SEPTEMBER 26, 2007 ATTACK – BAGHDAD** ................................................ 395

**132. THE SEPTEMBER 29, 2007 ATTACK – BAGHDAD** ................................................ 397

**133. THE SEPTEMBER 30, 2007 ATTACK – BAGHDAD** ................................................ 399

**134. THE OCTOBER 18, 2007 ATTACK – BAGHDAD** .................................................... **400**

**135. THE OCTOBER 21, 2007 ATTACK – ISKANDARIYAH** ................................. **401**

**136. THE OCTOBER 29, 2007 ATTACK – UMM QASR** ............................................ **401**

**137. THE NOVEMBER 7, 2007 ATTACK – BAGHDAD** .................................................... **402**

**138. THE NOVEMBER 14, 2007 ATTACK – BAGHDAD** .................................................. 403

**139. THE NOVEMBER 26, 2007 ATTACK – AZIZIYAH** .......................................... **404**

**140. THE DECEMBER 9, 2007 ATTACK – AZ ZUBAYDIYAH** .................................. **405**

**141. THE JANUARY 6, 2008 ATTACK – BAGHDAD** ...................................................... **409**

**142. THE JANUARY 30, 2008 ATTACK – BAGHDAD** .................................................... **412**

**143. THE FEBRUARY 19, 2008 ATTACK – BAGHDAD** .................................................. **413**

**144. THE FEBRUARY 19, 2008 ATTACK – BAGHDAD** .................................................. **416**

**145. THE MARCH 11, 2008 ATTACK – BABIL PROVINCE** ....................................... **417**

**146. THE MARCH 12, 2008 ATTACK – CAMP ADDER** ................................................ **417**

**147. THE MARCH 14, 2008 ATTACK – MUSAYYIB** ...................................................... **420**

**148. THE MARCH 17, 2008 ATTACK – BAGHDAD** ....................................................... **420**

**149. THE MARCH 23, 2008 ATTACK – BAGHDAD** ....................................................... **421**

**150. THE MARCH 23, 2008 ATTACK – BAGHDAD** ....................................................... **428**

**151. THE MARCH 27, 2008 ATTACK – SADR CITY** ..................................................... **429**

**152. THE MARCH 29, 2008 ATTACK – BAGHDAD** ....................................................... **431**

**153. THE APRIL 3, 2008 ATTACK – SADR CITY** .......................................................... **432**

**154. THE APRIL 6, 2008 ATTACK – BAGHDAD** ........................................................... **433**

**155. THE APRIL 7, 2008 ATTACK – BAGHDAD** ............................................................... **434**

**156. THE APRIL 8, 2008 ATTACK – KHARGULIAH** ........................................................ **435**

**157. THE APRIL 9, 2008 ATTACK – SADR CITY** ............................................................ **436**

**158. THE APRIL 12, 2008 ATTACK – BAGHDAD** ........................................................... **437**

**159. THE APRIL 17, 2008 ATTACK – SADR CITY** .......................................................... **437**

**160. THE APRIL 21, 2008 ATTACK – SADR CITY** .......................................................... **438**

**161. THE APRIL 21, 2008 ATTACK – BAGHDAD** ........................................................... **439**

**162. THE APRIL 21, 2008 ATTACK – SADR CITY** .......................................................... **440**

**163. THE APRIL 28, 2008 ATTACK – BAGHDAD** ........................................................... **441**

**164. THE APRIL 28, 2008 ATTACK – BAGHDAD** ........................................................... **442**

**165. THE APRIL 28, 2008 ATTACK – SADR CITY** .......................................................... **443**

**166. THE APRIL 28, 2008 ATTACK – SADR CITY** .......................................................... **444**

**167. THE APRIL 29, 2008 ATTACK – SADR CITY** .......................................................... **445**

**168. THE APRIL 30, 2008 ATTACK – BAGHDAD** ........................................................... **445**

**169. THE MAY 1, 2008 ATTACK – SADR CITY** .............................................................. **446**

**170. THE MAY 2, 2008 ATTACK – BAGHDAD** ............................................................... **447**

**171. THE MAY 9, 2008 ATTACK – BAGHDAD** ............................................................... **448**

**172. THE MAY 9, 2008 ATTACK – SADR CITY** .............................................................. **450**

**173. THE MAY 9, 2008 ATTACK – SADR CITY** .............................................................. **450**

**174. THE MAY 11, 2008 ATTACK – BAGHDAD** ............................................................. **451**

**175. THE MAY 11, 2008 ATTACK – BALAD** .................................................................. **452**

**176. THE MAY 25, 2008 ATTACK – AN-NAJAF** ............................................................ **453**

**177. THE JUNE 7, 2008 ATTACK – BAGHDAD** .............................................................. **454**

**178. THE JUNE 24, 2008 ATTACK - BAGHDAD** ............................................................. **455**

**179. THE AUGUST 4, 2008 ATTACK – BAGHDAD** ........................................................ **457**

**180. THE AUGUST 13, 2008 ATTACK – BAGHDAD** ....................................................... **458**

**181. THE AUGUST 26, 2008 ATTACK – SADR CITY** ...................................................... **459**

**182. THE OCTOBER 5, 2008 ATTACK – MUSAYYIB** ...................................................... **460**

**183. THE DECEMBER 28, 2008 ATTACK – SADR CITY** ................................................. **460**

**184. THE JANUARY 10, 2009 ATTACK – BAGHDAD** ..................................................... **461**

**185. THE JANUARY 18, 2009 ATTACK – BAGHDAD** ..................................................... **464**

**186. THE FEBRUARY 26, 2009 ATTACK – ADHAMIYAH** ............................................... **465**

**187. THE MAY 16, 2009 ATTACK – BASRA** .................................................................. **466**

**188. THE MAY 17, 2009 ATTACK – BAGHDAD** ............................................................ **467**

**189. THE JUNE 14, 2009 ATTACK – BALAD** ................................................................ **471**

**190. THE SEPTEMBER 8, 2009 ATTACK – BAGHDAD** ................................................. **472**

**191. THE JANUARY 18, 2010 ATTACK – BAGHDAD** ..................................................... **474**

**192. THE APRIL 27, 2010 ATTACK - KHALIS** .............................................................. **475**

**193. THE MARCH 10, 2011 ATTACK – BAGHDAD** ....................................................... **476**

**194. THE APRIL 22, 2011 ATTACK – NUMANIYAH** ...................................................... **477**

**195. THE MAY 22, 2011 ATTACK – BAGHDAD** ............................................................ **478**

**196. THE JUNE 6, 2011 ATTACK – BAGHDAD** ............................................................ **479**

**197. THE JUNE 29, 2011 ATTACK – WASIT PROVINCE** ............................................... **479**

**198. THE JULY 15, 2011 ATTACK – BASRA** ................................................................. **481**

**CLAIMS FOR RELIEF** ............................................................................................... **482**

**FIRST CLAIM FOR RELIEF** ...................................................................................... **482**

**SECOND CLAIM FOR RELIEF** .................................................................................. **488**

**THIRD CLAIM FOR RELIEF** ..................................................................................... **493**

**FOURTH CLAIM FOR RELIEF** .................................................................................. **497**

**FIFTH CLAIM FOR RELIEF** ...................................................................................... **500**

**SIXTH CLAIM FOR RELIEF** ................................................................................................. **502**

**SEVENTH CLAIM FOR RELIEF** ......................................................................................... **504**

**EIGHTH CLAIM FOR RELIEF** ............................................................................................ **508**

**NINTH CLAIM FOR RELIEF** .............................................................................................. **512**

**TENTH CLAIM FOR RELIEF** ............................................................................................. **515**

**ELEVENTH CLAIM FOR RELIEF** .................................................................................... **517**

**TWELFTH CLAIM FOR RELIEF** ...................................................................................... **519**

**PRAYER FOR RELIEF** ......................................................................................................... **522**

Plaintiffs, by their attorneys, allege the following:

# I.    **NATURE OF THE ACTION**

1.    Running a decades-long terror campaign that claimed the lives of hundreds of Americans while simultaneously trying to complete a clandestine Weapons of Mass Destruction ("WMD") program is an extremely expensive proposition requiring access to billions of U.S. dollars ("USD"), including dollar-denominated assets in the Eurodollar market.[1]

2.    For the Islamic Republic of Iran ("Iran") this was especially challenging since Iran's domestic currency, the Rial, was one of the world's least valued currencies, and was essentially worthless for purposes of global trade and commerce, including facilitating Iran's oil and natural gas exports, terror financing, conventional weapons trade, and WMD proliferation activities.

3.    During the last fifteen years, while Western governments increased pressure against terrorism financing after Al Qaeda's September 11, 2001 attacks on the U.S. ("9-11"), Iran intensified its efforts to access the U.S. financial system and U.S. export-controlled technologies, spare parts and raw materials while simultaneously evading U.S. sanctions, export restrictions and other laws and regulations intended to circumscribe its access to these capabilities and resources.

4.    Fortunately for Iran—despite the coordinated and ever-intensifying efforts of the United States, the European Union and the United Nations after 9-11 to isolate Iran and restrict its capacity to fund terrorism and obtain Weapons of Mass Destruction—it could rely upon an assortment of Western financial institutions willing to violate U.S. law to substantially assist its

---

[1]    Eurodollar refers to a time deposit denominated in U.S. dollars that is maintained by a bank outside the United States. Payment transactions in the Eurodollar market are not typically settled by the physical transfer of USD-denominated banknotes from one counterparty to another. Instead, Eurodollar transactions are settled electronically in New York through a bank-owned clearinghouse, and then maintained by book entries of credits and debits in the respective counterparties' accounting systems (based on the Society for Worldwide Interbank Financial Telecommunication network ("SWIFT-NET") messages sent between the counterparties and their correspondent banks).

sanctioned endeavors.

5.      Without the vital assistance of these Western financial institutions, Iran could not have conducted its terror campaign to nearly the same extent and magnitude, and it would have been severely hampered in its terror financing and WMD proliferation activities.

6.      This is a civil action under 18 U.S.C. § 2333(a) by American nationals and/or their families for treble damages against six Western international banks that knowingly conspired with Iran and its banking agents (including Defendant Bank Saderat Plc, Bank Melli Iran, the Central Bank of Iran ("CBI"),[2] Bank Mellat, Bank Tejarat, Bank Refah and Bank Sepah) to evade U.S. economic sanctions, conduct illicit trade-finance transactions, and disguise financial payments to and from U.S. dollar-denominated accounts (the "Conspiracy").

7.      The Conspiracy foreseeably enabled Iran and its agents to provide a combination of funding, weapons, munitions, intelligence, logistics, and training to the U.S.-designated Foreign Terrorist Organization Hezbollah, the U.S.-designated Islamic Revolutionary Guard Corps ("IRGC"), an IRGC directorate known as the Islamic Revolutionary Guard Corps-Qods Force ("IRGC-QF"), and Iran's terrorist agents (including a litany of Iraqi Shi'a terror groups referred to herein collectively as the "Special Groups"), who killed, injured, or maimed the Plaintiffs and/or their family members in Iraq from 2004 to 2011.

8.      The named Defendants herein are HSBC Holdings Plc, HSBC Bank Plc ("HSBC-London"), HSBC Bank Middle East Ltd., HSBC Bank USA, N.A. (referred to herein collectively as the "HSBC Defendants"); Barclays Bank Plc ("Barclays"); Standard Chartered Bank ("SCB"); Royal Bank of Scotland N.V. (referred to herein as "ABN Amro" or "RBS N.V."); Credit Suisse

---

[2]      CBI is occasionally referred to as Bank Markazi (spelled phonetically in a variety of ways).

AG ("Credit Suisse"); Bank Saderat Plc; Commerzbank AG ("Commerzbank") and John Does 1-50.

9.     Each Defendant committed acts of international terrorism and violated 18 U.S.C. § 2339A and § 2339B when it conspired to provide material support or resources, or concealed or disguised the nature, location, source, or ownership of material support or resources, (a) knowing or intending that they were to be used in preparation for, or in carrying out, a violation of 18 U.S.C. § 2332 and other federal crimes or (b) to foreign terrorist organizations Hezbollah and Kata'ib Hezbollah, knowing they were so designated or had engaged in terrorist activity.

10.     Each Defendant conspired to provide or conceal the source of material support by conspiring with Iran to evade U.S. economic sanctions and arms embargos against Iran knowing, or deliberately indifferent to the fact, that Iran would use some of the funds[3] it laundered through the United States to finance the IRGC, IRGC-QF, and Hezbollah for the purpose of killing and maiming, *inter alia*, American citizens serving as part of the Coalition Forces in Iraq from 2004 to 2011.

11.     As shown below, each Defendant conspired to provide material support by facilitating the transfer to the IRGC, other Iranian entities and Hezbollah and other designated entities and fronts for designated entities, of USD funds outside of the mechanism for Iran's legitimate agencies, operations, and programs.

12.     As shown below, each Defendant conspired to conceal the source of material support by removing that information from transactional messages, as necessary to deceive U.S. counter-terrorism finance regulators.

---

[3]     USD funds include the following U.S. dollar-denominated financial instruments: deposit balances in domestic or Eurodollar bank accounts, repurchase agreements, letters of credit, bills of exchange, payment orders, checks, banknotes and coins.

13. The United States designated Iran a State Sponsor of Terrorism on January 19, 1984, pursuant to § 6(j) of the Export Administration Act, § 40 of the Arms Export Control Act, and § 620A of the Foreign Assistance Act.

14. The United States designated Hezbollah a Foreign Terrorist Organization ("FTO") (as that term is defined in 8 U.S.C. § 1189 of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")) in 1997. The designation has remained in effect since that time.

15. In October 2007, the United States designated Iran's Ministry of Defense and Armed Forces Logistics ("MODAFL").

16. The U.S. government explained the basis for the designation as follows:

> The Ministry of Defense and Armed Forces Logistics (MODAFL) controls the Defense Industries Organization, an Iranian entity identified in the Annex to UN Security Council Resolution 1737 and designated by the United States under E.O. 13382 on March 30, 2007. MODAFL also was sanctioned, pursuant to the Arms Export Control Act and the Export Administration Act, in November 2000 for its involvement in missile technology proliferation activities.
>
> MODAFL has ultimate authority over Iran's Aerospace Industries Organization (AIO), which was designated under E.O. 13382 on June 28, 2005. The AIO is the Iranian organization responsible for ballistic missile research, development and production activities and organizations, including the Shahid Hemmat Industries Group (SHIG) and the Shahid Bakeri Industries Group (SBIG), which were both listed under UN Security Council Resolution 1737 and designated under E.O. 13382. The head of MODAFL has publicly indicated Iran's willingness to continue to work on ballistic missiles. Defense Minister Brigadier General Mostafa Mohammad Najjar said that one of MODAFL's major projects is the manufacturing of Shahab-3 missiles and that it will not be halted. MODAFL representatives have acted as facilitators for Iranian assistance to an E.O. 13382- designated entity and, over the past two years, have brokered a number of transactions involving materials and technologies with ballistic missile applications.

17. Formally, the IRGC is a subordinate directorate of MODAFL, but in practice, it has substantial autonomy from MODAFL.

18.     The IRGC, however, uses MODAFL to both procure and develop weapons and equipment for its use.

19.     In October 2007, the United States designated the IRGC-QF a Specially Designated Global Terrorist ("SDGT") pursuant to Executive Order ("E.O.") 13324, explaining that:

> The Qods Force has had a long history of supporting Hizballah's military, paramilitary, and terrorist activities, providing it with guidance, funding, weapons, intelligence, and logistical support. The Qods Force operates training camps for Hizballah in Lebanon's Bekaa Valley and has reportedly trained more than 3,000 Hizballah fighters at IRGC training facilities in Iran. The Qods Force provides roughly $100 to $200 million in funding a year to Hizballah and has assisted Hizballah in rearming in violation of UN Security Council Resolution 1701.
>
> *In addition, the Qods Force provides lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants who target and kill Coalition and Iraqi forces and innocent Iraqi civilians.* [Emphasis added.]

20.     In October 2007, Defendant Bank Saderat Plc, together with its parent company Bank Saderat Iran, was designated an SDGT by the United States pursuant to E.O. 13224.

21.     The U.S. Treasury Department's 2007 press release regarding Bank Saderat's designation stated:

> Bank Saderat, its branches, and subsidiaries: Bank Saderat, which has approximately 3200 branch offices, has been used by the Government of Iran to channel funds to terrorist organizations, including Hezbollah and EU-designated terrorist groups Hamas, PFLP-GC, and Palestinian Islamic Jihad. For example, from 2001 to 2006, Bank Saderat transferred $50 million from the Central Bank of Iran through its subsidiary in London to its branch in Beirut for the benefit of Hezbollah fronts in Lebanon that support acts of violence.

22.     On October 12, 2011, the United States designated the Iranian commercial airline Mahan Air as an SDGT for "providing financial, material and technological support to the Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF). Based in Tehran, Mahan Air provides transportation, funds transfers and personnel travel services to the IRGC-QF."

23.     The Treasury Department explained Mahan Air's direct involvement with terrorist operations, personnel movements and logistics on behalf of the IRGC-QF:

> Mahan Air also facilitated the covert travel of suspected IRGC-QF officers into and out of Iraq by bypassing normal security procedures and not including information on flight manifests to eliminate records of the IRGC-QF travel.
>
> Mahan Air crews have facilitated IRGC-QF arms shipments. Funds were also transferred via Mahan Air for the procurement of controlled goods by the IRGC-QF.
>
> In addition to the reasons for which Mahan Air is being designated today, Mahan Air also provides transportation services to Hezbollah [sic], a Lebanon-based designated Foreign Terrorist Organization. Mahan Air has transported personnel, weapons and goods on behalf of Hezbollah [sic] and omitted from Mahan Air cargo manifests secret weapons shipments bound for Hezbollah [sic].

24.     Mahan Air was also later identified as the conduit to Iran of *thousands* of radio frequency modules recovered by Coalition Forces in Iraq from Improvised Explosive Devices ("IEDs") that were used to target U.S. and Coalition Forces.

25.     Hamid Arabnejad Khanooki, Mahan Air's chairman and CEO, is a former member of the IRGC and is a veteran of the same local IRGC division that spawned IRGC-Qods Force Commander Qasem Soleimani.

26.     On May 31, 2013, the United States "designated . . . Mahan Air Managing Director Hamid Arabnejad who oversees Mahan Air's sanctions evasion efforts and provision of support and services to Iran's IRGC-QF."

27.     On August 2, 2017, the Countering America's Adversaries Through Sanctions Act, Pub. L. 115-44, was enacted, in which Congress found that "The IRGC, not just the IRGC-QF, is responsible for implementing Iran's international program of destabilizing activities, support for acts of international terrorism, and ballistic missile program."

28.     On October 13, 2017, the United States designated the IRGC an SDGT, finding that "The IRGC has played a central role to Iran becoming the world's foremost state sponsor of terror.  Iran's pursuit of power comes at the cost of regional stability, and Treasury will continue using its authorities to disrupt the IRGC's destructive activities."

29.     Specifically, the U.S. designated the IRGC as the "parent organization of the IRGC-QF," and "for the activities it undertakes to assist in, sponsor, or provide financial, material, or technological support for, or financial or other services to or in support of, the IRGC-QF."

30.     Further, the U.S found that the IRGC "undertakes to assist in, sponsor, or provide financial, material, or technological support for, or financial or other services to or in support of, the IRGC-QF."[4]

31.     As used in this Complaint, "the Conspiracy" refers to an illegal criminal agreement, beginning in 1987 and, on information and belief, continuing to the present, between Iran, its banking agents and various international financial institutions by and through which Defendants knowingly participated in a criminal scheme in which they agreed to alter, falsify, or omit information from bank-to-bank payment orders sent on the SWIFT private financial messaging network ("SWIFT-NET") operated by the Society for Worldwide Interbank Telecommunication ("SWIFT-Brussels")[5] that involved Iran or Iranian parties (including several Iranian banks (referred to herein collectively as the "Iranian Bank Co-conspirators") such as Bank Melli Iran,

---

[4]     Although the IRGC-QF had responsibility for orchestrating Iranian policy in Iraq, including its terror campaign, as referenced herein, the IRGC and its operational directorate IRGC-QF are used interchangeably. As the U.S. government has found, the IRGC is the parent organization and principal supporter of the IRGC-QF.

[5]     SWIFT-Brussels is a cooperative society under Belgian law owned by its member financial institutions. SWIFT-Brussels's global private network, SWIFT-NET, enables financial institutions to send and receive information about financial transactions in the Eurodollar market, among other financial markets, in a standardized message format.

Bank Saderat Iran, the CBI, Bank Mellat, Bank Tejarat, Bank Refah and Bank Sepah, as well as the Islamic Republic of Iran Shipping Lines ("IRISL"),[6] the National Iranian Oil Company ("NIOC") and Mahan Air) that serve as financial and logistical conduits for the IRGC and its terrorist activities.

32.     The aims and objectives of the Conspiracy, all of which were foreseeable to the Defendants, and which each Defendant knew or was deliberately indifferent to, included, among others:

a.     Concealing Iran's dollar-denominated financial activities and transactions from detection, scrutiny, or monitoring by U.S. regulators, law enforcement, and/or depository institutions;

b.     Facilitating illicit transactions totaling at least $50 million USD for the benefit of Hezbollah;

c.     Facilitating illicit transactions totaling at least $100 million in USD funds for the direct benefit of the IRGC and billions in USD funds for the benefit of the NIOC, then controlled by the IRGC;

d.     Facilitating at least hundreds of illicit transactions totaling more than $60 million on behalf of IRISL, including over 150 "stripped" transactions after IRISL was designated an SDN;

e.     Facilitating tens of millions of dollars in illicit transactions on behalf of MODAFL, the IRGC, Mahan Air and other instrumentalities of Iranian state-sponsored terror to further numerous violations of the U.S. trade embargo against Iran, conceal Iran's efforts to evade U.S. sanctions and enable Iran's acquisition from the United States of goods and technologies prohibited by U.S. law to be sold or transferred to Iran, including components of IEDs deployed against Coalition Forces in Iraq; and

f.     Enabling Iran, the Iranian Bank Co-conspirators (including Defendant Bank Saderat Plc), the IRGC, Hezbollah, and their Special Groups proxies to plan for, conspire to, and perpetrate acts of international terrorism under 18 U.S.C. § 2331(1); homicides, attempted homicides, or conspiracies to commit homicide under 18

---

[6]     IRISL is Iran's national maritime carrier: a global operator of merchant vessels with a worldwide network of subsidiaries, branch offices and agent relationships. It provides a variety of maritime transport services, including bulk, break-bulk, cargo and containerized shipping.

U.S.C. § 2332(a)-(c); bombings using destructive devices under 18 U.S.C. § 2332a; bombings and attempted bombings under 18 U.S.C. § 2332f; engaging in terrorist activity under 8 U.S.C. § 1189(a)(3)(B)(iii)-(iv); and/or engaging in terrorism under 22 U.S.C. § 2656f.

33.     As noted by the U.S. Treasury Department's Financial Crimes Enforcement Network ("FinCEN") in a March 20, 2008 advisory: "Through state-owned banks, the Government of Iran disguises its involvement in proliferation and terrorism activities through an array of deceptive practices specifically designed to evade detection."[7]

34.     Although the Conspiracy was effectuated in a variety of ways, four primary techniques were used by Iran acting in concert with both the Iranian Bank Co-conspirators, MODAFL, the IRGC, IRISL and the Defendants herein:

a.      The Defendants removed or altered the names, Bank Identifier Codes ("BICs"), and other identifying information of the Iranian Bank Co-conspirators or Iranian counter-parties in the payment orders sent through U.S. correspondent banks via SWIFT-NET– a practice commonly known and referred to as "stripping" SWIFT-NET messages;

b.      The Defendants converted ordinary transactions involving SWIFT-NET message type 103 ("MT 103") payment orders (that would disclose the details of the counter-parties to the transactions) into bank-to-bank transfers known as SWIFT-NET message type 202 ("MT 202") payment orders (that did not require the transmitting bank to include information disclosing the originator, beneficiary, and counter-parties), for the specific purpose of concealing the origin and destination of Iranian funds transfers;

c.      The Defendants deliberately chose not to conduct the required screening of Iran-linked SWIFT-NET messages[8] and letters of credit documents, worth at least tens of millions in USD funds on an annual basis, for compliance with the U.S. Office of Foreign Assets

_____

[7]      *See*, https://www.fincen.gov/statutes_regs/guidance/pdf/fin-2008-a002.pdf.

[8]      Including, but not limited to, SWIFT-NET messages for customer credit transfers ("MT 100" series messages), bank-to-bank transfers ("MT 200" series messages), foreign exchange ("MT 300" series messages), trade finance ("MT 400" and "MT 700" series messages), precious metals trading ("MT 600" series messages), and account management ("MT 900" series messages).

Control ("OFAC") list of SDNs; the U.S. State Department's United States Munitions List ("USML") of defense-related export controlled items; and/or the U.S. Bureau of Industry and Security's ("BIS") Commerce Control List ("CCL") of dual-use export controlled items, and Denied Persons List ("DPL") of export denied entities; and

d.   The Defendants knowingly and willfully facilitated the illicit export and import of Iranian petroleum products for the NIOC and other sanctioned Iranian entities. These petrodollar transactions, including trade-finance and foreign exchange, provided Iran with illegal access to billions of dollars, including the direct funding through the Defendants of the IRGC and its network of front companies.

35.   Absent the criminal collusion and conspiratorial conduct of the Defendants named herein, Iran and its agents—including MODAFL, the IRGC, IRISL, and NIOC; and Banks Melli, Sepah, Refah, Mellat and Saderat—could not have successfully hidden the volume of U.S. dollar clearing and trade-finance transactions that they succeeded in illegally clearing through the United States in U.S. dollars.[9]

36.   The connection between the IRGC, IRGC-QF and Bank Melli Iran, their "deceptive banking practices" and the attacks that injured the Plaintiffs is further illustrated by a 2009 U.S. diplomatic cable which stated:

> *Iran's Islamic Revolutionary Guards Corps (IRGC) and IRGC-Qods Force, who channel funds to militant groups that target and kill Coalition and Iraqi forces and innocent Iraqi civilians, have used Bank Melli and other Iranian banks to move funds internationally.* Bank Melli used deceptive banking practices to obscure its involvement from the international banking system by requesting that its name be removed from financial transactions when handling financial transactions on behalf of the IRGC. [Emphasis added.]

---

[9]   The Defendants willfully circumvented the sanctions screening, anti-money laundering ("AML"), and combatting the financing of terrorism ("CFT") requirements of OFAC, SWIFT-Brussels, Clearing House Interbank Payment System ("CHIPS-NY"), CLS Bank International ("CLS-NY"), Federal Reserve Bank of New York ("FRB-NY") and the Fedwire Funds Service ("Fedwire"). CHIPS is a Systemically Important Financial Market Utility ("SIFMU") for the U.S. financial system and the primary provider of clearing and settlement services in USD funds for Eurodollar transactions. CLS Bank is a Systemically Important Financial Market Utility ("SIFMU") for the U.S. financial system and the primary provider of clearing and settlement services for foreign exchange transactions in the Eurodollar market, and FRB-NY is one of the twelve U.S. Federal Reserve Banks and the central bank lender-of-last-resort for the Eurodollar market (via Fedwire).

37.     Iran's objectives were not secret. Its pursuit and development of Weapons of Mass Destruction—including mines and similar explosive munitions—were the subject of hundreds of news reports, U.S. government reports, and Congressional testimony, as well as U.N. Security Council resolutions and European Union regulations.

38.     Iran's "deceptive banking practices" were not secret either.

39.     Beginning in September 2006, the U.S. Treasury and State Departments launched a quiet campaign to warn 40 major international banks and financial institutions about the risks of conducting business with the Iranian government, particularly targeting financial transactions involving the IRGC.

40.     According to the March 26, 2007 edition of *The Washington Post*, Defendants Standard Chartered Bank, Commerzbank and the HSBC Defendants were among those briefed by U.S. government officials about the dangers posed (in terms of both proliferation and terror financing) in conducting business with Iran.

41.     On April 19, 2007, the Wolfsberg Group, an association of twelve global banks whose stated aim is to develop financial services industry standards, issued a statement "endorsing measures to enhance the transparency of international wire transfers to promote the effectiveness of global anti-money laundering and anti-terrorist financing programs. The measures include both the development of an enhanced payment message format, which would include more detailed information about those conducting wire transfers in certain instances, as well as calling for the global adoption of basic messaging principles aimed at promoting good practice with respect to the payment system." This statement was directed to the increasingly apparent risks inherent in MT 202 "cover payments" – one of the methods Defendants used to conceal their illegal USD funds transfers on behalf of Iran through the Eurodollar market.

42.     Defendants ABN Amro (RBS N.V.), Barclays, Credit Suisse, and HSBC were all members of the Wolfsberg Group, and were listed on the 2007 press statement.

43.     Iran's efforts to kill and maim U.S. and British citizens in Iraq, and to thwart U.S. policy objectives in Iraq, were also readily apparent and widely reported.

44.     In fact, Iran's role in funding "militant groups that target and kill Coalition and Iraqi forces and innocent Iraqi civilians" was a matter of public record.

45.     For example, on October 10, 2005, the British Broadcasting Company (BBC) reported that:

> An armour-piercing version of the bomb - blamed for the deaths of eight British soldiers this year - marks the latest advance in the insurgents' arsenal. *The UK has accused Iran of supplying the new weapon to militants in southern Iraq, via the Lebanese Hezbollah militia group,* although Tehran has denied this. [Emphasis added.]

46.     The BBC followed up with multiple reports in 2006 describing the details from military briefings about Iran's material support to Shi'a militia groups that were targeting and killing British and U.S. forces in Iraq.

47.     For example, on June 23, 2006, the BBC reported:

> BBC world affairs correspondent, Paul Reynolds, says both the American and British military in Iraq have claimed for some time that Iran, or factions within the Iranian government, have been supporting Shias politically and militarily.

> For example, the British ambassador to Baghdad William Patey accused the Iranian Revolutionary Guard of helping to supply the technology which has been used in bomb attacks against British troops in the south.

> "Since January we have seen an upsurge in their support, particularly to the Shia extremist groups," Gen Casey said.

> "They are using surrogates to conduct terrorist operations both against us and against the Iraqi people.

> "We are quite confident that the Iranians, through the special operations

12

forces, are providing weapons, IED [improvised explosive device] technology and training to Shia extremist groups in Iraq," he said.

48.     In another example, on September 26, 2008, CNN reported that U.S. officials claimed Iran had provided Shi'a militias in Iraq with "millions of dollars" in funding and that:

> The official said that high-grade military explosives and specialized timers are among the "boutique military equipment" moving from Iran into Iraq. Some of the equipment is of the same type that Hezbollah, an Iranian-backed Shiite militia, used against Israeli forces in Lebanon during the summer, the official said. The origin of the weapons was easy to discern because of Iranian markings on it, he said. Because Iran maintains tight control over armaments, he said, shipment of the weapons into Iraq had to involve "elements associated with the Iranian government."

49.     Each of the Defendants knew about the existence of the Conspiracy; directly conspired with Iran, through Defendant Bank Saderat Plc, Bank Melli Iran, the CBI and others, to facilitate the Conspiracy; took affirmative, extensive and unlawful actions to further the Conspiracy over long periods of time; and was aware of the existence and participation of other Co-conspirators, including other Defendants named herein.

50.     In fact, on numerous occasions, three or more of the Defendants acted jointly to facilitate the same illegal trade-finance transaction (*e.g.* providing material assistance to Mahan Air because the Iranian airline wanted to purchase U.S. manufactured aircraft and needed help circumventing U.S. export restrictions against Iran).

51.     Each of the Defendants, at the time it agreed to join and actively take part in the Conspiracy, knew that Iran was a U.S.-designated State Sponsor of Terrorism and knew that Iran was clandestinely routing billions of dollars through the United States to hide its unlawful conduct; and each Defendant took affirmative steps to help Iran in its unlawful conduct.

52.     Each of the Defendants also knew, or was deliberately indifferent to, the fact that Iran, as a U.S.-designated State Sponsor of Terrorism, would (and, in fact, did) channel hundreds

of millions of the dollars that Defendants helped launder and conceal from U.S. regulators and law enforcement agencies to the IRGC and Hezbollah as part of the Conspiracy.

53.     Each of the Defendants also knew, or was deliberately indifferent to, the well-publicized fact that Iran and its terror proxies were killing and maiming American civilians and servicemen in Iraq, and that U.S. nationals would foreseeably be injured or killed as a result of the substantial assistance those dollars provided to the IRGC and Hezbollah.

54.     Each of the Defendants also knew, or was deliberately indifferent to, the foreseeable (and inevitable) consequences of providing Iran, a State Sponsor of Terrorism, with access to hundreds of *billions* of dollars of concealed payments and the resulting funding of Iranian-controlled organizations and terror proxies that targeted American civilians and servicemen through acts of international terrorism in Iraq from 2004 to 2011.

55.     Without the active participation of the Defendants in the Conspiracy, Iran could not have transferred the same volume of USD to the IRGC and Hezbollah, nor could it have done so with the same ease and efficiency.

56.     Without the active participation of the Defendants in the Conspiracy, Iran could not have successfully violated U.S. export controls, financed its illicit arms shipments or manufactured the same volume and sophistication of factory-grade Explosively Formed Penetrators ("EFPs") to kill and maim Americans in Iraq as discussed below.[10]

---

[10]     EFPs are a particularly effective form of manufactured IED sometimes known as a shaped charge, usually made with a manufactured concave copper disk and a high explosive packed behind the liner. In Iraq, EFPs were often triggered by various technologies, including passive infra-red sensors (tripped by the engine heat of passing vehicles) and radio frequency modules (that would turn on the PIR before the high-powered radio waves generated by Coalition Forces' jamming devices could deploy). Metallurgic analysis by U.S. technicians helped confirm that the high-purity copper EFP liners were not produced in Iraq. Differences in the liners indicated the kind of press that was required to fabricate them—a heavy (hydraulic) press not commonly seen in Iraq. To produce these weapons, copper sheets were often loaded onto a punch press to yield copper discs. These discs were annealed in a furnace to soften the copper. The discs were then loaded into a large hydraulic press and formed into the disk-like final shape. This manufacturing process is critical to the design and concomitant lethality of the weapon. When the explosives inside an EFP detonate,

57.     The transfers of hundreds of millions of dollars by Iran to the IRGC and Hezbollah was within the scope, and in furtherance of, the Conspiracy; and the provision of material support to the IRGC and Hezbollah was the natural and reasonably foreseeable consequence of the Defendants' unlawful agreement to help Iran launder money through the United States financial system.

58.     As set forth below, the HSBC Defendants, Commerzbank, Standard Chartered Bank, Barclays, and Credit Suisse altered, falsified, or omitted information from payment order messages that they facilitated on behalf of Bank Saderat knowing, or deliberately indifferent to the fact, that Bank Saderat was engaged in money laundering on behalf of a State Sponsor of Terrorism, and after October 2007, that Bank Saderat was an SDGT that provided material support to Iran's terrorist activities, and, in the case of the HSBC Defendants, knew there was direct evidence of Bank Saderat "funding of Hezbollah."

59.     As set forth below, the HSBC Defendants, and Defendants Standard Chartered Bank, ABN Amro (RBS N.V.), and Commerzbank facilitated numerous payments totaling more than $60 million on behalf of IRISL knowing, or deliberately indifferent to the fact, that IRISL was designated a Specially Designated National ("SDN") by the United States for, as stated in the U.S. Treasury Department's September 10, 2008 press release announcing IRISL's designation, "facilitating shipments of military cargo destined for the (Iranian) Ministry of Defense and Armed Forces Logistics (MODAFL)," which could be used for terrorist attacks on Coalition Forces, including American nationals.

60.     IRISL *did*, in fact, facilitate shipments of military cargo to Hezbollah, one of the organizations responsible for acts of international terrorism that killed and injured American

---

the blast energy inverts the copper plate into a ragged slug traveling over a mile per second, capable of punching through armor even 300 feet away.

citizens in Iraq, including the Plaintiffs.

61.     As alleged below, Defendants Standard Chartered Bank, Credit Suisse, Bank Saderat Plc and Commerzbank all altered, falsified, or omitted information from payment messages (worth billions of U.S. dollars) that they facilitated on behalf of the National Iranian Oil Company, then an agent of the IRGC, knowing, or deliberately indifferent to the risk involved in rendering those payments without any transparency to U.S. regulators and law enforcement, and thereby directly providing the IRGC with access to billions of USD that it could move – undetected – through the global financial system.

62.     As alleged below, Defendant Standard Chartered Bank also knowingly and actively financed and facilitated illegal trade-finance transactions worth hundreds of millions of dollars on behalf of MODAFL, the IRGC and various instrumentalities of Iranian state-sponsored terror, including companies working directly for Hezbollah and the IRGC-Qods Force.

63.     Furthermore, as alleged below, Defendants HSBC Bank USA, N.A., Standard Chartered Bank, ABN Amro (RBS N.V.), and Commerzbank committed acts of international terrorism in violation of 18 U.S.C. § 2332d.

64.     Defendant HSBC Bank USA, N.A. is a U.S. person that knowingly conducted financial transactions with Iran in the United States in violation of 18 U.S.C. § 2332d, and it was reasonably foreseeable that Iran would provide material support to acts of international terrorism that killed and injured American citizens in Iraq.

65.     Plaintiffs further allege that the U.S. branches of Defendants Barclays, Standard Chartered Bank, ABN Amro (RBS N.V.), and Commerzbank are U.S. persons that knowingly conducted financial transactions with Iran in the United States in violation of 18 U.S.C. § 2332d, and it was reasonably foreseeable that Iran would provide material support to acts of international

16

terrorism that killed and injured American citizens in Iraq.

66.     Each of the Plaintiffs was injured as a result of an act of international terrorism for which Iran and its state-controlled organizations and terrorism proxies, including Hezbollah, were responsible.

## II.     JURISDICTION AND VENUE

67.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 2333(a) as a civil action brought by citizens of the United States and/or their estates, survivors, or heirs, who have been injured by reason of acts of international terrorism.

68.     Venue is proper in this district pursuant to 18 U.S.C. § 2334(a) and 28 U.S.C. §§ 1391(b) and 1391(d).

69.     Defendants are subject to personal jurisdiction in the United States pursuant to 18 U.S.C. § 2334(a), CPLR § 302, and Fed. R. Civ. P. 4(k)(1)-(2). Defendant HSBC Bank USA, N.A. is also subject to personal jurisdiction under CPLR § 301. Defendants' unlawful conduct was purposefully directed at the United States, and the Conspiracy was specifically designed to effectuate the flow of billions of USD through the United States in violation of U.S. laws, and in fact resulted in hundreds of billions of dollars illegally passing through the United States.

## III.     THE DEFENDANTS

### A.     THE HSBC DEFENDANTS

70.     Defendant HSBC Holdings Plc ("HSBC Holdings") is a public limited company organized under the laws of the United Kingdom. HSBC Holdings directly or indirectly owns, *inter alia*, Defendant HSBC Bank Plc, Defendant HSBC Bank Middle East Limited, and Defendant HSBC Bank USA, N.A. (as noted above, referred to herein collectively as the "HSBC Defendants"). HSBC Holdings is occasionally referred to internally (and in this Complaint) as

"HSBC Group," or "The Group," and members and affiliates of HSBC Holdings (including the named HSBC Defendants herein) are occasionally referred to herein as "HSBC Group members."

71.     Defendant HSBC Holdings constitutes the ultimate parent company of one of the world's largest banking and financial services groups with approximately 6,300 offices in over 75 countries and territories.

72.     HSBC Holdings is listed on the New York Stock Exchange ("NYSE"), London Stock Exchange ("LSE") and Hong Kong Stock Exchange ("SEHK").

73.     HSBC Group members comprise financial institutions throughout the world that are owned by various intermediate holding companies, and ultimately, but indirectly, by Defendant HSBC Holdings, which, as alleged above, is incorporated and headquartered in England.

74.     Defendant HSBC Bank Plc ("HSBC-London," often referred to internally by members of HSBC Group as "HBEU") is a financial institution registered under the laws of England and Wales.

75.     Defendant HSBC Bank Middle East Limited ("HSBC-Middle East," often referred to internally by members of HSBC Group as "HBME"), is a financial institution registered under the laws of the Jersey Channel Islands.

76.     Defendant HSBC Bank USA, N.A. ("HSBC-US," often referred to internally by members of HSBC Group as "HBUS"), is a national bank chartered under the National Bank Act (12 U.S.C. § 2 *et seq.*) that constitutes a "U.S. person" under the definitions set forth in 31 C.F.R. Part 560.314 of the Iranian Transactions Regulations (the "ITR") and 18 U.S.C. § 2332d(b)(2) of the Anti-Terrorism Act.

77.     According to the fact sheets published on HSBC-US's official website, HSBC-US's headquarters are in McLean, VA, and it has its principal office in New York City.

18

78.     HSBC-US operates more than 240 bank branches throughout the United States, with offices and branches in New York, California, Connecticut, Delaware, Washington, D.C., Florida, Maryland, New Jersey, Oregon, Pennsylvania, Virginia, and Washington State.

79.     HSBC-US is the principal subsidiary of HSBC USA Inc., which is, in turn, an indirect, wholly-owned subsidiary of HSBC North America Holdings, Inc. ("HNAH"). HNAH's businesses serve customers in retail banking and wealth management, commercial banking, private banking, and global banking and markets.

### B.     DEFENDANT BARCLAYS BANK PLC

80.     Defendant Barclays Bank Plc ("Barclays") is a global financial services provider headquartered in London, United Kingdom.

81.     Defendant Barclays is a wholly-owned subsidiary of Barclays Plc, a public limited liability company organized under the laws of England and Wales.

82.     As used in this Complaint, "Barclays" refers to Barclays Bank Plc, the wholly-owned subsidiary of Barclays Plc, not Barclays Plc, Defendant Barclays Bank Plc's parent company.

83.     Barclays is one of the largest banks in the world. Barclays' home country regulator is the United Kingdom's Financial Services Authority ("FSA").

### C.     DEFENDANT STANDARD CHARTERED BANK

84.     Defendant Standard Chartered Bank ("SCB") is one of the world's largest international banks, with over 1,700 branches, offices, and outlets in more than 70 countries. Headquartered in London, SCB operates principally in Asia, Africa, and the Middle East, and has operations in consumer, corporate and institutional banking, and treasury services.

85.     SCB-London is listed on the London Stock Exchange ("LSE") and Hong Kong Stock Exchange ("SEHK").

86.     Since 1976, SCB has had a license issued by the state of New York to operate as a foreign bank branch in New York, New York ("SCB-NY"). The branch provides wholesale banking services, primarily U.S.-dollar clearing for international wire payments.

87.     Standard Chartered's New York branch is the seventh largest U.S. dollar correspondent bank in the world, clearing and settling approximately 195 billion in USD funds per day.

88.     Standard Chartered's New York branch also constitutes a "U.S. person" under the definitions set forth in § 560.314 of the ITR and 18 U.S.C. § 2332d(b)(2).

### D.     DEFENDANT ROYAL BANK OF SCOTLAND N.V.

89.     In October 2007, a consortium consisting of Fortis, the Royal Bank of Scotland Group ("RBS"), and Banco Santander acquired ABN Amro Holding N.V., the parent company of ABN Amro Bank N.V., using the acquisition vehicle RFS Holdings.

90.     The former ABN Amro Bank N.V. subsequently underwent a restructuring process to transfer its Dutch State-acquired businesses and activities out of the existing ABN Amro Group. To do so, the relevant Dutch State-acquired businesses were first transferred to a new legal entity owned by ABN Amro Holding N.V.

91.     On February 5, 2010, through a statutory demerger process, the former ABN Amro Bank N.V. was renamed RBS N.V. In 2018, RBS N.V. was renamed NatWest Markets N.V.

92.     Ultimately, RBS acquired ABN Amro Holding N.V. As such, RBS acquired the New York and Chicago branches of ABN Amro Bank N.V. and began integrating certain business

lines handled by these branches into its other U.S. operations. These former branches constitute a "U.S. person" under the definitions set forth in § 560.314 of the ITR and 18 U.S.C. § 2332d(b)(2).

93.      In this Complaint, "ABN Amro (RBS N.V.)" refers to the named Defendant herein.

**E.      DEFENDANT CREDIT SUISSE AG**

94.      Defendant Credit Suisse AG ("Credit Suisse") is a financial services company headquartered in Zurich, Switzerland. Its U.S. headquarters are located at 11 Madison Avenue, New York, New York.

95.      Credit Suisse serves clients worldwide through its Private Banking unit, which includes a Wealth Management and Corporate & Institutional Clients unit; Investment Banking unit; and Asset Management unit.

96.      According to the CHIPS-NY website, Credit Suisse used the following U.S. financial institutions in New York to clear and settle its Eurodollar transactions:

a.      Defendant HSBC Bank USA, N.A. (identified by CHIPS-NY participant number 0108 and Fedwire routing number 021001088);

b.      The Bank of New York Mellon (identified by CHIPS-NY participant number 0001 and Fedwire routing number 011001234);

c.      Deutsche Bank Trust Co Americas (identified by CHIPS-NY participant number 0103 and Fedwire routing number 021001033); and

d.      Wells Fargo Bank NY International (identified by CHIPS-NY participant number 0509 and Fedwire routing number 026005092).

97.      Credit Suisse's New York branch is subject to oversight and regulation by the Board of Governors of the U.S. Federal Reserve System and the New York State Banking Department. The branch thus constitutes a "U.S. person" under the Iranian Transaction Regulations and § 2332d(b)(2).

## F.     DEFENDANT BANK SADERAT PLC

98.     Bank Saderat Iran is one of the largest banks in Iran. It has approximately 3,400 offices worldwide, including, as discussed below, a United Kingdom subsidiary (Defendant Bank Saderat Plc), and branches in Frankfurt, Paris, Athens, Dubai and Beirut.

99.     Bank Saderat Iran was nationalized after the Iranian Revolution, but allegedly privatized in 2009. According to Bank Saderat Iran, 49% of its shares are owned by the Iranian government, but it is technically a non-governmental entity.

100.     In 2002, Bank Saderat Iran's London bank branch became a wholly-owned bank subsidiary, incorporated under United Kingdom law (*i.e.* Defendant Bank Saderat Plc).

101.     Bank Saderat Plc is the legal successor in interest to the Iran Overseas Investment Bank ("IOIB"), London.

102.     IOIB changed its name to Bank Saderat Plc in March 2002.

103.     Defendant Bank Saderat Plc maintains its principal office in London, United Kingdom.

## G.     DEFENDANT COMMERZBANK AG

104.     Defendant Commerzbank AG ("Commerzbank") is a financial services company headquartered in Frankfurt, Germany, and has over 1,200 branches in Germany alone.

105.     According to the CHIPS-NY website, Commerzbank AG used, *inter alia,* the following U.S. financial institutions in New York to clear and settle its Eurodollar transactions:

>     a.     Defendant Commerzbank's New York branch (identified by CHIPS-NY participant number 0804 and Fedwire routing number 026008044);

>     b.     Defendant HSBC Bank USA, N.A. (identified by CHIPS-NY participant number 0108 and Fedwire routing number 021001088);

      c.     Defendant SCB-NY (identified by CHIPS-NY participant number 0256 and Fedwire routing number 026002561); and

      d.     Deutsche Bank Trust Co Americas (identified by CHIPS-NY participant number 0103 and Fedwire routing number 021001033).

106.    Commerzbank maintains 23 foreign branches, including a New York branch licensed by the State of New York since 1967.

107.    The New York branch of Commerzbank constitutes a "U.S. person" under the Iranian Transaction Regulations and § 2332d(b)(2).

108.    Commerzbank is listed on stock exchanges in Germany, London, and Switzerland.

109.    Defendants Barclays, Standard Chartered Bank, ABN Amro (RBS N.V.), Credit Suisse, Commerzbank, and the HSBC Defendants are sometimes referred to herein collectively as "the Western Bank Defendants."

## IV.   FACTUAL ALLEGATIONS

### A.   IRAN'S LONG HISTORY OF SUPPORTING AND FINANCING TERRORISM

110.    Since the Iranian Revolution in 1979, Iran has been a principal source of extremism and terrorism throughout the Middle East and the rest of the world, responsible for bombings, kidnappings and assassinations across the globe.

111.    As noted above, the United States designated Iran a State Sponsor of Terrorism on January 19, 1984. That designation has remained in force throughout the relevant time period to this Action.

112.    Since its 1984 designation, the United States has attempted to constrain and deter Iran's sponsorship and conduct of terrorist activities, as well as its development of Weapons of Mass Destruction, by imposing a wide variety of trade and economic sanctions intended to reduce

the flow of financial resources, especially U.S. dollar-denominated assets, for Iran's support of such activities.

**B.      U.S. SANCTIONS AND IRAN'S RELIANCE ON U.S. DOLLARS**

113.     On June 25, 1996, a truck bomb decimated a building at the Khobar Towers complex in Saudi Arabia that was used to house American military personnel, killing 19 Americans and wounding another 372 people.

114.     It was soon established that the terrorist operatives responsible for the bombing were trained and equipped by the IRGC.

115.     Soon thereafter, Congress responded by passing the 1996 Iran-Libya Sanctions Act finding that:

> (1) The efforts of the Government of Iran to acquire weapons of mass destruction and the means to deliver them *and its support of acts of international terrorism* endanger the national security and foreign policy interests of the United States and those countries with which the United States shares common strategic and foreign policy objectives.
>
> (2) The objective of preventing the proliferation of weapons of mass destruction and *acts of international terrorism* through existing multilateral and bilateral initiatives *requires additional efforts to deny Iran the financial means* to sustain its nuclear, chemical, biological, and missile weapons programs. [Emphasis added.]

116.     To ensure that U.S. financial institutions that process international wire transfers in the Eurodollar market do not assist Iran in its support of international terrorism and weapons proliferation or facilitate other prohibited transactions, U.S. financial institutions have been (and are) required to use sophisticated computer systems and software algorithms to monitor and screen all wire transfer activities.

117.     Banks in New York that process most of the world's Eurodollar payments and foreign exchange transactions depend on these automated systems to prevent Iran and other

sanctioned entities (as well as terrorists, money launderers, and other criminals) from gaining access to the United States banking system. In this way, U.S. financial institutions are supposed to be the first line of defense to prevent Iran from accessing the U.S. financial system to fund or otherwise engage in terrorism and other prohibited conduct.

118.    At the same time, because, on average, 60 percent of Iranian government revenues and 90 percent of Iran's export revenues originate from the sale of its oil and gas resources, a market largely denominated in USD (known as "petrodollars"[11]), and because Iran's currency, the Rial, was (in part due to U.S. sanctions) one of the world's least valued currencies, the Iranian regime was desperately dependent on access to the USD funds it maintained in the Eurodollar market, and the interest income these petrodollar deposits generated.[12]

119.    Thus, reliably consistent access to, and the ability to facilitate trade in, the Eurodollar market has been critical to the capacity of the Iranian regime to fund its terror proxies such as Hezbollah in Lebanon, and to fuel its other terrorism and weapons proliferation activities through the IRGC.

120.    The importance to Iran of funding Hezbollah, the IRGC and subsequently, Kata'ib Hezbollah and other Special Groups in Iraq, became even more acute after the 2003 U.S. invasion of Iraq. After that event, Iran directed Hezbollah to create "Unit 3800" (discussed below) and began devoting greater financial resources to gain influence in Iraq, inflict casualties on American citizens in Iraq, and intensify its quest for Weapons of Mass Destruction.

---

[11]    The petrodollar market developed because, *inter alia*, the United States was the largest producer and consumer of oil in the world; the world oil market has been priced in USD since the end of World War II.

[12]    The Eurodollar interest rate is also known as the London Interbank Offered Rate ("LIBOR").

121.    *None* of these goals could be accomplished by Iran without USD funds, access to the Eurodollar market, and the agreement of Western financial institutions, such as the Western Bank Defendants, to shield Iran's unlawful Eurodollar and trade-finance activities from detection.

**C.    IRAN CONTINUOUSLY EVADED U.S., EUROPEAN UNION AND UNITED NATIONS SANCTIONS**

122.    Congress and successive Administrations have enacted several laws and executive orders that imposed sanctions on countries and firms that sell Weapons of Mass Destruction technology and military equipment to Iran.

123.    On March 16, 1995, as a result of Iranian sponsorship of international terrorism and Iran's active pursuit of Weapons of Mass Destruction, President Clinton issued Executive Order 12957 prohibiting U.S. involvement with petroleum development in Iran.

124.    On May 6, 1995, President Clinton signed Executive Order 12959, pursuant to the International Emergency Economic Powers Act ("IEEPA"),[13]  as well as the 1985 International Security and Development Cooperation Act ("ISDCA"), substantially tightening sanctions against Iran.

125.    On August 19, 1997, President Clinton signed Executive Order 13059 clarifying Executive Orders 12957 and 12959, and confirming that virtually all trade and investment activities with Iran by U.S. persons, wherever located, were prohibited.

126.    In order to thwart U.S. sanctions efforts, Iran cultivated close relationships with foreign arms suppliers, including Russia, China, and North Korea.

---

[13]    On October 16, 2007, President Bush signed into law the International Emergency Economic Powers (IEEPA) Enhancement Act, Public Law No. 110-96, amending IEEPA section 206. The Act enhanced criminal and administrative penalties that could be imposed under IEEPA.

127.    In addition, Iran sought to clandestinely acquire dual-use technologies from European manufacturers, and certain export-controlled defense products, aircraft parts, dual-use technologies and materials from the United States.

128.    For years, U.S. law enforcement officials, customs agents and intelligence services have worked to thwart Iranian efforts to circumvent U.S. economic sanctions and arms embargos.

129.    A few brief examples illustrate the larger U.S. government effort:

- On March 12, 2001, criminal and civil sanctions were imposed on Refinery Industries, Inc., of Budd Lake, New Jersey, for attempted exports of gas detection equipment to Iran.

- On June 11, 2001, Saeed Homayouni and Yew Leng Fung, officials of Multicore, Inc., pled guilty in the U.S. in connection with the firm's purchase of commercial and military aircraft parts and missile components for export to Iran.

- In March 2007, the U.S. led efforts to pass U.N. Security Council Resolution 1747 that declared: "Iran shall not supply, sell or transfer directly or indirectly from its territory or by its nationals or using its flag vessels or aircraft any arms or related materiel."

- In March 2008, the U.S. led efforts to pass U.N. Security Council Resolution 1803 that called upon all member states "to exercise vigilance over the activities of financial institutions in their territories with all banks domiciled in Iran, in particular with Bank Melli and Bank Saderat, and their branches and subsidiaries abroad" and "to inspect the cargoes to and from Iran, of aircraft and vessels, at their airports and seaports, owned or operated by Iran Air Cargo and Islamic Republic of Iran Shipping Line, provided there are reasonable grounds to believe that the aircraft or vessel is transporting [prohibited] goods…"

- On September 17, 2008, the U.S. Department of Justice unsealed a criminal indictment against 16 foreign-based defendants related to Mayrow General Trading Company, for their involvement in providing Weapons of Mass Destruction-related, military, and dual-use items to Iran, specifically components found in IEDs in Iraq that caused deaths and injuries to U.S. military personnel.

- On December 11, 2009, at the request of the U.S. government, the Thai government detained a Russian aircraft containing a cargo of weapons from North Korea destined for Iran.

- On June 23, 2010, the U.S. Department of Justice charged an Iranian company and citizen, as well as Opto Electronics PTE, Ltd., a Singapore company and others with, *inter alia*, violations of the Arms Export Control Act (22 U.S.C. §2778) for facilitating the unlawful transfer of long range radio frequency modules used in IEDs targeting Coalition Forces in Iraq. The modules were flown to Iran by Mahan Air.

- On May 11, 2010, Balli Aviation Ltd., a subsidiary of the U.K.-based Balli Group Plc., was sentenced in the District of Columbia to pay a $2 million fine, and to serve a five-year corporate period of probation after pleading guilty to a two-count criminal information in connection with its illegal export of a commercial Boeing 747 aircraft from the United States to Iran.

- In December 2012, the U.S. Department of Justice charged Business Machinery World Wide, an Iranian corporation based in Tehran, Iran; three of its subsidiary companies located in Dubai, United Arab Emirates; and nine officers and individuals for conspiring to violate the IEEPA by facilitating the shipment of computers to the United Arab Emirates for delivery to Iran.

- In April 2014, John Alexander Talley was sentenced to 30 months in prison for conspiracy to violate the IEEPA and Iranian Transaction and Sanctions Regulations. Talley's company, Tallyho Peripherals, Inc., was also sentenced to one year of probation. According to court documents, from 2009 to September 2012, Talley and his company conspired with others to unlawfully export sophisticated computer equipment from the United States to Iran. The shipments of the computers and the payments transited through the United Arab Emirates.

130. In addition, both the U.S. Treasury Department and Commerce Department have blacklisted a long list of Iranian front companies, shell companies and middlemen that the U.S. has determined to be complicit in Iran's sanctions evasion efforts.

## D. THE EURODOLLAR MARKET – IRAN'S MONEY LAUNDERING AND ILLICIT EXPORT NEXUS WITH DEFENDANT BANKS

28

### 1.    The Conspiracy's Shared Goals

131.    As noted *supra*, Iran needed access to the Eurodollar market in order to sustain the Islamic Revolutionary government that has ruled Iran since 1979.

132.    Specifically, the Government of Iran used the Eurodollar market for the following economic activities:

        a.    Investing petrodollar (in USD funds) revenue from Iran's oil and gas export sales;

        b.    Exporting the Iranian Islamic Revolution through acts of international terrorism; and

        c.    Illicitly acquiring U.S.-manufactured equipment, parts and technology to further its nuclear and conventional weapons programs.

133.    Iran did not have a legitimate need to access the Eurodollar market for the benefit of any Iranian civilian agency, operation or program; it could have operated with funds denominated in any number of other Eurocurrencies[14] (deciding, instead, to continually conduct its international trade primarily in Eurodollars).

134.    Specifically, Iran did in fact have access to viable alternative options both for foreign exchange and time deposits in Eurocurrencies (other than Eurodollars) to meet the needs of its civilian programs, including, but not limited to, its credit at the European Central Bank denominated in Euros, its credit at the International Monetary Fund ("IMF") denominated in Special Drawing Rights ("SDRs"), its credit at the Asian Clearing Union ("ACU") denominated in Asian Monetary Units ("AMUs"), or its domestic credit denominated in Iranian Rial.

---

[14]    The term Eurocurrency refers to deposits of funds transferred to, and maintained by, banks outside of the home country for the respective currency. Thus, had Iran chosen to convert its petrodollars into Japanese Yen, it would have held "Euroyen" deposits at banks outside of Japan.

135.    However, Iran would not have been able to move its funds undetected through the Eurodollar market without the covert operational and technical assistance it received from the Defendants.

136.    Likewise, Iran would not have been able to substantially fund Hezbollah and Shi'a militias in Iraq—and acquire U.S.-manufactured products (including dual-use technologies and export-controlled manufacturing equipment)—without access to USD funds through the Eurodollar market.

137.    As a result of Iran's deceptive and illegal banking practices, in mid-2012, Iran's access to the Eurodollar market through the Defendant Banks was cut-off by SWIFT-Brussels.

138.    Soon thereafter, Iran's domestic currency collapsed.

139.    The CBI was forced to intensify the use of its gold reserves in order to prop-up the Rial's value.

140.    Absent the Defendant Banks providing Iran and its proxies with decades of clandestine access to the Eurodollar market, Iran's foreign policy goal of furthering its Islamic Revolution through the financing of terrorism—including Iran's sponsorship of terrorist attacks against Coalition Forces in Iraq between 2004 and 2011—would have been severely constrained.

### 2.    Eurodollar Market Operations

141.    As mentioned above, the global Eurodollar market is a wholesale, bank-to-bank market where a correspondent network of banks, bank branches and other bank affiliates outside the United States make loans and accept deposits denominated in U.S. dollars.

142.    According to the FRB-NY, the Eurodollar market emerged after World War II due to a large increase in U.S. dollars funds circulating outside of the United States from, *inter alia*, the Marshall Plan expenditures to rebuild Europe after the war.

143.    Prior to the launch of SWIFT-NET in 1977, most transactions in the Eurodollar market were conducted electronically by telegraphic transfer ("TELEX").

144.    By the time of the 1979 Iranian Revolution, the Bank of International Settlements ("BIS-Basel") estimated that the size of the Eurodollar market was over $600 billion.

145.    A mid-2015 report by the Bank of International Settlements ("BIS-Basel") estimated that the size of the Eurodollar market by the end of 2014 was over twenty-one *trillion* in USD funds.

146.    As mentioned *supra*, nearly all U.S. dollar transfers initiated through banks outside the United States are processed electronically by correspondent banks in the United States, almost exclusively in New York.

147.    The Clearing House Interbank Payment System ("CHIPS-NY") represents that it processes 95 percent of those Eurodollar funds transfers.

E.    THE IRANIAN U-TURN EXEMPTION AND ITS REVOCATION

148.    Alongside its economic sanctions against Iran, the United States government designed an exception process to permit Iran's circumscribed access to U.S. dollars through a narrowly-tailored exemption to the Iranian Trade Regulations, known as the "U-Turn exemption" (Section 560.516 of the Iranian Trade Regulations). At the same time, the U.S. government insisted that U.S. financial institutions operating in the Eurodollar market conduct careful monitoring of all Iranian transactions to both deter and detect the financing of sanctioned entities involved in, *inter alia*, Iran's terrorism and weapons proliferation activities.

149.    The purpose of the U-Turn exemption was to permit Iranian parties indirect access to USD funds, *provided* that these transactions were fully disclosed to U.S. correspondent banks;

were strictly for Iran's legitimate agencies, operations and programs; and were not earmarked for terrorist, WMD proliferation or other proscribed purposes.

150.    Until November 2008, U.S. financial institutions were authorized to process certain funds transfers (under the U-Turn exemption) for the direct or indirect benefit of Iranian banks, other persons in Iran or the Government of Iran, *provided* such payments were initiated offshore by a *non-Iranian*, non-U.S. financial institution and only passed through the U.S. financial system *en route* to another offshore, *non-Iranian*, non-U.S. financial institution; *and* provided that none of the parties to the transactions had been designated an SDN, or that the transaction was for an SDN's benefit.

151.    The U-Turn exemption was therefore conditioned on transparency to permit the careful monitoring of all Iranian transactions, both to deter and detect terror financing and weapons proliferation activities.

152.    Because so much of Iran's international trade has historically flowed through the United States for the clearing and settlement and because Iran's primary terrorist proxy, Hezbollah, operates in Lebanon (itself a dollarized economy and largely dependent on U.S. currency) maintaining transparency in the processing of Iranian USD transactions has been a vital part of the architecture of U.S. national security for decades and was reflected as such in the Iranian Trade Regulations.

153.    Iran's access through the U-Turn exemption was to be closely monitored filtering all U-Turn exemption transactions through sophisticated computer systems used by U.S. financial institutions to monitor and screen all USD-denominated wire transfers.

154.    The Western Bank Defendants, however, knowingly and intentionally agreed to, and did, manipulate tens of thousands of payment order messages (SWIFT-NET MT 103 and MT

202) and the records of such transactions to defeat such monitoring and screening, and prevent transparency, in order to provide USD funds to Iran for unlawful uses, which foreseeably included the support of Iranian terrorism and terrorist organizations.

155.     Over time, however, U.S. authorities began to understand the contours of the Conspiracy involving Iran and the Defendants that is set forth in this Complaint.

156.     Initially, the realization that Iran was engaging in "deceptive banking practices" led the U.S. to target key Iranian financial institutions, entities, and individuals under proliferation, counter-terrorism, and Iran-related sanctions (*i.e.*, E.O. 13382, E.O. 13224, and E.O. 13438, respectively).

157.     The apparent assumption made initially by U.S. authorities was that Iran and its banking agents (Iranian Bank Co-conspirators Bank Sepah, Bank Melli, Bank Saderat and others) were engaged in deception that was exploiting unwitting Western financial institutions that were engaged in high risk but legal, foreign exchange, precious metals, and trade-finance business with Iran.

158.     The truth was otherwise.

159.     *First*, despite Iran's feeble domestic economy during the entire relevant period of time, its oil and natural gas exports still provided the Iranian regime with substantial revenues denominated in U.S. dollars.

160.     *Second*, Iran's petrodollar revenues were managed by, and through, among others, the Central Bank of Iran ("CBI") and the Iranian Ministry of Petroleum (including the National Iranian Oil Company; later designated an SDN pursuant to E.O. 13382 and identified as an agent or affiliate of the IRGC).[15]

---

[15]     That designation was removed in January 2016.

161.     *Third*, the challenge Iran faced was that it was almost entirely dependent on USD funds but U.S. economic sanctions—and the attendant monitoring of Iran's financial activities—were incompatible with its terror financing and Weapons of Mass Destruction proliferation goals.

162.     *Fourth*, between 2004 and 2011, both Lebanon (where Iran's agent, Hezbollah, is based) and Iraq (where Iran's proxies were launching terror attacks killing and maiming the Plaintiffs) were U.S.-dollarized economies, a fiscal reality that made Iran's funding of its terror proxies a highly "dollar-sensitive" endeavor.

163.     *Fifth*, in order to free itself from U.S. economic sanctions, and circumvent the U.S., European Union ("EU") and United Nations ("U.N.") monitoring of its financial activities, Iran needed more than a single willing partner among Western financial institutions to assist its illegal goals.

164.     *Finally*, Iran needed the active assistance of at least *several* of the world's *largest* (non-U.S.) multinational banks that were already accustomed to handling large volumes of dollar clearing and settlement transactions, and thus would be less likely to raise suspicions with U.S. authorities.

165.     For example, in early 2001, the Central Bank of Iran asked Defendant Standard Chartered Bank to act as its correspondent bank with respect to Iranian petrodollar payments, trade-finance and foreign exchange transactions on behalf of NIOC.

166.     As set forth *infra*, Standard Chartered Bank agreed to participate in the Conspiracy and deliberately removed identifying data on NIOC's payment orders (SWIFT-NET MT 103 and MT 202 payment order messages) for these and other wire transfers.

167.    The sheer size and volume of these NIOC transactions would have raised numerous red flags if not undertaken by a bank of SCB's size and existing USD clearing and settlement volume.

168.    However, even the large international banks worried about attracting attention from U.S. authorities when their illegal dollar clearing activities for Iran markedly increased.

169.    For example, as detailed below, in 2003, Defendant Commerzbank's employees expressed concern that Commerzbank's increased volume of illegal Eurodollar clearing activities on behalf of Bank Melli and Bank Saderat would draw unwanted attention.

170.    In the spring of 2006, the Manhattan District Attorney's Office first discovered evidence of the Conspiracy engaged in by certain European banks (including the Western Bank Defendants herein) on behalf of Iran and Iranian banks.

171.    As the New York State Department of Financial Services ("DFS") later observed:

> By 2008 it was clear that this system of wire transfer checks had been abused, and that U.S. foreign policy and national security could be compromised by permitting U-Turns to continue. In November 2008, the U.S. Treasury Department revoked authorization for "U-Turn" transactions because it suspected Iran of using its banks – including the CBI/Markazi, Bank Saderat and Bank Melli – to finance its nuclear weapons and missile programs. *The U.S. also suspected that Iran was using its banks to finance terrorist groups, including Hezbollah, Hamas and the Palestinian Islamic Jihad, and engaging in deceptive conduct to hide its involvement in various other prohibited transactions, such as assisting OFAC-sanctioned weapons dealers*.  [Emphasis added].

172.    These findings led to a wide-ranging investigation that ultimately resulted in the entry of a series of Deferred Prosecution Agreements ("DPAs") with the Western Bank Defendants (as well as other European and Japanese banks), and it exposed catastrophic vulnerabilities in America's counter-financing of terrorism ("CFT") security architecture inherent in the U-Turn exemption because foreign banks, including the Western Bank Defendants herein, were actively

conspiring with Iran to help it evade U.S. economic sanctions and secret hundreds of billions of dollars through the U.S. financial system undetected.

173.    On October 11, 2007, the Financial Action Task Force ("FATF") released a statement of concern that "Iran's lack of a comprehensive anti-money laundering/counter-terrorist finance regime represents a significant vulnerability within the international financial system."

174.    FATF's October 11, 2007 statement further noted that "FATF members are advising their financial institutions to take the risk arising from the deficiencies in Iran's AML/CFT regime into account for enhanced due diligence."

175.    The U.S. criminal investigations would ultimately find that "the risk arising from the deficiencies in Iran's AML/CFT regime" ultimately included willful money laundering and terror financing by Iran with the *active*, ***critical*** assistance of the Defendants herein.

176.    Based on figures from both the International Monetary Fund and the Central Bank of Iran, from 2004 through 2011 Iran's total revenues from oil and natural gas export sales totaled approximately $972.9 billion USD.

177.    Without the Conspiracy between the Defendants herein, and other foreign financial institutions, Iran could not have (a) transferred the overall volume of USD funds through the international financial system that it did; (b) surreptitiously transferred large amounts of these USD funds for the benefit of Hezbollah and the IRGC; and (c) exploited the Iranian U-Turn exemption to blind U.S. regulators and law enforcement to the degree, and for the duration, that it did.

178.    As former Manhattan District Attorney Robert M. Morgenthau pointedly told Congress in 2009, "the U-Turn exemption constituted a glaring hole that undermined both the enforcement of, and the rationale behind, the Iranian sanctions program."

36

179.     Effective November 10, 2008, OFAC revoked the U-Turn exemption in its entirety, and, as of that date, U.S. depository institutions were no longer authorized to process any Iranian U-Turn payments.

180.     In revoking the U-Turn exemption, the U.S. government explained:

> Iran's access to the international financial system enables the Iranian regime to facilitate its support for terrorism and proliferation. The Iranian regime disguises its involvement in these illicit activities through the use of a wide array of deceptive techniques, specifically designed to avoid suspicion and evade detection by responsible financial institutions and companies. Iran also is finding ways to adapt to existing sanctions, including by turning to non-designated Iranian banks to handle illicit transactions.

> The Treasury Department is taking a range of measures, including today's action, to counter these deceptive activities.

**F.     LETTERS OF CREDIT – AN ALTERNATIVE METHOD OF UNDERMINING THE IRANIAN SANCTIONS PROGRAM**

**1.     Terminology**

181.     Letters of Credit ("LCs") are often used in international transactions to ensure that payment will be received. Due to the nature of international transactions, including factors such as the distance goods must travel, differing laws in each country, and the difficulty of trading parties knowing each party personally, the use of LCs has become a very important aspect of international trade.

182.     The LC transaction process begins when an "Applicant" opens the Letter of Credit with a bank.

183.     Normally, the Applicant is the purchaser of goods and the LC is opened with his/her bank according to the terms and conditions of the purchase order and business contract between buyer and seller.

184.    The "Beneficiary" of the LC is the party to the transaction who receives the payment amount agreed upon in the LC.

185.    In order to receive payment for the goods, the Beneficiary company submits all required documents under the terms and conditions of the LC.

186.    When an LC is required to be secured, an "Issuing Bank" agrees to guarantee payment for its customer upon the completion of the terms and conditions of the LC.

187.    The Issuing Bank's role is to provide a guarantee to the seller that if the required documentation is presented, the bank will examine the documents and pay the contract sum if these documents comply with the terms and conditions set out in the LC.

188.    Typically, the documents requested will include a commercial invoice, a transport document such as a bill of lading or airway bill and an insurance document; there are many other documents such as certificates of origin, packing lists and inspection certificates that can be included. LC transactions deal in documents, not in the underlying goods themselves.

189.    An "Advising Bank" is usually a foreign correspondent bank of the Issuing Bank that will advise the beneficiary of the transaction. Generally, a Beneficiary of an LC wants to use a local bank to insure that the LC is valid.

190.    In addition, the Advising Bank is usually responsible for sending the documentation to the Issuing Bank. Generally, the Advising Bank has no other obligation under the LC. If the Issuing Bank does not pay the beneficiary, the Advising Bank is not obligated to pay the obligation under the LC.

191.    The "Confirming Bank" is usually a correspondent bank that confirms the LC for the Beneficiary. At the request of the Issuing Bank, the Confirming Bank obligates itself to ensure payment under the LC.

192.     Because the Confirming Bank does not confirm the credit until it evaluates the country and bank where the LC originates, the Confirming Bank usually acts as the Advising Bank.

193.     In the middle of this serpentine process is the "Negotiating Bank," which negotiates documents delivered by the Beneficiary of the LC.

194.     The Negotiating Bank examines the drafts and/or documents, and verifies and confirms the terms and conditions under the LC on behalf of the Beneficiary to avoid discrepancies.

195.     A Negotiating Bank gives value to, and relies upon (or may rely upon), such drafts and/or documents, and may purchase or agree to purchase the drafts and/or documents presented.

196.     A Reimbursing Bank usually pays part or all of the amount due to the Beneficiary of the LC on behalf of the Issuing Bank once it receives a statement from the Negotiating Bank that the documents required comply with the LC's terms; however, in certain cases a Reimbursing Bank serves only as a guarantor for the payment by the Issuing Bank.

> **2.     The U.S. Trade Embargo – United States Munitions List (USML) and Commerce Control List (CCL)**

197.     For decades, U.S. trade with Iran has been carefully circumscribed by the International Traffic in Arms Regulations ("ITARs"), Export Administration Regulations ("EARs"), and Iran Trade Regulations ("ITRs").

198.     Certain types of U.S. defense articles and defense services, such as nuclear or conventional weapon systems, are identified based on the ITARs promulgated by the U.S. Department of State and its Directorate of Defense Trade Controls through a publically available United States Munitions List ("USML").[16]

---

[16]     The updated USML is available at:
https://www.pmddtc.state.gov/regulations_laws/documents/official_itar/ITAR_Part_121.pdf.

199.    In addition to USML items, certain types of U.S. dual-use products, such as nuclear materials, aerospace and other potentially sensitive materials, are identified based on the EARs and ITRs by the U.S. Department of Commerce and its Bureau of Industry and Security ("BIS") on a publicly available Commerce Control List ("CCL").[17]

200.    Dual-use items that are not published on the CCL by BIS are commonly referred to by U.S. manufacturers and shipping companies as "EAR99."

201.    These EAR99 items generally consist of low-technology consumer goods and do not always require a license; however, shipment from the United States of an EAR99 item to Iran, or any other embargoed country, often requires disclosure to BIS in addition to a license from the Commerce Department.

202.    As set forth below, one of the aims of the Conspiracy was to evade the U.S. ITARs, ITRs, and EARs—and also various EU decisions and U.N. Security Council Resolutions—prohibiting Iran from conducting both conventional weapons-trafficking and WMD proliferation.

203.    To facilitate this aim, Iran and its Co-Conspirators, including the Defendants herein, used LCs drawn on the CBI and other Iranian banks (and "stripped" the underlying payment orders), to clandestinely obtain and transport goods, technologies and weapons that were listed on the USML and/or CCL.

204.    Because the IRGC and Hezbollah needed to transport their terrorist operatives and weapons into Iraq, U.S. export-controlled item acquisitions financed by Letters of Credit were instrumental in facilitating the activities of these terrorist organizations, including, but not limited to, helping Iran acquire component parts and technologies used to make the IEDs, EFPs, and

---

[17]    The updated list is available at http://www.bis.doc.gov/index.php/regulations/export-administration-regulations-ear.

Improvised Rocket-Assisted Munitions ("IRAMs") that were deployed by the Iraqi Special Groups against Coalition Forces.

### G.    IRAN'S ILLEGAL ARMS SHIPMENTS THROUGH ISLAMIC REPUBLIC OF IRAN SHIPPING LINES (IRISL)

205.    As Iran's national maritime carrier, IRISL has a long history of facilitating arms shipments on behalf of the IRGC and the Iranian military, including copper discs that are a key component in EFPs (discussed below) used to kill and maim many of the Plaintiffs herein.[18]

206.    For example, a November 2007 State Department cable noted:

> Washington remains concerned about on-going conventional arms transfers from China to Iran, particularly given Iran's clear policy of providing arms and other support to Iraqi insurgents and terrorist groups like the Taliban and Hezbollah….
>
> We have specific information that Chinese weapons and components for weapons transferred to Iran are being used against U.S. and Coalition Forces in Iraq, which is a grave U.S. concern.

207.    The diplomatic cable went on to note that an IRISL-flagged vessel was loaded at a Chinese port with multiple containers of cargo bound for delivery at the port of Bandar Abbas, Iran.

208.    The cargo included Iranian Defense Industries Organization ("DIO")[19] manufactured ammunition cartridges (7.62 x 39 rounds for AK-47 assault rifles).

---

[18]    Improvised Explosive Device ("IED") is a term commonly used by the U.S. military as shorthand for a roadside bomb. However, unlike IEDs, the EFPs deployed by the IRGC, Hezbollah and the Special Groups in Iraq were not "improvised," but, instead, these advanced weapons were professionally manufactured and specifically designed to defeat the armor plating that protected the vehicles used by U.S. and Coalition Forces.

[19]    DIO was designated an SDN by the U.S. on March 30, 2007. IRGC Brigadier-General Seyyed Mahdi Farahi was the Managing Director of DIO and has been sanctioned by the EU since 2008 (*see,* http://eur-lex.europa.eu/legal-content/EN/TXT/?uri=CELEX%3A32008D0475). He was later sanctioned by the U.S. on January 17, 2016.

209.    DIO is an Iranian government-owned weapons manufacturer controlled by MODAFL.

210.    An April 2008 State Department cable warned of an IRISL shipment of chemical weapons precursors from China aboard the IRISL-leased, Iranian flagged merchant vessel ("M/V") *Iran Teyfouri*.

211.    In September 2008, the U.S. Treasury Department designated IRISL an SDN, stating: "Not only does IRISL facilitate the transport of cargo for U.N. designated proliferators, it also falsifies documents and uses deceptive schemes to shroud its involvement in illicit commerce."

212.    The Treasury Department further noted that:

> [i]n order to ensure the successful delivery of military-related goods, IRISL has deliberately misled maritime authorities through the use of deception techniques. These techniques were adopted to conceal the true nature of shipments ultimately destined for MODAFL [Iran's Ministry of Defense and Armed Forces Logistics].

213.    In January 2009, a former Russian merchant ship chartered by IRISL—named the M/V *Monchegorsk* and flying a Cypriot flag—was spotted leaving the Iranian port of Bandar Abbas and heading for the Suez Canal.

214.    Egyptian authorities were alerted by the U.S. Navy, and the M/V *Monchegorsk* was forced into an Egyptian port to be searched. Iran's DIO was later determined to be the shipper of the military-related cargo.

215.    Munitions, believed headed for Gaza, were found hidden in the cargo, including components for mortars and thousands of cases of powder, propellant, and shell casings for 125mm and 130mm guns.

216.    In October 2009, U.S. troops boarded a German-owned freighter, the M/V *Hansa India*, in the Gulf of Suez and found eight containers full of ammunition that were headed to Syria from Iran.

217.    The vessel carried seven containers of small arms ammunition (including 12 million bullet casings), as well as one container containing copper discs of the type used in EFPs to kill and maim many of the Plaintiffs herein.

218.    The acronym "IRISL" was painted in large block letters on the exterior side walls of each shipping container, and the barrels of munition parts discovered inside the containers were marked with the inscription "SAEZMANE SANAYE DEFA," a common transliteration from Farsi to English of the name for Iran's Defense Industries Organization (DIO).

219.    The M/V *Hansa India* was registered to the Hamburg-based shipping company Leonhardt & Blumberg, but had been under charter to IRISL for several years.

220.    In November 2009, the Government of Israel intercepted an IRISL-flagged ship, the M/V *Francop*, headed for Beirut, Lebanon and then Latakia, Syria. The vessel was loaded with munitions crates that were either stamped "IRISL" or included documentation marked with the IRGC-QF logo.

221.    The munitions found onboard included over two thousand 107mm "Katyusha" rockets, more than six hundred 122mm "Grad 20" rockets, and also various rocket fuses, mortar shells, rifle cartridges, fragment grenades and 7.62mm bullets.

222.    The M/V *Francop*, owned by the Cypriot shipping company UFS, was carrying shipping containers clearly marked IRISL.

223.    United Nations Security Council Resolution 1929, adopted on June 9, 2010, froze certain assets of IRISL and called on the international community to cease providing financial and

insurance services to both the IRGC and IRISL.

224.    In addition, a July 2010 European Union ("EU") sanctions implementing regulation confirmed that IRISL conducted deceptive business practices in order to access USD funds.

225.    Specifically, EU Council Implementation Regulation Number 668/2010 stated that "IRISL subsidiaries have used US dollar-denominated bank accounts registered under cover-names in Europe and the Middle East to facilitate routine fund transfers."

226.    Similarly, the June 2011 indictment of IRISL in New York stated:

> In many aspects of global commerce, including the international maritime industry, contracts and payments are denominated in U.S. dollars. Such U.S. dollar transactions are primarily executed, or "cleared," through correspondent banks in the United States. The U.S. dollar clearing operations for many large U.S. financial institutions are processed through correspondent bank accounts domiciled in New York County.

> In order to deceive and bypass these OFAC filters, SDNs designated under OFAC's non-proliferation of weapons of mass destruction program must falsify, or cause to be falsified, the originator and/or beneficiary information in wire transfers. In other words, by omitting or falsifying data regarding their roles as the true originators or beneficiaries, SDNs are able to send and receive wire transfers that would otherwise be blocked by U.S. financial institutions. Through the fraudulent use of a web of subsidiary entities and front companies, IRISL and the other defendants were able to deceive U.S. financial institutions and maintain their access to the U.S. financial system.

227.    Because the DIO, as discussed *infra*, was one of MODAFL's three main weapons systems manufacturers, it was required to use IRISL for most of its illicit shipments of military-related raw-materials, parts and finished products for, and from, foreign suppliers, Iranian arms dealers and terrorist organizations.

228.    Iran's DIO was listed as an entity of concern for military procurement activities in an early warning document distributed by the German government to industry in July 2005.

229.    The DIO was also designated by the United Nations in 2006 for its involvement in Iran's WMD program.

230.    During 2006 and 2007, weapons caches seized by Coalition Forces from the Special Groups in Iraq contained large quantities of weapons produced by Iran; including many 107 millimeter artillery rockets with closely clustered DIO lot numbers and production dates between 2005 and 2007, as well as rounds and fuses for 60 millimeter and 81 millimeter mortars with DIO lot markings and 2006 production dates.

231.    In sum, at no point in time was the DIO a legitimate agency of the Iranian government.

232.    According to the U.S. State Department, the DIO was the owner of a Eurodollar account that was maintained by Bank Melli Iran's branch in Hamburg; and this bank account was used to send and receive USD funds transfer transactions for the benefit of the DIO.

233.    Bank Melli Iran's branch in Hamburg was a customer of Defendant Commerzbank during the relevant period, and both Bank Melli Iran and Commerzbank were active participants in the Conspiracy set forth herein.

**H.    THE IRGC AND HEZBOLLAH COMMITTED ACTS OF INTERNATIONAL TERRORISM AT IRAN'S DIRECTION IN WHICH PLAINTIFFS WERE FORESEEABLY INJURED**

234.    As previously noted, Iran has had a long, deep, strategic partnership with the Lebanese-based Foreign Terrorist Organization Hezbollah, which historically has served as Iran's proxy and agent, enabling Iran to project extremist violence and terror throughout the Middle East and around the globe.

235.    After the U.S. and its Coalition partners invaded Iraq in March 2003, Iran embarked on a calculated and carefully calibrated campaign in Iraq.

236.    Iran's multifaceted goals included killing and maiming U.S. service members and other Coalition Forces (primarily Polish and British personnel), as well as Iraqi civilians, in Iraq

in order to induce Coalition Forces to leave Iraq; expanding Iranian influence in Iraq; and promoting an Iraqi government subservient to Iran.

237.    Iran was unable to confront the U.S. with its conventional military, or to risk provoking a U.S. military response, so it decided to employ its preferred method of statecraft: a terror campaign.

238.    Iran's two primary instruments for conducting this terrorist campaign against Coalition Forces were Lebanese Hezbollah (designated a Foreign Terrorist Organization by the United States in 1997) and the IRGC (designated an SDGT by the United States in 2017) including its foreign operations and terrorism directorate, the IRGC-QF (designated an SDGT by the United States in 2007).

239.    The United States designated the IRGC-QF an SDGT for, *inter alia*, "provid[ing] lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants who target and kill Coalition and Iraqi forces and innocent Iraqi civilians."

240.    In 2017, Congress found that the IRGC-QF "is the primary arm of the Government of Iran for executing its policy of supporting terrorist and insurgent groups. The IRGC-QF provides material, logistical assistance, training, and financial support to militants and terrorist operatives throughout the Middle East…."

241.    While the IRGC and the IRGC-QF were responsible for managing Iran's terror campaigns abroad, they lacked recent operational and tactical experience in developing terrorist capabilities and performing terrorist attacks against a modern military force. Moreover, as ethnically Persian, Farsi-speaking entities, IRGC personnel were at a disadvantage in recruiting and training ethnically Arab, Arabic-speaking Shi'a Iraqis.

242.    For that purpose, the IRGC-QF therefore turned to FTO Hezbollah, Iran's Lebanese

long-standing terror proxy, which had hard-earned experience in running terror campaigns against the Israel Defense Forces in Lebanon, and which shared ethnic and language connections with Iraqis.

243.    Hezbollah and the IRGC-QF worked symbiotically to plan, authorize, and commit attacks on Coalition Forces in Iraq. They accomplished this by developing agents among the Shi'a population in Iraq, providing them with funding, weapons, and training, and then guiding and directing them to attack Coalition Forces.

244.    Specifically, the IRGC-QF and Hezbollah provided these proxies with sophisticated weapons specially designed to inflict casualties on the well-protected Coalition Forces—principally, EFPs and IRAMs, along with the Tactics, Techniques, and Procedures ("TTPs") developed by Hezbollah necessary to use them most effectively.

245.    These Shi'a proxies included:

- **Badr Corps/Badr Organization**,
- **Jaysh al-Mahdi** ("JAM" or the "Mahdi Army") including the Promised Day Brigades
- **Asa'ib Ahl Al-Haq** ("AAH" or the "League of the Righteous")
- **Kata'ib Hezbollah** (KH) (designated an FTO in 2009).

246.    Although the precise roles and proficiencies of these groups evolved over time, at all relevant times each acted as the agent of Hezbollah and the IRGC-QF in attacking Coalition Forces.

247.    The IRGC-QF provided EFPs to their proxies for the *exclusive* purpose of targeting Coalition Forces, and Hezbollah's advanced EFP training was provided exclusively to these cells to improve their emplacement of EFPs against Coalition armored vehicles. The IRGC-QF and

Hezbollah were the sole source of the weapons.[20]

248.    These terror cells served as EFP emplacers (or in some cases, trigger pullers) for the IRGC-QF and Hezbollah. They were generally not permitted to use their independent judgment in choosing their targets (they were often directed to select a particular date or location for an attack, and even required to provide visual evidence that they had carried out the IRGC's directives). If a group or cell failed to comply with the IRGC's directives it could be deprived of EFPs and other support. EFPs were carefully controlled. For example, "[e]ach major arms cache [had] a 'hide custodian' who signs out weapons such as EFPs and is responsible for their proper use against U.S. forces and the minimization of Iraqi casualties."[21]

249.    When EFPs were misused, the IRGC would cut the group off.[22]

250.    A 2010 Department of Defense report confirmed that weapons Iran delivered to Shi'a groups in Iraq included EFPs (with radio-controlled, remote arming and passive infrared detonators), IEDs, anti-aircraft weapons, mortars, 107 and 122mm rockets, rocket-propelled grenades and launchers, explosives, and small arms.

251.    In the post-invasion period, the lethatlity of Shi'a attackson U.S. and Coalition Forces was the direct result of the IRGC's policy. And the terrorist cells that in fact targeted U.S. service members were created and sustained by the IRGC and Hezbollah for that purpose.

### 1.    The IRGC

252.    The IRGC is a paramilitary force answerable only to the Supreme Leader of Iran

---

[20]    In 2007, when AAH founder Qais Khazali was captured by Coalition Forces, he acknowledged that "EFPs still come solely from Iran and there is currently nobody in Iraq manufacturing the components of an EFP."

[21]    *See* Michael Knights, The Evolution of Iran's Special Groups in Iraq, CTC Sentinel, U.S. Military Academy at West Point (Nov. 2010), *available at* https://ctc.usma.edu/app/uploads/2011/05/CTCSentinel-Vol3Iss11-127.pdf.

[22]    On rare occasions, certain elements defied this directive. For example, EFPs were used in the assassinations of two provincial governors and two provincial police chiefs in the latter half of 2006. The U.S. military assessed that these events were contrary to IRGC policy.

himself. As the Supreme Leader's personal force, the IRGC's devotion to Ayatollah Khamenei is "a religious imperative." The IRGC differs from Iran's "regular" armed forces, which ostensibly functions under a national command structure. The IRGC is tasked with "protecting the revolution," which it does by silencing perceived enemies at home through secret police methods and attacking perceived enemies abroad (via its Qods Force) through terrorist tactics. It also aids in Iran's development of weapons of mass destruction, including EFPs and IRAMs and its nuclear program.

253.    As the U.S. Treasury Department explained in designating the IRGC an SDGT, "[t]he IRGC has played a central role to Iran becoming the world's foremost state sponsor of terror." Treasury also designated the IRGC "for the activities it undertakes to assist in, sponsor, or provide financial, material, or technological support for, or financial or other services to or in support of" its foreign operations directorate, the IRGC-QF.

254.    Also, in 2017, Congress found that "the IRGC, not just the IRGC-QF, is responsible for implementing Iran's international program of destabilizing activities, support for acts of international terrorism, and ballistic missile program."

255.    As the U.S. Treasury Department explained in designating the IRGC for a third time, it was also "previously designated pursuant to E.O. 13382 on October 25, 2007, in connection with its support to Iran's ballistic missile and nuclear programs, and pursuant to E.O. 13553 on June 9, 2011 and E.O. 13606 on April 23, 2012, in connection with Iran's human rights abuses."

256.    To fund and supply its terror apparatus, the IRGC owns or controls a significant number of Iran's private and public companies. According to a 2007 *Los Angeles Times* report, the IRGC has ties to over 100 companies, controlling billions of dollars in assets. These funds fuel the IRGC's terrorist operations, secret policing, and WMD efforts.

257.    As a Council on Foreign Relations assessment has noted, the IRGC is:

[H]eavily involved in everything from pharmaceuticals to telecommunications and pipelines – even the new Imam Khomeini Airport and a great deal of smuggling. Many of the front companies engaged in procuring nuclear technology are owned and run by the Revolutionary Guards. . . . It's a huge business conglomeration.

258.    The U.S. has designated these businesses or identified them as IRGC agents whenever possible. For example, 143 entities and individuals are currently sanctioned as operating under IRGC control (more were sanctioned during the relevant period, but some sanctions were removed as a result of negotiations related to the Joint Comprehensive Plan of Action, also known as the "Iran Nuclear Deal").These include Khatam al-Anbia, which, according to the U.S. Treasury Department, is "a construction and development wing of the IRGC that generates income and *funds operations for the IRGC*."

259.    It also includes the National Iranian Oil Company ("NIOC"), which the U.S. Treasury Department found was "an agent or affiliate of the" IRGC. As a result, the U.S. Treasury Department blocked NIOC's property pursuant to the International Emergency Economic Powers Act. "This means that foreign financial institutions determined to knowingly facilitate significant transactions or provide significant financial services for NIOC will be subject to [Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010] sanctions, including the prohibition or the imposition of strict conditions on the opening or maintaining of correspondent or payable-through accounts in the United States."

260.    These businesses are crucial to the IRGC's terror apparatus. The IRGC pays salaries of vast numbers of personnel both in Iran and abroad (including in Iraq) and funds training centers and schools for up-and-coming terrorists. It also funds an enormous weapons production system, from ballistic missiles to EFPs.

261.    In designating the IRGC's Basij militia (Basij is one of the IRGC's armed force components), the U.S. Treasury Department explained that IRGC and other elements of the Iranian military "have expanded their economic involvement in major industries and infiltrated seemingly legitimate businesses to fund terrorism and other malign activities. This vast network provides a financial lifeline to the Basij's efforts to recruit, train, and indoctrinate child soldiers as young as twelve who are coerced into combat under the IRGC's direction."

262.    In short, the IRGC funds its primary operations—terrorism, domestic repression and WMD development—through corporations under its control.

## 2.    IRGC-QF

263.    In July 2007, MNF-I spokesman General Kevin J. Bergner briefed the media on how the IRGC-QF employed Hezbollah operatives in Iraq: "Iran's Quds Force, a special branch of Iran's Revolutionary Guards, is training, funding and arming the Iraqi groups…. Iranian operatives are using Lebanese surrogates to create Hezbollah-like capabilities. And it paints a picture of the level of effort in funding and arming extremist groups in Iraq."

264.    In October 2007, the U.S. Treasury Department designated the IRGC-QF as an SDGT, finding:

> The Qods Force has had a long history of supporting Hizballah's military, paramilitary, and terrorist activities, providing it with guidance, funding, weapons, intelligence, and logistical support. The Qods Force operates training camps for Hizballah in Lebanon's Bekaa Valley and has reportedly trained more than 3,000 Hizballah fighters at IRGC training facilities in Iran. The Qods Force provides roughly $100 to $200 million in funding a year to Hizballah and has assisted Hizballah in rearming in violation of UN Security Council Resolution 1701.
>
> In addition, the Qods Force provides lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants who target and kill Coalition and Iraqi forces and innocent Iraqi civilians.

265.    The U.S. State Department's Country Reports on Terrorism for 2007 stated:

The [IRGC-QF] continued to provide Iraqi militants with Iranian-produced advanced rockets, sniper rifles, automatic weapons, mortars that have killed thousands of Coalition and Iraqi Forces, and explosively formed projectiles (EFPs) that have a higher lethality rate than other types of improvised explosive devised (IEDs) and are specially designed to defeat armored vehicles used by Coalition Forces. The Qods Force, in concert with Lebanese Hezbollah, provided training outside Iraq for Iraqi militants in the construction and use of sophisticated IED technology and other advanced weaponry.

266.     The U.S. State Department's Country Reports on Terrorism for 2008 reported that Iran was:

Provid[ing] lethal support, including weapons, training, funding, and guidance, to Iraqi militant groups that targeted Coalition and Iraqi forces and killed innocent Iraqi civilians. Iran's Qods Force continued to provide Iraqi militants with Iranian-produced advanced rockets, sniper rifles, automatic weapons, and mortars that have killed Iraqi and Coalition Forces as well as civilians. Tehran was […] providing militants with the capability to assemble improvised explosive devices (IEDs) with explosively formed projectiles (EFPs) that were specially designed to defeat armored vehicles. The Qods Force, **in concert with Lebanese Hezbollah,** provided training both inside and outside of Iraq for Iraqi militants in the construction and use of sophisticated IED technology and other advanced weaponry. (Emphasis added.)

267.     On January 9, 2008, the U.S. Department of the Treasury designated Ahmed Foruzandeh, a Brigadier General in the IRGC-QF, finding:

As of mid-February 2007, Foruzandeh ordered his Iranian intelligence officers to continue targeting Shia and Sunnis to further sectarian violence within Iraq. Foruzandeh is also responsible for planning training courses in Iran for Iraqi militias, including Sayyid al-Shuhada and Iraqi Hizballah [KH], to increase their ability to combat Coalition Forces. The training includes courses in guerilla warfare, light arms, marksmanship, planting improvised explosive devices (IEDs), and firing anti-aircraft missiles.

268.     At a July 2, 2007 press briefing, General Bergner noted:

The Qods Force also supplies the special groups with weapons and funding of 750,000 to 3 million U.S. dollars a month. Without this support, these special groups would be hard pressed to conduct their operations in Iraq […] The Qods Force goal was to develop the Iraqi special groups into a network similar to the Lebanese Hezbollah. Special groups would be unable

52

to conduct their terrorist attacks in Iraq without Iranian-supplied weapons and other support.

### 3. Lebanese Hezbollah and Unit 3800

269. As noted above, the relationship between the Iranian regime and Hezbollah is, and has been since the latter's creation, symbiotic.

270. The early Lebanese Shi'a clerics who emerged from the seminaries in Najaf (Iraq) and Qom (Iran) included Musa al-Sadr and Ayatollah Muhammad Hussein Fadlallah (Hezbollah's spiritual leader).

271. Like the late Ayatollah Muhammad Sadiq al-Sadr in Iraq, Musa al-Sadr is credited with first mobilizing the previously passive and marginalized Shi'a community in Lebanon by inspiring the foundation of the Amal movement which eventually gave birth to Hezbollah.

272. Musa al-Sadr disappeared (and was likely murdered) in Libya in 1978 which created an opening for Sadr's contemporary, Muhammad Hussein Fadlallah, to whom much of Musa al-Sadr's influence and power passed.

273. In June 1982, Sayyid Hussein al-Musawi, a member of Amal's command council, broke with the movement and founded "Islamic Amal," which soon transformed into Hezbollah.

274. Hezbollah's founders also included Subhi al-Tufayli, Muhammad Yazbek, Na'im Qasim, Ibrahim Amin al-Sayyid, and Hassan Nasrallah (who would later emerge as Hezbollah's leader).

275. Inspired by the success of Iran's Islamic revolution and influenced by Ayatollah Khomeini's ideological worldview, these young fanatics set to work building a network in Lebanon that was directly answerable to the Iranian Supreme Leader.

276. Since the early 1980s, Iran's IRGC has helped Hezbollah equip itself not only with vast supplies of weapons and explosive devices but also with broadcasting, healthcare, and

educational centers to expand its political and social reach within Lebanon. For example, Iran spends millions of dollars in Lebanon on the construction of bridges, roads, schools, and hospitals.

277.    To this day, Ayatollah Ali Khamenei, the current supreme leader of the Islamic Republic, maintains various offices in the southern suburbs of Beirut and in southern Lebanon. These offices serve as the official religious headquarters of the Ayatollah, but the Iranian intelligence service and Hezbollah also use these facilities for information gathering, political and security meetings, and surveillance, and as military courts for their prisoners.

278.    The Iranian government hosts hundreds of Hezbollah-affiliated Lebanese students each year in Iranian universities and seminaries, especially in Qom.

279.    The Iranian-funded welfare programs for Lebanese Shi'a are backed by a very professional and energetic propaganda machine that not only extols Hezbollah and its Iranian patron but also seeks to elevate Khamenei, who competes with the Grand Ayatollah Ali Hussein al-Sistani (based in Iraq) who espouses a less overtly political form of Shi'ism.

280.    Iranian clerics, especially Ayatollah Khamenei (with the help of the IRGC) pay monthly salaries to the roughly 2,500 Shi'a clerics of Lebanon, further cementing their loyalty to the Iranian regime.

281.    When Hezbollah leader Hassan Nasrallah met with Iran's supreme leader Ayatollah Khamenei in 2001, Nasrallah publicly kissed Khamenei's hand, a gesture heavy with meaning among the Shi'a: it implied that Nasrallah accepts Khamenei as his leader.

282.    Yet, when the U.S. entered Iraq in 2003, there was no immediate expectation that Hezbollah would follow.

283.     One of the first indications that Hezbollah operatives might be present in Iraq after the U.S.-led invasion came in an article in *The New York Times* published in November 2003 that stated:

> Both American and Israeli intelligence have found evidence that Hezbollah operatives have established themselves in Iraq, according to current and former United States officials. Separately, Arabs in Lebanon and elsewhere who are familiar with the organization say Hezbollah has sent what they describe as a security team of up to 90 members to Iraq. The organization has steered clear of attacks on Americans, the American officials and Arabs familiar with Hezbollah agree.

284.     In retrospect, another early warning sign occurred in May 2003 when Israeli naval commandos seized a small fishing boat off the country's northern coast and captured a Hezbollah explosives expert who had bomb detonators and computer disks on board.

285.     The computer disks contained instructions on how to manufacture and assemble EFPs, providing granular details on the key elements required to make them effective against armored vehicles, including the specifications for the concave copper liners needed for maximum lethality.

286.     Sometime in 2003, the IRGC-QF instructed Hezbollah to create "Unit 3800," an entity dedicated to developing and supporting Iraqi Shi'a terrorist cells which would execute IRGC and Hezbollah attacks on Multi National Forces in Iraq ("MNF-I").

287.     Unit 3800 was established by Hezbollah leader Hassan Nasrallah at Iran's behest.

288.     Unit 3800 later trained, advised and directed the JAM "Special Groups" and Badr Corps in Iraq.

289.     Hezbollah's expertise in the use of EFPs, kidnapping, communications and small-unit operations were critical to the effectiveness of the IRGC's proxies in Iraq between 2004 and 2011.

290.     As former Badr Corps leader and KH founder Abu Mahdi al-Muhandis (discussed below) would later explain to the Hezbollah-affiliated channel *Al-Mayadeen*:

> **Muhandis:** Of course, my relationship with martyr Imad, the great martyr Imad [Mughniyah], and martyr Mustafa Badr a-Din, started in the early 1980s. This was a strong and operational relationship. The first ones to train the first Iraqi jihadi resistance groups in the beginning of the 1980s were Imad and Mustafa. They also had a major role in organizing the resistance cells against the Americans in Iraq.
>
> **Host:** Training Iraqis here, to fight the Americans?
>
> **Muhandis:** Sure, they trained Iraqis. The first Iraqi cells, I was among them, after 2003.
>
> **Host:** After 2003…
>
> **Muhandis:** They had a major role, their brothers and men still have an essential role in training and planning… they have a very important role.

291.     A 2010 Department of Defense report noted that "Lebanese Hizballah provides insurgents with the training, tactics and technology to conduct kidnappings, small unit tactical operations and employ sophisticated IEDs."

292.     A July 2004 UK Joint Intelligence Committee ("JIC") assessment noted: "We also judge that Lebanese Hizballah will retain an influence in Iraq (Hizballah members may have been linked to the group that attacked the Sheraton Hotel) and could supply Iraqi groups with terrorist expertise and munitions."

293.     Tracing Hezbollah's carefully monitored introduction of EFPs, the UK Defence Intelligence Staff ("DIS") accurately predicted on Aug. 3, 2004, the evolution of the IED threat in Iraq: "IED technology in use with other Middle Eastern groups[,] especially Lebanese Hizballah, can be expected to appear in Iraq. This would include multiple systems, such as RC (Radio-Controlled) switched PIRs [Passive Infrared]."

294.    By the summer of 2004, British intelligence had detected the EFP's appearance in

southern Iraq:

> On 26 July, the DIS reported that an EFP IED had been found on 15 July in Baghdad. The DIS noted that the EFP IED design had not previously been encountered in Iraq but was, as with the find in May 2004, of a type associated with Lebanese Hizballah. There were also indications of Iranian involvement in the construction of the devices.

295.    On December 2, 2004, a British Defence Intelligence Report titled "The Evolution

of the IED Threat in Iraq" stated:

> Improvement in IED technology has been most significant in Shia areas since May [20]04, where technical progress has been made that we assess could only have been achieved through focused external assistance. **We assess that this may be due to an influx of Lebanese Hezbollah IED technology under Iranian sponsorship."** (Emphasis added.)

296.    Similarly, the United States Department of State Country Reports on Terrorism

2006 reported:

> Since at least 2004, Hizballah has provided training and logistics to select Iraqi Shia militants, including for the construction and use of shaped charge IEDs, which Hizballah developed against Israeli forces in southern Lebanon during the late 1990s and which can penetrate heavily armored vehicles.

297.    An Australian government reported in 2006:

> Hizballah has established an insurgent capability in Iraq, engaging in assassinations, kidnappings and bombings. The Hizballah units have been set up with the encouragement and resources of Iran's Revolutionary Guards al Qods Brigades. Hizballah has also established a special training cell known as Unit 3800 (previously known as Unit 2800) specifically to train Shia fighters prior to action in Iraq.

## V.    THE IRGC-QF'S AND HEZBOLLAH'S DEVELOPMENT AND DIRECTION OF SHI'A TERRORIST GROUPS AND CELLS IN IRAQ TO ATTACK COALITION FORCES.

### A.    THE BADR CORPS/BADR ORGANIZATION

298.    The Badr Corps was established in 1982 as the military wing of the Supreme

Council for Islamic Revolution in Iraq ("SCIRI"), which was founded by Muhammad Baqr Hakim

in the same year. The Badr Corps and SCIRI served as part of the Iranian attempt to influence Shi'a Iraqis during the Iran-Iraq war. The Badr Corps fought Saddam Hussein's forces on Iran's behalf during that war.

299.   From its headquarters in Iran, the Badr Corps operated extensive networks throughout Iraq in the 1990s. The group smuggled men and weapons into Iraq to conduct attacks against the Iraqi Ba'athist regime of Saddam Hussein (the Ba'athist regime was dominated by Sunnis and repressed the Shi'a majority population). The Badr Corps had long established four geographic commands inside Iraq, all with experience conducting attacks against the Hussein regime.

300.   Like Hezbollah in Lebanon, the Badr Corps established clandestine offices in businesses and social organizations in Iraq. The Badr Corps also used Iraqi front companies to recruit operatives, collect intelligence, and circulate propaganda materials in Shi'a populated areas.

301.   Before 2003, the Badr Corps served as Iran's most important surrogate inside Iraq, acting as a *de facto* arm of the IRGC-QF.

302.   The Badr Corps continuously received training, weapons and direction from the IRGC and Hezbollah.

303.   Following the toppling of the Hussein regime in 2003, the IRGC saw an immediate opportunity to repatriate Muhammad Baqr Hakim to Iraq and carefully cultivate his party's growth within the new post-war political framework being developed by the Coalition Forces, while simultaneously slipping thousands of Badr Corp fighters back across the border.

304.   After 2003, the Badr Corps renamed itself the Badr Organization, and it took on a political component with seats in the new Iraqi parliament through its political wing SCIRI. Nonetheless, despite its sanitized, self-given name, its core essence did not change. It continued

playing a significant role in facilitating IRGC-sponsored terror operations in Iraq. Several senior terror cell commanders such as Al-Muhandis are, or were, Badr Corps personnel on the IRGC-QF payroll.

305.    The Badr Organization inserted hundreds of its Iranian-trained operatives into Iraq's newly-formed state security organs (notably the Iraqi Ministry of Interior intelligence structure and key special forces and Iraqi Army units). This not only assisted in the Badr Organization's efforts to murder former Hussein regime leaders and pursue ethnic cleansing of Sunni neighborhoods, but it also made it possible for the Badr Organization to regularly provide other terror cell operatives with intelligence about Coalition Forces activities and to provide its own terror cells with targeting guidance.

306.    Published reports indicate that thousands of members of the Badr Organization remained on the IRGC-QF payroll after 2004.

307.    Several senior Badr Organization operatives later emerged as key conduits for funneling Iranian weapons and instructions to Iranian proxies in Iraq from 2004 through 2011, including Abu Mustafa al-Sheibani, a key smuggler of deadly Iranian weapons, including EFPs, and Jamal Ja'far Muhammad, a.k.a. Abu Mahdi al-Muhandis (which is Arabic for "the Engineer"), who later led Special Group KH, which is discussed further below.

308.    These Badr Organization operatives also remained (and may still remain) on the IRGC-QF payroll.

309.    The IRGC-QF's Ramazan Corps, led by General Abdul Reza Shahlai, was in charge of supporting Hezbollah-trained terror cells in Iraq and remains the largest Qods Force command outside of Iran. It coordinated, armed and directed the Badr Organization.

310. General Shahlai served as the case officer or supervisor of the Special Groups and other proxies, including the Badr Corps cells that acted as such. The United States later designated Shahlai in September 2008 "for threatening the peace and stability of Iraq and the Government of Iraq." The U.S. Treasury Department further found that:

> In late-August 2006, Shahlai provided material support to JAM Special Groups by supplying JAM Special Groups members with 122mm grad rockets, 240mm rockets, 107mm Katyushas, RPG-7s, 81mms, 60mm mortars, and a large quantity of C-4.
>
> Shahlai also approved and coordinated the training of JAM Special Groups. As of May 2007, Shahlai served as the final approving and coordinating authority for all Iran-based Lebanese Hizballah training for JAM Special Groups to fight Coalition Forces in Iraq. In late-August 2006, Shahlai instructed a senior Lebanese Hizballah official to coordinate anti-aircraft rocket training for JAM Special Groups.

311. The United States Department of State Country Reports on Terrorism 2006 noted:

> Iran provided guidance and training to select Iraqi Shia political groups, and weapons and training to Shia militant groups to enable anti-Coalition attacks. Iranian government forces have been responsible for at least some of the increasing lethality of anti-Coalition attacks by providing Shia militants with the capability to build IEDs with explosively formed projectiles similar to those developed by Iran and Lebanese Hezbollah. The Iranian Revolutionary Guard was linked to armor-piercing explosives that resulted in the deaths of Coalition Forces. The Revolutionary Guard, along with Lebanese Hezbollah, implemented training programs for Iraqi militants in the construction and use of sophisticated IED technology. *These individuals then passed on this training to additional militants in Iraq.* (Emphasis added.)

312. During the first half of 2004, when Hezbollah slowly began to introduce EFPs into Iraq in small numbers at the IRGC's direction, it did so through the Badr Organization.

313. Unlike JAM (discussed below), the Badr Organization had received prior (and extensive) military training from, and its operatives had longstanding operational ties to, Hezbollah and the IRGC.

314. The Baghdad-based command of the Badr Organization was supervised from an

IRGC base in nearby Bakhtaran, Iran by Abu Mustafa al-Sheibani, whose extensive smuggling routes were used both before and after the 2003 U.S.-led invasion for transporting weapons, men and money from Iran into Iraq.

315.     The most notable Badr Organization cells were the so-called "Sheibani Network" named after him.

316.     In January 2009, the U.S. Department of the Treasury designated Abu Mustafa Al-Sheibani for his role as the leader of the Sheibani Network, noting:

> The network's first objective is to fight U.S. forces, attacking convoys and killing soldiers. Its second objective is to eliminate Iraqi politicians opposed to Iran's influence. Elements of the IRGC were also sending funds and weapons to Al-Sheibani's network.
>
> Al-Sheibani's network – consisting of several hundred members – conducted IED attacks against Americans in the Baghdad region. As of March 2007, Al-Sheibani, known to transport Katyusha rockets to be used for attacks against Coalition Forces, launched rockets against Americans and made videos of the attacks to get money from Iran. As of April 2007, a member of Al-Sheibani's network supervised the transport of money and explosives from Iran for eventual arrival in Baghdad. In early-May 2007, Al-Sheibani's network assisted members of a Shia militia group by transporting them to Iran for training and providing them with weapons for their activities in Iraq.

317.     According to the Chilcot Report released by the British Government, "[t]he first IED attack in Iraq using an Explosively Formed Projectile (EFP) took place against a UK Warrior vehicle in al-Amara in May 2004." When Hezbollah introduced the EFP, its most effective anti-armor weapon into Iraq, it began by training Badr Organization operatives.

318.     At first, they were trained in the emplacement of single EFPs with relatively primitive initiation systems, a starting point that allowed Hezbollah to test the weapons, assess the capabilities of its Iraqi proxies, and probe Coalition Forces' responses to the threat, attack by attack.

319.    By this method of slowly introducing the weapon system and directing its use against British forces, Hezbollah was able to assess the capabilities of the Badr Organization personnel, assess the effectiveness of its own TTPs, and adjust those TTPs based on how first British (and later American) forces responded.

## B.    JAYSH AL-MAHDI ("JAM" OR THE "MAHDI ARMY")

320.    Initially, the Saddam Hussein regime sponsored the late Ayatollah Muhammad Sadiq al-Sadr, a leading Shi'a cleric in Iraq during much of Saddam Hussein's rule. He was perceived to be a relatively moderate counterbalance to the influence of more radical Shi'a religious leaders and was therefore allowed to appoint imams to lead mosques in hundreds of towns and cities.

321.    Sadiq al-Sadr used this opportunity to develop a cohesive network under his guidance and control. He was particularly popular in the Shi'a slums of Baghdad and Basra and established a network of mosques and social institutions that attempted to mirror Hezbollah's development in Lebanon.

322.    Unlike many of his Shi'a clerical peers, Sadr was not particularly favorably disposed toward Iran, even after the Islamic revolution in 1979, remaining instead an Arab nationalist, and supporting Arab control of the seminaries of Najaf, traditionally dominated by senior clerics who are either Iranian-born or of Iranian descent.

323.    Nonetheless, the Hussein regime ultimately came to regard Sadr as a political threat and assassinated him together with his two oldest sons, leaving his youngest son, Muqtada al-Sadr, as the de facto successor to what became known as the Sadrist Movement.

324.    The Sadrist Movement commanded the loyalty of perhaps millions of poor Iraqi Shi'a, but under the Hussein regime's rule it had no military capacity; it was almost exclusively a

social and political movement.

325.   The 2003 U.S.-led invasion freed Muqtada al-Sadr and his followers from the constraints placed on them by the Hussein regime, and the young Sadr set his sights on becoming the preeminent leader of Iraq's Shi'a community.

326.   In June 2003, shortly after the U.S. invasion, Iran's Supreme Leader, Ayatollah Ali Khamenei invited Sadr and his key deputies to Iran in the hope of organizing an armed faction of the Sadrist Movement. IRGC-QF deputy commander Abdul Reza Shahlai therefore served as the "chief of protocol" for the visit and IRGC-QF commander General Qasem Soleimani served as host to the Sadr delegation.

327.   Sadr also met with Ayatollah Khamenei during the visit and received assurances from General Shahlai that the IRGC-QF wanted to financially support the Sadrist movement.

328.   Shortly thereafter, the IRGC[-QF?] dispatched two of Hezbollah's most senior terror operatives, Imad Mughniyeh and Mustafa Badr al-Din – consecutively leaders of Hezbollah's terror wing known as the Islamic Jihad Organization – to help organize and birth the creation of the Sadrist Movement's armed faction.

329.   On July 18, 2003, Sadr gave a sermon in the Great Mosque in Kufa in which he branded the newly-formed Iraqi government "nonbelievers" and announced the formation of a religious army to counter the government called "Jaysh al-Mahdi" ("JAM") – the Mahdi Army.

330.   JAM featured several attractive assets for Iran and Hezbollah, including a strong base of support among the poorest and most disenfranchised Shi'a communities, a network of mosques and social institutions, and a vast supply of young, desperate men. However, it was initially an unruly and unprofessional organization ill-suited to confronting an advanced military in the way Hezbollah had successfully attacked the Israel Defense Forces.

331.    Hezbollah operatives were present on the ground in Iraq following the U.S. invasion in 2003 and were directly involved in providing training and support to JAM from its inception. Hezbollah operatives Imad Mughniyeh and Mustafa Badr al-Din worked closely both with Sadr and his associates and the Badr Organization at this time, but Hezbollah remained cautious and did not encourage either Badr or JAM to immediately attack Coalition Forces.

332.    Hezbollah also tapped a senior member of its Political Council, Muhammad Kawtharani, to be responsible for the organization's Iraq portfolio. As the U.S. Treasury Department noted when it designated him an SDGT on August 22, 2013, Kawtharani was:

> [T]he individual in charge of Hizballah's Iraq activities, Kawtharani has worked on behalf of Hizballah's leadership to promote the group's interests in Iraq, including Hizballah efforts to provide training, funding, political, and logistical support to Iraqi Shi'a insurgent groups.

333.    Kawtharani was an inspired choice because he not only previously lived in Iraq, but had also been a pupil of Ayatollah Muhammad Sadiq al-Ṣadr.

334.    Kawtharani wasted no time in contacting one of Sadr's most trusted deputies, Mustafa al-Yaqubi, soon after (and possibly before) the overthrow of the Hussein regime in 2003. Mustafa al-Yaqubi had frequent contact with Kawtharani through the years and appears to have served as a primary channel for communications between Hezbollah and Sadr and his JAM forces.

335.    Hezbollah was the obvious and natural choice for implementing the IRGC's creation and sponsorship of JAM in Iraq. First, as noted, Hezbollah operatives were, like the Iraqi Sadrists, ethnically Arabs and spoke Arabic, whereas the Iranian IRGC operatives were ethnically Persian and spoke Farsi. Second, there were many longstanding personal and intellectual connections between Hezbollah and the Sadrist Movement.

336.    According to a 2007 MNF-I report, "members of the Sadr movement have deep respect for Lebanese Hezbollah…. Hezbollah sends trainers to Iran to train Iraqi fighters on EFPs."

For instance, Muqtada al-Sadr's father-in-law was Grand Ayatollah Muhammad Baqir al-Sadr, who was a contemporary of Hezbollah's spiritual leader, Muhammad Fadlallah. Hezbollah's leader, Hassan Nasrallah, received his religious education in Lebanon from a seminary that taught Baqir al-Sadr's teachings on Shi'ism.

337.    From June 2003 through August 2004, at Iran's direction, Hezbollah's role was primarily to organize and train JAM gunmen and try to instill discipline and professionalism into the organization so that it could effectively threaten and attack U.S. and Coalition Forces in Iraq. Due to its conflict with Israel in Lebanon, Hezbollah possessed hard-earned specialized experience and expertise on how to deploy new tactical and technological counter-measures against a modern army.

338.    By early 2005, the presence of Hezbollah operatives in Iraq became an open secret when Iraqi Interior Minister Falah al-Naquib announced the arrest of eighteen Lebanese Hezbollah members on terrorism charges.

339.    The UK's *Belfast Telegraph* reported in 2007 that Muqtada al-Sadr publicly acknowledged his organization's coordination with Hezbollah: "Speaking in Tufa in Iraq, Muqtada al-Sadr, the head of the Mehdi Army, admitted to 'formal links' with Hizbollah. 'We have formal links with Hizbollah, we do exchange ideas and discuss the situation facing Shi'as in both countries,' he said. 'It is natural that we would want to improve ourselves by learning from each other. We copy Hizbollah in the way they fight and their tactics, we teach each other and we are getting better through this.'"

## C.    THE DEVELOPMENT OF THE JAM SPECIAL GROUPS AND THE PROMISED DAY BRIGADES

340.    A Sadrist uprising led by armed JAM forces in August 2004 in the Shi'a holy city of Najaf soon changed the direction of the conflict.

341.    In Najaf, JAM forces confronted U.S. Marines on a large scale and suffered significant casualties. An estimated 1,500 JAM fighters were killed and an undetermined number, most likely in the thousands, were wounded. By comparison, over the course of same three-week period, the U.S. military lost 9 soldiers and Marines in Najaf.

342.    IRGC-QF personnel were present during the bloodshed and carefully observed the fighting. The lesson the IRGC-QF gleaned from the Najaf uprising was clear—JAM members were too disorganized and undisciplined to cause any serious harm to Coalition Forces as then constituted.

343.    Thus, shortly after the uprising in Najaf was brought under control, Muqtada al-Sadr reluctantly authorized his deputies to create what became known as the "Special Groups" to be supported and trained by Hezbollah and funded and controlled by the IRGC.

344.    The IRGC wanted JAM to be able to deploy more professional (and lethal) forces that could successfully attack Coalition Forces in Iraq, while Sadr's "regular" JAM militia concentrated on ethnic cleansing and kidnapping Sunnis as well as its traditional criminal enterprises.

345.    Initially, the Special Groups functioned essentially as regional commands – clusters of terror cells – under the overall leadership of Muqtada al-Sadr's senior deputies, including Qais al-Khazali and Akram al-Kaabi (a/k/a Akram Abbas al-Kabi). As the U.S. military later noted:

> When Special Groups were formed, [Qais Khazali] and Akram al Kabi were named the general supervisors, or members of the Ishraf Committee (Ishraf means oversight and supervision). Qais and Layth [Qais' brother] were directly involved with Special Groups, and in this position, they would negotiate and procure weapons and IEDs from Iran and distribute them to JAM.

346.    This arrangement provided both a face-saving way for Sadr to retain overall control of his followers and a way for the IRGC-QF and Hezbollah to create, organize, oversee, and

supervise terror cells under its operational control that could more effectively carry out IRGC and Hezbollah attacks against U.S. Forces.

347. From the initial formation of JAM's Special Groups in 2004 through much of 2006, the IRGC-QF used Hezbollah – and particularly, its Unit 3800 – to train and direct these cells (as well as parallel Badr Organization cells) to target Coalition Forces.

348. Hezbollah also trained Special Groups and Badr Organization operatives at training camps in southern Lebanon and Iran.

349. From September 2004 to late 2005, these newly-formed Special Groups cells conducted low-intensity operations against the British and U.S. military, launching gradually increasing numbers of EFP attacks, and also training in Iran and Lebanon with Hezbollah and the IRGC-QF to develop and improve their TTPs while preparing for the next round of conflict.

350. As Special Groups members detained by Coalition Forces later explained, only Hezbollah instructors taught Special Groups operatives the "Engineers Course" that focused on the construction and employment of EFPs, and not every Special Group operative received this training.

351. One detainee reported that "Engineers are special and have to be smart. If you are not smart no one will waste the time and expenses to send you to Iran to train to be an engineer because you will fail."

352. Hezbollah also trained these "Engineers" on how to incorporate EFPs into the tactical design of ambushing Coalition Forces convoys, principally to kidnap Coalition soldiers. The tactics for a kidnapping-ambush using EFPs closely resembled the tactics Hezbollah developed in attempting to kidnap Israel Defense Forces soldiers in Southern Lebanon.

353. As one interrogation of a Detainee revealed:

> During one of [Detainee]'s training sessions, his group was instructed on techniques involving the attack of military convoys and abduction of POWs. Upon the arrival of a four-vehicle convoy, EFP's would be emplaced to disable the first three vehicles in a convoy. The attackers, who are hiding on one side of the road from an unidentified distance away, would successively fire upon the fourth vehicle with shoulder-fired missiles. Amidst the attack, two small groups of individuals would alternatively bound from the hidden area away from the road to the fourth vehicle while firing upon the fourth vehicle using small arms. The alternatively bounding small groups would advance to the vehicle, pull out any individual who is still living, and bring the individual back to an area where the attackers' own convoy of vehicles is waiting. In order to prevent a quick reaction force from arriving to aid the disabled convoys, a simultaneous mortar attack would be planned on a nearby military base. The simultaneous mortar attack would be followed through to keep the quick reaction force at the nearby base busy. Another way to prevent assistance from a quick reaction force would be to emplace more EFPs at a further distance down the same planned route as the military convoy. An attack combining an EFP and other methods of attacking a convoy is called a "complex attack."

354.    For approximately two years, under Hezbollah's tutelage and with the support and oversight of the IRGC, JAM Special Groups carry out attacks against Coalition Forces at the direction of Hezbollah and the IRGC.

355.    By 2007, MNF-I officials were reporting carefully planned, complex ambushes and retaliatory attacks on U.S. forces that included direct assaults on U.S. military outposts, ambushes in which American troops were captured and complex attacks that used multiple weapons to strike more than one U.S. target.

356.    Hezbollah and the IRGC-QF also introduced the Special Groups to the use of 107mm and 122mm artillery rockets (frequently referred to as "Katyusha rockets") which Hezbollah had previously deployed in large numbers against the Israel Defense Forces in southern Lebanon and against Israeli border towns in northern Israel.

357.    Both "regular" JAM and the Special Groups used these same types of artillery rockets in their indirect fire attacks on U.S. and Coalition Forward Operating Bases and MNF-I Headquarters in the Green Zone.

358.    The IRGC also supplied JAM and JAM Special Groups with 240mm rockets (also known as the Fadjr-3) developed by the Shahid Bagheri Industries division of the Aerospace Industries Organization of Iran ("AIO").

359.    Not only did the IRGC supply these weapons to both Hezbollah and (later) its Iraqi Shi'a proxies, but Hezbollah's TTPs in the use of these weapons were also transferred to JAM and the JAM Special Groups.

360.    During a July 2, 2007 press briefing, General Bergner noted that Special Groups were trained in Iran by Hezbollah instructors in a four-week long course that was titled "Artillery." According to General Bergner, U.S. intelligence concluded that: "This course teaches the use of indirect fire weapons including 60mm and 120mm mortars, and 107mm, 122mm and 240mm rockets."

361.    However, despite the increased tempo of Hezbollah-directed violence and improved lethality of the Special Groups, Sadr himself remained personally and politically erratic.

362.    Because the Special Groups were designed to carry out attacks on Coalition Forces on Hezbollah's and the IRGC's behalf and as their proxies, Hezbollah and IRGC would not tolerate deviations from their overall direction or strategies.

363.    Thus, while Hezbollah and the IRGC intensified the training of select operatives and cultivated Special Groups cell commanders, they gradually began peeling those cell commanders away from the Sadrist Movement (as discussed below).

364.    For much of 2007-2008, Sadr was also embroiled in political disputes with rival

Shi'a parties and "regular" JAM units engaged in violent clashes with the Badr Organization, including a very public clash in Karbala during a religious festival.

365.    In June 2008, Sadr announced his intention to disband JAM to focus his organization on social, cultural and religious activities. But he soon further proclaimed that he would maintain an elite force, the Promised Day Brigades ("PDB"), to carry out attacks against Coalition Forces.

366.    Although they had, by this time, directed their energies primarily into more disciplined Special Groups, Hezbollah and the IRGC were careful not to alienate Sadr.

367.    Accordingly, the PDB received funding and weapons from the IRGC and training and direction from both Hezbollah and the IRGC.

368.    PDB deployed many EFPs against American and Coalition Forces in Iraq after July 2008. In August 2009 alone, MNF-I attributed 15 EFP attacks in Baghdad to PDB.

369.    MNF-I took significant and forceful measures against the PDB. However, because of the financial, logistical and operational support it received from both Hezbollah and the IRGC, it was able to not only survive, but to continue to menace American forces in Iraq through 2011. For example, on June 28, 2011, the PDB issued a statement claiming responsibility for 10 mortar and Katyusha rocket attacks against U.S. military convoys in which U.S. officials confirmed that three U.S. troops were killed.

###    D.    ASA'IB AHL AL-HAQ

370.    The Asa'ib Ahl Al-Haq ("AAH," or the "League of the Righteous") terrorist organization began as a JAM Special Group, directed by Hezbollah and funded and armed by the IRGC-QF, that conducted numerous attacks on Coalition Forces—particularly on American targets—as well as Iraqi Security Forces.

371.    AAH was originally established by senior JAM commander and later MNF-I detainee, Qais al-Khazali. Qais Khazali was a pupil of Muqtada al-Sadr's father and later one of Muqtada al-Sadr's senior deputies. But he also maintained an uneasy rivalry with the younger al-Sadr that occasionally devolved into open hostilities.

372.    Khazali had accompanied Sadr to Tehran in 2003, and he maintained contact with senior IRGC-QF leadership when he assumed control of Special Groups cells after 2004. According to a report by the U.S. military:

> In August 2006 MAS (Muqtada al-Sadr) asked [Qais al-Khazali] to lead a delegation to Tehran to discuss the situation in Iraq and Iranian support for JAM (Jaysh al-Mahdi (JAM) Militia subordinate to Muqtada al-Sadr). According to reporting, Ali Khamenei (Sayyid Ali Hosseini Khamenei was then and is still now the Supreme Leader of Iran) met with [Qais al-Khazali] and recruited him to lead a special group known as Asayb al-Haq [AAH], or the K2 network. The K2 network would operate with the knowledge or authorization of MAS. [Qais al-Khazali] agreed. Iran was interested in working with [Qais al-Khazali] because of his influence on MAS. Layth (al-Khazali's brother, captured with him on 20 March, 2007 in Basra, served as the Operations Chief for Asayb al-Haq) and as a liaison between the secret network formed by Qayis and the Iranians. In his position, Layth travelled frequently between Iraq, Iran and Syria.

373.    Qais al-Khazali and his brother Layth al–Khazali returned to Iraq, requisitioned the most experienced and capable fighters from Sadr's JAM terror cells, and formed the new Special Group AAH.

374.    At first, AAH appears to have remained within JAM's orbit, nominally under the umbrella of the Sadrist Movement, but it later emerged as a more cohesive group whose commanders were no longer pledged to Sadr, but to Hezbollah and the IRGC.

375.    This likely resulted from assessments made by senior Hezbollah commanders, including Ali Musa Daqduq, who had travelled to Iraq at the IRGC-QF's behest to evaluate the training, organization and effectiveness of the Special Groups.

376.     AAH formally split from JAM in 2007 (though it continued to maintain significant ties with JAM even later).

377.     Hezbollah identified Qais Khazali and Akram Kaabi as among the more capable JAM Special Groups cell commanders.

378.     Hezbollah cultivated them, and ultimately recruited them to serve as direct proxies of the IRGC-QF unbeholden to Sadr.

379.     According to an April 2007 MNF-I report, Qais Khazali admitted that AAH received direct financing from the IRGC-QF.

380.     Within months of Qais Khazali's formation of AAH, he provided the religious blessing for the Hezbollah-planned and orchestrated raid on the Provincial Joint Coordination Center ("PJCC") in Karbala on January 20, 2007 (for which the IRGC-QF provided funding and extensive logistical support). As discussed more fully below, the kidnapping and murder of five American soldiers during the operation led to a concerted effort to locate the perpetrators, and it eventually resulted in the capture of both Khazalis in March 2007.

381.     Thereafter, despite the capture and detention of the Khazali brothers, AAH continued to function as a full-fledged terrorist organization because of the significant funding, training, and supply of weapons it received from the IRGC-QF, and from the training and other cooperation it obtained from Hezbollah.

382.     AAH was able to maintain a high-level offensive tempo from mid-2007 until the departure of U.S. forces at the end of 2011, when Qais Khazali emerged from U.S. detention to become one of Iraq's most important political leaders.

383.     In sum, from 2006 to 2011, AAH operated as Iran's direct terror proxy targeting U.S. personnel at the direction of Hezbollah and the IRGC-QF. Iran harbored elements of its

leadership (and their families), trained and supplied its operatives, and funded the AAH cells. Iran used Hezbollah to train and direct AAH to commit attacks on Americans in Iraq on its behalf.

384.     AAH has conducted countless of attacks against U.S. and Iraqi forces, targeted kidnappings of Westerners and Iraqis, rocket and mortar attacks on the U.S. Embassy, murdered American and British soldiers, and assassinated Iraqi officials.

385.     At all relevant times, AAH received its funding from Iran, and acted as an agent of Iran's IRGC-QF and Hezbollah.

386.     At a July 2, 2007 press briefing, General Bergner, spokesman for the MNF-I, noted:

> The Qods Force also supplies the special groups with weapons and funding of 750,000 to 3 million U.S. dollars a month. Without this support, these special groups would be hard pressed to conduct their operations in Iraq […] The Qods Force goal was to develop the Iraqi special groups into a network similar to the Lebanese Hezbollah. Special groups would be unable to conduct their terrorist attacks in Iraq without Iranian-supplied weapons and other support. Like Ali Musa Daqduq, Qais' [Khazali] main contact was [General Shahlai], the deputy commander for Qods Force Department of External Special Operations. Funding and training of the special groups started in 2004.

### E.     KATA'IB HEZBOLLAH ("KH")

387.     Kata'ib Hezbollah ("KH") (Hezbollah Brigades) was active in Iraq from 2007 to 2011. It was founded by Abu Mahdi al-Muhandis, a member of the Badr Corps and one of the IRGC-QF's senior operatives in Iraq. In the 1980s, al-Muhandis was a member of the Iraqi Da'wa Party, in which capacity he worked closely with the IRGC-QF and Lebanese Hezbollah.

388.     KH's overall operations were run by Karim Ja'far Muhsin al-Ghanimi, described by the U.S. Treasury Department as "the overall leader of KH, which has used facilities in Iran to send weapons to Iraq." According to the U.S. government, "Ghanimi has organized KH military-related training in Iran from the IRGC-QF and Lebanese Hizballah. Ghanimi has sent money provided by the IRGC-QF to KH leaders in Iraq."

389.     KH has functioned as Iran's premier terror proxy in Iraq and like other Special Groups, its fighters received training from the IRGC-QF and Hezbollah in guerilla warfare tactics and the use of explosives, as well as weapons like the RPG-29, EFPs, and the deployment of Katyusha rockets for indirect fire attacks on U.S. forward operating bases.

390.     The IRGC-QF provided RPG-29 anti-armor weapons exclusively to KH.

391.     The IRGC-QF also provided Improvised Rocket Assisted Munitions ("IRAMs") almost exclusively to KH. IRAMs are "flying IEDs" – explosive devices made from large metal canisters, such as propane gas tanks, filled with explosives, scrap metal and ball bearings, propelled into the air by rockets. IRAMs were "purpose-built" for one objective: being lobbed over walls and Hesco[23] barriers at short ranges, preventing interception by C-RAM defense systems[24] that were protecting Coalition Forces manning bases in Iraq.

392.     IRAMs first appeared in southern Iraq in November 2007.  Like other IEDs, IRAMs could be triggered remotely by radio control, or timed to detonate by a washing-machine timer. IRAMs could be launched from either a frame resting on the ground or mounted on the bed of a truck and were designed to cause catastrophic damage and inflict mass casualties.

393.     But, notwithstanding the fact that portions of IRAMs were sometimes constructed from commonly-used "household" materials (such as, *e.g.*, propane tanks), they require the use of military-grade rockets, and their proper assembly required a high-degree of technical sophistication that KH obtained from Hezbollah and the IRGC-QF.

---

[23]     Hesco barriers are a multi-cellular barrier system manufactured from welded zinc-aluminum coated steel wire mesh, joined with vertical, helical-coil joints, and lined with a heavy-duty non-woven polypropylene geotextile. Once filled with earth, sand, and dirt, the Hesco barriers provide exceptional protection against conventional fire attacks. *See* http://www.hesco.com/products/defensive-barriers/mil.

[24]     Counter Rocket, Artillery, and Mortar, abbreviated "C-RAM" or "Counter-RAM," is a set of systems used to detect and/or destroy incoming artillery, rockets and mortar rounds in the air before they hit their ground targets, or simply provide early warning. *See* https://en.wikipedia.org/wiki/Counter_Rocket,_Artillery,_and_Mortar.

74

394.     The first known IRAM attack in Iraq occurred at Forward Operating Base ("FOB")
Loyalty in Baghdad. Two American soldiers were killed and 16 wounded. A second attack in the
Sha'ab neighborhood of Baghdad was the result of an accidental explosion of IRAMs likely
intended for Combat Outpost Callahan, approximately 800 yards away from where the truck
carrying the IRAMs prematurely exploded, killing 18 civilians and wounding an additional 29.

395.     IRAM attacks were particularly dangerous to U.S. troops, and had the potential to
kill dozens in a single attack. Once launched, an incoming IRAM could not be stopped. A soldier
spotting the approach of a suspected IRAM-bearing vehicle could have as little as "two seconds to
decide whether the person emerging from it ha[d] just set it for firing or [was] simply an innocent
driver getting out to change a tire."

396.     IRAMs became a signature weapon of KH.

397.     KH operated mainly in Shi'a areas of Baghdad, such as Sadr City, and throughout
southeastern Iraq conducting (1) rocket-propelled grenade (RPG) attacks; (2) 107mm and 240mm
rocket attacks; (3) IRAM attacks; and (4) EFP attacks on U.S. and Coalition Forces. KH was also
supplied by Iran with their production model of the RPG-29 anti-tank rocket launcher.

398.     This model RPG-29 was first used against U.S. forces during operations in Sadr
City, Baghdad.

399.     On June 24, 2009, the United States designated KH an FTO. The State Department
explained that:

> The organization has been responsible for numerous violent terrorist attacks
> since 2007, including improvised explosive device bombings, rocket
> propelled grenade attacks, and sniper operations. Kata'ib Hezbollah [sic]
> also targeted the International Zone in Baghdad in a November 29, 2008
> rocket attack that killed two UN workers. In addition, KH has threatened
> the lives of Iraqi politicians and civilians that support the legitimate political
> process in Iraq.

400.    KH was also simultaneously designated an SDGT, because it was "responsible for numerous terrorist acts against Iraqi, U.S., and other targets in Iraq since 2007."

401.    The U.S. Treasury Department also designated KH as an entity threatening stability in Iraq pursuant to E.O. 13438. The Treasury Department's 2009 press release announcing KH's designation explained that KH had "committed, directed, supported, or posed a significant risk of committing acts of violence against Coalition and Iraqi Security Forces…."

402.    The Treasury press release also stated: "[f]urther, the IRGC-Qods Force provides lethal support to Kata 'ib Hizballah and other Iraqi Shia militia groups who target and kill Coalition and Iraqi Security Forces."

403.    The 2009 press release further reported that:

> Between March 2007 and June 2008, Baghdad-based Kata'ib Hizballah cell members participated in multiple rocket-propelled grenade (RPG) and improvised rocket-assisted mortar (IRAM) attacks against U.S. forces. These attacks included a May 13, 2008 RPG-29 attack on a U.S. tank located in Sha'ab, Iraq, and a February 19, 2008 IRAM attack on a U.S. base near Rustamiya, Iraq. A February 19, 2008 rocket attack in the Rustamiya area resulted in one U.S. civilian killed and injuries to U.S. civilian and Coalition Forces personnel.

> As of 2008, Kata'ib Hizballah was funded by the IRGC-Qods Force and received weapons training and support from Lebanon-based Hizballah. In one instance, Hizballah provided training--to include building and planting IEDs and training in coordinating small and medium arms attacks, sniper attacks, mortar attacks, and rocket attacks--to Kata'ib Hizballah members in Iran.

> Recordings made by Kata'ib Hizballah for release to the public as propaganda videos further demonstrate that Kata'ib Hizballah conducted attacks against Coalition Forces. In mid-August 2008, Coalition Forces seized four hard drives from a storage facility associated with a Kata'ib Hizballah media facilitator. The four hard drives included approximately 1,200 videos showing Kata'ib Hizballah's sophisticated planning and attack tactics, techniques, and procedures, and Kata'ib Hizballah's use of the most lethal weapons--including RPG-29s, IRAMs, and EFPs--against Coalition Forces in Iraq.

One of the hard drives contained 35 attack videos edited with the Kata'ib Hizballah logo in the top right corner. Additionally, between February and September 2008, Al-Manar in Beirut, Lebanon, broadcast several videos showing Kata'ib Hizballah conducting multiple attacks against Coalition Forces in Iraq.

Immediately preceding the Government of Iraq's approval of the United States-Iraq security agreement in late November 2008, Kata'ib Hizballah posted a statement that the group would continue fighting Coalition Forces and threatened to conduct attacks against the Government of Iraq if it signed the security agreement with the United States.

404.    In 2008, the U.S. Department of Defense described the linkages it found between KH, Iran and multiple terrorist attacks against Coalition Forces in Iraq—including KH's use of EFPs:

[A]lso known as Hezbollah Brigades, [KH] is a terrorist group believed to receive funding, training, logistics and material support from Iran to attack Iraqi and coalition forces using what the military calls 'explosively formed penetrators' – roadside bombs designed to pierce armor-hulled vehicles – and other weapons such as rocket-assisted mortars.

405.    As noted above—and as stated by the U.S Treasury Department in its July 2009 press release—throughout 2008, *Al-Manar*, Hezbollah's official television outlet in Lebanon (and itself a designated SDGT since May 2006), played numerous videos of KH launching rocket and IED/EFP attacks against U.S. troops. In this manner, Hezbollah helped publicize KH's activities and wage psychological warfare against the United States.

406.    The U.S. Treasury Department designated KH's founder, Abu Mahdi al-Muhandis, an SDGT in July 2009 and announced the designation in the same press release announcing KH's designation. The press release noted:

As of early 2007, al-Muhandis formed a Shia militia **group employing instructors from Hizballah** to prepare this group and certain Jaysh al-Mahdi (JAM) Special Groups for attacks against Coalition Forces. The groups received training in guerilla warfare, handling bombs and explosives, and employing weapons--to include missiles, mortars, and sniper rifles.  In another instance as of September 2007, al-Muhandis led

77

networks that moved ammunition and weapons--to include explosively formed penetrators (EFPs)--from Iran to Iraq, distributing them to certain JAM militias to target Coalition Forces. As of mid-February 2007, al-Muhandis also ran a weapons smuggling network that moved sniper rifles through the Iran-Iraq border to Shia militias that targeted Coalition Forces.

Al-Muhandis also provided logistical support for attacks against Iraqi Security Forces and Coalition Forces conducted by JAM Special Groups and certain Shia militias. In one instance, in April 2008, al-Muhandis facilitated the entry of trucks--containing mortars, Katyusha rockets, EFPs, and other explosive devices--from Iran to Iraq that were then delivered to JAM Special Groups in Sadr City, Baghdad. Additionally, al-Muhandis organized numerous weapons shipments to supply JAM Special Groups who were fighting Iraqi Security Forces in the Basrah and Maysan provinces during late March-early April 2008.

In addition to facilitating weapons shipments to JAM Special Groups and certain Shia militias, al-Muhandis facilitated the movement and training of Iraq-based Shia militia members to prepare them to attack Coalition Forces. In one instance in November 2007, al-Muhandis sent JAM Special Groups members to Iran to undergo a training course in using sniper rifles. Upon completion of the training course, the JAM Special Groups members had planned to return to Iraq and carry out special operations against Coalition Forces. Additionally, in early March 2007, al-Muhandis sent certain Shia militia members to Iran for training in guerilla warfare, light arms, marksmanship, improvised explosive devices (IED) and anti-aircraft missiles to increase the combat ability of the militias to fight Coalition Forces.

In addition to the reasons for which he is being designated today, al-Muhandis participated in the bombing of Western embassies in Kuwait and the attempted assassination of the Emir of Kuwait in the early 1980s. Al-Muhandis was subsequently convicted in absentia by the Kuwaiti government for his role in the bombing and attempted assassination. (Emphasis added.)

407.    In a July 2010 press briefing, U.S. General Ray Odierno identified KH as the group behind increased threats to U.S. bases in Iraq. General Odierno confirmed that KH operatives had gone to Iran for special training and then returned to Iraq. General Odierno stated, "[T]hey are clearly connected to Iranian IRGC [Iranian Revolutionary Guard Corps]."

408.    In sum, from 2007 to 2011, KH operated as Iran's direct terror proxy targeting U.S.

personnel at the direction of Hezbollah and the IRGC-QF. Iran harbored elements of its leadership (and their families), trained and supplied its operatives, and funded the KH cells. Iran used Hezbollah to train and direct KH to commit attacks on Americans in Iraq on its behalf.

### F.   CASE IN POINT: SENIOR HEZBOLLAH COMMANDER ALI MUSA DAQDUQ'S DIRECTION OF TERRORIST ATTACKS ON COALITION FORCES IN IRAQ

409.   In March 2007, Ali Musa Daqduq was captured in Basra, Iraq.

410.   At the time of his arrest, he produced identification saying his name was Hamid Muhammad Jabur Al Lami and that he was a mute. Only during further questioning did he admit to being part of Lebanese Hezbollah and acknowledge his ability to speak.

411.   In 2005, Hezbollah's leader, Hassan Nasrallah, had tapped Daqduq to work for Unit 3800, and in May 2006, he traveled to Tehran with Yusuf Hashim, a fellow Hezbollah operative and senior supervisor of Hezbollah operations in Iraq. There they met with General Shahlai, Deputy Commander of the IRGC-QF Special External Operations. Daqduq was directed to return to Iraq and report on the training and operations of the JAM Special Groups and provide assessments on their training in mortars and rockets, use of IEDs (particularly EFPs) and kidnapping operations.

412.   As MNF-I investigators later learned, Daqduq not only provided training to AAH cells and advised them on terrorist operations, he also helped plan operations and had final approval over them. Daqduq reported to Hashim and the latter reported to Hezbollah's Muhammad Kawtharani and General Shahlai.

413.   Daqduq conducted multiple visits to Iraq to undertake training needs assessments, survey the operational environment, and obtain feedback from JAM Special Groups members in Iraq on their needs. This was intended to ensure that the training being designed and staffed by

Hezbollah instructors would provide the greatest benefit to their students.

414.    In addition, Daqduq's assessments provided informed feedback to the IRGC-QF logisticians on the armaments the JAM Special Groups fighters needed to meet their needs and improve their operational performance.

415.    In early 2007, Daqduq planned, authorized, and directed an attack on U.S. service members in the PJCC in Karbala. Pursuant to his direction, on January 20, 2007, a team of at least 12 AAH gunmen, disguised as U.S. soldiers, infiltrated the PJCC in Karbala. In the well-planned attack, they killed one U.S. soldier and abducted four others, whom they later executed.

416.    Two months later, when Coalition Special Forces captured Qais al-Khazali, his brother Layth al-Khazali, who led the attack, and Daqduq in Basra, the documents, computers and media recovered from capture, as well as the subsequent interrogations of these men, significantly supplemented the U.S. military's understanding of Hezbollah's operational role in Iraq and the IRGC-QF's central role in supporting and enabling the JAM Special Groups.

417.    Amongst the documents recovered was a 22-page memorandum written by Daqduq that "detailed the planning, preparation, approval process and conduct of the [Karbala] operation," as well as Daqduq's role in overseeing other Special Groups operations.

418.    As noted in a Memorandum for Commander, Multi-National Force—Iraq, dated May 31, 2007:

> [Daqduq] has knowledge of Iranian surrogate networks operating in Iraq and has admitted to meeting Iranian Revolutionary Guard Corps-Quds Force (IRGC-QF) personalities on multiple occasions including Hajj Yusif, who is assessed to be Abdul Reza Shahlai, the Department 9000 (Lethal Aid) Deputy Commander.

419.    According to U.S. military officials, both Daqduq and Qais Khazali admitted that senior leadership within the IRGC-QF knew of and helped plan the attack on the Karbala PJCC,

and Daqduq served as the liaison between the IRGC-QF, Hezbollah and AAH.

420.     For example, a May 22, 2009 memorandum summarizing the interrogations of

Daqduq noted:

> [Daqduq] is a Lebanese Hizballah Commander and was an advisor to AAH
> leadership. [Daqduq] was involved in the planning of the Karbala PJCC
> attack in January 2007 and the reconnaissance of various CF bases and ports.
> [Daqduq] took his direction from IRGC-QF Officer Hajji Yusif [General
> Shahlai] and LH [Lebanese Hezbollah] Unit 2800 Commander Yusif
> Hashim.

421.     An August 13, 2007 Memorandum recounted the data retrieved from the Basra

location of the March raid:

> The hard drives contained numerous insurgent related documents and
> photographs, including a journal detailing upcoming operations or
> meetings; 'how to' manuals on operating arms/munitions systems—
> including various missiles and RPG launchers; old US military training
> materials; photographs of MNF equipment and resources; Google Earth
> aerial photographs of regions and cities in Iraq; photographs of U.S. service
> members performing their jobs; photographs of destroyed U.S. military
> equipment; photographs of an unknown shipyard; photographs of a
> destroyed MNF dining facility; and, propaganda videos by ISI showing
> missile testing, dead bodies, and destroyed vehicles. Of note, photographs
> were also found of items from the wallet of [3.5(c)] a U.S. soldier killed in
> a complex attack on the Provincial Joint Coordination Cell in Karbala on 20
> Jan 07—including his SSA card, credit cards, identification cards, and
> family photographs. Documents seized include: spreadsheets detailing
> weapons and targets; step-by-step instructions for operations/attacks; and
> numerous letters equivalent to after-action reports detailing attacks.

422.     An October 5, 2008 Memorandum further noted:

> [Daqduq] admitted to being Lebanese Hezbollah and admitted to an active
> role in Iraq as an agent of Iranian state-sponsored terrorism. [Daqduq]
> admitted that Abdul Reza Shahlai, Iranian Revolutionary Guard Corps -
> Quds Force (IRGC-QF) Department 9000 (Lethal Aid) Deputy Chief
> facilitated [Daqduq]'s illegal entry into Iraq on four separate occasions.
> IRGC-QF is one of the primary agents of Iranian state sponsored terrorism.
> [Daqduq] admitted that his role was to arrange for training of Shi'a
> extremist groups, facilitating training and weapons procurement for Special
> Groups. Special Groups have conducted numerous AIF [Anti-Iraqi Forces]
> and ACF [Anti-Coalition Forces] attacks throughout Iraq. [Daqduq]

admitted to a significant operational planning role in the abduction and murder of 5 U.S. Service Members.

423.     Khazali described Daqduq as the "designer of the Special Groups."[25] The exploitation of a computer that was captured during the raid revealed contents that confirmed the training and evaluation role that Daqduq performed. "Documents seized include: spreadsheets detailing weapons and targets, step-by-step instructions for operations/attacks; and numerous letters equivalent to after-action reports detailing attacks, including, for example: an ambush and IED attack on a MNF convoy in Karbala resulting in 4 X MNF KIA; an IED attack on a British patrol which destroyed two Land Rovers and killed the occupants; and a sniper attack on a British patrol which killed a British soldier."

424.     For example, Daqduq was found in possession of training manuals on tactics for launching rocket attacks.

425.     In his personal journal, Daqduq recorded: "Met with the brothers the observers of Diyalah province and I listened regarding operations … We conducted eight explosive charge operations on both sides."

426.     U.S. intelligence also learned about Hezbollah's series of 30-day training courses held for Iraqi Special Groups. These included:

- Engineering:  This is a demolitions course, focusing on the construction and emplacement of EFPs, including the use of Passive Infra-Red devices or "Magic Eye."
- Artillery: This course teaches the use of indirect fire weapons, including 60mm and 120mm mortars, and 107mm, 122mm, and 240mm rockets.
- Intelligence: This class covers basic source operations and collection, observations, etc. to derive intelligence that is used at the tactical level.

---

[25]     Ali Musa Daqduq was held in U.S. detention until November 2011 with the goal of extraditing him to the U.S. for trial. The Iraqi Government denied the request, and he was transferred to Iraqi custody on December 18, 2011. The charges that the U.S. had brought against him were summarily rejected by an Iraqi Court in May 2012 as lacking evidence and he was released from confinement, later returning to Lebanon.

427.    According to U.S. intelligence, Hezbollah also conducted "mini-courses" and "refresher training" at a camp near Tehran and also taught a course for JAM Special Groups on how to improve their "kidnapping capability."

428.    According to U.S. intelligence estimates, following Daqduq's 2007 arrest, the IRGC-QF provided Hezbollah and Daqduq up to $3 million in U.S. currency every *month* to run JAM Special Groups in Iraq.

429.    Ultimately, the U.S. military concluded that Daqduq's mandate was "to reorganize the Special Groups into an organization that mirrored Lebanese Hizbollah."

430.    On November 19, 2012, the U.S. Department of the Treasury designated Ali Musa Daqduq an SDGT pursuant to Executive Order (E.O.) 13224:

> Daqduq is a senior Hizballah commander responsible for numerous attacks against Coalition Forces in Iraq, including planning an attack on the Karbala Joint Provincial Coordination Center (JPCC) on January 20, 2007, which resulted in the deaths of five U.S. soldiers.
>
> On March 20, 2007, Coalition Forces in southern Iraq captured Daqduq, who falsely claimed to be a deaf mute at the time and produced a number of false identity cards using a variety of aliases.  From January 2009 until December 2011, U.S. military forces held Daqduq in Iraq under the terms of the 2008 "Agreement Between the United States of America and the Republic of Iraq on the Withdrawal of United States Forces from Iraq and the Organization of Their Activities during Their Temporary Presence in Iraq" (the Security Agreement).  In December 2011, the United States transferred Daqduq to Iraq's custody in accordance with our obligations under the Security Agreement.  He was subsequently tried in Iraq on terrorism and other charges.  On May 7, 2012, an Iraqi court dismissed terrorism and false documents charges against him.  Daqduq remained in Iraqi custody until last week when the Iraqi government determined that it no longer had a legal basis to hold him, and he was released Friday.

**G.    IRAN FUNDED THE DESIGN AND PRODUCTION OF EXPLOSIVELY FORMED PENETRATORS ("EFPS") USED TO KILL OR MAIM COALITION FORCES, INCLUDING THE PLAINTIFFS**

431.     As noted above, the EFPs deployed by the IRGC and Hezbollah in Iraq were not truly "improvised" explosive devices but professionally manufactured and specifically designed to target U.S. and Coalition Forces' armor.

432.     EFPs constitute "weapons of mass destruction" as that term is defined in 18 U.S.C. § 2332a(2)(A).

433.     First used by Hezbollah against Israeli armor in Lebanon, EFPs are categorized by the U.S. military as a type of shaped-charge weapon. They are usually made by placing a precision-manufactured concave copper disk in front of high-explosives that have been packed into a steel tube with a cap welded to one end.

434.     In Iraq, EFPs were often triggered by a passive infra-red devices that ultimately set off an explosion within the steel casing of the EFP, forcing the copper disk forward, and turning it into a high-velocity molten slug that could pierce the military-grade armor of most U.S. vehicles deployed in Iraq.

435.     To produce these weapons, copper sheets are often loaded onto a punch press to yield copper discs. These discs are annealed in a furnace to soften the copper. The discs are then loaded into a large hydraulic press and formed into the disk-like final shape.

436.     This munitions manufacturing process is critical to the design and concomitant lethality of the EFP weapon.

437.     Unlike homemade explosive devices such as traditional IEDs, EFPs are far more sophisticated and are specifically designed to target vehicles such as armored patrols and supply convoys, though Hezbollah and its Special Groups proxies have deployed them against U.S. and Iraqi civilians as well.

438.     Because Iran propagated its specialized weapons knowledge up and down its

network of terror proxies in Iraq, the U.S. State Department's 2006 Country Reports on Terrorism further documented Iran's specific efforts to provide terrorists with lethal EFPs to ambush and murder U.S. and other Coalition Forces:

> Iran provided guidance and training to select Iraqi Shia political groups, and weapons and training to Shia militant groups to enable anti-Coalition attacks. Iranian government forces have been responsible for at least some of the increasing lethality of anti-Coalition attacks by providing Shia militants with the capability to build IEDs with explosively formed projectiles similar to those developed by Iran and Lebanese Hezbollah. The Iranian Revolutionary Guard was linked to armor-piercing explosives that resulted in the deaths of Coalition Forces. The Revolutionary Guard, along with Lebanese Hezbollah, implemented training programs for Iraqi militants in the construction and use of sophisticated IED technology. *These individuals then passed on this training to additional militants in Iraq.* (Emphasis added.)

439.    Also in 2006, Brigadier Gen. Michael Barbero, Deputy Chief of Staff for Strategic Operations of MNF-I stated: "Iran is definitely a destabilizing force in Iraq. I think it's irrefutable that Iran is responsible for training, funding and equipping some of these Shi'a extremist groups and also providing advanced IED technology to them, and there's clear evidence of that."

440.    That same year, the Deputy Chief of Staff for Intelligence with the MNF-I, U.S. Army Major General Richard Zahner, declared that:

> Labels on weapons stocks seized inside and outside Iraq point to Iranian government complicity in arming Shiite militias in Iraq […] Iran is funneling millions of dollars for military goods into Iraq […] You'll find a red label on the C-4 [explosive] printed in English and will tell you the lot number and name of the manufacturer.

441.    Major General Zahner further added:

> [T]he control of military-grade explosives in Iran is controlled through the state apparatus and is not committed through rogue elements right there. It is a deliberate decision on the part of elements associated with the Iranian government to affect this type of activities.

442.    General Bergner commented on Iran funding Hezbollah operatives in Iraq:

Actions against these Iraqi groups have allowed coalition intelligence officials to piece together the Iranian connection to terrorism in Iraq […] Iran's Quds Force, a special branch of Iran's Revolutionary Guards, is training, funding and arming the Iraqi groups. […] It shows how Iranian operatives are using Lebanese surrogates to create Hezbollah-like capabilities. And it paints a picture of the level of effort in funding and arming extremist groups in Iraq.

443.    Bergner further noted that:

The groups operate throughout Iraq. They planned and executed a string of bombings, kidnappings, sectarian murders and more against Iraqi citizens, Iraqi forces and coalition personnel. They receive arms—including explosively formed penetrators, the most deadly form of improvised explosive device—and funding from Iran. They also have received planning help and orders from Iran.

444.    In May 2007, the Commander of the Multi-National Division-Center, U.S. Army

Major General Richard Lynch, stated that:

Most of our casualties have come from improvised explosive devices. That's still the primary threat to our soldiers—IEDs. And we have an aggressive campaign to counter those IEDs, but they still are taking a toll on our soldiers: 13 killed, 39 soldiers wounded. *What we're finding is that the technology and the financing and the training of the explosively formed penetrators are coming from Iran.* The EFPs are killing our soldiers, and we can trace that back to Iran." [Emphasis added.]

445.    According to the U.S. State Department's 2007 Country Reports on Terrorism:

Despite its pledge to support the stabilization of Iraq, Iranian authorities continued to provide lethal support, including weapons, training, funding, and guidance, to some Iraqi militant groups that target Coalition and Iraqi security forces and Iraqi civilians. In this way, Iranian government forces have been responsible for attacks on Coalition forces. The Islamic Revolutionary Guard Corps (IRGC)-Qods Force, continued to provide Iraqi militants with Iranian-produced advanced rockets, sniper rifles, automatic weapons, mortars that have killed thousands of Coalition and Iraqi Forces, and explosively formed projectiles (EFPs) that have a higher lethality rate than other types of improvised explosive devices (IEDs), and are specially designed to defeat armored vehicles used by Coalition Forces. The Qods Force, in concert with Lebanese Hezbollah, provided training outside Iraq for Iraqi militants in the construction and use of sophisticated IED technology and other advanced weaponry. These individuals then passed on this training to additional militants inside Iraq, a "train-the-trainer"

86

program. In addition, the Qods Force and Hezbollah have also provided training inside Iraq. In fact, Coalition Forces captured a Lebanese Hezbollah operative in Iraq in 2007.

446.    Other U.S. Government reports, such as the Department of Defense's 2007

*Measuring Stability and Security in Iraq* quarterly report to Congress, similarly concluded that:

> The Iranian regime's primary tool for exercising clandestine influence in Iraq is the Islamic Revolutionary Guard Corps' (IRGC) Qods Force (QF), which provides arms, intelligence, funds, training, and propaganda support to Iraqi Shi'a militants targeting and killing Coalition and Iraqi forces, as well as Iraqi civilians. The QF seeks to increase long-term Iranian strategic influence in Iraq and the withdrawal of U.S. forces. Among the weapons it provides to Iraqi militants are improvised explosive devices (IEDs), advanced IED technologies (including explosively formed projectiles (EFPs)), and rockets and mortars used for indirect fire attacks.

447.    These observations continued in 2008.

448.    According to the U.S. State Department's 2008 Country Reports on Terrorism:

> The Qods Force, an elite branch of the Islamic Revolutionary Guard Corps (IRGC), is the regime's primary mechanism for cultivating and supporting terrorists abroad. The Qods Force provided aid in the form of weapons, training, and funding to HAMAS and other Palestinian terrorist groups, Lebanese Hezbollah, Iraq-based militants, and Taliban fighters in Afghanistan.…

> Despite its pledge to support the stabilization of Iraq, Iranian authorities continued to provide lethal support, including weapons, training, funding, and guidance, to Iraqi militant groups that targeted Coalition and Iraqi forces and killed innocent Iraqi civilians. Iran's Qods Force continued to provide Iraqi militants with Iranian-produced advanced rockets, sniper rifles, automatic weapons, and mortars that have killed Iraqi and Coalition Forces as well as civilians. Tehran was responsible for some of the lethality of anti-Coalition attacks by providing militants with the capability to assemble improvised explosive devices (IEDs) with explosively formed projectiles (EFPs) that were specially designed to defeat armored vehicles. The Qods Force, in concert with Lebanese Hezbollah, provided training both inside and outside of Iraq for Iraqi militants in the construction and use of sophisticated IED technology and other advanced weaponry.

449.    One of the ways in which the IRGC provided "militants with the capability to assemble improvised explosive devices (IEDs) with explosively formed projectiles (EFPs) that

were specially designed to defeat armored vehicles" included providing them with manufacturing supplies such as copper and steel, as well as machinery—including hydraulic presses used to form copper into the shape of disks used in EFPs.

450.     Likewise, the State Department's 2011 Country Reports on Terrorism reported:

> Despite its pledge to support the stabilization of Iraq, Iran continued to provide lethal support, including weapons, training, funding, and guidance, to Iraqi Shia militant groups targeting U.S. and Iraqi forces, as well as civilians. Iran was responsible for the increase of lethal attacks on U.S. forces and provided militants with the capability to assemble explosives designed to defeat armored vehicles. The IRGC-QF [Islamic Revolutionary Guard Corps-Quds Force], in concert with Lebanese Hezbollah, provided training outside of Iraq as well as advisors inside Iraq for Shia militants in the construction and use of sophisticated improvised explosive device technology and other advanced weaponry.

451.     Similarly, in 2011, the U.S. Ambassador to Iraq, James F. Jeffrey, was quoted as saying:

> [F]resh forensic testing on weapons used in the latest deadly attacks in the country bolsters assertions by U.S. officials that Iran is supporting Iraqi insurgents with new weapons and training. [...] We're not talking about a smoking pistol. There is no doubt this is Iranian.

452.     All of the foregoing support from Iran and its agents for attacks on Coalition Forces and Iraqi civilians was financed and facilitated, in substantial part, by funds transfers initiated by Iran through Iranian banks (including, *inter alia*, the Central Bank of Iran, Bank Melli Iran and Defendant Bank Saderat Plc) on behalf of, and for the benefit of, the IRGC, Hezbollah and IRISL as part of the Conspiracy set forth in detail herein.

453.     Because of the size and scope of Iran's efforts to murder Americans in Iraq—and subvert the U.S.-sponsored and freely elected Iraqi government, Iran required access to hundreds of millions of dollars that it could only be reliably and effectively transfer through the global financial system with the illicit assistance of the Western Bank Defendants.

## H.    ALL OF THE ATTACKS AT ISSUE IN THIS COMPLAINT WERE ACTS OF INTERNATIONAL TERRORISM

454.    At no time relevant to this Action did the United States declare war or enact an Authorization for the Use of Military Force against Iran.

455.    At no time relevant to this Action did the United States engage in an armed conflict with the military forces of Iran, or Iran's military forces or their agents engage in lawful acts of war against Coalition Forces.

456.    At no time relevant to this action did the Hezbollah and the IRGC's agents in Iraq who killed and injured Coalition Forces and civilians carry fixed distinctive signs recognizable at a distance, carry arms openly, conduct their operations in accordance with the laws and customs of war, or enjoy any form of combatant immunity for their acts.

457.    The specific attacks alleged herein were all committed by Hezbollah and the IRGC-QF through their terror cells in Iraq, not by armed forces of recognized governments or military forces.

458.    The deaths and injuries Plaintiffs sustained were not the result of, nor did they occur in the course of, a declared war with Iran, or an armed conflict between the United States and Iran.

459.    The conduct of Iran, the IRGC and Hezbollah violated the laws of armed conflict (including, *e.g.*, AAH operatives masquerading as members of U.S. armed forces and executing defenseless prisoners), and the attacks upon Iraqi and other civilians constituted a substantial, rather than an incidental, part of their objectives and conduct.

460.    The acts of the IRGC and Hezbollah that injured the Plaintiffs were acts of international terrorism within the meaning of 18 U.S.C. § 2331, involving violent acts intended to influence the United States by coercion (by coercing the withdrawal of Coalition Forces from Iraq) and to intimidate and coerce the Iraqi population, and were also  acts constituting terrorist activities

within the meaning of 8 U.S.C. § 1182(a)(3)(B)(iii)-(iv), and/or engaging in terrorism within the meaning of  22 U.S.C. § 2656f.

461.    At all relevant times Hezbollah was (and remains) a designated Foreign Terrorist Organization.

462.    From October 25, 2007 to the present, the IRGC-QF has been an SDGT .

## VI.   OVERVIEW OF THE CONSPIRACY

### A.    AGREEMENT AND KNOWLEDGE

463.    As noted above, "the Conspiracy" identified in this Complaint first began in the years immediately after Iran was first designated by the United States as a State Sponsor of Terrorism in 1984.

464.    As a result of that designation, Iran developed various ways to circumvent U.S. economic sanctions levied against the regime and to facilitate the free movement of U.S. dollars that Iran obtained (largely from the sale of petroleum and natural gas) without detection by the U.S. government in order to pursue foreseeably illicit objectives, including:

  a.    Concealing hundreds of billions of dollars of Iran's U.S. dollar-denominated transactions from detection, scrutiny, or monitoring by U.S. regulators, U.S. law enforcement, and/or U.S. depository institutions;

  b.    Assisting Iran in transferring at least $150 million to the IRGC-QF, Hezbollah, the Special Groups, and other instruments of Iranian state-sponsored terrorism; and

  c.    Assisting Iran in acquiring technology and components for its illegal Weapons of Mass Destruction program and illicit conventional arms trade.

465.    To further those objectives, Iran enlisted several Iranian state-owned banks as well as Defendant Bank Saderat Plc and various international financial institutions, including the Western Bank Defendants in this Action, which agreed to alter, falsify, or omit information from

payment order messages that involved Iran or Iranian parties, in particular several Iranian banks (as noted above, referred to herein occasionally as the "Iranian Bank Co-conspirators" (including Defendant Bank Saderat Plc)), as well as IRISL, for the express purpose of concealing Iran's financial transactions in the Eurodollar market from detection, scrutiny, or monitoring by U.S. regulators, law enforcement, and/or depository institutions.

466.    The Conspiracy between Iran, the IRGC, IRISL, Defendant Bank Saderat Plc, the other Iranian Bank Co-conspirators, and the Western Bank Defendants began no later than 1987, and upon information and belief, continues to the present (though individual Defendants joined the Conspiracy at different dates).

467.    The Conspiracy orchestrated by Iran made it possible for Iran to transfer: (1) hundreds of billions in U.S. dollar-denominated funds from its Eurodollar accounts maintained by various international banks, including the Defendants, through the United States in a manner designed to purposefully circumvent monitoring by U.S. regulators and law enforcement agencies; and (2) hundreds of millions of dollars to Hezbollah, the IRGC, and other terrorist organizations actively engaged in murdering and maiming U.S. servicemen and civilians in Iraq.

468.    Each of the Defendants knowingly entered into an agreement with Iran and its agents, including but not limited, to Defendant Bank Saderat Plc, other Iranian Bank Co-conspirators, including but not limited to, the Central Bank of Iran, Bank Melli (including Bank Melli's United Kingdom subsidiary Melli Bank Plc), and Bank Sepah (which are all instrumentalities of Iran), as well as the IRGC-controlled IRISL, under which the conspirators agreed to alter, falsify, or omit information from payment order messages for USD-denominated Eurodollar, trade-finance, precious metals and foreign exchange transactions that were purposefully directed at, and processed through, the United States.

469.    As alleged in detail below, each Defendant committed numerous overt acts in furtherance of the Conspiracy and knowingly and unlawfully agreed to engage in "stripping" hundreds of millions – and in some cases, billions – of U.S. dollar-denominated transactions on behalf of Iran knowing that Iran was a designated State Sponsor of Terrorism.

470.    Each Defendant entered into its agreement with Iran and the Iranian Bank Co-conspirators (including Defendant Bank Saderat Plc) aware that other co-conspirators (either the Defendants herein, or other foreign financial institutions) were also actively participating in the Conspiracy, and shared the common goal of the scheme's purpose of providing Iran and the Iranian Bank Co-conspirators (including Defendant Bank Saderat Plc) the ability to illegally transfer billions of dollars (undetected) through the United States, and were aware of many of the (often same or similar) methods being used by other members of the Conspiracy to effectuate it.

471.    Accordingly, each Defendant understood that its conduct was part of a larger scheme engineered by Iran; each Defendant knew the participation of other conspirators was essential to the Conspiracy's success; and each Defendant knew of and joined in the overriding scheme and sought to achieve and facilitate a common goal of helping Iran transfer billions of dollars through the United States while avoiding detection, scrutiny, or monitoring by U.S. regulators, U.S. law enforcement, and/or U.S. depository institutions.

472.    In addition, each Defendant also knew, or was deliberately indifferent to, several of the Conspiracy's foreseeable purposes and criminal objectives that included:

> a.    Facilitating illicit transactions totaling at least $50 million USD for the benefit of Hezbollah;
>
> b.    Facilitating illicit transactions totaling at least $100 million in USD funds for the direct benefit of the IRGC and billions in USD funds for the benefit of the NIOC, then controlled by the IRGC;
>
> c.    Facilitating at least hundreds of illicit transactions totaling more

than $60 million on behalf of IRISL including over 150 "stripped" transactions after IRISL was designated an SDN;

d.　　Facilitating tens of millions of dollars in illicit transactions on behalf of MODAFL, the IRGC, Mahan Air and other instrumentalities of Iranian state sponsored terror to further numerous violations of the U.S. trade embargo against Iran, conceal Iran's efforts to evade U.S. sanctions and enable Iran's acquisition from the United States of goods and technologies prohibited by U.S. law to be sold or transferred to Iran, including components of IEDs deployed against Coalition Forces in Iraq; and

e.　　Enabling Iran, the Iranian Bank Co-conspirators (including Defendant Bank Saderat Plc), the IRGC, Hezbollah, and the Special Groups to plan for, conspire to, and perpetrate acts of international terrorism under 18 U.S.C. § 2331(1); homicides, attempted homicides, or conspiracies to commit homicide under 18 U.S.C. § 2332(a)-(c); bombings using destructive devices under 18 U.S.C. § 2332a; bombings and attempted bombings under 18 U.S.C. § 2332f; engaging in terrorist activity under 8 U.S.C. § 1189(a)(3)(B)(iii)-(iv); and/or engaging in terrorism under 22 U.S.C. § 2656f.

473.　　As set forth below, each of the Defendants knew that Iran was a U.S.-designated State Sponsor of Terrorism, and that U.S. laws and regulations required it to fully disclose all funds transfers through the United States made on behalf of Iran, Iranian entities and Iranian banks.

474.　　Despite that knowledge, each of the Defendants knowingly conspired with Iran and its agents (including Defendant Bank Saderat Plc) to violate those U.S. laws and regulations to conceal hundreds of millions (and in some cases, billions) of dollars in funds transfers routed through the Eurodollar correspondent banking network for clearance and settlement in the United States on behalf of Iran, IRISL, and the Iranian Bank Co-conspirators, including Defendant Bank Saderat Plc.

475.　　During the relevant time period from 2004 through 2011, and as set forth in greater detail herein, each of the Defendants knowingly agreed to join the Conspiracy; knowingly and willfully participated in the Conspiracy; knew or was deliberately indifferent to the Conspiracy's

criminal purposes and objectives; took initiatives to improve its workings; and was aware of the participation of many (if not all) of its members.

### B. ACTS AND EFFECTS

476.    Through the Conspiracy, Iran provided material support to Hezbollah, the IRGC and their Iraqi proxies, including the Special Groups, which targeted American citizens in Iraq, and with substantial assistance from the Western Bank Defendants, concealed and disguised the nature, location, source, and origin of the material support it provided to these terrorists, knowing and intending that the funds be used in preparation for and in carrying out acts of terrorism against Americans and others, including civilians, in Iraq.

477.    As part of the Conspiracy, each of the Defendants took affirmative steps to violate U.S. criminal laws and to conceal from U.S. depository institutions, law enforcement, regulators, bank auditors, and counter-terrorism agencies the flow of hundreds of millions (and in some cases, billions) of U.S. dollars it was clearing and settling in the United States, including transfers for the benefit of the IRGC and Hezbollah, and through them to KH and other terrorist organizations actively engaged in murdering and maiming U.S. servicemen and civilians in Iraq on the IRGC's and Hezbollah's behalf.

478.    The conduct of each Defendant, its awareness of other Defendants' and Co-conspirators' participation and conduct, and the resulting "glaring hole" in America's counter-financing of terrorism and sanctions architecture described by former Manhattan District Attorney Robert M. Morgenthau, provided Iran with vital access to the U.S. financial system.

479.    U.S. "dollar clearing and settlement" – primarily (in this case) through the Clearing House Interbank Payments System in New York or "CHIPS-NY" system and the Federal Reserve Bank of New York ("FRB-NY") – is an elaborate inter-bank system in the U.S. by which banks

clear and settle credits and debits in their Eurodollar accounts with other banks all across the globe on a daily basis.

480.     The U.S. "dollar clearing and settlement" system is critical not only to the workings of the global economy, but provides financial institutions (and nation states) with critical, essential access to global trade-finance credit denominated in U.S. dollars.

481.     Thus, once Iran gained clandestine access to the U.S. "dollar clearing and settlement" system in New York, it could not only launder billions of dollars through its accounts in the Eurodollar market, but it could also borrow against the Eurodollar deposits it held in the Defendants' banks – facilitating further undetected transactions around the world in USD –  both for ordinary commercial purposes and the illegal aims and objectives of the Conspiracy.

482.     This broad-based access to the U.S. "dollar clearing and settlement" system was essential to Iran because of the scope of Iran's global ambitions at the time, which included driving the United States and its Coalition partners out of Iraq, dominating that country, and acquiring Weapons of Mass Destruction.

483.     Thus, among the effects of the Conspiracy, a State Department diplomatic cable from March 2008 noted that:

> Bank Melli and the Central Bank of Iran also provide crucial banking services to the Qods Force, the IRGC's terrorist supporting arm that was headed by UNSCR 1747 designee Commander Ghassem Soleimani. Soleimani's Qods Force leads Iranian support for the Taliban, Hezbollah [sic], Hamas [sic] and the Palestinian Islamic Jihad. Entities owned or controlled by the IRGC or the Qods Force use Bank Melli for a variety of financial services. From 2002 to 2006, Bank Melli was used to send at least $100 million to the Qods Force. Bank Melli use of Deceptive Banking Practices … When handling financial transactions on behalf of the IRGC, Bank Melli has employed deceptive banking practices to obscure its involvement from the international banking system. For example, Bank Melli has requested that its name be removed from payment instructions for US dollar denominated transactions.

484.     In addition, absent the access to the U.S. "dollar clearing and settlement" system afforded to Bank Saderat by the HSBC Defendants, Defendants SCB, Barclays, Credit Suisse and Commerzbank, both Iran and Hezbollah's access to USDs would have been diminished, and Iran's efforts to transfer large sums of U.S. dollars to Hezbollah would have been substantially impaired.

485.     By knowingly agreeing to enter into the Conspiracy, and by knowing or being deliberately indifferent to its lethal purposes, and by committing multiple overt acts in furtherance of the Conspiracy, the Defendants provided Iran with the means by which it could transfer more than $150 million to the IRGC, Hezbollah and the Special Groups, which were actively engaged in planning and perpetrating the murder and maiming of hundreds of Americans in Iraq during the same period of time that the Conspiracy was proceeding, thereby substantially enhancing Iran, the IRGC's, Hezbollah's, and the Special Groups' ability to inflict the deaths and injuries described herein.

486.     The Conspiracy was a substantial cause in fact and a significant factor in the chain of events leading to the Plaintiffs' deaths and injuries because the Conspiracy substantially assisted Iran, the IRGC, IRISL, Mahan Air, Hezbollah, and/or the Special Groups in committing the acts of international terrorism that killed and injured the Plaintiffs herein, by providing them collectively with more than $200 million U.S. dollars in funding that were used, *inter alia*, to arm, train and fund Iranian terror proxies in Iraq that targeted American citizens.

487.     By knowingly agreeing to enter the Conspiracy, and participating in and committing overt acts in the course of the Conspiracy that resulted in damage and injury to the Plaintiffs, Defendants committed acts of international terrorism as defined by 18 U.S.C. §§ 2331, 2339A and 2339B that caused death and injury to the Plaintiffs in this action, and are civilly liable under 18 U.S.C. § 2333(a) of the Anti-Terrorism Act ("ATA") to the Plaintiffs, American citizens

who have been killed and injured by reason of acts of international terrorism perpetrated by Iran through its agents, including the IRGC, Hezbollah, and the Special Groups.

488.    Defendant HSBC-US not only knowingly participated in the Conspiracy, but as a U.S. person within the meaning of 18 U.S.C. § 2332d also committed further acts of international terrorism in violation of 18 U.S.C. §§ 2331 and 2332d by knowingly (or with reason to know) facilitating financial transactions with Iran, which it knew was a designated State Sponsor of Terrorism. HSBC-US's acts were a cause of the deaths and injuries sustained by the Plaintiffs in this action, and HSBC-US is therefore civilly liable under 18 U.S.C. § 2333(a) of the ATA to the Plaintiffs.

489.    Defendants SCB, ABN Amro (RBS N.V.), and Commerzbank not only knowingly participated in the Conspiracy, but because their respective New York branches constitute U.S. persons within the meaning of 18 U.S.C. § 2332d, these Defendants also committed further acts of international terrorism in violation of 18 U.S.C. §§ 2331 and 2332d by knowingly (or with reason to know) facilitating financial transactions with Iran, which each such Defendant knew was a designated State Sponsor of Terrorism. Those acts were a cause of the deaths and injuries sustained by the Plaintiffs in this action, and these Defendants are therefore civilly liable under 18 U.S.C. § 2333(a) of the ATA to the Plaintiffs.

C.    **BANK SADERAT PLC's AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY**

490.    On September 8, 2006, the U.S. Office of Foreign Assets Control ("OFAC") amended § 560.516 of the ITRs and excluded Bank Saderat from the Iranian U-Turn exemption.

491.    In announcing the 2006 change to the ITRs excluding Bank Saderat Iran from the U-Turn exemption, OFAC stated:

> OFAC has amended the Iranian Transactions Regulations (ITR) to cut off

> Bank Saderat, one of Iran's largest government-owned banks, from the U.S. financial system. Bank Saderat has been a significant facilitator of Hezbollah's financial activities and has served as a conduit between the Government of Iran and Hezbollah….

492.    According to then-Under Secretary for Terrorism and Financial Intelligence Stuart Levey, "Bank Saderat facilitates Iran's transfer of hundreds of millions of dollars to Hezbollah and other terrorist organizations each year. We will no longer allow a bank like Saderat to do business in the American financial system, even indirectly."

493.    The Treasury Department press release announcing the changes to the ITR stated that "a Hezbollah-controlled organization [] has received $50 million directly from Iran through Bank Saderat since 2001."

494.    Assistant Treasury Secretary for Terrorist Financing Daniel Glaser testified before the Senate Committee on Banking, Housing and Urban Affairs that "Hezbollah uses Saderat to send money to other terrorist organizations as well."

495.    For many years preceding the revocation of its U-Turn exemption, Bank Saderat illegally routed its USD transactions through the United States with the assistance of various Western commercial banks, including the Defendants herein.

496.    From 2002 forward, Defendant Bank Saderat Plc continued Bank Saderat's existing practice of: (1) illegally routing its USD transactions through the United States; and (2) transferring tens of millions of dollars to Hezbollah and other designated terrorist groups.

497.    As detailed in a January 9, 2009, Deferred Prosecution Agreement entered into by Lloyds TSB Bank Plc ("Lloyds") with U.S. law enforcement, Defendant Bank Saderat Plc directed illegal funds transfers to the U.S. and worked with Lloyds to strip its USD transactions of any reference to Iran or Bank Saderat.

498.    In 2003, Lloyds exited its relationship with Bank Saderat Plc, and Defendant Credit

Suisse assumed Lloyds' role of illegally transferring USD through the United States while stripping references to Bank Saderat Plc and Iran from the transactions (as set forth below and, as also discussed below, in a Deferred Prosecution Agreement that Defendant Credit Suisse signed in 2009).

499.    Notwithstanding the revocation of its access to the Iranian U-Turn exemption, Bank Saderat (and Bank Saderat Plc) continued to illegally direct USD transactions through the United States with the active assistance of the other Defendants listed herein.

500.    On February 13, 2004, Defendant SCB opened accounts for Bank Saderat Plc. It also maintained other accounts for Bank Saderat Iran, including an account at SCB, Dubai.

501.    During the relevant time period from 2004 to 2011, and as described in more detail below, Bank Saderat Plc, working in concert with Standard Chartered Bank, financed the illegal acquisition of various U.S.-origin export-controlled goods on behalf of Mahan Air and various sub-agencies of MODAFL.

502.    For example, Standard Chartered Bank facilitated at least 10 transactions involving Letters of Credit valued at $1,559,127, which involved the shipment of U.S.-origin export-controlled aircraft parts sold by the Singapore-based Monarch Aviation, a company that was part of Iran's illegal procurement network, to various MODAFL sub-agencies.

503.    A sub-agency of MODAFL obtained a Letter of Credit issued by Bank Refah, Iran, and sent it to Standard Chartered's branch in Singapore (where the Iranian front company Monarch Aviation maintained accounts) while reimbursement authorization was sent to the Iran Overseas Investment Bank London, i.e. Bank Saderat Plc's predecessor, which in turn either directly

financed the illegal acquisition of goods from the United States, or provided a surety for Bank Refah's payment.[26]

504.    The goods were shipped by Iran Air[27] from Kuala Lumpur Airport, Malaysia, to Tehran Airport, Iran.

505.    The LCs were refinanced by Standard Chartered's Dubai branch through its credit facility with the CBI, with payment being made to Monarch Aviation's account with Standard Chartered, Singapore through the latter's U.S. dollar account with Standard Chartered Bank, London, which in turn received the funds into its USD nostro account with Standard Chartered's New York branch.

506.    In another instance discussed *infra*, Bank Saderat Plc knowingly sent a concealed and illegal payment via Standard Chartered's New York branch and JP Morgan Chase, New York, to Standard Chartered Bank in Dubai on behalf of a MODAFL's subsidiary, the Iran Helicopter Support and Renewal Company ("IHSRC").

507.    The payment facilitated IHSRC's acquisition (via a company named Jetpower) of U.S. manufactured helicopter parts through an elaborate money laundering scheme intended to conceal from U.S. authorities: (1) the unlawful acquisition of U.S.- manufactured equipment for Iran's military; (2) the complex layering of the transaction involving Bank Melli's branches in London and Hong Kong; and (3) Bank Refah and Bank Saderat's involvement with SCB.

---

[26]    The Reimbursing Bank usually pays the Negotiating Bank (in this case SCB) against a valid reimbursement authority received from the Issuing Bank (in this case Bank Refah) and a validated statement from the Negotiating Bank that the documents complied with LC terms, but in certain cases it only serves as a surety for the payment. SCB-London was also one of Bank Refah's correspondent banks in the UK.

[27]    Iran Air was designated by the U.S. Treasury Department in 2011: "Iran's national airline carrier, Iran Air, is a commercial airline used by the IRGC and Iran's Ministry of Defense and Armed Forces Logistics (MODAFL) to transport military related equipment.… Iran Air has provided support and services to MODAFL and the IRGC through the transport and/or transfer of goods for, or on behalf of, these entities. On numerous occasions since 2000, Iran Air shipped military-related electronic parts and mechanical equipment on behalf of MODAFL."

508. The HSBC Defendants also maintained one or more accounts for Bank Saderat Plc during the relevant time period.

509. In an October 9, 2006 email, Defendant HSBC-Middle East's Regional Head of Legal and Compliance noted the U.S. government's "direct evidence against Bank Saderat particularly in relation to the alleged funding of Hezbollah" but nonetheless maintained the account(s) thereafter and continued to facilitate transactions for Bank Saderat Plc.

510. As noted *supra*, in October 2007, Bank Saderat Iran (including Defendant Bank Saderat Plc), was designated an SDGT pursuant to E.O. 13224.

511. The U.S. Treasury Department's press release regarding Bank Saderat's designation stated:

> Bank Saderat, its branches, and subsidiaries: Bank Saderat, which has approximately 3200 branch offices, has been used by the Government of Iran to channel funds to terrorist organizations, including Hezbollah and EU-designated terrorist groups Hamas, PFLP-GC, and Palestinian Islamic Jihad. For example, from 2001 to 2006, Bank Saderat transferred $50 million from the Central Bank of Iran through its subsidiary in London to its branch in Beirut for the benefit of Hezbollah fronts in Lebanon that support acts of violence.

512. As set forth below, Defendant Barclays closed its Eurodollar accounts for Bank Saderat Plc, in 2008, months *after* Bank Saderat Plc was designated an SDGT, and more than a year after the U.S. Treasury Department reported that "Bank Saderat facilitates Iran's transfer of hundreds of millions of dollars to Hezbollah and other terrorist organizations each year."

513. The HSBC Defendants, and Defendants Commerzbank, SCB, Barclays, and Credit Suisse altered, falsified, or omitted information from Eurodollar payment order messages that they facilitated on behalf of Bank Saderat (and Bank Saderat Plc) at all times knowing, or deliberately indifferent to the fact, that Bank Saderat was facilitating Iranian-sponsored terrorism and, after October 2007, knowing, or deliberately indifferent to the fact, that Bank Saderat (including Bank

Saderat Plc) was an SDGT so-designated for its very role as a "significant facilitator of Hezbollah's financial activities and has served as a conduit between the Government of Iran and Hezbollah."

514.    Moreover, as a Lebanese-based terrorist organization, Hezbollah was (and remains) particularly in need of USD funds because much of the Lebanese economy is "dollarized" (*i.e.* banking and retail transactions, credit and debt instruments are often, if not primarily, conducted in USD funds).

515.    Accordingly, Bank Saderat Plc's provision of tens of millions of dollars to Hezbollah provided Hezbollah with substantial assistance in carrying out its terrorist activities in Iraq, including Hezbollah's commission of the terrorist attacks that killed and injured the Plaintiffs.

516.    Moreover, Plaintiffs' deaths and injuries herein were a reasonably foreseeable result of Bank Saderat Plc's provision of tens of millions of dollars to Hezbollah.

D.    THE CENTRAL BANK OF IRAN'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY

517.    The Central Bank of Iran ("CBI") is fully controlled and run by individuals directly appointed by the Government of Iran.

518.    At all relevant times, the CBI has not functioned in the same manner as central banks in Western countries that are institutionally designed to be independent from political interference, nor is its purpose limited to "regulating" Iranian banks and managing Iran's currency and internal interest rates.

519.    Instead, the CBI is an alter-ego and instrumentality of the Iranian government and its Supreme Leader, and it has routinely used Iranian banks like Bank Melli Iran and Bank Saderat Iran as conduits for terror financing and weapons proliferation on behalf of the Iranian regime.

520.    At all relevant times, the CBI was an active participant in the Conspiracy.

521.    For example, leading up to the adoption of UN Security Council Resolution 1747

(March 2007), which resulted in the freezing of assets belonging to Iran's Bank Sepah, the CBI furthered the Conspiracy by using non-Iranian financial institutions to shield Bank Sepah's assets from the impact of impending sanctions.

522.    Throughout the relevant time period, the CBI maintained Eurodollar accounts at Bank Melli Iran, Bank Melli Plc, Bank Saderat Iran and Defendant Bank Saderat Plc in various currencies, including USD.

523.    Bank Melli Iran's U.K. subsidiary (later Bank Melli Plc) managed the CBI's Eurodollar accounts in Europe.

524.    In the wake of U.S. and later European Union designations against Iranian banks (including Bank Saderat and Bank Melli), the CBI often acted as a secret proxy for those designated entities.

525.    As part of the Conspiracy, the CBI utilized Defendant Bank Saderat Plc to transfer USD funds to Hezbollah.

526.    The CBI also maintained Eurodollar accounts, and unlawfully transferred USD funds in furtherance of the Conspiracy, with the assistance of Defendants SCB, ABN Amro (RBS N.V.) and the HSBC Defendants, including facilitating billions of dollars in USD funds transfers on behalf of the IRGC, through the aforementioned NIOC, which was designated as an SDN by the United States because it was an IRGC agent during the relevant time period.

527.    As such, illicit transfers on behalf of the NIOC at that time were not for the benefit of a legitimate agency, operation or program of Iran.[28]

---

[28]    The Superseding Indictment filed in *U.S. v. Zarrab* (filed in the S.D.N.Y (1:15-cr-00867)) demonstrates that NIOC continued to participate in the Conspiracy and launder U.S. dollars through U.S. financial institutions in 2013.

528.    In addition, the Iran Threat Reduction and Syria Human Rights Act 2012 stated

that:

> It is the sense of Congress that the National Iranian Oil Company and the
> National Iranian Tanker Company are not only owned and controlled by the
> Government of Iran but that those companies provide significant support to
> Iran's Revolutionary Guard Corps and its affiliates.[29]

529.    Moreover, according to a published report, the National Iranian Oil Company even

took an active role in support of Iran's terrorist activities in Iraq by providing intelligence in

support of attacks against Coalition Forces along the Iranian border by using its own helicopters

to conduct surveillance on Coalition Forces' Forward Operating Bases ("FOBs").

530.    In early 2001, and in furtherance of the Conspiracy, the CBI asked Defendant

Standard Chartered Bank to act as its correspondent bank with respect to Eurodollar payments on

behalf of the NIOC.

531.    As alleged herein, SCB agreed to participate in the Conspiracy and remove

identifying data on SWIFT-NET messages for these and other wire transfers.

532.    Thereafter, between 2001 and 2006, the CBI sent approximately 2,226 payment

order messages for a total value of *$28.9 billion* to Standard Chartered in London, the vast majority

of which were illegally routed through the U.S. as described herein.

533.    During the same time period, the CBI also maintained a Eurodollar credit facility

at Standard Chartered Bank's branch in Dubai, UAE, which it used to assist Iran in illegally

acquiring technology and components on behalf of MODAFL.

534.    As detailed further below, and in furtherance of the Conspiracy, the CBI and

Defendant ABN Amro (RBS N.V.) (which also maintained Eurodollar accounts for the CBI, and

---

[29]    *See*, https://www.treasury.gov/resource-center/sanctions/Documents/hr_1905_pl_112_158.pdf.

had numerous financial and business dealings with the CBI) conspired to provide illegal material support to Iran and Iranian parties.

535.    Between 2002 and 2004, Defendant ABN Amro (RBS N.V.) accepted USD Eurodollar deposits from the CBI on a regular basis with an average deposit size in the range of $200 million USD, and the CBI instructed, and ABN Amro (RBS N.V.) agreed, to follow illegal procedures to launder USD-denominated Eurodollar deposits to the CBI's Eurodollar and local currency accounts with other European banks with branches or offices in London.

536.    In furtherance of the Conspiracy, the CBI coordinated with Defendant ABN Amro (RBS N.V.)'s Central Bank Desk in Amsterdam regarding the procedure to be followed for repayment of USD deposits to their Eurodollar accounts with European banks with offices or branches in London.

537.    This procedure stipulated that payment order messages sent to U.S. clearing banks for payment of USD funds to the CBI should not contain *any* reference to the Central Bank of Iran, or *any other* reference relating to Iran.

538.    In 2001, the CBI also approached members of the HSBC Group, specifically Defendants HSBC-Middle East and HSBC-London, to obtain their agreement to move the CBI's clearing and settlement business from National Westminster Bank Plc to the HSBC Defendants, and intended to clear USD funds transactions through Defendant HSBC-US.

539.    Pursuant to that agreement, the CBI eventually moved its Eurodollar accounts to the HSBC Defendants, and by late 2003, the CBI was one of six Iranian banks that used members of the HSBC Group for (mostly illegal) correspondent banking through the U.S. dollar clearing and settlement in New York.

540.     With Defendant HSBC Holdings' knowledge, and in furtherance of the Conspiracy, Defendants HSBC-Middle East and HSBC-London manually intervened in the processing of payment orders by the CBI by removing: the Central Bank of Iran's name; its SWIFT-NET account (identified by BIC address BMJIIRTH); and country of origin (Iran).

541.     Defendant HSBC-US also knew that other HSBC Defendants were altering and omitting information in SWIFT-NET payment order messages regarding Iranian parties, *i.e.* "stripping" these transactions, but nevertheless knowingly continued processing transactions despite that very knowledge.[30]

### E.     BANK MELLI IRAN AND MELLI BANK PLC'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY

542.     Bank Melli Iran, one of the largest banks in Iran, was established in 1927 by order of the Iranian Parliament.

543.     Following the Iranian Revolution in 1979, all banks in Iran were nationalized, and even today most are effectively controlled by the Iranian regime.

544.     Melli Bank Plc in London, England, was established in January 2002 as a wholly-owned subsidiary of Bank Melli Iran.

545.     According to the U.S. government, from 2004 to 2011, Bank Melli Iran and Melli Bank Plc in London transferred approximately $100 million USD to the IRGC-QF, which trained, armed, and funded terrorist groups that targeted, killed and maimed American and Iraqi forces and civilians.

---

[30]     In furtherance of the Conspiracy, the CBI also conducted illegal precious metals transactions, primarily in gold bullion. For example, the December 2012 Consent Order entered into between OFAC and Defendant HSBC Holdings Plc stated that:

> On May 24, 2006, the London branch of HBUS acted as a clearing bank in a book entry transfer of 32,000 ounces of gold bullion, valued at $20,560,000, for the ultimate benefit of Bank Markazi, Iran [the CBI], in apparent violation of the prohibition against the "exportation . . . , directly or indirectly, from the United States, ... of any ... services to Iran or the Government of Iran," 31 C.F.R. § 560.204.

546. Specifically, according to the U.S. government in a November 10, 2009 diplomatic cable:

> [The] Islamic Revolutionary Guards Corps (IRGC) and IRGC-Qods Force, who channel funds to militant groups that target and kill Coalition and Iraqi forces and innocent Iraqi civilians, have used Bank Melli and other Iranian banks to move funds internationally. Bank Melli used deceptive banking practices to obscure its involvement from the international banking system by requesting that its name be removed from financial transactions when handling financial transactions on behalf of the IRGC.

547. Bank Melli Iran and Melli Bank Plc were designated as SDNs pursuant to E.O. 13382 in October 2007, and included on OFAC's SDN list, which resulted in, *inter alia*, their exclusion from the U-Turn exemption for Iranian Eurodollar transactions.

548. The U.S. Treasury Department press release announcing the designation stated:

> Bank Melli also provides banking services to the [Iranian Revolutionary Guard Corps] and the Qods Force. Entities owned or controlled by the IRGC or the Qods Force use Bank Melli for a variety of financial services. From 2002 to 2006, Bank Melli was used to send at least $100 million to the Qods Force. When handling financial transactions on behalf of the IRGC, Bank Melli has employed deceptive banking practices to obscure its involvement from the international banking system. For example, Bank Melli has requested that its name be removed from financial transactions.

549. In April 2008, Assistant Treasury Secretary for Terrorist Financing Daniel Glaser testified before the House Committee on Foreign Affairs, Subcommittee on the Middle East and South Asia and the Subcommittee on Terrorism, Nonproliferation and Trade, confirmed that:

> Entities owned or controlled by the IRGC or the Qods Force use Bank Melli for a variety of financial services. From 2002 to 2006, Bank Melli was used to send at least $100 million to the Qods Force. When handling financial transactions on behalf of the IRGC, Bank Melli has employed deceptive banking practices to obscure its involvement from the international banking system. For example, Bank Melli has requested that its name be removed from financial transactions.

550. In mid-2007, Bank Melli Iran's branch in Hamburg ("Bank Melli-Hamburg") transferred funds for the Defense Industries Organization ("DIO").

551.    DIO is an Iranian government-owned defense manufacturer whose name, logo and/or product tracking information was stamped on munitions found in weapons caches that were seized from the Special Groups in Iraq; including large quantities of weapons produced by DIO in 2006 and 2007 (for example, 107 millimeter artillery rockets, as well as rounds and fuses for 60 millimeter and 81 millimeter mortars.)

552.    Since at least the mid-1980s, Bank Melli has maintained Eurodollar accounts, at one time or another, with Defendants ABN Amro (RBS N.V.), Barclays, Credit Suisse, SCB, Commerzbank and the HSBC Defendants.

553.    As early as 1987, Bank Melli instructed Defendant Barclays to process Eurodollar transactions in favor of Bank Melli's London branch by referencing only Bank Melli's Eurodollar account number at Midland Bank Plc in London without referencing Bank Melli Iran's name in the SWIFT-NET payment orders.

554.    Bank Melli further instructed Barclays to send separate payment order message instructions, which included full transaction details, to Bank Melli's London Branch.

555.    Barclays agreed and assisted Bank Melli in its illegal conduct and continued to do so even *after* Bank Melli was designated by the United States and publicly identified as a major source of the IRGC's funding.

556.    No later than December 2000, Bank Melli opened a Eurodollar account with Defendant ABN Amro (RBS N.V.)'s branch in Dubai, United Arab Emirates ("UAE") and worked with ABN Amro (RBS N.V.) to strip its U.S. dollar-denominated transactions.

557.    Similarly, in July 2003, Defendant SCB learned that a competitor was exiting the Iranian business completely and sought to pick up this business and add Eurodollar accounts for

five Iranian banks at SCB-London. Bank Melli was among the banks whose business SCB expressly sought to (and did) acquire.

558.    In January 2004, SCB decided to proceed with the Iranian business, and no later than February 13, 2004, SCB opened Eurodollar accounts for Bank Melli and thereafter participated in the Conspiracy by facilitating unlawful transactions for Bank Melli.

559.    In addition, Bank Melli Iran's branch in the UAE was instrumental in facilitating U.S. sanctions-evading trade-finance and Eurodollar payment transactions on behalf of Mahan Air and MODAFL.

560.    For example, Bank Melli issued a Letter of Credit to Mahan Air in August 2004 through Standard Chartered Bank, Dubai in favor of a UAE-based company called Aeronautical & Security for the shipment of an aircraft engine (identified by model number CF6-50C2) manufactured by General Electric and shipped from Luxemburg to Tehran, Iran.

561.    Bank Melli UAE instructed Credit Suisse, Zurich to make the payment, which in turn instructed Bank of New York in New York (one of Credit Suisse's U.S. clearing and settlement banks) to credit SCB's New York branch for further credit to the account of SCB-Dubai, which then credited Aeronautical & Security's Eurodollar account.

562.    The following flow-chart shows the overall flow of USD funds involved with Mahan Air's illegal acquisition of a U.S.-manufactured, export-controlled aircraft engine:

## MAHAN AIR ACQUIRES AN AIRCRAFT ENGINE



563.     In another example, Bank Refah Kargaran, Iran issued a Letter of Credit in USD to a MODAFL sub-agency through Standard Chartered Bank, Dubai in favor of a Dubai-based company called FP Aeroparts for the illegal shipment (via Iran Air) of U.S. aircraft parts.

564.     Bank Melli served as the Reimbursing Bank on the trade-finance transaction, and it subsequently instructed Credit Suisse, Zurich to debit its Eurodollar account as part of the flow of USD funds between the LCs counterparties.

565.     As the LC transaction proceeded, Credit Suisse then further instructed The Bank of New York to pay Standard Chartered Bank's New York branch (the clearing bank for the transaction), which further credited the USD account it maintained for SCB, Dubai with the amount due for the shipment of aircraft parts.

110

566.   To close-out the LC transaction, SCB, Dubai then credited the Eurodollar account it maintained on behalf of FP Aeroparts Middle East for the amount of the shipment.

567.   The following flow-chart shows the overall flow of USD funds involved with MODAFL's illegal acquisition of the U.S.-manufactured aircraft parts:



568.   As reflected in the above flow-chart, and during the relevant time period, Defendant Credit Suisse maintained Eurodollar accounts in Zurich, Switzerland on behalf of Bank Melli.

569.   Credit Suisse also instructed and trained Bank Melli employees, and conspired with Bank Melli, on ways to format Bank Melli's payment orders so that the resulting SWIFT-NET

messages would avoid detection by the automated filter algorithms in U.S. depository institutions' automated OFAC sanction screening software.

570.     During the relevant time period (and beginning no later than July 2003), Defendant Commerzbank also conspired with Bank Melli to route its Eurodollar clearing and settlement business through Commerzbank's correspondent banking relationships and SWIFT-NET accounts.

571.     Commerzbank further advised Bank Melli to list "non ref" in the ordering party field in all payment order messages because it would trigger a manual review of the overall Eurodollar payment transaction, thereby enabling Commerzbank personnel to ensure that the SWIFT-NET messages did not contain any information linked to Iran.

572.     Defendant HSBC-London also maintained Eurodollar accounts for Bank Melli Iran, and it used HSBC-US to provide illegal USD funds clearing and settlement services for Bank Melli during the relevant period.

573.     Yet despite the fact that several SWIFT-NET payment order messages were supposed to have been fully "stripped" by HSBC-London—before their transmittal to the U.S.— they were nevertheless blocked by the HSBC-US OFAC filter in New York because Bank Melli was referenced in error (thus placing HSBC-US on notice that HSBC-London was working in concert with Bank Melli to evade U.S. law, regulations and economic sanctions against Iran).

574.     Even with these blatant warning signs, HSBC-US continued to routinely provide Eurodollar clearing and settlement services to the HSBC Defendants, knowing full well that they were violating U.S. laws and regulations by laundering money on behalf of Bank Melli.

575.     Because, as discussed below, HSBC-US knew of this unlawful conduct—and continued to facilitate it— HSBC-US violated, *inter alia*, 18 U.S.C. § 2332d.

F.     **BANK MELLAT'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY**

576.    Bank Mellat provides banking services in support of Iran's Weapons of Mass Destruction program through the Atomic Energy Organization of Iran ("AEOI") and Novin Energy Company.

577.    In 2007, Bank Mellat was designated by the U.S. Treasury Department for providing "banking services in support of Iran's nuclear entities, namely the Atomic Energy Organization of Iran (AEOI) and Novin Energy Company. Both AEOI and Novin Energy have been designated by the United States under E.O. 13382 and by the UN Security Council under UNSCRs 1737 and 1747."

578.    During the relevant time period, Bank Mellat provided financial services and maintained Eurodollar accounts for AEOI and Novin Energy Company, and as part of the Conspiracy, Bank Mellat affirmatively worked to prevent disclosure of its dollar-denominated transactions on behalf of these designated customers.

579.    In June 2006, Bank Mellat was involved in a transfer totaling over $250 million dollars into a Eurodollar account it held for Novin Energy Company.

580.    As part of the Conspiracy, the CBI effectuated the payment(s) in USD funds to Bank Mellat's Eurodollar account in London for further credit to the Eurodollar account of Bank Mellat's client – Novin Energy Company.[31]

581.    In 2007, Bank Sepah facilitated payments in USD funds to Eurodollar accounts at Bank Mellat on behalf of entities associated with Iran's Aerospace Industries Organization

---

[31]     Novin Energy Company was designated by the U.S. Treasury Department under E.O 13382 and by the United Nations Security Council in Resolution 1747.

("AIO"), a subsidiary of Iran's Ministry of Defense and Armed Forces Logistics ("MODAFL") that was designated by the United States on June 28, 2005.[32]

582.     The AIO is the Iranian organization responsible for ballistic missile research, development and production activities and organizations, including the Shahid Hemmat Industries Group ("SHIG") and the Shahid Bakeri Industries Group ("SBIG"), which were both listed under U.N. Security Council Resolution 1737 and designated by the United States under E.O. 13382.

583.     Bank Mellat was designated by the United States on October 25, 2007 in connection with Weapons of Mass Destruction proliferation activities, and was included on OFAC's SDN list. The designation, *inter alia*, excluded Bank Mellat from accessing the U-Turn exemption for Iranian Eurodollar transactions.

584.     In 2002, together with Iran's Bank Tejarat, Bank Mellat merged its London branch to form Persia International Bank Plc in the United Kingdom.

585.     During the relevant time period, both Defendant HSBC-London and Defendant Barclays maintained Eurodollar accounts for Persia International Bank Plc and served as its "principal bankers" in the Eurodollar market.

### G.     BANK SEPAH'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY

586.     Bank Sepah is an Iranian government-owned and government-controlled financial institution.

587.     In 2007, the U.S. Treasury Department designated Bank Sepah for providing support and services to designated Iranian proliferation firms. The designation was effectuated

---

[32]     When Bank Sepah was designated by the U.S. in January 2007, the U.S. government noted that "Bank Sepah is AIO's bank of choice, and since at least 2000, Sepah has provided a variety of critical financial services to Iran's missile industry, arranging financing and processing dozens of multi-million dollar transactions for AIO and its subordinates…" *See* https://www.treasury.gov/press-center/press-releases/Pages/hp219.aspx.

pursuant to E.O. 13382, due to Bank Sepah's Weapons of Mass Destruction proliferation-related activities.

588.    Bank Sepah International Plc, a wholly-owned subsidiary of Bank Sepah in the United Kingdom, was also designated.

589.    According to the U.S. Treasury Department, Bank Sepah was the financial linchpin of Iran's missile procurement network and actively assisted Iran's pursuit of missiles capable of carrying Weapons of Mass Destruction.

590.    As a result of the designation, Bank Sepah (including Bank Sepah International Plc) was excluded from accessing the U-Turn exemption for Eurodollar transactions.

591.    During the relevant time period, Defendant HSBC-London provided illegal Eurodollar clearing and settlement services to Bank Sepah.

592.    During the relevant time period, Standard Chartered Bank provided illegal Eurodollar clearing and settlement services for Bank Sepah, as well as facilitating US dollar-denominated Letters of Credit for Bank Sepah. SCB, as discussed *infra*, also provided Eurodollar payments and trade-finance services for Bank Saderat and Bank Melli.

593.    As detailed below, Bank Sepah, acting in concert with SCB, illegally financed the acquisition of U.S. goods on behalf of Mahan Air.

594.    For example, in February 2006, Credit Suisse in Zurich paid SCB Dubai almost $30 million dollars (cleared and settled through the United States) on behalf of Bank Sepah, which had, in turn, financed Mahan Air's acquisition of an Airbus A320-232 and several aircraft engines.[33]

---

[33]    Part of the trade-finance transaction was cleared through Standard Chartered's New York branch, and the paperwork indicates that SCB was aware that the transaction involved U.S. origin parts prohibited by U.S. sanctions.

595.     In another case in 2002, Bank Sepah financed (in USD funds) the purchase of U.S. aircraft parts from an Iranian front company—the Malaysian and UK exporter Downtown Trading Ltd—on behalf of a MODAFL-controlled entity.

596.     As part of the illegal scheme, once the U.S.-manufactured goods were transported from Malaysia to Iran by Iran Air, Downtown Trading Ltd., Malaysia sent documents to its bank, Maybank, Malaysia to collect payment against the Letter of Credit.

597.     Maybank then presented documents under Bank Sepah's Letter of Credit to SCB, Dubai (the Negotiating Bank) for validation and subsequent clearing and settlement of the transaction's final Eurodollar payment through Citibank, New York.

598.     Thus, Bank Sepah, with the assistance of Maybank and SCB, financed the illegal acquisition of U.S. aircraft parts by MODAFL, and induced Citibank in New York to provide dollar clearing and settlement to consummate the transaction.

599.     As detailed below, Defendant Commerzbank AG's New York branch also provided illegal Eurodollar clearing and settlement services for Bank Sepah.

**H.     JOHN DOE DEFENDANTS' 1-50 AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY**

600.     Other non-defendant co-conspirators (including other Iranian financial institutions and entities) conspired with the named Defendants and identified non-defendant Co-conspirators herein. Plaintiffs may amend this Complaint to identify such other non-Defendant Co-conspirators as additional evidence warrants.

601.     The true names, residences and capacities, whether individual, corporate or otherwise, of Defendants John Does 1 through 50 (collectively, the "Does") are presently unknown to Plaintiffs, who therefore sue those Defendants under such fictitious names. The Does are other financial institutions, their agents, officers and/or employees that conspired with the Western Bank

116

Defendants, Iran, and the Iranian Bank Co-conspirators (including Defendant Bank Saderat Plc). Each of the Does is responsible in some manner for the acts alleged herein and for the damages that each Plaintiff sustained. As warranted by the evidence, Plaintiffs will amend this Complaint to show the true names and capacities of the Does when they are ascertained and confirmed.

## I.    THE HSBC DEFENDANTS' AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY

602.    The HSBC Defendants have a longstanding relationship with Iran.

603.    In 1999, HSBC Group established a relationship with the Tehran office of Bank Melli Iran, and it launched an "Iran Representative" office in Tehran, Iran that same year.

604.    In December 2000, HSBC Group members entered into a $500 million project finance agreement with six Iranian commercial banks: Bank Saderat Iran, Bank Melli Iran, Bank Mellat, Bank Tejarat, Bank Sepah and the Export Development Bank of Iran ("EDBI").

605.    Beginning in the late 1990s, Defendant HBSC-Europe and Defendant HSBC-Middle East devised a procedure whereby their Iranian Bank Co-conspirators put a cautionary note in their SWIFT-NET payment order messages including language such as, "*care sanctioned country,*" "*do not mention our name in NY,*" and "*do not mention Iran.*"

606.    Eurodollar payment transactions with these cautionary notes automatically fell into what Defendant HSBC-Europe termed a "repair queue," where employees of HBSC-Europe and HSBC-Middle East manually removed all references to Iranian-sanctioned entities from the SWIFT-NET messages associated with each transaction.

607.    Between 2001 and 2007, the HSBC Defendants actively participated in the Conspiracy by repeatedly undertaking various methods to facilitate Eurodollar payments, trade finance and foreign exchange transactions on behalf of Iran through the United States that would

evade U.S. sanctions by disguising Iran's financial activities as its USD funds were cleared and settled by U.S. financial institutions, including Defendant HSBC-US.

608.    Unlawful Iranian transfers of USD funds from HSBC-Europe and HSBC-Middle East were sent through the HSBC Group's USD correspondent accounts at HSBC-US by:

      a.    Deleting references to Iran from the payment instructions (a.k.a. "stripping" the transactions), or otherwise altering the SWIFT-NET messages, to either omit or falsify information that would have otherwise indicated Iran's involvement in the transaction; and

      b.    Styling transactions as bank-to-bank "cover" transactions between two non-Iranian banks, solely because the MT 202 payment order message format used for such transactions did not expressly obligate HSBC to identify the transaction's originator and beneficiary, thus avoiding any disclosure of the transaction's Iranian connections, and blocking HSBC-US's electronic filter algorithms from recognizing the transaction, let alone assessing whether it qualified for any OFAC exemption or license.

609.    Defendant HSBC-Europe created detailed plans to avoid triggering HSBC-US's automated OFAC filter software and reduce the need for "manual intervention" (*e.g.* the re-formatting Eurodollar transactions), thus sparing HSBC-Europe's employees from the need to manually alter the SWIFT-NET messages in order to remove references that might otherwise identify the presence of Iranian parties to the transaction, and associated scrutiny.

610.    This enabled the HSBC Defendants' business with Iran in the Eurodollar market to proceed quickly and profitably.

611.    In 2010, facing U.S. government investigations, HSBC-US hired Deloitte LLP as its outside auditor to identify and examine HSBC Group's OFAC sensitive USD funds transactions involving Iran and other prohibited countries or persons that went through the bank.

612.    That "review" identified more than 25,000 illegal transactions that involved Iran, worth a total of more than $19.4 billion in USD funds.

613.    The payment orders had been sent to HSBC-US and other financial institutions in the United States without referencing Iran, ensuring that the Eurodollar payment transactions would be processed without delay and not be blocked nor rejected by the algorithms in the automated OFAC filtering systems.

614.    The HSBC Defendants deliberately amended SWIFT-NET payment order messages and used MT 202 cover payments to conceal the nature of the transactions from HSBC-US automated OFAC sanction screening filters and those of other financial institutions in the United States, and HSBC-US was aware that the other HSBC Defendants used such methods to alter payment order messages.

615.    At the same time, the HSBC Defendants further trained, mentored and educated their Iranian Co-conspirators on how to deceptively format SWIFT-NET payment order messages, *inter alia*, to avoid detection and scrutiny by U.S. financial institutions, thus ensuring that Iran could solicit other conspirators to facilitate Eurodollar payments in a like manner.

616.    Accordingly, the HSBC Defendants' (and other Defendants' and Co-conspirators') willingness to process payments in this manner enabled Iran to flood the global financial system with undetectable U.S. dollar payment transactions and effectuate—what would have otherwise been preventable—transfers of USD funds to Hezbollah and the IRGC.

617.    Defendant HSBC Holdings was aware of Defendants HBSC-Europe and HSBC-Middle East's involvement in the Conspiracy with Iran as early as 2000.

618.    For example, HSBC Group AML Compliance Head Susan Wright received an email on June 9, 2000, from Bob Cooper, an HSBC colleague, informing Wright of an existing procedure that the HSBC Defendants were already employing to avoid OFAC filter detection.

619.    Cooper explained:

  a.  A client bank had been "*automatically replacing a remitter's name with that of*" the client bank and that bank was utilizing bank-to-bank "cover payments" because the payment message formats did not expressly require identification of either the underlying party originating the transaction or the transaction's ultimate beneficiary.

  b.  In the future, for OFAC sensitive transactions, that bank would "*arrange cover for the payment using MT202/203 remittances*."

  c.  In addition, that bank planned to send a separate 'MT100 message' to the recipient bank, providing full payment details for the originator and ultimate beneficiary.

620. Cooper's email overtly acknowledged that "[i]n this way a payment in US$ can be made for an individual or company on the OFAC list, without the name being 'detected' by the OFAC filters that all US banks would apply."

621. Several days later, on June 14, 2000, Wright forwarded Cooper's June 9, 2000 email to the then-current Head of HSBC Group Compliance, Matthew King.

622. In her cover email, Wright stated that the "practice" detailed by Cooper was "unacceptable" and informed King that it was her position that:

  a.  "We advised them that this was contrary to SWIFT guidelines (drawn up to address FATF concerns re money laundering via wire transfers) which required that the full details (names and addresses) of remitters and beneficiaries are included."

  b.  "From a Group perspective I consider the continuation of this practice [the client bank's future plan to conceal OFAC sensitive transactions behind bank-to-bank transfers] to be unacceptable as a deliberate and calculated method to avoid US OFAC sanctions and has the potential to raise serious regulatory concerns and embarrass the Group."

623. Senior HSBC Group officials were aware of the Conspiracy, including the specific methods and overt acts by which Iran, the Iranian banks and the HSBC Defendants were carrying it out.

624. However, despite this awareness, senior compliance officials of HSBC Group and

its subsidiary banks and entities  (including compliance officials at Defendants HSBC Holdings, HSBC-Europe, HSBC-Middle East, and HSBC-US) did *not* put an end to this illicit banking "practice" with Iran. Instead, with clear knowledge of its purpose—and awareness that other banks participated in the Conspiracy—they knowingly employed similar techniques to evade OFAC requirements, thus allowing the HSBC Defendants to continue deploying and refining  their respective "procedures" to facilitate illegal Eurodollar payments from and for Iran in USD funds.

625.    In late 2000, in coordination with the CBI, HSBC signed a project finance framework agreement with six Iranian commercial banks: including Bank Melli, Bank Saderat, Bank Mellat, Bank Tejarat, Bank Sepah and the Export Development Bank of Iran.

### 1.    HSBC-Europe's 2001 "Bank Melli Proposal"

626.    In or around January 2001, Bank Melli's London branch maintained Eurodollar accounts with several other major international banks, but was interested in establishing a relationship with HSBC that would give HSBC the majority of Bank Melli's USD funds clearing and settlement business.

627.    In an April 30, 2001 letter, Defendant HSBC-Europe presented Bank Melli in London with a proposal (the "Bank Melli Proposal") for processing Bank Melli payments.  HSBC-Europe's proposal boasted that HSBC-Europe was "…confident that we have found a solution to processing your payments with minimal manual intervention."

628.    The Bank Melli Iran Proposal expressly underscored that, if it adopted HSBC-Europe's "solution," Bank Melli would not be identified as a sender in any payment order message and, thus, HSBC-Europe would ensure that Iranian transactions involving USD funds would not run into any 'speed bumps' or other obstacles.

629.    The "solution" provided specific alternative wording, as it explained:

"The key is to **always** populate field 52 – if you do not have an ordering party then quote 'One of our Clients,' **never leave blank.** This means that the outgoing payment instruction from HSBC will not quote 'Bank Melli' as sender – just HSBC London and whatever is in field 52. This then negates the need to quote 'DO NOT MENTION OUR NAME IN NEW YORK' in field 72." [Emphasis in original.]

630.    HSBC-Europe's proposal further requested, "In order to test our proposed solution we would appreciate if you used the following templates when submitting your next payments to the following customer, or alternatively submit a USD 1 test payment" and provided the following:

**MT202**
20:    *Your Ref….*
21:    *Related Ref….*
32:    *Amount/currency/Value date….*
50:    **DO NOT QUOTE IF IRANIAN**
52:    *Customer Name* **OR** *One of our clients* **MUST BE COMPLETED**
53:    **/68296908**
54:
56:
57:    *Beneficiary Banker (SWIFT codes where possible)*
58:    *Beneficiary (SWIFT codes where possible)*
70:    *Any Payments details for beneficiary…*
72:    **Please leave blank**
**MT100**
Pay as above.

(Emphasis in the original.)

631.    Thus, the Bank Melli Proposal documented the HSBC Defendants' active coordination and participation in the Conspiracy to illegally remove, omit or falsify essential information from SWIFT-NET messages so as not to trigger OFAC sanctions screening filters or otherwise permit HSBC-US or other U.S depository institutions to detect Iranian transactions in USD funds.[34]

632.    In 2001, John Wilkinson served as HSBC-Europe's Institutional Banking

---

[34]    An internal HSBC memorandum that was associated with the Bank Melli Proposal also makes clear HSBC's awareness of Defendant Standard Chartered Bank's role as NIOC's primary (Western) banker at the time.

Relationship Manager for HSBC-Europe's Bank Melli account.

633.    In a June 28, 2001 email titled "**Re: Bank Melli**" to HSBC-US, Wilkinson discussed the Bank Melli Proposal, describing HSBC-Europe's "usual method" to alter the wording of Iranian payment order messages, and the rationale for doing so:

- "Once the proposition goes live, we have instructed Bank Melli to alter the format of its [sic] payments to achieve straight through processing. The field 52 input of 'one of our clients' is a standard phrase used by MPD [Multicurrency Payments Department] in these situations."

- "Since sending the letter we have further asked them to only put 'One of our clients' in field 52, thus removing the chance of them inputting an 'Iranian referenced' customer name, that causes fall out of the cover payment sent to HSBC-US and a breach of OFAC regulations."

634.    In further support of his position to continue this standard 'procedure,' Wilkinson explained that a payment involving an Iranian bank had been blocked because HSBC-Europe's MPD [Multicurrency Payments Department] "failed to spot the poor input and did not follow the normal procedure of altering the payment."

635.    In other words, the HSBC Defendants' "normal" procedure was to conspire with Iranian banks, including Bank Melli, to *deliberately* alter payment order messages prior to sending them to New York for the express purpose of avoiding detection and analysis by U.S. banks, regulators and law enforcement.

636.    In an email exchange in October 2001 between David Bagley, Defendant HSBC-Middle East's Regional Head of Legal and Compliance, and Matthew King, a member (and later Head of) HSBC Group's Audit Department, King noted:

We also have to bear in mind pending US legislation which will in effect give the US extraterritorial authority over foreign banks, particularly if we are unfortunate enough to process a payment which turns out to be connected to terrorism. My own view therefore is that some of the routes traditionally used to avoid the impact of US OFAC sanctions may no longer be acceptable.

637.     HSBC Group AML Head Susan Wright and Money Laundering Control Officer John Allison received copies of King's e-mail.

638.     King's email further confirms that senior executives and managers within the HSBC Group comprehended what the HSBC Defendants (and other foreign banks) had "traditionally" been doing for years when they used "routes" (a euphemism for altering payment order messages prior to routing them to U.S. financial institutions through SWIFT-NET) to avoid disclosing a transaction's Iranian connections, and that some of those transactions might prove to be "connected to terrorism."

639.     A January 2003 memorandum authored by HSBC-Middle East and disseminated to other members of the HSBC Defendants confirms not only the HSBC Defendants' ongoing participation in the Conspiracy, but also their knowledge of the participation of other co-conspirators, and Iran's desire to further evade U.S. sanctions.

640.     The memorandum stated in relevant part:

- "It is believed that some service providers amend the payments to ensure Iran is not mentioned in the body of the payment instruction to their USD correspondent. This process minimizes the risk of payment being referred to OFAC."

- "Currently, it is estimated that Iranian banks issue up to 700 USD payments a day using their USD providers, mainly banks in the UK and Europe, which in turn use their New York USD correspondents to effect the payments."

641.     In addition to acknowledging the existence of the Conspiracy, the HSBC-Middle East memorandum also advised:

"[T]here is substantial income opportunity to sell a USD payments proposition to Iranian banks in view of the impending FATF regulations...The [requirements of the] new regulations…increases the risk of Iranian payments being held in the USA as they may fall foul of the OFAC regulations. The Iranian Banks have now prioritized this issue and

are now actively seeking a solution from their banks, including HSBC."

642.    From at least 2003 forward, HSBC provided banking and payment services in the Eurodollar market to, among other Iranian entities, the NIOC (which, as noted previously, was later designated pursuant to E.O. 13382 and identified as an agent or affiliate of the IRGC during the relevant time period).[35]

643.    Over the course of the next several years, the HSBC Defendants continued their participation in the Conspiracy.

644.    In an October 9, 2006 email, David Bagley [HSBC-Middle East's Regional Head of Legal and Compliance] informed senior HSBC Group officials that key U.S. policymakers were "…in favour of withdrawing the U-Turn exemption from all Iranian banks. This on the basis that, whilst having direct evidence against Bank Saderat particularly in relation to the alleged funding of Hezbollah, they suspected all major Iranian State owned banks of involvement in terrorist funding and WMD [weapons of mass destruction] procurement."

645.    Further demonstrating his awareness of the risks HSBC was engaged in with Iran, Bagley was listed as the contact person on the April 19, 2007 Wolfsberg Group press release calling for more transparency for international wire transfers "to promote the effectiveness of global anti-money laundering and anti-terrorist financing programs."

646.    Eight months later, in a June 8, 2007 email, Bagley informed HSBC Holding's CEO, Michael Geoghegan, and others, that "[U.S. Treasury Under Secretary for Counter Terrorist

---

[35]    The HSBC Defendants also provided Eurodollar, trade-finance, and foreign exchange services for NIOC. For example, the aforementioned January 2003 HSBC-Middle East memorandum stated that:

> L/C's [Letters of Credit] issued for Iranian Companies Abroad – Various Group Offices. HSBC offices are developing relationships with Iranian Government and non-Government companies. The L/C's issued are normally denominated in USD. Following NIOC's acceptance of HSBC as one of its listed banks, HSBC Bank Middle East now handles Iran's oil export L/C's. Turnover for this business is about USD400M [million] per year.

Financing and Sanctions] Levey essentially threatened that if HSBC did not withdraw from relationships with [redacted] we may well make ourselves a target for action in the US."

647.    Bagley's email thus confirmed that various relationships continued to exist in the Eurodollar market with Iran and Iranian banks, including Bank Saderat.

648.    Bagley not only acknowledged that HSBC had "…an agency banking relationship in HSBC-EUROPE both for [redacted] and other Iranian banks," but he confessed that "[t]here are further complications surrounding the process of closure with all Iranian banks as we have some USD 9m in reimbursements due from Sepah, where we are running off trade lines, where we may need cooperation from Central Bank of Iran."

649.    On December 11, 2012, the U.S. Department of Justice ("DOJ") announced that Defendants HSBC Holdings and HSBC-US had admitted to Anti-Money Laundering ("AML") and OFAC sanctions violations, and had agreed to enter into a Deferred Prosecution Agreement and pay a $1.256 billion forfeiture. As explained further *infra*, DOJ issued a press release announcing the DPA, and summarizing the HSBC Defendants' illegal conduct.

650.    In connection with the DPA, DOJ filed a four-count felony criminal information against HSBC Holdings and HSBC-US, charging them with: (1) willfully failing to maintain an effective AML program; (2) willfully failing to conduct due diligence on their foreign correspondent affiliates; (3) violating the International Emergency Economic Powers Act ("IEEPA"); and (4) violating the Trading with the Enemy Act ("TWEA"). HSBC Holdings and HSBC-US waived federal indictment, agreed to the filing of the information, and claimed to have accepted responsibility for HSBC's and its employees' criminal conduct.

651.    Despite its agreement to overhaul its U.S. and global compliance functions, HSBC remained a conduit for illicit funds.

652. On December 9, 2010, the U.S. Treasury Department designated Tajco, describing it as "a multipurpose, multinational business venture involved in international trade as well as real estate and presided over by Ali Husayn and Kassim Tajideen…. Since at least December 2007, Ali Tajideen used Tajco Sarl, operating as Tajco Company LLC, as the primary entity to purchase and develop properties in Lebanon on behalf of Hizballah."

653. The designation also covered Kairaba Supermarket, a subsidiary business of Tajco Ltd.

654. A July 13, 2012 article published by *Reuters* entitled "Special Report: HSBC's Money-Laundering Crackdown Riddled With Lapses" reported that an HSBC-US compliance officer had identified suspicious transactions involving Hezbollah, specifically Tajco and Kairaba Supermarket.

655. In December 2013, the Treasury Department announced that Defendant HSBC-US agreed to remit $32,400 to settle potential civil liability for three apparent violations of the Global Terrorism Sanctions Regulations, 31 C.F.R. Part 594.

656. The fine reflected the fact that HSBC-US facilitated transactions in late 2010 and early 2011 worth about $40,000 that benefited Tajco.

657. Although a relatively small sum, the facilitation of terrorism financing for Hezbollah a considerable time <u>after</u> Defendants HSBC Holdings and HSBC-US began negotiating their deal with DOJ, strongly suggests that, as of early 2011, the HSBC Defendants had not seriously remediated their AML/CFT controls and procedures, even after being caught committing hundreds of felonies.

### 2. Defendant HSBC-US's Agreement to, and Participation in, the Conspiracy in Violation of 18 U.S.C. § 2332d

658.    As alleged in greater detail below, even though at all relevant times Defendant HSBC-US was aware that: the HSBC Defendants were participating in the Conspiracy to unlawfully transmit Iranian USD funds through U.S. banks (including HSBC-US); and periodically complained about Defendants HSBC-Middle East and HSBC-London's conduct and proposed new procedures and policies for HSBC Group members that would have provided HSBC-US improved transparency, HSBC-US took no measures to prevent HSBC-US from facilitating hundreds of millions of dollars of payments to Iran in violation of 18 U.S.C. § 2332d. Accordingly, in addition to violating § 2332d, HSBC-US's conduct evidenced its agreement to continue participating in the Conspiracy despite its complaints, its knowledge or deliberate indifference to the Conspiracy's criminal objectives and purposes, and its commission of multiple overt acts in furtherance of the Conspiracy.

659.    One key example of HSBC-US's failure to take substantive measures to ensure that it would not facilitate the HSBC Defendants' provision of illegal material support and services to Iran is reflected in a July 12, 2001 e-mail to senior employees at HSBC-US (containing a memorandum authored by HSBC Group Representative for Iran, John Richards).

660.    Richards's memorandum outlined the business opportunities members of the HSBC Group were presented with in connection with prospects to expand and grow HSBC Group's relationships with Iran, the CBI and Bank Melli, explaining:

      a.    "We have been approached by the Central Bank of Iran to take back their USD clearing business from Natwest. In principal I am keen to do this but on the clear proviso that it can be done profitably and on a sustainable basis."

      b.    "One of our key objectives for the year is to develop HSBC's Asset Management activities in Iran and with the Central Bank now

managing the oil price stabilization fund amounting to some USD10bn there is considerable scope for this. Obviously many foreign banks are chasing the same business and so we need to demonstrate some competitive or relational advantage. The proposal from the Central Bank was therefore not unwelcome…The Central Bank manages their transactions through Bank Melli London…"

c.    "In summary if we can make this business independently profitable and sustainable the benefits that we can derive particularly from the Treasury Asset Management and Investment spin offs will be substantial."

661.    Richards's memorandum also demonstrates the HSBC Defendants' awareness that other foreign banks (including Defendants) were eagerly pursuing U.S. dollar clearing and settlement business with the CBI in the Eurodollar market.

662.    On July 12, 2001, Denise Reilly, HSBC-US's Senior Manager in Payment Operations, sent an e-mail titled "Re: Bank Melli" to various senior HSBC-US employees in which she stated, "It was relayed to us that the Group (with the Backing of Bond) [the Chairman] was looking to significantly grow our presence in Iran." Reilly also explained that the "current lines of credit [for Iran] were reported to be $800m, trade lines of $150m and growth was anticipated in trade, cash management and internet banking."

663.    Thus, HSBC-US senior employees understood the significance to the HSBC Defendants of their Iranian business and specifically, the HSBC Defendants' relationship with Bank Melli.

664.    As early as 2001, senior HSBC-US payments, compliance and business managers were informed that Iranian Eurodollar payment transactions were being sent by Defendant HSBC-London to HSBC-US for clearing and settlement in USD funds after references to Iran had been deleted.

665.   HSBC-US employees were also informed of an HSBC-London proposal to streamline the processing of Iranian U-turn transactions by omitting references to Iran so that the payment orders would not be halted by OFAC's sanctions screening filter in the United States. Emails at the time show that senior HSBC-US officials expressed discomfort with the HSBC-London proposal, but took no other action to stop or prevent the activity already occurring.

666.   As noted above, a senior HSBC-US employee received an e-mail on June 28, 2001 titled "*Re: Bank Melli*," which described HSBC-London's "usual method" of altering payment order messages and the reasons for doing so.

667.   Another example of HSBC-US' knowledge and acquiescence in the Conspiracy is memorialized in a November 14, 2002 memorandum entitled "COMPLIANCE-OFAC ISSUES IN GENERAL AND SPECIFIC TO IRAN" authored by HSBC-London's Multicurrency Payments Department Head Malcolm Eastwood ("the Eastwood Memorandum").

668.   The Eastwood Memorandum was sent to both HSBC-US and HSBC-London employees and forwarded to additional HSBC-US employees in separate emails.

669.   The Eastwood Memorandum discussed both HSBC's "cover payment method" of evading U.S. sanctions and the specific actions taken by HSBC to modify the contents of payment messages. In relevant parts, the Eastwood Memorandum stated:

- "As the custodian of HSBC-Europe's payments operation I currently feel that we may be exposing ourselves to unnecessary and unacceptable Reputational and Operational Risk when we are handling payments originating from FIs [financial institutions] domiciled in or who are a local branch of an FI domiciled in an OFAC regulated country."

- "HSBC-Europe's historical practice has been to send these types of payments where the U Turn principal applies (ie funds are generally moving from an European bank to another European bank for the credit of an OFAC regulated entity) via the Cover Payment method. This means that the payment instructions received by HSBC-US

contains no mention of the country or entity involved. My understanding is that this has been accepted practice for many years and that HSBC-Europe IBL hold accounts, some in USD for FIs domiciled in these countries ie Cuban, Iranian etc."

- "The Iranian banks continue to send us what I describe as conditional payment instructions which for HSBC-Europe require an element of amendment by ourselves. This introduces operational risk and under FATF principles we should not be amending these payments instructions. Acceptance of these items over many years means that we are bound by the precedents currently in place, and I believe that we need to break these precedents…"

- "[W]e need…[t]o agree a 'template' payment instruction for these U Turn Payments which can be used by PCM Sales and the RM team and sent to the Iranian Banks stipulating that payments must be formatted in this way, confirming that we will be sending these via the Serial method and that any deviation from this template will be at the Iranian Banks own risk."

- "Whilst I am told that there are significant business opportunities particularly with countries such as Iran there are also substantial Reputational and Operational Risks, not to mention financial losses associated with it."

670.    In addition, HSBC-US's OFAC filter occasionally stopped an Iranian-related transaction, sent by an HSBC Group affiliate, in which the identifying information had inadvertently been retained, demonstrating that undisclosed Iranian U-Turn exemption transactions continued to be sent through HSBC-US correspondent accounts.

671.    HSBC-US employees were copied on similar memoranda issued by other HSBC Defendants during the relevant period. For example, a January 2003 memorandum circulated by HSBC-Middle East (and received by several HSBC-US employees) also noted that "[t]he Group now has an excellent relationship with all Iranian banks and some very larger Iranian corporates such as National Iranian Oil Co, National Petrochemical Co, National Iranian Gas Co, National Iranian Steel Co, top Iranian insurance companies, Ministry of Power, Ministry of Post and Telecommunications, etc."

672.    The memorandum also confirmed the HSBC Defendants' awareness that other non-Iranian banks were participating in the Conspiracy, stating:

- "It is believed that some service providers amend the payments to ensure Iran is not mentioned in the body of the payment instruction to their USD correspondent. This process minimizes the risk of payment being referred to OFAC."

- "Currently, it is estimated that Iranian banks issue up to 700 USD payments a day using their USD providers, mainly banks in the UK and Europe, which in turn use their New York USD correspondents to effect the payments."

- "[T]here is substantial income opportunity to sell a USD payments proposition to Iranian banks in view of the impending FATF regulations...The [requirements of the] new regulations…increases the risk of Iranian payments being held in the USA as they may fall foul of the OFAC regulations. The Iranian Banks have now prioritized this issue and are now actively seeking a solution from their banks, including HSBC."

673.    An October 2003 document entitled "IRAN-STRATEGY DISCUSSION PAPER" circulated to senior HSBC-US employees further documented the HSBC Defendants' eagerness to facilitate USD funds transfers for Iran, noting: "One of the reasons to accelerate our process of engagement is to demonstrate, to the authorities within Iran, that we are committed to the development of their country. This is seen to be particularly important given the more aggressive/pragmatic approach to Iranian business adopted by French and German competitor banks."

674.    Nevertheless, despite being copied on such memos, HSBC-US took no further action to stop the unlawful activities.

675.    Even when HSBC-US blocked Iranian payment transactions, it failed to take further action to ensure that other HSBC Defendants would not continue these illegal practices.

676.     For example, in late December 2002, HSBC-US's OFAC sanctions screening filter stopped and rejected a payment order listing Bank Melli as the originator of the SWIFT-NET message that contained a field that read, "**Do not mention our name in NY**."

677.     An internal HSBC-US email dated December 30, 2002, informed HSBC-US's compliance team about the Bank Melli payment, which once again confirmed the HSBC Defendants' ongoing process of altering payment order messages.

678.     On June 13, 2003, HSBC-US's OFAC filter stopped another transaction, this time for $150,000 in USD funds, because it included both a reference to Bank Melli and the words "*do not mention our name.*"

679.     In a June 16, 2003 email entitled "PLC-Re do not mention our name," HSBC-US compliance officers were notified about the June 13 blocked transaction and received additional confirmation of the HSBC Defendants' illegal practice of altering fields within Iranian payment order messages for the express purpose of escaping detection in the United States.

680.     During 2004, in furtherance of the Conspiracy, HSBC Group members sent approximately *7,000* Iranian Eurodollar transactions through various SWIFT-NET network accounts for clearance and settlement by Defendant HSBC-US and other correspondent banks in the United States without disclosing their source.

681.     HSBC-US did not report any of the HSBC Defendants' illegal conduct involving Iran to any of its regulators or to U.S. law enforcement at that time.

682.     During 2005, in furtherance of the Conspiracy, HSBC-London and HSBC-Middle East together sent about *5,700* Iranian Eurodollar transactions through various SWIFT-NET network accounts for clearance and settlement by Defendant HSBC-US and other correspondent banks in the United States without disclosing their source.

683.    On April 19, 2005, HSBC-US's OFAC filter again stopped a $362,000 payment order from Bank Melli because it contained the phrase "*do not mention our name in New York.*"

684.    HSBC-London re-submitted the same payment on April 22, 2005, but HSBC-US stopped it again, this time sending HSBC-London a SWIFT-NET message requesting full disclosure of the name and address of the underlying originator and ultimate beneficiary of the USD funds.

685.    In early May 2005, HSBC-US stopped a $6.9 million USD payment order originating with Defendant Credit Suisse in Zurich because the SWIFT-NET message details included the phrase "*Bank Melli Iran.*"

686.    In fact, forty-four of the payments stopped by HSBC-US's OFAC filter in May 2005 alone (inadvertently) disclosed Iranian involvement.

687.    On June 3, 2005, HSBC-US informed Defendant HSBC Holdings that additional HSBC-London transfers in the amounts of $1.9 million USD and $160,000 USD had been stopped by HSBC-US due to the lack of full disclosure of the originator, beneficiary, and purpose of the payment transaction.

688.    HSBC-London responded that both payment orders were foreign exchange related, the originators were Bank Tejarat and Bank Melli,[36] and the beneficiaries of the USD funds were Persia International Bank and Defendant Credit Suisse's Zurich office, respectively.

689.    HSBC-US responded by requesting that HSBC-London follow up with the banks to obtain the names and addresses of the initial originators and ultimate beneficiaries, as well as confirmation of the underlying purpose of the payments.

---

[36]    HSBC-London also maintained correspondent accounts for Bank Refah.

690.    According to information provided by Bank Melli through HSBC-London, the $160,000 payment denoted an internal transfer from Bank Melli's Eurodollar account with HSBC-London to Bank Melli's Eurodollar account with Defendant Credit Suisse's Zurich office.

691.    From July 2005 to June 2006, HSBC-Middle East sent more than 2,500 Iranian Eurodollar transactions – through its various SWIFT-NET network accounts for clearance and settlement by Defendant HSBC-US and/or other correspondent banks in the United States – that illegally concealed the required data relating to Iran.

692.    On November 23, 2005, in an email entitled "Cover payment processed to Credit Suisse re 'Bank Melli' – USD 100,000," an HSBC-US OFAC Compliance officer notified HSBC-London that, on November 7, 2005, a $100,000 transaction involving Bank Melli had been processed through HSBC-London's USD account at HSBC-US without transparent documentation:

> We are bringing this to your attention as this situation indicates that cover payment involving Iran are still being processed by PLC [referring to HSBC-London]. It was our understanding that Group payments involving Iran would be fully disclosed as to the originators and beneficiaries.

693.    In furtherance of the Conspiracy, from April 2006 through December 2007, about 50% of the estimated *700* Iranian Eurodollar payment transactions sent by HSBC-London – through its various SWIFT-NET network accounts for clearance and settlement by Defendant HSBC-US and/or other correspondent banks in the United States – continued to not disclose their connection to Iran.

694.    In addition, through March 2010, HSBC-US was the conduit for at least twenty-four post-U.S. designation Eurodollar transactions on behalf of IRISL and/or its various subsidiaries and front companies.

695.    During the relevant time period, HSBC-US knew that Iran was a designated State Sponsor of Terrorism, and that HSBC-US's USD clearing and settlement operations with CHIPS-NY (Eurodollar clearing and settlement), CLS Bank (foreign exchange) and FRB-NY (domestic USD clearing and settlement and central bank lender of last resort for the Eurodollar market) were being used by the HSBC Defendants to facilitate unlawful transactions in USD funds on behalf of Iran in furtherance of the Conspiracy.

696.    As noted above, on December 11, 2012, Defendants HSBC Holdings and HSBC-US entered into a Deferred Prosecution Agreement with DOJ.

697.    DOJ issued a press release announcing the 2012 DPA's entry, including the fact that the DPA resulted in HSBC Holdings and HSBC-US admitting to AML and sanctions violations, as well as the fact that they would pay a $1.256 billion USD forfeiture.

698.    In addition to the $1.256 billion forfeiture under the DPA, HSBC Holdings and HSBC-US also agreed to pay $665 million in civil penalties – $500 million to the OCC and $165 million to the Federal Reserve – for the HSBC Defendants' AML/CFT program violations with Iran, other sanctioned countries, and transnational drug cartels.

699.    DOJ's press release announcing the DPA quoted then-Assistant Attorney General Lanny Breuer:

> HSBC is being held accountable for stunning failures of oversight – and worse – that led the bank to permit narcotics traffickers and others to launder hundreds of millions of dollars through HSBC subsidiaries, and to facilitate hundreds of millions more in transactions with sanctioned countries. The record of dysfunction that prevailed at HSBC for many years was astonishing.

700.    The United States Attorney for the Eastern District of New York Loretta Lynch was quoted as stating:

> HSBC's willful flouting of U.S. sanctions laws and regulations resulted in the processing of hundreds of millions of dollars in OFAC-prohibited transactions. Today's historic agreement, which imposes the largest penalty in any [Bank Secrecy Act] prosecution to date, makes it clear that all corporate citizens, no matter how large, must be held accountable for their actions.

701. Manhattan District Attorney Cyrus R. Vance Jr. was quoted in the same press release as stating:

> New York is a center of international finance, and those who use our banks as a vehicle for international crime will not be tolerated. … Sanctions enforcement is of vital importance to our national security and the integrity of our financial system. The fight against money laundering and terror financing requires global cooperation, and our joint investigations in this and other related cases highlight the importance of coordination in the enforcement of U.S. sanctions.

**J.    DEFENDANT BARCLAYS' AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY**

702. Until at least May 2008, Defendant Barclays maintained correspondent banking relationships with several of the Iranian Bank Co-conspirators, including Bank Saderat and Bank Melli.

703. Barclays is a member of SWIFT-Brussels and has historically used the SWIFT-NET system to transmit international payment messages from and for financial institutions around the world.

704. Barclays originally processed USD payment messages through numerous global locations.

705. Over time, Barclays consolidated its USD payment processing so that the payments were predominately processed at Barclays' Payment Processing Centre located in Poole, England ("Poole").

706. Barclays knowingly and willfully engaged in conduct that caused its New York branch and other financial institutions in the United States to process Eurodollar payment transactions in violation of U.S. sanctions.

707. As part of this effort to evade U.S. sanctions against Iran, Barclays:

   a. Followed instructions from Iran and its agents not to mention their names in USD payment transaction messages sent to Barclays-New York and to other U.S. financial institutions for clearance and settlement in USD funds;

   b. Routed transactions through an internal Barclays sundry account, thereby hiding the payment transactions' connection to Iranian entities;

   c. Amended or reformatted SWIFT-NET payment order messages to remove information identifying Iranian entities involved in the transfer of USD funds; and

   d. Re-sent Iranian entities' SWIFT-NET MT 103 payment order messages as cover payments to take advantage of the lack of transparency as to the ultimate originator/beneficiary that was achieved by using the MT 202 bank-to-bank cover payment message format.

708. Beginning in 1987, Bank Melli Iran instructed Barclays to process USD transactions in favor of Bank Melli's London branch by referencing only Bank Melli's Eurodollar account number at Midland Bank Plc and without referencing Bank Melli's name.

709. Bank Melli further instructed Barclays to send separate payment order instructions, which included full details about the Eurodollar payment transactions to Midland Bank Plc and Bank Melli's London Branch.

710. In response, Barclays memorialized Bank Melli's instructions for Eurodollar market transactions in a memorandum sent by its Head Office to Barclays' international offices, and, as early as the late 1990s, included them in Barclays' "List of Correspondents" ("LOC"),

which contained information related to Barclays' correspondent banking relationships and assisted Barclays' employees in effectuating international payment transactions involving USD funds.

711.    Barclays' LOC contained instructions on how to process payments for both sanctioned and non-sanctioned banks with which Barclays had correspondent relationships.

712.    Over time, the LOC grew to include instructions for payments related to several of Barclays' correspondent bank clients and included instructions to use cover payments (SWIFT-NET MT 202 payment order messages) when processing payments in USD funds for clearing and settlement in the United States, and omitting the names of U.S.-sanctions targets from the payment order messages so that U.S. financial institutions could not identify the sanctions nexus of the payments.

713.    In a November 1987 Head Office Circular, Barclays distributed payment instructions received from an Iranian bank directing Barclays "to amend the procedures governing the transfer of U.S. Dollars for any purpose in favour of our London branch" and to route such payments "without mentioning the name of our bank."

714.    The reason for, and effect of, these instructions was to disguise Iranian sanctioned entity payments from Barclays' correspondents in the United States so that such correspondents would unwittingly process the illegal payments.

715.    Barclays' employees followed the instructions in the LOC when processing USD payments involving sanctioned Iranian banks, thereby ensuring that the name of the bank would not appear in any MT 202 cover payment messages sent to Barclays' New York branch for clearing and settlement through CHIPS-NY and FRB-NY. For example, with regard to USD payments sent on behalf of an Iranian bank, the LOC stated, "[t]he cover MT202 for the direct Payment Order to

be arranged by the remitting Bank <u>without mentioning [the Iranian bank's]</u> name ...." (Underlined in the original.)

716.    Barclays' LOC also contained instructions to contact the remitter or beneficiary for routing instructions for certain payments of USD funds involving Iranian sanctioned entities. The general instructions for Iranian banks stated:

> USD PAYMENTS TO IRAN
> Certain payments may be blocked by the US Authorities. Therefore, any branch with a USD transfer is advised to contact the remitter beneficiary or beneficiary's bankers to request specific routing instructions.

717.    Barclays' standard operating procedures allowed and even educated its employees on how to bypass the sanction screening algorithms in both Poole's and the U.S. financial institution's OFAC filters to permit illegal payment transactions in USD funds.

718.    Pursuant to these "standard" procedures, when the Poole filter identified a Eurodollar payment transaction that referenced an Iranian entity, that payment order message was stopped for further review by Barclays' employees in Poole.

719.    If the Poole-based employees found that the payment order message referenced an Iranian entity, they would follow one of the following procedures: (i) return the payment order message to the remitting entity via a pre-formatted fax cover sheet; (ii) alter or delete fields in the SWIFT-NET payment order message; or (iii) change the message type from a serial payment (MT 103) to a cover payment (MT 202) in order to hide any connection to the Iranian entity.

720.    The then-Senior Manager for Barclays Group Payments Industry Management in Poole explained that if the MT 202 payment order message contained beneficiary information that caused it to be stopped by the OFAC filter in the U.K, that information was removed to ensure the payment transaction was not stopped by the OFAC filter when resubmitted.

721.    The same Senior Manager noted that he was aware that Defendant Barclays' payment operators amended payment order messages in order to facilitate the transfer of USD funds to Iran and that this was a "*common practice*" at Barclays.

722.    As noted above, consistent with Barclays' "standard" procedures, when an Iranian payment was flagged by the Poole OFAC filter, Barclays' employees generally returned the flagged payment order message to the original remitting bank.

723.    Barclays' employees used a specific fax cover sheet to advise the remitting area of Barclays that the payment message had been cancelled and would further identify the specific words in the payment message that had caused the message to be stopped by the Poole sanctions screening filter.

724.    The Barclays fax cover sheet contained the following language:

> OFAC ITEM: Wording below is contained in the message and does not comply with the Office of Foreign Assets Control regulations applicable to all payments sent via the U.S.A. Payments to U.S.A. must NOT contain the word listed below.

725.    Subsequently, because Barclays was advising the remitting bank of the prohibited language, some of these payment order messages would thereafter be re-sent by the remitting bank on the SWIFT-NET network without the "offending" language.

726.    This deliberate omission enabled the payment order message to pass through the Poole sanctions screening filter without being blocked, and then clear and settle in USD funds by Barclays' New York branch and unwitting U.S. financial institutions.

727.    In November 2001, the use of the fax cover sheet was identified by Barclays' internal auditors as problematic because (according to a Barclays internal audit report) "without adequate guidance the recipient of the fax advice may not be aware of the implications and may merely remove the offending text and re-submit the payment without any wider consideration."

728.    In early 2002, as a result of this internal audit report, the language of the fax template was re-worded in an attempt to mitigate these issues. The fax language was changed to:

> OFAC ITEM: Wording below is contained in the message and does
> not comply with the U.S.A. / U.K. / E.C. / U.N. Sanctions.

729.    Despite the altered wording in the fax cover sheet, no implementing guidance was circulated, and Barclays' "standard" practices nevertheless continued, as did the resubmission of prohibited OFAC-sanctioned transactions with the offending text removed.

730.    Barclays' employees generated internal correspondence that documented Barclays' awareness and acceptance of the fact that transactions were being processed via MT 202 cover payments for the specific purpose of hiding the identity of Iranian entities in order to ensure that Barclays could continue its unfettered processing of USD funds transfers involving Iranian entities through Barclays' New York branch.

731.    For example, one Barclays employee explained in an email:

> [W]e can get around [OFAC seizure] by sending only cover payments to
> US banks and then make MT103 direct to beneficiary's bank. The MT202
> cover must not mention of [sic] the offending entity which could cause
> funds to be seized. A good example is Cuba which the US says we shouldn't
> do business with but we do.

732.    Barclays' employees understood the advantage of using bank-to-bank cover payments. The cover payment message format (MT 202), with its limited information fields, was a better mechanism to process OFAC-prohibited transactions than using a more detailed serial payment message format (MT 103).

733.    A Barclays employee noted in an email: "If we were to route the payment via the serial payment method ... the payment would clearly be seized by the US authorities" but by using cover payments, "the US Treasury [would] remain blissfully unaware of [the payment's] existence."

734.     In December 2002, internal correspondence also brazenly acknowledged Barclays'

use of MT 202 cover payment messages to detour U.S. Iranian sanctions, stating:

> To circumvent US legislation, [Barclays is] currently rout[ing] US$ items
> for sanctioned institutions via unnamed account numbers, without mention
> of the sanctioned party. For customer transfers, payment cover is routed via
> MT202 to New York, naming only the account holding bank. A direct
> MT103 is them [sic] sent to the account holding bank. Further investigation
> suggests that we are carrying out this practice on behalf of four [Iranian
> bank] customers….

735.     A January 2004 report provided to Barclays' Group Risk Oversight Committee

noted that a recent failure "illustrat[ed] why the whole sanctions process needs to be reviewed and

brought up to date."

736.     In July 2004, an internal assessment of Barclays' payments processing explained:

> Cover payments are an issue for this project as they are effectively a way of
> by passing [sic] sanctions.... There is nothing in these payment messages
> [MT 103 and MT 202] that identifies them as linked for the purpose of
> screening.

737.     In April 2005, Barclays noted in an internal memo the risk of using MT 202 cover

payments rather than MT 103 serial payments, and also acknowledged that other financial

institutions such as the Western Bank Defendants facilitated payments for Iran in the same manner:

> Changing to different message types would be much more expensive to us.
> *Moral risk exists if we carry on using cover payments but that is what the
> industry does.* I[n] M[y] H[umble] O[pinion] we should carry on using
> cover payments and accept that there is a risk of these being used on
> occasion to hide true beneficiaries (who may or may not be sanctioned
> individuals or entities).  [Emphasis added.]

738.     In the spring of 2006, Barclays' senior management learned that four cover

payments involving sanctioned parties had been routed through Barclays' New York branch and

were processed because the cover payments did not mention the sanctioned beneficiary or

originator.

739.     Throughout this entire time period, Barclays knew that Iran was a designated State Sponsor of Terrorism and knew that Barclays was facilitating unlawful payments on behalf of Iran in furtherance of the Conspiracy.

740.     Barclays also continued to facilitate unlawful payments on behalf of Bank Saderat *after* Barclays knew that Bank Saderat had been designated an SDGT for enabling the transfer of USD funds to Hezbollah.

741.     Barclays also continued facilitating unlawful Eurodollar payments on behalf of Bank Melli *after* Barclays knew that Bank Melli had been designated by the United States in part for its enabling the transfer of USD funds to the IRGC.

742.     On August 18, 2010, DOJ announced that Barclays had entered into a Deferred Prosecution Agreement with federal and New York State prosecutors, and agreed to forfeit $298 million dollars in connection with violations of IEEPA and TWEA.

743.     A criminal information was filed on August 16, 2010, in the U.S. District Court for the District of Columbia charging Barclays with one count of violating the IEEPA, and one count of violating TWEA. Barclays waived indictment, agreed to the filing of the information, and accepted and acknowledged responsibility for its criminal conduct.

744.     In the press release announcing the DPA, then-FBI Assistant Director-in-Charge Janice K. Fedarcyk was quoted stating:

> Barclays Bank has admitted a decade-long pattern of violating U.S. banking laws, and taking certain steps to conceal prohibited transactions. Corporate responsibility entails more than just acting discreetly on behalf of one's clients. It means, first and foremost, acting lawfully.

### K.  DEFENDANT STANDARD CHARTERED BANK'S AGREEMENT TO AND PARTICIPATION IN THE CONSPIRACY

#### 1.  Standard Chartered Bank ("SCB") Conspired to Conceal Iran's Financial Activities and Transactions From Detection, Scrutiny, and Monitoring By U.S. Regulators, Law Enforcement, and/or Depository Institutions.

745.    Defendant SCB provided, *inter alia*, trade-finance, Eurodollar and foreign exchange banking services to Iranian clients starting in or about 1993.

746.    At some point thereafter, SCB began formulating plans to participate in and further the Conspiracy with Iran.

747.    For example, on June 1, 1995, SCB's General Counsel wrote an e-mail advising SCB's regulatory compliance staff: "if SCB London were to ignore OFACs regulations AND SCB NY were not involved in any way & (2) had no knowledge of SCB Londons [sic] activities & (3) could not be said to be in a position to control SCB London, then IF OFAC discovered SCB London's [sic] breach, there is nothing they could do against SCB London, or more importantly against SCBNY."

748.    The SCB General Counsel also instructed that a memorandum containing this plan was "highly confidential & MUST NOT be sent to the US."

749.    In the ensuing years, Standard Chartered Bank actively conspired with the CBI, Bank Melli Iran, Bank Saderat plc's predecessor (Iran Overseas Investment Bank) and many other entities to assist Iran evade U.S. sanctions.

750.    Standard Chartered Bank's role in the Conspiracy grew dramatically in early 2001, when the CBI approached SCB to act as the Central Bank of Iran's recipient bank for U.S. dollar proceeds from daily oil sales made by the NIOC in the Eurodollar market.[37]

---

[37]    At some point, SCB Dubai also opened a Eurodollar credit facility for the CBI.

751.     An e-mail dated February 19, 2001, from SCB's Head of Inbound Sales, Institutional Banking, characterized the CBI's solicitation of Standard Chartered as "*very prestigious*" because "*in essence, SCB would be acting as Treasurer to the CBI ...*"

752.     Thus, Standard Chartered was knowingly laundering billions of dollars in violation of multiple U.S. laws for the benefit of, among others, the IRGC.

753.     In a follow up e-mail dated March 23, 2001, SCB's Group Legal Advisor wrote to its Product Manager, Corporate & Institutional Banking and its General Counsel (the e-mail was also forwarded to SCB's Group Head of Audit) that "our payment instructions [for Iranian Clients] should not identify the client or the purpose of the payment."

754.     Standard Chartered Bank and the CBI quickly developed operating procedures for USD funds transfers to mask the involvement of Iranian entities in payment orders sent to Standard Chartered's New York branch ("SCB-NY").

755.     When the beneficiary bank of a CBI Eurodollar payment transaction was an Iranian bank, SCB-London would send a SWIFT-NET MT 100 or MT 103 to the beneficiary bank's non-U.S., non-Iranian correspondent bank with full details of the Iranian beneficiary bank, and a *separate* MT 202 to SCB-NY with no mention of the Iranian beneficiary bank.

756.     In fact, SCB-London set up routing rules within its payment system to route all incoming SWIFT-NET messages from the CBI to a repair queue, meaning that the payments were subject to manual review and processing by wire operators, to prevent Standard Chartered Bank - London from automatically processing outbound payment instructions for clearance and settlement in the United States with a reference to the CBI in the payment message.

757.     Standard Chartered Bank - London's payment processing team initially instructed the CBI to insert Standard Chartered Bank - London's SWIFT-NET BIC address (identified as

SCBLGB2L) in field 52 (ordering institution) of its incoming payment order messages so that SCB's payment system would not populate that field with the CBI's SWIFT-NET BIC address (identified as BMJIIRTH).

758.   When the CBI failed to remove its BIC address and insert Standard Chartered's BIC address into each SWIFT-NET message, Standard Chartered Bank - London wire operators would manually change field 52 to reference SCB - London's BIC in order to mask the CBI's involvement in the payments.

759.   Standard Chartered's willingness to further the Conspiracy in this manner attracted more illicit business.

760.   As early as February 2002, several additional Iranian banks approached Standard Chartered Bank - London to discuss the possibility of opening new accounts.

761.   SCB - London's Legal, Compliance, and Cash Management groups identified the need for written procedures for the operation of these additional Iranian banks' dollar-denominated accounts.

762.   SCB's central role in the Conspiracy was memorialized in an internal memorandum regarding SCB's procedures for processing payments sent through the United States from the Iranian banks.

763.   The document was entitled "Standard Chartered Bank Cash Management Services UK - Quality Operating Procedure: Iranian Bank Processing."

764.   It was first issued to SCB London staff on February 20, 2004, and included detailed instructions regarding the omission of the Iranian remitting bank's BIC:

> Ensure that if the field 52 of the payment is blank or that of the remitting bank that it is overtyped at the repair stage to a "." (Note: if this is not done then the Iranian Bank SWIFT code may appear - depending on routing - in the payment message being sent to [SCB-NY]).

765.    In addition to inserting a "." in field 52, the memorandum also instructed staff to use cover payments to process Iranian bank payments, which resulted in SCB London omitting any reference to the involvement of Iranian beneficiaries or beneficiary banks in SWIFT-NET payment order messages sent to Standard Chartered Bank's New York branch.

766.    This element of the Conspiracy was particularly important to Defendant Bank Saderat Plc which repeatedly served as the Reimbursing Bank on Letters of Credit for other Iranian banks that were financing various illegal, sanctions-evading transactions on behalf of the IRGC and MODAFL through the United States.

767.    Approximately 60,000 payments related to Iran, totaling **$250 billion**, were eventually processed by Standard Chartered Bank as part of the Conspiracy.

768.    An e-mail dated March 9, 2003, from SCB's Head of Transactional Banking Solutions, UK/Europe Corporate & Institutional Banking to several of SCB's wholesale bank business managers indicates that Standard Chartered Bank learned that another bank was "*withdrawing their services*" with one of its Iranian client banks "primarily for reputational risk reasons."

769.    In a memorandum accompanying the news of the aforementioned bank's reduction in Iranian business entitled "Summary of the Risks/Issues to be Addressed with Regard to Iranian Bank USD Clearing that Require Management Direction from Middle East Senior Management Team," the risks posed by additional Iranian business that might "trigger an action" from OFAC, "leaving SCB exposed, with potential reputational damage" were considered, but ultimately rejected in favor of pursuing additional Iranian business.

770.    An October 15, 2003 e-mail from SCB's Manager, Cash Management Services, London to SCB's Product Manager, Corporate & Institutional Banking and its Head of Cash

Management Services, UK (forwarded to SCB's Head of Legal & Compliance, Americas and Head of Legal for Corporate & Institutional Banking) outlined how the CBI was instructed to "send in their MT 202's with a [SCB London's business identifier code] as this is what we required them to do in the initial set up of the account. Therefore, the payments going to NY do not appear to NY to have come from an Iranian Bank."

771.    When Standard Chartered Bank anticipated that its business with the Iranian Bank Co-conspirators, including Defendant Bank Saderat Plc, would grow too large for SCB employees to manually "repair" the payment order messages for New York bound wire transfers, SCB automated the process by building an electronic repair system with "specific repair queues" for each Iranian client.

772.    Standard Chartered Bank's payment "Quality Operations Procedures" manual contained instructions on how to manually "repair" or "over-type field 52 as [SCB London]" in SWIFT-NET MT 202 payment message fields to hide CBI's role as originator of the MT 202 cover payment transactions SCB was processing through New York in USD funds.

773.    In October 2004, SCB consented to a formal enforcement action and executed a written agreement with the N.Y. State Banking Department and the Federal Reserve Board of New York ("FRB-NY"), which required SCB to adopt sound Bank Secrecy Act and Anti-Money Laundering ("BSA/AML") practices with respect to foreign bank correspondent accounts (the "Written Agreement").

774.    The Written Agreement arose as a result of identified flaws in AML risk controls at Standard Chartered Bank's New York branch and it required SCB to adopt sound AML practices with respect to foreign bank correspondent accounts.

775.    The Written Agreement also required SCB to hire an independent consultant to

conduct a retrospective transaction review for the period of July 2002 through October 2004.

776.    The review was intended to identify suspicious activity involving accounts or transactions at, by, or through Standard Chartered Bank's New York branch.

777.    Standard Chartered Bank failed to inform the N.Y. State Banking Department and the Federal Reserve Board of New York that its London and Dubai operations were secretly clearing hundreds of billions of dollars through Standard Chartered Bank's New York branch at the same time that it was promising to reform its AML practices.

778.    SCB also failed to inform the N.Y. State Banking Department and the Federal Reserve Board of New York that its London, Dubai, Bahrain, Singapore and Hong Kong operations were secretly helping MODAFL and the IRGC evade U.S. sanctions at a time when they were illegally acquiring a wide range of U.S. equipment and technologies, including components for IEDs and EFPs used to kill and maim Coalition Forces in Iraq.

779.    Standard Chartered Bank retained Deloitte & Touche LLP ("Deloitte") to conduct the required "independent" review and to report its findings to the regulators.

780.    On August 30, 2005, and again on September 17, 2005, Deloitte provided Standard Chartered Bank confidential historical transaction review reports that Deloitte had prepared for two other major foreign banking clients that were under investigation for OFAC violations and money laundering activities.

781.    Deloitte's reports contained detailed and highly confidential information concerning foreign banks involved in illegal U.S. dollar clearing activities.

782.    SCB then asked Deloitte to delete from its draft "independent" report any reference to certain types of payments that could ultimately reveal Standard Chartered Bank's illegal Iranian-related practices.

783.    In an e-mail dated October 1, 2005, SCB's Group Head of Legal & Compliance, Wholesale Bank, forwarding the *Quality Operating Procedure* to SCB's Group Head of Compliance and Regulatory Risk, its Group Legal Advisor and its Head of Financial Crime Risk Systems and Monitoring, observed that "read in isolation, is clearly ... designed to hide, deliberately, the Iranian connection of payments."

784.    A few days later, in an e-mail dated October 8, 2005, Deloitte's Global Leader of Anti-Money Laundering/Trade Sanctions Division wrote to SCB's Head of Compliance, that Deloitte had "agreed" to accede to Standard Chartered Bank's request that Deloitte delete from its draft "independent" report any reference to certain types of payments that could ultimately reveal Standard Chartered Bank's illegal Iranian U-Turn practices because "this is too much and too politically sensitive for both SCB and Deloitte. That is why I drafted the watered-down version."

785.    In a December 1, 2005 internal memorandum entitled "*Project Gazelle*," SCB's Group Head of Compliance and Regulatory Risk and its CEO in the United Arab Emirates wrote to SCB's Group Executive Director for Risk and its Group Head of Global Markets, acknowledging that Standard Chartered Bank repair procedures for U-Turn exemption transactions did "not provide assurance that it does not relate to a prohibited transaction, and therefore SCB NY is exposed to the risk of a breach of sanctions."

786.    A February 23, 2006 internal memorandum entitled "Iranian Business" sent from Standard Chartered Bank's General Counsel to SCB's Audit and Risk Committee confirmed SCB's continued recognition that the Conspiracy was expressly designed to enable Iran and the Iranian Bank Co-conspirators (including Defendant Bank Saderat Plc) to evade U.S. detection of their transactions and confirmed that "certain US$ clearing transactions handled in London were processed with the name of the Iranian Bank excluded or removed from the 'remitter field'" despite

the "requirement that due diligence in respect of 'U-turn' payments should be undertaken by our office in New York."

788.    In September 2006, New York State regulators requested that SCB provide them with statistics on Iranian U-Turns SCB handled, including the number and dollar volume of such transactions for a 12-month period.

788.    In response, SCB searched its records for 2005 and 2006.

789.    In a September 26, 2006 email from SCB's Project Manager for the Lookback Review to SCB's Head of Cash Management Services (2002-2005) and Head of Compliance (2005-2007) at Standard Chartered Bank's New York branch, SCB's Head of Operations and Head of Cash SCB identified 2,626 transactions totaling over $16 billion (for Iranian banks).

790.    Faced with the prospect of disclosing *billions* of dollars in Iranian transactions, Standard Chartered Bank's New York branch's Head of Compliance was directed by his superiors at SCB to provide instead only ***four days*** of U-Turn data to regulators; these four days were masquerading as a log covering two-years of transaction data.

791.    In October 2006, the CEO for SCB's U.S. Operations e-mailed the SCB Group Executive Director in London:

> Firstly, we believe [the Iranian business] needs urgent reviewing at the Group level to evaluate if its returns and strategic benefits are . . . still commensurate with the potential to cause very serious or even catastrophic reputational damage to the Group. Secondly, there is equally importantly potential of risk of subjecting management in US and London (e.g. you and I) and elsewhere to personal reputational damages and/or serious criminal liability.

792.    SCB's Group Executive Director responded (as quoted by a Standard Chartered Bank's New York branch officer): "You f---ing Americans. Who are you to tell us, the rest of the world, that we're not going to deal with Iranians."

793.    In 2007, SCB successfully convinced the N.Y. State Banking Department and

FRBNY to lift their consent order on SCB based on the watered down D&T report and its other fraudulent disclosures.

794.    As noted above, from approximately January 2001 through 2007, SCB transferred at least *$250 billion* through Standard Chartered Bank's New York branch on behalf of the Iranian Bank Co-conspirators, including Bank Melli Iran and the CBI, as well as Defendant Bank Saderat Plc.

795.    Standard Chartered Bank's New York branch processed approximately **60,000 wire transfers** on behalf of the Iranian Bank Co-conspirators, with roughly half the transactions originating with SCB's London office, and the other half with SCB's branch in Dubai, UAE.

796.    In early 2009, after being contacted by U.S. law enforcement authorities, SCB conducted yet another "internal investigation" into its OFAC sanctions screening procedures, business practices and technology.

797.    Nonetheless, Standard Chartered Bank's New York branch was the conduit for at least 50 post-U.S. designation transactions on behalf of IRISL and its various front companies through June 2010.

798.    As of 2011, however, even after its internal investigation and open law enforcement investigations commenced in the U.S., the New York State Banking Department still found that Standard Chartered Bank's New York branch had:

 a. No documented evidence of investigation before the release of funds for transactions with parties whose names matched the OFAC-sanctioned list; and

 b. Outsourced Standard Chartered Bank's New York branch's entire OFAC compliance process to Chennai, India, with no evidence of any oversight or communication between the Chennai and Standard Chartered Bank's New York branch.

## 2. SCB Facilitated Transactions On Behalf of MODAFL, Mahan Air and Other Instrumentalities of Iranian State-Sponsored Terror (Including a Hezbollah Affiliated Entity) in Furtherance of Numerous Violations of the U.S. Trade Embargo, Thereby Substantially Contributing to the Plaintiffs' Injuries.

799.    From at least 2001 to 2007, SCB illegally facilitated more than 1,300 Letters of Credit through stripping or cover payment methods that purposefully concealed the participation of Iranian counterparties in the transactions.[38]

800.    Many of those LCs were issued for the benefit of Iran's military / terror apparatus, facilitating and financing the IRGC's, MODAFL's and Hezbollah's illegal acquisitions of materials and technologies, including materials unlawfully obtained from the United States and components for IEDs and EFPs used against Coalition Forces in Iraq.

801.    SCB knowingly facilitated and financed the illegal export to Iran of U.S.-manufactured, export-controlled defense and dual-use products worth tens of millions of dollars. These were acquired by various Iranian-controlled front companies on behalf of, *inter alia*, the following entities:

    a.    Mahan Air;

    b.    Four MODAFL subsidiaries: the AIO, the IACI, the IHRSC, and HESA;

    c.    The Iran Power Development Company ("IPDC"), MAPNA and Zener Electronics Services (an agent of Hezbollah);

    d.    The National Iranian Oil Company ("NIOC") and several of its subsidiaries; and

    e.    Khoram Sanat Producing Co. – Iran.

802.    None of these aforementioned entities is (or was) a legitimate agency, operation, or program of the Iranian government.

---

[38]    A more accurate accounting would probably exceed 9,000 trade-finance and Eurodollar payment transactions.

803. On the contrary, Mahan Air is an SDGT that, according to the U.S. government, (1) "facilitated the covert travel of suspected IRGC-QF officers into and out of Iraq;" (2) "facilitated IRGC-QF arms shipments"; and (3) "transported personnel, weapons and goods on behalf of Hezbollah. [sic]"

804. Mahan Air was also later identified as the conduit to Iran of *thousands* of radio frequency modules recovered by Coalition Forces in Iraq from IED devices that were used to target, kill and maim U.S. and Coalition Forces.

805. Similarly, MODAFL is the principal procurement arm of Iran's military and terror apparatus.

806. The Mapna group is also a key component of MODAFL and the IRGC's procurement chain.

807. Abbas Aliaabadi, Chairman of Mapna International FZE and President of the Mapna Group, is a former member of the Iranian Ministry of Construction Jihad and of the Iranian Air Force. Aliaabadi was also a key member of the Ministry of Culture & Islamic Guidance instrumental in the creation of Hezbollah and has close links to the IRGC.

808. During the relevant time period, the National Iranian Oil Company was not only controlled by the IRGC but also served as the lifeblood of the Iranian regime's illicit financing activities, providing it with access to billions of dollars in oil and natural gas revenues that enabled the IRGC to gain access (through the Conspiracy) to the global financial system.

809. Standard Chartered Bank knowingly conspired with Iran to facilitate illicit trade for all of these entities in violation of U.S. law, thereby substantially assisting Iran in its criminal (and specifically terrorist) conduct in Iraq. The foreseeable consequence of that assistance was to enable

Iran, the IRGC and Hezbollah to kill or wound, or try to kill, or conspire to kill more Americans in Iraq.

810. At all relevant times, SCB was fully aware of both the Iran Trade Regulations and the Export Administration Regulations, the U.S. State Department's United States Munitions List ("USML") and their many restrictions.

## a. Standard Chartered Knowingly Provided Illegal Financing to Mahan Air.

811. Between 2000 and 2006, Standard Chartered Bank facilitated LCs for the benefit of Mahan Air totaling more than $120 million.

812. As noted above, the Treasury Department designated Mahan Air in 2011, finding that:

> Mahan Air also facilitated the covert travel of suspected IRGC-QF officers into and out of Iraq by bypassing normal security procedures and not including information on flight manifests to eliminate records of the IRGC-QF travel.

> Mahan Air crews have facilitated IRGC-QF arms shipments. Funds were also transferred via Mahan Air for the procurement of controlled goods by the IRGC-QF.

> In addition to the reasons for which Mahan Air is being designated today, Mahan Air also provides transportation services to Hezbollah [sic], a Lebanon-based designated Foreign Terrorist Organization. Mahan Air has transported personnel, weapons and goods on behalf of Hezbollah [sic] and omitted from Mahan Air cargo manifests secret weapons shipments bound for Hezbollah [sic].

813. Mahan Air also transported to Iran *thousands* of radio frequency modules illegally imported by OPTO Electronics in Singapore, NEL Electronics PTE Ltd. and Corezing International PTE Ltd. from the United States.[39]

---

[39] *See*, Superseding Indictment in *U.S. v. Larijani* at: https://www.justice.gov/opa/file/837996/download.

814.     These modules were recovered by Coalition Forces in Iraq from IED devices that were used to target U.S. and Coalition Forces.

815.     The modules had encryption capabilities and a particularly long range that allowed Special Groups operatives to operate them across significant distances.

816.     In 2008, Mahan Air transported the IED components from Singapore and Thailand to Tehran, Iran.

817.     Under Secretary of Commerce Eric L. Hirschhorn described this supply chain as "egregious conduct by… foreign companies and individuals who have endangered the lives of U.S. and coalition forces in Iraq."

818.     Five LCs facilitated by Standard Chartered Bank listed Mahan Air as the "Applicant" and involved the illegal acquisition of materials ranging from aviation parts to a U.S. shipment of an Airbus A320.

819.     The Issuing Banks for the LC included Defendant Bank Saderat Plc, Bank Melli Iran and Bank Sepah.

820.     SCB's New York branch served as the clearing bank for these LCs.

821.     Furthermore, in another transaction, Mahan Air was the listed Beneficiary of a $21 million dollar LC facilitating the leasing of several second-hand Airbus A320s from Europe.[40]

822.     In facilitating these trade-finance transactions, often for explicitly "Non-EAR 99" goods of U.S. origin – i.e. products on the Commerce Control List, Standard Chartered Bank knew that it was (1) working with Iranian banks, (2) concealing the Iranian connection to the trade-

---

[40]     Mahan Air was the target of a Temporary Denial Order ("TDO") by the U.S. Department of Commerce in March 2008 for, *inter alia*, "knowingly re-exporting to Iran three US-origin aircraft, specifically Boeing 747." The Bureau of Industry and Security's TDO was renewed subsequently several times.

finance and Eurodollar transactions and (3) facilitating the unlawful delivery of these U.S. export controlled parts or products to Iranian entities in Iran.

823.    For at least two transactions facilitated on behalf of Mahan Air (including one for export controlled goods of entirely U.S. origin), Credit Suisse in Zurich facilitated the payment on the LC to Standard Chartered Bank, Dubai, and on at least one of those transactions, the payment was routed by Credit Suisse in Zurich through New York on behalf of Bank Melli in the UAE with the transaction being cleared and settled in USD funds by Standard Chartered Bank's New York branch.

824.    On one occasion, Mahan Air purchased an Airbus (aircraft) using Blue Sky Aviation as its intermediary. Standard Chartered Bank, Dubai provided the nearly $30 million to Blue Sky for the purchase, and Bank Sepah (Iran) guaranteed the payment through a re-payment made by Credit Suisse on its behalf in 2006.

825.    The front companies listed as beneficiaries of the LCs facilitated by Standard Chartered Bank included Sirjanco Trading LLC ("Sirjanco") and Blue Sky Aviation Co FZE ("BSA FZE" or "BSA"), both later designated by the U.S. Treasury as SDGTs, in part, because of the illegal sanctions evading conduct facilitated and enabled by Standard Chartered.

826.    Hamidreza Malekouti Pour served simultaneously as the Regional Manager for Mahan Air in the UAE, and Managing Director of Sirjanco and BSA FZE – effectively demonstrating how these companies are all part of the same IRGC supply chain. Pour has also been designated as an SDGT for, *inter alia*, supplying equipment to the IRGC-QF.

827.    When designated by the U.S. Treasury Department in 2013 as a Specially Designated Global Terrorist,[41] Sirjanco was described as "a United Arab Emirates-based company designated pursuant to E.O. 13224 for acting for or on behalf of Mahan Air.

828.    Sirjanco was established specifically to serve as a financial front for Mahan Air. Sirjanco has also served as a front for Mahan Air's acquisition of aircraft. Additionally, Iran's IRGC-QF has used Sirjanco to procure sanctioned goods."

829.    A 2005 LC facilitated by Standard Chartered Bank listed Mahan as the Applicant, and Sirjanco as the beneficiary, for a total of $32,500,000.

830.    Bank Melli financed the payment through Credit Suisse, which sent the payment order through New York (clearing and settling in USD funds through Standard Chartered Bank's New York branch).

831.    The payment was made by Standard Chartered Bank, Dubai to Sirjanco's account with Bank Saderat, Dubai.

832.    At least two other LCs facilitated by Standard Chartered Bank listed Mahan Air as the Applicant, and Blue Sky Aviation as the Beneficiary, for a total of over $60,000,000.[42] All told, between 2000 and 2006, Standard Chartered Bank facilitated at least 11 LCs for the "Blue Sky Group" for a total of more than $125 million.

833.    When the U.S. Treasury Department designated Blue Sky Aviation in 2014, it described it as "a UAE-based company that is owned or controlled by Mahan Air and acts for or on behalf of the airline.

---

[41]    Sirjanco was previously the target of a Temporary Denial Order by the U.S. Department of Commerce in 2011.
[42]    Plaintiffs' estimates are based on only one Promontory report. SCB's historical relationship with the Blue Sky Group was the subject of a separate Promontory Report not (yet) available.

834.     BSA FZE's primary function has been to serve as a payment channel for Mahan Air to obscure the origination of funds.  Mahan Air has used BSA to make payments to oil suppliers, and purchase aircraft, engines, and parts."

835.     In sum, Standard Chartered Bank was vital to Mahan Air's continued operations and its ability to facilitate travel by IRGC-QF officers and arms shipments in and out of Iraq, transport IED technologies into Iraq as well as transit personnel, weapons and goods on behalf of Hezbollah, which helped facilitate terrorist attacks in Iraq during the relevant time period.

836.     While neither Mahan Air nor Blue Sky Aviation was designated as a terrorist at the time the LCs identified above were financed, Standard Chartered Bank engaged in criminal conduct in furtherance of the Conspiracy in order to aid these IRGC supply chain entities to evade U.S. sanctions knowing that its own conduct was illegal.

837.     At the time it agreed to engage in overt acts in furtherance of the Conspiracy, Standard Chartered Bank knew that: (1) Iran was a U.S.-designated State Sponsor of Terrorism; (2) the U.S. had imposed strict sanctions and export controls on Iran and Iranian trade; (3) Mahan Air was seeking to illegally acquire U.S. export controlled defense and dual-use materials; and (4) Mahan Air was using front companies to do so.

838.     In sum, Standard Chartered Bank affirmatively chose to facilitate Iran's illegal conduct and provide material support to its terror apparatus, including Mahan Air, Blue Sky Aviation and Sirjanco. All of these entities were later designated as SDGTs in part because of the types of trade-finance and Eurodollar transactions facilitated by Standard Chartered Bank.

   **b.   Standard Chartered Knowingly Provided Illegal Financing to MODAFL Companies: AIO, IACI, IHRSC and HESA.**

839.     Iran's Ministry of Defense and Armed Forces Logistics (MODAFL) operates the [Iran] Aviation Industries Organization (IAIO), the Aerospace Industries Organization (AIO) and

the Defense Industries Organization (DIO). MODAFL was designated by the United States on October 25, 2007.[43]

840.    The AIO was designated on June 28, 2005 for weapons proliferation. Standard Chartered Bank knowingly provided financing for both the AIO directly, and for 3 major sub-agencies of MODAFL's IAIO: the Iran Aircraft Industries (**"IACI"**)[44] a/k/a SAHA, the Iran Helicopter Support and Renewal Company ("IHSRC") a/k/a PANHA, and the Iran Aircraft Manufacturing Industrial Company ("IAMI" a/k/a "HESA"). Support for any of these entities, as sub-agencies of MODAFL and the IAIO, was not for legitimate agencies, operations or programs of Iran.



---

[43]    MODAFL was also sanctioned, pursuant to the Arms Export Control Act and the Export Administration Act, in November 2000.
[44]    IACI was also formerly listed by the European Union on July 26, 2010, and described as an entity that "[m]anufactures, repairs, and conducts overhauls of airplanes and aircraft engines and procures aviation-related parts often of US-origin typically via foreign intermediaries. IACI and its subsidiaries also have been detected using a worldwide network of brokers seeking to procure aviation-related goods." IACI was also formerly sanctioned by Switzerland, Norway, Japan, Australia, Canada, and the UK. It was designated by the United States in 2013.

### i. SCB Trade-Finance Transactions with MODAFL's Aerospace Industries Organization (AIO)

841. In 2002, Standard Chartered Bank facilitated an LC for MODAFL's Aerospace Industries Organization that cleared through SCB's New York branch valued at $57,662 USD for the illegal purchase of U.S. export controlled goods.[45]

842. That transaction was not for the benefit of any legitimate agencies, operations or programs of Iran.

### ii. SCB Trade-Finance Transactions with MODAFL's [Iran] Aviation Industries Organization (IAIO)

843. On numerous additional occasions, Standard Chartered Bank illegally facilitated trade-finance and Eurodollar transactions on behalf of other MODAFL sub-agencies, including HESA.

844. On September 17, 2008, the U.S. Treasury Department designated HESA,[46] finding that it is:

> owned or controlled by MODAFL, and also because it has provided support to the Iranian Revolutionary Guard Corps (IRGC). The IRGC, which was designated under Executive Order 13382 on October 25, 2007, is considered to be the military vanguard of Iran and has been outspoken about its willingness to proliferate ballistic missiles capable of carrying WMD.
>
> HESA utilizes its own facilities for the inspection, maintenance, repair overhaul research, development, and manufacture of military and civilian aircraft and related military logistic systems. HESA conducts research on, development of, production of, and flight operations for unmanned aerial vehicles (UAVs) in Iran. The IRGC utilizes the "Ababil" UAV, manufactured by HESA. HESA produces different variants of the Ababil UAV, which can be used for surveillance and attack. Farasakht Industries

---

[45]     AIO was reportedly responsible for developing anti-tank guided weapons; artillery rocket systems; anti-tank missiles; precision machining and metal forming for a variety of Iranian weapons systems.

[46]     HESA was previously identified in a document distributed by the German government in July 2005, warning of its potentially illicit activities. It was also identified by the UK government in February 1998 as having procured goods and/or technology for WMD programs.

is a subsidiary of HESA that specializes in the manufacturing of various aerospace tools and equipment.

**(A) SCB's Trade-Finance Transactions with MODAFL-IAIO Front Company Downtown Trading Ltd.**

845. Between 1998 and 2002, Standard Chartered Bank facilitated ten LCs involving a company based in Malaysia (and with links to a same named company registered in the U.K.), Downtown Trading Ltd ("Downtown Trading").

846. The total value of these ten LCs involving Downtown Trading amounted to $1,067,575.

847. MODAFL-IAIO's subsidiary Iran Aircraft Industries ("IACI") was the Applicant on these LCs, i.e. the purchaser of the U.S. origin aircraft engine parts in question for seven of these transactions, while Downtown Trading was the reported Beneficiary.

848. In most or all of these transactions, primarily those for 2002, Bank Sepah (Iran) served as the Issuing Bank, Bank Sepah (London) served as the Reimbursing Bank, SCB Dubai served as the Negotiating Bank, and SCB's New York branch helped facilitate the transactions by serving as the Clearing Bank.

849. With respect to at least four of these transactions, the U.S. aircraft parts were transported by Iran Air, later designated as "a commercial airline used by the IRGC and Iran's Ministry of Defense and Armed Forces Logistics (MODAFL) to transport military related equipment…. Iran Air has provided support and services to MODAFL and the IRGC through the transport and/or transfer of goods for, or on behalf of, these entities."

850. IACI's illegal procurements were often financed by Bank Sepah (as the Issuing Bank), but Standard Chartered Bank in Dubai frequently served as the Negotiating Bank and

SCB's New York branch usually served as the Clearing Bank for these same trade-finance transactions, in at least one case paying Citibank in New York the fund due.

851.    Citibank then paid Maybank, Malaysia, which effected the ultimate payment to the Eurodollar account of Downtown Trading.

852.    Standard Chartered Bank also facilitated similar LCs in USD funds for Downtown Trading after April 2005.

853.    In facilitating these transactions – 70% of which explicitly involved export-controlled "Non-EAR 99" goods of U.S. origin (i.e. products on the Commerce Control List) – Standard Chartered Bank knew that it was: (1) working with Iranian banks; (2) concealing the Iranian connection to the transactions; (3) facilitating the unlawful delivery of goods on the U.S. Commerce Control List to Iran's military and/or the IRGC; and (4) that these transactions were not for legitimate agencies, operations, or programs of Iran.

### (B)    SCB's Trade-Finance Transactions with MODAFL-IAIO Front Company Mac Aviation

854.    Mac Aviation is an Irish trading company incorporated in 1993 that purported to engage in the purchase and sale of aircraft and helicopter parts.

855.    The company and its owners[47] were indicted in 2008 for, among other things, violations of the IEEPA, the ITR, and U.S. export controls.

856.    During the relevant time period, Mac Aviation was a customer of Standard Chartered Bank in London.

---

[47]    In 1994, one of the owners of Mac Aviation, Thomas McGuinn, was convicted by a Florida court for exporting defense products to Iran. He pled guilty and was sentenced on April 19, 1996, to time served and 3 years of supervision on release. McGuinn was also barred from receiving licenses for exporting U.S. defense articles.

857.    According to the indictment, between June 2005 and July 2008 Mac Aviation solicited purchase orders from customers in Iran for U.S. origin aircraft parts and then forwarded these requests for the parts to U.S. companies.

858.    The indictment further alleges that Mac Aviation wired funds to banks in the U.S. as payment for these parts, and concealed from U.S. sellers the ultimate end-use and Iranian end-users of the purchased parts.

859.    The indictment also alleges that Mac Aviation caused the export of these parts from the U.S. to third countries, including Malaysia, before sending their shipments onward to Iran.

860.    At least one of those shipments, directed by Mac Aviation in February 2006, resulted in a shipment to be made from a firm called Microset Systems Sdn Bhd in Kuala Lumpur, Malaysia, to Sasadja Moavanate Bazargani in Tehran, Iran, an alter ego of Iran's Defense Industries Organization (DIO), which had been designated by Germany, the United Nations, and the United States as a procurer of unlawful weapons components beginning as early as 2005.

861.    As noted above, weapons caches seized from Special Groups by Coalition Forces in Iraq included many 107 mm artillery rockets with closely clustered DIO lot numbers and production dates between 2005 and 2007, as well as rounds and fuses for 60 mm and 81 mm mortars with DIO lot markings and 2006 production dates.

862.    In another example, in January 2006, police in the southern Iraqi city of Amara, near the Iranian border, captured seventy blocks of TNT explosives and seventy-nine blocks of plastic explosive, which were used by the Special Groups as components of IEDs, all with markings and lot numbers showing that they were produced by DIO.

863.    In July 2010, the DOJ obtained a 27-count superseding indictment in *USA v. Mac Aviation et al.* charging the company and its officers with:

purchasing F-5 fighter aircraft parts, helicopter engines and other aircraft components from U.S. firms and illegally exporting them to Iran.…

[…] Beginning as early as August 2005… through July 2008, the defendants solicited purchase orders from customers in Iran for U.S.-origin aircraft engines and parts and then sent requests for aircraft components to U.S. companies. These parts included helicopter engines, aircraft bolts and vanes, and canopy panels for the F-5 fighter aircraft. The defendants wired money to banks in the U.S. as payment for these parts and concealed from U.S. sellers the ultimate end-use and end-users of the purchased parts.

The defendants caused these parts to be exported from the U.S. to third countries like Malaysia before causing them to be transshipped to Iran. […]

From 2005 […] to] 2006, the defendants caused canopy panels designed for the F-5 fighter aircraft, valued at approximately $44,500, to be exported from the U.S. to Iran. The defendants falsely stated that the end user for the F-5 panels was the Republic of Nigeria. Instead, the panels were sold by the defendants to Sasadja Moavanate Bazargani, in Tehran, Iran for $86,400. The purchase was arranged through the Iran Aircraft Manufacturing Industrial Company, known by its Iranian acronym as HESA.

864.    According to the superseding indictment, Mac Aviation also shipped fifteen helicopter engines to Iran Aircraft Industrial Manufacturing Company ("HESA").

865.    These included ten Rolls-Royce Model 250 C-20B turboshaft engines, and five Rolls-Royce Model 250 C-20R2 turboshaft engines.

866.    Rolls-Royce Model 250 engines are used on HESA's 278 Shahed (military) helicopters (converted or adapted from the design of the American Bell 206B-III "Jet Ranger" and Bell 206L "Long Ranger" aircraft) flown by and developed for the IRGC.

867.    Between 2001 and 2005, Standard Chartered Bank facilitated at least 21 LCs involving Mac Aviation for a total of close to $8 million dollars.

868.    In each case, Mac Aviation was the nominal purchaser of the aircraft parts (Applicant), and the listed importer was either Iran Aircraft Industries ("IACI"), Iran Helicopter

Support and Renewal Industries ("IHSRC"), or Iran Aircraft Manufacturing Industrial Company ("HESA").[48]

869.    Most, if not all of these LCs appear to have been financed, at least in part, by: Bank Saderat in London (IOVB) serving as the Reimbursing Bank; Bank Refah Iran serving as the Issuing Bank; Standard Chartered Bank in London serving as the Advising Bank; SCB in Dubai serving as the Negotiating Bank; and Standard Chartered Bank's New York branch serving as the Clearing Bank.

870.    Some of the transactions were financed through the CBI's Eurodollar credit line with Standard Chartered Bank.

871.    The other transactions were financed through reimbursements in USD funds claimed by Standard Chartered Bank, London primarily from Defendant Bank Saderat Plc with funds deposited received into Standard Chartered Bank London's U.S. dollar account with Standard Chartered's New York branch for further credit to the Eurodollar account of Mac Aviation (SCB's customer).

872.    Iran Air was often used to deliver the illegally procured equipment to Iran.

873.    Notably, Bank Refah Iran was designated on February 17, 2011, by the U.S. Treasury Department for:

> providing financial services to the Iranian Ministry of Defense and Armed Forces Logistics (MODAFL) and the Iran Aircraft Manufacturing Industrial Company (HESA). In recent years, Bank Refah has facilitated millions of dollars of weapons-related purchases by MODAFL. These purchases included missiles and tanks and enabled Iran's leadership to maintain its fighter jets and submarines. Bank Refah also facilitated payments from

---

[48]    Iran used an Iranian national named Hossein Ali Khoshnevisrad as an intermediary. Khoshnevisrad used two Iranian companies – Ariasa AG (Tehran) and Onakish Co. (Kish Island, Iran) – to deal directly with Mac Aviation. Khoshnevisrad was arrested in the U.S. in 2009 and "charged with purchasing helicopter engines and advanced aerial cameras for fighter bombers from U.S. firms and illegally exporting them to Iran using companies in Malaysia, Ireland and the Netherlands. Among the alleged recipients of these U.S. goods was ... HESA."

HESA to businesses and individuals linked to Iran's weapons-related procurement.[49]

874.     Standard Chartered Bank's financing of MODAFL's clandestine and illegal acquisition of U.S. military (aircraft) spare parts did not fund or facilitate Iran's legitimate agencies, operations, or programs.

875.     Rather, Standard Chartered Bank actively participated in a criminal conspiracy to help Iran's military and terror apparatus obtain critical machinery and equipment and aircraft spare parts it desperately needed to sustain its violent and unlawful activities.

### (C)   SCB's Trade-Finance Transactions with MODAFL-IAIO Front Company Monarch Aviation (Singapore)

876.     Monarch Aviation was an Iranian front company based in Singapore that was owned and controlled by husband and wife, Brian Douglas Woodford, a UK citizen, and Laura Wang-Woodford, a dual U.S. and UK citizen.

877.     It purported to be a manufacturer, dealer, and repairer of aircrafts and related parts. At least during the period between 2001 and 2007, Standard Chartered Bank in Singapore ("SCB-Singapore) maintained accounts for Monarch Aviation, Brian Douglas Woodford, and Laura Wang-Woodford.

878.     At least one Monarch Aviation account at the SCB-Singapore Battery Road branch was listed as account number ACU- 26-0-000106-3.

879.     Defendant Credit Suisse's Singapore Branch at 80 Raffles Place also maintained a U.S. dollar account for Monarch Aviation with the account number K0100340.01.

---

[49]     Standard Chartered Bank maintained correspondent accounts for Bank Refah in Bangladesh, China, Hong Kong, India, Indonesia, Japan, South Korea, Malaysia, Qatar, Singapore, Sri Lanka, Taiwan, Thailand and UAE.

880.    On January 15, 2003, Woodford and Wang-Woodford were indicted for, among other things, violations of the IEEPA, and U.S. export control laws.[50]

881.    Laura Wang-Woodford was arrested on December 23, 2007, and later pled guilty to conspiring to violate the U.S. trade embargo by exporting U.S. origin aircraft components to Iran.

882.    According to the Superseding Indictment, between January 1998 and December 2007, Monarch Aviation, Jungda International Pte Ltd. (a Singapore based successor to Monarch Aviation), Brian Douglas Woodford and his wife, Laura Wang-Woodford, exported U.S. aircraft parts to Singapore and Malaysia, and then re-exported those items to companies in Tehran, Iran, without obtaining the required U.S. government licenses, while falsely listing their companies as the ultimate recipients of the parts on export documents filed with the U.S. government.

883.    Specifically, according to the Superseding Indictment and the U.S. Justice Department's Sentencing Recommendation, the funds transferred by Monarch Aviation paid for Boeing CH-47 ("Chinook") helicopter parts, including vane assemblies and bevel gears that were listed under category VIII on the United States Munitions List ("USML") and illegally exported to Iran.

884.    The vane assemblies, part number 2-080-090-02 and national stock number ("NSN")[51] 2840-01-022-7142, and bevel gears, part number 2-080-013-03 and NSN 3020-00-860-

---

[50]    A Superseding Indictment was returned on May 22, 2008.

[51]    The U.S. National Stock Number (NSN) is a unique thirteen-digit numerical identifier assigned to each part used by the U.S. Department of Defense (DOD).  The NSN system is managed by DOD's Defense Logistics Agency ("DLA"). The DLA system of NSNs was mandated by the 1952 Defense Cataloging and Standardization Act (Pub L No 82-436).

7419, were manufactured by Honeywell International Inc., commercial and government entity ("CAGE")[52] code 99193, in Phoenix, Arizona.

885.    These export controlled, U.S. manufactured helicopter parts were used in Iran's fleet of Boeing CH-47 Chinook heavy-lift utility helicopters that were refurbished by HESA.

886.    Iran's CH-47 helicopters are operated by the Islamic Republic of Iran Army Aviation ("IRIAA") and the Islamic Republic of Iran Air Force ("IRIAF").

887.    The Superseding Indictment also listed the following parts, *inter alia*, that were illegally exported to Iran by Monarch Aviation: o-rings, shear bolts, bushings, and rotary wing shields.

888.    The o-rings, identified by part numbers S6135-20059-102 (NSN 5331-01-270-1765) and S6135-20059-106 (NSN 5331-01-270-1766), were manufactured by Sikorsky Aircraft Corporation (CAGE code 78266) in Stamford, Connecticut.

889.    These export controlled, U.S. manufactured parts were used in Iran's fleet of Sikorsky SH-3D ("Sea King") medium-lift utility/anti-submarine warfare helicopters that were refurbished by Iran HESA.

890.    Iran's SH-3D helicopters are operated by the Islamic Republic of Iran Navy Aviation ("IRINA").

891.    The following parts were manufactured by Bell Helicopter Textron, Inc. (CAGE code 97499) in Fort Worth, Texas:

      a.     Shear bolts, identified by part number NAS625-44 (NSN 5306-00-924-6261);

---

[52]    The CAGE code is a unique identifier assigned to, *inter alia*, U.S. defense contractors and DOD maintenance facilities. The CAGE code provides a standardized method of identifying a given government or defense contractor facility at a specific location.

     b.     Bushings, identified by part number 205-030-477-11 (NSN 1560-00-413-1492); and

     c.     Rotary-wing shields, identified by part number 204-012-118-1 (NSN 1615-00-865-7914).

892.    These export controlled, U.S. manufactured parts were used in the following Iranian rotary-wing aircraft:

     a.     Bell AH-1J ("Cobra") air-assault helicopters (refurbished by HESA);

     b.     Bell UH-1 ("Iroquois") utility transport helicopters (refurbished by HESA);

     c.     Iranian Helicopter Support and Renewal Company ("PAHNA") 2091 ("Toufan") air-assault helicopters (the PAHNA 2091 is an Iranian remanufactured version of the Bell AH-1J helicopter); and

     d.     PAHNA 2-75 ("Shabaviz") utility transport helicopters (the PAHNA 2-75 is an Iranian remanufactured version of the Bell UH-1 helicopter).

893.    Iran's fleet of Bell AH-1J, Bell UH-1, PAHNA 2091 and PAHNA 2-75 helicopters are operated by the Iranian Revolutionary Guard Corps Air Force ("IRGC-AF") and IRIAA.

894.    From 1998 to 2005 (and likely thereafter), Standard Chartered facilitated at least 10 LCs financed by the CBI and Bank Refah with a total value of more than $1.5 million dollars involving the shipment of U.S. origin aircraft parts sold by Monarch Aviation to MODAFL's sub-agencies Iran Aircraft Industries ("IACI"), Iran Helicopter Support and Renewal Co. ("IHSRC"), and HESA.

895.    Defendant Bank Saderat Plc served as the Reimbursing Bank on most, if not all, of these transactions, which cleared through Standard Chartered Bank's New York branch on their way to Monarch Aviation's accounts at Standard Chartered in Singapore.

896.    The aircraft parts were transported by Iran Air from Kuala Lumpur Airport, Malaysia, to Tehran Airport, Iran.

897.    SCB in Dubai served as the Negotiating Bank, and funds from the financing were paid to Monarch Aviation's account with Standard Chartered Bank, Singapore through SCB Singapore's account with Standard Chartered, London, which in turn received the funds into its U.S. Dollar nostro account with Standard Chartered's New York branch from Standard Chartered Bank - Bahrain's Offshore Booking Unit ("OBU").[53]

898.    In sum, various overseas branches of Standard Chartered Bank conspired with multiple MODAFL sub-agencies and Monarch Aviation, and used Standard Chartered's New York branch to both assist Iran's military in illegally acquiring contraband U.S. goods and to illegally disguise the illicit financing of those acquisitions through the Standard Chartered Bank's New York accounts.[54]

899.    Standard Chartered Bank facilitated at least 316 <u>additional</u> transactions totaling $12,110,565 in USD funds that involved Monarch Aviation at its accounts at SCB in Singapore. Dozens of those transactions post-date Woodford and Wang-Woodford's 2003 indictment.

900.    Standard Chartered Bank's financing of MODAFL's clandestine and illegal acquisition of U.S. military spare parts through Monarch Aviation did not fund or facilitate Iran's legitimate agencies, operations, or programs. Rather, Standard Chartered Bank actively participated in a criminal conspiracy to help Iran's military and terror apparatus obtain critical

---

[53]    SCB, Bahrain's Offshore Booking Unit sent proceeds of the Eurodollar loan as payment of Letter of Credit through SCB's New York branch to credit SCB London's USD account in New York for further payment to SCB Singapore.

[54]    SCB, Singapore presented documents under Bank Refah Letter of Credit to SCB, Dubai (the Negotiating Bank) for negotiation and payment in USD funds through SCB's New York branch.

machinery and (aircraft) spare parts it desperately needed to sustain its violent and unlawful activities.

### (D)   SCB's Trade Finance Transactions with MODAFL-IAIO Front Company Jetpower Industrial Ltd (Hong Kong)

901.   Jetpower Industrial Ltd ("Jetpower") was a Hong-Kong based Iranian front company purporting to be a trading company in aircraft parts controlled by Hok Shek Chan, a/k/a John Chan.

902.   In 2011, Chan was sentenced to 42 months for conspiring to illegally export, and attempting to illegally export, 10 indicators, used in C-130 military flight simulators, in violation of the Arms Export Control Act.

903.   According to the U.S. Department of Justice:

> In 1993, Chan's company, Jetpower Industrial, was convicted in Hong Kong of export violations related to his export of U.S. military parts to Iran. Chan then changed his business practices to avoid detection. Rather than shipping U.S. origin goods directly from Hong Kong to Iran, Chan set up a sophisticated procurement network involving front companies and an experienced freight forwarder in Malaysia. Using his network, the defendant was engaged in the illegal procurement and export of aircraft parts from the U.S. for customers located in Iran, including several military related entities in Iran such as the Iranian Air Force, in direct violation of the U.S. Embargo against Iran since 1997.

904.   In fact, according to U.S. officials, Jetpower repeatedly and illicitly exported arms to Iran prior to Mr. Chan's arrest and conviction.[55]

905.   At all relevant times, Jetpower was a customer of Bank Melli in Hong Kong.

906.   The full scope of Standard Chartered Bank's involvement with and facilitation of Jetpower was extensive (involving at least dozens of transactions) but not yet fully known.

---

[55]   At least one Jetpower shipment was seized by UAE officials in 2007 along with several other containers that U.S. officials feared might contain parts or materials that could be used in manufacturing IEDs and EFPs. Bank Mellat financed the transaction, and—according to the LC supporting documentation—the goods were consigned to HESA.

907.     Illegal payments totaling close to $3 million dollars have specifically been identified, but the totals could be much higher.

908.     What is clear is that Standard Chartered Bank repeatedly and knowingly facilitated the illegal shipment of U.S. origin aircraft parts sold by Jetpower to one of MODAFL's sub-agencies (IHSRC), and that Jetpower was a significant link in Iran's illegal weapons procurement chain.

909.     For example, in 2001-2002, Bank Refah (the Issuing Bank) issued a LC to MODAFL's sub-agency IHSRC that was to be reimbursed by Bank Saderat Plc (known then as Iran Overseas Investment Bank), then amended the LC to be available with SCB-Dubai. Standard Chartered Bank's branches in New York, Singapore and Hong Kong were all instrumental in enabling Jetpower's receipt of payments at its Eurodollar account(s) with Bank Melli in Hong Kong.

910.     When Jetpower transported the contraband goods (U.S. helicopter parts) to MODAFL (using Iran Air), it asked Bank Melli in Hong Kong to present the documents required under the LC for payment to Standard Chartered Bank Dubai.

911.     However, in many instances, Standard Chartered Bank Dubai took at least four extra steps before Bank Melli in Hong Kong received the Eurodollar payment for Jetpower.

912.     Upon acceptance of the documents from Bank Melli, Standard Chartered Bank Dubai used the CBI's Eurodollar credit facility with Standard Chartered Bank Dubai and sent instructions for a Eurodollar loan to be issued by Standard Chartered Bank, Bahrain.

913.     Standard Chartered Bank, Bahrain booked the loan and sent the proceeds in USD funds as payment under the Letter of Credit through Standard Chartered Bank's New York branch

to National Westminster Bank's New York correspondent account for further credit to National Westminster, London for the Eurodollar account of its customer, Bank Melli, London.

914.    Standard Chartered Bank, Dubai then sent instructions to Bank Melli, London to pay Bank Melli, Hong Kong upon receipt of USD funds.

915.    Variations on this process were undertaken on multiple LCs in USD funds for the benefit of MODAFL's sub-agency.

916.    In these cases, Standard Chartered Bank, Bahrain knowingly cleared U.S. dollars through Standard Chartered's New York branch for the illegal trade-finance transactions by repackaging the payments on the LCs as loans that secretly routed through the U.S. to Bank Melli Iran through various British banks.

917.    Jetpower, in most cases, ultimately received payment in USD funds to its Eurodollar bank account with Bank Melli Plc's branch in Hong Kong for these illicit transactions with IHSRC.

918.    According to BIS-Basel and the Hong Kong Monetary Authority ("HKMA"),[56] all USD transfers from SCB-Hong Kong to Jetpower's account with Bank Melli Plc's Hong Kong branch were cleared by the Hong Kong Clearing House Automated Transfer System, and settled by HSBC's Hong Kong subsidiary.

919.    None of this illegal conduct was undertaken for the benefit of a legitimate agency, operation or program of Iran.

> c. **SCB's Trade-Finance Transactions Iran Power Development Company ("IPDC"), MAPNA and Zener Electronics Services (an Agent of Hezbollah)**

920.    The Iran Power Development Company ("IPDC"), an Iranian government-

---

[56]    HKMA is the *de facto* central bank of Hong Kong.

controlled entity, has worked extensively for years with a network of Iranian companies known as the Mapna Group.[57]

921.    Mapna International FZE is a UAE-based subsidiary. One of its directors, Mousa Refan, previously served as the first commander of the Air Force of the "Army of the Guardians of the Islamic Revolution [IRGC]."[58]

922.    Another director, Afshin Rezaei, pled guilty in the U.S. District Court for the Northern District of Georgia on April 24, 2008, to:

> one count of violating the IEEPA for the unlicensed export of computers to Iran via the United Arab Emirates. The computers were controlled for anti-terrorism reasons. On May 15, 2008, Rezaei was sentenced to six months of prison (credit for time served), followed by three years of supervised release, and agreed to forfeit $50,000. On February 18, 2010, a 10-year denial of export privileges was imposed on Rezaei, pursuant to Section 11(h) of the EAA.

923.    During the relevant time period, Mapna International maintained a Eurodollar account with Standard Chartered Bank, Dubai.[59]

924.    Between 2001 and 2007, Standard Chartered Bank facilitated at least 280 Letters of Credit involving Mapna International FZE (as Beneficiary). In most cases, SCB, Dubai acted as the Advising Bank on these transactions.

---

[57]    The Mapna Group lists on its website 41 subsidiaries, some of which were listed by the British government in 2011 as entities of concern for Weapons of Mass Destruction-related procurement.

[58]    As noted above, Abbas Aliaabadi, Mapna International FZE's chairman, is a former member of the Iranian Ministry of Construction Jihad and of the Iranian Air Force and former member of the Ministry of Culture & Islamic Guidance, instrumental in the creation of Hezbollah and with close links to the IRGC.

[59]    Mapna's subsidiary, Mobin Petrochemicals, was added to the SDN list on June 16, 2010 (and removed from the SDN list in January 2016 as part of the Joint Comprehensive Plan of Action). During the relevant time period, it maintained a USD account with HSBC.

925.     At least nine Letters of Credit involved Standard Chartered Bank's New York branch serving as the Clearing Bank for the transactions, and in some cases, SCB-London served as the Reimbursing Bank.

926.     Standard Chartered Bank facilitated at least 7 LCs – totaling $1,384,972 in USD funds – that involved the illegal shipment of U.S. origin goods to the Iran Power Development Company.

927.     The CBI served as the Issuing Bank on several of these LCs, and six of those seven involved goods shipped by IRISL.

928.     Of particular note, between 2003 and 2004, Standard Chartered Bank knowingly facilitated at least four unlawful USD funds transfer transactions (cleared through its New York branch) that involved Eurodollar payments to Zener Electronics (UAE), a procurement company for Hezbollah.[60]

929.     The IPDC was listed as the Applicant for these transactions, and Mapna was identified as the 1st Beneficiary, but assigned the payments under the Letters of Credit to Zener Electronics (UAE) as a "2nd Beneficiary."

930.     Each unlawful trade-finance transaction involved U.S. goods.

931.     The Central Bank of Iran acted as the Issuing Bank on at least two of the transactions and SCB, Dubai acted as the Advising and Negotiating Bank.[61]

---

[60]     In June 2014, the U.S. Commerce Department identified Zener Electronics as "involved in activities contrary to the national security and foreign policy interests of the United States, specifically the activities described under paragraph (b)(1) (Supporting persons engaged in acts of terror) of § 744.11 of the EAR" and noted its attempts "to procure U.S. technology on behalf of persons involved in activities contrary to the national security and foreign policy interests of the United States. Specifically, these persons have been involved in supplying U.S.-origin items to persons designated by the Secretary of State as Foreign Terrorist Organizations without the required authorizations."

[61]     On at least one occasion, SCB London also served as the Reimbursing Bank.

932.   On at least one occasion, SCB-London served as the Reimbursing Bank for the payment to Zener Electronics, sending the credit through its New York branch to SCB Dubai's account with Standard Chartered in New York.

933.   Upon receipt of the funds to its USD account with SCB in New York, Standard Chartered Bank, Dubai instructed Standard Chartered Bank's New York branch to forward the funds to JP Morgan Chase in New York, which held an account for the Commercial Bank of Dubai.

934.   The Commercial Bank of Dubai, in turn, credited the account of its customer, Zener Electronics.

935.   These illicit transfers on behalf of Mapna resulted in payments to Zener Electronics (a key link in Hezbollah's illicit supply chain) and were not for the benefit of a legitimate agency, operation or program of Iran. In a Superseding Indictment filed in federal court on March 30, 2016, Mapna was again implicated in the Conspiracy.[62]

936.   This time, DOJ charged multiple individuals with covert transactions in 2011 through a U.S. bank, wherein Mapna's name was omitted from the transaction to hide its identity as a counterparty.

### d.  SCB's Trade-Finance Transactions with National Iranian Oil Company (NIOC) Subsidiaries

937.   The Iranian Helicopter Aviation Company, Ahwaz Pipe Mill Co. and Kala Naft[63] are all subsidiaries of NIOC, which (as noted *supra*) was controlled by the IRGC during the relevant time period.

---

[62]   *See*, *U.S. v. Zarrab* filed in the S.D.N.Y (1:15-cr-00867).

[63]   Kala Naft was designated by the United States in 2010.

938. Between 1999 and 2001, Standard Chartered Bank knowingly facilitated two illegal transactions totaling $750,744 on behalf of the Iranian Helicopter Aviation Company (listed as the Applicant).

939. The Beneficiary listed on both LCs was Limo Sarl. The goods involved in these transactions were U.S. origin helicopter parts.

940. Payments for both transactions were cleared through Standard Chartered Bank's New York branch, and refinanced under the CBI's Eurodollar credit facility with Standard Chartered Bank, Dubai.

941. The Paris-based Limo Sarl was directed by a Ms. Laleh Moein, reported to have also been in the employ of Iran's Ministry of Intelligence and Security ("MOIS").[64]

942. Between 2002 and 2004, SCB knowingly facilitated four (4) illegal transactions totaling $611,713 that involved U.S. origin goods illegally transported to Iran on behalf of Kala Naft.

943. At least two of these transactions had Standard Chartered Bank New York's branch serving as its Clearing Bank.

944. As early as February 1998, Kala Naft was identified by the UK government "as having procured goods and/or technology for weapons of mass destruction programs."

945. Kala Naft was also publicly identified as a NIOC subsidiary in a 2003 Commerce Department action that further stated that Kala Naft was a recipient of illegally exported U.S. origin oilfield equipment from the U.S.

---

[64] MOIS was designated by the U.S. for, *inter alia*, providing support to terrorist groups, including Hezbollah.

946. Between 2001 and 2006, SCB knowingly facilitated at least two illegal transactions totaling $593,307 that involved U.S. origin goods illegally transported to Iran on behalf of Ahwaz Pipe Mill Co.

947. The CBI was used as the Refinancing Bank, and Standard Chartered Bank's New York branch served as the Clearing Bank.

948. The listed beneficiary of the Ahwaz Pipe Mill Co. trade-finance transactions was a Cypriot company named Polygon Co. Ltd.

949. Polygon's managing director and its owner had previously been indicted on November 19, 1992, in the Southern District of Florida for illegally conspiring to export oil field equipment and other goods, services and technology to Libya, demonstrating its history of illicit sanctions evasion on behalf of a State Sponsor of Terrorism.

950. The litany of trade-finance and Eurodollar transactions discussed *supra* often involved counterparties (such as Mac Aviation, Jetpower and Polygon) with established track records of criminal activity on behalf of Iran.

### e. SCB's Trade-Finance Transactions with Iranian Front Company Khoram Sanat Producing Co. - Iran

951. On June 20, 2005, Standard Chartered facilitated Khoram Sanat Producing Co.'s purchase of electromotors for hydraulic presses worth $2.79 million dollars.

952. The company is likely a subsidiary of another Iranian company known as "Alborz Steel."

953. The nominal purchaser of the equipment was an Iranian front company in the UAE called Diamonds Steel.[65]

---

[65]     SCB facilitated at least a dozen transactions on behalf of Diamonds Steel, mostly for the benefit of Alborz Steel, Iran. Many of these transactions involved both Bank Melli Iran, as well as Credit Suisse in Switzerland, acting on behalf of Bank Melli Iran or Bank Melli, Dubai.

954.    Diamonds Steel maintained one or more accounts with Standard Chartered Bank, Dubai.

955.    Between 2001 and 2007, SCB, Dubai facilitated at least 173 transactions involving Diamonds Steel, totaling more than $130 million.

956.    The aforementioned electromotors were illegally purchased from the United States with the LC facilitated by Standard Chartered Bank's New York branch, which served as the Clearing Bank for the transaction, while SCB, Dubai served as the Advising Bank.[66]

957.    Standard Chartered Bank facilitated this transaction despite the fact that the machinery required an export license because the equipment could be used for terrorist purposes.[67]

958.    Specifically, hydraulic presses are the precise type of machinery required to manufacture EFPs.[68]

959.    The production of an EFP shaped-charge munition requires at least a 10-ton hydraulic press in order to form sheets of copper and steel, respectively, into the necessary shaped-charge geometry for defeating the plating of American armored vehicles of the type used by the U.S. military in Iraq.

---

[66]    This occurred during a period of time (between 2004 and 2007) when SCB's New York branch was subject to a formal supervisory action by the New York State Banking Department and the Federal Reserve Bank of New York ("FRBNY") for other regulatory compliance failures involving the Bank Secrecy Act (BSA), anti-money laundering policies and procedures ("AML"), and OFAC regulations.

[67]    The product was designated with an ECCN of 2B999 (for Anti-Terrorism reasons) under Supplement 1 to Section 774 of the Commerce Control List (CCL).

[68]    SCB facilitated another Letter of Credit on May 12, 2005, involving Khoram Sanat (as Applicant) and Diamonds Steel (as Beneficiary) for over $1.9 million for goods described as "Back Up Roll Change Carriage, Spare Back Up Roll with Chuck and Main Gear Box." These standard terms are used to describe metal working equipment that may be integrated into large hydraulic presses or deployed as stand-alone equipment stations.

960.    Even assuming a steep mark-up in costs of delivery, Standard Chartered Bank financed Iran's acquisition of approximately fifty (50) hydraulic presses capable of manufacturing more than a hundred EFPs per day.[69]

961.    The hydraulic press machinery was transported to Iran by IRISL.

962.    Because Letters of Credit are intrinsically about the submission of detailed paperwork and required Standard Chartered Bank (Credit Suisse and other Defendants) to examine and retain the documentation evidencing Iran's illegal procurement chain, Standard Chartered Bank's knowledge of its role in the Conspiracy is indisputable.

963.    Furthermore, because Iran's illegal procurement chain was dependent on access to U.S. dollars, Standard Chartered Bank's (and other Defendants') participation in the Conspiracy was essential to its success.

964.    In sum, Standard Chartered Bank was integral to Iran's inherently lethal and illegal conduct, which included a wide variety of money laundering techniques in the service of weapons procurement, arms shipments, acquisition of WMDs, and terror financing that substantially and foreseeably assisted MODAFL, the IRGC and Hezbollah in their campaign of violence and terror against Coalition Forces in Iraq.

### 3.    Regulatory Actions and Criminal Investigations Against Standard Chartered Bank, 2012 – Present

965.    On September 21, 2012, Standard Chartered Bank and the New York State's Department of Financial Services ("DFS") executed a Consent Order resolving charges that, from at least 2001 through 2007, Standard Chartered Bank provided Eurodollar clearing and settlement

---

[69]     The dangers of Iran possessing hydraulic press equipment were evident from a 2009 reported incident wherein Turkish authorities, at the request of the U.S., halted a convoy of trucks heading from Iran to Syria that contained a large hydraulic press and punch press. The U.S. requested this action because "these items are likely intended for the production of explosively formed penetrators (EFPs)."

services to Iranian customers subject to U.S. economic sanctions, with respect to approximately 59,000 transactions totaling approximately $250 billion, through Standard Chartered's New York branch.

966.    DFS concluded that "SCB operated as a rogue institution."

967.    On December 10, 2012, DOJ announced that SCB had agreed to forfeit $227 million to the Justice Department for conspiring to violate the IEEPA, and that the forfeiture was part of Deferred Prosecution Agreements SCB entered into with DOJ and the Manhattan District Attorney's office for illegally moving millions of dollars through the U.S. financial system on behalf of, *inter alia*, sanctioned Iranian entities. SCB also entered into settlement agreements with OFAC and the Board of Governors of the Federal Reserve System, as well as with DFS.

968.    DOJ filed a criminal information charging SCB with one count of knowingly and willfully conspiring to violate IEEPA. SCB waived the federal indictment, agreed to the filing of the information and, according to DOJ's press release, "accepted responsibility for its criminal conduct and that of its employees."

969.    DOJ's 2012 press release announcing the Deferred Prosecution Agreement quoted then-Assistant Attorney General Lanny Bruer as stating: "[f]or years, Standard Chartered Bank deliberately violated U.S. laws governing transactions involving Sudan, Iran, and other countries subject to U.S. sanctions. The United States expects a minimum standard of behavior from all financial institutions that enjoy the benefits of the U.S. financial system. Standard Chartered Bank's conduct was flagrant and unacceptable. Together with the Treasury Department and our state and local partners, we will continue our unrelenting efforts to hold accountable financial institutions that intentionally mislead regulators to do business with sanctioned countries."

183

970.    Manhattan District Attorney Cyrus Vance Jr. stated in the press release: "Investigations of financial institutions, businesses, and individuals who violate U.S. sanctions by misusing banks in New York are vitally important to national security and the integrity of our banking system.  Banks occupy positions of trust. It is a bedrock principle that they must deal honestly with their regulators. I will accept nothing less; too much is at stake for the people of New York and this country. These cases give teeth to sanctions enforcement, send a strong message about the need for transparency in international banking, and ultimately contribute to the fight against money laundering and terror financing."

971.    Prior to entering into the 2012 DPA and its settlement with DFS, Standard Chartered Bank retained Promontory Financial Group, LLC ("Promontory") in 2009 to provide "consulting services in connection with the identification and collection of historical transaction records relating to cross-border financial transactions."

972.    In the first half of 2010, Standard Chartered Bank reported to various regulators, including the New York State Banking Department ("NYSBD"), DFS's predecessor, that it had engaged in conduct related to the evasion of U.S. sanctions.

973.    On April 15, 2010, Standard Chartered hired Promontory again to identify, collect and review historical transaction records implicating sanctions violations.

974.    Thereafter, Promontory produced a number of reports and made various presentations to government authorities, including the NYSBD (later DFS).

975.    These Promontory reports included, *inter alia*, interim reports throughout 2010, final reports in January and March of 2011, as well as updates to those final reports in October 2011.

976. DFS relied in part upon the work conducted and presented by Promontory to identify the scope of Standard Chartered's improper conduct prior to entering into the September 21, 2012 Consent Order.

977. On June 18, 2013, Deloitte entered into a Settlement Agreement with DFS wherein it agreed, *inter alia*, to pay a penalty of $10 million for misusing confidential information from other bank defendants.

978. For example, Deloitte provided Standard Chartered with copies of transaction review reports that Deloitte had prepared for these other clients and suggested to SCB management that they be used as templates for SCB's transactions review report, and agreeing to Standard Chartered's request that Deloitte remove a recommendation from its written final report explaining how "cover payment" messages used by SWIFT-NET (MT 202s) could be manipulated by banks to evade U.S. money laundering controls.

979. On August 19, 2014, DFS announced an order regarding Standard Chartered's failures to remediate AML/CFT compliance problems as required in Standard Chartered's 2012 settlement with DFS.

980. Under the August 2014 DFS order, Standard Chartered was required to: (1) suspend dollar clearing through Standard Chartered Bank's New York branch for high-risk retail business clients at SCB's Hong Kong subsidiary; (2) exit high-risk client relationships within certain business lines at SCB's branches in the UAE; (3) decline new dollar-clearing clients or accounts across its operations without prior approval from DFS; (4) pay a $300 million penalty; and (5) take other remedial steps.

981.    Additionally, according to an October 29, 2014 article in *The New York Times*, federal and Manhattan prosecutors have reopened their investigation into Standard Chartered Bank.

982.    *The New York Times* reported that prosecutors were questioning whether Standard Chartered Bank failed to disclose the extent of its wrongdoing to the government, thus imperiling SCB's 2012 settlement.

983.    In August 2015, DFS issued a "Report on Investigation of Promontory Financial Group, LLC."

984.    The DFS report stated that:

> On April 15, 2010, Promontory was engaged by Standard Chartered's counsel to identify, collect and review historical transaction records "with certain countries or certain Specially Designated Nationals ("SDNs") subject to sanctions" administered by OFAC. The engagement was known as Project Green.

> As part of the engagement, Promontory produced a number of reports and made various presentations to the Bank and government authorities, including the NYSBD. These reports included interim reports throughout 2010, final reports in January and March of 2011, and updates to those final reports in October 2011.

> In connection with the Department's investigation of Standard Chartered, the Department relied in part upon the work conducted and presented by Promontory to identify the scope of the Bank's improper conduct and to determine an appropriate resolution of the investigation.

985.    DFS ultimately concluded that "There are numerous instances where Promontory, at the direction of the Bank or its counsel, or at its own initiative, made changes to 'soften' and 'tone down' the language used in its reports, avoid additional questions from regulators, omit red flag terms or otherwise make the reports more favorable to the Bank."

986.    Examples identified by DFS included a written communication on January 19, 2011, wherein "the Bank's counsel wrote to Promontory that the title of a particular slide entitled

'The 77 non-u-turn payments fell into 3 categories' – meaning the transactions were potential OFAC violations – should be made 'more bland' and suggested a rewording to 'Categories identified in Amendment Analysis.' Promontory made the change to the more vague language requested by the Bank."

987.    The DFS Report further found that "Promontory omitted certain timelines from the reports that would have indicated an increase in violations over time."

988.    The Report went on to cite a December 17, 2010 statement by a senior analyst at Promontory explaining:

> Generally, the timelines serve a strong purpose with the Jersey payments. That is, there appears to be a positive trend over time to reduce the involvement with potential violations. **This will not be true with Dubai. I have a strong suspicion that people will not want to show the timelines for Dubai ([a particular client for which the Bank processed prohibited transactions] for example shows an upwardly sloping curve of violations).** If we are going to go ahead with the visuals across the workstreams, we should be cognizant of the graphics showing painful information and expect strong pushback from the bank and [the Bank's counsel].  (Emphasis added.)

989.    As described above, Standard Chartered Bank's Dubai operations were a central hub for the IRGC's and MODAFL's illegal procurement efforts.

990.    In August 2015, *The New York Times* reported that SCB was once again under investigation: "The Justice Department is examining whether it committed sanctions violations beyond those covered in the 2012 deal, which centered on what the bank called 'Project Gazelle,' an effort to forge 'new relationships with Iranian companies.'"

991.    The *Financial Times* also reported in September 2015:

> Documents seen by the FT suggest that StanChart continued to seek new business from Iranian and Iran-connected companies after it had committed in 2007 to stop working with such clients. These activities include foreign exchange transactions that, people familiar with StanChart operations say, would have involved the US dollar….

> The material reviewed by the FT depicts a bank — one of the few foreign lenders with a license [sic] to operate in the country — determined to keep working with Iranian companies. The status of numerous Iranian and Iran-connected entities was still being reviewed by StanChart as late as 2013, according to documents seen by the FT. These included entities that had internal "markers" and "blocks" placed against them, a way for the bank to flag up concern about links to Tehran. Many accounts belonging to Iranian or Iran-connected entities were indeed closed by 2007, as StanChart promised. But some, like Bank Saderat — which had sanctions imposed in 2006, or Bank Sepah — still had open accounts with no markers against them.

992.    Even as edited to be favorable to Standard Chartered Bank, the 2011 Promontory Report (attached as <u>Exhibit A</u> to the Complaint) provides a window into the vast array of wrongdoings undertaken by Standard Chartered Bank in concert with Iran and its agents.[70]

993.    As the Negotiating Bank on numerous illegal Iranian Letters of Credit, Standard Chartered Bank received the detailed documentation for the shipment of goods, and knew that it was helping Iran's military and terrorist apparatus acquire prohibited U.S. goods and dual-use technologies.

994.    In sum, as the Negotiating Bank on numerous illegal Iranian transactions for Mahan Air and various MODAFL sub-agencies, and as an active conduit and money-launderer for the CBI and other sanctioned Iranian banks, Standard Chartered Bank knew that: (1) it was dealing with Iran's military and terrorist apparatus; (2) it was conspiring to evade U.S. export sanctions; (3) it was laundering money in USD funds for Iran's military and terrorist apparatus;  (4) its own customers were front companies for Iran's military and terrorist apparatus; (5) that these customers were actively engaged in sanctions evasion and money laundering; and (6) that none of this illegal conduct was undertaken for the benefit of a legitimate agency, operation or program of Iran.

---

[70]    Other Promontory reports that have not (for the time being) been publicly disclosed, detail Standard Chartered's Dubai operations and SCB's activities on behalf of the CBI, as well as its role in financing, *inter alia*, Blue Sky Aviation's acquisitions of various materials and technologies.

995.    Lastly, Standard Chartered Bank chose to use its presence in the United States (and its New York branch specifically) to effectuate its crimes.

## L.    DEFENDANT ROYAL BANK OF SCOTLAND N.V.'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY

996.    As alleged above, Defendant RBS N.V. is the legal successor to ABN Amro Bank. As noted above, this Defendant is referred to herein as "ABN Amro (RBS N.V.)"

997.    In May 1995, top officials of ABN Amro (RBS N.V.) in Amsterdam e-mailed the entire management of ABN Amro (RBS N.V.) in Europe, Asia, South America, Africa, the Caribbean, and North America, advising them that any financial transactions in USD funds undertaken for or on behalf of Iranian persons or banks were subject to seizure or blocking in the United States.

998.    Soon after President Clinton signed the Executive Order implementing sanctions against Iran in May 1995, Iranian banks sought the services of ABN Amro (RBS N.V.) and other banks in aiding Iran to circumvent U.S. laws.

999.    ABN Amro (RBS N.V.) employees were aware of these requests, discussed these requests with the other Co-conspirator banks, and thereafter approved of ABN Amro (RBS N.V.) conducting the illegal transactions, contrary to the advice of outside counsel retained by ABN Amro (RBS N.V.) that its involvement in such transactions would potentially violate U.S. law.

1000.   From approximately 1995 until in or about 2005, ABN Amro (RBS N.V.) conspired with the Iranian Bank Co-conspirators (including the CBI, Bank Melli Iran and Defendant Bank Saderat Plc) and their agents to conceal evidence of ABN Amro (RBS N.V.)'s financial transactions from the U.S. government, law enforcement, and intelligence agencies, as well as U.S. financial institutions charged with detecting and blocking certain Iranian transactions.

1001.   ABN Amro (RBS N.V.) was, at the same time, aware that numerous other non-Iranian financial institutions were engaged in the Conspiracy to conceal evidence of the Iranian Bank Co-conspirators' financial transactions from the U.S. government, law enforcement and intelligence agencies, as well as U.S. financial institutions charged with detecting and blocking certain Iranian transactions.

1002.   From approximately 1995 until in or about 2005, ABN Amro (RBS N.V.) furthered the Conspiracy by methodically removing and/or falsifying payment messages on its funds transfer systems to disguise the movement of hundreds of millions of U.S. dollars illegally through the U.S. financial system on behalf of the Iranian Bank Co-conspirators (including Bank Melli Iran).

1003.   In furtherance of the Conspiracy, ABN Amro (RBS N.V.) and the Iranian Bank Co-conspirators developed methods by which ABN Amro (RBS N.V.) would format USD payments so that such payments would evade U.S. sanctions and detection by automated filters used by financial institutions in the United States.

1004.   When ABN Amro (RBS N.V.) employees received payment messages from the Iranian Bank Co-conspirators that contained certain words that could trigger a U.S. bank's automated OFAC filter software algorithms, ABN Amro (RBS N.V.) would manually alter or amend the messages (i.e. "strip" the transactions) to ensure that the transaction would go undetected when it was cleared and settled by financial institutions in the United States.

1005.   ABN Amro (RBS N.V.) thereby caused financial institutions in the United States to process transactions involving the Iranian Bank Co-conspirators that U.S. financial institutions would not otherwise have processed.

1006.   Like Standard Chartered Bank, certain offices, branches, and subsidiaries of ABN Amro (RBS N.V.) also altered Letters of Credit and foreign exchange transactions involving USD

funds by replacing the names of the Iranian Bank Co-conspirators (including Bank Melli Iran) on those transactions.

1007.   Beginning as early as 1995 and continuing until in or about 2005, ABN Amro (RBS N.V.) undertook various acts in furtherance of the Conspiracy. For example: The Dubai branch of ABN created procedures and guidelines to facilitate the processing of prohibited USD transactions.

1008.   For instance, one section of the ABN payment manual entitled "Special Conditions" listed specific instructions on how to effectuate these payments and avoid OFAC filters.

1009.   A specific instruction from this manual stated: "Payments by order of Iranian Banks …maintaining accounts with ABN, Dubai are to be handled with extra care to ensure the wordings "Iran" etc. are not mentioned in the payment due to OFAC regulations."

1010.   In June 1995, an Iranian Bank Co-conspirator requested of ABN Amro (RBS N.V.) officials in Dubai that ABN Amro (RBS N.V.) act as a conduit for all U.S. dollar transactions for that Iranian bank in Dubai.

1011.   The Iranian bank requested that all of its USD funds transfer be routed through, or be issued in the name of, ABN Amro (RBS N.V.) and carry no reference to the fact that these payments were issued on its behalf, and that all of its U.S. dollar receipts would come into ABN Amro (RBS N.V.)'s account.

1012.   Thereafter, ABN Amro (RBS N.V.) undertook various specific acts to conceal its actions on Iran's behalf.

1013.   ABN Amro (RBS N.V.) instructed the Iranian Bank Co-conspirators to include the code word "SPARE" in their payment messages through the bank so that ABN Amro (RBS N.V.)

could first segregate these messages from normal message payment processing, and then amend the message by removing/altering any potentially problematic text, i.e. any reference to Iran.

1014.  The payment message would then be stopped by ABN Amro (RBS N.V.), routed into a special queue, and manually altered to avoid being blocked by any OFAC sanctions screening filters.

1015.  In this manner, ABN Amro (RBS N.V.) assisted sanctioned entities, and ensured the processing of transactions by formatting payment order messages so that they would not be rejected or blocked by OFAC filters at financial institutions in the United States.

1016.  ABN Amro (RBS N.V.) added to its payment manuals the "Special Conditions" that were to be used on behalf of the Iranian Bank Co-conspirators in order to evade detection and circumvent the laws of the United States.

1017.  ABN Amro (RBS N.V.) used these same or materially similar procedures with respect to Letters of Credit in USD funds, and the processing of USD denominated checks and traveler's checks.

1018.  ABN Amro (RBS N.V.) and the Iranian Bank Co-conspirators knew and discussed the fact that without such alterations, amendments, and code words, the automated OFAC filters at clearing banks in the United States would likely halt most of the payment messages and other transactions, and, in many cases, would reject or block the sanctions-related transactions and report the same to OFAC.

1019.  ABN Amro (RBS N.V.) also removed the names, BICs, and any other identifying information of the Iranian Bank Co-conspirators in the payment order messages sent to ABN Amro (RBS N.V.)'s U.S. correspondent banks.

1020.   In order to circumvent U.S. sanctions, certain Iranian Bank Co-conspirators requested that ABN Amro (RBS N.V.) omit their names and BICs from payment order messages sent by ABN Amro (RBS N.V.) to ABN Amro (RBS N.V.)'s U.S. correspondent banks. ABN Amro (RBS N.V.) complied with the requests of these Iranian Bank Co-conspirators, and omitted their names and identifiers in order to help bypass the OFAC filtering mechanisms of U.S. financial institutions.

1021.   ABN Amro (RBS N.V.) also used SWIFT-NET MT 202 cover payment messages to shield the identities of the Iranian Bank Co-conspirators.

1022.   Instead of using serial MT 103 payment messages that require the names and details of counter-parties to transactions, ABN Amro (RBS N.V.) began using MT 202 cover payment messages expressly for the purpose of avoiding revealing the true identity of the ordering customer and beneficiary party for U.S. dollar payments sent through financial institutions in the United States.

1023.   The Central Bank of Iran coordinated with ABN Amro (RBS N.V.)'s Central Bank Desk in Amsterdam regarding the procedure to be followed for repayment of USD deposits to their accounts with European Banks in London.

1024.   This procedure stipulated that payment order messages sent to U.S. clearing banks for payment of USD funds to the CBI should not contain any reference to the Central Bank of Iran or any other reference relating to Iran.

1025.   In or about June and July 1995, officials at ABN Amro (RBS N.V.)'s Amsterdam Headquarters and New York offices were advised by outside U.S. counsel that the proposal by Iranian banks for ABN Amro (RBS N.V.) to serve as a conduit or means to bypass and avoid the sanctions imposed by the United States upon Iran risked breaching U.S. law.

1026.   An internal memorandum generated by ABN Amro (RBS N.V.) at the time stated "[t]he fund transfer mechanics proposed by [the first Iranian Bank] are an attempt to circumvent the Iranian trade embargo. Given that violations of the Executive Order and OFAC regulations carry substantial penalties, not to mention the negative publicity, the [first Iranian Bank] proposal must be strictly scrutinized and ABN Amro must weigh the risks before proceeding with any such transfers."

1027. Also in June 1995, another Iranian Bank Co-conspirator sent a written communication to certain banks in the UAE and the Iranian Bank's correspondent banks instructing those banks to undertake USD funds transfers for the Iranian bank in the name of a European financial institution "WITHOUT MENTIONING OUR BANK'S NAME" to defeat and circumvent the sanctions imposed upon Iran by the United States.

1028.   Like the first request, the Iranian Bank Co-conspirator's request was forwarded to officials located in several departments of the Amsterdam Headquarters of ABN Amro (RBS N.V.).

1029.   As early as 1997, in an internal strategy paper for the Middle East and Africa region named "Desert Spring," prepared by ABN Amro (RBS N.V.)'s Middle East and Africa Regional Office, ABN Amro (RBS N.V.) described a "product initiative" with "opportunities in LC discounting for Central Bank and Bank Melli, Iran" and "deposit mobilization from Iranian nationals."

1030.   On or about February 5, 2000, an official at the Dubai branch of ABN Amro (RBS N.V.) wrote to a Regional Director of one of the Iranian Bank Co-conspirators assuring him that ABN Amro (RBS N.V.) would take care of carrying out the scheme to evade and defeat the U.S. sanctions.

1031.  The ABN Amro (RBS N.V.) official's note stated: "[w]e understand the special nature of your US$ transactions and will ensure that all operations departments concerned are properly briefed regarding this, as well."

1032.  A July 19, 2003 e-mail written by John Ciccarone, Head of ABN Amro (RBS N.V.)'s USD Payments Product Management at ABN Amro (RBS N.V.)'s New York branch, discussed the use of MT 202 cover payments, stating: "There is no way the payment will get stopped as all NY ever sees is a bank to bank instruction."

1033.  In a July 25, 2003 e-mail, John Philbin, Senior Relationship Banker for Iranian Banks, wrote to Ciccarone:

> Surely Iran is the most obvious case in point for these structures. Twenty-four years of US sanctions and OFAC listing and Iran continues to sell oil and gas in USD. And, it imports and pays in USD as well. All of this is clearly done though accounts in Europe and elsewhere. There is a very good case to be made for getting an overall acceptance that when issues are purely US, we should not be a part of it. In fact, we should see it as an opportunity. OFAC is not the Bible for money laundering (e.g. Cuba is prominent on OFAC). It is a tool of broader US policy. We therefore need to distinguish between US foreign policy on the one hand and AML/anti-Terrorism on the other, however much the US administration may wish to insist that the two are closely linked. It is well worth working on a solution for clients who find themselves in this position or who fear (Syria, Saudi Arabia) that they, one day soon might find themselves there.

1034.  Also in 2003, Diane Perrin, a member of ABN Amro (RBS N.V.)'s Group Compliance team at the Defendant's Amsterdam Head Office, stated that "as a European Institution, we do not comply with US Sanctions because those sanctions are politically motivated."

1035.  A 2003 memorandum entitled "Proposal for Establishing a Representative Office in Tehran, Iran" drafted by ABN Amro (RBS N.V.)'s Country Representative in the UAE, Jan Willem van den Bosch, similarly stated:

> The Central Bank of Iran is faced with difficulties for USD denominated clearing transactions due to sanctions imposed by the US. The OFAC filter impounds all Iran related payments and receipts in the US. The Swiss and other European Banks have worked out a solution for this. The payment instructions are sent directly to the beneficiary's bank and cover payment is made to the beneficiary bank's US Correspondent as inter-bank payments.

1036.  Bosch later coordinated the meeting in Dubai between ABN Amro (RBS N.V.)'s Managing Board Member and CFO Tom De Swann and top functionaries of the CBI, including Aziz Farrashi, CBI's Director General.

1037.  During the meeting with the CBI's officials, ABN Amro (RBS N.V.) officials discussed the establishment of the Representative Office by ABN Amro (RBS N.V.) in Tehran and further business development, including the acceptance of USD deposits by the CBI's Desk in Amsterdam.

1038.  In an April 20, 2004 e-mail, the aforementioned Philbin mentioned the possibility of using a Jersey Special Purpose Vehicle as a way to circumvent OFAC restrictions:

> Mike Louwerens [ABN Amro's Vice President and Senior Analyst of Country Risk Management Department] mentioned this to me today and sent the attached. The structure below is very interesting and could have applicability for the banks in Iran as well. But whether that is the case or not, what is clear is that this structure envisages our making and receiving payments in USD which will clear through AA in New York. And for which Mike Bowman sees no objection. I am sending a second note in which OEM (Maarten Seckel) gives a go ahead based on Bowman's nihil obstat. The Way for our doing significant business with the Iranian banks in cash may yet be clear.

1039.  On July 23, 2004, ABN Amro (RBS N.V.) and its New York branch entered into a Written Agreement with the Federal Reserve Banks of New York and Chicago (collectively, the "Reserve Banks") and other regulators that had detected deficiencies at ABN Amro (RBS N.V.)'s New York Branch relating to AML policies, procedures, and practices that included:

> a pattern of previously undisclosed unsafe and unsound practices warranting further enforcement action…. A. ABN AMRO lacked adequate

risk management and legal review policies and procedures to ensure compliance with applicable U.S. law, and failed to adhere to those policies and procedures that it did have. As a result, one of ABN AMRO's overseas branches was able to develop and implement "special procedures" for certain funds transfers, check clearing operations, and letter of credit transactions that were designed and used to circumvent the compliance systems established by the Branches to ensure compliance with the laws of the U.S. In particular, the "special procedures" circumvented the Branches' systems for ensuring compliance with the regulations issued by the Office of Foreign Assets Control ("OFAC") (31 C.F.R. Chapter V).

1040.   U.S. regulators also found that "[p]rior to August 1, 2004, the New York Branch processed wire transfers originated by Bank Melli Iran, a financial institution owned or controlled by the Government of Iran. The payment instructions on the wire transfers had been modified by one of ABN Amro's overseas branches such that any reference to Bank Melli Iran was removed."

1041.   U.S. regulators also found that "[p]rior to August 1, 2004, the Branches advised a number of letters of credit issued by Bank Melli Iran. The letters of credit had been reissued by one of ABN Amro's overseas branches such that any reference to Bank Melli Iran was removed."

1042.   As DOJ later concluded: "Each year between and including 1996 and 2004, ABN caused ABN's U.S. affiliate to file false, misleading, and inaccurate Annual Reports of Blocked Property to OFAC. In each of those reports, the U.S. affiliate of ABN certified to OFAC that all information provided was accurate and that all material facts in connection with the report had been set forth."

1043.   Nonetheless, in September 2004, Michael Louwerens, ABN Amro (RBS N.V.)'s Vice President and Senior Analyst of Country Risk Management Department, travelled to Iran at the behest of ABN Amro (RBS N.V.)'s Head Office and reported back that he had communicated with the Chief Representative of HSBC in Tehran (presumably John Richards) and concluded that ABN Amro (RBS N.V.)'s payment procedures (to conceal Iranian financial activity) were in line with prevailing market practices of HSBC and other banks.

1044.   In addition, ABN Amro (RBS N.V.)'s then New York branch was the conduit for at least 90 post-U.S. designation transactions on behalf of IRISL and its various front companies through March, 2010.

1045.   On May 10, 2010, DOJ issued a press release announcing that ABN Amro's successor entity, Defendant Royal Bank of Scotland N.V., had agreed to forfeit $500 million to the United States in connection with a conspiracy to defraud the United States, to violate the IEEPA, the TWEA, and the Bank Secrecy Act ("BSA").

1046.   In connection with a Deferred Prosecution Agreement ABN Amro (RBS N.V.) entered into, a criminal information was filed in the U.S. District Court for the District of Columbia charging the Defendant with one count of violating the BSA, and one count of conspiracy to defraud the United States and violate the IEEPA and the TWEA. ABN Amro (RBS N.V.) waived indictment, agreed to the filing of the information, and, according to the press release "accepted and acknowledged responsibility for its conduct."

1047.   According to the criminal information, ABN Amro (RBS N.V.)'s participation in the conspiracy continued "until in or about December 2007." Prior to that time, ABN Amro (RBS N.V.) willfully and knowingly conspired, *inter alia*, to "engage in financial transactions with entities affiliated with Iran … in violation of the International Emergency Economic Powers Act, Title 50, United States Code, Section 1705, and regulations and embargoes issued thereunder…."

1048.   The criminal information confirmed that ABN Amro (RBS N.V.) was an active participant in the Conspiracy.

1049.   The criminal information stated that: "It was part of the conspiracy that the defendant discussed with the co-conspirators how to format United States Dollar message

payments so that such payments would avoid detection by automated filters used by financial institutions in the United States and thus evade United States sanctions."

1050.   The criminal information further stated that: "It was part of the conspiracy that the defendant removed names and references to the co-conspirators in United States Dollar message payments routed through the United States."

1051.   The criminal information further stated that: "It was part of the conspiracy that the defendant altered the names and references to the co-conspirators in United States Dollar message payments routed through the United States."

1052.   The criminal information further stated that: "It was part of the conspiracy that the defendant instructed the co-conspirators to use code words in United States Dollar payment messages."

1053.   Additionally, the criminal information stated that: "It was part of the conspiracy that the defendant created a special processing queue to manually and materially alter any of the co-conspirators' United States Dollar message payments that were to be routed through the United States."

1054.   The criminal information also stated that: "It was part of the conspiracy that the defendant created "Special Conditions" in the defendant's payment manuals in order to process any co-conspirators' United States Dollar transactions."

1055.   Finally, the criminal information further stated that: "It was part of the conspiracy that the defendant caused its United States affiliates to submit materially false and misleading reports or statements to the United States Department of the Treasury, OFAC."

M.    **DEFENDANT CREDIT SUISSE'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY**

1056.   Like the other Defendants in this Action, Credit Suisse worked hand-in-glove with

Iran and Iranian Bank Co-conspirators acting at Iran's behest to develop procedures to structure USD payments in ways that would evade U.S. sanctions and leave U.S. regulators, law enforcement and financial institutions blind as to Iran's financial activities.

1057.   To this end, Credit Suisse worked diligently to (1) develop methods that would avoid disclosing the true originators and/or beneficiaries of Iranian transactions that it was clearing and settling in the United States; (2) delete or omit certain information when transactions were to be processed through the United States; and (3) provide incorrect information in USD funds transfer instructions executed through the United States on behalf of U.S.-sanctioned individuals and entities.

1058.   Credit Suisse worked closely with Bank Melli, Bank Saderat, and Iran's Atomic Energy Organization (and other designated Weapons of Mass Destruction proliferators) for many years.

1059.   Before 2003, Credit Suisse was an active participant in the Conspiracy, but the sheer volume of its illegal conduct accelerated greatly in 2003 when Lloyds exited its Iran business and Bank Melli Plc, Defendant Bank Saderat Plc, and other Iranian agents moved their accounts to Credit Suisse.

1060.   For the next two years, Credit Suisse became one of the main USD funds clearing banks for the Iranian banking system, quadrupling in only 3 years the number of Iranian U.S. dollar payments, from approximately 49,000 in 2002 to nearly 200,000 in 2005.

1061.   The procedures Credit Suisse developed and refined over time to assist Iran were embodied in internal directives, memoranda, e-mails between Credit Suisse and its Iranian bank clients and internal e-mails involving, among others, a Credit Suisse Bank Payments Sector Head, Credit Suisse's Treasury and Trade Finance Departments, and the Head of Credit Suisse's Iran

Desk.

1062.   Since at least the mid-1990s, when it first agreed to assist Iran in carrying out the Conspiracy, Credit Suisse's Iran Desk began adding internal warnings to the accounts of its Iranian bank clients, instructing Credit Suisse employees: "*Do not mention the name of the Iranian bank in payment orders*."

1063.   Such warnings ensured that payment orders given by the Iranian Bank Co-conspirators would not be processed automatically, but rather would be manually reviewed, "corrected" if necessary, and effectuated by Credit Suisse employees.

1064.   For example, in June 1995, the Credit Suisse representative office in Dubai, United Arab Emirates, issued a memorandum recognizing Iran and the Iranian bank's general scheme to ensure that *any* foreign banks the Iranian Bank Co-conspirators did business with masked their transactions, and accordingly advised:

> Following the decision by the American authorities to declare a unilateral embargo against the Islamic Republic of Iran on April 30th, (an Iranian bank) approached Credit Suisse to open (a type of correspondent banking account for U.S. dollar transactions). Crucial to them was that the name of the bank would not be mentioned on the transfer orders... Subsequently, (the Iranian bank) was informed that though payments in such a way are basically feasible, to omit the name of the bank could lead to some problems. Meanwhile, operations through this account have started... Some transfers have been rejected by the American banks as the name of (the Iranian bank) appears under the rubric 'Ordering Bank.' Question: a) what can be done to avoid this?

1065.   Almost immediately after President Clinton issued E.O. Nos. 12957, 12959, and 13059, which strengthened existing U.S. sanctions against Iran, the Iranian Bank Co-conspirators began requesting that Credit Suisse omit their names and BICs from payment messages Credit Suisse sent to its U.S. correspondent banks.

1066.   Credit Suisse complied with the Iranian Bank Co-conspirators' illegal requests and

purposefully omitted their names and identifiers in order to help bypass U.S. financial institutions' sanctions filters.

1067. After a 1998 corporate reorganization, in order to further its ongoing efforts to evade U.S. sanctions and ensure that other U.S. financial institutions would automatically process this new stream of payments, Credit Suisse notified its Iranian clients about the change in USD funds clearing and settlement from Credit Suisse First Boston AG ("CSFB") to third-party U.S. correspondents, and provided them with a pamphlet entitled "How to transfer USD payments."

1068. The pamphlet provided detailed payment order formatting instructions for USD funds transfers on how to avoid triggering U.S. OFAC sanction screening filters.

1069. In a 1998 letter to an Iranian Bank Co-conspirator explaining the transfer of its USD clearing services to the Bank of New York, New York, Defendant Credit Suisse wrote:

> In order to provide your esteemed institution with our clearing services in U.S. Dollars, we have introduced a procedure to facilitate your USD payments through our clearing system. The change of our USD-clearer to Bank of New York, New York, will not affect our mutual relationship on any clearing transaction in U.S. Dollars as long as the established procedure will be followed.

1070. Beginning as early as 1995 and continuing through 2005, Credit Suisse, both internally and in coordination with the Iranian Bank Co-conspirators, created procedures and guidelines to facilitate the processing of prohibited USD transactions by its U.S. correspondent banks, primarily the Bank of New York, New York.

1071. By using Credit Suisse's internal processing system, employees manually keyed in "Order of a Customer" when Iranian payments had to be processed as serial payments through U.S. banks.

1072. This procedure was promoted at Credit Suisse, as demonstrated by an email from a Team Leader in the Bank Payments Unit:

> In order to put an end, once and for all, to the discussions regarding the processing of USD payment orders of Iranian banks, I have worked out various examples that are to be considered binding for everyone.

1073.   Attached to the email were several screenshots of Credit Suisse's payment application illustrating how to format payment order messages to ensure that they would pass through the U.S. financial institutions undetected by U.S. OFAC sanction screening filters.

1074.   For example, one such screenshot showed all incoming payment messages listing an Iranian bank as the ordering institution in SWIFT-NET payment order message field "52" and contained the following explicit instructions: "Population of field 52 with 'one of our clients' in case of serial payments via the US."

1075.   A second screenshot showed an incoming payment with the reference "*without mentioning our banks [sic] name*" in field 52 and contained the following instructions: "Population of field 52 with 'one of our clients' in case of serial payments."

1076.   Until 2004, Credit Suisse's use of "*Order of a Customer*" was its standard procedure for processing bank payment messages involving Credit Suisse's Iranian customers.

1077.   Credit Suisse's internal communications also reveal a continual dialogue about evading U.S. sanctions spanning approximately a decade, assessing how to better process Iranian transactions in order to promote and increase business from existing and future Iranian clients.

1078.   In February 1999, Credit Suisse's Iran Desk added internal warnings to the Customer Information Files (or "CIFs") it maintained for the accounts of its Iranian bank customers, expressly directing Credit Suisse employees: "*Do not mention the name of the Iranian bank in payment orders*."

1079.   Credit Suisse documented similar directives in subsequent years. For example, in 2002, another warning was loaded in the CIF that likewise stated: "FOR USD-PAYMENTS

OUTSIDE CREDIT SUISSE/CS FIRST BOSTON DO NOT MENTION THE NAME OF THE
IRANIAN BANK."

1080.   Credit Suisse later decided to remove warnings from the CIFs and replaced them
with long-term instructions concerning Iranian entities that instructed: "*Execute USD payment
orders always with direct order and cover payment*." These instructions explained that they were
intended to ensure (according to Credit Suisse's internal documentation) that "an Iranian origin
will never be named in USD payments carried out for Iranian banks (because of the US
sanctions)!"

1081.   An internal Credit Suisse memorandum dated March 12, 1999, stated:

> Payment orders in USD can only be paid via the American clearing, if the
> name of the Iranian party is not mentioned (US sanctions). Otherwise, the
> amounts are returned by the American banks. Even though corresponding
> warnings have been loaded, there (sic) almost every week cases that are
> processed incorrectly by us.

1082.   Between 2000 and 2004, Credit Suisse's Iran Desk provided similar instructions to
its Iranian Bank Co-conspirator clients via a standard letter, which stated in part: "*The most
important issue is that you and/or your* correspondents do not mention your good bank's name in
field 52."

1083.   Credit Suisse's Iran Desk also informed Iranian Bank Co-conspirator clients that
Credit Suisse would utilize cover payments to effect payments to or through the United States,
stating in one memorandum, for example, "[o]ur payment department will stop all USD payments
initiated by your fine bank in any case and shall be effected [by]... 'Direct payment order and cover
payment order.'"

1084.   In order to prevent straight-through processing of all payment orders sent by Iranian
Bank Co-conspirators, Credit Suisse configured its payment system to interdict the payments for

manual review.

1085.   Credit Suisse employees then reviewed the payments to ensure that they contained no references to Iran. If such references were detected, Credit Suisse employees would either delete the reference, or contact the Iranian Bank Co-conspirators to request further instructions.

1086.   Over time, Credit Suisse employees developed practices to omit information on the involvement of Iranian Bank Co-conspirators, including:

   a.   Entering in an empty field, or replacing the name of the Iranian Bank Co-conspirators with, "*Order of a Customer*" or a similar phrase instead of the actual name of the ordering institution in SWIFT-NET payment order messages;

   b.   Forwarding payment messages received from Iranian Bank Co-conspirators falsely referencing "Credit Suisse" or Credit Suisse's SWIFT-NET account code (identified by BIC address CRESCHZZ) instead of an Iranian bank as the originating institution. For example, a November 2000 email circulated by a team leader in Credit Suisse's Bank Payments Unit contained screenshots of an incoming payment order from an Iranian bank co-conspirator in which Credit Suisse was listed as the ordering institution in field "52" of the SWIFT-NET payment message. The instructions were to make no changes to the misleading information in the SWIFT-NET message's field "52" for serial payment messages made to U.S. financial institutions;

   c.   Inserting "Credit Suisse" as the ordering institution in payments originating with an Iranian Bank Co-conspirator;

   d.   Removing all references to Iranian names, addresses, cities, and telephone numbers from customer payments;

   e.   Substituting abbreviations for Iranian customer names. For example, in an April 16, 2003 email, the Head of Credit Suisse's Iran Desk wrote to the Credit Suisse representative office in Tehran, "*entry to their account works when account number plus XXX is stipulated as beneficiary. What is also important of course is that applicant will give details of final beneficiary as reference for the beneficiary, then it should work;*" and

   f.   Converting SWIFT-NET MT 103 Messages to SWIFT-NET MT 202 Messages to hide the details of Iranian transactions, and using

MT 202 cover payment messages approximately 95% of the time to facilitate outgoing customer payments involving Iran or Iranian parties.

1087.   A September 24, 2003 Credit Suisse internal email sent from a team leader in Customer Payments to a Sector Head within Customer Payments, described Credit Suisse's Iranian U.S. dollar processing:

> The procedure is identical for all Iranian banks: 1) We attempt to send all USD payments directly to the bank of the beneficiary. Only cover payments are made through the US. In such cases, the ordering institution is not disclosed. 2) Should 1) not be possible (if the beneficiary bank is an American bank, or if no Swift connection or no correspondent was named), then the payment will be made though America. We make sure that the ordering institution is not mentioned (this has been programmed into the system as a default) and that the ordering customer has no connection to 'Iran'. 3) Should 1) and 2) not be possible, then the payment order will be forwarded to Investigations for further clarifications with the ordering institution.

1088.   In addition, Credit Suisse actually instructed its Iranian Bank Co-conspirator customers on how to format U.S. dollar payments so that such payments would evade U.S. sanctions and detection by automated filters used by U.S. financial institutions.

1089.   Payment instructions included a letter from Credit Suisse's Iran Desk to an Iranian customer dated October 16, 2003, that stated: "This is to provide you our recommendation for the entry of funds how to handle bank-to-bank payments on your account with Credit Suisse and the following procedures should be applied in order to avoid any difficulties."

1090.   In December 2003, an Iranian bank asked Credit Suisse for an additional USD account identifying the Iranian beneficiary bank only by a designated abbreviation (first letter of each word constituting the bank's name, together with the abbreviation commonly used for a type of legal entity, i.e., Plc).

1091.   On January 28, 2004, Credit Suisse confirmed that it had opened the requested

account, writing to the Iranian bank: "Reference is made to the various conversations and your email, dated December 18, 2003 wherein you asked us to open a new USD account...Now, we would like to confirm the account number …."

1092.   In addition, Credit Suisse promised the Iranian Bank Co-conspirators, including Bank Saderat and Bank Melli, that no messages would leave Credit Suisse without being first hand-checked by a Credit Suisse employee to ensure that they had been formatted to avoid U.S. OFAC filters.

1093.   Credit Suisse also took a further step in the Conspiracy beyond *training* the Iranian Bank Co-conspirators on how to format their payment messages to evade the OFAC filters; it also gave Iranian Bank Co-conspirators materials to use for training *other* banks on how to prepare payment messages to evade U.S. OFAC filters and sanctions regimes.

1094.   In August 2003, Credit Suisse reached an agreement with the London branches of a number of Iranian Bank Co-conspirators to take over the banks' London branches' U.S. dollar clearing activity.

1095.   As a result of this agreement, Credit Suisse became one of the main USD clearing banks for the Iranian banking system.

1096.   Through its subsidiary Credit Suisse Asset Management Limited, United Kingdom ("CSAM"), Credit Suisse used code words for Iranian customers, including Iranian Bank Co-conspirators, when executing trades involving U.S. securities that were transmitted through the U.S.

1097.   Credit Suisse knew that without such alterations, amendments, and code words, automated OFAC filters at U.S. clearing banks would likely halt the payment order messages and securities transactions, and, in many cases, reject or block the sanctions-related transactions and

report the same to OFAC.

1098.   Credit Suisse manipulated payment order messages and removed any identifying reference to sanctioned countries and entities so that the OFAC filters at the U.S. clearing banks would not be able to identify the transactions, and the transactions would be automatically processed without detection.

1099.   In July 2004, the Swiss Federal Banking Commission issued an ordinance to implement the Financial Action Task Force ("FATF")'s Special Recommendation on Terrorist Financing VII.

1100.   The ordinance required the disclosure of the remitter in payment orders, and prompted Credit Suisse to issue an internal directive prohibiting the use of the "Order of a Customer" method when making international wire transfers.

1101.   In April 2004, in preparation for the implementation of the ordinance, Credit Suisse's Iran Desk began to inform its Iranian Bank Co-conspirator clients that neither "Order of a Customer" nor "Credit Suisse" could be used to replace references to Iranian banks on payment messages.

1102.   Credit Suisse again, however, provided information about the use of the cover payment method to send USD payments, ensuring that the Iranian Bank Co-conspirators (and, by extension, Iran and the IRGC-QF) remained cognizant of other means of ensuring an uninterrupted flow of surreptitious USD.

1103.   Although Credit Suisse's payment processing units ceased to use the "Order of a Customer" method following the Swiss Federal Banking Commission's July 2004 ordinance, Credit Suisse employees nonetheless continued removing and/or altering information in SWIFT payment order messages sent to one of its U.S. correspondent banks.

1104.   For example, in May 2005, an internal Credit Suisse email stated:

> If we do not have a key contact with the beneficiary's bank, we have to carry out the payment via the US, e.g. via BKTRUS33. However, no reference to Iran may be made in the field reserved for information on the ordering party (no Iranian telephone numbers either). No such reference should be made in fields 70 or 72 either.

1105.   Between March 2004 and November 2005, Credit Suisse repeatedly sent letters to its Iranian Bank Co-Conspirator customers describing its internal procedures for forwarding Iranian payment orders as:

> Our Payment department will stop all USD-payments initiated by your fine bank in any case and shall be effected as outlined in the drawing "Direct payment order and cover payment order."

1106.   From August 2003 to November 2006, Credit Suisse illegally processed electronic funds transfers, in the aggregate amount of at least *$480,072,032*, through financial institutions located in the United States for the benefit of Iran and Iranian financial institutions.

1107.   For a brief period of time, Credit Suisse became one of the main U.S. dollar clearing and settlement banks for the Iranian banking system.

1108.   In January 2006, Credit Suisse established a "Sensitive Countries" Task Force to implement the exit decision and ultimately ceased U.S. dollar clearing transactions for Iran in November 2006.

1109.   On September 11, 2006, Credit Suisse directed its payments centers to discontinue certain prohibited payments by an Iranian Bank Co-conspirator. Using the MT 202 cover payment method, during the six weeks from September 11, 2006 to October 27, 2006, Credit Suisse nevertheless processed 54 outbound payments involving that Iranian Bank Co-conspirator, the total value of which was in excess of $8 million.

1110.   As described *supra*, Credit Suisse also facilitated payments on Letters of Credit

involving Mahan Air's illegal purchase of U.S. aircraft and aircraft parts.

1111.   These included the illegal purchase of an aircraft engine and an Airbus A320-232 financed by Bank Melli, Bank Refah and Bank Sepah.

1112.   In each case, Credit Suisse directed USD payments through the United States in furtherance of the Conspiracy.

1113.   In March 2007, following the Deferred Prosecution Agreements of Lloyds and ABN Amro (RBS N.V.), Credit Suisse commenced an internal investigation of its historic USD funds clearing business involving U.S.-sanctioned countries and persons. Shortly thereafter, Credit Suisse was contacted by U.S. and New York law enforcement officials.

1114.   On December 16, 2009, DOJ issued a press release announcing that Credit Suisse had agreed to forfeit $536 million in USD funds to the United States and to the Manhattan District Attorney's Office in connection with violations of the IEEPA and New York State law, as a result of violations relating to transactions Credit Suisse illegally conducted on behalf of customers from, *inter alia*, Iran.

1115.   In connection with a DPA that Credit Suisse entered into, DOJ filed a criminal information in the U.S. District Court for the District of Columbia charging Credit Suisse with one count of violating the IEEPA. Credit Suisse waived the indictment, agreed to the filing of the information, and, according to the press release, accepted and acknowledged responsibility for its criminal conduct.

1116.   Credit Suisse also simultaneously entered into an agreement with OFAC to settle its violations of the IEEPA and agreed to a civil forfeiture as part of the DPA it entered into with DOJ, the Manhattan District Attorney's Office and OFAC.

1117.   The press release announcing the agreements quoted then-Treasury Under-

Secretary for Terrorism and Financial Intelligence Stuart Levey as stating "[t]his case provides a timely lesson about how Iran seeks to involve others in deceptive conduct to evade legal and regulatory controls. Those who do business with Iran expose themselves to the risk, and the consequences, of participating in transactions supporting proliferation, terrorism or sanctions evasion."

### N.    DEFENDANT COMMERZBANK AG'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY

1118.   As noted in a criminal information entered in connection with, as discussed below, a March 11, 2015 Deferred Prosecution Agreement between Defendant Commerzbank and DOJ:

> COMMERZBANK AG and others … unlawfully, willfully and knowingly combined, conspired, confederated and agreed with one another and with others to commit offenses against the United States, that is, to engage in financial transactions with Sanctioned Entities and SDNs in violation of IEEPA, and the executive orders and regulations issued thereunder.… The goal of the conspiracy was for COMMERZBANK and others …to enrich themselves by engaging in a conspiracy and a scheme to violate IEEPA, and the executive orders and regulations issued thereunder. A further goal of the conspiracy was for COMMERZBANK and others … to violate executive orders and regulations prohibiting the exportation, directly and indirectly, of services from the United States to Sanctioned Entities and SDNs.

1119.   Like many of the other Defendants who entered into the Conspiracy, Commerzbank adopted a variety of methods to facilitate Iran's illegal goals.

1120.   In particular, Commerzbank worked with Bank Sepah, Bank Melli, Bank Saderat and Bank Refah to facilitate the goals of the Conspiracy, stripping, altering or changing tens of thousands of SWIFT-NET payment order messages.

1121.   Since 2002, Commerzbank also appears to have engaged in various illegal gold transactions on behalf of the CBI, including trading orders through its New York branch while disguising the Iranian source of the trades.

1122.  A March 2015 Amended Complaint filed in a *qui tam* case against Defendant Commerzbank AG stated that:

> the gold trade has been essential to Iran's withstanding the increasingly restrictive U.S. sanctions. It has a substantial amount of gold reserves, amounting to $112 billion in gold, which it accumulated in part by trading oil for gold. It used gold to preserve its wealth especially to withstand the devaluation of its currency and to engage in trading that would bypass U.S. sanctions.[71]

1123.  On April 17, 2003, Commerzbank finalized a policy document entitled "Routing Instructions Iranian banks for USD payments." This policy admonished employees to "[u]nder no circumstances mention the Iranian background in the cover order." In other words, the German-based recipients of this policy were instructed to never mention Iranian customers nor Iranian connections to any payment messages sent to the United States.

1124.  Taking advantage of the fact that Lloyds and other competitors were exiting the Iran market, Commerzbank solicited more Iranian clients.

1125.  The resulting increase in the volume and significance of Iranian business at Commerzbank led to the establishment of a centralized process for handling certain Iranian dollar denominated payments within Commerzbank, and the Defendant designated one group of employees within Commerzbank's Frankfurt Back Office to manually process those payments. The task of this group was to review payments and amend them if necessary, to ensure that they would not get stopped by OFAC filters when sent to financial institutions in the United States, including Commerzbank's New York branch.

---

[71]     In July 2015, Commerzbank settled the *qui tam* case, 13-cv-8095 (S.D.N.Y. 2013), for approximately $866,000.

1126.   This increase in volume was in part due to illicit trade-finance, foreign exchange, and Eurodollar transactions undertaken by Commerzbank on behalf of Bank Refah, Bank Sepah, Bank Melli and Bank Saderat.

1127.   In July 2003, a Back Office employee emailed other bank employees explaining that two state-owned Iranian banks, Bank Melli and Bank Saderat, wanted to begin routing their entire USD funds clearing business through Commerzbank. The Back Office employee closed his email by writing, "If for whatever reason [Commerzbank] New York inquires why our turnover has increase [sic] so dramatically under no circumstances may anyone mention that there is a connection to the clearing of Iranian banks!!!!!!!!!!!!!" (Exclamation marks in the original).

1128.   On September 17, 2003, a Back Office employee sent an email advising a major Iranian Bank that maintained a US dollar account with Commerzbank to list "non ref" in the ordering party field in all of its future payment messages.

1129.   The author of the email had tested Commerzbank's compliance systems in Frankfurt, and knew that writing "non ref" would trigger a manual review of the payment, thereby enabling Commerzbank personnel to ensure that the messages did not contain any information revealing the true Iranian involvement in the transaction.

1130.   In fact, Commerzbank personnel explained to employees of Iranian bank clients the kinds of information that could lead to payments being delayed, rejected, or blocked within the United States, and encouraged the Iranian banks to omit this type of information from their payment orders so that Commerzbank employees would not have to manually remove it.

1131.   For example, Bank Sepah's UK subsidiary (Bank Sepah International Plc) provided its Iranian customers with routing instructions for "payments to our US Dollar account from

outside the United States" noting the SWIFT Code for Commerzbank's New York branch and the Bank's account number at Commerzbank followed by the instruction:

> **Please ensure that no mention is made of any recognisable Iranian entity in any message sent through the United States.**

(Emphasis in the original.) *See*, Exhibit B attached.

1132.   On October 13, 2003, the Head of Commerzbank's Internal Audit division emailed a member of Commerzbank's senior management advising that Iranian bank names in payment messages transiting through the United States were being "neutralized" and warned that "it raises concerns if we consciously reference the suppression of the ordering party in our work procedures in order to avoid difficulties in the processing of payments with the U.S.A."

1133.  On November 19, 2003, a memo was circulated to senior management memorializing the internal rules Commerzbank had developed for processing Iranian payments, including using MT 202 cover transactions (i.e., splitting a payment into two messages and sending a MT 103 to the foreign (non-U.S.) branch of the beneficiary and an MT 202 to the clearing institution in the United States), and using serial MT 103 messages that manually replaced the name of the (Iranian) ordering party with the bank code for Commerzbank Frankfurt to avoid detection by U.S. authorities.

1134.   It appears that Commerzbank may have ceased stripping some transactions in July 2004, relying primarily on cover payments (MT 202 payment order messages) to effectuate its unlawful conduct. At the same time, Commerzbank conspired with Bank Melli to facilitate over one hundred (100) checks totaling approximately $2 million in USD funds that Commerzbank issued for illegal payments in the United States.

1135.   However, as noted *supra*, Bank Sepah International Plc (Bank Sepah's UK subsidiary) provided "stripping" instructions to its clients even in 2006 directing that U.S. dollars wire transfers be sent through Commerzbank's New York branch.

1136.   DOJ described "the rigor with which the Bank enforced the policy during this period" by citing an email from a Back Office employee who wrote about Commerzbank's procedures for facilitating the Conspiracy "NO EXPERIMENTS PLEASE!!! Have fun with this and greetings." (Emphasis in the original.)

1137.   This ongoing conduct involving both "stripping" transactions and converting otherwise transparent SWIFT-NET MT 103 messages into opaque MT 202 cover transactions resulted in tens of millions of dollars being illegally transferred on Iran's behalf.

1138.   However, parallel to its illegal conduct on behalf of Bank Sepah, Bank Saderat and Bank Melli, as noted above, Commerzbank also directly coordinated with IRISL in laundering U.S. dollars through the United States despite the fact that IRISL was Iran's primary means of transporting both conventional and non-conventional weapons.

1139.   Between 2002 and 2008 (and upon information and belief, even later), Commerzbank worked directly with IRISL to facilitate illicit payments through the United States.

1140.   In January 2005, Commerzbank's New York branch rejected a series of payment transactions on behalf of Lancelin Shipping Company Ltd., an IRISL-formed entity registered in Cyprus, because the payment messages contained references to IRISL Europe GmbH, a wholly-owned IRISL subsidiary registered in Hamburg and designated by the United States in 2008.

1141.   This prompted a direct meeting between the relationship managers in Commerzbank's Hamburg branch and employees from IRISL on January 24, 2005.

1142.   A memorandum summarizing the meeting noted that: "[d]ue to the tense political relations between Iran and the U.S., sanctions that have existed for some years against Iran and Iranian companies have been tightened…. *The number of rejected payments recently increased sharply since the word "IRISL" results in inquiries at foreign banks.* Based on inquiries from Commerzbank, New York we assume that it appears as a term on the embargo list." (Emphasis in the original.)

1143.   In a written presentation that Commerzbank delivered to IRISL on January 25, 2005, following the in-person meeting, the Hamburg relationship manager stated: "*[t]he current rejections show that IRISL is in the OFAC list*" (Emphasis in the original).

1144.   The presentation then explained that "payments which are sent through a ... subsidiary are unlikely to be rejected to our present knowledge."

1145.   Commerzbank ultimately adopted a process it termed a "safe payments solution" by which IRISL initiated USD funds transfers through the U.S., using the accounts of less conspicuous subsidiaries to prevent its New York branch or other clearing banks from flagging IRISL U.S. dollar transactions.

1146.   Moreover, to assist IRISL in its bookkeeping, Commerzbank would sweep those accounts daily and zero them out so that IRISL could keep track of which USD funds belonged to it – as opposed to its subsidiaries.

1147.   On April 18, 2006, Commerzbank's New York branch rejected a payment on behalf of Lancelin, citing "US sanctions against Iran." As a result, Commerzbank altered the structure of the "safe payment solution," suggesting the use of two other subsidiaries to process payments on behalf of IRISL and IRISL Europe GmbH.

1148.   In fact, in only four months *following* IRISL's U.S. designation in 2008, Commerzbank illegally transferred almost $40 million on behalf of IRISL subsidiaries and related entities through Commerzbank's New York branch and other U.S. financial institutions.

1149.   These post-designation transactions, laundered by Commerzgank through the U.S. financial system, were self-evidently *not* for the benefit of a legitimate agency, operation or program of Iran.

1150.   Only months earlier, a U.S. State Department diplomatic cable warned of an IRISL-flagged vessel in China loaded with cargo containing weapons for Iran's Defense Industries Organization ("DIO").

1151.   The 2008 diplomatic cable further warned of the dangers of ongoing conventional arms transfers from China to Iran, "particularly given Iran's clear policy of providing arms and other support to Iraqi insurgents and terrorist groups like the Taliban and Hezbollah.... We have specific information that Chinese weapons and components for weapons transferred to Iran are being used against U.S. and Coalition Forces in Iraq, which is a grave U.S. concern."

1152.   Less than a year after Commerzbank in Hamburg provided IRISL with at least $40 million in illegal (post-designation) USD transactions in October 2009, U.S. troops boarded a German-owned freighter, the *Hansa India*, in the Gulf of Suez and found eight containers full of ammunition, and headed to Syria from Iran.

1153.   The *Hansa India* was registered to the Hamburg-based shipping company Leonhardt & Blumberg, but had in fact been under charter to IRISL for several years.

1154.   The *Hansa India* carried seven containers of small arms ammunition, as well as one container containing copper discs, which constitute, as noted *supra*, a key component in EFPs used to kill and maim many of the Plaintiffs herein.

1155.   Although Commerzbank worked to shield its New York branch from knowing all of the details of its illicit activities on behalf of Iran and IRISL, Commerzbank's New York branch was nonetheless aware that it was being used to facilitate unlawful conduct.

1156.   For example, in June 2006, in response to a request from the new Chief Compliance Officer asking if there were any concerns they wanted her to share with the new Global Head of Compliance in Germany, a New York compliance employee responded "[p]ersistent disregarding of OFAC rules by foreign branches. Hamburg is notorious for it."

1157.   In February 2007, Commerzbank's then Chief Executive Officer Klaus-Peter Mueller and Board Member Martin Blessing met with U.S. Treasury Deputy Secretary Robert Kimmitt. In the meeting, Mueller complained about the portrayal of Commerzbank by *The Wall Street Journal* (in a January 2007 article) which he said made it appear that the Bank was trying to evade sanctions on Iran. "This," claimed Mueller "is far from the case."

1158.   *The Wall Street Journal* reported on January 10, 2007 that "Commerzbank AG, Germany's second largest bank, said it will stop handling dollar transactions for Iran at its New York branch by Jan. 31." It went on to report that "[a]t present, Commerzbank handles both dollar and euro transactions for Iran's state owned banks. Like several other European banks, it will cease handling only dollar transactions."

1159.   *The Wall Street Journal* article went on to report:

> The risks of doing business with Iran are the same in all currencies," said Mr. [Stuart] Levey. Intelligence officials say Bank Saderat, a large, state-controlled Iranian bank placed on a U.S. Treasury blacklist in October for allegedly funding terrorism, has been able to process dollar transactions through Commerzbank's New York branch in recent months by using the accounts of two other Iranian banks. Commerzbank says it ceased dealing with Saderat after it was put on the U.S. blacklist and has no knowledge of any subsequent transactions. "Commerzbank has no knowledge of Bank Saderat directly or indirectly using the accounts of other Iranian banks to process dollar transactions," the bank said in a statement. Commerzbank, in

a response to an inquiry from *The Wall Street Journal* about its dealings with Iran, also said "all such [dollar clearing] transactions are currently being phased out" as of Jan. 31. It added that "any clearing conducted by our U.S. operations is in strict compliance" with U.S. government regulations.

1160.   Commerzbank's assurances to *The Wall Street Journal,* like its assurances to U.S. Treasury Deputy Secretary Robert Kimmitt, were plainly false.

1161.   As noted above, on September 10, 2008, the U.S. designated IRISL, IRISL Europe GmbH, and several IRISL subsidiaries based on evidence that the IRISL network of companies was engaged in WMD proliferation activity and the fact that "IRISL has pursued new strategies which could afford it the potential to evade future detection of military shipments."

1162.   The next day, on September 11, 2008, a senior official at OFAC personally forwarded the press release announcing IRISL's SDN designation to the Head of Compliance at Commerzbank in New York.

1163.   The press release was then forwarded to Commerzbank employees in Germany with responsibilities related to IRISL. In the email, the relationship manager noted that the U.S. government alleged "that IRISL as Iranian government carrier systematically circumvents the Iranian arms embargo."

1164.   Nonetheless, between September 10, 2008, and December 31, 2008 alone, Commerzbank illegally directed close to $40 million on behalf of IRISL subsidiaries and related entities through the United States.

O.   **DEFENDANT COMMERZBANK AG'S DIRECT FUNDING OF HEZBOLLAH THROUGH ITS CUSTOMER, ORPHANS PROJECT LEBANON e.V.**

1165.   During this same time period, Commerzbank also knowingly, or with deliberate indifference to the fact, maintained account number 7001688 for an open and notorious Hezbollah

fundraising organization in Germany known as Waisenkinderprojekt Libanon e.V. ("the Orphans Project Lebanon e.V.").

1166.   Despite prior public German government reports identifying its customer as a Hezbollah fundraising organization, and the fact that on July 24, 2007 the United States designated[72] the Lebanese organization that was primary recipient of funds donated from the account (Hezbollah's Martyrs Foundation), Commerzbank knowingly, or with deliberate indifference to the fact, continued to provide financial services to Waisenkinderprojekt Libanon e.V. and hence continued to transfer funds to Hezbollah.

## VII.   THE PLAINTIFFS

### 1.    THE JANUARY 20, 2007 ATTACK – KARBALA

1167.   In the early evening of January 20, 2007, Iran launched a coordinated terrorist attack against the Provincial Joint Coordination Center ("PJCC") in Karbala, about thirty miles south of Baghdad.

1168.   The attack on the PJCC was largely planned by Hezbollah, under the direction of Ali Musa Daqduq, and carried out by Hezbollah agents, Asa'ib Ahl al-Haq ("AAH") operatives led by Qais al-Khazali.

1169.   Just after nightfall, a five-car convoy of black GMC Suburban sport-utility vehicles ("SUVs") – the type frequently used by the U.S. government in Iraq – made its way through three checkpoints on the access road approaching the PJCC.

1170.   The vehicles contained at least a dozen AAH operatives dressed in U.S. military-style fatigues, carrying American-type weapons.

1171.   After they entered the PJCC compound, the five vehicles split up, with some

---

[72]    *See,* https://www.treasury.gov/press-center/press-releases/Pages/hp503.aspx

parking in front, and others waiting at the Iraqi Police checkpoints along the southern approach to the PJCC compound.

1172.   After exiting their vehicles, the AAH terrorists greeted in fluent English the two U.S. soldiers guarding the PJCC's western entrance before launching a surprise attack.

1173.   The AAH operatives shot and wounded the two U.S. soldiers outside the PJCC's main building and opened fire on the PJCC compound with automatic rifles, while two small teams quickly moved inside the main building and assaulted the Communications Room with small arms fire.

1174.   One U.S. soldier, Johnathon M. Millican, fell on a grenade that was thrown into the Communications Room, while other soldiers prevented the attackers from overrunning their position.

1175.   Although Millican was killed, and several other U.S. soldiers injured, his selfless act provided his fellow soldiers in the PJCC's main building a few extra moments to recover and begin returning fire.

1176.   For his act of bravery, Johnathon M. Millican was posthumously awarded the Silver Star medal by the U.S. Army.

1177.   At the same time that AAH terrorists were attacking the PJCC's main building, other AAH operatives conducted a coordinated attack on the compound's barracks and back gate, before abducting four U.S. soldiers (the two wounded soldiers and two officers from inside the main building) and fleeing the compound.

1178.   Five of the AAH getaway vehicles drove east, crossing the Euphrates River and then turned north. The other three departed in the opposite direction to confuse any pursuing forces.

1179.   After over an hour of travel on the main roads, the five SUVs were stopped at a checkpoint in Mahawil, after U.S. forces put out a radio alert regarding the abducted soldiers.

1180.   The AAH terrorists then abandoned the main road for back roads, and the Iraqi Police and Iraqi Army forces at the Mahawil checkpoint gave chase.

1181.   Realizing the likelihood of escaping with their captives was low, and darkness making back road navigation all but impossible, the AAH operatives murdered the four Americans they had just kidnapped, and abandoned their bodies and the vehicles near the town of Mahawil. Three of the four Americans died at the scene.

1182.   Only one of the four abducted U.S. soldiers, Brian S. Freeman, was still alive when rescuers reached the scene. Two of the soldiers were found in the back of one of the SUVs, handcuffed together and shot dead. A third soldier was found dead on the ground, near the abandoned vehicles. Brian S. Freeman had also been shot in the head, and died on the way to the hospital.

1183.   The terrorist group that planned and executed the PJCC attack, AAH, was trained and armed by Iran's IRGC with Hezbollah's assistance.

1184.   On March 20, 2007, two months after the attack was perpetrated, Hezbollah operative Ali Musa Daqduq ("Daqduq") and AAH leader Qais al-Khazali and his brother Laith al-Khazali were captured by Coalition Forces in southern Iraq.

1185.   The United States government charged them with responsibility for the Karbala PJCC attack.

1186.   Documents captured with Qais al-Khazali showed that the IRGC-QF had gathered detailed information on "soldiers' activities, shift changes and defenses" at the PJCC "and this information was shared with the attackers."

1187.   A 22-page memorandum found with Daqduq "detailed the planning, preparation, approval process and conduct of the [Karbala] operation," among others. Other documents discussed tactics to attack Iraqi and Coalition Forces.

1188.   Daqduq also had a personal journal that noted his having met with Special Groups members who were targeting other Iraqis and Coalition Forces in the Diyala province using Improvised Explosive Devices ("IEDs"), as well as small-arms fire.

1189.   According to U.S. military officials, both Daqduq and Qais al-Khazali admitted that senior leadership within the IRGC-QF knew of and helped plan the Karbala attack.

1190.   It was later reported that U.S. spy satellites spotted a full-scale mockup of the Karbala PJCC at the IRGC-QF Farj Garrison in the city of Ahwaz, Iran.

1191.   Analysis of the satellite imagery indicated that the IRGC had duplicated the PJCC's layout to specifically train the AAH operatives for the attack.

1192.   The terror attack on the PJCC was commanded by Azhar al-Dulaymi. He was trained by Hezbollah operatives, including Daqduq, near the city of Qom, Iran, where he and his AAH operatives trained to execute military-style, precision kidnappings.

1193.   Although al-Dulaymi commanded the attack, Daqduq, a longtime Hezbollah commander, masterminded it, authorized it and directed its execution down to the minor details.

1194.   Daqduq advised AAH commanders al-Dulaymi and Qais al-Khazali and served as a liaison between the IRGC-QF and Qais al-Khazali, who along with his brother Laith al-Khazali, oversaw the attack.

1195.   The U.S. Treasury Department's November 19, 2012 press release announcing Daqduq's designation as an SDGT stated, in part:

> Daqduq is a senior Hezbollah commander responsible for numerous attacks
> against Coalition Forces in Iraq, including planning an attack on the Karbala

> Joint Provincial Coordination Center (JPCC) [sic] on January 20, 2007, which resulted in the deaths of five U.S. soldiers.

1196.   Daqduq is Lebanese-born and served in Hezbollah for twenty-four years prior to the attack on the Karbala PJCC.

1197.   Daqduq served as a bodyguard for Hezbollah leader Hassan Nasrallah and also led Hezbollah operations in large areas of Lebanon.

1198.   According to the U.S. government, Daqduq "was in Iraq working as a surrogate for Iranian Revolutionary Guards Corps Quds Force operatives involved with special groups."

1199.   In 2005, Daqduq was directed by senior Lebanese Hezbollah leadership to go to Iran and work with the IRGC-QF to train Iran's proxies in Iraq.

1200.   According to the U.S. government: "In May 2006, [Daqduq] traveled to Tehran with Yussef Hashim, a fellow Lebanese Hezbollah and head of their operations in Iraq. There they met with the commander and deputy commander of the Iranian Quds Force special external operations."

1201.   Daqduq was ordered to Iraq to report on the training and operations of the Iraqi Special Groups.

1202.   In the year prior to his capture in 2007, Daqduq made four trips to Iraq where he monitored and reported on the training and arming of the Special Groups in mortars and rockets, manufacturing and employment of IEDs, and kidnapping operations.

1203.   Most significantly, Daqduq was tasked with organizing the Special Groups in ways that mirrored how Hezbollah was organized in Lebanon.

1204.   Daqduq also helped the IRGC train Iraqis at multiple sites in Iran.

1205.   Using training groups of approximately twenty to sixty Iraqis at a time, Daqduq instructed his trainees on how to use EFPs, mortars and rockets, as well as intelligence, sniper and kidnapping operations.

1206.   The IRGC then provided operational, intelligence and logistical support to insert the terrorist trainees back into various Iraqi cities where they rejoined their respective Special Groups.

1207.   The IRGC also supplied the Groups with weapons and a funding stream ranging from an estimated $750,000 to $3 million per month.

1208.   On April 26, 2007, the Commander of the Multi-National Force-Iraq, Gen. David Petraeus, gave a briefing in which he stated:

> The Iranian involvement has really become much clearer to us and brought into much more focus during the interrogation of the members -- the heads of the Khazali network and some of the key members of that network that have been in detention now for a month or more. This is the head of the secret cell network, the extremist secret cells. They were provided substantial funding, training on Iranian soil, advanced explosive munitions and technologies as well as run of the mill arms and ammunition, in some cases advice and in some cases even a degree of direction.   When we captured these individuals -- the initial capture, and then there have been a number of others since then -- we discovered, for example, a 22-page memorandum on a computer that detailed the planning, preparation, approval process and conduct of the operation that resulted in five of our soldiers being killed in Karbala. It also detailed -- there are numerous documents which detailed a number of different attacks on coalition forces, and our sense is that these records were kept so that they could be handed in to whoever it is that is financing them. And there's no question, again, that Iranian financing is taking place through the Quds force of the Iranian Republican Guards Corps.

1209.   The Americans killed during the Karbala attack included Brian S. Freeman, Johnathon M. Millican, Shawn P. Falter and Johnathan B. Chism. The Americans injured during the Karbala attack included Billy Wallace, Evan Kirby, Johnny Washburn and Marvin Thornsberry.

**The Freeman Family**

1210.   Brian S. Freeman was a citizen of the United States and domiciled in the State of California when he was killed in Iraq.

1211.   Plaintiff Kathaleen Freeman is a citizen of the United States and domiciled in the State of California. She is the step-mother of Brian S. Freeman.

1212.   Plaintiff Albert Snyder is a citizen of the United States and domiciled in the State of Utah. He is the step-father of Brian S. Freeman.

1213.   Plaintiff Richard Lee is a citizen of the United States and domiciled in the State of California. He is the step-brother of Brian S. Freeman.

1214.   As a result of the attack, and the death of Brian S. Freeman, Plaintiffs Kathaleen Freeman, Albert Snyder and Richard Lee have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

**The Kirby Family**

1215.   Evan Kirby is a citizen of the United States and domiciled in the State of Ohio.

1216.   Mr. Kirby was wounded during the attack on the PJCC's barracks.

1217.   As a result of an explosion that occurred during the attack, Mr. Kirby was thrown into the air and sustained injuries to his back and spine.

1218.   The aforementioned injuries have caused him great pain.

1219.   Plaintiff Marcia Kirby is a citizen of the United States and domiciled in the State of Ohio. She is the mother of Evan Kirby.

1220.   Plaintiff Steven Kirby is a citizen of the United States and domiciled in the State of Ohio. He is the father of Evan Kirby.

1221.   As a result of the attack and the injuries Evan Kirby suffered, Plaintiffs Marsha Kirby and Steven Kirby have experienced severe mental anguish and extreme emotional pain and suffering.

## 2. THE JANUARY 12, 2004 ATTACK – BAGHDAD

**The Crockett Family**

1222.   Ricky Leon Crockett was a citizen of the United States and domiciled in the State of Georgia.

1223.   On January 12, 2004, Ricky Leon Crockett, then 37, was serving in the U.S. military in Iraq when an IED emplaced by JAM terror operatives detonated near the vehicle.

1224.   Ricky Leon Crockett died from penetrating shrapnel injuries he sustained in the explosion.

1225.   The terror cell that emplaced the IED that killed Ricky Leon Crockett was trained by Hezbollah and funded and armed by the IRGC-QF.

1226.   Plaintiff Maxine E. Crockett is a citizen of the United States and domiciled in the State of North Carolina. She is the widow of Ricky Leon Crockett.

1227.   Plaintiff Maxine E. Crockett brings an action individually and on behalf of the Estate of Ricky Leon Crockett, as its legal representative.

1228.   Plaintiff Marvise L. Crockett is a citizen of the United States and domiciled in the State of North Carolina. She is the daughter of Ricky Leon Crockett.

1229.   As a result of the attack, and the death of Ricky Leon Crockett, Plaintiffs Maxine E. Crockett and Marvise L. Crockett have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice and counsel.

3.    **THE APRIL 4, 2004 ATTACK – BAGHDAD**

**The Arsiaga Family**

1230.   Robert R. Arsiaga was a citizen of the United States and domiciled in the State of Texas when he was killed in Iraq.

1231.   On April 4, 2004, Robert R. Arsiaga, aged 25, was serving in the United States military in Iraq when his unit was attacked by JAM terror operatives with rocket-propelled grenades and small-arms fire.

1232.   Robert R. Arsiaga was killed in the attack.

1233.   The terror cell that emplaced the IED that killed Robert R. Arsiaga was trained by Hezbollah and funded and armed by the IRGC-QF.

1234.   Tracie Arsiaga is a citizen of the United States and domiciled in the State of Texas. She is the widow of Robert R. Arsiaga.

1235.   Tracie Arsiaga brings an action on behalf of the Estate of Robert R. Arsiaga, as its legal representative, for his death and any suffering and/ or economic loss he/his Estate sustained as a result of the attack.

**The Greenwood Family**

1236.   Plaintiff Steven Greenwood is a citizen of the United States and domiciled in the State of Texas.

1237.   On April 4, 2004, Steven Greenwood, then 20, was serving in the United States military in Iraq when his unit was attacked by JAM terror operatives with rocket-propelled grenades and small-arms fire.

1238.   The terror cell that emplaced the IED that injured Steven Greenwood was trained by Hezbollah and funded and armed by the IRGC-QF.

1239.   As a result of the attack, Mr. Greenwood suffered shrapnel wounds to his wrist which caused nerve damage.

1240.   He was initially treated in Iraq for his injuries, but the nerve damage could not be treated there. Approximately one week after the attack, he was sent to Landstuhl, Germany where he was further treated for his wounds.

1241.   He was then sent back to the U.S. where he had surgery to remove the shrapnel.

1242.   He also suffers from Post-Traumatic Stress Disorder ("PTSD) and depression.

1243.   He has sought treatment for his wounds, PTSD and depression.

1244.   As a result of the attack, and the injuries he suffered, Plaintiff Steven Greenwood has experienced severe physical and mental anguish and extreme emotional pain and suffering.

**The Hiller Family**

1245.   Stephen Dustin Hiller was a citizen of the United States and domiciled in the State of Alabama.

1246.   On April 4, 2004, Stephen Dustin Hiller, aged 25, was serving in the U.S. military in Iraq when his unit was engaged in small arms fire with members of JAM in Sadr City, Iraq.

1247.   Stephen Dustin Hiller was killed by JAM rocket-propelled grenade ("RPG") fire while engaged in the exchange of gunfire with members of JAM.

1248.   The terror cell that fired at Stephen Dustin Hiller was trained by Hezbollah and funded and armed by the IRGC-QF.

1249.   Plaintiff Stephen W. Hiller is a citizen of the United States and domiciled in the State of Alabama. He is the father of Stephen Dustin Hiller.

1250.   Plaintiff Stephen W. Hiller brings an action individually and behalf of the Estate of Stephen Dustin Hiller, as its legal representative.

1251.   As a result of the attack, and the death of Stephen Dustin Hiller, Plaintiff Stephen W. Hiller has experienced severe mental anguish, extreme emotional pain and suffering, and loss of his son's society, companionship, comfort, advice and counsel.

### 4.   THE APRIL 9, 2004 ATTACK – BAGHDAD

**The Church Family**

1252.   Plaintiff Jeremy Church is a citizen of the United States and domiciled in the State of Missouri.

1253.   On April 9, 2004, Jeremy Church, then 26, was serving in the U.S. military in Iraq when his unit was attacked by JAM terror operatives with rocket-propelled grenades and small-arms fire.

1254.   He was driving in a convoy when an IED and an RPG struck his vehicle.

1255.   The terror cell that executed the attack in which Jeremy Church was injured was trained by Hezbollah and funded and armed by the IRGC-QF.

1256.   Mr. Church suffers from hearing issues as a result of the rocket fire and detonation of the IED. He continues to experience ringing in his ears.

1257.   He has experienced severe headaches.

1258.   Mr. Church has been diagnosed with PTSD.

1259.   He has sought treatment, including counseling.

1260.   He has been prescribed anti-anxiety medications, anti-depressants, and medication to address sleep-related issues.

1261.   As a result of the attack, and the injuries he suffered, Plaintiff Jeremy Church has experienced severe physical and mental anguish and extreme emotional pain and suffering.

1262.   Plaintiff Sandra Hankins is a citizen of the United States and domiciled in the State of Texas. She is the of mother of Jeremy Church.

1263.   As a result of the attack, and the injuries Jeremy Church suffered, Plaintiff Sandra Hankins has experienced severe mental anguish and extreme emotional pain and suffering.

## The Fisher Family

1264.   Steven Scott Fisher was a citizen of the United States and domiciled in the State of Virginia when he was killed in Iraq.

1265.   On April 9, 2004, Steven Scott Fisher, aged 43, was serving as a civilian contractor in Iraq when the convoy in which he was traveling was attacked by JAM terror operatives with rocket-propelled grenades and small-arms fire.

1266.   Steven Scott Fisher was killed in the attack.

1267.   The terror cell that executed the attack in which Steven Scott Fisher was killed was trained by Hezbollah and funded and armed by the IRGC-QF.

1268.   Plaintiff Ingrid Fisher is a citizen of the United States and domiciled in the State of Virginia. She is the widow of Steven Scott Fisher.

1269.   Plaintiff Ingrid Fisher brings an action individually and on behalf of the Estate of Steven Scott Fisher, as its legal representative.

1270.   Plaintiff Kristin Walker is a citizen of the United States and domiciled in the State of Virginia. She is the daughter of Steven Scott Fisher.

1271.   Plaintiff Steven T. Fisher is a citizen of the United States and domiciled in the State of Virginia. He is the son of Steven Scott Fisher.

1272.   Plaintiff Kathleen Gramkowski is a citizen of the United States and domiciled in the State of Virginia. She is the daughter of Steven Scott Fisher.

1273.   As a result of the attack, and the death of Steven Scott Fisher, Plaintiffs Ingrid Fisher, Kristin Walker, Steven T. Fisher, and Kathleen Gramkowski have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice and counsel.

## 5.   THE JUNE 4, 2004 ATTACK – BAGHDAD

**The Carvill Family**

1274.   Frank T. Carvill was a citizen of the United States and domiciled in the State of New Jersey when he was killed in Iraq.

1275.   On June 4, 2004, Frank T. Carvill, aged 51, was serving in the United States military in Iraq when his unit was attacked by JAM terror operatives with rocket-propelled grenades and IEDs in Baghdad.

1276.   Frank T. Carvill was killed in the attack.

1277.   The terror cell that executed the attack in which Frank T. Carvill was killed was trained by Hezbollah and funded and armed by the IRGC-QF.

1278.   Plaintiff Mary Carvill is a citizen of the United States and domiciled in the State of New Jersey. She is the mother of Frank T. Carvill.

1279.   Plaintiff Peggy Carvill-Liguori is a citizen of the United States and domiciled in the State of New Jersey. She is the sister of Frank T. Carvill.

1280.   Plaintiff Peggy Carvill-Liguori brings this action individually and on behalf of the Estate of Frank T. Carvill, as its legal representative.

1281.   Plaintiff Daniel Carvill is a citizen of the United States and domiciled in the State of New Jersey. He is the brother of Frank T. Carvill.

1282.   As a result of the attack, and the death of Frank T. Carvill, Plaintiffs Mary Carvill, Peggy Carvill-Liguori and Daniel Carvill have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

### 6.     THE JUNE 29, 2004 ATTACK – BAGHDAD

**The Adle Family**

1283.   Patrick Adle was a citizen of the United States and domiciled in the State of Maryland when he was killed in Iraq.

1284.   On June 29, 2004, Patrick Adle, aged 21, was serving in the U.S. military in Iraq when a roadside bomb emplaced by JAM terror operatives detonated near the vehicle in which he was traveling in Baghdad.

1285.   Patrick Adle was killed in the attack.

1286.   The terror cell that emplaced the roadside bomb that killed Patrick Adle was trained by Hezbollah and funded and armed by the IRGC-QF.

1287.   Plaintiff Pamela Adle-Watts is a citizen of the United States and domiciled in the State of Maryland. She is the mother of Patrick Adle.

1288.   Plaintiff Pamela Adle-Watts brings this action individually and on behalf of the Estate of Patrick Adle, as its legal representative.

1289.   Plaintiff John Watts is a citizen of the United States and domiciled in the State of Maryland. He is the step-father of Patrick Adle.

1290.   As a result of the attack, and the death of Patrick Adle, Plaintiffs Pamela Adle-Watts and John Watts have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's society, companionship, comfort, advice and counsel.

### 7.      THE JULY 27, 2004 ATTACK – BALAD RUZ

**The Talbert Family**

1291.   DeForest L. Talbert was a citizen of the United States and domiciled in the State of West Virginia.

1292.   On July 27, 2004, DeForest L. Talbert, then 24, was serving in the U.S. military in Iraq when an IED detonated near the vehicle.

1293.   On July 27, 2004, DeForest L. Talbert was traveling in an M998 Humvee in the vicinity of Balad Ruz close to the Iranian border and IRGC-QF smuggling routes when his vehicle was struck with an IED.

1294.   DeForest L. Talbert was killed in the attack.

1295.   The terror cell that emplaced the IED that killed DeForest L. Talbert was trained by Hezbollah and funded by the IRGC-QF.

1296.   Plaintiff Gloria Nesbitt is a citizen of the United States and domiciled in the State of Virginia. She is the mother of DeForest L. Talbert.

1297.   Plaintiff Gloria Nesbitt brings an action individually and on behalf of the Estate of DeForest L. Talbert, as its legal representative.

1298.   Plaintiff D.J.H., a minor, represented by his legal guardian Frances Hamilett, is a citizen of the United States and domiciled in the State of West Virginia. He is the son of DeForest L. Talbert.

1299.   Plaintiff Chiquita Talbert is a citizen of the United States and domiciled in the State of Virginia. She is the sister of DeForest L. Talbert.

1300.   Plaintiff Tawanna Talbert Darring is a citizen of the United States and domiciled in the State of Maryland. She is the sister of DeForest L. Talbert.

1301. Plaintiff Latasha Marble is a citizen of the United States and domiciled in the State of Virginia. She is the sister of DeForest L. Talbert.

1302. Plaintiff James Talbert is a citizen of the United States and domiciled in the State of Virginia. He is the brother of DeForest L. Talbert.

1303. As a result of the attack, and the death of DeForest L. Talbert, Plaintiffs Gloria Nesbitt, D.J.H., Chiquita Talbert, Tawanna Talbert Darring, Latasha Marble and James Talbert have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/father's/brother's society companionship, comfort, advice and counsel. advice and counsel.

**8.   THE AUGUST 5, 2004 ATTACK – NAJAF**

**The Rocha Family**

1304. Moses Rocha was a citizen of the United States and domiciled in the State of New Mexico when he was killed in Iraq.

1305. On August 5, 2004, Moses Rocha, aged 33, was serving in the U.S. military in Iraq when his unit was attacked by JAM terror operatives with rocket-propelled grenades and small-arms fire.

1306. Moses Rocha was killed in the attack.

1307. The terror cell that executed the attack in which Moses Rocha was killed was trained by Hezbollah and funded and armed by the IRGC-QF.

1308. Plaintiff Miranda Pruitt is a citizen of the United States and domiciled in the State of Texas. She is the daughter of Moses Rocha.

1309. Plaintiff Velina Sanchez is a citizen of the United States and domiciled in the State of New Mexico. She is the mother of Moses Rocha.

1310.   Plaintiff Velina Sanchez brings an action individually and on behalf of the Estate of Moses Rocha, as its legal representative.

1311.   Plaintiff Aloysius Sanchez, Sr. is a citizen of the United States and domiciled in the State of New Mexico. He is the step-father of Moses Rocha.

1312.   Plaintiff Rommel Rocha is a citizen of the United States and domiciled in the State of New Mexico. He is the brother of Moses Rocha.

1313.   Plaintiff Phillip Sanchez is a citizen of the United States and domiciled in the State of New Mexico. He is the brother of Moses Rocha.

1314.   Plaintiff Aloysius Sanchez, Jr. is a citizen of the United States and domiciled in the State of New Mexico. He is the brother of Moses Rocha.

1315.   As a result of the attack, and the death of Moses Rocha, Plaintiffs Miranda Pruitt, Velina Sanchez, Aloysius Sanchez, Sr., Rommel Rocha, Phillip Sanchez, and Aloysius Sanchez, Jr. have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their father's/son's/brother's society, companionship, comfort, advice and counsel.

**The Reynoso Family**

1316.   Yadir G. Reynoso was a citizen of the United States and domiciled in the State of Washington.

1317.   On August 5, 2004, Yadir G. Reynoso, aged 27, was serving in the U.S. military in Iraq when his unit was engaged in small arms fire with JAM terror operatives in Najaf, Iraq.

1318.   Yadir G. Reynoso was killed in the exchange of gunfire with JAM terror operatives.

1319.   The terror cell that fired at Yadir G. Reynoso was trained by Hezbollah and funded and armed by the IRGC-QF.

1320.   Plaintiff Gloria P. Reynoso is a citizen of the United States and domiciled in the State of Washington. She is the mother of Yadir G. Reynoso.

1321.   Plaintiff Gloria P. Reynoso brings an action individually and on behalf of the Estate of Yadir G. Reynoso, as its legal representative.

1322.   Plaintiff Jasmin Reynoso is a citizen of the United States and domiciled in the State of Washington. She is the sister of Yadir G. Reynoso.

1323.   Plaintiff Patricia Reynoso is a citizen of the United States and domiciled in the State of Washington. She is the sister of Yadir G. Reynoso.

1324.   Plaintiff Jose Reynoso is a citizen of the United States and domiciled in the State of Washington. He is the brother of Yadir G. Reynoso.

1325.   As a result of the attack, and the death of Yadir G. Reynoso, Plaintiffs Gloria P. Reynoso, Jasmin Reynoso, Patricia Reynoso, and Jose Reynoso have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

### 9.      THE AUGUST 6, 2004 ATTACK – NAJAF

**The Wells Family**

1326.   Larry Lloyd Wells was a citizen of the United States and domiciled in the State of Louisiana.

1327.   On August 6, 2004, Larry Lloyd Wells, aged 22, was serving in the U.S. military in Iraq when his unit was engaged in small arms fire with JAM terror operatives in the Wadi al-Salam Cemetery in Najaf, Iraq.

1328.   Larry Lloyd Wells was killed by sniper fire from JAM terror operatives.

1329.   The terror cell that fired at Larry Lloyd Wells was trained by Hezbollah and funded

and armed by the IRGC-QF.

1330.   Plaintiff Ashley Wells Simpson is a citizen of the United States and domiciled in the State of Louisiana. She is the sister of Larry Lloyd Wells.

1331.   Plaintiff Ashley Wells Simpson brings an action individually and on behalf of the Estate of Larry Lloyd Wells, as its legal representative.

1332.   Plaintiff Chad Wells is a citizen of the United States and domiciled in the State of Louisiana. He is the brother of Larry Lloyd Wells.

1333.   Plaintiff Crystal Stewart is a citizen of the United States and domiciled in the State of Louisiana. She is the sister of Larry Lloyd Wells.

1334.   Plaintiff Chasity Wells-George is a citizen of the United States and domiciled in the State of Louisiana.  She is the sister of Larry Lloyd Wells.

1335.   Plaintiff Candice Machella is a citizen of the United States and domiciled in the State of Louisiana. She is the sister of Larry Lloyd Wells.

1336.   Plaintiff Billy Doal Wells is a citizen of the United States and domiciled in the State of Tennessee. He is the brother of Larry Lloyd Wells.

1337.   As a result of the attack, and the death of Larry Lloyd Wells, Plaintiffs Ashley Wells Simpson, Chad Wells, Crystal Stewart, Chasity Wells-George, Candice Machella, and Billy Doal Wells have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their brother's society, companionship, comfort, advice and counsel.

## 10.   THE AUGUST 15, 2004 ATTACK – NAJAF

**The Sapp Family**

1338.   Brandon Robert Sapp was a citizen of the United States and domiciled in the State of Florida.

1339.  On August 15, 2004, Brandon Robert Sapp, then 21, was serving in the U.S. military in Najaf, Iraq when the M2 Bradley Fighting Vehicle he was operating rolled over a 500-pound IED emplaced by JAM terror operatives that sent the Bradley and Brandon Robert Sapp airborne, killing him.

1340.  The terror cell that emplaced the IED that killed Brandon Robert Sapp was trained by Hezbollah and funded and armed by the IRGC-QF.

1341.  Plaintiff Hope Elizabeth Veverka is a citizen of the United States and domiciled in the State of New Mexico. She is the mother of Brandon Robert Sapp.

1342.  As a result of the attack, and the death of Brandon Robert Sapp, Plaintiff Hope Elizabeth Veverka has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her son's society, companionship, comfort, advice and counsel.

**11.    THE AUGUST 16, 2004 ATTACK – SADR CITY**

**The Heath Family**

1343.  David Michael Heath was a citizen of the United States and domiciled in the State of Indiana.

1344.  On August 16, 2004, David Michael Heath, aged 30, was serving in the U.S. military in Iraq when an IED emplaced by JAM terror operatives detonated near his vehicle followed by smalls arms fire and a subsequent RPG attack in Sadr City.

1345.  David Michael Heath was killed in the attack by a gunshot wound to his head by JAM terror operatives.

1346.  The terror cell that fired at David Michael Heath was trained by Hezbollah and funded and armed by the IRGC-QF.

1347.  Plaintiff Donna Jean Heath is a citizen of the United States and domiciled in the

State of Indiana. She is the wife of David Michael Heath.

1348. Plaintiff Donna Jean Heath brings an action individually and on behalf of the Estate of David Michael Heath, as its legal representative.

1349. Plaintiff Lola Jean Modjeska is a citizen of the United States and domiciled in the State of Indiana. She is the mother of David Michael Heath.

1350. Plaintiff John David Heath is a citizen of the United States and domiciled in the State of Florida. He is the father of David Michael Heath.

1351. As a result of the attack, and the death of David Michael Heath, Plaintiffs Donna Jean Heath, Lola Jean Modjeska, and John David Heath have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/son's society, companionship, comfort, advice and counsel.

## 12. THE AUGUST 18, 2004 ATTACK – SADR CITY

### The Martir Family

1352. Jacob David Martir was a citizen of the United States and domiciled in the State of Connecticut.

1353. On August 18, 2004, Jacob David Martir, aged 21, was serving in the U.S. military in Iraq when his unit was engaged in small arms fire with JAM terror operatives in Sadr City.

1354. Jacob David Martir was shot and killed by JAM terror operatives while engaged in the exchange of gunfire.

1355. The terror cell that fired at Jacob David Martir was trained by Hezbollah and funded and armed by the IRGC-QF.

1356. Plaintiff Olga Lydia Gutierrez is a citizen of the United States and domiciled in the State of Connecticut. She is the mother of Jacob David Martir.

1357.   Plaintiff Olga Lydia Gutierrez brings an action individually and on behalf of the Estate of Jacob David Martir, as its legal representative.

1358.   Plaintiff Ismael Martir is a citizen of the United States and domiciled in the State of Florida. He is the brother of Jacob David Martir.

1359.   As a result of the attack, and the death of Jacob David Martir, Plaintiffs Olga Lydia Gutierrez and Ismael Martir have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## 13.   THE AUGUST 25, 2004 ATTACK – NAJAF

**The Arredondo Family**

1360.   Alexander Scott Arredondo was a citizen of the United States and domiciled in the State of Massachusetts.

1361.   On August 25, 2004, Alexander Scott Arredondo, aged 20, was serving in the U.S. military in Iraq when his unit was engaged in small arms fire with JAM terror operatives in Najaf, Iraq.

1362.   Alexander Scott Arredondo was killed by sniper fire from JAM terror operatives.

1363.   The terror cell that fired at Alexander Scott Arredondo was trained by Hezbollah and funded and armed by the IRGC-QF.

1364.   Plaintiff Victoria M. Foley is a citizen of the United States and domiciled in the State of Massachusetts. She is the mother of Alexander Scott Arredondo.

1365.   Plaintiff Victoria M. Foley brings an action individually and on behalf of the Estate of Alexander Scott Arredondo, as its legal representative.

1366.   Plaintiff Nathaniel Foley is a citizen of the United States and domiciled in the State of Massachusetts. He is the brother of Alexander Scott Arredondo.

1367.   As a result of the attack, and the death of Alexander Scott Arredondo, Plaintiffs Victoria M. Foley and Nathaniel Foley have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

### 14.   THE AUGUST 26, 2004 ATTACK – NAJAF

**The DeWilde Family**

1368.   Plaintiff Michael Scott DeWilde is a citizen of the United States and domiciled in the State of Texas.

1369.   On August 26, 2004, Michael Scott DeWilde, then 37, was serving in the U.S. military in Iraq.

1370.   On August 26, 2004, Michael Scott DeWilde was seriously injured when he came under fire from a rocket-propelled grenade fired by JAM terror operatives.

1371.   The terror cell that executed the attack in which Michael Scott DeWilde was injured was trained by Hezbollah and funded and armed by the IRGC-QF.

1372.   As a result of the attack, Michael Scott DeWilde sustained shrapnel injuries to his arm requiring him to medevaced from the scene and treated at the nearest Forward Operating Base.

1373.   As a result of the attack, and the injuries he suffered, Plaintiff Michael Scott DeWilde has experienced severe physical and mental anguish and extreme emotional pain and suffering.

### 15.   THE FEBRUARY 10, 2005 ATTACK – BAGHDAD

**The Morris Family**

1374.   Plaintiff Steven Morris is a citizen of the United States and domiciled in the State of North Carolina.

1375.   Steven Morris served in the U.S. military in Iraq on multiple rotations from March 2003 through 2011 as a member of a Special Operations Unit.

1376.   On February 10, 2005, Mr. Morris sustained a traumatic brain injury ("TBI") as well as neck and shoulder injuries when he was knocked from his armored vehicle *en* route to an operation against JAM Special Forces north of Sab' Abkar section of Baghdad.

1377.   On a separate occasion, he sustained an additional TBI from the blast wave of an Iranian 122mm rocket launched by JAM Special Groups.

1378.   As a result of the attack, and the injuries he suffered, Plaintiff Steven Morris has experienced severe physical and mental anguish and extreme emotional pain and suffering.

1379.   Plaintiff Danielle Dechaine-Morris is a citizen of the United States and domiciled in the State of North Carolina. She was the wife of Steven Morris.

1380.   Plaintiff Nicholas Morris is a citizen of the United States and domiciled in the State of North Carolina. He is the son of Steven Morris.

1381.   Plaintiff K.M., a minor represented by his legal guardian, Danielle Dechaine-Morris, is a citizen of the United States and domiciled in the State of North Carolina. He is the son of Steven Morris.

1382.   As a result of the attack, and the injuries Steven Morris suffered, Plaintiffs Danielle Dechaine-Morris, Nicholas Morris and K.M. have experienced severe mental anguish and extreme emotional pain and suffering.

### 16.    THE JUNE 8, 2005 ATTACK – BAGHDAD

**The Arizola Family**

1383.   Roberto Arizola, Jr. was a citizen of the United States and domiciled in the State of Texas when he was killed in Iraq.

1384. On June 8, 2005, Roberto Arizola, Jr., aged 31, was serving in the U.S. military near Rustimaya when an IED emplaced by JAM Special Groups terror operatives detonated near his vehicle.

1385. Roberto Arizola, Jr. was killed in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

1386. Plaintiff Monica Arizola is a citizen of the United States and domiciled in the State of Texas. She is the widow of Roberto Arizola, Jr.

1387. Plaintiff Roberto Aaron Arizola is a citizen of the United States and domiciled in the State of Texas. He is the son of Roberto Arizola, Jr.

1388. Plaintiff Roberto Arizola, Sr. is a citizen of the United States and domiciled in the State of Texas. He is the father of Roberto Arizola, Jr.

1389. Plaintiff Cecilia Arizola is a citizen of the United States and domiciled in the State of Texas. She is the mother of Roberto Arizola, Jr.

1390. Plaintiff Danny Arizola is a citizen of the United States and domiciled in the State of Texas. He is the brother of Roberto Arizola, Jr.

1391. Plaintiff Ricardo Arizola is a citizen of the United States and domiciled in the State of Texas. He is the brother of Roberto Arizola, Jr.

1392. As a result of the attack, and the death of Roberto Arizola, Jr., Plaintiffs Monica Arizola, Roberto Aaron Arizola, Roberto Arizola, Sr., Cecilia Arizola, Danny Arizola and Ricardo Arizola have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's/son's brother's society, companionship, comfort, advice and counsel.

17.   **THE JUNE 27, 2005 ATTACK – BAGHDAD**

**The Klecker Family**

1393.   Deborah Klecker was a citizen of the United States and domiciled in the State of Oregon when she was killed in Iraq.

1394.   On June 27, 2005, Deborah Klecker, aged 51, was working as a civilian contractor providing mentoring and training to Iraqi police officers when she was killed by an IED planted and detonated near her vehicle by JAM Special Groups.

1395.   Deborah Klecker was killed in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

1396.   Plaintiff Greg Klecker is a citizen of the United States and domiciled in the State of Oregon. He is the brother of Deborah Klecker.

1397.   As a result of the attack, and the death of Deborah Klecker, Plaintiff Greg Klecker has experienced severe mental anguish, extreme emotional pain and suffering, and loss of his sister's society, companionship, comfort, advice and counsel.

18.   **THE AUGUST 7, 2005 ATTACK – BAGHDAD**

**The Kalladeen Family**

1398.   Anthony N. Kalladeen was a citizen of the United States and domiciled in the State of New York when he was killed in Iraq.

1399.   On August 7, 2005, Anthony N. Kalladeen, aged 26, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

1400.   Anthony N. Kalladeen died on August 8, 2005 as a result of the injuries he sustained in the attack.

1401.   The weapon used to kill Anthony N. Kalladeen was a Hezbollah-designed and

Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

1402.   Plaintiff Maria Vidal is a citizen of the United States and domiciled in the State of Pennsylvania. She is the mother of Anthony N. Kalladeen.

1403.   As a result of the attack, and the death of Anthony N. Kalladeen, Plaintiff Maria Vidal has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her son's society, companionship, comfort, advice and counsel.

### 19.   THE SEPTEMBER 2, 2005 ATTACK – BAGHDAD

**The Hassler Family**

1404.   Plaintiff Tamara Hassler is a citizen of the United States and domiciled in the State of North Carolina.

1405.   On September 2, 2005, Tamara Hassler, then 36, was serving as a civilian contractor for DynCorp International in Iraq when an EFP emplaced by Special Groups detonated near the vehicle in which she was traveling in Baghdad.

1406.   The weapon used to injure Tamara Hassler was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

1407.   As a result of the attack, Ms. Hassler suffered bruising in her sacroiliac joint, soft tissue damage to her piriformis muscle, and injuries to her right hip.

1408.   Ms. Hassler also suffered from three bulging discs in her lower back as a result of the attack, as well as atrophied discs in her neck.

1409.   Ms. Hassler was also diagnosed with hearing loss, PTSD, and a TBI.

1410.   Ms. Hassler has been treated by numerous doctors and physical therapists for her injuries and has been prescribed medication to treat her symptoms.

1411.   As a result of the attack, and the injuries she suffered, Plaintiff Tamara Hassler has experienced severe physical and mental anguish and extreme emotional pain and suffering.

1412.   Plaintiff Richard E. Hassler is a citizen of the United States and domiciled in the State of North Carolina. He is the father of Tamara Hassler.

1413.   Plaintiff Joanne Sue Hassler is a citizen of the United States and domiciled in the State of North Carolina. She is the mother of Tamara Hassler.

1414.   As a result of the attack, and the injuries Tamara Hassler has suffered, Plaintiffs Richard E. Hassler and Joanne Sue Hassler have experienced severe mental anguish and extreme emotional pain and suffering.

**The Huckfeldt Family**

1415.   Plaintiff Scott Huckfeldt is a citizen of the United States and domiciled in the State of Arizona.

1416.   On September 2, 2005, Scott Huckfeldt, then 37, was serving as a civilian contractor for DynCorp International in Iraq when an EFP emplaced by Special Groups detonated near the vehicle in which he was traveling in Baghdad.

1417.   The weapon used to injure Scott Huckfeldt was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

1418.   As a result of the attack, Scott Huckfeldt suffered injuries to his left knee.

1419.   Mr. Huckfeldt was also diagnosed with PTSD.

1420.   As a result of the attack, and the injuries he suffered, Plaintiff Scott Huckfeldt has experienced severe physical and mental anguish and extreme emotional pain and suffering.

1421.   Plaintiff Kathryn Huckfeldt is a citizen of the United States and domiciled in the State of Arizona. She is the wife of Scott Huckfeldt.

1422.   Plaintiff Alisha Huckfeldt is a citizen of the United States and domiciled in the State of Arizona. She is the daughter of Scott Huckfeldt.

1423.   Plaintiff Matthew Huckfeldt is a citizen of the United States and domiciled in the State of Arizona. He is the son of Scott Huckfeldt.

1424.   As a result of the attack, and the injuries Scott Huckfeldt has suffered, Plaintiffs Kathryn Huckfeldt, Alisha Huckfeldt and Matthew Huckfeldt have experienced severe mental anguish and extreme emotional pain and suffering.

**The Newman Family**

1425.   Plaintiff Timothy Newman is a citizen of the United States and domiciled in the State of South Carolina.

1426.   On September 2, 2005, Timothy Newman, then 41, was serving as a civilian contractor for DynCorp International in Iraq when an EFP emplaced by Special Groups detonated near the vehicle in which he was traveling in Baghdad.

1427.   The weapon used to injure Timothy Newman was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

1428.   As a result of the attack, Mr. Newman's legs were injured, and his right leg had to be amputated above the knee.

1429.   Mr. Newman's left hand was injured, and it had to be partially amputated at the wrist.

1430.   Mr. Newman received a penetrating wound to his chest and abdomen and suffered a broken spine and various broken bones.

1431.   Mr. Newman was also diagnosed with PTSD and a TBI.

1432.   As a result of the attack, and the injuries he suffered, Plaintiff Timothy Newman has experienced severe physical and mental anguish and extreme emotional pain and suffering.

1433.   Plaintiff Padraic J. Newman is a citizen of the United States and domiciled in the State of South Carolina. He is the son of Timothy Newman.

1434.   As a result of the attack, and the injuries Timothy Newman has suffered, Plaintiff Padraic J. Newman has experienced severe mental anguish and extreme emotional pain and suffering.

## 20.   <u>THE SEPTEMBER 6, 2005 ATTACK – BAGHDAD</u>

**<u>The Jonaus Family</u>**

1435.   Jude Jonaus was a citizen of the United States and domiciled in the State of Florida when he was killed in Iraq.

1436.   On September 6, 2005, Jude Jonaus, aged 27, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near his HMMWV in Baghdad.

1437.   Jude Jonaus was killed in the attack.

1438.   The weapon used to kill Jude Jonaus was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

1439.   Plaintiff Amenia Jonaus is a citizen of the United States and domiciled in the State of Florida. She is the mother of Jude Jonaus.

1440.   Plaintiff Amenia Jonaus brings this action individually and on behalf of the Estate of Jude Jonaus, as its legal representative.

1441.   Plaintiff Gernessoit Jonaus is a citizen of the United States and domiciled in the State of Florida. He is the father of Jude Jonaus.

1442.   Plaintiff Daphnie Jonaus Martin is a citizen of the United States and domiciled in the State of Florida. She is the sister of Jude Jonaus.

1443.   Plaintiff Ricky Jonaus is a citizen of the United States and domiciled in the State of South Carolina. He is the brother of Jude Jonaus.

1444.   Plaintiff Marckendy Jonaus is a citizen of the United States and domiciled in the State of Florida. He is the brother of Jude Jonaus.

1445.   Plaintiff Claire Jonaus is a citizen of the United States and domiciled in the State of Florida. She is the sister of Jude Jonaus.

1446.   Plaintiff Sharen Jonaus Martin is a citizen of the United States and domiciled in the State of Florida. She is the sister of Jude Jonaus.

1447.   As a result of the attack, and the death of Jude Jonaus, Plaintiffs Amenia Jonaus, Gernessoit Jonaus, Daphnie Jonaus Martin, Ricky Jonaus, Marckendy Jonaus, Claire Jonaus and Sharen Jonaus Martin have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## 21.   THE SEPTEMBER 26, 2005 ATTACK – BAGHDAD

### The Tuliau Family

1448.   Tulsa T. Tuliau was a citizen of the United States and domiciled in the State of New

York when he was killed in Iraq.

1449.  On September 26, 2005, Tulsa T. Tuliau, aged 33, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

1450.  Tulsa T. Tuliau was killed in the attack.

1451.  The weapon used to kill Tulsa T. Tuliau was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

1452.  Plaintiff Masina Tuliau is a citizen of the United States and domiciled in the State of Washington. She is the mother of Tulsa T. Tuliau.

1453.  As a result of the attack, and the death of Tulsa T. Tuliau, Plaintiff Masina Tuliau has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her son's society, companionship, comfort, advice and counsel.

## 22.    THE SEPTEMBER 28, 2005 ATTACK – UMM QASR

**The Morin Family**

1454.  Steve Morin, Jr. was a citizen of the United States and domiciled in the State of Texas when he was killed in Iraq.

1455.  On September 28, 2005, Steve Morin, Jr., aged 34, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

1456.  Steve Morin, Jr. was killed in the attack.

1457.  The weapon used to kill Steve Morin, Jr. was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

1458.  Plaintiff Brianna Renee Navejas is a citizen of the United States and domiciled in

the State of Texas. She is the step-daughter of Steve Morin, Jr.

1459.   As a result of the attack, and the death of Steve Morin, Jr., Plaintiff Brianna Renee Navejas has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her father's society, companionship, comfort, advice and counsel.

**The Martinez Family**

1460.   Plaintiff Margarito A. Martinez, Jr. is a citizen of the United States and domiciled in the State of Texas.

1461.   On September 28, 2005, Margarito Martinez, then 36, was serving in the U.S. military in Iraq.

1462.   He was driving in a convoy when an EFP emplaced by Special Groups struck the lead vehicle.

1463.   The weapon used to injure Margarito Martinez was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

1464.   After the lead vehicle was stuck by an EFP, Margarito got out of his vehicle to check on the occupants of the vehicle that had been struck. He saw that Steve Morin had been hit in the back of the skull and appeared to be dead.

1465.   He then checked on Elizabeth Jacobson who had been in Steve Morin's HMMWV and observed that she had been decapitated.

1466.   Finally, he checked on Andy Martinez who was the gunner in the HMMWV. Andy was standing in the turret and couldn't hear or see anything. Margarito got on top of the vehicle and pulled Andy out. He cut off some of Andy's clothing to start an IV line for him.

1467.   As a result of the attack, Mr. Martinez suffers from PTSD.

1468.   As a result of the attack, and the injuries he suffered, Plaintiff Margarito Martinez, Jr. has experienced severe physical and mental anguish and extreme emotional pain and suffering.

### 23.   THE OCTOBER 6, 2005 ATTACK – BAGHDAD

**The Burns Family**

1469.   Plaintiff Alvis Burns is a citizen of the United States and domiciled in the State of Arizona.

1470.   On October 6, 2005, Alvis Burns, then 41, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

1471.   The weapon used to injure Alvis Burns was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

1472.   As a result of the blast, Alvis Burns's skull was cracked and shrapnel was lodged in his brain.

1473.   Mr. Burns experienced brain swelling and he underwent brain surgery. He has been diagnosed with a TBI.

1474.   Mr. Burns suffered shrapnel in his face and throughout his left arm. He also sustained hearing loss as a result of the blast.

1475.   Mr. Burns fell in and out of comas and was, at times, in a vegetative state for long periods. He was fed through a feeding tube.

1476.   As a result of the injuries sustained in the attack and following his many procedures, Mr. Burns has had to relearn how to swallow, eat, speak, and walk.

1477.   He experiences pain in his legs and feet and currently uses an electric wheelchair and at times, a walker.

1478. As a result of the attack, and the injuries he suffered, Plaintiff Alvis Burns has experienced severe physical and mental anguish and extreme emotional pain and suffering.

1479. Plaintiff JoDee Johnson is a citizen of the United States and domiciled in the State of Arizona. She is the sister of Alvis Burns.

1480. Plaintiff James Higgins is a citizen of the United States and domiciled in the State of Arizona. He is the brother of Alvis Burns.

1481. Plaintiff Wendy Coleman is a citizen of the United States and domiciled in the State of Washington. She is the sister of Alvis Burns.

1482. As a result of the attack, and the injuries Alvis Burns has suffered, Plaintiffs JoDee Johnson, James Higgins, and Wendy Coleman have experienced severe mental anguish, and extreme emotional pain and suffering.

**The Radke Family**

1483. Plaintiff Brian Radke is a citizen of the United States and domiciled in the State of Washington.

1484. On October 6, 2005, Brian Radke, then 30, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

1485. The weapon used to injure Brian Radke was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

1486. As a result of the attack, Brian Radke sustained shrapnel to his body, including a piece that clipped his carotid artery.

1487. He also sustained shrapnel in his right leg and he has undergone reconstructive knee surgery.

1488.   His jaw was fractured in multiple locations, and he lost his right finger.

1489.   His left arm was fractured in two locations, and his median nerve was severed.

1490.   He has undergone numerous surgical procedures, including those to address the severed nerve and to emplace rods and to apply skin grafts in his left arm.

1491.   He was in a coma, during which time he was fed by a feeding tube and breathed through a trach tube.

1492.   Mr. Radke still has pieces of shrapnel in his body, including some fragments lodged in his brain.

1493.   Mr. Radke's injuries have required physical therapy and occupational therapy.

1494.   Mr. Radke has been diagnosed with PTSD and has received treatment and counseling. He has been prescribed medication to address both the pain and emotional impact of the attack.

1495.   As a result of the attack, and the injuries he suffered, Plaintiff Brian Radke has experienced severe physical and mental anguish and extreme emotional pain and suffering.

1496.   Plaintiff Nova Radke is a citizen of the United States and domiciled in the State of Arizona.  She is the wife of Brian Radke.

1497.   As a result of the attack, and the injuries Brian Radke has suffered, Plaintiff Nova Radke has experienced severe mental anguish, and extreme emotional pain and suffering.

**The Vernier Family**

1498.   Plaintiff Steven Vernier, Jr. is a citizen of the United States and domiciled in the State of Tennessee.

1499.   On October 6, 2005, Steven Vernier, Jr., then 26, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

1500.   The weapon used to injure Steven Vernier, Jr. was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

1501.   As a result of the blast, Steven Vernier, Jr. sustained shrapnel to his face, neck, right shoulder, right wrist, and his thighs.

1502.   He also sustained first degree burns.

1503.   He has experienced and continues to experience hearing loss in both ears.

1504.   He has undergone procedures to remove the shrapnel.

1505.   The injuries he sustained resulted in a loss of range of motion in his right shoulder and right wrist.

1506.   He has been prescribed medication for pain. The pain continues to the present day.

1507.   Mr. Vernier has experienced flashbacks, nightmares, and extreme survivor's guilt.

1508.   He has been diagnosed with PTSD and has sought counseling.

1509.   As a result of the attack, and the injuries he suffered, Plaintiff Steven Vernier, Jr. has experienced severe physical and mental anguish and extreme emotional pain and suffering.

### 24.   THE DECEMBER 8, 2005 ATTACK – BAGHDAD

**The Smith Family**

1510.   Kevin J. Smith was a citizen of the United States and domiciled in the State of Florida when he was killed in Iraq.

1511.   On December 8, 2005, Kevin J. Smith, aged 28, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

1512.   Kevin J. Smith was killed in the attack.

1513.   The weapon used to kill Kevin J. Smith was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

1514.   Plaintiff Clifford L. Smith, Jr. is a citizen of the United States and domiciled in the State of Florida. He is the father of Kevin J. Smith.

1515.   Plaintiff Clifford L. Smith, Jr. brings an action individually and on behalf of the Estate of Kevin J. Smith, as its legal representative.

1516.   Plaintiff Georgianna Stephens-Smith is a citizen of the United States and domiciled in the State of North Carolina. She is the mother of Kevin J. Smith.

1517.   Plaintiff Corena Martin is a citizen of the United States and domiciled in the State of Florida. She is the sister of Kevin J. Smith.

1518.   As a result of the attack, and the death of Kevin J. Smith, Plaintiffs Clifford L. Smith, Jr., Georgianna Stephens-Smith, and Corena Martin have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

**The Mattis Family**

1519.   Plaintiff Adam Mattis is a citizen of the United States and domiciled in the State of Texas.

1520.   On December 8, 2005. Adam Mattis, then 23, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

1521.   The weapon used to injure Adam Mattis was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

1522.   Mr. Mattis was driving a HMMWV, the second vehicle in a five-vehicle convoy, when his vehicle was hit by an EFP.

1523.   Mr. Mattis was hit by shrapnel in his right arm. The shrapnel hit his bicep and went into his shoulder. The shrapnel cut and cauterized an artery.

1524.   Following the attack, he was medevaced to a combat support hospital in Iraq for initial treatment. He was not allowed to leave Iraq for further treatment to his wounds until the end of his deployment in January 2006 which resulted in Methicillin-resistant Staphylococcus aureus (MRSA), a secondary infection.

1525.   After his deployment ended in January 2006, he initially sought treatment at a civilian hospital in Savannah, Georgia and then at Fort Stewart.

1526.   Mr. Mattis has also sought treatment at the VA.

1527.   He has been diagnosed with a TBI and PTSD.

1528.   As a result of the attack, and the injuries he suffered, Plaintiff Adam Mattis has experienced severe physical and mental anguish and extreme emotional pain and suffering.

**The Peterson Family**

1529.   Plaintiff Terrance Peterson, III is a citizen of the United States and domiciled in the State of Arizona.

1530.   On March 23, 2008, Terrance Peterson, then 25, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

1531.   The weapon used to injure Terrance Peterson was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

1532.   Mr. Peterson was an occupant in the second vehicle traveling in a five-vehicle convoy, when his vehicle was hit by an EFP.

1533.   Mr. Peterson was hit by shrapnel in his right foot, both knees and his left arm. He had multiple fractures and tissue damage. The brachial artery in his right arm was severed.

1534.   Following the attack, Mr. Peterson was taken to FOB Loyalty to stabilize him and was then taken to Balad for surgery to repair the brachial artery. From there he was transferred to Landstuhl, Germany and then to Walter Reed Army Medical Center where he spent the next 9 months. Ultimately, he was sent to Wynn Army Hospital at Fort Stewart where he finished out his military service.

1535.   Mr. Peterson has undergone 33 surgeries as a result of the attack.

1536.   As a result of the attack, and the injuries he suffered, Plaintiff Terrance Peterson, III has experienced severe physical and mental anguish and extreme emotional pain and suffering.

1537.   Plaintiff Petra Spialek is a citizen of the United States and domiciled in the State of Illinois. She is the mother of Terrance Peterson, III.

1538.   As a result of the attack, and the injuries Terrance Peterson, III has suffered, Plaintiff Petra Spialek has experienced severe mental anguish, and extreme emotional pain and suffering.

## 25.   <u>THE DECEMBER 25, 2005 ATTACK – BAGHDAD</u>

<u>The Cardinal Family</u>

1539.   Anthony Cardinal was a citizen of the United States and domiciled in the State of Michigan when he was killed in Iraq.

1540.   On December 25, 2005, Anthony Cardinal, aged 20, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

1541.   Anthony Cardinal was killed in the attack.

1542.   The weapon used to kill Anthony Cardinal was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

1543.   Plaintiff David G. Cardinal, Jr. is a citizen of the United States and domiciled in the State of North Carolina. He is the father of Anthony Cardinal.

1544.   Plaintiff David G. Cardinal, Jr. brings an action individually and on behalf of the Estate of Anthony Cardinal, as its legal representative.

1545.   As a result of the attack, and the death of Anthony Cardinal, Plaintiff David G. Cardinal, Jr. has experienced severe mental anguish, extreme emotional pain and suffering, and loss of his son's society, companionship, comfort, advice and counsel.

## 26.   THE JANUARY 5, 2006 ATTACK – NAJAF

**The Hecker Family**

1546.   William F. Hecker, III was a citizen of the United States and domiciled in the State of Missouri when he was killed in Iraq.

1547.   January 5, 2006, William F. Hecker, III, aged 37, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

1548.   William F. Hecker, III was killed in the attack.

1549.   The weapon used to kill William F. Hecker, III was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

1550.   Plaintiff Richelle Hecker is a citizen of the United States and domiciled in the State of Colorado. She is the widow of William F. Hecker, III.

1551.   Plaintiff Richelle Hecker brings an action individually and on behalf of the Estate of William F. Hecker, III, as its legal representative.

1552.   Plaintiff Victoria Hecker is a citizen of the United States and domiciled in the State of Colorado. She is the daughter of William F. Hecker, III.

1553.   Plaintiff W.H., a minor represented by his legal guardian, Richelle Hecker, is a citizen of the United States and domiciled in the State of Colorado. He is the son of William F. Hecker, III.

1554.   Plaintiff C.H., a minor represented by her legal guardian, Richelle Hecker, is a citizen of the United States and domiciled in the State of Colorado.  She is the daughter of William F. Hecker, III.

1555.   Plaintiff William F. Hecker, Jr. is a citizen of the United States and domiciled in State of Colorado.  He is the father of William F. Hecker, III.

1556.   Plaintiff Nancy Hecker is a citizen of the United States and domiciled in the State of Colorado. She is the mother of William F. Hecker, III.

1557.   Plaintiff John D. Hecker is a citizen of the United States and domiciled in the State of New York. He is the brother of William F. Hecker, III.

1558.   As a result of the attack, and the death of William F. Hecker, III, Plaintiffs Richelle Hecker, Victoria Hecker, W.H., C.H., William F. Hecker, Jr., Nancy Hecker and John D. Hecker have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's/son's/brother's society, companionship, comfort, advice and counsel.

**The Mariano Family**

1559.   Robbie M. Mariano was a citizen of the United States and domiciled in the State of California when he was killed in Iraq.

1560.   January 5, 2006, Robbie M. Mariano, aged 21, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

1561.   Robbie M. Mariano was killed in the attack.

1562.   The weapon used to kill Robbie M. Mariano was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

1563.   Plaintiff Robert F. Mariano is a citizen of the United States and domiciled in State of California.  He is the father of Robbie M. Mariano.

1564.   Plaintiff Robert F. Mariano brings an action individually and on behalf of the Estate of Robbie M. Mariano, as its legal representative.

1565.   Plaintiff Debra Mariano is a citizen of the United States and domiciled in the State of California. She is the mother of Robbie M. Mariano.

1566.   Plaintiff Bobbie D. Mariano is a citizen of the United States and domiciled in the State of California. He is the brother of Robbie M. Mariano.

1567.   As a result of the attack, and the death of Robbie M. Mariano, Plaintiffs Robert F. Mariano, Debra Mariano and Bobbie D. Mariano have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

**The White Family**

1568.   Stephen J. White was a citizen of the United States and domiciled in the State of Alabama when he was killed in Iraq.

1569.   January 5, 2006, Stephen J. White, aged 39, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

1570.   Stephen J. White was killed in the attack.

1571.   The weapon used to kill Stephen J. White was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

1572.   Plaintiff Vickie Michay White is a citizen of the United States and domiciled in the State of Texas.  She is the widow of Stephen J. White.

1573.   Plaintiff Vickie Michay White brings an action individually and on behalf of the Estate of Stephen J. White, as its legal representative.

1574.   As a result of the attack, and the death of Stephen J. White, Plaintiff Vickie Michay White has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her husband's society, companionship, comfort, advice and counsel.

## 27.   THE JANUARY 5, 2006 ATTACK – BAGHDAD

**The Lopez Reyes Family**

1575.   Jason Lopez Reyes was a citizen of the United States and domiciled in the Puerto Rico.

1576.   On January 5, 2006, Jason Lopez Reyes, then 29, was serving in the U.S. military in Iraq when a dual-array EFP emplaced by Special Groups detonated near his vehicle.

1577.   Jason Lopez Reyes was killed in the attack.

1578.   The weapon used to kill Jason Lopez Reyes was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

1579.   Plaintiff Gladys E. Reyes Centeno is a citizen of the United States and domiciled in Puerto Rico. She is the mother of Jason Lopez Reyes.

1580.   Plaintiff Veronica Lopez Reyes is a citizen of the United States and domiciled in Puerto Rico. She is the sister of Jason Lopez Reyes.

1581.   Plaintiff Veronica Lopez Reyes brings an action individually and on behalf of the Estate of Jason Lopez Reyes, as its legal representative.

1582.   Plaintiff Zoraima Lopez is a citizen of the United States and domiciled in the State of Texas. She is the sister of Jason Lopez Reyes.

1583.   As a result of the attack, and the death of Jason Lopez Reyes, Plaintiffs Gladys E. Reyes Centeno, Veronica Lopez Reyes, and Zoraima Lopez have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## 28.   THE JANUARY 18, 2006 ATTACK – BASRA

### The Hickman Family

1584.   Richard Thomas "Rick" Hickman was a citizen of the United States and domiciled in the State of Georgia, when he was killed in Iraq.

1585.   On January 18, 2006, Richard Hickman, aged 52, a former soldier in the U.S. military, was serving as a civilian contractor in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

1586.   Richard Hickman was killed in the attack.

1587.   The weapon used to kill Richard Hickman was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

1588.   Plaintiff Jennifer Link is a citizen of the United States and domiciled in the State of Florida. She is the daughter of Richard Hickman.

1589.   Plaintiff Sharon Johnston is a citizen of the United States and domiciled in the State of Florida. She is the sister of Richard Hickman.

1590.   As a result of the attack, and the death of Richard Hickman, Plaintiffs Jennifer Link and Sharon Johnston have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their father's/brother's society, companionship, comfort, advice and counsel.

## 29.   THE FEBRUARY 17, 2006 ATTACK – BAGHDAD

**The Lee Family**

1591.   Plaintiff Kenny Lee is a citizen of the United States and domiciled in the State of Virginia.

1592.   On February 17, 2006, Kenny Lee, then 26, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

1593.   The weapon used to injure Kenny Lee was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

1594.   As a result of the attack, Kenny Lee was stunned and incapacitated by the force of the concussive blast and shrapnel that entered his body in his buttocks region and partially exited from his back. Because the M1114 remained operational after the detonation, Mr. Lee remained in shock and did not realize he had been hit with copper shrapnel from the EFP until he noticed that the back of his uniform was completely bloodstained. A few days after the explosion, he discovered a concussive bruise approximately ten inches in diameter on his chest as a result of the explosion. Mr. Lee has lost flexibility due to the scarring from his injuries in addition to back pain and sciatic pain.

1595.   As a result of the attack, and the injuries he suffered, Plaintiff Kenny Lee has experienced severe physical and mental anguish and extreme emotional pain and suffering.

1596.   Plaintiff Tom B. Lee is a citizen of the United States and domiciled in the State of Connecticut. He is the father of Kenny Lee.

1597.   Plaintiff Ling P. Lee is a citizen of the United States and domiciled in the State of Connecticut. She is the mother of Kenny Lee.

1598.   As a result of the attack, and the injuries Kenny Lee suffered, Plaintiffs Tom B. Lee and Ling P. Lee have experienced severe mental anguish and extreme emotional pain and suffering.

## 30.   THE FEBRUARY 20, 2006 ATTACK –HINDIYAH

### The Collado Family

1599.   Jay T. Collado was a citizen of the United States and domiciled in the State of South Carolina when he was killed in Iraq.

1600.   On February 20, 2006, Jay T. Collado, aged 31, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

1601.   Jay T. Collado was killed in the attack.

1602.   The weapon used to kill Jay T. Collado was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

1603.   Plaintiff Judy Collado is a citizen of the United States and domiciled in the State of California. She is the widow of Jay T. Collado.

1604.   Plaintiff Kaiya Collado is a citizen of the United States and domiciled in the State of California. She is the daughter of Jay T. Collado.

1605.   As a result of the attack, and the death of Jay T. Collado, Plaintiffs Judy Collado and Kaiya Collado have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice and counsel.

**The Waldeck Family**

1606.   Plaintiff Justin Waldeck is a citizen of the United States and domiciled in the State of Illinois.

1607.   On February 20, 2006, Justin Waldeck was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

1608.   The weapon used to injure Justin Waldeck was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

1609.   As a result of the attack, Mr. Waldeck sustained shrapnel injuries to his right knee and significant injuries to his left hand. The metacarpal bones in his left hand had to be fused and he suffered nerve damage to his left pinky.

1610.   As a result of the attack, and the injuries he suffered, Plaintiff Justin Waldeck has experienced severe physical and mental anguish and extreme emotional pain and suffering.

### 31.   THE FEBRUARY 20, 2006 ATTACK – BAGHDAD

**The Kuhlmeier Family**

1611.   Daniel Kuhlmeier was a citizen of the United States and domiciled in the State of Virginia when he was killed in Iraq.

1612.   February 20, 2006, Daniel Kuhlmeier, aged 30, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

1613.   Daniel Kuhlmeier was killed in the attack.

1614.   The weapon used to kill Daniel Kuhlmeier was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

1615.   Plaintiff Tanja Kuhlmeier is a citizen of the United States and domiciled in the State of Virginia. She is the widow of Daniel Kuhlmeier.

1616.   Plaintiff Tanja Kuhlmeier brings an action individually and on behalf of the Estate of Daniel Kuhlmeier, as its legal representative.

1617.   Plaintiff K.K., a minor represented by her legal guardian, Tanja Kuhlmeier, is a citizen of the United States and domiciled in the State of Virginia. She is the daughter of Daniel Kuhlmeier.

1618.   Plaintiff Robert J. Kuhlmeier is a citizen of the United States and domiciled in the State of Pennsylvania. He is the father of Daniel Kuhlmeier.

1619.   Plaintiff Theresa A. Kuhlmeier is a citizen of the United States and domiciled in the State of Pennsylvania. She is the mother of Daniel Kuhlmeier.

1620.   Plaintiff Theresa Ann Kuhlmeier is a citizen of the United States and domiciled in the State of Pennsylvania. She is the sister of Daniel Kuhlmeier.

1621.   Plaintiff Edward Kuhlmeier is a citizen of the United States and domiciled in the State of Pennsylvania. He is the brother of Daniel Kuhlmeier.

1622.   Plaintiff Thomas Kuhlmeier is a citizen of the United States and domiciled in the State of Pennsylvania. He is the brother of Daniel Kuhlmeier.

1623.   Plaintiff John Kuhlmeier is a citizen of the United States and domiciled in the State of Pennsylvania resident. He is the brother of Daniel Kuhlmeier.

1624.   Plaintiff Robert W. Kuhlmeier is a citizen of the United States and domiciled in the State of Pennsylvania. He is the brother of Daniel Kuhlmeier.

1625.   As a result of the attack, and the death of Daniel Kuhlmeier, Plaintiffs Tanja Kuhlmeier, K.K., Robert J. Kuhlmeier, Theresa A. Kuhlmeier, Theresa Ann Kuhlmeier, Edward Kuhlmeier, Thomas Kuhlmeier, John Kuhlmeier, and Robert W. Kuhlmeier have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's/son's/brother's society, companionship, comfort, advice and counsel.

## 32.   THE MARCH 26, 2006 ATTACK – BAGHDAD

**The Bershefsky Family**

1626.   Plaintiff Christopher Anthony Bershefsky is a citizen of the United States and domiciled in the State of Pennsylvania.

1627.   On March 26, 2006, Christopher Anthony Bershefsky, then 32, was a private contractor with Erinys International, a British security company, in Iraq. He had been in Iraq for approximately three months during this assignment. He had also previously served in the United States Marine Corps for six years with his discharge having taken place in 1998.

1628.   Mr. Bershefsky was driving an armored Ford F350 vehicle en route to his base after completing a mission a few miles outside the international zone in Baghdad. He was approximately two miles from Gate 2 to enter the international zone when his vehicle was struck by an EFP emplaced by Special Groups. The force of the blast blew through Mr. Bershefsky's door.

1629.   The weapon used to injure Mr. Bershefsky was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

1630.   As a result of the attack, Mr. Bershefsky sustained a fractured pelvis, damaged sciatic nerve, muscle tissue loss due to debridement in his left leg, damages to his left foot which was rendered mostly inoperable, a torn urethra, and additional shrapnel injuries that have caused him to have a colostomy bag and suffer from urological deficits. In addition to the physical injuries he sustained, Mr. Bershefsky also suffers from severe depression, anxiety, and Post-Traumatic Stress Disorder.

1631.   As a result of the attack, and the injuries he suffered, Plaintiff Christopher Anthony Bershefsky has experienced severe physical and mental anguish and extreme emotional pain and suffering.

### 33.   THE APRIL 1, 2006 ATTACK – BAGHDAD

**The Devora-Garcia Family**

1632.   Israel Devora-Garcia was domiciled in the State of Texas when he was killed in Iraq. He became a citizen of the United States posthumously.

1633.   On April 1, 2006, Israel Devora-Garcia, aged 23, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated while he was conducting a dismounted patrol.

1634.   Israel Devora-Garcia was killed in the attack.

1635.   The weapon used to kill Israel Devora-Garcia was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

1636.   Plaintiff Adrian Sandoval is a citizen of the United States and domiciled in the State of Texas. He is the brother of Israel Devora-Garcia.

1637.   Plaintiff Rosa Esther Sandoval is a citizen of the United States and domiciled in the

State of Kentucky. She is the sister of Israel Devora-Garcia.

1638.   As a result of the attack, and the death of Israel Devora-Garcia, Plaintiffs Adrian Sandoval and Rosa Esther Sandoval have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their brother's society, companionship, comfort, advice and counsel.

### 34.   THE APRIL 12, 2006 ATTACK – MISIAB

**The Bandhold Family**

1639.   Scott Bandhold was a citizen of the United States and domiciled in the State of New York when he was killed in Iraq.

1640.   On April 12, 2006, Scott Bandhold, aged 37, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

1641.   Scott Bandhold was killed in the attack.

1642.   The weapon used to kill Scott Bandhold was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

1643.   Plaintiff Henry J. Bandhold, Sr. is a citizen of the United States and domiciled in the State of Florida. He is the father of Scott Bandhold.

1644.   Plaintiff Henry J. Bandhold, Sr. brings this action individually and on behalf of the Estate of Scott Bandhold, as its legal representative.

1645.   Plaintiff Afonso Bandhold is a citizen of the United States and domiciled in Portugal. He is the son of Scott Bandhold.

1646.   Plaintiff Mariana Bandhold is a citizen of the United States and domiciled in the State of California. She is the daughter of Scott Bandhold.

1647.   As a result of the attack, and the death of Scott Bandhold, Plaintiffs Henry J.

Bandhold, Sr., Afonso Bandhold, and Mariana Bandhold have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/father's society, companionship, comfort, advice and counsel.

### 35.   THE APRIL 16, 2006 ATTACK – BAWB ASH-SHAM

**The Stein Family**

1648.   Plaintiff Joshua P. Stein is a citizen of the United States and domiciled in the State of Texas.

1649.   On April 16, 2006, Joshua P. Stein, then 22, was serving in the U.S. military in Iraq. He was traveling in a convoy from the Iraqi Police compound conducting route clearance when the vehicle he was driving, a Bradley Fighting Vehicle that was the second in the convoy, was hit with a dual-array EFP emplaced by Special Groups on the left side of the vehicle on ASR Dover in the Bawb Ash-Sham village north of Baghdad.

1650.   The weapon used to injure Joshua P. Stein was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

1651.   As a result of the attack, Mr. Stein sustained double above-the-knee amputations, two broken forearms, elbow replacement in his left arm, fasciotomy on his right arm, nerve and muscle damage to both forearms causing him to lose feeling in both of his forearms, and a TBI. Mr. Stein was in a coma for nearly a month following the attack and awoke from the coma in a military hospital in Texas after having been airlifted to Balad, Iraq, and Landstuhl, Germany.

1652.   Joshua P. Stein has received extensive medical treatment at various hospitals including various surgeries and prosthetic fittings where he has spent years in treatment. He has

been unable to utilize prosthetics because his right leg was not long enough after the amputation, so he is wheelchair-bound for ambulation.

1653.   As a result of the attack, and the injuries he suffered, Plaintiff Joshua P. Stein has experienced severe physical and mental anguish and extreme emotional pain and suffering.

1654.   Plaintiff Nicole B. Stein is a citizen of the United States and domiciled in the State of Texas. She is the wife of Joshua P. Stein.

1655.   Plaintiff R.M.S., a minor, represented by her legal guardian Joshua P. Stein, is a citizen of the United States and domiciled in the State of Texas. She is the daughter of Joshua P. Stein.

1656.   Plaintiff J.S.S., a minor, represented by her legal guardian Joshua P. Stein, is a citizen of the United States and domiciled in the State of Texas. She is the daughter of Joshua P. Stein.

1657.   Plaintiff Jesse P. Stein is a citizen of the United States and domiciled in the State of North Carolina. He is the father of Joshua P. Stein.

1658.   As a result of the attack, and the injuries Joshua P. Stein suffered, Plaintiffs Nicole B. Stein, R.M.S., and J.S.S. and Jesse P. Stein have experienced severe mental anguish and extreme emotional pain and suffering.

**The Shelswell Family**

1659.   Plaintiff Michael Paul Alan Shelswell is a citizen of the United States and domiciled in the State of Colorado.

1660.   On April 16, 2006, Michael Paul Alan Shelswell, then 23, was serving in the U.S. military in Iraq. He was sitting in the rear of a Bradley Fighting Vehicle traveling in a convoy from the Iraqi Police compound conducting route clearance when the Bradley was hit with a dual-array

EFP emplaced by Special Groups on the left side of the vehicle on ASR Dover in the Bawb Ash-Sham village north of Baghdad.

1661.   The weapon used to injure Michael Paul Alan Shelswell was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

1662.   As a result of the attack, Michael Paul Alan Shelswell was hit with the concussive blast in his face causing a TBI in addition to sustaining chemical burns to his face and upper body as the Bradley caught on fire as a result of the EFP detonation. He continues to suffer from vision and hearing difficulties, sustained memory loss memory loss, suffered a stroke in 2009 related to his injuries, and suffers from severe PTSD that has caused him to suffer from suicidal ideation in the past and makes it impossible for him to be in confined spaces.

1663.   As a result of the attack, and the injuries he suffered, Plaintiff Michael Paul Alan Shelswell has experienced severe physical and mental anguish and extreme emotional pain and suffering.

## 36.   THE APRIL 25, 2006 ATTACK – SADR CITY

### The Murphy Family

1664.   Plaintiff Luke Murphy is a citizen of the United States and domiciled in the State of Florida.

1665.   On April 25, 2006, Luke, then 24, was serving in the U.S. military in Iraq.

1666.   He was driving in a convoy when an EFP emplaced by Special Groups struck his vehicle.

1667.   The weapon used to injure Mr. Murphy was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

1668.   The explosive charge passed through Mr. Murphy's right leg, amputating it. Portions of his left leg muscles were destroyed, and he sustained a compound fracture of his left tibia and fibula, rendering his left leg useless.  Smoke began filling the inside of the vehicle.

1669.   The vehicle ultimately crashed into a wall and Mr. Murphy eventually found a way to exit the vehicle. He crawled on the ground, dragging the remaining stump of his right leg and injured left leg while he continued to experience significant blood loss.

1670.   Mr. Murphy has undergone over 30 procedures to address the injuries sustained in the attack, including those involving the additional shortening of the stump of his right leg and issues involving the problems that have developed with his left leg and foot.

1671.   Mr. Murphy has been prescribed anti-depressants and medication to assist with sleep issues.

1672.   As a result of the attack, and the injuries he suffered, Plaintiff Luke Murphy has experienced severe physical and mental anguish and extreme emotional pain and suffering.

1673.   Plaintiff Willette Murphy is a citizen of the United States and domiciled in the State of Florida. She is the mother of Luke Murphy.

1674.   As a result of the attack, and the injuries Luke Murphy suffered, Plaintiff Willette Murphy has experienced severe mental anguish and extreme emotional pain and suffering.

**The Irwin Family**

1675.   Plaintiff Shane Irwin is a citizen of the United States and domiciled in the State of Florida.

1676.   On April 25, 2006, Shane Irwin, then 23, was serving in the U.S. military in Iraq.

1677.   He was driving in a convoy when an EFP emplaced by Special Groups struck his vehicle.

1678.   The weapon used to injure Mr. Irwin was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

1679.   As a result of the attack, Mr. Irwin suffered lacerations, smoke inhalation and ruptured ear drums. He also suffers from a TBI and PTSD.

1680.   As a result of the attack, and the injuries he suffered, Plaintiff Shane Irwin has experienced severe physical and mental anguish and extreme emotional pain and suffering.

1681.   Plaintiff T.R., a minor represented by her legal guardian, Shane Irwin, is a citizen of the United States and domiciled in the State of Florida. She is the daughter of Shane Irwin.

1682.   Plaintiff Helen Marguerite Irwin is a citizen of the United States and domiciled in the State of Florida. She is the mother of Shane Irwin.

1683.   Plaintiff Nicole Irwin is a citizen of the United States and domiciled in the State of Florida. She is the sister of Shane Irwin.

1684.   As a result of the attack, and the injuries Shane Irwin suffered, Plaintiffs T.R., Helen Marguerite Irwin and Nicole Irwin have experienced severe mental anguish and extreme emotional pain and suffering.

### 37.   THE APRIL 28, 2006 ATTACK – BAGHDAD

**The Gomez Family**

1685.   Jose Gomez was a citizen of the United States and domiciled in the State of New York when he was killed in Iraq.

1686.   On April 28, 2006, Jose Gomez, aged 23, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

1687.   Jose Gomez was killed in the attack.

1688.   The weapon used to kill Jose Gomez was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

1689.   Plaintiff Maria Gomez is a citizen of the United States and domiciled in the State of New York.  She is the mother of Jose Gomez.

1690.   Plaintiff Maria Gomez brings an action individually and on behalf of the Estate of Jose Gomez, as its legal representative.

1691.   As a result of the attack, and the death of Jose Gomez, Plaintiff Maria Gomez has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her son's society, companionship, comfort, advice and counsel.

### 38.   THE MAY 2, 2006 ATTACK – BAGHDAD

**The Greer Family**

1692.   Plaintiff John Dana Greer is a citizen of the United States and domiciled in the State of Texas.

1693.   On May 2, 2006, John David Greer, then 49, was a civilian contractor with Blackwater Security Consulting in Iraq.

1694.   Mr. Greer was driving a South African Mamba vehicle in a four-vehicle caravan en route to the Iraqi Ministry of Finance when the vehicle he was driving was struck by five EFPs emplaced by Special Groups.

1695.   The weapon used to injure Mr. Greer was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

1696.   As a result of the attack, Mr. Greer lost his right hand from above the wrist and sustained third-degree burns on his upper chest.

1697.   He also suffered trauma to his back that necessitated a later L4 to S1 fusion.

1698.   Mr. Greer sustained a TBI injury that has impacted his short- and long-term memory.

1699.   He has been diagnosed with PTSD.

1700.   Mr. Greer received extensive medical treatment and has undergone various surgeries and prosthetic fittings.

1701.   As a result of the attack, and the injuries he suffered, Plaintiff John Dana Greer has experienced severe physical pain and mental anguish and extreme emotional pain and suffering.

1702.   Plaintiff Stephanie C. Sander is a citizen of the United States and domiciled in the State of California. She is the daughter of John David Greer.

1703.   Plaintiff Christopher D. Greer is a citizen of the United States and domiciled in the State of Georgia. He is the son of John David Greer.

1704.   Plaintiff Joseph L. Greer is a citizen of the United States and domiciled in the State of Arizona. He is the brother of John David Greer.

1705.   Plaintiff Carl K. Greer is a citizen of the United States and domiciled in the State of Arizona. He is the brother of John David Greer.

1706.   As a result of the attack, and the injuries John Dana Greer suffered, Plaintiffs Stephanie Sander, Christopher D. Greer, Joseph L. Greer, and Carl K. Greer have experienced severe mental anguish and extreme emotional pain and suffering.

**The Joyner Family**

1707.   Plaintiff Christopher Joyner is a citizen of the United States and domiciled in the State of North Carolina.

1708.   On May 2, 2006, Christopher Joyner, then 37, was a civilian contractor with Blackwater Security Consulting in Iraq.

1709.   Mr. Joyner was the Vehicle Commander riding in the passenger seat of the South African Mamba that was the fourth vehicle in a four-vehicle caravan en route to the Iraqi Ministry of Finance when the vehicle he was riding in was struck by an EFP array emplaced by Special Groups.

1710.   The weapon used to injure Mr. Joyner was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

1711.   As a result of the attack, Mr. Joyner suffered multiple fragment wounds to his face and the globe of his right eye. He also sustained shrapnel wounds to his right upper extremity and left lower extremity.

1712.   The severity of the injuries to his right eye resulted in the loss of use of the eye, and the eye had to be surgically removed.

1713.   He also sustained sinus fractures, loss of teeth, and a large wound to his right jaw.

1714.   Mr. Joyner continues to have shrapnel lodged in his right forearm and his face.

1715.   Mr. Joyner has been diagnosed as having cognitive deficits as a result of the attack that impair his short-term memory and his ability to engage in abstract thinking and remaining on topic in conversation.

1716.   He has also received psychological treatment and counseling following the attack and was diagnosed with Acute Stress Disorder.

1717.   As a result of the attack, and the injuries he suffered, Plaintiff Christopher Joyner has experienced severe physical pain and mental anguish and extreme emotional pain and suffering.

1718.   Plaintiff Anne P. "Poppy" Joyner is a citizen of the United States and domiciled in the State of North Carolina. She is the wife of Christopher Joyner.

1719.   Plaintiff Necole Dunlow Smith is a citizen of the United States and domiciled in the State of North Carolina. She is the step-sister of Christopher Joyner.

1720.   As a result of the attack, and the injuries Christopher Joyner suffered, Plaintiffs Anne P. "Poppy" Joyner and Necole Dunlow Smith have experienced severe mental anguish and extreme emotional pain and suffering.

**The Mills Family**

1721.   Plaintiff Michael R. Mills is a citizen of the United States and domiciled in the State of West Virginia.

1722.   On May 2, 2006, Michael Mills, then 37, was a civilian contractor with Blackwater Security Consulting in Iraq.

1723.   Mr. Mills was one of two gunners riding in an armored vehicle that was struck by a multiple EFP array emplaced by Special Groups.

1724.   The weapon used to injure Mr. Mills was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

1725.   As a result of the attack, Mr. Mills sustained blast and shrapnel injuries to his face, shoulder, and torso. It also caused a torn meniscus in his left knee.

1726.   Mr. Mills received extensive medical treatment and underwent various surgeries over a number of years.

1727.   As a result of the attack, and the injuries he suffered, Plaintiff Michael Mills has experienced severe physical pain and mental anguish and extreme emotional pain and suffering.

1728.   Plaintiff M.R.M., a minor, represented by his legal guardian Michael Mills, is a citizen of the United States and domiciled in the State of New Jersey. He is the son of Michael Mills.

1729.   Plaintiff M.R.M., a minor, represented by his legal guardian Michael Mills, is a citizen of the United States and domiciled in the State of New Jersey. He is the son of Michael Mills.

1730.   As a result of the attack, and the injuries Michael Mills suffered, Plaintiffs M.R.M. and M.R.M. have experienced severe mental anguish and extreme emotional pain and suffering.

### 39.   THE MAY 3, 2006 ATTACK – NASIRIYAH

**The Palinsky Family**

1731.   Jerry A. Palinsky, Jr. was a citizen of the United States and domiciled in the State of Washington when he was killed in Iraq.

1732.  On May 3, 2006, Jerry A. Palinsky, Jr., aged 42, was working as a civilian contractor with EODT in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

1733.  Jerry A. Palinsky, Jr. was killed in the attack.

1734.  The weapon used to kill Jerry A. Palinsky, Jr. was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

1735.  Plaintiff Eddie Jo Palinsky is a citizen of the United States and domiciled in the State of Washington. She is the widow of Jerry A. Palinsky, Jr.

1736.  Plaintiff Eddie Jo Palinsky brings an action individually and on behalf of the Estate of Jerry A. Palinsky, Jr., as its legal representative.

1737.  Plaintiff Jerry A. Palinsky, II is a citizen of the United States and domiciled in the State of Oregon. He is the son of Jerry A. Palinsky, Jr.

1738.  Plaintiff Adina Palinsky is a citizen of the United States and domiciled in the State of Washington. She is the daughter of Jerry A. Palinsky, Jr.

1739.  Plaintiff Jerry A. Palinsky, Sr. is a citizen of the United States and domiciled in the State of Washington. He is the father of Jerry A. Palinsky, Jr.

1740.  Plaintiff Kathleen Hoke is a citizen of the United States and domiciled in the State of Oregon. She is the mother of Jerry A. Palinsky, Jr.

1741.  Plaintiff Joel Palinsky is a citizen of the United States and domiciled in the State of Washington. He is the brother of Jerry A. Palinsky, Jr.

1742.  Plaintiff Karaleen Herb is a citizen of the United States and domiciled in the State of Oregon. She is the sister of Jerry A. Palinsky, Jr.

1743.   As a result of the attack, and the death of Jerry A. Palinsky, Jr., Plaintiffs Eddie Jo Palinsky, Jerry A. Palinsky, II, Adina Palinsky, Jerry A. Palinsky, Sr., Kathleen Hoke, Joel Palinsky and Karaleen Herb have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's/son's/brother's society, companionship, comfort, advice and counsel.

**The Stoneking Family**

1744.   Plaintiff Eric Brandon Stoneking is a citizen of the United States and domiciled in the State of Virginia.

1745.   On May 3, 2006, Eric Brandon Stoneking, then 26, was working as a civilian contractor with EODT in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

1746.   The weapon used to injure Eric Brandon Stoneking was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

1747.   As a result of the attack, Mr. Stoneking sustained a TBI, the loss of two tendons in his right arm, major facial trauma on the left side to his upper mandible and lower jaw, shrapnel and burns to the face, left shoulder, and torso.  Additionally, Mr. Stoneking has suffered from PTSD.

1748.   Mr. Stoneking has received extensive medical treatment at various hospitals for the extensive injuries he sustained on May 3, 2006.

1749.   As a result of the attack, and the injuries he suffered, Plaintiff Eric Brandon Stoneking has experienced severe physical and mental anguish and extreme emotional pain and suffering.

1750.  Plaintiff Carrie Sue Stoneking is a citizen of the United States and domiciled in Germany. She is the mother of Eric Brandon Stoneking.

1751.  Plaintiff Faith Renee Stoneking is a citizen of the United States and domiciled in Germany. She is the sister of Eric Brandon Stoneking.

1752.  As a result of the attack, and the injuries Eric Brandon Stoneking suffered, Plaintiffs Carrie Sue Stoneking and Faith Renee Stoneking have experienced severe mental anguish and extreme emotional pain and suffering.

### 40.  THE MAY 5, 2006 ATTACK – BAGHDAD

**The Saenz Family**

1753.  Carlos N. Saenz was a citizen of the United States and domiciled in the State of Nevada when he was killed in Iraq.

1754.  On May 5, 2006, Carlos N. Saenz, aged 46, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

1755.  Carlos N. Saenz was killed in the attack.

1756.  The weapon used to kill Carlos N. Saenz was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

1757.  Plaintiff Joaqina Saenz Chorens is a citizen of the United States and domiciled in the State of Nevada. She is the mother of Carlos N. Saenz.

1758.  Plaintiff Luz Maria Estrada-Pulido is a citizen of the United States and domiciled in the State of Nevada. She is the sister of Carlos N. Saenz.

1759.  Plaintiff Frances Catherine Castro is a citizen of the United States and domiciled in the State of Nevada. She is the sister of Carlos N. Saenz.

1760.   Plaintiff Elva Espinoza is a citizen of the United States and domiciled in the State of Nevada. She is the sister of Carlos N. Saenz.

1761.   As a result of the attack, and the death of Carlos N. Saenz, Plaintiffs Joaqina Saenz Chorens, Luz Maria Estrada-Pulido, Frances Catherine Castro and Elva Espinoza have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

**The Vacho Family**

1762.   Nathan J. Vacho was a citizen of the United States and domiciled in the State of Wisconsin when he was killed in Iraq.

1763.   On May 5, 2006, Nathan J. Vacho, aged 29, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

1764.   Nathan J. Vacho was killed in the attack.

1765.   The weapon used to kill Nathan J. Vacho was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

1766.   Amanda Vacho is a citizen of the United States and domiciled in the State of Wisconsin. She is the legal guardian of Plaintiff E.V.

1767.   Amanda Vacho brings an action solely on behalf of Plaintiff E.V.

1768.   Plaintiff E.V., a minor represented by her legal guardian Amanda Vacho, is a citizen of the United States and domiciled in the State of Wisconsin. She is the daughter of Nathan J. Vacho.

1769.   Plaintiff Bayli Vacho is a citizen of the United States and domiciled in the State of Wisconsin. She is the daughter of Nathan J. Vacho.

1770.   As a result of the attack, and the death of Nathan J. Vacho, Plaintiffs E.V. and Bayli Vacho have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their father's society, companionship, comfort, advice and counsel.

### 41.   THE MAY 6, 2006 ATTACK – DIWANIYAH

**The Veverka Family**

1771.   David M. Veverka was a citizen of the United States and domiciled in the State of Pennsylvania when he was killed in Iraq.

1772.   On May 6, 2006, David M. Veverka, aged 25, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

1773.   David M. Veverka was killed in the attack.

1774.   The weapon used to kill David M. Veverka was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

1775.   Plaintiff Ronald Veverka is a citizen of the United States and domiciled in the State of Pennsylvania. He is the father of David M. Veverka.

1776.   Plaintiff Carol Polley is a citizen of the United States and domiciled in the State of Pennsylvania. She is the mother of David M. Veverka.

1777.   Plaintiff Keith Veverka is a citizen of the United States and domiciled in the State of Pennsylvania. He is the brother of David M. Veverka.

1778.   Plaintiff Douglas Veverka is a citizen of the United States and domiciled in the State of Pennsylvania. He is the brother of David M. Veverka.

1779.   Plaintiff Sandra Soliday is a citizen of the United States and domiciled in the State of Pennsylvania. She is the sister of David M. Veverka.

1780.   As a result of the attack, and the death of David M. Veverka, Plaintiffs Ronald Veverka, Carol Polley, Keith Veverka, Douglas Veverka and Sandra Soliday have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

### 42.   THE MAY 21, 2006 ATTACK – MOSUL

**The Shumate Family**

1781.   Plaintiff Shannon Shumate is a citizen of the United States and domiciled in the State of Missouri.

1782.   On May 21, 2006, Shannon Shumate, was serving as a civilian contractor in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

1783.   The weapon used to injure Mr. Shumate was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

1784.   As a result of the attack, Shannon Shumate sustained injuries to his head and back and suffered hearing loss. He also suffers from PTSD.

1785.   Mr. Shumate continues to experience pain in his back as well as ringing in his ears and hearing loss. He continues to suffer from PTSD and has flash backs when he drives at night.

1786.   As a result of the attack, and the injuries he suffered, Plaintiff Shannon Shumate has experienced severe physical and mental anguish and extreme emotional pain and suffering.

1787.   Plaintiff Lauren Shumate is a citizen of the United States and domiciled in the State of Kansas. She is the daughter of Shannon Shumate.

1788.   Plaintiff L.S., a minor, represented by her legal guardian Shannon Shumate, is a citizen of the United States and domiciled in the State of Missouri. She is the daughter of Shannon Shumate.

1789.   Plaintiff L.S., a minor, represented by his legal guardian Shannon Shumate, is a citizen of the United States and domiciled in the State of Missouri. He is the son of Shannon Shumate.

1790.   As a result of the attack, and the injuries Shannon Shumate has suffered, Plaintiffs Lauren Shumate, L.S. and L.S. have experienced severe mental anguish and extreme emotional pain and suffering.

### 43.   THE MAY 25, 2006 ATTACK – BAGHDAD

**The DiCenzo Family**

1791.   Douglas Andrew DiCenzo was a citizen of the United States and domiciled in the State of New Hampshire.

1792.   On May 25, 2006, Douglas Andrew DiCenzo, then 30, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

1793.   Douglas Andrew DiCenzo was killed in the attack.

1794.   The weapon used to kill Douglas Andrew DiCenzo was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

1795.   Plaintiff Nicole DiCenzo is a citizen of the United States and domiciled in the State of Georgia. She is the wife of Douglas Andrew DiCenzo.

1796.   Plaintiff Nicole DiCenzo brings an action individually and on behalf of the Estate of Douglas Andrew DiCenzo, as its legal representative.

1797.  Plaintiff D.D., a minor, represented by his legal guardian, Nicole DiCenzo, is a citizen of the United States and domiciled in the State of Georgia. He is the son of Douglas Andrew DiCenzo.

1798.  Plaintiff Larry DiCenzo is a citizen of the United States and domiciled in the State of Florida. He is the father of Douglas Andrew DiCenzo.

1799.  Plaintiff Kathy Crane is a citizen of the United States and domiciled in the State of New Hampshire. She is the mother of Douglas Andrew DiCenzo.

1800.  As a result of the attack, and the death of Douglas Andrew DiCenzo, Plaintiffs Nicole DiCenzo, D.D., Larry DiCenzo, and Kathy Crane have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's/son's society, companionship, comfort, advice and counsel.

**The Blair Family**

1801.  Robert Edward Blair was a citizen of the United States and domiciled in the State of Florida.

1802.  On May 25, 2006, Robert Edward Blair, then 22, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

1803.  Robert Edward Blair was killed in the attack.

1804.  The weapon used to kill Robert Edward Blair was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

1805.  Plaintiff Johnny Allen Blair is a citizen of the United States and domiciled in the State of Montana. He is the father of Robert Edward Blair.

1806.   Plaintiff Johnny Allen Blair brings an action individually and on behalf of the Estate of Robert Edward Blair, as its legal representative.

1807.   Plaintiff Charlee Blair Webb is a citizen of the United States and domiciled in the State of Florida. She is the sister of Robert Edward Blair.

1808.   As a result of the attack, and the death of Robert Edward Blair, Plaintiffs Johnny Allen Blair and Charlee Blair Webb have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## 44.     THE JUNE 5, 2006 ATTACK – BAGHDAD

### The Eastlund Family

1809.   Plaintiff Arne Eastlund is a citizen of the United States and domiciled in the State of California.

1810.   On June 5, 2006, Arne Eastlund, age 45, was serving in the U.S. military in Iraq, when his vehicle was struck by an EFP emplaced by Special Groups.

1811.   The weapon used to injure Mr. Eastlund was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

1812.   Following the attack, pieces of one of the occupants on the vehicle, Isaac Lawson, landed on Mr. Eastlund's lap.

1813.   As a result of the attack, Mr. Eastlund sustained significant injuries to his back.

1814.   He also sustained burns to his body and has suffered hearing loss.

1815.   He has undergone multiple surgeries and procedures to address the injuries to his back. He continues to seek treatment for his back and neck.

1816.   Mr. Eastlund has been diagnosed with a TBI and PTSD.

1817.   As a result of the attack, and the injuries he suffered, Plaintiff Arne Eastlund has experienced severe physical and mental anguish and extreme emotional pain and suffering.

1818.   Plaintiff Tina Eastlund is a citizen of the United States and domiciled in the State of California. She is the wife of Arne Eastlund.

1819.   Plaintiff Sven Eastlund is a citizen of the United States and domiciled in the State of California. He is the son of Arne Eastlund.

1820.   Plaintiff Taylor Eastlund is a citizen of the United States and domiciled in the State of California. She is the step-daughter of Arne Eastlund.

1821.   Plaintiff Elizabeth Jo Eastlund is a citizen of the United States and domiciled in the State of California. She is the mother of Arne Eastlund.

1822.   As a result of the attack, and the injuries Arne Eastlund suffered, Plaintiffs Tina Eastlund, Sven Eastlund, Taylor Eastlund, and Elizabeth Jo Eastlund have experienced severe mental anguish and extreme emotional pain and suffering.

**The Adamson Family**

1823.   Plaintiff Matthew Adamson is a citizen of the United States and domiciled in the State of Oklahoma.

1824.   On June 5, 2006, Matthew Adamson, age 21, was serving in the U.S. military in Iraq. He was the gunner in a vehicle traveling in the same convoy as Arne Eastlund when Arne Eastlund's vehicle was struck by an EFP emplaced by Special Groups. ("the Adamson vehicle")

1825.   As a result of the explosion, Mr. Adamson was thrown back, injuring his head.

1826.   The weapon used to injure Mr. Adamson was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

1827.   Mr. Adamson has experienced frequent and severe headaches. He also experiences memory loss.

1828.   Mr. Adamson has been diagnosed with a modified TBI.

1829.   He has also been diagnosed with PTSD.

1830.   Mr. Adamson has sought counseling and has been prescribed medication, including anti-depressants, to treat his condition.

1831.   As a result of the attack, and the injuries he suffered, Plaintiff Matthew Adamson has experienced severe physical and mental anguish and extreme emotional pain and suffering.

1832.   Plaintiff R.A., a minor represented by his legal guardian Matthew Adamson, is a citizen of the United States and domiciled in the State of Oklahoma. He is the son of Matthew Adamson.

1833.   Plaintiff Kathy Adamson is a citizen of the United States and domiciled in the State of Oklahoma. She is the mother of Matthew Adamson.

1834.   Plaintiff Richard Adamson is a citizen of the United States and domiciled in the State of Oklahoma. He is the father of Matthew Adamson.

1835.   Plaintiff Christopher Adamson is a citizen of the United States and domiciled in the State of Oklahoma. He is the brother of Matthew Adamson.

1836.   Plaintiff Jeffrey Adamson is a citizen of the United States and domiciled in the State of Oklahoma. He is the brother of Matthew Adamson.

1837.   Plaintiff Justin Adamson is a citizen of the United States and domiciled in the State of Oklahoma. He is the brother of Matthew Adamson.

1838.   As a result of the attack, and the injuries Matthew Adamson suffered, Plaintiffs R.A., Kathy Adamson, Richard Adamson, Christopher Adamson, Jeffrey Adamson, and Justin Adamson have experienced severe mental anguish and extreme emotional pain and suffering.

**The Shepard Family**

1839.   Plaintiff James Shepard is a citizen of the United States and domiciled in the State of Oklahoma.

1840.   On June 5, 2006, James Shepard, age 32, was serving in the U.S. military in Iraq. He was the Truck Commander of the Adamson vehicle, traveling in the same convoy as Arne Eastlund when Arne Eastlund's vehicle was struck by an EFP emplaced by Special Groups.

1841.   The weapon used to injure Mr. Shepard was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

1842.   Following the attack, the Adamson vehicle traveled towards the location where Arne Eastlund's vehicle had stopped.

1843.   After exiting his vehicle, James Shepard went to the vehicle and opened the door. There, he saw Isaac Lawson moving, despite the fact that there were pieces of Lawson's face or neck visible in the interior of the vehicle.

1844.   James Shepard helped remove Isaac Lawson from the vehicle.

1845.   James Shepard continues to vividly recall the attack and his actions as well as what he witnessed following the attack.

1846.   Mr. Shepard has experienced extreme survivor's guilt.

1847.   He has been diagnosed with PTSD and has sought counseling.

1848.   As a result of the attack, and the injuries he suffered, Plaintiff James Shepard has experienced severe mental anguish and extreme emotional pain and suffering.

**The Sklaney Family**

1849.   Plaintiff John P. Sklaney, III is a citizen of the United States and domiciled in the State of Oklahoma.

1850.   On June 5, 2006, John Sklaney, age 35, was serving in the U.S. military in Iraq. He was the driver of the Adamson vehicle, traveling in the same convoy as Arne Eastlund when Arne Eastlund's vehicle was struck by an EFP emplaced by Special Groups.

1851.   The weapon used to injure Mr. Sklaney was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

1852.   Following the attack, the Adamson vehicle traveled towards the location where the Arne Eastlund's vehicle had stopped.

1853.   After exiting his vehicle, John P. Sklaney, III went to Arne Eastlund's vehicle. He saw Isaac Lawson, including the fact that Isaac Lawson's leg had been severed.

1854.   Together with James Shepard, John P. Sklaney, III removed Isaac Lawson from the vehicle. Mr. Sklaney helped to place Isaac Lawson on a stretcher.

1855.   Mr. Sklaney has experienced survivor's guilt.

1856.   He has experienced memory loss and has been diagnosed with PTSD.

1857.   Mr. Sklaney has sought counseling and has been prescribed medication to treat depression.

1858.   As a result of the attack, and the injuries he suffered, Plaintiff John P. Sklaney, III has experienced severe mental anguish and extreme emotional pain and suffering.

### 45.   THE JUNE 10, 2006 ATTACK – RUSTAMIYAH

**The Friedrich Family**

1859.   Plaintiff Steven J. Friedrich is a citizen of the United States and domiciled in the State of Florida.

1860.   On June 10, 2006, then 24, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

1861.   The weapon used to injure Mr. Friedrich was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

1862.   As a result of the attack, Mr. Friedrich sustained bilateral eardrum perforations and shrapnel injuries to his left forehead, right shoulder, and right leg.

1863.   He has undergone multiple surgeries on his ears and suffers from tinnitus.

1864.   As a result of the attack, and the injuries he suffered, Plaintiff Steven J. Friedrich has experienced severe physical pain and mental anguish and extreme emotional pain and suffering.

1865.   Plaintiff A.F., a minor, represented by her legal guardian Steven J. Friedrich, is a citizen of the United States and domiciled in the State of Texas. She is the daughter of Steven J. Friedrich.

1866.   As a result of the attack, and the injuries Steven J. Friedrich suffered, Plaintiff A.F. has experienced severe mental anguish and extreme emotional pain and suffering.

46.   **THE JULY 11, 2006 ATTACK – KARBALA**

**The Derise Family**

1867.   Plaintiff Philip Alan Derise is a citizen of the United States and domiciled in the State of Washington.

1868.   On July 11, 2006, Philip Alan Derise, then 26, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near the vehicle in which he was traveling outside of Karbala.

1869.   The weapon used to injure Philip Alan Derise was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

1870.   As a result of the attack, Mr. Derise suffered a loss of hearing and eyesight.

1871.   Mr. Derise was also diagnosed with a concussion, a TBI, and PTSD.

1872.   As a result of the attack, and the injuries he suffered, Plaintiff Philip Alan Derise has experienced severe physical and mental anguish and extreme emotional pain and suffering.

47.   **THE JULY 15, 2006 ATTACK – BAGHDAD**

**The Contreras Family**

1873.   Andres J. Contreras was a citizen of the United States and domiciled in the State of California when he was killed in Iraq.

1874.   On July 15, 2006, Andres J. Contreras, aged 23, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

1875.   Andres J. Contreras was killed in the attack.

1876.   The weapon used to kill Andres J. Contreras was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

1877.   Plaintiff Norma Alicia Contreras is a citizen of the United States and domiciled in the State of California. She is the mother of Andres J. Contreras.

1878.   Plaintiff Jonathan Contreras, Sr. is a citizen of the United States and domiciled in the State of California. He is the father of Andres J. Contreras.

1879.   Plaintiff Carlos Contreras is a citizen of the United States and domiciled in the State of California. He is the brother of Andres J. Contreras.

1880.   Plaintiff Cesar Contreras is a citizen of the United States and domiciled in the State of California. He is the brother of Andres J. Contreras.

1881.   Plaintiff Hernan Contreras is a citizen of the United States and domiciled in the State of California. He is the brother of Andres J. Contreras.

1882.   Plaintiff Noel Contreras is a citizen of the United States and domiciled in the State of California. He is the brother of Andres J. Contreras.

1883.   Plaintiff Dannyel Contreras is a citizen of the United States and domiciled in the State of California. He is the brother of Andres J. Contreras.

1884.   As a result of the attack, and the death of Andres J. Contreras, Plaintiffs Norma Alicia Contreras, Jonathan Contreras, Sr., Carlos Contreras, Cesar Contreras, Hernan Contreras, Noel Contreras and Dannyel Contreras have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## 48.   THE JULY 17, 2006 ATTACK – BAGHDAD

**The Pugh Family**

1885.   Kenneth Irving Pugh was a citizen of the United States and domiciled in the State of Texas.

1886.   On July 17, 2006, Kenneth Irving Pugh, then 39, was serving in the U.S. military in Iraq when his checkpoint in southeast Baghdad came under sniper fire from JAM Special Groups.

1887.   Kenneth Irving Pugh was killed in the attack from a gunshot wound to his head.

1888.   The terror cell operatives that fired at Kenneth Irving Pugh were trained by Hezbollah and funded and armed by the IRGC-QF and they launched the attack at the direction of both Hezbollah and the IRGC-QF, as their proxy.

1889.   Plaintiff Sharon M. Pugh is a citizen of the United States and domiciled in the State of Kentucky. She is the widow of Kenneth Irving Pugh.

1890.   Plaintiff Sharon M. Pugh brings an action individually and on behalf of the Estate of Kenneth Irving Pugh, as its legal representative.

1891.   Plaintiff Britney E. Carter is a citizen of the United States and domiciled in the State of Kentucky. She is the stepdaughter of Kenneth Irving Pugh.

1892.   Plaintiff Alicia Pearson is a citizen of the United States and domiciled in the State of Kentucky. She is the stepdaughter of Kenneth Irving Pugh.

1893.   As a result of the attack, and the death of Kenneth Irving Pugh, Plaintiffs Sharon M. Pugh, Britney E. Carter, and Alicia Pearson have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice and counsel.

## 49.   THE JULY 22, 2006 ATTACK – SADR CITY

**The Evans Family**

1894.   Plaintiff Daniel J. Evans is a citizen of the United States and domiciled in the State of Texas.

1895.   On July 22, 2006, Daniel J. Evans, then19, was serving in the U.S. military in Iraq. He was riding in the second vehicle of a four-vehicle convoy in the north-bound lane of Route Pluto en route to providing assistance to another unit involved in a previous IED attack in the vicinity of Sadr City when the M1114 vehicle in which he was riding in the rear passenger-side seat was hit by an EFP emplaced by Special Groups from the right side of the vehicle.

1896.   The weapon used to injure Daniel J. Evans was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

1897.   As a result of the attack, Daniel P. Evans sustained a TBI having been rendered unconscious from the blast for approximately 16 hours. He also suffered from a collapsed left lung and injuries to his left shoulder. He was also diagnosed with PTSD.

1898.   As a result of the attack, and the injuries he suffered, Plaintiff Daniel J. Evans has experienced severe physical and mental anguish and extreme emotional pain and suffering.

1899.   Plaintiff Justin Evans is a citizen of the United States and domiciled in the State of North Carolina. He is the brother of Daniel J. Evans.

1900.   As a result of the attack, and the injuries Daniel J. Evans suffered, Plaintiff Justin Evans has experienced severe mental anguish and extreme emotional pain and suffering.

50.    **THE JULY 25, 2006 ATTACK – BAGHDAD**

**The Graves Family**

1901.   Joseph A. Graves was a citizen of the United States and domiciled in the State of California when he was killed in Iraq.

1902.   On July 25, 2006, Joseph A. Graves, aged 21, was serving in the U.S. military in Iraq when the convoy he was travelling came under RPG and small arms fire from JAM Special Groups operatives.

1903.   Joseph A. Graves was killed in the attack.

1904.   Joseph A. Graves was killed in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

1905.   Plaintiff Kevin Graves is a citizen of the United States and domiciled in the State of California. He is the father of Joseph A. Graves.

1906.   As a result of the attack, and the death of Joseph A. Graves, Plaintiff Kevin Graves has experienced severe mental anguish, extreme emotional pain and suffering, and loss of his son's society, companionship, comfort, advice and counsel.

51.    **THE AUGUST 26, 2008 ATTACK – SADR CITY**

**The Koulchar Family**

1907.   Plaintiff Nicholas Gene Koulchar is a citizen of the United States and domiciled in the State of Michigan.

1908.   On August 26, 2008, Nicholas Gene Koulchar, then 26, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle. Nicholas Gene Koulchar was the gunner in an RG-33 armored vehicle that was the lead vehicle in a convoy conducting route-clearing in the vicinity of Route Grizzlies and Route Gold in Sadr City. Nicholas

Gene Koulchar's vehicle was struck by an EFP that had been mounted at a height of 86 inches in a shack near the side of the road.

1909.   The weapon used to injure Nicholas Gene Koulchar was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

1910.   As a result of the attack, Mr. Koulchar sustained traumatic bilateral above-knee amputations, scarring on his lower body and back, genital trauma, facial scars, ulnar neuropathy and dysesthesia in his right hand, tinnitus, and PTSD. He was transported to a Medical Aid Station in Sadr City and then to central Baghdad where he was stabilized following multiple surgeries and then airlifted to Landstuhl, Germany and then to Walter Reed Army Medical Center in Washington, DC.

1911.   Nicholas Gene Koulchar has received extensive medical treatment at various hospitals including various surgeries and prosthetic fittings where he has spent years in treatment.

1912.   As a result of the attack, and the injuries he suffered, Nicholas Gene Koulchar has experienced severe physical and mental anguish and extreme emotional pain and suffering.

1913.   Plaintiff Michael Koulchar is a citizen of the United States and domiciled in the State of Michigan. He is the brother of Nicholas Gene Koulchar.

1914.   As a result of the attack, and the injuries Nicholas Gene Koulchar suffered, Plaintiff Michael Koulchar has experienced severe mental anguish and extreme emotional pain and suffering.

### 52.     THE AUGUST 26, 2006 ATTACK – JISR DIYALA

**The Zayas Family**

1915.   Edgardo Zayas was a citizen of the United States and domiciled in the State of Massachusetts.

1916.   On August 26, 2006, Edgardo Zayas, then 30, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle. Edgardo Zayas was in a five-vehicle convoy with and was serving as the driver in the lead M1114 in the convoy.

1917.   Edgardo Zayas was killed in the attack.

1918.   The weapon used to injure Edgardo Zayas was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

1919.   Plaintiff Suheil Campbell is a citizen of the United States and domiciled in the State of Massachusetts. She is the widow of Edgardo Zayas.

1920.   Plaintiff Suheil Campbell brings an action individually and on behalf of the Estate of Edgardo Zayas, as its legal representative.

1921.   Plaintiff Alexander Zayas is a citizen of the United States and domiciled in the State of Massachusetts. He is the son of Edgardo Zayas.

1922.   Plaintiff A.Z., a minor, represented by her legal guardian Suheil Campbell, is a citizen of the United States and domiciled in the State of Massachusetts. She is the daughter of Edgardo Zayas.

1923.   As a result of the attack, and the death of Edgardo Zayas, Plaintiffs Suheil Campbell, Alexander Zayas, and A.Z. have experienced severe mental anguish, extreme emotional

pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice and counsel.

### 53.   THE SEPTEMBER 3, 2006 ATTACK – BAGHDAD

**The Andino Family**

1924.   Edwin A. Andino, Jr. was a citizen of the United States and domiciled in the State of Virginia when he was killed in Iraq.

1925.   On September 3, 2006, Edwin A. Andino, Jr., aged 23, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

1926.   Edwin A. Andino, Jr. was killed in the attack.

1927.   The weapon used to kill Edwin A. Andino, Jr. was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

1928.   Plaintiff Cathy Andino is a citizen of the United States and domiciled in the State of Virginia. She is the mother of Edwin A. Andino, Jr.

1929.   Plaintiff Cathy Andino brings an action individually and on behalf of the Estate of Edwin A. Andino, Jr., as its legal representative.

1930.   As a result of the attack, and the death of Edwin A. Andino, Jr., Plaintiff Cathy Andino has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her son's society, companionship, comfort, advice and counsel.

### 54.   THE SEPTEMBER 20, 2006 ATTACK – BAGHDAD

**The Puertas Family**

1931.   Plaintiff Luis Junior Puertas is a citizen of the United States and domiciled in the State of Florida.

1932.   On September 20, 2006, Luis Junior Puertas, then 20, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle. He was the driver of the lead vehicle in a four-vehicle convoy traveling north on Route Gold adjacent to the Khansa neighborhood in the eastern portion of Baghdad when a multiple-array EFP planted inside the bottom of a newly constructed light pole detonated next to the vehicle.

1933.   The weapon used to injure Luis Junior Puertas was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

1934.   As a result of the attack, Mr. Puertas lost his left foot as a result of a penetrator entering the vehicle and sustained significant damage to his right leg as well. He underwent above-the-knee amputations on both legs as a result of the damages inflicted by the EFP. He also sustained a loss of equilibrium due to damage sustained to his ears.

1935.   Mr. Puertas has received extensive medical treatment at various hospitals including various surgeries and prosthetic fittings where he has spent months in treatment.

1936.   As a result of the attack, and the injuries he suffered, Plaintiff Luis Junior Puertas has experienced severe physical and mental anguish and extreme emotional pain and suffering.

1937.   Plaintiff Lidia Sullivan is a citizen of the United States and domiciled in the State of Florida. She is the mother of Luis Junior Puertas.

1938.   Plaintiff Gabriela D. Puertas Vergara-Donoso is a citizen of the United States and domiciled in the State of Florida. She is the sister of Luis Junior Puertas.

1939.   As a result of the attack, and the injuries Luis Junior Puertas suffered, Plaintiffs Lidia Sullivan and Gabriela D. Puertas Vergara-Donoso have experienced severe mental anguish and extreme emotional pain and suffering.

## 55.    THE SEPTEMBER 30, 2006 ATTACK – BAGHDAD

**The Melendez Family**

1940.   Plaintiff Christopher Michael Melendez is a citizen of the United States and domiciled in the State of Florida.

1941.   On September 30, 2006, Christopher Michael Melendez, then 19 years, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle. Christopher Michael Melendez was a gunner in an M1114 vehicle on a routine patrol on Route Florida in the Mashtal neighborhood of Baghdad when his vehicle was disabled by a direct hit from an EFP on the driver's side of the vehicle.

1942.   The weapon used to injure Christopher Michael Melendez was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

1943.   As a result of the attack, Mr. Melendez's left leg was amputated above the knee, he sustained a TBI, an injury to his brachial plexus causing weakness in his dominant hand, tinnitus, jaw fractures, post-traumatic headaches, facial and hand nerve damage, disfiguring head and facial scarring, burns, and additional shrapnel injuries.

1944.   Mr. Melendez has received extensive medical treatment at various hospitals including various surgeries and prosthetic fittings where he has spent months in treatment.

1945.   As a result of the attack, and the injuries he suffered, Plaintiff Christopher Michael Melendez has experienced severe physical and mental anguish and extreme emotional pain and suffering.

1946.   Plaintiff Narciso Melendez is a citizen of the United States and domiciled in the State of New York. He is the father of Christopher Michael Melendez.

1947.   Plaintiff Christina Melendez is a citizen of the United States and domiciled in the State of Georgia. She is the sister of Christopher Michael Melendez.

1948.   As a result of the attack, and the injuries Christopher Michael Melendez suffered, Plaintiffs Narciso Melendez and Christina Melendez have experienced severe mental anguish and extreme emotional pain and suffering.

## 56.   THE OCTOBER 4, 2006 ATTACK – BAGHDAD

### The Barattieri Family

1949.   Guy Barattieri was a citizen of the United States and domiciled in the State of Washington when he was killed in Iraq.

1950.   On October 4, 2006, Guy Barattieri, aged 36, was serving as a civilian contractor with Falcon Security in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

1951.   Guy Barattieri was killed in the attack.

1952.   The weapon used to kill Guy Barattieri was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

1953.   Plaintiff Laurel Barattieri is a citizen of the United States and domiciled in the State of Washington. She is the widow of Guy Barattieri.

1954.   Plaintiff Laurel Barattieri brings an action individually and on behalf of the Estate of Guy Barattieri, as its legal representative.

1955.   Plaintiff Patricia Wheatley is a citizen of the United States and domiciled in the State of Ohio. She is the mother of Guy Barattieri.

1956.   Plaintiff Rebecca Barattieri is a citizen of the United States and domiciled in the State of Washington. She is the sister of Guy Barattieri.

1957.   Plaintiff Nicole Barattieri is a citizen of the United States and domiciled in the State of Kentucky. She is the sister of Guy Barattieri.

1958.   Plaintiff Gina Tesnar is a citizen of the United States and domiciled in the State of Kentucky. She is the sister of Guy Barattieri.

1959.   As a result of the attack, and the death of Guy Barattieri, Plaintiffs Laurel Barattieri, Patricia Wheatley, Rebecca Barattieri, Nicole Barattieri and Gina Tesnar have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/son's/brother's society, companionship, comfort, advice and counsel.

## 57.   THE OCTOBER 13, 2006 ATTACK – BAGHDAD

### The Stanton Family

1960.   Kenny Frances Stanton, Jr. was a citizen of the United States and domiciled in the State of California.

1961.   On October 13, 2006, Kenny Frances Stanton, Jr., then 20, was serving in the U.S. military in Iraq when his unit was struck by an IED emplaced by JAM Special Groups terror operatives in the Sholeh neighborhood in northwest Baghdad.

1962.   Kenny Frances Stanton, Jr. was killed in the attack.

1963.   Kenny Frances Stanton, Jr. was killed in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

1964.   Plaintiff Gloria L. Magana is a citizen of the United States and domiciled in the State of California. She is the mother of Kenny Frances Stanton, Jr.

1965.   Plaintiff Gloria L. Magana brings an action individually and on behalf of the Estate of Kenny Frances Stanton, Jr., as its legal representative.

1966.   Plaintiff Mario Stanton is a citizen of the United States and domiciled in the State of California. He is the brother of Kenny Frances Stanton, Jr.

1967.   Plaintiff Brandie Stanton is a citizen of the United States and domiciled in the State of California. She is the sister of Kenny Frances Stanton, Jr.

1968.   Plaintiff Terrymarie Stanton is a citizen of the United States and domiciled in the State of California. She is the sister of Kenny Frances Stanton, Jr.

1969.   As a result of the attack, and the death of Kenny Frances Stanton, Jr., Plaintiffs Gloria L. Magana, Mario Stanton, Brandie Stanton, and Terrymarie Stanton have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## 58.    THE OCTOBER 17, 2006 ATTACK – BAQUBAH

**The Haupt Family**

1970.   Ryan Haupt was a citizen of the United States and domiciled in the State of Arizona when he was killed in Iraq.

1971.   On October 17, 2006, Ryan Haupt, aged 24, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

1972.   Ryan Haupt was killed in the attack.

1973.   The weapon used to kill Ryan Haupt was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

1974.   Plaintiff Nannette Bryne-Haupt is a citizen of the United States and domiciled in the State of Colorado. She is the widow of Ryan Haupt.

1975.  Lynn Forehand is a citizen of the United States and domiciled in the State of

Tennessee. She is the mother of Ryan Haupt.

1976.   Lynn Forehand brings an action on behalf of the Estate of Ryan Haupt, as its legal representative, for his death and any suffering and/ or economic loss he/his Estate sustained as a result of the attack.

1977.   As a result of the attack, and the death of Ryan Haupt, Plaintiff Nannette Bryne-Haupt has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her husband's society, companionship, comfort, advice and counsel.

## 59.   THE OCTOBER 20, 2006 ATTACK – BAGHDAD

**The Witte Family**

1978.   Kevin M. Witte was a citizen of the United States and domiciled in the State of Oregon when he was killed in Iraq.

1979.   On October 20, 2006, Kevin M. Witte, aged 27, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

1980.   Kevin M. Witte was killed in the attack.

1981.   The weapon used to kill Kevin M. Witte was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

1982.   Plaintiff William Witte is a citizen of the United States and domiciled in the State of Oregon. He is the brother of Kevin M. Witte.

1983.   Plaintiff William Witte brings an action individually and on behalf of the Estate of Kevin M. Witte, as its legal representative.

1984.   As a result of the attack, and the death of Kevin M. Witte, Plaintiff William Witte has experienced severe mental anguish, extreme emotional pain and suffering, and loss of his brother's society, companionship, comfort, advice and counsel.

### 60.   THE OCTOBER 22, 2006 ATTACK – BAGHDAD

**The Mock Family**

1985.   Willsun Mock was a citizen of the United States and domiciled in the State of Kansas when he was killed in Iraq.

1986.   On October 22, 2006, Willsun Mock, aged 23, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

1987.   Willsun Mock was killed in the attack.

1988.   The weapon used to kill Willsun Mock was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

1989.   Plaintiff Michael Mock is a citizen of the United States and domiciled in the State of Kansas. He is the father of Willsun Mock.

1990.   Plaintiff Tammy Dorsey is a citizen of the United States and domiciled in the State of Kansas. She is the sister of Willsun Mock.

1991.   Plaintiff Eric Phye is a citizen of the United States and domiciled in the State of Arizona. He is the brother of Willsun Mock.

1992.   As a result of the attack, and the death of Willsun Mock, Plaintiffs Michael Mock, Tammy Dorsey and Eric Phye have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

**The Gmachowski Family**

1993.   Plaintiff James Gmachowski is a citizen of the United States and domiciled in the State of California.

1994.   On October 22, 2006, James Gmachowski, then 19, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near the vehicle.

1995.   The weapon used to injure James Gmachowski was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

1996.   As a result of the blast, a golf-ball-sized piece of copper was lodged in James Gmachowski back which required invasive surgery to remove. The wound took roughly five months to heal. Mr. Gmachowski was also diagnosed with a TBI and PTSD.

1997.   As a result of the attack, and the injuries he suffered, Plaintiff James Gmachowski has experienced severe physical and mental anguish and extreme emotional pain and suffering.

**61.    THE OCTOBER 22, 2006 ATTACK – BAGHDAD**

**The Brian Family**

1998.   Brian Brian was a citizen of the United States and domiciled in the State of Arkansas when he was killed in Iraq.

1999.   On October 22, 2006, Brian Brian, then 58, was serving as a civilian contractor for DynCorp International in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2000.   The weapon used to kill Brian Brian was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2001.   Plaintiff Constance Brian is a citizen of the United States and domiciled in the State of Arkansas. She is the widow of Brian Brian.

2002.   Plaintiff Constance Brian brings an action individually and on behalf of the Estate of Brian Brian, as its legal representative.

2003.   Plaintiff Amber Hensley is a citizen of the United States and domiciled in the State of North Dakota. She is the daughter of Brian Brian.

2004.   As a result of the attack, and the death of Brian Brian, Plaintiffs Constance Brian and Amber Hensley experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice and counsel.

## 62.   THE OCTOBER 22, 2006 ATTACK – BAGHDAD

**The Alabsawi Family**

2005.   Plaintiff Karar Alabsawi is a citizen of the United States and domiciled in the State of Pennsylvania.

2006.   On October 22, 2006, Karar Alabsawi was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2007.   The weapon used to injure Karar Alabsawi was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2008.   As a result of the attack, Mr. Alabsawi lost his left leg. He also suffered significant injuries to his left arm which he is unable to use as well as shrapnel wounds and burns on his body.

2009.   As a result of the attack, and the injuries he suffered, Plaintiff Karar Alabsawi has experienced severe physical and mental anguish and extreme emotional pain and suffering.

**The Taylor Family**

2010.   David G. Taylor was a citizen of the United States and domiciled in the State of North Carolina when he was killed in Iraq.

2011.   On October 22, 2006, David G. Taylor, aged 37, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2012.   David G. Taylor was killed in the attack.

2013.   The weapon used to kill David G. Taylor was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2014.   Plaintiff Michelle Taylor is a citizen of the United States and domiciled in the State of Florida. She is the widow of David G. Taylor.

2015.   Plaintiff Michelle Taylor brings an action individually and on behalf of the Estate of David G. Taylor as its legal representative.

2016.   Plaintiff J.T., a minor represented by his legal guardian, Michelle Taylor, is a citizen of the United States and domiciled in the State of Florida. He is the son of David G. Taylor.

2017.   Plaintiff Phyllis Taylor is a citizen of the United States and domiciled in the State of Florida. She is the mother of David G. Taylor.

2018.   Plaintiff John Taylor is a citizen of the United States. He is the brother of David G. Taylor.

2019.   As a result of the attack, and the death of David G. Taylor, Plaintiffs Michelle Taylor, J.T., Phyllis Taylor and John Taylor have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's/son's/brother's society, companionship, comfort, advice and counsel.

**The Taylor Family**

2020.   Plaintiff Brian G. Taylor is a citizen of the United States and domiciled in the State of Florida.

2021.   On October 22, 2006, Brian G. Taylor was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2022.   The weapon used to injure Brian G. Taylor was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2023.   As a result of the attack, Mr. Taylor lost his right leg. He also suffered injuries to his right thigh, loss of muscle, skin and part of his femur, a dislocated knee, a damaged femoral artery, and compartment syndrome.

2024.   As a result of the attack, and the injuries he suffered, Plaintiff Brian G. Taylor has experienced severe physical and mental anguish and extreme emotional pain and suffering.

**The Recendez Family**

2025.   Plaintiff Judas Recendez is a citizen of the United States and domiciled in the State of California.

2026.   On October 22, 2006, Judas Recendez was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2027.   The weapon used to injure Mr. Recendez was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2028.   As a result of the attack, both of Mr. Recendez's legs were amputated below the knee. He also sustained shrapnel injuries to the lower part of his body from the waist down, hearing

and vision damage, and nerve damage in his left hand.

2029.   As a result of the attack, and the injuries he suffered, Plaintiff Judas Recendez has experienced severe physical and mental anguish and extreme emotional pain and suffering.

### 63.   THE OCTOBER 22, 2006 ATTACK – SADR CITY

**The Norager Family**

2030.   Plaintiff Tyler Norager is a citizen of the United States and domiciled in the State of Utah.

2031.   On October 22, 2006, Tyler Norager was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2032.   The weapon used to injure Mr. Norager was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2033.   As a result of the attack, Mr. Norager sustained shrapnel wounds to the face, the right side of his body, and the top of his spine. His injuries have caused him long-term, permanent back pain.

2034.   As a result of the attack, and the injuries he suffered, Plaintiff Tyler Norager has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2035.   Plaintiff Shalee Norager is a citizen of the United States and domiciled in the State of Utah. She is the wife of Tyler Norager.

2036.   Plaintiff M.N., a minor resented by her legal guardian, Tyler Norager, is a citizen of the United States and domiciled in the State of Utah.

2037.   As a result of the attack, and the injuries suffered by Tyler Norager, Plaintiffs Shalee Norager and M.N. have experienced severe mental anguish, and extreme emotional pain

and suffering.

### 64.    THE NOVEMBER 2, 2006 ATTACK – BAGHDAD

**The Kruger Family**

2038.   Eric Kruger was a citizen of the United States and domiciled in the State of Texas when he was killed in Iraq.

2039.   On November 2, 2006, Eric Kruger, aged 44, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2040.   Eric Kruger was killed in the attack.

2041.   The weapon used to kill Eric Kruger was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2042.   Lawrence Kruger is a citizen of the United States and domiciled in the State of Texas. He is the father of Eric Kruger.

2043.   Lawrence Kruger brings an action on behalf of the Estate of Eric Kruger, as its legal representative, for his death and any suffering and/ or economic loss he/his Estate sustained as a result of the attack.

2044.   Plaintiff C.K., a minor represented by her conservator, Lawrence Kruger, is a citizen of the United States and domiciled in the State of Colorado. She is the daughter on Eric Kruger.

2045.   Plaintiff E.K., a minor represented by her conservator, Lawrence Kruger, is a citizen of the United States and domiciled in the State of Colorado. She is the daughter on Eric Kruger.

2046.   As a result of the attack, and the death of Eric Kruger, Plaintiffs C.K. and E.K. have

experienced severe mental anguish, extreme emotional pain and suffering, and loss of their father's society, companionship, comfort, advice and counsel.

**The Finken Family**

2047.   Paul Finken was a citizen of the United States and domiciled in the State of Iowa when he was killed in Iraq.

2048.   On November 2, 2006, Paul Finken, aged 40, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2049.   Paul Finken was killed in the attack.

2050.   The weapon used to kill Paul Finken was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2051.   Plaintiff Jackie Farrar-Finken is a citizen of the United States and domiciled in the State of Virginia. She is the widow of Paul Finken.

2052.   Plaintiff Jackie Farrar-Finken brings an action individually and on behalf of the Estate of Paul Finken, as its legal representative.

2053.   Plaintiff Emilie Finken is a citizen of the United States and domiciled in the State of Virginia. She is the daughter of Paul Finken.

2054.   Plaintiff C.F., a minor represented by her legal guardian, Jackie Farrar-Finken, is a citizen of the United States and domiciled in the State of Virginia. She is the daughter of Paul Finken.

2055.   Plaintiff J.F., a minor represented by her legal guardian, Jackie Farrar-Finken, is a citizen of the United States and domiciled in the State of Virginia. She is the daughter of Paul Finken.

2056.   Plaintiff Stephen Finken is a citizen of the United States and domiciled in the State of Iowa. He is the brother of Paul Finken.

2057.   Plaintiff Alan Finken is a citizen of the United States and domiciled in the State of Colorado. He is the brother of Paul Finken.

2058.   Plaintiff Richard Finken is a citizen of the United States and domiciled in the State of Iowa. He is the brother of Paul Finken.

2059.   Plaintiff David Finken is a citizen of the United States and domiciled in the State of Iowa. He is the brother of Paul Finken.

2060.   Plaintiff Mark Finken is a citizen of the United States and domiciled in the State of Iowa. He is the brother of Paul Finken.

2061.   Plaintiff Peter Finken is a citizen of the United States and domiciled in the State of Connecticut. He is the brother of Paul Finken.

2062.   Plaintiff Jean Pruitt is a citizen of the United States and domiciled in the State of Iowa. She is the sister of Paul Finken.

2063.   Plaintiff Joan Henscheid is a citizen of the United States and domiciled in the State of Iowa. She is the sister of Paul Finken.

2064.   As a result of the attack, and the death of Paul Finken, Jackie Farrar-Finken, Emilie Finken, C.F., J.F., Stephen Finken, Alan Finken, Richard Finken, David Finken, Mark Finken, Peter Finken, Jean Pruitt and Joan Henscheid have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's/brother's society, companionship, comfort, advice and counsel.

### 65. THE NOVEMBER 9, 2006 ATTACK – BAGHDAD

**The McCoy Family**

2065.  Gregory McCoy was a citizen of the United States and domiciled in the State of Michigan when he was killed in Iraq.

2066.  On November 2, 2006, Gregory McCoy, aged 26, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2067.  Gregory McCoy was killed in the attack.

2068.  The weapon used to kill Gregory McCoy was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2069.  Plaintiff Lori Ann McCoy is a citizen of the United States and domiciled in the State of Colorado. She is the widow of Gregory McCoy.

2070.  Plaintiff Lori Ann McCoy brings an action individually and on behalf of the Estate of Gregory McCoy, as its legal representative.

2071.  Plaintiff L.M., a minor represented by his legal guardian, Lori Ann McCoy, is a citizen of the United States and domiciled in the State of Colorado. He is the son of Gregory McCoy.

2072.  Plaintiff T.M., a minor represented by his legal guardian, Lori Ann McCoy, is a citizen of the United States and domiciled in the State of Colorado. He is the son of Gregory McCoy.

2073.  As a result of the attack, and the death of Gregory McCoy, Lori Ann McCoy, L.M. and T.M. have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice and counsel.

**The Cox Family**

2074.   Plaintiff Glenn Michael Cox is a citizen of the United States and domiciled in the State of Florida.

2075.   On November 9, 2006, Glenn Michael Cox, then 45, was serving as a civilian contractor for DynCorp International in Iraq when an EFP emplaced by Special Groups detonated near the vehicle in which he was traveling in Baghdad.

2076.   The weapon used to injure Glenn Michael Cox was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2077.   As a result of the attack, Mr. Cox received multiple shrapnel injuries to his right side.

2078.   Mr. Cox's right ulna was shattered, as were most of the bones in his right hand.  As a result, Mr. Cox has an artificial knuckle in his right hand.  Shrapnel severed a nerve in his right forearm, and he still has a large amount of scarring on his arm and hand.

2079.   Mr. Cox also suffers from hearing loss as a result of the attack.

2080.   As a result of the attack, and the injuries he suffered, Plaintiff Glenn Michael Cox has experienced severe physical and mental anguish and extreme emotional pain and suffering.

**66.   THE NOVEMBER 13, 2006 ATTACK – BAGHDAD**

**The Lamb Family**

2081.   Plaintiff Kurtiss Lamb is a citizen of the United States and domiciled in the State of Tennessee.

2082.   On November 13, 2006, Kurtiss Lamb, then 24, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near the vehicle.

2083.   The weapon used to injure Kurtiss Lamb was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2084.   As a result of the blast, Kurtiss Lamb suffered partial paralysis to his arm and bulging disks in his lumbar spine. Mr. Lamb was also diagnosed with a TBI.

2085.   As a result of the attack, and the injuries he suffered, Plaintiff Kurtiss Lamb has experienced severe physical and mental anguish and extreme emotional pain and suffering.

### 67.   THE NOVEMBER 16, 2006 ATTACK – BASRA

**The Coté Family**

2086.   Jonathon M. Coté was a citizen of the United States and domiciled in the State of New York, when he was kidnapped and killed in Iraq.

2087.   On November 16, 2006, Jonathon Coté was serving as a civilian contractor for Crescent Security near Basra, Iraq when he was kidnapped, held hostage, tortured, and ultimately murdered by JAM Special Groups.

2088.   Mr. Coté's remains were mutilated after he was executed. On April 23, 2008, the FBI announced that it had identified the remains of Mr. Coté – which were recovered four days prior – and made arrangements to return Mr. Coté's remains to his family.

2089.   Jonathon M. Coté was killed in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

2090.   Plaintiff Francis L. Coté is a citizen of the United States and domiciled in the State of New York. He is the father of Jonathon Coté.

2091.   Plaintiff Nancy Coté is a citizen of the United States and domiciled in the State of New York. She is the step-mother of Jonathon Coté.

2092.   Plaintiff Christopher Coté is a citizen of the United States and domiciled in the State of New York. He is the brother of Jonathon Coté.

2093.   Plaintiff Samantha Dunford is a citizen of the United States and domiciled in the State of New York. She is the step-sister of Jonathon Coté.

2094.   Plaintiff Maximillian Shroyer is a citizen of the United States and domiciled in the Ohio. He is the step-brother of Jonathon Coté.

2095.   As a result of the November 16, 2006 attack, and the subsequent kidnapping and execution of Jonathon Coté, Plaintiffs Francis L. Coté, Nancy Coté, Christopher Coté, Samantha Dunford and Maxilillian Shroyer have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

**The Johnson-Reuben Family**

2096.   Paul Johnson-Reuben was a citizen of the United States and domiciled in the State of Minnesota, when he was kidnapped and killed in Iraq.

2097.   On November 16, 2006, Paul Johnson-Reuben was serving as a civilian contractor for Crescent Security near Basra, Iraq when he was kidnapped, held hostage, tortured, and ultimately murdered by JAM Special Groups.

2098.   Mr. Johnson-Reuben's remains were mutilated after he was executed. In April 2008, Mr. Johnson-Reuben's remains were returned to his family.

2099.   Paul Johnson-Reuben was killed in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

2100.   Plaintiff Casey Reuben a citizen of the United States and domiciled in the State of Minnesota. She is the daughter of Paul Johnson-Reuben.

2101.   Plaintiff Bree Reuben a citizen of the United States and domiciled in the State of Minnesota. She is the daughter of Paul Johnson-Reuben.

2102.   Plaintiff Patrick Reuben a citizen of the United States and domiciled in the State of Wisconsin. He is the twin brother of Paul Johnson-Reuben.

2103.   As a result of the attack, and the death of Paul Johnson-Reuben, Plaintiffs Casey Reuben, Bree Reuben and Patrick Reuben have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their father's/brother's society, companionship, comfort, advice and counsel.

**The Munns Family**

2104.   Joshua Munns was a citizen of the United States and domiciled in the State of California, when he was kidnapped and killed in Iraq.

2105.   On November 16, 2006, Joshua Munns was serving as a civilian contractor for Crescent Security near Basra, Iraq when he was kidnapped, held hostage, tortured, and ultimately murdered by JAM Special Groups.

2106.   Mr. Munn's remains were mutilated after he was executed. In April 2008, Mr. Munn's remains were returned to his family.

2107.   Joshua Munns was killed in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

2108.   Plaintiff Jackie Stewart is a citizen of the United States and domiciled in the State of California. She is the mother of Joshua Munns.

2109.   Plaintiff Mark Munns is a citizen of the United States and domiciled in the State of California. He is the father of Joshua Munns.

2110.   Plaintiff Crista Munns is a citizen of the United States and domiciled in the State of California. She is the step-mother of Joshua Munns.

2111.   As a result of the attack, and the death of Joshua Munns, Plaintiffs Jackie Stewart, Mark Munns and Crista Munns have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's society, companionship, comfort, advice and counsel.

**The Young Family**

2112.   John Young was a citizen of the United States and domiciled in the State of Missouri, when he was kidnapped and killed in Iraq.

2113.   On November 16, 2006, John Young, aged 44, was serving as a civilian contractor for Crescent Security near Basra, Iraq when he was kidnapped, held hostage, tortured, and ultimately murdered by JAM Special Groups.

2114.   Mr. Young's remains were mutilated after he was executed. In March 2008, Mr. Young's remains were returned to his family.

2115.   John Young was killed in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

2116.   Plaintiff Sharon DeBrabander is a citizen of the United States and domiciled in the State of Arizona. She is the mother of John Young.

2117.   Plaintiff Dennis DeBrabander is a citizen of the United States and domiciled in the State of Arizona. He is the step-father of John Young.

2118.   Plaintiff Nicole DeBrabander is a citizen of the United States and domiciled in the State of Arizona. She is the sister of John Young.

2119.   Plaintiff Joella Pratt is a citizen of the United States and domiciled in the State of Missouri. She is the sister of John Young.

2120.   As a result of the attack, and the death of John Young, Plaintiffs Sharon DeBrabander, Dennis DeBrabander, Nicole DeBrabander and Joella Pratt have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

**68.    THE DECEMBER 3, 2006 ATTACK – BAGHDAD**

**The Starkey Family**

2121.   Plaintiff Joshua Starkey is a citizen of the United States and domiciled in the State of Georgia.

2122.   On December 3, 2006, Joshua Starkey, then 23, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2123.   The weapon used to injure Joshua Starkey was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2124.   As a result of the attack, shrapnel impacted Joshua Starkey's body on his right shoulder and right side of his face. He also sustained burns to his face and shoulder.

2125.   Joshua Starkey has been diagnosed with PTSD.  He has sought out counseling and has been prescribed medication to address related issues.

2126.   As a result of the attack, and the injuries he suffered, Plaintiff Joshua Starkey has experienced severe physical and mental anguish and extreme emotional pain and suffering.

**69.    THE DECEMBER 4, 2006 ATTACK – BAGHDAD**

**The Hinson Family**

2127.   Plaintiff Brent Hinson is a citizen of the United States and domiciled in the State of Florida.

2128.   On December 4, 2006, Brent Hinson, then 19, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2129.   The weapon used to injure Brent Hinson was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2130.   As a result of the attack, Brent Hinson suffered shrapnel injuries and was unable to walk for two weeks following the attack. He also required physical therapy.

2131.   As a result of the attack, and the injuries he suffered, Plaintiff Brent Hinson has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2132.   Plaintiff William Hinson is a citizen of the United States and domiciled in the State of Florida. He is the father of Brent Hinson.

2133.   Plaintiff Fran Hinson is a citizen of the United States and domiciled in the State of Florida. She is the mother of Brent Hinson.

2134.   Plaintiff Hilary Westerberg is a citizen of the United States and domiciled in the State of New Hampshire. She is the sister of Brent Hinson.

2135.   As a result of the attack, and the injuries suffered by Brent Hinson, Plaintiffs William Hinson, Fran Hinson and Hilary Westerberg have experienced severe mental anguish, and extreme emotional pain and suffering.

## 70.   THE DECEMBER 20, 2006 ATTACK – BAGHDAD

**The Little Family**

2136.   Plaintiff William Ronald Little is a citizen of the United States and domiciled in the State of Florida.

2137.   On December 20, 2006, William Ronald Little, then 43, and a former soldier in the U.S. military, was serving as a civilian contractor in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2138.   Mr. Little was injured in the attack.

2139.   The weapon used to injure Mr. Little was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2140.   As a result of the attack, Mr. Little sustained shrapnel to his right eye socket necessitating the placement of a metal plate under his right eye. Shrapnel also impacted the right side of his face and his arm.

2141.   He lost a portion of muscle tissue in his back and shoulder area and part of his right tricep muscle was detached. He no longer has full range of motion in his right arm.

2142.   He sustained nerve damage to his right cheek, sinus area, and his upper lip.  He has undergone rhinoplasty and other procedures to address the injuries to these areas.

2143.   As a result of the attack, and the injuries he suffered, Plaintiff William Ronald Little has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2144.   Plaintiff Brenda Little is a citizen of the United States and domiciled in the State of Florida. She is the wife of William Ronald Little.

2145.   Plaintiff Kira Sikes is a citizen of the United States and domiciled in the State of Florida. She is the daughter of William Ronald Little and Brenda Little.

2146.   Plaintiff William Ronald Little, Jr. is a citizen of the United States and domiciled in the State of Florida. He is the son of William Ronald Little and Brenda Little.

2147.   Brenda Little brings this action individually and on behalf of William Ronald Little, Jr. as his power of attorney.

2148.   As a result of the attack, and the injuries William Ronald Little has suffered, Plaintiffs Brenda Little, Kira Sikes and William Ronald Little, Jr. have experienced severe mental anguish, and extreme emotional pain and suffering.

**The Denman Family**

2149.   Plaintiff Joshua Denman is a citizen of the United States and domiciled in the State of Florida.

2150.   On December 20, 2008, Joshua Denman, then 21, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2151.   Joshua Denman was injured in the attack.

2152.   The weapon used to injure Joshua Denman was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2153.   As a result of the attack, Plaintiff Joshua Denman sustained shrapnel in his right arm and right hand.  He has undergone surgery and procedures to address the removal of shrapnel and scar tissue.

2154.   As a result of the attack, and the injuries he suffered, Plaintiff Joshua Denman has experienced physical and mental anguish and extreme emotional pain and suffering.

**71.   THE DECEMBER 22, 2006 ATTACK – BAGHDAD**

**The Nantz Family**

2155.   Plaintiff Randolph Delbert Nantz is a citizen of the United States and domiciled in the State of Texas.

2156.   On December 22, 2006, Randolph Delbert Nantz, then 38, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2157.   The weapon used to injure Randolph Delbert Nantz was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2158.   As a result of the blast, Randolph Delbert Nantz suffered serious injuries, including nerve damage, burns on 23% of his body, and the amputation of his left leg below the knee.

2159.   As a result of the attack, and the injuries he suffered, Plaintiff Randolph Delbert Nantz has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2160.   Plaintiff Joshua Ryan Nantz is a citizen of the United States and domiciled in the State of Texas. He is the son of Randolph Delbert Nantz.

2161.   As a result of the attack, and the injuries suffered by Randolph Delbert Nantz, Plaintiff Joshua Ryan Nantz has experienced severe mental anguish, and extreme emotional pain and suffering.

## 72.   THE DECEMBER 27, 2006 ATTACK – BAGHDAD

**The McCormick Family**

2162.   Clinton McCormick was a citizen of the United States and domiciled in the State of Florida when he was killed in Iraq.

2163.   On December 27, 2006, Clinton McCormick, aged 20, was serving in the United States military in Iraq when IED emplaced by JAM Special Groups detonated near his vehicle.

2164.   Clinton McCormick was killed in the attack.

2165.   Clinton McCormick was killed in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

2166.   Plaintiff Lori Ann McCormick is a citizen of the United States and domiciled in the State of Florida. She is the mother of Clinton McCormick.

2167.   Plaintiff Lori Ann McCormick brings an action individually and on behalf of the Estate of Clinton McCormick, as its legal representative.

2168.   As a result of the attack, and the death of Clinton McCormick, Lori Ann McCormick has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her son's society, companionship, comfort, advice and counsel.

### 73.   THE DECEMBER 31, 2006 ATTACK – BAGHDAD

**The Blohm Family**

2169.   Alan R. Blohm was a citizen of the United States and domiciled in the State of Alaska when he was killed in Iraq.

2170.   On December 31, 2006, Alan R. Blohm, aged 21, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2171.   Alan R. Blohm was killed in the attack.

2172.   The weapon used to kill Alan R. Blohm was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2173.   Denise Vennix is a citizen of the United States and domiciled in the State of Michigan. She is the mother of Alan R. Blohm.

2174.   Denise Vennix brings an action on behalf of the Estate of Alan R. Blohm, as its legal representative, for his death and any suffering and/ or economic loss he/his Estate sustained

as a result of the attack.

### 74.   THE JANUARY 14, 2007 ATTACK – BAGHDAD

**The Vaccaro Family**

2175.   Plaintiff Robert Vaccaro is a citizen of the United States and domiciled in the State of Rhode Island.

2176.   On January 14, 2007, Robert Vaccaro, then 23, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near the vehicle in which he was traveling in Baghdad.

2177.   The weapon used to injure Robert Vaccaro was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2178.   Mr. Vaccaro was in a coma for three weeks following the attack and endured several surgeries.

2179.   As a result of the attack, Mr. Vaccaro was diagnosed with a TBI, which caused him to suffer from seizures.

2180.   Mr. Vaccaro has had speech therapy, occupational therapy, and physical therapy for his injuries.

2181.   Robert Vaccaro has also been diagnosed with PTSD.

2182.   Robert Vaccaro has been prescribed medication to treat his injuries.

2183.   As a result of the attack, and the injuries he suffered, Plaintiff Robert Vaccaro has experienced severe physical and mental anguish and extreme emotional pain and suffering.

75.     **THE JANUARY 22, 2007 ATTACK – BAGHDAD**

**The Stout Family**

2184.   Brandon L. Stout was a citizen of the United States and domiciled in the State of Michigan when he was killed in Iraq.

2185.   On January 22, 2007, Brandon L. Stout, aged 23, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2186.   Brandon L. Stout was killed in the attack.

2187.   The weapon used to kill Brandon L. Stout was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2188.   Plaintiff Andrew Jeffrey Anderson is a citizen of the United States and domiciled in the State of Michigan. He is the brother of Brandon L. Stout.

2189.   Plaintiff Elizabeth Lynn Islas is a citizen of the United States and domiciled in the State of Michigan. She is the sister of Brandon L. Stout.

2190.   As a result of the attack, and the death of Brandon L. Stout, Plaintiffs Andrew Jeffrey Anderson and Elizabeth Lynn Islas have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their brother's society, companionship, comfort, advice and counsel.

76.     **THE JANUARY 25, 2007 ATTACK – BAGHDAD**

**The Balsley Family**

2191.   Michael C. Balsley was a citizen of the United States and domiciled in the State of California when he was killed in Iraq.

2192.   On January 25, 2007, Michael C. Balsley, aged 23, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2193.   Michael C. Balsley was killed in the attack.

2194.   The weapon used to kill Michael C. Balsley was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2195.   Plaintiff Samantha Balsley is a citizen of the United States and domiciled in the State of Virginia. She is the widow of Michael C. Balsley.

2196.   Plaintiff Samantha Balsley brings an action individually and on behalf of the Estate of Michael C. Balsley, as its legal representative.

2197.   Plaintiff L.R.-W., a minor represented by his legal guardian Samantha Balsley, is a citizen of the United States and domiciled in the State of Virginia. He is the son of Michael C. Balsley.

2198.   As a result of the attack, and the death of Michael C. Balsley, Plaintiffs Samantha Balsley and L.R.-W. have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice and counsel.

### 77.   THE JANUARY 27, 2007 ATTACK – BAGHDAD

**The Hobson Family**

2199.   Plaintiff Heath Damon Hobson is a citizen of the United States and domiciled in the State of Massachusetts.

2200.   On January 27, 2007, Heath Damon Hobson, then 34, was serving in the U.S. military in Iraq.

2201.   Heath Damon Hobson was in the motor pool at Camp Travis in the U.S. Embassy compound in Baghdad when multiple rockets were fired by Special Groups operatives at the compound and landed in his proximity.

2202.   Heath Damon Hobson was injured in the attack perpetrated by Hezbollah-trained Special Groups under the control and direction of the IRGC-QF and Hezbollah.

2203.   As a result of the attack, Heath Damon Hobson sustained a shrapnel-induced open leg fracture and an arterial tear and significant blood loss. He was evacuated to a Combat Support Hospital where he underwent an arterial graft to salvage his leg and received external fixation to stabilize his leg. He was then flown to Balad, Iraq and then to Germany finally arriving at Walter Reed Army Hospital in Washington, DC to be treated for his injuries. To this day, he has a loss of the use of his right foot and ankle, bone and soft-tissue loss, nerve damage, vascular damage, disfigurement, and PTSD.

2204.   Mr. Hobson has received extensive medical treatment at various hospitals to address the injuries he sustained in the attack.

2205.   As a result of the attack, and the injuries he suffered, Plaintiff Heath Damon Hobson has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2206.   Plaintiff Jodi Michelle Hobson is a citizen of the United States and domiciled in the State of Massachusetts. She is the wife of Heath Damon Hobson.

2207.   Plaintiff M.D.H., a minor, represented by his legal guardian Heath Damon Hobson, is a citizen of the United States and domiciled in the State of Massachusetts. He is the son of Heath Damon Hobson.

2208.    As a result of the attack, and the injuries Heath Damon Hobson suffered, Plaintiffs Jodi Michelle Hobson and M.D.H. have experienced severe mental anguish and extreme emotional pain and suffering.

### 78.    THE JANUARY 27, 2007 ATTACK – TAJI

**The Garrigus Family**

2209.    Mickel D. Garrigus was a citizen of the United States and domiciled in the State of Washington when he was killed in Iraq.

2210.    On January 27, 2007, Mickel D. Garrigus, aged 24, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2211.    Mickel D. Garrigus was killed in the attack.

2212.    The weapon used to kill Mickel D. Garrigus was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2213.    Plaintiff Deadra Garrigus is a citizen of the United States and domiciled in the State of Washington. She is the mother of Mickel D. Garrigus.

2214.    Plaintiff Deadra Garrigus brings an action individually and on behalf of the Estate of Mickel D. Garrigus, as its legal representative.

2215.    Plaintiff David Garrigus is a citizen of the United States and domiciled in the State of Washington. He is the step-father of Mickel D. Garrigus.

2216.    Plaintiff Nichole Garrigus is a citizen of the United States and domiciled in the State of Washington. She is the sister of Mickel D. Garrigus.

2217.    Plaintiff Kyla Ostenson is a citizen of the United States and domiciled in the State of Washington. She is the sister of Mickel D. Garrigus.

2218.   Plaintiff Matthew Garrigus is a citizen of the United States and domiciled in the State of Washington. He is the brother of Mickel D. Garrigus.

2219.   As a result of the attack, and the death of Mickel D. Garrigus, Plaintiffs Deadra Garrigus, David Garrigus, Nichole Garrigus, Kyla Ostenson and Matthew Garrigus have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

### 79.      THE FEBRUARY 1, 2007 ATTACK – BAGHDAD

**The Ryan Family**

2220.   Plaintiff Shawn Ryan is a citizen of the United States and domiciled in the State of Texas.

2221.   On February 1, 2007, Shawn Ryan was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2222.   The weapon used to injure Shawn Ryan was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2223.   As a result of the attack, Mr. Ryan sustained shrapnel injuries that left him permanently disabled.

2224.   As a result of the attack, and the injuries he suffered, Plaintiff Shawn Ryan has experienced severe physical and mental anguish and extreme emotional pain and suffering.

### 80.      THE FEBRUARY 2, 2007 ATTACK – MAHMUDIYAH

**The Dunn Family**

2225.   Terrence Dunn was a citizen of the United States and domiciled in the State of Texas when he was killed in Iraq.

2226.   On February 2, 2007, Terrence Dunn, aged 38, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2227.   Terrence Dunn was killed in the attack.

2228.   The weapon used to kill Terrence Dunn was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2229.   Plaintiff Sharon Y. Dunn Smith is a citizen of the United States and domiciled in the State of Texas. She is the sister of Terrence Dunn.

2230.   Plaintiff Sharon Y. Dunn Smith brings an action individually and on behalf of the Estate of Terrence Dunn, as its legal representative.

2231.   Plaintiff Dennis Dunn is a citizen of the United States and domiciled in the State of New Mexico. He is the brother of Terrence Dunn.

2232.   As a result of the attack, and the death of Terrence Dunn, Plaintiffs Sharon Y. Dunn Smith and Dennis Dunn have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their brother's society, companionship, comfort, advice and counsel.

**The Landeck Family**

2233.   Kevin C. Landeck was a citizen of the United States and domiciled in the State of Illinois when he was killed in Iraq.

2234.   On February 2, 2007, Kevin C. Landeck, aged 26, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2235.   Kevin C. Landeck was killed in the attack.

2236.   The weapon used to kill Kevin C. Landeck was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using

specialized training and components supplied by Hezbollah and the IRGC.

2237.   Plaintiff Richard Landeck is a citizen of the United States and domiciled in the State of Illinois. He is the father of Kevin C. Landeck.

2238.   Plaintiff Victoria Landeck is a citizen of the United States and domiciled in the State of Illinois. She is the mother of Kevin C. Landeck.

2239.   As a result of the attack, and the death of Kevin C. Landeck, Plaintiffs Richard Landeck and Victoria Landeck have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's society, companionship, comfort, advice and counsel.

## 81.   THE FEBRUARY 26, 2007 ATTACK – DIWANIYAH

**The Beardsley Family**

2240.   William J. Beardsley was a citizen of the United States and domiciled in the State of Minnesota when he was killed in Iraq.

2241.   On February 26, 2007, William J. Beardsley, aged 25, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2242.   William J. Beardsley was killed in the attack.

2243.   The weapon used to kill William J. Beardsley was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2244.   Plaintiff Lavonna Harper is a citizen of the United States and domiciled in the State of Oklahoma. She is the mother of William J. Beardsley.

2245.   As a result of the attack, and the death of William J. Beardsley, Plaintiff Lavonna Harper has experienced the loss of her son's society, companionship, comfort, advice and counsel.

82.   **THE MARCH 20, 2007 ATTACK – BAGHDAD**

**The Glawson Family**

2246.   Curtis E. Glawson was a citizen of the United States and domiciled in the State of Alabama when he was killed in Iraq.

2247.   On March 20, 2007, Curtis E. Glawson, aged 24, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2248.   Curtis E. Glawson was killed in the attack.

2249.   The weapon used to kill Curtis E. Glawson was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2250.   Hyunjung Glawson is domiciled in the State of Florida. She is the widow of Curtis E. Glawson.

2251.   Hyunjung Glawson brings an action on behalf of the Estate of Curtis E. Glawson, as its legal representative, for his death and any suffering and/ or economic loss he/his Estate sustained as a result of the attack.

2252.   Plaintiff Jazmon Reyna is a citizen of the United States and domiciled in the State of Arizona. She is the sister of Curtis E. Glawson.

2253.   As a result of the attack, and the death of Curtis E. Glawson, Plaintiff Jazmon Reyna has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her brother's society, companionship, comfort, advice and counsel.

83.   **THE MARCH 27, 2007 ATTACK – BAGHDAD**

**The Thomas Family**

2254.   Sean M. Thomas was a citizen of the United States and domiciled in the State of

Pennsylvania when he was killed in Iraq.

2255.   On March 27, 2007, Sean M. Thomas, aged 33, was serving in the U.S. military when he was killed in a 107mm rocket attack perpetrated by JAM Special Groups operatives.

2256.   Sean M. Thomas was killed in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

2257.   Plaintiff Carrie Thompson is a citizen of the United States and domiciled in the State of Pennsylvania. She is the widow of Sean M. Thomas.

2258.   Plaintiff Carrie Thompson brings a claim individually and on behalf of the Estate of Sean M. Thomas, as its legal representative.

2259.   Plaintiff A.T., a minor represented by her legal guardian, Carrie Thompson, is a citizen of the United States and domiciled in the State of Pennsylvania. She is the daughter of Sean M. Thomas.

2260.   Plaintiff Daniel Thomas, Sr. is a citizen of the United States and domiciled in the State of Pennsylvania. He is the father of Sean M. Thomas.

2261.   Plaintiff Diana Thomas is a citizen of the United States and domiciled in the State of Pennsylvania. She is the mother of Sean M. Thomas.

2262.   Plaintiff Daniel Thomas, Jr. is a citizen of the United States and domiciled in the State of Pennsylvania. He is the brother of Sean M. Thomas.

2263.   Plaintiff Kelly Gillis is a citizen of the United States and domiciled in the State of Pennsylvania. She is the sister of Sean M. Thomas.

2264.   Plaintiff Melinda Flick is a citizen of the United States and domiciled in the State of Pennsylvania. She is the sister of Sean M. Thomas.

2265.   As a result of the attack, and the death of Sean M. Thomas, Plaintiffs Carrie

Thompson, A.T., Daniel Thomas Sr., Diana Thomas, Daniel Thomas Jr., Kelly Gillis and Melinda Flick have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's/son's/brother's society, companionship, comfort, advice and counsel.

### 84.   THE APRIL 4, 2007 ATTACK – NASIRIYAH

**The Sabinish Family**

2266.   Plaintiff Ryan Sabinish is a citizen of the United States and domiciled in the State of Minnesota.

2267.   On April 4, 2007, Ryan Sabinish, then 25, was serving in the U.S. military in Iraq.

2268.   Mr. Sabinish was driving the third vehicle of a convoy when an EFP emplaced by Special Groups detonated near the first vehicle. During the attack, a secondary IED detonated, striking an Iraqi civilian vehicle.

2269.   The weapon used in the attack was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2270.   Mr. Sabinish dismounted his vehicle to pull security and would not allow the civilian vehicle to drive away from the scene. He witnessed a wounded child inside the vehicle die.

2271.   Mr. Sabinish was subsequently diagnosed with PTSD and has experienced suicidal ideation. He has been hospitalized for his emotional injuries and has sought mental health treatment as an outpatient.

2272.   Mr. Sabinish continues to seek treatment, including counseling, and has been prescribed anti-anxiety medications, anti-depressants, and medication to address sleep-related issues. He continues to take medication to treat his emotional injuries.

2273.   As a result of the attack, and the injuries he suffered, Ryan Sabinish has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2274.   Plaintiff R.J.S., a minor represented by her legal guardian Ryan Sabinish, is a citizen of the United States and domiciled in the State of Minnesota. She is the daughter of Ryan Sabinish.

2275.   Plaintiff S.J.S., a minor represented by her legal guardian Ryan Sabinish, is a citizen of the United States and domiciled in the State of Minnesota. She is the daughter of Ryan Sabinish.

2276.   As a result of the attack, and the injuries suffered by Ryan Sabinish, Plaintiffs R.J.S. and S.J.S. have experienced severe mental anguish, and extreme emotional pain and suffering.

## 85.   THE APRIL 6, 2007 ATTACK – BAGHDAD

**The Fuentes Family**

2277.   Daniel A. Fuentes was a citizen of the United States and domiciled in the State of New York when he was killed in Iraq.

2278.   On April 6, 2007, Daniel A. Fuentes, aged 19, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2279.   Daniel A. Fuentes was killed in the attack.

2280.   The weapon used to kill Daniel A. Fuentes was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2281.   Plaintiff Emma McGarry is a citizen of the United States and domiciled in the State of New York. She was the fiancée of Daniel A. Fuentes.

2282.   As a result of the attack, and the death of Daniel A. Fuentes, Plaintiff Emma McGarry has experienced the loss of her fiancée's society, companionship, comfort, advice and counsel.

### 86.   THE APRIL 6, 2007 ATTACK – SADR CITY

**The Kirby Family**

2283.   Plaintiff John Kirby is a citizen of the United States and domiciled in the State of Texas.

2284.   On April 6, 2007, John Kirby, then 31, was serving in the U.S. military in Iraq when both an EFP and an ambulance rigged with explosives detonated near his vehicle.

2285.   The weapon used to injure John Kirby was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2286.   As a result of the attack, Mr. Kirby suffered burns on his upper back. He also suffers from TBI and PTSD.

2287.   As a result of the attack, and the injuries he suffered, Plaintiff John Kirby has experienced severe physical and mental anguish and extreme emotional pain and suffering.

### 87.   THE APRIL 7, 2007 ATTACK – BAGHDAD

**The Murphy-Sweet Family**

2288.   Philip A. Murphy-Sweet was a citizen of the United States and domiciled in the State of Idaho when he was killed in Iraq.

2289.   On April 7, 2007, Philip A. Murphy-Sweet, aged 42 was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2290.   Philip A. Murphy-Sweet was killed in the attack.

2291.   The weapon used to kill Philip A. Murphy-Sweet was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2292.   Plaintiff Michael Murphy-Sweet is a citizen of the United States and domiciled in the State of Idaho. He is the brother of Philip A. Murphy-Sweet.

2293.   Plaintiff Elizabeth Murphy-Sweet is a citizen of the United States and domiciled in the State of Idaho. She is the sister of Philip A. Murphy-Sweet.

2294.   Plaintiff Anona Gonelli is a citizen of the United States and domiciled in the State of Idaho. She is the sister of Philip A. Murphy-Sweet.

2295.   As a result of the attack, and the death of Philip A. Murphy-Sweet, Plaintiffs Michael Murphy-Sweet, Elizabeth Murphy-Sweet and Anona Gonelli have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their brother's society, companionship, comfort, advice and counsel.

## 88.   THE APRIL 9, 2007 ATTACK – BAGHDAD

**The Walton Family**

2296.   Brett A. Walton was a citizen of the United States and domiciled in the State of Oregon when he was killed in Iraq.

2297.   On April 9, 2007, Brett A. Walton, aged 37, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2298.   Brett A. Walton was killed in the attack.

2299.   The weapon used to kill Brett A. Walton was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2300.   Plaintiff Lindsay Young is a citizen of the United States and domiciled in the State of Oregon. She is the widow of Brett A. Walton.

2301.   Plaintiff Lindsay Young brings an action individually and on behalf of the Estate of Brett A. Walton, as its legal representative.

2302.   Plaintiff S.W., a minor represented by her legal guardian Lindsay Young, is a citizen of the United States and domiciled in the State of Oregon. She is the daughter of Brett A. Walton.

2303.   As a result of the attack, and the death of Brett A. Walton, Plaintiffs Lindsay Young and S.W. have experienced the loss of their husband's/father's society, companionship, comfort, advice and counsel.

**The Holden Family**

2304.   Brian L. Holden was a citizen of the United States and domiciled in the State of North Carolina when he was killed in Iraq.

2305.   On April 9, 2007, Brian L. Holden, aged 20, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near his HMMWV in Baghdad.

2306.   Brian L. Holden was killed in the attack.

2307.   The weapon used to kill Brian L. Holden was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2308.   Plaintiff Leasa Dollar is a citizen of the United States and domiciled in the State of North Carolina. She is the mother of Brian L. Holden.

2309.   Plaintiff Eugene DeLozier is a citizen of the United States and domiciled in the

State of Washington. He is the step-father of Brian L. Holden.

2310.   As a result of the attack, and the death of Brian L. Holden, Plaintiffs Leasa Dollar and Eugene DeLozier have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's society, companionship, comfort, advice and counsel.

### 89.   THE APRIL 28, 2007 ATTACK – BAGHDAD

**The Stevens Family**

2311.   Plaintiff Jared S. Stevens is a citizen of the United States and domiciled in the State of Maryland.

2312.   On April 28, 2007, Jared S. Stevens was serving in the U.S. military in Iraq when he came under sniper fire by JAM Special Groups.

2313.   Jared S. Stevens was injured in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

2314.   As a result of the attack, Mr. Stevens was shot in the lip, lacerating it.

2315.   As a result of the attack, and the injuries he suffered, Plaintiff Jared S. Stevens has experienced severe physical and mental anguish and extreme emotional pain and suffering.

### 90.   THE APRIL 28, 2007 ATTACK – SALMAN PAK

**The Hicks Family**

2316.   Glenn Dale Hicks, Jr. was a citizen of the United States and domiciled in the State of Texas.

2317.   On April 28, 2007, Glenn Dale Hicks, Jr., then 24, was serving in the U.S. military in Iraq when an IED emplaced by Special Groups detonated the near his vehicle. His unit was on a routine patrol heading southwest on Route Kelp in the vicinity of Salman Pak, Iraq when the M1151 in which he was traveling was struck by an IED and subsequent small arms fire.

2318.   Glenn Dale Hicks, Jr. was killed in the attack from blast injuries.

2319.   The Special Groups terror cell operatives that emplaced the IED that killed Glenn Dale Hicks, Jr. were trained by Hezbollah and funded and supplied by the IRGC-QF and they launched the attack at the direction of both Hezbollah and the IRGC-QF, as their proxy.

2320.   Plaintiff Susan Maria Doskocil Hicks is a citizen of the United States and domiciled in the State of Texas. She is the mother of Glenn Dale Hicks, Jr.

2321.   Plaintiff Susan Maria Doskocil Hicks brings an action individually and on behalf of the Estate of Glenn Dale Hicks, Jr., as its legal representative.

2322.   Plaintiff Glenn Dale Hicks, Sr. is a citizen of the United States and domiciled in the State of Texas. He is the father of Glenn Dale Hicks, Jr.

2323.   Plaintiff David James Hicks is a citizen of the United States and domiciled in the State of Texas. He is the brother of Glenn Dale Hicks, Jr.

2324.   Plaintiff John Christopher Hicks is a citizen of the United States and domiciled in the State of Texas. He is the brother of Glenn Dale Hicks, Jr.

2325.   Plaintiff S.L.H., a minor, represented by his legal guardian Susan Maria Doskocil Hicks, is a citizen of the United States and domiciled in the State of Texas. He is the brother of Glenn Dale Hicks, Jr.

2326.   As a result of the attack, and the death of Glenn Dale Hicks, Jr., Plaintiffs Susan Maria Doskocil Hicks, Glenn Dale Hicks, Sr., David James Hicks, John Christopher Hicks, and S.L.H. have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## 91.   THE APRIL 29, 2007 ATTACK – BAGHDAD

**The Martin Family**

2327.   Jay E. Martin was a citizen of the United States and domiciled in the State of Maryland when he was killed in Iraq.

2328.   On April 29, 2007, Jay E. Martin, aged 29, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his unit.

2329.   Jay E. Martin was killed in the attack.

2330.   The weapon used to kill Jay E. Martin was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2331.   Plaintiff Dwight Martin is a citizen of the United States and domiciled in the State of Maryland. He is the father of Jay E. Martin.

2332.   Plaintiff Dwight Martin brings an action individually and on behalf of the Estate of Jay E. Martin, as its legal representative.

2333.   Plaintiff Dove Deanna Adams is a citizen of the United States and domiciled in the State of Maryland. She is the sister of Jay E. Martin.

2334.   Plaintiff Raven Adams is a citizen of the United States and domiciled in the State of Maryland. She is the sister of Jay E. Martin.

2335.   Plaintiff Lark Adams is a citizen of the United States and domiciled in the State of Maryland. She is the sister of Jay E. Martin.

2336.   As a result of the attack, and the death of Jay E. Martin, Plaintiffs Dwight Martin, Dove Deanna Adams, Raven Adams and Lark Adams have experienced severe mental anguish,

extreme emotional pain and suffering, and loss of their brother's/son's society, companionship, comfort, advice and counsel.

92.     **THE MAY 3, 2007 ATTACK – MUSAYYIB**

**The Umbrell Family**

2337.   Colby J. Umbrell was a citizen of the United States and domiciled in the State of Pennsylvania when he was killed in Iraq.

2338.   On May 3, 2007, Colby J. Umbrell aged 26, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2339.   Colby J. Umbrell was killed in the attack.

2340.   The weapon used to kill Colby J. Umbrell was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2341.   Plaintiff Casey Boehmer is a citizen of the United States and domiciled in the State of Maryland. She is the sister of Colby J. Umbrell.

2342.   As a result of the attack, and the death of Colby J. Umbrell, Plaintiff Casey Boehmer has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her brother's society, companionship, comfort, advice and counsel.

93.     **THE MAY 5, 2007 ATTACK – KAMALIYAH**

**The Smith Family**

2343.   Plaintiff Jeremy D. Smith is a citizen of the United States and domiciled in the State of North Carolina.

2344.   On May 5, 2007, Jeremy D. Smith was serving in the U.S. military in COP Bushmaster in Kamaliyah, Iraq when he was injured in a mortar attack perpetrated by JAM Special

Groups operatives.

2345.   Jeremy D. Smith was injured in the attack perpetrated by Hezbollah-trained JAM

Special Groups under the control and direction of the IRGC-QF and Hezbollah.

2346.   As a result of the attack, Jeremy Smith suffered shrapnel injuries to his right arm

and right leg. He also suffered a damaged a ligament in his right ankle.

2347.   As a result of the attack, and the injuries he suffered, Plaintiff Jeremy D. Smith has

experienced severe physical and mental anguish and extreme emotional pain and suffering.

### 94.   THE MAY 6, 2007 ATTACK – BAGHDAD

**The Dixon Family**

2348.   Robert J. Dixon was a citizen of the United States and domiciled in the State of

Minnesota when he was killed in Iraq.

2349.   On May 6, 2007, Robert J. Dixon aged 27, was serving in the U.S. military in Iraq

when an EFP emplaced by Special Groups detonated near his vehicle.

2350.   Robert J. Dixon was killed in the attack.

2351.   The weapon used to kill Robert J. Dixon was a Hezbollah-designed and Iranian-

manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using

specialized training and components supplied by Hezbollah and the IRGC.

2352.   Jessica Hubbard is a citizen of the United States and domiciled in the State of

Michigan. She is the ex-wife of Robert J. Dixon and is the legal guardian of Plaintiffs M.R. and

L.R.

2353.   Jessica Hubbard brings an action solely on behalf of Plaintiffs M.R. and L.R.

2354.   Plaintiff M.R., a minor represented by his legal guardian, Jessica Hubbard, is a citizen of the United States and domiciled in the State of Michigan. He is the son of Robert J. Dixon.

2355.   Plaintiff L.R., a minor represented by his legal guardian, Jessica Hubbard, is a citizen of the United States and domiciled in the State of Michigan. He is the son of Robert J. Dixon.

2356.   Plaintiff David Dixon is a citizen of the United States and domiciled in the State of Michigan. He is the brother of Robert J. Dixon.

2357.   Plaintiff Daniel Austin Dixon is a citizen of the United States and domiciled in the State of Michigan. He is the brother of Robert J. Dixon.

2358.   Plaintiff Gretchen Lang is a citizen of the United States and domiciled in the State of Michigan. She is the sister of Robert J. Dixon.

2359.   As a result of the attack, and the death of Robert J. Dixon, Plaintiffs M.R., L.R., David Dixon, Daniel Austin Dixon and Gretchen Lang have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their father's/brother's society, companionship, comfort, advice and counsel.

## 95.   THE MAY 9, 2007 ATTACK – AL-HILLAH

**The Conner Family**

2360.   Bradly D. Conner was a citizen of the United States and domiciled in the State of Idaho when he was killed in Iraq.

2361.   On May 9, 2007, Bradly D. Conner, aged 41, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2362.   Bradly D. Conner was killed in the attack.

2363.   The weapon used to kill Bradly D. Conner was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2364.   Plaintiff Cynthia Conner is a citizen of the United States and domiciled in the State of Alabama. She is the widow of Bradly D. Conner.

2365.   As a result of the attack, and the death of Bradly D. Conner, Plaintiff Cynthia Conner has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her husband's companionship, comfort, advice and counsel.

## 96.   THE MAY 14, 2007 ATTACK – BAGHDAD

**The Brooks Family**

2366.   Plaintiff Joshua Brooks is a citizen of the United States and domiciled in the State of Tennessee.

2367.   On May 14, 2007, Joshua Brooks, then 21, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups hit the HMMWV in which he was traveling in Baghdad.

2368.   The weapon used to injure Joshua Brooks was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2369.   The blast shattered Mr. Brooks' left fibula.

2370.   Mr. Brooks also suffered tissue loss in his left leg, nerve and tendon damage in his left foot and ankle, and scarring on his left foot.

2371.   Mr. Brooks has undergone over twenty surgeries to treat his injuries. His injuries have also necessitated extensive physical therapy.

2372. Mr. Brooks was diagnosed with PTSD and a TBI. He has been prescribed medication and has sought counseling to treat the emotional impact of the attack.

2373. As a result of the attack, and the injuries he suffered, Plaintiff Joshua Brooks has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2374. Plaintiff Joyce Brooks is a citizen of the United States and domiciled in the State of Kentucky. She is the mother of Joshua Brooks.

2375. Plaintiff Danny Brooks is a citizen of the United States and domiciled in the State of Kentucky. He is the father of Joshua Brooks.

2376. Plaintiff Daniel Tyler Brooks is a citizen of the United States and domiciled in the State of Kentucky. He is the brother of Joshua Brooks.

2377. As a result of the attack, and the injuries Joshua Brooks has suffered, Plaintiffs Joyce Brooks, Danny Brooks and Daniel Tyler Brooks have experienced severe mental anguish and extreme emotional pain and suffering.

## 97. THE MAY 18, 2007 ATTACK – BAGHDAD

**The Brown Family**

2378. Scott J. Brown was a citizen of the United States and domiciled in the State of Colorado when he was killed in Iraq.

2379. On May 18, 2007, Scott J. Brown, aged 33, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2380. Scott J. Brown was killed in the attack.

2381. The weapon used to kill Scott J. Brown was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2382.   Plaintiff Delilah Brown is a citizen of the United States and domiciled in the State of Tennessee. She is the widow of Scott J. Brown.

2383.   Plaintiff Delilah Brown brings an action individually and on behalf of the Estate of Scott J. Brown, as its legal representative.

2384.   As a result of the attack, and the death of Scott J. Brown, Plaintiff Delilah Brown has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her husband's society, companionship, comfort, advice and counsel.

## 98.   THE MAY 29, 2007 ATTACK – SADR CITY

**The Kirby Family**

2385.   Plaintiff John Kirby is a citizen of the United States and domiciled in the State of Texas.

2386.   On May 29, 2007, John Kirby, then 31, was serving in the U.S. military in Iraq when he came under sniper fire by JAM Special Groups.

2387.   John Kirby was injured in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

2388.   As a result of the attack, Mr. Kirby was shot in the arm breaking his humerus in three places and later requiring an implant.

2389.   As a result of the attack, and the injuries he suffered, Plaintiff John Kirby has experienced severe physical and mental anguish and extreme emotional pain and suffering.

## 99.   THE JUNE 2, 2007 ATTACK – BAGHDAD

**The Dressler Family**

2390.   Shawn E. Dressler was a citizen of the United States and domiciled in the State of California when he was killed in Iraq.

2391.  On June 2, 2007, Shawn E. Dressler, aged 22, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2392.  Shawn E. Dressler was killed in the attack.

2393.  The weapon used to kill Shawn E. Dressler was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2394.  Plaintiff Tanya Suzzette Dressler is a citizen of the United States and domiciled in the State of Arizona. She is the sister of Shawn E. Dressler.

2395.  Plaintiff Daniel Dressler is a citizen of the United States and domiciled in the State of Virginia. He is the brother of Shawn E. Dressler.

2396.  Plaintiff James Dressler is a citizen of the United States and domiciled in the State of Virginia. He is the brother of Shawn E. Dressler.

2397.  As a result of the attack, and the death of Shawn E. Dressler, Plaintiffs Tanya Suzzette Dressler, Daniel Dressler and James Dressler have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their brother's society, companionship, comfort, advice and counsel.

### 100.  THE JUNE 6, 2007 ATTACK – BAGHDAD

**The Gajdos Family**

2398.  Shawn D. Gajdos was a citizen of the United States and domiciled in the State of Michigan when he was killed in Iraq.

2399.  On June 6, 2007, Shawn D. Gajdos, aged 25, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2400.  Shawn D. Gajdos was killed in the attack.

2401.   The weapon used to kill Shawn D. Gajdos was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2402.   Plaintiff Derek Gajdos is a citizen of the United States and domiciled in the State of Michigan. He is the brother of Shawn D. Gajdos.

2403.   Plaintiff Tammie DenBoer is a citizen of the United States and domiciled in the State of Michigan. She is the sister of Shawn D. Gajdos.

2404.   As a result of the attack, and the death of Shawn D. Gajdos, Plaintiffs Derek Gajdos and Tammy DenBoer have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their brother's society, companionship, comfort, advice and counsel.

### 101.   THE JUNE 8, 2007 ATTACK – BAGHDAD

**The Campbell Family**

2405.   Plaintiff Brandeaux Campbell is a citizen of the United States and domiciled in the State of Texas.

2406.   On June 8, 2007, Brandeaux Campbell, then 20, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near the vehicle.

2407.   The weapon used to injure Mr. Campbell was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2408.   Brandeaux Campbell was severely wounded in the attack resulting in a concussion, slicing open his forehead, mouth, and tongue, and lodging shrapnel in both his shoulder and leg.

2409.   As a result of the attack, and the injuries he suffered, Plaintiff Brandeaux Campbell has experienced severe physical and mental anguish and extreme emotional pain and suffering.

**The Wilson Family**

2410.    Plaintiff Ryan Wilson is a citizen of the United States and domiciled in the State of Florida.

2411.    On June 8, 2007, Ryan Wilson was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near the vehicle.

2412.    The weapon used to injure Mr. Wilson was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2413.    Ryan Wilson was severely wounded in the attack resulting in shrapnel wounds to his right arm.

2414.    As a result of the attack, and the injuries he suffered, Plaintiff Ryan Wilson has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2415.    Plaintiff Jami Lin Wilson is a citizen of the United States and domiciled in the State of Florida. She is the wife of Ryan Wilson.

2416.    As a result of the attack, and the injuries Ryan Wilson has suffered, Plaintiff Jami Lin Wilson has experienced severe mental anguish and extreme emotional pain and suffering.

## 102.    THE JUNE 10, 2007 ATTACK – BAGHDAD

**The Lammers Family**

2417.    Plaintiff Matthew Lammers is a citizen of the United States and domiciled in the State of North Carolina.

2418.    On June 10, 2007, Matthew Lammers, then 25, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2419.    Matthew Lammers was injured in the attack.

2420.   The weapon used to injure Matthew Lammers was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2421.   As a result of the attack, Matthew Lammers' left hand was completely severed. Both of his legs were nearly severed below his kneecaps.

2422.   His femoral arteries had been cut and he lost a significant amount of blood.

2423.   After the attack he began to asphyxiate due to his lungs filling with bodily fluids. Mr. Lammers remained conscious while this occurred.

2424.   Mr. Lammers' injuries necessitated that he undergo surgery to fully amputate both of his legs below the knees. He has been rendered a triple amputee.

2425.   He underwent multiple procedures and frequent wound cleanings. His treatment included debridement of muscle tissue.

2426.   Mr. Lammers has prosthetics to assist with the use of his left hand. He must use a wheelchair to ambulate.

2427.   He has experienced and continues to experience severe phantom limb pain and pain in his back.

2428.   He has undergone extensive physical therapy.

2429.   He has been diagnosed with a TBI.

2430.   Mr. Lammers has also been diagnosed with PTSD and depression and has received treatment and counseling. He has been prescribed medication to address both the pain and emotional impact of the attack.

2431.   Mr. Lammers continues to experience pain and emotional distress each day and he receives continuing treatment for his injuries.

2432. As a result of the attack, and the injuries he suffered, Plaintiff Matthew Lammers has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2433. Plaintiff Alicia Lammers is a citizen of the United States and domiciled in the state of North Carolina. She is the wife of Matthew Lammers.

2434. Plaintiff Barbara Lammers is a citizen of the United States and domiciled in the state of Kansas. She is the mother of Matthew Lammers.

2435. Plaintiff Gary Lammers is a citizen of the United States and domiciled in the state of Kansas. He is the father of Matthew Lammers.

2436. Plaintiff Stacy Pate is a citizen of the United States and domiciled in the state of Kansas. She is the sister of Matthew Lammers.

2437. As a result of the attack, and the injuries Matthew Lammers has suffered, Plaintiffs Alicia Lammers, Barbara Lammers, Gary Lammers and Stacy Pate have experienced severe mental anguish and extreme emotional pain and suffering.

**The Gomez Family**

2438. Plaintiff Angel Gomez is a citizen of the United States and domiciled in the State of Texas.

2439. On June 10, 2007, Angel Gomez, then 20, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near the vehicle in which he was traveling in Baghdad.

2440. The weapon used to injure Angel Gomez was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2441.   The blast injured Mr. Gomez's right leg, necessitating its amputation below the knee.

2442.   Angel Gomez sustained shrapnel to his back, which resulted in complete muscle atrophy in his back.

2443.   Angel Gomez was wearing Interceptor Body Armor ("IBA"), which included ballistic plates to protect his abdomen.  The shrapnel hit the IBA plates, which slit Mr. Gomez's abdomen open and caused internal injuries.

2444.   Mr. Gomez was also diagnosed with a concussion, a TBI, and PTSD.

2445.   Mr. Gomez lived in a hospital for a year and a half while receiving treatment and undergoing numerous surgeries.  He has been prescribed medication to treat his injuries.

2446.   As a result of the attack, and the injuries he suffered, Plaintiff Angel Gomez has experienced severe physical and mental anguish and extreme emotional pain and suffering.

### 103.   THE JUNE 11, 2007 ATTACK – BAGHDAD

**The Payne Family**

2447.   Cameron K. Payne was a citizen of the United States and domiciled in the State of California when he was killed in Iraq.

2448.   On June 11, 2007, Cameron K. Payne, aged 22, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2449.   Cameron K. Payne was killed in the attack.

2450.   The weapon used to kill Cameron K. Payne was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2451.   Plaintiff Denise Jackson is a citizen of the United States and domiciled in the State

of California. She is the mother of Cameron K. Payne.

2452.   As a result of the attack, and the death of Cameron K. Payne, Plaintiff Denise Jackson has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her son's society, companionship, comfort, advice and counsel.

### 104.   THE JUNE 14, 2007 ATTACK – SCANIA

**The Moores Family**

2453.   Plaintiff Andrew Moores is a citizen of the United States and domiciled in the State of Maine.

2454.   On June 14, 2007, Andrew Moores, then 23, was serving in the United States military in Iraq. Mr. Moores was the truck commander in a gun truck that was part of a convoy tasked with escorting military vehicles between Kuwait and Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2455.   The weapon used to injure Andrew Moores was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2456.   As a result of the attack, Andrew Moores took shrapnel in his left hand and suffered injury to his right shoulder, which necessitated surgery and physical therapy. He experiences limitations on his shoulder movement to this day.

2457.   Mr. Moores also injured his neck as a result of the attack and takes medication for pain.

2458.   Andrew Moores was diagnosed with PTSD, for which he sought counseling. He takes medication for his PTSD, as well as medication for the sleep issues he experiences stemming from the attack.

2459.   As a result of the attack, and the injuries he suffered, Plaintiff Andrew Moores has experienced severe physical and mental anguish and extreme emotional pain and suffering.

## 105.   THE JUNE 17, 2007 ATTACK – BAGHDAD

**The Tracy Family**

2460.   Jacob Tracy was a citizen of the United States and domiciled in the State of Illinois when he was killed in Iraq.

2461.   On June 17, 2007, Jacob Tracy, aged 20, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near the vehicle in which he was traveling in Baghdad.

2462.   Jacob Tracy was injured in the attack and died on June 18, 2007 from the injuries he sustained in the attack.

2463.   The weapon used to kill Jacob Tracy was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2464.   Plaintiff Sheila Tracy is a citizen of the United States and domiciled in the State of Illinois. She is the mother of Jacob Tracy.

2465.   Plaintiff Sheila Tracy brings an action individually and on behalf of the Estate of Jacob Tracy, as its legal representative.

2466.   Plaintiff Donald Tracy is a citizen of the United States and domiciled in the State of Illinois.  He is the father of Jacob Tracy.

2467.   Plaintiff Nichole Sweeney is a citizen of the United States and domiciled in the State of Illinois.  She is the sister of Jacob Tracy.

2468.   Plaintiff Christina Sheridan is a citizen of the United States and domiciled in the State of Illinois.  She is the sister of Jacob Tracy.

2469.   As a result of the attack, and the death of Jacob Tracy, Plaintiffs Sheila Tracy, Donald Tracy, Nichole Sweeney, and Christina Sheridan have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

**The Benson Family**

2470.   Plaintiff Matthew Benson is a citizen of the United States and domiciled in the State of Arizona.

2471.   On June 17, 2007, Matthew Benson, then 28, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near the vehicle in which he was traveling in Baghdad.

2472.   The weapon used to injure Matthew Benson was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2473.   As a result of the attack, Matthew Benson sustained a skull fracture.

2474.   Copper shavings were embedded in Matthew Benson's body.

2475.   Mr. Benson also sustained burns and bruising on his back as well as lacerations to his hands, face, and head.

2476.   Mr. Benson has experienced severe headaches.

2477.   Mr. Benson has been diagnosed with PTSD.

2478.   As a result of the attack, and the injuries he suffered, Plaintiff Matthew Benson has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2479.   Plaintiff Melissa Benson is a citizen of the United States and domiciled in the State of Arizona. She is the wife of Matthew Benson.

2480.   Plaintiff C.B., a minor represented by his legal guardian, Matthew Benson, is a citizen of the United States and domiciled in the State of Arizona. He is the son of Matthew Benson.

2481.   Plaintiff B.B., a minor represented by his legal guardian, Matthew Benson, is a citizen of the United States and domiciled in the State of Arizona. He is the son of Matthew Benson.

2482.   Plaintiff Daniel P. Benson is a citizen of the United States and domiciled in the State of Kansas. He is the father of Matthew Benson.

2483.   Plaintiff Carol Benson is a citizen of the United States and domiciled in the State of Kansas. She is the mother of Matthew Benson.

2484.   Plaintiff Daniel R. Benson is a citizen of the United States and domiciled in the State of Kansas. He is the brother of Matthew Benson.

2485.   As a result of the attack, and the injuries Matthew Benson has suffered, Plaintiffs Melissa Benson, C.B., B.B., Daniel P. Benson, Carol Benson and Daniel R. Benson have experienced severe mental anguish, and extreme emotional pain and suffering.

## 106.   THE JUNE 23, 2007 ATTACK – BAGHDAD

**The Moody Family**

2486.   Michael Dean Moody, Jr. was a citizen of the United States and domiciled in the State of Virginia.

2487.   On June 23, 2007, Michael Dean Moody, Jr., then 21, was serving in the U.S. military in Iraq when an IED emplaced by JAM Special Groups detonated near his vehicle while

patrolling south of Sadr City. The IED strike was followed by small arms fire in the vicinity of the explosion.

2488.   Michael Dean Moody, Jr. was killed in the attack.

2489.   Michael Dean Moody, Jr. was killed in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

2490.   Plaintiff Michael Dean Moody, Sr. is a citizen of the United States and domiciled in the State of Virginia. He is the father of Michael Dean Moody, Jr.

2491.   Plaintiff Michael Dean Moody, Sr. brings an action individually and on behalf of the Estate of Michael Dean Moody, Jr., as its legal representative.

2492.   Plaintiff Connie Moody is a citizen of the United States and domiciled in the State of Virginia. She is the mother of Michael Dean Moody, Jr.

2493.   Plaintiff Kedrick Dante Moody is a citizen of the United States and domiciled in the State of Virginia. He is the brother of Michael Dean Moody, Jr.

2494.   As a result of the attack, and the death of Michael Dean Moody, Jr., Plaintiffs Michael Dean Moody, Sr., Connie Moody, and Kedrick Dante Moody have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

### 107.   THE JUNE 25, 2007 ATTACK – BAGHDAD

**The Edwards Family**

2495.   Plaintiff Drew Edwards is a citizen of the United States and domiciled in the State of Missouri.

2496.   On June 25, 2007, Drew Edwards, then 22, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near the vehicle in which he was

traveling in Baghdad.

2497.  The weapon used to injure Drew Edwards was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2498.  As a result of the attack, Drew Edwards suffered an injury to his neck.

2499.  Mr. Edwards has been diagnosed with a TBI.

2500.  Mr. Edwards was also diagnosed with PTSD. He has been prescribed medication to address the emotional impact of the attack.

2501.  As a result of the attack, and the injuries he suffered, Plaintiff Drew Edwards has experienced physical pain, severe mental anguish and extreme emotional pain and suffering.

2502.  Plaintiff Donielle Edwards is a citizen of the United States and domiciled in the State of Missouri. She is the wife of Drew Edwards.

2503.  As a result of the attack, and the injuries Drew Edwards has suffered, Plaintiff Donielle Edwards has experienced severe mental anguish and extreme emotional pain and suffering.

**The Craig Family**

2504.  Andre Craig, Jr. was a citizen of the United States and domiciled in the State of Connecticut when he was killed in Iraq.

2505.  On June 25, 2007, Andre Craig, Jr., aged 24, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2506.  Andre Craig, Jr. was killed in the attack.

2507.  The weapon used to kill Andre Craig, Jr. was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using

specialized training and components supplied by Hezbollah and the IRGC.

2508. Plaintiff Arifah Hardy is a citizen of the United States and domiciled in the State of Connecticut. She was the fiancée of Andre Craig, Jr.

2509. Plaintiff T.C., a minor represented by her legal guardian, Arifah Hardy, is a citizen of the United States and domiciled in the State of Connecticut. She is the daughter of Andre Craig, Jr.

2510. Plaintiff Aundra Craig is a citizen of the United States and domiciled in the State of Connecticut. He is the father of Andre Craig, Jr.

2511. Plaintiff Joyce Craig is a citizen of the United States and domiciled in the State of Connecticut. She is the mother of Andre Craig, Jr.

2512. Plaintiff Debra Cook-Russell is a citizen of the United States and domiciled in the State of Connecticut. She is the sister of Andre Craig, Jr.

2513. Plaintiff Nashima Williams Craig is a citizen of the United States and domiciled in the State of Connecticut. She is the sister of Andre Craig, Jr.

2514. Plaintiff Matthew Craig is a citizen of the United States and domiciled in the State of Connecticut. He is the brother of Andre Craig, Jr.

2515. Plaintiff Jonathan Craig is a citizen of the United States and domiciled in the State of Connecticut. He is the brother of Andre Craig, Jr.

2516. Plaintiff Andre Brown is a citizen of the United States and domiciled in the State of Connecticut. He is the brother of Andre Craig, Jr.

2517. Plaintiff Michael Cook is a citizen of the United States and domiciled in the State of Connecticut. He is the brother of Andre Craig, Jr.

2518.   Plaintiff Valencia Cook is a citizen of the United States and domiciled in the State of Connecticut. She is the sister of Andre Craig, Jr.

2519.   As a result of the attack, and the death of Andre Craig, Jr., Plaintiffs Aundra Craig, Joyce Craig, Debra Cook-Russell, Nashima Williams Craig, Jonathan Craig, Andre Brown, Michael Cook and Valencia Cook have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their fiancée's/father's/son's/brother's society, companionship, comfort, advice and counsel.

### 108.   THE JUNE 28, 2007 ATTACK – BAGHDAD

**The Crow Family**

2520.   William J. Crow was a citizen of the United States and domiciled in the State of Kansas when he was killed in Iraq.

2521.   On June 28, 2007, William J. Crow, aged 28, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2522.   William J. Crow died on June 28, 2007 as a result of injuries sustained in the attack.

2523.   The weapon used to kill William J. Crow was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2524.   Plaintiff Katherine M. Crow is a citizen of the United States and domiciled in the State of Texas. She is the widow of William J. Crow.

2525.   Plaintiff Katherine M. Crow brings an action individually and on behalf of the Estate of William J. Crow, as its legal representative.

2526.   Plaintiff K.A.C., a minor represented by her legal guardian, Katherine M. Crow, is a citizen of the United States and domiciled in the State of Texas. She is the daughter of William J. Crow.

2527.   Plaintiff K.E.C., a minor represented by her legal guardian, Katherine M. Crow, is a citizen of the United States and domiciled in the State of Texas. She is the daughter of William J. Crow.

2528.   Plaintiff Candace Cathryn Hudson is a citizen of the United States and domiciled in the State of Florida. She is the sister of William J. Crow.

2529.   Kathryn Ann Mondini was a citizen of the United States at the time of the death of William J. Crow. She was the mother of William J. Crow. She died on April 18, 2014.

2530.   Plaintiff Candace Cathryn Hudson brings an action individually and on behalf of the Estate of Kathryn Ann Mondini, as its legal representative.

2531.   As a result of the attack, and the death of William J. Crow, the late Kathryn Ann Mondini experienced, and Plaintiffs Katherine M. Crow, K.A.C., K.E.C. and Candace Cathryn Hudson have experienced and continue to experience severe mental anguish, extreme emotional pain and suffering, and loss of their son's/husband's/father's/brother's society, companionship, comfort, advice and counsel.

### 109.   THE JUNE 30, 2007 ATTACK – BAGHDAD

**The Tutwiler Family**

2532.   Plaintiff Patrick Tutwiler is a citizen of the United States and domiciled in the State of Tennessee.

2533.   On June 30, 2007, Patrick Tutwiler was serving in the U.S. military in Iraq when he came under sniper fire by JAM Special Groups terror operatives.

2534.   As a result of the attack, Mr. Tutwiler was shot through the face and neck.

2535.   Patrick Tutwiler was injured in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

2536.   As a result of the attack, and the injuries he suffered, Plaintiff Patrick Tutwiler has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2537.   Plaintiff Crystal Tutwiler is a citizen of the United States and domiciled in the State of Tennessee. She is the wife Patrick Tutwiler.

2538.   As a result of the attack, and the injuries suffered by Patrick Tutwiler, Plaintiff Crystal Tutwiler has experienced severe mental anguish, and extreme emotional pain and suffering.

## 110.   THE JULY 5, 2007 ATTACK – BAGHDAD

### The Ring Family

2539.   Michelle R. Ring was a citizen of the United States and was domiciled in the State of Oregon when she was killed in Iraq.

2540.   On July 5, 2007, Michelle R. Ring, aged 26, was serving in the U.S. military when she was killed in a mortar attack perpetrated by JAM Special Groups terror operatives.

2541.   Michelle R. Ring was killed in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

2542.   Plaintiff Shirley Stearns is a citizen of the United States and is domiciled in the State of Oregon. She is the mother of Michelle R. Ring.

2543.   Plaintiff John Stearns is a citizen of the United States and is domiciled in the State of Oregon. He is the father of Michelle R. Ring.

2544.   Plaintiffs Shirley Stearns and John Stearns bring an action individually and on

behalf of the Estate of Michelle R. Ring, as its legal representatives.

2545.   Plaintiff Karen Hall is a citizen of the United States and is domiciled in the State of Alaska. She is the sister of Michelle R. Ring.

2546.   Plaintiff Marilyn Haybeck is a citizen of the United States and is domiciled in the State of Oregon. She is the sister of Michelle R. Ring.

2547.   Plaintiff Marc Stearns is a citizen of the United States and is domiciled in the State of Oregon. He is the son of Michelle R. Ring.

2548.   James Cole is a citizen of the United States and domiciled in the State of Tennessee. He was the ex-husband of Michelle R. Ring and is the legal guardian of Plaintiff B.C. James Cole brings an action solely on behalf of Plaintiff B.C., a minor.

2549.   Plaintiff B.C., a minor represented by his legal guardian, James Cole, is a citizen of the United States and is domiciled in the State of Tennessee. He is the son of Michelle R. Ring.

2550.   As a result of the attack, and the death of Michelle R. Ring, Plaintiffs Shirley Stearns, John Stearns, Karen Hall, Marilyn Haybeck, Marc Stearns and B.C. have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their daughter's/sister's/mother's society, companionship, comfort, advice and counsel.

## 111.   THE JULY 6, 2007 ATTACK – BAGHDAD

**The McRill Family**

2551.   Robert McRill was a citizen of the United States and domiciled in the State of Virginia when he was killed in Iraq.

2552.   On July 6, 2007, Robert McRill, aged 42, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2553.   Robert McRill was killed in the attack.

2554.  The weapon used to kill Robert McRill was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2555.  Katherine McRill-Fellini is a citizen of the United States and domiciled in the State of Virginia. She is the widow of Robert McRill.

2556.  Katherine McRill-Fellini brings an action on behalf of the Estate of Robert McRill, as its legal representative, for his death and any suffering and/ or economic loss he/his Estate sustained as a result of the attack.

2557.  Plaintiff Ronald McRill is a citizen of the United States and domiciled in the State of California. He is the brother of Robert McRill.

2558.  As a result of the attack, and the death of Robert McRill, Plaintiff Ronald McRill has experienced severe mental anguish, extreme emotional pain and suffering, and loss of his brother's society, companionship, comfort, advice and counsel.

## 112.  THE JULY 6, 2007 ATTACK – BAGHDAD

**The Mergele Family**

2559.  Plaintiff Matthew L. Mergele is a citizen of the United States and domiciled in the State of Tennessee.

2560.  On July 6, 2007, Matthew L. Mergele was serving in the U.S. military in Iraq when an IED emplaced by JAM Special Groups terror operatives detonated while he was on a dismounted patrol near Rustimaya.

2561.  Matthew L. Mergele was injured in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

2562.   As a result of the attack, Mr. Mergele was blown back by the blast. He suffered difficulty hearing in his left ear, ringing in his ears and headaches.

2563.   As a result of the attack, and the injuries he suffered, Plaintiff Matthew L. Mergele has experienced severe physical and mental anguish and extreme emotional pain and suffering.

### 113.   THE JULY 7, 2007 ATTACK – BAGHDAD

**The Miller Family**

2564.   Mikeal Miller was a citizen of the United States and domiciled in the State of Oregon when he was injured in Iraq.

2565.   On July 7, 2007, Mikeal Miller, aged 21, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2566.   Mikeal Miller was severely injured in the attack when shrapnel went through his left eye and lodged in the back of his head.

2567.   Mikeal never regained consciousness after the attack.

2568.   Mikeal remained in a coma and died on January 27, 2008.

2569.   The weapon used to kill Mikeal Miller was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2570.   Plaintiff Rene Pool is a citizen of the United States and domiciled in the State of Oregon. She is the mother of Mikeal Miller.

2571.   As a result of the attack, and the death of Mikeal Miller, Plaintiff Rene Pool has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her son's society, companionship, comfort, advice and counsel.

114. **THE JULY 11, 2007 ATTACK – BAGHDAD**

**The Hollcroft Family**

2572. Plaintiff Derek Allen Hollcroft is a citizen of the United States and domiciled in the State of Florida.

2573. On July 11, 2007, Derek Allen Hollcroft, then 21, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle

2574. The weapon used to injure Derek Allen Hollcroft was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2575. As a result of the attack, Derek Allen Hollcroft sustained a TBI and post-concussion syndrome that has caused frequent chronic headaches and migraines and affected his memory.

2576. As a result of the attack, and the injuries he suffered, Derek Allen Hollcroft has experienced severe physical and mental anguish and extreme emotional pain and suffering.

115. **THE JULY 17, 2007 ATTACK – BAGHDAD**

**The Joshua Family**

2577. Ron J. Joshua, Jr. was a citizen of the United States and domiciled in the State of Texas when he was killed in Iraq.

2578. On July 17, 2007, Ron J. Joshua, Jr., aged 19, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2579. Ron J. Joshua, Jr. was killed in the attack.

2580. The weapon used to kill Ron J. Joshua, Jr. was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2581.  Ursula Ann Joshua is a citizen of the United States and domiciled in the State of New Mexico. She is the mother of Ron J. Joshua, Jr.

2582.  Ursula Ann Joshua brings an action on behalf of the Estate of Ron J. Joshua as its legal representative, for his death and any suffering and/ or economic loss he/his Estate sustained as a result of the attack.

### 116.   THE JULY 17, 2007 ATTACK – SADR CITY

**The Harrelson Family**

2583.  James J. Harrelson was a citizen of the United States and domiciled in the State of Alabama when he was killed in Iraq.

2584.  On July 17, 2007, James J. Harrelson, aged 19, was serving in the United States military in Iraq when JAM-Special Groups detonated an IED near his vehicle in Sadr City, Baghdad.

2585.  James J. Harrelson was killed in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

2586.  Plaintiff Tammy Kinney is a citizen of the United States and domiciled in the State of Alabama. She is the mother of James J. Harrelson.

2587.  As a result of the attack, and the death of James J. Harrelson's, Plaintiff Tammy Kinney has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her son's society, companionship, comfort, advice and counsel.

**The Price Family**

2588.  Plaintiff Daniel Price is a citizen of the United States and domiciled in the State of Illinois.

2589.  On July 17, 2007, Daniel Price, aged 20, was serving in the United States military

in Iraq when JAM-Special Groups detonated an IED near his vehicle in Sadr City, Baghdad.

2590.   Daniel Price was injured in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

2591.   As a result of the attack, Mr. Price suffered shrapnel wounds to his face which cut his tear duct and also suffered a fractured leg.

2592.   Mr. Price also suffers from a TBI and PTSD.

2593.   As a result of the attack, and the injuries he suffered, Plaintiff Daniel Price has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2594.   Plaintiff Steven Price a citizen of the United States and domiciled in the State of Tennessee. He is the brother of Daniel Price.

2595.   As a result of the attack and the injuries Daniel Price suffered, Plaintiff Steven Price has experienced severe mental anguish and extreme emotional pain and suffering.

**The Aieti Family**

2596.   Plaintiff Tausolo Aieti is a citizen of the United States and domiciled in the State of Nevada.

2597.   On July 17, 2007, Tausolo Aieti, aged 20, was serving in the United States military in Iraq when JAM-Special Groups detonated an IED near his vehicle in Sadr City, Baghdad.

2598.   Tausolo Aieti was injured in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

2599.   As a result of the attack, Mr. Aieti suffered a broken leg.

2600.   Mr. Aieti also suffers from a TBI and PTSD.

2601.   As a result of the attack, and the injuries he suffered, Plaintiff Tausolo Aieti has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2602.   Plaintiff Imo Aieti is a citizen of the United States and domiciled in the State of Texas. He is the brother of Tausolo Aieti.

2603.   Plaintiff Lisi Aieti is a citizen of the United States and domiciled in the State of Utah. She is the sister of Tausolo Aieti.

2604.   Plaintiff Poloka Aieti is a citizen of the United States and domiciled in the State of Utah. He is the brother of Tausolo Aieti.

2605.   As a result of the attack, and the injuries suffered by Tausolo Aieti, Plaintiffs Imo Aieti, Lisi Aieti and Poloka Aieti have experienced severe mental anguish, and extreme emotional pain and suffering.

## 117.   THE JULY 17, 2007 ATTACK – BAGHDAD

**The Bouten Family**

2606.   Plaintiff Christopher Bouten is a citizen of the United States and domiciled in the State of Kentucky.

2607.   On July 17, 2007, Christopher Bouten was serving in the United States military in Iraq when he was injured during a mortar attack launched by JAM Special Groups terror operatives in the Kamaliyah neighborhood in eastern Baghdad.

2608.   Christopher Bouten was injured in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

2609.   As a result of the attack, Mr. Bouten suffered shrapnel wounds to his back, neck and leg.

2610.   As a result of the attack, and the injuries he suffered, Plaintiff Christopher Bouten has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2611.   Plaintiff Erin Bouten is a citizen of the United States and domiciled in the State of Kentucky. She is the wife of Christopher Bouten.

2612.   As a result of the attack and the injuries Christopher Bouten suffered, Plaintiff Erin Bouten has experienced severe mental anguish and extreme emotional pain and suffering.

## 118.    THE JULY 19, 2007 ATTACK – HUSSEINYAH

**The Dudek Family**

2613.   Plaintiff Daniel Dudek is a citizen of the United States and domiciled in the State of Washington.

2614.   On July 19, 2007, Daniel Dudek was serving in the U.S. military in Iraq.

2615.   Mr. Dudek was in a convoy when an EFP emplaced by Special Groups struck his vehicle.

2616.   The weapon used to injure Mr. Dudek was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2617.   As a result of the attack, Mr. Dudek suffers from limited paralysis in his hips and legs, and complete paralysis in both of his ankles and feet. He also has a Lumbar 3/4 cauda equina with no glute muscles and no ability to move the muscles in his calf/ankles/feet and has reduced feeling in his legs down to his ankles. He also has a deep shrapnel hole in his back and pieces of fragmentation all throughout his left arm, hips, and buttocks area

2618.   As a result of the attack, and the injuries he suffered, Plaintiff Daniel Dudek has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2619.   Plaintiff Margaret Dudek is a citizen of the United States and domiciled in the State of North Carolina. She is the mother of Daniel Dudek.

2620.   Plaintiff Katie Woodard is a citizen of the United States and domiciled in the State of North Carolina. She is the sister of Daniel Dudek.

2621.   Plaintiff Sarah Dudek is a citizen of the United States and domiciled in the State of North Carolina. She is the sister of Daniel Dudek.

2622.   Plaintiff Andrew Dudek is a citizen of the United States and domiciled in the State of North Carolina. He is the brother of Daniel Dudek.

2623.   As a result of the attack, and the injuries suffered by Daniel Dudek, Plaintiffs Margaret Dudek, Katie Woodard, Sarah Dudek and Andrew Dudek have experienced severe mental anguish, and extreme emotional pain and suffering.

## 119.   THE JULY 23, 2007 ATTACK – BAGHDAD

### The Florexil Family

2624.   Camy Florexil was a citizen of the United States and domiciled in the State of Pennsylvania when he was injured in Iraq.

2625.   On July 23, 2007, Camy Florexil, aged 20, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2626.   Camy Florexil was injured in the attack and died on July 24, 2007 from the injuries he sustained in the attack.

2627.   The weapon used to kill Camy Florexil was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2628.   Plaintiff Emanuela Florexil is a citizen of the United States and domiciled in the State of Pennsylvania. She is the sister of Camy Florexil.

2629.   Plaintiff Emanuela Florexil brings an action individually and on behalf of the Estate

of Camy Florexil, as its legal representative.

2630.   As a result of the attack, and the death of Camy Florexil, Plaintiff Emanuela Florexil has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her brother's society, companionship, comfort, advice and counsel.

### 120.   THE JULY 24, 2007 ATTACK – BAGHDAD

**The Miller Family**

2631.   Plaintiff Joseph T. Miller is a citizen of the Unites States and domiciled in the State of Ohio.

2632.   On July 24, 2007, Joseph T. Miller was serving was serving in the U.S. military in Iraq.

2633.   Mr. Miller was in a convoy when an EFP emplaced by Special Groups struck his vehicle.

2634.   The weapon used to injure Mr. Miller was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2635.   As a result of the attack, Mr. Miller suffered a ruptured left ear drum, TBI and post-concussive syndrome.

2636.   As a result of the attack, and the injuries he suffered, Plaintiff Joseph T. Miller has experienced severe physical and mental anguish and extreme emotional pain and suffering.

### 121.   THE JULY 24, 2007 ATTACK – UMM QASR

**The Harrington Family**

2637.   Plaintiff Sean Harrington is a citizen of the United States and domiciled in the State of Pennsylvania.

2638.   On July 24, 2007, Sean Harrington, then 22, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near the vehicle in which he was traveling outside of Umm Qasr.

2639.   The weapon used to injure Sean Harrington was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2640.   Shrapnel from the EFP struck Sean Harrington's head and face, and copper from the EFP's liner remains fused to his face.

2641.   The impacting shrapnel has resulted in a partial loss of sight in his right eye and most of his hearing in his right ear.

2642.   Mr. Harrington has been diagnosed with a TBI. Medication has been prescribed to address this condition. He continues to endure migraines as a result of the attack.

2643.   Mr. Harrington was also diagnosed with PTSD a result of the attack, for which he has received treatment.

2644.   As a result of the attack, and the injuries he suffered, Plaintiff Sean Harrington has experienced severe physical and mental anguish and extreme emotional pain and suffering.

### 122.   THE JULY 31, 2007 ATTACK – BAGHDAD

**The Heinlein Family**

2645.   Charles T. Heinlein, Jr. was a citizen of the United States and domiciled in the State of Michigan when he was killed in Iraq.

2646.   On July 31, 2007, Charles T. Heinlein, Jr., aged 23, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2647.   Charles T. Heinlein, Jr. was killed in the attack.

2648.   The weapon used to kill Charles T. Heinlein, Jr. was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2649.   Plaintiff Jessica Heinlein is a citizen of the United States and domiciled in the State of Washington. She is the widow of Charles T. Heinlein, Jr.

2650.   Plaintiff Jessica Heinlein brings an action individually and on behalf of the Estate of Charles T. Heinlein, Jr., as its legal representative.

2651.   Plaintiff Charles Heinlein, Sr. is a citizen of the United States and domiciled in the State of Michigan. He is the father of Charles T. Heinlein, Jr.

2652.   Plaintiff Jody Lyn Heinlein is a citizen of the United States and domiciled in the State of Texas. She is the sister of Charles T. Heinlein, Jr.

2653.   As a result of the attack, and the death of Charles T. Heinlein, Jr., Plaintiffs Jessica Heinlein, Charles Heinlein, Sr. and Jody Lyn Heinlein have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/son's/brother's society, companionship, comfort, advice and counsel.

**The Jairala Family**

2654.   Alfred H. Jairala was a citizen of the United States and domiciled in the State of Florida when he was killed in Iraq.

2655.   On July 31, 2007, Alfred H. Jairala, aged 29, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near the vehicle in which he was traveling in Baghdad.

2656.   Alfred H. Jairala was killed in the attack.

2657.   The weapon used to kill Alfred H. Jairala was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2658.   Plaintiff Margarita Aristizabal is a citizen of the United States and domiciled in the State of Florida. She is the widow of Alfred H. Jairala.

2659.   Plaintiff Margarita Aristizabal brings an action individually and on behalf of the Estate of Alfred H. Jairala, as its legal representative.

2660.   Plaintiff J.J., a minor represented by her legal guardian, Margarita Aristizabal, is a citizen of the United States and domiciled in the State of Florida. She is the daughter of Alfred H. Jairala.

2661.   Plaintiff Sebastian Niuman is a citizen of the United States and domiciled in the State of Florida. He is the step-son of Alfred H. Jairala.

2662.   As a result of the attack, and the death of Alfred H. Jairala, Plaintiffs Margarita Aristizabal, J.J., and Sebastian Niuman have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice and counsel.

### 123.   THE AUGUST 14, 2007 ATTACK – BAGHDAD

**The Casey Family**

2663.   Plaintiff Brian J. Casey is a citizen of the United States and domiciled in the State of Montana.

2664.   On August 14, 2007, Brian J. Casey was serving in the U.S. military in Iraq when he came under sniper fire by JAM Special Groups terror operatives.

2665.   Brian J. Casey was injured in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

2666.   As a result of the attack, Mr. Casey suffered a collapsed lung and fractured ribs.

2667.   As a result of the attack, and the injuries he suffered, Plaintiff Brian J. Casey has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2668.   Plaintiff Brittany Hogan is a citizen of the United States and domiciled in the State of Montana. She was the wife of Brian J. Casey.

2669.   Plaintiff Shelley Ann Casey is a citizen of the United States and domiciled in the State of North Carolina. She is mother of Brian J. Casey.

2670.   Plaintiff Richard Casey is a citizen of the United States and domiciled in the State of North Carolina. He is the father of Brian J. Casey.

2671.   As a result of the attack, and the injuries suffered by Brian J. Casey, Plaintiffs Brittany Hogan, Shelley Ann Casey and Richard Casey have experienced severe mental anguish, and extreme emotional pain and suffering.

### 124.   THE AUGUST 17, 2007 ATTACK – BASRA

**The Chand Family**

2672.   Michael Chand, Sr. was a citizen of the United States and domiciled in the State of California when he was kidnapped and killed in Iraq.

2673.   Michael Chand, Sr. worked in southeast Iraq as a civilian contractor who provided security relating to road construction projects.

2674.   On August 17, 2007, Mr. Chand's convoy was ambushed by roughly 300 JAM fighters near the JAM stronghold of Amarah, northwest of Basra. Mr. Chand suffered a gunshot wound in the ambush and was kidnapped by JAM.

2675.   He was held in captivity by JAM for several years afterwards and was tortured in captivity. He was 52 years old at the time of his kidnapping.

2676.   On or about March 13, 2010, his body was returned to the U.S. government. The autopsy report revealed that Mr. Chand was killed by multiple gunshot wounds to the head and body, and his injuries were consistent with the conclusion that he had been tortured.

2677.   Initial reports of the August 17, 2007 attack suggested that Mr. Chand had been killed in the attack.

2678.   On August 24, 2007, the U.S. State Department officially informed Mr. Chand's wife that he was dead.

2679.   On October 31, 2007, the State Department reversed course and informed his wife, Mrs. Sally Chand, that, according to eyewitnesses, Mr. Chand was actually alive and being held in captivity. However, efforts to secure his release over the next several years failed, and, on or about March 13, 2010, the Chand family learned that Jaysh al-Mahdi had tortured and executed Mr. Chand while he was being held in captivity.

2680.   The JAM terror cell that kidnapped and murdered Michael Chand was trained by Hezbollah and funded and armed by the IRGC-QF.

2681.   Plaintiff Sally Chand is a citizen of the United States and domiciled in the State of California. She is the widow of Michael Chand, Sr.

2682.   Plaintiff Sally Chand brings an action individually and on behalf of the Estate Michael Chand, as its legal representative.

2683.   Plaintiff Michael Chand, Jr. is a citizen of the United States and domiciled in the State of California. He is the son of Michael Chand, Sr.

2684.   Plaintiff Christina Mahon is a citizen of the United States and domiciled in the State

of California. She is the daughter of Michael Chand, Sr.

2685.   Plaintiff Ryan Chand is a citizen of the United States and domiciled in the State of California. He is the son of Michael Chand, Sr.

2686.   Plaintiff Brenda Chand is a citizen of the United States and domiciled in the State of California. She is the daughter of Michael Chand, Sr.

2687.   As a result of the August 17, 2007 attack, and the subsequent kidnapping and execution of Michael Chand, Sr., Plaintiffs Sally Chand, Michael Chand, Jr., Christina Mahon, Ryan Chand and Brenda Chand have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice and counsel.

### 125.   THE AUGUST 23, 2007 ATTACK – BAGHDAD

**The Bowen Family**

2688.   Plaintiff Mario Bowen is a citizen of the United States and domiciled in the State of Tennessee.

2689.   On August 23, 2007, Mario Bowen was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2690.   The weapon used to injure Mario Bowen was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2691.   As a result of the attack, Mr. Bowen was rendered unconscious. He suffers from TBI, memory loss, headaches and speech issues.

2692.   As a result of the attack, and the injuries he suffered, Plaintiff Mario Bowen has experienced severe physical and mental anguish and extreme emotional pain and suffering.

126. **THE AUGUST 23, 2007 ATTACK – AZIZIYAH**

**The Hochstetler Family**

2693.   Plaintiff James David Hochstetler is a citizen of the United States and domiciled in the State of Tennessee.

2694.   On August 23, 2007, James David Hochstetler, then 29, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2695.   The weapon used to injure James David Hochstetler was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2696.   As a result of the blast, James David Hochstetler suffered serious injuries, including severe injuries to his hand and face.

2697.   As a result of the attack, and the injuries he suffered, Plaintiff James David Hochstetler has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2698.   Plaintiff Leanne Lizabeth Hochstetler is a citizen of the United States and domiciled in the State of Tennessee. She is the wife of James David Hochstetler.

2699.   Plaintiff J.H., a minor represented by his legal guardian, Leanne Lizabeth Hochstetler, is a citizen of the United States and domiciled in the State of Tennessee. He is the son of James David Hochstetler.

2700.   Plaintiff P.H., a minor represented by her legal guardian, Leanne Lizabeth Hochstetler, is a citizen of the United States and domiciled in the State of Tennessee. She is the daughter of James David Hochstetler.

2701.   Plaintiff Kyle Austin Marshall is a citizen of the United States and domiciled in

the State of Tennessee. He is the son of James David Hochstetler.

2702.   As a result of the attack, and the injuries suffered by James David Hochstetler, Plaintiffs Leanne Lizabeth Hochstetler, J.H., P.H. and Kyle Austin Marshall have experienced severe mental anguish, and extreme emotional pain and suffering.

**The Tully Family**

2703.   Michael Tully was a citizen of the United States and domiciled in the State of Pennsylvania when he was killed in Iraq.

2704.   On August 23, 2007, Michael Tully, aged 33, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2705.   Michael Tully was killed in the attack.

2706.   The weapon used to kill Michael Tully was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2707.   Plaintiff John Richard Tully is a citizen of the United States and domiciled in the State of Pennsylvania. He is the father of Michael Tully.

2708.   Plaintiff John Richard Tully brings an action individually and on behalf of the Estate of Michael Tully, as its legal representative.

2709.   Plaintiff Marilyn Louise Tully is a citizen of the United States and domiciled in the State of Pennsylvania. She is the mother of Michael Tully.

2710.   Plaintiff Slade Victor Tully is a citizen of the United States and domiciled in the State of Pennsylvania. He is the son of Michael Tully.

2711.   Plaintiff John Richard Tully II is a citizen of the United States and domiciled in the State of Arizona. He is the brother of Michael Tully.

2712.   Plaintiff Heather Ann Farkas is a citizen of the United States and domiciled in the State of Pennsylvania. She is the sister of Michael Tully.

2713.   As a result of the attack, and the death of Michael Tully, Plaintiffs John Richard Tully, Marilyn Louise Tully, S.V.T., John Richard Tully II and Heather Ann Farkas have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/father's/brother's society, companionship, comfort, advice and counsel.

**The Hunt Family**

2714.   Plaintiff Robert James Hunt is a citizen of the United States and domiciled in the State of Washington.

2715.   On August 23, 2007, Robert James Hunt, then 37, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2716.   The weapon used to injure Robert James Hunt was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2717.   As a result of the blast, Robert James Hunt suffered lacerations to his neck and head. He also suffered shrapnel wounds to the left side of his head, upper torso, right arm and right hand.

2718.   As a result of the attack, and the injuries he suffered, Plaintiff Robert James Hunt has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2719.   Plaintiff M.A.H., a minor represented by his legal guardian, Robert James Hunt, is a citizen of the United States and domiciled in the State of Washington. He is the son of Robert James Hunt.

2720.   Plaintiff A.M.H., a minor represented by her legal guardian, Robert James Hunt, is

a citizen of the United States and domiciled in the State of Washington. She is the daughter of Robert James Hunt.

2721.   Plaintiff Boonchob "Lynn" Prudhome is a citizen of the United States and domiciled in the State of Texas. She is the mother of Robert James Hunt.

2722.   As a result of the attack, and the injuries suffered by Robert James Hunt, Plaintiffs M.A.H., A.M.H. and Boonchob "Lynn" Prudhome have experienced severe mental anguish, and extreme emotional pain and suffering.

### 127.   THE SEPTEMBER 2, 2007 ATTACK – BAGHDAD

**The White Family**

2723.   Delmar White was a citizen of the United States and domiciled in the State of Kentucky when he was killed in Iraq.

2724.   On September 2, 2007, Delmar White, aged 37, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated by his vehicle.

2725.   Delmar White was killed in the attack.

2726.   The weapon used to kill Delmar White was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2727.   Plaintiff Michele White is a citizen of the United States and domiciled in the State of Kentucky. She is the widow of Delmar White.

2728.   Plaintiff Michele White brings an action individually and on behalf of the Estate of Delmar White, as its legal representative.

2729.   Plaintiff S.W., a minor represented by his legal guardian, Michele White, is a citizen of the United States and domiciled in the State of Kentucky. He is the son of Delmar White.

2730.   Plaintiff Shelby White is a citizen of the United States and domiciled in the State of Kentucky. She is the daughter of Delmar White.

2731.   Plaintiff Perry White is a citizen of the United States and domiciled in the State of Kentucky. He is the brother of Delmar White.

2732.   Plaintiff Robert White is a citizen of the United States and domiciled in the State of Ohio. He is the brother of Delmar White.

2733.   As a result of the attack, and the death of Delmar White, Plaintiffs Michele White, S.W., Shelby White, Perry White and Robert White have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's/brother's companionship, comfort, advice and counsel.

### 128.   THE SEPTEMBER 2, 2007 – RUSTAMIYAH

**The Wold Family**

2734.   Plaintiff Joshua P.G. Wold is a citizen of the United States and domiciled in the State of Oregon.

2735.   On September 2, 2007, Joshua P.G. Wold was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle. The convoy he was travelling in also came under small arms fire.

2736.   The weapon used to injure Joshua P.G. Wold was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2737.   As a result of the attack and the injuries sustained in the attack, Mr. Wold required partial amputation of his right foot.

2738.   As a result of the attack, and the injuries he suffered, Plaintiff Joshua P.G. Wold has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2739.   Plaintiff E.W., a minor represented by her legal guardian Joshua P.G. Wold, is a citizen of the United States and domiciled in the State of Oregon. She is the daughter of Joshua P.G. Wold.

2740.   Plaintiff P.A., a minor represented by her legal guardian Joshua P.G. Wold, is a citizen of the United States and domiciled in the State of Oregon. She is the step-daughter of Joshua P.G. Wold.

2741.   Plaintiff Celeste Yantis is a citizen of the United States and domiciled in the State of Washington. She was the wife of Joshua P.G. Wold.

2742.   As a result of the attack, and the injuries suffered by Joshua P.G. Wold, Plaintiffs E.W., P.A. and Celeste Yantis have experienced severe mental anguish, and extreme emotional pain and suffering.

### 129.   THE SEPTEMBER 4, 2007 ATTACK – BAGHDAD

**The Murray Family**

2743.   Joel L. Murray was a citizen of the United States and domiciled in the State of Missouri when he was killed in Iraq.

2744.   On September 4, 2007, Joel L. Murray, aged 26, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2745.   Joel L. Murray was killed in the attack.

2746.   The weapon used to kill Joel L. Murray was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2747.   Plaintiff Maricel Murray is a citizen of the United States and domiciled in the State of Kansas. She is the widow of Joel L. Murray.

2748.   Plaintiff Maricel Murray brings an action individually and on behalf of the Estate of Joel L. Murray, as its legal representative.

2749.   Plaintiff J.M., a minor represented by his legal guardian, Maricel Murray, is a citizen of the United States and domiciled in the State of Kansas. He is the son of Joel L. Murray.

2750.   As a result of the attack, and the death of Joel L. Murray, Plaintiffs Maricel Murray and J.M. have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice and counsel.

**The Shelton Family**

2751.   Randol S. Shelton was a citizen of the United States and domiciled in the State of Illinois when he was killed in Iraq.

2752.   On September 4, 2007, Randol S. Shelton, aged 22, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2753.   Randol S. Shelton was killed in the attack.

2754.   The weapon used to kill Randol S. Shelton was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2755.   Plaintiff Bryan S. Shelton is a citizen of the United States and domiciled in the State of Illinois. He is the father of Randol S. Shelton.

2756.   Plaintiff Bryan S. Shelton brings an action individually and on behalf of the Estate of Randol S. Shelton, as its legal representative.

2757.   Plaintiff Darlene Shelton is a citizen of the United States and domiciled in the State of Illinois. She is the mother of Randol S. Shelton

2758.   Plaintiff Amanda Shelton is a citizen of the United States and domiciled in the State of Illinois. She is the sister of Randol S. Shelton.

2759.   Plaintiff Bryan T. Shelton is a citizen of the United States and domiciled in the State of Illinois. He is the brother of Randol S. Shelton.

2760.   As a result of the attack, and the death of Randol S. Shelton, Plaintiffs Bryan S. Shelton, Darlene Shelton, Amanda Shelton and Bryan T. Shelton have experienced severe mental anguish, extreme emotional pain and suffering and loss of their son's/brother's society, companionship, comfort, advice and counsel.

### 130.   THE SEPTEMBER 12, 2007 ATTACK- BAGHDAD

**The Laird Family**

2761.   Plaintiff Dan Laird is a citizen of the United States and domiciled in the State of Florida.

2762.   On September 12, 2007, Mr. Laird, then 32, was a civilian contractor with Blackwater Worldwide in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2763.   The weapon used to injure Dan Laird was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC

2764.   As a result of the blast, Dan Laird suffered a concussion and nerve damage in his right leg, a level 5 AC separation which required him to undergo surgery on his right shoulder.

2765. He also sustained emotional injuries, including panic attacks and anxiety, for which he has sought counseling.

2766. As a result of the attack, and the injuries he suffered, Plaintiff Dan Laird has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2767. Plaintiff Angela M. Laird is a citizen of the United States and domiciled in the State of Florida. She is the wife of Dan Laird.

2768. Plaintiff Jordan M. Laird is a citizen of the United States and domiciled in the State of Florida. He is the son of Dan Laird.

2769. Plaintiff Hunter L. Laird is a citizen of the United States and domiciled in the State of Florida. She is the daughter of Dan Laird.

2770. Plaintiff C.L., a minor represented by his legal guardian, Angela M. Laird, is a citizen of the United States and domiciled in the State of Florida. He is the son of Dan Laird.

2771. As a result of the attack, and the injuries Dan Laird has suffered, Plaintiffs Angela M. Laird, Jordan M. Laird, Hunter L. Laird and C.L. have experienced severe mental anguish, and extreme emotional pain and suffering.

**131.** **THE SEPTEMBER 26, 2007 ATTACK – BAGHDAD**

**The Lee Family**

2772. Plaintiff William Lee is a citizen of the United States and domiciled in the State of Virginia.

2773. On September 26, 2007, William Lee, then 44, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle. William Lee was seated behind the driver in an up-armored M1151 vehicle traveling southwest on Route Raiders in the Saidiya neighborhood of Iraq when the vehicle in which he was traveling was struck by an EFP.

2774.   The weapon used to injure William Lee was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2775.   As a result of the attack, Mr. Lee sustained shrapnel injuries to his face including above his right eye and to various other parts of his body. One piece of shrapnel became lodged in his right medial sinus cavity while another piece of shrapnel impacted the subcutaneous nerve network in his right thigh which has caused intermittent shooting pain in his right leg which continues to a lesser degree even today. He has been informed that there is a likely piece of shrapnel from the EFP also lodged in his right anterior cruciate ligament. He has also suffered from PTSD.

2776.   As a result of the attack, and the injuries he suffered, Plaintiff William Lee has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2777.   Plaintiff Alexandria L. Lee is a citizen of the United States and domiciled in the State of Virginia. She is the daughter of William Lee.

2778.   Plaintiff William J. Lee is a citizen of the United States and domiciled in the State of Virginia. He is the son of William Lee.

2779.   Plaintiff Lillie Lai Lee is a citizen of the United States and domiciled in the State of Virginia. She is the ex-wife of William Lee. They were married at the time of the attack in which William Lee was injured and did not obtain a divorce until December 2018. The marital discord resulting in divorce was caused in significant part by the PTSD that William Lee has battled since he was injured in the EFP attack.

2780.   As a result of the attack, and the injuries William Lee suffered, Plaintiffs Alexandria L. Lee, William J. Lee, and Lillie Lai Lee have experienced severe mental anguish and extreme emotional pain and suffering.

**The Hunt Family**

2781.   Plaintiff Jennifer Lynn Hunt is a citizen of the United States and domiciled in the State of Maryland.

2782.   On September 26, 2007, Jennifer Lynn Hunt, then 23, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle. Jennifer Lynn Hunt was the driver in an up-armored M1151 vehicle traveling southwest on Route Raiders in the Saidiya neighborhood of Iraq when the vehicle that she was driving was struck by an EFP.

2783.   The weapon used to injure Jennifer Lynn Hunt was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2784.   As a result of the attack, Jennifer Lynn Hunt sustained shrapnel wounds to her face and to both of her arms, nerve damage to her dominant hand, burn injuries to her back, scarring, and PTSD.

2785.   As a result of the attack, and the injuries she suffered, Plaintiff Jennifer Lynn Hunt has experienced severe physical and mental anguish and extreme emotional pain and suffering.

### 132.   THE SEPTEMBER 29, 2007 ATTACK – BAGHDAD

**The Golembe Family**

2786.   Plaintiff Christopher Golembe is a citizen of the United States and domiciled in the State of West Virginia.

2787.   On September 29, 2007, Christopher Golembe, then 22, was serving in the U.S. military in Iraq, when his vehicle was struck by an EFP emplaced by Special Groups.

2788.   The weapon used to injure Christopher Golembe was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction,

using specialized training and components supplied by Hezbollah and the IRGC.

2789.   Mr. Golembe sustained a concussion as a result of the attack.

2790.   He has nightmares and has experienced survivor's guilt.

2791.   He has been diagnosed with PTSD and has sought counseling.

2792.   Mr. Golembe has suffered memory loss since the attack and has difficulty recalling information.

2793.   As a result of the attack, and the injuries he suffered, Plaintiff Christopher Golembe has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2794.   Plaintiff Kathryn Head is a citizen of the United States and domiciled in the State of Virginia. She is the of mother of Christopher Golembe.

2795.   As a result of the attack, and the injuries Christopher Golembe suffered, Plaintiff Kathryn Head has experienced severe mental anguish and extreme emotional pain and suffering.

**The Watts Family**

2796.   Plaintiff Christopher Watts is a citizen of the United States and domiciled in the State of Texas.

2797.   On September 29, 2007, Christopher Watts, then 22, was serving in the U.S. military in Iraq, when his vehicle was struck by an EFP emplaced by Special Groups.

2798.   The weapon used to injure Christopher Watts was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2799.   Mr. Watts sustained a concussion as a result of the attack. He has been diagnosed with a TBI.

2800.   He experiences memory loss and at times his speech is slurred.

2801.   He has been prescribed anti-depressants and medication to address sleep-related issues.

2802.   As a result of the attack, and the injuries he suffered, Plaintiff Christopher Watts has experienced severe physical and mental anguish and extreme emotional pain and suffering.

### 133.   THE SEPTEMBER 30, 2007 ATTACK – BAGHDAD

**The Olguin Family**

2803.   Randell Olguin was a citizen of the United States and domiciled in the State of Texas when he was killed in Iraq.

2804.   On September 30, 2007, Randell Olguin, aged 24, was serving in the U.S. military in Iraq when his unit came under sniper fire by JAM Special Groups terror operatives.

2805.   Randell Olguin was killed in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

2806.   Randell Olguin was killed in the attack.

2807.   Plaintiff Janet L. Rios is a citizen of the United States and domiciled in the State of Texas. She is the sister of Randell Olguin.

2808.   Plaintiff Anita Baker is a citizen of the United States and domiciled in the State of Texas. She is the sister of Randell Olguin.

2809.   Plaintiff Jennie L. Morin is a citizen of the United States and domiciled in the State of Texas. She is the sister of Randell Olguin.

2810.   As a result of the attack, and the death of Randell Olguin, Plaintiffs Janet L. Rios, Anita Baker and Jennie L. Morin have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their brother's society, companionship, comfort, advice and counsel.

### 134.   THE OCTOBER 18, 2007 ATTACK – BAGHDAD

**The Geiger Family**

2811.   Wayne M. Geiger was a citizen of the United States and domiciled in the State of California when he was killed in Iraq.

2812.   On October 18, 2007, Wayne M. Geiger, aged 23, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near the vehicle in which he was traveling in Baghdad.

2813.   Wayne M. Geiger was killed in the attack.

2814.   The weapon used to kill Wayne M. Geiger was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2815.   Plaintiff Randall Geiger is a citizen of the United States and domiciled in the State of California. He is the father of Wayne M. Geiger.

2816.   Plaintiff Randall Geiger brings an action individually and on behalf of the Estate of Wayne M. Geiger, as its legal representative.

2817.   Plaintiff Kimberly Geiger is a citizen of the United States and domiciled in the State of California. She is the mother of Wayne M. Geiger.

2818.   Plaintiff Jesseca Lyn Tsosie is a citizen of the United States and domiciled in the State of California. She is the sister of Wayne M. Geiger.

2819.   As a result of the attack, and the death of Wayne M. Geiger, Plaintiffs Randall Geiger, Kimberly Geiger and Jesseca Lyn Tsosie have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's companionship, comfort, advice and counsel.

135.   **THE OCTOBER 21, 2007 ATTACK – ISKANDARIYAH**

**The Donoho Family**

2820.   Plaintiff Eric Donoho is a citizen of the United States and domiciled in the State of Indiana.

2821.   On October 21, 2007, Eric Donoho, then 29, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near the vehicle in which he was traveling in Iskandariyah.

2822.   The weapon used to injure Eric Donoho was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2823.   Mr. Donoho suffered a concussion as a result of the blast.

2824.   Mr. Donoho was also diagnosed with a TBI and PTSD.  He has been prescribed daily medication to address these conditions.

2825.   Mr. Donoho continues to endure migraines as a result of the attack.

2826.   As a result of the attack, and the injuries he suffered, Plaintiff Eric Donoho has experienced severe physical and mental anguish and extreme emotional pain and suffering.

136.   **THE OCTOBER 29, 2007 ATTACK – UMM QASR**

**The Ginavan Family**

2827.   Plaintiff Tyler Ginavan is a citizen of the United States and domiciled in the State of Kansas.

2828.   On October 29, 2007, Tyler Ginavan, then 26, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near the vehicle in which he was traveling in Umm Qasr.

2829.   The weapon used to injure Mr. Ginavan was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2830.   As a result of the attack, copper from the EFP lodged in Mr. Ginavan's face, neck, knee, and calf. Copper from the EFP remains fused to Mr. Ginavan's jawline.

2831.   Tyler Ginavan has been diagnosed with PTSD, and he has received treatment and counseling. He has been prescribed medication to address both the physical pain and emotional impact of the attack.

2832.   As a result of the attack, and the injuries he suffered, Plaintiff Tyler Ginavan has experienced severe physical and mental anguish and extreme emotional pain and suffering.

### 137.   THE NOVEMBER 7, 2007 ATTACK – BAGHDAD

**The Tiffner Family**

2833.   Benjamin David Tiffner was a citizen of the United States and domiciled in the State of West Virginia when he was killed in Iraq.

2834.   On November 7, 2007, Benjamin David Tiffner, aged 31, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle in Baghdad.

2835.   Benjamin David Tiffner was killed in the attack.

2836.   The weapon used to kill Benjamin David Tiffner was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2837.   Plaintiff Timothy Tiffner is a citizen of the United States and domiciled in the State of Tennessee. He is the father of Benjamin David Tiffner.

2838.   Plaintiff Timothy Tiffner brings a claim individually and on behalf of the Estate of Benjamin David Tiffner, as its legal representative.

2839.   Plaintiff Judith Tiffner is a citizen of the United States and domiciled in the State of Tennessee.  She is the mother of Benjamin David Tiffner.

2840.   Plaintiff Joshua Tiffner is a citizen of the United States and domiciled in the State of Utah. He is the brother of Benjamin David Tiffner.

2841.   Plaintiff Seth Tiffner is a citizen of the United States and domiciled in the State of Alabama. He is the brother of Benjamin David Tiffner.

2842.   Plaintiff Sarah Crosby is a citizen of the United States and domiciled in the State of Alaska. She is the sister of Benjamin David Tiffner.

2843.   As a result of the attack, and the death of Benjamin David Tiffner, Plaintiffs Timothy Tiffner, Judith Tiffner, Joshua Tiffner, Seth Tiffner and Sarah Crosby have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

### 138.   THE NOVEMBER 14, 2007 ATTACK – BAGHDAD

**The Burks Family**

2844.   Peter Burks was a citizen of the United States and domiciled in the State of Texas when he was killed in Iraq.

2845.   On November 14, 2007, Peter Burks, aged 26, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle in Baghdad.

2846.   Peter Burks was killed in the attack.

2847.   The weapon used to kill Peter Burks was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using

specialized training and components supplied by Hezbollah and the IRGC.

2848.   Plaintiff Alan Burks is a citizen of the United States and domiciled in the State of Texas. He is the father of Peter Burkes.

2849.   Plaintiff Alan Burks brings a claim individually and on behalf of the Estate of Peter Burks, as its legal representative.

2850.   Plaintiff Jackie Merck Hlastan is a citizen of the United States and domiciled in the State of Texas. She is the mother of Peter Burks.

2851.   Plaintiff G.B., a minor represented by her legal guardian, Alan Burks, is a citizen of the United States and domiciled in the State of New Jersey. She is the sister of Peter Burks.

2852.   Plaintiff Alison Burks McRuiz is a citizen of the United States and domiciled in the State of Texas. She is the sister of Peter Burks.

2853.   Plaintiff Sarah Phillips is a citizen of the United States and domiciled in the State of Texas. She is the sister of Peter Burks.

2854.   Plaintiff Zachary Burks is a citizen of the United States and domiciled in the State of Alabama. He is the brother of Peter Burks.

2855.   As a result of the attack, and the death of Peter Burks, Plaintiffs Alan Burks, Jackie Merck Hlastan, G.B., Alison Burks McRuiz, Sarah Phillips and Zachary Burks have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

### 139.   **THE NOVEMBER 26, 2007 ATTACK – AZIZIYAH**

**Juneau Family**

2856.   William ("Bill") Juneau was a citizen of the Unites States and domiciled in the State of Minnesota when he was killed in Iraq.

2857.   On November 26, 2007, William Juneau, aged 36, was serving as a civilian contractor in southern Iraq when an IED emplaced by JAM Special Groups terror operatives detonated near his vehicle.

2858.   William Juneau was killed in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

2859.   Plaintiff Bridget Juneau is a citizen of the United States and domiciled in the State of Minnesota. She is the twin sister of William Juneau.

2860.   Plaintiff Bridget Juneau brings an action individually and on behalf of the Estate of William Juneau, as its legal representative.

2861.   Plaintiff Stephanie Juneau is a citizen of the United States and domiciled in the State of Montana. She is the sister of William Juneau.

2862.   As a result of the attack, and the death of William Juneau, Plaintiffs Bridget Juneau and Stephanie Juneau have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their brother's society, companionship, comfort, advice and counsel.

### 140.   THE DECEMBER 9, 2007 ATTACK – AZ ZUBAYDIYAH

**The Shaw Family**

2863.   Micah Shaw was a citizen of the United States and domiciled in the State of Washington when he was killed in Iraq.

2864.   On December 9, 2007, Micah Shaw, aged 32, was serving as a civilian contractor in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2865.   Micah Shaw was killed in the attack.

2866.   The weapon used to kill Micah Shaw was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2867.   Plaintiff Elena Shaw is a citizen of the United States and domiciled in the State of New Hampshire. She is the widow of Micah Shaw.

2868.   Plaintiff C.S., a minor represented by his legal guardian Elena Shaw, is a citizen of the United States and domiciled in the State of New Hampshire. He is the minor son of Micah Shaw.

2869.   Plaintiff L.S., a minor represented by her legal guardian Elena Shaw, is a citizen of the United States and domiciled in the State of New Hampshire. She is the minor daughter of Micah Shaw.

2870.   Plaintiff Emily Shaw is a citizen of the United States and domiciled in the State of Pennsylvania. She is the daughter of Micah Shaw.

2871.   As a result of the attack, and the death of Micah Shaw, Plaintiffs Elena Shaw, C.S., L.S. and Emily Shaw have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice and counsel.

**The Doheny Family**

2872.   Michael Doheny was a citizen of the United States and domiciled in the State of Nebraska when he was killed in Iraq.

2873.   On December 9, 2007, Michael Doheny, aged 30, was serving as a civilian contractor in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2874.   Michael Doheny was killed in the attack.

2875.   The weapon used to kill Michael Doheny was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2876.   Plaintiff Melissa Doheny is a citizen of the United States and domiciled in the State of Nebraska. She is the widow of Michael Doheny.

2877.   Plaintiff Melissa Doheny brings a claim individually and on behalf of the Estate of Michael Doheny, as its legal representative.

2878.   Plaintiff Kathy Kugler is a citizen of the United States and domiciled in the State of Nebraska. She is the mother of Michael Doheny.

2879.   Plaintiff Robert Kugler is a citizen of the United States and domiciled in the State of Oregon. He is the brother of Michael Doheny.

2880.   As a result of the attack, and the death of Michael Doheny, Plaintiffs Melissa Doheny, Kathy Kugler and Robert Kugler have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/son's/brother's society, companionship, comfort, advice and counsel.

**The Evrard Family**

2881.   Steven Evrard was a citizen of the United States and domiciled in the State of Texas when he was killed in Iraq.

2882.   On December 9, 2007, Steven Evrard, aged 36, was serving as a civilian contractor in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2883.   Steven Evrard was killed in the attack.

2884.   The weapon used to kill Steven Evrard was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2885.   Plaintiff Tanya Evrard is a citizen of the United States and domiciled in the State of Texas. She is the widow of Steven Evrard.

2886.   As a result of the attack, and the death of Steven Evrard, Plaintiff Tanya Evrard has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her husband's companionship, comfort, advice and counsel.

**The Johnson Family**

2887.   Plaintiff Billy Johnson is a citizen of the United States and domiciled in the State of Tennessee.

2888.   On December 9, 2007, Billy Johnson was serving as a civilian contractor in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2889.   The weapon used to injure Billy Johnson was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2890.   As a result of the attack, Mr. Johnson's right leg was amputed below the knee. He also required multiple surgical implants in his left leg and left arm. In addition, Mr. Johnson suffered amputation of one finger on his left hand and partial amputation of a finger on his right hand.

2891.   M. Johnson has endured more than fifty surgical procedures including multiple skin grafts. He also sustained a TBI and suffers from PTSD.

2892.   As a result of the attack, and the injuries he suffered, Plaintiff Billy Johnson has experienced severe physical and mental anguish and extreme emotional pain and suffering.

## 141.   THE JANUARY 6, 2008 ATTACK – BAGHDAD

### The Gudridge Family

2893.   James D. Gudridge was a citizen of the United States and domiciled in the State of New York when he was killed in Iraq.

2894.   On January 6, 2008, James D. Gudridge, aged 20, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2895.   James D. Gudridge was killed in the attack.

2896.   The weapon used to kill James D. Gudridge was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2897.   Plaintiff Judy Hoffman is a citizen of the United States and domiciled in the State of Florida. She is the mother of James D. Gudridge.

2898.   As a result of the attack, and the death of James D. Gudridge, Plaintiff Judy Hoffman has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her son's society, companionship, comfort, advice and counsel.

### The Schichtl Family

2899.   Plaintiff Joshua Schichtl is a citizen of the United States and domiciled in the State of Florida.

2900.   On January 6, 2008, Joshua Schichtl, then 40, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2901.   The weapon used to injure Joshua Schichtl was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2902.   As a result of the attack, Joshua Schichtl sustained shrapnel to his body, impacting his left eye, face and bicep. He also lost the use of his right eye.

2903.   As a result of the blast, his cheekbone and roof of his mouth were shattered, and he lost several of his teeth. His lower jawbone was broken in 19 locations and he has had pins placed in the area to attempt to provide some stability. He is still unable to open his mouth as wide as necessary and chewing continues to be difficult.

2904.   Joshua Schichtl received medical treatment both as an in-patient and resident for approximately five years.

2905.   He has undergone multiple surgeries including bone and skin grafts, many of which have involved the reconstruction of his mouth.

2906.   Significant scarring is apparent on his face.

2907.   Joshua Schichtl has been diagnosed with a TBI and an anxiety disorder and has sought and continues to seek counseling.

2908.   He still experiences frequent pain.

2909.   As a result of the attack, and the injuries he suffered, Plaintiff Joshua Schichtl has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2910.   Plaintiff Mark Schichtl is a citizen of the United States and domiciled in the State of Arkansas. He is the father of Joshua Schichtl.

2911.   Plaintiff Katherine Prowse is a citizen of the United States and domiciled in the State of Arkansas. She is the sister of Joshua Schichtl.

2912.   Plaintiff Nicholas Prowse is a citizen of the United States and domiciled in the State of Arkansas. He is the brother of Joshua Schichtl.

2913.   Plaintiff H.S., a minor represented by his legal guardian, Joshua Schichtl, is a citizen of the United States and domiciled in the State of Florida. He is the son of Joshua Schichtl.

2914.   Plaintiff S.S., a minor represented by his legal guardian, Joshua Schichtl, is a citizen of the United States and domiciled in the State of Florida. He is the son of Joshua Schichtl.

2915.   Plaintiff C.S., a minor represented by his legal guardian, Joshua Schichtl, is a citizen of the United States and domiciled in the State of Florida. He is the son of Joshua Schichtl.

2916.   Plaintiff A.S., a minor represented by his legal guardian, Joshua Schichtl, is a citizen of the United States and domiciled in the State of Florida. He is the son of Joshua Schichtl.

2917.   As a result of the attack, and the injuries Joshua Schichtl has suffered, Plaintiffs Mark Schichtl, Katherine Prowse, Nicholas Prowse, H.S., S.S., C.S. and A.S. have experienced severe mental anguish, and extreme emotional pain and suffering.

**The Wadleigh Family**

2918.   Plaintiff Steve Wadleigh is a citizen of the United States and domiciled in the State of Washington.

2919.   On January 6, 2008, Steve Wadleigh, then 25, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2920.   The weapon used to injure Steve Wadleigh was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2921.   As a result of the attack, Steve Wadleigh sustained shrapnel to his face, neck, and shoulder. Shrapnel was imbedded in his jaw bone, necessitating both facial surgery oral surgeries.

2922.   The impact of the blast caused his head to be thrown into the window of the vehicle. Mr. Wadleigh sustained a concussion and has been diagnosed with a TBI.

2923.   In addition, his ear drum was perforated, and his tooth was broken.

2924.   The vision in his left eye has been diminished and he continues to experience pain in his shoulder and hip.

2925.   He has been diagnosed with PTSD and he has sought counseling. He has experienced night terrors and has been prescribed medication to address them and other sleep-related issues.

2926.   The effects of the PTSD, along with the TBI, impact his daily living.

2927.   As a result of the attack, and the injuries he suffered, Plaintiff Steve Wadleigh has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2928.   Plaintiff Lea-Ann Wadleigh is a citizen of the United States and domiciled in the State of Washington. She is the wife of Steve Wadleigh.

2929.   As a result of the attack, and the injuries Steve Wadleigh has suffered, Plaintiff Lea-Ann Wadleigh has experienced severe mental anguish, and extreme emotional pain and suffering.

**142.**   **THE JANUARY 30, 2008 ATTACK – BAGHDAD**

**The Lukow Family**

2930.   Plaintiff Michael Lukow is a citizen of the United States and domiciled in the State of Utah.

2931.   On January 30, 2008, Michael Lukow was serving in the U.S. military in Iraq.

2932.   Mr. Lukow was in a convoy when an EFP emplaced by Special Groups struck his vehicle.

2933.   The weapon used to injure Mr. Lukow was a Hezbollah-designed and Iranian-

manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2934.   As a result of the attack, Mr. Lukow's foot was amputated.

2935.   As a result of the attack, and the injuries he suffered, Plaintiff Michael Lukow has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2936.   Plaintiff Rikki Lukow is a citizen of the United States and domiciled in the State of Colorado. She is the mother of Michael Lukow.

2937.   Plaintiff Bruce Lukow is a citizen of the United States and domiciled in the State of Colorado. He is the father of Michael Lukow.

2938.   Plaintiff Joseph Lukow is a citizen of the United States and domiciled in the State of Colorado. He is the brother of Michael Lukow.

2939.   Plaintiff Andrew Lukow is a citizen of the United States and domiciled in the State of Wisconsin. He is the brother of Michael Lukow.

2940.   Plaintiff Kristen Kelley is a citizen of the United States and domiciled in the State of Colorado. She is the sister of Michael Lukow.

2941.   As a result of the attack and the injuries Michael Lukow suffered, Plaintiff Rikki Lukow, Bruce Lukow, Joseph Lukow, Andrew Lukow and Kristen Kelley have experienced severe mental anguish and extreme emotional pain and suffering.

### 143.   THE FEBRUARY 19, 2008 ATTACK – BAGHDAD

**The Alvarez Family**

2942.   Conrad Alvarez was a citizen of the United States and domiciled in the State of Texas when he was killed in Iraq.

2943.   On February 19, 2008, Conrad Alvarez, aged 22, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2944.   Conrad Alvarez was injured in the attack and died on February 20, 2008 from the injuries he sustained in the attack.

2945.   The weapon used to kill Conrad Alvarez was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2946.   Plaintiff Maira Alvarez is a citizen of the United States and domiciled in the State of Texas. She is the widow of Conrad Alvarez.

2947.   Plaintiff Maira Alvarez brings a claim individually and on behalf of the Estate of Conrad Alvarez, as its legal representative.

2948.   Plaintiff K.A., a minor represented by his legal guardian, Maira Alvarez, is a citizen of the United States and domiciled in the State of Texas. He is the son of Conrad Alvarez.

2949.   Angela Alvarez is a citizen of the United States and domiciled in the State of California. She is the ex-wife of Conrad Alvarez and is the legal guardian of Plaintiffs A.A. and C.A. Angela Alvarez brings this action solely on behalf of Plaintiffs A.A. and C.A., both minors.

2950.   Plaintiff A.A., a minor represented by her legal guardian, Angela Alvarez, is a citizen of the United States and domiciled in the State of California. She is the daughter of Conrad Alvarez.

2951.   Plaintiff C.A., a minor represented by her legal guardian, Angela Alvarez, is a citizen of the United States and domiciled in the State of California. She is the daughter of Conrad Alvarez.

2952.   Plaintiff Belinda Garcia is a citizen of the United States and domiciled in the State of Texas. She is the mother of Conrad Alvarez.

2953.   As a result of the attack, and the death of Conrad Alvarez, Plaintiffs Maira Alvarez, K.A., A.A., C.A. and Belinda Garcia have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's/son's society, companionship, comfort, advice and counsel.

**The Whitehorse Family**

2954.   Plaintiff Jason Whitehorse is a citizen of the United States and domiciled in the State of New Mexico.

2955.   On February 19, 2008, Jason Whitehorse, then 22, was serving in the U.S. military in Iraq.

2956.   Mr. Whitehorse was on a routine patrol in Baghdad when his vehicle was struck by an EFP emplaced by Special Groups.

2957.   The weapon used to injure Mr. Whitehorse was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2958.   As a result of the attack, he sustained injuries due to the impact of shrapnel impacting his body.  This has resulted in scarring.

2959.   Apart from the shrapnel-related injuries he also sustained burns to his skin. This has also resulted in scarring.

2960.   Mr. Whitehorse has been diagnosed with PTSD and major depression and has received treatment and counseling.

2961.   Mr. Whitehorse continues to experience emotional distress, depression and survivor's guilt.

2962.   As a result of the attack, and the injuries he suffered, Plaintiff Jason Whitehorse has experienced severe mental anguish and extreme emotional pain and suffering.

### 144.   THE FEBRUARY 19, 2008 ATTACK – BAGHDAD

**The Mann Family**

2963.   Plaintiff Jeffrey C. Mann is a citizen of the United States and domiciled in the State of North Carolina.

2964.   On February 19, 2008, Jeffrey C. Mann, then 25, was serving in the U.S. military in Iraq.

2965.   Jeffrey C. Mann was inside a building at Forward Operating Base Rustamiyah in the southeast portion of Baghdad when the base was hit with a barrage of Improvised Rocket-Assisted Munitions ("IRAMs") fired from a dump truck in close proximity to the base.

2966.   One of the rockets caused a fuel tank on the base to explode which destroyed part of the building in which Jeffrey C. Mann was standing.

2967.   KH operatives fired the IRAMS at the base. Those operatives were trained by Hezbollah and funded and supplied by the IRGC-QF and they launched the attack at the direction of both Hezbollah and the IRGC-QF as their proxy.

2968.   The concussive blast of the explosion threw Jeffrey C. Mann backward, and he hit his head causing him to lose consciousness.

2969.   As a result of the attack, Jeffrey C. Mann suffered a TBI that has impeded his ability to concentrate or work. He also suffers from migraines and difficulty in completing tasks. The injuries he sustained have also caused him impaired vision and loss of feeling in part of his face in

addition to tinnitus and hearing loss. He also suffered injuries to his back which now require him to walk with a cane when walking for any extended period of time while also suffering pain and numbness in his legs. He also suffers from PTSD.

2970.   As a result of the attack, and the injuries he suffered, Jeffrey C. Mann has experienced severe physical and mental anguish and extreme emotional pain and suffering.

### 145.   THE MARCH 11, 2008 ATTACK – BABIL PROVINCE

**The West Family**

2971.   Laurent J. West was a citizen of the United States and domiciled in the State of North Carolina when he was killed in Iraq.

2972.   On March 11, 2008, Laurent J. West, aged 32, was serving in the U.S. military in Iraq when an IED (likely an EFP) was emplaced and detonated near his vehicle by JAM Special Groups.

2973.   Laurent J. West was killed in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

2974.   Plaintiff Michelle West is a citizen of the United States and domiciled in the State of New Mexico. She is the widow of Laurent J. West.

2975.   As a result of the attack, and the death of Laurent J. West, Plaintiff Michelle West has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her husband's society, companionship, comfort, advice and counsel.

### 146.   THE MARCH 12, 2008 ATTACK – CAMP ADDER

**The Samten Family**

2976.   Tenzin Lobsang Samten was a citizen of the United States and domiciled in the State of Arizona.

2977.   On March 12, 2008, Tenzin Lobsang Samten, then 33, was serving in the U.S. military in Iraq near the city of An-Nasiriyah when his vehicle was struck by mortar fire launched by JAM Special Groups terror operatives.

2978.   Tenzin Lobsang Samten was killed in the attack.

2979.   The attack that killed Tenzin Lobsang Samten was carried out by JAM Special Groups operatives working at the behest of Hezbollah and the IRGC-QF, using weapons supplied by the IRGC-QF and employing tactics taught to them by Hezbollah.

2980.   Plaintiff Rebecca L. Samten-Finch is a citizen of the United States and domiciled in the State of North Carolina. She is the wife of Tenzin Lobsang Samten.

2981.   Plaintiff Rebecca L. Samten-Finch brings an action individually and on behalf of the Estate of Tenzin Lobsang Samten, as its legal representative.

2982.   Plaintiff D.A.S., a minor, represented by her legal guardian, Rebecca L. Samten-Finch, is a citizen of the United States and domiciled in the State of North Carolina. She is the daughter of Tenzin Lobsang Samten.

2983.   Plaintiff M.B.S., a minor, represented by his legal guardian, Rebecca L. Samten-Finch, is a citizen of the United States and domiciled in the State of North Carolina. He is the son of Tenzin Lobsang Samten.

2984.   As a result of the attack, and the death of Tenzin Lobsang Samten, Plaintiffs Rebecca L. Samten-Finch, D.A.S., and M.B.S. have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice and counsel.

**The Bradley Family**

2985.   Juantrea Tyrone Bradley was a citizen of the United States and domiciled in the

State of North Carolina.

2986.   On March 12, 2008, Juantrea Tyrone Bradley, then 28, was serving in the U.S. military in Ira near the city of An-Nasiriyah when his vehicle was struck by mortar fire launched by JAM Special Groups terror operatives.

2987.   Juantrea Tyrone Bradley was killed in the attack.

2988.   The attack that killed Juantrea Tyrone Bradley was carried out by JAM Special Groups operatives working at the behest of Hezbollah and the IRGC-QF, using weapons supplied by the IRGC-QF and employing tactics taught to them by Hezbollah.

2989.   Plaintiff Ava Lanette Bradley is a citizen of the United States and domiciled in the State of North Carolina. She is the widow of Juantrea Tyrone Bradley.

2990.   Plaintiff Ava Lanette Bradley brings an action individually and on behalf of the Estate of Juantrea Tyrone Bradley, as its legal representative.

2991.   Plaintiff A.D.B., a minor, represented by her legal guardian, Ava Lanette Bradley, is a citizen of the United States and domiciled in the State of North Carolina. She is the daughter of Juantrea Tyrone Bradley.

2992.   Plaintiff T.T.B., a minor, represented by his legal guardian, Ava Lanette Bradley, is a citizen of the United States and domiciled in the State of North Carolina. He is the son of Juantrea Tyrone Bradley.

2993.   Plaintiff J.T.B., a minor, represented by his legal guardian, Ava Lanette Bradley, is a citizen of the United States and domiciled in the State of North Carolina. He is the son of Juantrea Tyrone Bradley.

2994.   Plaintiff Anthony Hudson is a citizen of the United States and domiciled in the State of North Carolina. He is the step-son of Juantrea Tyrone Bradley.

2995.   As a result of the attack, and the death of Juantrea Tyrone Bradley, Plaintiffs Ava Lanette Bradley, A.D.B., T.T.B., J.T.B., and Anthony Hudson have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice and counsel.

### 147.   THE MARCH 14, 2008 ATTACK – MUSAYYIB

**The Bewley Family**

2996.   Plaintiff Austin Bewley is a citizen of the United States and domiciled in the State of Oregon.

2997.   On March 14, 2008, Austin Bewley, then 20, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near the vehicle in which he was traveling on the way to Baghdad.

2998.   The weapon used to injure Austin Bewley was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2999.   Mr. Bewley suffered shrapnel wounds in his left leg, right hand, and face.

3000.   Mr. Bewley was also diagnosed with PTSD.

3001.   Mr. Bewley was prescribed pain medication and medication to regrow the nerve in his leg.  He was also prescribed medication to treat the symptoms of his PTSD.

3002.   As a result of the attack, and the injuries he suffered, Plaintiff Austin Bewley has experienced severe physical and mental anguish and extreme emotional pain and suffering.

### 148.   THE MARCH 17, 2008 ATTACK – BAGHDAD

**The Simpson Family**

3003.   Christopher Simpson was a citizen of the United States and domiciled in the State

of Virginia when he was killed in Iraq.

3004.   On March 17, 2008, Christopher Simpson, aged 23, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3005.   Christopher Simpson was killed in the attack.

3006.   The weapon used to kill Christopher Simpson was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3007.   Plaintiff Mary Catherine McLaughlin is a citizen of the United States and domiciled in the State of New York. She is the mother of Christopher Simpson.

3008.   As a result of the attack, and the death of Christopher Simpson, Plaintiff Mary Catherine McLaughlin has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her son's society, companionship, comfort, advice and counsel.

### 149.   THE MARCH 23, 2008 ATTACK – BAGHDAD

**The Habsieger Family**

3009.   Andrew J. Habsieger was a citizen of the United States and domiciled in the State of Missouri when he was killed in Iraq.

3010.   On March 23, 2008, Andrew J. Habsieger, aged 22, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3011.   Andrew J. Habsieger was killed in the attack.

3012.   The weapon used to kill Andrew J. Habsieger was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3013.   Brenda Habsieger is a citizen of the United States and domiciled in the State of

Missouri. She is the mother of Andrew J. Habsieger.

3014.   Brenda Habsieger brings an action on behalf of the Estate of Andrew J. Habsieger, as its legal representative, for his death and any suffering and/ or economic loss he/his Estate sustained as a result of the attack.

## The Hake Family

3015.   Christopher M. Hake was a citizen of the United States and domiciled in the State of Oklahoma when he was killed in Iraq.

3016.   On March 23, 2008, Christopher M. Hake, aged 26, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3017.   Christopher M. Hake was killed in the attack.

3018.   The weapon used to kill Christopher M. Hake was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3019.   Plaintiff Jennifer Renee York is a citizen of the United States and domiciled in the State of Oklahoma. She is the step-sister of Christopher M. Hake.

3020.   Plaintiff Jason York is a citizen of the United States and domiciled in the State of Oklahoma. He is the step-brother of Christopher M. Hake.

3021.   As a result of the attack, and the death of Christopher M. Hake, Plaintiffs Jennifer Renee York and Jason York have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their brother's society, companionship, comfort, advice and counsel.

## The Fieser Family

3022.   Plaintiff Matthew Fieser is a citizen of the United States and domiciled in the State of Washington.

3023. On March 23, 2008, Matthew Fieser, then 25, was serving in the U.S. military in Iraq.

3024. He was an occupant in a vehicle traveling in the same convoy when an EFP emplaced by Special Groups detonated near the lead vehicle, resulting in the deaths of four soldiers that day and the death of Steve A. McCoy, who subsequently died as a result of his injuries.

3025. The weapon that caused the deaths of the soldiers who had been traveling in the lead vehicle was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3026. Following the blast, the lead vehicle began to burn, eventually burning uncontrollably.

3027. Steve A. McCoy, the truck commander of the lead vehicle exited the vehicle, his body and clothes on fire. Nearly all his clothes had been burned off.

3028. After the vehicle in which Mr. Fieser was traveling approached the disabled vehicle he dismounted. While engulfed in flames, Steve A. McCoy began running towards Mr. Fieser, screaming and crying out to him.

3029. Although severely burned all over his body, Steve A. McCoy remained conscious following the attack. After a period of time, Mr. Fieser helped to move Mr. McCoy onto a support to prepare him for transport.

3030. Mr. Fieser traveled alongside Steve A. McCoy and continued to talk to him he was transported to the hospital. Throughout this period, Steve A. McCoy continued to scream with pain and cough up a foamy substance.

3031.   After arriving at the hospital Mr. Fieser learned that the other occupants of the lead vehicle had been severely burned, could not be extricated from their vehicle, and did not survive.

3032.   Mr. Fieser has been diagnosed with PTSD and has experienced nightmares.

3033.   Mr. Fieser has sought counseling and has been prescribed medication, including anti-depressants, to treat his condition.

3034.   As a result of the attack, and the injuries he suffered, Plaintiff Matthew Fieser has experienced severe physical and mental anguish and extreme emotional pain and suffering.

**The Carrington Family**

3035.   Plaintiff Benjamin Daniel Carrington is a citizen of the United States and domiciled in the State of Georgia.

3036.   On March 23, 2008, Benjamin Daniel Carrington, then 22, was serving in the U.S. military in Iraq.

3037.   Mr. Carrington was the driver of the vehicle in which Plaintiff Matthew Fieser was traveling when an EFP emplaced by Special Groups detonated near the lead vehicle in the convoy, resulting in the deaths of four soldiers that day and the death of Steve A. McCoy, who subsequently died as a result of his injuries.

3038.   The weapon that caused the deaths of the soldiers who had been traveling in the lead vehicle was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3039.   Mr. Carrington witnessed the attack scene and the aftermath, including the soldier who was engulfed in flames.

3040.   He has been diagnosed with PTSD.

3041.   Mr. Carrington has sought counseling and has been prescribed medication to treat his condition.

3042.   As a result of the attack, and the injuries he suffered, Plaintiff Benjamin Daniel Carrington has experienced severe physical and mental anguish and extreme emotional pain and suffering.

**The Heslop Family**

3043.   Plaintiff Jonathan Heslop is a citizen of the United States and domiciled in the State of Ohio.

3044.   On March 23, 2008, Jonathan Heslop, then 23, was serving in the U.S. military in Iraq.

3045.   Jonathan Heslop was the gunner of the vehicle that Benjamin Carrington was driving and was traveling in the same convoy when an EFP emplaced by Special Groups detonated near the lead vehicle, resulting in the deaths of four soldiers that day and the death of Steve A. McCoy, who subsequently died as a result of his injuries.

3046.   The weapon that caused the deaths of the soldiers who had been traveling in the lead vehicle was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3047.   Mr. Heslop witnessed the attack scene and the aftermath, including seeing Mr. McCoy when he was engulfed in flames.

3048.   Jonathan Heslop has been diagnosed with PTSD.

3049.   Mr. Heslop has sought counseling to address the PTSD and the impact that the attack has had upon him. He has been prescribed medication to treat this condition.

3050. As a result of the attack, and the injuries he suffered, Plaintiff Jonathan Heslop has experienced severe physical and mental anguish and extreme emotional pain and suffering.

**The Mason Family**

3051. Plaintiff Russell Mason is a citizen of the United States and domiciled in the State of Maryland.

3052. On March 23, 2008, Russell Mason, then 23, was serving in the U.S. military in Iraq.

3053. Russell Mason was the commander of the convey and was an occupant in the vehicle being driven by Benjamin Carrington traveling in the same convoy when an EFP emplaced by Special Groups detonated near the lead vehicle, resulting in the deaths of four soldiers that day and the death of Steve A. McCoy, who subsequently died as a result of his injuries.

3054. The weapon that caused the deaths of the soldiers who had been traveling in the lead vehicle was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3055. Following the blast, the lead vehicle began to burn, eventually burning uncontrollably.

3056. Steve A. McCoy, the truck commander of the lead vehicle exited the vehicle, his body and clothes on fire. Nearly all his clothes had been burned off.

3057. After the vehicle in which Mr. Mason was traveling approached the disabled vehicle he dismounted. While engulfed in flames, Steve A. McCoy began running towards Mr. Fieser, screaming and crying out to him.

3058.   While trying to help Steve A. McCoy, they came under fire from the ground floor and a second-floor window positions south of where the convey had been attacked.

3059.   He suffers from PTSD and has experienced survivor's guilt. He has received treatment and counseling for these issues.

3060.   As a result of the attack, and the injuries he suffered, Plaintiff Russell Mason has experienced severe physical and mental anguish and extreme emotional pain and suffering.

**The Pool Family**

3061.   Plaintiff Andy Pool is a citizen of the United States and domiciled in the State of Arkansas.

3062.   On March 23, 2008, Andy Pool, then 26, was serving in the U.S. military in Iraq.

3063.   Andy Pool was an occupant of the vehicle that Benjamin Carrington was driving when an EFP emplaced by Special Groups detonated near the lead vehicle in the convoy, resulting in the deaths of four soldiers that day and the subsequent death of Steve A. McCoy.

3064.   The weapon that caused the deaths of the soldiers who had been traveling in the lead vehicle was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3065.   Mr. Pool witnessed the attack scene and the aftermath, including seeing Steve A. McCoy when he was engulfed in flames. Although essentially unrecognizable, Mr. Pool realized it was Steve A. McCoy solely from his tattoo that was somewhat visible.

3066.   Mr. Pool traveled alongside Steve A. McCoy and continued to talk to him as he was transported to the hospital. Throughout this period, Steve A. McCoy continued to scream with

pain. While en route to the hospital, Steve A. McCoy asked Andy Pool to tell his wife and children that he loved them.

3067.   Andy Pool endures extreme survivor's guilt. He has also experienced nightmares and sleep issues.

3068.   He has been diagnosed with PTSD.

3069.   Mr. Pool has sought counseling to address the PTSD and the impact that the attack has had upon him. He has been prescribed medication to treat this condition and the sleep issues that have developed since the attack.

3070.   As a result of the attack, and the injuries he suffered, Plaintiff Andy Pool has experienced severe physical and mental anguish and extreme emotional pain and suffering.

## 150.   THE MARCH 23, 2008 ATTACK – BAGHDAD

**The Converse Family**

3071.   Paul R. Converse was a citizen of the United States and domiciled in the State of Washington.

3072.   On March 23, 2008, Paul R. Converse, then 56, was a civilian working as an auditor for the Special Inspector General for Iraq Reconstruction ("SIGIR") in Baghdad.

3073.   On March 23, 2008, a barrage of six 107mm rockets were fired by JAM Special Groups into the Green Zone in Baghdad where Paul R. Converse was working on Easter Sunday.

3074.   Paul R. Converse was mortally wounded in the rocket attack and succumbed to his wounds the following day.

3075.   The JAM Special Groups terror operatives that murdered Paul R. Converse were trained by Hezbollah and funded and armed by the IRGC-QF and they launched the attack at the direction of both Hezbollah and the IRGC-QF, as their proxy

3076.   Plaintiff Frank L. Converse is a citizen of the United States and domiciled in the State of Washington. He is the brother of Paul R. Converse.

3077.   Plaintiff Frank L. Converse brings an action individually and on behalf of the Estate of Paul R. Converse, as its legal representative.

3078.   As a result of the attack, and the death of Paul R. Converse, Plaintiff Frank L. Converse has experienced severe mental anguish, extreme emotional pain and suffering, and loss of his brother's society, companionship, comfort, advice and counsel.

### 151.   THE MARCH 27, 2008 ATTACK – SADR CITY

**The Gerber Family**

3079.   Plaintiff Anthony M. Gerber is a citizen of the United States and domiciled in the State of Washington.

3080.   On March 27, 2008, Anthony M. Gerber was serving in the U.S. military in Iraq.

3081.   Mr. Gerber was in a convoy when an EFP emplaced by Special Groups struck the vehicle immediately in front of his.

3082.   The weapon used to injure Mr. Gerber was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3083.   Additionally, Mr. Gerber was also involved in additional attacks involving JAM during the Battle of Sadr City. He was involved in several counter-offensives against JAM terrorists. He was the target of regular ambushes by JAM that relied on the use of women and children as human shields and RPG and sniper attacks. Mr. Gerber was also part of: the fight surrounding the construction of the wall on Route Gold; the battle involving Chris Kyle depicted in American Sniper; the fighting to interdict JAM attempts to resupply Sadr City and/or counter

JAM attempts to overwhelm the Americans on the flanks of Sadr City during the Battle of Sadr City.

3084.   As a result of this attack and the additional combat Mr. Geber was involved in, he suffered multiple concussions and suffers from PTSD, TBI, chronic back pain and tinnitus.

3085.   As a result of the attack, and the injuries he suffered, Plaintiff Anthony M. Gerber has experienced severe physical and mental anguish and extreme emotional pain and suffering.

**The Gregston Family**

3086.   Plaintiff Charles B. Gregston served in Iraq as part of the 1-2 Stryker Calvary Regiment. He is a citizen of the United States and domiciled in the State of California.

3087.   During 2007 and 2008, Charles B. Gregston was deployed in and/or near Sadr City, Iraq for 15 months. For the entire Battle of Sadr City, Charles B. Gregston was either directly in Sadr City or doing patrols on the outskirts of the area. Charles B. Gregston's second and final deployment was from November 2009 to December 2010, when he was stationed on the outskirts of Baghdad.

3088.   During both deployments in Iraq, Charles B. Gregston's unit confronted JAM Special Groups. Charles B. Gregston was an immediate responder during the JAM Special Groups sniper attack that killed Randell Olguin on September 30, 2007, and the JAM Special Groups EFP attack that killed Joshua A. Molina and injured Plaintiff Anthony M. Gerber on March 27, 2008. Charles B. Gregston was exposed to multiple roadside bombs while his unit patrolled JAM Special Groups strongholds.

3089.   The weapon used to kill Joshua A. Molina was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3090.   The attacks described herein were perpetrated by JAM Special Groups operatives working at the direction of Hezbollah and the IRGC-QF, using weapons supplied by the IRGC-QF and employing training provided by Hezbollah.

3091.   Due to his multiple encounters with JAM, JAM Special Groups and exposure to multiple blasts from JAM and JAM Special Groups devices, Charles B. Gregston sustained a number of injuries, including PTSD, TBIs, and tinnitus, resulting in, among other things, permanent hearing loss. Due to his injuries, Charles B. Gregston received a 100% disability rating from the VA.

3092.   As a result of the JAM and JAM Special Groups attacks, Charles B. Gregston has experienced severe physical and mental anguish and extreme emotional pain and suffering.

## 152.   THE MARCH 29, 2008 ATTACK – BAGHDAD

### The Reiher Family

3093.   Plaintiff Carl Reiher is a citizen of the United States and domiciled in the State of Arkansas.

3094.   On March 29, 2008, Carl Reiher was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3095.   The weapon used to injure Carl Reiher was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3096.   As a result of the attack, Mr. Reiher's left arm was amputated. He also sustained multiple burns injuries.

3097.   As a result of the attack, and the injuries he suffered, Plaintiff Carl Reiher has experienced severe physical and mental anguish and extreme emotional pain and suffering.

### 153.   THE APRIL 3, 2008 ATTACK – SADR CITY

**The Robinson Family**

3098.   Plaintiff Jason Robinson is a citizen of the United States and domiciled in the State of Virginia.

3099.   On April 3, 2008, Jason Robinson was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3100.   The weapon used to injure Jason Robinson was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3101.   As a result of the attack, Jason Robinson's sustained shrapnel wounds to his face, neck and shoulder. The blast also dislocated two lumbar disks and ruptured both of his eardrums.

3102.   As a result of the attack, and the injuries he suffered, Plaintiff Jason Robinson has experienced severe physical and mental anguish and extreme emotional pain and suffering.

3103.   Plaintiff Frances Robinson is a citizen of the United States and domiciled in the State of Virginia. She is the wife of Jason Robinson.

3104.   Plaintiff E.R., a minor represented by her legal guardian, Frances Robinson, is a citizen of the United States and domiciled in the State of Virginia. She is the daughter of Jason Robinson.

3105.   Plaintiff William Justin Weatherly is a citizen of the United States and domiciled in the State of Virginia. He is the step-son of Jason Robinson.

3106.   Plaintiff Michael Weatherly is a citizen of the United States and domiciled in the State of Texas. He is the step-son of Jason Robinson.

3107.   As a result of the attack, and the injuries suffered by Jason Robinson, Plaintiffs

Frances Robinson, E.R., William Justin Weatherly and Michael Weatherly have experienced severe mental anguish, and extreme emotional pain and suffering.

### 154. THE APRIL 6, 2008 ATTACK – BAGHDAD

**The Wolfer Family**

3108.  Stuart Wolfer was a citizen of the United States and domiciled in the State of Idaho when he was killed in Iraq.

3109.  On April 6, 2008, Stuart Wolfer, aged 36, was serving in the United States military in Iraq when JAM Special Groups terror operatives attacked his unit.

3110.  Stuart Wolfer was killed as a result of injuries sustained in the attack.

3111.  The attack was perpetrated by JAM Special Groups terror operatives working at the direction of Hezbollah and the IRGC-QF, using weapons supplied by the IRGC-QF and employing training provided by Hezbollah.

3112.  Plaintiff Lee Wolfer is a citizen of the United States and domiciled in the State of Iowa. She is the widow of Scott Wolfer.

3113.  Plaintiff Lee Wolfer brings an action individually and on behalf of the Estate of Stuart Wolfer, as its legal representative.

3114.  Plaintiff L.W., a minor represented by her legal guardian, Lee Wolfer, is a citizen of the United States and domiciled in the State of Iowa. She is the daughter of Scott Wolfer.

3115.  Plaintiff M.W., a minor represented by her legal guardian, Lee Wolfer, is a citizen of the United States and domiciled in the State of Iowa. She is the daughter of Scott Wolfer.

3116.  Plaintiff I.W., a minor represented by her legal guardian, Lee Wolfer, is a citizen of the United States and domiciled in the State of Iowa. She is the daughter of Scott Wolfer.

3117.  Plaintiff Beverly Wolfer is a citizen of the United States and domiciled in the State

of New York. She is the sister of Stuart Wolfer.

3118.    As a result of the attack, and the death of Stuart Wolfer, Plaintiffs Leonard Wolfer, Esther Wolfer, Lee Wolfer, L.W., M.W., I.W., and Beverly Wolfer have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/husband's/father's/son's/brother's society, companionship, comfort, advice and counsel.

### 155.    THE APRIL 7, 2008 ATTACK – BAGHDAD

**The Vaughn Family**

3119.   Richard A. Vaughn was a citizen of the United States and domiciled in the State of California when he was killed in Iraq.

3120.    On April 7, 2008, Richard A. Vaughn, aged 22, was serving in the U.S. military in Iraq when a vehicle in his unit, 1st Battalion, 66th Armor Regiment, 1st Brigade Combat Team, 4th Infantry Division, was struck by an EFP emplaced by Special Groups and Vaugh and his unit came under attack by RPGs and small arms fire.

3121.   Richard A. Vaughn was killed in the attack.

3122.    The weapon used in the attack that killed Richard A. Vaughn was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3123.    Plaintiff Rachelle Idol is a citizen of the United States and domiciled in the State of North Carolina. She is the widow of Richard A. Vaughn.

3124.    Plaintiff James Vaughn is a citizen of the United States and domiciled in the State of Arizona. He is the father of Richard A. Vaughn.

3125.    Plaintiff Jeannine Vaughn is a citizen of the United States and domiciled in the State of Arizona. She is the mother of Richard A. Vaughn.

3126.   Plaintiff Clifford Vaughn is a citizen of the United States and domiciled in the State of Arizona. He is the brother of Richard A. Vaughn.

3127.   As a result of the attack, and the death of Richard A. Vaughn, Plaintiffs Rachelle Idol, James Vaughn, Jeannine Vaughn and Clifford Vaughn have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/son's/brother's society, companionship, comfort, advice and counsel.

### 156.   THE APRIL 8, 2008 ATTACK – KHARGULIAH

**The Hartley Family**

3128.   Jeffery Hartley was a citizen of the United States and domiciled in the State of Texas when he was killed in Iraq.

3129.   On April 8, 2008, Jeffery Hartley, aged 25, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3130.   Jeffery Hartley was killed in the attack.

3131.   The weapon used to kill Jeffery Hartley was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3132.   Plaintiff David Wayne Hartley is a citizen of the United States and domiciled in the State of Texas. He is the brother of Jeffrey Hartley.

3133.   Plaintiff Kaylie Hartley is a citizen of the United States and domiciled in the State of Texas. She is the sister of Jeffery Hartley.

3134.   Plaintiff Lisa Duncan is a citizen of the United States and domiciled in the State of Texas. She is the sister of Jeffery Hartley.

3135.   As a result of the attack, and the death of Jeffery Hartley, Plaintiffs David Wayne

Hartley, Kaylie Hartley and Lisa Duncan have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their brother's society, companionship, comfort, advice and counsel.

### 157.   THE APRIL 9, 2008 ATTACK – SADR CITY

**The Ault Family**

3136.   Jesse A. Ault was a citizen of the United States and domiciled in the State of Virginia when he was killed in Iraq.

3137.   On April 9, 2008, Jesse A. Ault, aged 28, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3138.   Jesse A. Ault was killed in the attack.

3139.   The weapon used to kill Jesse A. Ault was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3140.   Plaintiff Virginia Billiter is a citizen of the United States and domiciled in the State of West Virginia. She is the mother of Jesse A. Ault.

3141.   Plaintiff Eric Billiter is a citizen of the United States and domiciled in the State of West Virginia. He is the step-father of Jesse A. Ault.

3142.   Plaintiff Adrianne Kidd is a citizen of the United States and domiciled in the State of North Carolina. She is the step-sister of Jesse A. Ault.

3143.   As a result of the attack, and the death of Jesse A. Ault, Plaintiffs Virginia Billiter, Eric Billiter and Adrianne Kidd have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

**158.** **THE APRIL 12, 2008 ATTACK – BAGHDAD**

**The Allmon Family**

3144.   William E. Allmon was a citizen of the United States and domiciled in the State of Oklahoma when he was killed in Iraq.

3145.   On April 12, 2008, William E. Allmon, aged 25, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3146.   William E. Allmon was killed in the attack.

3147.   The weapon used to kill William E. Allmon was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3148.   Plaintiff William Allmon is a citizen of the United States and domiciled in the State of Georgia. He is the father of William E. Allmon.

3149.   Plaintiff William Allmon brings an action individually and on behalf of the Estate of William E. Allmon, as its legal representative.

3150.   As a result of the attack, and the death of William E. Allmon, Plaintiff William Allmon has experienced severe mental anguish, extreme emotional pain and suffering and loss of his son's society, companionship, comfort, advice and counsel.

**159.** **THE APRIL 17, 2008 ATTACK – SADR CITY**

**The Sloan Family**

3151.   Plaintiff Ronald Sloan is a citizen of the United States and domiciled in the State of Tennessee.

3152.   On April 17, 2008, Ronald Sloan, age 32, was serving in the U.S. military in Iraq.

3153.   Mr. Sloan was on patrol in Sadr City when the Abrams tank he was in was struck by an EFP emplaced by Special Groups.

3154.   The weapon used to injure Mr. Sloan was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3155.   As a result of the attack, Mr. Sloan was struck by shrapnel on the right side of his face and neck.

3156.   He was medevaced to the 86th combat support hospital for treatment of his wounds. He was then sent to the Green Zone for further evaluation.

3157.   Mr. Sloan also suffers from PTSD as a result of the attack.

3158.   As a result of the attack, and the injuries he suffered, Plaintiff Ronald Sloan has experienced severe physical and mental anguish and extreme emotional pain and suffering.

**160.   THE APRIL 21, 2008 ATTACK – SADR CITY**

**The Thomsen Family**

3159.   Plaintiff Mark E. Thomsen is a citizen of the Unites States and domiciled in the State of Arkansas.

3160.   On April 21, 2008, Mark E. Thomsen was serving in the U.S. military in Iraq when his unit was attacked with an IRAM.

3161.   The attack was perpetrated by Hezbollah-trained and IRGC-QF-supplied operatives of the JAM and KH Special Groups acting as agents and proxies of Hezbollah and the IRGC-QF.

3162.   As a result of the attack, Mark E. Thomsen suffered a concussion. He also suffers from TBI and PTSD.

3163.   As a result of the attack, and the injuries he suffered, Plaintiff Mark E. Thomsen

has experienced severe physical and mental anguish and extreme emotional pain and suffering.

3164.   Plaintiff Ardell Thomsen is a citizen of the United States and domiciled in the State of Arkansas. She is the mother of Mark E. Thomsen.

3165.   Plaintiff Ralph Thomsen is a citizen of the United States and domiciled in the State of Arkansas. He is the father of Mark E. Thomsen.

3166.   As a result of the attack, and the injuries suffered by Mark E. Thomsen, Plaintiffs Ardell Thomsen and Ralph Thomsen have experienced severe mental anguish, and extreme emotional pain and suffering.

**161.   THE APRIL 21, 2008 ATTACK – BAGHDAD**

**The Bogart Family**

3167.   Plaintiff Evan D. Bogart is a citizen of the Unites States and domiciled in the State of Arizona.

3168.   On April 21, 2008, Evan Bogart was serving was serving in the U.S. military in Iraq.

3169.   Mr. Bogart was in a convoy when an EFP emplaced by Special Groups struck his vehicle.

3170.   The weapon used to injure Mr. Bogart was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3171.   As a result of the attack, Mr. Bogart sustained burns and blast injuries to his face as well as a shrapnel injury to his left shoulder. He also suffers from PTSD and tinnitus.

3172.   As a result of the attack, and the injuries he suffered, Plaintiff Evan D. Bogart has experienced severe physical and mental anguish and extreme emotional pain and suffering.

3173.   Plaintiff Lani D. Bogart is a citizen of the Unites States and domiciled in the State of Arizona. She is the mother of Evan D. Bogart.

3174.   Plaintiff Douglas R. Bogart is a citizen of the Unites States and domiciled in the State of Arizona. He is the brother of Evan D. Bogart.

3175.   Plaintiff Christopher Bogart is a citizen of the Unites States and domiciled in the State of Arizona. He is the brother of Evan D. Bogart.

3176.   Plaintiff Cana Hickman is a citizen of the Unites States and domiciled in the State of Texas. She is the sister of Evan D. Bogart.

3177.   As a result of the attack, and the injuries suffered by Evan D. Bogart, Plaintiffs Lani D. Bogart, Douglas R. Bogart, Christopher Bogart and Cana Hickman have experienced severe mental anguish, and extreme emotional pain and suffering.

## 162.   THE APRIL 21, 2008 ATTACK – SADR CITY

### The Rosa-Valentin Family

3178.   Plaintiff Luis Rosa-Valentin is a citizen of the United States and domiciled in the State of Maryland.

3179.   On April 21, 2008, Luis Rosa-Valentin, then 24, was serving in the U.S. military in Iraq.

3180.   Mr. Rosa-Valentin was on foot patrol in the Al Amin neighborhood of Baghdad when he was struck by an EFP emplaced by Special Groups.

3181.   The weapon used to injure Mr. Rosa-Valentin was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3182.   As a result of the attack, Mr. Rosa-Valentin lost both of his legs and his left arm.

He also suffered blindness in one eye, lost his hearing, and broke every bone in his face.

3183.  He has also been diagnosed with a TBI and PTSD.

3184.  As a result of the attack, and the injuries he suffered, Plaintiff Luis Rosa-Valentin has experienced severe physical and mental anguish and extreme emotional pain and suffering.

3185.  Plaintiff M.R., a minor represented by her legal guardian Luis Rosa-Valentin, is a citizen of the United States and domiciled in the State of Maryland. She is the daughter of Luis Rosa-Valentin.

3186.  Plaintiff Iliana M. Rosa-Valentin is a citizen of the Unites States and domiciled in the State of Maryland. She is the sister of Luis Rosa Valentin.

3187.  As a result of the attack, and the injuries suffered by Luis Rosa-Valentin, Plaintiffs M.R. and Iliana M. Rosa-Valentin have experienced severe mental anguish, and extreme emotional pain and suffering.

### 163.  THE APRIL 28, 2008 ATTACK – BAGHDAD

**The Sloan Family**

3188.  Plaintiff Ronald Sloan is a citizen of the United States and domiciled in the State of Tennessee.

3189.  On April 28, 2008, Ronald Sloan, age 32, was serving in the U.S. military in Iraq when his unit was attacked with IRAMs by Hezbollah-trained and IRGC-QF-supplied operatives of the KH Special Groups acting as agents and proxies of Hezbollah and the IRGC-QF.

3190.  As a result of the attack, Mr. Sloan was knocked unconscious. He also suffered ear pain and general discomfort.

3191.  Mr. Sloan has subsequently been diagnosed as suffering from a TBI and PTSD.

3192.  As a result of the attack, and the injuries he suffered, Plaintiff Ronald Sloan has

experienced severe physical and mental anguish and extreme emotional pain and suffering

### 164. THE APRIL 28, 2008 ATTACK – BAGHDAD

**The Kaplan Family**

3193.   Plaintiff Preston Charles Kaplan is a citizen of the United States and domiciled in the State of Texas.

3194.   On April 28, 2008, Preston Charles Kaplan, then 23, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle. He was the turret gunner in an M1114 up-armored Humvee that was hit with an EFP on the front passenger-side door while traveling in the Kadhimiya neighborhood of Baghdad.

3195.   The weapon used to injure Preston Charles Kaplan was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3196.   As a result of the attack, Preston Charles Kaplan sustained a penetrating wound to his right leg including blast injuries to his tibial shaft. Shrapnel lacerated his popliteal artery and injured his peroneal nerve. He also sustained a TBI, bilateral hearing loss, tinnitus, scarring, sleep apnea, GERD, and PTSD. After numerous attempts to save his right leg below the knee, he underwent a below-the-knee amputation 19 months after the attack and suffered additional infections following the amputations that required significant additional surgeries.

3197.   Mr. Kaplan has received extensive medical treatment at various hospitals including various surgeries and prosthetic fittings where he has spent years in treatment.

3198.   As a result of the attack, and the injuries he suffered, Preston Charles Kaplan has experienced severe physical and mental anguish and extreme emotional pain and suffering.

3199.   Plaintiff Nicole A. Kaplan is a citizen of the United States and domiciled in the

State of Texas. She is the wife of Preston Charles Kaplan.

3200.   Plaintiff Noni Kaplan is a citizen of the United States and domiciled in the State of California. She is the mother of Preston Charles Kaplan.

3201.   Plaintiff David Kaplan is a citizen of the United States and domiciled in the State of California. He is the father of Preston Charles Kaplan.

3202.   Plaintiff Jaime Zarcone is a citizen of the United States and domiciled in the State of California. She is the sister of Preston Charles Kaplan.

3203.   Plaintiff Jessalyn Holt is a citizen of the United States and domiciled in the State of California. She is the sister of Preston Charles Kaplan.

3204.   As a result of the attack, and the injuries Preston Charles Kaplan suffered, Plaintiffs Nicole A. Kaplan, Noni Kaplan, David Kaplan, Jaime Zarcone, and Jessalyn Holt have experienced severe mental anguish and extreme emotional pain and suffering.

### 165.   **THE APRIL 28, 2008 ATTACK – SADR CITY**

**The Woodard Family**

3205.   Plaintiff David Woodard is a citizen of the United States and domiciled in the State of Georgia.

3206.   On April 28, 2008, David Woodard, then 34, was serving was serving in the U.S. military in Iraq.

3207.   Mr. Woodard was in a convoy when an EFP emplaced by Special Groups struck his vehicle.

3208.   The weapon used to injure Mr. Woodard was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3209.   As a result of the attack, a large fragment from the EFP struck Mr. Woodard's right leg and blew out four inches of his leg bone. Two large shrapnel fragments entered his left calf, removing approximately 25% of the calf muscle and another fragment entered near his Achilles tendon.

3210.   As a result of the attack, and the injuries he suffered, Plaintiff David Woodard has experienced severe physical and mental anguish and extreme emotional pain and suffering.

3211.   Plaintiff D.M.W., a minor represented by his legal guardian David Woodard, is a citizen of the United States and domiciled in the State of Georgia. He is the son of David Woodard.

3212.   As a result of the attack, and the injuries suffered by David Woodard, Plaintiff D.W.M. has experienced severe mental anguish, and extreme emotional pain and suffering.

### 166.   THE APRIL 28, 2008 ATTACK – SADR CITY

**The Magers Family**

3213.   Plaintiff Adam Magers is a citizen of the United States and domiciled in the State of Missouri.

3214.   On April 28, 2008, Adam Magers was serving was serving in the U.S. military in Iraq and was at Joint Security Station Thawra in Sadr City when it was attacked with IRAMs by Hezbollah-trained and IRGC-QF-supplied operatives of the KH Special Groups acting as agents and proxies of Hezbollah and the IRGC-QF.

3215.   As a result of the attack, Mr. Magers suffered lacerations on his left arm, hands, right ear and small cuts on the back of his neck. He also sustained injuries to his shoulder which ultimately required surgery

3216.   As a result of the attack, and the injuries he suffered, Plaintiff Adam Magers has experienced severe physical and mental anguish and extreme emotional pain and suffering.

167.    **THE APRIL 29, 2008 ATTACK – SADR CITY**

**The Garza Family**

3217.   Plaintiff Luis Garza is a citizen of the United States and domiciled in the State of Florida.

3218.   On April 29, 2008, Luis Garza, then 22, was serving was serving in the U.S. military in Iraq.

3219.   Mr. Garza was in a convoy when an EFP emplaced by Special Groups struck his vehicle.

3220.   The weapon used to injure Mr. Garza was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3221.   As a result of the attack, Mr. Garza suffered shrapnel injuries to his face. He also suffers from PTSD and sleep apnea. Eventually, part of his kidney had to be removed as a result of the wounds he suffered.

3222.   As a result of the attack, and the injuries he suffered, Plaintiff Luis Garza has experienced severe physical and mental anguish and extreme emotional pain and suffering.

168.    **THE APRIL 30, 2008 ATTACK – BAGHDAD**

**The Tucker Family**

3223.   Ronald J. Tucker was a citizen of the Unites States and domiciled in the State of Colorado when he was killed in Iraq.

3224.   On April 30, 2008, Ronald J. Tucker, aged 21, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near his HMMWV in Baghdad.

3225.   Ronald J. Tucker was killed in the attack.

3226.   The weapon used to kill Ronald J. Tucker was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3227.   Plaintiff Susan Arnold is a citizen of the United States and domiciled in the State of Colorado. She is the mother of Ronald J. Tucker.

3228.   Plaintiff Susan Arnold brings an action individually and on behalf of the Estate of Ronald J. Tucker, as its legal representative.

3229.   Plaintiff David Arnold is a citizen of the United States and domiciled in the State of Colorado. He is the step-father of Ronald J. Tucker.

3230.   Plaintiff Samantha Tucker is a citizen of the United States and domiciled in the State of Ohio. She is the sister of Ronald J. Tucker.

3231.   Plaintiff Brandon Arnold is a citizen of the United States and domiciled in the State of Colorado. He is the brother of Ronald J. Tucker.

3232.   Plaintiff Daisy Tucker is a citizen of the United States and domiciled in the State of Ohio. She is the sister of Ronald J. Tucker.

3233.   As a result of the attack, and the death of Ronald J. Tucker, Plaintiffs Susan Arnold, David Arnold, Samantha Tucker, Brandon Arnold and Daisy Tucker have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

### 169.   THE MAY 1, 2008 ATTACK – SADR CITY

**The Daggett Family**

3234.   John K. Daggett was a citizen of the United States and domiciled in the State of

Arizona when he was injured in Iraq.

3235.   On May 1, 2008, John K. Daggett, aged 21, was serving in the U.S. military in Iraq when a rocket propelled grenade fired by a JAM Special Groups terror operative hit the vehicle in which he was travelling.

3236.   John K. Daggett was injured in the attack, and he died on May 15, 2008 from the injuries he sustained in the attack.

3237.   John K. Daggett was killed in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

3238.   Plaintiff John Daggett is a citizen of the United States and domiciled in the State of Arizona. He is the father of John K. Daggett.

3239.   Plaintiff Colleen Czaplicki is a citizen of the United States and domiciled in the State of Arizona. She is the mother of John K. Daggett.

3240.   As a result of the attack, and the death of John K. Daggett, Plaintiffs John Daggett and Colleen Czaplicki have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's society, companionship, comfort, advice and counsel.

### 170.   THE MAY 2, 2008 ATTACK – BAGHDAD

**The Hicks Family**

3241.   Corey L. Hicks was a citizen of the United States and domiciled in the State of Arizona when he was killed in Iraq.

3242.   On May 2, 2008, Corey L. Hicks, aged 22, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3243.   Corey L. Hicks was killed in the attack.

3244.   The weapon used to kill Corey L. Hicks was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3245.   Plaintiff Russel Hicks, Sr. is a citizen of the United States and domiciled in the State of Wyoming. He is the father of Corey L. Hicks.

3246.   Plaintiff Russel Hicks, Jr. is a citizen of the United States and domiciled in the State of Arizona. He is the brother of Corey L. Hicks.

3247.   As a result of the attack, and the death of Corey L. Hicks, Plaintiffs Russel Hicks, Sr. and Russel Hicks, Jr. have experienced severe mental anguish, extreme emotional pain and suffering and loss of their son's/brother's society, companionship, comfort, advice and counsel.

### 171.   THE MAY 9, 2008 ATTACK – BAGHDAD

**The Williamson Family**

3248.   Wesley Williamson is a citizen of the United States and domiciled in the State of Texas.

3249.   On May 9, 2008, Wesley Williamson, then 23, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3250.   The weapon used to injure Mr. Williamson was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3251.   As a result of the attack, Mr. Williamson's right ulna and radius were completely shattered, and his posterior interosseous nerve was severed.

3252.   Shrapnel also penetrated his body.

3253.   Mr. Williamson received medical treatment in Iraq, Germany, Washington D.C.,

and Brooke Army Medical Center in San Antonio, Texas.

3254.   He has undergone multiple procedures to stabilize his condition and address his injuries.

3255.   In an attempt to regain functionality of his right arm and hand, Mr. Williamson underwent multiple surgeries.

3256.   These surgeries included the installation of plates and 16 screws in his right arm and tendon transfer surgery.

3257.   Mr. Williamson underwent occupational therapy for approximately 18 months. During that time, he was prescribed medications to manage the pain that he experienced.

3258.   The injury to his hand has resulted in a loss of dexterity to his fingers. This has forced Mr. Williamson to re-learn simple everyday tasks such as typing.

3259.   He experiences pain and limitations of movement daily.

3260.   Mr. Williamson has suffered memory loss since the attack and has difficulty recalling information.

3261.   He has been diagnosed with PTSD and TBI, and has sought counseling and been prescribed medication to treat those conditions.

3262.   Plaintiff Jesse Williamson is a citizen of the United States and domiciled in the State of New Mexico. He is the brother of Wesley Williamson.

3263.   As a result of the attack, and the injuries Wesley Williamson has suffered, Plaintiff Jesse Williamson has experienced severe mental anguish, and extreme emotional pain and suffering.

### 172.    THE MAY 9, 2008 ATTACK – SADR CITY

**The Garza Family**

3264.   Plaintiff Luis Garza is a citizen of the United States and domiciled in the State of Florida.

3265.   On May 9, 2008, Luis Garza, then 22, was serving was serving in the U.S. military in Iraq.

3266.   Mr. Garza was in a convoy when an EFP emplaced by Special Groups struck his vehicle.

3267.   The weapon used to injure Mr. Garza was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3268.   As a result of the attack, Mr. Garza suffered shrapnel injuries to his face. He also suffers from PTSD and sleep apnea. Eventually, part of his kidney had to be removed as a result of the wounds he suffered.

3269.   As a result of the attack, and the injuries he suffered, Plaintiff Luis Garza has experienced severe physical and mental anguish and extreme emotional pain and suffering.

### 173.    THE MAY 9, 2008 ATTACK – SADR CITY

**The Magers Family**

3270.   Plaintiff Adam Magers is a citizen of the United States and domiciled in the State of Missouri.

3271.   On May 9, 2008, Adam Magers was serving was serving in the U.S. military in Iraq.

3272.   Mr. Magers was in a convoy when four separate EFPs emplaced by Special Groups

struck the convoy in which he was traveling.

3273.  The weapon used to injure Mr. Magers was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3274.  As a result of the attack, Mr. Magers suffers from TBI.

3275.  As a result of the attack, and the injuries he suffered, Plaintiff Adam Magers has experienced severe physical and mental anguish and extreme emotional pain and suffering.

## 174.  THE MAY 11, 2008 ATTACK – BAGHDAD

### The O'Neill Family

3276.  Plaintiff Patrick O'Neill is a citizen of the United States and domiciled in the State of Virginia.

3277.  On May 11, 2008, Patrick O'Neill, then 18, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3278.  Patrick O'Neill was injured in the attack.

3279.  The weapon used to injure Patrick O'Neill was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3280.  As a result of the attack, Patrick O'Neill was rendered unconscious.

3281.  He had sustained shrapnel in his back, buttock, and right shoulder and had also suffered injuries to his neck and face.

3282.  His shoulder had been fractured and his right ear was severed in multiple places.

3283.  Shrapnel had also pierced through Mr. O'Neill's body, causing his right lung to collapse.

3284.   He continues to experience pain in his chest and shoulder.

3285.   Mr. O'Neill was diagnosed with PTSD and has sought counseling. He continues to have nightmares stemming from the attack.

3286.   As a result of the attack, and the injuries he suffered, Plaintiff Patrick O'Neill has experienced physical and mental anguish and extreme emotional pain and suffering.

3287.   Plaintiff John O'Neill is a citizen of the United States and domiciled in the State of Virginia. He is the father of Patrick O'Neill.

3288.   Plaintiff Dianne O'Neill is a citizen of the United States and domiciled in the State of Virginia. She is the mother of Patrick O'Neill.

3289.   As a result of the attack, and the injuries Patrick O'Neill has suffered, Plaintiffs John O'Neill and Dianne O'Neill have experienced severe mental anguish, and extreme emotional pain and suffering.

## 175.   THE MAY 11, 2008 ATTACK – BALAD

### The Luckett Family

3290.   Plaintiff Daniel Luckett is a citizen of the United States and domiciled in the State of Kentucky.

3291.   On May 11, 2008, Daniel Luckett, then 24, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3292.   The weapon used to injure Daniel Luckett was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3293.   As a result of the attack, Daniel Luckett his left foot was sheared off above the ankle and his right foot was cut off above the toes.

3294.   As a result of the attack, and the injuries he suffered, Plaintiff Daniel Luckett has experienced severe physical and mental anguish and extreme emotional pain and suffering.

### 176.   THE MAY 25, 2008 ATTACK – AN-NAJAF

**The Gasper Family**

3295.   Frank J. Gasper was a citizen of the United States and domiciled in the State of Colorado when he was killed in Iraq.

3296.   On May 25, 2008, Frank J. Gasper, aged 25, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near the vehicle in which he was traveling in Najaf.

3297.   Frank J. Gasper was killed in the attack.

3298.   The weapon used to kill Frank J. Gasper was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3299.   Plaintiff Breanna Lynn Gasper is a citizen of the United States and domiciled in the State of Georgia. She is the widow of Frank J. Gasper.

3300.   Plaintiff Breanna Lynn Gasper brings an action individually and on behalf of the Estate of Frank J. Gasper, as its legal representative.

3301.   Plaintiff Jamie Barnes is a citizen of the United States and domiciled in the State of California. She is the sister of Frank J. Gasper.

3302.   As a result of the attack, and the death of Frank J. Gasper, Plaintiffs Breanna Lynn Gasper and Jamie Barnes have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/brother's society, companionship, comfort, advice and counsel.

177.   **THE JUNE 7, 2008 ATTACK – BAGHDAD**

**The Hurst Family**

3303.   David R. Hurst was a citizen of the United States and domiciled in the State of Louisiana when he was killed in Iraq.

3304.   On June 7, 2008, David R. Hurst, aged 31, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3305.   David R. Hurst was killed in the attack.

3306.   The weapon used to kill David R. Hurst was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3307.   Plaintiff Max W. Hurst is a citizen of the United States and domiciled in the State of Louisiana. He is the father of David R. Hurst.

3308.   Plaintiff Max W. Hurst brings an action individually and on behalf of the Estate of David R. Hurst, as its legal representative.

3309.   Plaintiff Lillian Hurst is a citizen of the United States and domiciled in the State of Louisiana. She is the step-mother of David R. Hurst.

3310.   Plaintiff Christopher Hurst is a citizen of the United States and domiciled in the State of Louisiana. He is the brother of David R. Hurst.

3311.   Plaintiff Mark Hurst is a citizen of the United States and domiciled in the State of Louisiana. He is the brother of David R. Hurst.

3312.   As a result of the attack, and the death of David R. Hurst, Plaintiffs Max W. Hurst, Lillian Hurst, Christopher Hurst and Mark Hurst have experienced severe mental anguish, extreme

emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

### 178.   THE JUNE 24, 2008 ATTACK - BAGHDAD

**The Farley Family**

3313.   Steven L. Farley was a citizen of the United States and domiciled in the State of Oklahoma when he was killed in Iraq.

3314.   Steven L. Farley worked in Iraq under the auspices of the U.S. Department of State as a member of a Provincial Reconstruction Team ("PRT") in eastern Baghdad in 2008.

3315.   On June 24, 2008, a JAM-Special Groups cell executed a sophisticated assassination bombing in a local government office in Sadr City that targeted Americans and local government officials who were not Sadr followers. The bomb killed eleven people, including Mr. Farley and three other Americans.

3316.   The attack was perpetrated by JAM Special Groups operatives working at the direction of Hezbollah and the IRGC-QF, using weapons supplied by the IRGC-QF and employing training provided by Hezbollah.

3317.   Plaintiff Donna Farley is a citizen of the United States and domiciled in the State of Oklahoma. She is the widow of Steven Farley.

3318.   Plaintiff Noel J. Farley, Sr. is a citizen of the United States and domiciled in the State of Oklahoma. He is the father of Steven Farley.

3319.   Plaintiff Barbara Farley is a citizen of the United States and domiciled in the State of Oklahoma. She is the mother of Steven Farley.

3320.   Plaintiff Brett Farley is a citizen of the United States and domiciled in the State of Oklahoma. He is the son of Steven Farley.

3321.   Plaintiff Cameron Farley is a citizen of the United States and domiciled in the State of Oklahoma. He is the son of Steven Farley.

3322.   Plaintiff Chris Farley is a citizen of the United States and domiciled in the State of Oklahoma. He is the son of Steven Farley.

3323.   Plaintiff Vickie McHone is a citizen of the United States and domiciled in the State of Oklahoma. She is the sister of Steven Farley.

3324.   Plaintiff Noel S. Farley is a citizen of the United States and domiciled in the State of Oklahoma. He is the brother of Steven Farley.

3325.   As a result of the June 24, 2008 attack, and the death of Steven Farley, Plaintiffs Donna Farley, Noel J. Farley, Sr., Barbara Farley, Brett Farley, Jessica Farley, Cameron Farley, Chris Farley, Vickie McHone and Noel S. Farley have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's/son's/brother's society, companionship, comfort, advice and counsel.

**The Suveges Family**

3326.   Nicole Suveges was a citizen of the United States and domiciled in the State of Illinois when she was killed in Iraq.

3327.   Nicole Suveges was a political scientist who worked for BAE Systems in the Human Terrain System (HTS) program in eastern Bagdad in 2008. The HTS program was designed to promote cultural understanding between U.S. military and Iraqis.

3328.   On June 24, 2008, a JAM-Special Groups cell executed a sophisticated assassination bombing in a local government office in Sadr City that targeted Americans and local government officials who were not Sadr followers. The bomb killed eleven people, including Ms. Suveges and three other Americans.

3329.   The attack was perpetrated by JAM Special Groups operatives working at the direction of Hezbollah and the IRGC-QF, using weapons supplied by the IRGC-QF and employing training provided by Hezbollah.

3330.   Plaintiff David C. Iverson is a citizen of the United States and domiciled in the State of Maryland. He is the widower of Nicole Suveges.

3331.   As a result of the attack, and the death of Nicole Suveges, Plaintiff David C. Iverson has experienced severe mental anguish, extreme emotional pain and suffering, and loss of his wife's society, companionship, comfort, advice and counsel.

### 179.   THE AUGUST 4, 2008 ATTACK – BAGHDAD

**The Menke Family**

3332.   Jonathan D. Menke was a citizen of the United States and domiciled in the State of Indiana when he was killed in Iraq.

3333.   On August 4, 2008, Jonathan D. Menke, aged 22, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3334.   Jonathan D. Menke was killed in the attack.

3335.   The weapon used to kill Jonathan D. Menke was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3336.   Daniel Menke is a citizen of the United States and domiciled in the State of Indiana. He is the father of Jonathan D. Menke.

3337.   Daniel Menke brings an action on behalf of the Estate of Jonathan D. Menke, as its legal representative, for his death and any suffering and/ or economic loss he/his Estate sustained as a result of the attack.

180.    **THE AUGUST 13, 2008 ATTACK – BAGHDAD**

**The Hale Family**

3338.   James M. Hale was a citizen of the United States and domiciled in the State of Illinois when he was killed in Iraq.

3339.   On August 13, 2008, James M. Hale, aged 23, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3340.   James M. Hale was killed in the attack.

3341.   The weapon used to kill James M. Hale was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3342.   Plaintiff Jessica H. Williams is a citizen of the United States and domiciled in the State of Texas. She is the widow of James M. Hale.

3343.   Plaintiff Jessica H. Williams brings an action individually and on behalf of the Estate of James M. Hale, as its legal representative.

3344.   Plaintiff J.M.H., a minor represented by his legal guardian, Jessica H. Williams, is a citizen of the United States and domiciled in the State of Texas. He is the son of James M. Hale.

3345.   Plaintiff J.J.H., a minor represented by his legal guardian, Jessica H. Williams, is a citizen of the United States and domiciled in the State of Texas. He is the son of James M. Hale.

3346.   Plaintiff J.H., a minor represented by his legal guardian, Jessica H. Williams, is a citizen of the United States and domiciled in the State of Texas. He is the son of James M. Hale.

3347.   As a result of the attack, and the death of James M. Hale, Plaintiffs Jessica H. Williams, J.M.H., J.J.H. and J.H. have experienced severe mental anguish, extreme emotional pain

and suffering, and loss of their husband's/father's society, companionship, comfort, advice and counsel.

### 181.   THE AUGUST 26, 2008 ATTACK – SADR CITY

**The Latham Family**

3348.   Plaintiff Tyler Latham is a citizen of the United States and domiciled in the State of Michigan.

3349.   On August 26, 2008, Tyler Latham, age 22, was serving in the U.S. military in Iraq, when his vehicle was struck by an EFP emplaced by Special Groups.

3350.   The weapon used to injure Tyler Latham was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3351.   As a result of the attack, Mr. Latham sustained significant injuries to his left hand. This required complex surgery to reconnect tendons and ligaments in that hand.

3352.   The damage to his hand has necessitated extensive physical therapy.

3353.   He also sustained significant injuries due to the impact of multiple pieces of shrapnel in his face, legs, and arm. This necessitated surgery and treatment.

3354.   He continues to experience limitations in strength and mobility of his left hand.

3355.   He suffers with chronic pain in his left hand and arm.

3356.   In addition, Mr. Latham has been diagnosed with a TBI.

3357.   As a result of the attack, and the injuries he suffered, Plaintiff Tyler Latham has experienced severe physical and mental anguish and extreme emotional pain and suffering.

### 182.    THE OCTOBER 5, 2008 ATTACK – MUSAYYIB

**The Bearfield Family**

3358.    Plaintiff Bryant Bearfield is a citizen of the United States and domiciled in the State of New York.

3359.    On October 5, 2008, Bryant Bearfield, then 23, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near the vehicle in which he was traveling on Route Cleveland.

3360.    The weapon used to injure Bryant Bearfield was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3361.    As a result of the blast, Bryant Bearfield suffered shrapnel wounds to his head, and a concussion. Mr. Bearfield was also diagnosed with anxiety as a result of the attack.

3362.    As a result of the attack, and the injuries he suffered, Plaintiff Bryant Bearfield has experienced severe physical and mental anguish and extreme emotional pain and suffering.

### 183.    THE DECEMBER 28, 2008 ATTACK – SADR CITY

**The Paul Family**

3363.    Plaintiff Carllie Paul is a citizen of the United States and domiciled in the State of Florida.

3364.    On December 28, 2008, Carllie Paul, then 22, was serving in the U.S. military in Iraq when his M1151 vehicle was attacked with grenades and small arms fire by JAM Special Groups terror operatives.

3365.    Carllie Paul was injurd in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

3366.   As a result of the attack, Carllie Paul sustained burns to both of his arms resulting in lasting scars and injuries to his back. He was airlifted to Landstuhl, Germany where he stayed for approximately two weeks after which he was transferred to Fort Bliss, Texas. He also suffered from severe PTSD. He has difficulty sleeping, experiences nightmares, and suffers from depression, anxiety, and suicidal ideation.

3367.   As a result of the attack, and the injuries he suffered, Carllie Paul has experienced severe physical and mental anguish and extreme emotional pain and suffering.

### 184.   THE JANUARY 10, 2009 ATTACK – BAGHDAD

**The Bauer Family**

3368.   Justin Bauer was a citizen of the United States and domiciled in the State of Colorado when he was killed in Iraq.

3369.   On January 10, 2009, Justin Bauer, aged 24, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3370.   Justin Bauer was killed in the attack.

3371.   The weapon used to kill Justin Bauer was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3372.   Kari Carosella is a citizen of the United States and domiciled in the State of Colorado. She is the widow of Justin Bauer.

3373.   Kari Carosella brings an action on behalf of the Estate of Justin Bauer, as its legal representative, for his death and any suffering and/ or economic loss he/his Estate sustained as a result of the attack.

3374.   Plaintiff Connie Haddock is a citizen of the United States and domiciled in the State

of Colorado. She is the mother of Justin Bauer.

3375.   Plaintiff Jacob Bauer is a citizen of the United States and domiciled in the State of Colorado. He is the brother of Justin Bauer.

3376.   Plaintiff Jeremy Bauer is a citizen of the United States and domiciled in the State of Colorado Mexico. He is the brother of Justin Bauer.

3377.   As a result of the attack, and the death of Justin Bauer, Plaintiffs Connie Haddock, Jacob Bauer and Jeremy Bauer have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

**The Bradley Family**

3378.   Plaintiff Andrew Bradley is a citizen of the United States and domiciled in the State of Texas.

3379.   On January 10, 2009, Andrew Bradley, then 20, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

3380.   The weapon used to injure Andrew Bradley was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3381.   As a result of the attack, Mr. Bradley lost part of his right leg, rendering him a below-the-knee amputee.

3382.   He also sustained burns on his left foot and has experienced nerve damage in that foot.

3383.   Apart from treatment in Iraq and Germany, Mr. Bradley received in-patient treatment at Brooke Army Medical Center for over one year.

3384.   Surgeons performed bone reconstruction to retain as much of his joint area as possible.

3385.   He also underwent multiple procedures to address infections in his wounds.

3386.   He has received physical therapy and has been prescribed medications to address pain resulting from his injuries.

3387.   Mr. Bradley has also required treatment for medical conditions that developed from issues involving his prosthetics.

3388.   Mr. Bradley continues to experience pain and emotional distress each day, and he receives treatment for his injuries as necessary.

3389.   As a result of the attack, and the injuries he suffered, Plaintiff Andrew Bradley has experienced severe physical and mental anguish and extreme emotional pain and suffering.

3390.   Plaintiff Julie Salhus is a citizen of the United States and domiciled in the State of Texas. She is the mother of Andrew Bradley.

3391.   Plaintiff Kristen Galen is a citizen of the United States and domiciled in the State of Texas. She is the sister of Andrew Bradley.

3392.   As a result of the attack, and the injuries Andrew Bradley suffered, Plaintiffs Julie Salhus and Kristen Galen have experienced severe mental anguish and extreme emotional pain and suffering.

**The Ward Family**

3393.   Plaintiff Patrick Ward is a citizen of the United States and domiciled in the State of Pennsylvania.

3394.   On January 10, 2009, Patrick Ward, then aged 36, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

3395.   Mr. Ward was an occupant in the third vehicle traveling in a four-vehicle convoy, when the lead vehicle was hit by an EFP.

3396.   The EFP used to injure Patrick Ward was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC

3397.   After the EFP impacted the lead vehicle. Mr. Ward got out of is vehicle and went to check on the occupants of the lead vehicle. He observed that the back of Justin Bauer's legs had been blown off and that he appeared to be dead. He assisted the medic in extricating Andrew Bradley, whose right leg had been severed, out of the HMMWV.

3398.   Following the explosion of the EFP, the convoy was attacked by a sniper on a nearby roof.

3399.   As a result of the attack, Mr. Ward was diagnosed with PTSD. He sought counseling once he came back to the U.S.

3400.   As a result of the attack, Plaintiff Patrick Ward has experienced severe mental anguish and extreme emotional pain and suffering.

3401.   Plaintiff Jarrett Ward is a citizen of the United States and domiciled in the State of Pennsylvania. He is the son of Patrick Ward.

3402.   As a result of the attack, and the injuries Patrick Ward suffered, Plaintiff Jarrett Ward has experienced severe mental anguish and extreme emotional pain and suffering.

**185.   THE JANUARY 18, 2009 ATTACK – BAGHDAD**

**The Andrade Family**

3403.   Roberto Andrade, Jr. was a citizen of the United States and domiciled in the State of Illinois when he was killed in Iraq.

3404.   On January 18, 2009, Roberto Andrade, Jr., aged 26, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3405.   Roberto Andrade, Jr. was killed in the attack.

3406.   The weapon used to kill Roberto Andrade, Jr. was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3407.   Roberto Andrade, Sr. is a citizen of the United States and domiciled in the State of Arizona. He is the father of Roberto Andrade, Jr.

3408.   Roberto Andrade, Sr. brings an action on behalf of the Estate of Roberto Andrade, Jr., as its legal representative, for his death and any suffering and/ or economic loss he/his Estate sustained as a result of the attack.

3409.   Plaintiff Sandra Valencia is a citizen of the United States and domiciled in the State of Arizona. She is the mother of Roberto Andrade, Jr.

3410.   As a result of the attack, and the death of Roberto Andrade, Jr., Plaintiff Sandra Valencia has experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

### 186.   THE FEBRUARY 26, 2009 ATTACK – ADHAMIYAH

**The Connelly Family**

3411.   Brian Connelly was a citizen of the United States and domiciled in the State of New Jersey when he was killed in Iraq.

3412.   On February 26, 2009, Brian Connelly, aged 26, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle in the Adhamiyah District in eastern Baghdad.

3413.   Brian Connelly was killed in the attack.

3414.   The weapon used to kill Brian Connelly was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3415.   Plaintiff Kara Connelly is a citizen of the United States and domiciled in the State of New Jersey. She is the widow of Brian Connelly.

3416.   Plaintiff Jean Dammann is a citizen of the United States and domiciled in the State of Ohio. She is the mother of Brian Connelly.

3417.   Plaintiff Mark Dammann is a citizen of the United States and domiciled in the State of Ohio. He is the father of Brian Connelly.

3418.   Plaintiff Kevin Connelly is a citizen of the United States and domiciled in the State of New Jersey. He is the brother of Brian Connelly.

3419.   As a result of the attack, and the death of Brian Connelly, Plaintiffs Kara Connelly, Jean Dammann, Mark Dammann and Kevin Connelly have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/son's/brother's society, companionship, comfort, advice and counsel.

## 187.   THE MAY 16, 2009 ATTACK – BASRA

**The Schaefer Family**

3420.   David Schaefer was a citizen of the United States and domiciled in the State of Illinois, County of St. Clair, when he was killed in Iraq.

3421.   On May 16, 2009, David Schaefer, aged 27, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3422.   David Schaefer was killed in the attack.

466

3423.   The weapon used to kill David Schaefer was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3424.   Plaintiff Rhonda Kemper is a citizen of the United States and domiciled in the State of Kentucky. She is the mother of David Schaefer.

3425.   As a result of the attack, and the death of David Schaefer, Plaintiff Rhonda Kemper has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her son's society, companionship, comfort, advice and counsel.

### 188.   THE MAY 17, 2009 ATTACK – BAGHDAD

**The Canine Family**

3426.   Robert Canine is a citizen of the United States and domiciled in the State of Missouri.

3427.   On May 17, 2009, Robert Canine, age 29, was serving in the U.S. military in Iraq.

3428.   Mr. Canine was on a routine patrol in northwest Baghdad when his vehicle was struck by an EFP emplaced by Special Groups.

3429.   The weapon used to injure Mr. Canine was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3430.   As a result of the attack, he sustained significant injuries due to the impact of shrapnel and portions of the explosive device impacting his body.

3431.   Mr. Canine's injuries included significant damage to his right leg and foot and the essential removal of the toes of his left foot as well as the loss of a great deal of blood.

3432.   The injuries necessitated the amputation of his right leg and left foot.

3433.   Apart from the injuries to his legs and feet, he also sustained a large laceration that ran from his buttocks to the back of his knee. It was determined that muscle and tissue was removed in these areas due to the blast.

3434.   Mr. Canine has suffered infections that have required treatment and assessment.

3435.   Apart from medical treatment while in Iraq, Mr. Canine received treatment and rehabilitation at Walter Reed Hospital for approximately 18 months.

3436.   Mr. Canine has been diagnosed with PTSD and has received treatment and counseling. He has been prescribed medication to address both the pain and emotional impact of the attack.

3437.   Mr. Canine continues to experience pain and emotional distress each day, and he receives treatment for his injuries.

3438.   Plaintiff S.C., a minor, represented by his legal guardian Robert Canine, is a citizen of the United States and domiciled in the State of Missouri. He is the son of Robert Canine.

3439.   Plaintiff Jennifer Roose is a citizen of the United States and domiciled in the State of Ohio. She is the sister of Robert Canine.

3440.   As a result of the attack, and the injuries Robert Canine suffered, Plaintiffs S.C. and Jennifer Roose have experienced severe mental anguish and extreme emotional pain and suffering.

**The Murphy Family**

3441.   Plaintiff Rhett Murphy is a citizen of the United States and domiciled in the State of Minnesota.

3442.   On May 17, 2009, Rhett Murphy, then 30, was serving in the U.S. military in Iraq.

3443.   Mr. Murphy was on a routine patrol in northwest Baghdad when his vehicle was struck by an EFP.

3444.   The weapon used to injure Mr. Murphy was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3445.   As a result of the attack, he sustained significant injuries due to the impact of shrapnel impacting his body. This has resulted in scarring.

3446.   Apart from the shrapnel-related injuries he also sustained injuries to the tendons in his left hand a fracture of his finger. These have necessitated various surgical procedures.

3447.   Mr. Murphy has been diagnosed with PTSD and major depression and has received treatment and counseling. He has been prescribed medication to address both the pain and emotional impact of the attack.

3448.   Mr. Murphy continues emotional distress and he receives treatment for his injuries.

3449.   As a result of the attack, and the injuries he suffered, Plaintiff Rhett Murphy has experienced severe physical and mental anguish and extreme emotional pain and suffering.

**The Landtiser Family**

3450.   Plaintiff Roady Landtiser is a citizen of the United States and domiciled in the State of Oklahoma.

3451.   On May 17, 2009, Roady Landtiser, then 21, was serving in the U.S. military in Iraq.

3452.   Mr. Landtiser was on a routine patrol in northwest Baghdad when his vehicle was struck by an EFP.

3453.   The weapon used to injure Mr. Landtiser was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3454.   As a result of the attack, he sustained a concussion and was rendered unconscious.

3455.   He developed tinnitus in his right ear and this condition continues to the present day.

3456.   Mr. Landtiser has experienced flashbacks and night terrors.

3457.   He has been diagnosed with PTSD. He has received treatment, has been prescribed medication, and sought counseling for these issues.

3458.   As a result of the attack, and the injuries he suffered, Plaintiff Roady Landtiser has experienced severe mental anguish and extreme emotional pain and suffering.

**The Richards Family**

3459.   Plaintiff Nathan Richards is a citizen of the United States and domiciled in the State of Florida.

3460.   On May 17, 2009, Nathan Richards, then 22, was serving in the U.S. military in Iraq.

3461.   Mr. Richards was on a routine patrol in northwest Baghdad when his vehicle was struck by an EFP.

3462.   The weapon used to injure Mr. Richards was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3463.   As a result of the attack, he sustained a concussion and was knocked unconscious. His eardrum was also ruptured as a result of the blast.

3464.   Mr. Richards has developed vertigo and has experienced migraines.

3465.   He has been diagnosed with a TBI and has dealt with long-term and short-term memory loss.

3466.   He has been diagnosed with PTSD and has had nightmares and flashbacks as well as experienced survivor's guilt.  He has received treatment and counseling for these issues.

3467.   As a result of the attack, and the injuries he suffered, Plaintiff Nathan Richards has experienced severe mental anguish and extreme emotional pain and suffering.

3468.   Plaintiff Steven Richards is a citizen of the United States and domiciled in the State of Massachusetts. He is the father of Nathan Richards.

3469.   As a result of the attack, and the injuries suffered by Nathan Richards, Plaintiff Steven Richards has experienced severe mental anguish, and extreme emotional pain and suffering.

## 189.   THE JUNE 14, 2009 ATTACK – BALAD

**The Songer Family**

3470.   Plaintiff Christopher Songer is a citizen of the United States and domiciled in the State of Washington.

3471.   On June 14, 2009, Christopher Songer, then 36, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3472.   The weapon used to injure Christopher Songer was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3473.   As a result of the attack, Christopher Songer suffered a broken middle finger, deep lacerations on both hands requiring reconstructive surgery, shrapnel throughout his body, burns to hands, arms, face and legs, a large should wound and multiple bone fractures. He also suffered from smoke inhalation which damaged lungs, nerve damage and hearing loss. He also suffers from TBI.

3474. As a result of the attack, and the injuries he suffered, Plaintiff Christopher Songer has experienced severe physical and mental anguish and extreme emotional pain and suffering.

3475. Plaintiff Kimberly Songer is a citizen of the United States and domiciled in the State of Washington. She is the wife of Christopher Songer.

3476. Plaintiff C.S., a minor represented by his legal guardian, Kimberly Songer, is a citizen of the United States and domiciled in the State of Washington. He is the son of Christopher Songer.

3477. As a result of the attack, and the injuries suffered by Christopher Songer, Plaintiffs Kimberly Songer and C.S. have experienced severe mental anguish, and extreme emotional pain and suffering.

### 190. <u>THE SEPTEMBER 8, 2009 ATTACK – BAGHDAD</u>

**<u>The Helton Family</u>**

3478. Joseph D. Helton, Jr. was a citizen of the United States and domiciled in the State of Georgia when he was killed in Iraq.

3479. On September 8, 2009, Joseph D. Helton, Jr., aged 24, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3480. Joseph D. Helton Jr. was killed in the attack.

3481. The weapon used to kill Joseph D. Helton, Jr. was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3482. Plaintiff Joseph Helton, Sr. is a citizen of the United States and domiciled in the State of Washington. He is the father of Joseph D. Helton, Jr.

3483.   Plaintiff Joseph Helton, Sr. brings an action individually and on behalf of the Estate of Joseph D. Helton, Jr., as its legal representative.

3484.   Plaintiff Jessica Cabot is a citizen of the United States and domiciled in the State of California. She is the sister of Joseph D. Helton, Jr.

3485.   Plaintiff Jeanne Rhea McManus is a citizen of the United States and domiciled in the State of Pennsylvania. She is the sister of Joseph D. Helton, Jr.

3486.   As a result of the attack, and the death of Joseph D. Helton, Jr., Plaintiffs Joseph Helton, Sr., Jessica Cabot, and Jeanne Rhea McManus have experienced severe mental anguish, extreme emotional pain and suffering and loss of their son's/brother's society, companionship, comfort, advice and counsel.

**The Wise Family**

3487.   Plaintiff Victor Ray Wise, II is a citizen of the United States and domiciled in the State of Kentucky.

3488.   On September 8, 2009, Victor Ray Wise, II, then 22, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

3489.   The weapon used to injure Victor Ray Wise, II was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3490.   Mr. Wise was in the gunner's hatch when the EFP hit the vehicle he was in.

3491.   He was extricated from the vehicle and tourniquets were placed on his legs and was initially treated at Camp Falcon. He was then taken to a hospital up north for surgery.

3492.   He was subsequently taken to Landstuhl, Germany and then Walter Reed Army Medical Center where he spent six months. He has undergone eleven surgeries. After six months

at Walter Reed Army Medical Center, Mr. Wise was sent to Omaha Offutt Air Force Base, where he was treated at the base hospital.

3493.   The EFP hit Mr. Wise's legs. He had to have some of his toes amputated. He also sustained nerve damage to his legs and is missing muscles in legs, some of which had to be amputated.

3494.   Mr. Wise was diagnosed with PTSD as a result of the attack.

3495.   As a result of the attack, and the injuries he suffered, Plaintiff Victor Ray Wise, II has experienced severe physical and mental anguish and extreme emotional pain and suffering.

## 191.   THE JANUARY 18, 2010 ATTACK – BAGHDAD

### The Lester Family

3496.   Plaintiff Theodore Lester is a citizen of the United States and domiciled in the State of Texas.

3497.   On January 18, 2010, Theodore Lester, then 32, and a former soldier in the U.S. military, was serving as a civilian contractor in Baghdad, Iraq when his camp was attacked with Katyusha rockets deployed by JAM Special Groups.

3498.   While running for cover from the Katyusha rockets, Mr. Lester was injured in the attack when he stepped into an existing mortar impact hole. Mr. Lester fell to the ground and was forced to crawl to cover.

3499.   The rocket attack was perpetrated by JAM Special Groups terror operatives working at the direction of Hezbollah and the IRGC-QF, using weapons supplied by the IRGC-QF and employing training provided by Hezbollah.

3500.   Mr. Lester was only able to obtain an X-ray of his foot a day later, which revealed that he had fractured three bones in his left foot. Mr. Lester still experiences pain in his left leg and

foot from his injuries.

3501. Mr. Lester was subsequently diagnosed with, and treated for, PTSD.

3502. As a result of the attack, and the injuries he suffered, Plaintiff Theodore Lester has experienced severe physical and mental anguish and extreme emotional pain and suffering.

## 192. **THE APRIL 27, 2010 ATTACK - KHALIS**

**The Coe Family**

3503. Keith Coe was a citizen of the United States and domiciled in the State of Florida when he was killed in Iraq.

3504. On April 27, 2010, Keith Coe, aged 30, was serving in the U.S. military in Iraq.

3505. Mr. Coe was north of his base in Iraq when his vehicle was struck by an EFP emplaced by Special Groups.

3506. The weapon used to kill Mr. Coe was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3507. Plaintiff Katrina Coe is a citizen of the United States and domiciled in the State of Tennessee. She is the widow of Keith Coe.

3508. Plaintiff Katrina Coe brings an action individually and on behalf of the Estate of Keith Coe, as its legal representative.

3509. Plaintiff K.A.C., a minor represented by his legal guardian, Katrina Coe, is a citizen of the United States and domiciled in the State of Tennessee. He is the son of Keith Coe.

3510. Plaintiff K.A.C., a minor represented by his legal guardian, Katrina Coe, is a citizen of the United States and domiciled in the State of Tennessee. He is the son of Keith Coe.

3511.   Plaintiff K.A.C., a minor represented by her legal guardian, Katrina Coe, is a citizen of the United States and domiciled in the State of Tennessee. She is the daughter of Keith Coe.

3512.   Plaintiff Rhonda Smith is a citizen of the United States and domiciled in the State of Florida. She is the mother of Keith Coe.

3513.   Plaintiff Matthew Coe is a citizen of the United States and domiciled in the State of Florida. He is the brother of Keith Coe.

3514.   Plaintiff Sabrina Chapman is a citizen of the United States and domiciled in the State of Florida. She is the sister of Keith Coe.

3515.   As a result of the attack, and the death of Keith Coe, Plaintiffs Katrina Coe, K.A.C, K.A.C., K.A.C., Rhonda Smith, Matthew Coe and Sabrina Chapman have experienced severe physical and mental anguish and extreme emotional pain and suffering and loss of their husband's/father's/son's/brother's society, companionship, comfort, advice and counsel.

### 193.   THE MARCH 10, 2011 ATTACK – BAGHDAD

**The Kinsey Family**

3516.   Plaintiff James Kinsey is a citizen of the United States and domiciled in the State of Arkansas.

3517.   On March 10, 2011, James Kinsey, then 34, was serving in the U.S. military in Iraq when his base came under indirect fire by JAM Special Groups terror operatives working at the direction of Hezbollah and the IRGC-QF, using weapons supplied by the IRGC-QF and employing training provided by Hezbollah.

3518.   An Iranian-made 240mm rocket exploded within the base perimeter, approximately 50 meters from where Mr. Kinsey was standing.

3519.   The resulting blast threw Mr. Kinsey into a barrier wall, and he suffered a severe concussion.

3520.   Mr. Kinsey was later diagnosed with a TBI and PTSD from the attack.

3521.   As a result of the attack, and the injuries he suffered, Plaintiff James Kinsey has experienced severe mental anguish and extreme emotional pain and suffering.

### 194.   THE APRIL 22, 2011 ATTACK – NUMANIYAH

**The Stiggins Family**

3522.   Antonio Stiggins was a citizen of the United States and domiciled in the State of New Mexico when he was killed in Iraq.

3523.   On April 22, 2011, Antonio Stiggins, aged 25, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3524.   Antonio Stiggins was killed in the attack.

3525.   The weapon used to kill Antonio Stiggins was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3526.   Plaintiff Angel Mayes is a citizen of the United States and domiciled in the State of New Mexico. She is the mother of Antonio Stiggins.

3527.   Plaintiff Angel Mayes brings an action individually and on behalf of the Estate of Antonio Stiggins, as its legal representative.

3528.   Plaintiff Luke Stiggins is a citizen of the United States and domiciled in the State of New Mexico. He is the father of Antonio Stiggins.

3529.   Plaintiff Donald Mayes is a citizen of the United States and domiciled in the State of New Mexico. He is the step-father of Antonio Stiggins.

3530. As a result of the attack, and the death of Antonio Stiggins, Plaintiffs Angel Mayes, Luke Stiggins, and Donald Mayes have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's society, companionship, comfort, advice and counsel.

### 195. THE MAY 22, 2011 ATTACK – BAGHDAD

**The Beattie Family**

3531. Clifford Beattie was a citizen of the United States and domiciled in the State of Washington when he was killed in Iraq.

3532. On May 22, 2011, Clifford Beattie, aged 37, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3533. Clifford Beattie was killed in the attack.

3534. The weapon used to kill Clifford Beattie was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3535. Plaintiff Rhonda Beattie is a citizen of the United States and domiciled in the State of Ohio. She is the mother of Clifford Beattie.

3536. Plaintiff Rhonda Beattie brings an action individually and on behalf of the Estate of Clifford Beattie, as its legal representative.

3537. Plaintiff Jaydean Hamilton is a citizen of the United States and domiciled in the State of Washington. She is the daughter of Clifford Beattie.

3538. As a result of the attack, and the death of Clifford Beattie, Plaintiffs Rhonda Beattie and Jaydean Hamilton have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/father's society, companionship, comfort, advice and counsel.

196.   **THE JUNE 6, 2011 ATTACK – BAGHDAD**

**The Fishbeck Family**

3539.   Christopher Brook Fishbeck was a citizen of the United States and domiciled in the State of California.

3540.   On June 6, 2011, Christopher Brook Fishbeck, then 24 was serving in the U.S. military in Iraq when the base he was at, Forward Operating Base Loyalty in Baghdad, came under attack by IRAMs.

3541.   Christopher Brook Fishbeck was killed in the attack.

3542.   KH operatives fired the IRAMs at the base. Those operatives were trained by Hezbollah and funded and supplied by the IRGC-QF and they launched the attack at the direction of both Hezbollah and the IRGC-QF as their proxy. Specifically, KH claimed responsibility for the attack that killed Christopher Brook Fishbeck.

3543.   Plaintiff Stephanie Kidder is a citizen of the United States and domiciled in the State of California. She is the wife of Christopher Brook Fishbeck.

3544.   As a result of the attack, and the death of Christopher Brook Fishbeck, Plaintiff Stephanie Kidder has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her husband's society, companionship, comfort, advice and counsel.

197.   **THE JUNE 29, 2011 ATTACK – WASIT PROVINCE**

**The Field Family**

3545.   Plaintiff Donald Field is a citizen of the United States and domiciled in the State of Texas.

3546.   On June 29, 2011, Donald Field, then 42, was serving in the U.S. military in Iraq when his unit was attacked with IRAMs fired by KH Special Groups terror operatives.

479

3547.   Those operatives were trained by Hezbollah and funded and supplied by the IRGC-QF and they launched the attack at the direction of both Hezbollah and the IRGC-QF as their proxy.

3548.   One of the many explosions caused a concrete retaining wall to fall, portions of which landed on Donald Field, rendering him unconscious.

3549.   When he came to, he was able to extricate himself from the debris and noticed much of his clothing had been burned and torn.

3550.   Both lower lobes of Donald Field's lungs had collapsed due to the force of the blast and the concrete wall having landed on him.

3551.   He sustained injuries to his back, primarily to his lower vertebrae, requiring surgery.  He has limited motion.

3552.   He has been prescribed medication to address the pain he experiences on a daily basis.

3553.   As a result of the blast, Mr. Field also suffered first and second-degree burns on his head, neck, and the back of his arms.

3554.   Mr. Field also injured the right side of his head and right ear.  He has experienced and continues to deal with short-term cognitive and memory issues.  He has undergone multiple surgeries to address the injuries to his head and ear.

3555.   Mr. Field has been diagnosed with a TBI.

3556.   He has sought counseling and continues to seek treatment with a psychiatrist. He has been prescribed medication for anxiety and mood-related issues.

3557.   As a result of the attack, and the injuries he suffered, Plaintiff Donald Field has experienced severe physical and mental anguish and extreme emotional pain and suffering.

3558.   Plaintiff Angelica Field is a citizen of the United States and domiciled in the State of Texas. She is the of wife of Donald Field.

3559.   Plaintiff Senovia Field is a citizen of the United States and domiciled in the State of Texas. She is the of daughter of Donald Field.

3560.   Plaintiff Selicia Field is a citizen of the United States and domiciled in the State of Texas. She is the of daughter of Donald Field.

3561.   As a result of the attack, and the injuries Donald suffered, Plaintiffs Angelica Field, Senovia Field and Selicia Field have experienced severe mental anguish and extreme emotional pain and suffering.

## 198.   THE JULY 15, 2011 ATTACK – BASRA

**The Elliott Family**

3562.   Daniel L. Elliott was a citizen of the United States and domiciled in the state of North Carolina when he was killed in Iraq.

3563.   On July 15, 2011, Daniel L. Elliott, aged 21, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3564.   Daniel L. Elliott was killed in the attack.

3565.   The weapon used to kill Daniel L. Elliott was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3566.   Plaintiff Ed Elliott is a citizen of the United States and domiciled in the State of North Carolina. He is the father of Daniel L. Elliott.

3567.   As a result of the attack, and the death of Daniel L. Elliott, Plaintiff Ed Elliott has experienced severe mental anguish, extreme emotional pain and suffering, and loss of his son's society, companionship, comfort, advice and counsel.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

## CIVIL LIABILITY UNDER 18 U.S.C. § 2333(a) AGAINST ALL DEFENDANTS FOR VIOLATIONS OF 18 U.S.C. § 2339A CONSTITUTING ACTS OF INTERNATIONAL TERRORISM

3568.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

3569.   By knowingly agreeing to provide, and providing, material support to Iran in an illegal manner, and knowing, or with deliberate indifference to the fact, that the objects and aims of the Conspiracy were to be used in preparation for or carrying out multiple acts set forth in 18 U.S.C. § 2339A, each Defendant violated § 2339A's express prohibition against conspiring to provide material support within the meaning of § 2339A, and committed and completed overt acts in furtherance of the Conspiracy.

3570.   Each Defendant's conduct in agreeing to provide Iran with hundreds of millions (or more) of USD in an illegal manner, violated 18 U.S.C. § 2339A's express prohibition against concealing or disguising the nature, location, source, or ownership of material support or resources, knowing that the material support or resources are to be used in preparation for, or in carrying out, a violation of any of 18 U.S.C. §§ 32, 37, 81, 175, 229, 351, 831, 842(m)-(n), 844(f) or (i), 930 (c), 956, 1091, 1114, 1116, 1203, 1361, 1362, 1363, 1366, 1751, 1992, 2155, 2156, 2280, 2281, 2332, 2332a, 2332b, 2332f, 2340A, or 2442, 42 U.S.C. § 2284, 49 U.S.C. §§ 46502 or 60123 (b),

or any offense listed in 18 U.S.C. § 2332b (g)(5)(B) (except for §§ 2339A and 2339B).

3571.   Both the Conspiracy itself and the acts of international terrorism that injured the Plaintiffs constitute acts of international terrorism under 18 U.S.C. § 2331, and constitute "engaging in terrorist activity" under 8 U.S.C. § 1182(a)(3)(B)(iii)-(iv), and/or "engaging in terrorism" under 22 U.S.C. § 2656f.

3572.   The Conspiracy between Iran and its agents and the Defendants (including Defendants John Does 1-50), and other non-defendant Co-conspirators resulted in the transfer of: (a) more than two hundred billion dollars through the United States in a manner designed to purposefully circumvent monitoring by U.S. regulators and law enforcement agencies; and (b) hundreds of millions of dollars to Hezbollah, the IRGC and other terrorist organizations (including the Special Groups) actively engaged in murdering and maiming U.S. nationals in Iraq.

3573.   The Defendants (including Defendants John Does 1-50) together with other non-defendant Co-conspirators (including Iran) agreed to, and did in fact, purposefully transfer billions of USD through the United States knowing that such funds would be delivered to Iran and Iranian agents, and that the payment order messages facilitating such funds transfers had been deliberately and intentionally structured, designed, and processed in a manner expressly designed to ensure that such funds would not be detected or monitored by U.S. regulators and law enforcement agencies.

3574.   At the time each Defendant knowingly agreed to provide Iran material support in an illegal manner, each Defendant knew that the United States had formally designated Iran as a State Sponsor of Terrorism and knew, or was deliberately indifferent to the fact that, *inter alia*, Iran used the IRGC and Hezbollah as primary mechanisms to cultivate and support terrorism.

3575.   Among other things, and as documented in the U.S. State Department's 2013

Country Reports on Terrorism, between 2004 and 2011 the IRGC, in concert with Hezbollah, provided training outside of Iraq, as well as sending advisors to Iraq, to assist, train, supply and guide Special Groups in the construction and use of EFPs and other advanced weaponry, devices that constitute "weapons of mass destruction" as defined in 18 U.S.C. § 2332a, incorporating the definition of "destructive devices" set forth in 18 U.S.C. § 924(4)(A)-(C).

3576. Each Defendant knew or was deliberately indifferent to the fact that Iran, the IRGC, Hezbollah, and the Special Groups engaged or engages in terrorist activity (8 U.S.C. § 1182(a)((3)(B)(iii)-(iv)), terrorism (22 U.S.C § 2656f), and acts of international terrorism (18 U.S.C. § 2331), including facilitating, funding, preparing for, and supporting terrorist activity by the Special Groups.

3577. Through this clandestine stream of U.S. dollars, each Defendant knew, or was deliberately indifferent to the fact that as a result of knowingly agreeing to join the Conspiracy to provide Iran with illegal material support, such conduct foreseeably (and in fact did) facilitate the transfer of hundreds of millions of dollars in payments to the IRGC and Hezbollah through the international financial system, including payments initiated, processed, altered, modified, falsified, or released by or through the Defendants.

3578. Each Defendant knowingly and purposefully agreed to provide material support and services to Iran in an illegal manner, knowing or deliberately indifferent to the fact that such illegal support and services facilitated Iran's clandestine support for the IRGC and Hezbollah, and that such agreements and resultant overt acts and conduct would foreseeably facilitate acts of international terrorism, terrorist activities, and terrorism, including homicides, attempted homicides, or conspiracies to commit homicide against U.S. nationals by the IRGC, Hezbollah and the Special Groups (including KH, JAM and AAH), as well as attacks conducted by weapons of

mass destruction, such as EFPs, and bombings, attempted bombings, or conspiracies to bomb places of public use, state or government facilities, public transportation systems, or infrastructure facilities by the IRGC, Hezbollah, and the Special Groups.

3579.   The material support that Defendants knowingly agreed to illegally provide to Iran, provided foreseeable, substantial assistance to the IRGC, Hezbollah and the Special Groups, thereby preparing and facilitating acts of terrorism in violation of 18 U.S.C. §§ 1114, 1203, 1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f that caused Plaintiffs' injuries.

3580.   The material support that Defendants knowingly agreed to illegally provide to Iran included facilitating tens of millions of dollars in illicit transactions on behalf of MODAFL, the IRGC, Mahan Air and other instrumentalities of Iranian state-sponsored terror to enable numerous violations of the U.S. trade embargo against Iran, concealing Iran's efforts to evade U.S. sanctions and enabling Iran's acquisition from the United States of goods and technologies prohibited by U.S. law to be sold or transferred to Iran, including components of IEDs deployed against Coalition Forces in Iraq.

3581.   Each Defendant also: knew of the existence of other conspirators including some or all of the Defendants; was aware that the other conspirators (including Defendants and Iranian Bank Co-conspirators) engaged in the same or similar conduct, and that the other conspirators shared the objective of providing material support to Iran in an illegal manner for the explicit purpose of enabling Iran to avoid U.S. sanctions and regulations enacted specifically to prevent Iran's ability to finance, support, prepare for, plan, or carry out acts of international terrorism, including the types of acts that injured the Plaintiffs.

3582.   Each Defendant also knew or was deliberately indifferent to the fact that one of the specific aims and objectives of the Conspiracy was keeping U.S. depository institutions, law

485

enforcement and counter-terrorism agencies blind to Iran's movement of U.S. dollars through the international financial system, and thus also knew or was deliberately indifferent to the fact that the overt acts they performed in furtherance of the Conspiracy facilitated that specific objective.

3583.   Having entered into an agreement to provide Iran material support in an illegal manner, in direct contravention of U.S. laws and regulations enacted expressly to mitigate Iran's sponsorship of terrorism and terrorist organizations (including Weapons of Mass Destruction proliferation activities in furtherance of such sponsorship) each Defendant also knew or was deliberately indifferent to the fact, that the Conspiracy's aims would foreseeably result in Iran transferring millions of dollars in order to engage in terrorist activities (8 U.S.C. § 1182(a)(3)(B)(iii)-(iv)), terrorism (22 U.S.C. § 2656f), and acts of international terrorism (18 U.S.C. § 2331).

3584.   The Defendants' overt acts and agreement to purposefully transfer billions of dollars through the United States to Iran in a manner expressly designed to ensure that the funds could be transferred by and to Iran without being monitored by U.S. regulators and law enforcement agencies, involved acts that were dangerous to human life, by their nature, and as further evidenced by their consequences.

3585.   The Defendants' acts either occurred primarily outside the territorial jurisdiction of the United States or transcended national boundaries in terms of the means by which they were accomplished.

3586.   Each Defendant's agreement to enter into the Conspiracy and purposeful transfer of billions of dollars through the United States in a manner designed to purposefully circumvent monitoring by U.S. regulators and law enforcement agencies foreseeably resulted in material support being delivered in order to carry out or prepare for violations of, *inter alia*, 18 U.S.C. §§

2332(a)-(c), 2332a, and § 2332f by the IRGC, Hezbollah and the Special Groups, and were thus themselves acts of international terrorism because they either were, or objectively appear to have been intended to: (a) intimidate or coerce the civilian population of the United States and other nations, (b) influence the policy of the governments of the United States and other nations by intimidation or coercion, and/or (c) affect the conduct of the governments of the United States and other nations by facilitating the IRGC, Hezbollah and the Special Groups' abilities to prepare for, support, fund, train, initiate, and/or carry out mass destruction and murder.

3587.   Each Defendant's conduct was a substantial cause in fact and a significant factor in the chain of events leading to the Plaintiffs' injuries, and foreseeably, substantially enhanced the IRGC, Hezbollah and the Special Groups' ability to engage in terrorist activity (8 U.S.C. § 1182(a)(3)(B)(iii)-(iv)), terrorism (22 U.S.C. § 2656f), and/or commit acts of international terrorism (18 U.S.C. § 2331) (including violations of 18 U.S.C. §§ 1114, 1203, 1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f and 2339A). Each Defendant's conduct was thus also a substantial, foreseeable factor in bringing about the Plaintiffs' injuries.

3588.   Furthermore, each Plaintiff's injuries constitutes a harm falling within the foreseeable risk contemplated by each Defendant's violations, including each Defendant's knowing agreement to enter into the Conspiracy, each Defendant's performance of overt acts in furtherance of the Conspiracy, and each Defendant's knowledge or deliberate indifference to the full scope, objectives, and results of the Conspiracy. Injuries resulting from terrorist attacks (including attacks launched by the IRGC, Hezbollah and the Special Groups) that were planned, supported by, funded, or assisted by Iran are precisely the risks contemplated by Executive Orders, statutes and regulations (including, without limitation, designations under Executive Orders specifically concerning the IRGC, Defendant Bank Saderat Plc, and the IRISL) enacted

specifically to ensure that Iran had restricted access to USD and financial services under conditions of maximum transparency, that such dollars were used only for legitimate agencies, operations, and programs and not by or for the benefit of SDNs, and not for Iran's efforts to acquire, develop, and distribute Weapons of Mass Destruction (including weapons such as EFPs directed at Coalition Forces), and to ensure that any funds Iran did receive that touched U.S. depository institutions could be monitored by U.S. regulators and law enforcement agencies.

3589.   Through its conduct as described above, by knowingly entering into the Conspiracy and violating 18 U.S.C. § 2339A in the manner and with the state of mind alleged above, each Defendant committed acts of international terrorism and is civilly liable for damages to each Plaintiff for their injuries pursuant to 18 U.S.C. § 2333(a).

## SECOND CLAIM FOR RELIEF

### CIVIL LIABILITY UNDER 18 U.S.C. § 2333(a) AGAINST ALL DEFENDANTS FOR VIOLATIONS OF 18 U.S.C. § 2339B CONSTITUTING ACTS OF INTERNATIONAL TERRORISM

3590.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

3591.   In knowingly agreeing to provide, and providing, material support to Iran in an illegal manner, and knowing, or deliberately indifferent to the fact, that the objects and aims of the Conspiracy were to provide material support to Foreign Terrorist Organizations (FTOs), including Hezbollah and Kata'ib Hezbollah, each Defendant violated § 2339B's express prohibition against conspiring to provide material support within the meaning of § 2339B, and committed and completed overt acts in furtherance of the Conspiracy

3592.   The Defendants herein (including Defendants John Does 1-50) and Iran agreed to, and did in fact, purposefully transfer hundreds of billions of dollars through the United States in a

manner expressly designed to purposefully circumvent monitoring by U.S. regulators and law enforcement agencies and evade U.S. sanctions; minimize the transparency of their financial activities; and knowingly, or with deliberate indifference, facilitated the transfer of tens of millions of dollars in payments to Hezbollah through the international financial system. In doing so, the Defendants were willing to, and did, commit numerous felonies under U.S. law to assist Iran in concealing its financial activities and violated 18 U.S.C. § 2339B by knowingly, or with deliberate indifference, entering the Conspiracy, which provided material support to FTOs that were responsible for Plaintiffs' injuries.

3593.   At the time each Defendant knowingly agreed to provide Iran material support in an illegal manner, each Defendants knew that Iran had, since 1984, been officially designated by the United States as a State Sponsor of Terrorism, subject to various U.S. sanctions, and knew or were deliberately indifferent to the fact that such designation was based in part on Iran's sponsorship and patronage of Hezbollah and other FTOs, and that Iran used Hezbollah as a primary mechanism to enable it to cultivate and support terrorism.

3594.   Each Defendant knew, or was deliberately indifferent to the fact that, Hezbollah was designated an FTO at all times relevant to this action. Each Defendant also knew that Hezbollah engaged in terrorist activities (8 U.S.C. § 1183(a)(3)(B)(iii)-(iv)), terrorism (22 U.S.C. § 2656f), and acts of international terrorism (18 U.S.C. § 2331).

3595.   Each Defendant knew or was deliberately indifferent to the fact that its agreement to provide Iran material support in an illegal manner, and the overt acts it completed in connection with the Conspiracy unlawfully evaded U.S. sanctions and regulations directed at mitigating the risk that Iran would carry out, support, fund, plan for, prepare, conspire with, or facilitate acts of international terrorism by FTOs, including acts planned, attempted, and perpetrated by Iran's

proxy, agent, and strategic partner, Hezbollah.

3596.   Both the Conspiracy itself and the acts of international terrorism that injured the Plaintiffs constitute acts of international terrorism under 18 U.S.C. § 2331, and constitute "engaging in terrorist activity" under 8 U.S.C. § 1182(a)(3)(B)(iii)-(iv), and/or "engaging in terrorism" under 22 U.S.C. § 2656f.

3597.   Each Defendant also: knew of the existence of other Co-conspirators including some or all of the Defendants; was aware that the other Co-conspirators (including Defendants and Iranian Bank Co-conspirators) engaged in the same or similar conduct, and that the other Co-conspirators shared the objective of providing material support and services to Iran in an illegal manner for the explicit purpose of enabling Iran to avoid U.S. sanctions and regulations enacted specifically to prevent Iran's ability to finance, support, prepare for, plan, or carry out acts by FTOs including Iran's proxy, agent, and strategic partner, Hezbollah.

3598.   Each Defendant also knew or was deliberately indifferent to the fact that one of the specific aims and objectives of the Conspiracy was to keep U.S. depository institutions, law enforcement and counter-terrorism agencies blind to Iran's movement of U.S. dollars through the international financial system, and thus also knew or was deliberately indifferent to the fact that the overt acts it performed in furtherance of the Conspiracy facilitated that specific objective.

3599.   Having entered into an agreement to provide Iran material support in an illegal manner, in direct contravention of U.S. laws and regulations enacted expressly to mitigate Iran's sponsorship of terrorism and terrorist organizations (including Weapons of Mass Destruction proliferation activities in furtherance of such sponsorship), each Defendant also knew or was deliberately indifferent to the fact, that the Conspiracy's aims would foreseeably result in Iran transferring millions of dollars to Hezbollah, an FTO.

3600.   The material support that each Defendant, through the Conspiracy, knowingly, or with deliberate indifference, provided to Hezbollah, constituted substantial assistance to Hezbollah, thereby facilitating acts of terrorism in violation of §§ 1114, 1203, 1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f, and that have caused injuries to Plaintiffs.

3601.   The Defendants' overt acts in entering into the Conspiracy and knowingly agreeing to provide Iran – a known and designated State Sponsor of Terrorism – material support and services in an illegal manner, and resultant, purposeful transfer of billions of USD through the United States in a manner expressly designed to ensure that the funds could be transferred without being monitored by U.S. regulators and law enforcement agencies – involved acts that were dangerous to human life, by their nature, and as further evidenced by their consequences.

3602.   The Defendants' acts either occurred primarily outside the territorial jurisdiction of the United States or transcended national boundaries in terms of the means by which they were accomplished.

3603.   Each Defendant's agreement to enter into the Conspiracy and purposeful transfer (collectively) of billions of dollars through the United States in a manner designed to purposefully circumvent monitoring by U.S. regulators and law enforcement agencies foreseeably resulted in material support being provided to FTOs, and were thus themselves acts of international terrorism because they either were, or objectively appear to have been intended to: (a) intimidate or coerce the civilian population of the United States and other nations, (b) influence the policy of the governments of the United States and other nations by intimidation or coercion (in part to cause them to withdraw Coalition Forces from Iraq), and/or (c) affect the conduct of the governments of the United States and other nations by facilitating Hezbollah's role in killing and injuring hundreds of American nationals in Iraq.

3604. Each Defendant's conduct was a substantial cause in fact and a significant factor in the chain of events leading to the Plaintiffs' injuries, and foreseeably, substantially accelerated and multiplied Hezbollah's ability to engage in terrorist activity (8 U.S.C. § 1182(a)(3)(B)(iii)-(iv)), terrorism (22 U.S.C. § 2656f), and acts of international terrorism under the definition set forth in 18 U.S.C. § 2331. Each Defendant's conduct was thus also a substantial, foreseeable factor in bringing about the Plaintiffs' injuries.

3605. Furthermore, each Plaintiff's injuries constitutes a harm falling within the risk contemplated by each Defendant's violations, including each Defendant's knowing agreement to enter into the Conspiracy, the overt acts each Defendant performed in furtherance of the Conspiracy, and each Defendant's knowledge of, or deliberate indifference to, the fact that a specific, foreseeable aim and purpose of the Conspiracy was to provide material support to Hezbollah and other FTOs. Injuries resulting from terrorist attacks planned, designed, assisted, funded, initiated, and/or overseen by Hezbollah are precisely the risks contemplated by statutes, regulations and Executive Orders designed to ensure that Hezbollah's sponsor, principal, and strategic partner – Iran – had restricted access to U.S. dollars and financial services, and that any funds it did receive that touched U.S. depository institutions were transparent and could be blocked if warranted.

3606. Through its conduct as described above, by knowingly entering into the Conspiracy and violating 18 U.S.C. § 2339B in the manner and with the state of mind alleged above, each Defendant committed acts of international terrorism and is civilly liable for damages to each Plaintiff for their injuries pursuant to 18 U.S.C. § 2333(a).

## THIRD CLAIM FOR RELIEF

## CIVIL LIABILITY AGAINST HSBC BANK USA, N.A. UNDER 18 U.S.C. § 2333(a) FOR VIOLATIONS OF 18 U.S.C. § 2332d CONSTITUTING ACTS OF INTERNATIONAL TERRORISM

3607.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

3608.   Defendant HSBC-US is a juridical person organized under the laws of the United States pursuant to 18 U.S.C. § 2332d(b)(2)(C), and is also a person within the United States pursuant to 18 U.S.C. § 2332d(b)(2)(D).

3609.   As alleged above, at all relevant times HSBC-US knew that Iran was a country designated by the United States under section 6(j) of the Export Administration Act of 1979 (50 App. U.S.C. 2405) as a country supporting international terrorism, yet HSBC-US nevertheless engaged in thousands of financial transactions with Iran in violation of 18 U.S.C. § 2332d.

3610.   Defendant HSBC-US also knew, or was deliberately indifferent to the fact, that Hezbollah had been designated an FTO.

3611.   Defendant HSBC-US also knew, or was deliberately indifferent to the fact, that the IRGC-QF had been designated an SDGT.

3612.   Defendant HSBC-US also knew, or was deliberately indifferent to the fact, that Bank Saderat (including Defendant Bank Saderat Plc) had been designated an SDGT.

3613.   Defendant HSBC-US also knew, or was deliberately indifferent to the fact, that the IRGC had been designated an SDN.

3614.   Defendant HSBC-US also knew or was deliberately indifferent to the fact that Bank Melli (including Melli Bank Plc), Bank Saderat (including Defendant Bank Saderat Plc), Bank Mellat, and Bank Sepah had been designated SDNs before November 2008, and, as such, were

excluded from accessing the U-Turn exemption in the Iranian Transaction Regulations.

3615.   Defendant HSBC-US also knew or was deliberately indifferent to the fact that the IRISL and multiple IRISL entities had been designated SDNs.

3616.   As alleged above, HSBC-US knowingly conducted illegal financial transactions on behalf of Iran through Bank Melli and other Iranian counter-parties that did not fall within the safe harbor provisions of the regulations issued by the U.S. Treasury Department – regulations passed for the specific purposes of mitigating the risk that funds transfers to Iran could be used to: engage in terrorist activity under 8 U.S.C. § 1182(a)(3)(B)(iii)-(iv), terrorism under 22 U.S.C. § 2656f, or acts of international terrorism under 18 U.S.C. § 2331.

3617.   In fact, the transactions at issue (including at least the $183 million HSBC-US facilitated on behalf of sanctioned entities in Iran that were identified in HSBC-US's December 11, 2012 Deferred Prosecution Agreement with DOJ) explicitly violated 31 C.F.R 535.701(a)(2) and 31 C.F.R 560.203.

3618.   Defendant HSBC-US knew that Defendants HSBC-Europe and HSBC-Middle East were deliberately altering and omitting information in funds transfer payment order messages being processed through HSBC-US, thereby evading U.S. laws and regulations whose express purpose was (and is) to ensure that only a very limited class of payments could be facilitated to Iran, and that payment order messages for such funds transfers required transparency in order to ensure that the transfers qualified for the limited exceptions and exemptions, and did not result in U.S. depository institutions processing transactions for the benefit of SDNs.

3619.   As alleged in detail above, throughout the relevant time period, HSBC-US knew that other HSBC Defendants such as HSBC-London and HSBC-Middle East were providing material support to Iran in a manner violating U.S. laws and regulations, and HSBC-US also knew

its own systems and networks were being used to facilitate the HSBC Defendants' illegal conduct.

3620.   Defendant HSBC-US also thus knew or was deliberately indifferent to the fact that Iran, the IRGC, IRISL, Hezbollah, and Defendant Bank Saderat Plc all engaged in terrorist activity under 8 U.S.C. § 1182(a)(3)(B)(iii)-(iv), terrorism under 22 U.S.C. § 2656f, and acts of international terrorism under 18 U.S.C. § 2331 (including violations of 18 U.S.C. §§ 1114, 1203, 1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f), and that Iran provided massive support and sponsorship for violations of all these statutes, while also providing support for other acts of international terrorism, such as those planned, attempted, and perpetrated by the Special Groups.

3621.   Knowing that Defendants HSBC-London and HSBC-Middle East were moving billions of sanctions-evading Iranian USD through HSBC-US's offices with the specific intent of defeating HSBC-US's OFAC filters and violating HSBC-US reporting requirements, it was reasonably foreseeable that HSBC-US's conduct would aid Iran and Iran's agents, proxies, and strategic partners (including Hezbollah, the IRGC, and Special Groups) to engage in terrorist activity under 8 U.S.C. § 1182(a)(3)(B)(iii)-(iv), terrorism under 22 U.S.C. § 2656f, and acts of international terrorism under 18 U.S.C. § 2331.

3622.   Because Defendant HSBC-US is a financial institution operating in the United States, at all times relevant to the Complaint, it is deemed by law to be aware of all designations made to the SDN list, including without limitation designations for Iran, Hezbollah, the IRGC, the IRGC-QF, Bank Saderat (including Defendant Bank Saderat Plc), Bank Melli, Bank Mellat, Bank Sepah, IRISL (and multiple IRISL entities).

3623.   Defendant HSBC-US thus also knew or was deliberately indifferent to the fact that Bank Melli (including Melli Bank Plc), Bank Saderat (including Defendant Bank Saderat Plc)

Bank Mellat, and Bank Sepah had been designated SDNs before November 2008, and, as such, were excluded from accessing the U-Turn exemption in the Iranian Transaction Regulations.

3624.  Defendant HSBC-US's conduct foreseeably and substantially enhanced Hezbollah's, the IRGC's and the Special Groups' and other Iranian-sponsored terrorists' ability to engage in terrorist activity, including preparing and facilitating acts of terrorism in violation of 18 U.S.C. §§ 1114, 1203, 1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f that caused Plaintiffs' injuries, and thus HSBC-US's conduct was also a substantial, foreseeable factor in bringing about the Plaintiffs' injuries.

3625.  Defendant HSBC-US's knowing or deliberately indifferent provision of illegal financial services to Iran, enabled Iran to move billions of U.S. dollars through the United States without those funds being monitored by U.S. regulators and law enforcement agencies and therefore involved acts that were dangerous to human life, by their nature and as evidenced by their consequences.

3626.  Defendant HSBC-US's acts transcended national boundaries in terms of the means by which they were accomplished.

3627.  Defendant HSBC-US's conduct itself constitutes an act of international terrorism because it either was, or objectively appears to have been intended to: (a) intimidate or coerce the civilian population of the United States and other nations, (b) influence the policy of the governments of the United States and other nations by intimidation or coercion, and/or (c) affect the conduct of the governments of the United States and other nations by facilitating Iran's ability to prepare for and/or carry out mass destruction and murder.

3628.  Furthermore, each Plaintiff's injuries constitute a harm falling within the risk contemplated by Defendant HSBC-US's violations, including its knowing agreement to provide

illegal services to Iran. Injuries resulting from terrorist attacks (including attacks launched by Hezbollah through its proxies) that were planned, supported by, funded, or assisted by the IRGC and/or Hezbollah are precisely the risks contemplated by Executive Orders, statutes and regulations designed to ensure that Iran had restricted access to U.S. dollars and financial services, and that any funds it did receive that touched U.S. depository institutions could be monitored by U.S. regulators and law enforcement agencies, and that the transactions were not for the benefit of SDNs.

3629.   Through its conduct as described above, by violating § 2332d in the manner and with the state of mind alleged above, HSBC-US committed acts of international terrorism, and is civilly liable for damages to each Plaintiff for their injuries pursuant to 18 U.S.C. § 2333(a).

## FOURTH CLAIM FOR RELIEF

### CIVIL LIABILITY UNDER 18 U.S.C. § 2333(a) AGAINST STANDARD CHARTERED BANK, ROYAL BANK OF SCOTLAND N.V. AND COMMERZBANK FOR VIOLATIONS OF 18 USC § 2332d CONSTITUTING ACTS OF INTERNATIONAL TERRORISM

3630.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

3631.   Defendants SCB, ABN Amro (RBS N.V.), and Commerzbank each utilized their respective New York branches in connection with their agreement to provide Iran material support in an illegal manner in order to effectuate and facilitate the Conspiracy, and each of those respective New York branches is a "person in the United States" within the scope of 18 U.S.C. § 2332d(b)(2)(D).

3632. As set forth above, each of the above-referenced Defendants knew or was deliberately indifferent to the fact that Iran was designated under section 6(j) of the Export Administration Act of 1979 (50 App. U.S.C. 2405) as a country supporting international terrorism

and nonetheless knowingly engaged in thousands of illegal financial transactions with the government of Iran through their U.S. operations.

3633.   The New York branch of each of the above-referenced Defendants also knew, or was deliberately indifferent to the fact, that Hezbollah had been designated an FTO, that the IRGC-QF and Bank Saderat (including Defendant Bank Saderat Plc) had each been designated an SDGT, and that multiple other Iranian actors and agents (including the IRGC, Bank Melli, Bank Mellat, Bank Sepah, IRISL (and multiple IRISL entities)) had been designated SDNs.

3634.   The New York branches of the above-referenced Defendants also knew or were deliberately indifferent to the fact that Bank Melli (including Melli Bank Plc), Bank Saderat (including Defendant Bank Saderat Plc), Bank Mellat, and Bank Sepah had been designated SDNs before November 2008, and, as such, were excluded from accessing the U-Turn exemption in the Iranian Transaction Regulations.

3635.   As set forth above, the illegal transactions knowingly facilitated through New York by the respective New York branches of the above-referenced Defendants thus did not fall within the safe harbor provisions of the regulations issued by the U.S. Treasury Department for U-Turn exemption transactions, and therefore violated the criminal provisions of 18 U.S.C § 2332d(a).

3636.   In fact, the transactions at issue explicitly violated 31 C.F.R 535.701(a)(2) and 31 C.F.R 560.203.

3637.   Each of the above-referenced Defendants' New York branch's acts transcended national boundaries in terms of the means by which they were accomplished.

3638.   Each of the above-referenced Defendants' New York branch's conduct foreseeably and substantially enhanced Hezbollah's, the IRGC's and Special Groups' and other Iranian sponsored terrorists' ability to engage in terrorist activity, including preparing and facilitating acts

of terrorism in violation of 18 U.S.C. §§ 1114, 1203, 1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f that caused Plaintiffs' injuries, and thus each of the above Defendants' New York branch's conduct was also a substantial, foreseeable factor in bringing about the Plaintiffs' injuries.

3639.   Each of the above-referenced Defendant's New York branch knowingly, or with deliberate indifference, provided financial services to Iran in the United States, knowing that its conduct enabled Iran to move millions (or in some cases, billions) of USD through the United States without those funds being monitored by U.S. regulators and law enforcement agencies. That conduct involved acts that were dangerous to human life, by their nature and as evidenced by their consequences.

3640.   Each of the above-referenced Defendant's conduct itself constitutes an act of international terrorism because it either was, or objectively appears to have been intended to: (a) intimidate or coerce the civilian population of the United States and other nations, (b) influence the policy of the governments of the United States and other nations by intimidation or coercion, and/or (c) affect the conduct of the governments of the United States and other nations by facilitating Iran's ability to prepare for and/or carry out mass destruction and murder.

3641.   Furthermore, each Plaintiff's injuries constitute a harm falling within the risk contemplated by each of the above-referenced Defendants' New York branch's unlawful conduct, including their knowing agreement to provide illegal services to Iran. Injuries resulting from terrorist attacks committed, planned, or authorized by Hezbollah and the IRGC and carried out by their proxies, the Special Groups are precisely the risks contemplated by Executive Orders, statutes and regulations designed to ensure that Iran had restricted access to U.S. dollars and financial services, and that any funds it did receive that touched U.S. depository institutions could be monitored by U.S. regulators and law enforcement agencies.

3642.   Each of the above-referenced Defendants' criminal violations of the provisions of 18 U.S.C. § 2332d(a) was a sufficient cause of Plaintiffs' injuries, and, for the reasons alleged in Plaintiffs' Third Claim for Relief against Defendant HSBC-US, constitutes an act of international terrorism rendering each of the above Defendants civilly liable for damages to each Plaintiff for their injuries pursuant to 18 U.S.C. § 2333(a).

## FIFTH CLAIM FOR RELIEF

## CIVIL LIABILITY AGAINST COMMERZBANK AG UNDER 18 U.S.C. § 2333(a) FOR VIOLATIONS OF 18 U.S.C. § 2339A CONSTITUTING ACTS OF INTERNATIONAL TERRORISM

3643.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

3644.   Defendant Commerzbank provided material support to the IRGC through Commerzbank's acts on behalf of IRISL, and Commerzbank violated § 2339A in concealing and disguising the nature, location, source, and ownership of material support it provided to IRISL, knowing or deliberately indifferent to the fact, that IRISL and the IRGC would use that support in preparation for, or in carrying out acts of international terrorism, including violations of 18 U.S.C. §§ 1114, 1203, 1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f .

3645.   Defendant Commerzbank knew or was deliberately indifferent that to the fact that the IRISL had been designated an SDN for Weapons of Mass Destruction-related activities that included arms shipments, including shipments destined for Hezbollah and other terrorists.

3646.   Defendant Commerzbank's conduct was a substantial cause in fact and a significant factor in the chain of events leading to the Plaintiffs' injuries, and substantially accelerated and multiplied the IRGC's ability to engage in terrorist activity (8 U.S.C § 1182(a)(3)(B)(iii)-(iv)), terrorism (22 U.S.C. § 2656f), and/or commit acts of international terrorism as that terms is defined

in 18 U.S.C. § 2331.

3647.   The material support that Commerzbank knowingly and illegally provided to the IRISL provided foreseeable, substantial assistance to the IRGC, Hezbollah and the Special Groups, thereby preparing and facilitating acts of terrorism in violation of 18 U.S.C. §§ 1114, 1203, 1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f that caused Plaintiffs' injuries, and thus Commerzbank's conduct was also a substantial, foreseeable factor in bringing about the Plaintiffs' injuries.

3648.   Commerzbank's illegal conduct transcended national boundaries in terms of the means by which it was accomplished.

3649.   Commerzbank's knowing or deliberately indifferent provision of illegal financial services to the IRGC and IRISL involved acts that were dangerous to human life, by their nature and as evidenced by their consequences.

3650.   Commerzbank's conduct itself constitutes an act of international terrorism because it either was, or objectively appears to have been intended to: (a) intimidate or coerce the civilian population of the United States and other nations, (b) influence the policy of the governments of the United States and other nations by intimidation or coercion, and/or (c) affect the conduct of the governments of the United States and other nations by facilitating Iran's ability to prepare for and/or carry out mass destruction and murder.

3651.   Furthermore, each Plaintiff's injuries constitute a harm falling within the risk contemplated by Commerzbank's material support to the IRGC and IRISL. Injuries resulting from terrorist attacks perpetrated, planned, supported by, funded, or assisted by Iran and Hezbollah are precisely the risks contemplated by statutes and regulations designed to ensure that the IRGC, IRISL and Iran had restricted access to USD and financial services, and that any funds they did

receive that touched U.S. depository institutions were transparent and could be blocked if warranted, and did not benefit an SDN.

3652.  Through its conduct as described above, by knowingly or with deliberate indifference, providing material support to Iran, the IRGC, and IRISL, and thereby violating 18 U.S.C. § 2339A in the manner and with the state of mind alleged above, Commerzbank is civilly liable for damages to each Plaintiff for their injuries pursuant to 18 U.S.C. § 2333(a).

## SIXTH CLAIM FOR RELIEF

## CIVIL LIABILITY AGAINST COMMERZBANK AG UNDER 18 U.S.C. § 2333(a) FOR VIOLATIONS OF 18 U.S.C. § 2339B CONSTITUTING ACTS OF INTERNATIONAL TERRORISM

3653.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

3654.   Defendant Commerzbank violated § 2339B by providing material support to Hezbollah through Commerzbank's acts on behalf of its customer Waisenkinderprojekt Libanon e.V. (Orphans Project Lebanon e.V.).

3655.   Commerzbank knew, or was deliberately indifferent to the fact, that Orphans Project Lebanon e.V. was transferring funds through Commerzbank to FTO Hezbollah and that Hezbollah would use that support in preparation for, or in carrying out, acts of international terrorism, including violations of 18 U.S.C. §§ 1114, 1203, 1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f.

3656.   Defendant Commerzbank's conduct was a substantial cause in fact and a significant factor in the chain of events leading to the Plaintiffs' injuries, and substantially accelerated and multiplied Hezbollah's ability to engage in terrorist activity (8 U.S.C § 1182(a)(3)(B)(iii)-(iv)), terrorism (22 U.S.C. § 2656f), and acts of international terrorism as that terms is defined in 18

U.S.C. § 2331.

3657.   The material support that Commerzbank knowingly and illegally provided to the Orphans Project Lebanon e.V. and hence to Hezbollah, provided foreseeable, substantial assistance to the Hezbollah and the Special Groups, thereby preparing and facilitating acts of terrorism in violation of 18 U.S.C. §§ 1114, 1203, 1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f that caused Plaintiffs' injuries, and thus Commerzbank's conduct was also a substantial, foreseeable factor in bringing about the Plaintiffs' injuries.

3658.   Commerzbank's illegal conduct transcended national boundaries in terms of the means by which it was accomplished.

3659.   Commerzbank's knowing or deliberately indifferent provision of illegal financial services to Hezbollah involved acts that were dangerous to human life, by their nature and as evidenced by their consequences.

3660.   Commerzbank's conduct itself constitutes an act of international terrorism because it either was, or objectively appears to have been intended to: (a) intimidate or coerce the civilian population of the United States and other nations, (b) influence the policy of the governments of the United States and other nations by intimidation or coercion, and/or (c) affect the conduct of the governments of the United States and other nations by facilitating Iran's ability to prepare for and/or carry out mass destruction and murder.

3661.   Furthermore, each Plaintiff's injuries constitute a harm falling within the risk contemplated by Commerzbank's material support to Hezbollah.

3662.   Through its conduct as described above, by knowingly or with deliberate indifference, providing material support to Hezbollah, and thereby violating 18 U.S.C. § 2339B in the manner and with the state of mind alleged above, Commerzbank is civilly liable for damages

to each Plaintiff for their injuries pursuant to 18 U.S.C. § 2333(a).

**SEVENTH CLAIM FOR RELIEF**

**CIVIL LIABILITY AGAINST STANDARD CHARTERED BANK UNDER 18 U.S.C. § 2333(a) FOR VIOLATIONS OF 18 U.S.C. § 2339A CONSTITUTING ACTS OF INTERNATIONAL TERRORISM**

3663.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

3664.   Defendant Standard Chartered Bank provided material support to the IRGC and its Qods Force through its acts on behalf of Mahan Air, MODAFL and other entities identified *supra* in violation of § 2339A by concealing and disguising the nature, location, source, and ownership of material support it provided to Mahan Air, MODAFL and other entities identified *supra*, knowing or deliberately indifferent to the fact that the IRGC and its Qods Force would use that support in preparation for, or in carrying out, acts of international terrorism, including violations of 18 U.S.C. §§ 1114, 1203, 1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f .

3665.   Defendant Standard Chartered Bank knew or was deliberately indifferent to the fact that Mahan Air, MODAFL and other entities identified *supra* were utilizing Letters of Credit facilitated by Standard Chartered Bank to evade U.S. sanctions and acquire materials used, *inter alia*, to effectuate arms shipments, transport weapons, personnel and technology to the IRGC-QF and Hezbollah.

3666.   Mahan Air did, in fact, transport weapons, personnel and technology into Iraq on behalf of the IRGC-QF and Hezbollah and did, in fact, transport modules used to control and activate IEDs and EFPs deployed against Coalition Forces in Iraq.

3667.   Iran could not have successfully evaded U.S. sanctions and obtained raw materials and manufacturing equipment prohibited by the International Traffic in Arms Regulations

("ITARs"), Export Administration Regulations ("EARs"), and Iran Trade Regulations ("ITRs") simply by establishing front companies in foreign jurisdictions like Malaysia, Singapore or Dubai because those front companies could not have negotiated international payments without being able to provide U.S. and other suppliers with conventional letters of credit drawn on Western banks with established correspondent accounts with U.S. clearing banks.

3668.   Nor could the front companies that participated in Iran's clandestine supply chain have succeeded in their efforts had they been forced to rely solely on financing by Iranian banks because those banks could not have provided financing directly since they could not maintain correspondent accounts with U.S. clearing banks and most of them were blacklisted at one point in time or another and frozen out of the US dollar-clearing system.

3669.   For example, no legitimate U.S. manufacturer would have agreed to transport materials subject to the ITARs, EARs or ITRs to an unknown company in Singapore or Dubai based on a letter of credit issued by Bank Saderat or Bank Melli.

3670.   The linchpin of Iran's illegal and clandestine supply chain was the cooperation of Standard Chartered Bank and the other Western Bank Defendants who concealed both the role of Iranian banks in providing the credit necessary to finance the transactions and the identities of the Iranian military and IRGC sub-agencies that were actually purchasing the raw materials and manufacturing equipment (invariably being transported to Iran by IRISL, Mahan Air or Iran Air).

3671.   Defendant Standard Chartered Bank knew, or was deliberately indifferent to the fact, that Mahan Air, MODAFL and other entities identified *supra* were utilizing Letters of Credit facilitated by Standard Chartered Bank to evade U.S. sanctions and acquire materials used, *inter alia*, to effectuate arms shipments, transport weapons, personnel and technology to the IRGC-QF and Hezbollah.

3672.   Mahan Air did, in fact, transport weapons, personnel and technology into Iraq on behalf of the IRGC-QF and Hezbollah and did, in fact, transport modules used to control and activate IEDs and EFPs deployed against Coalition Forces in Iraq.

3673.   With the necessary assistance of Standard Chartered Bank and the other Western Bank Defendants, MODAFL did in fact acquire spare parts for various military aircraft.

3674.   With the necessary assistance of Standard Chartered Bank and the other Western Bank Defendants, Iranian front companies did purchase hydraulic press components  of the kind used to manufacture EFPs and did purchase steel and copper and other materials necessary for the manufacturing of EFPs and other weapons deployed against Coalition Forces in Iraq.

3675.   This substantial assistance to Iran's terror apparatus (including the IRGC and MODAFL), knowingly provided by Defendant Standard Chartered Bank, made it possible for Iran to procure the radio frequency modules, metals, and hydraulic presses used to manufacture the copper plates and steel cylinders necessary to manufacture the EFPs and other Iranian weapons used in the attacks on the Plaintiffs, as well Iran's transport of weapons, supplies, and IRGC and Hezbollah operatives (who conducted, supervised, and trained the perpetrators of those attacks).

3676.   Defendant Standard Chartered Bank's conduct was a substantial cause in fact and a significant factor in the chain of events leading to the Plaintiffs' injuries, and substantially accelerated and multiplied the IRGC's ability to engage in terrorist activity (8 U.S.C § 1182(a)(3)(B)(iii)-(iv)), terrorism (22 U.S.C. § 2656f), and commit acts of international terrorism as that terms is defined in 18 U.S.C. § 2331.

3677.   The material support that Standard Chartered Bank knowingly and illegally provided to Mahan Air, MODAFL and other entities identified *supra* provided foreseeable, substantial assistance to the IRGC, Hezbollah and the Special Groups, thereby preparing and

facilitating acts of terrorism in violation of 18 U.S.C. §§ 1114, 1203, 1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f that caused Plaintiffs' injuries, and thus Standard Chartered Bank's conduct was also a substantial, foreseeable factor in bringing about the Plaintiffs' injuries.

3678.   Standard Chartered Bank's illegal conduct transcended national boundaries in terms of the means by which it was accomplished.

3679.   Standard Chartered Bank's knowing or deliberately indifferent provision of illegal financial services to the IRGC, Mahan Air, MODAFL and other entities identified *supra*, involved acts that were dangerous to human life, by their nature and as evidenced by their consequences.

3680.   Standard Chartered Bank's conduct itself constitutes an act of international terrorism because it either was, or objectively appears to have been intended to: (a) intimidate or coerce the civilian population of the United States and other nations, (b) influence the policy of the governments of the United States and other nations by intimidation or coercion, and/or (c) affect the conduct of the governments of the United States and other nations by facilitating Iran's ability to prepare for and/or carry out mass destruction and murder.

3681.   Furthermore, each Plaintiff's injuries constitute a harm falling within the risk contemplated by Standard Chartered Bank's material support to the IRGC, Mahan Air, MODAFL and other entities identified *supra*. Injuries resulting from terrorist attacks perpetrated, planned, supported by, funded, or assisted by Iran and Hezbollah are precisely the risks contemplated by statutes and regulations designed to ensure that Iran had restricted access to U.S. dollars and financial services, and that any funds they did receive that touched U.S. depository institutions were transparent and could be blocked if warranted, and did not benefit an SDN.

3682.   Through its conduct as described above, by knowingly or with deliberate indifference, providing material support to Iran, the IRGC, Mahan Air, MODAFL and other

entities identified *supra*, and thereby violating 18 U.S.C. § 2339A in the manner and with the state of mind alleged above, Standard Chartered Bank is civilly liable for damages to each Plaintiff for their injuries pursuant to 18 U.S.C. § 2333(a).

### EIGHTH CLAIM FOR RELIEF

### CIVIL LIABILITY FOR CONSPIRACY IN VIOLATION OF 18 U.S.C. § 2333(d)(2) (JASTA)

3683.   Plaintiffs repeat and re-allege every allegation of the foregoing paragraphs as if fully set forth herein.

3684.   Plaintiffs allege that Defendants conspired with the persons who committed the acts of international terrorism (set forth herein), within the meaning of 18 U.S.C. § 2333(d) and within the legal framework of *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), which Congress has found to provide "civil litigants with the broadest possible basis" for relief against those "that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States." Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. 114-222, § 2(b) (2016).

3685.   Each attack alleged herein was an act of international terrorism as defined by 18 U.S.C. § 2331(1).

3686.   The IRGC's and Hezbollah's provision of EFPs and other weapons, training, funding, and direction to their proxies and agents in Iraq to target Coalition Forces constitutes acts of international terrorism as defined by 18 U.S.C. § 2331(1).

3687.   The Plaintiffs' injuries were proximately caused by the IRGC's and Hezbollah's acts of international terrorism, which included the provision of EFPs and other weapons, training, funding, and direction to their proxies and agents in Iraq to target Coalition Forces.

3688.   Each attack and act of international terrorism alleged herein was committed, planned or authorized by the designated Foreign Terrorist Organizations ("FTOs") Hezbollah (and, in some cases, also Kata'ib Hezbollah ("KH")), in concert with the IRGC.

3689.   Hezbollah has been designated an FTO from October 8, 1997 to the present, and KH has been designated an FTO from July 2, 2009 to the present.

3690.   Each attack and act of international terrorism alleged herein was committed by the IRGC and FTO Hezbollah through their agents and proxies who, acting in concert with them and at their direction, perpetrated the attacks in Iraq.

3691.   The IRGC and Hezbollah provided the EFPs, IRAMs, and other explosive devices used in the attacks against Coalition Forces that injured the Plaintiffs and killed their decedents.

3692.   The IRGC and Hezbollah funded, trained, equipped, guided, directed and controlled the cells and individuals who emplaced and activated the EFPs, IRAMs and other explosive devices and/or, shot, kidnapped and/or tortured Plaintiffs and their decedents, in concert with, and at the direction of, the IRGC and Hezbollah.

3693.   Each Defendant joined Iran's Conspiracy and agreed and conspired with Iran, the IRGC, Hezbollah, their agents, the "Iranian commercial co-conspirators" (constituting Bank Melli, Defendant Bank Saderat, the Central Bank of Iran, the National Iranian Oil Company ("NIOC"), the Islamic Republic of Iran Shipping Lines ("IRISL"), various entities owned by the Ministry of Defense Armed Forces Logistics ("MODAFL"), the IRGC and other Iranian entities), KH, and their banking co-Defendants to provide material support, directly or indirectly, for terrorism and terrorist crimes and for FTOs, the FTOs' agents, and FTO-affiliated entities. This material support was channeled, *inter alia,* through the Iranian commercial co-conspirators, acting as funding conduits on behalf of, and as agents for, the IRGC, Hezbollah, and KH.

3694. Each Defendant joined Iran's Conspiracy and agreed and conspired with Iran, the IRGC, Hezbollah, their agents, the Iranian "commercial" co-conspirators, KH, and their banking co-Defendants to conceal and disguise the nature, location, source, or ownership of that material support, which constituted illegal services that the IRGC, Hezbollah, and their agents needed in order to perform acts of international terrorism without interference by U.S. authorities.

3695. Each Defendant agreed and conspired with Iran, the IRGC, its agents, the Iranian "commercial" co-conspirators, Hezbollah, KH, and their banking co-Defendants, to deceive U.S. counter-terror finance authorities and evade legal controls, and to illegally perform transactions outside of Iran's regulatory safe harbor for performing legitimate transactions, to give Iran, the IRGC, and Hezbollah, and their agents and proxies concealed access to the U.S. financial system for illegitimate activities, enabling them to commit acts of terrorism and to facilitate their support for terrorism.

3696. Each Defendant agreed and conspired to provide, and conceal and disguise the source of, material support for agents, affiliates, and alter egos of the IRGC and Hezbollah.

3697. At least some of the Defendants also knowingly facilitated Iran's and the IRGC's illegal acquisition of materials specifically prohibited from export to Iran because of their military or terrorism applications, including items used in the manufacture of EFPs.

3698. Each Defendant knew that, or exhibited deliberate indifference to whether, Iran's terrorism campaigns, including the campaign carried out by the IRGC and Hezbollah in Iraq, required vast sums of money.

3699. Each Defendant knew that most of Iran's financial resources were held in Eurodollars.

3700.   Each Defendant knew that the U.S. sanctions and authorities it circumvented on behalf of its Iranian co-conspirators were designed to prevent Iran from financing terrorism and, in some cases, weapons of mass destruction proliferation.

3701.   Each Defendant knew, from its interactions with co-conspirators, the counter-terror financing and counter-WMD proliferation sanctions laws they were violating, and publicly available information, that providing and concealing and disguising the source of material support and controlled materials for the foregoing purposes and entities was Iran's core purpose for the Conspiracy.

3702.   Each Defendant also knew that, or exhibited deliberate indifference as to whether, its acts in furtherance of the Conspiracy raised a substantial probability that some of the funds it concealed and provided would be used by Iran, the IRGC, Hezbollah, and their proxies and agents for terrorist activities and acts of international terrorism.

3703.   Each Defendant knew that it and its Iranian co-conspirators were mutually dependent on the Conspiracy.

3704.   Specifically, each Defendant understood that the lucrative fees it collected from its Iranian co-conspirators and the large pools of Eurodollars it was allowed to invest on behalf its Iranian co-conspirators were dependent on each Defendant's ongoing willingness to commit multiple crimes on behalf of its Iranian co-conspirators.

3705.   As set forth above, Iran, the IRGC, Hezbollah and their terror agents and proxies depended on this illegal assistance of major banks with the financial and legal capacity to clear billions of dollars through the United States and their willingness to circumvent U.S. counter-terror financing controls.

3706.   Despite this knowledge, each Defendant continued to participate in the Conspiracy for several years during the relevant period.

3707.   The Defendants' unlawful acts for the benefit of Iranian banks and entities, in stripping financial transactions, disguising payment sources, directly or indirectly transferring funds to sanctioned entities, manually altering payment information, and related activities intended to evade U.S. sanctions, were pursuant to, and in furtherance of, the Conspiracy.

3708.   The use of the funds that the Iranian commercial co-conspirators channeled to co-conspirators IRGC, FTOs Hezbollah and KH and their agents, proxies and affiliates were within the scope of the Conspiracy.

3709.   The acts of international terrorism at issue were overt acts foreseeably committed as a consequence of, in furtherance of, and pursuant to the Conspiracy.

**NINTH CLAIM FOR RELIEF**

**CIVIL LIABILITY FOR AIDING AND ABETTING IN VIOLATION OF 18 U.S.C. § 2333(d)(2) (JASTA)**

3710.   Plaintiffs repeat and re-allege every allegation of the foregoing paragraphs as if fully set forth herein.

3711.   Plaintiffs allege that Defendants knowingly aided and abetted the persons who committed the acts of international terrorism (set forth herein), within the meaning of 18 U.S.C. § 2333(d) and within the legal framework of *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), which Congress has found to provide "civil litigants with the broadest possible basis" for relief against those "that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States." JASTA, § 2(b).

3712.   Each attack alleged herein was an act of international terrorism as defined by 18 U.S.C. § 2331(1).

3713.   The IRGC's and Hezbollah's provision of EFPs and other weapons, training, funding, and direction to their proxies and agents in Iraq to target Coalition Forces constitute acts of international terrorism as defined by 18 U.S.C. § 2331(1).

3714.   The Plaintiffs' injuries were proximately caused by the IRGC's and Hezbollah's acts of international terrorism, which included the provision of EFPs and other weapons, training, funding, and direction to their proxies and agents in Iraq to target Coalition Forces.

3715.   Each Defendant substantially assisted these acts of international terrorism by knowingly providing material support to the IRGC, Hezbollah, their agents in Iraq, and their Iranian commercial co-conspirators, directly or indirectly, for terrorism and terrorist crimes.

3716.   Each Defendant substantially assisted the acts of international terrorism committed by the IRGC, Hezbollah, and their agents by concealing and disguising the nature, location, source, or ownership of material support, which constituted illegal services the IRGC, Hezbollah, and their agents needed to perform acts of international terrorism without interference by U.S. authorities.

3717.   Specifically, each Defendant, by stripping financial transactions, disguising payment sources, directly or indirectly transferring funds to sanctioned entities, manually altering payment information, and performing related activities helped blind U.S. regulators and law enforcement authorities from tracking Iranian material support for terrorism (regardless of how any specific concealed transfer was used), and therefore substantially assisted the IRGC, Hezbollah, and their agents.

3718.   At least some of the Defendants also knowingly facilitated Iran and the IRGC's illegal acquisition of materials specifically prohibited from export to Iran because of their military or terrorism applications, including items used in the manufacture of EFPs.

3719.  Each Defendant knew that, or exhibited deliberate indifference to whether, Iran's terrorism campaigns, including the campaign carried out by the IRGC and Hezbollah in Iraq, required vast sums of money.

3720.  Each Defendant was generally aware that by providing, and concealing and disguising the source of, material support for Iran, the IRGC, Hezbollah, and their agents, it played a role in giving these entities, directly or indirectly, concealed access to the U.S. financial system that enabled Iran to facilitate its support for terrorism.

3721.  Each Defendant knew that much of Iran's financial resources was held in U.S. dollars.

3722.  From their interactions with their co-conspirators, the counter-terror financing and counter-WMD proliferation sanctions laws they were violating, and publicly available information, each Defendant knew that, or exhibited deliberate indifference as to whether, providing or concealing the source of material support and controlled materials for the foregoing purposes and entities provided substantial assistance to Iran, the IRGC, Hezbollah and their agents and raised a substantial probability that some of these funds would be used by Iran, the IRGC, Hezbollah, and their proxies and agents for terrorist activities and acts of international terrorism.

3723.  The nature of the acts encouraged, which were acts of international terrorism, including providing weapons, training, and funding for and directing attacks on American service members, aid workers, private contractors and journalists and the attacks themselves, benefited from and were virtually dependent on access to vast amounts of U.S. dollars.

3724.  The amount of assistance each Defendant provided—billions of dollars illegally transferred to Iranian entities so as to blind U.S. counter-terror finance authorities—was integral to the acts of terrorism at issue.

3725.  Each Defendant had a close relationship with many of the Iranian entities in working out and maintaining the scheme, including exchanging secret communications in order to develop and constantly adjust methods for circumventing U.S. counter-terrorism controls.

3726.  Each Defendant knew or was deliberately indifferent to Iran's purposes for the assistance (acts of international terrorism, which are particularly offensive acts), and yet continued to provide that assistance.

3727.  Each Defendant provided assistance to the Iranian entities for several years.

3728.  The acts of terrorism at issue were foreseeable from Defendants' substantial assistance.

### TENTH CLAIM FOR RELIEF

### COMMERZBANK'S CIVIL LIABILITY FOR AIDING AND ABETTING IN VIOLATION OF 18 U.S.C. § 2333(d)(2) (JASTA)

3729.  Plaintiffs repeat and re-allege every allegation of the foregoing paragraphs as if fully set forth herein.

3730.  Plaintiffs allege that Commerzbank aided and abetted Hezbollah within the meaning of 18 U.S.C. § 2333(d) and within the legal framework of *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), which Congress has found to provide "civil litigants with the broadest possible basis" for relief against those "that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States." JASTA, § 2(b).

3731.  Each attack alleged herein was an act of international terrorism as defined by 18 U.S.C. § 2331(1).

3732.   Hezbollah's provision of EFPs and other weapons, training, funding, and direction to its proxies and agents in Iraq to target Coalition Forces constitute acts of international terrorism as defined by 18 U.S.C. § 2331(1).

3733.   The Plaintiffs' injuries were proximately caused by Hezbollah's acts of international terrorism, which included (acting in concert with the IRGC-QF) the provision of EFPs and other weapons, training, funding, and direction to its proxies and agents in Iraq to target Coalition Forces, and the attacks they committed through those proxies and agents.

3734.   Hezbollah (acting in concert with the IRGC-QF) committed, planned and authorized acts of international terrorism—namely, it provided EFPs and other weapons, training, funding, and direction to its proxies and agents in Iraq to target Coalition Forces, and committed, planned and authorized attacks on Coalition Forces in Iraq. Each of these acts constituted acts of international terrorism as defined by 18 U.S.C. § 2331(1).

3735.   These acts of international terrorism caused Plaintiffs' injuries.

3736.   Defendant Commerzbank substantially assisted Hezbollah by knowingly providing material support to Hezbollah through Hezbollah's Martyrs Foundation in Lebanon.

3737.   Defendant Commerzbank knew that, or exhibited deliberate indifference as to whether, providing material support to Hezbollah through the Martyrs Foundation raised a substantial probability that the funds it provided would be used to benefit Hezbollah and its agents and increase Hezbollah's capacity to engage in terrorist activities and acts of international terrorism.

3738.   Defendant Commerzbank was generally aware that by providing material support for Hezbollah through the Martyrs Foundation, it played a role in giving Hezbollah, directly or

indirectly, access to the international financial system that allowed the terrorist organization to effectively raise funds from donors outside of Lebanon.

3739.   The nature of the acts encouraged, which were acts of international terrorism, including providing weapons, training, and funding for and directing attacks on American service members, aid workers, private contractors and journalists and the attacks themselves, benefited from and were virtually dependent on access to vast amounts of U.S. dollars.

3740.   The assistance Commerzbank provided was substantial.

3741.   Defendant Commerzbank knew or was deliberately indifferent to Hezbollah's unlawful acts (acts of international terrorism, which are particularly offensive acts), and yet continued to provide it assistance.

3742.   Defendant Commerzbank assisted Hezbollah for several years.

3743.   The acts of terrorism at issue were foreseeable from Defendant Commerzbank's substantial assistance.

## ELEVENTH CLAIM FOR RELIEF

## BANK SADERAT PLC'S CIVIL LIABILITY FOR AIDING AND ABETTING IN VIOLATION OF 18 U.S.C. § 2333(d)(2) (JASTA)

3744.   Plaintiffs repeat and re-allege every allegation of the foregoing paragraphs as if fully set forth herein.

3745.   Plaintiffs allege that Bank Saderat Plc aided and abetted Hezbollah within the meaning of 18 U.S.C. § 2333(d) and within the legal framework of *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), which Congress has found to provide "civil litigants with the broadest possible basis" for relief against those "that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States." JASTA, § 2(b).

3746.  Each attack alleged herein was an act of international terrorism as defined by 18 U.S.C. § 2331(1).

3747.  Hezbollah's provision of EFPs and other weapons, training, funding, and direction to its proxies and agents to target Coalition Forces to proxy groups and agents in Iraq constitute acts of international terrorism as defined by 18 U.S.C. § 2331(1).

3748.  The Plaintiffs' injuries were proximately caused by Hezbollah's acts of international terrorism, which included (acting in concert with the IRGC-QF) the provision of EFPs and other weapons, training, funding, and direction to its proxies and agents in Iraq to target Coalition Forces, and the attacks they committed through those proxies and agents.

3749.  Hezbollah (acting in concert with the IRGC-QF) committed, planned and authorized acts of international terrorism—namely, it provided EFPs and other weapons, training, funding, and direction to its proxies and agents in Iraq to target Coalition Forces, and committed, planned and authorized attacks on Coalition Forces in Iraq. Each of these acts constituted acts of international terrorism as defined by 18 U.S.C. § 2331(1).

3750.  These acts of international terrorism proximately caused Plaintiffs' injuries.

3751.  Defendant Bank Saderat Plc substantially assisted Hezbollah by knowingly providing it material support.

3752.  Defendant Bank Saderat Plc knew that, or exhibited deliberate indifference as to whether, providing material support to Hezbollah raised a substantial probability that the funds it provided, and the sources of which it concealed and disguised, would be used to benefit Hezbollah and its agents and increase Hezbollah's capacity to engage in terrorist activities and acts of international terrorism.

3753.   Defendant Bank Saderat Plc was generally aware that by providing, and concealing and disguising the source of, material support for Hezbollah, it played a role in giving Hezbollah, directly or indirectly, access to the U.S. and international financial system that allowed the terrorist organization to fund its terrorist activities.

3754.   The nature of the acts encouraged, which were acts of international terrorism, including providing weapons for and directing attacks on American service members, aid workers, private contractors and journalists and the attacks themselves, benefited from and were virtually dependent on access to vast amounts of U.S. dollars.

3755.   The amount of assistance Defendant Bank Saderat Plc provided—millions of dollars illegally transferred to Hezbollah and access to the U.S. financial system while blinding U.S. counter-terror finance authorities—was integral to the acts of terrorism at issue.

3756.   Defendant Bank Saderat Plc had an extremely close relationship with, and was a fundraising conduit of, Hezbollah.

3757.   Defendant Bank Saderat Plc knew or was deliberately indifferent to Hezbollah's unlawful acts (acts of international terrorism, which are particularly offensive acts), and yet continued to provide it assistance.

3758.   Defendant Bank Saderat Plc assisted Hezbollah for several years.

3759.   The acts of terrorism at issue were foreseeable from Defendant Bank Saderat Plc's substantial assistance.

## TWELFTH CLAIM FOR RELIEF

## STANDARD CHARTERED BANK'S, CREDIT SUISSE'S, AND HSBC'S CIVIL LIABILITY FOR AIDING AND ABETTING IN VIOLATION OF 18 U.S.C. § 2333(d)(2) (JASTA)

3760.   Plaintiffs repeat and re-allege every allegation of the foregoing paragraphs as if fully set forth herein.

3761.   Plaintiffs allege that SCB, Credit Suisse, and HSBC knowingly aided and abetted the IRGC within the meaning of 18 U.S.C. § 2333(d) and within the legal framework of *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), which Congress has found to provide "civil litigants with the broadest possible basis" for relief against those "that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States." JASTA, §2(b).

3762.   Each attack alleged herein was an act of international terrorism as defined by 18 U.S.C. § 2331(1).

3763.   The IRGC's and Hezbollah's provision of EFPs and other weapons, training, funding, and direction to their proxies and agents in Iraq to target Coalition Forces constitute acts of international terrorism as defined by 18 U.S.C. § 2331(1).

3764.   The Plaintiffs' injuries were proximately caused by the IRGC's and Hezbollah's acts of international terrorism, which included the provision of EFPs and other weapons, training, funding, and direction to their proxies and agents in Iraq to target Coalition Forces, and the attacks they committed through those proxies and agents.

3765.   Defendants SCB and Credit Suisse substantially assisted the IRGC and Hezbollah by facilitating their acquisition of U.S.-origin export-controlled goods on behalf of, among others, Mahan Air and various sub-agencies of MODAFL.

3766.   These controlled items include aircraft parts that enabled Mahan Air to transport IRGC and Hezbollah personnel, weapons, and funds into Iraq.

3767.   Defendants SCB and HSBC provided material support to the IRGC through, *inter alia*, the IRGC's U.S.-designated "agent and affiliate," NIOC.

3768.   From the counter-terror and counter-WMD proliferations export control and financial sanctions they violated and from publicly available information, Defendants SCB and Credit Suisse knew that, or exhibited deliberate indifference as to whether, the IRGC and Hezbollah would use, or with a substantial probability would use, those export-controlled items to increase their capacity to commit acts of international terrorism in Iraq.

3769.   From the counter-terror and counter-WMD proliferations export control and financial sanctions they violated and from publicly available information, Defendants SCB and Credit Suisse were generally aware of their role in facilitating the IRGC's and Hezbollah's acts of international terrorism.

3770.   From the counter-terror and counter-WMD proliferations sanctions they violated and from publicly available information, Defendants SCB and HSBC knew that, or exhibited deliberate indifference as to whether, the IRGC would use material support generated through NIOC to increase its capacity to commit acts of international terrorism in Iraq.

3771.   From the counter-terror and counter-WMD proliferations sanctions they violated and from publicly available information, Defendants SCB and HSBC were generally aware of their role in facilitating the IRGC's acts of international terrorism.

3772.   The nature of the acts encouraged, which were acts of international terrorism, including providing weapons, training, and funding for and directing attacks on American service members, aid workers, private contractors and journalists and the attacks themselves, benefited from and were virtually dependent on access to vast amounts of U.S. dollars.

3773.   The amount of assistance Defendants SCB, Credit Suisse, and HSBC provided— access to export-controlled items and billions of dollars illegally transferred to NIOC and other

IRGC entities so as to blind U.S. counter-terror finance authorities—was integral to the acts of terrorism at issue.

3774. Defendants SCB, Credit Suisse, and HSBC had a close relationship with many of the Iranian entities in working out and maintaining the scheme, including exchanging secret communications in order to develop and constantly adjust methods for circumventing U.S. counter-terrorism controls.

3775. Defendants SCB, Credit Suisse, and HSBC knew or were deliberately indifferent to Iran's unlawful acts (acts of international terrorism, which are particularly offensive acts), and yet continued to provide that assistance.

3776. Defendants SCB, Credit Suisse, and HSBC assisted the IRGC and other Iranian entities that were a part of its terror apparatus for several years.

3777. The acts of terrorism at issue were foreseeable from Defendants SCB's, Credit Suisse's, and HSBC's substantial assistance.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

(a)     Accept jurisdiction over this action;

(b)     Enter judgment against Defendants and in favor of Plaintiffs for compensatory damages in amounts to be determined at trial;

(c)     Enter judgment against Defendants and in favor of Plaintiffs for treble damages pursuant to 18 U.S.C. § 2333(a);

(d)     Enter judgment against Defendants and in favor of Plaintiffs for any and all costs sustained in connection with the prosecution of this action, including attorneys' fees, pursuant to 18 U.S.C. § 2333(a);

(e)     Enter an Order declaring that Defendants have violated the Anti-Terrorism

Act, 18 U.S.C. § 2331 *et seq*.; and

(f)     Grant such other and further relief as justice requires.


PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Dated: December 26, 2018


By     /s/ Gary M. Osen
       Gary M. Osen
       Peter Raven-Hansen, Of Counsel
       Ari Ungar
       Aaron Schlanger
       Michael Radine
       **OSEN LLC**
       2 University Plaza, Suite 402
       Hackensack, NJ 07601
       (201) 265-6400
       (201) 265-0303 Fax

       1441 Broadway, Suite 6022
       New York, New York 10018
       (212) 354-0111

       **TURNER & ASSOCIATES, P.A.**
       C. Tab Turner
       4705 Somers Avenue, Suite 100
       North Little Rock, AR 72116
       (501) 791-2277

       Attorneys for Plaintiffs