UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------x
KATHALEEN FREEMAN, *et al.*,

                Plaintiffs,

- against -

HSBC HOLDINGS PLC, HSBC BANK PLC,
HSBC BANK MIDDLE EAST LIMITED,
HSBC BANK USA, N.A., BARCLAYS,
STANDARD CHARTERED BANK, ROYAL
BANK OF SCOTLAND, N.V., CREDIT
SUISSE, BANK SADERAT PLC,
COMMERZBANK AG, *and* JOHN DOES 1-50,

                Defendants.
---------------------------------------------------------x
RYAN BOWMAN, *et al.*,

                Plaintiffs,

- against -

HSBC HOLDINGS PLC, HSBC BANK PLC,
HSBC BANK MIDDLE EAST LIMITED,
HSBC BANK USA, N.A., BARCLAYS,
STANDARD CHARTERED BANK, ROYAL
BANK OF SCOTLAND, N.V., CREDIT
SUISSE, BANK SADERAT PLC,
COMMERZBANK AG, *and* JOHN DOES 1-50,

                Defendants.
---------------------------------------------------------x

**MEMORANDUM & ORDER**
18-CV-7359 (PKC) (CLP)
19-CV-2146 (PKC) (CLP)

PAMELA K. CHEN, United States District Judge:

       In November 2014, a group of American citizens killed or injured by terrorist attacks in Iraq between 2004 and 2011, and/or their families, filed an action, *Freeman, et al. v. HSBC Holdings PLC, et al.*, 14-CV-6601 (PKC) (CLP) ("*Freeman I*"), against ten banking institutions—HSBC Holdings, PLC, HSBC Bank PLC, HSBC Bank Middle East Ltd., HSBC Bank USA, N.A.

1

(collectively, "HSBC"), Barclays Bank PLC ("Barclays"), Standard Chartered Bank ("SCB"), Royal Bank of Scotland, N.V. ("RBS"), Credit Suisse AG ("Credit Suisse"), Bank Saderat PLC ("Saderat"), and Commerzbank AG ("Commerzbank")—as well as John Does 1–50, seeking damages pursuant to the Antiterrorism Act (the "ATA"), 18 U.S.C. § 2333, as amended by the Justice Against State Sponsors of Terrorism Act ("JASTA"),[1] Pub. L. No. 114-222, 130 Stat. 852 (2016). *See Freeman v. HSBC Holdings PLC*, 413 F. Supp. 3d 67, 72 (E.D.N.Y. 2019) ("*Freeman I*"). While *Freeman I* was pending, a different group of Americans who were injured or killed by terrorist attacks in Iraq, and/or their families, represented by the *Freeman I* counsel, filed these two additional actions, *Freeman, et al. v. HSBC Holdings PLC, et al.* 18-CV-7359 (PKC) (CLP) ("*Freeman II*"), and *Bowman, et al. v. HSBC Holdings PLC, et al.*, 19-CV-2146 (PKC) (CLP) ("*Bowman*"), seeking damages under the ATA and JASTA against the same defendants for materially the same conduct.[2]

On September 16, 2019, the Court dismissed *Freeman I* in its entirety. *See generally Freeman I*, 413 F. Supp. 3d 67.[3] Pending before the Court are Defendants'[4] motions to dismiss in

---

[1] JASTA was enacted after the initiation of *Freeman I* and, though the complaint in that case was not amended, the Court ultimately construed it as alleging a claim of secondary conspiracy liability under JASTA in addition to the original primary liability claims under the ATA. *Freeman I*, 413 F. Supp. 3d at 72 n.1.

[2] For purposes of this Memorandum & Order, "Plaintiffs" refers to the plaintiffs in both *Freeman II* and *Bowman*.

[3] In dismissing *Freeman I*, the Court declined to adopt the Report and Recommendation ("R&R") of the Honorable Cheryl L. Pollak, Magistrate Judge, recommending denial of Defendants' motions to dismiss. *See generally Freeman I*, No. 14-CV-6601 (PKC) (CLP), 2018 WL 3616845 (E.D.N.Y. July 27, 2018). The Court denied the *Freeman I* Plaintiffs' motion for reconsideration of some of the Court's decision in *Freeman I* at oral argument on October 28, 2019. (*See Freeman I*, 14-CV-6601, Oct. 28, 2019 Minute Order).

[4] Defendant Saderat has not appeared in *Freeman II* or *Bowman*. On March 14, 2019, a Certificate of Default was entered against Saderat in *Freeman II*. (No. 18-CV-7359, Dkt. 52.) Accordingly, the Court's decision on the pending motions to dismiss in *Freeman II* and *Bowman*

2

*Freeman II* and *Bowman*. For the same reasons articulated in *Freeman I*, the Court dismisses Plaintiffs' ATA claims and their JASTA conspiracy claims in *Freeman II* and *Bowman*. This includes dismissing Count 6 of the *Freeman II* and *Bowman* Complaints against Defendant Commerzbank for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure ("FRCP") 12(b)(2). In addition, the Court also dismisses Plaintiffs' JASTA aiding and abetting claims, which were not alleged in *Freeman I*, for failure to state a claim under FRCP 12(b)(6).

## BACKGROUND

The Court assumes the parties' familiarity with the facts of these two actions and with the Court's September 16, 2019 Memorandum and Order dismissing *Freeman I*. In brief, Plaintiffs are alleging a wide-ranging conspiracy between Defendants, Saderat, the Government of Iran, and multiple state-affiliated and private Iranian entities that, at times, operate as financial and logistical conduits for the Islamic Revolutionary Guard Corps' ("IRGC") and Hezbollah's terrorist activities. *Freeman I*, 413 F. Supp. 3d at 73.[5] Plaintiffs allege that the conspiracy was formed in 1987 for

---

does not apply to Saderat, and the term "Defendants" in this Memorandum and Order refers only to the moving defendants. In addition, the Court directs the *Bowman* Plaintiffs (No. 19-CV-2146) to move for a certificate of default as to Defendant Saderat within seven (7) days of this Memorandum & Order.

