UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
KATHALEEN FREEMAN, *et al.*,

               Plaintiffs,

      - against -

HSBC HOLDINGS PLC, HSBC BANK PLC,
HSBC BANK MIDDLE EAST LIMITED,
HSBC BANK USA, N.A., BARCLAYS BANK
PLC, STANDARD CHARTERED BANK,
ROYAL BANK OF SCOTLAND, N.V.,
CREDIT SUISSE AG, BANK SADERAT
PLC, COMMERZBANK AG, and JOHN
DOES 1–50,

               Defendants.
-------------------------------------------------------x
RYAN BOWMAN, *et al.*,

               Plaintiffs,

      - against -

HSBC HOLDINGS PLC, HSBC BANK PLC,
HSBC BANK MIDDLE EAST LIMITED,
HSBC BANK USA, N.A., BARCLAYS BANK
PLC, STANDARD CHARTERED BANK,
ROYAL BANK OF SCOTLAND, N.V.,
CREDIT SUISSE AG, BANK SADERAT
PLC, COMMERZBANK AG, and JOHN
DOES 1–50,

               Defendants.
-------------------------------------------------------x

**MEMORANDUM & ORDER**
18-CV-7359 (PKC) (CLP)
19-CV-2146 (PKC) (CLP)

PAMELA K. CHEN, United States District Judge:

      In November 2014, a group of American citizens killed or injured by terrorist attacks in

Iraq between 2004 and 2011, and/or their families, filed an action, *Freeman, et al. v. HSBC*

*Holdings PLC, et al*., 14-CV-6601 (PKC) (CLP) ("*Freeman I*"), against ten banking institutions—

HSBC Holdings, PLC, HSBC Bank PLC, HSBC Bank Middle East Ltd., and HSBC Bank USA,

1

N.A. (the "HSBC Defendants"); Barclays Bank PLC; Standard Chartered Bank; Royal Bank of Scotland, N.V.; Credit Suisse AG; Bank Saderat PLC ("Bank Saderat")[1]; and Commerzbank AG ("Commerzbank")—as well as John Does 1–50, seeking damages pursuant to the Antiterrorism Act (the "ATA"), 18 U.S.C. § 2333, as amended by the Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 114-222, 130 Stat. 852 (2016).  While *Freeman I* was pending, a different group of Americans who were injured or killed by terrorist attacks in Iraq, and/or their families, represented by the *Freeman I* counsel, filed these two additional actions, *Freeman, et al. v. HSBC Holdings PLC, et al.* No. 18-CV-7359 (PKC) (CLP) ("*Freeman II*"), and *Bowman, et al. v. HSBC Holdings PLC, et al.*, No. 19-CV-2146 (PKC) (CLP) ("*Bowman*"), seeking damages under the ATA and JASTA against the same defendants for materially the same conduct.[2]

On September 16, 2019, the Court dismissed *Freeman I* in its entirety.  *See* 413 F. Supp. 3d 67, 73 (E.D.N.Y. 2019).  The Court thereafter denied the *Freeman I* plaintiffs' motion for reconsideration with respect to defendants Standard Chartered Bank and Bank Saderat at oral argument on October 28, 2019.  (*See Freeman I*, No. 14-CV-6601, Oct. 28, 2019 Minute Order.)  On June 5, 2020, the Court dismissed the claims in *Freeman II* and *Bowman* except for those asserted against Bank Saderat, *see Freeman v. HSBC Holdings PLC*, 465 F. Supp. 3d 220, 224 (E.D.N.Y. 2020) ("*Freeman II-Bowman*, 465 F. Supp. 3d 220")[3], and on August 4, 2020, denied

---

[1] Bank Saderat PLC is the defendant in this matter; its parent company is Bank Saderat Iran.  (Freeman II Am. Compl., Dkt. 72, ¶ 26.)

[2] For purposes of this Memorandum & Order, the term "Plaintiffs" refers to the plaintiffs in both *Freeman II* and *Bowman*.

[3] In its August 4, 2020 Memorandum and Order on Defendant Commerzbank's motion for reconsideration, *Freeman v. HSBC Holdings PLC*, 2020 WL 4481944 (E.D.N.Y. Aug. 4, 2020) ("*Freeman II-Bowman*, 2020 WL 4481944"), the Court referred to its June 5, 2020 decision as "Freeman III."  *See Freeman II-Bowman*, 2020 WL 4481944, at *1.  In order to avoid confusion

Defendant Commerzbank's motion for reconsideration. *Freeman II-Bowman*, 2020 WL 4481944, at \*6. Currently pending before the Court are Plaintiffs' motions for a default judgment against Defendant Bank Saderat. For the reasons that follow, the Court grants in part and denies in part Plaintiffs' motions as to liability, and sets a briefing schedule and date for an inquest as to damages.

## BACKGROUND

The Court assumes the parties' familiarity with the facts of these three actions and with its prior orders. In brief, Plaintiffs are alleging a wide-ranging conspiracy between Defendants, Bank Saderat, the Government of Iran, and multiple state-affiliated and private Iranian entities that, at times, operate as financial and logistical conduits for the Islamic Revolutionary Guard Corps' ("IRGC") and Hezbollah's terrorist activities. *Freeman II-Bowman*, 465 F. Supp. 3d. at 224. In addition to asserting the same seven claims alleged (and ultimately dismissed) in the *Freeman I* Second Amended Complaint ("SAC")[4], Plaintiffs assert in *Freeman II* and *Bowman* five claims for secondary liability—one for conspiracy and four for aiding and abetting under JASTA, 18 U.S.C. § 2333(d)(2). (*Compare Freeman I*, No. 14-CV-6601, Second Amended Complaint ("SAC"), Dkt. 115, ¶¶ 2179–293, *with Freeman II*, No. 18-CV-7359, Amended Complaint ("Freeman II Am. Compl."), Dkt. 72, ¶¶ 3724–86; *and Bowman*, No. 19-CV-2146, Amended

---

about that decision relating to a third case filed by the Freeman plaintiffs, the Court instead refers to that decision herein as *Freeman II-Bowman*, 465 F. Supp. 3d. 220.