[5] The Court notes that, in *Freeman II* and *Bowman*, Plaintiffs have added allegations detailing how Defendants helped Iran evade sanctions and the relationship between Iran and its proxies and the designated terrorist groups. (*See, e.g.*, *Freeman II*, No. 18-CV-7359, Am. Compl., Dkt. 72, ¶ 42(c) (describing how Defendants failed to complete the required screening of certain messages and valuable letters of credit documents); *id.* ¶¶ 131–39 (relating how Iran continuously evaded international sanctions); *id.* ¶¶ 140–56 (alleging that Defendants provided Iran with access to the Eurodollar market which allowed Iran to continue funding various illicit schemes); *id.* ¶ 163 ("The Western Bank Defendants, however, knowingly and intentionally agreed to, and did, manipulate tens of thousands of payment order messages . . . and the records of such transactions to defeat such monitoring and screening, and prevent transparency, in order to provide USD funds to Iran for unlawful uses, which foreseeably included the support of Iranian terrorism and terrorist organizations."); *id.* ¶¶ 192–207 (describing the function of letters of credit); *id.* ¶¶ 586–98 (explaining how MODAFL acquired aircraft engines and other parts); *id.* ¶¶ 726–27 (recounting public statements by federal officials regarding HSBC's "willful flouting of U.S. sanctions laws and regulations"); *id.* ¶¶ 861–63 ("While neither Mahan Air nor Blue Sky Aviation was designated

the purposes of evading U.S. sanctions on financial and business dealings with Iran, conducting illicit trade-finance transactions, concealing the involvement of Iranian agents in financial payments to and from United States dollar-denominated accounts, and facilitating Iran's provision of material support to support terrorist activities and organizations, including Hezbollah. *Id.*

In addition to asserting the same seven claims alleged in the *Freeman I* complaint, *Freeman II* and *Bowman* assert five claims for secondary liability, one for conspiracy, and four for aiding and abetting under JASTA, 18 U.S.C. § 2333(d)(2).[6] (*Compare Freeman I*, No. 14-CV-6601,

---

as a terrorist at the time the LCs [Letters of Credit] . . . were financed, [SCB] engaged in criminal conduct in furtherance of the Conspiracy in order to aid these IRGC supply chain entities to evade U.S. sanctions knowing that its own conduct was illegal . . . In sum, [SCB] affirmatively chose to facilitate Iran's illegal conduct and provide material support to its terror apparatus[.]"); *id.* ¶¶ 899–900, 989, 1019 (summarizing how SCB's participation assisted "Iran's military and terror apparatus"); *see also id.* ¶¶ 246–55, 259–75, 284–87, 297–300, 309–11 (adding new allegations to explain how the IRGC and Hezbollah committed acts of international terrorism at the direction of Iran and asserting that "Plaintiffs were foreseeably injured").) The Court finds that, at their essence, Plaintiffs' claims with respect to the alleged conspiracy remain the same.

[6] The JASTA conspiracy claim in each of the Complaints is essentially the same as the JASTA conspiracy claims construed by the Court in *Freeman I*. *See* discussion *supra* note 1. The JASTA aiding and abetting claims are asserted for the first time in *Freeman II* and *Bowman*.

Although Plaintiffs contend in their response to Defendants' motions to dismiss that "Plaintiffs have consistently maintained that each of their conspiracy and aiding and abetting claims in *Freeman I* predicated on primary liability should also be treated as secondary liability claims under § 2332(d)(2) once JASTA was enacted" (*Freeman II*, No. 18-CV-7359, Plaintiffs' Response, Dkt. 76, at 2 n.1; *see also Bowman*, No. 19-CV-2146, Plaintiffs' Response, Dkt. 41, at 2 n.1), the Court made clear that that was not the case at the hearing on the motion for reconsideration in *Freeman I*. During the oral argument, the Court stated:

> To the extent that I said at the first meeting with all the parties that I'm assuming that the claims are being construed under JASTA as well . . . I was not in any way endorsing the theory that you were alleging aiding and abetting along with conspiracy under JASTA. . . . [The] letter [docketed as 222] seemed to stake out the position . . . that the plaintiffs were relying on the conspiracy theory both for purposes of primary liability under the ATA and then also under JASTA. That certainly was the focus of the briefing thereafter.

\* \* \*

Second Amended Complaint ("SAC"), Dkt. 115, ¶¶ 2179–293 *with Freeman II*, No. 18-CV-7359, Amended Complaint ("Am. Compl."), Dkt. 72, at ¶¶ 3724–86; *Bowman*, No. 19-CV-2146, Am. Compl., Dkt. 21, at ¶¶ 1321–83.)

## DISCUSSION

As in *Freeman I*, Defendants move to dismiss the Complaints in *Freeman II* and *Bowman* (the "Complaints"), pursuant to FRCP 12(b)(6), on the basis that they fail to adequately assert primary and secondary liability claims under the ATA and JASTA, and therefore fail to state a claim for which relief can be granted. (*Freeman II*, No. 19-CV-2146, Defendants' Motion to Dismiss ("MTD"), Dkt. 75; *Bowman*, No. 18-CV-7359, MTD, Dkt. 34.) Defendant Commerzbank, as before, separately moves to dismiss Count 6 of the Complaints for lack of personal jurisdiction under FRCP 12(b)(2). (*Bowman*, No. 19-CV-2146, MTD, Dkt. 34, at 1 n.1.) Because all but the aiding and abetting claims in *Freeman II* and *Bowman* are materially the same as those asserted in *Freeman I*, the Court relies on, and incorporates by reference, its *Freeman I* decision, and dismisses all of Plaintiffs' ATA claims and their JASTA conspiracy claims in the Complaints. *See Freeman I*, 413 F. Supp. 3d at 80–81 (resolving personal jurisdiction challenge); 81–94 (dismissing ATA primary liability and conspiracy claims); *id* at 95–98 (dismissing JASTA conspiracy claim).[7] The Court, therefore, addresses Defendants' motion to dismiss with respect to the only claims not alleged in *Freeman I*, Plaintiffs' JASTA aiding and abetting claims.