[4] Those seven claims in *Freeman I* were ATA primary liability claims (1) against all defendants for predicate violations of 18 U.S.C. § 2339A; (2) against all defendants for predicate violations of 18 U.S.C. § 2339B; (3) against HSBC Bank for predicate violations of 18 U.S.C. § 2332d; (4) against Standard Chartered Bank, Royal Bank of Scotland, and Commerzbank for predicate violations of 18 U.S.C. § 2332d; (5) against Commerzbank for predicate violations of 18 U.S.C. § 2339A; (6) against Commerzbank for predicate violations of 18 U.S.C. § 2339B; and (7) against Standard Chartered Bank based on predicate violations of 18 U.S.C. § 2339A. *Freeman I*, 413 F. Supp. 3d at 74–75. All were brought pursuant to 18 U.S.C. § 2333(a). *Id.* at 81. In its decision on the motion to dismiss, however, the Court also construed the First and Second claims as alleging secondary conspiracy liability under the newly-enacted JASTA. *Id.* at 72 n.1.

Complaint ("Bowman Am. Compl."), Dkt. 21, ¶¶ 1321–83.)  The *Freeman II* and *Bowman* claims that implicate Bank Saderat, the only remaining defendant, are the: First and Second Claims for Relief alleging ATA primary liability against all Defendants (Freeman II Am. Compl., Dkt. 72, at ¶¶ 3606–47; Bowman Am. Compl., Dkt. 21, ¶¶ 1203–44)[5]; the Eighth Claim for Relief alleging a JASTA conspiracy claim against all Defendants (Freeman II, Am. Compl., Dkt. 72, at ¶¶ 3724–37; Bowman Am. Compl., Dkt. 21, at ¶¶ 1321–34); the Ninth Claim for Relief alleging a JASTA aiding-and-abetting claim against all Defendants (Freeman II, Am. Compl., Dkt. 72, at ¶¶ 3738–56; Bowman Am. Compl., Dkt. 21, at ¶¶ 1335–53); and the Eleventh Claim for Relief alleging a JASTA aiding-and-abetting claim against Bank Saderat in particular (Freeman II, Am. Compl., Dkt. 72, at ¶¶ 3765–74; Bowman Am. Compl., Dkt. 21, at ¶¶ 1362–71).   !

A non-exhaustive list of the non-conclusory and factual allegations against Bank Saderat includes the following:

- In October 2007, Bank Saderat was designated a Specially Designated Global Terrorist Group ("SDGT"[6]) pursuant to Executive Order 13224 (*id.* ¶ 26) because of its role as a "significant facilitator of Hezbollah's financial activities" and "serv[ing] as a conduit between the Government of Iran and Hezbollah" (*id.* ¶ 539).

- According to a 2007 U.S. Treasury Department press release, between 2001 and 2006, Bank Saderat "transferred $50 million from the Central Bank of Iran through its subsidiary in London to its branch in Beirut for the benefit of Hezbollah fronts in Lebanon that support acts of violence."  (*Id.* ¶ 27.)[7]

---

[5] The first two claims in *Freeman II* and *Bowman* mirror claims from, and dismissed in, *Freeman I*.

[6] *See* 31 C.F.R. § 594.310 ("The term specially designated global terrorist or SDGT means any person whose property and interests in property are blocked pursuant to § 594.201(a).").

[7] Plaintiffs also describe Senate testimony that "Hezbollah uses Saderat to send money to other terrorist organizations as well."  (Freeman II Compl., Dkt. 72, ¶ 520.)  However, Plaintiffs fail to identify those other organizations or connect those actions to the injuries they claim.

- "Bank Saderat was engaged in money laundering on behalf of a State Sponsor of Terrorism, and after October 2007, . . . Bank Saderat was an SDGT that provided material support to Iran's terrorist activities[.]"  (*Id.* ¶ 67.)

- "In March 2008, the U.S. led efforts to pass U.N. Security Council Resolution 1803 that called upon all member states 'to exercise vigilance over the activities of financial institutions in their territories with all banks domiciled in Iran, in particular with Bank Melli and Bank Saderat . . . .'"  (*Id.* ¶ 138.)

- The New York State Department of Financial Services noted that "[i]n November 2008, the U.S. Treasury Department revoked authorization for 'U-Turn'[8] transactions because it suspected Iran of using its banks—including . . . Bank Saderat . . . —to finance its nuclear weapons and missile programs.  The U.S. also suspected that Iran was using its banks to finance terrorist groups, including Hezbollah . . . , and engaging in deceptive conduct to hide its involvement in various other prohibited transactions[.]"  (*Id.* ¶ 180; *see also id.* ¶¶ 515–22, 537 (detailing the U.S. Treasury's revocation).)

- "All of the [] support from Iran and its agents for attacks on Coalition Forces and Iraqi civilians was financed and facilitated, in substantial part, by funds transfers initiated by Iran through Iranian banks (including, *inter alia*, . . . Defendant Bank Saderat Plc) on behalf of, and for the benefit of, the IRGC, Hezbollah and IRISL [Islamic Republic of Iran Shipping Lines]."  (*Id.* ¶ 478.)

- The U.S. government had evidence that Bank Saderat helped fund Hezbollah.  (*Id.* ¶ 535; *see also id.* ¶ 522 ("From 2002 forward, Defendant Bank Saderat Plc continued Bank Saderat's existing practice of . . . transferring tens of millions of dollars to Hezbollah and other designated terrorist groups.").)

- "Bank Saderat Plc's provision of tens of millions of dollars to Hezbollah provided Hezbollah with substantial assistance[9] in carrying out its terrorist activities in Iraq, including Hezbollah's commission of the terrorist attacks that killed and injured [] Plaintiffs."  (*Id.* ¶ 541.)

- Defendant Bank Saderat was the reimbursing bank "on most, if not all" of the manufacturing transactions Plaintiffs detail with respect to the Iranian front companies.

---

[8] A U-turn exemption is defined as an exception process designed by the United States government "to permit Iran's circumscribed access to U.S. dollars through a narrowly tailored exemption to the Iranian Trade Regulations."  (Freeman II Am. Compl., Dkt. 72, ¶ 157.)