---

> Nowhere in any of your submissions have you actually used the words, We are alleging aiding and abetting liability under JASTA, and even in your briefing now, you simply say that one of the elements is met . . . but I just think the way you proceeded is . . . a little disingenuous, to be perfectly frank, because you never declared in this case that you were advancing an aiding and abetting theory.

(*Freeman I*, No., No. 14-CV-6601, Oral Argument Transcript, Dkt. 248, 44:18–46:2.)

[7] Cases decided in this Circuit after *Freeman I* lend additional support to the Court's reasoning in *Freeman I*. For example, in *Zapata v. HSBC Holdings PLC*, 414 F. Supp. 3d 342,

5

I.      **Plaintiffs' Aiding and Abetting Claims under JASTA**

Plaintiffs' Ninth Claim for Relief, brought against all of the defendants in *Freeman II* and *Bowman*, asserts, *inter alia*, that "[t]he IRGC and Hezbollah together with their Iraqi agents and proxies, including the Special Groups [a litany of Iraqi Shi'a terror groups], committed, planned and authorized each attack alleged." (*See Freeman II*, No. 18-CV-7359, Am. Compl., Dkt. 72, at ¶ 3742; *see also id.* ¶¶ 7, 3743–45.) Plaintiffs further assert that Defendants aided and abetted the acts of international terrorism by "knowingly provid[ing] substantial assistance, directly or indirectly, to the IRGC and its agents . . . and Hezbollah." (*Id.* ¶¶ 3746–47.) Each Defendant, according to Plaintiffs, had general knowledge of its role in the illegal laundering of money on behalf of a State Sponsor of Terrorism, its banks, and its entities and agents, for the purpose of concealing the transactions from United States' authorities, which "directly or indirectly . . . enabled Iran to facilitate its support and preparation for, and carrying out of, acts of international

---

355–58 (E.D.N.Y. 2019), the court considered proximate causation in the ATA context, and found it lacking when plaintiffs did not allege "any relationship between [Defendant] HSBC's money laundering and the acts of violence perpetrated against them." More specifically, the court noted that plaintiffs did not allege "that the Cartels [*i.e.*, the drug cartels serviced by HSBC] require laundered money to carry out any acts of violence in Mexico, let alone the specific atrocities inflicted upon Plaintiffs." *Id.* at 356. The court also noted that "Plaintiffs acknowledge that the Cartels have abundant cash resources, and there is no plausible inference that the Cartels would not be able to commit these acts of violence without HSBC first laundering their money. *Id.*; *id.* at 358 ("[T]he Cartels are not purely terrorist organizations and laundering money that the Cartels independently accumulate is an act of a fundamentally different sort from giving terrorist organizations money that they do not already have. Because Plaintiffs have failed to plead proximate cause, their claims must be dismissed." (internal citation omitted)); *see also O'Sullivan v. Deutsche Bank AG*, No. 17-CV-8709 (LTS) (GWG), 2020 WL 906153, at *1, 4–5 (S.D.N.Y. Feb. 25, 2020) (applying substantially similar proximate cause analysis as *Freeman I* in denying plaintiffs, who were U.S. service members, or families of U.S. service members, injured or killed in terrorist attacks in Iraq between 2003 and 2011, leave to amend previously dismissed ATA and JASTA complaint); *Kaplan v. Lebanese Canadian Bank, SAL*, 405 F. Supp. 3d 525, 532–33 (S.D.N.Y. 2019) (finding, *inter alia*, that plaintiff's "conclusory allegations" that the actions of a bank, in "intentionally and/or recklessly providing extensive banking services to Hizbollah, which caused the terrorist rocket attacks," failed to plausibly establish proximate cause for ATA claim) internal quotation marks, alterations, and citations omitted)).

terrorism." (*Id.* ¶¶ 3748–51.) Plaintiffs contend that by "blinding" American authorities "to Iran's access to the financial system for the purpose of facilitating material support for terrorism," Defendants provided "unusual and unlawful banking services under unusual circumstances by working closely and interactively with" their "Iranian counterparties." (*Id.* ¶ 3751.) Moreover, each Defendant had knowledge, "or knew of the substantial certainty, that some of the funds it disguised and concealed would be used by Iran, the IRGC, Hezbollah, and their agents and proxies to support and commit acts of international terrorism, and yet continued to provide assistance" for multiple years. (*Id.* ¶¶ 3752–54.)

Plaintiffs' Tenth Claim for Relief,[8] brought against Commerzbank only, asserts that it knowingly provided substantial assistance to Hezbollah through Hezbollah's Martyrs Foundation (the "Foundation") in Lebanon. (*Id.* ¶¶ 3757–64.) The Complaints, however, do not allege any

---

[8] Plaintiffs' Tenth Claim for Relief, brought as an aiding and abetting claim in violation of JASTA, is premised on substantially the same factual allegations as their Sixth Claim in *Freeman I*, *Freeman II*, and *Bowman*, though this Sixth Claim is asserted as a conspiracy, rather than an aiding-and-abetting claim. (*Compare Freeman I*, No. 14-CV-6601, SAC, Dkt. 115, ¶¶ 2264–73, *with Freeman II*, No. 18-CV-7359, Am. Compl., Dkt. 72, at ¶¶ 3757–64 *and Bowman*, No. 19-CV-2146, Am. Compl., Dkt. 21, ¶¶ 1354–61). In *Freeman I*, the Court dismissed the conspiracy claim against Commerzbank for lack of personal jurisdiction. *Freeman I*, 413 F. Supp.3d at 80–81. While the Court believes that the same analysis applies to Plaintiffs' Tenth Claim, which is based on the materially same facts, but alleges aiding and abetting instead of conspiracy, Commerzbank has not moved to dismiss the Tenth Claim for lack of personal jurisdiction under FRCP 12(b)(2). Instead, Commerzbank joins its co-defendants in moving to dismiss all of the JASTA aiding and abetting claims in the Complaints for failure to state a claim under FRCP 12(b)(6). (*See Freeman II*, No. 18-CV-7359, MTD, Dkt. 75, at 1 n.2, 3–5; *Bowman*, No. 19-CV-2146, MTD, Dkt. 34, at 1 n.2, 3–5.) "Personal jurisdiction, unlike subject-matter jurisdiction, can . . . be purposely waived or inadvertently forfeited . . . [t]herefore, a district court should not raise personal jurisdiction *sua sponte* when a defendant has appeared and consented, voluntarily or not, to the jurisdiction of the court." *City of New York v. Mickalis Pawn Shop*, LLC, 645 F.3d 114, 133 (2d Cir. 2011) (internal quotation marks and citations omitted). Because Defendant Commerzbank has appeared and not moved to dismiss the Tenth Claim of the Complaints for lack of personal jurisdiction, the Court deems Commerzbank as having consented to the Court's jurisdiction for the purposes of the Tenth Claim and, therefore, addresses it as part of Defendants' motions to dismiss pursuant to FRCP 12(b)(6).