[9] The Court notes that it does not consider Plaintiffs' use of the term "substantial assistance" to reference an element of an aiding-and-abetting offense under JASTA, as discussed *infra*, but does credit the factual allegation that providing material support to a terrorist organization can assist them in carrying out acts of terrorism, like the ones at issue in this matter.

(*See id.* ¶¶ 901–02, 908–921); *cf. Freeman I*, 413 F. Supp. 3d at 91 (describing some of the business dealings between Defendants and Iranian governmental agencies).

## LEGAL STANDARD

The procedure when a party defaults is governed by Federal Rule of Civil Procedure ("FRCP") 55, which outlines a two-step process: "first, the entry of a default, and second, the entry of a default judgment." *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 128 (2d Cir. 2011) (citing *New York v. Green*, 420 F.3d 99, 104 (2d Cir. 2005)). The entry of default "formalizes a judicial recognition that a defendant has, through its failure to defend the action, admitted liability to the plaintiff." *Id.*; *see also Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 246 (2d Cir. 2004) (noting that a default "tracks the ancient common law axiom that a default is an admission of all well-pleaded allegations against the defaulting party"); *United States v. DiPaolo*, 466 F. Supp. 2d 476, 482 (S.D.N.Y. 2006) ("[A] party's default is deemed to constitute a concession of all well pleaded allegations of liability." (citations omitted)). Second, the entry of a default judgment "converts the defendant's admission of liability into a final judgment that terminates the litigation and awards the plaintiff any relief to which the court decides it is entitled, to the extent permitted by [FRCP] 54(c)." *Mickalis Pawn Shop*, 645 F.3d at 128.

"[T]he decision to grant a motion for a default judgment lies in the sound discretion of the trial court." *O'Callaghan v. Sifre*, 242 F.R.D. 69, 73 (S.D.N.Y. 2007) (citing *Shah v. N.Y. State Dep't of Civ. Serv.*, 168 F.3d 610, 615 (2d Cir. 1999)). A district court deciding a motion for default judgment "is required to accept all of the [plaintiff's] factual allegations as true and draw all reasonable inferences in its favor." *Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009) (citation omitted). However, "a district court need not agree that the alleged facts constitute a valid cause of action," *Mickalis Pawn Shop*, 645 F.3d at 128 (internal quotation and citation

omitted), and the court therefore must "determine whether [a plaintiff's] allegations establish [a defendant's] liability as a matter of law," *Finkel*, 577 F.3d at 84.

## DISCUSSION

### I.   Procedural Requirements

Plaintiffs meet the first criteria for entry of default judgment, as certificates of default have been issued against Bank Saderat in both cases.[10]   *See Mickalis Pawn Shop, LLC*, 645 F.3d at 128. In *Freeman II*, Plaintiffs requested a Certificate of Default on March 5, 2019 (No. 18-CV-7359, ECF No. 46), which was entered on March 14, 2019 (No. 18-CV-7359, ECF No. 52).  In *Bowman*, the Court directed Plaintiffs to seek a Certificate of Default on June 5, 2020, after Defendant Bank Saderat failed to answer the complaint.  (Order, No. 19-CV-2146, ECF No. 44.)  That request was

---

[10] Bank Saderat's counsel also improperly verbally communicated to the Court's chambers that his client did not wish to proceed in defending the claims against it.  As described in the Court's October 8, 2019 docket entry:

> Counsel for Defendant Saderat Bank called chambers [] and advised that Saderat Bank does not intend to respond to the reconsideration motion filed by Plaintiffs [Dkt. 239].  Counsel further advised that Plaintiffs' counsel mischaracterized the conversation between them in Plaintiffs' letter to the Court in which they stated that Saderat Bank would be responding to Plaintiffs' motion shortly and within the[] time frame set by the Local Rules. . . .  Counsel are reminded that all communication with the Court should be made in writing and filed on ECF.

(Oct. 8, 2019 Docket Order, No. 14-CV-6601.)  Thereafter, counsel for Bank Saderat ceased filing anything further on the *Freeman I* and *Freeman II* dockets and failed to enter a notice of appearance *Bowman*.  The actions taken by Bank Saderat's counsel appear consistent with actions taken by Bank Saderat in other matters pending before courts in this Circuit.  *See, e.g.*, *Lelchook v. Islamic Republic of Iran*, 393 F. Supp. 3d 261, 263–64 (E.D.N.Y. 2019) ("On August 10, 2018, [Bank Saderat's] attorney moved to withdraw from this action on the basis that [it] discharged him. After finding that the same attorney is representing [Bank Saderat] in another matter and [Bank Saderat] simply directed it to cease working on the Lelchook case, Chief Magistrate Judge [Roanne L.] Mann warned [Bank Saderat] that should its counsel withdraw, the Court will enter a default judgment against the unrepresented entity." (internal quotation marks and record citations omitted)).

filed on June 10, 2020 (No. 19-CV-2146, ECF No. 46), and granted on June 24, 2020 (No. 19-CV-2146, ECF No. 49).

## II.   Liability

As a preliminary matter, the Court adopts and incorporates herein a number of its previous determinations.  First, the Court agrees with Plaintiffs that its prior decisions foreclose Plaintiffs' ATA and JASTA conspiracy claims, pursuant to 18 U.S.C. §§ 2333(a) and (d), against Bank Saderat, as they "are based on allegations materially identical to those alleged in *Freeman I*." (*Freeman II*, No. 18-CV-7359, Plaintiffs' Brief, ECF No. 87-1; *Bowman*, No. 19-CV-2146, Plaintiffs' Brief, ECF No. 53-1 ("Pls.' Br."), at 2.)[11]  The Court therefore denies Plaintiffs' default judgment motion as to their First, Second, and Eighth Claims for Relief.   !