7

facts as to the source, if any, of Commerzbank's knowledge of the connection between Hezbollah and the Foundation or between the Foundation's fundraising activities and the terrorist attacks at issue. (*See id.* ¶¶ 1193–94.)

Finally, Plaintiffs Twelfth Claim for Relief, asserted against SCB, Credit Suisse, and HSBC for aiding and abetting in violation of JASTA, describes a conspiracy between IRISIL, Mahan Air, and others to provide Hezbollah and other terrorist organizations with material support to facilitate acts of terrorism, but does not allege any facts that these Defendants directly processed funds for Hezbollah or any other terrorist organization. (*See id.* ¶¶ 3775–86.)

## II. The Complaints Fail to Sufficiently Allege Aiding and Abetting under JASTA

### A. Legal Standard

JASTA provides that liability may be asserted

> for an injury arising from an act of international terrorism committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization under section 219 of the Immigration and Nationality Act (8 U.S.C. 1189), as of the date on which such act of international terrorism was committed, planned, or authorized, liability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism.

18 U.S.C. § 2333(d)(2). When Congress enacted JASTA, they indicated that "the proper legal framework for federal civil aiding and abetting and conspiracy liability" claims under the statute was *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983). *Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217, 223 (2d Cir. 2019) (internal quotation marks, alterations, and citation omitted). The Circuit in *Siegel* used *Halberstam* to explain that

> aiding-and-abetting includes three elements: (1) "the party whom the defendant aids must perform a wrongful act that causes an injury;" (2) "the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance;" and (3) "the defendant must knowingly and substantially assist the principal violation."

8

*Id.* at 224 (adopting *Halberstam*'s aiding-and-abetting standard as the standard for analyzing a JASTA aiding and abetting claim). To evaluate the "substantial" requirement of the third element—knowing and substantial assistance of the principal violation—the Court must consider "(1) the nature of the act encouraged, (2) the amount of assistance given by defendant, (3) defendant's presence or absence at the time of the tort, (4) defendant's relation to the principal, (5) defendant's state of mind, and (6) the period of defendant's assistance." *Linde v. Arab Bank, PLC*, 882 F.3d 314, 329 (2d Cir. 2018) (citing *Halberstam*, 705 F.2d at 483–84); *see Siegel*, 933 F. 3d at 225 (analyzing *Linde* factors in assessing "substantial assistance" prong of JASTA aiding and abetting claim).

### B. Application[9]

Any argument about the viability of Plaintiffs' aiding and abetting claim under JASTA is all but foreclosed by the Second Circuit's decision in *Siegel*, 933 F.3d 217. In *Siegel*, the plaintiffs were victims, or representatives of victims, of a series of terrorist attacks in Jordan on November 9, 2005, for which the terrorist organization al-Qaeda in Iraq ("AQI") claimed responsibility. *Id.* at 219. The plaintiffs sued various HSBC entities under JASTA for aiding and abetting AQI's perpetration of the attacks, by helping Al Rajhi Bank ("ARB"), a Saudi bank, evade U.S. sanctions and by transmitting millions of dollars to ARB that were then transferred to AQI and other terrorist

---

[9] The Court declines to adopt the approach urged by Defendants to simply rely on its analysis from *Freeman I* regarding Defendants' alleged knowledge or awareness of the terrorism-related activities and goals of the Iranian entities for and to which Defendants transferred funds in violation of U.S. sanctions—an issue that the Court addressed in the context of Plaintiffs' ATA conspiracy claims. (*Freeman II*, No. 19-CV-2146, MTD, Dkt. 75, at 5; *Bowman*, No. 18-CV-7359, MTD, Dkt. 34, at 5); *Freeman I*, 413 F. Supp. 3d at 87 n.28. Instead, the Court separately analyzes under *Halberstam* whether the Complaints sufficiently allege that Defendants were "generally aware of [their] role as part of [the] overall illegal or tortious activity" engaged in by "the person who committed [the] act of international terrorism." *Siegel*, 933 F.3d at 223 (quoting *Halberstam*, 705 F.2d at 477; 18 U.S.C. § 2333(d)(2)).

9

organizations to commit terrorist acts. *Id*. at 219, 220–21. In affirming the district court's dismissal of the plaintiffs' aiding-and-abetting claim, the *Siegel* panel summarized its reasoning as follows:

> The plaintiffs argue that the defendants' willingness to do business with Al Rajhi Bank despite their knowledge of its links to terrorism is sufficient to expose the defendants to aiding-and-abetting liability under JASTA. They are wrong. Like the district court, we conclude that because the plaintiffs did not adequately allege in their operative pleading . . . that the defendants knowingly played a role in the November 9 attacks or provided substantial assistance to the terrorist organization that perpetrated it, they failed to state a plausible claim for relief under JASTA.