The Court also incorporates its discussion of personal jurisdiction from *Freeman I* to find that it has jurisdiction over Defendant Bank Saderat.  *See Freeman I*, 413 F. Supp. 3d at 78–80; *cf. Spetner v. Palestine Investment Bank*, No. 19-CV-0005 (EK) (RLM), 2020 WL 6119298, at * 11 n.18 (E.D.N.Y. Oct. 16, 2020) (distinguishing the facts of that case from *Freeman I* in finding personal jurisdiction lacking and highlighting that, in *Freeman I*, Bank Saderat took affirmative acts aimed at New York and that the *Freeman I* complaint "was 'replete with allegations' that Bank Saderat entered into a conspiracy with other non-U.S. banks 'intending that they operate as

---

[11] The Court does not interpret the aiding-and-abetting liability provision in Section 2333(d) as requiring the same nexus between an aider-and-abettor and "the person who committed [the] act of international terrorism" as required by the conspiracy liability clause.  This conclusion remains consistent with more recent cases decided within the Second Circuit.  *See*, *e.g.*, *Bartlett v. Societe Generale de Banque Au Liban Sal*, No. 19-CV-00007 (CBA) (VMS), 2020 WL 7089448, at *8 (E.D.N.Y. Nov. 25, 2020) ("Although I conclude that the Amended Complaint sufficiently alleges that Defendants knowingly provided substantial assistance to Hezbollah, I agree with [another court's] conclusion on the question of primary liability that providing financial services such as those alleged here is not an act which is 'violent or dangerous to human life' as contemplated by the ATA.  Accordingly, Plaintiffs' primary liability claims are dismissed." (internal record citation omitted)).

Bank Saderat's agents in transferring U.S. dollars through correspondent accounts in New York, and that Bank Saderat took steps to ensure that such transfers were accomplished'" (citation omitted)).

Finally, the Court incorporates its *Freeman I* findings that Plaintiffs plausibly pleaded that "[designated foreign terrorist organizations ("FTOs")] Hezbollah and Kata'ib Hezbollah and the IRGC (an [SDGT]), acting through agents and proxies, are the entities responsible for committing the acts of international terrorism that injured Plaintiffs." *Freeman I*, 413 F. Supp. 3d at 97–98; *see id.* at 97 ("Though Plaintiffs have not named the precise individuals clandestinely involved in committing each attack, a fair reading of the SAC points to the high-level involvement of Hezbollah and its affiliates. Drawing all reasonable inferences in Plaintiffs' favor, the Court may reasonably infer that a designated FTO, namely Hezbollah, was responsible for committing, planning, or, at the very least, authorizing the attacks that injured Plaintiffs."); *see also* Freeman II Am. Compl., Dkt. 72, ¶¶ 255–63, 280, 297–311, 324–456; Bowman Am. Compl., Dkt. 21, ¶¶ 262–70, 287, 304–18, 331–464.

The Court now considers whether to grant Plaintiffs default judgment as to their JASTA aiding-and-abetting claims against Defendant Bank Saderat, set forth in their Ninth and Eleventh Claims for Relief.

## B.     The Legal Standard for Aiding and Abetting Liability Under JASTA

Under JASTA, when a party brings suit "for an injury arising from an act of international terrorism committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization," it may assert liability "as to any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism." 18 U.S.C. § 2333(d)(2). When Congress enacted JASTA, it

incorporated the aiding-and-abetting framework from *Halberstam v. Welch*, 705 F.2d 472 (D.C.

Cir. 1983) as the proper standard for evaluating aiding-and-abetting liability under JASTA. *Siegel*,

933 F.3d at 223.   Relying on *Halberstam*, the Second Circuit in *Siegel* explained that, under

JASTA,

> aiding-and-abetting includes three elements: (1) "the party whom the defendant
> aids must perform a wrongful act that causes an injury"; (2) "the defendant must be
> generally aware of his role as part of an overall illegal or tortious activity at the
> time that he provides the assistance"; and (3) "the defendant must knowingly and
> substantially assist the principal violation."

*Id.* at 223 (adopting *Halberstam* standard for JASTA aiding-and-abetting claim).

> With respect to the second element,

> [i]n the ATA context, aiding and abetting liability requires the secondary actor to
> be aware that, by assisting the principal, it is itself assuming a role in terrorist
> activities.   Thus, although a defendant need not know of or intend to bring about
> the specific attacks at issue, the Complaint must allege plausibly that, in providing
> financial services, Defendants were generally aware that they were thereby playing
> a role in an FTO's violent or life-endangering activities.

*O'Sullivan v. Deutsche Bank AG*,[12] No. 17-CV-8709 (LTS) (GWG), 2019 WL 1409446, at *10

(S.D.N.Y Mar. 28, 2019) (internal quotation marks and citations omitted) (quoting *Linde v. Arab*

*Bank, PLC*, 882 F.3d 314, 329 (2d Cir. 2018))

> To evaluate the "substantial" requirement of the third element—knowing and substantial

assistance of the principal violation—the Court must consider "(1) the nature of the act

---

[12] *O'Sullivan* was brought under JASTA on behalf of "members of the United States armed
forces who were killed or injured in one of 55 terrorist attacks in Iraq between December 17, 2003,
and October 12, 2011, as well as estates and family members of deceased military victims of such
attacks" against many of the same defendants who are parties in the *Freeman* and *Bowman* matters.
*O'Sullivan*, 2019 WL 1409446, at *1.   In *O'Sullivan*, the Honorable Laura Taylor Swain dismissed
the claims against all of the defendants with the exception of Bank Saderat, against whom a
certificate of default has been issued, but no motion for a default judgment has been filed.
Certificate of Default, *O'Sullivan v. Deutsche Bank AG*, No. 17-CV-8709 (S.D.N.Y. May 17,
2018), ECF No. 126.

encouraged, (2) the amount of assistance given by defendant, (3) defendant's presence or absence at the time of the tort, (4) defendant's relation to the principal, (5) defendant's state of mind, and (6) the period of defendant's assistance." *Linde*, 882 F.3d at 329 (citing *Halberstam*, 705 F.2d at 483–84); *see Siegel*, 933 F.3d at 225 (analyzing *Linde* factors in assessing "substantial assistance" prong of JASTA aiding-and-abetting claim).