*Id*. at 219. In particular, the *Siegel* panel found that the plaintiffs had "failed to allege adequately two of the three *Halberstam* elements of civil aiding-and-abetting: (1) that HSBC was 'generally aware' of its role as part of an 'overall illegal or tortious activity at the time that [it] provide[d] the assistance,' and (2) that HSBC 'knowingly and substantially assist[ed] the principal violation.'" *Id*. at 224 (quoting *Halberstam*, 705 F.2d at 477).

The Circuit's holding in *Siegel* dictates the same result here: Plaintiffs' aiding and abetting claims must be dismissed because they fail to adequately allege two of the three *Halberstam* elements.[10]

---

[10] The Court notes that with respect to the first *Halberstam* prong—*i.e.*, that the defendant aided the party that performed the wrongful act that caused the injury—there is an open question as to how direct the defendant's support must be. As the Second Circuit wrote in *Siegel*,

> [JASTA] does not, by its terms, limit aiding-and-abetting liability to those who provide direct support to terrorist organizations, and Congress wrote that its purpose in enacting the statute was "to provide civil litigants with the *broadest possible basis*" to seek relief against those who "have provided material support, *directly or indirectly*, to foreign organizations or persons that engage in terrorist activities against the United States."

933 F.3d at 223 n.5 (quoting 18 U.S.C. § 2333 Statutory Notes) (emphasis in original); *see also Honickman for Estate of Goldstein v. BLOM Bank SAL* ("*Honickman*"), ___ F. Supp. 3d ___, 2020 WL 224552, at *7 (E.D.N.Y. 2020). Indeed, in *Siegel*, when contrasting the relief provided by the ATA with that provided by JASTA, the Circuit quoted JASTA as creating secondary liability against "any person who aids and abets, by knowingly providing substantial assistance [to], or who

10

1.      *Halberstam* **Awareness Element**

As the Second Circuit explained in *Siegel*:

> In order to plead adequately the "general-awareness" element, a plaintiff must plausibly allege that the defendant was "aware that, by assisting the principal, it is itself assuming a role in terrorist activities." *See Linde*, 882 F.3d at 329 (internal quotation marks omitted). In *Linde*, we explained that although "[s]uch awareness does not require proof of . . . specific intent" or knowledge "of the specific attacks at issue," it does require that "the bank was generally aware that[, by providing financial services to a client,] it was thereby playing a 'role' in [the] violent or life-endangering activities." *Id.* We contrasted this with "the *mens rea* required to establish material support in violation of 18 U.S.C. § 2339B, which requires only knowledge of the organization's connection to terrorism, not intent to further its terrorist activities or awareness that one is playing a role in those activities." *Id.* at 329–30.

*Id.* at 224; *see Honickman*, 2020 WL 224552, at *7 (explaining that defendant "must have known [that] it was assuming a role in [the FTO's] terrorist activities 'at the time that [it] provide[d] the assistance.'" (quoting *Linde*, 882 F.3d at 329)).[11] As the court in *Honickman* further explained:

---

conspires with the person who committed[,] such an act of international terrorism," Siegel, 933 F.3d at 222–23 (quoting 18 U.S.C. § 2333(d)(2)) (alterations in original)—thus, reinforcing an interpretation of JASTA as creating aiding-and-abetting liability against one who provides substantial assistance "[to]" the act of international terrorism, but not necessarily to the person who committed that act.

The Court need not resolve that uncertainty here, given its finding that the Complaints fail to adequately allege the second and third *Halberstam* elements, which requires dismissal of Plaintiffs' aiding and abetting claims. *Siegel*, 933 F.3d at 223–24, 223 n.4 (noting that with regard to the first *Halberstam* element, "[w]e need not here decide whether JASTA's reach is as limited as [the defendant] suggests"—*i.e.*, that "JASTA aiding and abetting lies only where a defendant knowingly provides substantial assistance *to the person who committed such an act of international terrorism*"—"because the plaintiffs' claim fails even under their more expansive interpretation of the statute.").

[11] In *Honickman*, the plaintiffs were victims and relatives of victims of terrorist attacks committed by Hamas, and sued BLOM Bank SAL ("BLOM") under the ATA and JASTA for providing financial services to three organizations "alleged to have engaged in non-violent conduct in furtherance of Hamas' goals." 2020 WL 224552, at *1. BLOM, however, was not alleged to have engaged in illegal activity with any of the three organizations, such as violating U.S. sanctions. *See id.* at *3. Relying primarily on *Weiss*, *Linde* and *Siegel*, the court dismissed the complaint in *Honickman*, including the plaintiffs' JASTA aiding and abetting claim. *Id.* at *7–9. Although the facts underlying *Honickman* vary from those here, the Court finds instructive

11

> "Evidence that [a bank] knowingly provided banking services to [an FTO], without more, is insufficient to satisfy JASTA's scienter requirement." *Weiss v. National Westminster Bank PLC*, 381 F. Supp. 3d 223, 239 (E.D.N.Y. 2019). This is because "aiding and abetting an act of international terrorism requires more tha n the provision of material support to a designated terrorist organization." *Linde*, 882 F.3d at 329 (emphasis in original).
>
> \* \* \*
>
> In light of this precedent, it is not enough for Plaintiffs to "plausibl[y] allege that [the defendant bank] was 'generally aware of [its] role' in 'terrorist activities,' from which terrorist attacks were a natural and foreseeable consequence.". . . Adopting this reading would, in effect, replace the scienter for aiding-and-abetting liability with the lower scienter required for material support, in direct contravention of *Linde*'s holding that the bank must be aware that it is assuming a role in the organization's "violent or life-endangering activities." *See Siegel*, 933 F.3d at 224 (citing *Linde*, 882 F.3d at 329). Attempts to conflate these scienter requirements have been rejected by courts within this circuit. *See, e.g., Weiss*, 381 F. Supp. 3d at 238–39.

*Id*. at \*7–8 (parenthetical for *Weiss* omitted).