### C.   The Amended Complaints in *Freeman II* and *Bowman* Sufficiently Allege Aiding-and-Abetting Liability as to Bank Saderat[13]

Before applying the *Halberstam* three-part framework to the aiding-and-abetting allegations against Bank Saderat, the Court observes that there is a fundamental difference between Plaintiffs' allegations as to this claim against Bank Saderat and their aiding-and-abetting allegations against the dismissed Defendants.[14]  In fact, the amended (and original) complaints distinguish Bank Saderat from the other banks by labeling it as an "Iranian Bank Co-conspirator[]" and differentiating its role from that of the dismissed Defendants.  (*See* Freeman II Complaint,

---

[13] The Court notes that Plaintiffs' JASTA aiding-and-abetting claims are timely, as Congress intended JASTA to be a retroactive statute.  *See Linde*, 882 F.3d at 320 ("JASTA's amendment to the ATA applies to any civil action, (1) pending on, or commenced after the date of JASTA's enactment; and (2) arising out of an injury on or after September 11, 2001." (internal quotation marks and citation omitted)).

[14] The Court is mystified by Plaintiffs' extensive arguments that the Court's prior holdings foreclose liability here.  (*See* Pls.' Br., at 18–25 ("In sum, construing this Court's reasoning and holding in [*Freeman II-Bowman*, 465 F. Supp. 3d 220], Plaintiffs reluctantly conclude that their allegations appear not to satisfy this Court's application of the First and Fifth *Halberstam* factors— nature of the act assisted or encouraged and state of mind—and arguably fail to satisfy this Court's application of three other factors (Plaintiffs concede that [Bank Saderat] was clearly not present at the time of the attacks in Iraq). . . .  Therefore, unless Plaintiffs have misconstrued the Court's reasoning[,] . . . they conclude that given the law of the case, the *Freeman II* and *Bowman* amended complaints do not provide a legal basis for entry of a default judgment against [Bank Saderat].  If the Court agrees, then it should dismiss the claims against [Bank Saderat] on the same legal basis that it previously dismissed all claims against [Bank Saderat] in *Freeman I* and all other Defendants in [*Freeman II-Bowman*, 465 F. Supp. 3d 220].")  Despite Plaintiffs' arguments against their interests, this Court still has a duty to review the entirety of their complaints and consistently apply the law.

Dkt. 1, ¶ 31; Freeman II Am. Compl., Dkt. 72, ¶ 40(f); *see also* Freeman II Am. Compl., Dkt. 72, ¶ 498 (describing that "Iran, the Iranian Bank Co-conspirators (including Defendant Bank Saderat PLC), the IRGC, Hezbollah, and the Special Groups" were "enabl[ed]" to "perpetrate acts of international terrorism"); *id.* ¶ 67 ("As set forth below, the HSBC Defendants, Commerzbank, Standard Chartered Bank, Barclays, and Credit Suisse altered, falsified, or omitted information from payment order messages that they facilitated on behalf of Bank Saderat knowing, or deliberately indifferent to the fact, that Bank Saderat was engaged in money laundering on behalf of a State Sponsor of Terrorism, and after October 2007, that Bank Saderat was an SDGT that provided material support to Iran's terrorist activities, and, in the case of the HSBC Defendants, knew there was direct evidence of Bank Saderat 'funding of Hezbollah.'"); Bowman Complaint, Dkt. 1, ¶ 31; Bowman Am. Compl., Dkt. 21, ¶ 38.)  Defendant Bank Saderat is the only bank that Plaintiffs allege transferred money directly to Hezbollah.[15]  (*See, e.g.*, Freeman II Am. Compl., Dkt. 72, ¶¶ 27, 67, 180, 478, 539, 541.)  When enacting JASTA, Congress expressly found that

---

[15] The Court acknowledges that Plaintiffs also allege that Commerzbank transferred money to Hezbollah, and argue that if their claims against Commerzbank fail then so too should their claims against Bank Saderat.  (*See*, *e.g.*, Pls.' Br., at 20–21.)  With respect to Commerzbank, Plaintiffs assert that

> Commerzbank [] maintained account number 7001688, knowing, or with deliberate indifference to the fact, that it was for an open and notorious Hezbollah fundraising organization in Germany known as Waisenkinderprojekt Libanon e.V. ("the Orphans Project Lebanon e.V.").

> Despite prior public German government reports identifying its customer as a Hezbollah fundraising organization, and the fact that on July 24, 2007 the United States designated the Lebanese organization that was primary recipient of funds donated from the account (Hezbollah's Martyrs Foundation), Commerzbank knowingly, or with deliberate indifference to the fact, continued to provide financial services to Waisenkinderprojekt Libanon e.V. and hence continued to transfer funds to Hezbollah.

(Freeman II Compl., Dkt. 72, ¶¶ 1193–94.)  However, as this Court explained in *Freeman II-Bowman*, 465 F. Supp. 3d 220, the level of knowledge is different for a bank, like Commerzbank,

> [p]ersons, entities, or countries that knowingly or recklessly contribute material support or resources, directly or indirectly, to persons or organizations that pose a significant risk of committing acts of terrorism that threaten the security of nationals of the United States necessarily direct their conduct at the United States, and should reasonably anticipate being brought to court in the United States to answer for such activities.

*Estate of Henkin v. Kuveyt Turk Katilim Bankasi, A.S.*, No. 19-CV-5394 (BMC), ⌐___ F. Supp.3d ___, 2020 WL 6143654, at *10 (alteration omitted) (quoting JASTA § 2(a)(6)).  Plaintiffs in this matter allege that Defendant Bank Saderat—an SDGT—*directly* contributed material resources to Hezbollah, an FTO that threatens the security of U.S. nationals.  Accordingly, in light of the fundamental differences between the allegations regarding Bank Saderat and those regarding the other Defendants, the Court's prior decisions do not necessarily foreclose Plaintiffs' claims of aiding and abetting with respect to Defendant Bank Saderat, and the Court now turns to whether Plaintiffs have sufficiently alleged such claims under the *Halberstam* framework.[16]

---

that provided routine banking services to maintain an account on behalf of a foundation suspected of using its funds to support Hezbollah's terrorist activities, and a bank, like Bank Saderat, that served as the conduit through which money was transferred directly to the FTO, Hezbollah.  *See Freeman II-Bowman*, 465 F. Supp. 3d at 231 n.14.  Moreover, as Plaintiffs concede in their brief, the U.S. has designated Bank Saderat, but not Commerzbank, an SDGT.  (Pls.' Br., at 21.).