Furthermore, even if, as here, the services provided by the Defendants are non-routine or illegal, such as facilitating the FTO's evasion of U.S. sanctions, this conduct still does not create aiding and abetting liability under JASTA. As the court held in *O'Sullivan v. Deutsche Bank AG*,[12] "allegations that Defendants knowingly violated laws that were designed principally to prevent terrorist activity do not allege plausibly a general awareness that Defendants had assumed a role in a foreign terrorist organization's *act* of international terrorism." No. 17-CV-8709 (LTS)

---

*Honickman*'s discussion about the second and third elements of *Halberstam*. *See also Kaplan*, 405 F. Supp. 3d at 535–36 (dismissing JASTA aiding and abetting claim brought against bank that maintained accounts Hezbollah affiliates, based on the failure to satisfy *Halberstam* requirements).

[12] The Court notes that the defendants named in *Freeman I*, *Freeman II*, *Bowman*, and in *O'Sullivan* are mostly the same, including HSBC, SCB, Credit Suisse, and Saderat, and that the nature of the claims and the theory of liability for all three cases is substantially the same. (*Compare O'Sullivan*, 2020 WL 906153 at \*1, n.1, *with Freeman I*, 413 F. Supp. 3d at 72, *and Freeman II*, No. 18-CV-7359, Am. Compl., Dkt. 72, at 19–25, *and Bowman*, No. 19-CV-2146, Dkt. 21, at 21–26.)

12

(GWG), 2020 WL 906153, at *6 (S.D.N.Y. Feb. 25, 2020) (emphasis in original). In other words, it is not enough for a defendant-bank to be aware that its conduct violates the law—even one intended to prevent terrorism—or that the organization or entity to which it is providing financial services supports terrorist organizations; the bank must be aware that through its own conduct, whether legal or illegal, it is assuming a role in actual terrorist activity. *See Siegel*, 933 F.3d at 225–26 (finding insufficient "allegations establish[ing], at most, that . . . HSBC helped ARB violate banking regulations despite knowing that ARB supported terrorist organizations").

Here, Plaintiffs simply do not plead any facts from which to plausibly infer that Defendants were generally aware of their role in the actual acts of international terrorism committed by Hezbollah in Iraq between 2004 and 2011, or even in the provision of material support to Hezbollah by the IRGC or other Iranian entities.[13] For example, Plaintiffs' Tenth Claim for Relief, asserted only as to Commerzbank, alleges that Commerzbank was "generally aware" that by maintaining a bank account for the Hezbollah Martyrs Foundation, the bank was involved in giving Hezbollah, "directly or indirectly," access to the international financial system that allowed Hezbollah to "effectively raise funds from donors outside of Lebanon." (*Freeman II*, No. 18-CV-7359, Am. Compl., Dkt. 72, at ¶¶ 1193–94, 3759.) What Plaintiffs do not plead is a direct connection between the services that Commerzbank provided to the Foundation and any alleged terrorist activities. Even assuming that the Foundation was an FTO at the time Commerzbank maintained an account for the Foundation, the absence of any factual allegations showing a

---

[13] This is not to say that, even if the allegations in the Complaints were sufficient to establish that Defendants had provided, or conspired to provide, material support to a designated terrorist organization, this conduct in itself qualifies as an international act of terrorism under the ATA or JASTA. As the Court found in *Freeman I*, it does not. *Freeman I*, 413 F. Supp. 3d at 89–93 (finding that even if Plaintiffs had sufficiently alleged violations of the material support statutes, *i.e.*, §§ 2339A and 2339B, those violations would not constitute acts of international terrorism, as defined in § 2331(1), because the other elements of § 2331(1) are not met).

connection between the bank's services and the terrorist activity at issue is fatal to Plaintiffs' aiding and abetting claim. *See Honickman*, 2020 WL 224552, at *7 ("'Evidence that [a bank] knowingly provided banking services to [an FTO], without more, is insufficient to satisfy JASTA's scienter requirement.' This is because 'aiding and abetting an *act* of international terrorism requires more than the provision of material support to a designated terrorist organization.'") (internal citations omitted) (quoting *Weiss*, 381 F. Supp. 3d at 239; *Linde*, 882 F.3d at 329);[14] *see also Kaplan*, 405 F. Supp. 3d at 536 (dismissing JASTA aiding and abetting claim brought against bank that maintained accounts for Hezbollah affiliates, based on failure to sufficiently allege second *Halberstam* element, because, *inter alia*, "although Plaintiffs assert[ed] that Defendant processed millions of dollars' worth of wire transfers through [Defendant's] Accounts, Plaintiffs [did] not plausibly allege that Hizbollah received any of those funds or that Defendant knew or intended that Hizbollah would receive the funds").

The Ninth and Twelfth Claims, brought against some or all Defendants, allege even less of a connection between Defendants' conduct and the terrorist acts at issue, and even fewer facts supporting an inference that Defendants were aware that the assistance they were providing the Iranian entities would be used to help Hezbollah or any other organizations or individuals carry

---

[14] The absence of any allegations indicating that Commerzbank knew that the Foundation had funded specific terrorist activities of Hezbollah distinguishes this case from *Miller v. Arab Bank PLC*, 372 F. Supp. 3d 33 (E.D.N.Y. 2019). There, the court found that the plaintiffs had sufficiently stated an aiding and abetting claim under JASTA based on "[t]he allegation that [the defendant-bank] provided banking services 'in an unusual way under unusual circumstances,'— including by administering the Insurance Scheme for individuals whose cause of death included 'Martyr Operation'. . . ." *Id*. at 48 (quoting *Halberstam*, 705 F.2d at 487) (internal citation omitted). The *Miller* court found that this allegation "strongly suggests that [the defendant-bank] was generally aware of the nature of the conduct it was supporting." *Id*. Here, Plaintiffs do not allege that Commerzbank administered or oversaw any special program or fund, the purpose of which was clearly tied to terrorist activity, so as to permit a plausible inference that Commerzbank was "generally aware" that through its conduct "it [was] itself assuming a role in terrorist activities." *Siegel*, 933 F.3d at 224.