[16] The Court further notes that its dismissal of the JASTA conspiracy claims against Bank Saderat and the other defendant banks in *Freeman I*—a ruling now incorporated here—does not foreclose Plaintiff's claims of aiding and aiding against Bank Saderat in *Freeman II* and *Bowman*. The Court does not interpret the aiding-and-abetting liability provision in Section 2333(d) as requiring the same nexus between an aider-and-abettor and "the person who committed [the] act of international terrorism" as required by the conspiracy liability clause.  *Halberstam* makes clear that liability for aiding-and-abetting "often turns on how much encouragement or assistance is substantial enough," whereas liability for conspiracy requires "an agreement to participate in wrongful conduct."  *Halberstam*, 705 F.2d at 478.  *Halberstam* moreover notes:

> Courts and commentators have frequently blurred the distinction between [aiding-and-abetting and conspiracy].  Most commonly, courts have relied on evidence of assistance to the main tortfeasor to infer an agreement, and then attached the label "civil conspiracy" to the resultant amalgam.  Sometimes, although not always, the inference has been factually justified; many tort defendants have both conspired with and substantially assisted each other.  But we find it important to keep the distinctions clearly in mind as we review the facts in this novel case to see if tort

Plaintiffs satisfy the first *Halberstam* element, *i.e.*, that the party aided by the defendant performed a wrongful act that caused injury, *Halberstam*, 705 F.2d at 477, and sufficiently allege that their injuries arose from an act of international terrorism that was committed, planned, or authorized by Hezbollah, an officially designated FTO. *Compare Bartlett*, 2020 WL 7089448, at *8 ("Hezbollah has been an officially designated FTO since 1997. . . . Here, Plaintiffs allege that Hezbollah trained the Iraqi militias, controlled and directed those militias, planned the Attacks[17], and designed and emplaced the weapons used in the Attacks." (internal record citations omitted) (citing, *inter alia*, *Freeman I*, 413 F. Supp. 3d at 96–97)), *and* Freeman II Am. Compl., Dkt. 72, ¶¶ 327–33, 355–59, 369–456 (describing how Hezbollah develops and directs terrorist groups in Iraq to attack coalition forces), *with* Freeman II Am. Compl., Dkt. 72, ¶¶ 1195–1237 (describing the attacks on the victims in *Freeman II*), *and* Bowman Am. Compl., Dkt. 21, ¶¶ 78–85 (describing the attack on Ryan Bowman).[18]

---

> liability is warranted on either or both concerted action theories. For the distinctions can make a difference. There is a qualitative difference between proving an *agreement to participate* in a tortious line of conduct, and proving *knowing action* that substantially aids tortious conduct. In some situations, the trier of fact cannot reasonably infer an agreement from substantial assistance or encouragement.

*Id.* (citing *Rael v. Cadena*, 604 P.2d 822 (N.M. 1979)).

[17] The term "Attacks" in the *Freeman II* and *Bowman* amended complaints refers to the terrorist attacks on Coalition Forces in Iraq between 2004 and 2011. (*See, e.g.*, Freeman II Am. Compl., Dkt. 72, ¶ 16; Bowman Am. Compl., Dkt. 21, ¶ 156.)

[18] The Court recognizes that the District of Columbia recently came to a seemingly contrary conclusion. *Compare Atchley v. AstraZeneca UK Ltd.*, No. 17-CV-2136 (RJL),___ F. Supp. 3d ___, 2020 WL 4040345, at *1, *10–11 (D.D.C. July 17, 2020) (finding plaintiffs' allegations that the attacks at issue were carried out by Jaysh al-Mahdi ("JAM"), an armed insurgent group in Iraq not designated as an FTO, but were planned or authorized by Hezbollah, insufficient to satisfy the first *Halberstam* prong), *with* Bowman Am. Compl., Dkt. 21, ¶¶ 360–412 (describing the relationship between JAM and Hezbollah). However, this Court is not bound by the District of Columbia. Moreover, the District of Columbia's approach is inconsistent with this Court's prior

Plaintiffs have also sufficiently pleaded the second and third *Halberstam* factors, namely, that the defendant was generally aware of its role in the overall illegal or tortious activity at the time it provided the assistance and that the defendant knowingly and substantially assisted that activity. *Halberstam*, 705 F.2d at 477; *see Linde*, 882 F.3d at 329 (describing second *Halberstam* aiding-and-abetting element as requiring defendant to be generally aware that by assisting the principal it was assuming a role in terrorist activities). The amended complaints in *Freeman II* and *Bowman* allege that Defendant Bank Saderat knew, when it provided banking and other financial services to Hezbollah, that the organization was an FTO engaged in terrorist activity in Iraq and that Bank Saderat knowingly provided substantial assistance to Hezbollah to carry out these illegal and tortious activities by serving as financial conduit for Hezbollah.

With respect to the second *Halberstam* element, the Court agrees with Plaintiffs' contention that Bank Saderat's "general awareness of [its] role in a continuing criminal enterprise" is demonstrated by its provision of financial services directly to "the primary tortfeasor," Hezbollah, "knowing that Hezbollah is an FTO engaged in terrorism[.]" (Pls.' Br., at 15.) Indeed, as Plaintiffs argue, "[a]cts of terrorism were a far more foreseeable consequence of assisting a *terrorist* enterprise than an unplanned murder was a foreseeable consequence of a burglary or fencing enterprise[,]" the criminal enterprise that the defendant was found to have aided and abetted in *Halberstam*. (*Id*.)