out acts of terrorism. The most that can be plausibly inferred from the Complaints' non-conclusory allegations is that Defendants assisted the Iranian entities in violating U.S. sanctions, despite knowing or having reason to believe that these entities provided some financial support to Hezbollah and other terrorist organizations for purposes of committing terrorist acts in Iraq during the relevant time frame. These allegations are not enough to satisfy *Halberstam*'s awareness requirement. *See Siegel*, 933 F.3d at 224 (finding second *Halberstam* element not established where plaintiffs "failed to allege that HSBC was aware that by providing banking services to ARB, it was supporting AQI, much less assuming a role in AQI's violent activities"); *O'Sullivan*, 2020 WL 906153, at *6 (denying leave to amend complaint to plead JASTA aiding and abetting claim, where proposed amended complaint "proffers no facts from which the Court can infer that Defendants knowingly played a role in the terrorist activities that injured Plaintiffs"); *Honickman*, 2020 WL 224552, at *7–10 (finding that the plaintiffs did not meet the "general awareness element" of the second *Halberstam* prong as they did not allege that the defendant bank knew it was assuming a role in Hamas's *terrorist activities* at the time assistance was provided); *Weiss*, 381 F. Supp. 3d at 239 ("Plaintiffs present no evidence that creates a jury question as to whether Defendant generally was aware that it played a role in any of Hamas's or even Interpal's or the Union of Good's violent or life-endangering activities.").

Thus, the Court finds that the Complaints fail to adequately allege the second *Halberstam* element for an aiding and abetting claim under JASTA.

### 2. Knowingly and Substantially Assisting the Principal Violation

Plaintiffs' theory of how Defendants "knowingly and substantially assisted" in the commission of the terrorist activities is essentially premised on the same facts alleged in support of Defendants' conspiracy claims in *Freeman I* and the Complaints: beginning in 1984, after Iran

15

was first designated by the United States as a State Sponsor of Terrorism (*Bowman*, No. 19-CV-2146, Am. Compl., Dkt. 21, ¶ 497), Iran developed a myriad of ways to circumvent United States sanctions and obtain United States dollars (*id.* at 498); Defendants helped various Iranian entities evade sanctions by "alter[ing], falsify[ing], or omit[ting] information" for Iranian banks, like Bank Saderat and IRISL, to conceal Iran's financial transactions from the Eurodollar market (*see, e.g.*, *id.* at 499, 504–05); Iran then used that money for "illicit objectives," which included concealing money from United States institutions, transferring money to the IRGC-QF, Hezbollah, and other instruments of terrorism, and acquiring technology and components for its "illegal Weapons of Mass Destruction program and illicit conventional arms trade" (*id.*); Defendants' conduct substantially helped Iran, the IRGC, IRISL, Mahan Air, Hezbollah, and/or the Special Groups in committing the acts of international terrorism by using United States dollars to fund Iran's arming, training, and funding of them (*id.* at 520); and the terrorist attacks were a foreseeable consequence of Defendants' alleged laundering scheme on behalf of Iran, a state sponsor of terrorism. (*See, e.g. Freeman II*, No. 18-CV-7359, Am. Compl., Dkt. 72, at ¶¶ 7, 40, 62–74, 163, 498, 836, 989, 3615–28, 3643–46, 3665, 3678–80, 3688, 3698, 3718, 3733, 3755, 3764; *see also id.* ¶¶ 245–311 (describing Iran's terror apparatus).)

Based on the same precedent and for many of the same reasons discussed above, these allegations are simply insufficient to satisfy the "knowing" and "substantial" requirements of the third element of *Halberstam*. *See*, *e.g.*, *Siegel*, 933 F.3d at 225–26 (finding allegations that HSBC helped ARB violate banking regulations, knowing that ARB supported terrorist organizations, "even were that proven, however, it would be an insufficient basis for liability under JASTA because the plaintiffs have failed to allege that HSBC *knowingly* assumed a rule in AQI's terrorist activities or substantially assisted AQI in those activities") (emphasis added). With regard to

16

Defendants' knowledge, as the court held in *Brill v. Chevron Corp.*, "at most, [the Complaints] allege[] that [Defendants] should have known that [they were] contributing to terrorism and chose to ignore the possible consequences. That is in effect an allegation of recklessness, but JASTA requires more." No. 15-CV-4916 (JD), 2018 WL 3861659, at *3 (N.D. Cal. Aug. 14, 2018) (internal citations omitted)); *see Honickman*, 2020 WL 224552, at *11 (finding "knowing" prong of *Halberstam*'s third element unmet where, *inter alia*, "none of the factual allegations in Plaintiffs' complaint suggest that BLOM knowingly encouraged Hamas' violent activities, such as those which caused Plaintiffs' injuries"); *see also Averbach v. Cairo Amman Bank*, No. 19-CV-4 (GHW) (KHW), 2020 WL 486860, at *12–17 (S.D.N.Y. Jan. 21, 2020) (noting, in a report and recommendation on a motion to dismiss, that a "trend in JASTA case law toward disallowing claims against defendants who did not deal directly with a terrorist organization or its proxy," and recommending the finding that plaintiffs did not plead sufficient facts to support a JASTA aiding and abetting claim with respect to the first and second prongs of *Halberstam*).