In denying a motion to dismiss for failure to state a claim in a recent, similar matter, also concerning banks that were alleged to have "knowingly provided Hezbollah with wide-ranging

---

rulings, and with decisions reached within this Circuit. *See Bartlett*, 2020 WL 7089448, at *8 (collecting cases).

financial services," the Honorable Carol Bagley Amon highlighted with respect to this prong that the conduct of the defendants

> differs from the "mere" provision of material support.  Plaintiffs have not alleged an isolated provision of financial services to Hezbollah.  Rather, they allege a wide-ranging, years-long, knowing scheme of coordination in which Defendants acted as Hezbollah's core financial service-providers.  Plaintiffs allege that despite Hezbollah's purportedly multifaceted nature, it remains singularly dedicated to religiously inspired terrorist attacks[.]

*Bartlett*, 2020 WL 7089448, at *11 (internal record citation omitted).  Although the allegations here might not be as starkly worded as those in *Bartlett*, Plaintiffs do allege in substance a "wide-ranging, years-long, knowing scheme of coordination in which Defendants acted as [one of] Hezbollah's core financial service-providers."  *See id.*  For instance, Plaintiffs note that Bank Saderat was designated an SDGT because of its role as a facilitator of Hezbollah's financial activities and as a conduit between the Government of Iran and Hezbollah (Freeman II Am. Compl., Dkt. 72, ¶¶ 26, 539); from 2001 to 2006, Bank Saderat transferred $50 million dollars from the Central Bank of Iran through its subsidiary in London to its branch in Beirut for the benefit of Hezbollah fronts in Lebanon (*id.* ¶¶ 27, 522); and "[a]ll of the [] support from Iran and its agents for attacks on Coalition Forces and Iraqi civilians was financed and facilitated, in substantial part, by funds transfers initiated by Iran through Iranian banks (including, *inter alia*, . . . Defendant Bank Saderat Plc) on behalf of, and for the benefit of, the IRGC, Hezbollah and IRISL" (*id.* ¶ 478).  Just as Judge Amon found in *Bartlett*, so too here, "any suggestion that Hezbollah's core bankers would be unaware of their role in those attacks by providing it banking services necessary to funding those attacks is highly dubious."  *Bartlett*, 2020 WL 7089448, at *11.

Plaintiffs have also sufficiently pleaded the third *Halberstam* element—that Defendant Bank Saderat knowingly provided substantial assistance to the principal violation.  Like other

courts, the Court distinguishes between assistance as it relates to the provision of routine banking services to an arm of a country's government, such as Iran and its agencies, and the provision of the same services directly to a designated terrorist organization, like Hezbollah, whose involvement in funding, planning, and carrying out terrorist operations in Iraq during the relevant period of time is sufficiently alleged. *Cf. Siegel*, 933 F.3d at 225 (concluding that plaintiffs failed to adequately plead substantial assistance in part because they "ha[d] not plausibly alleged that [defendant] encouraged the heinous [acts of terrorism] or provided any funds to [a designated terrorist organization]"); *O'Sullivan,* 2019 WL 1409446, at *10 (finding that the provision of financial services to Iranian entities was insufficient to show that those services "were destined to aid the FTOs"). Again, as Judge Amon noted in *Bartlett*: "While in the abstract there may be a gap between banking services and terrorist attacks, [the] allegations [concerning Hezbollah and Bank Saderat] plausibly bridge that gap. . . . As in *Halberstam*, a party can aid and abet an act even if its role is a purely bureaucratic one—financial machinations on which 'the success of the tortious enterprise' rests." *Bartlett*, 2020 WL 7089448, at *12 (quoting *Halberstam*, 705 F.2d at 488); *cf. Averbach v. Cairo Amman Bank*, No. 19-CV-0004 (GHW) (KHP), 2020 WL 486860, at *12 (S.D.N.Y. Jan. 21, 2020) (discussing "the trend in JASTA case law toward disallowing claims against defendants who did not deal directly with a terrorist organization or its proxy" (citation omitted)), *report and recommendation adopted*, 2020 WL 113733 (S.D.N.Y. Mar. 9, 2020). Indeed, "[i]mplicit in [the Second Circuit's reasoning in] *Siegel*[][19] is the suggestion that knowingly processing millions of dollars in bank transfers for a terrorist organization (rather than its bank) *would* constitute substantial assistance." *Bartlett*, 2020 WL 7089448, at *12.

---

[19] *Siegel*, 933 F.3d at 217.

Here, Plaintiffs allege that Defendant Bank Saderat dealt directly with Hezbollah, the terrorist organization that helped the Iranian governmental agencies carrying out the attacks on Coalition Forces in Iraq that are at issue.  (Bowman Am. Compl., Dkt. 21, ¶ 262 ("Hezbollah and the IRGC-QF[20] worked symbiotically to plan, authorize, and commit attacks on Coalition Forces in Iraq.  They did this by . . . [*inter alia*,] providing them with funding, weapons, and training, and then guiding and directing them to attack Coalition Forces."); *id.* ¶ 263 (Hezbollah "provided these proxies with sophisticated weapons specially designed to inflict casualties"); *id.* ¶ 266 ("Hezbollah's advanced EFP[21] training was provided exclusively to these cells to improve their emplacement of EFPs against Coalition armored vehicles.  The IRGC-QF and Hezbollah were the sole sources of the weapons").)  Based on Plaintiffs' allegations, the Court finds that it can be plausibly inferred that Defendant Bank Saderat knowingly provided substantial assistance to Hezbollah in connection with terrorist activities in Iraq between 2004 and 2011, by directly funneling millions of dollars to Hezbollah and thereby helping "the tortious enterprise" succeed.  *See Bartlett*, 2020 WL 7089448, at *13 ("The Second Circuit in *Linde* and *Siegel* [] indicated that processing wire transfers for terrorists could support a finding of substantial assistance." (citing *Linde*, 882 F.3d at 330; *Siegel*, 933 F.3d at 221)).