The Complaints are also insufficient, based on the six *Linde* factors to satisfy the "substantial" aspect of the third *Halberstam* factor. *Linde*, 882 F.3d at 329; *see Siegel*, 933 F.3d at 225 (analyzing *Linde* factors). First, "the nature of the act encouraged," *Siegel*, 933 F.3d at 225, by Defendants, as alleged in the Complaints, was violating U.S. sanctions, not committing acts of terrorism. *See id.* (finding that plaintiffs did not plausibly allege "that HSBC encouraged the heinous November 9 Attacks or provided any funds to AQI," and also finding that, despite alleging that "HSBC provided hundreds of millions of dollars to ARB, . . . [Plaintiffs] did not advance any non-conclusory allegation that AQI received any of those funds or that HSBC knew or intended that AQI would receive the funds"); *Honickman*, 2020 WL 224552, at *11 (finding that "Plaintiffs have not plausibly alleged that BLOM encouraged the attacks which injured Plaintiffs or

17

knowingly provided funds to Hamas for its violent activities"). Second, "the amount of assistance given by [D]efendant[s]," *Linde*, 882 F.3d at 329, though involving substantial amounts of money, was not given to the organizations or individuals who committed the acts of terrorism that injured Plaintiffs. *See Honickman*, 2020 WL 224552, at *11 (finding that "Plaintiffs make no non-conclusory assertions that any of the funds processed by the [three Hamas-affiliated organizations that banked with BLOM] actually went to Hamas, or that BLOM, at the time it provided banking services to [the three organizations], was aware or intended that Hamas would receive the corresponding funds" (citing *Siegel*, 933 F.3d at 225)). Third, Defendants plainly were not "presen[t] . . . at the time of the tort," *Linde*, 882 F.3d at 329, *i.e.*, the terrorist acts in Iraq between 2004 and 2011. *See Siegel*, 933 F.3d at 225 (noting that plaintiffs themselves alleged that HSBC was not "present" at the time of the November 9 terrorist attacks); *Honickman*, 2020 WL 224552, at *11 (finding no presence, "[e]ven if the term 'presence' could be broadly interpreted" (quoting *Siegel*, 933 F.3d at 225)). Fourth, Defendants are not alleged to have any "relation[ship] to the principal," *Linde*, 882 F.3d at 329, *i.e.*, Hezbollah. *See Siegel*, 933 F.3d at 225 (finding that "plaintiffs do not plead any non-conclusory allegations that HSBC had any relationship with AQI"); *Honickman*, 2020 WL 224552, at *11 (finding no relationship between BLOM and Hamas). Fifth, the Complaints do not plausibly allege that Defendants' "state of mind," *Linde,* 882 F.3d at 329, involved an intent to finance or otherwise promote or carry out terrorist acts; if anything, the Complaints' non-conclusory allegations show that Defendants' intentions were to profit commercially by assisting the Iranian entities to evade U.S. sanctions. *See Freeman I*, 413 F. Supp. 3d at 92 (noting that based on its review of the operative complaint, the Court could only infer that "Defendants 'appear' to have been purely motivated by the opportunity to make money"); *id*. at 88 ("Even assuming Defendants knew of Iran's myriad ties to, and history of,

18

supporting terrorist organizations, including Hezbollah, the Court cannot infer from this fact that Defendants agreed to provide illegal financial services to Iranian financial and commercial entities, which have many legitimate interests and functions, with the intent that those services would ultimately benefit a terrorist organization."); *see also Siegel*, 933 F.3d at 225 (finding that "plaintiffs do not plausibly allege that HSBC knowingly assumed a role in AQI's terrorist activities or otherwise knowingly or intentionally supported AQI"); *Honickman*, 2020 WL 224552, at *11 (finding that "Plaintiffs make no non-conclusory allegations that BLOM knowingly assumed a role in Hamas' terrorist activities or otherwise knowingly or intentionally supported Hamas"). Finally, although "the period of [Defendants'] assistance," *Linde*, 882 F.3d at 329, was lengthy, as previously noted, there are no allegations that Defendants provided any services to, or had any dealings with, the "principal," Hezbollah. *See Siegel*, 933 F.3d at 225 (observing that HSBC's 25 years of providing banking services to ARB "certainly bespeaks a lengthy relationship but not necessarily of assistance in terrorism").

      The closest Plaintiffs come to asserting an aiding and abetting claim are their allegations pertaining to SCB. Plaintiffs contend that SCB worked directly with Iran to evade sanctions (*see, e.g.*, *Bowman*, No. 19-CV-2146, Am. Compl., Dkt. 21, ¶¶ 785–88 (describing SCB's actions to act as the recipient bank for U.S. dollar proceeds from daily oil sales made by the NIOC in the Eurodollar market)) and avoid United States authorities (*see, e.g.*, *id.* ¶¶ 797–833 (outlining SCB's central role in hiding money from United States authorities)). Plaintiffs allege that SCB was the negotiating bank on many illegal Iranian transactions for Mahan Air and MODAFL sub-agencies (*id.* ¶ 1027), and include flow-charts demonstrating how Mahan Air and MODAFL purchased aircraft parts (*id.* at 117–18). However, even these allegations fall far short of establishing that

19

Defendants "knowingly and substantially assist[ed] the principal violation, *i.e.*, the alleged acts of terrorism. *Siegel*, 933 F.3d at 223.

Thus, the Court finds that the Complaints fail to "adequately [] plead the 'substantial assistance' element of aiding-and-abetting liability under JASTA." *Id*.

\* \* \*

For these reasons, the Court dismisses Plaintiffs' aiding and abetting counts in *Freeman II* and *Bowman* for failure to state a claim upon which relief can be granted.

## CONCLUSION

For the reasons contained herein, the Court dismisses the First, Second, Third, Fourth, Fifth, Seventh, Eighth, Ninth, Tenth, and Twelfth Claims for Relief,[15] as asserted against the moving Defendants, in *Freeman II* and *Bowman*, for failing to state a claim under FRCP 12(b)(6). The Court also dismisses the Sixth Claim of Relief of both Complaints, brought against Defendant Commerzbank, for lack of personal jurisdiction pursuant to FRCP 12(b)(2). Lastly, the Court directs Plaintiffs to move for a certificate of default as to Defendant Bank Saderat PLC in *Bowman* (No. 19-CV-2146) within seven (7) days of this Memorandum & Order.

SO ORDERED.

/s/ Pamela K. Chen
Pamela K. Chen
United States District Judge

Dated: June 5, 2020
      Brooklyn, New York

---

[15] The Eleventh Claim of the Complaints is asserted only as to Bank Saderat, which, as previously discussed, despite appearing in *Freeman I*, has defaulted in *Freeman II* and *Bowman*.