A detailed analysis of the *Linde* factors further supports this conclusion.  The first factor— the nature of the act encouraged—weighs in favor of finding aiding-and-abetting liability.  Specifically, the tortious acts at issue were violent acts of terrorism, powered by funds that Defendant Bank Saderat transmitted to Hezbollah.  *Cf. Bartlett*, 2020 WL 7089448, at *12 ("While

[20] The IRGC-QF is a paramilitary force answerable only to the Supreme Leader of Iran, Ayatollah Khamenei.  (Bowman Am. Compl., Dkt. 21, ¶ 271.)

[21] An "EFP" is a factory-grade explosively formed penetrator, which was allegedly used to kill and maim Americans in Iraq.  (Bowman Am. Compl., Dkt. 21, ¶ 64.)

Defendants are not alleged to be bombmakers, they are alleged to have knowingly enabled Hezbollah to access the funds to purchase its weaponry. That conduct is certainly 'integral' to the Attacks[22] that were ultimately committed."). The second factor—the amount and kind of assistance—also weighs in favor of finding liability. The amended complaints allege that Defendant Bank Saderat transferred *at least* fifty million dollars to Hezbollah. (*See, e.g.*, Freeman II Am. Compl., Dkt. 72, ¶ 27.)

The Court accords little weight to the third factor—Defendant's presence at the time of the tort. As the court in *Bartlett* explained:

> *Halberstam* discounted this factor because the tortious enterprise there necessarily required certain activities away from where the tort was committed, and the defendant's 'role in that side of the business was substantial.' The same is true here: the Attacks required substantial funding activities which can be expected to occur far earlier and away from the where the Attacks were committed.

2020 WL 7089448, at *13 (quoting *Halberstam*, 705 F.2d at 488).

The fourth factor—the relation to the tortfeasor—also militates in favor of finding aiding-and-abetting liability. Plaintiffs allege that Bank Saderat was designated an SDGT *because* of its role as a significant facilitator of Hezbollah's financial activities, and because it served as a conduit between the Iranian government and Hezbollah. (Freeman II Am. Compl., Dkt. 72, ¶ 539.) Thus, the amended complaints allege a direct, substantial, and meaningful relationship between the tortfeasor, Hezbollah, and Defendant Bank Saderat.

The Court similarly finds that the fifth factor—the defendant's state of mind—supports a liability finding, for many of the same reasons it concludes that Defendant Bank Saderat had a

---

[22] The term "Attacks" in *Bartlett*, like here, refers to Iranian-sponsored terrorist attacks on Coalition Forces in Iraq between 2004 and 2011. *Bartlett*, 2020 WL 7089448, at *1.

general awareness of its role in aiding and abetting a terrorist enterprise.[23]  Bank Saderat provided

years-long financial assistance to an FTO that was openly and notoriously engaged in terrorist

activities.  *See Estate of Henkin*, 2020 WL 6143654, at \*12 ("Even if [defendant] Bank did not

know about the specific attack at issue when it provided banking services to its customers for

several years, plaintiffs have plausibly alleged that the bank was generally aware of its role in

terrorist activities in light of the ubiquitous information available concerning its customers from

which the Court can infer that the bank knowingly and substantially assisted the principal

violation[.]").

Finally, the Court finds that the sixth factor—the duration of the defendant's assistance—

also favors a finding of aiding-and-abetting liability.   Plaintiffs have plausibly alleged a

relationship between Bank Saderat and Hezbollah that spanned from at least 2001 through 2008.

(*See*, *e.g.*, Freeman Am. Compl., Dkt. 72, ¶ 27 (relying on a U.S. Treasury Department's press

release identifying that the Bank had, between 2001 and 2006, "transferred $50 million from the

Central Bank of Iran through its subsidiary in London to its branch in Beirut for the benefit of

Hezbollah fronts in Lebanon that support acts of violence"); *id.* ¶¶ 180, 516–22, 537 (detailing the

U.S. Treasury Department's revocation of a particular status for Bank Saderat, in part because the

---

[23] The Court does not address Plaintiffs' argument about the absence of any foreseeability requirement in analyzing a defendant's state of mind for purposes of a JASTA violation.  (Pls.' Br., at 24 & n.17 (arguing that the Court's conclusion in *Freeman II-Bowman*, 465 F. Supp. 3d. 220,—that "Plaintiffs failed to allege 'that Defendants' state of mind involved an intent to finance or otherwise promote or carry out terrorist acts; if anything, the Complaints' non-conclusory allegations show that Defendants' intentions were to profit commercially by assisting the Iranian entities to evade U.S. sanctions.'"—was incorrect because "neither *Halberstam* nor *Linde* requires an 'intent to finance or otherwise promote or carry out terrorist acts'")).  Regardless of the merits of Plaintiffs' position, their allegations about Defendant Bank Saderat providing financial services directly to Hezbollah materially distinguishes the aiding-and-abetting claim against Bank Saderat from the same claim against the dismissed Defendants, whom Plaintiffs merely allege provided routine banking services to customers that allegedly provided funds to an FTO.

U.S. "suspected that Iran was using its banks to finance terrorist groups, including Hezbollah");
*id.* ¶ 522 (alleging that Defendant Bank Saderat transferred tens of millions of dollars to Hezbollah
and other designated terrorist groups beginning in 2002).)

For these reasons, the Court finds that the *Linde* factors weigh in favor of a finding of
substantial assistance.

*       *       *

In sum, the Court finds that, accepting Plaintiffs' non-conclusory, factual allegations in the
amended complaints as true and drawing all reasonable inferences in their favor, *see Finkel*, 577
F.3d at 84, Plaintiffs have successfully pleaded a cause of action as to aiding-and-abetting liability
under JASTA with respect to Defendant Bank Saderat.

**CONCLUSION**

For the reasons contained herein, the Court denies Plaintiffs' motion for a default judgment
relating to Defendant Bank Saderat PLC as to Plaintiffs' First, Second, and Eighth Claims for
Relief, but grants that motion as to their Ninth and Eleventh Claims for Relief asserting aiding-
and-abetting liability under the JASTA.  The Court shall hold an inquest on Plaintiffs' damages
on Wednesday, April 7, 2021 at 2 p.m.  Plaintiffs shall file a brief outlining their damages demand
by March 8, 2021.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: January 7, 2021
          Brooklyn, New York