UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

KATHALEEN FREEMAN, *et al.*,

        Plaintiffs,

-against-

HSBC HOLDINGS PLC, *et al.*,

        Defendants.

-------------------------------------------------------------------x

**Case No. 18–cv–7359 (PKC)(CLP)**

# THIRD AMENDED COMPLAINT
# JURY TRIAL DEMANDED

**TABLE OF CONTENTS**

I.  NATURE AND OVERVIEW OF THE ACTION ................................................................. 1

II.  JURISDICTION AND VENUE ....................................................................................... 10

III.  DEFENDANTS ............................................................................................................... 11

    A.  THE HSBC DEFENDANTS ...................................................................................... 11

    B.  DEFENDANT STANDARD CHARTERED BANK ..................................................... 19

    C.  DEFENDANT COMMERZBANK AG ........................................................................ 23

    D.  DEFENDANT CREDIT SUISSE AG.......................................................................... 25

    E.  DEFENDANT ROYAL BANK OF SCOTLAND NV .................................................. 29

    F.  DEFENDANT BARCLAYS BANK PLC .................................................................... 32

    G.  DEFENDANT BANK SADERAT PLC ....................................................................... 35

IV.  THE IRGC....................................................................................................................... 36

    A.  THE IRGC'S LONG HISTORY OF SUPPORTING AND FINANCING
        TERRORISM ............................................................................................................. 36

    B.  U.S. SANCTIONS AND IRAN'S RELIANCE ON U.S. DOLLARS .......................... 37

    C.  THE EURODOLLAR MARKET—THE IRGC'S MONEY LAUNDERING AND
        ILLICIT EXPORT NEXUS WITH DEFENDANT BANKS ....................................... 40

        1.  The IRGC's Objectives................................................................................... 40

        2.  Eurodollar Market Operations ....................................................................... 41

    D.  THE IRANIAN U-TURN EXEMPTION AND ITS REVOCATION........................... 42

    E.  LETTERS OF CREDIT—AN ALTERNATIVE METHOD OF UNDERMINING THE
        IRANIAN SANCTIONS PROGRAM .......................................................................... 49

        1.  Terminology ..................................................................................................... 49

        2.  The U.S. Trade Embargo – United States Munitions List (USML) and Commerce
        Control List (CCL) .......................................................................................... 51

    F.  THE FINANCIAL ACTION TASK FORCE AND IRAN'S BANKING SECTOR..... 52

G.   THE IRGC'S REVENUE SOURCES, FINANCING MECHANISMS AND KEY COMMERCIAL ASSETS ......................................................................... 55

1.   PUBLIC SOURCES LINKING NIOC AND THE IRANIAN PETROCHEMICAL INDUSTRY TO THE IRGC ...................................................................... 59

2.   NIOC/NITC WERE CONTROLLED BY THE IRGC AND ARE CLOSELY INTERTWINED WITH ITS TERRORIST ACTIVITIES....................................... 68

3.   IRGC'S CRUDE OIL EXPORTS TO CHINESE REFINERIES ............................ 72

4.   CENTRAL BANK OF IRAN (CBI) ......................................................... 80

5.   IRANIAN STATE-OWNED BANKS ........................................................ 84

     a.   BANK SADERAT IRAN ................................................................... 85

     b.   BANK MELLI IRAN ...................................................................... 89

6.   ISLAMIC REPUBLIC OF IRAN SHIPPING LINES (IRISL)................................ 93

7.   MAHAN AIR ..................................................................................... 97

V.   HEZBOLLAH.............................................................................................. 99

A.   HEZBOLLAH'S HISTORY, KEY LEADERS, AND CURRENT ORGANIZATIONAL STRUCTURE ............................................................... 99

1.   SHURA COUNCIL (*MAJLIS AL-SHURA*)............................................. 101

2.   EXECUTIVE COUNCIL ...................................................................... 102

3.   PARLIAMENTARY COUNCIL ............................................................ 102

4.   JIHAD COUNCIL—ISLAMIC JIHAD ORGANIZATION ("IJO") OR EXTERNAL SECURITY ORGANIZATION ("ESO")................................. 102

     a.   Imad Mughniyah ............................................................... 103

     b.   Mustafa Badr al-Din .......................................................... 104

     c.   Muhammad Kawtharani......................................................... 106

     d.   Assad Ahmad Bakarat.......................................................... 107

     e.   Sobhi Mahmoud Fayad ........................................................ 108

5.   THE MARTYRS FOUNDATION–LEBANON (THE *SHAHID* FOUNDATION OR *MUA'ASSASAT AL-SHAHID*) ................................................................. 108

B.      HEZBOLLAH FINANCING ..................................................................... 114

   1.      HEZBOLLAH'S BUSINESS AFFAIRS COMPONENT ("BAC") ...................... 115

      a.     Abdallah Ali Safieddine .................................................................. 118

      b.     Adham Hussein Tabaja ................................................................... 119

   2.      TRADE-BASED MONEY LAUDERING ............................................................ 120

   3.      LEBANON: A PRIMARY HEZBOLLAH/IRGC MONEY LAUNDERING HUB ......................................................................................................................... 121

      a.     "The System" ................................................................................ 121

      b.     Al Qard Al Hasan—Hezbollah's Shadow Bank ................................... 124

   4.      LEBANESE EXCHANGE HOUSES ................................................................. 126

      a.     New Line Exchange Network ............................................................ 128

      b.     Elissa Exchange Network ................................................................ 129

      c.     Hassan Ayash Exchange Network ..................................................... 130

      d.     Halawi Exchange Network ............................................................... 131

      e.     Mecattaf Exchange Network ............................................................ 132

      f.     Kassem Rmeiti Network .................................................................. 134

   5.      LEBANESE CANADIAN BANK ..................................................................... 135

   6.      THE IRGC AND HEZBOLLAH IN THE UNITED ARAB EMIRATES ............. 139

   7.      DUBAI—A PRIMARY HEZBOLLAH AND IRGC MONEY LAUNDERING HUB WITHIN THE UAE ............................................................................................. 144

      a.     Al Zarooni Exchange ...................................................................... 146

      b.     Kaloti Jewellery Group ................................................................... 154

      c.     Reza Zarrab IRGC Money Laundering Network ................................. 160

   8.      HEZBOLLAH'S "SUPER FACILITATORS" ..................................................... 165

      a.     The Nassour Clan Network .............................................................. 166

      b.     The Tajideen Clan Network ............................................................. 171

    c.     Muhammad Ibrahim Bazzi (SDGT) ................................................... 180

   9.     SUB-SAHARAN AFRICA—A PRIMARY HEZBOLLAH/IRGC MONEY LAUNDERING HUB ................................................................................ 188

   10.   HEZBOLLAH'S CONFLICT DIAMOND AND MONEY LAUNDERING NETWORK ................................................................................... 190

   11.   ARMS DEALING ....................................................................... 198

    a.     Weapons Trafficking in the United States ......................................... 198

    b.     Weapons Trafficking in Nigeria ..................................................... 201

VI.   EACH OF THE DEFENDANTS KNOWINGLY PROVIDED SUBSTANTIAL ASSISTANCE TO THE IRGC AND HEZBOLLAH ....................................... 204

  A.   DEFENDANT STANDARD CHARTERED BANK'S KNOWING AND SUBSTANTIAL ASSISTANCE TO THE IRGC AND HEZBOLLAH .................... 204

   1.     Standard Chartered Bank Knowingly Provided Substantial Assistance to the IRGC ......................................................................................... 206

    a.     Standard Chartered Bank Knowingly Concealed the IRGC's Financial Activities and Transactions from Detection, Scrutiny, and Monitoring by U.S. Regulators, Law Enforcement, and/or Depository Institutions ............................. 206

    b.     SCB Facilitated Transactions on Behalf of MODAFL, Mahan Air, and Other IRGC Agents in Furtherance of Numerous Violations of the U.S. Trade Embargo, Thereby Substantially Contributing to Plaintiffs' Injuries ................... 216

    c.     SCB Knowingly Provided Illegal Financing to Mahan Air ................... 218

    d.     SCB Knowingly Provided Illegal Financing to MODAFL Companies: AIO, IACI, IHSRC, and HESA ............................................................... 222

      i.    SCB Trade-Finance Transactions with MODAFL's Aerospace Industries Organization (AIO) ................................................................. 223

      ii.   SCB Trade-Finance Transactions with MODAFL's [Iran] Aviation Industries Organization (IAIO) ................................................................ 223

    e.     SCB's Trade-Finance Transactions for the Iran Power Development Company ("IPDC"), MAPNA, and Zener Electronics Services (an Agent of Hezbollah) ............................................................................. 235

    f.     SCB's Trade-Finance Transactions with NIOC Subsidiaries ............... 238

g.     SCB's Trade-Finance Transactions with Iranian Front Company Khoram Sanat Producing Company .......................................................................................... 240

h.     SCB provided Critical Trade-Finance and Money Laundering Services for the IRGC's Telecommunications Networks ............................................................ 243

2.     Regulatory Actions and Criminal Investigations Against SCB, 2012 – Present ..... 245

3.     SCB Knowingly Provided Substantial Assistance to Hezbollah ............................ 252

a.     SCB Knowingly Provided Substantial Assistance to Money Service Businesses and Gold Traders Who Laundered Vast Sums of Money for Hezbollah (and the IRGC) .................................................................................................................. 252

b.     SCB Knowingly Provided Substantial Assistance to Hezbollah Super Facilitators ......................................................................................................... 255

i.     Muhammad Bazzi ............................................................................... 255

ii.     Tajco (SDGT) ..................................................................................... 261

B.     THE HSBC DEFENDANTS KNOWINGLY PROVIDED SUBSTANTIAL ASSISTANCE TO THE IRGC AND HEZBOLLAH ................................................. 262

1.     HSBC–Europe's 2001 "Bank Melli Proposal" ..................................................... 272

2.     Zarrab Money Laundering Network ..................................................................... 285

3.     HSBC Knowingly Provided Substantial Assistance to Hezbollah Money Launderers and Super Facilitators .......................................................................................... 286

a.     Kaloti .................................................................................................. 286

e.     Tajco .................................................................................................. 286

C.     DEFENDANT COMMERZBANK AG'S KNOWING AND SUBSTANTIAL ASSISTANCE TO THE IRGC AND HEZBOLLAH ................................................. 287

1.     Commerzbank Knowingly Provided Substantial Assistance to the IRISL ............. 292

2.     Waisenkinderprojekt Libanon e.V. ("The Orphans Project Lebanon") ................. 296

D.     DEFENDANT CREDIT SUISSE KNOWINGLY PROVIDED SUBSTANTIAL ASSISTANCE TO THE IRGC AND HEZBOLLAH ................................................. 303

E.     DEFENDANT ROYAL BANK OF SCOTLAND NV'S KNOWING SUBSTANTIAL ASSISTANCE TO THE IRGC AND HEZBOLLAH ................................................. 317

F.     DEFENDANT BARCLAYS KNOWING SUBSTANTIAL ASSISTANCE TO THE IRGC AND HEZBOLLAH ...................................................................................... 331

G.     BANK SADERAT PLC's KNOWING SUBSTANTIAL ASSISTANCE TO THE IRGC AND HEZBOLLAH ...................................................................................... 339

VII.   THE IRGC–QF AND HEZBOLLAH COMMITTED ACTS OF INTERNATIONAL TERRORISM AT THE IRGC'S DIRECTION IN WHICH PLAINTIFFS WERE FORESEEABLY INJURED ......................................................................................... 341

A.     THE IRGC AND IRGC–QF ................................................................................ 342

1.    The IRGC ................................................................................................... 342

2.    The IRGC–QF ............................................................................................ 343

B.     HEZBOLLAH ........................................................................................................ 345

1.    Hezbollah's Founding as an IRGC Proxy ............................................. 347

2.    Hezbollah in Iraq ..................................................................................... 353

3.    Development of the Iraqi Proxies ........................................................... 357

C.     HEZBOLLAH'S AND THE IRGC'S AGENTS & PROXIES IN IRAQ ................. 375

1.    The Badr Corps (A/K/A Badr Organization) ......................................... 375

2.    Asa'ib Ahl Al–Haq ("AAH" or the "League of the Righteous") ............................. 377

3.    Jaysh al Mahdi ("JAM" or the "Mahdi Army") and the Promised Day Brigades ("PDB") ......................................................................................... 380

4.    Kataib Hezbollah ("KH") ........................................................................ 382

5.    Case in Point: Senior Hezbollah Commander Ali Musa Daqduq's Direction of Terrorist Attacks on Coalition Forces in Iraq ......................................... 388

6.    The IRGC Funded the Design and Production of Explosively Formed Penetrators ("EFPs") Used to Kill or Maim Coalition Forces, Including Plaintiffs .................. 393

D.     ALL OF THE ATTACKS AT ISSUE IN THIS COMPLAINT WERE ACTS OF INTERNATIONAL TERRORISM ........................................................................... 398

VIII.  THE PLAINTIFFS ........................................................................................................ 399

1.    The January 20, 2007, Attack–Karbala ..................................................... 399

a) The Freeman Family ...................................................................................... 404

b) The Kirby Family ................................................................. 405

2. The January 12, 2004, Attack–Baghdad ................................. 406

a) The Crockett Family .......................................................... 406

3. The April 4, 2004, Attack–Baghdad ...................................... 406

a) The Arsiaga Family ........................................................... 406

b) The Greenwood Family ...................................................... 407

c) The Hiller Family .............................................................. 408

4. The April 9, 2004, Attack–Baghdad ...................................... 409

a) The Church Family ............................................................ 409

b) The Fisher Family ............................................................. 410

5. The June 4, 2004, Attack–Baghdad ....................................... 411

a) The Carvill Family ............................................................ 411

6. The June 29, 2004, Attack–Baghdad ..................................... 412

a) The Adle Family ............................................................... 412

7. The July 27, 2004, Attack–Balad Ruz .................................... 412

a) The Talbert Family ............................................................ 412

8. The August 5, 2004, Attack–Najaf ........................................ 414

a) The Rocha Family ............................................................. 414

b) The Reynoso Family .......................................................... 415

9. The August 6, 2004, Attack–Najaf ........................................ 416

a) The Wells Family .............................................................. 416

10. The August 15, 2004, Attack–Najaf ...................................... 417

a) The Sapp Family ............................................................... 417

11. The August 16, 2004, Attack–Sadr City ................................ 418

a) The Heath Family .............................................................. 418

12. The August 18, 2004, Attack–Sadr City ...................................................... 419

   a) The Martir Family ...................................................... 419

13. The August 25, 2004, Attack–Najaf ...................................................... 419

   a) The Arredondo Family ...................................................... 419

14. The August 26, 2004, Attack–Najaf ...................................................... 420

   a) The DeWilde Family ...................................................... 420

15. The February 10, 2005, Attack–Baghdad ...................................................... 421

   a) The Morris Family ...................................................... 421

16. The June 8, 2005, Attack–Baghdad ...................................................... 422

   a) The Arizola Family ...................................................... 422

17. The June 27, 2005 Attack–Baghdad ...................................................... 423

   a) The Klecker Family ...................................................... 423

18. The August 7, 2005, Attack–Baghdad ...................................................... 424

   a) The Kalladeen Family ...................................................... 424

19. The September 2, 2005 Attack–Baghdad ...................................................... 424

   a) The Hassler Family ...................................................... 424

   b) The Huckfeldt Family ...................................................... 425

   c) The Newman Family ...................................................... 426

20. The September 6, 2005, Attack–Baghdad ...................................................... 427

   a) The Jonaus Family ...................................................... 427

21. The September 26, 2005, Attack–Baghdad ...................................................... 429

   a) The Tuliau Family ...................................................... 429

22. The September 28, 2005, Attack–Umm Qasr ...................................................... 429

   a) The Morin Family ...................................................... 429

   b) The Martinez Family ...................................................... 430

23.    The October 6, 2005, Attack–Baghdad ............................................................. 431

    a) The Burns Family ....................................................................................... 431

    b) The Radke Family ...................................................................................... 432

    c) The Vernier Family .................................................................................... 434

24.    The December 8, 2005, Attack–Baghdad ........................................................ 435

    a) The Smith Family ...................................................................................... 435

    b) The Mattis Family ..................................................................................... 436

    c) The Peterson Family .................................................................................. 437

25.    The December 25, 2005 Attack–Baghdad ....................................................... 438

    a) The Cardinal Family .................................................................................. 438

26.    The January 5, 2006, Attack–Najaf ................................................................. 438

    a) The Hecker Family .................................................................................... 438

    b) The Mariano Family .................................................................................. 440

    c) The White Family ...................................................................................... 441

27.    The January 5, 2006, Attack–Baghdad ............................................................ 441

    a) The Lopez Reyes Family ........................................................................... 441

28.    The January 18, 2006, Attack–Basra ............................................................... 442

    a) The Hickman Family ................................................................................. 442

29.    The February 17, 2006 Attack–Baghdad ......................................................... 443

    a) The Lee Family .......................................................................................... 443

30.    The February 20, 2006, Attack –Hindiyah ...................................................... 444

    a) The Collado Family ................................................................................... 444

    b) The Waldeck Family .................................................................................. 445

31.    The February 20, 2006, Attack–Baghdad ........................................................ 445

    a) The Kuhlmeier Family .............................................................................. 445

32. The March 26, 2006, Attack–Baghdad.............................................................. 447

   a) The Bershefsky Family ..................................................................... 447

33. The April 1, 2006, Attack–Baghdad................................................................. 448

   a) The Devora-Garcia Family ................................................................ 448

34. The April 12, 2006, Attack–Misiab................................................................. 449

   a) The Bandhold Family........................................................................ 449

35. The April 16, 2006, Attack–Bawb Ash-Sham.................................................. 450

   a) The Stein Family ............................................................................... 450

   b) The Shelswell Family ....................................................................... 451

36. The April 25, 2006, Attack–Sadr City............................................................. 452

   a) The Murphy Family ........................................................................... 452

   b) The Irwin Family .............................................................................. 453

37. The April 28, 2006 Attack–Baghdad............................................................... 454

   a) The Gomez Family ............................................................................ 454

38. The May 2, 2006, Attack–Baghdad................................................................. 455

   a) The Greer Family .............................................................................. 455

   b) The Joyner Family ............................................................................ 456

   c) The Mills Family .............................................................................. 458

39. The May 3, 2006, Attack–Nasiriyah .............................................................. 459

   a) The Palinsky Family ......................................................................... 459

   b) The Stoneking Family....................................................................... 460

40. The May 5, 2006, Attack–Baghdad................................................................. 461

   a) The Saenz Family.............................................................................. 461

   b) The Vacho Family............................................................................. 462

41. The May 6, 2006, Attack–Diwaniyah ............................................................ 463

a) The Veverka Family ........................................................................................ 463

42. The May 21, 2006, Attack–Mosul ...................................................... 464

a) The Shumate Family ..................................................................................... 464

43. The May 25, 2006, Attack–Baghdad.................................................. 465

a) The DiCenzo Family ..................................................................................... 465

b) The Blair Family ........................................................................................... 466

44. The June 5, 2006, Attack–Baghdad ................................................... 467

a) The Eastlund Family .................................................................................... 467

b) The Adamson Family .................................................................................... 468

c) The Shepard Family ..................................................................................... 469

d) The Sklaney Family ..................................................................................... 470

45. The June 10, 2006, Attack–Rustamiyah ............................................ 471

a) The Friedrich Family ................................................................................... 471

46. The July 11, 2006, Attack–Karbala ................................................... 472

a) The Derise Family ........................................................................................ 472

47. The July 15, 2006, Attack–Baghdad .................................................. 473

a) The Contreras Family .................................................................................. 473

48. The July 17, 2006, Attack–Baghdad .................................................. 474

a) The Pugh Family ........................................................................................... 474

49. The July 22, 2006, Attack–Sadr City ................................................ 475

a) The Evans Family ......................................................................................... 475

50. The July 25, 2006, Attack–Baghdad .................................................. 476

a) The Graves Family ....................................................................................... 476

51. The August 26, 2008, Attack–Sadr City ............................................ 476

a) The Koulchar Family ................................................................................... 476

52. The August 26, 2006, Attack–Jisr Diyala ............................................................. 477

   a) The Zayas Family ............................................................................................... 477

53. The September 3, 2006, Attack–Baghdad ........................................................... 478

   a) The Andino Family ............................................................................................. 478

54. The September 20, 2006, Attack–Baghdad ......................................................... 479

   a) The Puertas Family ............................................................................................. 479

55. The September 30, 2006, Attack–Baghdad ......................................................... 480

   a) The Melendez Family ......................................................................................... 480

56. The October 4, 2006, Attack–Baghdad .............................................................. 482

   a) The Barattieri Family ......................................................................................... 482

57. The October 13, 2006, Attack–Baghdad ............................................................ 483

   a) The Stanton Family ............................................................................................ 483

58. The October 17, 2006, Attack–Baqubah ............................................................ 484

   a) The Haupt Family ............................................................................................... 484

59. The October 20, 2006, Attack–Baghdad ............................................................ 485

   a) The Witte Family ................................................................................................ 485

60. The October 22, 2006, Attack–Baghdad ............................................................ 485

   a) The Mock Family ............................................................................................... 485

   b) The Gmachowski Family ................................................................................... 486

61. The October 22, 2006, Attack–Baghdad ............................................................ 487

   c) The Brian Family ............................................................................................... 487

62. The October 22, 2006, Attack–Baghdad ............................................................ 488

   a) The Alabsawi Family ......................................................................................... 488

   b) The Taylor Family .............................................................................................. 488

   c) The Taylor Family .............................................................................................. 489

d) The Recendez Family ........................................................................... 490

63.    The October 22, 2006, Attack–Sadr City ......................................... 490

a) The Norager Family .......................................................................... 490

64.    The November 2, 2006, Attack–Baghdad ......................................... 491

a) The Kruger Family ........................................................................... 491

b) The Finken Family ........................................................................... 492

65.    The November 9, 2006, Attack–Baghdad ......................................... 494

a) The McCoy Family ........................................................................... 494

b) The Cox Family ............................................................................... 495

66.    The November 13, 2006, Attack–Baghdad ....................................... 496

a) The Lamb Family ............................................................................. 496

67.    The November 16, 2006, Attack–Basra ............................................ 496

a) The Coté Family .............................................................................. 496

b) The Johnson-Reuben Family ............................................................ 497

c) The Munns Family ........................................................................... 498

d) The Young Family ............................................................................ 499

68.    The December 3, 2006, Attack–Baghdad .......................................... 500

a) The Starkey Family .......................................................................... 500

69.    The December 4, 2006, Attack–Baghdad .......................................... 501

a) The Hinson Family ........................................................................... 501

70.    The December 20, 2006, Attack–Baghdad ........................................ 502

a) The Little Family ............................................................................. 502

b) The Denman Family ......................................................................... 503

71.    The December 22, 2006, Attack—Baghdad ....................................... 504

a) The Nantz Family ............................................................................ 504

72. The December 27, 2006, Attack–Baghdad ................................................................ 504

  a) The McCormick Family ................................................................................ 504

73. The December 31, 2006, Attack–Baghdad ................................................................ 505

  a) The Blohm Family ...................................................................................... 505

74. The January 14, 2007, Attack–Baghdad ................................................................... 506

  a) The Vaccaro Family .................................................................................... 506

75. The January 22, 2007, Attack–Baghdad ................................................................... 507

  a) The Stout Family ........................................................................................ 507

76. The January 25, 2007, Attack–Baghdad ................................................................... 507

  a) The Balsley Family ..................................................................................... 507

77. The January 27, 2007, Attack–Baghdad ................................................................... 508

  a) The Hobson Family .................................................................................... 508

78. The January 27, 2007, Attack–Taji ......................................................................... 509

  a) The Garrigus Family ................................................................................... 509

79. The February 1, 2007, Attack–Baghdad ................................................................... 511

  a) The Ryan Family ........................................................................................ 511

80. The February 2, 2007, Attack–Mahmudiyah ............................................................. 511

  a) The Dunn Family ........................................................................................ 511

  b) The Landeck Family ................................................................................... 512

81. The February 26, 2007, Attack–Diwaniyah .............................................................. 513

  a) The Beardsley Family ................................................................................. 513

82. The March 20, 2007, Attack–Baghdad ..................................................................... 513

  a) The Glawson Family ................................................................................... 513

83. The March 27, 2007, Attack–Baghdad ..................................................................... 514

  a) The Thomas Family .................................................................................... 514

84. The April 4, 2007, Attack–Nasiriyah ........................................................ 516

a) The Sabinish Family .......................................................................... 516

85. The April 6, 2007, Attack–Baghdad ......................................................... 517

a) The Fuentes Family ........................................................................... 517

86. The April 6, 2007, Attack–Sadr City ........................................................ 518

a) The Kirby Family ............................................................................... 518

87. The April 7, 2007, Attack–Baghdad ......................................................... 518

a) The Murphy-Sweet Family ................................................................. 518

88. The April 9, 2007, Attack–Baghdad ......................................................... 519

a) The Walton Family ............................................................................ 519

b) The Holden Family ............................................................................ 520

89. The April 28, 2007, Attack–Baghdad ....................................................... 521

a) The Stevens Family ........................................................................... 521

90. The April 28, 2007, Attack–Salman Pak .................................................. 521

a) The Hicks Family ............................................................................... 521

91. The April 29, 2007, Attack–Baghdad ....................................................... 522

a) The Martin Family ............................................................................. 522

92. The May 3, 2007, Attack–Musayyib ......................................................... 523

a) The Umbrell Family ........................................................................... 523

93. The May 5, 2007, Attack–Kamaliyah ....................................................... 524

a) The Smith Family .............................................................................. 524

94. The May 6, 2007, Attack–Baghdad .......................................................... 525

a) The Dixon Family .............................................................................. 525

95. The May 9, 2007, Attack–Al-Hillah .......................................................... 526

a) The Conner Family ............................................................................ 526

96. The May 14, 2007, Attack–Baghdad .................................................................. 526

   a) The Brooks Family ............................................................................ 526

97. The May 18, 2007, Attack–Baghdad .................................................................. 527

   a) The Brown Family ............................................................................. 527

98. The May 29, 2007, Attack–Sadr City ................................................................ 528

   a) The Kirby Family .............................................................................. 528

99. The June 2, 2007, Attack–Baghdad ................................................................... 529

   a) The Dressler Family .......................................................................... 529

100. The June 6, 2007, Attack–Baghdad .................................................................. 529

   a) The Gajdos Family ............................................................................ 529

101. The June 8, 2007, Attack–Baghdad .................................................................. 530

   a) The Campbell Family ........................................................................ 530

   b) The Wilson Family ........................................................................... 531

102. The June 10, 2007, Attack–Baghdad ................................................................ 531

   a) The Lammers Family ......................................................................... 531

   b) The Gomez Family ............................................................................ 533

103. The June 11, 2007, Attack–Baghdad ................................................................ 534

   a) The Payne Family .............................................................................. 534

104. The June 14, 2007, Attack–Scania ................................................................... 535

   a) The Moores Family ........................................................................... 535

105. The June 17, 2007 Attack–Baghdad ................................................................. 536

   a) The Tracy Family .............................................................................. 536

   b) The Benson Family ........................................................................... 537

106. The June 23, 2007, Attack–Baghdad ................................................................ 538

   a) The Moody Family ............................................................................ 538

107.  The June 25, 2007, Attack–Baghdad ........................................................ 539

    a) The Edwards Family ........................................................................ 539

    b) The Craig Family ............................................................................ 540

108.  The June 28, 2007, Attack–Baghdad ........................................................ 542

    a) The Crow Family ............................................................................ 542

109.  The June 30, 2007, Attack–Baghdad ........................................................ 543

    a) The Tutwiler Family ........................................................................ 543

110.  The July 5, 2007, Attack–Baghdad .......................................................... 544

    a) The Ring Family ............................................................................. 544

111.  The July 6, 2007, Attack–Baghdad .......................................................... 545

    a) The McRill Family .......................................................................... 545

112.  The July 6, 2007, Attack–Baghdad .......................................................... 546

    a) The Mergele Family ........................................................................ 546

113.  The July 7, 2007, Attack–Baghdad .......................................................... 546

    a) The Miller Family ........................................................................... 546

114.  The July 11, 2007, Attack–Baghdad ........................................................ 547

    a) The Hollcroft Family ...................................................................... 547

115.  The July 17, 2007, Attack–Baghdad ........................................................ 548

    a) The Joshua Family .......................................................................... 548

116.  The July 17, 2007, Attack–Sadr City ....................................................... 548

    a) The Harrelson Family ..................................................................... 548

    b) The Price Family ............................................................................ 549

    c) The Aieti Family ............................................................................. 549

117.  The July 17, 2007, Attack–Baghdad ........................................................ 550

    a) The Bouten Family .......................................................................... 550

118.  The July 19, 2007, Attack–Husseinyah ............................................................. 551

a) The Dudek Family ............................................................................................. 551

119.  The July 23, 2007, Attack–Baghdad ............................................................... 552

a) The Florexil Family .......................................................................................... 552

120.  The 2007, Attack–Baghdad ............................................................................. 553

a) The Miller Family ............................................................................................. 553

121.  The July 24, 2007, Attack–Umm Qasr ............................................................ 554

a) The Harrington Family ..................................................................................... 554

122.  The July 31, 2007, Attack–Baghdad ............................................................... 554

a) The Heinlein Family ......................................................................................... 554

b) The Jairala Family ........................................................................................... 555

123.  The August 14, 2007, Attack–Baghdad .......................................................... 556

a) The Casey Family ............................................................................................ 556

124.  The August 17, 2007, Attack–Basra ............................................................... 557

a) The Chand Family ........................................................................................... 557

125.  The August 23, 2007, Attack–Baghdad .......................................................... 559

a) The Bowen Family ........................................................................................... 559

126.  The August 23, 2007, Attack–Aziziyah .......................................................... 560

a) The Hochstetler Family ................................................................................... 560

b) The Tully Family .............................................................................................. 561

c) The Hunt Family .............................................................................................. 562

127.  The September 2, 2007, Attack–Baghdad ....................................................... 563

a) The White Family ............................................................................................. 563

128.  The September 2, 2007, Attack–Rustamiyah .................................................. 564

a) The Wold Family .............................................................................................. 564

129. The September 4, 2007, Attack–Baghdad .................................................. 565

   a) The Murray Family ............................................................................ 565

   b) The Shelton Family ........................................................................... 566

130. The September 12, 2007, Attack–Baghdad ................................................ 567

   a) The Laird Family .............................................................................. 567

131. The September 26, 2007, Attack–Baghdad ................................................ 568

   a) The Lee Family ................................................................................ 568

   b) The Hunt Family .............................................................................. 569

132. The September 29, 2007, Attack–Baghdad ................................................ 570

   a) The Golembe Family ......................................................................... 570

   b) The Watts Family ............................................................................. 571

133. The September 30, 2007, Attack–Baghdad ................................................ 571

   a) The Olguin Family ............................................................................ 571

134. The October 18, 2007, Attack–Baghdad ................................................... 572

   a) The Geiger Family ............................................................................ 572

135. The October 21, 2007, Attack–Iskandariyah ............................................. 573

   a) The Donoho Family .......................................................................... 573

136. The October 29, 2007, Attack–Umm Qasr ................................................ 574

   a) The Ginavan Family ......................................................................... 574

137. The November 7, 2007, Attack–Baghdad .................................................. 575

   a) The Tiffner Family ............................................................................ 575

138. The November 14, 2007, Attack–Baghdad ................................................ 576

   a) The Burks Family ............................................................................. 576

139. The November 26, 2007, Attack–Aziziyah ................................................ 577

   a) The Juneau Family ........................................................................... 577

140. The December 9, 2007, Attack–Az Zubaydiyah .......................................................... 578

    a) The Shaw Family .......................................................................................................... 578

    b) The Doheny Family .................................................................................................... 579

    c) The Evrard Family ...................................................................................................... 580

    d) The Johnson Family ................................................................................................... 580

141. The January 6, 2008, Attack–Baghdad ..................................................................... 581

    a) The Gudridge Family .................................................................................................. 581

    b) The Schichtl Family .................................................................................................... 581

    c) The Wadleigh Family .................................................................................................. 583

142. The January 30, 2008, Attack–Baghdad ................................................................... 584

    a) The Lukow Family ....................................................................................................... 584

143. The February 19, 2008, Attack–Baghdad .................................................................. 585

    a) The Alvarez Family ...................................................................................................... 585

    b) The Whitehorse Family ............................................................................................... 587

144. The February 19, 2008, Attack–Baghdad .................................................................. 588

    a) The Mann Family ......................................................................................................... 588

145. The March 11, 2008, Attack–Babil Province ............................................................. 589

    a) The West Family .......................................................................................................... 589

146. The March 12, 2008, Attack–Camp Adder ................................................................ 589

    a) The Samten Family ...................................................................................................... 589

    b) The Bradley Family ...................................................................................................... 590

147. The March 14, 2008, Attack–Musayyib ..................................................................... 591

    a) The Bewley Family ...................................................................................................... 591

148. The March 17, 2008, Attack–Baghdad ...................................................................... 592

    a) The Simpson Family .................................................................................................... 592

149.  The March 23, 2008, Attack–Baghdad.......................................................... 593

    a) The Habsieger Family ........................................................................ 593

    b) The Hake Family............................................................................... 593

    c) The Fieser Family ............................................................................. 594

    d) The Carrington Family....................................................................... 595

    e) The Heslop Family ............................................................................ 596

    f) The Mason Family............................................................................. 597

    g) The Pool Family ............................................................................... 598

150.  The March 23, 2008, Attack–Baghdad.......................................................... 599

    a) The Converse Family ........................................................................ 599

151.  The March 27, 2008, Attack–Sadr City......................................................... 600

    a) The Gerber Family ............................................................................ 600

    b) The Gregston Family ........................................................................ 601

152.  The March 29, 2008, Attack–Baghdad.......................................................... 602

    a) The Reiher Family ............................................................................ 602

153.  The April 3, 2008, Attack–Sadr City............................................................. 603

    a) The Robinson Family ........................................................................ 603

154.  The April 6, 2008, Attack–Baghdad.............................................................. 604

    a) The Wolfer Family ............................................................................ 604

155.  The April 7, 2008, Attack–Baghdad.............................................................. 605

    a) The Vaughn Family........................................................................... 605

156.  The April 8, 2008, Attack–Kharguliah .......................................................... 606

    a) The Hartley Family ........................................................................... 606

157.  The April 9, 2008, Attack–Sadr City............................................................. 607

    a) The Ault Family ............................................................................... 607

158. The April 12, 2008, Attack–Baghdad ................................................................. 608

    a) The Allmon Family ........................................................................ 608

159. The April 17, 2008, Attack–Sadr City ............................................................. 608

    a) The Sloan Family .......................................................................... 608

160. The April 21, 2008, Attack–Sadr City ............................................................. 609

    a) The Thomsen Family ..................................................................... 609

161. The April 21, 2008, Attack–Baghdad ............................................................. 610

    a) The Bogart Family ........................................................................ 610

162. The April 21, 2008, Attack–Sadr City ............................................................. 611

    a) The Rosa-Valentin Family ............................................................. 611

163. The April 28, 2008, Attack–Baghdad ............................................................. 612

    a) The Sloan Family .......................................................................... 612

164. The April 28, 2008, Attack–Baghdad ............................................................. 613

    a) The Kaplan Family ........................................................................ 613

165. The April 28, 2008, Attack–Sadr City ............................................................. 614

    a) The Woodard Family ..................................................................... 614

166. The April 28, 2008, Attack–Sadr City ............................................................. 615

    a) The Magers Family ....................................................................... 615

167. The April 29, 2008, Attack–Sadr City ............................................................. 616

    a) The Garza Family .......................................................................... 616

168. The April 30, 2008, Attack–Baghdad ............................................................. 616

    a) The Tucker Family ........................................................................ 616

169. The May 1, 2008, Attack–Sadr City ............................................................... 617

    a) The Daggett Family ....................................................................... 617

170. The May 2, 2008, Attack–Baghdad ................................................................ 618

a) The Hicks Family ........................................................................ 618

171. The May 9, 2008, Attack–Baghdad ............................................ 619

a) The Williamson Family .............................................................. 619

172. The May 9, 2008, Attack–Sadr City ......................................... 620

a) The Garza Family ...................................................................... 620

173. The May 9, 2008, Attack–Sadr City ......................................... 621

a) The Magers Family ................................................................... 621

174. The May 11, 2008, Attack–Baghdad .......................................... 622

a) The O'Neill Family .................................................................... 622

175. The May 11, 2008, Attack–Balad .............................................. 623

a) The Luckett Family ................................................................... 623

176. The May 25, 2008, Attack–An-Najaf ......................................... 623

a) The Gasper Family .................................................................... 623

177. The June 7, 2008, Attack–Baghdad ........................................... 624

a) The Hurst Family ...................................................................... 624

178. The June 24, 2008, Attack–Baghdad ......................................... 625

a) The Farley Family ..................................................................... 625

b) The Suveges Family .................................................................. 627

179. The August 4, 2008, Attack–Baghdad ....................................... 628

a) The Menke Family ..................................................................... 628

180. The August 13, 2008, Attack–Baghdad ..................................... 628

a) The Hale Family ........................................................................ 628

181. The August 26, 2008, Attack–Sadr City .................................... 629

a) The Latham Family .................................................................... 629

182. The October 5, 2008, Attack–Musayyib .................................... 630

a) The Bearfield Family ................................................................................ 630

183. The December 28, 2008, Attack–Sadr City ................................................ 631

a) The Paul Family ...................................................................................... 631

184. The January 10, 2009, Attack–Baghdad .................................................... 631

a) The Bauer Family .................................................................................... 631

b) The Bradley Family ................................................................................. 632

c) The Ward Family ..................................................................................... 634

185. The January 18, 2009 Attack–Baghdad ..................................................... 635

a) The Andrade Family ................................................................................ 635

186. The February 26, 2009, Attack–Adhamiyah .............................................. 636

a) The Connelly Family ............................................................................... 636

187. The May 16, 2009, Attack–Basra ............................................................... 637

a) The Schaefer Family ................................................................................ 637

188. The May 17, 2009, Attack–Baghdad .......................................................... 637

a) The Canine Family ................................................................................... 637

b) The Murphy Family ................................................................................. 639

c) The Landtiser Family ............................................................................... 640

d) The Richards Family ................................................................................ 640

189. The June 14, 2009, Attack–Balad .............................................................. 641

a) The Songer Family ................................................................................... 641

190. The September 8, 2009, Attack–Baghdad .................................................. 642

a) The Helton Family ................................................................................... 642

b) The Wise Family ...................................................................................... 643

191. The January 18, 2010, Attack–Baghdad .................................................... 644

a) The Lester Family .................................................................................... 644

192. The April 27, 2010, Attack–Khalis ............................................................ 645

    a) The Coe Family ........................................................................................ 645

193. The March 10, 2011, Attack–Baghdad ...................................................... 646

    a) The Kinsey Family .................................................................................. 646

194. The April 22, 2011, Attack–Numaniyah .................................................... 647

    a) The Stiggins Family ................................................................................ 647

195. The May 22, 2011, Attack–Baghdad .......................................................... 648

    a) The Beattie Family .................................................................................. 648

196. The June 6, 2011, Attack–Baghdad ............................................................ 649

    a) The Fishbeck Family ............................................................................... 649

197. The June 29, 2011, Attack–Wasit Province ................................................ 649

    a) The Field Family ..................................................................................... 649

198. The July 10, 2011, Attack–Maysan Province ............................................. 651

    a) The Kenney Family ................................................................................. 651

199. The July 15, 2011, Attack–Basra ................................................................ 652

    a) The Elliott Family ................................................................................... 652

200. The April 13, 2009, Attack .......................................................................... 653

    a) The Bowman Family ............................................................................... 653

CLAIMS FOR RELIEF ...................................................................................... 654

FIRST CLAIM FOR RELIEF ............................................................................. 654

SECOND CLAIM FOR RELIEF ........................................................................ 659

THIRD CLAIM FOR RELIEF ............................................................................ 663

FOURTH CLAIM FOR RELIEF ........................................................................ 667

FIFTH CLAIM FOR RELIEF ............................................................................. 670

SIXTH CLAIM FOR RELIEF ............................................................................. 672

SEVENTH CLAIM FOR RELIEF ............................................................................ 674

EIGHTH CLAIM FOR RELIEF .............................................................................. 678

NINTH CLAIM FOR RELIEF ................................................................................ 681

TENTH CLAIM FOR RELIEF ................................................................................ 685

ELEVENTH CLAIM FOR RELIEF ........................................................................ 686

PRAYER FOR RELIEF ........................................................................................... 688

## I. NATURE AND OVERVIEW OF THE ACTION

1. This is a civil action brought under 18 U.S.C. § 2333(a) and (d) of the Anti-Terrorism Act ("ATA"), as amended by the Justice Against Sponsors of Terrorism Act ("JASTA"), by American nationals who were injured, and by the estates and families of American nationals who were killed or injured, as a result of terrorist attacks in Iraq between 2004 and 2011.[1] These attacks were committed, planned, or authorized by the United States-designated Foreign Terrorist Organization ("FTO") (Lebanese) Hezbollah[2] in coordination with and under the direction of Iran's FTO-designated Islamic Revolutionary Guard Corps ("IRGC")[3] and its external directorate, FTO-designated IRGC Qods Force ("IRGC–QF"),[4] and their terrorist proxies and agents.

2. Hezbollah operates as an extension and proxy of the IRGC, but for historical reasons it has been separately designated a Specially Designated Terrorist ("SDT") (1995), FTO (1997), and Specially Designated Global Terrorist ("SDGT") (2001) by the United States.

3. To implement the Iranian regime's terror campaign in Iraq after the Baathist

---

[1]    Unless otherwise specified, the most relevant period for this Third Amended Complaint is 2001 to 2011 ("Relevant Period"). All allegations relate to that period unless otherwise stated.

[2]    Hezbollah is transliterated in a variety of ways. The U.S. government prefers the spelling "Hizballah," but for the sake of consistency, all spellings in the Third Amended Complaint use the more common iteration, "Hezbollah." In 1997, the U.S. Department of State designated Hezbollah an FTO (as that term is defined in 8 U.S.C. § 1189 of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")). *See* U.S. Dep't of State, Foreign Terrorist Organizations (2025), https://www.state.gov/foreign-terrorist-organizations (last visited Mar. 26, 2025). Hezbollah has remained designated an FTO since that time.

[3]    In 2019, the U.S. Department of State designated the IRGC an FTO (as that term is defined in 8 U.S.C. § 1189 of AEDPA). *See* Press Release, *Designation of the Islamic Revolutionary Guard Corps*, U.S. Dep't of State (Apr. 8, 2019), https://2017-2021.state.gov/designation-of-the-islamic-revolutionary-guard-corps/. The IRGC has remained designated an FTO since that time.

[4]    In 2007, the IRGC–QF was designated a Specially Designated Global Terrorist ("SDGT"). *See* Fact Sheet, *Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism*, U.S. Dep't of Treasury (Oct. 25, 2007), https://home.treasury.gov/news/press-releases/hp644. The IRGC–QF has remained designated an SDGT since that time. In 2019, the U.S. Department of State designated the IRGC–QF an FTO (as that term is defined in 8 U.S.C. § 1189 of AEDPA). *See* Press Release, *Designation of the Islamic Revolutionary Guard Corps*, U.S. Dep't of State (Apr. 8, 2019), https://2017-2021.state.gov/designation-of-the-islamic-revolutionary-guard-corps/. The IRGC–QF has remained designated an FTO since that time.

regime's 2003 ouster, the IRGC–QF and Hezbollah, under the IRGC's direction, worked together to establish, recruit, train, fund, arm, and direct Iraqi Shia proxies, including FTO Kataib Hezbollah ("KH") and FTO Asa'ib Ahl al Haq ("AAH"), to attack U.S. and other peacekeeping forces that were supporting Operation Iraqi Freedom (2003–2008) and Operation New Dawn (2009–2011).

4.    The weapons the IRGC, IRGC–QF, and Hezbollah provided to their Iraqi Shi'a proxies included a signature anti-armor weapon known as an Explosively Formed Penetrator ("EFP") which was designed by Hezbollah, precision manufactured by the IRGC, and distributed in Iraq by the IRGC–QF.

5.    Each attack set forth in the Third Amended Complaint was committed jointly by FTO Hezbollah, FTO IRGC, and FTO IRGC–QF and their Iraqi proxies as part of a campaign to drive U.S. and Coalition Forces out of Iraq (the "Coalition Forces," constituting U.S. and allied forces in Iraq, were referred to as Multi-National Force–Iraq ("MNF–I")).

6.    Defendants are ten commercial banks that knowingly providing extensive and sustained material support to the IRGC and Hezbollah through those respective terrorist organizations' multinational networks of commercial agents, operatives, and facilitators.

7.    Specifically, during the Relevant Period, each Defendant worked individually—and often in concert with other Defendant co-conspirators—to benefit the IRGC and Hezbollah by knowingly, actively, and deliberately providing them with (a) unusual, illegal, and substantial banking and payment services (including, among others, removing incriminating content from banking records, exploiting secure financial messaging networks, and manipulating internal bank audit controls); (b) multi-currency foreign exchange trading, processing, and settlement; and (b) facilitating massive trade-based money laundering (including helping convert bulk cash from trafficking in conflict diamonds, gold, and narcotics) on behalf of notorious customers publicly

linked to terrorism.

8. For instance, Defendants' pervasive and systemic support—individually and collectively—included, among other things, illegally providing the IRGC and Hezbollah vital access to the United States financial system through Defendants' respective Society for Worldwide Interbank Financial Telecommunications ("SWIFT") cross-border financial messaging (known as "SWIFTNet FIN messages," also referred to herein as "SWIFT messages"); U.S. dollar accounts at domestic and foreign correspondent banks; Eurodollar[5] clearing and settlement accounts at the Clearing House Interbank Payment System ("CHIPS"); and Federal Reserve Bank of New York ("FRB–New York") real-time gross settlement ("RTGS") accounts ("Fedwire").[6]

9. Defendants also knowingly assisted Hezbollah and the IRGC (including, hereinafter, the IRGC–QF, explained further below) by converting the proceeds Hezbollah derived from its various illicit activities, including trafficking in conflict diamonds, gold, narcotics, weapons (involving sums of bulk-cash, gold, and other precious metals), and conducting illicit oil sales. Defendants then moved those proceeds around the world, including through currency

---

[5]     Eurodollars are unsecured U.S. dollar-denominated deposits held at banks outside the United States. Payment transactions between counterparty banks are initiated and confirmed by SWIFTNet FIN, Telex, fax, or e-mail messages. The underlying transfer of funds—that is, central bank money held by commercial banks in Federal Reserve accounts—occurs through correspondent banks in New York which clear and settle Eurodollar transactions by book-entries between accounts or via CHIPS.

[6]     At the Court's direction, Plaintiffs have removed all previously redacted allegations sourced from records received from third parties in response to subpoenas issued in *Bartlett v. SGBL*, No. 19-cv-7-CBA-TAM (E.D.N.Y.) (all Plaintiffs in this action are also plaintiffs in *Bartlett*), subject to a protective order in that case. *Bartlett*, ECF No. 273. *See Freeman* Order dated Feb. 26, 2025 (ECF No. 136) ("Order"). Plaintiffs note that the Order is predicated on a discovery ruling by the *Bartlett* court which in their view is erroneous and contrary to law, but is effectively unappealable in that case. Thus, Plaintiffs expressly reserve all rights to the extent the removed allegations sourced from records received from third parties in response to subpoenas issued in *Bartlett* prove material to the disposition of this case in whole or in part. Plaintiffs note that Magistrate Judge Merkl found that there was no "compelling need" to use *Bartlett* records in this case because Plaintiffs can allege their theory of the case "regardless of [their] access to these materials": "under  Rule 12, you have to provide …, upon information and belief, good-faith allegations as to why there is a valid theory of the case with the understanding that you wouldn't be ordinarily in a position to provide specific transaction records and things along those lines because discovery hasn't commenced." Transcript, *Bartlett v. SGBL* (E.D.N.Y. Sept. 27, 2023) at 47-48. Plaintiffs herein *do* provide a litany of allegations pertaining to specific transaction records, but in accordance with the Order, none of the specific transaction records cited are sourced from records received from third parties in response to subpoenas issued in *Bartlett*.

exchange houses in the Middle East and Hezbollah's unofficial bank in Lebanon, al-Qard al-Hassan ("AQAH"), at the direction of Hezbollah's and the IRGC's agents.

10.     The IRGC and Hezbollah have long deployed complex networks of operatives and front-companies across the globe that allow them to move vast sums of illicit funds, evade U.S., European Union ("EU"), and United Nations ("UN") counterterrorism and non-proliferation sanctions, and fund their terrorist operations in Iraq and throughout much of the world.

11.     Because each Defendant functions as a major node in the Eurodollar interbank money market and global payment system,[7] the Iranian regime and its terrorist proxies actively welcomed each Defendant's respective willingness to actively assist them in their criminal activities.

12.     During the Relevant Period, Defendants were among the systemically important global financial institutions that knowingly, actively, and substantially assisted Hezbollah and the IRGC by covertly extending credit and exchanging currencies, illicitly financing trade in restricted dual-use commercial items, and illegally laundering funds on their behalf in a variety of unusual ways—all in violation (to varying degrees) of U.S., UK, EU, and UN counterterrorism sanctions.

13.     Hezbollah and the IRGC also exploited the weak underbelly of the global regulatory system by strategically operating in jurisdictions with weak or non-existent anti-money laundering and financial crime controls and enforcement (including, among others, Lebanon,

---

[7]     The Eurodollar money market serves as the principal channel for trade financing, foreign exchange transactions, and cross-border payments. While critical to global commerce—supporting roughly 80 percent of trade finance and over $6.6 trillion U.S. dollars in daily foreign exchange activity—the Eurodollar payment system operates largely beyond U.S. regulatory oversight. This creates a structural asymmetry: foreign banks benefit from the Federal Reserve's lender-of-last-resort protections yet evade U.S. supervisory frameworks governing domestic payment systems. The Eurodollar market's complexity and opacity—including cross-jurisdictional transactions, layered intermediaries, and correspondent banking networks—enable systemic exploitation by illicit actors. Money launderers, terrorist financiers, and narco-trafficking organizations exploit these gaps—often with the active assistance of foreign financial institutions like the Defendants here—to obscure Eurodollar flows, circumventing detection mechanisms that are more robustly enforced in regulated domestic payment systems such as Fedwire.

Syria, Turkey, UAE, The Gambia, Angola, Colombia, Paraguay, and Venezuela), and lax oversight of high–risk commodity-based enterprises (including, among others, conflict diamonds, gold, crude oil, bulk-cash currency exchange, and narcotics trafficking).

14.	In its 2019 "Fifth Special Measure Against the Islamic Republic of Iran as a Jurisdiction of Primary Money Laundering Concern" pursuant to Section 311 of the USA PATRIOT Act ("Section 311 Designation"), the U.S. government found that "Iran has continued to evade these sanctions, fund terror and destabilizing activities, and advance its ballistic missile development" and that "Iran is a jurisdiction of primary money laundering concern."[8]

15.	The U.S. government's Section 311 Designation of Iran also described the "illicit finance threat, including the terrorist-finance threat, that the jurisdiction of Iran poses to the United States and the U.S. financial system."

16.	The U.S. government further confirmed that "Iran has developed covert methods for accessing the international financial system and pursuing its malign activities, including misusing banks and exchange houses, operating procurement networks that utilize front or shell companies, exploiting commercial shipping, and masking illicit transactions using senior officials, including those at the Central Bank of Iran ('CBI')", and that "[t]hese efforts often serve to fund the Islamic Revolutionary Guard Corps (IRGC), its Islamic Revolutionary Guard Corps Qods Force (IRGC–QF), Lebanese Hezbollah (Hezbollah), Hamas, the Taliban and other terrorist groups."

17.	The Section 311 Designation further found the following regarding the CBI's role as the leading fiscal agent for Iran's state-sponsored terrorism:

---

[8]	U.S. government designations and other findings issued after 2011 are not offered here as notice events to the Defendants. Rather, they are set forth for the facts they contain which often describe historical conduct from the Relevant Period or earlier.

Senior CBI officials have played a critical role in enabling illicit networks, using their official capacity to procure hard currency and conduct transactions for the benefit of the IRGC–QF and its terrorist proxy groups. The CBI has been complicit in these activities, including providing billions of U.S. dollars (USD) and euros to the IRGC–QF, Hezbollah and other terrorist organizations.

18. During the Relevant Period, Hezbollah and the IRGC, through entities the IRGC controlled, such as the National Iranian Oil Company ("NIOC") and state-owned Iranian banks that the IRGC had the power to direct, worked closely with Defendants to move vast sums of money through the U.S. and global financial system in manner intended to circumvent counterterror financing sanctions and authorities. Defendants provided Hezbollah and the IRGC an array of illicit, often customized and irregular financial services on behalf of, among others, the following entities and groups:

- NIOC and its subsidiaries.[9]
- The CBI, Iranian banks Bank Saderat and Bank Melli, and other Iranian banks which the U.S. government has found were used by Iran to direct funds to Hezbollah, the IRGC and their Iraqi proxy groups.
- Other IRGC agents, front companies, and IRGC-controlled entities like Islamic Republic of Iran Shipping Lines ("IRISL") and Mahan Air.
- Currency and Gold Exchange Houses in Lebanon, United Arab Emirates, and other high-risk jurisdictions.
- Hezbollah's Islamic Jihad Organization ("IJO") (in coordination with the IRGC) through Hezbollah/IRGC operatives and front companies.

19. Defendants used their cross-border banking expertise and payment system technical access to knowingly process illicit Eurodollar transactions worth billions of U.S. dollars through New York for the benefit of the IRGC and Hezbollah.

20. A key component of this scheme involved sophisticated "stripping" operations, which systematically removed or altered critical identifiers (such as bank names, routing codes, or

---

[9] These include the National Iranian Tanker Company ("NITC"). *See* Press Release, *Treasury Sanctions Key Actors in Iran's Oil Sector for Supporting Islamic Revolutionary Guard Corps–Qods Force*, U.S. DEP'T OF TREASURY (Oct. 26, 2020), https://home.treasury.gov/news/press-releases/sm1165.

customer details) from SWIFTNet FIN MT–103 and MT–202 financial messages tied to Iranian banks, IRGC controlled entities, and Hezbollah front companies and super facilitators.

21.     These deliberate manipulations of Eurodollar transaction records exploited known vulnerabilities in compliance screening algorithms used by U.S. financial institutions, regulators, and law enforcement agencies such as the U.S. Department of Treasury's Terrorist Financing Threat Program ("TFTP").

22.     By falsifying standardized data fields, Defendants methodically circumvented transaction monitoring systems specifically configured to enforce U.S. counterterrorism sanctions targeting Iran and Hezbollah under IEEPA, OFAC regulations, and related Executive Orders such as 13224.

23.     As a direct consequence of these circumventions, Defendants knowingly provided the IRGC and Hezbollah with unimpeded access to laundered Eurodollar funds through the global correspondent banking system, which were subsequently used by these organizations for financing terrorist operations in Iraq and other regions.

24.     During the Relevant Period, Iran's revenues from export sales of crude oil and natural gas via NIOC and its subsidiaries were the largest source of the IRGC's revenues (which it shared in part with Hezbollah). But, as detailed below, with the help of the IRGC, Hezbollah's IJO[10] developed its own "Business Affairs Component" ("BAC") which provided the IRGC not only with alternative ways to launder oil-related revenues but also provided additional funding streams and trafficking routes via Hezbollah's illegal trade in conflict diamonds, gold, weapons, and narcotics.

---

[10]     The IJO is the component within Hezbollah responsible for procurement, intelligence, counterintelligence, surveillance, planning, coordination, and execution of terrorist attacks against Hezbollah's and Iran's targets, including in Iraq during the Relevant Period.

25.     The BAC also provided Hezbollah and the IRGC with alternative methods to access military equipment, industrial merchandise, advanced technologies, and commercially available dual-use goods that Iran could not legally obtain in international markets due to counterterrorism and counter-proliferation sanctions.

26.     As with their active assistance to the IRGC-controlled NIOC and the IRGC's favored banks, Defendants also knowingly, actively, and substantially assisted Hezbollah's BAC and its money laundering networks on behalf of Hezbollah's crude oil, refined gasoline and diesel fuel, conflict diamonds, gold, weapons, and narcotics traffickers.

27.     As set forth in detail below, each Defendant was aware of its role in these illegal activities and each Defendant's conduct was pervasive and systemic involving multiple customers and multiple illicit schemes—all perpetrated over multiple years and encompassing the Relevant Period and involving hundreds if not thousands of illicit transactions totaling billions of U.S. dollars for the benefit of Hezbollah and the IRGC.

28.     Each Defendant, except Bank Saderat PLC, was charged in federal court in the U.S. with violating legal duties to adhere to U.S. counterterrorism and counter-proliferation sanctions[11] and file accurate reports required by the Bank Secrecy Act ("BSA") with the U.S. government.[12] Each Defendant, except Bank Saderat PLC, pleaded guilty to multiple offenses and agreed not to contest the U.S. government's findings.

---

[11]     These included Executive Order Nos. 12957, 12959, and 13059 which imposed economic sanctions, including a trade embargo, on Iran. The Executive Orders prohibited, among other things, the exportation, re-exportation, sale, or supply, directly or indirectly, to Iran of any goods, technology, or services from the United States or by a United States person. The Executive Orders also prohibited any transaction by any United States person or within the United States that evaded or avoided, or had the purpose of evading or avoiding, any prohibition set forth in the Executive Orders.

[12]     State laws violated included New York State Penal Law Sections 175.05 and 175.10, Falsifying Business Records in the First Degree and Second Degree, respectively, which make it a crime to "with intent to defraud ... (i) make or cause a false entry in the business records of an enterprise ... or (iv) prevent the making of a true entry or cause the omission thereof in the business records of an enterprise."

29.     Given Defendants' full knowledge of their own respective key roles in the criminal activities of their Hezbollah and IRGC-affiliated customers and counterparties and their knowledge that they were specifically breaking laws intended to prevent the financing of terrorism, the acts of international terrorism that injured Plaintiffs were a reasonably foreseeable (if not inevitable) risk of each Defendant's illicit and proscribed conduct.

30.     Each Defendant also violated § 2333(d) by conspiring with Hezbollah and the IRGC and by agreeing to participate in Hezbollah's and the IRGC's criminal conspiracy to finance, facilitate, and commit acts of international terrorism, traffic in proscribed military equipment, and develop nuclear weapons and ballistic missile capabilities. The injuries Plaintiffs sustained in Iraq were all in furtherance of the ultimate objectives of the conspiracy and Defendants' unlawful conduct was integral to and in furtherance of the conspiracy's objectives. All Defendants understood that by helping a notorious State Sponsor of Terrorism evade counterterror financing laws, they were assisting in Iran's terror financing and acts of international terrorism, regardless of whether they were themselves motivated by or indifferent to Iran's terror campaign.

31.     With the exception of Bank Saderat PLC, each Defendant has admitted to affirmatively engaging in criminal activity that furthered the aims of that conspiracy. Each Defendant did so by laundering funds worth tens of millions of U.S. dollars annually, most of it through the U.S. financial system, thereby concealing the flows of money sent by and for the benefit of Hezbollah and the IRGC. They did so with knowledge that they were violating strict counterterrorism and counter-proliferation sanctions imposed by the United States that, if properly observed, would have significantly hindered Hezbollah's and the IRGC's respective access to the global financial system and each terrorist organization's ability to finance and carry out terrorist attacks, including in Iraq during the Relevant Period.

32.     Each Defendant knew that by deliberately engaging in numerous criminal acts on behalf of various Hezbollah-affiliated, IRGC-affiliated, and other proscribed customers and counterparties it was circumventing sanctions imposed for the express stated purpose of hindering terrorist activities. But, nevertheless, each Defendant proceeded to knowingly, actively, and unlawfully assist and support Hezbollah and the IRGC in facilitating terrorist financing, sanctions evasion, and acts of international terrorism, including in Iraq during the Relevant Period.

33.     Each act of international terrorism at issue here was a foreseeable consequence of Defendants' pervasive and systemic assistance to the IRGC and Hezbollah, particularly by assisting their terror financing and procurement of dual-use items.

34.     For the aforementioned reasons and based on the factual allegations set forth below, each Defendant is liable to each Plaintiff for the injuries those Plaintiffs have sustained as a result of acts of international terrorism.

## II.     JURISDICTION AND VENUE

35.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, 18 U.S.C. § 2333(a) and (d), and 18 U.S.C. § 2338 as a civil action brought by nationals of the United States who have been injured by reason of acts of international terrorism, and/or their estates, survivors, or heirs.

36.     Venue is proper in this District pursuant to 18 U.S.C. § 2334(a) and 28 U.S.C. § 1391(b) and (d).

37.     Defendants are each subject to personal jurisdiction in New York pursuant to 18 U.S.C. § 2334(a), CPLR § 302, and Fed. R. Civ. P. 4(k)(1)–(2).

38.     Defendant HSBC Bank USA, N.A. is also subject to personal jurisdiction under CPLR § 301.

39. Commerzbank waived any jurisdictional defenses as to the Tenth Claim for Relief. ECF Nos. 81, 86.

40. Bank Saderat PLC defaulted, waiving any jurisdictional defenses. (ECF No. 52.)

41. Defendants' unlawful conduct was purposefully directed at the United States, and specifically designed to effectuate the flow of billions of U.S. dollars through the United States (and specifically U.S. correspondent bank accounts in New York) in violation of U.S. laws.

42. In summary, Defendants knowingly and actively provided extensive, unusual, substantial, and illegal financial services to Hezbollah and the IRGC on a recurring basis and over an extended period of time, including, among other illicit activities, by covertly processing, clearing, and settling funds transfers worth at least hundreds of millions of U.S. dollars through their New York correspondent bank accounts at the direction, or for the benefit, of the IRGC, Hezbollah, and their agents.[13]

## III.   DEFENDANTS

### A.   THE HSBC DEFENDANTS

43. Defendant HSBC Holdings PLC ("HSBC Holdings") is a public limited company organized under the laws of the United Kingdom. HSBC Holdings directly or indirectly owns, *inter alia*, Defendant HSBC Bank PLC, Defendant HSBC Bank Middle East Limited, and Defendant HSBC Bank USA, N.A. HSBC Holdings is occasionally referred to internally (and in this Third Amended Complaint) as "HSBC Group," or "The Group," and members and affiliates of HSBC Holdings (including the named HSBC Defendants herein) are occasionally referred to herein as "HSBC Group members." They are referred to jointly herein as the "HSBC Defendants" or in some contexts, "HSBC."

---

[13]   Bank Saderat PLC directed other Defendants to transfer funds through their New York correspondent bank accounts.

44.     Defendant HSBC Holdings was the ultimate parent company of one of the world's largest banking and financial services groups with approximately 6,300 offices in over 75 countries and territories.

45.     HSBC Holdings is listed on the New York Stock Exchange ("NYSE"), London Stock Exchange ("LSE"), and Hong Kong Stock Exchange ("SEHK").

46.     HSBC Group members comprise licensed and regulated financial institutions throughout the world that are owned by various intermediate holding companies, and ultimately, but indirectly, by Defendant HSBC Holdings, which, as alleged above, is incorporated and headquartered in England.

47.     Defendant HSBC Bank Plc ("HSBC–London," often referred to internally by members of HSBC Group as "HBEU") is a licensed bank and regulated financial institution registered under the laws of England and Wales.

48.     Defendant HSBC Bank Middle East LTD ("HSBC–Middle East") is a licensed bank and regulated financial institution, initially incorporated under the laws of the Jersey Channel Islands until July 2016, when it formally redomiciled and registered under the laws of the Dubai International Financial Centre ("DIFC") in UAE.

49.     Throughout the Relevant Period, HSBC–Middle East maintained active banking operations in multiple high-risk jurisdictions such as Iran, Lebanon, Bahrain, and UAE, providing HSBC with significant operational presence and correspondent banking capabilities in these jurisdictions known for elevated money laundering and terrorism financing risks.

50.     Defendant HSBC Bank USA, N.A. ("HSBC–US," often referred to internally by members of HSBC Group as "HBUS"), is a national bank chartered under the National Bank Act (12 U.S.C. § 2 *et seq*.) that constitutes a "U.S. person" under the definitions set forth in 31 C.F.R.

Part 560.314 of the Iranian Transactions Regulations (the "ITR") and 18 U.S.C. § 2332d(b)(2) of the Anti-Terrorism Act.

51.     According to the fact sheets published on HSBC–US's official website, HSBC–US's headquarters are in McLean, Virginia, and it has its principal office in New York City.

52.     HSBC–US operates more than 240 bank branches throughout the United States, with offices and branches in New York, California, Connecticut, Delaware, Washington, D.C., Florida, Maryland, New Jersey, Oregon, Pennsylvania, Virginia, and Washington State.

53.     HSBC–US is the principal subsidiary of HSBC USA Inc., which is, in turn, an indirect, wholly owned subsidiary of HSBC North America Holdings, Inc. ("HNAH"). HNAH's businesses serve customers in retail banking and wealth management, commercial banking, private banking, and global banking and markets.

54.     During the Relevant Period, Defendant HSBC Holdings–London was responsible for promulgating and enforcing global AML, CFT, and sanctions compliance policies for its branches, subsidiaries, and affiliates around the world.

55.     In September 2004, HSBC Holdings–London set forth its counter-threat finance purported policies to satisfy FATF's AML/CFT Recommendations:[14]

> This policy applies not only to money laundering related to the proceeds of crime, but also to terrorist financing, and all references to money laundering and AML in the HSBC Group Money Laundering Deterrence Global Policy and Principles (GPPs) include terrorist financing. The policy reflects the Financial Action Task Force on Money Laundering (FATF) 40 Recommendations to combat money laundering and the 9 Special

---

[14]     *See* FINANCIAL ACTION TASK FORCE, INTERNATIONAL STANDARDS ON COMBATTING MONEY LAUNDERING AND THE FINANCING OF TERRORISM & PROLIFERATION (2012), online at https://www.fatf-gafi.org/content/dam/fatf-gafi/recommendations/FATF%20Recommendations%202012.pdf.coredownload.inline.pdf ("The Financial Action Task Force … is an independent inter-governmental body that develops and promotes policies to protect the global financial system against money laundering, terrorist financing and the financing of proliferation of weapons of mass destruction.").

Recommendations to counter terrorist financing.[15]

56.     Also, HSBC Holdings–London acknowledged in the following that each of its banking subsidiaries and business units had a duty of care for screening, among others, all cross-border U.S. dollar payments in real-time against OFAC, EU and UN economic sanctions and terrorist lists before executing the transaction.[16]

57.     At all relevant times, the HSBC Defendants knew that Hezbollah and the IRGC were violent terrorist organizations.

58.     At all relevant times, the HSBC Defendants knew that Hezbollah and the IRGC utilized the global financial system to raise and transfer funds that financed their terrorist operations and that Hezbollah and the IRGC, like other terrorist organizations, were particularly reliant on access to U.S. dollar funds and hence to financial institutions capable of processing, clearing, and settling cross-border payments denominated in U.S. dollars.

59.     At all relevant times, the HSBC Defendants were aware of the strict economic sanctions programs imposed by the United States on Iran and its terror proxies and that the U.S. Sanctions Regime[17] is and was intended to prevent Hezbollah and the IRGC (among other terrorist organizations) from conducting banking activities, including electronic funds transfers, and thereby limit their ability to operate and to carry out terrorist attacks.

60.     At all relevant times, the HSBC Defendants had actual knowledge that terrorist

---

[15]     HSBC HOLDINGS PLC, HSBC MONEY LAUNDERING DETERRENCE—HIGH LEVEL GLOBAL POLICY AND PRINCIPLES (GPPS) 1 (2004) ("The HSBC Group's … global policy is to comply with high standards of anti-money laundering…practice in all markets and jurisdictions in which it operates, and to comply with both the specific provisions and the spirit of all relevant laws and regulations.").

[16]     *Id*. at 4.

[17]     The Sanctions Regime as referred to herein includes regulations implemented under the Iran-Libya Sanctions Act, International Emergency Economic Powers Act ("IEEPA") and Trading with the Enemy Act ("TWEA"), including the Iranian Transactions Regulations ("ITR"). It also includes the material support statutes (18 U.S.C. § 2331 *et seq*.), related Executive Orders and implementing regulations, and U.S. export controls laws and regulations.

organizations such as Hezbollah and the IRGC utilize and arrange electronic funds transfers and other financial services in order to operate and that providing banking and financial services to them enables and enhances their capabilities to plan, prepare for, and perpetrate terrorist attacks.

61.     The HSBC Defendants were aware of the recommendations promulgated by the inter-governmental Financial Action Task Force ("FATF"), the requirements of the USA Patriot Act, UN Security Council Resolution 1373, and other domestic and international laws and regulations enacted after the September 11, 2001, terrorist attacks that required financial institutions to know their customers and perform enhanced due diligence on those customers to prevent money laundering and terror financing.

62.     For example, in September 2004, Defendant HSBC Holdings' 2004 Global Anti-Money Laundering Policy publicly affirmed:

> This policy applies not only to money laundering related to the proceeds of crime, but also to terrorist financing, and all references to money laundering and AML in the HSBC Group Money Laundering Deterrence Global Policy and Principles (GPPs) include terrorist financing. The policy reflects the Financial Action Task Force on Money Laundering (FATF) 40 Recommendations[18] to combat money laundering and the 9 Special Recommendations to counter terrorist financing.[19]

63.     It further stated that each of its banking subsidiaries and business units will verify "a prospective customer's identity … using reliable, independent documentary and/or electronic source material" and, "[w]ithout such, the business should be declined."

---

[18]     *See* FINANCIAL ACTION TASK FORCE, INTERNATIONAL STANDARDS ON COMBATTING MONEY LAUNDERING AND THE FINANCING OF TERRORISM & PROLIFERATION (2012), online at https://www.fatf-gafi.org/content/dam/fatf-gafi/recommendations/FATF%20Recommendations%202012.pdf.coredownload.inline.pdf ("The Financial Action Task Force…is an independent inter-governmental body that develops and promotes policies to protect the global financial system against money laundering, terrorist financing and the financing of proliferation of weapons of mass destruction.").

[19]     HSBC HOLDINGS PLC, HSBC MONEY LAUNDERING DETERRENCE—HIGH LEVEL GLOBAL POLICY AND PRINCIPLES (GPPs) 1 (2004) ("The HSBC Group's…global policy is to comply with high standards of anti-money laundering…practice in all markets and jurisdictions in which it operates, and to comply with both the specific provisions and the spirit of all relevant laws and regulations.").

64.     In that same 2004 statement it noted that part of its Know Your Customer ("KYC") due diligence information includes "appropriate personal, business, and financial details with regard to the customer, details on the purpose and intended nature of the business relationship, including anticipated transactional activity, details as to the source of funds/wealth."

65.     As of at least 2004, HSBC also used the services of World-Check, a compliance service that purported to identify and profile "High risk individuals, companies and organizations,"[20] provide "KYC and PEP[21] Checking before account opening," "Regular Customer base filtering," and "Payment filtering."

66.     World-Check purported to monitor customer profiles "24 hours a day in 40 languages" and make it possible for banks to "audit [an] entire client database" as well as "filter incoming /outgoing payments."

67.     In 2005, HSBC acknowledged that:

> The USA Patriot Act ('Patriot Act') signed into law in October 2001, imposes significant record keeping and customer identity requirements, expanded the US federal government's powers to freeze or confiscate assets and increases the available penalties that may be assessed against financial institutions for failure to comply with obligations imposed on such institutions to detect, prevent and report money laundering and terrorist financing.[22]

68.     In a February 2007 letter to the U.S. Securities and Exchange Commission ("SEC"), HSBC stated that its global Anti-money laundering ("AML")/Counter financing of terrorism ("CFT") policy required its banking subsidiaries and business units to comply with all applicable

---

[20]     World-Check described "High Risk" as "money launderers, arms dealers, terrorists, drug, fraud. War crimes etc."

[21]     World-Check described PEPs as "Politicians, their families, companies linked & business associates."

[22]     HSBC HOLDINGS PLC, 2004 ANNUAL REPORT AND ACCOUNTS 23 (2005), https://www.hsbc.com/-/files/hsbc/investors/investing-in-hsbc/all-reporting/group/2004/hsbc2004ara0.pdf.

threat finance sanctions, including those imposed by OFAC:

> In addition to any sanctions imposed and binding in local jurisdictions in which HSBC subsidiaries operate are incorporated, HSBC subsidiaries are required to observe sanctions imposed by United Nations resolutions and to screen for, identify report and reject transactions in any currency involving certain high-risk categories of customers, including those alleged to have involvement in terrorist activity or financing and the promulgation or trading in weapons of mass destruction. Consistent with the above Group policy HSBC companies comply to the extent applicable with US law and regulation, including country and individual sanctions promulgated by the US Office of Foreign Assets Control ("OFAC").[23]

69.    Despite the HSBC Defendants' publicly stated commitments to comply with U.S. and State of New York legal and regulatory obligations, investigations by multiple government agencies uncovered systematic financial misconduct and counterterrorism sanctions evasion workflows.

70.    These agencies included the U.S. Department of Treasury's Financial Crimes Enforcement Network (i.e., FinCEN), OFAC, and Office of the Comptroller of the Currency, and the U.S. Department of Justice investigating HSBC–US; and the Federal Reserve Board of Governors and FRB–New York investigating HSBC North America Holdings, HSCB–US's parent company.

71.    The regulatory and criminal investigations focused largely on HSBC–US's anti-money laundering and counter-financing of terrorism failures which were pervasive and systemic, such as: inadequate risk ratings for countries, customers, and products; failures to monitor large volumes of high-risk transactions and related failures to file suspicious activity reports; clearance of large numbers of alerts without any review; and failure to perform any customer due diligence on foreign affiliates holding U.S. correspondent accounts.

---

[23]    Letter from Douglas Flint, Grp. Fin. Dir., HSBC Holdings, to Donald Walker, Sr. Asst. Chief Acct., Sec. & Exch. Comm. 2 (Feb. 27, 2007).

72. The failures of HSBC–US were exacerbated by the "stove-piping" of information between the bank's ultimate parent (HSBC PLC), the intermediate holding companies (including HNAH), and foreign affiliates (including HSBC–Middle East and HSBC Mexico SA).

73. Among other things, HSBC's AML, CFT, and sanctions compliance failures resulted in over $60 *trillion* U.S. dollars' worth of Eurodollar wire transfer transactions through the United States being excluded from monitoring each year, $15 billion U.S. dollars' worth of bulk-cash banknotes entering the United States from abroad being excluded from monitoring over a three-year period, and related failures to timely file at least 7,000 Suspicious Activity Reports ("SARs").

74. Moreover, DOJ's criminal investigation determined that criminals took advantage of the lax AML program at HSBC–US to launder drug trafficking-related funds worth at least $881 million U.S. dollars through the bank.

75. From 2006 to 2009, Defendant HSBC–US monitored wire transfers using an automated system called the Customer Account Monitoring Program ("CAMP"). The CAMP system would detect suspicious wire transfers based on parameters set by HSBC–US.

76. Under the CAMP system, various factors triggered review, in particular, the amount of the transaction and the type and location of the customer.

77. During this period, HSBC–US assigned each customer a risk category based on the country in which it was located. Countries were placed into one of four categories based on the perceived AML and CFT risk of doing business in that country (from lowest to highest risk): standard, medium, cautionary, and high.

78. Transactions that met the thresholds for review and the parameters for suspicious activity were flagged for additional review by HSBC–US's compliance department. These were

referred to as "alerts."

79.     From 2006 to 2009, HSBC–US knowingly set the thresholds in CAMP so that wire transfers by customers, including foreign financial institutions with correspondent accounts, located in countries categorized as standard or medium risk would not be reviewed.

80.     Only transactions that involved customers in countries rated as cautionary or high risk were reviewed by CAMP.

81.     During this period, HSBC–US processed over 100 million cross-border wire transfers totaling over $300 trillion U.S. dollars.

82.     Over two-thirds of these transactions involved customers in standard or medium risk countries. Therefore, in this four-year period alone, over $200 trillion U.S. dollars in electronic funds transfers were not reviewed in CAMP.

### B.     DEFENDANT STANDARD CHARTERED BANK

83.     Defendant Standard Chartered Bank PLC ("SCB–London") is one of the world's largest multinational banks, with over 1,700 branches, offices, and outlets in more than 70 countries.

84.     Headquartered in London, the bank operates principally through its branches and subsidiaries in Asia, Africa, and the Middle East, and has operations in consumer, corporate and institutional banking, and treasury services.

85.     SCB–London is listed on the London Stock Exchange and Hong Kong Stock Exchange.

86.     Since 1976, SCB–London has had a license issued by the state of New York to operate as a foreign bank branch in New York, New York ("SCB–New York"). The New York branch provides wholesale banking services, primarily U.S. dollar clearing and settlement services

for international wire payments through CHIPS and FRB–New York.

87. SCB's New York branch was one of the highest-value and largest-volume U.S. dollar correspondent banks in the world, processing, clearing, and settling funds transfers worth approximately $195 billion U.S. dollars each banking day during the Relevant Period.

88. Although SCB–London operates branches and subsidiaries across the globe, during the Relevant Period, its compliance functions were centralized and under the direct and ultimate supervision of SCB's management in London, responsible for both monitoring and prevention of terror financing by all branches and subsidiaries within the SCB group.

89. During the Relevant Period, SCB maintained a representative office in Tehran, Iran ("SCB–Tehran")—established in 1993 and led by country manager Mohammad Sarrafzadeh—which nominally operated under legal restrictions that prohibited it from conducting direct banking transactions within Iran, including accepting deposits, executing foreign exchange operations, or extending credit facilities.

90. But in reality, SCB–Tehran acted as a liaison with and near Bank Markazi's headquarters, providing intelligence on evading U.S. counterterrorism sanctions, managing Iranian client relationships, and enabling Eurodollar transactions routed through SCB's non-Iranian branches to bypass regulatory scrutiny.

91. SCB has licensed branches in the UAE serving over 340,000 customers throughout the UAE, the Middle East, North Africa and beyond. Its UAE presence consists of 14 branches, with its main banking office in Dubai and its regional headquarters in the Dubai International Finance Centre ("DIFC"). The UAE represented one of SCB's highest earning regions across its Group during the Relevant Period.

92. At all relevant times, SCB considered its UAE branches to be a high financial crime

risk environment, in part because of the UAE branches' geographic proximity to sanctioned countries, including Iran. SCB also knew that the UAE lacked adequate regulatory oversight and was a haven for money laundering, sanctions evasion, and terror financing.

93.     At all relevant times, SCB knew that Hezbollah and the IRGC were violent terrorist organizations.

94.     At all relevant times, SCB knew that Hezbollah and the IRGC utilized the global financial system to raise and transfer funds that financed their terrorist operations and that Hezbollah and the IRGC, like other terrorist organizations, were particularly reliant on access to U.S. dollars and hence to financial institutions capable of clearing and settling payments denominated in U.S. dollars.

95.     At all relevant times, SCB was aware of the U.S. Sanctions Regime and that the U.S. Sanctions Regime is and was intended to prevent Hezbollah and the IRGC (among other terrorist organizations) from conducting banking activities, including electronic funds transfers, and thereby limit their ability to operate and to carry out terrorist attacks.

96.     At all relevant times, SCB had actual knowledge that terrorist organizations such as Hezbollah and the IRGC utilize electronic funds transfers and other banking services in order to operate and that providing banking services to them enables them to and enhances their capabilities to plan, prepare for, and perpetrate terrorist attacks.

97.     SCB was aware of the recommendations promulgated by FATF, the requirements of the USA Patriot Act, UNSC Resolution 1373, and other domestic laws and regulations enacted after the September 11, 2001, attacks that required financial institutions to know their customers and perform enhanced due diligence on those customers to prevent money laundering and terror financing.

98.     SCB–London set global standards across the entire SCB group as a whole.

99.     At all relevant times, SCB knew it was required to perform customer due diligence ("CDD") that included:

- Identifying the customer and verifying the customer's identity on the basis of documents or other data obtained from a reliable and independent source;
- Identifying the beneficial owner(s) of the customer, and taking adequate measures on a risk-sensitive basis to verify that beneficial owner's identity; and
- Obtaining information on the purpose and intended nature of the customer's relationship with the firm.

100.    SCB also knew that where the business relationship with a customer presented, by its nature, a higher risk of money laundering or terrorist financing, it was obligated to conduct Enhanced Due Diligence ("EDD") and if unable to apply such measures, it was required to not accept the customer or perform any transactions with or for that person or entity.

101.    If SCB was not able to apply CDD measures to an existing customer, it was required to terminate its existing relationship with that customer.

102.    In 2001, SCB opened what it then described as its "state-of-the-art" global service center in Chennai, India, where SCB–London would eventually route its SWIFT messages from around the globe (including for its various subsidiaries) for initial compliance review.

103.    In 2005, SCB purportedly introduced financial crime and compliance software developed by Norkom Technologies that was supposed to be "installed across the bank's operations in more than 50 countries, on four continents to provide transaction monitoring and real time sanctions filtering."

104.    Norkom's technology solutions were purported to help SCB "to detect, analyze, intercept and report suspicious and criminal activity" and to "immediately identify transactions to or from individuals, organizations or countries that are viewed as 'high risk,' prioritizing

22

investigations so that the bank can focus its attention first on those that represent the greatest risk."

105.    In 2005, SCB stated that "[a]n important part of our approach to tackling money laundering is our Know Your Customer (KYC) scheme. We encourage and train all our employees to develop a real knowledge of their customers to help us serve them better and to sharpen our processes in tackling fraud and money laundering."

106.    In April 2009, SCB's Group Policy for the Prevention of Money Laundering stated:

> It is essential, in order to protect its reputation and to meet its legal and regulatory obligations, that the Group minimizes the risks of being used by money launderers. For the purposes of this policy 'money laundering' also includes terrorist financing.

107.    Additionally, SCB's 2009 AML policy noted that:

> The Group's policy on the prevention of money laundering applies to all countries in which the Group operates and to all business activities within those countries. It is a clear statement to our staff, customers, and regulators of the Group's position on this critical risk issue.

108.    In 2011, SCB reiterated the bank's commitment to fighting money laundering, terrorist financing, fraud, and bribery:

> We are committed to combating money laundering, terrorist financing, fraud, bribery, and market abuse. To guard against the risk of financial crime within our business, we focus on training our employees, strengthening our screening systems, and ensuring that our policies and procedures are comprehensive and up-to-date.

## C.    DEFENDANT COMMERZBANK AG

109.    Defendant Commerzbank AG ("Commerzbank") is a financial services company headquartered in Frankfurt, Germany, and it has over 1,200 branches in Germany alone.

110.    According to the CHIPS[24] website, Commerzbank AG used, among others, the

---

[24]    The Clearing House Interbank Payments System ("CHIPS") is a private-sector, New York-based clearinghouse that serves as a foundational infrastructure component for the global Eurodollar money market. For foreign financial institutions such as Defendants, CHIPS provides essential access to FRB–New York's lender of last

following U.S. financial institutions in New York to clear and settle its U.S. dollar transactions:

    a. Defendant Commerzbank's New York branch (identified by CHIPS participant number 0804 and Fedwire routing number 026008044);

    b. Defendant HSBC Bank USA, N.A. (identified by CHIPS participant number 0108 and Fedwire routing number 021001088);

    c. Defendant SCB–New York (identified by CHIPS participant number 0256 and Fedwire routing number 026002561); and,

    d. Deutsche Bank Trust Co Americas (identified by CHIPS participant number 0103 and Fedwire routing number 021001033).

111. Commerzbank maintains twenty-three foreign branches, including a New York branch licensed by the State of New York since 1967.

112. The New York branch of Commerzbank constitutes a "U.S. person" under the Iranian Transaction Regulations and § 2332(b)(2).

113. At all relevant times, Commerzbank knew that Hezbollah and the IRGC were violent terrorist organizations.

114. At all relevant times, Commerzbank knew that Hezbollah and the IRGC utilized the global financial system to raise and transfer funds that financed their terrorist operations and that Hezbollah and the IRGC, like other terrorist organizations, were particularly reliant on access to U.S. dollars and hence to financial institutions capable of clearing and settling payments denominated in U.S. dollars.

115. At all relevant times, Commerzbank was aware of the U.S. Sanctions Regime and that the U.S. Sanctions Regime is and was intended to prevent Hezbollah and the IRGC (among other terrorist organizations) from conducting banking activities, including electronic funds transfers, and thereby limit their ability to operate, and to perpetrate terrorist attacks.

116. At all relevant times, Commerzbank had actual knowledge that terrorist

_____

resort liquidity facilities. This bypasses stricter capital and reserve rules, allowing lower-cost Eurodollar operations while retaining U.S. financial stability during crises.

organizations such as Hezbollah and the IRGC utilize electronic funds transfers and other banking services in order to operate and that providing banking services to them enables them to and enhances their capabilities to plan, prepare for, and perpetrate terrorist attacks.

117. Commerzbank was aware of the recommendations promulgated by FATF, the requirements of the USA Patriot Act, UNSC Resolution 1373, and other domestic laws and regulations enacted after the September 11, 2001, attacks that required financial institutions to know their customers and perform enhanced due diligence on those customers to prevent money laundering and terror financing.

118. For example, in its 2005 Annual report, Commerzbank stated:

> The Bank's employees are obliged to report out-of-the-ordinary transactions raising the suspicion of money laundering or the funding of terrorist activities to Compliance/Financial Investigations, so that the transaction can be subjected to individual scrutiny.

119. Similarly, in its 2006 Annual report, Commerzbank stated:

> Given the global character of Financial Institutions' duties, it bears special responsibility for aspects relevant to compliance. In order to identify and prevent money laundering and the financing of terrorism, for example, a money laundering prevention office has been set up that is linked up with the Bank's distribution units. Drawing upon our knowledge of the cultural, economic and legal conditions, we practice not only an extended customer due diligence but also a special assessment and identification of the risks.

**D.    DEFENDANT CREDIT SUISSE AG**

120. Defendant Credit Suisse AG ("Credit Suisse") was a financial services company headquartered in Zurich, Switzerland. Its U.S. headquarters were located at 11 Madison Avenue, New York, New York.

121. It was acquired by UBS AG in June 2023 and merged into UBS Group AG. According to UBS, "pending further integration" UBS Group AG intends to manage "two separate parent banks—UBS AG and Credit Suisse AG. Each institution will continue to have its own

subsidiaries and branches, serve its clients and deal with counterparties."

122. According to the CHIPS website, Credit Suisse used the following U.S. financial institutions in New York to clear and settle its U.S. dollar transactions:

    a. Defendant HSBC Bank USA, N.A. (identified by CHIPS participant number 0108 and Fedwire routing number 021001088);
    b. The Bank of New York Mellon (identified by CHIPS participant number 0001 and Fedwire routing number 011001234);
    c. Deutsche Bank Trust Company Americas (identified by CHIPS participant number 0103 and Fedwire routing number 021001033); and
    d. Wells Fargo Bank NA, International Branch (identified by CHIPS participant number 0509 and Fedwire routing number 026005092).

123. Credit Suisse's New York branch was subject to oversight and regulation by the Board of Governors of the U.S. Federal Reserve System and the New York State Banking Department.

124. In April 2006, Credit Suisse disclosed to the SEC that the bank provided the following cross-border services to Iranian clients:

- Financing for import/export contracts involving multinational entities and commodity trading clients;
- Correspondent banking services to both governmental and private Iranian banks;
- Private banking wealth and asset management services for clients located in Iran; and
- Insurance contracts involving Iran-domiciled clients and cargo insurance for Iranian imports.[25]

125. At all relevant times, Credit Suisse knew that Hezbollah and the IRGC were violent terrorist organizations.

126. At all relevant times, Credit Suisse knew that Hezbollah and the IRGC utilized the global financial system to raise and transfer funds that financed their terrorist operations and that

---

[25] Letter from Urs Rohner, Credit Suisse Grp., to Cecilia D. Blye, Chief, Off. of Glob. Sec. Risk, Div. of Corp. Fin., Sec. & Exch. Comm'n (Apr. 28, 2006) (regarding Credit Suisse Group Form 20–F for the Fiscal Year Ended December 31, 2004), https://www.sec.gov/Archives/edgar/data/1159510/000090342306000442/filename1.htm.

Hezbollah and the IRGC, like other terrorist organizations, were particularly reliant on access to U.S. dollars and hence to financial institutions capable of clearing and settling payments denominated in U.S. dollars.

127.    At all relevant times, Credit Suisse was aware of the U.S. Sanctions Regime and that the U.S. Sanctions Regime is and was intended to prevent Hezbollah and the IRGC (among other terrorist organizations) from conducting banking activities, including electronic funds transfers, and thereby limit their ability to operate, and to perpetrate terrorist attacks.

128.    At all relevant times, Credit Suisse had actual knowledge that terrorist organizations such as Hezbollah and the IRGC utilize electronic funds transfers and other banking services in order to operate and that providing banking services to them enables them to and enhances their capabilities to plan, prepare for, and perpetrate terrorist attacks.

129.    Credit Suisse was aware of the recommendations promulgated by FATF, the requirements of the USA Patriot Act, U.N. Security Council Resolution 1373, and other domestic laws and regulations enacted after the September 11, 2001, terrorist attacks that required financial institutions to know their customers and perform enhanced due diligence on those customers to prevent money laundering and terror financing.

130.    For example, in July 2004, Credit Suisse affirmed its obligations to prevent, detect, and report money laundering, terrorist financing, or other unusual or suspicious activity:

> Switzerland and many other countries have enacted laws that make money laundering and terrorist financing a crime and have imposed affirmative obligations on banks, securities firms and other financial institutions to prevent, detect and report money laundering, terrorist financing or other unusual or suspicious activity.

131.    Furthermore, Credit Suisse stated that the bank will not "maintain business relationships with individuals or [entities] known or suspected to be a terrorist or criminal

organization or which are affiliated with or support or finance such an organization."

132.    As of at least 2004, Credit Suisse also used the services of World-Check, the aforementioned compliance services company that purported to identify and profile "High risk individuals, companies and organizations," provide "KYC and PEP Checking before account opening," "Regular Customer base filtering" and "Payment filtering."

133.    As noted above, World-Check purported to monitor customer profiles "24 hours a day in 40 languages" and make it possible for banks to "audit [an] entire client database" as well as "filter incoming /outgoing payments."

134.    According to Credit Suisse's 2006 Global Anti-Money Laundering Policy, part of its Know Your Customer due diligence involves the following activities:

> a.  Identifying and verifying the identity of new clients;
> b.  Establishing the identity of beneficial owners;
> c.  Assigning risk ratings to client relationships and transactions;
> d.  Conducting enhanced due diligence on high-risk client relationships or transactions; and,
> e.  Screening applicable sanctions and terrorist lists.

135.    According to a Banker's Almanac anti-money laundering and combating the financing of terrorism ("AML/CFT") questionnaire completed in 2006 by Credit Suisse's Compliance Department, the bank had "a monitoring program for suspicious or unusual activity that covers funds transfers and monetary instruments" and took steps "to understand the normal and expected transactions of its customers based on its risk assessment of its customers."

136.    In 2007, Credit Suisse stated the following regarding the bank's duty of care for implementing comprehensive counter-threat finance programs and capabilities:

> Our failure to maintain and implement adequate programs to combat money laundering and terrorist financing, and violations of such economic sanctions, laws and regulations, could have serious legal and reputational consequences. We take our obligations to prevent money laundering and terrorist financing very seriously, while appropriately respecting and

protecting the confidentiality of clients. We have policies, procedures and training intended to ensure that our employees comply with 'know your customer' regulations and understand when a client relationship or business should be evaluated as higher risk for us.

137.    Furthermore, Credit Suisse advised its shareholders of the following regarding the bank's legal and regulatory obligations for combating, among other financial crimes, terrorist financing:

In recent years, a major focus of international policy and regulation has been on combating money laundering and terrorist financing. Applicable regulations impose obligations to maintain appropriate policies, procedures and controls to detect, prevent and report money laundering and terrorist financing, including verifying the identity of customers. Failure of Credit Suisse and its subsidiaries to implement and maintain adequate programs to combat money laundering and terrorist financing could have serious legal and reputational consequences.[26]

138.    According to a Wolfsberg Group[27] AML/CFT questionnaire Credit Suisse completed in 2008 the bank conducted enhanced due diligence "for those categories of customers and transactions" that the bank had "reason to believe pose a heightened risk of illicit activities" and would "screen transactions" which the bank "deems to be of significantly high risk."[28]

### E.    DEFENDANT ROYAL BANK OF SCOTLAND NV

139.    In October 2007, a consortium consisting of Fortis, the Royal Bank of Scotland Group ("RBS"), and Banco Santander acquired ABN Amro Holding NV, the parent company of ABN Amro Bank NV, using the acquisition vehicle RFS Holdings.

140.    The former ABN Amro Bank NV subsequently underwent a restructuring process

---

[26]    *Id*. at 379.

[27]    The Wolfsberg Group is an association, formed in 2000, of thirteen global banks that develops "frameworks and guidance for the management of financial crime risks, particularly with respect to Know Your Customer, Anti-Money Laundering and Counter Terrorist Financing Policies."

[28]    CREDIT SUISSE AG, ANTI-MONEY LAUNDERING QUESTIONNAIRE ENDORSED BY THE WOLFSBERG GROUP 1 (2008).

to transfer its Dutch State-acquired businesses and activities out of the existing ABN Amro Group. To do so, the relevant Dutch State-acquired businesses were first transferred to a new legal entity owned by ABN Amro Holding NV.

141. On February 5, 2010, through a statutory demerger process, the former ABN Amro Bank NV was renamed RBS NV In 2018, RBS NV was renamed NatWest Markets NV.

142. Ultimately, RBS acquired ABN Amro Holding NV. As such, RBS acquired the New York and Chicago branches of ABN Amro Bank NV and began integrating certain business lines handled by these branches into its other U.S. operations. These former branches constitute a "U.S. person" under the definitions set forth in § 560.314 of the ITR and 18 U.S.C. § 2332d(b)(2).

143. In this Third Amended Complaint, "ABN Amro (RBS NV)" refers to the named Defendant herein.

144. During the Relevant Period, ABN Amro (RBS NV) was a leading international financial institution with its headquarters in Amsterdam, Netherlands, operating in more than 50 countries through offices, branches, affiliates, and subsidiaries around the globe, including within the United States.

145. At all relevant times, ABN Amro (RBS NV) knew that Hezbollah and the IRGC were violent terrorist organizations.

146. At all relevant times, ABN Amro (RBS NV) knew that Hezbollah and the IRGC utilized the global financial system to raise and transfer funds that financed their terrorist operations and that Hezbollah and the IRGC, like other terrorist organizations, were particularly reliant on access to U.S. dollars and hence to financial institutions capable of clearing and settling payments denominated in U.S. dollars.

147. At all relevant times, ABN Amro (RBS NV) was aware of the U.S. Sanctions

Regime and that the U.S. Sanctions Regime is and was intended to prevent Hezbollah and the IRGC (among other terrorist organizations) from conducting banking activities, including electronic funds transfers, and thereby limit their ability to operate, and to perpetrate terrorist attacks.

148.    At all relevant times, ABN Amro (RBS NV) had actual knowledge that terrorist organizations such as Hezbollah and the IRGC utilize electronic funds transfers and other banking services in order to operate and that providing banking services to them enables them to and enhances their capabilities to plan, prepare for, and perpetrate terrorist attacks.

149.    ABN Amro (RBS NV) was aware of the recommendations promulgated by FATF, the requirements of the USA Patriot Act, UNSC Resolution 1373, and other domestic laws and regulations enacted after the September 11, 2001, attacks that required financial institutions to know their customers and perform enhanced due diligence on those customers to prevent money laundering and terror financing.

150.    In 2005, ABN Amro (RBS NV) represented that it had a monitoring program for suspicious or unusual activity that covered funds transfers and had policies and practices in place to screen transactions it deemed to be of significantly high risk.

151.    It also claimed to have written policies documenting the processes the bank had in place to prevent, detect, and report suspicious transactions.

152.    ABN Amro (RBS NV) characterized itself as "an active member of the Wolfsberg Group" in its General Statement on the Observance of Anti-Money Laundering Requirements and ABN Amro's Response to Regulatory Actions issued on May 15, 2006.

153.    Acknowledging that enforcement actions were taken against it in 2005 by U.S. federal and state bank regulatory agencies and the Dutch Central Bank for "weaknesses in the

Bank's and the Branches' anti-money laundering controls and the Bank Secrecy Act compliance programme as well as from deficiencies at ABN AMRO's Dubai Branch related to compliance with rules issued by the US Department of Treasury's Office of Foreign Assets Control," the bank centralized its worldwide compliance functions and affirmed that its "global policies included identification of new clients and beneficial owners and enhanced due diligence for clients with increased risks."

154.    As of at least 2004, ABN Amro (RBS NV) also used the services of World-Check, the aforementioned compliance services company that purported to identify and profile "High risk individuals, companies and organizations," provide "KYC and PEP Checking before account opening," "Regular Customer base filtering" and "Payment filtering."

155.    As noted above, World-Check purported to monitor customer profiles "24 hours a day in 40 languages" and make it possible for banks to "audit [an] entire client database" as well as "filter incoming /outgoing payments."

## F.    DEFENDANT BARCLAYS BANK PLC

156.    Defendant Barclays Bank PLC ("Barclays") is a global financial services provider headquartered in London, United Kingdom.

157.    Defendant Barclays is a wholly owned subsidiary of Barclays PLC, a public limited liability company organized under the laws of England and Wales.

158.    As used in this Third Amended Complaint, "Barclays" refers to Barclays Bank PLC, the wholly owned subsidiary of Barclays PLC, not Barclays PLC, Defendant Barclays Bank PLC's parent company.

159.    Barclays is one of the largest banks in the world. Barclays' home country regulator is the United Kingdom's Financial Services Authority ("FSA").

160. At all relevant times, Barclays knew that Hezbollah and the IRGC were violent terrorist organizations.

161. At all relevant times, Barclays knew that Hezbollah and the IRGC utilized the global financial system to raise and transfer funds that financed their terrorist operations and that Hezbollah and the IRGC, like other terrorist organizations, were particularly reliant on access to U.S. dollars and hence to financial institutions capable of clearing and settling payments denominated in U.S. dollars.

162. At all relevant times, Barclays was aware of the U.S. Sanctions Regime and that the U.S. Sanctions Regime is and was intended to prevent Hezbollah and the IRGC (among other terrorist organizations) from conducting banking activities, including electronic funds transfers, and thereby limit their ability to operate, and to perpetrate terrorist attacks.

163. At all relevant times, Barclays had actual knowledge that terrorist organizations such as Hezbollah and the IRGC utilize electronic funds transfers and other banking services in order to operate and that providing banking services to them enables them to and enhances their capabilities to plan, prepare for, and perpetrate terrorist attacks.

164. Barclays was aware of the recommendations promulgated by FATF, the requirements of the USA Patriot Act, UNSC Resolution 1373, and other domestic laws and regulations enacted after the September 11, 2001, attacks that required financial institutions to know their customers and perform enhanced due diligence on those customers to prevent money laundering and terror financing.

165. As of at least 2004, Barclays also used the services of World-Check, the aforementioned compliance services company that purported to identify and profile "High risk individuals, companies and organizations," provide "KYC and PEP Checking before account

opening," "Regular Customer base filtering" and "Payment filtering."

166. As noted above, World-Check purported to monitor customer profiles "24 hours a day in 40 languages" and make it possible for banks to "audit [an] entire client database" as well as "filter incoming /outgoing payments."

167. Defendant Barclays purported to adopt the so-called Wolfsberg Group's anti-money laundering and counter-terrorist financing principles in a May 2006 statement, noting that:

> Money laundering and terrorist financing has been identified as a major threat to the Barclays Group, and indeed the International financial services community. The British Government, in common with many others, has passed legislation designed to prevent money laundering which imposes certain requirements upon institutions registered in their jurisdiction.

168. Barclays further stated that:

> Each Policy requires monitoring of the customer relationship and accounts by various methods, including automated systems. Manual monitoring of accounts, review and refreshers of customer accounts, transaction and information is conducted on a regular basis or at pre-determined trigger points. This ensures that our customer information is up to date and represents a true picture of that relationship.

169. In its 2007 Statement of Policies and Procedures, Barclays stated that its AML/CFT policies were intended to "prevent Group products or services being used for laundering the proceeds of crime and to counter terrorist financing"; ensuring "compli[ance] with money laundering legislation/regulations in whatever jurisdiction [the bank] does business"; "ensur[ing] that we do not deal with any sanctioned regimes or individuals"; and "ensur[ing] that we are aware of whom we do business with including Politically Exposed Persons."

170. In 2007, Defendant Barclays' AML/CFT policy further confirmed its obligations:

- To ensure that Barclays always knows who it is undertaking business with and recognizes when PEPs [Politically Exposed Persons] are involved in such business relationships; and,

- To ensure that Barclays does not undertake business activities with sanctioned regimes, individuals or entities.[29]

### G. DEFENDANT BANK SADERAT PLC

171. Bank Saderat Iran is one of the largest banks in Iran. It has approximately 3,400 offices worldwide, including, as discussed below, a United Kingdom subsidiary (Defendant Bank Saderat PLC), and branches in Frankfurt, Paris, Athens, Dubai, and Beirut.

172. Bank Saderat Iran was nationalized after the Iranian Revolution, but allegedly privatized in 2009. According to Bank Saderat Iran, 49 percent of its shares are owned by the Iranian government, but it is technically a non-governmental entity.

173. In 2002, Bank Saderat Iran's London bank branch became a wholly owned bank subsidiary, incorporated under United Kingdom law (that is, Defendant Bank Saderat PLC).

174. Bank Saderat PLC is the legal successor in interest to the Iran Overseas Investment Bank ("IOIB"), London.

175. IOIB changed its name to Bank Saderat PLC in March 2002.

176. Defendant Bank Saderat PLC maintains its principal office in London, United Kingdom.

177. Defendant Bank Saderat PLC did not appear in this case or in *Bowman v. HSBC Holdings PLC,* No. 19–cv–2146, consolidated with this case.

178. On March 14, 2019, a Certificate of Default was entered against Bank Saderat PLC in this case, ECF No. 52, and on June 24, 2020, a Certificate of Default was entered against Bank Saderat PLC in *Bowman*, ECF No. 49.

---

[29] BARCLAYS BANK PLC, STATEMENT OF ANTI-MONEY LAUNDERING (AML) AND COUNTER FINANCING OF TERRORISM (CFT) POLICIES AND PRINCIPLES 2 (2007).

## IV.    THE IRGC

### A.    THE IRGC'S LONG HISTORY OF SUPPORTING AND FINANCING TERRORISM

179.    Since the Iranian Revolution in 1979, Iran has been a principal source of extremism and terrorism throughout the Middle East and the rest of the world, responsible for bombings, kidnappings, and assassinations across the globe.

180.    The United States designated Iran a State Sponsor of Terrorism on January 19, 1984.

181.    That designation has remained in force since that time, including throughout the Relevant Period.

182.    As the U.S. Department of State noted in 2019, the designation of the IRGC was based on its history of supporting terrorism since the 1980's: "Iran is an outlaw regime that uses terrorism as a key tool of statecraft and … the IRGC, part of Iran's official military, has engaged in terrorist activity or terrorism since its inception 40 years ago."

183.    Based on that history, the U.S. government found that "the IRGC has been directly involved in terrorist plotting; its support for terrorism is foundational and institutional, and it has killed U.S. citizens," and noted that Iran was responsible "for the deaths of at least 603 American service members in Iraq since 2003," a number that includes some of the deceased family members of the Plaintiffs.

184.    In announcing the designation of the IRGC as an FTO, the President affirmed the "[t]he IRGC is the Iranian government's primary means of directing and implementing its global terrorist campaign." He also said: "If you are doing business with the IRGC, you will be bankrolling terrorism."

185.     That designation statement affirmed what was already well known for decades—Iran's and the IRGC's use of terrorism have been infamous for decades. Since its 1984 designation of Iran as a State Sponsor of Terrorism, the United States has attempted to constrain and deter Iran's sponsorship and commission of acts of terrorism, as well as its development of Weapons of Mass Destruction, by imposing a wide variety of trade and economic sanctions intended to reduce the flow of financial resources, especially U.S. dollar assets, for Iran's support of such activities, primarily through the IRGC.

186.     Indeed, the success of the IRGC's terror campaigns relied on its terror financing facilitated by the Defendants and others. As the announcement of the IRGC's designation as an FTO—the first for a state entity—explained, the designation was necessitated because, notwithstanding global sanctions regimes, "the IRGC continues to provide financial and other material support, training, technology transfer, advanced conventional weapons, guidance, or direction to a broad range of terrorist organizations, including Hizballah, … Kata'ib Hizballah in Iraq … and other terrorist groups."

### B.     U.S. SANCTIONS AND IRAN'S RELIANCE ON U.S. DOLLARS

187.     On March 16, 1995, as a result of Iranian sponsorship of international terrorism and Iran's active pursuit of Weapons of Mass Destruction, President Clinton issued Executive Order 12957 prohibiting U.S. involvement with petroleum development in Iran.

188.     On May 6, 1995, President Clinton signed Executive Order 12959, pursuant to the International Emergency Economic Powers Act ("IEEPA"),[30] as well as the 1985 International

---

[30]     On October 16, 2007, President Bush signed into law the International Emergency Economic Powers (IEEPA) Enhancement Act, Public Law No. 110–96, amending IEEPA section 206. The Act enhanced criminal and administrative penalties that could be imposed under IEEPA.

Security and Development Cooperation Act ("ISDCA"), substantially tightening sanctions against Iran.

189.    On June 25, 1996, a truck bomb decimated a building at the Khobar Towers complex in Saudi Arabia that was used to house American military personnel, killing 19 Americans and wounding another 372 people.

190.    It was soon established that the IRGC and Hezbollah trained and equipped the terrorist operatives responsible for the bombing.

191.    Soon thereafter, Congress responded by passing the 1996 Iran–Libya Sanctions Act finding that:

> The efforts of the Government of Iran to acquire weapons of mass destruction and the means to deliver them and its support of acts of international terrorism endanger the national security and foreign policy interests of the United States and those countries with which the United States shares common strategic and foreign policy objectives.

> The objective of preventing the proliferation of weapons of mass destruction and acts of international terrorism through existing multilateral and bilateral initiatives requires additional efforts to deny Iran the financial means to sustain its nuclear, chemical, biological, and missile weapons programs.

192.    On August 19, 1997, President Clinton signed Executive Order 13059 clarifying Executive Orders 12957 and 12959 and confirming that virtually all trade and investment activities with Iran by U.S. persons, wherever located, were prohibited.

193.    To ensure that U.S. financial institutions do not inadvertently assist Iran in its support of international terrorism and weapons proliferation, or facilitate other prohibited transactions, the U.S. government requires U.S. financial institutions to use sophisticated computer systems and software algorithms to monitor and screen all wire transfer activities.

194.    Banks in New York clear and settle the vast majority of the world's U.S. dollar payments and foreign exchange transactions and are supposed to be the first line of defense to prevent the IRGC, Hezbollah, and other terrorist organizations from accessing the U.S. financial system to fund or otherwise engage in terrorism and other prohibited conduct.

195.    At the same time, however, during the Relevant Period approximately 60 percent of Iranian government revenues and 90 percent of Iran's export revenues originated from the sale of its oil and gas resources controlled by the IRGC, a market largely denominated in U.S. dollars (known as "petrodollars"[31]). Insofar as Iran's currency, the rial, was (in part due to U.S. sanctions) one of the world's least valued currencies, the Iranian regime was desperately dependent on access to U.S. dollars it held overseas, and the interest income these petrodollar deposits generated.[32]

196.    Given the IRGC's control of Iran's oil revenues through NIOC and other oil and gas companies they controlled, the U.S. Sanctions Regime posed a significant obstacle not only for the Iranian regime as a whole, but particularly for the IRGC, which was reliant on access to U.S. dollars and the ability to move them through the international financial system via a combination of Iranian and Western financial institutions.

197.    IRGC access to international payment system platforms was also critical to its capacity to fund its terror proxies, such as Hezbollah in Lebanon and Kataib Hezbollah in Iraq, and to fuel its global terrorism and weapons proliferation activities.

198.    After the 2003 U.S. invasion of Iraq involving over 130,000 U.S. troops, the Iranian regime feared that American military power might be refocused in its direction, but it also saw an opportunity to eventually seize control of Iraq and turn it into an Iranian client state, which it did,

---

[31]    The petrodollar market developed because, among other reasons, the United States was the largest producer and consumer of oil in the world; the world oil market has been priced in U.S. dollars since the end of World War II.

[32]    The Eurodollar interest rate is also known as the London Interbank Offered Rate ("LIBOR").

following the U.S. withdrawal from Iraq at the end of 2011. Detering the U.S., weakening its position in Iraq, and laying the groundwork for subverting the Iraqi government and eventually turning it into a client state depended on the IRGC–QF's ability to successfully form, organize, arm, and control its terror proxy groups in Iraq.

199. As discussed below, soon after the fall of Saddam Hussein's Baathist regime in Iraq, Iran directed Hezbollah to create "Unit 3800" and began devoting substantial financial resources, personnel, and materiel to gain influence in Iraq and inflict casualties on American citizens in Iraq.

200. Yet, during the Relevant Period, Iran's murderous objectives in Iraq were ironically dependent on the IRGC maintaining access to its U.S. dollar revenue streams and its continued ability to direct transactions clandestinely through the U.S. financial system. Those requirements could only be met if multinational banks, such as Defendants, were willing to shield Iran's terrorist financing, money laundering, sanctions evasion, and other financial crimes from detection by regulators and law enforcement.

## C. THE EURODOLLAR MARKET—THE IRGC'S MONEY LAUNDERING AND ILLICIT EXPORT NEXUS WITH DEFENDANT BANKS

### 1. The IRGC's Objectives

201. During the Relevant Period, the IRGC's strategy was to:

- Invest and deploy revenues it controlled from NIOC's oil and gas export sales.
- Finance its terrorist proxy organizations and fund their acts of international terrorism (as well as its own).
- Illicitly acquire U.S.-manufactured equipment, parts and technology to further its nuclear and conventional weapons programs.

202. Until November 10, 2008, Iran had significant access to the U.S. financial system for the benefit of its civilian agencies and ordinary commercial enterprises and it had viable alternative options both for foreign exchange and time deposits in Eurocurrencies (other than

Eurodollars) to meet the needs of its civilian programs. These included, but were not limited to, its credit at the European Central Bank denominated in euros, its credit at the International Monetary Fund ("IMF") denominated in Special Drawing Rights ("SDRs"), its credit at the Asian Clearing Union ("ACU") denominated in Asian Monetary Units ("AMUs"), or its domestic credit denominated in Iranian rials.

203.   However, as noted above, the IRGC and Hezbollah conducted the majority of their revenue generating activities in U.S. dollars (including oil sales, narcotics trafficking, and weapons sales) and were therefore dependent on access to banks with U.S. dollar clearing privileges (either via U.S. branches or U.S. correspondent bank accounts with U.S. banks) who would be willing to assist them in moving large sums of U.S. dollars undetected through the U.S. financial system.

204.   This critical financial pathway was vital to the IRGC's efforts to finance Hezbollah and its other Shi'a proxies in Iraq—and to its efforts to acquire U.S.-manufactured products (including dual-use technologies and export-controlled manufacturing equipment)—all routed undetected through the U.S. financial system.

205.   As a result of the IRGC-directed exploitation of Iranian banks and the deceptive and illegal banking practices they engaged in (with Defendants' active, knowing, and substantial assistance), Iran was temporarily cut-off from the SWIFT Network in mid–2012.

206.   Soon thereafter, Iran's domestic currency collapsed.

## 2.   Eurodollar Market Operations

207.   The global Eurodollar market is a wholesale, bank-to-bank market where a correspondent network of banks, bank branches, and other bank affiliates outside the United States make loans and accept deposits denominated in U.S. dollars.

208.    According to FRB–New York, the Eurodollar market emerged after World War II due to a large increase in U.S. dollars funds circulating outside of the United States from, among others, the Marshall Plan expenditures to rebuild Europe after the war.

209.    Prior to SWIFT's launch of its secure financial messaging network in 1977, most transactions in the Eurodollar market were conducted electronically by telegraphic transfer ("Telex").

210.    By the time of the 1979 Iranian Revolution, the Bank of International Settlements ("BIS") estimated that the size of the Eurodollar market was over $600 billion U.S. dollars.

211.    A mid–2015 BIS report estimated that the size of the Eurodollar market by the end of 2014 was over twenty-one *trillion* in U.S. dollar funds.

212.    As mentioned herein, nearly all U.S. dollar transfers initiated through banks outside the United States are processed electronically by correspondent banks in the United States, almost exclusively in New York.

213.    The Clearing House Interbank Payment System ("CHIPS") represents that it processes 95 percent of those Eurodollar funds transfers.

**D.    THE IRANIAN U-TURN EXEMPTION AND ITS REVOCATION**

214.    Alongside its economic sanctions against Iran, the United States government designed a limited exception process to permit Iran's circumscribed access to U.S. dollars through a narrowly tailored exemption to the Iranian Trade Regulations, known as the "U-Turn exemption" (Section 560.516 of the Iranian Trade Regulations).

215.    At the same time, the U.S. government insisted that U.S. financial institutions operating in the Eurodollar market carefully monitor all Iranian transactions to both deter and detect the financing of sanctioned entities involved in, among others, Iran's terrorism and weapons proliferation activities.

216. The purpose of the U-Turn exemption was to permit Iranian parties indirect access to U.S. dollar funds, *provided* that these transactions were fully disclosed to U.S. correspondent banks; were strictly for Iran's legitimate agencies, operations, and programs; and were not earmarked for terrorist, WMD proliferation, or other proscribed purposes.

217. Until November 2008, U.S. financial institutions were authorized to process certain funds transfers (under the U-Turn exemption) for the direct or indirect benefit of Iranian banks, other persons in Iran or the Government of Iran, *provided* such payments were initiated offshore by a *non-Iranian*, non-U.S. financial institution and only passed through the U.S. financial system *en route* to another offshore, *non-Iranian*, non-U.S. financial institution; *and* provided that none of the parties to the transactions had been designated an SDN, or that the transaction was for an SDN's benefit.

218. The U-Turn exemption was therefore conditioned on transparency to permit the careful monitoring of all Iranian transactions, both to deter and detect terror financing and weapons proliferation activities.

219. Because so much of Iran's oil and gas revenues have historically flowed through the financial system and because Iran's primary terrorist proxy, Hezbollah, operates in Lebanon (itself a dollarized economy and largely dependent on U.S. currency) maintaining transparency in processing Iranian U.S. dollar transactions has been a vital part of the architecture of U.S. national security for decades and was reflected as such in the Iranian Trade Regulations.

220. Iran's access through the U-Turn exemption was to be closely monitored filtering all U-Turn exemption transactions through sophisticated computer systems used by U.S. financial institutions to monitor and screen all U.S. dollar wire transfers.

221.    Defendants, however, knowingly, and intentionally agreed to, and did, manipulate tens of thousands of payment order messages (SWIFT MT–103 and MT–202 message types) and the records of such transactions to defeat such monitoring and screening, and prevent transparency, in order to provide U.S. dollar funds to Iran for unlawful uses, which foreseeably included the support of Iranian terrorism and terrorist organizations.

222.    Over time, however, U.S. authorities began to understand the contours of the money laundering and terror financing conspiracy that IRGC had engineered, working through various Iranian banks and commercial enterprises it controlled, to move large sums of U.S. dollars through Defendants.

223.    Initially, the realization that Iran and the IRGC were engaging in "deceptive banking practices" led the U.S. to target key Iranian financial institutions, entities, and individuals under proliferation, counterterrorism, and Iran-related sanctions (for example, E.O. 13382, E.O. 13224, and E.O. 13438).

224.    The apparent assumption made initially by U.S. authorities was that the IRGC and its banking agents (Bank Melli, Bank Saderat, and others) were engaged in deception that was exploiting *unwitting* Western financial institutions that were engaged in high risk but legal, foreign exchange, precious metals, and trade-finance business with Iran.

225.    The truth was otherwise.

226.    *First*, despite Iran's feeble domestic economy during the entire Relevant Period, its oil and natural gas exports still provided the Iranian regime (and particularly the IRGC) with substantial revenues denominated in U.S. dollars.

227.     *Second*, Iran's petrodollar revenues were managed by, and through, among others, the CBI, Bank Melli, and Bank Saderat) which acted at the direction of the IRGC and NIOC, which was controlled-by the IRGC.

228.     *Third*, the challenge the IRGC faced was that it was almost entirely dependent on U.S. dollar funds, but U.S. economic sanctions—and the attendant monitoring of Iran's financial activities—were incompatible with the IRGC's terror financing and Weapons of Mass Destruction proliferation goals.

229.     *Fourth*, between 2004 and 2011, both Lebanon (where the IRGC's premiere proxy, Hezbollah, is based) and Iraq (where Iran's proxies were launching terror attacks killing and maiming Plaintiffs) were U.S.-dollarized economies, a fiscal reality that made the IRGC's funding of its terror proxies a highly "dollar-sensitive" endeavor.

230.     Therefore, in order to free itself from U.S. economic sanctions, and circumvent the U.S., EU, and UN monitoring of its financial activities, the IRGC needed to identify more than one willing partner among western financial institutions to assist its illegal goals, given the volume of its U.S. dollar revenues.

231.     The IRGC needed the active assistance of at least *several* of the world's *largest* (non-U.S.) multinational banks that were already accustomed to handling large volumes of Eurodollar clearing and settlement transactions, and thus would be less likely to raise suspicions with U.S. authorities.

232.     Thus, for example, in early 2001, the CBI asked Defendant Standard Chartered Bank to act as its correspondent bank with respect to Iranian U.S. dollar payments, trade-finance, derivatives, and foreign exchange transactions on behalf of NIOC.

233. As set forth hereinafter, SCB agreed to deliberately remove identifying data on NIOC's payment orders (MT–103 and MT–202 SWIFT messages) for these and other wire transfers.

234. The sheer size and volume of NIOC's Eurodollar transactions would have raised numerous red flags if not undertaken by a bank of SCB's size and existing U.S. dollar clearing and settlement volume.

235. However, even the large international banks worried about attracting attention from U.S. authorities when their illegal dollar clearing activities for Iran markedly increased.

236. For example, in 2003, Defendant Commerzbank's employees expressed concern that Commerzbank's increased volume of illegal U.S. dollar clearing and settlement activities through New York on behalf of Bank Melli and Bank Saderat would draw unwanted attention.

237. In the spring of 2006, the Manhattan District Attorney's Office first discovered evidence of the conspiracy engaged in by certain European banks (including Defendants herein) on behalf of Iran and Iranian banks.

238. As the New York State Department of Financial Services ("DFS") later observed:

> By 2008 it was clear that this system of wire transfer checks had been abused, and that U.S. foreign policy and national security could be compromised by permitting U-Turns to continue. In November 2008, the U.S. Treasury Department revoked authorization for "U-Turn" transactions because it suspected Iran of using its banks – including the CBI/Markazi, Bank Saderat and Bank Melli – to finance its nuclear weapons and missile programs. *The U.S. also suspected that Iran was using its banks to finance terrorist groups, including Hezbollah, Hamas and the Palestinian Islamic Jihad, and engaging in deceptive conduct to hide its involvement in various other prohibited transactions, such as assisting OFAC-sanctioned weapons dealers*. [Emphasis added.]

239. These findings led to a wide-ranging investigation that ultimately resulted in the entry of a series of Deferred Prosecution Agreements ("DPAs") with Defendants (as well as other

European and Japanese banks), and it exposed catastrophic vulnerabilities in America's counter-financing of terrorism ("CFT") security architecture inherent in the U-Turn exemption because foreign banks, including Defendants herein, were actively conspiring with Iran (and the IRGC) to help it evade U.S. economic sanctions and secret hundreds of billions of dollars through the U.S. financial system undetected.

240.    On October 11, 2007, FATF released a statement of concern that "Iran's lack of a comprehensive anti-money laundering/counter-terrorist finance regime represents a significant vulnerability within the international financial system."

241.    The statement further noted that "FATF members are advising their financial institutions to take the risk arising from the deficiencies in Iran's AML/CFT regime into account for enhanced due diligence."

242.    The U.S. criminal investigations found that "the risk arising from the deficiencies in Iran's AML/CFT regime" ultimately included willful money laundering and terror financing by Iran with the *active*, *critical* assistance of Defendants herein.

243.    Based on figures from both the International Monetary Fund and the Central Bank of Iran, from 2004 through 2011, Iran's total revenues from oil and natural gas export sales totaled over $972.9 billion U.S. dollars, several billion of which were diverted by the IRGC to its support of terrorism via the IRGC–QF, Hezbollah, and its other terror proxies.

244.    Without Defendants' active and knowing assistance with its wrongful and illegal conduct, the IRGC could not have:

- Successfully transferred the same volume of U.S. dollar funds that it did through the international financial system;
- Surreptitiously transferred large amounts of these U.S. dollar funds for the benefit of the IRGC–QF, Hezbollah, and its Iraqi terror proxies; and
- Exploited the Iranian U-Turn exemption to blind U.S. regulators and law enforcement agencies to the degree, and for the duration, that it did.

245.     As former Manhattan District Attorney Robert M. Morgenthau pointedly told Congress in 2009, "the U-Turn exemption constituted a glaring hole that undermined both the enforcement of, and the rationale behind, the Iranian sanctions program."

246.     Effective November 10, 2008, OFAC revoked the U-Turn exemption in its entirety, and, as of that date, U.S. depository institutions were no longer authorized to process any Iranian U-Turn payments.

247.     In announcing the revocation of the U-Turn exemption on November 6, 2008, Treasury stated:

> The U.S. Department of the Treasury today announced that it is revoking the "U-turn" license for Iran, further restricting Iran's access to the U.S. financial system. Treasury's move today follows a series of U.S. government actions to expose Iranian banks' involvement in the Iranian regime's support to terrorist groups and nuclear and missile proliferation.

248.     As part of that announcement, Treasury further explained:

> Iran's access to the international financial system enables the Iranian regime to facilitate its support for terrorism and proliferation. The Iranian regime disguises its involvement in these illicit activities through the use of a wide array of deceptive techniques, specifically designed to avoid suspicion and evade detection by responsible financial institutions and companies. Iran also is finding ways to adapt to existing sanctions, including by turning to non-designated Iranian banks to handle illicit transactions.

> The Treasury Department is taking a range of measures, including today's action, to counter these deceptive activities.

249.     From that date forward, every financial institution was on formal notice that Iran and Iranian banks had exploited the U-turn" license to provide "support to terrorist groups."

## E. LETTERS OF CREDIT—AN ALTERNATIVE METHOD OF UNDERMINING THE IRANIAN SANCTIONS PROGRAM

### 1. Terminology

250. Letters of Credit ("LCs") are often used in international transactions to ensure that payment will be received. Due to the nature of international transactions, including factors such as the distance goods must travel, differing laws in each country, and the difficulty of trading parties knowing each party personally, the use of LCs has become a very important aspect of international trade.

251. The LC transaction process begins when an "Applicant" opens the Letter of Credit with a bank.

252. Normally, the Applicant is the purchaser of goods, and the LC is opened with his/her bank according to the terms and conditions of the purchase order and business contract between buyer and seller.

253. The "Beneficiary" of the LC is the party to the transaction who receives the payment amount agreed upon in the LC.

254. In order to receive payment for the goods, the Beneficiary company submits all required documents under the terms and conditions of the LC.

255. When an LC is required to be secured, an "Issuing Bank" agrees to guarantee payment for its customer upon the completion of the terms and conditions of the LC.

256. The Issuing Bank's role is to provide a guarantee to the seller that if the required documentation is presented, the bank will examine the documents and pay the contract sum if these documents comply with the terms and conditions set out in the LC.

257. Typically, the documents requested will include a commercial invoice, a transport document such as a bill of lading or airway bill, and an insurance document; there are many other

documents such as certificates of origin, packing lists, and inspection certificates that can be included. LC transactions deal in documents, not in the underlying goods themselves.

258.    An "Advising Bank" is usually a foreign correspondent bank of the Issuing Bank that will advise the beneficiary of the transaction. Generally, a Beneficiary of an LC wants to use a local bank to ensure that the LC is valid.

259.    In addition, the Advising Bank is usually responsible for sending the documentation to the Issuing Bank. Generally, the Advising Bank has no other obligation under the LC. If the Issuing Bank does not pay the beneficiary, the Advising Bank is not obligated to pay the obligation under the LC.

260.    The "Confirming Bank" is usually a correspondent bank that confirms the LC for the Beneficiary. At the request of the Issuing Bank, the Confirming Bank obligates itself to ensure payment under the LC.

261.    Because the Confirming Bank does not confirm the credit until it evaluates the country and bank where the LC originates, the Confirming Bank usually acts as the Advising Bank.

262.    In the middle of this serpentine process is the "Negotiating Bank," which negotiates documents delivered by the Beneficiary of the LC.

263.    The Negotiating Bank examines the drafts and/or documents and verifies and confirms the terms and conditions under the LC on behalf of the Beneficiary to avoid discrepancies.

264.    A Negotiating Bank gives value to, and relies upon (or may rely upon), such drafts and/or documents, and may purchase or agree to purchase the drafts and/or documents presented.

265.    A Reimbursing Bank usually pays part or all the amount due to the Beneficiary of the LC on behalf of the Issuing Bank once it receives a statement from the Negotiating Bank that

the documents required comply with the LC's terms; however, in certain cases a Reimbursing Bank serves only as a guarantor for the payment by the Issuing Bank.

### 2. The U.S. Trade Embargo – United States Munitions List (USML) and Commerce Control List (CCL)

266. For decades, U.S. trade with Iran has been carefully circumscribed by the International Traffic in Arms Regulations ("ITARs"), Export Administration Regulations ("EARs"), and Iran Trade Regulations ("ITRs").

267. Certain types of U.S. defense articles and defense services, such as nuclear or conventional weapon systems, are identified based on the ITARs promulgated by the U.S. Department of State and its Directorate of Defense Trade Controls through a publicly available United States Munitions List ("USML").[33]

268. In addition to USML items, certain types of U.S. dual-use products, such as nuclear materials, aerospace, and other potentially sensitive materials, are identified based on the EARs and ITRs by the U.S. Department of Commerce and its Bureau of Industry and Security ("BIS") on a publicly available Commerce Control List ("CCL").[34]

269. Dual-use items that are not published on the CCL by BIS are commonly referred to by U.S. manufacturers and shipping companies as "EAR99."

270. These EAR99 items generally consist of low-technology consumer goods and do not always require a license; however, shipment from the United States of an EAR99 item to Iran, or any other embargoed country, often requires disclosure to BIS in addition to a license from the Commerce Department.

---

[33]     *See*, United States Munitions List, 22 C.F.R. § 121.1 (2023), https://www.ecfr.gov/current/title-22/chapter-I/subchapter-M/part-121/subject-group-ECFRf7e5fe639be4566/section-121.1.

[34]     *See*, Commerce Control List, 15 C.F.R. § 774 (2023), https://www.ecfr.gov/current/title-15/subtitle-B/chapter-VII/subchapter-C/part-774.

271. One of the aims of the conspiracy was to evade the U.S. ITARs, ITRs, and EARs—and also various EU decisions and UN Security Council Resolutions—prohibiting Iran from conducting both conventional weapons-trafficking and WMD proliferation.

272. To facilitate this aim, the IRGC, used LCs drawn on the CBI and other Iranian banks (and "stripped" the underlying payment orders), to clandestinely obtain and transport goods, technologies, and weapons that were listed on the USML and/or CCL.

273. Because the IRGC and Hezbollah needed to transport their terrorist operatives and weapons into Iraq, U.S. export-controlled item acquisitions financed by Letters of Credit were instrumental in facilitating the activities of these terrorist organizations, including, but not limited to, helping Iran acquire component parts and technologies used to make the IEDs, EFPs, and Improvised Rocket-Assisted Munitions ("IRAMs") that were deployed by the Iraqi Special Groups against Coalition Forces.

## F. THE FINANCIAL ACTION TASK FORCE AND IRAN'S BANKING SECTOR

274. FATF was established in July 1989 by a Group of Seven (G–7) Summit in Paris, initially to examine and develop measures to combat money laundering.

275. FATF is the inter-governmental body that sets international standards for AML/CFT, conducts so-called "mutual" evaluations of countries against these standards, and publicly identifies jurisdictions that fail to address deficiencies in those areas.

276. Originally focused on AML, FATF in October 2001 expanded its mandate to incorporate efforts to combat terrorist financing, in addition to money laundering.[35]

---

[35] *See*, "History of the FATF" Financial Action Task Force (2023), https://www.fatf-gafi.org/en/the-fatf/history-of-the-fatf.html. The "originator" is the party seeking to send funds; the "beneficiary" is the intended recipient.

277.    Specifically, FATF's Special Recommendation VII stated that countries should take measures to require financial institutions to include accurate and meaningful originator information on funds transfers and related payment messages.[36]

278.    FATF further stated that member countries should closely monitor any funds transfers that did not contain complete originator information.

279.    Since 2008, FATF has maintained two separate lists of jurisdictions with strategic AML/CFT deficiencies: (1) a so-called "black" list for high-risk jurisdictions where member states are recommended to apply countermeasures to protect the international financial system from AML/CFT risks posed by these jurisdictions and (2) a so-called "grey" list, reserved for countries that have worked with FATF on developing an action plan to address their deficiencies and who have made a high-level political commitment to complete the plan.

280.    Iran has been on FATF's "black" list since it was introduced in 2008.[37] During the Relevant Period, Iran was never compliant with FATF's international standards.

281.    In 2010, FATF publicly expressed concern regarding the Iranian regime's flagrant money-laundering and terrorist financing activities:

> Iran's failure to meaningfully address the ongoing and substantial deficiencies in its anti-money laundering and combating the financing of terrorism (AML/CFT) regime.
>
> The FATF remains particularly concerned about Iran's failure to address the risk of terrorist financing and the serious threat this poses to the integrity of

---

[36]     In 2012, FATF updated and revised its recommendations, resulting in a re-numbering of the recommendations. Currently, FATF recommendation 16 relating to wire transfers continues to advise countries to ensure that "financial institutions include required and accurate originator information, and required beneficiary information, on wire transfers and related messages, and that the information remains with the wire transfer or related message throughout the payment chain." The updated version of the recommendations is available at: https://www.fatf-gafi.org/content/dam/fatf-gafi/recommendations/FATF%20Recommendations%202012.pdf.

[37]     In June 2016, FATF temporarily suspended countermeasures for twelve months in order to monitor Iran's progress in implementing the Action Plan. In return, Iran pledged to improve controls to help counter the financing of terrorism and other illicit financial conduct rampant within the Iranian financial system.

the international financial system. The FATF urges Iran to immediately and meaningfully address its AML/CFT deficiencies, by criminalizing terrorist financing and effectively implementing suspicious transaction reporting (STR) requirements.[38]

282.    In February 2020, FATF reinstated full countermeasures on Iran, citing specifically "Iran's failure to enact the Palermo and Terrorist Financing Conventions in line with the FATF Standards."[39]

283.    A significant obstacle was Iran's exemption of "liberation organizations" from counter-terrorist financing provisions—which in practical terms means state-sponsorship of terrorism exemptions for among others, terrorist groups such as Hezbollah, its Iraqi Shi'a proxies, and Hamas.

284.    For example, Iranian legislation ratifying the UN Convention on the Suppression of the Financing of Terrorism noted that Iran's recognition of "the struggles of peoples against colonial domination and foreign occupation" does not allow it to recognize the convention's "written framework of terrorism."

285.    Likewise, a subsequent bill containing amendments to Iran's CFT law noted that terrorist designations will only be issued in line with Article 154 of the Iranian constitution, which supports "the struggles of the oppressed for their rights against oppressors anywhere in the world."

286.    Although FATF only requires that countries implement UN-level sanctions, which do not list Iranian-sponsored groups such as Hamas and Hezbollah, similar CFT exemptions have not been acceptable to FATF in the past.[40]

---

[38]    *FATF Public Statement–February 2010*, FINANCIAL ACTION TASK FORCE (2010), https://www.fatf-gafi.org/en/publications/High-risk-and-other-monitored-jurisdictions/Fatfpublicstatement-february2010.html.

[39]    *High-Risk Jurisdictions Subject to a Call for Action–21 February 2020*, FINANCIAL ACTION TASK FORCE (2020), http://www.fatf-gafi.org/publications/high-risk-and-other-monitored-jurisdictions/documents/call-for-action-february-2020.html.

287. Significantly, on October 11, 2018, FinCEN issued an Advisory on the Iranian Regime's Illicit and Malign Activities and Attempts to Exploit the Financial System which warned financial institutions the Iranian regime uses "covert means" to access the financial system:

> to further its malign activities includ[ing] misusing banks and exchange houses, operating procurement networks that utilize front or shell companies, exploiting commercial shipping, and masking illicit transactions using senior officials, including those at the Central Bank of Iran (CBI)…. Often, these efforts serve to fund the regime's nefarious activities, including providing funds to the Islamic Revolutionary Guard Corps (IRGC) and its Islamic Revolutionary Guard Corps–Qods Force (IRGC–QF), as well to Lebanese Hezbollah, Hamas, and other terrorist groups.[41]

## G.  THE IRGC'S REVENUE SOURCES, FINANCING MECHANISMS AND KEY COMMERCIAL ASSETS

288. During the Relevant Period and even today, the IRGC has financed much of its operations through a web of commercial companies and foundations in Iran and transnationally.

289. As a state-sponsored terrorist organization, the IRGC operates as a part of Iran's dual or parallel military establishments[42] and receives its baseline funding through the country's national budget, which is approved by the Iranian Parliament (*Majlis*) and sanctioned by Supreme Leader Ali Khamenei.

290. Yet, because the IRGC and IRGC–QF report directly to Ayatollah Khamenei, he also provides them "off-the-books" funding sourced from oil reserves given to the IRGC and

---

[40]     Katherine Bauer, *Iran Faces Challenges in Implementing Its FATF Action Plan*, WASHINGTON INSTITUTE (Oct. 26, 2016), https://www.washingtoninstitute.org/policy-analysis/view/iran-faces-challenges-in-implementing-its-fatf-action-plan. *See also* Remarks by Treasury Assistant Secretary for Terrorism Financing Daniel L. Glaser at The Washington Institute for Near East Policy (Oct. 21, 2016), https://www.washingtoninstitute.org/policy-analysis/view/the-evolution-of-terrorism-financing-disrupting-the-islamic-state.

[41]     FINANCIAL CRIMES ENFORCEMENT NETWORK, ADVISORY ON THE IRANIAN REGIME'S ILLICIT AND MALIGN ACTIVITIES AND ATTEMPTS TO EXPLOIT THE FINANCIAL SYSTEM (2018) https://www.fincen.gov/sites/default/files/advisory/2018-10-12/Iran%20Advisory%20FINAL%20508.pdf.

[42]     The IRGC in some ways resembles Iran's conventional military, but it operates largely separately and above the Iranian armed forces and answers directly to the Supreme Leader.

IRGC–QF for their own uses and funding from Islamic charity donations channeled through Iran's *bonyads*, which are nominally charitable trusts (often controlled by the IRGC) operating with little or no transparency.

291.    Furthermore, IRGC leaders and operatives, operating through affiliates and front-companies, engage in enormous quantities of trade-based money laundering, smuggling of state-owned resources (especially oil), trafficking in proscribed items, and organized fraud schemes worth billions of U.S. dollars annually.

292.    Illicit financial crime networks operated by the IRGC and IRGC–QF fuel domestic and foreign influence while undermining Iran's market integrity, trade transparency, and rule of law.

293.    Many IRGC-linked entities, including the IRGC's flagship engineering and construction enterprise, *Gharargah Sazandegi-ye Khatam al-Anbia* ("Khatam al-Anbia" or "GHORB"), derived their revenues from the IRGC's control of the sale of Iranian crude oil, refined petroleum products, and natural gas.

294.    During the Relevant Period and even today, the IRGC controlled the National Iranian Oil Company and its subsidiaries, including the National Iranian Tanker Company, National Iranian Oil Refining and Distribution Company ("NIORDC"), and the National Petrochemical Company ("NPC").

295.    NIOC, overseen by Iran's Ministry of Petroleum, is responsible for the exploration, production, refining, and export of oil and petroleum products in Iran.

296.    NITC, a subsidiary of NIOC, is responsible for transporting Iranian crude oil exports around the world.

297. NIOC and NITC provide both the Iranian oil and the tankers to transport it for the extensive oil sales conducted by the IRGC.

298. Specifically, during the Relevant Period, NIOC coordinated with the CBI to collect proceeds from IRGC oil sales, amounting to hundreds of millions of dollars that directly benefited the IRGC.

299. Meanwhile, NITC provided Iranian tankers to transport the oil sold by the IRGC to its international customers.

300. Together, they provided vital assistance to the IRGC's extensive oil trading activities and crucial access to Eurodollars from foreign buyers to support its terrorist operations.

301. The coordination spanned Iran's state oil sector, banking system, and transportation industries specifically to aid the IRGC in selling Iranian oil abroad, collecting payments, transferring funds, and directing those funds to support IRGC and IRGC–QF weapons programs and terrorist activities.

302. The IRGC's involvement in Iran's oil and natural gas sector became widely known after the ascension of Mahmoud Ahmadinejad as President of the Iranian government in 2005.[43]

303. Mr. Ahmadinejad's appointed Energy Ministers were uniformly allied with or part of the IRGC establishment, advancing the IRGC's energy interests including possessing veto power over contracts, visibility into budget planning, and a dominant position overseeing crude oil and natural gas output quotas.

304. At various operational and functional levels, and with Mr. Ahmadinejad's backing, former IRGC officers gained control of NIOC's and NITC's oversight councils, pipeline operations

---

[43] Because the entire Iranian regime is answerable to the Office of the Supreme Leader, and the IRGC serves as an executive arm of the Supreme Leader, Ahmadinejad's formal moves added a more formal (de jure) gloss to a power structure that already existed (de facto).

boards, and shipping management, and had the opportunity to place loyalists across the state-owned entities' respective bureaucracies.

305. Under Mr. Ahmadinejad's presidency from 2005 to 2013, GHORB and IRGC construction giant Sepasad Engineering Company,[44] among other IRGC-affiliated enterprises, were awarded natural resource extraction and infrastructure contracts without open tender.

306. According to the U.S. Department of Treasury, in 2006, GHORB "secured deals worth at least $7 billion in the oil, gas, and transportation sectors, among others."[45]

307. Mr. Ahmadinejad also spearheaded the privatization of various state-owned energy assets, transferring ownership or control stakes to Iranian firms affiliated with or controlled outright by the IRGC and its network of subsidiaries.

308. On November 30, 2009, an article in *Newsweek* titled "Iran's Dirty Hands" stated the following regarding the Ahmadinejad regime's privatization of the Telecommunication Company of Iran:

> Last week a special parliamentary commission blasted the government's privatization efforts, which have been riddled with backdoor dealings. One shady transaction was singled out: the recent $7.8 billion sale of the Telecommunication Co. of Iran, which the commission says was essentially handed over to the Revolutionary Guards (or IRGC), *whose only competitor in the bidding process was fictitious*. And this sale was just one sign of the surging economic power of the Guards. [Emphasis added.]

309. The IRGC and IRGC–QF also utilize relationships with banks and front companies operating in, among other jurisdictions, Bahrain, Germany, Iraq, Lebanon, Oman, Turkey, UAE,

---

[44]     In October 2010, OFAC designated Sepasad Engineering Company as an entity "owned or controlled by the IRGC and its leaders." Fact Sheet, *Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism*, U.S. Dep't of Treasury (Oct. 27, 2007), https://home.treasury.gov/news/press-releases/hp644.

[45]     *Id.*

and the United Kingdom to place, layer, and integrate funds (the core steps of money laundering) from its illicit revenue streams.

310.     Much of the IRGC's revenue flowed at its direction through the CBI, Bank Saderat, Bank Melli, and other Iranian banks that Defendants and other banks actively concealed using various illegal methods detailed herein.

311.     However, the IRGC and Hezbollah's BAC did not depend solely on Iranian banking conduits; a substantial portion of their illicit activity flowed through exchange houses, front companies, and diamond, gold, and other trading platforms that were also opaque and well suited to black market dealings.

312.     In the UAE alone, the IRGC and IRGC–QF were tied to over 130 front companies which generate profits of over $80 million U.S. dollars per month that ultimately flow back to the IRGC's budget. Most of these companies (as well as the Iranian banks operating in the UAE) did not attempt to conceal their Iranian provenance. On the contrary, it was precisely the reason these nominally commercial entities sought access—through UAE branches—to Western banks like Defendants herein.

     **1.     PUBLIC SOURCES LINKING NIOC AND THE IRANIAN PETROCHEMICAL INDUSTRY TO THE IRGC**

313.     Both the IRGC's relationship with NIOC and NIOC's long-standing involvement in Iran's violent and malevolent activities, have been widely reported for years.

314.     According to an August 4, 1985, *Los Angeles* Times article titled "Billion-Dollar Iran Arms Search Spans U.S., Globe," NIOC's London headquarters, called "NIOC House," was a key site for the IRGC's weapons smuggling operations dating back to the 1980s.

315.     The *Los Angeles Times* article noted that Iranian weapons smuggling operations— that is, "Iran's global effort to keep its military machine operating"—were run from a "well-

guarded, seven-story, modern building at 4 Victoria St., London" called "NIOC House because the National Iranian Oil Company is headquartered here."

316. Furthermore, the article described how the NIOC House was also home to the Islamic Republic of Iran Air Force and its Logistics Support Center and the Iranian Navy and its Technical Supply Office.

317. According to the article, the building "has an empty look to it," and "[u]niformed guards stand behind locked, smoked glass doors, moving quickly to the doors when strangers approach. A sign in Persian and English warns those who approach to have their passes ready."

318. From those offices, "neatly typed but sometimes badly misspelled orders for munitions, parts and giant war machines are issued."

319. The investigation published an example of such an order dated September 1984, in which Iran purchased radar parts for nearly $300,000 U.S. dollars.

320. A September 3, 1985, *Los Angeles Times* article called NIOC House "the command center of Iran's multibillion-dollar campaign to acquire American-made weapons and military supplies."

321. An interviewed British government official commented: "It is one of the most secure buildings in London. It is quite a stronghold, solidly built with discreet security."

322. A December 27, 1986, article in *The Daily Telegraph* titled "London base for Iranian arms search" described Iran's use of London's NIOC House to purchase arms since 1981, detailing how "the top three floors of this soulless glass and concrete building opposite the Department of Trade and Industry is given over to Iran's logistics centre or revolutionary guards." Security for the building "verges on the obsessive"; "visitors are vetted by uniformed security guards and their briefcases passed through an X-ray machine."

323.     A September 24, 1987, article in the *New York Times* titled "British Shut Down Iran Arms Office," reported that the UK shut down the Iranian Military Procurement Office, an operation with over fifty employees located in NIOC House.

324.     Five months later, the British paper *The Observer* published an article on February 28, 1988, titled "London Arms Ban Ignored," describing how "Iranian Revolutionary Guards and army officers, posing as employees of Iran's state oil company, are continuing to use London as an arms purchasing centre, five months after the Government ordered a ban on such activities."

325.     *The Observer*'s article detailed how as many as thirty employees working in NIOC's offices in Westminster "are involved in clearing world-wide purchases of military equipment."

326.     Iran's pre-ban arms purchases through London had amounted to over $2.5 billion U.S. dollars a year, and subsequent trading had returned to about half the pre-closure level.

327.     The article specified how the transactions were completed: "Expelled military procurement staff, now scattered throughout Europe, keep in daily contact with colleagues at NIOC House."

328.     When the Iranian Defense Ministry publicizes that it wants to purchase a certain piece of equipment, "[t]he role of the army officers and Revolutionary Guards at NIOC House is to check on the sustainability and condition of the equipment being offered, authorize the financial transaction and arrange shipment if necessary."

329.     Not only was the IRGC's use of NIOC House as an armament smuggling operation well publicized, *two Defendants in* this *case had offices in that building during the Relevant Period*.

330.     According to Barclay's 2019 annual Form 20–F report filed with the SEC, Barclays has rented space in the NIOC House from NIOC, starting in 1979 and terminating in 2039. HSBC was also listed as an existing tenant.

331.     Later published reports again pointed to the close nexus between NIOC and the IRGC.

332.     On June 26, 2005, the Iranian daily newspaper *Farhang-e Ashti* reported the following regarding the IRGC's expanding role in Iran's domestic economy:

> With the coming to power of the ninth government came expanded military involvement in economic projects. The military, particularly the Islamic Revolution Guards Corps [IRGC], are mostly involved in oil projects—the most important economic projects in the country. Awarding two no-bid oil contracts without any formalities to the Khatam-al-Anbiya Base within a one-month period marks the beginning of military involvement in national oil projects.

333.     On July 1, 2005, the oil industry trade publication *Upstream* reported the following regarding the Iranian regime's corrupt government contracting practices with IRGC-affiliated entities:

> Another open question is the status of commercial companies affiliated to the Revolutionary Guard and to militia groups and the security agencies, all of which would expect a supporting hand from their friend in the presidency.
>
> The Revolutionary Guards Construction Corps has, for example, been playing a major role in tenders for oil and gas projects—most recently in an abortive tender round with Aker Kvaerner of Norway in Phases 15 and 16 of the South Pars project.

334.     On November 19, 2005, *United Press International* reported that Iranian President Ahmadinejad had "purged senior figures from the Iranian Foreign Ministry and Oil Ministry, to replace them with his own loyalists, many of them from the Pasdaran (Revolutionary Guard)."

335.    On December 12, 2005, the *Arab Press Service* published an article titled "Iran's Petroleum Sector Is Being Taken Over by Revolutionary Guards" that stated the following about the IRGC's expanding role in NIOC:

> Staging a military coup d'état gradually, the Islamic Revolutionary Guards Corps (IRGC) is about to take over Iran's petroleum sector. On the sidelines of a conference in Tehran backed by the state-owned National Iranian Oil Co. (NIOC) and the Petroleum Ministry, Iranian executives said over 400 managers in this sector would be replaced by IRGC appointees.

336.    On May 17, 2006, the Iranian daily newspaper *Farhang-e Ashti* quoted a report by the official Fars news agency quoting IRGC spokesman Seyyed Ahmad Mohy'eddin Morshedi:

> Many are not familiar with the Corps in all its aspects. The Corps' involvement in various sectors including oil and petrochemical, road building, information technology and health as well as its military and civilian inventions remain unknown.

337.    On June 28, 2006, *Dow Jones Newswires* reported the following regarding a multi-billion U.S. dollar construction contract being set-aside for the IRGC's Khatam al-Anbiya:

> Iran is about to award a lucrative gas deal to the country's Revolutionary Guards, a senior Iranian oil official said Wednesday. The official, speaking to *Dow Jones Newswires* on condition of anonymity, said Iranian contractor Ghorb, will be awarded a $2.3 billion contract to develop phases 15 and 16 of Iran's giant South Pars gas field…. The Revolutionary Guard, Iran's elite militia, is a key shareholder in Ghorb.

338.    The *Wall Street Journal* reported on July 26, 2006, that "Iran's Revolutionary Guard is set to win multibillion-dollar energy contracts, as foreign companies weigh the country's nuclear-power standoff with the West and its president tightens his grip on hydrocarbon resources."

339.    The *Wall Street Journal*'s article further reported the following regarding President Ahmadinejad's support for the IRGC's non-military activities:

> The Revolutionary Guard's foray into Iran's energy sector is raising concerns in the international community and with Iranian officials. A senior Iranian government official said the Guard has considerable influence under the president and can now participate in the tender process for new oil

projects. '[The president] wants their support and in return will give them weight,' the official added.

340. The *Wall Street Journal* article stated that Mr. Ahmadinejad was previously a "key figure" in the IRGC and noted the following regarding the IRGC's influence over Iranian import and export revenues:

> The Revolutionary Guard has a number of other large oil and gas projects in its sights, Iranian industry officials say. Ghorb, headed by Abdul-Reza Abed, a military man, is reported by local media to be in talks to buy Oriental Oil Kish, an Iranian firm. The Guard holds sway over a number of enterprises in Iran, especially imports and exports, and has been heavily involved in creating the Islamic nation's infrastructure.[46]

341. The *Wall Street Journal* reported on October 14, 2006, on the IRGC's "commercial" growth:

> The secretive paramilitary group, according to the U.S., arms both violent Shiite militias in Iraq and Hezbollah, the Lebanese group that fought a war with Israel this summer. It runs feared prisons inside Iran. The Revolutionary Guard also has a big role that is less understood in the West: an active player in business.
>
> It builds highways and tunnels. Two years ago it muscled aside a Turkish firm that had a contract to run a new Tehran airport. Now the Revolutionary Guard is making an aggressive push into the backbone of Iran's economy, its oil and gas fields, one of the world's richest troves of fossil fuel.
>
> In June, a Revolutionary Guard engineering group won a $2.3 billion contract to develop part of a big gas field in Iran's part of the Persian Gulf.

342. The *Wall Street Journal Europe* reported on November 7, 2006, the following regarding Khatam al-Anbiya's massive contract award:

> Mr. Ahmadinejad caused some alarm in July when he awarded a $2.3 billion contract to the engineering arm of Iran's Revolutionary Guard, Khatam-al-Anbiya Construction Headquarters, or Ghorb, to develop two future phases of South Pars [oil fields].

---

[46] During the Relevant Period, SCB's "Iran Group" processed foreign exchange forward transactions worth over $2 million U.S. dollars for Oriental Oil Company FZE.

343.    On August 11, 2006, the *Middle East Economic Digest* ("*MEED*") reported the

following regarding the IRGC's rise to power under President Ahmadinejad:

> For nearly two years, Iranian political analysts have watched the seemingly
> unstoppable rise of the Islamic Revolutionary Guards Corps (IRGC) to top
> positions across the government. The fact that many former guardsmen now
> hold senior positions in every branch of power is undeniable.

344.    MEED's report further noted the following about the depth of the IRGC's takeover

of middle-management positions in both government and commercial entities:

> What has concerned some analysts is the extent to which guardsmen are
> taking second-tier positions in ministries and other government institutions,
> as well as their rise to top positions in state-owned companies. The head of
> Iran Khodro, the Middle East's largest carmaker, Manouchehr Manteghi is
> a former IRGC general. Others have major positions in Oil Ministry
> companies.

345.    On September 5, 2007, *Time* magazine published an article titled "Iran's Rich

Revolutionary Guard," noting that the IRGC is:

> [N]otorious in the West as the troublemaking arm of the Islamic Republic,
> accused of supporting Hezbollah and other militant groups, destabilizing
> the Iraqi government, and nurturing a covert nuclear weapons program.
> Inside Iran itself, however, the image of the Guards is more that of an
> economic powerhouse, with more influence and assets than even the Tehran
> bazaar, the institution whose cash has traditionally helped drive the
> country's politics.

346.    The *Time* article went on to detail some of the IRGC's involvement in the Iranian

oil industry:

> Since around 2000, the IRGC's hand has extended into new and far more
> lucrative sectors of the economy. Most significantly, it has been awarded
> billions of dollars in contracts in the oil, gas and petrochemical industries,
> as well as major infrastructure projects. The government awards some of
> the no-bid contracts directly to the Guard's engineering arm, Khatam Al-
> Anbia. Other times, the link is more indirect: "Sometimes you see newly
> established firms, indirectly owned by IRGC members, receiving the
> contracts," says a director of a major engineering firm on condition of
> anonymity.

347.    An August 16, 2007, article in the *Wall Street Journal Europe* titled "Leading the News: Can the U.S. step up pressure on Iran?" reported that "Treasury officials have barnstormed Europe to explain to bank regulators and executives there how Iran is using its financial system to allegedly further illicit activities."

348.    The *Wall Street Journal Europe* further noted that "[e]xperts say the IRGC controls more than 100 companies in Iran, many of which, such as the engineering giant Khatam al-Anbia, are involved in huge infrastructure and oil- and gas-pipeline projects."

349.    On October 22, 2007, the American Enterprise Institute ("AEI") (Washington, DC) published a report entitled, "How Intertwined Are the Revolutionary Guards in Iran's Economy?"

350.    AEI's report states the following regarding the Iranian regime's directive to transfer state-owned company profits to the IRGC:

> On June 11, 2003, the Ministry of Defense and Armed Forces Logistics issued a directive calling upon 'units designated and identified by the Islamic Revolution's Guard Corps…the Islamic Republic Army, Ministry of Defense and Armed Forces Logistics and its affiliated institutions' to act as contractors in development schemes and projects. Any profit, the directive continued, should be 'transferred to the Chancery,' which in turn would fund not only the contract in question, but would use any surplus to purchase and upgrade equipment for the Revolutionary Guards and fund its other activities. The IRGC claims the right to involve itself in any project under the guise of 'supporting the programs of the government of the Islamic Republic' and to mobilize the Basij, a para-military volunteer force affiliated with the IRGC, to advance economic development.[47]

351.    On October 25, 2007, the U.S. Department of Treasury designated many IRGC-related entities, including the IRGC–QF, as SDGTs, noting that the IRGC "runs prisons, and has numerous economic interests involving defense production, construction, and the oil industry."

---

[47]    Ali Alfoneh, *How Intertwined Are the Revolutionary Guards in Iran's Economy?*, AMERICAN ENTERPRISE INSTITUTE (Oct. 22, 2007), https://www.aei.org/research-products/report/how-intertwined-are-the-revolutionary-guards-in-irans-economy (citing, MINISTRY OF DEFENSE AND ARMED FORCES, "Logistics Implementation Directive," June 11, 2003, as quoted in *Official Gazette*, ISLAMIC REPUBLIC OF IRAN, June 28, 2003).

352.    On February 10, 2010, the U.S. Department of Treasury designated multiple IRGC-controlled companies, noting the following regarding the IRGC's presence in Iran's markets:

> IRGC has a growing presence in Iran's financial and commercial sectors and extensive economic interests in the defense production, construction, and oil industries, controlling billions of dollars of business. The profits from these activities are available to support the full range of the IRGC's illicit activities, including WMD proliferation and support for terrorism.

353.    The U.S. Department of Treasury concluded the following regarding the IRGC's role in Iran's economy:

> In practice … the IRGC's domination of the oil and gas sectors and the hard currency-generating import-export business means that bolstering trade strengthens not moderate forces, but the most hard-line segment of society in the Islamic Republic.

354.    On February 15, 2010, the *Guardian* published an article titled, "The Financial Power of the Revolutionary Guards," reporting that the IRGC's Khatam al-Anbia won "a succession of huge no-bid contracts," including a contract worth $1.3 billion U.S. dollars to build a natural gas pipeline and a contract worth $2.5 billion U.S. dollars to build infrastructure in Iran's South Pars oil field.

355.    The *Guardian*'s article further quotes a former IRGC founder, describing the designated terrorist organization as:

> [A] very strange and unique organization…. It's also like a huge investment company with a complex of business empires and trading companies, while also being a de facto foreign ministry through the Qods force, which controls relations with countries in the region. They are involved in smuggling drugs and alcohol. I know of no other institution like the Revolutionary Guards.

356.    On February 16, 2010, the German magazine *Spiegel* published an article titled "Revolutionary Guards Keep Stranglehold on Iran," which quoted former IRGC founder Mohsen

Sazegara, who observed that the IRGC is "a unique mixture of army and militia, terrorist organization and mafia—a state within a state."

357.     The *Spiegel* article goes on to state that apart from the IRGC's general control of Iran's oil industry, it tolerates no competition:

> Iranian business owners in Tehran still remember how, in August 2006, Revolutionary Guards, their weapons at the ready, took a military boat out to the Orizont drilling platform and boarded the platform. A short time later, the largest privately owner Iranian oil producer abandoned the well, and from then on the proceeds from Orizont's oil went directly into the coffers of the Pasdaran [i.e., the IRGC].

## 2.     NIOC/NITC WERE CONTROLLED BY THE IRGC AND ARE CLOSELY INTERTWINED WITH ITS TERRORIST ACTIVITIES

358.     In 2019, the U.S. Department of Treasury designated a worldwide Iranian petroleum shipping network originating with NIOC for "financially support[ing] [the IRGC–QF] and its terror proxy Hezbollah" in a "vast oil-for-terror shipping network."

359.     It found that the shipping network "is directed by [the IRGC–QF] and its terrorist proxy Hezbollah," and that "[t]he IRGC–QF also relies heavily on Hezbollah officials and front companies to broker associated contracts," and it declared "that those purchasing Iranian oil are directly supporting Iran's militant and terrorist arm, [the IRGC–QF]."

360.     Notably, according to the U.S Department of Treasury, the network was overseen by senior IRGC–QF official and former Iranian Minister of Petroleum (2011–2013) Rostam Qasemi.[48]

---

[48]     Prior to serving as Minister of Petroleum and Chairman of NIOC, Mr. Qasemi was Commander of the IRGC's Khatam al-Anbiya (or GHORB) construction conglomerate. In 2010, Mr. Qasemi was first designated under E.O. 13382 for his role in Khatam al-Anbiya and, in 2019, further designated as a terrorist under E.O. 13224, along with the broader petroleum-shipping network that he oversaw. *See*, Press Release, *Treasury Targets Iran's Islamic Revolutionary Guard Corps*, U.S. DEP'T OF TREASURY (Feb. 10, 2010), https://home.treasury.gov/news/press-releases/tg539.

361.     In January 2020, the U.S. Department of Treasury reaffirmed that NIOC finances the IRGC–QF and "its terrorist proxies," and designated four international petrochemical and petroleum companies.

362.     The U.S. Department of Treasury stated the following regarding the four IRGC–QF supporting entities:

> [They] have collectively transferred the equivalent of hundreds of millions of dollars' worth of exports from the National Iranian Oil Company (NIOC), an entity instrumental in Iran's petroleum and petrochemical industries, which helps to finance Iran's Islamic Revolutionary Guard Corps–Qods Force (IRGC–QF) and its terrorist proxies.[49]

363.     A month later, OFAC designated five additional UAE-based companies for having "purchased hundreds of thousands of metric tons of petroleum products from [] NIOC []."

364.     The U.S. Department of Treasury again stressed that "Iran's petroleum and petrochemical industries are major sources of revenue for the Iranian regime, which has used these funds to support the Islamic Revolutionary Guard Corps–Qods Force's (IRGC–QF) malign activities throughout the Middle East, including the support of terrorist groups."[50]

365.     NIOC and its NITC subsidiary were ultimately formally designated as SDGTs by the U.S. Department of Treasury in 2020.

366.     The U.S. Department of Treasury stated the following reasons for jointly designating NIOC and NITC as terrorist organizations:

---

[49]     Press Release, *Treasury Targets International Network Supporting Iran's Petrochemical and Petroleum Industries*, U.S. DEP'T OF TREASURY (Jan. 23, 2020), https://home.treasury.gov/news/press-releases/sm885.

[50]     Press Release, *Treasury Targets Companies Facilitating Iran's Petroleum Sales*, U.S. DEP'T OF TREASURY (Mar. 19, 2020), https://home.treasury.gov/news/press-releases/sm949. Treasury also designated Iran's largest petrochemical holding group, Persian Gulf Petrochemical Industries Company ("PGPIC"), for providing financial support to U.S.-designated Khatam al Anbiya, along with its vast network of thirty-nine subsidiary petrochemical companies and foreign-based sales agents. Press Release, *Treasury Sanctions Iran's Largest Petrochemical Holding Group and Vast Network of Subsidiaries and Sales Agents*, U.S. DEP'T OF TREASURY (Jun. 7, 2019), https://home.treasury.gov/news/press-releases/sm703.

[They] provide both the oil and tankers for the sale of Iranian oil by the IRGC–QF. The cooperation and coordination between the IRGC–QF and these entities extends well beyond the simple sale of oil, including coordination between NIOC and the Central Bank of Iran to facilitate the collection of tens of millions of dollars in proceeds from the sale of oil that benefitted the IRGC–QF.

367.    The U.S. Department of Treasury further noted the following regarding the historical role of NITC and NIOC in supporting both the IRGC–QF and Hezbollah:

NITC has also played a significant role in oil deals used to generate revenue for the IRGC–QF and Hezbollah. NITC personnel coordinated with the IRGC–QF on the loading of oil provided by NIOC, and NITC Managing Director Nasrollah Sardashti (Sardashti) worked with Hezbollah on logistics and pricing for oil shipments to Syria.[51]

368.    The reference to Hezbollah in the designations of NIOC and NITC reflects the symbiotic relationship between Hezbollah and the IRGC and their deep coordination in both financial and operational matters.

369.    Previously, the Iran Threat Reduction and Syria Human Rights Act 2012 stated that:

It is the sense of Congress that the National Iranian Oil Company and the National Iranian Tanker Company are not only owned and controlled by the Government of Iran but that those companies provide significant support to Iran's Revolutionary Guard Corps and its affiliates.[52]

370.    The U.S. Department of Treasury also announced in 2012 that it found NIOC to be "an agent or affiliate of the" IRGC.

---

[51]    Press Release, *Treasury Sanctions Key Actors in Iran's Oil Sector for Supporting Islamic Revolutionary Guard Corps-Qods Force*, U.S. DEP'T OF TREASURY (Oct. 26, 2020), https://home.treasury.gov/news/press-releases/sm1165.

[52]    Iran Threat Reduction and Syria Human Rights Act of 2012, Pub. L. 112–158, 126 Stat. 1214, codified as amended at 112 U.S.C. § 202.

371.    In reporting its finding, the U.S. Department of Treasury emphasized the IRGC's "support for terrorism" and "history of attempting to circumvent sanctions by maintaining a complex network of front companies."

372.    In 2019, the U.S. Department of Treasury again noted that "[t]he international community must vehemently reject Iranian oil and related products in the same way that it rejects the violent acts of terrorism these [oil-for-terror] networks fund."[53]

373.    The IRGC's leadership worked with Hezbollah to cultivate a variety of means for smuggling oil to finance their joint terrorist activities during the Relevant Period.

374.    For example, in 2019 the U.S. Department of Treasury designated multiple IRGC officials and co-conspirators, noting that:

> The IRGC–QF also uses several front companies to mask its role in selling the crude oil, condensate, and gas oil. The companies are overseen by Hezbollah officials Muhammad Qasir and Muhammad Qasim al-Bazzal (al-Bazzal), both of whom were designated pursuant to E.O. 13224 in 2018 in connection with another oil-for-terror scheme.[54]

375.    In another instance, the U.S. Department of Treasury designated Sitki Ayanhas and his extensive business network for facilitating and concealing the sale and shipment of Iranian NIOC oil sold on behalf of the IRGC–QF and in partnership with senior IRGC–QF officials, including former IRGC–QF official Rostam Ghasemi (NIOC's former chairman) who "previously played a central role in facilitating shipments of oil and petroleum products for the financial benefit of the IRGC–QF."

---

[53]    Press Release, *Treasury Designates Vast Iranian Petroleum Shipping Network That Supports IRGC–QF and Terror Proxies*, U.S. DEP'T OF TREASURY (Sept. 4, 2019), https://home.treasury.gov/news/press-releases/sm767.

[54]    *Id.*

376. The same pattern of close coordination between the IRGC and Hezbollah in, among other arenas, the illicit sale of Iranian crude oil, can be seen in the efforts of Hezbollah operative Muhammad Bazzi's efforts to broker sales of Iranian oil in Africa.

### 3. IRGC'S CRUDE OIL EXPORTS TO CHINESE REFINERIES

377. During the Relevant Period, the IRGC facilitated the substantial growth of Iranian oil exports to China, rising from seven percent of Iran's total oil exports in 2004 to 25 percent by 2011.

378. This trade, which was priced in U.S. dollars, required illegal methods to circumvent sanctions on Iran's sale of oil in dollars, a fact understood by Defendants, crude oil customers in Asia and middlemen and oil brokers around the world.

379. Much of this flowed from four IRGC-controlled entities: NIOC, National Iranian Gas Company ("NIGC"), National Iranian Oil Refining and Distribution Company ("NIORDC"), and the NPC.[55]

380. For the IRGC, generating "off-the-books" revenue by selling crude oil accounted for a substantial part of its operating budget and financed its acts of international terrorism.

381. For its part, the Chinese government secured a steadily increasing supply of Iranian crude oil for its national oil companies—China National Petroleum Corporation ("CNPC"), China National Offshore Oil Corporation ("CNOOC"), and China Petroleum and Chemical Corporation ("Sinopec")—through its state-owned oil broker Zhuhai Zhenrong Company LTD, later designated by the U.S. Department of State in 2012 and 2019.

---

[55] In October 2020, OFAC designated the Iranian Ministry of Petroleum under E.O. 13224 for providing financial support to the IRGC–QF. OFAC found that "[t]he Iranian Ministry of Petroleum has been used by individuals at the highest levels of the Iranian regime to facilitate the IRGC revenue generation scheme." *See*, Press Release, *Treasury Sanctions Key Actors in Iran's Oil Sector for Supporting Islamic Revolutionary Guard Corps-Qods Force*, U.S. DEP'T OF TREASURY (Oct. 26, 2020), https://home.treasury.gov/news/press-releases/sm1165.

382. According to a June 2, 2000, *Reuters* article titled "Iran Doubles Crude Sales to China at 160,000–[Barrels per Day]," Zhuhai Zhenrong began purchasing crude oil from IRGC-controlled NIOC in the mid-1990s.

383. Further, the *Reuters* article stated that "NIOC vice president Ahmad Rahgozar told a news conference in Kuala Lumpur [Malaysia] that the increased volume was due to a refinery upgrading programme in China which allows them to process more sour crudes" and quoted Mr. Rahgozar as saying that "China is buying a good portion of our crude...they are importing 160,000 bpd from Iran and it is increasing...."

384. In April 2004, *Reuters* reported that NIOC was selling six million barrels of oil a month to Zhuhai Zhenrong, China's sole importer at the time of "term-supplies" of crude oil from Iran.[56]

385. During the Relevant Period, the IRGC used a variety of methods to sell Iranian oil to China, including, among others:

- Establishing front-companies and using intermediaries to conceal the origin of the oil and circumvent sanctions;
- Using false flags on oil tankers, making ship-to-ship oil transfers, and falsifying documents to disguise the origin of the oil;
- Shipping oil to third countries, such as Oman, United Arab Emirates, Malaysia, and Indonesia, and then re-exporting it to China;
- Using barter trade to exchange oil for goods and services, such as construction and engineering services;
- Offering discounts on oil prices to Chinese buyers, making it more attractive to purchase Iranian oil despite the risks; and
- Using informal networks, bribes of officials, and personal connections to negotiate oil deals and avoid detection.

---

[56] According to the U.S. Energy Information Administration ("EIA"), "term supplies" of crude oil refer to the long-term contracts between crude oil producers and buyers, typically for a period of one to five years. These contracts provide a stable supply of crude oil to the buyer and a guaranteed demand for the producer. The terms of these contracts can vary, including the price, volume, and delivery schedule. This type of arrangement helps both parties to manage risks associated with price fluctuations and supply disruptions. *See Glossary*, U.S. ENERGY INFORMATION ADMINISTRATION (2023), https://www.eia.gov/tools/glossary/index.php.

386.     The above illicit methods allowed the IRGC to sell significant amounts of oil to China, despite international sanctions and restrictions.

387.     In response to U.S. counter-terrorism financing sanctions, the IRGC assembled an intricate network of front companies in Turkey, Hong Kong, Singapore, Oman, United Arab Emirates, and even China itself to facilitate the illicit sale of Iranian oil.

388.     For instance, the IRGC-controlled NIOC advised its Chinese customers to conceal any Iranian involvement in their respective advance crude oil payments by using a Chinese law firm's U.S. dollar escrow account at the Hongkong and Shanghai Banking Corporation LTD ("HSBC–Hong Kong").

389.     During the Relevant Period, HSBC–Hong Kong ignored clear indicia of IRGC trade-based money laundering ("TBML") conducted through the law firm's U.S. dollar account.

390.     Specifically, HSBC–Hong Kong ignored the TBML red flags associated with a *law firm* processing *crude oil* transactions worth tens of millions of U.S. dollars for the ultimate benefit of NIOC.

391.     Moreover, to clear and settle the respective IRGC's TBML transactions, HSBC–Hong Kong exploited the Hong Kong Monetary Authority's domestic U.S. dollar payment system, the Clearing House Automated Transfer System ("CHATS"), and the global Eurodollar payment system—all for the ultimate benefit of IRGC-controlled NIOC.

392.     HSBC's and SCB's respective branches and subsidiaries in Hong Kong, Singapore, and UAE helped CBI launder "stripped" payment orders and process credit transactions worth billions of dollars to NIOC's oil export broker, Naftiran Intertrade Company SARL ("NICO"), that were cleared and settled through New York.

393.    Transactions between the Chinese state-owned oil broker Zhuhai Zhenrong's and NICO[57] illustrate how the IRGC clandestinely moved oil sale proceeds through the global financial system with Defendants' assistance.

394.    In Singapore, HSBC–Singapore maintained a U.S. dollar account for NICO front-company, Mid Oil Asia PTE LTD.

395.    During the Relevant Period, HSBC–Singapore processed MT–910 SWIFT credit messages from HSBC in the U.S., worth millions of dollars annually, by crediting Mid Oil Asia's U.S. dollar account with payments from Zhuhai Zhenrong for NIOC's crude oil shipments via NITC's tankers to Chinese refineries.

396.    For example, on July 4, 2008, HSBC–Singapore credited a payment from Zhuhai Zhenrong worth $31.2 million U.S. dollars into Mid Oil Asia's U.S. dollar account, for further credit to NICO and for the ultimate benefit of the IRGC-controlled NIOC.[58]

397.    During the Relevant Period, HSBC–Hong Kong also maintained a U.S. dollar account for NICO front company Teltek Vendor Services LTD ("Teltek") and processed MT–910 SWIFT credit messages worth millions of U.S. dollars annually, by crediting Teltek's U.S. dollar account with payments from Zhuhai Zhenrong for NIOC's crude oil shipments via NITC's tankers to Chinese refineries.

---

[57]    In November 2008, OFAC identified NICO, among others, as an entity "owned or controlled by the Government of Iran." *See* Press Release, *OFAC Identifies Entities Owned or Controlled by the Government of Iran*, OFFICE OF FOREIGN ASSETS CONTROL (Nov. 26, 2008), https://home.treasury.gov/news/press-releases/hp1299.

[58]    The U.S. Treasury later found that NITC used Mid Oil Asia as a front company for making "NITC's urgent payments in violation of international sanctions." *See* Press Release, *Additional Treasury and State Designations Targeting Networks Linked to Iranian WMD Proliferation and Sanctions Evasion*, U.S. DEP'T OF TREASURY (Nov. 2013), https://home.treasury.gov/news/press-releases/jl2241.

398.     In April 2010, HSBC–Singapore also credited a payment from Zhuhai Zhenrong worth $19.6 million U.S. dollars into Teltek's U.S. dollar account, for further credit to NICO and for the ultimate benefit of the IRGC-controlled NIOC.

399.     On multiple occasion between 2008 and 2011, HSBC–Hong Kong processed payments of between $70,000 and $80,700 U.S. dollars from its customer, Great Seas Shipping, a front for NICO, to pay Asia Pacific STS Lightering for its work helping facilitate the illegal sale of Iranian oil on the high seas.

400.     During the Relevant Period, SCB–Dubai maintained a U.S. dollar account for NICO front-company FAL Oil Company LTD ("FAL Oil") (a/k/a "FAL Energy Company LTD" or "FAL Group") and processed MT–910 SWIFT credit messages from SCB's New York branch, worth millions of dollars annually, by crediting FAL Oil's U.S. dollar account with payments for NIOC's crude oil shipments via NITC's tankers.

401.     For example, in May 2005, SCB–Dubai credited a payment worth $33 million U.S. dollars into FAL Oil's U.S. dollar account, for further credit to NICO and for the ultimate benefit of the IRGC-controlled NIOC.

402.     Between January 2, 2008, and January 5, 2012, SCB–Dubai processed 314 foreign exchange transactions for FAL Oil worth a total value of $3,059,171,977.11 U.S. dollars.

403.     In 2012, the U.S. Department of State designated Zhuhai Zhenrong for brokering "the delivery of over $500 million in gasoline to Iran between July 2010 and January 2011," and FAL Oil for brokering "over $70 million in refined petroleum to Iran over multiple shipments in late 2010…."[59]

---

[59]     *See* Press Release, *Three Companies Sanctioned Under the Amended Iran Sanctions Act*, U.S. DEP'T OF STATE (Jan. 12, 2012), https://2009-2017.state.gov/e/eb/rls/fs/2012/180645.htm.

404.    In 2019, the U.S. Department of State further designated Zhuhai Zhenrong for purchasing hundreds of millions of dollars in oil from NIOC, noting that the designation was intended to "deny the [Iranian] regime critical income to fund terror around the world, engage in foreign conflicts, and advance its ballistic missile development."[60]

405.    The IRGC also relied on a web of foreign exchange houses in Iran and the UAE, as well as a vast network of front companies in Hong Kong, Singapore, Turkey, and the UAE, to orchestrate the sale of billions of dollars' worth of petrochemicals from Iran-based companies such as the IRGC-affiliated Mehr Petrochemical Company.

406.    In March 2023, OFAC described the IRGC's alleged decades-long use of "shadow banking" networks based on foreign exchange houses as a prime example of its various "multi-jurisdictional illicit finance systems."[61]

407.    Defendants acted as indispensable components of these shadow banking networks and trade-based money laundering schemes by allowing various brokers and front companies engaged in the "multi-jurisdictional illicit finance systems" to gain entry to the U.S. and global financial system with all its commercial advantages.

408.    Subsequently, *Reuters* quoted a U.S. Deputy Treasury official as stating that "Iran cultivates complex sanctions evasion networks where foreign buyers, exchange houses, and dozens of front companies cooperatively help sanctioned Iranian companies to continue to trade."[62]

---

[60]    Press Release, *The United States to Impose Sanctions on Chinese Firm Zhuhai Zhenrong Company Limited for Purchasing Oil from Iran*, U.S. DEP'T OF STATE (Jul. 22, 2019), https://2017-2021.state.gov/the-united-states-to-impose-sanctions-on-chinese-firm-zhuhai-zhenrong-company-limited-for-purchasing-oil-from-iran/.

[61]    Press Release, *Treasury Targets Sanctions Evasion Network Moving Billions for Iranian Regime*, U.S. DEP'T OF TREASURY (Mar. 9, 2023), https://home.treasury.gov/news/press-releases/jy1330.

[62]    Timothy Gardner and Daphne Psaledakis, *U.S. Targets 'Shadow Banking' Network Helping Iran Evade Sanctions*, REUTERS (Mar. 9, 2023), https://www.reuters.com/world/us-targets-shadow-banking-network-helping-iran-evade-sanctions-2023-03-09.

409. During the Relevant Period, Bank of Kunlun, a Chinese state-owned financial institution, was at the center of the IRGC's economic relationship between China and Iran, facilitating oil payments and blunting the impact of U.S. counter-financing of terrorism sanctions.

410. Established in 2006, the Bank of Kunlun is a commercial bank based in Karamay, an oil-producing hub in China's far-western Xinjiang region.

411. In 2010, due to increasing OFAC sanctions against Iranian entities, the Bank of Kunlun was chosen by the Chinese government as the primary bank for processing Zhuhai Zhenrong's payments to NIOC—denominated in Chinese yuan and EU euros.

412. To ensure the continued success of Iran's oil trade with China during the Relevant Period, NICO-brokered oil shipments to China were (and are) carried by a "dark fleet" of older tankers owned by IRGC-controlled NITC or foreign IRGC front companies.

413. The IRGC's "dark fleet" of ships typically switch off their automatic identification system ("AIS") transponders when loading at Iranian ports to avoid detection and often modify their AIS transponder data to mask a respective tanker's movements at sea.

414. In January 2004, *TradeWinds*, a shipping industry publication, reported that NITC had purchased a Very Large Crude Carrier ("VLCC") oil tanker named *Iran Hengam,* identified by International Maritime Organization ("IMO") number 9212905, from Hyundai in South Korea.

415. In August 2006, SCB–Dubai credited a payment from NITC worth $378,833.73 U.S. dollars into FAL Oil's U.S. dollar account. NITC's U.S. dollar payment covered the costs of replenishing the refined fuel oil products used by VLCC *Iran Hengam* in its shipping voyages.

416. In 2019, the U.S. Department of Treasury designated, among others, NITC's VLCC *Iran Hengam* (subsequently renamed "*Happiness I*") as an SDGT for participating in a "large

shipping network" that was "directed by and financially supports the Islamic Revolutionary Guard Corps–Qods Force (IRGC–QF) and its terrorist proxy Hizballah."[63]

417.    In 2012, Royal Bank of Scotland (not Defendant RBS NV) attempted to locate the *Sharjah Pride*, a vessel belonging to the FAL Group to whom they provided the financing.

418.    RBS later reported that the AIS transponder had been turned off, and that from June 16, 2012, through the beginning of 2013, the *Sharjah Pride* "had been reported as calling at (the port of) Bandar Imam Khomeini, Iran, eight times."

419.    According to OFAC, the IRGC's AIS transponder tradecraft tactics "can conceal the cargo's Iranian origin or create uncertainty regarding the location of Iranian vessels and obfuscate transfers of Iranian cargo."[64]

420.    Yet, according to the UN's International Maritime Organization, as of December 2004, "all ships of 300 gross tonnage and upwards engaged on international voyages," such as oil tankers, are required to "maintain AIS transponders in operation at all times."[65]

421.    Other tactics, techniques, and procedures used by the IRGC's "dark fleet" of ships include conducting ship-to-ship ("STS") transfer operations of oil at locations outside of authorized transfer zones and sometimes in poor weather to conceal activities.

422.    During the Relevant Period, HSBC–Hong Kong maintained a U.S. dollar account for at least one Hong Kong shipping company that conducted STS transfers of Iranian crude oil for the benefit of IRGC-controlled NIOC.

---

[63]    Press Release, *Treasury Designates Vast Iranian Petroleum Shipping Network That Supports IRGC–QF and Terror Proxies*, U.S. DEP'T OF TREASURY (Sep. 4, 2019), https://home.treasury.gov/news/press-releases/sm767.

[64]    OFFICE OF FOREIGN ASSETS CONTROL, SANCTIONS RISKS RELATED TO SHIPPING PETROLEUM AND PETROLEUM PRODUCTS FROM IRAN (2019), https://ofac.treasury.gov/media/46006/download?inline.

[65]    *Regulations for Carriage of AIS*, INTERNATIONAL MARITIME ORGANIZATION (2023), https://www.imo.org/en/OurWork/Safety/Pages/AIS.aspx.

423. During the Relevant Period, U.S. and other maritime investigators used commercial and government satellite imagery to trace the IRGC's "dark fleet" ship operations near ports in Oman, UAE and most prominently Malaysia, a top crude oil trans-shipment hub, before discharging tanker cargoes mostly at ports in China's Shandong province.

424. In addition to the IRGC–China nexus for the illicit sale of oil, the IRGC provided incentives to and cultivated relationships with figures in the Chinese military-industrial complex to procure restricted items and technical expertise that substantially aid IRGC military capabilities.

425. State-affiliated Chinese companies and banks regularly overlooked evidence of IRGC illicit activities due to the prioritization of Iran's oil imports and China's broader economic strategy for the Middle East.

### 4. CENTRAL BANK OF IRAN (CBI)

426. As far back as February 1999, published reports stated that the IRGC was financed by the CBI.

427. In an article titled "Iranians Put Faith in Dollars as Clerical Economy Falls Victim to High Inflation," the *Financial Times* reported on February 3, 1999, that **"[m]any state industries, such as the bonyad and the IRGC…'are financed by the central bank**, whose 'loans' are officially considered to be 'revenue,' synonymous with the wealth that is created by productive goods and services in more orthodox countries.'" (Emphasis added.)

428. In fact, like Iran's many state-owned banks, the CBI functioned not as an independent central bank, but as an arm of the Office of the Supreme Leader which coordinates regime policy closely with the IRGC.

429. Thus, throughout the Relevant Period, the CBI and Iran's banking sector served as knowing and active conduits for the financing of IRGC and Hezbollah-sponsored terrorism.

430.     The *Associated Press* reported on July 6, 2007, that Stuart Levey, then Treasury Undersecretary for Terrorism and Financial Intelligence, met with his European counterparts in Britain, France, and Germany to discuss the countering of European funding for the IRGC and Hezbollah.

431.     The *Associated Press* article further noted the following regarding Iran's use of deceptive financial practices:

> [The] United States has alleged that Iran has engaged in deceptive financial conduct. It has used front companies and other mechanisms that make it difficult, if not impossible, for companies dealing with Iran to know their actual customer, Treasury says. State-owned Iranian banks, including the Central Bank of Iran, repeatedly asked other financial institutions to remove their names from global transactions….

432.     A U.S. Department of State diplomatic cable from March 2008 noted the CBI's and Bank Melli's financial support of the IRGC–QF and its commander, Maj. Gen Soleimani:

> Bank Melli and the Central Bank of Iran also provide crucial banking services to the Qods Force, the IRGC's terrorist supporting arm that was headed by UNSCR 1747 designee Commander Ghassem Soleimani. Soleimani's Qods Force leads Iranian support for the Taliban, Hezbollah [sic], Hamas [sic] and the Palestinian Islamic Jihad. Entities owned or controlled by the IRGC or the Qods Force use Bank Melli for a variety of financial services. From 2002 to 2006, Bank Melli was used to send at least $100 million to the Qods Force.

433.     Furthermore, the diplomatic cable stated the following regarding Bank Melli's use of illicit tradecraft when processing IRGC-related funds transfers through the U.S. financial system:

> When handling financial transactions on behalf of the IRGC, Bank Melli has employed deceptive banking practices to obscure its involvement from the international banking system. For example, Bank Melli has requested that its name be removed from payment instructions for US dollar denominated transactions.

434.     In February 2008, the *Wall Street Journal* reported that the CBI was investigated by the U.S. Department of Treasury for helping other Iranian financial institutions evade U.S. sanctions by processing U.S. dollar funds transfers and letters of credit on behalf of blacklisted Iranian banks.

435.     In that same article, the *Wall Street Journal* reported the following regarding the CBI's role in evading counter-terrorism sanctions against Iran:

> In a speech in London on Feb. 7, Bank Markazi Gov. Tahmasb Mazaheri essentially acknowledged that he works to help his country's banks evade the U.S. quarantine. 'The central bank assists Iranian private and state-owned banks to do their commitments regardless of the pressure on them.'

436.     The *Wall Street Journal* also observed the following regarding Mr. Mazaheri's disdain for U.S. counter-terrorism policies against Iran:

> [He] appeared to taunt Washington, saying that two Persian Gulf nations aligned with the U.S. have helped Iran circumvent the American campaign to strangle its financial system. He indicated the two countries are Bahrain and the United Arab Emirates, which have close trading ties to Iran.

437.     On March 5, 2008, twenty-five Democratic senators issued a letter to then President Bush expressing their "deep concern with the activity of the Central Bank of Iran."

438.     The senators urged President Bush "to designate [CBI] as a supporter of terrorism and weapons proliferation" because the Iranian central bank was "heavily involved in the funding of terrorism and the financing of Iran's proliferation activities."

439.     In March 2008, FinCEN promulgated an advisory notice titled "Guidance to Financial Institutions on the Continuing Money Laundering Threat Involving Illicit Iranian Activity."

440.     In its advisory, FinCEN warned the following regarding the Iranian regime's use of its state-owned banks for obfuscating transactions involving proliferation and terrorism:

> Through state-owned banks, the Government of Iran disguises its involvement in proliferation and terrorism activities through an array of deceptive practices specifically designed to evade detection. The Central Bank of Iran and Iranian commercial banks have requested that their names be removed from global transactions in order to make it more difficult for intermediary financial institutions to determine the true parties in the transaction.[66]

441. On April 17, 2008, Representative Ed Royce (who would later serve as Chairman of the House Foreign Affairs Committee) issued a statement during a hearing of the House Foreign Affairs Committee noting that "the Treasury Department has persuaded many foreign banks not to provide financing for exports to Iran or process its dollar transactions," but urged that "[m]ore can be done" and suggested that "Bank Markazi, the central bank of terrorism, should be targeted."

442. *Dow Jones* reported in April 2008 that the U.S. Department of Treasury believed that "[p]ersistent warnings to leading world banks since early 2007—that they may be held accountable by the US legal system for dealing with Iranian banks that may be financing international terrorism and weapons of mass destruction—have also been effective."

443. On May 15, 2018, the U.S. Department of Treasury further confirmed the critical role the CBI historically played in financing terrorism, sanctioning the governor and another senior CBI official for moving "millions of dollars on behalf of the Islamic Revolutionary Guard Corps–Qods Force (IRGC–QF) to Hezbollah."[67]

444. The U.S. Department of Treasury's press release quoted Treasury Secretary Steven Mnuchin, who stated that "Iran's Central Bank Governor covertly funneled millions of dollars on behalf of the IRGC–QF…to enrich and support the violent and radical agenda of Hezbollah. It is

---

[66] FINANCIAL CRIMES ENFORCEMENT NETWORK, GUIDANCE TO FINANCIAL INSTITUTIONS ON THE CONTINUING MONEY LAUNDERING THREAT INVOLVING ILLICIT IRANIAN ACTIVITY 1 (2008), https://www.fincen.gov/resources/advisories/fincen-advisory-fin-2008-a002.

[67] *See* Press Release, *Treasury Targets Iran's Central Bank Governor and an Iraqi Bank Moving Millions of Dollars for IRGC-Qods Force*, U.S. DEP'T OF TREASURY (May 15, 2018), https://home.treasury.gov/news/press-releases/sm0385.

appalling, but not surprising, that Iran's senior-most banking official would conspire with the IRGC–QF to facilitate funding of terror groups like Hezbollah …."

445.    On September 20, 2019, after years of delay predicated on diplomatic considerations, the U.S. Department of Treasury finally designated the CBI as an SDGT for its decades-long support for Hezbollah and IRGC terrorism.

446.    Of significance here, the U.S. Department of Treasury found that "Iran's Central Bank has provided billions of dollars to the Islamic Revolutionary Guards Corps (IRGC), its Qods Force (IRGC–QF) and its terrorist proxy, Hezbollah."

447.    The CBI's funding included the $50 million U.S. dollars that it transferred to Hezbollah between 2001 and 2006 through Bank Saderat's subsidiary in London and to its branch in Beirut "for the benefit of Hezbollah fronts in Lebanon that support acts of violence," Eurodollar transfers that were publicly identified by the U.S. Treasury on September 8, 2006, when it denied Bank Saderat direct and indirect access to the U.S. financial system.

448.    But the U.S. Department of Treasury noted that the CBI never stopped its terror financing activities, finding that:

> Since at least 2016, the IRGC–QF has received the vast majority of its foreign currency from the CBI and senior CBI officials have worked directly with the IRGC–QF to facilitate CBI's financial support to the IRGC–QF. In 2017, the IRGC–QF oversaw the transfer of tens of millions of euros to Iraq from the CBI. Then-Governor of the CBI Valiollah Seif directed the transfer.

### 5.    IRANIAN STATE-OWNED BANKS

449.    Like the CBI and unlike other commercial banks, including those with questionable customers, key Iranian banks like Bank Saderat and Bank Melli Iran routinely conducted their commercial dealings in a manner that signaled that they were involved in criminal activities.

450.     For example, prior to 2008, when the U.S. revoked the so-called U-turn exemption, these banks could legally facilitate many transactions involving Eurodollars but affirmatively chose to conceal the flow of billions of dollars and enlisted Defendants to commit felonies to assist them in falsifying records among other crimes.

451.     They conducted themselves in this manner because they were acting under the IRGC's direction, and were, in the words of the U.S. government, part of efforts "to fund the Islamic Revolutionary Guard Corps (IRGC), its Islamic Revolutionary Guard Corps Qods Force (IRGC–QF), Lebanese Hezbollah (Hezbollah), Hamas, the Taliban and other terrorist groups."

### a.     BANK SADERAT IRAN

452.     For many years preceding the revocation of its U-Turn exemption, Bank Saderat Iran illegally routed its Eurodollar transactions through the United States with the assistance of various Western commercial banks, including Defendants herein.

453.     From 2002 forward, Defendant Bank Saderat PLC continued Bank Saderat Iran's existing practice of illegally routing its Eurodollar transactions through the United States and transferring tens of millions of dollars to Hezbollah and other designated terrorist groups.

454.     On September 8, 2006, the U.S. Office of Foreign Assets Control amended § 560.516 of the ITRs and excluded Bank Saderat from the Iranian U-Turn exemption in the Eurodollar payment system.

455.     OFAC stated the following regarding Bank Saderat Iran's exclusion:

> OFAC has amended the Iranian Transactions Regulations (ITR) to cut off Bank Saderat, one of Iran's largest government-owned banks, from the U.S. financial system. Bank Saderat has been a significant facilitator of Hezbollah's financial activities and has served as a conduit between the Government of Iran and Hezbollah….

456.     According to then-Under Secretary for Terrorism and Financial Intelligence Stuart Levey: "Bank Saderat facilitates Iran's transfer of hundreds of millions of dollars to Hezbollah and

other terrorist organizations each year. We will no longer allow a bank like Saderat to do business in the American financial system, even indirectly."

457. The Department of Treasury press release announcing the changes to the ITR stated that "a Hezbollah-controlled organization [] has received $50 million directly from Iran through Bank Saderat since 2001."

458. In an October 9, 2006, email, Defendant HSBC–Middle East's Regional Head of Legal and Compliance noted the U.S. government's "direct evidence against Bank Saderat particularly in relation to the alleged funding of Hezbollah" but nonetheless maintained the account(s) thereafter and continued to facilitate transactions for Bank Saderat Plc.

459. Then-Assistant Treasury Secretary for Terrorist Financing Daniel Glaser testified on March 21, 2007, before the Senate Committee on Banking, Housing and Urban Affairs that during the prior nine months, senior U.S. Department of Treasury officials had "engaged in unprecedented outreach to the international private sector, meeting with more than 40 banks around the world to share information and discuss the risks of doing business with Iran," and emphasized that "Hezbollah uses Saderat to send money to other terrorist organizations as well."

460. As detailed in a January 9, 2009, Deferred Prosecution Agreement entered by Lloyds TSB Bank PLC ("Lloyds") with U.S. law enforcement, Defendant Bank Saderat PLC directed illegal funds transfers to the U.S. and worked with Lloyds to strip its U.S. dollar transactions of any reference to Iran or Bank Saderat.

461. In 2003, Lloyds exited its relationship with Bank Saderat PLC, and Credit Suisse assumed Lloyds' role of using the Eurodollar payment system for illegally transferring funds through the United States by means of stripping references to Bank Saderat PLC and Iran from the relevant SWIFT messages.

462.     Notwithstanding the revocation of its access to the Iranian U-Turn exemption, Bank Saderat Iran (and Bank Saderat PLC) continued to illegally direct U.S. dollar transactions through the United States with the active assistance of the other Defendants listed herein.

463.     In October 2007, Bank Saderat Iran (including Defendant Bank Saderat PLC), was designated an SDGT pursuant to E.O. 13224.

464.     The U.S. Department of Treasury's press release regarding Bank Saderat's designation stated the following regarding the bank's material support of Hezbollah:

> Bank Saderat, its branches, and subsidiaries: Bank Saderat, which has approximately 3200 branch offices, has been used by the Government of Iran to channel funds to terrorist organizations, including Hezbollah and EU-designated terrorist groups Hamas, PFLP–GC, and Palestinian Islamic Jihad. For example, from 2001 to 2006, Bank Saderat transferred $50 million from the Central Bank of Iran through its subsidiary in London to its branch in Beirut for the benefit of Hezbollah fronts in Lebanon that support acts of violence.

465.     Among others, the HSBC Defendants maintained one or more accounts for Bank Saderat PLC and knowingly assisted Bank Saderat PLC in illegally disguising its U.S. dollar transactions during the Relevant Period.

466.     On February 13, 2004, Defendant SCB opened accounts for Bank Saderat PLC. It also maintained other accounts for Bank Saderat Iran, including an account at SCB–Dubai.

467.     During the Relevant Period, and as described in more detail below, Bank Saderat PLC, working in concert with SCB, also financed the illegal acquisition of various U.S.-origin export-controlled goods on behalf of Mahan Air and various sub-agencies of MODAFL.

468.     For example, SCB facilitated at least ten Letter of Credit transactions, valued at $1,559,127 U.S. dollars, which involved the shipment of U.S.-origin, export-controlled aircraft parts sold by the Singapore-based Monarch Aviation—a company that was part of Iran's illegal procurement network—to various MODAFL sub-agencies.

469. A sub-agency of MODAFL obtained a Letter of Credit issued by Iran's Bank Refah and sent it to SCB's branch in Singapore (where the Iranian front company Monarch Aviation maintained accounts) while reimbursement authorization was sent to the Iran Overseas Investment Bank London (Bank Saderat PLC's predecessor), which in turn either directly financed the illegal acquisition of goods from the United States or provided a surety for Bank Refah's payment.

470. The goods were shipped by Iran Air from Malaysia's Kuala Lumpur Airport to Iran's Tehran Airport.

471. The LCs were refinanced by SCB's Dubai branch through its credit facility with the CBI, with payment being made through the Eurodollar payment system to Monarch Aviation's account with SCB–Singapore through the latter's U.S. dollar account with SCB–London, which in turn received the funds into its correspondent account with SCB's New York branch.

472. In another instance, Bank Saderat PLC used the Eurodollar payment system to send concealed and illegal payments to SCB–Dubai for the benefit of the Iran Helicopter Support and Renewal Company ("IHSRC"), a subsidiary of MODAFL.

473. Bank Saderat PLC's MT–202 SWIFT message relating to IHSRC resulted in a payment that was cleared and settled in New York via SCB–New York.

474. Bank Saderat PLC intentionally concealed from U.S. authorities, by means of an elaborate money laundering scheme to transfer U.S Dollars, IHSRC's payment relating to its acquisition (via a company named Jetpower) of U.S. manufactured helicopter parts.

475. Bank Melli Iran's branch in Hong Kong, Bank Refah in Iraq, and SCB–London assisted Bank Saderat PLC with layering the funds by means of exploiting internal weaknesses in the SWIFT messaging type rules and message routing paths.

476. Defendants Commerzbank, Credit Suisse, and Barclays also altered, falsified, or omitted information from U.S. dollar SWIFT messages that they facilitated on behalf of Bank Saderat (and Bank Saderat PLC), at all times knowing, or deliberately indifferent to the fact, that Bank Saderat was facilitating Iran's state-sponsored terrorism and, after October 2007, knowing that Bank Saderat (including Bank Saderat PLC) was an SDGT so-designated for its very role as a "significant facilitator of Hezbollah's financial activities and has served as a conduit between the Government of Iran and Hezbollah."

477. Moreover, Defendant Barclays closed its U.S. dollar accounts for Bank Saderat PLC, in 2008, months *after* Bank Saderat PLC was designated an SDGT, and more than a year after the U.S. Department of Treasury reported that "Bank Saderat facilitates Iran's transfer of hundreds of millions of dollars to Hezbollah and other terrorist organizations each year."

### b. BANK MELLI IRAN

478. Bank Melli Iran (or "Bank Melli"), one of the largest banks in Iran, was established in 1927 by order of the Iranian Parliament.

479. Following the Iranian Revolution in 1979, all banks in Iran were nationalized, and even today most are effectively controlled by the Iranian regime.

480. Melli Bank PLC in London, England, was established in January 2002 as a wholly owned subsidiary of Bank Melli Iran.

481. According to the U.S. government, from 2004 to 2011, Bank Melli Iran and Melli Bank PLC in London used the Eurodollar payment system to transfer funds worth approximately $100 million U.S. dollars to the IRGC–QF, which was simultaneously training, arming, and funding Hezbollah and the Iraqi Shia terrorist groups that targeted, killed, and maimed American and Iraqi forces and civilians.

482. In October 2007, OFAC designated Bank Melli Iran and Melli Bank PLC as SDNs pursuant to E.O. 13382, and included on OFAC's SDN list, which resulted in, among other things, their exclusion from OFAC's U-Turn exemption for Iranian transactions processed through the Eurodollar payment system by foreign banks.

483. A U.S. Department of State diplomatic cable on November 10, 2009, stated the following regarding Bank Melli's exploitation of the global financial system for the benefit of the IRGC's and IRGC–QF's operations in Iraq:

> [The] Islamic Revolutionary Guards Corps (IRGC) and IRGC–Qods Force, who channel funds to militant groups that target and kill Coalition and Iraqi forces and innocent Iraqi civilians, have used Bank Melli and other Iranian banks to move funds internationally. Bank Melli used deceptive banking practices to obscure its involvement from the international banking system by requesting that its name be removed from financial transactions when handling financial transactions on behalf of the IRGC.

484. The U.S. Department of Treasury's press release announcing Bank Melli Iran's SDGT designation stated the following:

> Bank Melli also provides banking services to the [Iranian Revolutionary Guard Corps] and the Qods Force. Entities owned or controlled by the IRGC or the Qods Force use Bank Melli for a variety of financial services. From 2002 to 2006, Bank Melli was used to send at least $100 million to the Qods Force. When handling financial transactions on behalf of the IRGC, Bank Melli has employed deceptive banking practices to obscure its involvement from the international banking system. For example, Bank Melli has requested that its name be removed from financial transactions.

485. In April 2008, then-Assistant Treasury Secretary for Terrorist Financing Daniel Glaser testified the following before the House Committee on Foreign Affairs and its subcommittees:

> Entities owned or controlled by the IRGC or the Qods Force use Bank Melli for a variety of financial services. From 2002 to 2006, Bank Melli was used to send at least $100 million to the Qods Force. When handling financial transactions on behalf of the IRGC, Bank Melli has employed deceptive

banking practices to obscure its involvement from the international banking system. For example, Bank Melli has requested that its name be removed from financial transactions.

486. The October 24, 2019, Section 311 Designation of Iran as a "Jurisdiction of Primary Money Laundering Concern" stated that:

> Bank Melli was among those banks designated pursuant to E.O. 13224 for assisting in, sponsoring, or providing financial, material, or technological support for, or other services to or in support of, the IRGC–QF. As of 2018, the equivalent of billions of USD in funds had transited IRGC–QF controlled accounts at Bank Melli. Moreover, Bank Melli had enabled the IRGC and its affiliates to move funds into and out of Iran, while the IRGC–QF, using Bank Melli's presence in Iraq, had used Bank Melli to pay Iraqi Shia militant groups.

487. During the Relevant Period, Bank Melli maintained U.S. dollar accounts, at one time or another, with the HSBC Defendants, SCB, Credit Suisse, Commerzbank, ABN Amro (RBS NV), and Barclays.

488. Defendant HSBC–London maintained U.S. dollar accounts for Bank Melli Iran, and knowingly assisted Bank Melli in illegally disguising its U.S. dollar transactions during the Relevant Period.

489. Yet despite the fact that SWIFT messages were supposed to have been fully "stripped" by HSBC–London—before their transmittal to the U.S.—they were nevertheless occasionally blocked by the HSBC–US OFAC filter in New York because Bank Melli was referenced in error (thus placing HSBC–US on notice that HSBC–London was working in concert with Bank Melli to evade U.S. laws, regulations, and economic sanctions against Iran).

490. During the Relevant Period, Defendant Barclays agreed to illegally process Eurodollar transactions in favor of Bank Melli's London branch by referencing only Bank Melli's U.S. dollar account at Midland Bank PLC in London without referencing Bank Melli Iran's name in the SWIFT messages.

491.     Similarly, in July 2003, Defendant SCB learned that a competitor was exiting the Iranian business completely and sought to pick up this business and add U.S. dollar accounts for five Iranian banks at SCB–London.

492.     Bank Melli was among the banks whose business SCB expressly sought to (and did) acquire.

493.     In 2004, SCB opened U.S. dollar accounts for Bank Melli and thereafter knowingly assisted Bank Melli in illegally disguising its U.S. dollar transactions.

494.     Bank Melli Iran's branch in the UAE was also instrumental in facilitating U.S. sanctions-evading trade-finance and Eurodollar payment transactions on behalf of the IRGC's Mahan Air and MODAFL.

495.     During the Relevant Period (and beginning no later than July 2003), Defendant Commerzbank also knowingly assisted Bank Melli in illegally disguising its Eurodollar transactions.

496.     Commerzbank further advised Bank Melli to list "non ref" in the ordering party field in all payment order messages because it would trigger a manual review of the overall Eurodollar payment transaction, thereby enabling Commerzbank personnel to ensure that the SWIFT messages did not contain any information linked to Iran.

497.     During the Relevant Period, Bank Melli maintained a U.S. dollar account with Defendant ABN Amro (RBS NV)'s branch in Dubai, UAE, and ABN Amro (RBS NV) actively and knowingly assisted Bank Melli in illegally disguising its Eurodollar transactions.

498.     During the Relevant Period, Barclays maintained at least one U.S. dollar account on behalf of Bank Melli. Barclays knowingly assisted Bank Melli in illegally disguising its

Eurodollar transactions and sent separate payment order message instructions, which included full transaction details, to Bank Melli's London Branch so it could track its anonymized transactions.

499.     Barclays knowingly assisted Bank Melli in its illegal conduct and continued to do so even after Bank Melli was designated by the United States and publicly identified as a major source of the IRGC's funding.

### 6.     ISLAMIC REPUBLIC OF IRAN SHIPPING LINES (IRISL)

500.     During the Relevant Period, the IRGC controlled NITC which maintained Iran's oil tanker fleet and gave the IRGC both the means to sell black-market oil and to exert enormous pressure on the rest of Iran's government to claim its piece of those oil and gas revenues that appeared in the state's official budget.

501.     However, at the same time, the IRGC also controlled Iran's national maritime carrier, IRISL, and used it repeatedly to facilitate arms shipments on behalf of the IRGC, including precision, industrially manufactured copper discs that are a key component in EFPs (discussed below) used to kill and maim many of the Plaintiffs herein.[68]

502.     Some of the arms were obtained from Iranian manufacturers, and others were obtained through the IRGC and Hezbollah's various procurement networks.

503.     For example, a November 2007 U.S. Department of State diplomatic cable noted:

> Washington remains concerned about on-going conventional arms transfers from China to Iran, particularly given Iran's clear policy of providing arms and other support to Iraqi insurgents and terrorist groups like the Taliban and Hezbollah….

---

[68]     IED is a term commonly used by the U.S. military as shorthand for a roadside bomb. However, unlike IEDs, the EFPs deployed by the IRGC, Hezbollah, and the Special Groups in Iraq were not "improvised." Instead, these advanced weapons were professionally manufactured and specifically designed to defeat the armor plating that protected the vehicles used by U.S. and Coalition Forces.

We have specific information that Chinese weapons and components for weapons transferred to Iran are being used against U.S. and Coalition Forces in Iraq, which is a grave U.S. concern.

504.     The diplomatic cable noted that an IRISL-flagged vessel was loaded at a Chinese port with multiple containers of cargo bound for delivery at the port of Bandar Abbas, Iran.

505.     The cargo included Iranian Defense Industries Organization ("DIO")[69] manufactured ammunition cartridges (7.62 x 39 rounds for AK–47 assault rifles).[70]

506.     DIO is an Iranian government-owned weapons manufacturer controlled by MODAFL.

507.     An April 2008 State Department cable warned of an IRISL shipment of chemical weapons precursors from China aboard the IRISL-leased, Iranian flagged merchant vessel ("M/V") *Iran Teyfouri*.

508.     In September 2008, the U.S. Department of Treasury designated IRISL an SDN, stating: "Not only does IRISL facilitate the transport of cargo for U.N. designated proliferators, it also falsifies documents and uses deceptive schemes to shroud its involvement in illicit commerce."

509.     The U.S. Department of Treasury further noted that:

---

[69]     DIO was designated an SDN by the U.S. on March 30, 2007. IRGC Brigadier-General Seyyed Mahdi Farahi was the Managing Director of DIO and has been sanctioned by the EU since 2008. *See,* Council Decision, *Implementing Article 7(2) of Regulation (EC) No 423/2007 Concerning Restrictive Measures Against Iran*, 29–33, 2008 O.J. (L 163), https://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:32008D0475. Brig. Gen. Farahi was later sanctioned by the U.S. on January 17, 2016. *See*, Press Release, *Treasury Sanctions Those Involved in Ballistic Missile Procurement for Iran*, U.S. DEP'T OF TREASURY (Jan. 17, 2016), https://home.treasury.gov/news/press-releases/jl0322.

[70]     In an earlier 2006 diplomatic cable, the U.S. State Department identified that China's state-owned NORINCO weapons manufacturer had shipped large quantities of 7.62 x 39mm armor piercing ammunition to Iran for use in AK–47 rifles. Coalition Forces captured NORINCO's 7.62 x 39mm armor piercing ammunition from FTO Khatib Hezbollah, FTO Asaib Ahl al-Haq, and other IRGC proxies during the Relevant Period. Although Iran's state-owned defense companies also manufactured 7.62 x 39mm armor piercing ammunition, the IRGC appears to have supplied its Iraqi proxy groups with Chinese manufactured ammunition to maintain a measure of plausible deniability concerning Iran's role in supporting attacks on Coalition Forces.

[i]n order to ensure the successful delivery of military-related goods, IRISL has deliberately misled maritime authorities through the use of deception techniques. These techniques were adopted to conceal the true nature of shipments ultimately destined for MODAFL [Iran's Ministry of Defense and Armed Forces Logistics].

510.    In January 2009, a former Russian merchant ship chartered by IRISL—named the M/V *Monchegorsk* and flying a Cypriot flag—was spotted leaving the Iranian port of Bandar Abbas and heading for the Suez Canal.

511.    Egyptian authorities were alerted by the U.S. Navy, and the M/V *Monchegorsk* was forced into an Egyptian port to be searched. Iran's DIO was later determined to be the shipper of the military-related cargo.

512.    Munitions, believed headed for Gaza, were found hidden in the cargo, including components for mortars and thousands of cases of powder, propellant, and shell casings for 125mm and 130mm guns.

513.    In October 2009, U.S. troops boarded a German-owned freighter, the M/V *Hansa India*, in the Gulf of Suez and found eight containers full of ammunition that were headed to Syria from Iran.

514.    The vessel carried seven containers of small arms ammunition (including 12 million bullet casings), as well as one container containing copper discs of the type used in EFPs to kill and maim many of the Plaintiffs herein.

515.    The acronym "IRISL" was painted in large block letters on the exterior side walls of each shipping container, and the barrels of munition parts discovered inside the containers were marked with the inscription "SAEZMANE SANAYE DEFA," a common transliteration from Farsi to English of the name for Iran's Defense Industries Organization ("DIO").

516.    The M/V *Hansa India* was registered to the Hamburg-based shipping company Leonhardt & Blumberg but had been under charter to IRISL for several years.

517.    In November 2009, the Government of Israel intercepted an IRISL-flagged ship, the M/V *Francop*, headed for Beirut, Lebanon, and then Latakia, Syria. The vessel was loaded with munitions crates that were either stamped "IRISL" or included documentation marked with the IRGC–QF logo.

518.    The munitions found onboard included over two thousand 107mm "Katyusha" rockets, more than six hundred 122mm "Grad 20" rockets, and also various rocket fuses, mortar shells, rifle cartridges, fragment grenades, and 7.62mm bullets.

519.    The M/V *Francop*, owned by the Cypriot shipping company UFS, was carrying shipping containers clearly marked IRISL.

520.    United Nations Security Council Resolution 1929, adopted on June 9, 2010, froze certain assets of IRISL and called on the international community to cease providing financial and insurance services to both the IRGC and IRISL.

521.    In addition, a July 2010 EU sanctions implementing regulation confirmed that IRISL conducted deceptive business practices in order to access U.S. dollar funds.

522.    Specifically, EU Council Implementation Regulation Number 668/2010 stated that "IRISL subsidiaries have used US dollar bank accounts registered under cover-names in Europe and the Middle East to facilitate routine fund transfers."

523.    Similarly, the June 2011 indictment of IRISL in New York stated:

> In many aspects of global commerce, including the international maritime industry, contracts and payments are denominated in U.S. dollars. Such U.S. dollar transactions are primarily executed, or "cleared," through correspondent banks in the United States. The U.S. dollar clearing operations for many large U.S. financial institutions are processed through correspondent bank accounts domiciled in New York County.

> In order to deceive and bypass these OFAC filters, SDNs designated under OFAC's non-proliferation of weapons of mass destruction program must falsify, or cause to be falsified, the originator and/or beneficiary information in wire transfers. In other words, by omitting or falsifying data regarding

their roles as the true originators or beneficiaries, SDNs are able to send and receive wire transfers that would otherwise be blocked by U.S. financial institutions. Through the fraudulent use of a web of subsidiary entities and front companies, IRISL and the other defendants were able to deceive U.S. financial institutions and maintain their access to the U.S. financial system.

524. Iran's DIO was listed as an entity of concern for military procurement activities in an early warning document distributed by the German government to industry in July 2005.

525. The DIO was also designated by the United Nations in 2006 for its involvement in Iran's WMD program.

526. During 2006 and 2007, weapons caches seized by Coalition Forces from the Special Groups in Iraq contained large quantities of weapons produced by Iran; including many 107 millimeter artillery rockets with closely clustered DIO lot numbers and production dates between 2005 and 2007, as well as rounds and fuses for 60 millimeter and 81 millimeter mortars with DIO lot markings and 2006 production dates.

527. According to the U.S. State Department, the DIO was the owner of a U.S. dollar account that was maintained by Bank Melli Iran's branch in Hamburg; and this bank account was used to send and receive U.S. dollar funds transfer transactions for the benefit of the DIO.

528. Bank Melli Iran's branch in Hamburg was a customer of Defendant Commerzbank during the Relevant Period, and both Bank Melli Iran and Commerzbank.

## 7. MAHAN AIR

529. Mahan Air is nominally owned by the Mola Almowaheddin Institute, which describes itself as a charity, but it is effectively owned and controlled by the IRGC.

530. Its Chairman, Hamid Arabnejad, was a very close friend to Qassem Soleimani, the now-deceased head of the IRGC–QF.

531. Two other senior Mahan Air officials, Hamid Aslani and Hamid Asgari, previously held high ranks in the IRGC.

532.    On October 12, 2011, the United States designated the Iranian commercial airline Mahan Air as an SDGT for "providing financial, material and technological support to the Islamic Revolutionary Guard Corps–Qods Force (IRGC–QF). Based in Tehran, Mahan Air provides transportation, funds transfers and personnel travel services to the IRGC–QF."

533.    The U.S. Department of Treasury explained Mahan Air's direct involvement with terrorist operations, personnel movements, and logistics on behalf of the IRGC–QF:

> Mahan Air also facilitated the covert travel of suspected IRGC–QF officers into and out of Iraq by bypassing normal security procedures and not including information on flight manifests to eliminate records of the IRGC–QF travel.

> Mahan Air crews have facilitated IRGC–QF arms shipments. Funds were also transferred via Mahan Air for the procurement of controlled goods by the IRGC–QF.

> In addition to the reasons for which Mahan Air is being designated today, Mahan Air also provides transportation services to Hezbollah [sic], a Lebanon-based designated Foreign Terrorist Organization. Mahan Air has transported personnel, weapons and goods on behalf of Hezbollah [sic] and omitted from Mahan Air cargo manifests secret weapons shipments bound for Hezbollah [sic].

534.    Mahan Air also transported to Iran *thousands* of radio frequency modules illegally imported from the United States by IRGC procurement front companies—OPTO Electronics in Singapore, NEL Electronics PTE LTD, and Corezing International PTE LTD.[71]

535.    These modules were recovered by Coalition Forces in Iraq from IED components that were used to target U.S. and Coalition Forces.

536.    The modules had encryption capabilities and a particularly long range that allowed Special Groups operatives to operate them across significant distances.

---

[71]    *See* Superseding Indictment, *United States v. Larijani*, No. 10-cr-174 (EGS) (D.D.C. Sep. 15, 2010), ECF No. 4, https://www.justice.gov/opa/file/837996/download.

537.     In 2008, Mahan Air transported the IED components from Singapore and Thailand to Tehran, Iran.

538.     Under Secretary of Commerce Eric L. Hirschhorn described this supply chain as "egregious conduct by … foreign companies and individuals who have endangered the lives of U.S. and coalition forces in Iraq."

## V.     HEZBOLLAH

### A.     HEZBOLLAH'S HISTORY, KEY LEADERS, AND CURRENT ORGANIZATIONAL STRUCTURE

539.     The early Lebanese Shi'a clerics who emerged from the seminaries in Najaf (Iraq) and Qom (Iran) included Musa al-Sadr and Ayatollah Muhammad Hussein Fadlallah (Hezbollah's spiritual leader).

540.     Like the late Ayatollah Muhammad Sadiq al-Sadr in Iraq, Musa al-Sadr is credited with first mobilizing the previously passive and marginalized Shi'a community in Lebanon by inspiring the foundation of the Amal movement which eventually gave birth to Hezbollah.

541.     Musa al-Sadr disappeared (and was likely murdered) in Libya in 1978 which created an opening for Sadr's contemporary, Muhammad Hussein Fadlallah, to whom much of Musa al-Sadr's influence and power passed.

542.     In June 1982, Sayyid Hussein al-Musawi, a member of Amal's command council, broke with the movement and founded "Islamic Amal," which soon transformed into Hezbollah.

543.     Hezbollah's founders also included Subhi al-Tufayli, Muhammad Yazbek, Na'im Qasim, Ibrahim Amin al-Sayyid, and Hassan Nasrallah (who would later emerge as Hezbollah's leader).

544. Inspired by the success of Iran's Islamic revolution and influenced by Iranian Supreme Leader Ayatollah Ruhollah Khomeini's ideological worldview, these young fanatics set to work building a network in Lebanon that was directly answerable to him.

545. Since the early 1980s, Iran's IRGC has helped Hezbollah equip itself not only with vast supplies of weapons and explosive devices but also with broadcasting, healthcare, and educational centers to expand its political and social reach within Lebanon. For example, the IRGC spends millions of dollars in Lebanon on the construction of bridges, roads, schools, and hospitals.

546. To this day, Ayatollah Ali Khamenei, the second and current supreme leader of the Islamic Republic, maintains various offices in the southern suburbs of Beirut and in southern Lebanon.

547. These offices serve as Khameini's official religious headquarters, but the Iranian intelligence service and Hezbollah also use them for information gathering, political and security meetings, surveillance, and as military courts for their prisoners.

548. The Iranian government hosts hundreds of Hezbollah-affiliated Lebanese students each year in Iranian universities and seminaries, especially in Qom.

549. The IRGC-funded welfare programs for Lebanese Shi'a are backed by a very professional and energetic propaganda machine that extols Hezbollah and its Iranian patron and also seeks to elevate Khamenei, who competes with the Grand Ayatollah Ali Hussein al-Sistani (based in Iraq) who espouses a less overtly political form of Shi'ism.

550. Iranian clerics, especially Ayatollah Khamenei (with the IRGC's help) pay monthly salaries to the roughly 2,500 Shi'a clerics of Lebanon, further cementing their loyalty to the Iranian regime.

551.    After its founding, Hezbollah evolved into a multifaceted, sophisticated, highly organized, politically powerful, and well-financed terrorist organization.

552.    Hezbollah now resembles a multinational corporate or governmental entity, with departments, agencies, branches, in-house banking, insurance, and other financial services, and media outreach. Its estimated enterprise value is worth billions of U.S. dollars.

553.    Notwithstanding Hezbollah's multifaceted nature, it is a single, unified entity dedicated to religiously inspired terrorism.

### 1.    SHURA COUNCIL (*MAJLIS AL-SHURA*)

554.    Hezbollah's Shura Council (a/k/a *Majlis al-Shura*) is the decision-making body within the terrorist organization, composed of Hezbollah's highest in command—its Secretary-General and overall leader Hassan Nasrallah, the heads of the other Councils (see below), and Nasrallah's advisors.

555.    Hezbollah's various Councils are all subordinate to and overseen by its Shura Council.

556.    Mr. Nasrallah presides over the Shura Council and functions as the group's leader under the authority of the "jurist theologian" Ayatollah Ali Khamenei, Iran's Supreme Leader.

557.    Hezbollah's Shura Council include the following members:

- **Hassan Nasrallah**. In 1992, after Mr. al-Musawi's death, Hassan Nasrallah became Hezbollah's leader and Secretary General. At all relevant times, he has remained in that position. He was designated an SDT on January 24, 1995, and an SDGT on May 16, 2018.

- **Naim Qassem**. Sheikh Naim Qassem is Hezbollah's Deputy Secretary General. He was designated an SDGT on May 16, 2018.

- **Hashem Safieddine**. In 1995, Hashem Safieddine was promoted to the Majlis al-Shura. He is the Head of the Executive Council, Hezbollah's largest council. He was designated an SDGT on May 19, 2017.

- **Muhammad Yazbek**. Muhammad Yazbek is the Head of Hezbollah's Judicial Council. He was designated an SDGT on May 16, 2018. He is considered the personal representative of the Supreme Leader of the Islamic Revolution, Ali Khamenei, in Lebanon. Moreover, Mr. Yazbek manages many of Hezbollah's bank accounts.

- **Hussein al-Shami**. Mr. Al-Shami was formerly the head of the Islamic Resistance Support Organization and Bayt al-Mal, fundraising institutions that help finance Hezbollah. Due to Mr. Al-Shami's significant role in this effort, he was appointed to be a member of Hezbollah's Governing Council. Prior to that time, Mr. Al-Shami headed Hezbollah's Social Services Unit. He was designated an SDGT on September 7, 2006.

## 2. EXECUTIVE COUNCIL

558. Hezbollah's Executive Council (*Majlis al-Tanfizi*) ensures the execution of the Shura Council's policies and runs Hezbollah's day-to-day operations, including its educational networks, youth movements, hospitals and health associations, women's association, labor unions, professional associations, and other "charitable" and social organizations.

559. Hezbollah's Executive Council is headed by Shura Council member Hashem Safieddine (SDGT).

## 3. PARLIAMENTARY COUNCIL

560. Hezbollah's Parliamentary Council is subordinate to the Shura Council and is composed of Hezbollah's members of Lebanon's parliament and ministers, both current and past.

561. This council supervises the actions of Hezbollah's bloc in Lebanon's parliament, known as "the Loyalty to the Resistance."

## 4. JIHAD COUNCIL—ISLAMIC JIHAD ORGANIZATION ("IJO") OR EXTERNAL SECURITY ORGANIZATION ("ESO")

562. Hezbollah's Jihad Council is the functional council responsible for its paramilitary and terrorist activities.

563.     The Jihad Council overseas the terrorist organization's "resistance" operations, including oversight of operations, recruitment, training, equipment procurement, and internal security.

564.     Hezbollah's terror apparatus, the Islamic Jihad Organization ("IJO") (a/k/a External Security Organization), is a substantial component of its Jihad Council.

565.     The Jihad Council established the IJO in 1983 after Hezbollah's terrorist attack in Beirut on U.S. military personnel conducting U.N. peacekeeping operations in Lebanon.

566.     As a sub-directorate of the Jihad Council, IJO works alongside, but distinct from, Hezbollah's domestic militia activity in Lebanon.

567.     The IJO is functionally responsible for procurement, intelligence, counterintelligence, surveillance, planning, coordination, and execution of terrorist attacks against Hezbollah's and Iran's enemies outside of Lebanon.

### a.     Imad Mughniyah

568.     Imad Mughniyah was one of Hezbollah's founders in the 1980s and, until his death in 2008, headed the IJO under the Jihad Council's supervision.

569.     Mr. Mughniyah was known as Hezbollah's "Chief of Staff" and, as such, oversaw Hezbollah's military, intelligence, and security apparatuses.

570.     Mr. Mughniyah began his career in terrorism with the Palestinian Fatah movement and rose through the organization's ranks.

571.     Later, he joined Hezbollah and formed the organization's IJO with his brother-in-law, cousin, and successor Mustafa Badr al-Din.

572.     Mr. Mughniyah was identified by both Israeli and American officials as personally involved in planning and directing many of Hezbollah's suicide bombings, terrorist attacks,

murders, kidnappings, and assassinations throughout the 1980s and 1990s against the United States and other Western countries, and against Israel and Jewish targets around the world.

573. Mr. Mughniyah established the BAC to invest the IJO's money and help it develop additional revenue streams to support its terrorist activities.

574. Consistent with his utter ruthlessness, Mr. Mughniyah placed no restrictions on the BAC's range of activities. Thus, although Hezbollah generally adheres to a fanatical religious ideology, the BAC quickly embraced drug trafficking and a variety of other criminal activities incompatible with traditional Islamic principles.

575. In 2003, Mr. Mughniyah and his brother-in-law Mustafa Badr al-Din traveled secretly to Iraq at then IRGC–QF leader Qassem Soleimani's direction to begin establishing Shi'a proxy groups that the IRGC and Hezbollah could later deploy against U.S. and Coalition Forces.

576. Many Iraqi Shi'a leaders admired Hezbollah and were eager to mimic its success in taking over Lebanon. They also related culturally to Hezbollah as fellow Arabs (as opposed to the Iranian regime which was ethnically Persian) with religious ties to the Shi'a clerical schools in Najaf, Iraq.

577. Thus, Mr. Mughniyah was a key figure in establishing, training, and directing the Shi'a terrorist cells that caused Plaintiffs' injuries.

### b. Mustafa Badr al-Din

578. Mustafa Badr al-Din was a Hezbollah military leader and both the cousin and brother-in-law of Mr. Mughniyah (Mughniyah was married to Mustafa Badr al-Din's sister Sa'ada).[72]

---

[72] Mustafa Badr al-Din had a brother named Muhammad Amin Badr al-Din who is discussed *infra*.

579.     Like Mr. Mughniyah, Mr. Badr al-Din served in Fatah's Force 17 in Beirut (before 1982) and joined Hezbollah with him.

580.     Mr. Badr al-Din later became an expert bomb maker.

581.     Mr. Badr al-Din headed Hezbollah's security apparatus and was a member of the Shura Council as well as Head of the IJO unit responsible for overseas terrorist operations. He was a key participant in Hezbollah's bombing of the U.S. Marine Corps barracks in Lebanon in 1983 that killed 241 Marines.

582.     Soon after that bombing, Mr. Badr al-Din was dispatched to Kuwait to work with a joint Iraqi Da'wa Party–Hezbollah operation to attack Western targets at the IRGC's behest.

583.     At the beginning of his terrorist career, Mr. Badr al-Din commanded the IRGC's operation to assassinate the Emir of Kuwait. The attempt failed, and he ultimately spent five years in a Kuwaiti jail. (He was also charged with bombing American and French embassies in Kuwait City.)

584.     The Kuwaiti authorities sentenced Mr. Badr al-Din to death, but he fled from prison during the Iraqi invasion of Kuwait in August 1990.

585.     Hezbollah had previously tried to gain Mr. Badr al-Din's release, along with other Hezbollah operatives held in Kuwait, by hijacking airplanes as bargaining chips, including hijacking a TWA flight in 1985 and Kuwaiti aircraft in 1984 and 1988.

586.     In June 2011, the prosecutor of the Special Tribunal for Lebanon charged Mr. Badr al-Din with involvement in the February 14, 2005, bombing that killed former Lebanese Prime Minister Rafic Hariri and 21 others.[73]

---

[73]     Press Release, *Treasury Designates Hizballah Commander Responsible for American Deaths in Iraq*, U.S. DEP'T OF TREASURY (Nov. 19, 2012), https://home.treasury.gov/news/press-releases/tg1775.

587.    The U.S. Department of Treasury designated Mr. Badr al-Din an SDGT in September 2012 "for providing support to Hezbollah's terrorist activities in the Middle East and around the world." Saudi Arabia also designated Mr. Badr al-Din as a global terrorist linked to Hezbollah, and as an activist in the Syrian war.

### c.    Muhammad Kawtharani

588.    Since 2003, Muhammad Kawtharani has been responsible for Hezbollah's Iraq portfolio, overseeing all the terrorist organization's Iraqi operations. He has also assisted in coordinating the movement of Hezbollah fighters to support pro-regime forces in Syria.

589.    As the individual in charge of Hezbollah's Iraq activities, Mr. Kawtharani worked on behalf of Hezbollah's leadership to promote the terrorist group's interests in Iraq, including Hezbollah's efforts to provide training, funding, political, and logistical support to Iranian-backed terror cells in Iraq.

590.    As a member of Hezbollah's Political Council, Mr. Kawtharani also helped secure the release from Iraqi custody of senior Hezbollah commander Ali Mussa Daqduq. The latter was designated an SDGT by the U.S. Department of Treasury in November 2012 and was responsible for directing numerous attacks against the Coalition Forces in Iraq, including the January 20, 2007, attack on a compound in Karbala that claimed the lives of five American soldiers and injured many others.

591.    On August 22, 2013, Mr. Kawtharani was designated an SDGT by the U.S. Department of Treasury for, among other things, his supervisory role in Iraq where he "worked on behalf of Hezbollah's leadership to promote the group's interests in Iraq, including Hezbollah

efforts to provide training, funding, political, and logistical support to Iraqi Shi'a insurgent groups."[74]

### d. Assad Ahmad Bakarat

592.     During the Relevant Period, Assad Ahmad Barakat managed Hezbollah's operations in South America's Tri-Border Area between Brazil, Paraguay, and Argentina.

593.     Mr. Bakarat, born in 1967, immigrated from Lebanon to Paraguay to escape the Lebanese Civil War.

594.     In October 2001, *Reuters* reported that Paraguayan prosecutors were seeking Mr. Bakarat's arrest after the country's counter-terrorism police seized evidence "in raids on a business belonging to him" which contained documents and videos "calling for armed struggle and of suicide attacks on North American and Jewish interests."[75]

595.     In June 2004, OFAC designated Mr. Bakarat as an SDGT and stated that he is "[o]ne of the most prominent and influential members of the Hezbollah terrorist organization."[76]

596.     Mr. Bakarat was involved in various financial crimes and illicit activity to generate funding for Hezbollah, including money laundering, extortion, counterfeiting, and front-company activities.

597.     In the TBA, Mr. Barakat served as a regional treasurer and liaison for Hezbollah, often personally carrying cash contributions to Lebanon where he met regularly with Hassan Nasrallah and other members of Hezbollah's Shura Council.

---

[74]     Press Release, *Treasury Sanctions Hizballah Leadership*, U.S. Dep't of Treasury (Aug. 22, 2013), https://home.treasury.gov/news/press-releases/jl2147.

[75]     *Paraguay Seeks Lebanese Suspected of Guerrilla Links*, Reuters (Oct. 23, 2001).

[76]     Press Release, *Treasury Designates Islamic Extremist, Two Companies Supporting Hizballah in Tri-Border Area*, U.S. Dep't of Treasury (Jun. 10, 2004), https://home.treasury.gov/news/press-releases/js1720.

598. Two of Barakat's businesses, Casa Apollo in Paraguay and Barakat Import Export LTD in Chile, were used to facilitate Hezbollah fundraising and support operations in the TBA.

599. Mr. Bakarat regularly hosted and attended meetings with senior regional IJO leaders in the TBA region regarding Hezbollah's intentions to target enemies of the group in Central and South America.

### e. Sobhi Mahmoud Fayad

600. During the Relevant Period, Sobhi Mahmoud Fayad was IJO's leader in the TBA region, reporting to Mr. Bakarat.

601. In 2006, OFAC designated Mr. Fayad as an SDGT for providing "financial and logistical support to the Hezbollah terrorist organization."[77]

602. Furthermore, OFAC stated that Mr. Fayad "served as a liaison between the Iranian embassy and the Hezbollah community in the TBA" and received "military training" from the IRGC in Iran.

### 5. THE MARTYRS FOUNDATION–LEBANON (THE *SHAHID* FOUNDATION OR *MUA'ASSASAT AL-SHAHID*)

603. Since its emergence in the 1980s, under the IRGC's patronage, Hezbollah has developed a network of social welfare institutions that it uses as an instrument of its political, psychological, and military strategy.

604. For example, Hezbollah provides welfare benefits to the families of its "martyrs" (*shahid*, or *shuhadaa*, plural), particularly their children.

---

[77] Press Release, *Treasury Targets Hizballah Fundraising Network in the Triple Frontier of Argentina, Brazil, and Paraguay*, U.S. DEP'T OF TREASURY (Dec. 6, 2006), https://home.treasury.gov/news/press-releases/hp190.

605.    The children of Hezbollah's *shuhadaa* are privileged because they are educated in Hezbollah-subsidized schools and receive free health care in a country where, for many years, Lebanese citizens spent an estimated 40 percent of their income on medical expenses.

606.    Hezbollah's social welfare institutions are not only operated by senior Hezbollah operatives; these institutions and their leaders are also actively involved in Hezbollah's network of commercial enterprises which, in turn, provide services to these social welfare institutions.

607.    The Martyrs Foundation–Lebanon (a/k/a *Shahid* Foundation, a/k/a *Mua'assasat al-Shahid*) is a branch of the Iranian Martyrs Foundation. It was established after the Israeli incursion into Lebanon in 1982, with the goal of supporting the families of Hezbollah fighters who died as a result of their attacks on the Israel Defense Forces ("IDF").

608.    In July 1987, the *Financial Times* reported that the IRGC built the Imam Khomeni Hospital in Baalbek, Lebanon, as part of Iran's monthly expenditures in Lebanon of over $5 million U.S. dollars per month.

609.    Furthermore, the *Financial Times* stated that Iran's "money is used not only to finance the Islamic resistance movement and Hezbollah, the rapidly growing Party of God, but to 'alleviate the pain and burden of martyrs' families and under-privileged citizens'" by means of assistance from the Martyrs Foundation–Lebanon.

610.    Companies belonging to another Hezbollah institution, Jihad al-Bina (SDGT), receive the construction contracts for those projects, and still other Hezbollah companies arrange the financing, acquire the real estate, and provide the architectural and engineering services for the projects.

611.    Martyrs Foundation–Lebanon is controlled and operated by Hezbollah and is one of the most open and notorious Hezbollah institutions in Lebanon.

612. Hezbollah has openly, publicly, and repeatedly acknowledged and publicized that the Martyrs Foundation belongs to and is a part of Hezbollah, including on its official websites, in official press releases issued by Hezbollah, on Hezbollah's official television station, *Al-Manar*,[78] on Hezbollah's official radio station, *Al-Nour*, and in numerous press conferences and news media interviews conducted by senior Hezbollah officials.

613. The Martyrs Foundation's affiliation with Hezbollah was not only widely known in Lebanon. For example, as early as October 1991, *The Independent* newspaper (published in London) reported that the Martyrs Foundation supplies stipends to the families of Hezbollah terrorists.

614. Similarly, on May 30, 2000, *The Irish Times* published an article reporting that Hezbollah operatives, including personnel "from the Martyrs' Foundation," were moving into parts of Southern Lebanon.

615. The Martyrs Foundation glorifies death in jihad by cultivating Hezbollah's "cult of the martyr."

616. Its purpose is to serve the Islamic Revolution in Iran.

617. In a widely reported story, the *Associated Press* reported on a November 2004 meeting in the offices of the Foundation's parent organization in Iran:

> The 300 men filling out forms in the offices of an Iranian aid group were offered three choices: Train for suicide attacks against US troops in Iraq; for suicide attacks against Israelis or to assassinate British author Salman Rushdie.[79]

---

[78] For example, on November 7, 2003, the BBC Worldwide Monitoring service published an English-language transcript of a November 3, 2003, report on *Al-Manar* of a Martyrs Foundation event at which the Secretary-General of Hezbollah, Hassan Nasrallah, presided. *See*, BBC WORLDWIDE MONITORING, *Lebanese Hezbollah Leader Discusses Bush's Speech, Democracy in Mideast*, BRITISH BROADCASTING CORPORATION (London) (Nov. 7, 2003).

[79] "Iranian aid group recruits suicide bombers to attack U.S. troops," Ali Akbar Dareini, *Associated Press,* (Nov. 28, 2004), https://www.southcoasttoday.com/story/news/nation-world/2004/11/29/iranian-aid-group-recruits-suicide/50441304007/.

618. The Martyrs Foundation–Lebanon's own official website in February 2006 explained that "the culture of jihad and martyrdom was at the heart of the institution's message and promotion as a target for its various works, activities and programs" and that the Foundation's aims included "supporting the march of the Islamic resistance in Lebanon."

619. The Martyrs Foundation's stated purpose since its inception has been to help Hezbollah wage jihad against the perceived enemies of Shi'a Islam.

620. Its website openly (and prominently) quoted Hezbollah leader Hassan Nasrallah offering his gratitude to donors for giving money to the "martyrs' children who are truthful to their covenant with Allah."

621. A senior U.S. military analyst correctly characterized as the "most important branch of the Hezbollah organization…. The Social Service Section [which] serves as an equal arm within the organization and is used as much as the military and political wing in terms of leverage."

622. The Martyrs Foundation's purpose is to provide financial and other material support to Hezbollah terrorists wounded in action, and to the families of Hezbollah terrorists killed in action. The purpose of that funding and support is to "provide peace of mind to current and prospective" Hezbollah terrorists, "by knowing that they and their families will be cared for in the event of death or injury."[80]

623. On March 9, 2010, Hezbollah's *Al Manar* television station provided on-air commentary about a speech by Hezbollah Deputy Secretary General Sheikh Naim Qassem at Al-Rasul al-Azam Hospital marking the Prophet Muhammad's birthday.

---

[80] Major James B. Love, *Hezbollah: Social Services as a Source of Power*, U.S. JOINT SPECIAL OPERATIONS UNIVERSITY, at 21–24 (2010).

624.     During the segment, *Al Manar* broadcast footage of Mr. Qassem stating the following about Hezbollah's armed operatives in Lebanon: "The weapons are not a topic of discussion at the negotiating table. Our weapons are a result of the defense strategy and are not the basis for it. The weapons are fine, the security situation is stable, and there is political stability."

625.     In honor of the hospital's 25th anniversary, Hezbollah leader Nasrallah delivered a speech at the hospital. He acknowledged the role of the Martyrs Foundation in establishing the hospital and described the hospital as part of the *jihad*, the resistance.

626.     This merely echoed numerous prior public events at which Hezbollah celebrated its flagship "social welfare" organization. For example, in November 2003, Nasrallah headlined an event at the Martyrs Foundation where he denounced a recent speech given by President Bush, whom Nasrallah famously referred to subsequently as the "greatest Satan" and "Pharoah of modern times."

627.     On February 13, 2009, Mr. Qassem spoke at a celebration held by the Institute and College of the Greatest Messenger (PBUH) of the Martyrs Foundation "in memory of the martyrs, leaders of the Islamic Resistance."

628.     The Martyrs Foundation is entirely controlled and operated by Hezbollah and is one of the most open and notorious Hezbollah institutions in Lebanon. Its management and leadership consist of senior Hezbollah operatives closely tied to the organizations governing the Shura Council and its Islamic Jihad Organization component, and it functions as an integral part of Hezbollah.

629.     The U.S. Department of Treasury has described the Martyrs Foundation– Lebanon as "openly affiliated with Hezbollah."[81]

---

[81]     *See*, Press Release, *Treasury Labels Bank Providing Financial Services to Hizballah as Specially Designated Global Terrorist,* U.S. DEP'T OF TREASURY (Aug. 29, 2019), https://home.treasury.gov/news/press-releases/sm760.

630.     As noted above, the Martyrs Foundation's affiliation with Hezbollah was not only open and public in Lebanon, but widely ascertainable.

631.     The Martyrs Foundation was designated an SDGT by the U.S. Department of Treasury on July 24, 2007, for its role in subsidizing the families of Hezbollah (and Palestinian) suicide bombers and other terrorists.[82]

632.     According to the U.S. Department of Treasury:

> Martyrs Foundation branches in Lebanon has also provided financial support to the families of killed or imprisoned Hezbollah … In addition to fundraising responsibilities, senior Martyrs Foundation officials were directly involved in Hezbollah operations against Israel during the July-August 2006 conflict.[83]

633.     The U.S. Department of Treasury also found that:

> [T]he Martyrs Foundation is an Iranian parastatal organization that channels financial support from Iran to several terrorist organizations in the Levant, including Hezbollah, Hamas, and the Palestinian Islamic Jihad (PIJ). To this end, the Martyrs Foundation established branches in Lebanon staffed by leaders and members of these same terrorist groups. Martyrs Foundation branches in Lebanon has also provided financial support to the families of killed or imprisoned Hezbollah and PIJ members, including suicide bombers in the Palestinian territories.[84]

634.     On July 21, 2006, *Agence France Presse* reported on Israeli airstrikes, including a strike on the "Martyrs' Foundation, a Hezbollah-run charity group."

635.     The Orphans Project Lebanon (Waisenkinderprojekt Libanon e.V.) was, until its closure in 2014, the German branch of Hezbollah's Martyrs Foundation and responsible for collecting donations in Germany and transferring those funds to Hezbollah in Lebanon.

---

[82]     *See*, Press Release, *Twin Treasury Actions Take Aim at Hizballah's Support Network*, U.S. DEP'T OF TREASURY (Jul. 24, 2007), https://home.treasury.gov/news/press-releases/hp503.

[83]     *Id.*

[84]     *Id.*

636. In April 2007, *The Wall Street Journal* stated the following regarding the Orphans Project Lebanon's fundraising activities in Germany for Hezbollah's benefit:

> German security services believe that about 900 Hezbollah core activists are in the country and regularly meet in 30 cultural community centers and mosques. These activists financially support Hezbollah in Lebanon through fund-raising organizations, such as the 'Orphans Project Lebanon Association.' This harmless-sounding charity belongs to the Lebanese 'al-Shahid (the Martyr) Association,' which is part of the Hezbollah network that supports the families of militia fighters and suicide bombers.[85]

637. Commerzbank's assistance to Orphans Project Lebanon during the Relevant Period is discussed extensively below.

## B. HEZBOLLAH FINANCING

638. Hezbollah is subject to strict economic sanctions programs imposed by the United States as the result of its designation as an SDT (1995), FTO (1997) and SDGT (2001).

639. The U.S. Sanctions Regime is intended, among other things, to prevent Hezbollah from engaging in banking activities through the U.S. financial system, including via electronic funds transfers, and thereby limits Hezbollah's ability to carry out terrorist attacks.

640. Hezbollah requires formal banking services, including the ability to execute electronic funds transfers through the global financial system, in order to:

    a. Build and maintain its operational infrastructure for the planning and execution of terrorist attacks;
    b. Purchase and store weapons, explosives, and other materiel used by it to carry out terrorist attacks;
    c. Pay, train, transport and shelter its terrorist operatives and proxies; and,
    d. Carry out specific terrorist attacks.

641. The U.S. Sanctions Regime is only effective to the extent that global financial institutions adhere to its restrictions.

---

[85] Alexander Ritzmann and Mark Dubowitz, *Hezbollah's German Helpers*, WALL STREET JOURNAL (Apr. 17, 2007).

642. Hezbollah is unable to execute electronic funds transfers through the U.S. financial system and conduct other banking activities via banks and other financial institutions which observe and enforce the U.S. Sanctions Regime.

643. If all banks and financial institutions worldwide observed and genuinely enforced the U.S. Sanctions Regime, Hezbollah's ability to access the global financial system and conduct banking activities would be severely restricted, and Hezbollah's capabilities (including acts of terrorism) would be significantly reduced.

644. As Treasury Under Secretary for Terrorism and Financial Intelligence Stuart Levey explained to the House Financial Services Subcommittee on Oversight and Investigations in July 2006:

> [W]hen we block the assets of a terrorist front company, arrest a donor, or shut down a corrupt charity, we deter other donors, restrict the flow of funds to terrorist groups and shift their focus from planning attacks to worrying about their own needs. While any single terrorist attack may be relatively inexpensive to carry out, terrorist groups continue to need real money. They depend on a regular cash flow to pay operatives and their families, arrange for travel, train new members, forge documents, pay bribes, acquire weapons, and stage attacks. Disrupting money flows stresses terrorist networks and undermines their operations.

645. Hezbollah and its Business Affairs Component (discussed below) therefore select financial institutions that are willing to work with them and in practice flout the U.S. Sanctions Regime.

### 1. HEZBOLLAH'S BUSINESS AFFAIRS COMPONENT ("BAC")

646. For many years, American intelligence and law enforcement agencies were aware of Hezbollah's growing capabilities and its increasing reliance on illicit activities to fund its operations.

647. Most of what is publicly known about Hezbollah, its exploitation of the U.S. financial system, and its collaboration with Lebanese banks comes from three principal sources:

(a) publicly announced U.S. Department of Treasury designations of Hezbollah leaders, operatives, and commercial enterprises and related official testimony to Congress; (b) publicly available information concerning what became known as Project Cassandra, which originated in the Drug Enforcement Administration's ("DEA") investigation of Hezbollah's development into an international crime syndicate that collected funds worth as much as $1 billion U.S. dollars a year from narcotics and weapons trafficking, money laundering, and other criminal activities across Europe, Africa, and the Americas; and (c) publicly disclosed materials relating to U.N. and European investigations of diamond smugglers and money launderers.

648.    According to published reports, DEA's Project Cassandra Taskforce members in particular came to learn that Hezbollah, working closely with Iran's intelligence services and its IRGC, had carefully cultivated illicit networks among Lebanese expatriate communities around the world to create a web of businesses that acted as front companies for Hezbollah's and the IRGC's black-market trading and money laundering activities.

649.    According to these published reports, Project Cassandra Taskforce members tracked Hezbollah's flow of weapons, drugs, conflict diamonds,[86] ammunition, explosives, military-grade spare parts (including parts for Iran's illicit nuclear and ballistic missile programs), and U.S. dollar funds along the same Hezbollah transit routes that carried shipments of seemingly legal goods, such as frozen chicken, raw materials, precious metals, used cars, cigarettes, and consumer electronics.

---

[86]    "Conflict Diamonds" (a/k/a "Blood Diamonds") as used herein refers to the illegal trade in diamonds with African countries where violent conflicts have taken place between armed militias and African government forces. Almost two decades ago, the UNSC initiated international embargos regarding trading in diamonds with countries like Liberia, Sierra Leone, and Angola. Beginning in 1999, the EU adopted regulations regarding banning the direct or indirect import into the EU of rough diamonds from Liberia, Sierra Leone, and Angola.

650.     As the Project Cassandra Taskforce would learn, Hezbollah ran these networks through its BAC, i.e., its "commercial apparatus," a special financial and business unit established by the late Imad Mughniyah, then Hezbollah's most senior terrorist commander, and overseen by two deputies, Adham Hussein Tabaja, a prominent Hezbollah financier and real estate developer in Lebanon, and Abdallah Ali Safieddine (a/k/a "Safi al-Din"), the brother of Hashem Safieddine, one of Hezbollah's most senior leaders who is reportedly the designated successor to Hezbollah's supreme leader and U.S.-designated terrorist Hassan Nasrallah.[87]

651.     Both Adham Tabaja and Abdallah Safieddine have been designated SDGTs by the U.S. Department of Treasury.

652.     As discussed in detail below, the BAC oversees Hezbollah's vast network of world-wide criminal and commercial enterprises which it uses to finance its terrorist operations.

653.     During the Relevant Period, Abdallah Safieddine served as Hezbollah's de facto ambassador and deputy to the IRGC–QF in Iran and as Imad Mughniyah's representative (until the latter's death in 2008), among other things, coordinating the BAC's joint financial efforts with the IRGC–QF and reporting to the late Qassem Soleimani.

654.     According to the DEA, Hezbollah's BAC developed extensive operational and financial linkages with various drug cartels and money laundering networks across South America:

> Members of the Hezbollah BAC have established business relationships with South American drug cartels, such as La Oficina de Envigado, responsible for supplying large quantities of cocaine to the European and United States drug markets. Further, the Hezbollah BAC continues to launder significant drug proceeds as part of a trade-based money laundering scheme known as the Black-Market Peso Exchange.

---

[87]     DEA had launched "Operation Titan" targeting an international cocaine smuggling and money laundering ring in South America, but surveillance led them to a significant operative with strong connections to the Colombian cartels who was referred to as "Taliban." This individual turned out to be a Hezbollah operative named Chekry Harb and the discovery of his (and Hezbollah's) role in drug trafficking and money laundering led to further revelations and eventually to DEA's efforts to map Hezbollah's drug trafficking networks, including those of Ayman Joumaa.

655. The Project Cassandra Taskforce investigations of Mr. Safieddine and the Hezbollah-affiliated narcotic trafficker Ayman Joumaa eventually intersected with a separate effort by U.S. Special Operations Command ("SOCOM") that was tracking the source of funds used by Iranian proxies that were deploying sophisticated weapons against U.S. armored vehicles in Iraq, including, among other weapons, IRGC-supplied (and Hezbollah-designed) EFPs (discussed in detail below).

656. When phone numbers connected to the IRGC network supplying EFPs to Iranian and Hezbollah proxies in Iraq matched phone numbers intercepted during the Project Cassandra Taskforce's Colombia investigation of Mr. Joumaa's narcotic trafficking network, Project Cassandra and SOCOM investigative teams were able to tie Mr. Safieddine's EFP network in Iran to Hezbollah's narcotics trafficking and money laundering network operating in Colombia and the "Tri-Border Area."

657. Ultimately, the U.S. Intelligence Community and Department of Justice's analysis of thousands of hours of intercepted Arabic phone conversations from Colombia, among other locations, painted a picture of Abdallah Safieddine as a central figure in Hezbollah's (and the IRGC's) global financial network and in the flow of U.S. dollars into Iraq to fuel attacks against U.S. service members, among others.

658. According to then-DEA Acting Deputy Administrator Jack Riley, "[t]hese drug trafficking and money laundering schemes utilized by the Business Affairs Component provide a revenue and weapons stream for an international terrorist organization responsible for devastating terror attacks around the world."

### a.  Abdallah Ali Safieddine

659. Abdallah Safieddine is the co-head of Hezbollah's BAC.

660. As noted above, Mr. Safieddine is also Hezbollah's longtime Tehran-based envoy to the IRGC and oversees Hezbollah's international drug trafficking networks and global money laundering operations.

661. Mr. Safieddine was directly involved in IRGC officials gaining access to Lebanese Canadian Bank ("LCB") and key LCB managers, who provide Iran and Hezbollah and the IRGC with banking services (including U.S. dollar bank accounts and access to the U.S. financial system). (LCB is discussed more fully below.)

662. Mr. Safieddine is also the brother of senior Hezbollah leader Hashem Safieddine, and of Hamzah Safieddine, who represents his brothers' and Hezbollah's interests on the boards of several companies and businesses.

663. Abdallah Safieddine was designated an SDGT by the U.S. Department of Treasury on May 17, 2018. He was described by the U.S. Department of Treasury as "Hezbollah's representative to Iran."

664. Mr. Safieddine is also closely connected to another senior BAC operative named Muhammad Bazzi, who was designated an SDGT on the same date and is discussed in detail below.

**b.    Adham Hussein Tabaja**

665. Adham Hussein Tabaja is a prominent Hezbollah leader and one of its most important financiers. Alongside Abdallah Safieddine, Mr. Tabaja presides over the BAC in Lebanon and operates an enormous network of well-known companies and businesses, whose proceeds support Hezbollah's terrorist endeavors.

666. In Lebanon, Mr. Tabaja has been a public figure for decades and is widely known as a leading Hezbollah operative and real estate mogul, standing at the forefront of Hezbollah's leading projects from building hospitals and schools to public works projects to a series of amusement parks and entertainment projects.

667.    For these reasons, Mr. Tabaja was designated an SDGT by the U.S. Department of Treasury on June 10, 2015.

668.    Adham Tabaja is an investor and holds key positions in a wide variety of Hezbollah commercial enterprises, which together form the "Tabaja Network." These entities also share common shareholders and officers, many of whom are U.S.-designated terrorist entities or individuals.

669.    On April 23, 2019, the U.S. government's "Rewards for Justice" Program announced a reward of up to $10 million U.S. dollars "for information leading to the disruption of the financial mechanisms of Lebanese Hezbollah."

670.    The announcement described Mr. Tabaja as a "Hezbollah member who maintains direct ties to senior Hezbollah organizational elements, including the terrorist group's operational component, Islamic Jihad. Tabaja also holds properties in Lebanon on behalf of the group."

671.    Adham Tabaja controls a vast network of companies in Lebanon and Iraq on Hezbollah's behalf that encompasses everything from real estate development to engineering to large entertainment projects to insurance.

## 2.    TRADE-BASED MONEY LAUDERING

672.    The IRGC and Hezbollah have long utilized trade-based money laundering ("TBML") techniques to move illicit funds through the global financial system. However, unlike some criminal enterprises, they also use TBML methods to obtain goods (often dual-use technologies) that they are otherwise prevented from acquiring due to U.S., U.N. and EU sanctions.

673.    TBML is generally defined as the process of disguising the proceeds of crime and moving value through the use of trade transactions in an attempt to legitimize their illicit origin.

674.    This is often done by misrepresenting the price, quantity, or quality of imports or exports involved.

675.    In most cases, this involves using the services of global financial institutions that operate in high-risk jurisdictions and are willing to assist high risk customers.

676.    The basic techniques of trade-based money laundering include:

- Over- and under-invoicing of goods and services.
- Multiple invoicing of goods and services.
- Over- and under-shipments of goods and services.
- Falsely described goods and services.

677.    Indicia of trade-based money laundering include:

- The type of commodity being shipped is designated as "high risk" for money laundering activities.
- The type of commodity being shipped appears inconsistent with the exporter or importer's regular business activities.
- The shipment does not make economic sense.
- The commodity is shipped to (or from) a jurisdiction designated as "high risk" for money laundering activities.
- The commodity is transshipped through one or more jurisdictions for no apparent economic reason.
- The method of payment appears inconsistent with the risk characteristics of the transaction.
- The transaction involves the receipt of cash (or other payments) from third party entities that have no apparent connection with the transaction.
- The transaction involves the use of front (or shell) companies.

3.    **LEBANON: A PRIMARY HEZBOLLAH/IRGC MONEY LAUNDERING HUB**

a.    **"The System"**

678.    For more than two decades, Hezbollah has participated directly in the fragmented Lebanese political system.

679.    While Hezbollah does not formally control Lebanon's government or judicial system, it wields enormous political influence and maintains its own private militia which not only rivals but is militarily superior to the Lebanese army.

680. Operating a terrorist organization of Hezbollah's size, ambition, reach, and sophistication requires vast amounts of money annually.

681. And despite Hezbollah's virulent hatred of the United States, because Lebanon was at all relevant times a dollarized economy and it IRGC patron was equally dependent on U.S. dollars obtained through the sale of Iranian oil and natural gas, Hezbollah has been highly dependent on access to the U.S. financial system—via (among others) Defendants.

682. Hezbollah's BAC provides the terrorist organization with numerous illicit revenue streams for criminal syndicates operating among the Lebanese diaspora communities of West Africa, South America, and the Persian Gulf.

683. Hezbollah views these revenue streams as part of its Islamic resistance activity—even when conducted with criminal organizations that share no ideological affinity with Hezbollah.

684. As a U.S. National Defense University report titled *Combating Crime–Terror Pipelines* stated:

> Ideology is not an obstacle: when it comes to money, Hezbollah will do business with anyone. Violent Extremists may justify their involvement in drug trafficking in many creative ways, including as a weapon against infidel consumers.[88]

685. Hezbollah's finances were closely tied to a larger, highly sophisticated, criminal enterprise that involved much of Lebanon's banking sector (including Defendants HSBC and SCB herein), many of the country's pre-existing organized crime families, and a significant portion of its political class (comprising members of all major religious groups in Lebanon, i.e., Sunni, Shi'a, Maronite, Druze, etc.).

---

[88]     Final Report, *Trans-Atlantic Dialogue on Combating Crime-Terror Pipelines Dismantling Converging Threat Networks to Strengthen Global Security*, NATIONAL DEFENSE UNIVERSITY (2012).

686.     This arrangement is sometimes referred to by Hezbollah and others in Lebanon as "The System."

687.     During the Relevant Period, The System came to reflect Hezbollah's integration of several different criminal networks ranging from conflict diamond dealers, counterfeiters, gold traders, narcotics traffickers, weapons traffickers, and trade-based money launderers.

688.     The U.S. Department of Treasury characterized the dynamics of the Lebanese banking system as follows:

> [A] steady flow of diaspora deposits in recent years have helped the Lebanese banking system to maintain relatively robust lending, improve asset quality, and maintain adequate liquidity and capitalization positions. However, banks remain highly exposed to the heavily indebted sovereign, carry significant currency risk on their balance sheets, and operate in a volatile political security environment…. Of particular relevance is the possibility that a portion of the substantial flow of remittances from the Lebanese diaspora, estimated at $7 billion—21% of GDP—in 2009, according to the World Bank, could be associated with underground finance and Trade-Based Money Laundering ("TBML") activities. Laundered criminal proceeds come primarily from Lebanese criminal activity and organized crime.

689.     Lebanon's substantial influx of remittances from expatriates has been estimated by the World Bank in 2011 at approximately $7.6 billion U.S. dollars annually.[89]

690.     This included enormous amounts of U.S. dollars flowing from drug-trafficking, the conflict diamond trade, arms dealing, corrupt government contracting by Hezbollah operatives with friendly African governments, and even ordinary (that is, otherwise legal) trade conducted by Hezbollah's world-wide enterprises.

---

[89]     According to the U.S. Dep't of Treasury, "Lebanon's banking sector continues to rely on significant capital inflows from the Lebanese diaspora community, which has been a large contributor to banking sector liquidity and capitalization, estimated by the World Bank at $7.6 billion—18% of GDP—in 2011." *See,* FINANCIAL CRIMES ENFORCEMENT NETWORK, NOTICE OF FINDING THAT KASSEM RMEITI & CO. FOR EXCHANGE IS A FINANCIAL INSTITUTION OF PRIMARY MONEY LAUNDERING CONCERN (2013), https://www.fincen.gov/sites/default/files/special_measure/311--ExchHouse-R-NoticeofFinding-Final.pdf.

691.    Hezbollah's cross-border flow of funds also includes massive amounts of Iranian financial support (most of it in U.S. dollars, the currency in which Iranian crude oil was priced and upon which Lebanon was and is dependent) that was laundered through Hezbollah and IRGC-affiliated organizations based in Lebanon, Hezbollah's commercial networks, and Iran's global sanctions evasions networks that it then routed through Lebanese entities and banks.

### b.    Al Qard Al Hasan—Hezbollah's Shadow Bank

692.    Throughout the Relevant Period, Lebanon served as a major hub for Hezbollah and the IRGC's illicit financing networks.

693.    Hezbollah's al-Qard al-Hasan Association ("AQAH") was founded in the early 1980s and functions as an unlicensed bank for Hezbollah, holding customer deposits worth almost $500 million U.S. dollars in 2019, much of it in gold bullion.

694.    AQAH currently operates over twenty-five branch offices and branches across Lebanon and, because it is not licensed as a bank but as a charity, it pays no taxes.

695.    When the U.S. Department of Treasury designated AQAH as an SDGT on July 24, 2007, it noted the following regarding Hezbollah's involvement:

> Hezbollah has used AQAH as a cover to manage its financial activity. AQAH is run by Husayn al-Shami, a senior Hezbollah leader who has served as a member of Hezbollah's Shura Council and as head of several Hezbollah-controlled organizations. Following the September 7, 2006, designation of al-Shami, along with Bayt al-Mal and Yousser Company for Finance and Investment, AQAH assumed a more prominent role in Hezbollah's financial infrastructure.

696.    Hezbollah's leading financiers held accounts at AQAH, as did several Iranian companies closely affiliated with Hezbollah and the IRGC, such as Mahan Air.

697.    Hezbollah's social welfare associations which maintained accounts with AQAH included the Martyrs Foundation.

698.     The May 11, 2021, U.S. Department of Treasury designation of several members

of AQAH's senior management explained further:

> While AQAH purports to serve the Lebanese people, in practice it illicitly
> moves funds through shell accounts and facilitators, exposing Lebanese
> financial institutions to possible sanctions. AQAH masquerades as a non-
> governmental organization (NGO) under the cover of a Ministry of Interior-
> granted NGO license, providing services characteristic of a bank in support
> of Hezbollah while evading proper licensing and regulatory supervision. By
> hoarding hard currency that is desperately needed by the Lebanese
> economy, AQAH allows Hezbollah to build its own support base and
> compromise the stability of the Lebanese state. AQAH has taken on a more
> prominent role in Hezbollah's financial infrastructure over the years, and
> designated Hezbollah -linked entities and individuals have evaded sanctions
> and maintained bank accounts by re-registering them in the names of senior
> AQAH officials, including under the names of certain individuals being
> designated today.[90]

699.     Furthermore, the U.S. Department of Treasury stated the following regarding

evidence that AQAH officials used joint Lebanese bank accounts and "shadow accounts" to

transfer funds worth over $500 million U.S. dollars on Hezbollah's behalf:

> The AQAH officials designated today have all participated in evasive
> "shadow" banking activity. Yazbeck, Gharib, Harb, Akar, and Othman
> maintain joint bank accounts in Lebanese banks that have allowed them to
> transfer more than $500 million within the formal financial system over the
> past decade, despite existing sanctions against AQAH.

700.     In 2021, the SpiderZ hacking group infiltrated AQAH, seizing data from its servers

that showed the firm provided loans to both member-borrowers and unsecured applicants in

exchange for gold deposits or other guarantees, including cash.

701.     The documents hacked by SpiderZ exposed Iranian account holders, including

sanctioned entities, such as Hezbollah's Martyrs Foundation, the Imam Khomeini Relief Aid

---

[90]     *See* Press Release, *Treasury Targets Hizballah Finance Official and Shadow Bankers in Lebanon*, U.S. DEP'T
OF TREASURY (May 11, 2021), https://home.treasury.gov/news/press-releases/jy0170 ("By hoarding hard currency that
is desperately needed by the Lebanese economy, AQAH allows Hizballah to build its own support base and
compromise the stability of the Lebanese state.").

Committee, Mahan Air, and Iran Air, in addition to accounts for the office of Iran's Supreme Leader Ali Khamenei, among others.

702.  The leaked documents also showed that AQAH maintains eight correspondent accounts with Iran's Bank Saderat–Lebanon branch.

703.  Most relevant to this Action, AQAH's financial records demonstrate the symbiotic relationship between the IRGC and Hezbollah.

704.  IRGC assets such as Mahan Air channeled funds through Hezbollah's shadow banking system at the same time that Mahan Air was moving Hezbollah and IRGC personnel and military equipment into Iraq to orchestrate the attacks on Plaintiffs.

705.  At the same time, operating as Hezbollah's shadow bank, AQAH worked with Bank Saderat to both access formal banking channels and provide closer financial coordination with the IRGC and its investments in Lebanon.

### 4.    LEBANESE EXCHANGE HOUSES

706.  For at least two decades, money exchange businesses have played a key role as a waystation for Hezbollah BAC bulk cash to transition into the Lebanese banking system.

707.  The exchange houses first became a major feature of Lebanon's financial sector during the Lebanese civil war, and in 2001, the Lebanese Central Bank published a set of circulars expanding regulations for exchange houses operating in the country.

708.  In 2011, the U.S. Department of Treasury designated three of those exchange houses because of their significant roles in laundering money for Ayman Joumaa's narcotics trafficking network: New Line Exchange Trust Company, the Elissa Exchange Company, and the Hassan Ayash Exchange Company.

709.  In 2013, the U.S. Department of Treasury named Rmeiti Exchange and Halawi Exchange as foreign financial institutions of primary money laundering concern under Section 311

of the USA PATRIOT Act for essentially stepping in and taking over the roles played by Elissa Exchange Company and the Hassan Ayash Exchange Company in laundering money for Hezbollah and the Joumaa Network.

710. From 2004 through 2011, Lebanese exchange houses were also a key transit point for Hezbollah funds flowing into Iraq to support Hezbollah's proxies and finance attacks on American personnel, including Plaintiffs herein.

711. Cash from narcotics, weapons, conflicts diamonds, or other illicit sales were deposited in an exchange house, which would then convert it into electronic funds at its correspondent accounts at a Lebanese bank. Those electronic funds could then be transmitted anywhere by that bank, including through the United States.

712. Hezbollah's BAC set aside funds from its narcotics trafficking proceeds to send to Iraq via its preferred Lebanese exchange houses, invested some of the proceeds in Lebanese real estate and commercial ventures, and laundered the rest using elaborate trade-based money laundering arrangements.

713. Mr. Joumaa's movement of hundreds of millions of U.S. dollars into Lebanon each year provided desperately needed liquidity to the Lebanese banking system as did similar deliveries by other parallel drug trafficking networks approved by the BAC and overseen by Abdallah Safieddine who coordinated Hezbollah and IRGC–QF financing on behalf of Qassem Soleimani.

714. Lebanese exchange houses provided a valuable service both to the BAC and its drug trafficking networks as well as to Lebanon's commercial banks that preferred these intermediary financial institutions to handle the bulk cash deliveries and serve as the intermediaries for the trade-based money laundering that follows.

### a.　New Line Exchange Network

715.　New Line Exchange Trust Company SAL ("New Line Exchange") was incorporated in May 2008 and operated by Ziyad Muhammad Youssef on behalf of Ayman Joumaa, who effectively controlled the company.

716.　Both New Line Exchange and Ziyad Muhammad Youssef were designated in January 2011 as SDNTKs[91] for their direct involvement in Mr. Joumaa's narcotics money laundering activities.

717.　The transaction below provides an example of Ayman Joumaa's trade-based money laundering operations through the combination of bulk cash, Lebanese exchange houses, HBSC–Hong Kong, and U.S. correspondent banks:

---

[91]　OFAC's designations are made pursuant to the Foreign Narcotics Kingpin Designation Act and target major narcotics traffickers. *See*, Press Release, *Treasury Targets Major Lebanese-Based Drug Trafficking and Money Laundering Network*, U.S. DEP'T OF TREASURY (Jan. 26, 2011), https://home.treasury.gov/news/press-releases/tg1035.

## Joumaa–22
$49,650 USD via Defendant BBAC on October 5, 2008



### b.    Elissa Exchange Network

718.    Elissa Exchange Company SARL ("Elissa Exchange") was established in 1996 and designated by the U.S. Department of Treasury as an SDNTK in January 2011 along with its principals, Jamal Muhammad Kharrubi and Ali Muhammad Kharrubi.[92]

719.    During the Relevant Period, Elissa Exchange and its network of Lebanese companies were a prime vehicle for Hezbollah's money laundering and drug trafficking operations, including cash smuggling via massive inflows of funds from Africa.

---

[92]    Ali Kharrubi was a business partner of Muhammad Bazzi in a significant company in Ghana called SOAGEL.

720.     LCB's senior management was advised of this information but continued to facilitate Elissa Exchange's money laundering activities on Hezbollah's behalf until the U.S. government's Section 311 notification necessitated the bank's fire sale.

721.     However, long before the U.S. designation of Elissa Exchange in 2011, it was obvious that the company was a money laundering enterprise.

722.     In fact, a 2006 LCB customer due diligence report noted that the Elissa Exchange and its principals were implicated in smuggling cash out of Africa through several channels, including bulk-cash smuggling on flights from Ghana to Beirut.

723.     The report further described large cash deposits into accounts of the exchange's owners, transactions inconsistent with the nature and purpose of the accounts, and the exchange's failures to supply information about the nature and purpose of transactions.

724.     Between January 2007 and January 2011, Elissa Exchange transferred more than $60 million U.S. dollars to bank accounts in the United States for the purpose of purchasing or shipping cars on behalf of the Joumaa Network.

### c.       Hassan Ayash Exchange Network

725.     The Hassan Ayash Exchange Company SARL ("Hassan Ayash Exchange") is a money exchange based in Beirut, Lebanon, owned and controlled by Hassan Muhammad Hasan Ayash, who has long been openly affiliated with Hezbollah.[93]

726.     The exchange's principal office is located adjacent to the Caesars Park Hotel in Beirut, which is owned by Ayman Joumaa's brother, Akram Said Joumaa (SDNTK).

---

[93]     According to the U.S. government, Hassan Ayash has publicly stated that he has family ties to Hezbollah, including Secretary General Hassan Nasrallah.

727.    On January 26, 2011, Hassan Ayash Exchange was designated an SDNTK for its role in laundering illicit proceeds from Ayman Joumaa's narcotics trafficking network. Hassan Ayash was also designated personally.

728.    Between 2007 and 2011, the Hassan Ayash Exchange Company transferred approximately $140 million U.S. dollars to bank accounts in the United States for the purpose of purchasing or shipping used cars for the Joumaa Network.

729.    Hassan Ayash Exchange Company was also used by Hezbollah to channel U.S. dollars into Iraq during the Relevant Period.

### d.    Halawi Exchange Network

730.    Halawi Exchange is owned and controlled by Mahmud Fuad Halawi and his family, including Ali Ahmad Halawi and Mahmud's sons, Wa'el Halawi, Fuad Halawi, and Rawad Halawi.

731.    According to the U.S. Department of Treasury, the Halawi family's entities leverage common office space and operational capabilities:

> Halawi Exchange, along with other related entities, is organized under a holding company known as Halawi Holding SAL, which also owns several other related companies in Lebanon. The Halawi companies are based in Beirut, Lebanon, share key corporate leadership, maintain offices at the same addresses, share common phone numbers and common email addresses, and frequently reference their close connection to one another.

732.    This network of companies (collectively, the "Halawi Network") includes the following entities:

- Halawi Holding SAL.
- Halawi Investment Trust SAL.
- Halawi Trading & Contracting Est.
- Halawi Real Estate SAL.
- General Investment Co SARL.
- L'ambiance de Rêve SARL.
- Info Trust SAL.
- Info Trust SARL.

733. Like the other Lebanese exchange houses discussed herein, the companies that form the Halawi Network furnish money laundering and bulk cash exchange services to Hezbollah's BAC and provide it with a means of converting banknotes into bank credit for setting off debts through the international banking system.

734. On April 22, 2013, the Director of Financial Crimes Enforcement Network ("FinCEN") of the U.S. Department of Treasury found that Halawi Exchange "is a financial institution operating outside the United States that is of primary money laundering concern."

735. The U.S. Department of Treasury further described Halawi Exchange's "extensive illicit financial activity on behalf of a variety of international narcotics trafficking and money laundering networks," further noting its role in facilitating "transactions for a network of individuals and companies which launder money through the purchase and sale of used cars in the United States for export to West Africa."

**e.      Mecattaf Exchange Network**

736. Mecattaf SAL is part of a network of Lebanon-based money and precious metal exchange brokerage firms controlled by the Mecattaf family.

737. Unlike its competitors identified herein, Mecattaf has not (yet) been designated by the United States for its role in laundering money for Hezbollah's BAC and/or Ayman Joumaa's network.

738. However, Mecattaf played perhaps the largest role in the BAC's and Mr. Joumaa's money laundering operations.

739. Below is an example of how Mecattaf and a Lebanese bank played important roles in facilitating Ayman Joumaa's movement of bulk cash from narcotics trafficking through Lebanon.

740.     The transaction below illustrates how trade-based money laundering for the BAC

works. While the cash originates with Mr. Joumaa's South American narcotics network, it was

ultimately converted into a seemingly unrelated purchase of food products worth $115,050 U.S.

dollars in Southeast Asia that wound up being supplied to Tajideen family companies in Africa.

741.     New Line Exchange processed the bulk-cash deposit and then debited its account

with Mecattaf Exchange. The latter then used its account at a Lebanese bank to transfer U.S. dollars

through a U.S. correspondent bank account to effectuate a U.S. dollar transfer to the commodity

food supplier in Singapore that shipped the commodity to the Tajideen Network in Africa which,

in turn, sold the commodity food products and converted those sales back into cash in Africa:



**Ayman Joumaa Network and Tajideen Network: Trade-based Money Laundering**
$115,050 U.S. dollars via New Line Exchange, Mecattaf Exchange and Defendant LEBANON AND GULF BANK on June 21, 2010

742.     Another transaction illustrates how the BAC uses couriers transporting bulk cash

to effectuate its trade-based money laundering operations, this time using a trusted courier named

Fawaz who deposited U.S. dollar-denominated banknotes worth over $250,000 U.S dollars with New Line Exchange (SDNTK).

743. The funds were then debited from New Line Exchange's account at Mecattaf Exchange which, in turn, initiated an electronic wire transfer by its bank in Lebanon. The resulting transaction cleared U.S. dollars through the U.S. correspondent bank account of the Lebanese bank and credited the account of a Vietnamese bank whose customer was a wholesale food supplier:



**Ayman Joumaa Network and Tajideen Network: Trade-based Money Laundering**
$269,678 U.S. dollars via New Line Exchange and Defendant LEBANON AND GULF BANK on August 5, 2009

**f. Kassem Rmeiti Network**

744. Kassem Rmeiti & Company for Exchange ("Rmeiti Exchange") is a Lebanon-based money exchanger with branches and affiliates in Switzerland and Benin. Rmeiti Exchange, through its owner, Kassem Rmeiti, also owns companies including, but not limited to, the Rmeiti Group

SAL Offshore in Lebanon and Société Rmeiti SARL (a/k/a STE Rmeiti) located in Benin (collectively, the "Rmeiti Network").

745. As with the other Lebanese exchange houses described herein, according to the U.S. Department of Treasury, the Rmeiti Network "uses accounts held at foreign banks that maintain correspondent relationships with U.S. financial institutions to gain access to the U.S. financial system."

746. Also, according to the U.S. Department of Treasury, Rmeiti Exchange was involved in trade-based money laundering with drug cartels for Hezbollah's benefit:

> Rmeiti Exchange, its ownership, management, and associates are involved in illicit activity that includes the same trade based money laundering activities conducted by U.S.-designated narcotics kingpin Ali Mohamed Kharrubi and Elissa Exchange, facilitate money laundering by other Lebanese exchanges on behalf of drug traffickers, and provide financial services to Hezbollah.

### 5. LEBANESE CANADIAN BANK

747. During the relevant Period, Lebanese Canadian Bank ("LCB") was a central part of Hezbollah's financing operations and proved to be a wellspring of further DEA investigations into Hezbollah money laundering in the UAE and elsewhere.

748. Those investigations revealed that LCB held U.S. dollar accounts for and provided financial services to hundreds of BAC components, including the Martyrs Foundation, Al Qard al-Hassan, the major narcotics, weapons, and conflict diamond smuggling networks, and the exchange houses responsible for laundering those networks' revenues.

749. During the Relevant Period, LCB moved hundreds of millions of dollars for the benefit of persons and entities it knew were part of Hezbollah and/or the BAC of Hezbollah's IJO through New York.

750. FinCEN found that "Hezbollah derived financial support from the criminal

activities of [Hezbollah's narcotics trafficking] network; and that LCB managers are complicit in the network's money laundering activities."[94]

751.    The Project Cassandra team targeted LCB by gathering evidence showing how Ayman Joumaa's narcotics network was laundering an estimated $200 million a month in U.S. dollar-denominated funds through LCB directly and through various Lebanese money exchange houses, including New Line Exchange, Elissa Exchange, Hassan Ayash Exchange, Halawi Exchange, and Mecattaf SAL that held accounts with LCB, as well as several other Lebanese banks.[95]

752.    These exchange houses were also a vital conduit for BAC narcotics proceeds transited to Iraq to help Hezbollah underwrite its terrorist proxies, including so-called Special Groups that targeted Plaintiffs herein and hundreds of other Americans.

753.    After the United States Department of Treasury's Office of Foreign Assets Control ("OFAC") designated Mr. Joumaa, the *New York Times* published the following chart showing the intricate money laundering system LCB used to "divert money to the Shiite militant group Hezbollah":[96]

---

[94]    The U.S. Department of Justice's Verified Amended Complaint against Lebanese Canadian Bank et. al (S.D.N.Y. 11 Civ. 9186) is incorporated by reference into this Second Amended Complaint. A copy of the complaint is available at: https://www.investigativeproject.org/case_docs/us-v-lebanese-canadian-bank-sal-et-al/2192/amended-complaint.pdf.

[95]    *See* Press Release, *Treasury Targets Major Lebanese-Based Drug Trafficking and Money Laundering Network*, U.S. DEP'T OF TREASURY (Jan. 26, 2011), https://home.treasury.gov/news/press-releases/tg1035. The U.S. Department of Treasury later designated Kassem Rmeiti and Company for Exchange SAL ("Rmeiti Exchange"), Halawi Exchange and, more recently, Chams Exchange Company SAL ("Chams Exchange") for laundering money through The System on behalf of Mr. Joumaa, among others.

[96]    *See Money Laundering at Lebanese Bank*, NEW YORK TIMES (Dec. 13, 2011), https://archive.nytimes.com/www.nytimes.com/interactive/2011/12/13/world/middleeast/lebanese-money-laundering.html.



According to American officials, the **Lebanese Canadian Bank** was the hub of an international drug money laundering operation with ties to Hezbollah. Used car and other consumer goods sales revenues had been used to mask the proceeds of illegal drug trade.

MONEY

MONEY

Some money is returned to the U.S. to purchase more used cars.

**Used cars** are shipped from the U.S. and sold in Africa.

CARS

**Cocaine** is sent from Colombia to European markets via Africa.

MONEY

**LEBANESE CANADIAN BANK**

MONEY

Some money is diverted to **Hezbollah**.

MONEY

**EXCHANGE HOUSES**

Money from the L.C.B. is sent through U.S. accounts to pay Asian suppliers of **consumer goods**

**EUROPE**

MONEY

**Drugs** are sold in Europe. Proceeds are mixed with legitimate **used car sale** profits in Africa and sent to the L.C.B. through exchange houses.

DRUGS

**U.S.**

**CHINA**

**AFRICA**

**COLOMBIA**

DRUGS

**SOUTH AMERICA**

MONEY

CONSUMER GOODS

**Goods from Asia** are shipped to consumer product dealers and sold in South America in a scheme to pay off cocaine suppliers.

754.    FinCEN's February 10, 2011, report described how Mr. Joumaa instructed LCB to perform wire transfers in furtherance of two money laundering schemes:

> [S]ome of the funds move to LCB's U.S. correspondent accounts via suspiciously structured electronic wire transfers to multiple U.S.-based used car dealerships—some of which are operated by individuals who have been separately identified in drug-related investigations. The recipients use the funds to purchase vehicles in the United States, which are then shipped to West Africa and/or other overseas destinations, with the proceeds ultimately repatriated back to Lebanon. Other funds are sent through LCB's U.S. correspondent accounts to pay Asian suppliers of consumer goods, which are shipped to Latin America and sold, and the proceeds are laundered through a scheme known as the Black-Market Peso Exchange, in each case through other individuals referred to in this finding or via companies owned or controlled by them.

755.    The U.S. Department of Treasury also found that LCB was the "favored bank" for the Joumaa–Hezbollah illegal banking activity:

> With respect to the exchanges and companies related to Ayman Joumaa, numerous instances indicate that substantial amounts of illicit funds may have passed through LCB. Since January 2006, hundreds of records with a cumulative equivalent value of $66.4 million identified a Lebanese bank that originated the transfer; approximately half of those were originated by

LCB, for a cumulative equivalent value of $66.2 million, or 94%, thus, indicating that LCB probably is the favored bank for these exchange houses, particularly in the context of illicit banking activity. Similarly, a review of all dollar-denominated wire transfers with the two primary exchange houses either as sender or receiver between January 2004 and December 2008 showed 72% originated by one of the exchange houses through LCB.

756. The movement of money was also facilitated by Oussama Salhab, a Hezbollah operative born in the Bekaa Valley in Lebanon, a Hezbollah stronghold. Mr. Salhab, who is described further below, controlled a network of money couriers based primarily in West Africa.

757. Proceeds from the drug sales were transported by the BAC to Beirut, deposited as bulk cash into the exchange houses, which in turn deposited the currency (primarily U.S. dollars) into their LCB accounts.

758. Mr. Joumaa or the exchange houses he directed then instructed LCB to perform wire transfers in furtherance of at least two trade-based money laundering operations, including transfers of large U.S. dollar sums used to purchase used cars throughout the United States.

759. In addition, LCB knowingly maintained multiple accounts for, and provided financial services to, Al Qard al Hasan during the Relevant Period including after it was designated an SDGT by the United States in 2007. It continued to serve AQAH through personal accounts nominally in the name of AQAH employees. As structured, most of these AQAH employee accounts function as the equivalent of correspondent bank accounts – with LCB acting as the correspondent bank, facilitating international wire transfers, conducting business transactions, and accepting deposits on behalf of AQAH as if it were a licensed bank.

760. SCB was a major correspondent banker for LCB, Hezbollah's "favored bank."

761. Between 2008 and 2011, SCB–Dubai maintained at least four U.S. dollar accounts for LCB, including account numbers ending in 4308, 4556, 4929, and 4005.

762. These were highly active accounts—for a single month in 2008 (September 22–

October 22), SCB–Dubai processed U.S. dollar deposit transactions for these LCB accounts worth a total of $68,879,495.50 U.S. dollars. SCB would have processed these transactions through New York.

763. In fact, as shown in the Banker's Almanac, SCB–New York also maintained a correspondent account for LCB during the relevant period, ending in 7001.

### 6. THE IRGC AND HEZBOLLAH IN THE UNITED ARAB EMIRATES

764. Because of the UAE's strategic location in the Persian Gulf and relatively lax regulations, the IRGC and Hezbollah have long leveraged the UAE as a hub for illicit financial activities.

765. For instance, according to the U.S. Department of Treasury, during the Relevant Period (and afterward), Hezbollah and the IRGC used the UAE-based Altaf Khanani money laundering organization ("MLO") and its currency exchange houses, and front-companies based in Dubai, UAE, and Karachi, Pakistan, for processing illicit transactions worth billions of U.S. dollars.[97]

---

[97] *See*, Press Release, *Treasury Sanctions the Khanani Money Laundering Organization*, U.S. DEP'T OF TREASURY (Nov. 12, 2015), https://home.treasury.gov/news/press-releases/jl0265; Press Release, *Treasury Sanctions Individuals and Entities as Members of the Altaf Khanani Money Laundering Organization*, U.S. DEP'T OF TREASURY (Oct. 11, 2016), https://home.treasury.gov/news/press-releases/jl0574.



766.     During the Relevant Period, over 450,000 Iran nationals or persons of Iranian origin were residing in the UAE, making it the largest Iranian diaspora community in the world after the United States, and there were more than 200 flights per week between UAE and various cities across Iran.

767.     According to the *Economist*, in 2003, UAE took over from Germany the position of largest exporter to Iran, mostly in the form of re-exports through Dubai, doubling in sales value within two years from $3.2 billion U.S. dollars (2003) to $7.3 billion U.S. dollars (2005).[98]

768.     UAE's Dubai Multi Commodities Centre ("DMCC") and Dubai International Financial Centre ("DIFC") both boast glittering images as thriving free-trade zones, attracting companies and investors with generous incentives like zero tax, full ownership, streamlined licensing, and financial subsidies.

---

[98]     *Iran Politics: Sanctions Spanner*, ECONOMIST (Mar. 21, 2007).

769.     In 2002, UAE established DMCC as a strategic initiative of the Dubai government to create a commodity marketplace in Dubai, supported by the Central Bank of UAE's domestic payment system and the global Eurodollar payment system.

770.     Functionally, DMCC is a free-zone authority that provides a platform for global trade and business, including gold, precious metals, diamonds, plastics, pearls, base metals, steel, energy, oil, textiles, food, and chemicals.

771.     In November 2005, the Dubai Gold and Commodities Exchange ("DGCX") started trading derivates within the DMCC, offering futures contracts and options on precious metals, energy, and currencies.

772.     In September 2004, UAE established the Dubai International Financial Centre ("DIFC") as a "global financial hub" offering zero percent taxes on financial services profits and assets.

773.     During the Relevant Period, the following Defendants respectively established and operated a licensed branch or representative office in DIFC:

- HSBC Bank PLC (regulatory reference number F000131, licensed in September 2005);
- HSBC Bank Middle East LTD (regulatory reference number F000268, licensed in September 2006);
- Standard Chartered Bank PLC (reference number F000003, licensed in September 2004);
- Commerzbank AG (regulatory reference number F000521, licensed in September 2007);
- Credit Suisse AG (regulatory reference number F000011, licensed in May 2005); and
- Royal Bank of Scotland NV (including ABN Amro Bank NV) (regulatory reference number F000071, licensed in June 2006).

774.     DIFC operates under its own regulatory regime, separate from UAE's central bank and overseen by the Dubai Financial Services Authority ("DFSA") which at least professes to

prohibit money laundering and terror financing in accordance with international AML/CFT standards.

775.    In March 2007, then-Under Secretary for Terrorism and Financial Intelligence Stuart Levey gave a speech to members of Dubai's business and financial community, including entities from DMCC and DIFC, regarding the IRGC's and Hezbollah's illicit business activities:

> Iran's Revolutionary Guard Corps, or IRGC, is used by the regime to provide a 'train and equip program' for terrorist organizations like Hezbollah, as well as to pursue other military objectives of the regime. The IRGC's control and influence in the Iranian economy is growing exponentially under the regime of Ahmadinejad. More and more IRGC-associated companies are being awarded important government contracts. An IRGC company, for example, took over management of the airport and runways in Tehran, while another company won the contract to build the Tehran metro. When corporations do business with IRGC companies, they are doing business with organizations that are providing direct support to terrorism.[99]

776.    Nonetheless, in 2008, the International Monetary Fund ("IMF") found that severe money-laundering and terrorist financing vulnerabilities exist throughout the DMCC, DIFC, and UAE's other free-trade zones "as [a] result of the heavy use of cash in the economy for business transactions, the expansion into offshore business, the use of international business companies, and the increasing amount of direct foreign investment from many countries."[100]

777.    UAE's DMCC prioritizes speedy registration over thorough verification, allowing companies to provide minimal, often unvalidated information about their ownership structures and

---

[99]    U.S. Dep't of Treasury, Remarks by Under Secretary Stuart Levey before the 5th Annual Conference on Trade, Treasury, and Cash Management in the Middle East (2007), https://www.iranwatch.org/library/government/united-states/executive-branch/department-treasury/remarks-under-secretary-stuart-levey-5th-annual-conference-trade-treasury-and; see also, Treasury Says UAE Needs "Close Look" at Iran Banks, Reuters (Feb. 28, 2008), https://www.reuters.com/article/us-iran-sanctions-treasury/treasury-says-uae-needs-close-look-at-iran-banks-idUSDXB00016620080228.

[100]    International Monetary Fund, United Arab Emirates: Detailed Assessment Report on Anit-Money Laundering and Combating the Financing of Terrorism 15–17 (2008), https://www.imf.org/external/pubs/ft/scr/2008/cr08305.pdf.

operations and provides a haven for Hezbollah and the IRGC to engage in terrorist financing and sanctions evasion through trafficking in, among other things, gold, diamonds, and narcotics.

778.    During the Relevant Period, Hezbollah and the IRGC established and operated numerous front-companies in DMCC to engage in trade-based money laundering ("TBML") by manipulating commodity trade transactions.

779.    Specific TBML examples include over-invoicing or under-invoicing goods and services and using fake documentation to conceal the true nature of the transactions.

780.    DMCC's lax due diligence procedures enable companies to manipulate invoices and trade reports without fear of detection.

781.    Hezbollah and the IRGC also used the traditional informal value-transfer system known as hawala to launder money through the DMCC taking advantage of its unregulated environment.

782.    This system relies on a network of brokers (*hawaladars*) and money exchange houses which transfer funds without the need for physical movement of cash or the use of formal banking channels.

783.    DMCC's vulnerabilities created an environment conducive to the operations of transnational criminal organizations, further undermining global security and stability.

784.    For example, during the Relevant Period, Hezbollah financier Nazim Ahmad established the following DMCC front-companies for conducting TBML and terrorist financing operations:

- **Best Diamond House DMCC**, registration number "DMCC–0399," was established by Mr. Ahmed in May 2005 and used for trading high-value art, jewelry, watches, diamonds and other precious gems, and precious metals.

- **White Star DMCC**, registration number "DMCC–31921," was established by Mr. Ahmed in June 2008 and used for trading high-value art, jewelry, watches, precious stones, and precious metals.

785. As a global financial hub and free zone, DIFC was susceptible to similar money laundering and terrorist financing activities as DMCC.

786. During the Relevant Period, as described below, Defendants' respective branches in DIFC committed financial crimes for the benefit of IRGC-controlled NIOC and Iranian banks that worked closely with the IRGC, including the CBI, Bank Saderat, and Bank Melli.

787. For example, during the Relevant Period, Barclays–Dubai's DIFC branch and its other branches in the UAE processed high-value checks denominated in the UAE dirhams without conducting any AML/CFT screening for payments made Bank Saderat and Bank Melli, even after OFAC designated each Iranian bank as an SDGT.

788. Only after the Relevant Period, did Barclays announce:

> Banks in the United Arab Emirates ('UAE'), including certain of the Iranian banks that are SDNs, participate in the various banking payment and settlement systems used in the UAE (the 'UAE Clearing Systems'). Barclays, by virtue of its banking activities in the UAE, participates in the UAE Clearing Systems, and its participation in the UAE Clearing Systems is in compliance with applicable law and regulations. However, in order to help reduce the risk of participating in transactions in which participant Iranian SDN banks may be involved, as of 1 July 2012, Barclays implemented restrictions relating to its participation in the UAE Image Cheque Clearance System and the UAE Funds Transfer System.[101]

## 7. DUBAI—A PRIMARY HEZBOLLAH AND IRGC MONEY LAUNDERING HUB WITHIN THE UAE

789. Dubai came under particular criticism during the Relevant Period for its lack of regulation. FATF specifically noted the aforementioned significant difference in the value of its

---

[101]    BARCLAYS BANK PLC, 2012 ANNUAL REPORT AND SEC FORM 20–F 322 (Mar. 3, 2013), https://home.barclays/content/dam/home-barclays/documents/investor-relations/annualreports/ar2012/2012-form-20-F.PDF.

rough diamond imports and exports, observing that "[i]n essence, diamond multinationals will channel their rough diamond purchases … through Dubai. Often, the parcels are not even opened and, after re-invoicing, are shipped to the final destination, often Belgium, India or far-east cutting centres. The invoice will inevitably provide a higher figure … As a result, the local company produces a profit – which is a purely paper profit, because it generally remains a transaction between affiliated companies."

790.    The UAE also served a role as a diamond trade center, providing a link between mining countries and polishing centers and providing the supply needed by cutters and polishers who produce polished diamonds.

791.    During the Relevant Period, the volumes (carat) imported to and exported from UAE were almost the same—approximately 60 million carats.

792.    Diamond traders in Dubai additionally benefited from its various free trade zones, including the DMCC and the Dubai Airport Free Zone Area ("DAFZA"). The Chairman of the Dubai Diamond Exchange was reported to have commented that "[Dubai has] no issues with tax evasion because there is no tax."

793.    Dubai also emerged as "one of the world's least regulated gold markets," as described by the Institute for National Strategic Studies, National Defense University.[102] It served as the destination point for 95 percent of gold from East and Central Africa, which included its receipt of conflict gold from countries affected by armed conflict and corruption—the Democratic Republic of Congo ("DRC"), South Sudan, Sudan, and Central African Republic ("CAR").

794.    The *New York Times* reported in an October 5, 2003, article titled "U.S. Focusing on Dubai as a Terrorist Financial Center" that "Dubai "has become an important crossroads for

---

[102]    Kimberly L. Thachuk, *Terrorism's Financial Lifeline: Can It Be Severed?* STRATEGIC FORUM 191 (2002), at 4.

financing terrorism," citing a former counterterrorism official with the Central Intelligence Agency and the State Department: "'Contraband of all kinds moves through there—liquor, cigarettes, precious gems, you name it. Dubai is going to emerge as one of the battlegrounds in terrorist financing. It's a real, real problem and I don't know anyone who has a handle on what's going on there.'"

795.     As set forth herein, multiple Defendants maintained accounts in Dubai and performed obviously high-risk services for notorious money launderers and other glaringly high-risk customers despite the fact that they were obviously engaged in illegal activities (bulk cash, conflict diamonds, gold bullion, shady oil brokers) and were, in many cases, associated with individuals or entities publicly tied to terrorism.

### a.     Al Zarooni Exchange

796.     Consistent with SCB's long-standing policy of facilitating money laundering and terror financing across the globe, SCB's Dubai branch maintained one or more U.S. dollar accounts for, and provided valuable services to, the Dubai-based Al Zarooni Exchange during the Relevant Period—despite glaring red flags and obvious indications that the company was engaged in illegal activities on a massive scale.

797.     As the *New York Times* noted as far back as 2003, in an article titled, "U.S. Focusing on Dubai as a Terrorist Financial Center," Dubai served as a major conduit "for terrorist money," particularly "the emirates' many free trade zones, which allow the commingling of legal and illegal commerce. But the most significant, elusive conduit is the informal international money-transfer network known as hawala."

798.     Al Zarooni Exchange, run by Atif Abdul Aziz Polani and Obaid Altaf Khanani (who was in his early twenties during the Relevant Period), the son of Altaf Khanani and Altaf's brother

Javed Khanani, was one of those conduits for "terrorist money." All of them were Pakistani nationals.

799. These red flags included numerous public sources describing Altaf Khanani's relatives and business associates and the investigation in Pakistan of their money laundering activities, including reports dating back to the early 2000s describing law enforcement concerns about Mr. Khanani transferring money to "militant groups" in Pakistan.

800. It also included the sheer volume and risk level of the transactions and business in which Mr. Khanani's companies were engaged.

801. Not only was Dubai itself a high-risk jurisdiction for money laundering (and terror financing) but Mr. Khanani's "customers" and counterparties were in other high-risk jurisdictions like Pakistan, Lebanon, and South America.

802. Al Zarooni Exchange was ultimately designated by OFAC on November 12, 2015, pursuant to E.O. 13581 for "being owned or controlled by, or acting for or on behalf of" the Altaf Khanani Money Laundering Organization ("Khanani MLO").[103]

803. On the same day, OFAC also designated the Khanani MLO itself as a "transnational criminal organization" which "exploits its relationships with financial institutions to funnel billions of dollars across the globe on behalf of terrorists, drug traffickers, and criminal organizations."

804. The OFAC designation described how the Khanani MLO "facilitates illicit money movement between Pakistan, the United Arab Emirates (UAE), United States, United Kingdom, Canada, Australia, and other countries, and is responsible for laundering billions of dollars in organized crime proceeds annually."

---

[103] Press Release, *Treasury Sanctions the Khanani Money Laundering Organization*, U.S. DEP'T OF TREASURY (Nov. 12, 2015), https://home.treasury.gov/news/press-releases/jl0265.

805.     According to OFAC, the Khanani MLO's "diverse" money laundering clientele included "Chinese, Colombian, and Mexican organized crime groups **and individuals associated with Hezbollah**." (Emphasis added.)

806.     Among those "individuals associated with Hezbollah" was a Canadian of Lebanese origin named Hassan Mohsen Mansour who was later arrested in France, in February 2016, and indicted in a Florida court for drug trafficking and money laundering.

807.     The affidavit supporting his arrest warrant described him as "a Hezbollah associate, known to be involved in multi-faceted criminal activity, not simply money laundering and drug trafficking," adding that Mr. Mansour was "working directly with established members of Hezbollah."

808.     One of Mr. Mansour's responsibilities for Hezbollah's BAC was to arrange transport for narcotics to Australia and then to move the cash collected back out of Australia for the drug cartels (with Hezbollah getting its commission).[104]

809.     To help move the cash out of Australia, Mr. Mansour contracted Altaf Khanani whose Al Zarooni Exchange could process currency in Dubai and generate U.S. dollar deposits that would translate into electronic funds transfers through SCB's Dubai branch (among others).

810.     The Khanani MLO has laundered billions of dollars annually for criminals, terrorists, and narco-traffickers in significant part by using SCB–Dubai to wash cash it obtained through its currency exchange businesses including, Al Zarooni Exchange and Mazaka General Trading, LLC.[105]

---

[104]     Mr. Mansour was connected to Hezbollah narcotics traffickers Chekry Harb and Ayman Joumaa (discussed herein).

[105]     The company was nominally owned by Mohammed Hamad Ali Muri, but the U.S. Department of Treasury designated it as a Transnational Criminal Organization ("TCO") in 2016 for its role as part of the Khanani money laundering enterprise.

811.    The Khanani MLO began in 1984, when Altaf Khanani and his identical twin brother Javed Khanani formed Khanani and Kalia International, or "KKI."

812.    By the late 1990s, the company had transformed into one of the largest currency traders in Pakistan, with a web of remittance agents across the world. KKI relied heavily on hawala, which the Pakistan government attempted in vain to regulate in an effort to curb the money laundering problem that had plagued the country for decades.[106]

813.    As KKI grew in prominence, different law enforcement agencies conducted investigations into the company.

814.    The UK targeted Khanani's network as early as 1997, tracing funds worth hundreds of millions of British pounds across Spain, Italy, Germany, and the Netherlands.

815.    The Khananis evaded arrest, however, having become indispensable to politicians and military officials within Pakistan's corrupt government.

816.    As far back as 2001, KKI was cited as an example of one of Pakistan's currency exchanges which potentially "run illicit money-transfer operations that are linked informally to a vast network of similar operations around the globe" in an October 1, 2001, *USA Today* article titled "'Hundi' system may foil investigators."

817.    On October 5, 2003, in an article titled "U.S. Focusing on Dubai as a Terrorist Financial Center," the *New York Times* reported that:

> One of the largest exchange houses and hawala dealers in the Muslim world, the Khanani and Kalia International based in Karachi, Pakistan, has shipped funds through Dubai and is now being investigated by the Pakistani authorities on suspicion of having transferred money to militant groups, American and Pakistani officials said. The authorities in the emirates also investigated the company about 18 months ago in connection with a

---

[106]    Since the 1950s, Pakistan has been part of the "Golden Crescent," along with Iran and Afghanistan, which comprises the most important opium-producing center of the world. As a result of the extensive drug trade in the region, Pakistan became, and remains, a hub for drug trafficking and money laundering.

suspicious transfer of funds between Pakistan and Britain through Dubai, Central Bank officials here said.

818.     By 2007–2008, KKI's official banking records showed that the company processed funds worth $2.3 billion U.S. dollars, but authorities estimated the true unreported figure to be many times higher—between $14–$16 billion U.S. dollars annually.

819.     KKI was shifting huge volumes of hard currency in physical bulk-cash banknote shipments across the border into war-ravaged Afghanistan, much of it going to heroin producers.

820.     As KKI grew in prominence, different law enforcement agencies conducted investigations into the company.

821.     Pakistan's financial crisis in 2008, precipitated an investigation into KKI, which at the time was handling 40 percent of all of Pakistan's foreign currency transactions.

822.     The country's Federal Investigation Agency ("FIA") raided its head office and franchises and arrested eight senior figures, including Javed Khanani.

823.     Altaf Khanani was living in Dubai, and eluded capture.

824.     The agency alleged that KKI had illegally siphoned funds worth $10 billion U.S. dollars out of Pakistan.

825.     The raid and arrests received media attention, including the following:

- A *The* National (AsiaNet) article on November 8, 2008, titled "Crackdown on Money-Changers."
- An article on November 9, 2008, in the same publication titled "FIA Intensifies Crackdown," which reported that Pakistan's money changing market largely shuttered as a result of the raid.
- An Agence France Presse article on November 10, 2008, titled "Pakistan Courts Extend Detention of Money Changers."
- A Pakistan Press International article on November 18, 2008, titled "FIA to Keep Strict Watch on Illegal Foreign Exchange Flight."
- A United News of India article on November 11, 2008, titled "Pakistan's Central Bank Suspends License of Foreign Exchange Firm" reported that KKI's license had been suspended temporarily.

- A Dawn article on December 3, 2008, titled "Charge-Sheet Filed Against Forex Scam Suspects" which described the charge sheet submitted by the investigation officer to the Pakistan court.

826.   The charge sheet listed additional websites and databases KKI used for money laundering which were not registered with the State Bank of Pakistan.

827.   It further stated that KKI had used the services of Al-Zarooni Exchange in the UAE, listing Atif Aziz Polani (later designated in 2106) and Jawed Qasim as the point people to assist with their illicit dealings.

828.   Altaf Khanani's son, Obaid Khanani, who worked as a senior manager at Al-Zarooni Exchange, was designated along with Polani in 2016.

829.   As described in a *Business Recorder* article published on May 17, 2009, titled "Atif Polani remanded to FIA custody," Mr. Polani, "accused in [the] country's biggest foreign exchange scam," was arrested in Dubai and brought to Karachi to face charges.

830.   Mr. Polani was reported to be "facing charges of illegal banking, money laundering, fraud and cheating by sending and bringing foreign currency worth billions of rupees endangering economy of the country" in a November 5, 2009, *Daily Times (Pakistan)* article titled "KKI director's medical report sought in 2 days."

831.   His charge of "illegal banking; money laundering and electronic money transfer illegally in and out of country" was additionally reported in a January 20, 2010, *Right Vision News* article titled "Pakistan: Bail plea for Kalia adjourned," and a February 19, 2010, *Right Vision News* article titled "Pakistan: K&K directors granted bail in illegal forex transfer case," which reported that the KKI directors "fraudulently created replica website clik.pk.net without the knowledge of SBP for affecting illegal transfer of money from and outside Pakistan in a clandestine manner and

setting up offices outside the country by appointing Atif Polani and Javed Qasim as focal persons to execute the illegal transactions."

832.     On March 9, 2010, *Right Vision News* reported in an article titled "Pakistan: Charge-sheet filed in forex scam case" that Polani was accused of participating in *another* scam which "illegally transferred an amount of over Rs3 billion abroad through 11 bogus accounts opened by them in different banks."

833.     The arrested KKI officials, including Javed Khanani, were formally charged in a Pakistan court in 2011. The prosecution reiterated that KKI had used the services of Al-Zarooni Exchange in the UAE, again naming Atif Polani and Jawed Qasim as the point people who assisted on all such dealings.

834.     This allegation was reported on by the media, including in a January 30, 2011, *Plus Patent News* article titled "Charges Framed Against Forex Dealers," and, the next day, a *Right Vision News* article titled "Pakistan: Charges Framed Against Forex Dealers."

835.     A March 27, 2011, *Islamabad Dateline* article titled "FIA to re-probe case against Khanani, Kalia" reported that names of the KKI officials had been deleted from the investigation report submitted to the court overseeing the money laundering case, and a *Pakistan Today* article from the same date titled "FIA drags Khanani, Kalia and their friends back to court" reiterated that KKI was accused of having used Al-Zarroni Exchange's services, with Atif Polani and Jawed Qasim as the point people.

836.     Nevertheless, the company officials were acquitted in 2011, and then-FIA director general Waseem Ahmed gave an angry public statement saying that the accused had "used their resources" to obtain their acquittals. Altaf Khanani himself was exonerated in 2013.[107]

---

[107]     According to a February 4, 2018, *ABC News* article titled "Catching the Money Man: How Australian Taxpayer Dollars and a Fake Drug Cartel Helped Bring Down the World's Most Wanted Money Launderer" Altaf

837.    The article described how Pakistan's hawala system "is the subject of international scrutiny," and "has been singled out by the 30-nation Organization for Economic Cooperation and Development and other international institutions as a prime tool for money launderers."

838.    It further cited *Money Laundering Alert*, a Miami-based newsletter, as stating that "[t]he possibility that al-Qa'eda and other terrorist groups have moved money through the *hundi* network is 'more than remote.'"

839.    In 2014, the DEA worked with law enforcement officials from Britain, Canada, New Zealand, and Australia to hatch a plan to capture Altaf Khanani. They posed as a cartel on the rise, inserting undercover agents into Khanani's network.

840.    Mr. Khanani agreed to launder funds worth up to $200,000 U.S. dollars every few days and wire it into an American bank account secretly under DEA control. The agency eventually lured him from his usual locations in Dubai and Pakistan to Panama.

841.    Altaf Khanani was arrested by the DEA in Panama on September 11, 2015, pursuant to a grand jury sealed indictment. On October 27, 2016, he pled guilty to federal money laundering charges, and in 2017, he was sentenced to 68 months in prison for conspiracy to commit money laundering.

842.    In 2016, OFAC designated Altaf Khanani's twin brother, Javed Khanani; his son and senior manager at Al-Zarooni Exchange, Obaid Khanani; and his nephew, Hozaifa Khanani, along with Atif Polani, who "played a pivotal role in managing Al Zarooni Exchange and moved

---

Khanani is "the world's most wanted money launderer," and his and Kalia's "exoneration" in Pakistan generated rumors "that the bribe paid was in nine figures."

funds on behalf of the Khanani MLO." The designation additionally designated nine entities associated with the Khanani MLO.[108]

843.    The February 4, 2018, *ABC News* (Australia) article titled "Catching the Money Man: How Australian Taxpayer Dollars and a Fake Drug Cartel Helped Bring Down the World's Most Wanted Money Launderer" described how Altaf Khanani, "the world's most wanted money launderer," was "running the underworld's equivalent of Goldman Sachs."

844.    A May 2023 report titled "Next Generation Organised Crime" by The Hague Centre for Strategic Studies characterized the Al Zarooni Exchange as "essentially a mass-volume hawala bank."

### b.    Kaloti Jewellery Group

845.    The Kaloti Jewellery Group ("Kaloti") was founded by Munir Al Kaloti in Dubai in 1988 as a small jewelry wholesaler and began buying gold from local markets in 1989.[109]

846.    By 2000 it was trading gold bullion, and in 2005 it entered into a partnership with Swiss refiner Valcambi SA to produce customized kilo bars.

847.    Kaloti expanded to Hong Kong, Turkey, and Singapore over the next five years and has become Dubai's largest gold refinery and retailer, and one of the largest gold traders and refiners in the world.

---

[108]    Press Release, *Treasury Sanctions Individuals and Entities as Members of the Altaf Khanani Money Laundering Organization*, U.S. DEP'T OF TREASURY (Oct. 11, 2016), https://home.treasury.gov/news/press-releases/jl0574.

[109]    The Kaloti family of companies included Kaloti Gold Factory LLC (Dubai), Kaloti Laboratory (Muscat), Kaloti Jewellery International DMCC, Kaloti Metals & Logistics LLC (Miami FL), and Kaloti Investment Group Inc (Miami, FL). Kaloti Gold Factory LLC was originally co-founded with the Mdaka family from Lebanon.

848. During the Relevant Period, Kaloti was a customer of Defendant SCB's Dubai branch, and SCB moved large sums of money from Katoli's accounts at SCB–Dubai to a variety of other high-risk jurisdictions.[110]

849. By 2007 at the latest, U.S. correspondent banks began filing Suspicious Activity Reports ("SARs") regarding Kaloti transactions due to the volume of its transactions and the high-risk nature and location of its businesses.

850. A U.S. government investigation into the company commenced in earnest after the U.S. Treasury designated the Lebanese Canadian Bank ("LCB") as a "primary money laundering concern" in February 2011, due to its extensive involvement with and support for Hezbollah,

851. DEA investigators noticed that money sent to some of the used-car companies implicated in the LCB money laundering scheme for Hezbollah appeared to be passing through Kaloti in the UAE, which soon became one of the targets of a new probe, code-named *Operation Honey Badger*.

852. Investigators were especially interested in two Kaloti clients involved in laundering drug money using gold: Salor DMCC, based in Dubai,[111] and a business in Benin called Trading Track Company.

853. Scouring financial records, investigators noticed large wire transfers, sometimes more than once a day, from Kaloti to Salor DMCC, and in the same day, wire transfers from Salor

---

[110] Standard Chartered Bank (Geneva, Switzerland) was also utilized as part of the Kaloti's money laundering schemes.

[111] Salor DMCC was operated by a Lebanese businessman, Muhammad El Jouzo, affiliated with Hezbollah's BAC.

DMCC to used car dealers linked to Hezbollah's BAC through its notorious narcotics kingpin Ayman Joumaa (SDNTK).[112]

854.    In the payment details, Kaloti referenced gold trading and Trading Track.

855.    Investigators also observed that Kaloti made cash payments worth millions of dollars to suppliers, a major money laundering red flag.

856.    For example, Kaloti paid Salor $414 million U.S. dollars *in cash* for gold in 2012, and in that same year, it paid Trading Track $28 million U.S. dollars in cash for gold.

857.    As part of their investigation, DEA agents subpoenaed bank records from numerous U.S. banks.

858.    As a result, between 2012 and 2013 U.S. banks filed a flurry of Suspicious Activity Reports regarding Kaloti.

859.    For example, Deutsche Bank reported that in 2012, Kaloti transferred large sums from its Deutsche Bank accounts to its Emirates NBD bank account in Dubai.

860.    Agents for the company then began withdrawing so much cash from Emirates NBD that the money had to be moved in wheelbarrows.

861.    Deutsche Bank reported the withdrawals to U.S. authorities the next year, writing that some traders on the London commodities exchange "seemed to be backing away" from Kaloti and that Deutsche Bank planned to do the same.

862.    Around the same time, JPMorgan Chase advised that it had suspended commodities trading with Kaloti because the company had "attracted interest" from law enforcement and appeared to be engaging in "high-risk" transactions.

---

[112]    Hezbollah's BAC used Salor DMCC to convert cash from sales of used cars in Africa to buy gold sold to Kaloti in Dubai and then use the proceeds of the gold sales to further launder Hezbollah's money, often by purchasing additional used cars.

863.     SCB's Dubai branch nevertheless continued to maintain its accounts with Kaloti during this time and continued to provide it with access to the global financial system.

864.     After 2011, eight different banks, including SCB–New York, flagged thousands of Kaloti transactions, worth $9.3 billion, that occurred between 2007 and 2015.

865.     For example, SCB–New York filed a SAR regarding transactions between Kaloti and Dubai-based Bafleh Jewellery that occurred between January 2008 and August 2012, and another SAR on October 17, 2012, reporting 31 transactions worth a total of $74.72 million U.S. dollars between Chennai-based Surana Corporation and Kaloti from October 2009 through December 2011. (These filings followed law enforcement subpoenas signifying that Kaloti was under investigation.)

866.     In July 2012, for example, SCB filed another SAR to report nearly $100 million in "suspicious wire transfers." In the span of five months, Asanska Jewellery LTD received $10.25 million in 10 transactions into accounts at Intercontinental Bank Ghana and Access Bank Ghana from JLM Trading FZE in Dubai.

867.     The SAR reported that almost half of the $100 million was sent by Kaloti to JLM Trading during the same period in 2012. According to the SAR, SCB alerted FinCEN to the transactions involving the companies for various reasons, including high-risk jurisdictions, such as the United Arab Emirates, the "high-risk business…in jewelry industry, which is known to be a high-risk industry for money laundering" and because "a number of transactions were remitted in round dollar amounts" which the bank said are "a known vehicle for money laundering."

868.     Of course, Kaloti's areas of operation, line of business and transaction structures did not become high-risk in 2012; they were *always* high-risk—as SCB well understood—and

there was nothing routine about the volume or nature of Kaloti's business or the transactions SCB's Dubai branch was facilitating.[113]

869.    Investigators and auditors later discovered that over 40 percent of Kaloti's business was conducted in cash and that the total amount of Kaloti's cash transactions was over $5.2 *billion* U.S. dollars and that their quantum, had not been reported to the Dubai or United Arab Emirates authorities.

870.    Kaloti had also purchased over 57 tons of gold from suppliers in Sudan (including Sudan's central bank) which was both a designated State Sponsor or Terrorism at the time and engaged in a bitter civil war fueled in part by illicit trade in precious minerals, including gold.

871.    It also engaged in more than $450 million in cash transactions for Viren Jewellery Limited whose gold sales appeared to have been derived from mines controlled by armed rebels in the Democratic Republic of Congo and over $200 million in cash transactions with Persian Gold LLC and Golden Commodities General Trading LLC, both of which sourced their gold from Iran.

872.    Kaloti also directed $90 million in Eurodollar wire transfers for offshore drug money launderers working for South American clients.

873.    In May 2012, SCB submitted an SAR regarding transactions worth $3.9 million U.S. dollars relating to 11 companies, including Ghana-based Vital Insight Investments LTD.

874.    According to SCB, on September 28, 2011, and October 6, 2011, Kaloti sent Vital Insight Investments an electronic funds transfer worth $550,000 U.S. dollars with payment details reflecting "Purpose of Payment: Gold Trading B/O Gold Diam Export Ltd."

---

[113]    In the *2003 National Money Laundering Strategy* report, the U.S. Departments of Treasury and Justice described how "[t]errorist organizations around the world have also used gold and the trade of precious commodities to launder money or transfer value," and explained the multiple reasons that "gold is popular with money launderers."

875. SCB reported in the SAR that Vital Insight is registered in the tax haven of British Virgin Islands but has an "operations office" in Accra (Ghana), and that it "appears to be a potential shell company with no verifiable business purpose."

876. Even after other western banks were scared off by the reputational and legal risks posed by Kaloti, SCB continued its relationship with Kaloti.

877. SCB's UAE branches understood (as did SCB as a whole) that its operations in that country were hugely profitable because they facilitated money laundering, terror financing, sanctions evasion, and other financial crimes, yet the exposure of its complicity in various criminal schemes (including those linked to terrorism) did not lead either to SCB's departure from the UAE market or a significant overhaul of its operations there until after the Relevant Period, and even then – after numerous government investigations, criminal penalties and fines – SCB's corporate culture still emphasized cultivating high risk customers as long as the potential for profits justified the risk of getting caught (again).

878. In an April 12, 2014, press interview in *Middle East Economic Digest* titled "Kaloti Jewellery Group: the Dubai-based refiner's expansion plans reflect faith in gold's long-term prospects," the chairman of the Kaloti Group, Munir Ragheb Al-Kaloti, stated:

> The group trades and hedges hundreds of tonnes of bullion a year via international and local exchanges and some of the world's largest bullion banks such as the UK's Standard Bank and HSBC, Canada-based Bank of Nova Scotia and Switzerland's Credit Suisse.

879. Credit Suisse's relationship with Kaloti is not surprising, given that Switzerland is home to Valcambi, which operates the world's largest gold refinery, and which was formerly owned by Credit Suisse.

880. In addition to working with Kaloti in Dubai, HSBC appears to have transferred significant sums from HSBC–Hong Kong to Kaloti Gold Factory LLC via another HSBC customer, a company called United Trading.[114]

881. RBS also filed SARs flagging transactions of Indian companies with Kaloti. Specifically, an SAR filed by RBS Connecticut, on October 1, 2013, red-flagged 65 suspicious transactions between September 2012 and August 2013 for $4.44 million involving Amico, General and Jai Gurudev, all part of the Mumbai-based Rajsi Group, which mainly exports agri commodities.

### c.      Reza Zarrab IRGC Money Laundering Network

882. Reza Zarrab is an Iranian–Turkish gold trader who admitted to helping Iran evade economic sanctions through a money-laundering scheme that U.S. federal prosecutors say threatened international security.

883. Mr. Zarrab was arrested in Miami on March 19, 2016, on charges that he "conspired for years to violate and evade United States sanctions against Iran and Iranian entities."

884. According to prosecutors, Mr. Zarrab bribed Turkish government officials and executives at Turkey's Halkbank to allow the IRGC to use proceeds from oil and gas sales to buy billions of dollars in gold. Zarrab later testified that his employees smuggled the gold in suitcases to Dubai, where it was sold.

885. The proceeds from the gold sales were then used by IRGC-controlled companies like NIOC, Naftiran Intertrade Company SARL, and Mahan Air to initiate or benefit from

---

[114]      HSBC's Dubai branch also maintained at least one account and served as the "Principal Banker" for Supergems Middle East LTD which at least officially imported diamonds and precious stones from Belgium and the DRC.

international funds transfers, including Eurodollar funds transfers through the U.S. financial system.

886.    Prosecutors recovered letters from Mr. Zarrab to then-Iranian President Mahmoud Ahmadinejad and the head of the CBI responding to Ayatollah Khamenei's call for "economic jihad" to beat the crippling international sanctions imposed against Iran with an offer to use his family's business, which he described as having "half a century of experience in foreign exchange."

887.    The letter continued: "The Zarrab family… considers it to be our national and moral duty to declare our willingness to participate in any kind of cooperation in order to implement monetary and foreign exchange anti-sanction policies."

888.    Adem Karahan, a Turkish national who helped execute Reza Zarrab's money laundering scheme, testified that this was actually a pledge of continued loyalty, as "Ahmadinejad is a good friend of Zarrab's father [Hossein Zarrab]." Mr. Zarrab himself confirmed in court that he was able to pitch his services directly to the head of Iran's central bank because "acquaintances of my father" arranged the meeting.

889.    Mr. Zarrab's scheme ran from at least 2007 through 2016 and involved gold and oil purchases, falsified export records, transactions in multiple currencies, and shell companies in three countries. Much of the proceeds associated with avoiding Iranian sanctions moved through Western banks, including $1.2 billion U.S. dollars through SCB.

890.    SCB–New York eventually filed a SAR in 2012 flagging $142 million in "quite unusual and suspicious" transactions involving Dubai-based Gunes General Trading, part of Mr.

Zarrab's money laundering scheme, but Gunes General Tradings's SCB account was still active in 2013, and continued to engage in transactions that were obviously suspect.[115]

891. Three months *after* Mr. Zarrab was arrested in 2016, SCB–New York filed several suspicious activity reports detailing a decade of bank transactions involving Zarrab and other entities.

892. That October, SCB–New York filed a series of reports as part of another SAR, listing $133 million worth of Eurodollar transactions made by entities tied to Mr. Zarrab's network.[116]

893. SCB said it filed those reports "for continued transactional activity related to a multi-jurisdictional investigation of possible money laundering and other offenses related to Reza Zarrab."

894. SARS filed by SCB–New York on entities and individuals tied to Mr. Zarrab reported thousands of transactions totaling more than $5.8 billion between January 2007 and September 2016—some of it after his criminal activities became public.[117]

895. U.S. prosecutors later identified 1,575 SCB Eurodollar transactions, totaling more than $338.7 million, with Al Nafees Exchange LLC, a UAE-based money services business owned in part by Reza Zarrab's father, Iranian businessman Hossein Zarrab.

---

[115]   Mr. Zarrab later testified that he used accounts at SCB in the UAE belonging to a Dubai-based money transfer business Al Rostamani International Exchange to wire millions of dollars of Iranian money through a Zarrab shell company in 2014 and 2015 as well.

[116]   Indeed, Mr. Zarrab's criminal activity had become public years before his 2016 arrest in the U.S.; he was arrested in Turkey in December 2013 as part of a widely publicized probe of corruption, gold smuggling, and money laundering. He was released after the investigation was quashed, but a detailed law enforcement investigative report was leaked to the Turkish media in early 2014, as reported in the March 14, 2014, edition of the Turkish paper *Cumhuriyet Gazetesi*, which set out his work for Iran.

[117]   Some of those funds constituting millions of dollars flowed through Bella Investments, a front company established by Zarrab in May 2007 that used its SCB account(s) in Dubai involving four Turkish firms registered to Adem Karahan but controlled by Zarrab. Some of that money appears to have involved money laundering for various Russian clients as well.

896.    Al Nafees, which was named in Mr. Zarrab's U.S. indictment, made hundreds of millions of dollars in wire transfers to Asia Exchange Centre, a Dubai currency exchange owned by Emirati businessman Ali Omran Salim Al Owais, whose license was revoked by UAE's central bank in 2013 reportedly for regulatory violations.

897.    Between January 2007 and April 2012, Al Nafees processed some $3.58 billion in financial transactions for thousands of companies around the world. Much of that money was of dubious origin.

898.    In 2010 and early 2011, for example, nearly $170 million was wired to Al Nafees by Kapital Kiymetli Madenler and Pirlanta Kiymetli Madenler. Those Turkish companies were directed by employees of Reza Zarrab who were identified by Turkish authorities as members of his criminal organization.

899.    Kapital Kiymetli Madenler was fronted by Adem Karahan, who testified during Zarrab's criminal trial that the firm had "no commercial activity" and was used only to facilitate money transfers that ultimately benefited Iran.

900.    According to the U.S. Attorney's Office for the Southern District of New York:

> Al Nafees Exchange conducted international U.S. dollar financial transactions on behalf of and for the benefit of Iranian clients, such as Mellat Exchange, that were executed through correspondent accounts held at banks located in the United States; that Al Nafees Exchange conducted international financial transactions in U.S. dollars and foreign currencies for the benefit of and on behalf of Iranian entities, including entities designated as Specially Designated Nationals ("SDNs") by the U.S. Department of the Treasury, Office of Foreign Assets Control ("OFAC"); that Al Nafees Exchange conducted huge volumes of U.S. dollar international financial transfers and currency exchanges; and that Al Nafees Exchange communicated regularly with Zarrab and with Royal Holdings employees concerning international financial transactions, precious metals transactions, and currency transactions.

901.    Prosecutors estimated that Mr. Zarrab moved at least $20 billion U.S. dollars for the Iran conspiracy from 2010 to 2015 alone, but SCB's UAE branches continued to process transactions for various Zarrab entities at the same SCB–New York periodically filed SARs identifying money laundering activities.

902.    HSBC processed more than $263 million in transactions for Zarrab-linked companies between 2007 and 2015.

903.    Some of those transactions were processed by HSBC for HMEA Company LTD, a Hong Kong-registered company which moved least $450 million between 2012 and 2014, nearly a quarter of which represented oil payments between China and Iran. The company was reported to have used seven banks, but HSBC alone handled nearly $100 million U.S. dollars linked to the secretive oil trading. HMEA also banked with Hang Seng Bank, a Hong Kong-based lender in the HSBC Group.

904.    HMEA sent at least $45 million to obscure Turkish and UAE firms that were controlled by Zarrab associates and linked to Dubai companies in Zarrab's money-laundering scheme: Atlantis Capital General Trading, which transferred more than $1 billion to Iranian banks, and Hanedan General Trading, a Dubai-based company owned and operated by Mr. Zarrab's brother Mohammad, which moved $250 million through U.S. bank accounts.

905.    Although Mr. Zarrab's criminal activity became public in December 2013, when he was arrested in Turkey as part of a widely publicized probe of corruption, gold smuggling and money laundering, after which a detailed law enforcement investigative report was leaked to Turkish media in 2014 spelling out his work for Iran, HSBC continued to handle Mr. Zarrab's money, allowing it to flow through its correspondent accounts.

906.     For example, HSBC continued to process transactions worth $1.2 million for Hanedan General Trading LLC, a Dubai-based company owned and operated by Mr. Zarrab's brother, Mohammad. Mohammad Zarrab's role in his brother's sanctions-busting was also revealed in the leaked Turkish police report, which described his payment of bribes to Muammer Guler, Turkey's Interior Minister, as well as his role in preparing fake invoices submitted to Halkbank. The indictment outlined Hanedan General Trading's role in making payments benefiting Mahan Air, sanctioned for providing material support to the IRGC–QF.

907.     Additionally, Adem Karahan, a Turkish citizen who smuggled gold and cash across borders for Mr. Zarrab for five years and testified during his trial, called HSBC his boss's "bank of choice" for his own accounts. In a media interview with Mr. Karahan, he stated: "I sent money to Reza Zarrab with HSBC. Not only one time. Several times." Mr. Karahan also stated that Mr. Zarrab held an HSBC credit card, and that they conducted trades with HSBC's branch in Beyazit, Istanbul.

### 8.     HEZBOLLAH'S "SUPER FACILITATORS"

908.     Much of Hezbollah's revenue derived from narcotics trafficking, conflict diamonds, gold smuggling and a myriad of trade-based money laundering schemes is directed by a cadre of what the U.S. government has termed Hezbollah's "Super Facilitators."

909.     These are individuals (almost exclusively Lebanese nationals) who either headed Lebanese Shi'a organized crime clans like the Ahmads, Nassours, Khanafers and Tajideens, ran narcotics trafficking networks like Ayman Joumaa or operated vast Hezbollah BAC–IRGC networks that were involved in multiple lines of criminal conduct, like Muhammad Bazzi.

910.     Importantly, during the Relevant Period, the activities of these Super Facilitators was coordinated by Abdallah Safieddine at the direction of the IRGC–QF and, among other things,

was used to finance the IRGC and Hezbollah's joint terror campaign against U.S. and Coalition Forces in Iraq.

### a.        The Nassour Clan Network

911.    In 2002, the United Nations Security Council ("UNSC") issued a report about Conflict Diamonds titled: Final Report of the Panel of Experts on the Illegal Exploitation of Natural Resources and Other Forms of Wealth of the Democratic Republic of the Congo ("the UNSC Report").

912.    The UNSC Report stated that the Nassour, Ahmad, and Khanafer clans provided banknote counterfeiting, money laundering, and diamond smuggling services to Hezbollah and other Hezbollah-related entities.

913.    In 2011, the U.S. National Security Council ("NSC") released a report addressing the converging threats to U.S. national security from transnational organized crime—including Hezbollah.[118]

914.    For example, the NSC's report identified, among other threats, a growing nexus between crime, terrorism, and insurgencies:

> Terrorists and insurgents increasingly are turning to [Transnational Organized Crime] to generate funding and acquire logistical support to carry out their violent acts… We are concerned about *Hezbollah's drug and criminal activities*… [Emphasis added.]

915.    As these Conflict Diamond transnational criminal organizations grew in size, expanding in scope and reach over time, they became invaluable service providers to other BAC enterprises that were in need of, among other things, discreet access to ports and airfields in Africa,

---

[118]    NATIONAL SECURITY COUNCIL, STRATEGY TO COMBAT TRANSNATIONAL ORGANIZED CRIME (July 2011), https://obamawhitehouse.archives.gov/sites/default/files/microsites/2011-strategy-combat-transnational-organized-crime.pdf.

reliable bulk cash couriers, favorable government contracts and innovative ways to launder narcotics proceeds through trade-based money laundering techniques.

916.    The leader of the Nassour clan, one of the three "clans" identified by the UN Security Council in 2002, was Ibrahim Khalil Nassour, a prominent Lebanese businessman who controlled a major diamond business in Antwerp.

917.    In 1984, Mr. Nassour established a company called Diamonds Forever with his sons Khalil Ibrahim Nassour, Muhammad Ibrahim Nassour, and Aziz Ibrahim Nassour.

918.    For many years, Diamonds Forever was known as the key Nassour business before it entered into bankruptcy in 1999. One of its principal businesses was counterfeiting U.S. and Zaire banknotes.

919.    Ibrahim Nassour was also the director of Echogem, a diamond exporter based in Antwerp, Belgium, and closely tied to the Democratic Republic of Congo.

920.    The 2002 UNSC Report, Annex III, listed Echogem as one of several companies found to have violated the Organization for Economic Cooperation and Development's ("OECD's") Guidelines for Multinational Enterprises.[119]

921.    Ibrahim Khalil Nassour had eight children:

- Khalil Ibrahim Nassour;
- Muhammad Ibrahim Nassour;
- Aziz Ibrahim Nassour;
- Sahar Ibrahim Nassour;
- Diana Nassour;
- Abdul Menhem Ibrahim Nassour;
- Hassan Ibrahim Nassour; and
- Ali Ibrahim Nassour.

---

[119]    ORGANIZATION FOR ECONOMIC COOPERATION AND DEVELOPMENT, OECD GUIDELINES FOR MULTINATIONAL ENTERPRISES (2011), http://www.oecd.org/daf/inv/mne/48004323.pdf.

922.     Ibrahim Nassour's son Khalil Nassour was also affiliated with Diamonds Forever in Antwerp (where Khalil Nassour was a co-founder of the company).

923.     In 2001, Khalil Nassour was implicated in a massive $90 million U.S. dollar diamond fraud at the ABN Amro Bank (Defendant RBS NV) in Amsterdam's diamond district.

924.     Ibrahim Nassour's son Aziz Nassour served as director of one of the family's diamond firms in Belgium known as ASA Diam NV, which it jointly controlled with the Ahmad clan (discussed below).[120]

925.     Aziz Nassour's sister, Diana Nassour, is married to Ali Sa'id Ahmad and was registered as a co-director of another key company in the network known as Sierra Gem Diamonds NV that was registered in Antwerp, Belgium, in 1980. Sierra Gem Diamonds NV is also a BAC company that launders funds for Hezbollah.

926.     Aziz Nassour reportedly left the Democratic Republic of Congo in 1994 and eventually used ASA Diam NV, a company controlled by his brother-in-law Ali Said Ahmad, to import the diamonds into Belgium. During 2000, for example, he reportedly imported diamonds worth approximately $14 million from the Democratic Republic of Congo, mostly from Kisangani.

927.     The Nassour and Ahmad clans—working together and separately—have long engaged in a variety of methods and schemes to smuggle conflict diamonds, secure trading rights in Africa, and launder money, both on their own behalf and on Hezbollah's behalf.

928.     For example, according to Belgian authorities, Aziz Nassour "established a mechanism whereby rough diamonds, the so-called 'conflict or blood diamonds' were smuggled

---

[120]     Annex III of the UNSC Report also listed ASA Diam NV as one of several companies found to have violated OECD Guidelines for Multinational Enterprises. As indicated above, the 2002 UNSC Report noted that the company provided "counterfeit United States dollars" and was associated with the Ahmad criminal organization.

from the region of Kono (Sierra Leone) via Monrovia (Liberia) to the Antwerp diamond market."
Nassour's right hand man and key figure acting for him in Africa was Samih Ossaily.

929.     Mr. Ossaily was introduced by Aziz Nassour to Ali Darwish,[121] who had a personal
relationship with Ibrahim Bah, a leader of the Revolutionary United Front ("RUF"), a group that
fought a vicious civil war in Sierra Leone until 2002.

930.     In late 2000, Mr. Ossaily worked with Mr. Bah to smuggle conflict diamonds from
Sierra Leone to Belgium where they could be "laundered" through ASA Diam NV.

931.     A World Bank report estimated that diamond exports from Sierra Leone were worth
$138 million U.S. dollars per year, of which only $1.2 million U.S. dollars were shipped legally.

932.     From January 2000 through August 2001, according to a later financial audit under
the auspices of Belgian authorities, ASA Diam NV moved funds worth $19 million U.S. dollars
from Belgium to Lebanon, of which $16.5 million U.S. dollars was withdrawn in cash.

933.     Between January and May 2001, Mr. Nassour withdrew another $20 million U.S.
dollars in cash from an account controlled by ASA Diam NV. Some of the banknotes were
physically transferred to Beirut.[122]

934.     Mr. Nassour and ASA Diam NV were also linked to the RUF in Sierra Leone, and
to both Al Qaeda operatives and members of the Iranian regime.

935.     According to the Belgian police, ASA Diam NV phone records in Belgium
indicated that from January to May 2001, a considerable number of telephone calls were made to

---

[121]     Likely, Ali Hussein Darwish, discussed below.

[122]     According to a U.N. investigation: "The company, represented by Ali Ahmad in its response to the Panel,
confirms buying diamonds from a Mr. Aziz Nassour, but asserts that the consignments were imported into Belgium
with official invoices having been declared at E.C. airports in a correct way. Asa Diam NV maintains that it was not
its responsibility to search out whether Mr. Nassour was dealing in any incorrect way whatsoever." Left unstated is
the familial relationship between Mr. Nassour and Mr. Ahmad.

Liberia and to RUF members in Sierra Leone. After May 2001, phone records show that calls were placed from ASA Diam NV's office to Afghanistan, Pakistan, Iran, and Iraq.

936.     When interviewed, Mr. Nassour admitted to calling a Lebanese minister who was in Iran on personal business but could not explain the other calls, stating that anyone could have walked into the office and used the phone.

937.     Belgian police later concluded that Mr. Nassour "is the leader of an international criminal organization who delivers weapons to African war-territories in exchange for 'blood' diamonds. The money is subsequently being laundered on the Antwerp Diamond Market."[123]

938.     Using interviews and banks and phone records, Belgian police further linked Mr. Nassour via ASA Diam NV's offices in Antwerp to his brother-in-law Ali Said Ahmad and the phone calls from the company's offices to weapons purchases. For example:

---

[123]     The *Washington Post* reported in January 2003 that European law enforcement investigations, launched soon after September 11, 2001, focused on Aziz Nassour (among others) "who now lives in Beirut and is barred by the UN from international travel." The article went on to say that "[o]n December 26, 2000, according to sources, Osailly and Allie Darwish, another Lebanese diamond dealer, met with the two al-Qaida operatives. Joined by several senior RUF commanders, they drove by caravan from Monrovia to Sierra Leone [where] a courier sent by Nassour delivered $300,000 to pay [the Liberian rebels Revolutionary United Front] for the diamonds. Investigators say they found calls from Nassour's ASA Diam company telephone, as well as a satellite telephone, made over the next several weeks to places that raise alarms: several calls to Afghanistan; a fax to Lahore, Pakistan; two calls to Iraq and four calls to Iran. Nassour, in a telephone interview, said he did not recall personally calling Afghanistan or Pakistan, although he said he had called Iran on personal business."



939. Mr. Nassour's phone records also linked certain weapons purchases to Sierra Gem Diamonds NV, Said Ali Ahmad, and his sons Nazim and Hassan (discussed below).

940. Sierra Gem Diamonds NV was also linked to phone calls placed from its offices on September 10, 2001, to an individual named Zine Qayoum who was in direct contact with notorious arms dealer Victor Bout and unidentified Iranians.

941. Ibrahim Nassour's daughter, Diana Nassour, married Ali Said Ali Ahmad (discussed below). She was registered as a director of Sierra Gem Diamonds NV in Antwerp.

### b. The Tajideen Clan Network

942. The Tajideen Family Network owns many businesses in Lebanon and several other countries, including the United Kingdom, Democratic Republic of Congo, The Gambia, Sierra Leone, Ghana, Mozambique, Angola, Belgium, and the United Arab Emirates.

943.    There were originally eleven siblings, at least nine of whom are or were active in the Tajideen Network in some fashion:

- Kassim Muhammad Tajideen;
- Mahmoud Muhammad Tajideen;
- Hassan Muhammad Tajideen (deceased);
- Ali Muhammad Tajideen;
- Hussein Muhammad Tajideen;
- Fatimah Muhammad Tajideen;
- Youssef Muhammad Tajideen;
- Ibrahim Muhammad Tajideen;
- Ahmad Muhammad Tajideen;
- Jaffar Muhammad Tajideen; and
- Mariam Muhammad Tajideen.

944.    The Tajideen brothers Kassim Tajideen, Ali Tajideen, and Hussein Tajideen are Lebanese businessmen who have all been designated SDGTs for their role as Hezbollah fundraisers, money launderers, and financial contributors. Furthermore, the other Tajideen family members listed above, though not (yet) designated SDGTs, play important supporting roles in the Tajideen Network.

945.    The eldest brother, Kassim Tajideen, built a global network of food-trading companies and real-estate holdings after he emigrated from Lebanon to Africa in 1976.

946.    Initially, he settled in Sierra Leone before setting up shop in Cote d'Ivoire, Angola, and the Democratic Republic of Congo over the next two decades.

947.    Together, the Tajideen family controls a vast network of interlocking companies spanning the globe involved in billions of dollars in money laundering and illicit finance on Hezbollah's behalf.

948.    The Tajideen family network is a vast commercial and criminal enterprise funded by Hezbollah's BAC, built on a foundation of sizeable bribes to top officials in cooperative jurisdictions.

949. By bribing officials across Africa for decades, Tajideen companies were able to evade import and export tariffs, undercut local competitors' prices, gain monopolies and government contracts, and secure discrete access to airports, landing strips, and ports across central and western Africa.

950. Although likely known to Western intelligence long before the turn of the century, the Tajideens and their business associates first came to the attention of European law enforcement after the September 11, 2001, attacks when these law enforcement agencies were collecting intelligence on radical Islamists, and the Belgian Federal Police placed one particular individual under surveillance.

951. This individual had taken a low-level administrative job at a trading company in Antwerp known as Soafrimex which conducted extensive trade with Africa.

952. Soafrimex was a company registered in Antwerp in 1989 by Kassim Tajideen (listed as residing in Sierra Leone) and Salim Reda (listed as a resident of the Ivory Coast).

953. Through the investigation of Soafrimex, police investigators began to better understand "The System" in Lebanon (as described above).

954. Soafrimex would (on paper) purchase commodities from companies all over Africa (*e.g.* food, clothing, wood) that belonged to its own network of companies and would transport the goods using its own transport network, principally in Africa.

955. These commodities would then be re-sold (through affiliated companies) and the proceeds (in local currency) would be used to purchase conflict diamonds for further sale and/or money laundering or deposited in "cooperative" banks in Lebanon and then reinvested.

956.     In May 2003, as the result of the Soafrimex investigation, Kassim Tajideen and his wife Huda were arrested in Belgium in connection with fraud, money laundering, and diamond smuggling.

957.     Belgian police discovered more than a dozen affiliated diamond companies that operated in Africa and received funds transfers through the same money laundering network.

958.     Nevertheless, a Belgian judge determined that the Tajideens were not a flight risk and released them on bail.

959.     They immediately fled to Beirut, and Kassim Tajideen restructured Soafrimex, folding it into a newly acquired corporate vehicle called Ovlas Trading SA (SDGT).

960.     Other reporting also detailed this money laundering network.

961.     For example, Partnership Africa Canada ("PAC"), a coalition of Canadian and African NGOs working together on issues of human rights, published its Annual Review of the Diamond Industry in 2004 focusing on the DRC's listing by the UN Development Program as the 167th country on its Human Development Index of 175 countries.

962.     PAC's report noted that despite the DRC being one of the largest producers of diamonds in the world, it draws scarce benefits from its natural resources, and attributed the problem to the African government's inability to tax the illegal export of diamonds from the region.

963.     Furthermore, PAC's report detailed how this illegal exportation was often conducted by Lebanese nationals involved in money laundering through their "extensive family networks which operate in several economic sectors."

964.     PAC specifically cited the "Antwerp company, Soafrimex[, …] run by the Tajideen family," as having been "accused of money laundering," and described how an investigation of the company following its raid by Belgian police in May 2003 was still ongoing.

965.     PAC's review further reported that the "Tajideen are connected to one of the largest importers of basic products from the DRC, Congo-Futur."

966.     On February 26, 2007, the *Mideast Mirror* published an article titled "Gloomy Assessments" reporting on a recent intelligence briefing given to Israeli Prime Minister Ehud Olmert and the other members of his cabinet.

967.     The briefing included a discussion of a media report by the *London Times*, picked up by *The Jerusalem Post*, describing how Hezbollah was expanding its presence into the border of a UN-patrolled peacekeeping zone "with the apparent aim of creating a Shiite-controlled buffer that would allow the organization to avoid being noticed while they build their forces."

968.     Hezbollah's expansion was enabled, according to the reports, by "Shiite businessman Ali Tajiddine, a diamond trader with close ties to Hezbollah, who has begun buying large tracts of land from their Christian and Druze owners to serve as Hezbollah's base of operations."

969.     The same day, the *Christian Science Monitor* published an article titled "Hezbollah Builds New Line of Defense," reporting that Ali Tajideen's "connections to Hezbollah are widely known locally in south Lebanon."

970.     In addition, the *Christian Science Monitor* article stated that one of Mr. Tajideen's "relatives was arrested in Antwerp, Belgium, in May 2003 in a case involving diamonds from West Africa and suspected money laundering on behalf of Hezbollah," and that Mr. Tajideen "snapping up vast tracts of land" on the northern border of the UN's peacekeeping zone.

971.     Mr. Tajideen was making these purchases in cash in whatever amounts the Christian and Druze property holders requested, using funds reportedly transferred by Iran.

972.     The *Christian Science Monitor* article also reported that Ali Tajideen's intention in purchasing the land was presumably "to create a Shiite belt spanning the northern bank of the Litani, allowing Hezbollah freedom to operate while severing Christian and Druze districts from each other," since there was no other reason the land would be valuable to Mr. Tajideen.

973.     The article also confirmed that Hezbollah did not deny that it was replenishing its arms, reporting that three weeks prior, Lebanese customs police detained "a truck filled with rockets and mortars destined for Hezbollah," which was followed by a speech by Hezbollah leader Nasrallah in which he admitted that Hezbollah was transporting its weapons to its front lines.

974.     Hezbollah's expansion into the UN-patrolled zone, facilitated by Ali Tajideen's all-cash property purchases, was widely reported by the international media, including by:

- *The Australian* of Syndey in an article titled "Hezbollah Land Grab Heralds War" published on February 27, 2007;
- The *Sunday Independent*, an Irish newspaper, in an article titled "Hezbollah in Land Grab as War with Israel Looms" published on August 12, 2007;
- *The Sunday Telegraph* of London, in an article titled "Hezbollah Snaps up Frontier Land to Launch Second War on Israel—UN Helpless as Teheran-backed Militants Take Over Villages in Southern Lebanon" published on August 12, 2007;
- The *Edmonton Journal* of Alberta, Canada, in an article titled "Hezbollah Buying up Real Estate Near Israeli Border; Iranian Money Helping Rebuild War Footing" published on August 12, 2007; and,
- *United Press International* on August 12, 2007, in a website article titled "Hezbollah Buying Land Near Israel."

975.     The *Sunday Independent* and *The Sunday Telegraph* articles specifically described how "Mr Tajeddine keeps a Hezbollah charity box in the waiting room of his Tyre office," and is "believed to be a major player in Hezbollah's massive reconstruction programme."

976.     In an article titled "Puiul Vulpii, Majorat in Business la 30 de Ani" (Puiul Vulpii, Grown Up in Business at 30 Years Old"), published on November 21, 2007, Romania's *Jurnalul*

*National* profiled different foreign companies registered to do business in Romania and reported that Kassim Tajideen had been investigated for money laundering in African countries through his company Soafrimex, describing how Kassim "Tajideen was involved in the exchange of frozen chicken for illegal diamonds, the so-called blood diamonds."

977.    The *Jurnalul National* article further reported that Tajideen was also investigated for his role in the assassination of Former President of the Democratic Republic of the Congo Laurent-Désiré Kabila.

978.    On May 27, 2009, Kassim Tajideen was designated an SDGT by the U.S. Department of Treasury, which identified him as follows:

> [A]n important financial contributor to Hezbollah who operates a network of businesses in Lebanon and Africa. He has contributed tens of millions of dollars to Hezbollah and has sent funds to Hezbollah through his brother, a Hezbollah commander in Lebanon. In addition, Kassim Tajideen and his brothers run cover companies for Hezbollah in Africa.

979.    Kassim Tajideen was later arrested in Morocco in 2017 and extradited to the United States. In December 2018, he pleaded guilty to various OFAC violations and was sentenced to five years in prison before being released during the COVID–19 epidemic on compassionate medical grounds.

980.    Kassim Tajideen owns or controls several companies designated as SDGTs, including the following entities:

- **Tajco Company** (LTD; SARL; LLC). On December 9, 2010, Tajco was designated an SDGT. Tajco is a multinational company involved with real estate, international trade, and merchandising based in The Gambia. It manages a series of grocery stores in The Gambia called "Kairaba Shopping Centre" (SDGT), as well as other organizations throughout Lebanon, Sierra Leone, the Democratic Republic of Congo, Angola, and the British Virgin Islands. In 2013, it was reported that the company's name was changed to "Senesco Banjul." The following individuals were involved with the company:

- o Kassim Tajideen was listed as a co-owner and founder of the company;
- o Ali Tajideen was listed as a co-owner and director general of the company;
- o Hassan Ali Tajideen was listed as executive director of the company; and
- o Hussein Tajideen was listed as a co-owner and managing director in the company.

- **Tradex (Sierra Leone)** On December 9, 2010, Tradex was designated an SDGT.

- **Kairaba Supermarket** (a/k/a Kairaba Shopping Center). Kairaba Supermarket is a subsidiary business of SDGT Tajco LTD. Both companies named Hussein Tajideen as the same point of contact and manager, and both use the same primary business address.[124]

- **Ovlas Trading SA**. Ovlas Trading SA is the parent company of Ovlas Trading SAL (Offshore) and Béton Liban SARL (a/k/a BL SARL). The company deals with general trading and food manufacturing. Ovlas Trading SA was designated an SDGT by the U.S. Department of Treasury on December 9, 2010. Ovlas Trading SA opened a branch in the British Virgin Islands in 2005, shortly after being founded in Lebanon. The following individuals were involved with the company:

- Ovlas Trading SAL (Offshore).

- Afrimex (Offshore) SAL. Established in 2003, the company was owned and controlled by members of the Tajideen family and served as part of the Tajideen Network in Africa on behalf of Hezbollah. It was closely linked to Ayman Joumaa's narcotics trafficking and money laundering network and provided trade-based money laundering service to the Joumaa Network.

- Congo Futur SPRL was established in the Democratic Republic of Congo in 1997 as a subsidiary of Soaframex BV. Officially, the company is controlled by Ahmad Tajideen, but Kassim Tajideen controls the company and the entire network of subsidiaries and sister companies related to it.

---

[124]    A 2013 OFAC enforcement action demonstrates the way in which the Tajideen Network conducts its illicit money laundering operations between Africa and Lebanon by means of U.S. dollar-clearing in the United States. *See,* OFFICE OF FOREIGN ASSETS CONTROL, HSBC BANK USA N.A. SETTLES POTENTIAL CIVIL LIABILITY FOR APPARENT VIOLATIONS OF THE GLOBAL TERRORISM SANCTIONS REGULATIONS (Dec. 2013), https://ofac.treasury.gov/media/13721/download?inline.

981.     Kassim's brothers, Ali and Hussein Tajideen, were also designated SDGTs by the U.S. Department of Treasury on December 9, 2010. Ali Tajideen and Hussein Tajideen were, at all relevant times, business partners of Kassim Tajideen.

982.     Both Ali and Hussein Tajideen were among Hezbollah's top financiers in Africa.

983.     Hussein Tajideen was a primary Hezbollah fundraiser and prominent Hezbollah supporter in The Gambia.

984.     Since at least March 2006, Hussein Tajideen owned 50 percent of Tajco LTD, in Banjul, Gambia, and served as the managing director of the company.

985.     Ali Muhammad Tajideen controlled Tajco Company SAE/SARL, the Lebanese sister company of Tajco in Africa. It was used for many years as Hezbollah's conduit for purchasing land in Lebanon to expand its areas of control and to acquire strategic parcels for political and strategic purposes.[125]

986.     Ali Tajideen, through Tajco, also controlled a network of companies in The Gambia, Sierra Leone, the Democratic Republic of Congo, Angola, and the British Virgin Islands.

987.     Ali Tajideen's Tajco real estate empire was of strategic importance to Hezbollah because the Tajideen clan is from southern Lebanon and Ali Tajideen's acquisitions were situated in militarily strategic locations south of the Litani river in Lebanon where UN peacekeeping forces have nominally been responsible for preventing Hezbollah from entrenching along the border with Israel.

---

[125]     Kassim Tajideen (SDGT) was listed as the co-founder of the company, Ali Tajideen's wife, Nur al-Ain Muhammad Ali Atwi, was listed as one of the partners (owning 20 percent of the shares) in the company and Hussein Muhammad Tajideen (SDGT) was listed as one of the partners (owning 20 percent of the shares).

988.     As the relatively recent discovery of networks of Hezbollah tunnels burrowed under Israeli territory attest, UN peacekeeping forces have—at best—been ineffectual in their stated purpose.

989.     By contrast, Ali Tajideen, Jihad al-Bina, the IRGC–QF, and Hezbollah's BAC have been highly effective in rebuilding Hezbollah's military / terror infrastructure south of the Litani river.

### c.     Muhammad Ibrahim Bazzi (SDGT)

990.     Born on August 10, 1964, in Bint Jbeil in southern Lebanon, Muhammad Ibrahim Bazzi is a Hezbollah Super Facilitator who has fundraised at least hundreds of millions of dollars for Hezbollah through his business activities in Belgium, Lebanon, Iraq, and West Africa.

991.     Mr. Bazzi was expelled from Sierra Leone in 1998.

992.     At various times, Mr. Bazzi has held passports from Lebanon, Belgium, the United Kingdom, Sierra Leone, and The Gambia. He is married to Sawsan Hodroj, the sister of Michigan businessman Ahmad Hodroj. She is the niece of Hezbollah operative and supporter Talal Chahine.

993.     Ahmad Hodroj's wife Fatima is a sister of the wife of the deposed president of The Gambia, Yahyah Jammeh.

994.     Thus, Muhammad Bazzi had familial ties to the president of The Gambia. Bazzi, was issued a diplomatic passport by then-President Jammeh and also served during the Relevant Period as an Honorary Consul for The Gambia in Lebanon where he reportedly met periodically with Abdallah Safieddine and other members of the BAC leadership.

995.     Liberia's *The Daily Observer,* reproduced in *Africa News* on July 14, 2008, in an article titled "Gambia; Dubai Investors Meet Jammeh," referred to Mr. Bazzi as the Honorary Consul for The Gambia in Lebanon.

996. Mr. Bazzi had extensive personal and business connections with Abdallah Safieddine, the co-head of Hezbollah's BAC and Hezbollah's representative to Iran and served as an important cut-out for the BAC and the IRGC–QF when they required specific assistance.

997. Due to his leading role in financing Hezbollah's IJO, Mr. Bazzi was known throughout the Relevant Period as a senior Hezbollah operative, particularly in Lebanon where his association with Kassim Tajideen and Abdallah Safieddine was also widely known.[126]

998. In West Africa, Mr. Bazzi was also closely associated with more than one corrupt government and was widely known as a close personal associate of President Jammeh and local oligarchs.

999. Thus, even outside of Lebanon, public sources repeatedly described allegations of Mr. Bazzi's illicit conduct and his association with Hezbollah.

1000. Mr. Bazzi received particularly significant media coverage starting in 2006, when then-Gambian President Yahya Jammeh started selling The Gambia's failing energy and telecommunications companies to companies owned and controlled by Bazzi.

1001. *All Africa*, an online news source aggregating news published across Africa, published an article on October 9, 2006, titled "Problèmes d'électricité, les solutions du voisin Global Management System" ("Electricity problems, neighbor's solutions") describing how President Jammeh sold The Gambia's national water and electric company ("NAWEC") to Global Management System, a company owned by Mr. Bazzi.

1002. *The Gambia Journal* also reported on this "move that took everyone by surprise" on October 2, 2006, in an article titled "Gambia: Surprise NAWEC Take Over Announced." The article reported how "Mr. Bazzi is the same person who less than two months ago announced that

---

[126] In The Gambia, Mr. Bazzi worked closely with the Tajideens and Tajco and worked with LCB's Prime Bank to launder money for them.

another previously unknown company, Global Trading Group, also owned by him, was in turn, the owner of three 6.8 MW generators at the new Brikama Power Plant. That time too, it took many by surprise that the generators were not owned by the Gambian state…."

1003.  *Freedom Newspaper*, an online newspaper published by a Gambian American journalist focused on injustices in The Gambia during President Jammeh's time in office, launched an investigation into Muhammad Bazzi, publishing two articles on October 15 and 25, 2007, linking Mr. Bazzi with Hezbollah.

1004.  On November 5, 2007, *Freedom Newspaper* reprinted a letter to the editor by the "Management of Gam Petroleum" which had read the articles and were threatening to sue the paper. The letter insisted that despite the reports reflected in the October 2007 articles, Mr. Bazzi was the major shareholder and managing director of a group of companies in The Gambia, including Gam Petroleum; GEG (a new power plant in the country); Gam Veg (an edible oil refinery); and Royal Residence (a prime real estate developer) but was not associated with Hezbollah and "has never been involved in the diamond business, directly or indirectly."

1005.  Mr. Bazzi's subsequent failure to deliver services to The Gambia quickly made headlines. In an article reproducing a *Freedom Newspaper* report dated December 12, 2007, titled "Gambia; Contractor Alleges Fraud Over Generators Sale," *Africa News* reported that Bazzi and his company, the Spectrum Group, cancelled a contract for generators with a Turkish-based contact without any explanation and instead purchased used defective generators from China.

1006.  *Africa News* predicted "a full blown political crisis" in The Gambia on December 19, 2007, in an article titled "Gambia; Spectrum Group Will Not Resolve Economic Woes," which reproduced a *Freedom Newspaper* report describing "Lebanese runaway Hezbollah fighters" entrusted by the corrupt Gambian government to "milk Gambia's ailing economy." The report

listed how the "so called" Lebanese investors "helped to wreck war ravaged Sierra Leone," "engaged in shady business activities, ranging from drug trafficking, foreign exchange hoarding, the sale of 'blood diamonds,'" and "gun running just to name a few." The article specifically identified Muhammad Bazzi, head of the Spectrum Group, as having "hijacked" Gambia's telecommunications, airline, and water and electricity companies without any transparency into whether the funds allegedly used to buy these institutions were "clean money" or not. The article further reported on the Spectrum Groups' colossal failures to provide services, and that any funds generated "are wired through Standard Chartered Bank Banjul Branch to Arab countries."

1007.   *Freedom Newspaper* reported on the association between President Jammeh and Iran on December 31, 2007, in an article titled "Iran's landmines, howitzer canons in The Gambia – the effects are serious!" The report cited the presence of Iranian security personnel "dining and wining in Banjul," the capital of The Gambia, and warned that the "GAMTEL [The Telecommunications Company LTD]–HEZBOLLAH links are being traced."

1008.   In 2008, Muhammed Bazzi brokered a large consignment of petroleum between the National Iranian Oil Refining and Distribution Company ("NIORDC") and the NAWEC, a Gambian State-owned oil company, run by a close friend of President Jammeh.

1009.   Bazzi's Gam Petroleum received proceeds from this and other insider transactions and parked these proceeds in several banks.

1010.   *Freedom Newspaper* continued to report on the connection between President Jammah, Iran, and Hezbollah, publishing a report on February 26, 2011, titled "Breaking News: Gambia: Did Jammeh Sell Iranian Arms to Hezbollah?" The report described thirteen containers of Iranian arms intercepted during their transit to The Gambia and stated that a "Hezbollah cartel in Banjul" was "acting in concert with the country's President Yahya Jammeh to sell arms to the

terrorist group's main base in Lebanon," in a "well-coordinated scheme, which has been going on for a while" – at least as far back as 2005.

1011.   The report stated that Muhammad Bazzi was President Jammeh's "conduit" for selling Iranian arms as well as drugs to Hezbollah, and included a section titled "Who is Muhammed Bazzi," which described how Mr. Bazzi devised the plan to be awarded a monopoly for the sale of all petroleum productions in Gambia through "GamPetroleum," of which he owned 99%. Bazzi was also listed as co-owner of Spectrum Group, which controlled The Gambia's energy and telecommunications sectors. The report described how Mr. Bazzi initially exported the funds generated by his companies to Lebanon via bags of dollars, but when his money laundering activity was detected, he registered "his own money laundering 1-branch bank called Prime Bank." The report cited the U.S. government's identification of Prime Bank as the subsidiary of LCB which is "partially owned by a Lebanese individual known to be a supporter of Hezbollah," a/k/a, Muhammad Bazzi.

1012.   Mr. Bazzi was also described in that article as The Gambia's Consul General to Lebanon.

1013.   The *Freedom Newspaper* report on Mr. Bazzi acting as the intermediary between President Jammeh, Iran, and Hezbollah was cited in a report published by the Gatestone Institute on March 25, 2011, titled "Iran's Charm Offensive In Africa." The report repeated the claims that President Jammeh was colluding with Bazzi to buy weapons from Iran to sell to Hezbollah, and that Mr. Bazzi created Prime Bank, a subsidiary of the blacklisted LCB, to "assist in money laundering and weapons trading activities."

1014.   The Iranian weapons were also reported on in more detail by the Critical Threats Project in an article dated March 7, 2011, titled "Qods Force Operation in Africa." The article

described how Nigerian security forces intercepted the shipment of thirteen twenty-foot containers of Iranian weapons in October 2010, which contained "107 mm artillery rockets, 60/81/120 mm mortars, grenades, explosives, and rocket launchers." The report characterized the seizure as a "public revelation of Iranian hard power activity in Africa."

1015.   On February 27, 2013, *Freedom Newspaper* published an editorial titled "Lebanese Mobsters increase their Stranglehold on Gambian Economy," which described how President Jammeh permitted the Lebanese "mobsters" in the region monopolies over its natural resources. The article cited the U.S. Department of Treasury's press release announcing its identification of LCB as a "primary money laundering concern" under the PATRIOT Act, in which The Gambia-based Prime Bank was specifically identified as being "partially owned by a Lebanese individual known to be a supporter of Hezbollah." The article further cited how no Gambian at that time was allowed to import any petroleum or fuel, as Gam Petroleum, a "company owned by Muhammad Bazzi and his cohorts" had a monopoly over that right. The report further described how NAWEC was obligated to purchase electricity by these Lebanese monopolies at prices determined by them.

1016.   In 2011, Mr. Bazzi and Mr. Safieddine worked to resolve a dispute and reestablish relations between Iran and The Gambia.

1017.   The U.S. Department of Treasury later confirmed that Mr. Bazzi was also a "close associate" of Yahya Jammeh, the former president of The Gambia, who was sanctioned by the United States in December 2017 for his record of human rights abuses and money laundering.

1018.   On May 17, 2018, Mr. Bazzi was designated an SDGT by the U.S. Department of Treasury.[127]

---

[127]   A month after designating him for supporting Hezbollah's terrorist activities, the U.S. Dep't of Treasury released a report on human rights that criticized the Gambian regime of Yahya Jammeh. The U.S. Dep't of State also described The Gambia as "a source and destination country for women and children subjected to forced labor and sex trafficking." According to the U.S. Dep't of State, "Gambian women are subjected to forced labor and sex trafficking

1019.  Five companies Mr. Bazzi owned or controlled were also designated by the U.S. Department of Treasury on the same date.

1020.  Mr. Bazzi worked closely with former Gambian president Yahyah Jammeh to loot the country and open it up to Hezbollah for narcotics trafficking, money laundering, and arms dealing.

1021.  Mr. Bazzi ran several companies around the world, often with a business associate named Fadi George Mazegi.

1022.  In The Gambia, Mr. Bazzi installed Fadi George Mazegi as a "Non-Executive Director" of Prime Bank, a subsidiary of Lebanese Canadian Bank used by Hezbollah's BAC and the IRGC to launder enormous sums of money. Although official documents reportedly show Mr. Bazzi was an owner of the bank, he has told *The Wall Street Journal* that "he had only helped procure a banking license for friends."

1023.  Prime Bank (Gambia) became a key money laundering hub for Hezbollah and a favored channel for moving Hezbollah's money to LCB in Lebanon. It was a major conduit for Ayman Joumaa's network to launder drug money for the Mexican cartels. It also moved hundreds of millions of dollars for the IRGC at the behest of and in coordination with Muhammad Bazzi (SDGT) and Abdallah Safieddine, who reported directly to the late Maj. Gen. Qassem Soleimani who was the head of the IRGC–QF at the time.

---

in the Middle East, including Lebanon and Kuwait." Muhammad Bazzi has been linked to the Gambian human trafficking network, and a published report further linked him to "the process of using the Syrian girls who are collected from refugee camps and trading them for money to help Hezbollah."

1024.  Mr. Bazzi's son, Wa'el Muhammad Bazzi, owns shares in several of his father's corporate holdings and has assumed control of several of them following his father's SDGT designation (in order to facilitate sanctions evasion).[128]

1025.  Mr. Bazzi owned or controlled the following companies:

- **Global Trading Group NV** (SDGT), a global energy products and services company headquartered in Antwerp, Belgium, that also has locations in Sierra Leone, The Gambia, Ivory Coast, and Benin. On August 9, 2018, the company changed its name to Energy Engineers Procurement and Construction.[129]
- **Euro African Group LTD** (SDGT), a major fuel supplier in The Gambia. According to *Reuters*, Euro African Group LTD held exclusive rights to import fuel to Gambia between 2008 and 2013 and a fuel supply deal to the state-run utility. Mr. Bazzi acknowledged to *Reuters* that the company made three payments to the Jammeh Foundation for Peace totaling $1.3 million in 2013. Documents obtained by *Reuters* reflect five payments into the account in 2013 totaling $2.55 million— each referencing Euro African Group.
- **Africa Middle East Investment Holding SAL** (SDGT).
- **Premier Investment Group SAL Offshore** (SDGT).
- **GAM Petroleum** (Storage Facility).
- **Prime Bank (Gambia)**.
- Ibrahim Bazzy and Sons LTD (Sierra Leone).

1026.  Muhammad Bazzi is (or was prior to his SDGT designation) a director of the Gambia Milling Corporation along with Fadi George Mazegi. Mr. Bazzi's Premier Investment Group (SDGT) appears to have owned 50 percent of the company.

1027.  During the Relevant Period, Mr. Bazzi maintained close ties to other U.S.-designated individuals, including Hezbollah financiers Adham Hussein Tabaja and Ali Youssef

---

[128]     Wa'el Bazzi was designated an SDGT by OFAC on April 24, 2019. *See*, Press Release, *Treasury Targets Sanctions Evasion Conduits for Major Hizballah Financier*s, U.S. DEP'T OF TREASURY (Apr. 24, 2019), https://home.treasury.gov/news/press-releases/sm668.

[129]     In October 2018, Muhammad Bazzi was still attempting to negotiate oil-related contracts on behalf of Global Trading Group NV "for the benefit of the government of Iran" but noted the need "to take definite precautions, attentions and preparations in our steps and actions…"

Charara. He also had extensive links to Hezbollah's most senior narcotics traffickers, including the U.S.-designated SDNTK, Ayman Joumaa.

1028.  On April 23, 2019, the U.S. government's "Rewards for Justice" Program announced a reward of up to $10 million "for information leading to the disruption of the financial mechanisms of Lebanese Hezbollah."

1029.  The announcement described Mr. Bazzi as a "key Hezbollah financier, who has provided millions of dollars to Hezbollah generated from his business activities" and noted that the reward offer was highlighting him and two other individuals "as examples of key Hezbollah financiers and facilitators about whom it seeks information and whom the U.S. Department of the Treasury has designated as SDGTs."

1030.  In February 2023, a three-count indictment was unsealed in United States District Court for the Eastern District of New York charging Mohammad Ibrahim Bazzi, a Lebanese and Belgian citizen, and Talal Chahine, a Lebanese citizen, with conspiracy to conduct and cause United States persons to conduct unlawful transactions with a Specially Designated Global Terrorist, attempt to conduct and cause United States persons to conduct unlawful transactions with a Specially Designated Global Terrorist, and money laundering conspiracy.

1031.  He was also apprehended that same month in Romania and later extradited to the United States where he is currently incarcerated pending trial.

### 9. SUB-SAHARAN AFRICA—A PRIMARY HEZBOLLAH/IRGC MONEY LAUNDERING HUB

1032.  The fact that Hezbollah's early sources of illicit revenue came from the Lebanese criminal networks active in sub-Saharan Africa was widely publicized by the early 2000s.

1033.  At the BAC's direction, the families that control these networks invested a substantial portion of their illicit proceeds in Lebanese real estate, often forming separate

companies to deposit the millions of dollars they have laundered through black market sales and phony invoicing of conflict diamonds back into Lebanese and UAE exchange houses and ultimately through Defendants.

1034. These include the Nassour, Ahmad, and Khanafer clans and individuals and companies that have facilitated their money laundering operations over the past two decades.

1035. As discussed above, in 2002, the United Nations Security Council ("UNSC") issued a report about conflict diamonds titled: Final Report of the Panel of Experts on the Illegal Exploitation of Natural Resources and Other Forms of Wealth of the Democratic Republic of the Congo ("the UNSC Report").

1036. The UNSC Report stated that the Nassour, Ahmad and Khanafer clans provided banknote counterfeiting, money laundering and diamond smuggling services to Hezbollah and other Hezbollah-related entities:

> The Panel has documents showing that three "clans" of Lebanese origin, who operate licensed diamond businesses in Antwerp, purchased diamonds from the Democratic Republic of the Congo worth $150 million in 2001, either directly through Kinshasa or through comptoirs in the Republic of the Congo. The three "clans"—Ahmad, Nassour and Khanafer—are distinct criminal organizations that operate internationally. Their activities, known to intelligence services and police organizations, include counterfeiting, money-laundering and diamond smuggling. Several credible sources have reported that the clans also have ties with Amal and Hezbollah. Some businesses associated with the clans are Sierra Gem Diamonds, Asa Diam, Triple A Diamonds and Echogem. A group linked to the clans' operations is providing counterfeit United States dollars to former generals from the time of President Mobutu, who are trying to overthrow the Government of the Democratic Republic of the Congo.

1037. In fact, all three clans and their conflict diamonds and money laundering networks are tightly integrated into Hezbollah's BAC and The System, and a significant portion of the vast quantities of U.S. dollar-denominated banknotes they obtained and laundered from South America,

Africa and the Persian Gulf were deposited in and flowed through Lebanese and Emirate exchange houses.

### 10.    HEZBOLLAH'S    CONFLICT    DIAMOND    AND    MONEY LAUNDERING NETWORK

1038.   The global diamond industry consists of two distinct components: mining and retail:

- Mining and Manufacturing, which is the segment of the industry that deals with rough diamonds and includes diamond mining through to rough diamond cutting and polishing.
- Jewelry Manufacturing and Sales, which is the segment that deals in finished (cut and polished) diamonds and includes polished diamond dealing on through to jewelry retailing.

1039.   The global diamond industry's supply-chain begins with the mining of raw diamonds at production sites around the world.

1040.   The diamonds then go to sorting and classification centers where they are categorized by characteristics like cut, color, clarity, and carat before entering the market and traveling to diamond cutters and polishers.

1041.   After the diamonds are prepared by cutters and polishers, they move onto jewelry manufacturing where the finished diamonds become retail jewelry sold by jewelers to consumers.

1042.   In Botswana, Namibia, South Africa, Angola, and the Democratic Republic of Congo, diamond exports generate billions of dollars annually, accounting for 11 to 25 percent of gross domestic product ("GDP") and 50 to 90 percent of the export revenues for those countries.

1043.   By value, Africa produces approximately 60 percent of the global rough diamond supply, making the continent the world's largest diamond producing region.

1044.   In an effort to address the illegal exploitation of resources in the DRC exacerbating and prolonging the conflict in the area, the UN Security Council appointed an independent panel

of experts to research the issue in June 2000. The experts produced a series of reports detailing how the exploitation of resources in the region funded many of the different armed groups fighting there.

1045.  As part of this investigation, five Western and African intelligence sources published reports between 2000–2002 specifically naming the Ahmad and Nassour families (related through marriage) and companies Sierra Gem Diamonds and Triple A Diamonds as having purchased diamonds from UNITA in violation of the UN's diamond embargo.

1046.  NGO Global Witness included an account of these reports in its report titled "For A Few Dollars More: How al Qaeda moved into the diamond trade," published in April 2003.

1047.  In July 2000, the world's major diamond organizations conducted a meeting in Antwerp, where the vast majority of the world's rough diamonds are purchased and sold, and issued a joint resolution vowing to crack down on the conflict-diamond trade.

1048.  Antwerp's top diamond banks warned customers they would sever relations with anyone dealing in conflict diamonds.

1049.  The World Diamond Council was established after the meeting as an organization representing the entire diamond value chain including representatives from diamond mining, manufacturing, trading, and retail, tasked with keeping the supply chain of diamonds as free as possible from conflict diamonds.

1050.  Despite these endeavors, the *Washington Post* published an article in late 2001 claiming that Hezbollah and al Qaida terrorist networks reaped millions of dollars from illicit diamonds mined by rebels in Sierra Leone and Congo, with the best stones smuggled into Antwerp.

1051.    The *Washington Post* cited intelligence sources stating that two Antwerp diamond dealers were facilitating the trades, and that Antwerp itself was transforming into a financial headquarters for radical Islamic groups.

1052.    These claims prompted an Antwerp court to launch a judicial investigation into illicit diamond trading networks, as reported in a March 7, 2002, feature article in the *United Press International* titled "Antwerp and Dirty Diamond Rumors."

1053.    In October 2002, the UN Security Council received the "Final Report of the Panel of Experts on the Illegal Exploitation of Natural Resources and Other Forms of Wealth of DR Congo," which provided extensive details on how politicians in the diamond-rich northern area of the DRC enabled foreign diamond dealers to legally monopolize the market, and also explained Hezbollah's involvement.

1054.    The UNSC report listed the companies and individuals participating in the illegal exploitation of the DRC, including "three 'clans' of Lebanese origin … —Ahmad, Nassour and Khanafer—[] distinct criminal organizations that operate internationally," adding that "[s]everal credible sources" have reported that "the clans also have ties with Amal and Hezbollah," and "[s]ome businesses associated with the clans are Sierra Gem Diamonds, Asa Diam, Triple A Diamonds and Echogem."

1055.    The UNSC report was reported widely in the media.

1056.    The Belgian news agency *Agentschap Belga* covering the UN report listed the three Lebanese clans, including the Ahmad clan and their four Belgium companies, including Sierra Gem Diamonds, and their ties to "the Lebanese Shiite movements Amal and Hezbollah" in an article titled "Belgische Bedrijven Genoemd in VN-rapport Over Plundering van Congo"

("Belgian Companies Mentioned in UN Report on Plundering of Congo") published on October 21, 2002.

1057.　A separate Belgian news agency, *Agence Belga*, also listed the Lebanese clans, four Belgium companies, and their ties to Hezbollah in an article titled "Entreprises Belges Citées Dans le Rapport ONU sur le Pillage de la RDC" ("Entreprises in Belgium and the UN report on the Pillage of the RDC"), published on October 21, 2002.

1058.　French news agency *Agence France Presse* covered the UN report in an article titled "Des Responsables Africains et des Entreprises Pillent la RDC (panel ONU)" ("African Officials, Businesses Loot DRC: UN Panel"), published on October 20, 2002, which listed the diamond trading companies cited in the UN report, including Sierra Gem Diamonds. An English version of the article was published the next day, on October 21, 2002.

1059.　On October 21, 2002, the Spanish language edition of *Europa Press– Servicio Internacional*, in an article titled "RD Congo–La ONU Denuncia la Implicación de Altos Responsables Africanos en la Expoliación" ("DR Congo–The UN Denounces the Involvement of African Officials in Exploitation"), also summarized the UN report and listed the diamond trading companies cited within, including Sierra Gem Diamonds.

1060.　In a news roundup published on October 22, 2002, Belgium's *Persoverzicht* (*Press Review*) reported that the UN Security Council had received the recommendation to impose financial sanctions on four Antwerp diamond companies, including Sierra Gem Diamonds, and cited the UN report's conclusion that the companies are linked to Lebanese clans which operate as "criminal organizations with international reach engaged in money laundering, counterfeiting and diamond smuggling," having purchased 150 million U.S. dollars' worth of diamonds from the Congo in 2001.

1061. The UN report's incrimination of the four Belgium companies, including Sierra Gem Diamonds, was again referenced by Belgian news agency *Agentschap Belga* in an article titled "Congo Ontslaat Directie Staatsmijnbedrijf Miba" ("Congo Dismisses Management of State Mining Company Miba"), published on November 2, 2002.

1062. On April 23, 2001, *Agence France Presse* noted that the Belgian daily *Le Soir* had reported about a secret military file titled "Diamond Trafficking from Angola, Belgium's Role," that "voiced suspicions that Belgian diamond trafficking is involved in Lebanese terrorist organizations."

1063. Specifically, *Agence France Presse* reported of "indications that certain persons named in the diamond trafficking file are also in money laundering, drug trafficking and the financing of terrorist organizations such as Amal and Hezbollah."

1064. On December 30, 2001, the *Orlando Sentinel* (Florida) reported that for much of the past decade radical Islamic organizations in Congo had used diamonds as a means for survival.

1065. The *Orlando Sentinel* article further noted the following about Hezbollah's role in the diamond trade:

> Interviews with diamond dealers, intelligence sources, diplomats and investigators in Belgium, the United States and western and central Africa open a window on how such groups have exploited the corruption and chaos endemic to Congo to tap into the diamond trade and funnel millions of dollars to their organizations back home. The most prominent of these groups is the Lebanon-based movement Hezbollah.

1066. On November 3, 2002, *The New York Times* reported that according to Christine Gordon, an independent, London-based diamond analyst, "there were strong suspicions of ties between Lebanese diamond smugglers in West Africa and the militant Hezbollah movement in Lebanon."

1067.  On November 8, 2002, *Africa News* reported the following about Hezbollah's role in the African diamond trade:

> One prominent diamond trader who is a De Beers "sightholder"—the term used to denote the elite cadre of about 120 dealers selected to buy and market the company's rough stones—was alleged in a 1999 classified European intelligence report to have continued buying diamonds from Angola, a hub of conflict diamond trading, after the United Nations banned purchases from African nations known to deal in conflict diamonds. He is also known in the diamond industry for having ties to Hezbollah, the Islamic terrorist organization.

1068.  The *Africa News* article further noted that:

> The diamond dealer identified in the European intelligence report is known in the industry for his association with Hezbollah, according to two diamond dealers who have worked closely with him but who would not speak on the record. The intelligence report also says that the dealer's company has done business with the terrorist organization, and that the dealer is connected to a web of influential Lebanese families working in the Congo and West Africa that includes Imad Bakri. Bakri was identified in a 2000 U.N. report (under the name Imad Kebir) as a major supplier of weapons for UNITA.

1069.  On May 28, 2004, *Voice of America News* reported that "Sierra Leone's top exporter, Lebanese Hisham Mackie, who last year accounted for 40 percent of legal exports, … rejected accusations by non-governmental organizations that diamond exporters in West Africa may be helping to finance such terrorist organizations as Hezbollah and al-Qaida."

1070.  On June 29, 2004, the *Associated Press*, in an article titled "US: Hezbollah Extorting Diamonds From Africa," quoted then Deputy Chief of Mission to Sierra Leone Larry Andre as stating: "One thing that's incontrovertible is the financing of Hezbollah. It's not even an open secret; there is no secret."

1071.  The *Associated Press*'s article was re-published in the June 30, 2004, edition of North Carolina's *Charlotte Observer* with the title "Diplomats Say Hezbollah Profits from

Diamond Trade; Lebanese Guerrilla Group Extorts Money from Merchants in West Africa, U.S. Officials Say."

1072. On August 3, 2006, the *New York Post* reported about Hezbollah's diamond trafficking:

> The world's diamond-trading market has been disrupted with plunging prices in the wake of Lebanon's bombing attacks that wrecked its notorious diamond-smuggling rings run by Hezbollah terrorists. The illegal black market for rough gems was centered in areas controlled by Hezbollah in and around Beirut and is said to have raised as much as $100 million for terrorist activities, industry experts say.

1073. The *New York Post* article further noted that, "the market for diamonds has steadily cooled as Hezbollah-run smuggling operations in Lebanon have flooded the market."

1074. In an article titled "Chi Finanzia la Guerra Hezbollah" ("Who Finances Hezbollah's War") published on August 25, 2006, Italian newspaper *Il Mondo* described the role played by "two dynasties [which] share the diamond market, the Nassours and the Ahmads … who with their donations have for years constituted one of the main financing channels of the Hezbollah movement in Lebanon, after the government of Tehran, the largest sponsor of the Party of God [Hezbollah] (with aid for 120 million dollars a year)."

1075. The *Il Mondo* article identified the four Ahmad brothers by name, Ali Said, Saada, Assan, and Nazim, and two of their Antwerp-based companies, Triple A Diamonds and Sierra Gem Diamonds.

1076. On February 15, 2008, the U.S. Embassy in Africa published a report stating that Hezbollah raised millions of dollars by selling diamonds in Europe mined in Sierra Leone.

1077. The report was covered by *BBC Monitoring* in Africa in a February 22, 2008, article titled "Sierra Leone: Smuggled Diamonds Reportedly Support Hezbollah," describing Hezbollah's long-standing connections to the diamond trade.

1078.   Based on a report by the Sierra Leone newspaper *The Concord*, the *BBC* reported that the:

> US Embassy report published by International Analysts Network on 15 February says for the past five years in Africa, Hezbollah has raised millions of dollars by selling diamonds in Europe mined in Sierra Leone. Details on the online-portal for analysts in the spheres of foreign policy, geopolitics, counter-terrorism and conflict also stated that "The US Embassy in Freetown has published a report to the effect that rough diamonds worth $70 million to $100 million are smuggled out of the country each year for the purpose of buying and smuggling weapons for terrorist activities."

1079.   The article further notes the following regarding Hezbollah's fundraising from selling diamonds mined in Sierra Leone and criminal activities in the tri-border region of South America:

> In Africa for the past five years, Hezbollah has raised millions of dollars by selling diamonds in Europe mined in Sierra Leone. The US Embassy in Freetown has published a report to the effect that rough diamonds worth $70 to $100 million are smuggled out of the country each year for the purpose of buying and smuggling weapons for terrorist activities. The UN and Belgian police believe that Hezbollah sold at least $19 million of the stones on the Antwerp diamond market in the year before the September 11, 2001 attacks. In South America, the tri-border region (formed by the city of Puerto Igauzu, Argentina; Foz do Iguazu, Brazil and Ciudad des Este, Paraguay) has also proven to be a literal "gold mine" for Hezbollah global criminal enterprises….

1080.   The article further noted that Assad Barakat was a very significant Hezbollah financier and that evidence at his trial established that he used some of his properties as a front to "recruit Hezbollah volunteers and as a large source of financial support for terrorist activities including the Israeli Embassy and the AMIA bombings in Argentina in the mid-1990s."

1081.   On June 2, 2009, *Diamond Intelligence Briefs* reported that the U.S. Department of Treasury had designated Kassim Tajideen and Menhem Qubaysi, "two Africa-based supporters of Hezbollah, as terrorists providing support to terrorists or acts of terrorism."

1082. Mr. Tajideen was described as "an important financial contributor to Hezbollah…[who] operates a network of businesses in Lebanon and Africa [who has] contributed tens of millions of dollars to the terrorist organization…Tajideen and his brothers run cover companies for Hezbollah in Africa."

1083. On Hezbollah's behalf, the clans that control these criminal networks have invested a substantial portion of their illicit proceeds in Lebanese real estate, often forming separate companies to deposit the millions of dollars they have laundered through black market sales and phony invoicing of conflict diamonds back into Lebanese and UAE currency exchange houses.

## 11.    ARMS DEALING

1084. During the Relevant Period, Hezbollah's BAC operated on six continents and was actively involved in arms trafficking throughout the world.

1085. Hezbollah's clandestine procurement networks meticulously acquired a vast arsenal of weaponry—including both lethal materiel like rifles, grenades, and missiles, as well as sophisticated non-kinetic equipment such as export-restricted night-vision goggles, advanced rifle scopes, and precision fuses.

1086. Hezbollah's acquisition and supply-chain capabilities served a multitude of purposes: bolstering its own military capabilities, generating significant financial revenue and profits through black market sales, and fostering strategic influence over client governments and IRGC proxy groups across the Middle East, Africa, and South America.

### a.    Weapons Trafficking in the United States

1087. In one leading example, Hezbollah's IJO sought to acquire approximately 1,200 Colt M4 Carbines (military assault rifles) from the United States.

1088. Hasan Antar Karaki, the brother of a senior Hezbollah operative, worked closely with Hassan Hodroj, a Hezbollah spokesman and head of the organization's portfolio on "Palestinian issues," to acquire weapons from around the world.

1089. As with other Hezbollah efforts, the common denominator was criminality. Thus, Mr. Karaki and Mr. Hodroj were not only involved in procuring weapons for Hezbollah; they were also attempting to sell counterfeit U.S. currency and fake passports to finance their purchases.

1090. On or before July 2008, Hassan Hodroj and his son-in-law, Dib Hani Harb (also a Hezbollah operative and close associate of Mr. Karaki), engaged in a multi-layered scheme to sell counterfeit currency and fake passports to acquire weapons and technology on Hezbollah's behalf, but the scheme was foiled by undercover U.S. law enforcement agents.

1091. In September 2008, an undercover U.S. law enforcement agent was introduced to Dib Hani Harb, who was identified as someone involved in the sale of counterfeit money to support Hezbollah.

1092. Mr. Harb also advised the undercover U.S. law enforcement agent (and later established) that he was involved in cocaine trafficking.

1093. In April 2009, Mr. Karaki sent Mr. Harb to a meeting in southern Florida to meet with undercover law enforcement operatives. Terms were negotiated for the sale of stolen U.S. currency and multiple counterfeit currencies.

1094. Mr. Harb stated that $100 bills could be obtained for approximately 40 percent of face value and that the notes were manufactured in Iran specifically for Hezbollah's benefit.

1095. He also demanded a 3 percent commission on every deal between undercover U.S. law enforcement agents and Hezbollah.

1096.   Mr. Harb specified that the counterfeit bills were printed in Baalbeck, Lebanon, and that no one should fear criminal prosecution for this counterfeiting activity, indicating that "they" know everyone, even the judges.

1097.   At the meeting, Mr. Harb also explained that Hezbollah produced not only counterfeit currency, but also false European travel documents as well.

1098.   Mr. Harb explained that Mr. Karaki was a major figure in Hezbollah's forgery operations, and he offered several varieties of passports, including passports from Italy and the Czech Republic (fake British, American, and French passports were also offered at a separate meeting).

1099.   A few months after the meetings in Florida, Mr. Harb and Mr. Karaki delivered fraudulent British and Canadian passports to a law enforcement operative using the pictures and biographical information he had provided.

1100.   In June 2009, a U.S. undercover agent first discussed the possibility of Mr. Harb acquiring Colt M4 Carbines for Hezbollah.

1101.   Subsequently, Mr. Harb introduced the undercover U.S. law enforcement agent to his father-in-law Hassan Hodroj, and Mr. Hodroj agreed to purchase approximately 1,200 M4s at a price of approximately $1,800 U.S. dollars per M4 rifle and stated that he was involved in weapons and technology procurement for Hezbollah.

1102.   In November 2009, Mr. Harb, Mr. Hodroj, and others were indicted for, among other things, conspiring to provide material support to Hezbollah.

1103.   On November 24, 2009, U.S. law enforcement contacted Defendant Standard Chartered Bank-NY, serving a seizure warrant on it and requesting that SCB, as the U.S.

correspondent bank for Lebanon's Bank Audi, freeze Mr. Harb's account (which remained active).

The FBI's letter stated:

> As discussed, attached is a United States District Court, Eastern District of Pennsylvania seizure warrant for all funds on deposit in any and all U.S. interbank accounts maintained at Standard Chartered Bank by Bank Audi, up to and including all funds maintained in account number 813364 at Bank Audi Beirut Lebanon. This warrant requires the immediate freezing of those accounts.

1104.   As discussed herein, not for the first or last time, SCB–New York was advised that one its correspondent bank customers was moving U.S. dollars for the purpose of financing terrorism.

### b.      Weapons Trafficking in Nigeria

1105.   Hezbollah has strong connections to (among others) an arms-dealing network in Nigeria.

1106.   According to the following from a report by the Combating Terrorism Center at West Point, the IRGC–QF and Hezbollah were shipping weapons to Nigeria, including Iranian 107mm rockets, and were connected to heroin shipments from Iran:

> Iran's Quds Force and [Hezbollah]'s global operations have involved Nigeria for more than a decade, but their activities were exposed in October 2010. Nigerian customs officials in Lagos seized 13 containers of weapons from a ship operated by the same French-Lebanese businessman's company that in March 2011 saw a ship bound for Sinai, Egypt, via Syria to supply weapons to Hamas in Gaza intercepted by Israeli naval commandos. The containers in Lagos, which included 107mm Katyusha artillery rockets used by [Hezbollah] against Israel in 2006, were shipped on behalf of a Tehran–based Islamic Revolutionary Guard Corps (IRGC) "front company" and were picked up at Bandar Abbas in Iran, where the IRGC has a naval base. According to Nigeria's foreign minister, the weapons were destined for a warehouse in Abuja, but shippers altered documents to send them to Gambia (presumably for anti-Senegalese rebels in Casamance). Nigerian security officials arrested four individuals: a senior Quds Force officer; a Nigerian who formerly studied in Iran and worked at Radio Tehran's Hausa language service; and two Nigerian customs officials. A fifth Iranian suspect, Sayyed Akbar Tabatabaei, who was the Quds Force Africa Corps commander, took refuge in the Iranian Embassy, flew back to Tehran with

Iran's foreign minister and was reportedly reassigned to Venezuela to run Quds Force operations in Latin America. One month after these arrests, $10 million worth of heroin hidden in auto engine parts suspected of being linked to the weapons shipment in October was seized in Lagos from a ship originating in Iran.

1107.  Muhammad Ibrahim Bazzi (SDGT) organized the above-referenced weapons shipment in coordination with the IRGC–QF through Abdallah Safieddine, using Prime Bank Gambia subsidiary to help finance the deal.

1108.  Mustafa Reda Darwish Fawaz was another prominent Hezbollah arms dealers in Nigeria who was designated by the U.S. Department of Treasury as an SDGT on February 26, 2015, "for acting for or on behalf of Hezbollah."

1109.  Mustafa Fawaz has been a significant donor to Hezbollah and a member of Hezbollah's Islamic Jihad Organization.

1110.  Mr. Fawaz is a Lebanese citizen who owns a chain of supermarkets in Abuja, Nigeria, called Amigo Supermarket LTD (SDGT) as well as the Wonderland Amusement Park and Resort LTD (SDGT) in Abuja, Nigeria.

1111.  According to the U.S. Department of Treasury, since the 1990s, Mr. Fawaz has been involved in activities related to communications, surveillance, and reporting for Hezbollah.

1112.  Mr. Fawaz communicated with Hezbollah in Lebanon by e-mail and reportedly received updates and newsletters regarding Hezbollah activities and distributed this information to other Hezbollah supporters in Abuja, Nigeria.

1113.  According to the U.S. Department of Treasury, Mr. Fawaz used special surveillance cameras based at Amigo Supermarket (SDGT) to monitor the movements of foreigners, especially Israelis. He also provided Hezbollah with a report of his visit to the U.S. Embassy in Nigeria.

1114. As of at least mid-September 2003, Mr. Fawaz solicited donations in Abuja, Nigeria, and helped arrange the transmission of these funds to Hezbollah in Lebanon.

1115. In mid-May 2013, the Nigerian State Security Service arrested Mr. Fawaz and two other men after the discovery of an arms cache in a residence in the northern Nigerian city of Kano.

1116. On May 30, 2013, Nigerian intelligence agents escorted journalists to a property in Kano and showed them a bunker where a massive haul of weapons had been stored.

1117. A Nigerian official, Bassey Etang, described the room as a "Hezbollah armory."

1118. Mr. Fawaz reportedly confessed the details of his Hezbollah activities in Nigeria and identified additional names of other Hezbollah IJO cell members in Nigeria, as well as a specific property in Kano, Nigeria, that was used to support terrorism.

1119. In November 2013, Mr. Fawaz and one of the men arrested with him were acquitted of the charges against them because Hezbollah was not an illegal organization in Nigeria.

1120. The third man was convicted of conspiring to import weapons illegally.

1121. Fouzi Reda Darwish Fawaz, Mustafa Fawaz's brother, was also part of Hezbollah's Nigerian network.

1122. He was designated an SDGT by the U.S. Department of Treasury on February 26, 2015.

1123. Fouzi Fawaz was a Hezbollah Foreign Relations Department ("FRD") official in Abuja, Nigeria. The FRD claims to be in charge of "community relations," but the primary goal of the FRD in Nigeria was to scout recruits for Hezbollah's military units, as well as to create and support Hezbollah's terrorist infrastructure in Africa and globally.

## VI. EACH OF THE DEFENDANTS KNOWINGLY PROVIDED SUBSTANTIAL ASSISTANCE TO THE IRGC AND HEZBOLLAH

### A. DEFENDANT STANDARD CHARTERED BANK'S KNOWING AND SUBSTANTIAL ASSISTANCE TO THE IRGC AND HEZBOLLAH

1124. Defendant SCB consciously and culpably participated in the IRGC's terror financing activities on an industrial scale.

1125. Defendant SCB provided extensive and sustained material support, including financial services provided in unusual ways, including altering financial records, to facilitate money laundering on behalf of the IRGC and Hezbollah through those terrorist organizations' commercial agents, operatives, and facilitators.

1126. Defendant SCB's pervasive and systemic support included, among other things, knowingly providing the IRGC and Hezbollah with illegal access to the United States financial system through SWIFT cross-border financial messaging accounts and its own transactional accounts in New York.

1127. Defendant SCB knowingly provided *billions of dollars'* worth of money laundering services to the IRGC and Hezbollah across its branch networks in Europe, Africa, the Middle East and Asia, going far beyond "pervasive and systemic" assistance. During the Relevant Period, it served as the primary banker of the CBI—an institution directed by the IRGC to oversee many of its terror financing schemes.

1128. In that role, SCB knowingly assisted the IRGC and Hezbollah in a wide variety of ways, from evading U.S. counter-terror financing sanctions to acquiring export-controlled, "dual use" technologies—including some most associated with building EFPs—to facilitate massive volumes of trade-based money laundering. SCB's massive illegal assistance to the IRGC and Hezbollah lasted decades, including throughout the Relevant Period, and extended to all corners of Iran's terrorism apparatus and Hezbollah's network of fronts and crime syndicates.

1129. As described herein, SCB's criminal conduct knowingly facilitated massive volumes of money laundering on behalf of IRGC subcomponents and agents in a variety of innovative and unusual ways that it knew were criminal. SCB also served as one of the go-to Western banks for some of the world's biggest money launderers and Hezbollah Super Facilitators.

1130. SCB also worked on behalf of other components of the IRGC's terror network, including NIOC, NITC, Mahan Air, IRISL and MODAFL, all of which were responsible for procuring and transporting arms or money for the IRGC. This work included procuring letters of credit for dual use technologies.

1131. During the Relevant Period, SCB–Dubai alone maintained U.S. dollar bank accounts and processed millions of dollars of foreign exchange ("FX") transactions for the following IRGC-affiliated entities:

- Bank Saderat Iran, Dubai branch
- Bank Melli Iran
- Central Bank of Iran, client account numbers ending in 1201, 4045, 2025, 3472, 1365, 6723, 4045, 0123, and 1961.
- Iranian Offshore Engineering Company
- Mahan Air
- MAPNA International FZE, account number ending in 4762
- NIOC
- NITC.

1132. Specifically, SCB–Dubai's DIFC branch processed FX transactions—denominated in, among other units of account, U.S. dollars, EU euros, Iranian rials, Japanese yen, and UAE dirhams—worth millions of U.S. dollars for CBI, Bank Saderat Iran, and Bank Melli Iran.

1133. Critically, SCB–Dubai's Dubai International Finance Center branch stripped identifying information relating to FX transactions—involving, among others, CBI, Bank Saderat Iran, and Bank Melli Iran—from the following types of SWIFT messages that it processed through the U.S. financial system to SCB–Dubai's correspondent account at SCB–New York:

- MT–300, *Foreign Exchange Confirmation*: Sent by the bank confirming the details and terms of a foreign exchange trade between the bank and its customer.
- MT–302, *Pre-Settled Foreign Exchange Confirmation*: Used when two banks are exchanging currencies but want to defer the settlement by a set date in the future rather than settling immediately.
- MT–305, *Foreign Currency Option Confirmation*: Confirms the details of a foreign exchange options contract between counterparties.
- MT–320, *Fixed Loan/Deposit Confirmation*: Confirms placements of fixed term currency deposits between counterparty banks.
- MT–202, *General Financial Institution Transfer*: Used to instruct cross-border payments and settlements between counterparty banks, including foreign exchange transactions.
- MT–210, *Notice to Receive*: Used to confirm receipt or non-receipt of funds that were previously instructed to be transferred between counterparty banks by means of an MT–202 payment order.
- MT–900, *Confirmation of Debit*: Confirms the debit of funds from a counterparty's correspondent bank account.
- MT–910, *Confirmation of Credit*: Confirms the credit of funds to a counterparty's bank account.

1134.   U.S. authorities repeatedly levied criminal penalties and fines against SCB (totaling more than a billion dollars), but it remained committed to assisting Iran's terror apparatus, each time resuming illegal activities immediately after admitting to its wrongdoing, leading New York's Department of Financial Services to conclude in 2012 that "SCB operated as a rogue institution."

1.   **Standard Chartered Bank Knowingly Provided Substantial Assistance to the IRGC**

   a.   **Standard Chartered Bank Knowingly Concealed the IRGC's Financial Activities and Transactions from Detection, Scrutiny, and Monitoring by U.S. Regulators, Law Enforcement, and/or Depository Institutions**

1135.   SCB provided, among others, trade-finance, Eurodollar payments, and foreign exchange banking services to Iranian clients as far back as the early 1990s.

1136.   At some point thereafter, SCB began formulating plans to take a leading and active role in assisting the IRGC and other elements of the Iranian regime dedicated to counterterror sanctions evasion.

1137.  For example, on June 1, 1995, SCB's General Counsel wrote an e-mail advising SCB's regulatory compliance staff: "if SCB London were to ignore OFACs [sic] [Office of Foreign Assets Control] regulations AND SCB NY were not involved in any way & (2) had no knowledge of SCB Londons [sic] activities & (3) could not be said to be in a position to control SCB London, then IF OFAC discovered SCB London's [sic] breach [branch], there is nothing they could do against SCB London, or more importantly against SCBNY."

1138.  SCB's General Counsel also instructed that a memorandum containing this plan was "highly confidential & MUST NOT be sent to the US."

1139.  In the ensuing years, SCB actively conspired with the CBI, Bank Melli Iran, Bank Saderat plc's predecessor (Iran Overseas Investment Bank) and many other entities to assist Iran's terror apparatus evade the U.S. sanctions meant to prevent terror financing.[130]

1140.  SCB's role in Iran's terror financing grew dramatically in early 2001, when the CBI asked SCB to act as the CBI's recipient bank for U.S. dollar proceeds from daily oil sales NIOC made in the oil export market.[131]

1141.  An e-mail dated February 19, 2001, from SCB's Head of Inbound Sales, Institutional Banking, characterized the CBI's solicitation of SCB as "*very prestigious*" because "*in essence, SCB would be acting as Treasurer to the CBI ...*"

1142.  Thus, SCB was knowingly laundering billions of dollars in violation of multiple U.S. laws for the benefit of, among others, the IRGC and at the direction of the IRGC (through the CBI).

---

[130]  For example, during the Relevant Period, SCB–Dubai's DIFC branch maintained dollar-denominated accounts and processed foreign exchange transactions for, among other sanctioned Iranian banks, the CBI, Bank Saderat Iran and Bank Melli Iran.

[131]  At some point, SCB–Dubai also opened a U.S. dollar credit facility for the CBI.

1143.  In a follow up e-mail dated March 23, 2001, SCB's Group Legal Advisor wrote to its Product Manager, Corporate & Institutional Banking and its General Counsel (the e-mail was also forwarded to SCB's Group Head of Audit) that "our payment instructions [for Iranian Clients] should not identify the client or the purpose of the payment."

1144.  SCB and the CBI quickly developed operating procedures for U.S. dollar funds transfers to mask the involvement of Iranian entities in payment orders sent to SCB–New York.

1145.  When the beneficiary bank of a CBI U.S. dollar payment transaction was an Iranian bank, SCB–London would send a MT–100 or MT–103 SWIFT message to the beneficiary bank's non-U.S., non-Iranian correspondent bank with full details of the Iranian beneficiary bank, and a *separate* MT–202 to SCB–New York with no mention of the Iranian beneficiary bank—the so-called "cover" method of SWIFT payment manipulation for evading U.S. counterterrorism sanctions.

1146.  In fact, SCB–London set up routing rules within its payment system to route all incoming SWIFT messages from the CBI to a repair queue, meaning that the payments were subject to manual review and processing by wire operators, to prevent SCB–London from automatically processing outbound payment instructions for clearance and settlement in the United States with a reference to the CBI in the payment message.

1147.  SCB–London's payment processing team initially instructed the CBI to strip SWIFT payment messages by inserting SCB–London's SWIFT messages Business Identifier Code ("BIC") address (identified as SCBLGB2L) in field 52 (ordering institution) of its incoming SWIFT payment order messages so that SCB's payment system would not populate that field with the CBI's own SWIFT messages BIC address (identified as BMJIIRTH).

1148. When the CBI failed to remove its BIC address and insert SCB–London's BIC address into each SWIFT message, SCB–London wire operators would manually change field 52 to reference SCB–London's BIC in order to mask the CBI's involvement in the payments.

1149. SCB's willingness to illegally assist the CBI (and, therefore, the IRGC and Hezbollah) in this manner attracted more illicit business.

1150. As early as February 2002, several additional Iranian banks approached SCB–London to discuss the possibility of opening new accounts.

1151. SCB–London's Legal, Compliance, and Cash Management groups identified the need for written procedures for the operation of these additional Iranian banks' dollar accounts.

1152. SCB's central role in the CBI's and IRGC's terror financing schemes was memorialized in an internal memorandum regarding SCB's procedures for processing payments sent through the United States from key Iranian banks.

1153. The document was titled "Standard Chartered Bank Cash Management Services UK—Quality Operating Procedure: Iranian Bank Processing" (the "Quality Operating Procedure").

1154. It was first issued to SCB–London staff on February 20, 2004, and included detailed instructions regarding the need for them to omit the Iranian remitting bank's BIC:

> Ensure that if the field 52 of the payment is blank or that of the remitting bank that it is overtyped at the repair stage to a "." (Note: if this is not done then the Iranian Bank SWIFT code may appear—depending on routing—in the payment message being sent to [SCB–New York]).

1155. In addition to inserting a "." in field 52, the memorandum also instructed staff to use cover payments to process Iranian bank payments, which resulted in SCB–London omitting any reference to the involvement of Iranian beneficiaries or beneficiary banks in SWIFT messages sent to SCB–New York.

1156.   This aspect of SCB's assistance was particularly important to Defendant Bank Saderat PLC, which repeatedly served as the Reimbursing Bank on Letters of Credit ("LCs") for other Iranian banks that were financing various illegal, sanctions-evading transactions on behalf of the IRGC and MODAFL through the United States.

1157.   During the Relevant Period, SCB knowingly processed approximately 60,000 Iran-related payments, totaling **$250 billion**, as part of its key role in assisting Iran's terror apparatus.

1158.   An e-mail dated March 9, 2003, from SCB's Head of Transactional Banking Solutions, UK/Europe Corporate & Institutional Banking to several of SCB's wholesale bank business managers indicates that SCB learned that another bank was "*withdrawing their services*" with one of its Iranian client banks "primarily for reputational risk reasons."

1159.   In a memorandum accompanying the news of the aforementioned bank's reduction in Iranian business titled "Summary of the Risks/Issues to be Addressed with Regard to Iranian Bank USD Clearing that Require Management Direction from Middle East Senior Management Team," the risks posed by additional Iranian business that might "trigger an action" from OFAC, "leaving SCB exposed, with potential reputational damage" were considered, but ultimately rejected in favor of pursuing additional Iranian business.

1160.   An October 15, 2003, e-mail from SCB's Manager, Cash Management Services, London to SCB's Product Manager, Corporate & Institutional Banking and its Head of Cash Management Services, UK (forwarded to SCB's Head of Legal & Compliance, Americas and Head of Legal for Corporate & Institutional Banking) outlined how SCB instructed the CBI to "send in their MT 202's with a [SCB London's business identifier code] as this is what we required them to do in the initial set up of the account. Therefore, the payments going to NY do not appear to NY to have come from an Iranian Bank."

1161. When SCB anticipated that its business with its Iranian bank clients, including Defendant Bank Saderat Plc, would grow too large for SCB employees to manually "repair" the payment order messages for New York bound wire transfers, SCB automated the process by building an electronic repair system with "specific repair queues" for each Iranian client.

1162. SCB's payment "Quality Operations Procedures" manual contained instructions on how to manually "repair" or "over-type field 52 as [SCB London]" in MT–202 SWIFT message fields to hide the CBI's role as originator of the MT–202 cover payment transactions SCB was processing through New York in U.S. dollar funds.

1163. In October 2004, SCB consented to a formal enforcement action (the "SCB Consent Order") and executed a written agreement with the New York State Banking Department ("NYSBD") and the Federal Reserve Board of New York ("FRBNY"), which required SCB to adopt sound Bank Secrecy Act and Anti-Money Laundering ("BSA/AML") practices with respect to foreign bank correspondent accounts (the "Written Agreement").

1164. The Written Agreement arose as a result of identified flaws in AML risk controls at SCB–New York and it required SCB to adopt sound AML practices with respect to foreign bank correspondent accounts.

1165. The Written Agreement also required SCB to hire an independent consultant to conduct a retrospective transaction review for the period of July 2002 through October 2004.

1166. The review was intended to identify suspicious activity involving accounts or transactions at, by, or through SCB–New York.

1167. SCB failed to inform the NYSBD and the FRBNY that its London and Dubai operations were secretly clearing hundreds of billions of dollars through SCB–New York for Iranian entities at the same time that it was promising to reform its AML practices.

1168. SCB also failed to inform the NYSBD and the FRB–New York that its London, Dubai, Bahrain, Singapore, and Hong Kong operations were secretly helping MODAFL and the IRGC evade U.S. sanctions at a time when they were illegally acquiring a wide range of U.S. equipment and technologies, including components for improvised explosive devices ("IEDs") and EFPs used to kill and maim Coalition Forces in Iraq.

1169. SCB retained Deloitte & Touche LLP ("Deloitte") to conduct the required "independent" review and to report its findings to the regulators.

1170. On August 30, 2005, and again on September 17, 2005, Deloitte provided SCB confidential historical transaction review reports that Deloitte had prepared for two other major foreign banking clients that were under investigation for OFAC violations and money laundering activities.

1171. Deloitte's reports contained detailed and highly confidential information concerning foreign banks involved in illegal U.S. dollar clearing activities.

1172. SCB then asked Deloitte to delete from its draft "independent" report any reference to certain types of payments that could ultimately reveal SCB's illegal Iranian-related practices.

1173. In an e-mail dated October 1, 2005, SCB's Group Head of Legal & Compliance, Wholesale Bank, forwarding the Quality Operating Procedure to SCB's Group Head of Compliance and Regulatory Risk, its Group Legal Advisor, and its Head of Financial Crime Risk Systems and Monitoring, observed that "read in isolation, it is clearly ... designed to hide, deliberately, the Iranian connection of payments."

1174. A few days later, in an e-mail dated October 8, 2005, Deloitte's Global Leader of Anti-Money Laundering/Trade Sanctions Division wrote to SCB's Head of Compliance, that Deloitte had "agreed" to accede to SCB's request that Deloitte delete from its draft "independent"

report any reference to certain types of payments that could ultimately reveal SCB's illegal Iranian U-Turn practices because "this is too much and too politically sensitive for both SCB and Deloitte. That is why I drafted the watered-down version."

1175.   In a December 1, 2005, internal memorandum entitled "*Project Gazelle*," SCB's Group Head of Compliance and Regulatory Risk and its CEO in the United Arab Emirates wrote to SCB's Group Executive Director for Risk and its Group Head of Global Markets, acknowledging that SCB repair procedures for U-Turn exemption transactions did "not provide assurance that it does not relate to a prohibited transaction, and therefore SCB NY is exposed to the risk of a breach of sanctions."

1176.   A February 23, 2006, internal memorandum entitled "Iranian Business" sent from SCB's General Counsel to SCB's Audit and Risk Committee confirmed SCB's continued recognition that its role was expressly intended to enable Iran and the Iranian banks under its control (including Defendant Bank Saderat PLC) to evade U.S. detection of their transactions and confirmed that "certain US$ clearing transactions handled in London were processed with the name of the Iranian Bank excluded or removed from the 'remitter field'" despite the "requirement that due diligence in respect of 'U-turn' payments should be undertaken by our office in New York."

1177.   In September 2006, New York State regulators requested that SCB provide them with statistics on Iranian U-Turn transactions SCB handled, including the number and dollar volume of such transactions for a 12-month period.

1178.   In response, SCB searched its records for 2005 and 2006.

1179.   In a September 26, 2006, e-mail from SCB's then Project Manager for the Lookback Review to SCB's Head of Cash Management Services and Head of Compliance at SCB–

New York, SCB identified 2,626 Eurodollar transactions totaling over $16 billion (for Iranian banks).

1180.   Faced with the prospect of disclosing *billions* of dollars in Iranian transactions, SCB–New York's Head of Compliance was directed by his superiors at SCB to provide instead only ***four days*** of U-Turn data to regulators; these four days masqueraded as a log covering two years of transaction data.

1181.   In October 2006, the CEO for SCB's U.S. Operations e-mailed the SCB Group Executive Director in London:

> Firstly, we believe [the Iranian business] needs urgent reviewing at the Group level to evaluate if its returns and strategic benefits are ... still commensurate with the potential to cause very serious or even catastrophic reputational damage to the Group. Secondly, there is equally importantly potential of risk of subjecting management in US and London (e.g. you and I) and elsewhere to personal reputational damages and/or serious criminal liability.

1182.   Demonstrating contempt for both U.S. counterterrorism and counterproliferation laws and the foreseeable consequences of evading those laws, SCB's Group Executive Director responded (as quoted by an SCB–New York officer): "You f---ing Americans. Who are you to tell us, the rest of the world, that we're not going to deal with Iranians."

1183.   In 2007, SCB successfully convinced the NYSBD and FRB–New York to lift the SCB Consent Order based on the materially misleading, watered-down Deloitte report and its other fraudulent disclosures.

1184.   As noted above, from approximately January 2001 through 2007, SCB processed Eurodollar transactions worth at least *$250 billion* U.S. dollars through SCB–New York on behalf of NIOC, NITC, Mahan Air, SCB's Iranian bank clients (including Bank Melli Iran, the CBI and Defendant Bank Saderat PLC) and other entities the IRGC directed and/or controlled.

1185. SCB–New York processed approximately **60,000 Eurodollar wire transfers** on behalf of SCB's Iranian bank clients, with roughly half of the transactions originating with SCB–London, and the other half with SCB's branch in Dubai, UAE.

1186. In early 2009, after being contacted by U.S. law enforcement authorities, SCB conducted yet another "internal investigation" into its OFAC sanctions screening procedures, business practices, and technology.

1187. Nonetheless, SCB–New York was the conduit for at least 50 post-U.S. designation transactions on behalf of IRISL and its various front companies through June 2010.

1188. As of 2011, even after its internal investigation and open law enforcement investigations commenced in the U.S., the NYSBD still found that SCB–New York had:

> No documented evidence of investigation before the release of funds for transactions with parties whose names matched the OFAC-sanctioned list; and
>
> Outsourced SCB–New York's entire OFAC compliance process to Chennai, India, with no evidence of any oversight or communication between the Chennai and SCB–New York.

1189. SCB held accounts for other banks involved in Iranian money laundering as well.

1190. For example, SCB–Dubai maintained at least eight U.S. dollar bank accounts for Bank Tejarat, a U.S.-designated Iranian, ending in numbers 6043, 1099, 4406, 1796, 8577, 5432, 0889, and 9713.

1191. SCB also processed 44 foreign exchange transactions for the Banque d'Algerie, account number ending in 7349, worth a total of $726,729,007.47 U.S. dollars between January 10, 2008, and November 29, 2011, for the ultimate benefit of the Central Bank of Iran (account number ending in 1201), thereby helping Iran circumvent U.S. economic sanctions and launder money generated by IRGC-controlled NIOC's crude oil sales.

b. **SCB Facilitated Transactions on Behalf of MODAFL, Mahan Air, and Other IRGC Agents in Furtherance of Numerous Violations of the U.S. Trade Embargo, Thereby Substantially Contributing to Plaintiffs' Injuries**

1192.  From at least 2001 to 2007, SCB illegally facilitated more than 1,300 Letters of Credit using stripping or cover payment methods that purposefully concealed the participation of Iranian counterparties in the transactions.[132]

1193.  Many of those LCs were issued for the benefit of Iran's military/terror apparatus, facilitating and financing the IRGC's, MODAFL's and Hezbollah's illegal acquisitions of materials and technologies, including materials unlawfully obtained from the United States and components for IEDs and EFPs used against Coalition Forces in Iraq.

1194.  SCB knowingly facilitated and financed the illegal export to Iran of U.S.-manufactured, export-controlled defense and dual-use products worth tens of millions of dollars. These were acquired by various Iranian-controlled front companies on behalf of, among others, the following entities:

      a.  Mahan Air;
      b.  Four MODAFL subsidiaries: the Aerospace Industries Organization ("AIO"), the Iran Aircraft Industries ("IACI"), the Helicopter Support and Renewal Company ("IHSRC"), and the Iran Aircraft Manufacturing Industrial Company ("IAMI" a/k/a "HESA")[133];
      c.  The Iran Power Development Company ("IPDC"), MAPNA, and Zener Electronics Services (an agent of Hezbollah);
      d.  NIOC and several of its subsidiaries; and
      e.  Khoram Sanat Producing Company Iran.

---

[132]  A more accurate accounting would probably exceed 9,000 trade-finance and Eurodollar payment transactions.

[133]  The U.S. Department of Treasury has determined that "[t]he IRGC utilizes the Ababil UAV, manufactured by HESA. HESA produces different variants of the Ababil UAV, which can be used for surveillance and attack." *See* Press Release, *Treasury Designates Iranian Military Firms*, U.S. DEP'T OF TREASURY (Sep. 17, 2008), https://home.treasury.gov/news/press-releases/hp1145. Treasury later confirmed HESA's role in supplying the IRGC, noting that "the IRGC utilizes UAVs manufactured by HESA." Press Release, *Treasury Sanctions Network and Individuals in Connection with Iran's Unmanned Aerial Vehicle Program*, U.S. Dep't of Treasury (Oct. 29, 2021), https://home.treasury.gov/news/press-releases/jy0443.

1195.   MODAFL is the principal procurement arm of Iran's military and terror apparatus.

1196.   The MAPNA Group is also a key component of MODAFL and the IRGC's procurement chain.

1197.   Abbas Aliaabadi, Chairman of MAPNA International FZE and President of the Mapna Group, is a former member of the Iranian Ministry of Construction Jihad and of the Iranian Air Force. Mr. Aliaabadi was also a key member of the Ministry of Culture & Islamic Guidance, instrumental in the creation of Hezbollah, and has close links to the IRGC.

1198.   During the Relevant Period, NIOC was controlled by, and an agent of, the IRGC and served as the lifeblood of the IRGC's illicit financing activities. NIOC thereby provided the IRGC with access to billions of dollars in oil and natural gas revenues (as well as allocations of oil) that not only enabled the IRGC to gain access (through Defendants' knowing assistance) to the global financial system but also helped finance its global terror campaigns.

1199.   SCB–Dubai maintained U.S. dollar and UAE dirham accounts for NIOC and several of its UAE-based subsidiaries knowing that NIOC was controlled by, and an agent of, the IRGC and served as the lifeblood of the IRGC's illicit financing activities.

1200.   These subsidiaries included the Petrochemical Commercial Company ("PCC"), account number ending in 2464; Iranian Offshore Engineering and Construction Company ("IOECC"), account number ending in 0485; and Oil Industries Engineering and Construction ("OIEC"), account number ending in 1921.

1201.   During the Relevant Period, SCB–Dubai processed, cleared, and settled dozens of transactions for each of these entities, including trade finance, foreign exchange, and cross-border payments worth millions of dollars per entity.

1202. NIOC's operations were fundamental to the IRGC's illicit financial infrastructure and primary revenue source for its violent activities.

1203. Through its authority over Iran's hydrocarbon sectors, NIOC channeled billions in oil revenues and crude oil allocations to the IRGC.

1204. These resources enabled IRGC infiltration of the global financial system—facilitated by SCB's deliberate intermediation—and funded transnational terrorist operations, including with Hezbollah in Iraq.

1205. SCB–Dubai maintained a U.S. dollar account for NITC (which, as described above, was designated as an SDGT for enabling IRGC terrorism), number 11155369, processing ten U.S. dollar transactions totaling $23,263,352.30 between January–August 2009, circumventing sanctions and anti-money laundering protocols.[134]

1206. SCB knowingly and substantially assisted IRGC agents to facilitate illicit trade for all of these entities in violation of U.S. law, thereby substantially assisting the IRGC in its terror campaign in Iraq. The foreseeable (and inevitable) consequence of that assistance was to enable the IRGC and Hezbollah to kill or wound, or try to kill, or conspire to kill more Americans in Iraq.

1207. At all relevant times, SCB was fully aware of both the Iran Trade Regulations and the Export Administration Regulations, the U.S. State Department's United States Munitions List ("USML") and their many restrictions.

c. **SCB Knowingly Provided Illegal Financing to Mahan Air**

1208. Between 2000 and 2006, SCB facilitated LCs (that it knew were illegal) for the benefit of the IRGC's Mahan Air totaling more than $120 million.

---

[134] SCB's relationship manager for NITC regularly communicated with NITC's managers in Tehran, Iran.

1209.   The U.S. Department of Treasury designated Mahan Air in 2011, finding that:

> Mahan Air also facilitated the covert travel of suspected IRGC–QF officers into and out of Iraq by bypassing normal security procedures and not including information on flight manifests to eliminate records of the IRGC–QF travel.
>
> Mahan Air crews have facilitated IRGC–QF arms shipments. Funds were also transferred via Mahan Air for the procurement of controlled goods by the IRGC–QF.
>
> In addition to the reasons for which Mahan Air is being designated today, Mahan Air also provides transportation services to Hezbollah, a Lebanon-based designated Foreign Terrorist Organization. Mahan Air has transported personnel, weapons and goods on behalf of Hezbollah and omitted from Mahan Air cargo manifests secret weapons shipments bound for Hezbollah.

1210.   Five LCs SCB facilitated listed Mahan Air specifically as the "Applicant" and involved the illegal acquisition of materials ranging from aviation parts to a U.S. shipment of an Airbus A320.

1211.   The Issuing Banks for the LCs included Defendant Bank Saderat PLC, Bank Melli Iran, and Bank Sepah.

1212.   SCB–New York served as the clearing bank for these LCs.

1213.   Furthermore, in another transaction, Mahan Air was the listed Beneficiary of a $21 million LC facilitating the leasing of several second-hand Airbus A320s from Europe.[135]

1214.   In facilitating these trade-finance transactions, often for explicitly "Non-EAR 99" goods of U.S. origin—that is, products on the Commerce Control List—SCB knew that it was illegally (1) working with Iranian banks, (2) concealing the Iranian connection to the trade-finance

---

[135]     Mahan Air was the target of a Temporary Denial Order ("TDO") by the U.S. Department of Commerce in March 2008 for, *inter alia*, "knowingly re-exporting to Iran three US-origin aircraft, specifically Boeing 747." The Department of Commerce's Bureau of Industry and Security's TDO was renewed subsequently several times.

and U.S. dollar transactions and (3) facilitating the unlawful delivery of these U.S. export-controlled parts or products to Iranian entities in Iran.

1215.   For at least two transactions facilitated on behalf of Mahan Air (including one for export-controlled goods of entirely U.S. origin), Credit Suisse in Zurich facilitated the payment on the LC to SCB–Dubai. In at least one of those transactions, the payment was routed by Credit Suisse in Zurich through New York on behalf of Bank Melli in the UAE with the transaction being cleared and settled in U.S. dollar funds by SCB–New York.

1216.   On one occasion, Mahan Air purchased an Airbus aircraft using Blue Sky Aviation Company FZE ("Blue Sky Aviation") as its intermediary. SCB–Dubai provided the nearly $30 million to Blue Sky Aviation for the purchase, and Bank Sepah (Iran) guaranteed the payment through a re-payment made by Credit Suisse on its behalf in 2006.

1217.   The front companies listed as beneficiaries of the LCs SCB facilitated included Sirjanco Trading LLC ("Sirjanco") and Blue Sky Aviation, both later designated by the U.S. Treasury as SDGTs, in part because of the illegal sanctions evasion SCB facilitated and enabled.

1218.   Hamidreza Malekouti Pour served simultaneously as the Regional Manager for Mahan Air in the UAE and Managing Director of Sirjanco and Blue Sky Aviation, effectively demonstrating how these companies are all part of the same interconnected IRGC supply chain. Mr. Pour was designated by OFAC as an SDGT for, among other reasons, supplying equipment to the IRGC–QF.

1219.   In 2013, the U.S. Department of Treasury described Sirjanco[136] as "a United Arab Emirates-based company designated pursuant to E.O. 13224 for acting for or on behalf of Mahan

---

[136]     Sirjanco was previously the target of a Temporary Denial Order by the U.S. Department of Commerce in 2011.

Air. Sirjanco was established specifically to serve as a financial front for Mahan Air. Sirjanco has also served as a front for Mahan Air's acquisition of aircraft. Additionally, Iran's IRGC–QF has used Sirjanco to procure sanctioned goods."

1220.   A 2005 LC SCB facilitated listed Mahan Air as the Applicant, and Sirjanco as the Beneficiary, for a total of $32,500,000 U.S. dollars.

1221.   Bank Melli financed the payment through Credit Suisse, which sent the payment order through New York (clearing and settling in U.S. dollar funds through SCB–New York).

1222.   SCB–Dubai made the payment to Sirjanco's account with Bank Saderat, Dubai.

1223.   At least two other LCs SCB facilitated listed Mahan Air as the Applicant, and Blue Sky Aviation as the Beneficiary, for a total of over $60,000,000 U.S. dollars.[137] All told, between 2000 and 2006, SCB facilitated at least 11 LCs for the "Blue Sky Group" for a total of more than $125 million U.S. dollars.

1224.   When the U.S. Department of Treasury designated Blue Sky Aviation in 2014, it described it as "a UAE-based company that is owned or controlled by Mahan Air and acts for or on behalf of the airline. BSA FZE's primary function has been to serve as a payment channel for Mahan Air to obscure the origination of funds. Mahan Air has used BSA to make payments to oil suppliers, and purchase aircraft, engines, and parts."

1225.   In sum, SCB was vital to Mahan Air's continued operations and its ability to facilitate travel by IRGC–QF officers and arms shipments in and out of Iraq, transport IED technologies into Iraq as well as transit personnel, weapons, and goods on behalf of Hezbollah, which helped facilitate terrorist attacks in Iraq during the Relevant Period.

1226.   At the time it agreed to provide this assistance, SCB knew that: (1) Iran was a U.S.-

---

[137]    Plaintiffs' estimates are based on only one Promontory report. SCB's historical relationship with the Blue Sky Group was the subject of a separate Promontory Report not (yet) available.

designated State Sponsor of Terrorism; (2) the U.S. had imposed strict sanctions and export controls on Iran and Iranian trade; (3) Mahan Air was seeking to illegally acquire U.S. export controlled defense and dual-use materials; and (4) Mahan Air was using front companies to do so.

1227. In sum, SCB affirmatively chose to facilitate the IRGC's illegal conduct and provide substantial material support to its terror apparatus, including Mahan Air, Blue Sky Aviation, and Sirjanco. All of these entities were later designated as SDGTs in part because of the types of U.S. dollar-denominated trade-finance and Eurodollar payment transactions SCB facilitated.

### d. SCB Knowingly Provided Illegal Financing to MODAFL Companies: AIO, IACI, IHSRC, and HESA

1228. Iran's Ministry of Defense and Armed Forces Logistics (MODAFL) operates the [Iran] Aviation Industries Organization ("IAIO"), the Aerospace Industries Organization ("AIO"), and the Defense Industries Organization ("DIO"). MODAFL was designated by the United States on October 25, 2007.[138]

1229. The AIO was designated on June 28, 2005, for weapons proliferation. SCB knowingly provided financing for both the AIO directly, and for 3 major sub-agencies of MODAFL's IAIO: the Iran Aircraft Industries ("IACI," a/k/a SHAHA),[139] the Iran Helicopter Support and Renewal Company ("IHSRC," a/k/a PANHA), and the Iran Aircraft Manufacturing Industrial Company ("IAMI" a/k/a "HESA").

---

[138]    MODAFL was also sanctioned, pursuant to the Arms Export Control Act and the Export Administration Act, in November 2000.

[139]    IACI was also formerly listed by the European Union on July 26, 2010, and described as an entity that "[m]anufactures, repairs, and conducts overhauls of airplanes and aircraft engines and procures aviation-related parts often of US-origin typically via foreign intermediaries. IACI and its subsidiaries also have been detected using a worldwide network of brokers seeking to procure aviation-related goods." IACI was also formerly sanctioned by Switzerland, Norway, Japan, Australia, Canada, and the UK. It was designated by the United States in 2013.



### i.    SCB Trade-Finance Transactions with MODAFL's Aerospace Industries Organization (AIO)

1230.  In 2002, SCB facilitated an LC for MODAFL's Aerospace Industries Organization ("AIO"), including Eurodollar payments that were cleared through SCB–New York and valued at $57,662 U.S. dollars for the illegal purchase of U.S. export-controlled goods.[140]

### ii.    SCB Trade-Finance Transactions with MODAFL's [Iran] Aviation Industries Organization (IAIO)

1231.  On numerous additional occasions, SCB illegally facilitated trade-finance and Eurodollar payment transactions on behalf of other MODAFL sub-agencies, including the Iran Aircraft Manufacturing Industrial Company ("IAMI" a/k/a "HESA").

1232.  As noted above, on September 17, 2008, the U.S. Department of Treasury

---

[140]    AIO was reportedly responsible for developing anti-tank guided weapons; artillery rocket systems; anti-tank missiles; precision machining; and metal forming for a variety of Iranian weapons systems.

designated HESA,[141] finding that it was:

> owned or controlled by MODAFL, and also because it has provided support to the Iranian Revolutionary Guard Corps (IRGC). The IRGC, which was designated under Executive Order 13382 on October 25, 2007, is considered to be the military vanguard of Iran and has been outspoken about its willingness to proliferate ballistic missiles capable of carrying WMD.
>
> HESA utilizes its own facilities for the inspection, maintenance, repair overhaul research, development, and manufacture of military and civilian aircraft and related military logistic systems. HESA conducts research on, development of, production of, and flight operations for unmanned aerial vehicles (UAVs) in Iran. The IRGC utilizes the "Ababil" UAV, manufactured by HESA. HESA produces different variants of the Ababil UAV, which can be used for surveillance and attack. Farasakht Industries is a subsidiary of HESA that specializes in the manufacturing of various aerospace tools and equipment.

### (A) SCB's Trade-Finance Transactions with MODAFL–IAIO Front Company Downtown Trading LTD

1233.   Between 1998 and 2002, SCB facilitated ten LCs involving a company based in Malaysia (and with links to a same named company registered in the UK), Downtown Trading LTD ("Downtown Trading").

1234.   The total value of these ten LCs involving Downtown Trading amounted to $1,067,575 U.S. dollars.

1235.   MODAFL–IAIO's subsidiary IACI was the Applicant on these LCs, i.e., the purchaser of the U.S. origin aircraft engine parts in question for seven of these transactions, while Downtown Trading was the reported Beneficiary.

1236.   In most or all of these transactions, primarily those for 2002, Bank Sepah (Iran) served as the Issuing Bank, Bank Sepah (London) served as the Reimbursing Bank, SCB–Dubai

---

[141]     HESA was previously identified in a document distributed by the German government in July 2005, warning of its potentially illicit activities. It was also identified by the UK government in February 1998 as having procured goods and/or technology for WMD programs.

served as the Negotiating Bank, and SCB–New York helped facilitate the transactions by serving as the Clearing Bank.

1237. With respect to at least four of these transactions, the U.S. aircraft parts were transported by Iran Air, later designated as "a commercial airline used by the IRGC and Iran's Ministry of Defense and Armed Forces Logistics (MODAFL) to transport military related equipment…. Iran Air has provided support and services to MODAFL and the IRGC through the transport and/or transfer of goods for, or on behalf of, these entities."

1238. IACI's illegal procurements were often financed by Bank Sepah (as the Issuing Bank), but SCB–Dubai frequently served as the Negotiating Bank and SCB–New York usually served as the Clearing Bank for these same trade-finance transactions, in at least one case paying Citibank in New York the funds due.

1239. Citibank then paid Maybank, Malaysia, which effected the ultimate payment to the U.S. dollar account of Downtown Trading.

1240. SCB also facilitated similar LCs in U.S. dollar funds for Downtown Trading after April 2005.

1241. In facilitating these transactions—70 percent of which explicitly involved export-controlled "Non-EAR 99" goods of U.S. origin—SCB knew that it was: (1) working with Iranian banks; (2) concealing the Iranian connection to the transactions; (3) facilitating the unlawful delivery of goods on the U.S. Commerce Control List to Iran's military and/or the IRGC; and (4) that these transactions were not for legitimate agencies, operations, or programs of Iran.

> **(B)    SCB's Trade-Finance Transactions with MODAFL–IAIO Front Company Mac Aviation**

1242. Mac Aviation is an Irish trading company incorporated in 1993 that purported to engage in the purchase and sale of aircraft and helicopter parts.

1243.    The company and its owners[142] were indicted in 2008 for, among other things, violations of the International Emergency Economic Powers Act ("IEEPA"), the Iranian Transactions Regulations ("ITR"), and U.S. export controls.

1244.    During the Relevant Period, Mac Aviation was SCB's customer in London.

1245.    According to the indictment, between June 2005 and July 2008, Mac Aviation solicited purchase orders from customers in Iran for U.S. origin aircraft parts and then forwarded these requests for the parts to U.S. companies.

1246.    The indictment further alleges that Mac Aviation wired funds to banks in the U.S. as payment for these parts and concealed from U.S. sellers the ultimate end-use and Iranian end-users of the purchased parts.

1247.    The indictment also alleges that Mac Aviation caused the export of these parts from the U.S. to third countries, including Malaysia, before sending their shipments onward to Iran.

1248.    At least one of those shipments, directed by Mac Aviation in February 2006, resulted in a shipment being made from a firm called Microset Systems Sdn Bhd in Kuala Lumpur, Malaysia, to Sasadja Moavanate Bazargani in Tehran, Iran, an alter ego of Iran's Defense Industries Organization ("DIO"), which had been designated by Germany, the UN, and the United States as a procurer of unlawful weapons components beginning as early as 2005.

1249.    As noted above, weapons caches seized from Special Groups by Coalition Forces in Iraq included many 107 mm artillery rockets with closely clustered DIO lot numbers and production dates between 2005 and 2007, as well as rounds and fuses for 60 mm and 81 mm mortars with DIO lot markings and 2006 production dates.

---

[142]    In 1994, one of the owners of Mac Aviation, Thomas McGuinn, was convicted by a Florida court for exporting defense products to Iran. He pled guilty and was sentenced on April 19, 1996, to time served and 3 years of supervision on release. McGuinn was also barred from receiving licenses for exporting U.S. defense articles.

1250.  In another example, in January 2006, police in the southern Iraqi city of Amara, near the Iranian border, captured seventy blocks of TNT explosives and seventy-nine blocks of plastic explosives, which were used by the Special Groups as components of IEDs, all with markings and lot numbers showing that they were produced by DIO.

1251.  In July 2010, the DOJ obtained a 27-count superseding indictment in *USA v. Mac Aviation et al.* charging the company and its officers with:

> [P]urchasing F–5 fighter aircraft parts, helicopter engines and other aircraft components from U.S. firms and illegally exporting them to Iran.…
>
> […] Beginning as early as August 2005… through July 2008, the defendants solicited purchase orders from customers in Iran for U.S.-origin aircraft engines and parts and then sent requests for aircraft components to U.S. companies. These parts included helicopter engines, aircraft bolts and vanes, and canopy panels for the F–5 fighter aircraft. The defendants wired money to banks in the U.S. as payment for these parts and concealed from U.S. sellers the ultimate end-use and end-users of the purchased parts.
>
> The defendants caused these parts to be exported from the U.S. to third countries like Malaysia before causing them to be transshipped to Iran. […]
>
> From 2005 […] to] 2006, the defendants caused canopy panels designed for the F–5 fighter aircraft, valued at approximately $44,500, to be exported from the U.S. to Iran. The defendants falsely stated that the end user for the F–5 panels was the Republic of Nigeria. Instead, the panels were sold by the defendants to Sasadja Moavanate Bazargani, in Tehran, Iran for $86,400. The purchase was arranged through the Iran Aircraft Manufacturing Industrial Company, known by its Iranian acronym as HESA.

1252.  According to the superseding indictment, Mac Aviation also shipped fifteen helicopter engines to HESA.

1253.  These included ten Rolls-Royce Model 250 C–20B turboshaft engines, and five Rolls-Royce Model 250 C–20R2 turboshaft engines.

1254.  Rolls-Royce Model 250 engines are used on HESA's 278 Shahed (military) helicopters (converted or adapted from the design of the American Bell 206B–III "Jet Ranger" and Bell 206L "Long Ranger" aircraft) flown by and developed for the IRGC.

1255.  Between 2001 and 2005, SCB facilitated at least 21 LCs involving Mac Aviation for a total of close to $8 million U.S. dollars.

1256.  In each case, Mac Aviation was the nominal purchaser of the aircraft parts (Applicant), and the listed importer was either IACI, IHSRC, or HESA.[143]

1257.  Most, if not all, of these illegal LCs appear to have been financed, at least in part, by: Bank Saderat in London serving as the Reimbursing Bank; Bank Refah Iran serving as the Issuing Bank; SCB in London serving as the Advising Bank; SCB–Dubai serving as the Negotiating Bank; and SCB–New York serving as the Clearing Bank.

1258.  Some of the illegal transactions were financed through the CBI's U.S. dollar credit line with SCB.

1259.  The other transactions were financed through reimbursements in U.S. dollar funds claimed by SCB London primarily from Defendant Bank Saderat Plc with funds deposited received into SCB London's U.S. dollar account with SCB–New York for further credit to the U.S. dollar account of Mac Aviation (SCB's customer).

1260.  Iran Air was often used to deliver the illegally procured equipment to Iran.

1261.  Notably, Bank Refah Iran was designated on February 17, 2011, by the U.S. Department of Treasury for:

---

[143]     Iran used an Iranian national named Hossein Ali Khoshnevisrad as an intermediary. Khoshnevisrad used two Iranian companies—Ariasa AG (Tehran) and Onakish Co. (Kish Island, Iran)—to deal directly with Mac Aviation. Khoshnevisrad was arrested in the U.S. in 2009 and "charged with purchasing helicopter engines and advanced aerial cameras for fighter bombers from U.S. firms and illegally exporting them to Iran using companies in Malaysia, Ireland and the Netherlands. Among the alleged recipients of these U.S. goods was ... HESA."

[P]roviding financial services to the Iranian Ministry of Defense and Armed Forces Logistics (MODAFL) and the Iran Aircraft Manufacturing Industrial Company (HESA). In recent years, Bank Refah has facilitated millions of dollars of weapons-related purchases by MODAFL. These purchases included missiles and tanks and enabled Iran's leadership to maintain its fighter jets and submarines. Bank Refah also facilitated payments from HESA to businesses and individuals linked to Iran's weapons-related procurement.[144]

1262.   SCB's financing of MODAFL's clandestine and illegal acquisition of U.S. military (aircraft) spare parts did not fund or facilitate Iran's legitimate agencies, operations, or programs.

1263.   Rather, SCB knowingly and substantially assisted Iran's military and terror apparatus (directed by the IRGC) in obtaining critical machinery and equipment and aircraft spare parts it desperately needed to sustain its violent and unlawful activities.

### (C)   SCB's Trade-Finance Transactions with MODAFL–IAIO Front Company Monarch Aviation (Singapore)

1264.   Monarch Aviation was an Iranian front company based in Singapore that was owned and controlled by husband and wife, Brian Douglas Woodford, a UK citizen, and Laura Wang–Woodford, a dual U.S. and UK citizen.

1265.   It purported to be a manufacturer, dealer, and repairer of aircraft and related parts. At least between 2001 and 2007, SCB in Singapore ("SCB–Singapore") maintained accounts for Monarch Aviation, Brian Douglas Woodford, and Laura Wang–Woodford.

1266.   Monarch Aviation held at least one account at the SCB–Singapore Battery Road branch, under the account number ending in 106-3.

1267.   Defendant Credit Suisse's Singapore Branch at 80 Raffles Place also maintained a U.S. dollar account for Monarch Aviation with the account number ending in 40.01.

---

[144]   SCB maintained correspondent accounts for Bank Refah in Bangladesh, China, Hong Kong, India, Indonesia, Japan, South Korea, Malaysia, Qatar, Singapore, Sri Lanka, Taiwan, Thailand, and UAE.

1268. On January 15, 2003, Woodford and Wang–Woodford were indicted for, among other things, violations of the IEEPA, and U.S. export control laws (a superseding indictment was returned on May 22, 2008).

1269. Laura Wang–Woodford was arrested on December 23, 2007, and later pled guilty to conspiring to violate the U.S. trade embargo by exporting U.S. origin aircraft components to Iran.

1270. According to the superseding indictment, between January 1998 and December 2007, Monarch Aviation, Jungda International PTE LTD (a Singapore based successor to Monarch Aviation), Brian Douglas Woodford and his wife, Laura Wang–Woodford, exported U.S. aircraft parts to Singapore and Malaysia, and then re-exported those items to companies in Tehran, Iran, without obtaining the required U.S. government licenses, while falsely listing their companies as the ultimate recipients of the parts on export documents filed with the U.S. government.

1271. Specifically, according to the Superseding Indictment and the U.S. Justice Department's Sentencing Recommendation, the funds transferred by Monarch Aviation paid for Boeing CH–47 ("Chinook") helicopter parts, including vane assemblies and bevel gears that were listed under category VIII on the USML and illegally exported to Iran.

1272. The vane assemblies, part number 2–080–090–02 and national stock number ("NSN")[145] 2840–01–022–7142, and bevel gears, part number 2–080–013–03 and NSN 3020–00–

---

[145] The U.S. National Stock Number ("NSN") is a unique thirteen-digit numerical identifier assigned to each part used by the U.S. Department of Defense ("DOD"). The NSN system is managed by DOD's Defense Logistics Agency ("DLA"). The DLA system of NSNs was mandated by the 1952 Defense Cataloging and Standardization Act (Pub L. No. 82–436).

860–7419, were manufactured by Honeywell International Inc., commercial and government entity ("CAGE")[146] code 99193, in Phoenix, Arizona.

1273.  These export-controlled, U.S.-manufactured helicopter parts were used in Iran's fleet of Boeing CH–47 Chinook heavy-lift utility helicopters that were refurbished by HESA.

1274.  Iran's CH–47 helicopters are operated by the Islamic Republic of Iran Army Aviation ("IRIAA") and the Islamic Republic of Iran Air Force.

1275.  The Superseding Indictment also listed the following parts, among others, that were illegally exported to Iran by Monarch Aviation: o-rings, shear bolts, bushings, and rotary wing shields.

1276.  The o-rings, identified by part numbers S6135–20059–102 (NSN 5331–01–270–1765) and S6135–20059–106 (NSN 5331–01–270–1766), were manufactured by Sikorsky Aircraft Corporation (CAGE code 78266) in Stamford, Connecticut.

1277.  These export-controlled, U.S.-manufactured parts were used in Iran's fleet of Sikorsky SH–3D ("Sea King") medium-lift utility/anti-submarine warfare helicopters that were refurbished by HESA.

1278.  These export-controlled, U.S.-manufactured parts were also used in Iranian Helicopter Support and Renewal Company ("PAHNA") 2091 ("Toufan") air-assault helicopters (the PAHNA 2091 is an Iranian remanufactured version of the Bell AH–1J helicopter) and PANHA 2–75 ("Shabaviz") utility transport helicopters (the PANHA 2–75 is an Iranian remanufactured version of the Bell UH–1 helicopter) both used by the IRGC.

1279.  From 1998 to 2005 (and likely thereafter), SCB facilitated at least ten LCs financed

---

[146]    The CAGE code is a unique identifier assigned to, among others, U.S. defense contractors and DOD maintenance facilities. The CAGE code provides a standardized method of identifying a given government or defense contractor facility at a specific location.

by the CBI and Bank Refah with a total value of more than $1.5 million U.S. dollars involving the shipment of U.S. origin aircraft parts sold by Monarch Aviation to MODAFL's sub-agencies IACI, IHSRC, and HESA.

1280.   Defendant Bank Saderat PLC served as the Reimbursing Bank on most, if not all, of these transactions, which cleared through SCB–New York on their way to Monarch Aviation's accounts at SCB in Singapore.

1281.   The aircraft parts were transported by Iran Air from Kuala Lumpur Airport, Malaysia, to Tehran Airport, Iran.

1282.   SCB–Dubai served as the Negotiating Bank, and funds from the financing were paid to Monarch Aviation's account with SCB–Singapore through SCB Singapore's U.S. dollar correspondent account with SCB–London, which in turn received the funds into its U.S. dollar *nostro* account with SCB–New York from SCB–Bahrain's Offshore Booking Unit ("OBU").[147]

1283.   In sum, various overseas SCB branches conspired with multiple MODAFL sub-agencies and Monarch Aviation to assist Iran's military (under the direction of the IRGC) to illegally acquire contraband U.S. goods using SCB–New York to effectuate their illegal conduct.

1284.   SCB facilitated at least 316 *additional* transactions totaling $12,110,565 in U.S. dollar funds that involved Monarch Aviation at its SCB accounts in Singapore. Dozens of those transactions post-date Woodford and Wang–Woodford's 2003 indictment.

1285.   SCB's financing of MODAFL's clandestine and illegal acquisition of U.S. military spare parts through Monarch Aviation did not fund or facilitate Iran's legitimate agencies, operations, or programs.

---

[147]     SCB–Bahrain's Offshore Booking Unit ("OBU") sent proceeds of the U.S. dollar loan as payment of an LC through SCB–New York to credit SCB London's U.S. dollar account in New York for further payment to SCB–Singapore.

1286.   Rather, SCB actively and knowingly assisted Iran's military and terror apparatus obtain critical machinery and (aircraft) spare parts it desperately needed to sustain its violent and unlawful activities.

**(D)   SCB's Trade Finance Transactions with MODAFL–IAIO Front Company Jetpower Industrial LTD (Hong Kong)**

1287.   Jetpower Industrial Ltd ("Jetpower") was a Hong Kong-based Iranian front company controlled by Hok Shek Chan, a/k/a John Chan, purporting to be a trading company in aircraft parts.

1288.   In 2011, Chan was sentenced to 42 months for conspiring to illegally export, and attempting to illegally export, 10 indicators, used in C–130 Hercules military flight simulators, in violation of the Arms Export Control Act.

1289.   According to the U.S. Department of Justice:

> In 1993, Chan's company, Jetpower Industrial, was convicted in Hong Kong of export violations related to his export of U.S. military parts to Iran. Chan then changed his business practices to avoid detection. Rather than shipping U.S. origin goods directly from Hong Kong to Iran, Chan set up a sophisticated procurement network involving front companies and an experienced freight forwarder in Malaysia. Using his network, the defendant was engaged in the illegal procurement and export of aircraft parts from the U.S. for customers located in Iran, including several military related entities in Iran such as the Iranian Air Force, in direct violation of the U.S. Embargo against Iran since 1997.

1290.   In fact, according to U.S. officials, Jetpower repeatedly and illicitly exported arms to Iran prior to Mr. Chan's arrest and conviction.[148]

1291.   At all relevant times, Jetpower was a customer of Bank Melli in Hong Kong.

---

[148]   At least one Jetpower shipment was seized by UAE officials in 2007 along with several other containers that U.S. officials feared might contain parts or materials that could be used in manufacturing IEDs and EFPs. Bank Mellat financed the transaction, and—according to the LC supporting documentation—the goods were consigned to HESA.

1292. The full scope of SCB's involvement with and facilitation of Jetpower was extensive (involving at least dozens of transactions) but not yet fully known.

1293. Illegal payments totaling close to $3 million dollars have specifically been identified, but the totals could be much higher.

1294. What is clear is that SCB repeatedly and knowingly facilitated the illegal shipment of U.S. origin aircraft parts sold by Jetpower to one of MODAFL's sub-agencies (IHSRC), and that Jetpower was a significant link in Iran's illegal weapons procurement chain.

1295. For example, in 2001–2002, Bank Refah (the Issuing Bank) issued a LC to MODAFL's sub-agency IHSRC that was to be reimbursed by Bank Saderat PLC (known then as Iran Overseas Investment Bank) and then amended the LC to be available with SCB–Dubai. SCB's branches in New York, Singapore, and Hong Kong were all instrumental in enabling Jetpower's receipt of payments at its U.S. dollar account(s) with Bank Melli in Hong Kong.

1296. When Jetpower transported the contraband goods (U.S. helicopter parts) to MODAFL (using Iran Air), it asked Bank Melli in Hong Kong to present the documents required under the LC for payment to SCB–Dubai.

1297. However, in many instances, to cover its tracks, SCB–Dubai took at least four extra steps before Bank Melli in Hong Kong received the Eurodollar payment for Jetpower.

1298. Upon acceptance of the documents from Bank Melli, SCB–Dubai used the CBI's U.S. dollar credit facility with SCB–Dubai and sent instructions for a U.S. dollar loan to be issued by SCB–Bahrain.

1299. SCB Bahrain booked the loan and sent the proceeds in U.S. dollar funds as payment under the LC through SCB–New York to National Westminster Bank's New York correspondent account for further credit to National Westminster Bank, London for the U.S. dollar account of its

customer, Bank Melli, London.

1300.  SCB–Dubai then sent instructions to Bank Melli, London, to pay Bank Melli, Hong Kong, upon receipt of U.S. dollar funds.

1301.  Variations on this process were undertaken on multiple LCs in U.S. dollar funds for the benefit of MODAFL's sub-agency.

1302.  In these cases, SCB–Bahrain knowingly processed Eurodollar transactions through SCB–New York for the illegal trade-finance transactions by repackaging the payments on the LCs as loans that were secretly routed through the U.S. to Bank Melli Iran through various British banks.

1303.  Jetpower, in most cases, ultimately received payment in U.S. dollar funds to its U.S. dollar bank account with Bank Melli PLC's branch in Hong Kong for these illicit transactions with IHSRC.

1304.  According to the Bank for International Settlements ("BIS") and the Hong Kong Monetary Authority ("HKMA"),[149] all Eurodollar transfers from SCB–Hong Kong to Jetpower's account with Bank Melli PLC's Hong Kong branch were cleared by the Hong Kong Clearing House Automated Transfer System and settled by HSBC's Hong Kong subsidiary.

1305.  None of this illegal conduct was undertaken for the benefit of a legitimate agency, operation, or program of Iran.

> **e.**  **SCB's Trade-Finance Transactions for the Iran Power Development Company ("IPDC"), MAPNA, and Zener Electronics Services (an Agent of Hezbollah)**

1306. The Iran Power Development Company ("IPDC"), an Iranian government-controlled entity, has worked extensively for years with a network of Iranian companies known as

---

[149]  HKMA is the *de facto* central bank of Hong Kong.

the MAPNA Group.[150]

1307.   MAPNA International FZE is a UAE-based subsidiary. One of its directors, Mousa Refan, previously served as the first commander of the Air Force of the "Army of the Guardians of the Islamic Revolution [IRGC]."[151]

1308.   Another director, Afshin Rezaei, pled guilty in the U.S. District Court for the Northern District of Georgia on April 24, 2008, to:

> [O]ne count of violating the IEEPA for the unlicensed export of computers to Iran via the United Arab Emirates. The computers were controlled for anti-terrorism reasons. On May 15, 2008, Rezaei was sentenced to six months of prison (credit for time served), followed by three years of supervised release, and agreed to forfeit $50,000. On February 18, 2010, a 10-year denial of export privileges was imposed on Rezaei, pursuant to Section 11(h) of the EAA.

1309.   During the Relevant Period, MAPNA International maintained a U.S. dollar account with SCB Dubai.[152]

1310.   Between 2001 and 2007, SCB facilitated at least 280 illicit Letters of Credit involving MAPNA International FZE (as Beneficiary). In most cases, SCB–Dubai acted as the Advising Bank on these transactions.

1311.   At least nine LCs involved SCB—New York serving as the Clearing Bank for the transactions, and in some cases, SCB–London served as the Reimbursing Bank.

1312.   SCB facilitated at least seven LCs—totaling $1,384,972 in U.S. dollar funds—that

---

[150]     The MAPNA Group lists on its website 41 subsidiaries, some of which were listed by the British government in 2011 as entities of concern for Weapons of Mass Destruction-related procurement.

[151]     As noted above, Abbas Aliaabadi, MAPNA International FZE's chairman, is a former member of the Iranian Ministry of Construction Jihad and of the Iranian Air Force and a former member of the Ministry of Culture & Islamic Guidance, instrumental in the creation of Hezbollah, and closely linked to the IRGC.

[152]     MAPNA's subsidiary, Mobin Petrochemicals, was added to the SDN list on June 16, 2010 (and removed from the SDN list in January 2016 as part of the Joint Comprehensive Plan of Action). During the Relevant Period, Mobin maintained a U.S. dollar account with HSBC.

involved the illegal shipment of U.S. origin goods to the Iran Power Development Company ("IPDC").

1313.   The CBI served as the Issuing Bank on several of these LCs, and six of those seven involved goods shipped by IRISL.

1314.   Of particular note, between 2003 and 2004, SCB knowingly facilitated at least four unlawful U.S. dollar funds transfer transactions (cleared through its New York branch) that involved Eurodollar payments to Zener Electronics (UAE), a procurement company for Hezbollah.[153]

1315.   The IPDC was listed as the Applicant for these transactions, and MAPNA was identified as the first Beneficiary, but assigned the payments under the Letters of Credit to Zener Electronics (UAE) as a "2nd Beneficiary."

1316.   Each unlawful trade-finance transaction involved U.S. goods.

1317.   The CBI acted as the Issuing Bank on at least two of the transactions, and SCB Dubai acted as the Advising and Negotiating Bank.[154]

1318.   On at least one occasion, SCB–London served as the Reimbursing Bank for the payment to Zener Electronics, sending the credit through its New York branch to SCB–Dubai's account with SCB–New York.

1319.   Upon receipt of the funds to its U.S. dollar account with SCB–New York, SCB–Dubai instructed SCB–New York to forward the funds to JP Morgan Chase in New York, which

---

[153]     In June 2014, the U.S. Dep't of Commerce identified Zener Electronics as "involved in activities contrary to the national security and foreign policy interests of the United States, specifically the activities described under paragraph (b)(1) (Supporting persons engaged in acts of terror) of § 744.11 of the EAR" and noted its attempts "to procure U.S. technology on behalf of persons involved in activities contrary to the national security and foreign policy interests of the United States. Specifically, these persons have been involved in supplying U.S.-origin items to persons designated by the Secretary of State as Foreign Terrorist Organizations without the required authorizations."

[154]     On at least one occasion, SCB London also served as the Reimbursing Bank.

held an account for the Commercial Bank of Dubai.

1320.   The Commercial Bank of Dubai, in turn, credited the U.S. dollar account of its customer, Zener Electronics.

1321.   These illicit transfers on behalf of MAPNA resulted in payments to Zener Electronics (a key link in Hezbollah's illicit supply chain) and were not for the benefit of a legitimate agency, operation, or program of Iran. In a Superseding Indictment filed in federal court on March 30, 2016, MAPNA was again implicated in the IRGC's sanctions evasion conspiracy.[155]

1322.   This time, DOJ charged multiple individuals with covert transactions in 2011 through a U.S. bank, wherein MAPNA's name was intentionally omitted from the transaction to hide its identity as a counterparty.

1323.   SCB's "Iran Group" also processed at least $1,570,051 in foreign exchange forward transactions for MAPNA during the Relevant Period.

### f.      SCB's Trade-Finance Transactions with NIOC Subsidiaries

1324.   The Iranian Helicopter Aviation Company, Ahwaz Pipe Mill Company, and Kala Naft[156] are all subsidiaries of NIOC, which was controlled by, and an agent of, the IRGC during the Relevant Period.[157]

1325.   Between 1999 and 2001, SCB knowingly facilitated two illegal transactions totaling $750,744 U.S. dollars on behalf of the Iranian Helicopter Aviation Company (which was listed as the Applicant on the LCs).

---

[155]      *See United States v. Zarrab*, No. 15-cr-867 (S.D.N.Y). SCB's central role in Zarrab's money laundering schemes on behalf of the IRGC are detailed above.

[156]      Kala Naft was designated by the United States in 2010.

[157]      As discussed above, SCB also maintained one or more accounts for NIOC and laundered billions of dollars on its behalf.

1326.   The Beneficiary listed on both LCs was Limo SARL. The goods involved in these transactions were U.S.-origin helicopter parts.

1327.   Payments for both transactions were cleared through SCB–New York and refinanced under the CBI's U.S. dollar credit facility with SCB–Dubai.

1328.   The Paris-based Limo SARL was directed by a Ms. Laleh Moein, reported to have also been in the employ of Iran's Ministry of Intelligence and Security ("MOIS").[158]

1329.   Between 2002 and 2004, SCB knowingly facilitated four illegal transactions totaling $611,713 U.S. dollars that involved U.S. origin goods illegally transported to Iran on behalf of Kala Naft.

1330.   At least two of these transactions had SCB–New York serving as its Clearing Bank.

1331.   As early as February 1998, Kala Naft was identified by the UK government "as having procured goods and/or technology for weapons of mass destruction programs."

1332.   Kala Naft was also publicly identified as a NIOC subsidiary in a 2003 Commerce Department action that further stated that Kala Naft was a recipient of illegally exported U.S.-origin oilfield equipment from the U.S.

1333.   Between 2001 and 2006, SCB knowingly facilitated at least two illegal transactions totaling $593,307 that involved U.S.-origin goods illegally transported to Iran on behalf of Ahwaz Pipe Mill Company.

1334.   The CBI was used as the Refinancing Bank, and SCB–New York served as the Clearing Bank.

1335.   The listed beneficiary of the Ahwaz Pipe Mill Company trade-finance transactions was a Cypriot company named Polygon Company LTD.

---

[158]    MOIS was designated by the U.S. for, *inter alia*, providing support to terrorist groups, including Hezbollah.

1336. Polygon's managing director and its owner had previously been indicted on November 19, 1992, in the Southern District of Florida for illegally conspiring to export oil field equipment and other goods, services, and technology to Libya, demonstrating its history of illicit sanctions evasion on behalf of a State Sponsor of Terrorism.

1337. The litany of trade-finance and U.S. dollar transactions discussed *supra* often involved counterparties (such as Mac Aviation, Jetpower, and Polygon) with established track records of criminal activity on behalf of Iran.

1338. SCB's "Iran Group" also processed over $8 million in a foreign exchange forward transactions for Petropars LTD, a U.S.-designated Iranian subsidiary of NIOC, during the Relevant Period.

### g. SCB's Trade-Finance Transactions with Iranian Front Company Khoram Sanat Producing Company

1339. On June 20, 2005, SCB facilitated Khoram Sanat Producing Company's purchase of electromotors for hydraulic presses worth $2.79 million U.S. dollars.

1340. The company is likely a subsidiary of another Iranian company known as "Alborz Steel."

1341. The nominal purchaser of the equipment was an Iranian front company in the UAE called Diamonds Steel.[159]

1342. Diamonds Steel maintained one or more accounts with SCB–Dubai.

1343. Between 2001 and 2007, SCB–Dubai facilitated at least 173 transactions involving Diamonds Steel, totaling more than $130 million U.S. dollars.

---

[159] SCB facilitated at least a dozen transactions on behalf of Diamonds Steel, mostly for the benefit of Alborz Steel, Iran. Many of these transactions involved both Bank Melli Iran, as well as Credit Suisse in Switzerland, acting on behalf of Bank Melli Iran or Bank Melli, Dubai.

1344.   The aforementioned electromotors were illegally purchased from the United States with the LC facilitated by SCB–New York, which served as the Clearing Bank for the transaction, while SCB–Dubai served as the Advising Bank.[160]

1345.   SCB facilitated this transaction despite the fact that the machinery required an export license because it could be used for terrorist purposes.[161]

1346.   Specifically, hydraulic presses are the precise type of machinery required to manufacture EFPs.[162]

1347.   The production of an EFP shaped-charge munition requires at least a 10-ton hydraulic press in order to form sheets of copper and steel into the necessary shaped-charge geometry for defeating the plating of American armored vehicles of the type the U.S. military used in Iraq.

1348.   Even assuming a steep mark-up in costs of delivery, SCB financed Iran's acquisition of approximately 50 hydraulic presses each capable of manufacturing more than a hundred EFPs per day.[163]

1349.   The hydraulic press machinery was transported to Iran by IRISL.

1350.   Because LCs intrinsically require the submission of detailed paperwork and

---

[160]   This occurred between 2004 and 2007 when SCB–New York was subject to a formal supervisory action by the NYSBD and FRB–New York for other regulatory compliance failures involving the Bank Secrecy Act ("BSA"), anti-money laundering policies and procedures, and OFAC regulations.

[161]   The product was designated with an Export Control Classification Number ("ECCN") of 2B999 (for Anti-Terrorism reasons) under Supplement 1 to Section 774 of the Commerce Control List ("CCL").

[162]   SCB facilitated another Letter of Credit on May 12, 2005, involving Khoram Sanat (as Applicant) and Diamonds Steel (as Beneficiary) for over $1.9 million for goods described as "Back Up Roll Change Carriage, Spare Back Up Roll with Chuck and Main Gear Box." These standard terms are used to describe metal working equipment that may be integrated into large hydraulic presses or deployed as stand-alone equipment stations.

[163]   The dangers of Iran possessing hydraulic press equipment were evident from a 2009 reported incident wherein Turkish authorities, at the request of the U.S., halted a convoy of trucks heading from Iran to Syria that contained a large hydraulic press and punch press. The U.S. requested this action because "these items are likely intended for the production of explosively formed penetrators (EFPs)."

required SCB (as well as Credit Suisse and other Defendants) to examine and retain the documentation evidencing Iran's illegal procurement chain, SCB's knowledge of its role in assisting Iran obtain export-controlled items (i.e., items with potential military uses) is indisputable.

1351. Furthermore, because Iran's illegal procurement chain was dependent on access to U.S. dollars, SCB's (and other Defendants') pervasive and systemic assistance for the IRGC was essential to its success.

1352. SCB also processed transactions during the Relevant Period for U.S.-designated Iranian steel producers Khorasan Steel Company and Khouzestan Steel Company. They were designated under E.O. 13871 which seeks to deny Iran "revenue derived from the export of products from Iran's iron, steel, aluminum, and copper sectors, that that may be used to provide funding and support for the proliferation of weapons of mass destruction [and] terrorist groups and networks…."

1353. SCB–Dubai maintained a U.S. dollar bank account for Khorasan Steel Company, number ending in 8261, and processed a structured trade finance transaction for the company worth $209,000,000 U.S. dollars on June 30, 2009.

1354. SCB–Dubai maintained two U.S. dollar bank accounts for Khouzestan Steel, numbers ending in 4730 and 5496. During the relevant period, SCB–Dubai processed Eurodollar transactions for Khouzestan Steel worth a total value of $63,702,163.57 U.S. dollars between January 7, 2008, and May 31, 2009, alone.

1355. In sum, SCB was integral to Iran's and the IRGC's inherently lethal and illegal conduct, which included a wide variety of money laundering techniques in the service of weapons procurement, arms shipments, acquisition of WMDs, and terror financing. That assistance

substantially and foreseeably assisted the IRGC and Hezbollah in their campaign of violence and terror against Coalition Forces in Iraq.

### h. SCB provided Critical Trade-Finance and Money Laundering Services for the IRGC's Telecommunications Networks

1356. During the Relevant Period, Iran had two major telecommunications companies: MTN–Irancell and TCI (Telecommunications Company of Iran). Both were controlled by, and largely owned by, the IRGC.

1357. U.S. counterterrorism sanctions prevented these strategic companies from acquiring equipment necessary to improve the IRGC's telecommunications infrastructure.

1358. The IRGC, working with China's ZTE Corporation and Huawei (specifically, its Iranian subsidiary Skycom Technology Company LTD), worked out a robust trade finance/money laundering scheme to evade these sanctions.

1359. The United States charged ZTE Corporation and Huawei for sanctions violations.

1360. In 2017, DOJ announced that ZTE Corporation pleaded guilty and agreed to pay over $430.4 million "for Violating U.S. Sanctions by Sending U.S.-Origin Items to Iran."

1361. In 2021, Huawei's CFO admitted its role in this scheme.

1362. According to DOJ, "between 2010 and 2014, Huawei caused Skycom to conduct approximately $100 million worth of U.S.-dollar transactions through Financial Institution 1"— that is, SCB—"that cleared through the United States."

1363. As part of this scheme, the IRGC set up a front company called Exit40. According to Reuters, Exit40 "was headquartered in Switzerland, with offices in Dubai, Florida, Switzerland and India."

1364. A 2012 *Reuters* report indicated that Exit40 played a role in MTN's illegal procurement scheme of U.S. equipment for Irancell.

1365.   Indeed, SCB was critical to this scheme. As *Reuters* reported in the same article, "Standard Chartered bank and China's ZTE Corp, have helped Iran undermine increasingly tougher sanctions."

1366.   During the relevant period, SCB–Dubai maintained a U.S. dollar account for Exit40 FZE, number ending in 5184, and processed millions of dollars' worth of foreign exchange transactions for Exit40, including Eurodollar settlement payments through SCB–New York.

1367.   During the relevant period, SCB–Dubai maintained a U.S. dollar account for ZTE Corporation, number ending in 2801, and processed foreign exchange transactions worth over $100 million U.S. dollars for ZTE, including Eurodollar settlement payments through SCB–New York.

1368.   During the relevant period, SCB–Dubai maintained a U.S. dollar account for MTN Dubai LTD (including MTN-Irancell), number ending in 0801, and processed foreign exchange transactions worth over $40 million U.S. dollars for MTN Dubai, including Eurodollar settlement payments through SCB–New York.

1369.   During the Relevant Period, SCB–Dubai maintained a U.S. dollar account for Huawei's Skycom Technology Company LTD, number ending in 5401, and processed foreign exchange transactions worth millions of U.S. dollars for Skycom, including Eurodollar settlement payments through SCB–New York.

1370.   During the relevant period, SCB knew that Skycom was controlled and owned by Huawei and was part of a money laundering scheme to benefit Iran's telecommunications system.

1371.   On July 30, 2014—years after these stories were first reported—SCB attempted to cover its tracks by filing a SAR against ZTE Corporation (as reported in the "FinCEN Files" stories).

1372.   SCB had another role in the scheme. In the scheme to win one of two mobile phone licenses in Iran, MTN paid 173.9 million U.S. dollars. to Irancell through Bank Melli in 2005. MTN's purpose for this payment, styled as a loan, was to cover the IRGC's purchase (through U.S.-designated, IRGC-controlled, major Iranian defense industry companies) from Irancell of 49% of Irancell shares. MTN purchased 51% of Irancell shares, making Irancell essentially a joint venture between MTN and the IRGC and making Irancell the IRGC's phone company for its terrorist apparatus.

1373.   From 2006-2011, Irancell—an IRGC-controlled company—made hundreds of millions of dollars in shareholder payments to MTN at its account at SCB-Dubai. Moreover, in 2011, Irancell made repayment on the "loan" to MTN at MTN's account at SCB-Dubai in Euros.

1374.   SCB knew it was processing payments from an IRGC-controlled entity, critical to the IRGC's operations. Parts of the IRGC-controlled ownership structure of Irancell were designated by the United States during the relevant period (e.g., Iran Electronics Industries, designated in 2008 by the EU and U.S. and owned by MODAFL). It was publicly reported during the relevant period that the IRGC controlled Iran's telecommunications companies (i.e., Irancell and TCI). For example, UPI reported in 2009 that the IRGC controlled all of Iran's cellphone companies.

### 2.  Regulatory Actions and Criminal Investigations Against SCB, 2012 – Present

1375.   On September 21, 2012, SCB and the New York State's Department of Financial Services ("DFS") executed a Consent Order resolving charges that, from at least 2001 through 2007, SCB provided U.S. dollar clearing and settlement services to Iranian customers subject to U.S. economic sanctions, with respect to approximately 60,000 transactions totaling approximately *$250 billion*, through SCB–New York.

1376. DFS concluded that "SCB operated as a rogue institution."

1377. On December 10, 2012, DOJ announced that SCB had agreed to forfeit $227 million to the Justice Department for conspiring to violate the International Emergency Economic Powers Act ("IEEPA"), and that the forfeiture was part of Deferred Prosecution Agreements SCB entered into with DOJ and the Manhattan District Attorney's office for illegally moving millions of dollars through the U.S. financial system on behalf of, among others, sanctioned Iranian entities. SCB also entered into settlement agreements with OFAC and the Board of Governors of the Federal Reserve System, as well as with DFS.

1378. DOJ filed a criminal information charging SCB with one count of knowingly and willfully conspiring to violate IEEPA. SCB waived the federal indictment, agreed to the filing of the information and, according to DOJ's press release, "accepted responsibility for its criminal conduct and that of its employees."

1379. DOJ's 2012 press release announcing the DPA quoted then-Assistant Attorney General Lanny Bruer as stating: "[f]or years, Standard Chartered Bank deliberately violated U.S. laws governing transactions involving Sudan, Iran, and other countries subject to U.S. sanctions. The United States expects a minimum standard of behavior from all financial institutions that enjoy the benefits of the U.S. financial system. Standard Chartered Bank's conduct was flagrant and unacceptable. Together with the Treasury Department and our state and local partners, we will continue our unrelenting efforts to hold accountable financial institutions that intentionally mislead regulators to do business with sanctioned countries."

1380. Manhattan District Attorney Cyrus Vance Jr. stated in the press release: "Investigations of financial institutions, businesses, and individuals who violate U.S. sanctions by misusing banks in New York are vitally important to national security and the integrity of our

banking system. Banks occupy positions of trust. It is a bedrock principle that they must deal honestly with their regulators. I will accept nothing less; too much is at stake for the people of New York and this country. These cases give teeth to sanctions enforcement, send a strong message about the need for transparency in international banking, and ultimately contribute to the fight against money laundering and terror financing."

1381.   Prior to entering into the 2012 DPA and its settlement with DFS, SCB retained Promontory Financial Group, LLC ("Promontory") in 2009 to provide "consulting services in connection with the identification and collection of historical transaction records relating to cross-border financial transactions."

1382.   In the first half of 2010, SCB reported to various regulators, including the NYSBD, DFS's predecessor, that it had engaged in sanctions evasion conduct.

1383.   On April 15, 2010, SCB hired Promontory again to identify, collect, and review historical transaction records implicating sanctions violations.

1384.   Thereafter, Promontory produced a number of reports and made various presentations to government authorities, including the NYSBD (later DFS).

1385.   These Promontory reports included, *inter alia*, interim reports throughout 2010, final reports in January and March of 2011, as well as updates to those final reports in October 2011.

1386.   DFS relied in part upon the work conducted and presented by Promontory to identify the scope of SCB's improper conduct prior to entering into the September 21, 2012, Consent Order.

1387.   On June 18, 2013, Deloitte entered into a Settlement Agreement with DFS wherein it agreed, *inter alia*, to pay a penalty of $10 million for misusing confidential information from

other bank Defendants.

1388.   For example, Deloitte provided SCB with copies of transaction review reports that Deloitte had prepared for these other clients and suggested to SCB management that they be used as templates for SCB's transactions review report and agreed to SCB's request that Deloitte remove a recommendation from its written final report explaining how "cover payment" messages used in MT–202 SWIFT messages could be manipulated by banks to evade U.S. money laundering controls.

1389.   On August 19, 2014, DFS announced an order regarding SCB's failures to remediate AML/CFT compliance problems as required in SCB's 2012 settlement with DFS.

1390.   Under the August 2014, DFS order, SCB was required to: (1) suspend dollar clearing through SCB–New York for high-risk retail business clients at SCB's Hong Kong subsidiary; (2) exit high-risk client relationships within certain business lines at SCB's branches in the UAE; (3) decline new dollar-clearing clients or accounts across its operations without prior approval from DFS; (4) pay a $300 million penalty; and (5) take other remedial steps.

1391.   Additionally, according to an October 29, 2014, article in *The New York Times*, federal and Manhattan prosecutors reopened their investigation into SCB.

1392.   The *New York Times* reported that prosecutors were questioning whether SCB failed to disclose the extent of its wrongdoing to the government, thus imperiling SCB's 2012 settlement.

1393.   In August 2015, DFS issued a "Report on Investigation of Promontory Financial Group, LLC."

1394.   The DFS report stated that:

> On April 15, 2010, Promontory was engaged by Standard Chartered's counsel to identify, collect and review historical transaction records "with certain countries or certain Specially Designated Nationals ("SDNs")

subject to sanctions" administered by OFAC. The engagement was known as Project Green.

As part of the engagement, Promontory produced a number of reports and made various presentations to the Bank and government authorities, including the NYSBD. These reports included interim reports throughout 2010, final reports in January and March of 2011, and updates to those final reports in October 2011.

In connection with the Department's investigation of Standard Chartered, the Department relied in part upon the work conducted and presented by Promontory to identify the scope of the Bank's improper conduct and to determine an appropriate resolution of the investigation.

1395. DFS ultimately concluded that "There are numerous instances where Promontory, at the direction of the Bank or its counsel, or at its own initiative, made changes to 'soften' and 'tone down' the language used in its reports, avoid additional questions from regulators, omit red flag terms or otherwise make the reports more favorable to the Bank."

1396. Examples identified by DFS included a written communication on January 19, 2011, wherein "the Bank's counsel wrote to Promontory that the title of a particular slide entitled 'The 77 non-u-turn payments fell into 3 categories' – meaning the transactions were potential OFAC violations – should be made 'more bland' and suggested a rewording to 'Categories identified in Amendment Analysis.' Promontory made the change to the more vague language requested by the Bank."

1397. The DFS Report further found that "Promontory omitted certain timelines from the reports that would have indicated an increase in violations over time."

1398. The Report went on to cite a December 17, 2010, statement by a senior analyst at Promontory explaining:

Generally, the timelines serve a strong purpose with the Jersey payments. That is, there appears to be a positive trend over time to reduce the involvement with potential violations. **This will not be true with Dubai. I**

**have a strong suspicion that people will not want to show the timelines for Dubai ([a particular client for which the Bank processed prohibited transactions] [that] for example shows an upwardly sloping curve of violations).** If we are going to go ahead with the visuals across the workstreams, we should be cognizant of the graphics showing painful information and expect strong pushback from the bank and [the Bank's counsel]. (Emphasis added.)

1399. As described above, SCB's Dubai operations were a central hub for the IRGC's and MODAFL's illegal procurement efforts.

1400. In August 2015, the *New York Times* reported that SCB was once again under investigation: "The Justice Department is examining whether it committed sanctions violations beyond those covered in the 2012 deal, which centered on what the bank called 'Project Gazelle,' an effort to forge 'new relationships with Iranian companies.'"

1401. The *Financial Times* also reported in September 2015:

> Documents seen by the FT suggest that StanChart continued to seek new business from Iranian and Iran-connected companies after it had committed in 2007 to stop working with such clients. These activities include foreign exchange transactions that, people familiar with StanChart operations say, would have involved the US dollar….

> The material reviewed by the FT depicts a bank—one of the few foreign lenders with a license [sic] to operate in the country—determined to keep working with Iranian companies. The status of numerous Iranian and Iran-connected entities was still being reviewed by StanChart as late as 2013, according to documents seen by the FT. These included entities that had internal "markers" and "blocks" placed against them, a way for the bank to flag up concern about links to Tehran. Many accounts belonging to Iranian or Iran-connected entities were indeed closed by 2007, as StanChart promised. But some, like Bank Saderat—which had sanctions imposed in 2006, or Bank Sepah—still had open accounts with no markers against them.

1402. Even as edited to be favorable to SCB, the 2011 Promontory Report (attached as Exhibit A to the Third Amended Complaint) provides a window into the vast array of wrongdoings

SCB undertook in concert with Iran and its agents.[164]

1403.   As the Negotiating Bank on numerous illegal Iranian LCs, SCB received the detailed documentation for the shipment of goods and knew that it was actively helping Iran's military and terrorist apparatus acquire prohibited U.S. goods and dual-use technologies.

1404.   In sum, as the Negotiating Bank on numerous illegal Iranian transactions for Mahan Air and various MODAFL sub-agencies, and as an active conduit and money-launderer for the CBI and other sanctioned Iranian banks, SCB knew that: (1) it was dealing with Iran's military and terrorist apparatus; (2) it was conspiring to evade U.S. export sanctions; (3) it was laundering money in U.S. dollar funds for Iran's military and terrorist apparatus; (4) its own customers were front companies for Iran's military and terrorist apparatus; (5) these customers were actively engaged in sanctions evasion and money laundering; and (6) none of this illegal conduct was undertaken for the benefit of a legitimate agency, operation, or program of Iran.

1405.   On April 9, 2019, SCB entered into yet another Consent Order with DFS agreeing to pay an additional $180 million U.S. dollars to address its newly discovered misconduct.

1406.   DFS ultimately concluded that "during the period November 2008 through July 2014, the Bank processed nearly 15,000 illegal payments for the benefit of sanctioned Iranian parties, totaling more than $600 million."[165]

1407.   These 15,000 illegal payments for the benefit of sanctioned Iranian parties came *after* the U.S. Department of Treasury revoked the U-Turn exemption and placed every financial institution in the world on formal notice that Iran and Iranian banks had exploited the U-turn

---

[164]    Other Promontory reports that have not (for the time being) been publicly disclosed, detail SCB's Dubai operations and SCB's activities on behalf of the CBI, as well as its role in financing, among others, Blue Sky Aviation a/k/a/ BSA FZE's acquisitions of various materials and technologies.

[165]    The factual findings contained in the April 9, 2019, DFS Consent Order are incorporated herein by reference.

license to provide "support to terrorist groups."

1408. But there was more SCB was hiding from regulators. SCB's so-called "Iran Group" processed at least 906 Iran-related foreign exchange, trade finance, and term deposit transactions worth a total of $9,590,088,848 U.S. dollars between 2008 and 2012.

### 3. SCB Knowingly Provided Substantial Assistance to Hezbollah

1409. In addition to its industrial scale assistance to the IRGC, SCB also provided comparable assistance to Hezbollah, moving money for it across the globe, including proceeds of narcotics trafficking.

### a. SCB Knowingly Provided Substantial Assistance to Money Service Businesses and Gold Traders Who Laundered Vast Sums of Money for Hezbollah (and the IRGC)

1410. As described above, consistent with SCB's long-standing policy of facilitating money laundering and terror financing across the globe, SCB's Dubai branch maintained one or more U.S. dollar accounts for, and provided valuable services to, the Dubai-based Al Zarooni Exchange (controlled by Altaf Khanani and his family) during the Relevant Period – part of what the U.S. Department of Treasury describes as a "transnational criminal organization" which "exploits its relationships with financial institutions to funnel billions of dollars across the globe on behalf of terrorists, drug traffickers, and criminal organizations," including "individuals associated with Hezbollah" such as Hassan Mohsen Mansour, "a Hezbollah associate, known to be involved in multi-faceted criminal activity, not simply money laundering and drug trafficking," who was "working directly with established members of Hezbollah" to arrange transport for narcotics to Australia and arrange to move the cash collected back out of Australia for the drug cartels (with Hezbollah getting its commission).[8]

1411.  To help move the cash out of Australia, Mansour contacted Altaf Khanani whose Al Zarooni Exchange could process currency in Dubai and generate U.S. dollar deposits that would translate into electronic funds transfers through SCB's Dubai branch.

1412.  The Khanani network laundered billions of dollars annually for criminals, terrorists, and narco-traffickers (including Hezbollah) in significant part by using SCB's Dubai branch to wash cash it obtained through its currency exchange businesses including Al Zarooni Exchange and Mazaka General Trading, LLC.[166]

1413.  Similarly, SCB's Dubai branch knowingly assisted its customer Kaloti Jewellery Group, Dubai's largest gold refinery and retailer, launder significant sums of money for Hezbollah and other criminal organizations.

1414.  As described above, by 2007 at the latest, U.S. correspondent banks began filing Suspicious Activity Reports ("SARs") regarding Kaloti transactions due to the volume of its transactions and the high-risk nature and location of its businesses.

1415.  During the Relevant Period, SCB knew that UAE was a high-risk jurisdiction; Kaloti was involved in a "high-risk business…in jewelry industry, which is known to be a high-risk industry for money laundering"; and many of Kaloti's transactions "were remitted in round dollar amounts" which SCB understood are "a known vehicle for money laundering."[167]

1416.  SCB's Dubai branch nevertheless continued to maintain its accounts with Kaloti during this time and continued to provide it with access to the global financial system.

---

[166]    The complaint identifies numerous public sources contemporaneously linking Khanani, his family, and business associates to money laundering and terrorism.

[167]    Many of Kaloti's transactions were done in cash.

1417.  SCB–New York did protect *itself* by retroactively filing several SARs after the Relevant Period, once it became aware of U.S. law enforcement's interest in Kaloti, but the bank's UAE operation were *still* assisting Kaloti in 2014.

1418.  Following the same pattern as Khanani and Kaloti, as discussed above, SCB knowingly and substantially assisted IRGC-controlled entities (e.g., NIOC, Naftiran Intertrade Company Sarl, and Mahan Air) launder money through Reza Zarrab's network of front companies.

1419.  Once again SCB–New York did protect *itself* by retroactively filing several SARs, flagging $142 million in "quite unusual and suspicious" transactions involving a Zarrab front called Gunes General Trading that held one or more accounts with SCB in the UAE – and once again SCB continued to do business with the company in 2013, and continued to engage in transactions that were obviously suspicious.

1420.  Three months *after* Mr. Zarrab was arrested in 2016, SCB–New York filed several Suspicious Activity Reports detailing a decade of bank transactions involving Zarrab and other entities. All told, SCB–New York's SARs on entities and individuals tied to Zarrab, reported thousands of transactions totaling more than $5.8 billion U.S. dollars between January 2007 and September 2016.

1421.  U.S. prosecutors identified 1,575 SCB transactions, totaling more than $338.7 million, with Al Nafees Exchange LLC, a UAE-based money services business owned in part by Reza Zarrab's father, Iranian businessman Hossein Zarrab.

1422.  As with its other money laundering endeavors, SCB branches and subsidiaries in high-risk jurisdictions profited from what they knew to be obviously illegal financial activities and actively assisted their consummation while SCB–New York was relegated to engaging in damage

control, reporting to U.S. regulators whenever a risk of discovery arose and SCB wanted to plausibly deny its knowledge of the criminal schemes in which it was engaged.

<blockquote>

**b.    SCB Knowingly Provided Substantial Assistance to Hezbollah Super Facilitators**

**i.    Muhammad Bazzi**
</blockquote>

1423.   Muhammad Bazzi's role as one of the most preeminent money launderers for Hezbollah's BAC is described above.

1424.   Several of Mr. Bazzi's commercial operations served as major conduits for Hezbollah's BAC investments and its money laundering and illicit oil and weapons trafficking operations. SCB was described as the "Principal Banker" for the following corporate entities controlled by Muhammad Bazzi during the Relevant Period:[168]

- Ibrahim Bazzy and Sons LTD (Sierra Leone)
- Gam Petroleum (Gambia)
- Global Trading Group NV (Belgium), an SDGT
- Euro African Group LTD (Gambia), an SDGT.

1425.   Mr. Bazzi not only worked with SCB closely in multiple jurisdictions including high-risk jurisdictions like Sierra Leone and Gambia—known for high levels of government corruption—but Mr. Bazzi was also a Politically Exposed Person ("PEP") who served as an "honorary consul" and was related by marriage to the President of Gambia during the Relevant Period and was closely associated with government corruption in that country.

1426.   SCB played a key operational role in providing Mr. Bazzi and his network entities with tailored financial services designed to evade counter-terrorism financing controls.

1427.   These services included:

---

[168]    SCB's Gambian subsidiary was also described as the "Principal Banker" for the Gambian operations of Hezbollah's BAC investment vehicle, Tajco (SDGT) according to a publicly available report.

- Maintaining nested correspondent accounts that obscured the true origination points of transactions from U.S. regulators;
- Processing structured transactions just below reporting thresholds;
- Facilitating foreign exchange transactions that enabled currency conversion crucial for international operations; and
- Providing trade finance facilities through documentary letters of credit that created a veneer of legitimacy for otherwise illegal transactions.

1428.   In 2000, Mr. Bazzi founded Global Trading Group NV as a commodities trading firm based in Antwerp, Belgium.

1429.   According to Gambia's 2019 Jammeh Commission findings,[169] Mr. Bazzi's Global Trading Group and Euro African Group operated as alter egos, systematically committing procurement fraud, bribery, and money laundering by exploiting their exclusive petroleum supply contract with the Gambian government.

1430.   Euro African Group operated as the exclusive importer of Heavy Fuel Oil ("HFO") into Gambia beginning in 2002 under an exclusive license from then-President Jammeh's corrupt regime.

1431.   Euro African Group's primary shareholder and managing director was Muhammed Bazzi, the company's "principal banker" was SCB–Gambia, and the company was located in the Standard Chartered Bank Building, 2nd Floor, in Banjul, Gambia. It was listed as an affiliated company of Gam Petroleum Storage Facility Co. Ltd, whose address is also  Standard Chartered House Building, 2nd Floor.

---

[169]      The Jammeh Commission of Inquiry, established under Gambia's Constitution to investigate financial misconduct during former President Yahya Jammeh's 22-year authoritarian regime (1994–2017), concluded its work on March 19, 2019, submitting a nine-volume report to Gambia's democratically elected President. Tasked with forensically examining systemic mismanagement of public funds—such as diverted revenues, inflated contracts, and central bank exploitation—the Commission analyzed bank records, audit reports, and testimony from over 190 witnesses (including Mr. Bazzi).

1432.  As Gambia's HFO importer, Euro African Group received payments in Gambian dalasi from domestic customers, including the National Water and Electricity Company, but needed to purchase HFO—with Global Trading Group acting as broker—from African and European suppliers, with transactions primarily denominated in U.S. dollars as evidenced in shipping documentation and commercial invoices.

1433.  This required the systematic conversion of Gambian dalasi into U.S. dollars through foreign exchange transactions that created numerous opportunities for value manipulation and layering.

1434.  Because the Central Bank of Gambia lacked the technical mechanisms to handle settlement risk inherent in cross-currency transactions, SCB acted in some respects as Gambia's central bank, particularly relating to the interbank foreign exchange market (indeed SCB–Gambia effectively *was* Gambia's central bank until 1971).

1435.  SCB–London maintaining a nested U.S. dollar correspondent account for the Central Bank of Gambia (account number ending in 2950). SCB–Gambia and SCB–Dubai simultaneously maintained separate U.S. dollar accounts for Mr. Bazzi's Euro African Group (account numbers ending in 6270 and 9770 respectively).

1436.  This account structure enabled SCB to layer the transactions through New York in a way that obscured from U.S. regulators the relationship between the origin and destination of funds while facilitating the conversion between local currency and U.S. dollars needed for Mr. Bazzi's money laundering operations.

1437.  SCB–Gambia's credit capacity, backed by the strength of SCB's $690 billion global balance sheet, was operationally crucial because it enabled the bank to provide upfront U.S. dollar liquidity, issue documentary letters of credit, and absorb currency conversion risks for Euro

African Group while awaiting the settlement of dalasi-denominated payments through the Central Bank of Gambia's manual deferred net settlement payment system.

1438.  For Mr. Bazzi, SCB–Gambia's access to international correspondent banking networks through SCB–New York, SCB–London, and SCB–Dubai and its ability to pre-fund Eurodollar payments were indispensable for his money laundering operations on behalf of Hezbollah and the IRGC.

1439.  SCB–Gambia's financial capacity was crucial to Euro African Group's and Global Trading Group's ability to engage in large cross border transactions.

1440.  Euro African Group LTD (itself an SDGT) was controlled and operated by Mr. Bazzi, who OFAC designated as an SDGT for being a key Hezbollah financier and facilitator.[170]

1441.  As a prominent Hezbollah BAC operative, Bazzi provided millions of dollars to Hezbollah and worked closely with other Hezbollah financiers like Adham Tabaja (also an OFAC designated SDGT) on oil ventures in Iraq to generate funds for the terrorist group.[171]

1442.  Euro African Group held exclusive rights to import fuel to Gambia between 2002 and 2016 and held a fuel supply deal with the country's state-run utility.

1443.  This dominant market position enabled the company to generate substantial revenues that could be diverted to support Hezbollah.

---

[170]  Press Release, *Treasury Targets Key Hizballah Financing Network and Iranian Conduit*, U.S. DEP'T OF TREASURY (May 17, 2018), https://home.treasury.gov/news/press-releases/sm0388.

[171]  *See* Press Release, *Treasury Sanctions Hizballah Front Companies and Facilitators in Lebanon and Iraq*, U.S. DEP'T OF TREASURY (Jun. 10, 2015), https://home.treasury.gov/news/press-releases/jl0069; Press Release, *Treasury Targets Sanctions Evasion Conduits for Major Hizballah Financiers*, U.S. DEP'T OF TREASURY (Apr. 24, 2019), https://home.treasury.gov/news/press-releases/sm668.

1444.  During the Relevant Period, SCB processed, cleared, and settled trade finance, foreign exchange, and payment transactions worth tens of millions of dollars for Mr. Bazzi's Euro African Group.

1445.  SCB–Gambia used its CHIPS Universal Identifier 080917 to facilitate U.S. dollar transactions for Euro African Group through its correspondent relationship with SCB–New York, which acted as its intermediary and direct CHIPS participant.

1446.  For Euro African Group's foreign exchange transactions, SCB–Dubai relied on specific SWIFTNet FIN message types to document and execute trades.

1447.  For Euro African Group's foreign exchange spot transactions, SCB–Gambia would transfer the U.S. dollars from Euro African Group's account to the counterparty's bank via SCB–New York's CHIPS account, while the counterparty bank would use its Eurosystem TARGET2 account for sending the agreed euros to Euro African Group's account.

1448.  During the Relevant Period, SCB–Dubai maintained a U.S. dollar account (number ending with 9770, group number 990057340) for Euro African Group.

1449.  SCB–Dubai processed Euro African Group's foreign exchange transactions through this account, including using the branch's U.S. dollar correspondent account at SCB–New York (number 3582088678001) for settling the U.S. dollar leg of each foreign exchange trade in New York.

1450.  During the eighteen-month period between January 2009 and June 2010 alone, SCB–Dubai processed and settled at least seventy-three foreign exchange transactions for Euro African Group with an aggregate value of $16,659,286.07 U.S. dollars.

1451.  During the Relevant Period, SCB–Gambia processed, cleared, and settled U.S. dollar funds transfers between Euro African Group's account at SCB–Gambia and Global Trading

Group's account, number ending 1241 at KBC Bank NV (Brussels) worth an aggregate value of at least $72.8 million U.S. dollars.

1452.   In March 2009, the same month that SCB–New York received a $2.2 billion loan from the Federal Reserve Board, SCB–Dubai executed two foreign exchange spot trades for Euro African Group totaling $1,273,138.57 U.S. dollars which were settled by SCB–New York.

1453.   Separately, SCB–Gambia maintained at least two accounts for Euro African Group: one in U.S. dollars (number ending 2700) and one for Gambian dalasi.

1454.   To facilitate cross-border payments, SCB–Gambia used its SWIFTNet account (identified by BIC SGBLGMGM) to send and receive FIN payment orders, confirmations, correspondent account statements, and encrypted free-text messages.

1455.   During the Relevant Period, SCB–Sierra Leone maintained a U.S. dollar account for Mr. Bazzi's Ibrahim Bazzi & Sons LTD, identified in its eBBS core banking system by "Bazzi Group", number 990013209.

1456.   Separately, SCB–Dubai maintained a U.S. dollar account, number 990013209, for Ibrahim Bazzi & Sons.

1457.   In December 2009, SCB–Dubai processed foreign exchange transaction for Ibrahim Bazzi & Sons worth $94,426 U.S. dollars.

1458.   The U.S. dollar portion of this foreign exchange transaction was settled through SCB–New York and CHIPS.

1459.   SCB–Dubai also maintained a U.S. dollar account ending in 2579, for Prime Bank LTD of Gambia, in order to provide Prime Bank access to New York's financial system through SCB–New York. Prime Bank, the LCB-owned bank that operated as a key Hezbollah money laundering center and Bazzi's personal laundering operation, is discussed above.

## ii. Tajco (SDGT)

1460. During the Relevant Period, SCB Gambia maintained both U.S. dollar and Gambian dalasi-denominated bank accounts in its eBBS core banking system for Tajco LTD (Gambia) ("Tajco–Gambia"), identified by SCB group ID number 990057865.

1461. Tajco–Gambia was co-owned by three Tajideen brothers: Hussein, Ali, and Kassim, each of whom were designated SDGTs (discussed above).

1462. SCB–Gambia and processed, cleared, and settled U.S. dollar funds transfers worth over $38.2 million U.S. dollars through SCB–New York using SWIFT, CHIPS, and FRB–New York.

1463. Separately, SCB–Dubai maintained a U.S. dollar account for Tajco, number 112409201 (group ID 990057865) in its eBBS core banking system and processed foreign exchange transactions worth an aggregate of at least $2.31 million U.S. dollars during the Relevant Period.

1464. SCB–Dubai processed the U.S. dollar foreign exchange settlement leg of these transactions through its correspondent account at SCB–New York (number ending 8001) and its designated CHIPS sub-account, UID number 312988.

1465. This settlement process relied on SCB–New York's mandatory daily pre-funding of its master CHIPS account (number 0256) and its continuous provisioning of intraday credit to facilitate timely transaction clearing and settlement.

1466. Further, SCB knew that in May 2009 OFAC had designated Kassim Tajideen as an SDGT under E.O. 13224 for contributing "tens of millions of dollars to Hizballah" from his "network of businesses in Lebanon and Africa."[172]

---

[172]     Press Release, *Treasury Targets Hizballah Network in Africa*, U.S. DEP'T OF TREASURY (May 27, 2009), https://home.treasury.gov/news/press-releases/tg149.

1467. Nonetheless, in August 2010, SCB–Dubai processed a foreign exchange transaction for Tajco through its account, number ending 9201, valued at $290,803.56 U.S. dollars.

1468. The U.S. dollar portion of this foreign exchange transaction was settled through SCB–New York and CHIPS.

1469. During the Relevant Period, Standard Chartered Bank Sierra Leone LTD ("SCB–Sierra Leone") maintained both U.S. dollar and Sierra Leonean leone accounts for Tajco Company LTD (Sierra Leone) ("Tajco–Sierra Leone"), identified in eBBS by SCB group ID 990066849.

1470. In December 2010, OFAC designated Tajco and Mr. Tajideen's two brothers, Ali Tajideen and Husayn Tajideen ("two of Hizballah's top financiers in Africa"), as SDGTs under E.O. 13224 for providing "millions of dollars in financial support to Hizballah."[173]

## B. THE HSBC DEFENDANTS KNOWINGLY PROVIDED SUBSTANTIAL ASSISTANCE TO THE IRGC AND HEZBOLLAH

1471. Throughout the Relevant Period, the HSBC Defendants (collectively, "HSBC") consciously and culpably facilitated the IRGC's wrongdoing by providing vital financial services to key components of the IRGC's financial network and Hezbollah's BAC networks.

1472. Specifically, the HSBC Defendants knowingly and actively provided the IRGC with pervasive and systemic assistance by laundering tens of millions of dollars for what the U.S. Department of Treasury called the IRGC's "complex network of front companies," including NIOC and IRISL. HSBC also knowingly provided the IRGC with illegal access to the United States financial system through Defendants' respective SWIFT cross-border financial messaging accounts and transactional accounts in New York.

1473. The HSBC Defendants also knowingly provided pervasive and systemic support

---

[173] Press Release, *Treasury Targets Hizballah Financial Network*, U.S. Dep't of Treasury (Dec. 9, 2010), https://home.treasury.gov/news/press-releases/tg997.

for Hezbollah through the terrorist organization's commercial assets, operatives, and facilitators.

1474. As one HSBC officer put it, in significant understatement, the HSBC Defendants were aware that some of the transactions they were illegally processing may be "connected to terrorism."

1475. HSBC had important relationships with several IRGC agent entities. For example, a January 2003 memorandum HSBC–Middle East circulated (and several HSBC–US employees received) noted that "[t]he Group now has an excellent relationship with all Iranian banks and some very large Iranian corporates such as National Iranian Oil Co, National Petrochemical Co, National Iranian Gas Co, National Iranian Steel Co, top Iranian insurance companies, Ministry of Power, Ministry of Post and Telecommunications, etc."

1476. As noted above, the IRGC's control and exploitation of Iran's oil and natural gas sector was publicized and widely known.

1477. From at least 2003 forward, HSBC provided banking and payment services, often in unusual (and unlawful) ways, to the IRGC-controlled NIOC, as well as to other Iranian entities controlled or directed as agents of the IRGC.

1478. These services included providing U.S. dollar banking, trade-finance, and foreign exchange services for NIOC.

1479. For example, a January 2003 HSBC–Middle East memorandum stated that:

> L/C's [Letters of Credit] issued for Iranian Companies Abroad—Various Group Offices. HSBC offices are developing relationships with Iranian Government and non-Government companies. The L/C's issued are normally denominated in USD. Following NIOC's acceptance of HSBC as one of its listed banks, HSBC Bank Middle East now handles Iran's oil export L/C's. Turnover for this business is about USD400M [million] per year.

1480. As explained above, the Central Bank of Iran ("CBI") managed the IRGC's scheme

to launder funds, coordinating between the IRGC and its various portfolio of companies, Iranian banks acting at the IRGC's direction, and Defendants. The HSBC Defendants' role was, among others, facilitating, through a variety of unusual means, illegal transactions for the IRGC through entities either owned, controlled, or acting as agents of the IRGC, by removing identifying information from Eurodollar payment messages and letters of credit so that they would not be blocked in the United States.

1481.  The HSBC Defendants actively assisted the IRGC evade and violate sanctions specifically designed to prevent the IRGC from financing terrorism.

1482.  To this end, the HSBC Defendants devised methods for processing illegal transactions for—in the words of an HSBC officer—"compan[ies] on the OFAC list."[174]

1483.  As an HSBC officer admitted in a 2001 internal memorandum, the CBI approached HSBC to help launder NIOC's massive oil revenues and "[t]he Central Bank manages their transactions through Bank Melli London."

1484.  The HSBC Defendants had a longstanding relationship with Iranian banks, including Bank Melli, and other IRGC agents.

1485.  For example, in 1999, HSBC Group established a relationship with the Tehran office of Bank Melli Iran, and it launched an "Iran Representative" office in Tehran, Iran, that same year.

1486.  According to a December 20, 1999, article in *Middle East Economic Digest* titled

---

[174]    As discussed above, from 2006 to 2009, HSBC Bank USA used an automated system called the Customer Account Monitoring Program ("CAMP") that assigned each customer a risk category based on the country in which it was located. Countries were placed into one of four categories based on the perceived AML risk of doing business in that country (from lowest to highest risk): standard, medium, cautionary, and high. In theory, transactions that met the thresholds for review and the parameters for suspicious activity were flagged for additional review by HSBC Bank USA's AML department. However, HSBC Bank USA knowingly set the thresholds in CAMP so that wire transfers by customers, including foreign financial institutions with correspondent accounts, located in countries categorized as standard or medium risk would not be reviewed. This resulted in $200 trillion in transactions involving customers in standard or medium risk countries that were never reviewed in CAMP.

"In Brief," Andrew Dixon, Deputy Chairman of Defendant HSBC–Middle East, stated the following about the bank's trade finance goals in the Iranian market:

> The group has historically been driven by trade and there is a growing volume of trade coming through Tehran. We are in Iran for deal making reasons, we are there to facilitate deals and help the other banks. The group policy is to have a full banking presence wherever there is the need, and in most places, where possible, we have an eye to convert representative offices into a full presence.

1487.   In February 2000, HSBC–Middle East signed several trade finance and project development agreements with the CBI.

1488.   As part of the CBI agreements, HSBC–London committed to supporting loans for Iranian state-owned and commercial entities.

1489.   In December 2000, HSBC Group members entered into a ten-year, $500 million project finance agreement with six Iranian commercial banks: Bank Saderat Iran, Bank Melli Iran, Bank Mellat, Bank Tejarat, Bank Sepah, and the Export Development Bank of Iran ("EDBI").

1490.   On December 1, 2000, *Gulf News* (Dubai) reported in an article titled "HSBC in Iran Project Financing Accord" the following statement by John Richards, HSBC–Middle East's Country Manager for Iran:

> There is, without doubt, going to be interest in the wide range of potential trade and investment opportunities which Iran offers to its international partners. This increases the need, in particular, for project finance. We welcome the positive line being taken by export credit agencies on Iran. HSBC is extremely well placed to support projects for which such cover is granted.

1491.   To support their increasingly close Iranian ties, beginning in the late 1990s, Defendant HBSC–Europe and Defendant HSBC–Middle East devised procedures whereby Iranian banks put a cautionary note in their SWIFT messages including language such as, "*care sanctioned country,*" "*do not mention our name in NY,*" and "*do not mention Iran.*"

1492. U.S. dollar transactions with these cautionary notes automatically fell into what Defendant HSBC–Europe termed a "repair queue," where employees of HBSC–Europe and HSBC–Middle East manually removed all references to Iranian-sanctioned entities from the SWIFT messages associated with each transaction.

1493. Between 2001 and 2007, the HSBC Defendants actively assisted the IRGC by repeatedly undertaking various methods to facilitate U.S. dollar payments, trade finance, and foreign exchange transactions on behalf of IRGC-controlled and other Iranian entities through the United States so that they would evade U.S. sanctions. HSBC did so by disguising these financial activities so that their U.S. dollar funds would be cleared and settled by U.S. financial institutions, including Defendant HSBC–US.

1494. HSBC–Europe and HSBC–Middle East facilitated unlawful Iranian transfers of U.S. dollar funds through the HSBC Group's U.S. dollar correspondent accounts at HSBC–US by:

    a. Deleting references to Iran from the payment instructions (a.k.a. "stripping" the transactions), or otherwise altering SWIFT messages, to either omit or falsify information that would have otherwise indicated Iran's involvement in the transaction; and

    b. Styling transactions as bank-to-bank "cover" transactions between two non-Iranian banks, solely because the MT–202 payment order message format used for such transactions did not expressly obligate HSBC to identify the transaction's originator and beneficiary, thus avoiding any disclosure of the transaction's Iranian connections, and blocking HSBC–US's or other U.S. banks' electronic filter algorithms from recognizing the transaction, let alone assessing whether it qualified for any OFAC exemption or license (although HSBC–US was ultimately aware of the scheme).

1495. Defendant HSBC–Europe created detailed plans to avoid triggering HSBC–US's automated OFAC filter software and reduce the need for "manual intervention" (for instance, re-formatting Eurodollar payment transactions), thus sparing HSBC–Europe's employees from the need to manually alter SWIFT messages in order to remove references that might otherwise

identify the presence of Iranian parties to the transaction, and associated scrutiny.

1496.   HSBC cultivated a longstanding relationship with NIOC, despite knowing it was controlled by the IRGC.

1497.   Indeed, as noted above, during the Relevant Period and even today, the IRGC controlled NIOC and its subsidiaries, including the National Iranian Tanker Company ("NITC").

1498.   As also noted above, NIOC's affiliation with the IRGC and activities unrelated to oil sales dates back to the 1980s, as exemplified in a series of articles about NIOC House in London (where HSBC also maintained a branch).

1499.   Articles in the *Los Angeles Times*, *New York Times*, *The Daily Telegraph* and the *Observer* all described NIOC's London headquarters as an illegal Iranian military procurement operation.

1500.   Numerous articles in the mid–2000s continued to link NIOC to the IRGC and refer to the latter's control of the petroleum sector.

1501.   In the early 2000s, NIOC approved HSBC as a preferred bank for trade finance involving Iranian crude oil exports, and the bank's deal-flow increased rapidly.

1502.   In January 2003, Rick Pudner, HSBC Middle East's Director of Corporate and Investment Banking ("CIB"), stated in an internal memo that the bank was successfully processing, clearing, and settling [IRGC-controlled] NIOC's letter of credit transactions and related payments worth over $400 million U.S. dollars annually.[175]

---

[175]    HSBC MIDDLE EAST LTD, BUSINESS CASE—USD PAYMENTS FROM IRANIAN BANKS/ENTITIES 4 (2003), in *U.S. Vulnerabilities to Money Laundering, Drugs, and Terrorist Financing: HSBC Case History: Hearing Before the S. Perm. Sub. on Investigations of the Comm. on Homeland Sec. and Gov't Aff. Vol. 1*, S. Hrg. 112–597, 112th Cong. 783 (2012).

1503.   Rather than recoil at the prospect of assisting the IRGC, HSBC was delighted with the prospect of increasing its role in servicing this highly profitable customer.

1504.   Throughout the Relevant Period, the HSBC Defendants worked with other components of the IRGC-controlled Iranian oil sector.

1505.   Iran's NPC, founded in 1964, nominally operates under Iran's Ministry of Petroleum[176] and produces a wide range of petrochemical products—including ethylene, propylene, polymers, fertilizers, and aromatics—which generate billions of U.S. dollars in annual revenue from domestic and export markets. It was designated an SDGT in 2020.[177]

1506.   During the Relevant Period, the IRGC effectively controlled NPC, which awarded no-bid construction contracts worth millions of U.S. dollars to the IRGC's GHORB construction company.

1507.   In turn, the IRGC exploited NPC's procurement capabilities and international supply-chain relationships to procure dual-use technologies and equipment required for Iran's nuclear enrichment and ballistic missile development programs and to produce revenue for the IRGC–QF and Hezbollah.

1508.   In February 2003, HSBC established a line of credit for NPC worth $108 million U.S. dollars.

1509.   With HSBC–London's expert assistance, NPC obtained a credit guarantee—covering its purchases of products and services from foreign suppliers using the line of credit.[178]

---

[176]    Press Release, *Treasury Sanctions Key Actors in Iran's Oil Sector for Supporting Islamic Revolutionary Guard Corps-Qods Force*, U.S. DEP'T OF TREASURY (Oct. 26, 2020), https://home.treasury.gov/news/press-releases/sm1165. ("The Iranian Ministry of Petroleum has been used by individuals at the highest levels of the Iranian regime to facilitate the IRGC–QF's revenue generation scheme.").

[177]    *Id.*
[178]    Export credit guarantees are insurance policies issued by export credit agencies ("ECAs"), like the UK's Export Credits Guarantee Department ("ECGD") and Italy's SACE, to protect exporters against foreign buyer non-payment, covering risks like default, bankruptcy, or currency inconvertibility, and promising to pay the exporter

1510.  After NPC's line of credit was publicly announced, HSBC–Middle East's senior representative in Iran stated to reporters that "[t]he completion of this sizable transaction represents an important step in HSBC's progressive engagement with Iran in general, and NPC in particular."[179]

1511.  By February 2006, HSBC's branches and subsidiary banking entities in France, Japan, South Korea, Spain, and the UK had extended over twenty project finance loans to IRGC-controlled NPC.

1512.  NPC's mix of secured "structured finance" and unsecured "clean risk" loans from various HSBC entities were denominated in U.S. dollars, UK pounds, EU euros, or Japanese yen and had an average loan maturity of ten years.[180]

1513.  In 2010, the U.S. Department of Treasury sanctioned NPC, among others, along with its key subsidiaries for supporting "Iran's use of its financial sector, shipping industry and Islamic Revolutionary Guards Corps to carry out and mask its proliferation activities."[181]

1514.  In 2010, facing U.S. government investigations, HSBC–US hired Deloitte LLP as its outside auditor to identify and examine HSBC Group's OFAC sensitive U.S. dollar transactions involving Iran and other prohibited countries or persons that went through the bank.

1515.  That "review" identified more than 25,000 illegal transactions that involved Iranian

---

directly up to 90 percent of invoice value if the buyer fails to pay. Reinsurance for export credit is a financial arrangement where ECAs or private insurers transfer part of their risk associated with providing export credit guarantees to other insurance entities, known as reinsurers.

[179]     *Profiting From Iran, and the U.S.*, New York Times (Mar. 6, 2010), https://archive.nytimes.com/www.nytimes.com/interactive/2010/03/06/world/iran-sanctions.html#methodology.

[180]     In trade finance, a "structured finance" loan is often secured by specific assets, projects, or cash flows when the borrower's creditworthiness alone is not sufficient to mitigate the risk to the lender. A "clean risk" unsecured loan usually does not require the borrower to provide collateral or specific assets as a guarantee for the loan.

[181]     Fact Sheet, *U.S. Treasury Department Targets Iran's Nuclear and Missile Programs*, U.S. Dep't of Treasury (Jun. 16, 2010), https://home.treasury.gov/news/press-releases/tg747.

persons, and IRGC-controlled entities and agents, worth a total of more than $19.4 billion in U.S. dollar funds.

1516.   The payment orders had been sent to HSBC–US and other financial institutions in the United States having deleted references to Iran, including the names of IRGC-controlled entities and agents, ensuring that the U.S. dollar payment transactions would be processed without delay and not be blocked nor rejected by the algorithms in the automated OFAC filtering systems.

1517.   At the same time, the HSBC Defendants further trained, mentored, and educated their Iranian counterparts on how to deceptively format SWIFT messages, *inter alia*, to avoid detection and scrutiny by U.S. financial institutions, thus ensuring that IRGC-controlled entities and agents could solicit other Western banks to facilitate U.S. dollar payments in a like manner.

1518.   Accordingly, the HSBC Defendants' willingness to process payments in this manner assisted the IRGC to collect and distribute its U.S. dollar revenues to fund its costly terror apparatus.

1519.   By working with IRGC-controlled entities and agents to evade detection of their U.S. dollar transactions, the HSBC Defendants assisted Hezbollah and the IRGC even when transfers they facilitated were unrelated to terrorism or weapons proliferation because they helped the IRGC flood the global financial system with undetectable U.S. dollar payment transactions that helped conceal from law enforcement and intelligence agencies the most dangerous transactions.

1520.   Defendant HSBC Holdings was aware of Defendants HBSC–Europe and HSBC–Middle East's involvement in assisting the IRGC sanctions evasion conspiracy as early as 2000.

1521.   For example, HSBC Group AML Compliance Head Susan Wright received an email on June 9, 2000, from Bob Cooper, an HSBC colleague, informing Wright of an existing

procedure that the HSBC Defendants were already employing to avoid OFAC filter detection.

1522.  Mr. Cooper explained:

 a. A client bank had been "*automatically replacing a remitter's name with that of*" the client bank and that bank was utilizing bank-to-bank "cover payments" because the payment message formats did not expressly require identification of either the underlying party originating the transaction or the transaction's ultimate beneficiary.

 b. In the future, for OFAC sensitive transactions, that bank would "*arrange cover for the payment using MT202/203 remittances*."

 c. In addition, that bank planned to send a separate 'MT100 message' to the recipient bank, providing full payment details for the originator and ultimate beneficiary.

1523.  Mr. Cooper's email overtly acknowledged that "[i]n this way a payment in US$ can be made for an individual or company on the OFAC list, without the name being 'detected' by the OFAC filters that all US banks would apply."

1524.  Several days later, on June 14, 2000, Ms. Wright forwarded Mr. Cooper's June 9, 2000, email to the then-current Head of HSBC Group Compliance, Matthew King.

1525.  In her cover email, Ms. Wright stated that the "practice" detailed by Cooper was "unacceptable" and informed King that it was her position that:

 a. "We advised them that this was contrary to SWIFT guidelines (drawn up to address FATF concerns re money laundering via wire transfers) which required that the full details (names and addresses) of remitters and beneficiaries are included."

 b. "From a Group perspective I consider the continuation of this practice [the client bank's future plan to conceal OFAC sensitive transactions behind bank-to-bank transfers] to be unacceptable as a deliberate and calculated method to avoid US OFAC sanctions and has the potential to raise serious regulatory concerns and embarrass the Group."

1526.  Senior HSBC Group officials were aware of the IRGC sanctions evasion conspiracy, including the specific methods and overt acts by which the HSBC Defendants were

carrying it out together with IRGC-controlled entities and agents.

1527. However, despite this awareness, senior compliance officials of HSBC Group and its subsidiary banks and entities (including compliance officials at Defendants HSBC Holdings, HSBC–Europe, HSBC–Middle East, and HSBC–US) did *not* put an end to this illicit banking "practice" orchestrated by the IRGC.

1528. Instead, the HSBC Defendants continued deploying and refining their respective "procedures" to facilitate illegal U.S. dollar payments from and for the benefit of IRGC-controlled entities and agents.

### 1. HSBC–Europe's 2001 "Bank Melli Proposal"

1529. In or around January 2001—six months after Ms. Wright's email—Bank Melli's London branch (which maintained U.S. dollar accounts with several other major international banks) approached HSBC to propose giving HSBC the majority of Bank Melli's Eurodollar clearing and settlement business.

1530. In an April 30, 2001, letter, Defendant HSBC–Europe presented Bank Melli in London with a proposal (the "Bank Melli Proposal") for processing Bank Melli payments. HSBC–Europe's proposal boasted that HSBC–Europe was "confident that we have found a solution to processing your payments with minimal manual intervention."

1531. The Bank Melli Iran Proposal expressly underscored that, if it adopted HSBC–Europe's "solution," Bank Melli would not be identified as a sender in any payment order message and, thus, HSBC–Europe would ensure that Iranian transactions involving U.S. dollar funds would not run into any "speed bumps" or other obstacles.

1532. The "solution" provided specific alternative wording, as it explained:

> "The key is to **always** populate field 52—if you do not have an ordering party then quote 'One of our Clients,' **never leave blank.** This means that

the outgoing payment instruction from HSBC will not quote 'Bank Melli' as sender—just HSBC London and whatever is in field 52. This then negates the need to quote 'DO NOT MENTION OUR NAME IN NEW YORK' in field 72." [Emphasis in original.]

1533. HSBC–Europe's proposal further requested, "In order to test our proposed solution we would appreciate if you used the following templates when submitting your next payments to the following customer, or alternatively submit a USD 1 test payment" and provided the following:

**MT202**

20: *Your Ref....*

21: *Related Ref....*

32: *Amount/currency/Value date....*

50: <u>**DO NOT QUOTE IF IRANIAN**</u>

52: *Customer Name* **OR** *One of our clients* **MUST BE COMPLETED**

53: **/68296908**

54:

56:

57: *Beneficiary Banker (SWIFT codes where possible)*

58: *Beneficiary (SWIFT codes where possible)*

70: *Any Payments details for beneficiary...*

72: **Please leave blank**

**MT100**

Pay as above.

(Emphasis in the original.)

1534. Thus, the Bank Melli Proposal documented the HSBC Defendants' active coordination and participation in the IRGC sanctions evasion conspiracy to illegally remove, omit, or falsify essential information from SWIFT messages so as not to trigger OFAC sanctions

screening filters or otherwise permit HSBC–US or other U.S. depository institutions to detect Iranian transactions in U.S. dollar funds.[182]

1535. HSBC Group Representative for Iran, John Richards, issued a memorandum outlining the business opportunities members of the HSBC Group were presented with in connection with prospects to expand and grow HSBC Group's relationships with the CBI and Bank Melli, explaining:

> a. "We have been approached by the Central Bank of Iran to take back their USD clearing business from Natwest. In principal I am keen to do this but on the clear proviso that it can be done profitably and on a sustainable basis."
>
> b. "One of our key objectives for the year is to develop HSBC's Asset Management activities in Iran and with the Central Bank now managing the oil price stabilization fund amounting to some USD10bn there is considerable scope for this. Obviously many foreign banks are chasing the same business and so we need to demonstrate some competitive or relational advantage. The proposal from the Central Bank was therefore not unwelcome…The Central Bank manages their transactions through Bank Melli London…"
>
> c. "In summary if we can make this business independently profitable and sustainable the benefits that we can derive particularly from the Treasury Asset Management and Investment spin offs will be substantial."

1536. A senior HSBC–US employee received an e-mail on June 28, 2001, titled "*Re: Bank Melli*," which described HSBC–Europe's "usual method" of altering payment order messages and the reasons for doing so. The email was from John Wilkinson, who served as HSBC–Europe's Institutional Banking Relationship Manager for HSBC–Europe's Bank Melli account.

1537. The email explained the "usual method" of altering the wording of Iranian payment order messages, and the rationale for doing so:

---

[182]    An internal HSBC memorandum that was associated with the Bank Melli Proposal also makes clear HSBC's awareness of Defendant Standard Chartered Bank's role as NIOC's primary (Western) banker at the time.

- "Once the proposition goes live, we have instructed Bank Melli to alter the format of its [sic] payments to achieve straight through processing. The field 52 input of 'one of our clients' is a standard phrase used by MPD [Multicurrency Payments Department] in these situations."

- "Since sending the letter we have further asked them to only put 'One of our clients' in field 52, thus removing the chance of them inputting an 'Iranian referenced' customer name, that causes fall out of the cover payment sent to HSBC–US and a breach of OFAC regulations."

1538.   In further support of his position to continue this standard "procedure," Mr. Wilkinson explained that a payment involving an Iranian bank had been blocked because HSBC–Europe's MPD [Multicurrency Payments Department] "failed to spot the poor input and did not follow the normal procedure of altering the payment."

1539.   In other words, the HSBC Defendants' "normal" procedure was to assist Iranian banks, including Bank Melli, to *deliberately* alter payment order messages prior to sending them to New York for the express purpose of avoiding detection and analysis by U.S. banks, regulators, and law enforcement.

1540.   On July 12, 2001, Denise Reilly, HSBC–US's Senior Manager in Payment Operations, sent an e-mail titled "Re: Bank Melli" to various senior HSBC–US employees in which she stated, "It was relayed to us that the Group (with the Backing of Bond) [the Chairman] was looking to significantly grow our presence in Iran." Reilly also explained that the "current lines of credit [for Iran] were reported to be $800m, trade lines of $150m and growth was anticipated in trade, cash management and internet banking."

1541.   Thus, HSBC–US senior employees understood the significance to the HSBC Defendants of their Iranian business and specifically, the HSBC Defendants' relationship with Bank Melli—including as to Iran's oil industry, dominated by NIOC.

1542.   As early as 2001, senior HSBC–US payments, compliance, and business managers were informed that Iranian U.S. dollar payment transactions were being sent by Defendant HSBC–

London to HSBC–US for clearing and settlement in U.S. dollar funds after references to Iran had been deleted.

1543.   HSBC–US employees were also informed of an HSBC–London proposal to streamline the processing of Iranian U-turn transactions by omitting references to Iran so that the payment orders would not be halted by OFAC's sanctions screening filter in the United States. Emails at the time show that senior HSBC–US officials expressed discomfort with the HSBC–London proposal but took no other action to stop or prevent the activity already occurring.

1544.   In an email exchange in October 2001 between David Bagley, Defendant HSBC–Middle East's Regional Head of Legal and Compliance, and Matthew King, a member (and later Head of) HSBC Group's Audit Department, King noted:

> We also have to bear in mind pending US legislation which will in effect give the US extraterritorial authority over foreign banks, particularly if we are unfortunate enough to process a payment which turns out to be connected to terrorism. My own view therefore is that some of the routes traditionally used to avoid the impact of US OFAC sanctions may no longer be acceptable.

1545.   HSBC Group AML Head Susan Wright and Money Laundering Control Officer John Allison received copies of King's e-mail.

1546.   King's email further confirms that senior executives and managers within the HSBC Group comprehended what the HSBC Defendants (and other foreign banks) had "traditionally" been doing for years when they used "routes" (a euphemism for altering payment order messages prior to routing them to U.S. financial institutions through SWIFT) to avoid disclosing a transaction's Iranian connections, and that some of those transactions might prove to be "connected to terrorism."

1547.   Another example of HSBC–US' knowledge and acquiescence in HSBC's assistance to Iran's terror apparatus is memorialized in a November 14, 2002, memorandum entitled

"COMPLIANCE–OFAC ISSUES IN GENERAL AND SPECIFIC TO IRAN" authored by HSBC–London's Multicurrency Payments Department Head Malcolm Eastwood ("the Eastwood Memorandum").

1548. The Eastwood Memorandum was sent to both HSBC–US and HSBC–London employees and forwarded to additional HSBC–US employees in separate emails.

1549. The Eastwood Memorandum discussed both HSBC's "cover payment method" of evading U.S. sanctions and the specific actions HSBC took to modify the contents of payment messages. In relevant parts, the Eastwood Memorandum stated:

- "As the custodian of HSBC–Europe's payments operation I currently feel that we may be exposing ourselves to unnecessary and unacceptable Reputational and Operational Risk when we are handling payments originating from FIs [financial institutions] domiciled in or who are a local branch of an FI domiciled in an OFAC regulated country."

- "HSBC–Europe's historical practice has been to send these types of payments where the U Turn principal applies (i.e. funds are generally moving from an European bank to another European bank for the credit of an OFAC regulated entity) via the Cover Payment method. This means that the payment instructions received by HSBC–US contains no mention of the country or entity involved. My understanding is that this has been accepted practice for many years and that HSBC–Europe IBL hold accounts, some in USD for FIs domiciled in these countries ie Cuban, Iranian etc."

- "The Iranian banks continue to send us what I describe as conditional payment instructions which for HSBC–Europe require an element of amendment by ourselves. This introduces operational risk and under FATF principles we should not be amending these payments instructions. Acceptance of these items over many years means that we are bound by the precedents currently in place, and I believe that we need to break these precedents…"

- "[W]e need…[t]o agree a 'template' payment instruction for these U Turn Payments which can be used by PCM Sales and the RM team and sent to the Iranian Banks stipulating that payments must be formatted in this way, confirming that we will be sending these via the Serial method and that any deviation from this template will be at the Iranian Banks own risk."

- "Whilst I am told that there are significant business opportunities particularly with countries such as Iran there are also substantial Reputational and Operational Risks, not to mention financial losses associated with it."

1550. HSBC–US's OFAC filter occasionally stopped an Iranian-related transaction an HSBC Group affiliate sent in which the identifying information had inadvertently been retained, demonstrating that undisclosed Iranian transactions continued to be sent through HSBC–US correspondent accounts.

1551. A January 2003 memorandum authored by HSBC–Middle East and disseminated to other members of the HSBC Defendants confirms not only the HSBC Defendants' ongoing assistance to IRGC-controlled entities and agents, but also their knowledge of the participation of other Western and Iranian banks, and Iran's desire to further evade U.S. sanctions.

1552. The memorandum stated in relevant part:

- "It is believed that some service providers amend the payments to ensure Iran is not mentioned in the body of the payment instruction to their USD correspondent. This process minimizes the risk of payment being referred to OFAC."

- "Currently, it is estimated that Iranian banks issue up to 700 USD payments a day using their USD providers, mainly banks in the UK and Europe, which in turn use their New York USD correspondents to effect the payments."

- "[T]here is substantial income opportunity to sell a USD payments proposition to Iranian banks in view of the impending FATF regulations...The [requirements of the] new regulations…increases the risk of Iranian payments being held in the USA as they may fall foul of the OFAC regulations. The Iranian Banks have now prioritized this issue and are now actively seeking a solution from their banks, including HSBC."

1553. Under this plan, HSBC knowingly provided illegal banking services to NIOC and other IRGC-controlled entities and agents.

1554. An October 2003 document titled "IRAN—STRATEGY DISCUSSION PAPER"

278

circulated to senior HSBC–US employees further documented the HSBC Defendants' eagerness to facilitate U.S. dollar funds transfers for Iran, noting: "One of the reasons to accelerate our process of engagement is to demonstrate, to the authorities within Iran, that we are committed to the development of their country. This is seen to be particularly important given the more aggressive/pragmatic approach to Iranian business adopted by French and German competitor banks."

1555.   Although HSBC–US periodically complained about Defendants HSBC–Middle East and HSBC–London's conduct and proposed new procedures and policies for HSBC Group members that would have provided HSBC–US improved transparency, HSBC–US continued to assist other HSBC Defendants to launder U.S. dollar transactions on behalf of IRGC-controlled entities and agents and failed to report these criminal activities to its regulators.

1556.   For example:

- In late December 2002, HSBC–US's OFAC sanctions screening filter stopped and rejected a payment order listing Bank Melli as the originator of the SWIFT message that contained a field that read, "**Do not mention our name in NY**."

- An internal HSBC–US email dated December 30, 2002, informed HSBC–US's compliance team about the Bank Melli payment, which once again confirmed the HSBC Defendants' ongoing process of altering payment order messages.

- On June 13, 2003, HSBC–US's OFAC filter stopped another transaction, this time for $150,000 in U.S. dollar funds, because it included both a reference to Bank Melli and the words "*do not mention our name.*"

- In a June 16, 2003, email entitled "PLC–Re do not mention our name," HSBC–US compliance officers were notified about the June 13 blocked transaction and received additional confirmation of the HSBC Defendants' illegal practice of altering fields within Iranian payment order messages for the express purpose of escaping detection in the United States. Yet, HSBC–US did not object, nor did it notify OFAC as it was required to do by law.

- During 2004, HSBC Group members sent approximately *7,000* Iranian Eurodollar transactions through various accounts for clearance and settlement by Defendant HSBC–US and other correspondent banks in the United States without disclosing their source.

1557.  HSBC–US knowingly chose to "look the other way," failing for years to meet its AML, CFT, and OFAC sanctions compliance obligations, knowing that its foreign parent, branches and sister companies were deliberately laundering billions of dollars through its correspondent accounts.

1558.  HSBC–US was legally obligated to adhere to and filter transactions against OFAC's SDN List of prohibited parties in order to screen transactions and halt electronic funds transfers that might violate U.S. sanctions and terrorism and other designations.

1559.  HSBC–US knew that HSBC–London, HSBC–Middle East, and other HSBC affiliates were actively engaged in money laundering on behalf of the IRGC-controlled entities and agents among many other rogue actors, but continued to facilitate that money laundering, providing those HSBC affiliates with vital U.S. dollar clearing and settlement services that made their illegal conduct possible.

1560.  During 2005, HSBC–London and HSBC–Middle East together sent about *5,700* Iranian Eurodollar transactions through various accounts for clearance and settlement by Defendant HSBC–US and other correspondent banks in the United States without disclosing their source and fully aware that such concealment was for the IRGC's benefit and would foreseeably further its violent activities.

1561.  On April 19, 2005, HSBC–US's OFAC filter again stopped a $362,000 payment order from Bank Melli because it contained the phrase "*do not mention our name in New York.*"

1562.   HSBC–London re-submitted the same payment on April 22, 2005, but HSBC–US stopped it again, this time sending HSBC–London a SWIFT message requesting full disclosure of the name and address of the underlying originator and ultimate beneficiary of the U.S. dollar funds.

1563.   In early May 2005, HSBC–US stopped a $6.9 million U.S. dollar payment order originating with Defendant Credit Suisse in Zurich because the SWIFT message details included the phrase "*Bank Melli Iran*."

1564.   In fact, 44 of the payments stopped by HSBC–US's OFAC filter in May 2005 alone (inadvertently) disclosed Iranian involvement.

1565.   On June 3, 2005, HSBC–US informed Defendant HSBC Holdings that HSBC–US had stopped additional HSBC–London transfers in the amounts of $1.9 million and $160,000 due to the lack of full disclosure of the originator, beneficiary, and purpose of the payment transaction.

1566.   HSBC–London responded that both payment orders were foreign exchange related, the originators were Bank Tejarat and Bank Melli,[183] and the beneficiaries of the U.S. dollar funds were Persia International Bank and Defendant Credit Suisse's Zurich office, respectively.

1567.   HSBC–US responded by requesting that HSBC–London follow up with the banks to obtain the names and addresses of the initial originators and ultimate beneficiaries, as well as confirmation of the underlying purpose of the payments.

1568.   According to information provided by Bank Melli through HSBC–London, the $160,000 payment denoted an internal transfer from Bank Melli's U.S. dollar account with HSBC–London to Bank Melli's U.S. dollar account with Defendant Credit Suisse's Zurich office.[184]

---

[183]     HSBC–London also maintained nested U.S. dollar correspondent accounts for Iran's Bank Refah.

[184]     One IRGC method for concealing the movement of NIOC's oil revenues was to credit and debit accounts Bank Melli held at various banks to further layer its transactions.

1569. From July 2005 to June 2006, HSBC–Middle East sent more than 2,500 Iranian U.S. dollar transactions—through its various accounts for clearance and settlement by Defendant HSBC–US and/or other correspondent banks in the United States—that illegally concealed the required data relating to Iran.

1570. On November 23, 2005, in an email titled "Cover payment processed to Credit Suisse re 'Bank Melli'—USD 100,000," an HSBC–US OFAC compliance officer notified HSBC–London that, on November 7, 2005, a $100,000 transaction involving Bank Melli had been processed through HSBC–London's U.S. dollar account at HSBC–US without transparent documentation:

> We are bringing this to your attention as this situation indicates that cover payment involving Iran are still being processed by PLC [referring to HSBC–London]. It was our understanding that Group payments involving Iran would be fully disclosed as to the originators and beneficiaries.

1571. From April 2006 through December 2007, about 50 percent of the estimated *700* Iranian U.S. dollar payment transactions sent by HSBC–London—through its various SWIFT network accounts for clearance and settlement by Defendant HSBC–US and/or other correspondent banks in the United States—continued to not disclose their connection to Iran.

1572. In May 2006, HSBC–US's London branch cleared the sale of gold bullion between two foreign banks for the ultimate benefit of the CBI.

1573. HSBC indicated that it had been aware that the CBI was the beneficiary but had viewed the transaction as a permissible U-turn.

1574. Over the course of the next several years, the HSBC Defendants continued assisting IRGC-controlled entities and agents to evade counterterrorism sanctions.

1575. In an October 9, 2006, email, David Bagley [HSBC–Middle East's Regional Head of Legal and Compliance] informed senior HSBC Group officials that key U.S. policymakers were

"in favour of withdrawing the U-Turn exemption from all Iranian banks. **This on the basis that, whilst having direct evidence against Bank Saderat particularly in relation to the alleged funding of Hezbollah, they suspected all major Iranian State-owned banks of involvement in terrorist funding and WMD [weapons of mass destruction] procurement**." (Emphasis added.)

1576.   Further demonstrating his awareness of the risks with which HSBC was engaging, Mr. Bagley was listed as the contact person on the April 19, 2007, Wolfsberg Group press release calling for more transparency for international wire transfers "to promote the effectiveness of global anti-money laundering and anti-terrorist financing programs."

1577.   Two months later, in a June 8, 2007, e-mail, Mr. Bagley informed HSBC Holding's CEO, Michael Geoghegan, and others, that "[U.S. Treasury Under Secretary for Counter Terrorist Financing and Sanctions] Levey essentially threatened that if HSBC did not withdraw from relationships with [redacted] we may well make ourselves a target for action in the US."

1578.   Mr. Bagley's email thus confirmed that various HSBC relationships continued to exist in the Eurodollar market with Iranian banks, including Bank Saderat.

1579.   Mr. Bagley not only acknowledged that HSBC had "…an agency banking relationship in HSBC–EUROPE both for [redacted] and other Iranian banks," but he confessed that "[t]here are further complications surrounding the process of closure with all Iranian banks as we have some USD 9m in reimbursements due from Sepah, where we are running off trade lines, where we may need cooperation from Central Bank of Iran."

1580.   Thus, during the Relevant Period, the HSBC Defendants knew that Iran was a designated State Sponsor of Terrorism, that particular Iranian entities were designated by the United States for their roles in Iran's terrorism apparatus (run by the IRGC), that the "OFAC list" included such entities, and that HSBC–US's U.S. dollar clearing and settlement operations were

being used by the HSBC Defendants to facilitate unlawful U.S. dollar transactions in support of Iran's financing of terrorism and weapons proliferation.

1581.   On December 11, 2012, the U.S. Department of Justice ("DOJ") announced that Defendants HSBC Holdings and HSBC–US had admitted to Anti-Money Laundering ("AML") and OFAC sanctions violations. As part of the DOJ's investigation, HSBC had agreed to enter into a Deferred Prosecution Agreement and pay a $1.256 billion forfeiture. As explained further *infra*, DOJ issued a press release announcing the DPA and summarizing the HSBC Defendants' illegal conduct.

1582.   In connection with the DPA, DOJ filed a four-count felony criminal information against HSBC Holdings and HSBC–US, charging them with: (1) willfully failing to maintain an effective AML program; (2) willfully failing to conduct due diligence on their foreign correspondent affiliates; (3) violating the International Emergency Economic Powers Act ("IEEPA"); and (4) violating the Trading with the Enemy Act ("TWEA"). HSBC Holdings and HSBC–US waived federal indictment, agreed to the filing of the information, and claimed to have accepted responsibility for HSBC's and its employees' criminal conduct.

1583.   DOJ issued a press release announcing the 2012 DPA's entry, including the fact that the DPA resulted in HSBC Holdings and HSBC–US admitting to AML and sanctions violations, as well as the fact that they would pay a $1.256 billion USD forfeiture. The DPA specifically noted that the settlement was part of "[t]he fight against … terror financing …."

1584.   In addition to the $1.256 billion forfeiture under the DPA, HSBC Holdings and HSBC–US also agreed to pay $665 million in civil penalties—$500 million to the OCC and $165 million to the Federal Reserve—for the HSBC Defendants' AML/CFT program violations with Iran, other sanctioned countries, and transnational drug cartels. DOJ's press release announcing

the DPA quoted then-United States Attorney for the Eastern District of New York Loretta Lynch as stating:

> HSBC's willful flouting of U.S. sanctions laws and regulations resulted in the processing of hundreds of millions of dollars in OFAC-prohibited transactions. Today's historic agreement, which imposes the largest penalty in any [Bank Secrecy Act] prosecution to date, makes it clear that all corporate citizens, no matter how large, must be held accountable for their actions.

1585.   Then-Manhattan District Attorney Cyrus R. Vance Jr. was quoted in a press release announcing the DPA as stating:

> New York is a center of international finance, and those who use our banks as a vehicle for international crime will not be tolerated. … Sanctions enforcement is of vital importance to our national security and the integrity of our financial system. The fight against money laundering and terror financing requires global cooperation, and our joint investigations in this and other related cases highlight the importance of coordination in the enforcement of U.S. sanctions.

## 2.      Zarrab Money Laundering Network

1586.   Reza Zarrab's role as a money launderer for IRGC-controlled entities is described above.

1587.   Consistent with its policy of assisting IRGC-controlled entities and agents launder U.S. dollar funds, HSBC–Middle East maintained one or more accounts for Hanedan General Trading LLC, a Dubai-based company owned by Mohammad Zarrab, Reza Zarrab, Camelia Jamshidy, and Hossein Jagafzadeh.

1588.   It was part of a network of companies that used the U.S. financial system to conduct hundreds of millions of dollars' worth of transactions on behalf of IRGC-controlled entities, laundering funds and concealing their true nature.

1589.  Between 2010 and 2015, HSBC–Middle East transferred $15 million through New York in furtherance of Hanedan General Trading's sanctions evasion enterprise, much of it during the Relevant Period.[185]

1590.  As noted above, Reza Zarrab's criminal activity became public in December 2013 when he was arrested in Turkey as part of a widely publicized probe of corruption, gold smuggling, and money laundering. Although he was released after the investigation was quashed, a detailed law enforcement investigative report was leaked to Turkish media in 2014, spelling out his illegal activities.

1591.  Nevertheless, HSBC continued to assist Hanedan General Trading through 2015.

### 3.  HSBC Knowingly Provided Substantial Assistance to Hezbollah Money Launderers and Super Facilitators

#### a.  Kaloti

1592.  Kaloti's role as money launderers for Hezbollah and IRGC-controlled individuals and entities is described above.

1593.  As noted, the HSBC Defendants assisted the Kaloti money laundering enterprise which laundered money for Hezbollah (among others) and continued to do so even after numerous public sources identified Kaloti as a major money laundering enterprise. Even after multiple SARs made clear that every aspect of its financial dealings with commercial banks raised massive red flags, Kaloti's chairman, Munir Ragheb Al-Kaloti, boasted in 2014 that it continued to work with "some of the world's largest bullion banks" including HSBC.

#### e.  Tajco

1594.  On December 9, 2010, the U.S. Department of Treasury designated Tajco, describing it as "a multipurpose, multinational business venture involved in international trade as

---

[185]    The IRGC's Mahan Air was one of the beneficiaries of Hanedan General Trading's money laundering efforts.

well as real estate and presided over by Ali Husayn and Kassim Tajideen…. Since at least December 2007, Ali Tajideen used Tajco Sarl, operating as Tajco Company LLC, as the primary entity to purchase and develop properties in Lebanon on behalf of Hezbollah."

1595.   The designation also covered Kairaba Supermarket, a subsidiary business of Tajco LTD.

1596.   A July 13, 2012, article published by *Reuters* entitled "Special Report: HSBC's Money-Laundering Crackdown Riddled With Lapses" reported that an HSBC–US compliance officer had identified suspicious transactions involving Hezbollah, specifically Tajco and Kairaba Supermarket.

1597.   In December 2013, the Department of Treasury announced that Defendant HSBC–US agreed to remit $32,400 to settle potential civil liability for three apparent violations of the Global Terrorism Sanctions Regulations, 31 C.F.R. Part 594.

1598.   The fine reflected the fact that HSBC–US facilitated Eurodollar transactions in late 2010 and early 2011 worth about $40,000 U.S. dollars that benefited Tajco.

## C.   DEFENDANT COMMERZBANK AG'S KNOWING AND SUBSTANTIAL ASSISTANCE TO THE IRGC AND HEZBOLLAH

1599.   Like the other Defendants in this Action, Commerzbank consciously and culpably participated in the IRGC's wrongdoing. Specifically, Commerzbank knowingly and actively provided the IRGC with pervasive and systemic assistance by working hand-in-glove with the CBI and its Iranian bank agents to fund Iran's terror apparatus.

1600.   Commerzbank did so by assisting the IRGC evade U.S. counterterror financing sanctions through its special relationship with the CBI and IRGC-selected Iranian banks and move large sums of money through the U.S. and global financial system while purposefully blinding U.S. regulators, law enforcement, and financial institutions to the IRGC's activities.

1601. For example, Commerzbank assisted the IRGC and Hezbollah by intentionally helping Bank Saderat evade U.S. sanctions *after* the U.S. designated the bank for "for allegedly funding terrorism." As described herein, Bank Saderat was not only a key element of the IRGC sanctions evasion conspiracy, it transferred funds worth at least $50 million U.S. dollars at the IRGC's behest from the CBI in via London to Hezbollah in Lebanon.

1602. And as described in the next section, Commerzbank also provided substantial, direct and illegal banking services to a Hezbollah fundraising front *after* it was publicly identified as a Hezbollah fundraiser by the German government and it transferred money to one of Hezbollah's core organizations *after* it was designated a SDGT by the United States.

1603. Commerzbank also directly coordinated with and provided substantial assistance to IRISL by laundering millions of dollars through the United States despite the fact that IRISL was Iran's primary means of transporting both conventional and non-conventional weapons. Commerzbank did so for years, even after the United States designated IRISL and its fronts for its illicit and violent activities.

1604. Indeed, U.S. State Department diplomatic cables even warned that IRISL was transferring weapons that "are being used against U.S. and Coalition Forces in Iraq…."

1605. As noted in a criminal information entered in connection with, as discussed below, a March 11, 2015, Deferred Prosecution Agreement between Defendant Commerzbank and DOJ:

> COMMERZBANK AG and others…unlawfully, willfully and knowingly combined, conspired, confederated and agreed with one another and with others to commit offenses against the United States, that is, to engage in financial transactions with Sanctioned Entities and SDNs in violation of IEEPA, and the executive orders and regulations issued thereunder.… The goal of the conspiracy was for COMMERZBANK and others…to enrich themselves by engaging in a conspiracy and a scheme to violate IEEPA, and the executive orders and regulations issued thereunder. A further goal of the conspiracy was for COMMERZBANK and others…to violate executive

orders and regulations prohibiting the exportation, directly and indirectly, of services from the United States to Sanctioned Entities and SDNs.

1606.   Like many of the other Defendants who provided substantial assistance to the IRGC and Hezbollah, Commerzbank adopted a variety of methods to facilitate the IRGC's terror financing.

1607.   In particular, Commerzbank worked with Bank Melli, Bank Saderat and others to facilitate that terror financing by stripping, altering, or changing tens of thousands of SWIFT messages.

1608.   Since 2002, Commerzbank also appears to have engaged in various illegal gold transactions on behalf of the CBI, including trading orders through its New York branch while disguising the Iranian source of the trades. As noted above, even when the IRGC is not involved, financial transactions involving gold and other precious metals pose a high-risk for money laundering.

1609.   A March 2015 amended complaint filed in a *qui tam* case against Defendant Commerzbank stated that:

> the gold trade has been essential to Iran's withstanding the increasingly restrictive U.S. sanctions. It has a substantial amount of gold reserves, amounting to $112 billion in gold, which it accumulated in part by trading oil for gold. It used gold to preserve its wealth especially to withstand the devaluation of its currency and to engage in trading that would bypass U.S. sanctions.[186]

1610.   On April 17, 2003, Commerzbank finalized a policy document entitled "Routing Instructions Iranian banks for USD payments." This policy admonished employees to "[u]nder no circumstances mention the Iranian background in the cover order." In other words, the German-

---

[186]     In July 2015, Commerzbank settled the *qui tam* case, No. 13-cv-8095 (S.D.N.Y. 2013), for approximately $866,000.

based recipients of this policy were instructed to never mention Iranian customers nor Iranian connections to any payment messages sent to the United States.

1611. Taking advantage of the fact that Lloyds and other competitors were exiting the Iran market, Commerzbank solicited more Iranian clients.

1612. The resulting increase in the volume and significance of Iranian business at Commerzbank led to the establishment of a centralized process for handling certain Iranian Eurodollar payments within Commerzbank, and the Defendant designated one group of employees within Commerzbank's Frankfurt Back Office to manually process those payments. The task of this group was to review payments and amend them if necessary, to ensure that they would not get stopped by OFAC filters when sent to financial institutions in the United States, including Commerzbank's New York branch.

1613. This increase in volume was in part due to illicit trade-finance, foreign exchange, and U.S. dollar transactions undertaken by Commerzbank on behalf of Bank Melli, Bank Saderat and others.

1614. In July 2003, a Back Office employee emailed other bank employees explaining that two state-owned Iranian banks, Bank Melli and Bank Saderat, wanted to begin routing their entire USD funds clearing business through Commerzbank. The Back Office employee closed his email by writing, "If for whatever reason [Commerzbank] New York inquires why our turnover has increase [sic] so dramatically under no circumstances may anyone mention that there is a connection to the clearing of Iranian banks!!!!!!!!!!!!!" (Exclamation marks in the original.)

1615. On September 17, 2003, a Back Office employee sent an email advising a major Iranian bank that maintained a U.S. dollar account with Commerzbank to list "non ref" in the ordering party field in all of its future payment messages.

1616.   The author of the email had tested Commerzbank's compliance systems in Frankfurt and knew that writing "non ref" would trigger a manual review of the payment, thereby enabling Commerzbank personnel to ensure that the messages did not contain any information revealing the true Iranian involvement in the transaction.

1617.   In fact, Commerzbank personnel explained to employees of Iranian bank clients the kinds of information that could lead to payments being delayed, rejected, or blocked within the United States, and encouraged the Iranian banks to omit this type of information from their payment orders so that Commerzbank employees would not have to manually remove it.

1618.   On October 13, 2003, the Head of Commerzbank's Internal Audit division emailed a member of Commerzbank's senior management advising that Iranian bank names in payment messages transiting through the United States were being "neutralized" and warned that "it raises concerns if we consciously reference the suppression of the ordering party in our work procedures in order to avoid difficulties in the processing of payments with the U.S.A."

1619.   On November 19, 2003, a memo was circulated to senior management memorializing the internal rules Commerzbank had developed for processing Iranian Eurodollar payments, including using MT–202 cover transactions (i.e., splitting a payment into two messages and sending a MT–103 to the foreign (non-U.S.) branch of the beneficiary and an MT–202 to the clearing institution in the United States), and using serial MT–103 messages that manually replaced the name of the (Iranian) ordering party with the bank code for Commerzbank Frankfurt to avoid detection by U.S. authorities.

1620.   It appears that Commerzbank may have ceased stripping some Eurodollar transactions in July 2004, relying instead primarily on cover payments (MT–202 payment order messages) to effectuate its unlawful conduct. At the same time, Commerzbank conspired with

Bank Melli to facilitate over 100 checks totaling approximately $2 million in U.S. dollar funds that Commerzbank issued for illegal payments in the United States.

1621.  DOJ described "the rigor with which the Bank enforced the policy during this period" by citing an email from a Back Office employee who wrote about Commerzbank's procedures for facilitating the IRGC's sanctions evasion conspiracy which stated: "NO EXPERIMENTS PLEASE!!! Have fun with this and greetings." (Emphasis in the original.)

1622.  This ongoing conduct involving both "stripping" Eurodollar transactions and converting otherwise transparent MT–103 SWIFT messages into opaque MT–202 cover transactions resulted in tens of millions of dollars being illegally transferred on Iran's and the IRGC's behalf.

### 1.  Commerzbank Knowingly Provided Substantial Assistance to the IRISL

1623.  Parallel to its illegal conduct on behalf of Iranian banks directed by the IRGC, Commerzbank also directly coordinated with IRISL in laundering U.S. dollars through the United States between 2002 and 2008 (and upon information and belief, even later).

1624.  In January 2005, Commerzbank's New York branch rejected a series of payment transactions on behalf of Lancelin Shipping Company LTD, an IRISL-formed entity registered in Cyprus, because the payment messages contained references to IRISL Europe GmbH, a wholly owned IRISL subsidiary registered in Hamburg and designated by the United States in 2008.

1625.  This prompted a direct meeting between the relationship managers in Commerzbank's Hamburg branch and employees from IRISL on January 24, 2005.

1626.  A memorandum summarizing the meeting noted that: "[d]ue to the tense political relations between Iran and the U.S., sanctions that have existed for some years against Iran and Iranian companies have been tightened…. *The number of rejected payments recently increased*

*sharply since the word 'IRISL' results in inquiries at foreign banks.* Based on inquiries from Commerzbank, New York we assume that it appears as a term on the embargo list." (Emphasis in the original.)

1627.  In a written presentation that Commerzbank delivered to IRISL on January 25, 2005, following the in-person meeting, the Hamburg relationship manager stated: "*[t]he current rejections show that IRISL is in the OFAC list*." (Emphasis in the original.)

1628.  The presentation then explained that "payments which are sent through a … subsidiary are unlikely to be rejected to our present knowledge."

1629.  Commerzbank ultimately adopted a process it termed a "safe payments solution" by which IRISL initiated Eurodollar funds transfers through the U.S., using the accounts of less conspicuous subsidiaries to prevent its New York branch or other clearing banks from flagging IRISL U.S. dollar transactions.

1630.  Moreover, to assist IRISL in its bookkeeping, Commerzbank would sweep those accounts daily and zero them out so that IRISL could keep track of which U.S. dollar funds belonged to it—as opposed to its subsidiaries.

1631.  On April 18, 2006, Commerzbank's New York branch rejected a Eurodollar payment on behalf of Lancelin, citing "US sanctions against Iran." As a result, Commerzbank altered the structure of the "safe payment solution," suggesting the use of two other subsidiaries to process payments on behalf of IRISL and IRISL Europe GmbH.

1632.  In fact, in only four months *following* IRISL's U.S. designation in 2008, Commerzbank illegally transferred almost $40 million on behalf of IRISL subsidiaries and related entities through Commerzbank's New York branch and other U.S. financial institutions.

1633.    These post-designation Eurodollar transactions, laundered by Commerzbank through the U.S. financial system, were self-evidently *not* for the benefit of a legitimate agency, operation, or program of Iran.

1634.    Only months earlier, a U.S. State Department diplomatic cable warned of an IRISL-flagged vessel in China loaded with cargo containing weapons for Iran's Defense Industries Organization ("DIO") which, among other things, answers to the IRGC and helped it supply weapons to its proxy groups in Iraq.

1635.    The 2008 diplomatic cable further warned of the dangers of ongoing conventional arms transfers from China to Iran, "particularly given Iran's clear policy of providing arms and other support to Iraqi insurgents and terrorist groups like the Taliban and Hezbollah…. We have specific information that Chinese weapons and components for weapons transferred to Iran are being used against U.S. and Coalition Forces in Iraq, which is a grave U.S. concern."

1636.    Less than a year after Commerzbank in Hamburg provided IRISL with at least $40 million in illegal (post-designation) U.S. dollar transactions in October 2009, U.S. troops boarded a German-owned freighter, the *Hansa India*, in the Gulf of Suez and found eight containers full of ammunition and headed to Syria from Iran.

1637.    The *Hansa India* was registered to the Hamburg-based shipping company Leonhardt & Blumberg but had in fact been under charter to IRISL for several years and was used by the IRGC.

1638.    The *Hansa India* carried seven containers of small arms ammunition, as well as one container containing copper discs, which constitute, as noted supra, a key component in EFPs used to kill and maim many of the Plaintiffs herein.

1639. Although Commerzbank worked to shield its New York branch from knowing all of the details of its illicit activities on behalf of Iran and IRISL, Commerzbank's New York branch was nonetheless aware that it was being used to facilitate unlawful conduct.

1640. For example, in June 2006, in response to a request asking if there were any concerns they wanted her to share with the new Global Head of Compliance in Germany, a New York compliance employee responded "[p]ersistent disregarding of OFAC rules by foreign branches. Hamburg is notorious for it."

1641. In February 2007, Commerzbank's then Chief Executive Officer Klaus–Peter Mueller and Board Member Martin Blessing met with U.S. Treasury Deputy Secretary Robert Kimmitt. In the meeting, Mueller complained about the portrayal of Commerzbank by *The Wall Street Journal* (in a January 2007 article) which he said made it appear that the bank was trying to evade sanctions on Iran. "This," claimed Mueller "is far from the case."

1642. The *Wall Street Journal* reported on January 10, 2007, that "Commerzbank AG, Germany's second largest bank, said it will stop handling dollar transactions for Iran at its New York branch by Jan. 31." It went on to report that "[a]t present, Commerzbank handles both dollar and euro transactions for Iran's state-owned banks. Like several other European banks, it will cease handling only dollar transactions."

1643. The *Wall Street Journal* article went on to report:

> 'The risks of doing business with Iran are the same in all currencies,' said Mr. [Stuart] Levey. Intelligence officials say Bank Saderat, a large, state-controlled Iranian bank placed on a U.S. Treasury blacklist in October for allegedly funding terrorism, has been able to process dollar transactions through Commerzbank's New York branch in recent months by using the accounts of two other Iranian banks. Commerzbank says it ceased dealing with Saderat after it was put on the U.S. blacklist and has no knowledge of any subsequent transactions. 'Commerzbank has no knowledge of Bank Saderat directly or indirectly using the accounts of other Iranian banks to process dollar transactions,' the bank said in a statement. Commerzbank, in

a response to an inquiry from *The Wall Street Journal* about its dealings with Iran, also said 'all such [dollar clearing] transactions are currently being phased out' as of Jan. 31. It added that 'any clearing conducted by our U.S. operations is in strict compliance' with U.S. government regulations.

1644. Commerzbank's assurances to the *Wall Street Journal,* like its assurances to U.S. Treasury Deputy Secretary Robert Kimmitt, were plainly false.

1645. As noted above, on September 10, 2008, the U.S. designated IRISL, IRISL Europe GmbH, and several IRISL subsidiaries based on evidence that the IRISL network of companies was engaged in WMD proliferation activity and the fact that "IRISL has pursued new strategies which could afford it the potential to evade future detection of military shipments."

1646. The next day, on September 11, 2008, a senior official at OFAC personally forwarded the press release announcing IRISL's SDN designation to the Head of Compliance at Commerzbank in New York.

1647. The press release was then forwarded to Commerzbank employees in Germany with responsibilities related to IRISL. In the email, the relationship manager noted that the U.S. government alleged "that IRISL as Iranian government carrier systematically circumvents the Iranian arms embargo."

1648. Nonetheless, between September 10, 2008, and December 31, 2008, alone, Commerzbank illegally processed Eurodollar transactions worth close to $40 million U.S. dollars on behalf of IRISL subsidiaries and related entities through the United States.

## 2. Waisenkinderprojekt Libanon e.V. ("The Orphans Project Lebanon")

1649. The Orphans Project Lebanon was, until its closure in 2014, the German branch of Hezbollah's Martyrs Foundation and responsible for collecting donations in Germany and transferring those funds to Hezbollah in Lebanon.

1650.   It was founded in Germany in 1997 and, during the Relevant Period, it transferred several million dollars to Hezbollah's Martyrs Foundation in Lebanon through Commerzbank.

1651.   The director of the Orphans Project Lebanon was Dr. Hisham Jamil Hassan, a Lebanese national and surgeon who held two private accounts with Hezbollah's unofficial bank, Al Qard al Hassan. He also maintained four accounts designated in his capacity as a member of Hezbollah.

1652.   The Orphans Project Lebanon's registration as an association in Stuttgart, Germany (registered under the number VR 6074) stated that should the Orphans Project Lebanon be dissolved, its assets would be transferred to the Martyrs Foundation.

1653.   Orphans Project Lebanon did not attempt to conceal its association with Hezbollah's Martyrs Foundation.

1654.   For example, as of 2002, Orphans Project Lebanon's website stated its affiliation with the Martyrs Foundation, declaring: "[W]e work closely with the Aschahid [i.e., al-Shahid or Martyrs] Association in Beirut. This organization is a committed and reputable institution that supports children and families of war victims through sponsorships as well as projects to promote education and medical care. The Orphan Child Project Lebanon e.V. has set itself the task of promoting the projects of the Aschahid Association and making them known in Germany."

1655.   As of 2004, Orphans Project Lebanon's website stated (in English) that "Ashahid is an integer [sic] and highly committed organization which assists children and families of victims of war with its sponsorship – educational – and medical programs. The orphans project has committed itself to making the Ashahid Association known in Germany and to support its projects."

1656.  By at least 2005, Orphans Project Lebanon's website was also providing direct contact information for the Martyrs Foundation, including its website.



1657.  Martyrs Foundation–Lebanon is controlled and operated by Hezbollah and is one of the most open and notorious Hezbollah institutions in Lebanon.[187]

1658.  The U.S. Department of Treasury has described the Martyrs Foundation–Lebanon as "openly affiliated with Hezbollah."[188]

1659.  Hezbollah has openly, publicly, and repeatedly acknowledged and publicized that the Martyrs Foundation belongs to and is a part of Hezbollah, including on its official websites, in official press releases issued by Hezbollah, on Hezbollah's official television station, Al-Manar, on Hezbollah's official radio station, Al-Nour, and in numerous press conferences and news media interviews conducted by senior Hezbollah officials.[189]

---

[187]    *See also* Second Amended Complaint, *Kaplan v. Lebanese Canadian Bank, SAL,* No. 08-cv-07253 (S.D.N.Y. 2018), ECF No. 99, describing public sources identifying the Martyrs Foundation with Hezbollah and its terrorist activities, incorporated herein.

[188]    *See* Press Release, *Treasury Labels Bank Providing Financial Services to Hizballah as Specially Designated Global Terrorist*, U.S. Dep't of Treasury (Aug. 29, 2019), https://home.treasury.gov/news/press-releases/sm760.

[189]    For example, on November 7, 2003, the *BBC Worldwide Monitoring* service published an English-language transcript of a November 3, 2003, broadcast on Hezballah's *Al-Manar* television station of a Martyrs Foundation event at which the Secretary General of Hezbollah, Hassan Nasrallah, presided. *See*, BBC Worldwide Monitoring, Lebanese Hezbollah Leader Discusses Bush's Speech, Democracy in Mideast (2003).

1660.  The Martyrs Foundation's purpose is to provide financial and other material support to Hezbollah terrorists wounded in action, and to the families of Hezbollah terrorists killed in action. The purpose of that funding and support is to "provide peace of mind to current and prospective" Hezbollah terrorists, "by knowing that they and their families will be cared for in the event of death or injury."[190]

1661.  The Martyrs Foundation's affiliation with Hezbollah was not only widely known in Lebanon. For example, as early as October 1991, The *Independent* newspaper (published in London) reported that the Martyrs Foundation supplies stipends to the families of Hezbollah terrorists.

1662.  Similarly, on May 30, 2000, The *Irish Times* published an article reporting that Hezbollah operatives, including personnel "from the Martyrs' Foundation," were moving into parts of Southern Lebanon.

1663.  On December 30, 2004, *Slate* Magazine published an article about Hezbollah's television station, Al-Manar, noting that "[a]n Al-Manar public service message tells families of suicide bombers where to go to collect the subsidy from a martyrs' foundation."[191]

1664.  Similarly, in February 2005, counterterrorism expert Dr. Matthew Levitt published an article on the website of the Washington Institute for Near East Policy, which confirmed that Shahid [the Martyrs Foundation] provides funds for Hezbollah terrorists.

1665.  The Martyrs Foundation glorifies death in jihad by cultivating Hezbollah's "cult of the martyr."

---

[190]  Major James B. Love, *Hezbollah: Social Services as a Source of Power*, U.S. JOINT SPECIAL OPERATIONS UNIVERSITY, at 21–24 (2010).

[191]  *See* Jack Shafer, *Who's Afraid of Hezbollah TV?* SLATE MAGAZINE (Dec. 30, 2004).

1666. For example, the Martyrs Foundation's own official website in February 2006 explained that "the culture of jihad and martyrdom was at the heart of the institution's message and promotion as a target for its various works, activities and programs" and that the foundation's aims included "supporting the march of the Islamic resistance in Lebanon."

1667. The Martyrs Foundation's stated purpose since its inception has been to help Hezbollah wage jihad against the perceived enemies of Shi'a Islam.

1668. Its website openly (and prominently) quoted Hezbollah leader Hassan Nasrallah offering his gratitude to donors for giving money to the "martyrs' children who are truthful to their covenant with Allah."

1669. The Martyrs Foundation–Lebanon was designated an SDGT by the U.S. Department of Treasury on July 24, 2007.[192]

1670. According to the U.S. Department of Treasury, "Martyrs Foundation branches in Lebanon has also provided financial support to the families of killed or imprisoned Hezbollah [sic]… In addition to fundraising responsibilities, senior Martyrs Foundation officials were directly involved in Hezbollah operations against Israel during the July–August 2006 conflict."

1671. The U.S. Department of Treasury also found that:

> [T]he Martyrs Foundation is an Iranian parastatal organization that channels financial support from Iran to several terrorist organizations in the Levant, including Hezbollah, Hamas, and the Palestinian Islamic Jihad (PIJ). To this end, the Martyrs Foundation established branches in Lebanon staffed by leaders and members of these same terrorist groups. Martyrs Foundation branches in Lebanon has also provided financial support to the families of killed or imprisoned Hezbollah and PIJ members, including suicide bombers in the Palestinian territories.

---

[192] *See* Press Release, *Twin Treasury Actions Take Aim at Hizballah's Support Network*, U.S. DEP'T OF TREASURY, (Jul. 24, 2007), https://home.treasury.gov/news/press-releases/200772412472214594.

1672.   Alexander Ritzmann, Senior Fellow at the European Foundation for Democracy, testified before the U.S. House Foreign Affairs Subcommittee on Europe on June 20, 2007, that Hezbollah activists "financially support Hezbollah in Lebanon through fund-raising organizations, such as the 'Orphans Project Lebanon Association.' This harmless-sounding charity belongs to the Lebanese al-Shahid (the Martyr) Association, which is part of the Hezbollah network that supports the families of militia fighters and suicide bombers."

1673.   In January 2008, the German newspaper *Die Welt* reported that Orphans Project Lebanon e.V. collected donations in Germany and belonged to the Lebanese "Al-Shahid (The Martyr) Association," which in turn is affiliated with Hezbollah.

1674.   During this same time period when Orphans Project Lebanon was proudly proclaiming its affiliation with the Martyrs Foundation on its website, Commerzbank maintained account number ending in 1688 for the Orphans Project Lebanon and transferred millions of dollars on its behalf, knowing that it was Hezbollah's fundraising organization in Germany.

1675.   Commerzbank did so despite multiple (public) German government reports identifying its customer as a Hezbollah fundraising organization as well as press reports to the same effect. It also did so despite the fact that the primary recipient of funds donated from the account—Hezbollah's Martyrs Foundation—was designated by the United States as an SDGT on July 24, 2007.

1676.   For example, the 2003 report publicly issued by the Baden–Württemberg State Office for Protection of the Constitution (one of the security services for the German states) found:

> 'Hezbollah' has an extensive network of charitable institutions in which not only Shiites find support.… Funding is also done through donations made by certain organizations who collect funds from abroad. This includes, for

example, the 'Orphans Project Lebanon e.V.' which is active in Baden–Württemberg.[193]

1677.    The following year, the Bremen State Office for the Protection of the Constitution issued a public report finding that:

> The 'Orphans Project Lebanon' exists in Germany since 1993 and cooperates closely with the Hezbollah organization—'Ashahid Association' (Martyrs Foundation). It is a welfare organization within the Hezbollah Network which tasks are the support of family members of martyrs, war wounded and prisoners and arranging sponsors for martyrs' orphans.[194]

1678.    The Bremen State Office for the Protection of the Constitution issued another public report in 2009 once again noting the link between Orphans Project Lebanon and the Martyrs Foundation, which it described as providing support for the fallen in Hezbollah's armed struggle against Israel.[195]

> In sum, Orphans Project Lebanon's affiliation with the Martyrs Foundation and Hezbollah was conspicuous, open, and well documented throughout the relevant period. Nevertheless, Commerzbank knowingly provided financial services for the benefit of an integral part of Hezbollah throughout the relevant period, thereby assisting Hezbollah to raise and transfer funds that foreseeably enabled Hezbollah to operate and enhanced its ability to carry out terrorist attacks.

---

[193]    *See* BREMEN STATE OFFICE FOR THE PROTECTION OF THE CONSTITUTION, SECURITY SERVICE REPORT (2003) (in German), https://hdms.bsz-bw.de/frontdoor/deliver/index/docId/374/file/Verfassungsschutzbericht_2003.pdf.  A year earlier, the same office in Baden-Württemberg publicly identified "Orphan Child Project Lebanon e.V." as an organization associated with Hezbollah (while noting Hezbollah's recent emphasis on its role as a parliamentary party to play down its identity as a "terrorist organization").

[194]    *See* BREMEN STATE OFFICE FOR THE PROTECTION OF THE CONSTITUTION, SECURITY SERVICE REPORT (2004) (in German), https://www.verfassungsschutz.bremen.de/sixcms/media.php/13/VS-Bericht%202004.pdf.

[195]    On August 1, 2009, the *Jerusalem Post* published an article citing a European Foundation for Democracy report identifying Orphans Project Lebanon as "the German branch of a Hizbullah suborganization" which "promotes suicide bombings."

1679.   Orphans Project Lebanon was also implicated in the 2007–2008 recruitment of a medical student in Goettingen, Germany, who was arrested in Israel for spying on behalf of Hezbollah.[196]

1680.   On February 13, 2009, Deputy Secretary General of Hezbollah Sheikh Naim Qassem spoke at a celebration held by the Institute and College of the Greatest Messenger of the Martyrs Foundation "in memory of the martyrs, leaders of the Islamic Resistance."

### D.    DEFENDANT CREDIT SUISSE KNOWINGLY PROVIDED SUBSTANTIAL ASSISTANCE TO THE IRGC AND HEZBOLLAH

1681.   Like the other Defendants in this Action, Credit Suisse consciously and culpably participated in the IRGC's wrongdoing. Specifically, Credit Suisse knowingly and actively provided the IRGC with pervasive and systemic assistance by working hand-in-glove with NIOC and the CBI and its Iranian bank agents to fund Iran's terror apparatus.

1682.   Credit Suisse did so by assisting the IRGC evade U.S. counterterror financing sanctions through NIOC, the CBI, and IRGC-selected Iranian banks, including Bank Saderat and Bank Melli, and moved large sums of money through the U.S. and global financial system while purposefully blinding U.S. regulators, law enforcement, and financial institutions to the IRGC's activities.

1683.   Credit Suisse also knowingly substantially assisted the IRGC and Hezbollah by facilitating Mahan Air's (SDGT) illegal purchases of U.S. aircraft and aircraft parts.

1684.   As stated above, Mahan Air was a key player in the IRGC's and Hezbollah's operations. According to the U.S. government, Mahan Air "facilitated the covert travel of suspected IRGC–QF officers into and out of Iraq," "facilitated IRGC–QF arms shipments," and

---

[196]     *See* DER SPIEGEL (Aug. 7, 2008) (also noting that the organization is "suspected of collecting money for Hezbollah").

transferred funds "for the procurement of controlled goods by the IRGC–QF." It also "transported personnel, weapons and goods on behalf of Hezbollah."

1685.   For instance, Mahan Air specifically shipped equipment and electronic components later recovered by U.S. forces from IEDs in Iraq.

1686.   Facilitating these transactions reflected especially conscious and culpable conduct because it involved assisting Iran in acquiring export-controlled items—that is, items that had obvious and tangible uses that could facilitate terrorism and weapons proliferation. Credit Suisse surreptitiously moved tens of millions of dollars for the benefit of Mahan Air, which was effectively IRGC's civilian aviation wing, to obtain these restricted goods, as transaction records would have made clear. (Credit Suisse also held an account for Monarch Aviation, whose owners were later arrested for supplying Iran with military helicopters and equipment).

1687.   For example, Bank Melli issued a Letter of Credit to Mahan Air in August 2004 through Standard Chartered Bank, Dubai in favor of a UAE-based company called Aeronautical & Security for the shipment of an aircraft engine (identified by model number CF6–50C2) manufactured by General Electric and shipped from Luxemburg to Tehran, Iran.

1688.   Bank Melli UAE instructed Credit Suisse–Zurich to make the payment, which in turn instructed Bank of New York in New York (one of Credit Suisse's U.S. clearing and settlement banks) to credit SCB–New York for further credit to the account of SCB–Dubai, which then credited Aeronautical & Security's U.S. dollar bank account.

1689.   The following flow-chart shows the overall flow of funds through the Eurodollar payment system which supported Mahan Air's illegal acquisition of a U.S.-manufactured, export-controlled aircraft engine:

**MAHAN AIR ACQUIRES AN AIRCRAFT ENGINE**

1690.    In another example, Bank Refah Kargaran, Iran issued a U.S. dollar-denominated Letter of Credit to a MODAFL sub-agency through SCB–Dubai in favor of a Dubai-based company called FP Aeroparts for the illegal shipment (via Iran Air) of U.S. export-controlled aircraft parts.

1691.    Bank Melli served as the Reimbursing Bank on the trade-finance transaction, and it subsequently instructed Credit Suisse, Zurich to debit its U.S. dollar account as part of the flow of U.S. dollar funds between the LCs counterparties.

1692.    As the LC transaction proceeded, Credit Suisse then further instructed The Bank of New York to pay SCB–New York (the clearing bank for the transaction), which further credited the U.S. dollar account it maintained for SCB–Dubai with the amount due for the shipment of aircraft parts.

1693.    To close-out the LC transaction, SCB–Dubai then credited the U.S. dollar account it maintained on behalf of FP Aeroparts Middle East for the shipment.

1694.    The following flow-chart shows the overall flow of funds through the U.S. financial system which supported MODAFL's illegal acquisition of the U.S.-manufactured aircraft parts:



MODAFL ACQUIRES AN AIRCRAFT ENGINE

1695.   As reflected in the above flow-chart, and during the Relevant Period, Defendant Credit Suisse maintained U.S. dollar accounts in Zurich, Switzerland, on behalf of Bank Melli.

1696.   Credit Suisse also instructed and trained Bank Melli employees, and conspired with Bank Melli, on ways to format Bank Melli's payment orders so that the resulting SWIFT messages would avoid detection by the automated filter algorithms in U.S. depository institutions' automated OFAC sanction screening software.

1697.   As detailed below, Credit Suisse also knowingly provided substantial assistance to Hezbollah's BAC networks.

1698.   To play its important role in the IRGC's terror financing operation, Credit Suisse worked diligently to assist its Iranian customers (1) develop methods that would avoid disclosing the true originators and/or beneficiaries of Iranian transactions that it was clearing and settling in the United States; (2) delete or omit certain information when Eurodollar transactions were to be processed through the United States; and (3) provide incorrect information in U.S. dollar funds transfer instructions executed through the United States on behalf of U.S.-sanctioned individuals and entities.

1699.   Credit Suisse worked closely with NIOC, Bank Melli, Bank Saderat, and Iran's Atomic Energy Organization (and other designated Weapons of Mass Destruction proliferators) for many years.

1700.   Credit Suisse eventually became a central player in the IRGC's scheme to finance terrorism, becoming one of the main U.S. dollar clearing banks for the Iranian banking system and training other Western banks how to evade U.S. counter-terrorism sanctions on behalf of the IRGC's sanctions evasion scheme.

1701.   As a senior Treasury official said in announcing Credit Suisse's eventual admission of its criminal assistance to Iran, Credit Suisse chose to "expose [itself] to the risk, and the consequences, of participating in transactions supporting ... terrorism …."

1702.   Before 2003, Credit Suisse actively participated in the IRGC's scheme to finance terrorism by evading U.S. counterterror financing sanctions, but the sheer volume of its illegal conduct accelerated greatly in 2003 when Lloyds exited its Iran business and Bank Melli PLC, Defendant Bank Saderat PLC, and other Iranian agents moved their accounts to Credit Suisse.

1703.   For the next two years, Credit Suisse became one of the main U.S. dollar clearing banks for the Iranian banking system and the IRGC, quadrupling in only 3 years the number of Iranian Eurodollar payment transactions from approximately 49,000 in 2002 to nearly 200,000 in 2005.

1704.   The procedures Credit Suisse developed and refined over time to assist Iran were embodied in internal directives, memoranda, e-mails between Credit Suisse and its Iranian bank clients, and internal e-mails involving, among others, a Credit Suisse Bank Payments Sector Head, Credit Suisse's Treasury and Trade Finance Departments, and the Head of Credit Suisse's Iran Desk.

1705.   Since at least the mid-1990s, when it first agreed to assist the IRGC in carrying out the counterterrorism sanctions evasion operation, Credit Suisse's Iran Desk began adding internal warnings to the accounts of its Iranian bank clients, instructing Credit Suisse employees: "*Do not mention the name of the Iranian bank in payment orders*."

1706.   Such warnings ensured that payment orders given by the Iranian banks laundering IRGC funds (and other Iranian funds mixed in with the IRGC's capital) would not be processed automatically, but rather would be manually reviewed, "corrected" if necessary, and effectuated by Credit Suisse employees.

1707.   For example, in June 1995, the Credit Suisse representative office in Dubai, United Arab Emirates, issued a memorandum advising:

> Following the decision by the American authorities to declare a unilateral embargo against the Islamic Republic of Iran on April 30th, (an Iranian bank) approached Credit Suisse to open (a type of correspondent banking account for U.S. dollar transactions). Crucial to them was that the name of the bank would not be mentioned on the transfer orders... Subsequently, (the Iranian bank) was informed that though payments in such a way are basically feasible, to omit the name of the bank could lead to some problems. Meanwhile, operations through this account have started... Some transfers have been rejected by the American banks as the name of (the Iranian bank) appears under the rubric 'Ordering Bank.' Question: a) what can be done to avoid this?

1708.   Almost immediately after President Clinton issued E.O.s 12957, 12959, and 13059, which strengthened existing U.S. sanctions against Iran, Iranian banks began requesting that Credit Suisse omit their names and BICs from payment messages Credit Suisse sent to its U.S. correspondent banks.

1709.   Credit Suisse complied with these illegal requests and purposefully omitted their names and identifiers in order to help bypass U.S. financial institutions' sanctions filters.

1710.   After a 1998 corporate reorganization, in order to further its ongoing efforts to evade U.S. sanctions and ensure that other U.S. financial institutions would automatically process this new stream of payments, Credit Suisse notified its Iranian clients about the change in Eurodollar clearing and settlement from Credit Suisse First Boston AG ("CSFB") to third-party U.S. correspondents and provided them with a pamphlet entitled "How to transfer USD payments."

1711.   The pamphlet provided detailed payment order formatting instructions for U.S. dollar funds transfers on how to (illegally) avoid triggering U.S. OFAC sanction screening filters.

1712.   In a 1998 letter to an Iranian bank explaining the transfer of its U.S. dollar clearing services to the Bank of New York, New York, Defendant Credit Suisse wrote:

> In order to provide your esteemed institution with our clearing services in U.S. Dollars, we have introduced a procedure to facilitate your USD payments through our clearing system. The change of our USD-clearer to Bank of New York, New York, will not affect our mutual relationship on any clearing transaction in U.S. Dollars as long as the established procedure will be followed.

1713.   Beginning as early as 1995 and continuing through 2005, Credit Suisse, both internally and in coordination with the Iranian banks, created procedures and guidelines to facilitate the processing of prohibited U.S. dollar transactions by its U.S. correspondent banks, primarily the Bank of New York.

1714.   By using Credit Suisse's internal processing system, employees manually keyed in "Order of a Customer" when Iranian payments had to be processed as serial payments through U.S. banks.

1715.   This procedure was promoted at Credit Suisse, as demonstrated by an email from a Team Leader in the Bank Payments Unit:

> In order to put an end, once and for all, to the discussions regarding the processing of USD payment orders of Iranian banks, I have worked out various examples that are to be considered binding for everyone.

1716. Attached to the email were several screenshots of Credit Suisse's payment application illustrating how to format payment order messages to ensure that they would pass through the U.S. financial institutions undetected by U.S. OFAC sanction screening filters.

1717. For example, one such screenshot showed all incoming payment messages listing an Iranian bank as the ordering institution in SWIFT message field "52" and contained the following explicit instructions: "Population of field 52 with 'one of our clients' in case of serial payments via the US."

1718. A second screenshot showed an incoming payment with the reference "*without mentioning our banks [sic] name*" in field 52 and contained the following instructions: "Population of field 52 with 'one of our clients' in case of serial payments."

1719. Until 2004, Credit Suisse's use of "Order of a Customer" was its standard procedure for processing bank payment messages involving Credit Suisse's Iranian customers.

1720. Credit Suisse's internal communications also reveal a continual dialogue about evading U.S. sanctions spanning approximately a decade, assessing how to better process Iranian transactions in order to promote and increase business from existing and future Iranian clients.

1721. In February 1999, Credit Suisse's Iran Desk added internal warnings to the Customer Information Files (or "CIFs") it maintained for the accounts of its Iranian bank customers, expressly directing Credit Suisse employees: "*Do not mention the name of the Iranian bank in payment orders*."

1722. Credit Suisse documented similar directives in subsequent years. For example, in 2002, another warning was loaded in the CIF that likewise stated: "FOR USD–PAYMENTS OUTSIDE CREDIT SUISSE/CS FIRST BOSTON DO NOT MENTION THE NAME OF THE IRANIAN BANK."

1723.   Credit Suisse later decided to remove warnings from the CIFs and replaced them with long-term instructions concerning Iranian entities that instructed: "*Execute USD payment orders always with direct order and cover payment*." These instructions explained that they were intended to ensure (according to Credit Suisse's internal documentation) that "an Iranian origin will never be named in USD payments carried out for Iranian banks (because of the US sanctions)!"

1724.   An internal Credit Suisse memorandum dated March 12, 1999, stated the following regarding the bank's implementation of sanctions evasion:

> Payment orders in USD can only be paid via the American clearing, if the name of the Iranian party is not mentioned (US sanctions). Otherwise, the amounts are returned by the American banks. Even though corresponding warnings have been loaded, there (sic) almost every week cases that are processed incorrectly by us.

1725.   Between 2000 and 2004, Credit Suisse's Iran Desk provided similar instructions to its Iranian Bank clients via a standard letter, which stated in part: "*The most important issue is that you and/or your* correspondents do not mention your good bank's name in field 52."

1726.   Credit Suisse's Iran Desk also informed Iranian clients that Credit Suisse would utilize cover payments to effect payments to or through the United States, stating in one memorandum, for example, "[o]ur payment department will stop all USD payments initiated by your fine bank in any case and shall be effected [by]... 'Direct payment order and cover payment order.'"

1727.   In order to prevent straight-through processing of all payment orders sent by Iranian banks, Credit Suisse configured its payment system to interdict the payments for manual review.

1728.   Credit Suisse employees then reviewed the payments to ensure that they did not reference Iran. If such references were detected, Credit Suisse employees would either delete the reference, or contact the Iranian bank to request further instructions.

1729.   Over time, Credit Suisse employees developed practices to omit information on the involvement of Iranian bank, including:

a.   Entering in an empty field, or replacing the name of the Iranian banks with "Order of a Customer" or a similar phrase instead of the actual name of the ordering institution in SWIFT payment order messages;

b.   Forwarding payment messages received from Iranian banks falsely referencing "Credit Suisse" or Credit Suisse's SWIFT account code (identified by BIC address CRESCHZZ) instead of an Iranian bank as the originating institution. For example, a November 2000 email circulated by a team leader in Credit Suisse's Bank Payments Unit contained screenshots of an incoming payment order from an Iranian bank in which Credit Suisse was listed as the ordering institution in field "52" of the SWIFT messages. The instructions were to make no changes to the misleading information in the SWIFT message's field "52" for serial payment messages made to U.S. financial institutions;

c.   Inserting "Credit Suisse" as the ordering institution in payments originating with an Iranian bank;

d.   Removing all references to Iranian names, addresses, cities, and telephone numbers from customer payments;

e.   Substituting abbreviations for Iranian customer names. For example, in an April 16, 2003, email, the Head of Credit Suisse's Iran Desk wrote to the Credit Suisse representative office in Tehran, "entry to their account works when account number plus XXX is stipulated as beneficiary. What is also important of course is that applicant will give details of final beneficiary as reference for the beneficiary, then it should work"; and

f.   Converting SWIFT MT–103 and MT–202 payment order messages to hide the details of Iranian transactions and using MT–202 cover payment messages approximately 95 percent of the time to facilitate outgoing customer payments involving Iran or Iranian parties.

1730.  A September 24, 2003, Credit Suisse internal email sent from a team leader in Customer Payments to a Section Head within Customer Payments, described Credit Suisse's Iranian U.S. dollar processing:

> The procedure is identical for all Iranian banks: 1) We attempt to send all USD payments directly to the bank of the beneficiary. Only cover payments are made through the US. In such cases, the ordering institution is not disclosed. 2) Should 1) not be possible (if the beneficiary bank is an American bank, or if no Swift connection or no correspondent was named), then the payment will be made though America. We make sure that the ordering institution is not mentioned (this has been programmed into the system as a default) and that the ordering customer has no connection to 'Iran'. 3) Should 1) and 2) not be possible, then the payment order will be forwarded to Investigations for further clarifications with the ordering institution.

1731.  In addition, Credit Suisse instructed its Iranian customers on how to format U.S. dollar payments so that such payments would evade U.S. sanctions and detection by automated OFAC sanctions enforcement software filters used by U.S. financial institutions.

1732.  Payment instructions included a letter, dated October 16, 2003, from Credit Suisse's Iran Desk to an Iranian customer that stated: "This is to provide you our recommendation for the entry of funds how to handle bank-to-bank payments on your account with Credit Suisse and the following procedures should be applied in order to avoid any difficulties."

1733.  In December 2003, an Iranian bank asked Credit Suisse for an additional U.S. dollar account identifying the Iranian beneficiary bank only by a designated abbreviation (first letter of each word constituting the bank's name, together with the abbreviation commonly used for a type of legal entity, i.e., Plc).

1734.  On January 28, 2004, Credit Suisse confirmed that it had opened the requested account, writing to the Iranian bank: "Reference is made to the various conversations and your

email, dated December 18, 2003, wherein you asked us to open a new USD account...Now, we would like to confirm the account number…."

1735.  In addition, Credit Suisse promised its Iranian customers, including Bank Saderat and Bank Melli, that no messages would leave Credit Suisse without being first hand-checked by a Credit Suisse employee to ensure that they had been formatted to avoid U.S. OFAC filters.

1736.  Credit Suisse also took a further step beyond *training* the Iranian banks on how to format their payment messages to evade the OFAC filters; it also gave them materials to use for training *other* banks on how to prepare payment messages to evade U.S. OFAC filters and sanctions regimes.

1737.  In August 2003, Credit Suisse reached an agreement with the London branches of a number of Iranian banks to take over the banks' London branches' U.S. dollar clearing activity.

1738.  As a result of this agreement, Credit Suisse became one of the main U.S. dollar clearing banks for the Iranian banking system.

1739.  Through its subsidiary Credit Suisse Asset Management Limited, United Kingdom ("CSAM"), Credit Suisse used code words for Iranian customers, including the Iranian banks, when executing trades involving U.S. securities that were transmitted through the U.S.

1740.  Credit Suisse knew that without such alterations, amendments, and code words, automated OFAC filters at U.S. clearing banks would likely halt the payment order messages and securities transactions, and, in many cases, reject or block the sanctions-related transactions and report the same to OFAC.

1741.  Credit Suisse manipulated payment order messages and removed any identifying reference to sanctioned countries and entities so that the OFAC filters at the U.S. clearing banks

would not be able to identify the transactions, and the transactions would be automatically processed without detection.

1742. In July 2004, the Swiss Federal Banking Commission issued an ordinance to implement FATF's Special Recommendation on Terrorist Financing VII.

1743. The ordinance required the disclosure of the remitter in payment orders and prompted Credit Suisse to issue an internal directive prohibiting the use of the "Order of a Customer" method when making international wire transfers.

1744. In April 2004, in preparation for the implementation of the ordinance, Credit Suisse's Iran Desk began to inform its Iranian bank clients that neither "Order of a Customer" nor "Credit Suisse" could be used to replace references to Iranian banks on payment messages.

1745. Credit Suisse again, however, provided information about the use of the cover payment method to send U.S. dollar payments, ensuring that the Iranian banks (and, by extension, the IRGC) remained cognizant of other means of ensuring an uninterrupted flow of surreptitious U.S. dollars.

1746. Although Credit Suisse's payment processing units ceased to use the "Order of a Customer" method following the Swiss Federal Banking Commission's July 2004 ordinance, Credit Suisse employees nonetheless continued removing or altering information in SWIFT payment order messages sent to one of its U.S. correspondent banks.

1747. For example, in May 2005, an internal Credit Suisse email stated:

> If we do not have a key contact with the beneficiary's bank, we have to carry out the payment via the US, e.g. via BKTRUS33. However, no reference to Iran may be made in the field reserved for information on the ordering party (no Iranian telephone numbers either). No such reference should be made in fields 70 or 72 either.

1748.  Between March 2004 and November 2005, Credit Suisse repeatedly sent instructional letters to its Iranian bank customers describing its internal procedures for forwarding Iranian payment orders as:

> Our Payment department will stop all USD-payments initiated by your fine bank in any case and shall be effected as outlined in the drawing "Direct payment order and cover payment order."

1749.  From August 2003 to November 2006, Credit Suisse illegally processed electronic funds transfers in the aggregate amount of at least $480,072,032 through financial institutions located in the United States to Iranian financial institutions, much of it for the benefit of the IRGC.

1750.  In January 2006, Credit Suisse established a "Sensitive Countries" Task Force to implement its decision to cease U.S. dollar clearing transactions for Iran in November 2006.

1751.  On September 11, 2006, Credit Suisse directed its payments centers to discontinue certain prohibited payments by a particular Iranian bank. Using the MT–202 cover payment method, during the six weeks from September 11, 2006, to October 27, 2006, Credit Suisse nevertheless processed 54 outbound payments involving that Iranian bank, the total value of which was in excess of $8 million U.S. dollars.

1752.  As described *supra*, Credit Suisse also facilitated payments on Letters of Credit involving Mahan Air's illegal purchase of U.S. aircraft and aircraft parts.

1753.  These included the illegal purchase of an aircraft engine and an Airbus A320–232 passenger aircraft.

1754.  In each case, Credit Suisse directed U.S. dollar payments through the United States, assisting Iran's terror apparatus in transferring funds cross-border.

1755.  In March 2007, only following the Deferred Prosecution Agreements of Lloyds and ABN Amro Bank NV (Defendant RBS NV), Credit Suisse commenced an internal investigation

of its historic U.S. dollar funds clearing business involving U.S.-sanctioned countries and persons. Shortly thereafter, Credit Suisse was contacted by U.S. and New York law enforcement officials.

1756.   On December 16, 2009, DOJ issued a press release announcing that Credit Suisse had agreed to forfeit funds worth $536 million U.S. dollars to the United States and to the Manhattan District Attorney's Office in connection with violations of the IEEPA and New York State law, as a result of violations relating to transactions Credit Suisse illegally conducted on behalf of customers from, among others, Iran.

1757.   In connection with a DPA that Credit Suisse entered into, DOJ filed a criminal information in the U.S. District Court for the District of Columbia charging Credit Suisse with one count of violating the IEEPA. Credit Suisse waived the indictment, agreed to the filing of the information and, according to the press release, accepted and acknowledged responsibility for its criminal conduct.

1758.   Credit Suisse also simultaneously entered into an agreement with OFAC to settle its violations of the IEEPA and agreed to a civil forfeiture as part of the DPA it entered into with DOJ, the Manhattan District Attorney's Office, and OFAC.

1759.   The press release announcing the agreements quoted then-Treasury Under-Secretary for Terrorism and Financial Intelligence Stuart Levey as stating "[t]his case provides a timely lesson about how Iran seeks to involve others in deceptive conduct to evade legal and regulatory controls. Those who do business with Iran expose themselves to the risk, and the consequences, of **participating in transactions supporting proliferation, terrorism or sanctions evasion**." (Emphasis added.)

E.     **DEFENDANT ROYAL BANK OF SCOTLAND NV'S KNOWING SUBSTANTIAL ASSISTANCE TO THE IRGC AND HEZBOLLAH**

1760.   As alleged above, Defendant RBS NV is the legal successor to ABN Amro Bank.

As noted above, this Defendant is referred to herein as "ABN Amro (RBS NV)"

1761.  Like the other Defendants in this Action, ABN Amro (RBS NV) consciously and culpably provided substantial assistance to the IRGC. Specifically, ABN Amro (RBS NV) knowingly and actively provided the IRGC with pervasive and systemic assistance by working hand-in-glove with the CBI and its Iranian bank agents to provide the IRGC with clandestine access to funds that supported the IRGC's terrorist activities, including the attacks that injured Plaintiffs.

1762.  It did so by assisting the IRGC evade U.S. counterterror financing sanctions through its special relationship with the CBI and IRGC-selected Iranian banks by facilitating the clandestine movement of large sums of money through the U.S. and global financial system while purposefully blinding U.S. regulators, law enforcement, and financial institutions to the IRGC's activities.

1763.  Indeed, ABN Amro (RBS NV) played a crucial role in knowingly assisting the IRGC because it held accounts for and worked *directly* with the CBI to evade U.S. counterterrorism sanctions, and the CBI, in turn, at the IRGC's direction, served as a primary conduit for the IRGC's illicit funds.

1764.  As stated above, ABN Amro processed U.S. dollar deposits from the CBI on a regular basis with an average deposit size in the range of $200 million USD and regularly assisted the CBI in moving funds through its accounts in unusual and illegal ways.

1765.  Similarly, ABN Amro held accounts for Bank Melli and knowingly provided it with illicit services for the benefit of the IRGC.

1766.  ABN Amro (RBS NV) also knowingly substantially assisted the IRGC by serving as the conduit for at least 90 post-U.S. designation transactions on behalf of IRISL and its various

front companies through March 2010.

1767.  ABN Amro (RBS NV) was specifically aware that it was violating U.S. laws designed to prevent terrorism but saw doing so as an "opportunity."

1768.  As far back as May 1995, top officials of ABN Amro (RBS NV) in Amsterdam e-mailed the entire management of ABN Amro (RBS NV) in Europe, Asia, South America, Africa, the Caribbean, and North America, advising them that any financial transactions denominated in U.S. dollars undertaken for or on behalf of Iranian persons or banks were subject to seizure or blocking in the United States.

1769.  Soon after President Clinton signed the Executive Order implementing sanctions against Iran in May 1995, Iranian banks sought ABN Amro's active assistance in their efforts to circumvent U.S. laws.

1770.  ABN Amro employees were aware of these requests, discussed them with other Western banks who were also willing to assist Iran and the IRGC violate U.S. counter-terror sanctions, and thereafter approved of ABN Amro (RBS NV) conducting the illegal transactions, contrary to the advice of outside counsel retained by ABN Amro (RBS NV) that its involvement in such transactions would potentially violate U.S. law.

1771.  From approximately 1995 until in or about 2005, ABN Amro (RBS NV) conspired with the other Western and Iranian banks facilitating the IRGC's sanctions evasion (including the CBI, Bank Melli Iran and Defendant Bank Saderat Plc) and their agents to conceal Iranian financial transactions (primarily involving NIOC's oil and natural gas revenues) from the U.S. government, law enforcement, and intelligence agencies, as well as from U.S. financial institutions charged with detecting and blocking certain Iranian transactions.

1772.   From approximately 1995 until in or about 2005, ABN Amro (RBS NV) assisted the IRGC by methodically removing and/or falsifying payment messages on its funds transfer systems to disguise the movement of hundreds of millions of U.S. dollars illegally through the U.S. financial system on behalf of or for the benefit of the IRGC sanctions evasion conspiracy.

1773.   In furtherance of the IRGC's sanctions evasion conspiracy, ABN Amro (RBS NV) and its Iranian banks customers developed methods by which ABN Amro (RBS NV) would format U.S. dollar payments so that such payments would evade U.S. sanctions and detection by automated filters used by financial institutions in the United States.

1774.   When ABN Amro (RBS NV) employees received payment messages from the Iranian banks that contained certain words that could trigger a U.S. bank's automated OFAC filter software algorithms, ABN Amro (RBS NV) would manually alter or amend the messages (i.e. "strip" the transactions) to ensure that the transaction would go undetected when it was cleared and settled by financial institutions in the United States.

1775.   ABN Amro (RBS NV) thereby caused financial institutions in the United States to process Iranian transactions, including for the benefit of the IRGC, that U.S. financial institutions would not otherwise have processed.

1776.   Like Standard Chartered Bank, certain offices, branches, and subsidiaries of ABN Amro (RBS NV) also altered Letters of Credit and foreign exchange transactions involving U.S. dollar funds by replacing the names of the Iranian bank customers (including e.g., Bank Melli Iran) on those transactions.

1777.   As noted above, beginning as early as 1995 and continuing until in or about 2005, ABN Amro (RBS NV) undertook various acts in furtherance of the IRGC's sanctions evasion

conspiracy. For example: The Dubai branch of ABN Amro (RBS NV) created procedures and guidelines to facilitate the processing of prohibited U.S. dollar transactions.

1778.   As discussed above, because of the UAE's permissive regulatory environment (particularly in its free trade zones), Dubai's geographical proximity to Iran and the two countries long-standing commercial ties, the Dubai branches of Western banks, including ABN Amro (RBS NV), served as a vital conduit for the IRGC's illicit activities including terror financing.

1779.   In another example of ABN Amro (RBS NV)'s various acts in furtherance of the IRGC's sanctions evasion conspiracy, one section of the ABN Amro (RBS NV) payment manual entitled "Special Conditions" listed specific instructions on how to effectuate these payments and avoid OFAC filters.

1780.   A specific instruction from this manual stated: "Payments by order of Iranian Banks…maintaining accounts with ABN, Dubai are to be handled with extra care to ensure the wordings 'Iran' etc. are not mentioned in the payment due to OFAC regulations."

1781.   In June 1995, an Iranian bank customer requested of ABN Amro (RBS NV) officials in Dubai that ABN Amro (RBS NV) act as a conduit for all U.S. dollar transactions for that Iranian bank in Dubai.

1782.   The Iranian bank requested that all of its U.S. dollar funds transfers be routed through, or be issued in the name of, ABN Amro (RBS NV) not reference that these payments were issued on its behalf, and that all of its U.S. dollar receipts would come into ABN Amro (RBS NV)'s account.

1783.   Thereafter, ABN Amro (RBS NV) undertook various specific acts to conceal its actions on the bank's behalf.

1784.  ABN Amro (RBS NV) instructed its Iranian bank customers to include the code word "SPARE" in their payment messages through the bank so that ABN Amro (RBS NV) could first segregate these messages from normal message payment processing, and then amend the message by removing/altering any potentially problematic text, i.e., any reference to Iran.

1785.  The payment message would then be stopped by ABN Amro (RBS NV), routed into a special queue, and manually altered to avoid being blocked by any OFAC sanctions screening filters.

1786.  In this manner, ABN Amro (RBS NV) assisted sanctioned entities, and ensured the processing of transactions by formatting payment order messages so that they would not be rejected or blocked by OFAC filters at financial institutions in the United States.

1787.  ABN Amro (RBS NV) added to its payment manuals the "Special Conditions" that were to be used on behalf of its Iranian bank customers in order to evade detection and circumvent the laws of the United States.

1788.  ABN Amro (RBS NV) used these same or materially similar procedures with respect to Letters of Credit in U.S. dollar funds, and the processing of U.S. dollar-denominated checks and traveler's checks.

1789.  ABN Amro (RBS NV) and its Iranian bank customers knew and discussed the fact that without such alterations, amendments, and code words, the automated OFAC filters at clearing banks in the United States would likely halt most of the payment messages and other transactions, and, in many cases, would reject or block the sanctions-related transactions and report same to OFAC, but it was essential to the IRGC that it be able to transit funds in U.S. dollars, particularly oil revenues, without U.S. authorities being able to trace the transaction flows.

1790. ABN Amro (RBS NV) also removed the names, BICs, and any other identifying information of the Iranian bank customers in the payment order messages sent to ABN Amro (RBS NV)'s U.S. correspondent banks.

1791. In order to circumvent U.S. sanctions, certain Iranian bank customers requested that ABN Amro (RBS NV) omit their names and BICs from payment order messages sent by ABN Amro (RBS NV) to ABN Amro (RBS NV)'s U.S. correspondent banks. ABN Amro (RBS NV) complied with the requests of these Iranian bank customers and omitted their names and identifiers in order to help bypass the OFAC filtering mechanisms of U.S. financial institutions.

1792. ABN Amro (RBS NV) also used MT–202 cover payment SWIFT messages to shield the identities of its Iranian bank customers.

1793. Instead of using serial MT–103 payment messages that require the names and details of counterparties to transactions, ABN Amro (RBS NV) began using MT–202 cover payment messages expressly for the purpose of not revealing the true identity of the ordering customer and beneficiary party for U.S. dollar payments sent through financial institutions in the United States.

1794. The CBI coordinated with ABN Amro (RBS NV)'s Central Bank Desk in Amsterdam regarding the procedure to be followed for repayment of U.S. dollar deposits to their accounts with European Banks in London.

1795. This procedure stipulated that Eurodollar payment order messages sent to U.S. clearing banks for payment of U.S. dollar funds to the CBI should not reference the Central Bank of Iran or Iran.

1796. In or about June and July 1995, officials at ABN Amro (RBS NV)'s Amsterdam Headquarters and New York offices were advised by outside U.S. counsel that the proposal by

Iranian banks for ABN Amro (RBS NV) to serve as a conduit or means to bypass and avoid the sanctions imposed by the United States upon Iran risked breaching U.S. law.

1797.   An internal memorandum generated by ABN Amro (RBS NV) at the time stated "[t]he fund transfer mechanics proposed by [the first Iranian bank] are an attempt to circumvent the Iranian trade embargo. Given that violations of the Executive Order and OFAC regulations carry substantial penalties, not to mention the negative publicity, the [first Iranian bank] proposal must be strictly scrutinized, and ABN Amro must weigh the risks before proceeding with any such transfers."

1798.   Also in June 1995, another Iranian bank customer sent a written communication to certain banks in the UAE and the Iranian bank's correspondent banks instructing those banks to undertake U.S. dollar funds transfers for the Iranian bank in the name of a European financial institution "WITHOUT MENTIONING OUR BANK'S NAME" to defeat and circumvent the sanctions imposed upon Iran by the United States.

1799.   Like the first request, the Iranian bank customer's request was forwarded to officials located in several departments of the Amsterdam Headquarters of ABN Amro (RBS NV).

1800.   As early as 1997, in an internal strategy paper for the Middle East and Africa region named "Desert Spring," prepared by ABN Amro (RBS NV)'s Middle East and Africa Regional Office, ABN Amro (RBS NV) described a "product initiative" with "opportunities in LC discounting for Central Bank and Bank Melli, Iran" and "deposit mobilization from Iranian nationals."

1801.   On or about February 5, 2000, an official at the Dubai branch of ABN Amro (RBS NV) wrote to a Regional Director of one of its Iranian bank customers assuring him that ABN Amro (RBS NV) would take care of carrying out the scheme to evade and defeat the U.S. sanctions.

1802. The ABN Amro (RBS NV) official's note stated: "[w]e understand the special nature of your US$ transactions and will ensure that all operations departments concerned are properly briefed regarding this, as well."

1803. A July 19, 2003, e-mail written by John Ciccarone, Head of ABN Amro (RBS NV)'s USD Payments Product Management at ABN Amro (RBS NV)'s New York branch, discussed the use of MT–202 cover payments, stating: "There is no way the payment will get stopped as all NY ever sees is a bank to bank instruction."

1804. ABN Amro (RBS NV) clearly understood that the American government (and U.S. law) viewed its conduct as both money laundering and terror financing, but even after the September 11th attacks, it valued its relationships with the CBI and other Iranian banks (and ultimately the IRGC and the Iranian regime) more.

1805. Thus, in a July 25, 2003, e-mail, John Philbin, Senior Relationship Banker for Iranian banks, wrote to Ciccarone to make the case that American anti money laundering and counter terror financing laws should be disregarded:

> Surely Iran is the most obvious case in point for these structures. Twenty-four years of US sanctions and OFAC listing and Iran continues to sell oil and gas in USD. And, it imports and pays in USD as well. All of this is clearly done though accounts in Europe and elsewhere. There is a very good case to be made for getting an overall acceptance that when issues are purely US, we should not be a part of it. In fact, we should see it as an opportunity. OFAC is not the Bible for money laundering (e.g. Cuba is prominent on OFAC). It is a tool of broader US policy. We therefore need to distinguish between US foreign policy on the one hand and AML/anti-Terrorism on the other, however much the US administration may wish to insist that the two are closely linked. It is well worth working on a solution for clients who find themselves in this position or who fear (Syria, Saudi Arabia) that they, one day soon might find themselves there.

1806. This view was not limited to the business side of the bank. Also in 2003, Diane Perrin, a member of ABN Amro (RBS NV)'s Group Compliance team at the Defendant's

Amsterdam Head Office, stated that "as a European Institution, we do not comply with US Sanctions because those sanctions are politically motivated."

1807.   A 2003 memorandum entitled "Proposal for Establishing a Representative Office in Tehran, Iran" drafted by ABN Amro (RBS NV)'s Country Representative in the UAE, Jan Willem van den Bosch, similarly stated:

> The Central Bank of Iran is faced with difficulties for USD denominated clearing transactions due to sanctions imposed by the US. The OFAC filter impounds all Iran related payments and receipts in the US. The Swiss and other European Banks have worked out a solution for this. The payment instructions are sent directly to the beneficiary's bank and cover payment is made to the beneficiary bank's US Correspondent as inter-bank payments.

1808.   Bosch later coordinated the meeting in Dubai between ABN Amro (RBS NV)'s Managing Board Member and CFO Tom De Swann and top functionaries of the CBI, including Aziz Farrashi, CBI's Director General.

1809.   During the meeting with the CBI's officials, ABN Amro (RBS NV) officials discussed the establishment of the Representative Office by ABN Amro (RBS NV) in Tehran and further business development, including the acceptance of U.S. dollar deposits by the CBI's Desk in Amsterdam.

1810.   In an April 20, 2004, e-mail, the aforementioned John Philbin (Senior Relationship Banker for Iranian banks) mentioned the possibility of using a Jersey Special Purpose Vehicle as a way to circumvent OFAC restrictions:

> Mike Louwerens [ABN Amro's Vice President and Senior Analyst of Country Risk Management Department] mentioned this to me today and sent the attached. The structure below is very interesting and could have applicability for the banks in Iran as well. But whether that is the case or not, what is clear is that this structure envisages our making and receiving payments in USD which will clear through AA in New York. And for which Mike Bowman sees no objection. I am sending a second note in which OEM (Maarten Seckel) gives a go ahead based on Bowman's nihil obstat. The

Way for our doing significant business with the Iranian banks in cash may yet be clear.

1811.    On July 23, 2004, ABN Amro (RBS NV) and its New York branch entered into a

Written Agreement with the Federal Reserve Banks of New York and Chicago (collectively, the

"Reserve Banks") and other regulators that had detected deficiencies at ABN Amro (RBS NV)'s

New York Branch relating to AML policies, procedures, and practices that included:

> a pattern of previously undisclosed unsafe and unsound practices warranting further enforcement action…. A. ABN AMRO lacked adequate risk management and legal review policies and procedures to ensure compliance with applicable U.S. law, and failed to adhere to those policies and procedures that it did have. As a result, one of ABN AMRO's overseas branches was able to develop and implement "special procedures" for certain funds transfers, check clearing operations, and letter of credit transactions that were designed and used to circumvent the compliance systems established by the Branches to ensure compliance with the laws of the U.S. In particular, the "special procedures" circumvented the Branches' systems for ensuring compliance with the regulations issued by the Office of Foreign Assets Control ("OFAC") (31 C.F.R. Chapter V).

1812.    U.S. regulators also found that "[p]rior to August 1, 2004, the New York Branch

processed wire transfers originated by Bank Melli Iran, a financial institution owned or controlled

by the Government of Iran. The payment instructions on the wire transfers had been modified by

one of ABN Amro's overseas branches such that any reference to Bank Melli Iran was removed."

1813.    U.S. regulators also found that "[p]rior to August 1, 2004, the Branches advised a

number of letters of credit issued by Bank Melli Iran. The letters of credit had been reissued by

one of ABN Amro's overseas branches such that any reference to Bank Melli Iran was removed."

1814.    As DOJ later concluded: "Each year between and including 1996 and 2004, ABN

caused ABN's U.S. affiliate to file false, misleading, and inaccurate Annual Reports of Blocked

Property to OFAC. In each of those reports, the U.S. affiliate of ABN certified to OFAC that all

information provided was accurate and that all material facts in connection with the report had been set forth."

1815.   Nonetheless, in September 2004, Michael Louwerens, ABN Amro (RBS NV)'s Vice President and Senior Analyst of Country Risk Management Department, traveled to Iran at the behest of ABN Amro (RBS NV)'s Head Office and reported back that he had communicated with the Chief Representative of HSBC in Tehran (presumably John Richards) and concluded that ABN Amro (RBS NV)'s payment procedures (to conceal Iranian financial activity) were in line with prevailing market practices of HSBC and other banks.

1816.   Despite its prior 2004 Written Agreement with the Federal Reserve Banks of New York and Chicago, through March 2010, ABN Amro (RBS NV)'s then-New York branch acted as the conduit for at least 90 post-U.S. designation transactions on behalf of IRISL and its various front companies.

1817.   On May 10, 2010, DOJ issued a press release announcing that ABN Amro's successor entity, Defendant Royal Bank of Scotland NV, had agreed to forfeit $500 million to the United States in connection with a conspiracy to defraud the United States, to violate the IEEPA, the TWEA, and the Bank Secrecy Act ("BSA").

1818.   In connection with a Deferred Prosecution Agreement ABN Amro (RBS NV) entered into, a criminal information was filed in the U.S. District Court for the District of Columbia charging the Defendant with one count of violating the BSA, and one count of conspiracy to defraud the United States and violate the IEEPA and the TWEA. ABN Amro (RBS NV) waived indictment, agreed to the filing of the information, and, according to the press release "accepted and acknowledged responsibility for its conduct."

1819.  According to the criminal information, despite its prior 2004 Written Agreement with the Federal Reserve Banks of New York and Chicago, ABN Amro (RBS NV)'s criminal assistance to Iran continued "until in or about December 2007."

1820.  Prior to that time, ABN Amro (RBS NV) willfully and knowingly conspired, *inter alia*, to "engage in financial transactions with entities affiliated with Iran … in violation of the International Emergency Economic Powers Act, Title 50, United States Code, Section 1705, and regulations and embargoes issued thereunder…."

1821.  The criminal information confirmed that ABN Amro (RBS NV) was an active participant in the IRGC's sanctions evasion conspiracy.

1822.  The criminal information stated that: "It was part of the conspiracy that the defendant discussed with the co-conspirators how to format United States Dollar message payments so that such payments would avoid detection by automated filters used by financial institutions in the United States and thus evade United States sanctions."

1823.  The criminal information further stated that: "It was part of the conspiracy that the defendant removed names and references to the co-conspirators in United States Dollar message payments routed through the United States."

1824.  The criminal information further stated that: "It was part of the conspiracy that the defendant altered the names and references to the co-conspirators in United States Dollar message payments routed through the United States."

1825.  The criminal information further stated that: "It was part of the conspiracy that the defendant instructed the co-conspirators to use code words in United States Dollar payment messages."

1826.  Additionally, the criminal information stated that: "It was part of the conspiracy

that the defendant created a special processing queue to manually and materially alter any of the co-conspirators' United States Dollar message payments that were to be routed through the United States."

1827.   The criminal information also stated that: "It was part of the conspiracy that the defendant created 'Special Conditions' in the defendant's payment manuals in order to process any co-conspirators' United States Dollar transactions."

1828.   Finally, the criminal information further stated that: "It was part of the conspiracy that the defendant caused its United States affiliates to submit materially false and misleading reports or statements to the United States Department of the Treasury, OFAC."

1829.   At all relevant times, ABN Amro (RBS NV) knew that most of its illicit U.S. dollar denominated transactions derived from the sale of Iranian "oil and gas," that the U.S. government (and specifically OFAC) considered these transactions extremely high risk for money laundering and terror financing, and that it was illegal to assist Iranian entities to evade U.S. laws prohibiting clandestine funds transfers of the kind in which the bank regularly engaged.

1830.   ABN Amro (RBS NV) knew it was facilitating thousands of transactions that posed an extremely high risk for money laundering and terror financing, but consciously and culpably decided that "OFAC is not the Bible for money laundering" and to disregard "the US administration's" view that its prohibitions against Iranian money laundering and terror financing genuinely implicated "AML/anti-Terrorism" as opposed to "broader US policy."

1831.   In sum, ABN Amro (RBS NV) knowingly assisted the IRGC's sanctions evasion conspiracy, actively worked with the CBI and other participants in that conspiracy to help it succeed, and did so with expressed contempt for U.S. efforts to prevent money laundering and

terror financing, including money laundering and terror financing conduct directed through the United States.

### F. DEFENDANT BARCLAYS KNOWING SUBSTANTIAL ASSISTANCE TO THE IRGC AND HEZBOLLAH

1832.  Like the other Defendants in this Action, Defendant Barclays consciously and culpably participated in the IRGC's wrongdoing. Specifically, Barclays knowingly and actively provided the IRGC with pervasive and systemic assistance by working hand-in-glove with the CBI and its Iranian bank agents to fund Iran's terror apparatus. It did so by assisting the IRGC evade U.S. counterterror financing sanctions through its special relationship with Bank Melli and other IRGC-selected Iranian banks and move large sums of money through the U.S. and global financial system while purposefully blinding U.S. regulators, law enforcement, and financial institutions to the IRGC's activities.

1833.  Until at least May 2008, Defendant Barclays maintained correspondent banking relationships with several of the Iranian banks used by the CBI to launder the IRGC's funds, including Bank Saderat and Bank Melli.

1834.  Barclays continued to facilitate unlawful payments on behalf of Bank Saderat and Bank Melli *after* they were designated by the United States for transferring U.S. dollar funds to Hezbollah and the IRGC, respectively.[197]

1835.  Indeed, internal communications show that Barclays officers knew that their role was to help Iranian banks and other entities evade sanctions designed to prevent them from transferring funds to the IRGC and Hezbollah.

---

[197]  Barclays is also identified in a publicly available report as the "Principal Banker" for TAJ Investments in Ghana, one of Hezbollah's BAC investments operating by Kassem Tajideen. Upon information and belief, discovery will show that Defendant Barclays knowingly facilitated many transactions for the Hezbollah BAC companies.

1836. Barclays is a member of SWIFT-Brussels and has historically used the SWIFT system to transmit international payment messages from and for financial institutions around the world.

1837. Barclays originally processed U.S. dollar payment messages through numerous global locations.

1838. Over time, Barclays consolidated its Eurodollar payment processing so that the payments were predominately processed at Barclays' Payment Processing Centre located in Poole, England ("Poole").

1839. Barclays knowingly and willfully engaged in conduct that caused its New York branch and other financial institutions in the United States to process U.S. dollar payment transactions in violation of U.S. sanctions. Barclays knew that these sanctions were designed to prevent the financing of Iranian terrorism, including that committed by the IRGC.

1840. As part of this effort to evade U.S. sanctions against Iran, Barclays:

    a. Followed instructions from Iran and its agents not to mention their names in Eurodollar payment transaction messages sent to Barclays-New York and to other U.S. financial institutions for clearance and settlement in U.S. dollar funds;

    b. Routed transactions through an internal Barclays sundry account, thereby hiding the payment transactions' connection to Iranian entities;

    c. Amended or reformatted SWIFT messages to remove information identifying Iranian entities involved in the transfer of U.S. dollar funds; and

    d. Re-sent Iranian entities' MT–103 SWIFT messages as cover payments to take advantage of the lack of transparency as to the ultimate originator/beneficiary that was achieved by using the MT–202 bank-to-bank cover payment message format.

1841.  Beginning in 1987, Bank Melli Iran instructed Barclays to process U.S. dollar transactions in favor of Bank Melli's London branch by referencing only Bank Melli's U.S. dollar account number at Midland Bank Plc and without referencing Bank Melli's name.

1842.  Bank Melli further instructed Barclays to send separate payment order instructions, which included full details about the U.S. dollar payment transactions to Midland Bank Plc and Bank Melli's London Branch.

1843.  In response, Barclays memorialized Bank Melli's instructions for U.S. dollar market transactions in a memorandum sent by its Head Office to Barclays' international offices, and, as early as the late 1990s, included them in Barclays' "List of Correspondents" ("LOC"), which contained information related to Barclays' correspondent banking relationships and assisted Barclays' employees in effectuating international payment transactions involving U.S. dollar funds.

1844.  Barclays' LOC contained instructions on how to process payments for both sanctioned and non-sanctioned banks with which Barclays had correspondent relationships.

1845.  Over time, the LOC grew to include instructions for payments related to several of Barclays' correspondent bank clients and included instructions to use cover payments (MT–202 SWIFT messages) when processing payments in U.S. dollar funds for clearing and settlement in the United States, and omitting the names of U.S.-sanctions targets from the payment order messages so that U.S. financial institutions could not identify the sanctions nexus of the payments.

1846.  In a November 1987 Head Office Circular, Barclays distributed payment instructions received from an Iranian bank directing Barclays "to amend the procedures governing the transfer of U.S. Dollars for any purpose in favour of our London branch" and to route such payments "without mentioning the name of our bank."

1847.   The reason for, and effect of, these instructions was to disguise Iranian sanctioned entity payments from Barclays' correspondents in the United States so that such correspondents would unwittingly process the illegal payments.

1848.   Barclays' employees followed the instructions in the LOC when processing U.S. dollar payments involving sanctioned Iranian banks, thereby ensuring that the name of the bank would not appear in any MT–202 cover payment messages sent to Barclays' New York branch for clearing and settlement through CHIPS and FRB–New York. For example, with regard to U.S. dollar payments sent on behalf of an Iranian bank, the LOC stated, "[t]he cover MT202 for the direct Payment Order to be arranged by the remitting Bank <u>without mentioning [the Iranian bank's]</u> name ...." (Underlined in the original.)

1849.   Barclays' LOC also contained instructions to contact the remitter or beneficiary for routing instructions for certain payments of U.S. dollar funds involving Iranian sanctioned entities. The general instructions for Iranian banks stated:

> USD PAYMENTS TO IRAN
> Certain payments may be blocked by the US Authorities. Therefore, any branch with a USD transfer is advised to contact the remitter beneficiary or beneficiary's bankers to request specific routing instructions.

1850.   Barclays' standard operating procedures even educated its employees on how to bypass the sanction screening algorithms in both Poole's and the U.S. financial institution's OFAC filters to facilitate illegal payment transactions in U.S. dollar funds.

1851.   Pursuant to these "standard" procedures, when the Poole filter identified a U.S. dollar payment transaction that referenced an Iranian entity, that payment order message was stopped for further review by Barclays' employees in Poole.

1852.   If the Poole-based employees found that the payment order message referenced an

Iranian entity, they would follow one of the following procedures: (i) return the payment order message to the remitting entity via a pre-formatted fax cover sheet; (ii) alter or delete fields in SWIFT messages; or (iii) change the message type from a serial payment (MT–103) to a cover payment (MT–202) in order to hide any connection to the Iranian entity.

1853.   The then-Senior Manager for Barclays Group Payments Industry Management in Poole explained that if the MT–202 payment order message contained beneficiary information that caused it to be stopped by the OFAC filter in the UK, that information was removed to ensure the payment transaction was not stopped by the OFAC filter when resubmitted.

1854.   The same Senior Manager noted that he was aware that Defendant Barclays' payment operators amended payment order messages in order to facilitate the transfer of U.S. dollar funds to Iran and that this was a "*common practice*" at Barclays.

1855.   As noted above, consistent with Barclays' "standard" procedures, when an Iranian Eurodollar payment was flagged by the Poole OFAC filter, Barclays' employees generally returned the flagged payment order message to the original remitting bank.

1856.   Barclays' employees used a specific fax cover sheet to advise the remitting area of Barclays that the payment message had been cancelled and would further identify the specific words in the payment message that had caused the message to be stopped by the Poole sanctions screening filter.

1857.   The Barclays fax cover sheet contained the following language:

> OFAC ITEM: Wording below is contained in the message and does not comply with the Office of Foreign Assets Control regulations applicable to all payments sent via the U.S.A. Payments to U.S.A. must NOT contain the word listed below.

1858.   Subsequently, because Barclays was advising the remitting bank of the prohibited language, some of these payment order messages would thereafter be re-sent by the remitting bank on the SWIFT network without the "offending" language.

1859.   This deliberate omission enabled the payment order message to pass through the Poole sanctions screening filter without being blocked, and then clear and settle in U.S. dollar funds by Barclays' New York branch and unwitting U.S. financial institutions.

1860.   In November 2001, the use of the fax cover sheet was identified by Barclays' internal auditors as problematic because (according to a Barclays internal audit report) "without adequate guidance the recipient of the fax advice may not be aware of the implications and may merely remove the offending text and re-submit the payment without any wider consideration."

1861.   In early 2002, as a result of this internal audit report, the language of the fax template was re-worded in an attempt to mitigate these issues. The fax language was changed to:

> OFAC ITEM: Wording below is contained in the message and does not comply with the U.S.A. / U.K. / E.C. / U.N. Sanctions.

1862.   Despite the altered wording in the fax cover sheet, no implementing guidance was circulated, and Barclays' "standard" practices nevertheless continued, as did the resubmission of prohibited OFAC-sanctioned transactions with the offending text removed.

1863.   Barclays' employees generated internal correspondence that documented Barclays' awareness and acceptance of the fact that transactions were being processed via MT–202 cover payments for the specific purpose of hiding the identity of Iranian entities in order to ensure that Barclays could continue its unfettered processing of U.S. dollar funds transfers involving Iranian entities through Barclays' New York branch.

1864.   For example, one Barclays employee explained in an email:

> [W]e can get around [OFAC seizure] by sending only cover payments to US banks and then make MT103 direct to beneficiary's bank. The MT202 cover must not mention of [sic] the offending entity which could cause funds to be seized. A good example is Cuba which the US says we shouldn't do business with but we do.

1865.    Barclays' employees understood the advantage of using bank-to-bank cover payments. The cover payment message format (MT–202), with its limited information fields, was a better mechanism to process OFAC-prohibited transactions than using a more detailed serial payment message format (MT–103).

1866.    A Barclays employee noted in an email: "If we were to route the payment via the serial payment method ... the payment would clearly be seized by the US authorities" but by using cover payments, "the US Treasury [would] remain blissfully unaware of [the payment's] existence."

1867.    In December 2002, internal correspondence also brazenly acknowledged Barclays' use of MT–202 cover payment messages to circumvent U.S. Iranian sanctions, stating:

> To circumvent US legislation, [Barclays is] currently rout[ing] US$ items for sanctioned institutions via unnamed account numbers, without mention of the sanctioned party. For customer transfers, payment cover is routed via MT202 to New York, naming only the account holding bank. A direct MT103 is them [sic] sent to the account holding bank. Further investigation suggests that we are carrying out this practice on behalf of four [Iranian bank] customers….

1868.    A January 2004 report provided to Barclays' Group Risk Oversight Committee noted that a recent failure "illustrat[ed] why the whole sanctions process needs to be reviewed and brought up to date."

1869.    In July 2004, an internal assessment of Barclays' payments processing explained:

> Cover payments are an issue for this project as they are effectively a way of by passing [sic] sanctions.... There is nothing in these payment messages [MT–103 and MT–202] that identifies them as linked for the purpose of screening.

337

1870.   In April 2005, Barclays noted in an internal memo the risk of using MT–202 cover payments rather than MT–103 serial payments, and also acknowledged that other financial institutions such as Defendants facilitated Eurodollar payments for Iran in the same manner:

> Changing to different message types would be much more expensive to us. *Moral risk exists if we carry on using cover payments but that is what the industry does.* I[n] M[y] H[umble] O[pinion] we should carry on using cover payments and accept that there is a risk of these being used on occasion to hide true beneficiaries (who may or may not be sanctioned individuals or entities). [Emphasis added.]

1871.   In the spring of 2006, Barclays's senior management learned that four cover payments involving sanctioned parties had been routed through Barclays' New York branch and were processed because the cover payments did not mention the sanctioned beneficiary or originator.

1872.   Throughout this entire time period, Barclays knew that Iran was a designated State Sponsor of Terrorism and knew that Barclays was facilitating unlawful payments on behalf of Iran to assist its terror apparatus in evading U.S. counterterror financing sanctions.

1873.   Barclays also continued to facilitate unlawful payments on behalf of Bank Saderat *after* Barclays knew that Bank Saderat had been designated an SDGT for facilitating the transfer of U.S. dollar funds to Hezbollah.

1874.   Barclays also continued facilitating unlawful U.S. dollar payments on behalf of Bank Melli *after* Barclays knew that Bank Melli had been designated by the United States in part for its enabling the transfer of U.S. dollar funds to the IRGC.

1875.   On August 18, 2010, DOJ announced that Barclays had entered into a Deferred Prosecution Agreement with federal and New York State prosecutors and agreed to forfeit $298 million dollars in connection with violations of IEEPA and TWEA.

1876.   A criminal information was filed on August 16, 2010, in the U.S. District Court for the District of Columbia charging Barclays with one count of violating the IEEPA, and one count of violating TWEA. Barclays waived indictment, agreed to the filing of the information, and accepted and acknowledged responsibility for its criminal conduct.

1877.   In the press release announcing the DPA, then-FBI Assistant Director-in-Charge Janice K. Fedarcyk was quoted stating:

> Barclays Bank has admitted a decade-long pattern of violating U.S. banking laws, and taking certain steps to conceal prohibited transactions. Corporate responsibility entails more than just acting discreetly on behalf of one's clients. It means, first and foremost, acting lawfully.

### G.   BANK SADERAT PLC's KNOWING SUBSTANTIAL ASSISTANCE TO THE IRGC AND HEZBOLLAH

1878.   Bank Saderat PLC is the legal successor in interest to the Iran Overseas Investment Bank ("IOIB"), London.

1879.   IOIB changed its name to Bank Saderat PLC in March 2002.

1880.   Defendant Bank Saderat PLC maintains its principal office in London, United Kingdom.

1881.   During the Relevant Period, Bank Saderat Plc (often in concert with the CBI) acted on instructions from the IRGC as its agent to collect and transfer funds for the benefit of the IRGC and Hezbollah.

1882.   During the Relevant Period, at the IRGC's direction, Bank Saderat PLC worked with the other Defendants to falsify U.S. dollar SWIFT transfer messages and LCs to conceal the true counterparties of transactions which the IRGC did not want disclosed to U.S. financial institutions, U.S. regulators, law enforcement agencies. and intelligence agencies.

1883.   On September 8, 2006, OFAC amended § 560.516 of the Iranian Transactions

Regulations ("ITRs") and excluded Bank Saderat from the Iranian U-Turn exemption.

1884. In announcing the 2006 change to the ITRs excluding Bank Saderat from the U-Turn exemption, OFAC stated:

> OFAC has amended the Iranian Transactions Regulations (ITR) to cut off Bank Saderat, one of Iran's largest government-owned banks, from the U.S. financial system. Bank Saderat has been a significant facilitator of Hezbollah's financial activities and has served as a conduit between the Government of Iran and Hezbollah....

1885. According to then-Under Secretary for Terrorism and Financial Intelligence Stuart Levey, "Bank Saderat facilitates Iran's transfer of hundreds of millions of dollars to Hezbollah and other terrorist organizations each year. We will no longer allow a bank like Saderat to do business in the American financial system, even indirectly."

1886. The U.S. Department of Treasury press release announcing the changes to the ITR stated that "a Hezbollah-controlled organization [] has received $50 million directly from Iran through Bank Saderat since 2001."

1887. Under Secretary Levey publicly stated in 2006 that Hezbollah uses Saderat "to send money to other terrorist organizations as well."

1888. In October 2007, Defendant Bank Saderat PLC, together with its parent company Bank Saderat Iran, was designated an SDGT by the United States pursuant to E.O. 13224.

1889. The U.S. Department of Treasury's 2007 press release regarding Bank Saderat's designation stated:

> Bank Saderat, its branches, and subsidiaries: Bank Saderat, which has approximately 3200 branch offices, has been used by the Government of Iran to channel funds to terrorist organizations, including Hezbollah and EU-designated terrorist groups Hamas, PFLP-GC, and Palestinian Islamic Jihad. For example, from 2001 to 2006, Bank Saderat transferred $50 million from the Central Bank of Iran through its subsidiary in London [Bank Saderat Plc] to its branch in Beirut for the benefit of Hezbollah fronts in Lebanon that support acts of violence.

1890.   In March 2008, the U.S. led efforts to pass U.N. Security Council Resolution 1803 that called upon all member states "to exercise vigilance over the activities of financial institutions in their territories with all banks domiciled in Iran, in particular with Bank Melli and Bank Saderat, and their branches and subsidiaries abroad."

1891.   This Court granted Plaintiffs' motion as to their Ninth and Eleventh Claims for Relief against Bank Saderat Plc asserting aiding-and-abetting liability under JASTA and entered a default judgment on January 7, 2021, ECF No. 90.

## VII.  THE IRGC–QF AND HEZBOLLAH COMMITTED ACTS OF INTERNATIONAL TERRORISM AT THE IRGC'S DIRECTION IN WHICH PLAINTIFFS WERE FORESEEABLY INJURED

1892.   As previously noted, the IRGC helped establish, fund, arm and direct the Lebanese-based Foreign Terrorist Organization Hezbollah.

1893.   From its inception, Hezbollah has served as Iran's proxy and agent and throughout the Relevant Period it was in all material respects the Lebanese arm of the IRGC, enabling it to project extremist violence and terror throughout the Middle East and around the globe.

1894.   After the U.S. and its Coalition partners invaded Iraq in March 2003, the IRGC embarked on a calculated and carefully calibrated campaign in Iraq mixing political maneuvers and terrorism to gain gradual control of the country.

1895.   The IRGC's multifaceted goals included killing and maiming U.S. service members and other Coalition Forces (primarily Polish and British personnel), as well as Iraqi civilians, in Iraq in order to induce Coalition Forces to leave Iraq; expand Iranian influence in Iraq; and promote an Iraqi government subservient to Iran.

1896.   The Iranian regime was unable to confront the U.S. with its conventional military, or to risk provoking a U.S. military response, so it decided to employ its preferred method of statecraft: deploying the IRGC to orchestrate a terror campaign.

1897.  Iran's two primary instruments for conducting this terrorist campaign against Coalition Forces were Lebanese Hezbollah (designated a Foreign Terrorist Organization by the United States in 1997) and the IRGC (designated an SDGT by the United States in 2017 and an FTO in 2019) including its foreign operations and terrorism directorate, the IRGC–QF (designated an SDGT by the United States in 2007 and an FTO in 2019).

## A.    THE IRGC AND IRGC–QF

### 1.    The IRGC

1898.  The IRGC is a paramilitary force answerable only to the Supreme Leader of Iran himself. The IRGC's devotion to Ayatollah Khamenei is "a religious imperative," because the IRGC is the Supreme Leader's personal force.

1899.  The IRGC differs from Iran's "regular" armed forces, which ostensibly functions under a national command structure. The IRGC is tasked with "protecting the revolution," which it accomplishes by silencing perceived enemies at home through secret police methods and attacking perceived enemies abroad (via its Qods Force) through terrorist tactics. It also aids in Iran's development of weapons of mass destruction, including EFPs and IRAMs and its nuclear program.

1900.  As the U.S. Department of Treasury explained in designating the IRGC an SDGT, "[t]he IRGC has played a central role to Iran becoming the world's foremost state sponsor of terror." Treasury also designated the IRGC "for the activities it undertakes to assist in, sponsor, or provide financial, material, or technological support for, or financial or other services to or in support of" its foreign operations directorate, the IRGC–QF.[198]

---

[198]    *See* Press Release, *Treasury Designates the IRGC under Terrorism Authority and Targets IRGC and Military Supporters under Counter-Proliferation Authority*, U.S. Dep't of Treasury (Oct. 13, 2017), https://home.treasury.gov/news/press-releases/sm0177.

1901.   Also, in 2017, Congress found that "the IRGC, not just the IRGC–QF, is responsible for implementing Iran's international program of destabilizing activities, support for acts of international terrorism, and ballistic missile program."

1902.   As the U.S. Department of Treasury explained in designating the IRGC for a third time, it was also "previously designated pursuant to E.O. 13382 on October 25, 2007, in connection with its support to Iran's ballistic missile and nuclear programs, and pursuant to E.O. 13553 on June 9, 2011, and E.O. 13606 on April 23, 2012, in connection with Iran's human rights abuses."

1903.   The IRGC was designated an FTO on April 15, 2019, in part for its role in killing Americans in Iraq. The designation press release explained:

> The Iranian regime is responsible for the deaths of at least 603 American service members in Iraq since 2003. This accounts for 17% of all deaths of U.S. personnel in Iraq from 2003 to 2011, and is in addition to the many thousands of Iraqis killed by the IRGC's proxies.[199]

### 2.   The IRGC–QF

1904.   The United States designated the IRGC–QF an SDGT for, among others things, "provid[ing] lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants who target and kill Coalition and Iraqi forces and innocent Iraqi civilians."

1905.   In 2017, Congress found that the IRGC–QF "is the primary arm of the Government of Iran for executing its policy of supporting terrorist and insurgent groups. The IRGC–QF provides material, logistical assistance, training, and financial support to militants and terrorist operatives throughout the Middle East…."

1906.   According to the U.S. Department of State's *Country Reports on Terrorism 2008*:

> The Qods Force, an elite branch of the Islamic Revolutionary Guard Corps (IRGC), is the regime's primary mechanism for cultivating and supporting terrorists abroad. The Qods Force provided aid in the form of weapons,

---

[199]   Press Release, *Designation of the Islamic Revolutionary Guard Corps*, U.S. DEP'T OF STATE (Apr. 8, 2019), https://2017-2021.state.gov/designation-of-the-islamic-revolutionary-guard-corps/.

training, and funding to HAMAS and other Palestinian terrorist groups, Lebanese Hezbollah, Iraq-based militants, and Taliban fighters in Afghanistan....

1907. In July 2007, MNF–I spokesman Brig. Gen. Kevin J. Bergner briefed the following to media about how the IRGC–QF employed Hezbollah operatives in Iraq:

> Iran's Quds Force, a special branch of Iran's Revolutionary Guards, is training, funding and arming the Iraqi groups.... Iranian operatives are using Lebanese surrogates to create Hezbollah-like capabilities. And it paints a picture of the level of effort in funding and arming extremist groups in Iraq.

1908. In October 2007, the U.S. Department of Treasury designated the IRGC–QF as an SDGT, finding the following:

> The Qods Force has had a long history of supporting Hezbollah's military, paramilitary, and terrorist activities, providing it with guidance, funding, weapons, intelligence, and logistical support. The Qods Force operates training camps for Hezbollah in Lebanon's Bekaa Valley and has reportedly trained more than 3,000 Hezbollah fighters at IRGC training facilities in Iran. The Qods Force provides roughly $100 to $200 million in funding a year to Hezbollah and has assisted Hezbollah in rearming in violation of UN Security Council Resolution 1701.
>
> In addition, the Qods Force provides lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants who target and kill Coalition and Iraqi forces and innocent Iraqi civilians.

1909. The U.S. Department of State's *Country Reports on Terrorism for 2007* stated the following about the IRGC–QF's operations in Iraq:

> The [IRGC–QF] continued to provide Iraqi militants with Iranian-produced advanced rockets, sniper rifles, automatic weapons, mortars that have killed thousands of Coalition and Iraqi Forces, and explosively formed projectiles (EFPs) that have a higher lethality rate than other types of improvised explosive devised (IEDs) and are specially designed to defeat armored vehicles used by Coalition Forces. The Qods Force, in concert with Lebanese Hezbollah, provided training outside Iraq for Iraqi militants in the construction and use of sophisticated IED technology and other advanced weaponry.

1910. On January 9, 2008, the U.S. Department of Treasury designated Ahmed Foruzandeh, a Brigadier General in the IRGC–QF, finding:

> As of mid-February 2007, Foruzandeh ordered his Iranian intelligence officers to continue targeting Shia and Sunnis to further sectarian violence within Iraq. Foruzandeh is also responsible for planning training courses in Iran for Iraqi militias, including Sayyid al-Shuhada and Iraqi Hezbollah [KH], to increase their ability to combat Coalition Forces. The training includes courses in guerilla warfare, light arms, marksmanship, planting improvised explosive devices (IEDs), and firing anti-aircraft missiles.

1911. At a July 2, 2007, press briefing, Brig. Gen. Bergner noted:

> The Qods Force also supplies the special groups with weapons and funding of 750,000 to 3 million U.S. dollars a month. Without this support, these special groups would be hard pressed to conduct their operations in Iraq […] The Qods Force goal was to develop the Iraqi special groups into a network similar to the Lebanese Hezbollah. Special groups would be unable to conduct their terrorist attacks in Iraq without Iranian-supplied weapons and other support.

## B.     HEZBOLLAH

1912. While the IRGC and the IRGC–QF were responsible for managing Iran's terror campaigns abroad, they lacked recent operational and tactical experience in developing terrorist capabilities and performing terrorist attacks against a modern military force. Moreover, as ethnically Persian, Farsi-speaking entities, IRGC personnel were at a disadvantage in recruiting and training ethnically Arab, Arabic-speaking Shi'a Iraqis.

1913. For that purpose, the IRGC–QF turned to FTO Hezbollah, Iran's Lebanese long-standing terror proxy, which had hard-earned experience in running terror campaigns against the Israel Defense Forces in Lebanon, and which shared ethnic and language connections with Iraqis.

1914. At the IRGC's direction, Hezbollah and the IRGC–QF worked symbiotically to plan, authorize, and commit attacks on Coalition Forces in Iraq. They accomplished this by establishing Iraqi Shi'a proxy groups and then providing them with funding, weapons, and training, and then guiding and directing them to attack Coalition Forces.

1915.  Specifically, the IRGC–QF and Hezbollah provided these proxies with sophisticated weapons specially designed to inflict casualties on the well-protected Coalition Forces—principally, EFPs and IRAMs, along with the tactics, techniques, and procedures ("TTPs") developed by Hezbollah necessary to use them most effectively.

1916.  These Shi'a proxies included:

- Badr Corps (Badr Organization)
- Jaysh al-Mahdi ("JAM" or the "Mahdi Army") including the Promised Day Brigades
- Asa'ib Ahl Al-Haq ("AAH" or the "League of the Righteous")
- Kataib Hezbollah ("KH") (designated an FTO in 2009).

1917.  Although the precise roles and proficiencies of these groups evolved over time, at all relevant times each acted as the agents and proxies of Hezbollah and the IRGC when attacking Coalition Forces.

1918.  The IRGC provided EFPs to these proxies for the *exclusive* purpose of targeting Coalition Forces, and Hezbollah's advanced EFP training was provided exclusively to these cells to improve their emplacement of EFPs against Coalition armored vehicles. The IRGC and Hezbollah were the sole sources of the weapons.[200]

1919.  These terror cells served as EFP emplacers (or in some cases, trigger pullers) for the IRGC and Hezbollah. They were generally not permitted to use their independent judgment in choosing their targets (they were often directed to select a particular date or location for an attack, and even required to provide visual evidence that they had carried out the IRGC's directives).

1920.  If a group or cell failed to comply with the IRGC's directives it could be deprived of EFPs and other support. EFPs were carefully controlled. For example, "[e]ach major arms cache

---

[200]    In 2007, when AAH founder Qais Khazali was captured by Coalition Forces, he acknowledged that "EFPs still come solely from Iran and there is currently nobody in Iraq manufacturing the components of an EFP."

[had] a 'hide custodian' who signs out weapons such as EFPs and is responsible for their proper use against U.S. forces and the minimization of Iraqi casualties."[201]

1921.   When EFPs were misused, the IRGC cut the group off.[202]

1922.   The IRGC delivered other weapons to these groups, as well, as described below.

1923.   In the post-invasion period, the lethality of Shi'a attacks on U.S. and Coalition Forces was the direct result of the IRGC's policy. And the terrorist cells that in fact targeted U.S. service members were created and sustained by the IRGC and Hezbollah for that purpose.

### 1.      Hezbollah's Founding as an IRGC Proxy

1924.   Hezbollah was established in Lebanon circa 1982 by Sheikh Subhi al-Tufayli and Abbas al-Musawi with the support and assistance of Iran's IRGC.

1925.   Mr. al-Tufayli was Hezbollah's first Secretary General, from 1989 until 1991.

1926.   Sheikh Muhammad Hussein Fadlallah served as the group's "Spiritual Leader," providing Hezbollah its intellectual basis for both pursuing jihad and departing from the more apolitical and passive theological trend in Shi'a Islam.

1927.   At all times relevant hereto, Hezbollah is and was a radical Islamic terrorist organization that views the United States and other Western countries as its enemies.

1928.   From its founding through the present, Hezbollah has carried out hundreds of terrorist attacks against American targets that have killed hundreds of U.S. citizens and wounded hundreds more.

---

[201]    *See* Michael Knights, *The Evolution of Iran's Special Groups in Iraq*, CTC SENTINEL (U.S. Military Academy at West Point) (Nov. 2010), https://ctc.westpoint.edu/wp-content/uploads/2011/05/CTCSentinel-Vol3Iss11-127.pdf.

[202]    On rare occasions, certain elements defied this directive. For example, EFPs were used in the assassinations of two provincial governors and two provincial police chiefs in the latter half of 2006. The U.S. military assessed that these events were contrary to IRGC policy.

1929. Since its founding, Hezbollah has committed numerous acts of international terrorism, including, but not limited to, the following attacks that predate the Relevant Period:

- July 19, 1982: The kidnapping of American University president David S. Dodge in Beirut.
- April 18, 1983: A car bomb attack on the United States Embassy in Beirut, in which sixty-three people were killed.
- October 23, 1983: A truck bomb attack on the U.S. Marine barracks where American military personnel stationed in Beirut were serving as part of a peace-keeping force in which 241 American military personnel were killed; a separate attack against the French military compound in Beirut killed 58 people.
- December 12, 1983: Bombings against U.S. and French embassies in Kuwait, in which 5 people were killed.
- September 20, 1984: A car bomb attack on the U.S. Embassy annex in Beirut, in which two Americans and twenty-two others were killed.

1930. Hezbollah's policy and practice of carrying out terrorist attacks against United States targets was well known to Defendants, because Hezbollah has openly, publicly, and repeatedly acknowledged having such a policy and carrying out such attacks.

1931. Hassan Nasrallah, who has been Hezbollah's Secretary General and supreme leader for decades, has made public pronouncements that leave no doubt about Hezbollah's embrace of terrorism. For example:

- "[P]ut a knife in your shirt, then get close to an Israeli occupier and stab him." (*Nightline*, October 19, 2000)
- "Suicide attacks shake the enemy from within, they plunge him into an existential crisis, and thus prepare the ground for victory; these acts are completely legitimate, since there are no innocent civilians in Israel; rather they all are occupiers and accomplices to crime and massacre." (Statement broadcast on Al-Manar TV, September 14, 2001)
- "Martyrdom operations - suicide bombings - should be exported outside Palestine. I encourage Palestinians to take suicide bombings worldwide. Don't be shy about it." (*Washington Times*, December 6, 2002)
- "[T]his American administration is an enemy. Our motto, which we are not afraid to repeat year after year, is: 'Death to America.'" (Statement broadcast on Al-Manar TV, February 18-19, 2005)
- "The Lebanese resistance today inspires all the resistance in the world, all the free persons, all the noble people and all who refuse to surrender to American

humiliation in the world. This is our victory, and this too is the result of our battle." (Speech after the July 2006 War "Divine Victory Rally," September 22, 2006)

- "There is no doubt that American terrorism is the source of all terrorism in the world. The Bush administration has turned the U.S. into a danger—threatening the whole world, on all levels." (Statement broadcast in November 2009).

1932.  Hezbollah made these and many other acknowledgments on its official websites, in its official press releases, on its official television station, Al-Manar, on its official radio station, Al-Nour, and in numerous press conferences and news media interviews conducted by senior Hezbollah officials.

1933.  As a result of its mission, conduct, and terrorist activities, on January 23, 1995, Hezbollah was designated an SDT by the United States. It has retained this designation since that time.

1934.  On October 8, 1997, Hezbollah was designated an FTO by the United States. It has retained this designation since that time.

1935.  On October 31, 2001, Hezbollah was designated an SDGT by the United States. It has retained this designation since that time.

1936.  The IRGC has funded, trained, and supplied Hezbollah, and facilitated its attacks against the Israel Defense Forces since at least as early as 1983.

1937.  When Hezbollah leader Hassan Nasrallah met with Iran's supreme leader Ayatollah Khamenei in 2001, Nasrallah publicly kissed Khamenei's hand, a gesture heavy with meaning among the Shi'a: it implied that Nasrallah accepts Khamenei as his leader.

1938.  Hezbollah had developed advanced tactical capabilities through the battlefield experience of attacking the IDF in southern Lebanon, including the use of roadside bombs featuring remote detonators and passive infrared ("PIR") switch systems.

1939.   By the late 1990s, Hezbollah effectively deployed EFPs against IDF armor and had developed sophisticated tools to defeat IDF countermeasures.

1940.   Over time, Hezbollah became increasingly adept at inflicting casualties on the Israeli military, and it eventually forced the IDF to withdraw into what Israel called a "Security Zone" in southern Lebanon.

1941.   For 15 years, the IDF maintained this buffer zone until increasing IDF casualties precipitated an Israeli withdrawal in 2000 to its current border with Lebanon.

1942.   During that 15-year period, southern Lebanon served as a laboratory for Hezbollah to hone its tactical war fighting skills and weapons development.

1943.   Attacks on the IDF's Security Zone allowed Hezbollah to study and improve its insurgent tactics, including: (1) effectively ambushing Israeli patrols;(2) deploying IEDs; (3), kidnapping Israeli soldiers; and, (4), developing and deploying EFPs in the late 1990s against Israeli armored vehicles.

1944.   The accumulated experience Hezbollah gained through its decades-long campaign against the IDF also included developing precision use of indirect fire weapons and employing Iranian-provided 107mm and 122mm rockets to launch indirect fire attacks on Israeli fortified outposts and on Israel itself.

1945.   Hezbollah's tactics evolved and improved over time. Examples included:

- Beginning in August 1991, Hezbollah began regularly detonating bombs by remote radio control, precluding the need for command wire. The IDF attempted to counter the remote-control detonations by sweeping a wide spectrum of radio frequencies from its listening bases on the mountain peak of Mount Hermon to explode the bombs prematurely.

- In response, Hezbollah resumed using command-wire, victim-initiated pressure plates and mat detonations for a while, before introducing a new coded remote-control system in mid-1993. The bombs were fitted

with two receivers and scramblers, initially defeating Israeli attempts to reproduce the detonating signals. Hezbollah engineers then refined the bombs' switches further by incorporating small jammers and turning the weapons on using computerized multi-frequency transmissions.

- By 1995, Hezbollah was equipping its IEDs with cellular phone receivers to trigger firing switches. In turn, Israel jammed cell phone frequencies from aircraft flying high above southern Lebanon. As the technology improved and grew smaller, the IDF fitted cell phone jammers into armored personnel carriers and vehicles. Eventually foot soldiers could carry the equipment in a backpack.

- In a major step change in capability, Hezbollah began using passive infrared receivers in 1997 with the IED detonating when the target, human or vehicular, crossed the beam, thereby negating the effectiveness of IDF jamming devices.

1946.   The relatively rapid evolution of Hezbollah's Tactics, Techniques & Procedures ("TTP") was a product of at least three related factors.

1947.   *First*, Hezbollah's operatives were highly motivated and willing to risk heavy losses in their confrontations with Israel. *Second*, Hezbollah benefited enormously from Iranian financial support and IRGC training and technology transfers. *Finally*, Hezbollah took advantage of the first two factors and perfected its TTP through trial and error against the IDF and its proxy, the South Lebanese Army.

1948.   These combined factors allowed Hezbollah to inflict significant (but not decisive) casualty levels on the IDF.

1949.   The status quo began to change, however, with the first reported use of an EFP by Hezbollah in southern Lebanon on October 5, 1998, when an Israeli High Mobility Multipurpose Wheeled Vehicle ("HMMWV") was struck, killing two Israeli soldiers and wounding six more.

1950.   As noted above, EFPs are explosive devices with liners (usually made of copper) shaped like an inverted metal dish or platter.

1951.   EFPs introduced into the Israeli Security Zone in southern Lebanon quickly began to significantly increase Israeli casualties because they were highly effective against Israeli armor and therefore diminished the IDF's ability to protect its patrols and supply lines, forcing the IDF to resupply their now isolated and beleaguered outposts by helicopter, thereby avoiding the use of armored convoys whenever possible.

1952.   By the late 1990s, Hezbollah effectively deployed EFPs against IDF armor and had developed sophisticated tools to defeat IDF counter-IED measures.

1953.   As noted above, in 2000, the Israelis withdrew their forces to the current border with Lebanon rather than suffer further personnel losses that were becoming politically unsustainable.

1954.   In 2003, Hezbollah began to successfully export its TTP to Iraq – particularly its experience deploying EFPs against HMMWVs, including hiding EFPs inside fiberglass 'rocks' painted to match the limestone geology of South Lebanon.

1955.   This included TTP for ambushes, kidnappings, indirect fire on stationary bases and particularly its experience deploying EFPs against HMMWVs.

1956.   Hezbollah's transfer of TTP was critical to the effectiveness and lethality of its proxies in Iraq that would go on to kill and maim more than a thousand Americans between 2004 and 2011.

1957.   Another early warning sign of Hezbollah's threat to American personnel in Iraq occurred in May 2003 when Israeli naval commandos seized a small fishing boat off the country's northern coast and captured a Hezbollah explosives expert who had bomb detonators and computer disks containing, among other things, bomb making instructions stowed on board.

1958. For example, the computer disks contained detailed instructions on how to manufacture and assemble EFPs:

**Anti-armor devices**

Like with anti-personnel devices, one of the most important factors in increasing the effectiveness of anti-armor devices is:

1. The speed of the explosive substance: the faster the explosive substance is and the more powerful it is, the more effective the device is.
2. The weight of the explosive substance: the greater the weight of the explosive substance, the more effective the device is.
3. The case: the thicker the case is, the more effective the device is. The container is normally between 5 mm and 2½ cm in thickness.

Anti-armor devices come in two types: plate devices and hollow devices.

1. Plate devices: these are devices designed to be used against light armor, such as: Land Hummer and the M113 armored personnel carrier.

   To penetrate armor, these devices depend on a formed projectile moving at a speed 2,000 to 3,000 meters per second.

   This is a concave projectile.

## 2. Hezbollah in Iraq

1959. As set forth below, the IRGC–QF and Hezbollah jointly played a pivotal role in fomenting sectarian violence in Iraq between 2004 and 2011, and they orchestrated numerous attacks against U.S. service members in Iraq, including nearly all attacks involving EFPs, Improvised Rocket Assisted Munitions and other specified weapons. One of the first indications that Hezbollah operatives might be present in Iraq after the U.S.-led invasion came in an article in *The New York Times* published in November 2003 that stated:

Both American and Israeli intelligence have found evidence that Hezbollah operatives have established themselves in Iraq, according to current and former United States officials. Separately, Arabs in Lebanon and elsewhere who are familiar with the organization say Hezbollah has sent what they describe as a security team of up to 90 members to Iraq. The organization

has steered clear of attacks on Americans, the American officials and Arabs familiar with Hezbollah agree.

1960.   Sometime in 2003, the IRGC instructed Hezbollah to create "Unit 3800," an entity dedicated to creating, developing and supporting Iraqi Shi'a terrorist cells which would execute IRGC and Hezbollah attacks on MNF–I.

1961.   Unit 3800 was established by Hezbollah leader Hassan Nasrallah at Iran's behest.

1962.   Unit 3800 later trained, advised, and directed the JAM "Special Groups" and Badr Corps in Iraq.

1963.   Hezbollah's expertise in the use of EFPs, kidnapping, communications, and small-unit operations were critical to the effectiveness of the IRGC's proxies in Iraq between 2004 and 2011.

1964.   A 2010 Department of Defense report noted that "Lebanese Hezbollah provides insurgents with the training, tactics and technology to conduct kidnappings, small unit tactical operations and employ sophisticated IEDs."

1965.   A July 2004 UK Joint Intelligence Committee ("JIC") assessment noted: "We also judge that Lebanese Hezbollah will retain an influence in Iraq (Hezbollah members may have been linked to the group that attacked the Sheraton Hotel) and could supply Iraqi groups with terrorist expertise and munitions."

1966.   Tracing Hezbollah's carefully monitored introduction of EFPs, the UK Defence Intelligence Staff ("DIS") accurately predicted on August 3, 2004, the evolution of the IED threat in Iraq: "IED technology in use with other Middle Eastern groups[,] especially Lebanese Hezbollah, can be expected to appear in Iraq. This would include multiple systems, such as RC (Radio-Controlled) switched PIRs [Passive Infrared]."

1967.   By the summer of 2004, British intelligence had detected the EFP's appearance in

southern Iraq:

> On 26 July, the DIS reported that an EFP IED had been found on 15 July in
> Baghdad. The DIS noted that the EFP IED design had not previously been
> encountered in Iraq but was, as with the find in May 2004, of a type
> associated with Lebanese Hezbollah. There were also indications of Iranian
> involvement in the construction of the devices.

1968.   On December 2, 2004, a British Defence Intelligence Report titled "The Evolution

of the IED Threat in Iraq" stated:

> Improvement in IED technology has been most significant in Shia areas
> since May [20]04, where technical progress has been made that we assess
> could only have been achieved through focused external assistance. We
> assess that this may be due to an influx of Lebanese Hezbollah IED
> technology under Iranian sponsorship.

1969.   Similarly, the U.S. Department of State's *Country Reports on Terrorism 2006*

reported the following about Hezbollah's activities in Iraq:

> Since at least 2004, Hezbollah has provided training and logistics to select
> Iraqi Shia militants, including for the construction and use of shaped charge
> IEDs, which Hezbollah developed against Israeli forces in southern
> Lebanon during the late 1990s and which can penetrate heavily armored
> vehicles.

1970.   In 2006, the Australian government reported the following regarding Hezbollah's

Unit 3800 and the IRGC–QF:

> Hezbollah has established an insurgent capability in Iraq, engaging in
> assassinations, kidnappings and bombings. The Hezbollah units have been
> set up with the encouragement and resources of Iran's Revolutionary
> Guards al Qods Brigades. Hezbollah has also established a special training
> cell known as Unit 3800 (previously known as Unit 2800) specifically to
> train Shia fighters prior to action in Iraq.

1971.   For example, the IRGC–QF Department of Special External Operations

(Department 9000) was responsible for providing weapons to its favored Shi'a proxy groups.

1972.  A 2010 Department of Defense report stated that weapons the IRGC delivered to its proxies in Iraq included EFPs (with radio-controlled, remote arming, and passive infrared detonators), IEDs, anti-aircraft weapons, mortars, 107 and 122mm rockets, rocket-propelled grenades and launchers, explosives, and small arms.[203]

1973.  It also noted that "Lebanese Hezbollah provides insurgents with the training, tactics, and technology to conduct kidnappings, small unit tactical operations and employ sophisticated IEDs." U.S. and Coalition Forces' discovery and exploitation of weapons caches in Iraq frequently evidenced the Iranian source of the arms through their markings or inventory documents.

1974.  These developments were reported in the international media. By 2006 and 2007, EFPs were a defining feature of the U.S. presence in Iraq in public reporting—but reports of Iran's and Hezbollah's use of their proxies in Iraq to attack U.S. and Coalition Forces, including the EFPs, dates back even earlier.

1975.  As early as mid-2004, the *New Republic* reported that "Shia militias enjoy the backing of Iran…."

1976.  In October 2005, a British news source reported that Iran provided the militia with highly sophisticated tools and intelligence, including that "They are believed to have supplied armour-piercing explosives to Shia militia."

1977.  The report continued:

> Iraqi insurgents are being fed Iranian satellite images of our Army bases. Terrorists will soon be able to record British troop movements and view real time video footage of military vehicles and personnel.

---

[203]    U.S. Dep't of Defense, Report on the Military Power of Iran 2–3 (2010), https://fas.org/man/eprint/dod_iran_2010.pdf.

> Iraq's neighbour Iran puts its first spy satellite into orbit later this month- and UK Foreign Office sources last night warned that the Iranian Revolutionary Guard is passing pictures to Iraqi rebels.
>
> One source said: "We have discovered in Iraq plans of UK defence bases, which are believed to originate from Iran.
>
> "There is computer evidence terrorists in Iraq have computer equipment from Iran to receive satellite data." Raids by US and British troops in central and southern Iraq uncovered the gear.

1978.   In mid-2005, British forces reported on weapons smuggling from Iran, including "timers, detonators and other bomb-making equipment." The smuggling group "had the 'fingerprints' of either Iran's Revolutionary Guard, controlled by the supreme leader Ayatollah Ali Khamenei, or the Lebanese based Hezbollah which Tehran backs." The *Guardian*, Iranian arms intercepted at Iraqi border: Britain warns Tehran about weapons smuggling (Aug. 11, 2005).

1979.   Also in 2005, *The Times* (UK) reported on accusations from the British government that the IRGC was supplying EFPs to Shi'a militia, using Hezbollah agents:

> The British Government provoked a war of words with Iran last month when it accused the country's Revolutionary Guard of supplying the technology for the bombs, which use infra-red "trip wires" to set off explosives as a military vehicle passes. The bombs use a shaped charge, capable of piercing armour, believed to have been developed in Iran.
>
> The complex technique was first mastered by the Iranian-backed Hezbollah organisation in Lebanon. British officials believe that the technology has now come to southern Iraq via Hezbollah's backers in Iran. The Iranian Government has denied the accusations.

### 3.      Development of the Iraqi Proxies

1980.   Muqtada al-Sadr's Sadrist Movement commanded the loyalty of perhaps millions of Iraqi Shi'a, but under the Hussein regime's rule it had no military capacity; it was almost exclusively a social and political movement.

1981.   The 2003 U.S.-led invasion freed Muqtada al-Sadr and his followers from the constraints placed on them by the Hussein regime, and the young Sadr set his sights on becoming the preeminent leader of Iraq's Shi'a community.

1982.   At the invitation of Iran's Supreme Leader, Ayatollah Khamenei, Mr. Sadr and his key deputies were formally received in Iran in June 2003, shortly after the U.S. invasion.

1983.   General Abdul Reza Shahlai—a deputy commander of the IRGC–QF—served as the "chief of protocol" for the visit and Qasem Soleimani, IRGC–QF Commander, served as host to the Sadr delegation.

1984.   Mr. Sadr also met with Ayatollah Khamenei during the visit and received assurances from General Shahlai that the IRGC–QF wanted to financially support the Sadrist movement.

1985.   Shortly thereafter, the IRGC dispatched two of Hezbollah's most senior terror operatives, Imad Mughniyah and Mustafa Badr al-Din, to help organize and birth the creation of the Sadrist Movement's armed faction.

1986.   On July 18, 2003, Sadr gave a sermon in the Great Mosque in Kufa in which he branded the newly-formed Iraqi government "nonbelievers" and announced the formation of a religious army to counter the government called "Jaysh al-Mahdi" or "JAM" – the Mahdi Army.

1987.   Hezbollah operatives were present on the ground in Iraq following the U.S. invasion in 2003 and were directly involved in providing training and support to JAM from its inception.

1988.   JAM featured several attractive assets for Iran and Hezbollah, including a strong base of support among the poorest and most disenfranchised Shi'a communities, a network of mosques and social institutions, and a vast supply of young, desperate men. However, it was an

unruly and unprofessional organization ill-suited to confronting an advanced military in the way Hezbollah had successfully attacked the IDF.

1989.   Imad Mughniyah and Mustafa Badr al-Din worked closely both with Sadr and his associates and the Iranian-sponsored Badr Corps (made up of Iraqi Shi'a who opposed the Hussein regime during the 1980–1988 Iran-Iraq War), but Hezbollah remained cautious and did not encourage either Badr or JAM to immediately confront Coalition Forces.

1990.   As former Badr Corps leader and Special Group Kataib Hezbollah (discussed below) founder Abu Mahdi al-Muhandis (discussed below) would later explain to the Hezbollah-affiliated channel *Al-Mayadeen*:

> *Al-Muhandis*: Of course, my relationship with martyr Imad, the great martyr Imad [Mughniyah], and martyr Mustafa Badr a-Din, started in the early 1980s. This was a strong and operational relationship. The first ones to train the first Iraqi jihadi resistance groups in the beginning of the 1980s were Imad and Mustafa. They also had a major role in organizing the resistance cells against the Americans in Iraq.

> *Host*: Training Iraqis here, to fight the Americans?

> *Al-Muhandis*: Sure, they trained Iraqis. The first Iraqi cells, I was among them, after 2003.

> *Host*: After 2003…

> *Al-Muhandis*: They had a major role; their brothers and men still have an essential role in training and planning… they have a very important role.

1991.   The same Mr. al-Muhandis was the mastermind behind the 1983 Kuwait bombings, and later became the founder of KH in Iraq and an advisor to Qasem Soleimani, the commander of the IRGC–QF. (The two men were both killed in the same airstrike in January 2020.)

1992.   Mustafa Badr al-Din, one of Hezbollah's leading bomb-makers at the time, was arrested by Kuwait after the attacks and convicted for his role in the bombings. He later became a leading figure in Hezbollah after his escape from a Kuwaiti prison.

1993.   As previously noted, in 2008, Imad Mughniyah was killed in Syria.

1994.   Ten years after his death, several of Mr. Mughniyah's former protégés gathered at an elaborate ceremony to pay tribute to him and extol his contributions to the terror campaign he helped launch in Iraq.

1995.   At an event commemorating the anniversary of Mr. Mughniyah's death, on February 23, 2018, several Iraqi Shi'a notables spoke, including Mr. al-Muhandis, who declared: "The martyr Mughniyah is still present in all fields of confrontation as [part of] a jihadist school that terrorized the enemies...."

1996.   Qais Khazali (discussed below), also in attendance, asserted that "[t]he pillars of the Islamic Resistance that took place in Iraq were the fruit of the martyr Mughniyah."

1997.   Mr. Khazali went on to say:

> I got to know him in 2003 or 2004. At that time when I met him, I didn't know that he is Imad Mughniyeh. I only knew him as "Haj Radwan." Imad Mughniyah was the person behind the Iraqi Resistance against the American occupation of Iraq. The first generation of the commanders of the Resistance were the product of the Mughniyah's training.

1998.   Although Mr. Mughniyah was a key figure in Hezbollah's operational (terrorist) activities in Iraq, the terrorist organization's political and diplomatic role in guiding Iraqi Shi'a factions was of equal, if not greater, importance.

1999.   For this purpose, Hezbollah tapped a senior member of its Political Council, Muhammad Kawtharani, to be responsible for the organization's Iraq portfolio.

2000.   As the U.S. Department of Treasury noted when it designated him an SDGT on August 22, 2013, Mr. Kawtharani was:

> [T]he individual in charge of Hezbollah's Iraq activities, Kawtharani has worked on behalf of Hezbollah's leadership to promote the group's interests in Iraq, including Hezbollah efforts to provide training, funding, political, and logistical support to Iraqi Shi'a insurgent groups.

2001.   Mr. Kawtharani was an inspired choice because he not only previously lived in Iraq but had also been a pupil of Ayatollah Muhammad Sadiq al-Ṣadr.

2002.   Mr. Kawtharani wasted no time in contacting one of Mr. Sadr's most trusted deputies, Mustafa al-Yaqubi, soon after (and possibly before) the overthrow of the Saddam Hussein regime by Coalition Forces in March 2003.

2003.   Mustafa al-Yaqubi had frequent contact with Mr. Kawtharani through the years and appears to have served as a primary channel for communications between Hezbollah, Mr. Sadr, and his JAM proxy group.

2004.   According to one of MNF–I's Tactical Interrogation Reports documenting an interview of Mr. al-Yaqubi, the Hezbollah and IRGC backed As'aib Ahl al-Haq leader:

> Mustafa al-Yaqubi has frequent contact with Lebanese Hezbollah. He speaks often by phone with al-Kawtharani, who is Lebanese Hezbollah's political spokesperson on Iraq issues. Al-Kawtharani has served in that position since shortly after Saddam Hussein's regime fell. Al-Kawtharani is a former student of the Najaf al-Hawza. But he is Lebanese-one of two Lebanese students who attended. He and Mustafa discuss major events that take place in Iraq.[204]

2005.   From June 2003 through August 2004, at the IRGC's direction, Hezbollah organized and trained JAM gunmen, instilled organizational discipline and professionalism into the nascent militia and slowly built up its capabilities so that it could effectively threaten U.S. and Coalition Forces across Iraq.

2006.   According to a 2007 Multi-National Forces – Iraq ("MNF–I") report, "members of the Sadr movement have deep respect for Lebanese Hezbollah…. Hezbollah sends trainers to Iran to train Iraqi fighters on EFPs."

---

[204]   MULTI-NATIONAL FORCES–IRAQ, TACTICAL INTERROGATION REPORT OF QAIS AL-KHAZALI, TIR N122A–28 (28th Interrogation) (April 5, 2007).

2007.   For instance, Muqtada al-Sadr's father-in-law was Grand Ayatollah Muhammad Baqir al-Sadr, who was a contemporary of Hezbollah's spiritual leader, Muhammad Fadlallah.

2008.   Hezbollah's leader, Hassan Nasrallah, received his religious education in Lebanon from a seminary that taught Baqir al-Sadr's teachings on Shi'ism.

2009.   Due to its conflict with Israel in Lebanon, Hezbollah also possessed hard-earned specialized knowledge on how to deploy new tactical and technological countermeasures against a modern army.

2010.   Yet, despite the affinity between Hezbollah and the leaders of the Sadrist Movement, when Hezbollah slowly began to introduce EFPs into Iraq in small numbers at the IRGC's direction (during the late autumn of 2003 and into the first half of 2004), it did so through Iran's other, more established proxy, the Badr Corps.

2011.   Unlike JAM, the Badr Corps had prior (and extensive) military training from, and its operatives had long-standing operational ties to, both the IRGC–QF and Hezbollah.[205]

2012.   Most notable among the Badr Corps cells was the so-called "Sheibani Network" named after Hamid A'atabi al-Sheibani, also known as Abu Mustafa al-Sheibani.

2013.   Accordingly, when Hezbollah introduced its most effective anti-armor weapon into Iraq, it began by training Badr Corp operatives on the emplacement of single EFPs with relatively primitive initiation systems—a process that allowed Hezbollah to test the weapons, assess the capabilities of its Iraqi proxies, and probe Coalition Forces' responses to the threat.

---

[205]   The Badr Corps had long established four geographic commands inside Iraq, all with experience conducting attacks against the Hussein regime. The Baghdad-based command was supervised from an IRGC base in nearby Bakhtaran, Iran by Abu Mustafa al-Sheibani, whose extensive smuggling routes were used both before and after the 2003 U.S.-led invasion for transporting weapons, men, and money from Iran into Iraq.

2014. According to the Chilcot Report released by the British Government, "[t]he first IED attack in Iraq using an Explosively Formed Projectile (EFP) took place against a UK Warrior vehicle in al-Amara in May 2004."

2015. By this method of slowly introducing the weapon system and directing its use against British forces, Hezbollah was able to assess the capabilities of the Badr Corp personnel, assess the effectiveness of its tactics, techniques, and procedures and adjust those TTPs based on how first British (and later American) forces responded.

2016. At the same time it was supplying the Badr Corp with the initial training and direction to launch EFP attacks against Coalition Forces, Hezbollah also provided training and logistical support to JAM, but did not initially furnish JAM operatives with EFPs.

2017. A Sadrist uprising led by armed JAM forces in August 2004 in the Shi'a holy city of Najaf would soon change the direction of the conflict.

2018. In Najaf in August, JAM forces launched an uprising and soon confronted U.S. Marines, other U.S. Army units, and their tactical air support.

2019. As a result, JAM suffered significant casualties.

2020. Over the course of approximately three weeks, the U.S. military lost nine soldiers and Marines.

2021. By contrast, an estimated 1,500 JAM fighters were killed and an undetermined number, most likely in the thousands, were wounded.

2022. IRGC personnel were present during the bloodshed and carefully observed the fighting.

2023. The lesson from the uprising was clear—JAM members were, at that time, insufficiently organized and disciplined to cause any serious harm to Coalition Forces. Thus,

shortly after the uprising in Najaf was brought under control, Muqtada al-Sadr authorized his deputies to create what became known as the "Special Groups" to be supported and trained by Hezbollah and funded and controlled by the IRGC.

2024. Mr. Sadr's key deputies wanted to be able to deploy more professional (and lethal) forces that could successfully attack Coalition Forces in Iraq while his "regular" JAM militia concentrated on ethnic cleansing and kidnapping Sunnis as well as its traditional criminal enterprises.

2025. Initially, the Special Groups functioned essentially as regional commands under the overall leadership of Muqtada al-Sadr's senior deputies, including Qais al-Khazali and Akram al-Kaabi (a/k/a Akram Abbas al-Kabi).

2026. As the U.S. military later noted:

> When Special Groups were formed, [Qais Khazali] and Akram al-Kabi were named the general supervisors, or members of the Ishraf Committee (Ishraf means oversight and supervision). Qais and Layth [Qais' brother] were directly involved with Special Groups, and in this position, they would negotiate and procure weapons and IEDs from Iran and distribute them to JAM.

2027. Predictably, the IRGC and Hezbollah saw these newly formed Special Groups (which they helped create and organize) as an opportunity to intensify Iran's control over JAM's terror apparatus.

2028. From the initial formation of JAM's Special Groups in 2004 through much of 2006, the IRGC used Hezbollah to train and direct Special Groups cells to target Coalition Forces.

2029. This was confirmed by Akram Kaabi himself during a January 1, 2019, interview on Al-Nujaba TV, a channel operated by Al-Nujaba, an Iranian-backed Shi'a group formed in 2013 as an outgrowth of Special Group Asa'ib Ahl al-Haq ("AAH") (discussed below) and designated (together with Mr. Kaabi) as an SDGT on March 5, 2019.

2030. During the interview, Mr. Kaabi stated that:

> After [the 2004 Battle of Najaf], we realized that we needed a new method, especially since the brothers from Hezbollah and from the IRGC helped us in that battle in Najaf. Even in Sadr City, there were Iranian consultants. There was an IRGC officer called Abu Ali, who was originally from Ahwaz and spoke fluent Arabic. He was with us in Najaf, and he helped us with the battle management and provided much-needed basic and important advice.

2031. Mr. Kaabi went on to say:

> Our chief engineer in Najaf, Dr. Jassem Al-Abadi, who was martyred, was among the first to be trained by that brother from Hezbollah and by the brothers from the IRGC. So, we realized that if we acquired more capabilities, things would improve. Our morale was high. Our mujahideen were ready to make sacrifices. So, we decided to take this path and acquire a lot of expertise. So, we developed our relationship with the brothers in Hezbollah and the IRGC. Both Hezbollah and the IRGC were open with us about everything....

2032. Mr. Kaabi was also explicit about the degree to which his exploits in Iraq were directed and coordinated with Hezbollah's senior leadership:

> After the battle of Najaf, I traveled by land to Syria and then to Lebanon, and I met Hassan Nasrallah for the first time. The brothers [in Hezbollah] did not keep any secrets from us. They were forthcoming with their years of experience. They summarized this experience and presented it to us in full detail and this, indeed, led to a significant change in our resistance on the ground.

2033. Mr. Kaabi also stated the following about Mr. Mughniyah:

> The late Imad Mughniyah participated in my meeting [with Nasrallah]. Nasrallah and Mughniyah asked me to debrief them about the battle of Najaf – the events, and the deployment of the forces and the vehicles. Mughniyah even asked me to present everything on a blackboard so that they would get a feel for what had happened on the ground. So, I reviewed all the details. Nasrallah was... Obviously, all this happened in the second meeting. The first meeting was an official introductory meeting. Then, since I was still in Lebanon, the second meeting was held. Both Nasrallah and Mughniyah sympathized with us. Both said that they had tried to contact us many times prior to the events in Najaf and that had they succeeded we would have been able to accomplish greater victories, and to change the balance of power significantly. But they said that this was the will of the Lord and that Hezbollah will not deny us anything. They said: 'All of our capabilities and expertise are at your disposal.'

2034.   Perhaps most notable, in the interview Mr. Kaabi specifically discussed the role of EFPs in targeting American forces in Iraq:

> At first, we used old anti-aircraft missiles to manufacture IEDs. They would cause a large explosion, with a loud noise and lots of smoke, but they had little effect on the heavily armored [American] vehicles. Penetrating this armor was no easy task.

> But later, our IEDs improved. We started using explosively formed penetrators. These charges would not cause a lot of smoke or a loud explosion, but they would penetrate the armor of the tanks through a certain hole. They would explode inside the tank, destroying it and killing everyone inside.

2035.   Mr. Kaabi's narrative broadly confirms the intelligence assessment publicly disclosed over the past decade.

2036.   Hezbollah also trained Special Groups and Badr Corps operatives at training camps in southern Lebanon and Iran, and Hezbollah's expertise in the use of EFPs, kidnapping, communications, and small-unit operations were critical to the IRGC's operations in Iraq between 2003 and 2011.

2037.   By early 2005, the presence of Hezbollah operatives in Iraq became an open secret when Iraqi Interior Minister Falah al-Naquib announced the arrest of eighteen Lebanese Hezbollah operatives on terrorism charges.

2038.   On October 10, 2005, the *British Broadcasting Company* ("*BBC*") reported that:

> An armour-piercing version of the bomb—blamed for the deaths of eight British soldiers this year—marks the latest advance in the insurgents' arsenal. *The UK has accused Iran of supplying the new weapon to militants in southern Iraq, via the Lebanese Hezbollah militia group,* although Tehran has denied this. (Emphasis added.)

2039.   The UK's *Belfast Telegraph* reported in 2007 that Muqtada al-Sadr publicly acknowledged his organization's coordination with Hezbollah:

Speaking in Tufa in Iraq, Muqtada al-Sadr, the head of the Mehdi Army, admitted to "formal links" with Hezbollah. "We have formal links with Hezbollah, we do exchange ideas and discuss the situation facing Shiites in both countries," he said. "It is natural that we would want to improve ourselves by learning from each other. We copy Hezbollah in the way they fight and their tactics, we teach each other, and we are getting better through this."

2040.   From September 2004 to late 2005, these newly-formed Special Groups conducted low-intensity operations against the British and U.S. militaries, launching increasing numbers of EFP attacks but mostly training in Iran and Lebanon with Hezbollah and the IRGC–QF, developing their TTPs and preparing for the next round of conflict.[206]

2041.   As Special Groups operatives detained by Coalition Forces later explained, only Hezbollah instructors taught Special Groups operatives the "Engineers Course" that focused on constructing and employing EFPs.

2042.   Not every Iraqi Special Group operative received this training. One detainee reported that "Engineers are special and have to be smart. If you are not smart no one will waste the time and expenses to send you to Iran to train to be an engineer because you will fail."

2043.   Hezbollah also trained these "Engineers" on how to incorporate EFPs into the tactical design of ambushing MNF–I convoys, principally to kidnap U.S. and Coalition soldiers.

2044.   Iraqi Special Group tactics for a kidnapping-ambush using EFPs closely resembled the tactics Hezbollah developed in attempting to kidnap IDF soldiers in southern Lebanon.

---

[206]    EFPs were provided by the IRGC for the exclusive purpose of targeting Coalition Forces, and Hezbollah's advanced training was provided exclusively to assist Special Groups to improve their emplacement of EFPs against United States and British armored vehicles. On rare occasions certain elements defied this directive. For example, EFPs were used in the assassinations of two provincial governors and two provincial police chiefs in the latter half of 2006. The U.S. military assessed that these events were contrary to IRGC policy.

2045.   One MNF–I interrogation of a Detainee revealed the extensive training he and other Iraqi operatives received from the IRGC–QF and Hezbollah for attacking MNF–I convoys with EFPs and other weapons:

> During one of [Detainee]'s training sessions, his group was instructed on techniques involving the attack of military convoys and abduction of POWs. Upon the arrival of a four-vehicle convoy, EFP's would be emplaced to disable the first three vehicles in a convoy. The attackers, who are hiding on one side of the road from an unidentified distance away, would successively fire upon the fourth vehicle with shoulder-fired missiles. Amidst the attack, two small groups of individuals would alternatively bound from the hidden area away from the road to the fourth vehicle while firing upon the fourth vehicle using small arms. The alternatively bounding small groups would advance to the vehicle, pull out any individual who is still living, and bring the individual back to an area where the attackers' own convoy of vehicles is waiting. In order to prevent a quick reaction force from arriving to aid the disabled convoys, a simultaneous mortar attack would be planned on a nearby military base. The simultaneous mortar attack would be followed through to keep the quick reaction force at the nearby base busy. Another way to prevent assistance from a quick reaction force would be to emplace more EFPs at a further distance down the same planned route as the military convoy.

2046.   An attack combining an EFP and other methods of attacking a convoy is called a "complex attack."

2047.   By 2007, MNF–I officials were reporting carefully planned, complex ambushes and retaliatory attacks on United States forces that included direct assaults on U.S. military outposts, ambushes in which American troops were captured, and complex attacks that used multiple weapons to strike more than one U.S. military target.

2048.   As Qais Khazali would later explain to his interrogators: "EFPs still come solely from Iran and there is currently nobody in Iraq manufacturing the components of an EFP."

2049.   Hezbollah and the IRGC also introduced their proxies to the use of 107mm and 122mm artillery rockets (which Hezbollah had previously deployed in large numbers against the IDF in southern Lebanon and against Israeli border towns in northern Israel).

2050.    Both JAM and the Special Groups used these same types of rockets in their indirect fire attacks on U.S. and Coalition Forward Operating Bases and MNF–I Headquarters in the Green Zone.

2051.    The IRGC also supplied JAM and JAM Special Groups with 240mm rockets (also known as the Fadjr-3) developed by the Shahid Bagheri Industries division of the Aerospace Industries Organization of Iran ("AIO").

2052.    Not only did the IRGC supply these weapons to both Hezbollah and (later) its Iraqi Shi'a proxies (including the Special Groups), but Hezbollah's TTP in the use of these weapons was also transferred to JAM and JAM Special Groups.

2053.    During a July 2, 2007, press briefing, U.S. Brigadier General Kevin J. Bergner noted that Special Groups were trained in Iran by Hezbollah instructors in a four-week long course that was titled "Artillery."

2054.    According to Brig. Gen. Bergner, U.S. intelligence concluded that: "This course teaches the use of indirect fire weapons including 60mm and 120mm mortars, and 107mm, 122mm and 240mm rockets."

2055.    In May 2006, senior Hezbollah commander Ali Mussa Daqduq traveled to Tehran with Youssef Hashim, a fellow Hezbollah operative and senior supervisor of Hezbollah operations in Iraq.

2056.    There Messrs. Daqduq and Hashim met with the Commander and Deputy Commander of the IRGC–QF's Special External Operations.

2057.    Mr. Daqduq was directed to return to Iraq and report to the IRGC–QF on the training and operations of the Special Groups and provide assessments on their training in mortars and rockets, use of IEDs, and kidnapping operations.

2058.   General Shahlai—the aforementioned deputy commander in the IRGC–QF who met with Messrs. Daqduq and Hashim—served as the case officer or supervisor of the Special Groups.

2059.   The United States later designated General Shahlai in September 2008 "for threatening the peace and stability of Iraq and the Government of Iraq."

2060.   The U.S. Department of Treasury further found that General Shahlai supplied weapons and training to the Iraqi Special Groups:

> In late-August 2006, Shahlai provided material support to JAM Special Groups by supplying JAM Special Groups members with 122mm grad rockets, 240mm rockets, 107mm Katyushas, RPG-7s, 81mms, 60mm mortars, and a large quantity of C-4.

> Shahlai also approved and coordinated the training of JAM Special Groups. As of May 2007, Shahlai served as the final approving and coordinating authority for all Iran-based Lebanese Hezbollah training for JAM Special Groups to fight Coalition Forces in Iraq. In late-August 2006, Shahlai instructed a senior Lebanese Hezbollah official to coordinate anti-aircraft rocket training for JAM Special Groups.

2061.   The U.S. Department of State's *Country Reports on Terrorism 2006* noted that Iran provided guidance and training to Iraqi Special Groups for carrying out attacks against MNF–I and Coalition Forces:

> Iran provided guidance and training to select Iraqi Shia political groups, and weapons and training to Shia militant groups to enable anti-Coalition attacks. Iranian government forces have been responsible for at least some of the increasing lethality of anti-Coalition attacks by providing Shia militants with the capability to build IEDs with explosively formed projectiles similar to those developed by Iran and Lebanese Hezbollah. The Iranian Revolutionary Guard was linked to armor-piercing explosives that resulted in the deaths of Coalition Forces. The Revolutionary Guard, along with Lebanese Hezbollah, implemented training programs for Iraqi militants in the construction and use of sophisticated IED technology. *These individuals then passed on this training to additional militants in Iraq.* (Emphasis added.)

2062. The Australian government reported in 2006 that Hezbollah, along with the IRGC–QF, was committing attacks in Iraq through insurgent groups it developed:

> Hezbollah has established an insurgent capability in Iraq, engaging in assassinations, kidnappings and bombings. The Hezbollah units have been set up with the encouragement and resources of Iran's Revolutionary Guards al-Qods Brigades. Hezbollah has also established a special training cell known as Unit 3800 (previously known as Unit 2800) specifically to train Shia fighters prior to action in Iraq.

2063. In July 2007, Brig. Gen. Bergner briefed the media on how the IRGC–QF used Hezbollah operatives in Iraq:

> Iran's Quds Force, a special branch of Iran's Revolutionary Guards, is training, funding and arming the Iraqi groups…. Iranian operatives are using Lebanese surrogates to create Hezbollah-like capabilities. And it paints a picture of the level of effort in funding and arming extremist groups in Iraq.

2064. Brig. Gen. Bergner further noted that:

> The groups operate throughout Iraq. They planned and executed a string of bombings, kidnappings, sectarian murders and more against Iraqi citizens, Iraqi forces and coalition personnel. They receive arms—including explosively formed penetrators, the deadliest form of improvised explosive device—and funding from Iran. They also have received planning help and orders from Iran.

2065. As stated above, in designating the IRGC–QF an SDGT, the U.S. Department of Treasury found that it "provides lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants who target and kill Coalition and Iraqi forces and innocent Iraqi civilians."

2066. The U.S. Department of State's *Country Reports on Terrorism 2007* stated that the IRGC–QF and Hezbollah provided Iraqi Special Groups with the tools necessary to carry out attacks against armored Coalition vehicles:

> The [IRGC–QF] continued to provide Iraqi militants with Iranian-produced advanced rockets, sniper rifles, automatic weapons, mortars that have killed

thousands of Coalition and Iraqi Forces, and explosively formed projectiles (EFPs) that have a higher lethality rate than other types of improvised explosive devises (IEDs) and are specially designed to defeat armored vehicles used by Coalition Forces. The Qods Force, in concert with Lebanese Hezbollah, provided training outside Iraq for Iraqi militants in the construction and use of sophisticated IED technology and other advanced weaponry.

2067. The U.S. Department of State's *Country Reports on Terrorism 2008* noted that the IRGC and Hezbollah continued attacks on MNF–I and Coalition Forces through their Iraqi proxies by:

> Provid[ing] lethal support, including weapons, training, funding, and guidance, to Iraqi militant groups that targeted Coalition and Iraqi forces and killed innocent Iraqi civilians. Iran's Qods Force continued to provide Iraqi militants with Iranian-produced advanced rockets, sniper rifles, automatic weapons, and mortars that have killed Iraqi and Coalition Forces as well as civilians. Tehran was […] providing militants with the capability to assemble improvised explosive devices (IEDs) with explosively formed projectiles (EFPs) that were specially designed to defeat armored vehicles. The Qods Force, *in concert with Lebanese Hezbollah,* provided training both inside and outside of Iraq for Iraqi militants in the construction and use of sophisticated IED technology and other advanced weaponry. (Emphasis added.)

2068. Ali Mussa Daqduq conducted multiple visits to Iraq to undertake training needs assessments, survey the operational environment, and obtain feedback from Special Groups members in Iraq on their needs.

2069. This was intended to ensure that the training being designed and staffed by Hezbollah instructors would provide the greatest benefit to their students.

2070. In addition, Mr. Daqduq's assessments provided informed feedback to the IRGC–QF logisticians on the armaments the Special Groups fighters needed to meet their needs and improve their operational performance.

2071. Hezbollah's coordination with the IRGC–QF in support of Special Groups came into stark relief on January 20, 2007, when a team of approximately twelve AAH gunmen,

disguised as U.S. soldiers, entered the Provincial Joint Coordination Center ("PJCC") in Karbala, where U.S. soldiers were conducting a meeting with local officials and killed five U.S. service members.

2072.    Two months later, in March 2007, British Special Air Service commandos assigned to MND–S captured Qais al-Khazali, his brother Layth al-Khazali, and Mr. Daqduq in Basra.

2073.    The documents, computers, and media recovered from the target site as well as the subsequent interrogations of these men significantly supplemented the U.S. military's understanding of Hezbollah's operational role in Iraq and the IRGC's central role in supporting and enabling the Special Groups.

2074.    Mr. Khazali later described Mr. Daqduq as the "designer of the Special Groups."[207]

2075.    MNF–I's exploitation of a computer that was captured during the 2007 raid revealed contents that confirmed the training and evaluation role that Mr. Daqduq performed.

2076.    MNF–I described the contents of the files recovered from the captured computer as follows:

> Documents seized include: spreadsheets detailing weapons and targets, step-by-step instructions for operations/attacks; and numerous letters equivalent to after-action reports detailing attacks, including, for example; an ambush and IED attack on a MNF convoy in Karbala resulting in 4 X MNF KIA; an IED attack on a British patrol which destroyed two Land Rovers and killed the occupants; and a sniper attack on a British patrol which killed a British soldier.

2077.    According to U.S. intelligence estimates following Mr. Daqduq's 2007 arrest, the IRGC provided Hezbollah and Mr. Daqduq up to $3 million in U.S. currency every month to run Special Groups in Iraq.

---

[207]    Ali Mussa Daqduq was held in U.S. detention until November 2011 with the goal to continue to hold him in U.S. custody. The Iraqi government denied the request, and he was transferred to Iraqi custody on December 18, 2011. The charges that the U.S. had brought against him were summarily rejected by an Iraqi Court in May 2012 as lacking evidence, and he was released from confinement, later returning to Lebanon.

2078.  On January 9, 2008, the U.S. Department of Treasury designated several individuals and entities "for threatening the peace and stability of Iraq and the Government of Iraq."

2079.  These individuals included Ahmad Foruzandeh, a Brigadier General in the IRGC–QF. As described above, Mr. Foruzandeh was directly involved in terrorist operations targeting MNF–I and Coalition Forces in Iraq.

2080.  At the same time, the U.S. Department of Treasury designated Abu Mustafa al-Sheibani for his role as the leader of the Sheibani Network, noting:

> The network's first objective is to fight U.S. forces, attacking convoys and killing soldiers. Its second objective is to eliminate Iraqi politicians opposed to Iran's influence. Elements of the IRGC were also sending funds and weapons to Al-Sheibani's network.
>
> Al-Sheibani's network—consisting of several hundred members—conducted IED attacks against Americans in the Baghdad region. As of March 2007, Al-Sheibani, known to transport Katyusha rockets to be used for attacks against Coalition Forces, launched rockets against Americans and made videos of the attacks to get money from Iran. As of April 2007, a member of Al-Sheibani's network supervised the transport of money and explosives from Iran for eventual arrival in Baghdad. In early-May 2007, Al-Sheibani's network assisted members of a Shia militia group by transporting them to Iran for training and providing them with weapons for their activities in Iraq.

2081.  As stated above, a 2010 Department of Defense report confirmed that weapons the IRGC delivered to its proxy militias in Iraq included EFPs (with radio-controlled, remote arming and passive infrared detonators), IEDs, anti-aircraft weapons, mortars, 107mm and 122mm rockets, rocket-propelled grenades and launchers, explosives, and small arms.

2082.  The report also noted that "Lebanese Hezbollah provides insurgents with the training, tactics and technology to conduct kidnappings, small unit tactical operations and employ sophisticated IEDs."

2083.  As numerous federal courts have found,[208] Hezbollah and the IRGC orchestrated the terror campaign that killed and injured Plaintiffs herein.

2084.  Specifically, Hezbollah and the IRGC created, trained, funded, and armed several proxy groups that targeted American citizens in Iraq, and through these proxy groups, they jointly planned, authorized, and committed hundreds if not thousands of attacks on American and Coalition Forces during the Relevant Period, including the attacks that injured Plaintiffs.

## C.    HEZBOLLAH'S AND THE IRGC'S AGENTS & PROXIES IN IRAQ

### 1.    The Badr Corps (A/K/A Badr Organization)

2085.  The Badr Corps was established in 1982 as the military wing of the Supreme Council for Islamic Revolution in Iraq ("SCIRI"), which was founded by Muhammad Baqr Hakim in Iran in 1982 during the Iran-Iraq War.

2086.  From its headquarters in Iran, the Badr Corps operated extensive networks throughout Iraq in the 1990s. The group smuggled men and weapons into Iraq to conduct attacks against the Iraqi regime of Saddam Hussein.

---

[208]    *See Est. of Fishbeck v. Islamic Republic of Iran*, No. 18-cv-2248 (CRC), 2023 U.S. Dist. LEXIS 201125, at *24 (D.D.C. Aug. 18, 2023) ("The use of the EFP was reserved for use by Iranian-backed Shia Militant Groups with direct support from Islamic Revolutionary Guard Corps (IRGC)-Qods Force and Hezbollah.") (internal citation and quotation marks omitted); *Lee v. Islamic Republic of Iran*, No. 19-cv-00830 (APM), 2023 U.S. Dist. LEXIS 15314 (D.D.C. Jan. 30, 2023) (finding 25 EFP attacks were "part of the EFP campaign orchestrated by the IRGC and Hezbollah that was conducted by one of the IRGC's Hezbollah-trained Special Group proxies") (internal citation and quotation marks omitted); *Roth v. Islamic Republic of Iran*, 651 F. Supp. 3d 65, 76 (D.D.C. 2023) ("The unique components of EFPs, the tactics through which they are deployed, and the expertise necessary to create them have led many experts to trace the EFPs detonated in Iraq to Iran and Hezbollah."); *Stearns v. Islamic Republic of Iran*, 633 F. Supp. 3d 284 (D.D.C. 2022) (finding 61 EFP attacks were "part of the EFP campaign orchestrated by the IRGC and Hezbollah, that was conducted by one of the IRGC's Special Group proxies") (internal citation and quotation marks omitted); *Roberts v. Islamic Republic of Iran*, 581 F. Supp. 3d 152 (D.D.C. 2022) (finding nine attacks "could only" have been perpetrated by EFPs that were "designed, manufactured, and distributed by Hezbollah [or] the IRGC") (internal citation and quotation marks omitted); *Burks v. Islamic Republic of Iran*, No. 16-cv-1102 (CRC), 2022 U.S. Dist. LEXIS 244554, at *28-29 (D.D.C. Sep. 30, 2022) (finding that "Iran and its proxy Hezbollah played a central role ... in devising and supporting EFP attacks that killed and injured many hundreds of U.S. service members in Iraq") (internal citation and quotation marks omitted); *Karcher v. Islamic Republic of Iran*, No. 16-cv-232 (CKK), 2021 U.S. Dist. LEXIS 7170 (D.D.C. Jan. 14, 2021) (finding 73 EFP attacks were "part of the EFP campaign orchestrated by the IRGC and Hezbollah that was conducted by one of the IRGC's Hezbollah-trained Special Group proxies.") (internal citation and quotation marks omitted).

2087. Like Hezbollah, the Badr Corps established clandestine offices in various businesses and social organizations in Iraq.

2088. The Badr Corps also used Iraqi front companies to recruit operatives, collect intelligence, and circulate propaganda materials in Shi'a populated areas.

2089. Before 2003, the Badr Corps served as Iran's most important surrogate inside Iraq, acting as a de facto arm of the IRGC-QF in conducting operations against Saddam Hussein's government.

2090. The Badr Corps received training and weapons from the IRGC and Hezbollah.

2091. Following the toppling of the Hussein regime in 2003, the IRGC saw an immediate opportunity to repatriate Muhammad Baqr Hakim into Iraq and carefully cultivate his party's growth within the new post-war political framework being developed by the Coalition Forces, while simultaneously slipping thousands of Badr Corp fighters back across the border.

2092. After Saddam Hussein's overthrow in 2003, the Badr Corps renamed itself the Badr Organization, and many of its operatives joined the newly formed Iraqi security forces.

2093. Published reports indicate that thousands of members of the Badr Organization remained on the IRGC–QF payroll after 2004.

2094. Several senior Badr Corps operatives later emerged as key conduits for funneling weapons to IRGC proxies in Iraq from 2004 through 2011, including the previously mentioned Abu Mustafa al-Sheibani, a key smuggler of deadly Iranian IEDs, and Jamal Ja'far Muhammad, a/k/a Abu Mahdi al-Muhandis (a/k/a "The Engineer"), who later led Kataib Hezbollah (discussed further below).

2095.   The IRGC–QF's Ramazan Corps, led by General Abdul Reza Shahlai, was in charge of supporting Hezbollah-trained terror cells in Iraq and remains the largest Qods Force command outside of Iran. It coordinated, armed, and directed the Badr Organization.

2096.   Although the Badr Organization evolved into a major political organization with seats in the new Iraqi parliament through its political wing SCIRI, it also played a significant role in facilitating Special Groups operations in Iraq.

2097.   Several senior Special Groups commanders such as Mr. al-Muhandis are, or were, Badr Organization personnel.

2098.   After 2003, the Badr Organization inserted hundreds of its Iranian-trained operatives into Iraq's state security organs (notably the Iraqi Ministry of Interior intelligence structure and key special forces and Iraqi Army units).

2099.   This infiltration of Iraqi police, intelligence, and military units not only assisted in Badr Organization's efforts to murder former Hussein regime leaders and pursue ethnic cleansing of Sunni neighborhoods, but also made it possible for Badr Organization operatives to regularly tip-off Special Groups' operatives of Coalition Forces' activities and provided Badr Organization's own terror cells with targeting guidance.

### 2.      Asa'ib Ahl Al–Haq ("AAH" or the "League of the Righteous")

2100.   The Asa'ib Ahl Al–Haq ("AAH" or the "League of the Righteous") terrorist organization was a Special Group that was directed and trained by Hezbollah and the IRGC, and funded and armed by the IRGC.

2101.   It conducted numerous attacks on Iraqi Security Forces and Coalition Forces, particularly on American targets.

2102.   AAH was originally established by senior JAM commander and later MNF–I detainee, Qais al-Khazali.

2103.    Qais al-Khazali was a pupil of Muqtada al-Sadr's father and later one of Muqtada al-Sadr's senior deputies. But he also maintained an uneasy rivalry with the younger al-Sadr that occasionally devolved into open hostilities.

2104.    Khazali accompanied Sadr to Tehran in 2003, and he maintained contact with senior IRGC–QF leadership when he assumed control of Special Groups cells after 2004.

2105.    According to a report by the U.S. military:

> In August 2006 MAS (Muqtada al-Sadr) asked [Qais al-Khazali] to lead a delegation to Tehran to discuss the situation in Iraq and Iranian support for JAM (Jaysh al-Mahdi (JAM) Militia subordinate to Muqtada al-Sadr). According to reporting, Ali Khamenei (Sayyid Ali Hosseini Khamenei was then and is still now the Supreme Leader of Iran) met with [Qais al-Khazali] and recruited him to lead a special group known as Asayb Al–Haq, or the K2 network. The K2 network would operate with the knowledge or authorization of MAS. [Qais al-Khazali] agreed. Iran was interested in working with [Qais al-Khazali] because of his influence on MAS. Layth (al-Khazali's brother, captured with him on 20 March 2007 in Basra, served as the Operations Chief for Asayb Al–Haq) and as a liaison between the secret network formed by Qayis and the Iranians. In his position, Layth travelled frequently between Iraq, Iran and Syria.

2106.    Qais al-Khazali and his brother Layth al–Khazali returned to Iraq, requisitioned the most experienced and capable fighters from Sadr's JAM terror cells, and formed AAH.

2107.    At first, AAH appears to have remained within JAM's orbit.

2108.    At its inception, AAH was a Hezbollah-directed and IRGC-supplied cluster of terror cells that owed fealty to Mr. Sadr. Over time, it became a more cohesive entity that grew more independent of Mr. Sadr (even ceremonially).

2109.    AAH's evolution was the product of assessments made by senior Hezbollah commanders, including Mr. Daqduq, who had travelled to Iraq at the IRGC's behest to evaluate the training, organization, and effectiveness of their Iraqi proxy groups.

2110. Hezbollah identified Qais Khazali and Akram Kaabi as among the more capable JAM commanders, cultivated them, and ultimately recruited them to serve as direct agents and proxies of the IRGC–QF.

2111. According to an April 2007 MNF–I report, Qais Khazali admitted that AAH received direct financing from the IRGC–QF.

2112. Within months of Qais Khazali's formation of AAH, he blessed the Hezbollah-planned and orchestrated raid on the PJCC in Karbala on January 20, 2007.

2113. As discussed more fully below, the kidnapping and murder of five American soldiers during the operation led to a concerted effort to locate the perpetrators, and it eventually resulted in the capture of both Khazali brothers in March 2007.

2114. Thereafter, despite the capture and detention of the Khazali brothers, AAH continued to function as a full-fledged terrorist organization because of the significant funding, training, and supply of weapons it received from the IRGC, and from the training it received from, and close cooperation and coordination it maintained with, Hezbollah.

2115. AAH was able to maintain a high-level offensive tempo from mid-2007 until the departure of United States forces from Iraq at the end of 2011, and Qais Khazali emerged from U.S. detention to become one of Iraq's most important political leaders.

2116. In sum, from 2006 to 2011, AAH operated as the IRGC's direct terror proxy targeting U.S. personnel at the direction of Hezbollah, working in concert with the IRGC.

2117. Iran harbored elements of its leadership (and their families) and the IRGC, trained, and supplied its operatives, and funded the AAH cells.

2118. The IRGC used Hezbollah to train and direct AAH to commit attacks on Americans in Iraq.

2119.   AAH formally split from JAM in 2007 (though it continued to maintain significant ties with JAM cells even later).

2120.   Since that time, AAH has conducted countless attacks against U.S. and Iraqi forces, targeted kidnappings of Westerners and Iraqis, rocket, and mortar attacks on the U.S. Embassy, murdered American and British soldiers, and assassinated Iraqi officials.

2121.   At his July 2, 2007, press briefing, Brig. Gen. Bergner noted the extensive financial support the IRGC–QF provided in developing the Special Groups:

> The Qods Force also supplies the special groups with weapons and funding of 750,000 to 3 million U.S. dollars a month. Without this support, these special groups would be hard pressed to conduct their operations in Iraq […] The Qods Force goal was to develop the Iraqi special groups into a network similar to the Lebanese Hezbollah. Special groups would be unable to conduct their terrorist attacks in Iraq without Iranian-supplied weapons and other support. Like Ali Mussa Daqduq, Qais [Khazali] main contact was [General Shahlai], the deputy commander for Qods Force Department of External Special Operations. Funding and training of the special groups started in 2004.

2122.   As MNF–I investigators would later learn, senior Lebanese Hezbollah commander Ali Mussa Daqduq not only provided training to AAH cells and advised them on terrorist operations, he also helped plan operations and had final approval over them.

2123.   Mr. Daqduq reported to Youssef Hashim, the head of Lebanese Hezbollah Special Operations, and the latter reported to Hezbollah's Muhammad Kawtharani and General Shahlai, the director of the IRGC–QF External Operations.

### 3.     Jaysh al Mahdi ("JAM" or the "Mahdi Army") and the Promised Day Brigades ("PDB")

2124.   As noted above, Jaysh al-Mahdi ("JAM" or the "Mahdi Army") was established by radical Shi'a cleric Muqtada al-Sadr in June 2003 with the help of Imad Mughniyah and Mustafa Badr al-Din, two of Hezbollah's most senior commanders.

2125.   JAM expanded its territorial control of mixed or predominantly Shi'a neighborhoods and displaced or killed the local Sunni population.

2126.   JAM was able to gain initial control in many of the neighborhoods in and around Baghdad (such as Sadr City) by offering the Shi'a population protection and social services.

2127.   After Hezbollah and the IRGC began their complete takeover of the Special Groups in 2006-2007, JAM receded to a degree.

2128.   In the summer of 2007, Mr. Sadr declared a six-month ceasefire and a ban on attacking Coalition Forces.

2129.   According to a 2007 MNF–I report, during this time, Mr. Sadr was receiving funds worth approximately $2 million U.S. dollars per month from Iran.

2130.   For much of 2007-2008, he was also embroiled in political disputes with rival Shi'a parties, and JAM engaged in violent clashes with the Badr Corps in Karbala during a religious festival.

2131.   In June 2008, Mr. Sadr announced his intention to disband JAM to focus his organization on social, cultural, and religious activities, but he soon further proclaimed that he would maintain an elite force, the Promised Day Brigades ("PDB"), to carry out attacks against Coalition Forces.

2132.   The PDB received funding and weapons from the IRGC and training and direction from both Hezbollah and the IRGC–QF and deployed many EFPs against American and Coalition Forces in Iraq after July 2008.

2133.   In August 2009 alone, MNF–I attributed fifteen EFP attacks in Baghdad to the PDB.

2134.   MNF–I took significant and forceful measures against the PDB, but because of the financial, logistical, and operational support it received from both Hezbollah and the IRGC, PDB was able to survive and continued to menace American forces in Iraq through 2011.

2135.   For example, on June 28, 2011, the PDB issued a statement claiming responsibility for ten mortar and Katyusha rocket attacks against U.S. military convoys in which U.S. officials confirmed that three U.S. troops were killed.

### 4.      Kataib Hezbollah ("KH")

2136.   Kataib Hezbollah ("KH") (Hezbollah Brigades) was active in Iraq from 2007 to 2011.

2137.   KH was founded by Abu Mahdi al-Muhandis, a member of the Badr Corps and one of the IRGC–QF's senior operatives in Iraq.

2138.   In the 1980s, al-Muhandis was a member of the Iraqi Da'wa Party, in which capacity he worked closely with the IRGC–QF and Lebanese Hezbollah.

2139.   KH's overall operations were run by Karim Ja'far Muhsin al-Ghanimi, described by the U.S. Department of Treasury as "the overall leader of KH, which has used facilities in Iran to send weapons to Iraq." According to the U.S. government, "Ghanimi has organized KH military-related training in Iran from the IRGC–QF and Lebanese Hezbollah. Ghanimi has sent money provided by the IRGC–QF to KH leaders in Iraq."

2140.   KH functioned as Iran's premier terror proxy in Iraq, and like other Special Groups, its operatives received extensive training from the IRGC–QF and Hezbollah, including Hezbollah's TTP for the use of explosives, as well as weapons like the RPG–29, EFP, and the deployment of Katyusha rockets for indirect fire attacks on U.S. Forward Operating Bases.

2141.   According to MNF–I, IRGC–QF provided RPG–29 anti-armor weapons exclusively to KH.

2142.   The IRGC also provided IRAMs almost exclusively to KH.

2143.   IRAMs are "flying IEDs"—explosive devices made from large metal canisters, such as propane gas tanks, filled with explosives, scrap metal and ball bearings, propelled into the air by rockets.

2144.   IRAMs first appeared in southern Iraq in November 2007.

2145.   Like other IEDs, IRAMs could be triggered remotely by radio control, or set to fire by way of a washing-machine timer. But, notwithstanding the fact that IRAMs were constructed from commonly-used "household" materials (such as, e.g., propane tanks), proper assembly required a high-degree of technical sophistication that KH obtained from Hezbollah and the IRGC–QF.

2146.   IRAMs were "purpose-built" for one thing: being lobbed over walls and Hesco[209] barriers at short ranges, preventing interception by C–RAM defense systems[210] that were protecting Coalition Forces manning bases in Iraq.

2147.   The first known IRAM attack in Iraq occurred at Forward Operating Base Loyalty in Baghdad, which killed two American soldiers and wounded 16 others.

2148.   A second attack in the Sha'ab neighborhood of Baghdad resulted from an accidental explosion of IRAMs likely intended for Combat Outpost Callahan, approximately 800-yards away from where the truck carrying the IRAMs prematurely exploded, killing 18 civilians and wounding an additional 29 people.

---

[209]   Hesco barriers are a multi-cellular barrier system manufactured from welded zinc-aluminum coated steel wire mesh, joined with vertical, helical-coil joints, and lined with a heavy-duty non-woven polypropylene geotextile. Once filled with earth, sand, and dirt, the Hesco barriers provide protection against conventional fire attacks.

[210]   Counter Rocket, Artillery, and Mortar (abbreviated "C-RAM" or "Counter-RAM") refers to a set of systems used to detect and destroy incoming artillery, rockets and mortar rounds in the air before they hit their ground targets, or simply provide early warning.

2149.   IRAM attacks were particularly dangerous to U.S. troops and had the potential to kill dozens in a single attack. Once launched, an incoming IRAM could not be stopped.

2150.   A soldier spotting the approach of a suspected IRAM-bearing vehicle could have as little as "two seconds to decide whether the person emerging from it ha[d] just set it for firing or [was] simply an innocent driver getting out to change a tire."[211]

2151.   IRAMs could be launched from either a frame resting on the ground or mounted on the bed of a truck and were designed to cause catastrophic damage and inflict mass casualties.

2152.   IRAMs became a signature weapon of KH.

2153.   KH operated mainly in Shi'a areas of Baghdad, such as Sadr City, and throughout southeastern Iraq conducting, first, rocket-propelled grenade ("RPG") attacks; second, 107mm and 240mm rocket attacks; third, IRAM attacks; and fourth, EFP attacks on U.S. and Coalition Forces.

2154.   KH was also supplied by Iran with their production model of the RPG–29 anti-armor shoulder fired weapon that was first used against U.S. Forces during operations in Sadr City, Baghdad.

2155.   On June 24, 2009, the United States designated KH an FTO.

2156.   The U.S. Department of State's notice of KH's FTO designation stated that:

> [KH] has been responsible for numerous violent terrorist attacks since 2007, including improvised explosive device bombings, rocket propelled grenade attacks, and sniper operations. Kata'ib Hezballah [sic] also targeted the International Zone in Baghdad in a November 29, 2008 rocket attack that killed two UN workers. In addition, KH has threatened the lives of Iraqi politicians and civilians that support the legitimate political process in Iraq.[212]

---

[211]   Robert Burns, *Lob Bombs' Biggest Worry for U.S. in Baghdad*, ASSOCIATED PRESS (Jul. 12, 2008).

[212]   Press Release, *Designation of Kata'ib Hizballah as a Foreign Terrorist Organization*, U.S. DEP'T OF STATE (Jul. 2, 2009), https://2009-2017.state.gov/r/pa/prs/ps/2009/july/125582.htm.

2157. KH was also simultaneously designated an SDGT, because it was "responsible for numerous terrorist acts against Iraqi, U.S., and other targets in Iraq since 2007."

2158. The U.S. Department of Treasury also designated KH pursuant to EO 13438.

2159. The U.S. Department of Treasury's 2009 press release announcing KH's designation explained that KH had "committed, directed, supported, or posed a significant risk of committing acts of violence against Coalition and Iraqi Security Forces…."

2160. The press release also quoted then-Under Secretary for Terrorism and Financial Intelligence Stuart Levey as stating that "[t]hese designations play a critical role in our efforts to protect Coalition troops, Iraqi security forces, and civilians from those who use violence against innocents to intimidate and to undermine a free and prosperous Iraq."

2161. The U.S. Department of Treasury's press release also stated that "the IRGC–Qods Force provides lethal support to Kata'ib Hezbollah and other Iraqi Shia militia groups who target and kill Coalition and Iraqi Security Forces."

2162. The U.S. Department of Treasury's 2009 press release further reported that:

> Between March 2007 and June 2008, Baghdad-based Kata'ib Hezbollah cell members participated in multiple rocket-propelled grenade (RPG) and improvised rocket-assisted mortar (IRAM) attacks against U.S. forces. These attacks included a May 13, 2008 RPG–29 attack on a U.S. tank located in Sha'ab, Iraq, and a February 19, 2008 IRAM attack on a U.S. base near Rustamiya, Iraq. A February 19, 2008 rocket attack in the Rustamiya area resulted in one U.S. civilian killed and injuries to U.S. civilian and Coalition Forces personnel.

> As of 2008, Kata'ib Hezbollah was funded by the IRGC–Qods Force and received weapons training and support from Lebanon-based Hezbollah. In one instance, Hezbollah provided training—to include building and planting IEDs and training in coordinating small and medium arms attacks, sniper attacks, mortar attacks, and rocket attacks—to Kata'ib Hezbollah members in Iran.

> Recordings made by Kata'ib Hezbollah for release to the public as propaganda videos further demonstrate that Kata'ib Hezbollah conducted attacks against Coalition Forces. In mid-August 2008, Coalition Forces

seized four hard drives from a storage facility associated with a Kata'ib Hezbollah media facilitator. The four hard drives included approximately 1,200 videos showing Kata'ib Hezbollah's sophisticated planning and attack tactics, techniques, and procedures, and Kata'ib Hezbollah's use of the most lethal weapons—including RPG–29s, IRAMs, and EFPs—against Coalition Forces in Iraq.

One of the hard drives contained 35 attack videos edited with the Kata'ib Hezbollah logo in the top right corner. Additionally, between February and September 2008, Al-Manar in Beirut, Lebanon, broadcast several videos showing Kata'ib Hezbollah conducting multiple attacks against Coalition Forces in Iraq.

Immediately preceding the Government of Iraq's approval of the United States-Iraq security agreement in late November 2008, Kata'ib Hezbollah posted a statement that the group would continue fighting Coalition Forces and threatened to conduct attacks against the Government of Iraq if it signed the security agreement with the United States.

2163.    In 2008, the U.S. Department of Defense described the linkages it found between KH, Iran, and multiple terrorist attacks against Coalition Forces in Iraq—including KH's use of EFPs:

[A]lso known as Hezbollah Brigades, [it] is a terrorist group believed to receive funding, training, logistics and material support from Iran to attack Iraqi and coalition forces using what the military calls 'explosively formed penetrators'— roadside bombs designed to pierce armor-hulled vehicles— and other weapons such as rocket-assisted mortars.

2164.    As noted above—and as stated by the U.S. Department of Treasury in its July 2009 press release—throughout 2008, *Al-Manar*, Hezbollah's official television outlet in Lebanon (and itself a designated SDGT since May 2006), played numerous videos of KH launching rocket and IED attacks against U.S. troops.

2165.    In this manner, Hezbollah helped publicize KH's activities and wage psychological warfare against the United States.

2166. The U.S. Department of Treasury designated KH's founder, Abu Mahdi al-Muhandis, an SDGT in July 2009 and announced the designation in the same press release announcing KH's designation.

2167. The U.S. Department of Treasury's press release noted the following about Mr. al-Muhandis's terrorist activities in Iraq:

> As of early 2007, al-Muhandis formed a Shia militia *group employing instructors from Hezbollah* to prepare this group and certain Jaysh al-Mahdi (JAM) Special Groups for attacks against Coalition Forces. The groups received training in guerilla warfare, handling bombs and explosives, and employing weapons--to include missiles, mortars, and sniper rifles. In another instance as of September 2007, al-Muhandis led networks that moved ammunition and weapons—to include explosively formed penetrators (EFPs)—from Iran to Iraq, distributing them to certain JAM militias to target Coalition Forces. As of mid-February 2007, al-Muhandis also ran a weapon smuggling network that moved sniper rifles through the Iran-Iraq border to Shia militias that targeted Coalition Forces.

> Al-Muhandis also provided logistical support for attacks against Iraqi Security Forces and Coalition Forces conducted by JAM Special Groups and certain Shia militias. In one instance, in April 2008, al-Muhandis facilitated the entry of trucks—containing mortars, Katyusha rockets, EFPs, and other explosive devices—from Iran to Iraq that were then delivered to JAM Special Groups in Sadr City, Baghdad. Additionally, al-Muhandis organized numerous weapons shipments to supply JAM Special Groups who were fighting Iraqi Security Forces in the Basrah and Maysan provinces during late March–early April 2008.

> In addition to facilitating weapons shipments to JAM Special Groups and certain Shia militias, al-Muhandis facilitated the movement and training of Iraq-based Shia militia members to prepare them to attack Coalition Forces. In one instance in November 2007, al-Muhandis sent JAM Special Groups members to Iran to undergo a training course in using sniper rifles. Upon completion of the training course, the JAM Special Groups members had planned to return to Iraq and carry out special operations against Coalition Forces. Additionally, in early March 2007, al-Muhandis sent certain Shia militia members to Iran for training in guerilla warfare, light arms, marksmanship, improvised explosive devices (IED) and anti-aircraft missiles to increase the combat ability of the militias to fight Coalition Forces.

> In addition to the reasons for which he is being designated today, al-Muhandis participated in the bombing of Western embassies in Kuwait and

the attempted assassination of the Emir of Kuwait in the early 1980s. Al-Muhandis was subsequently convicted in absentia by the Kuwaiti government for his role in the bombing and attempted assassination. [Emphasis added.]

2168. In a July 2010 press briefing, the then-MNF–I commander, U.S. Army General Ray Odierno, identified KH as the group behind increased threats to U.S. bases in Iraq.

2169. General Odierno confirmed that KH operatives had gone to Iran for special training and then returned to Iraq.

2170. General Odierno stated, "[T]hey are clearly connected to [the] Iranian IRGC."

**5. Case in Point: Senior Hezbollah Commander Ali Musa Daqduq's Direction of Terrorist Attacks on Coalition Forces in Iraq**

2171. In March 2007, Ali Musa Daqduq was captured in Basra, Iraq.

2172. At the time of his arrest, he produced identification indicating his name was Hamid Muhammad Jabur Al Lami and that he was a mute.

2173. Only during further questioning by MNF–I did Mr. Daqduq admit to being part of Lebanese Hezbollah and acknowledge his ability to speak.

2174. In 2005, Hezbollah's leader, Hassan Nasrallah, had tapped Daqduq to work for Unit 3800, and in May 2006, Daqduq traveled to Tehran with Yusuf Hashim, a fellow Hezbollah operative and senior supervisor of Hezbollah operations in Iraq.

2175. There they met with General Shahlai, Deputy Commander of the IRGC–QF Special External Operations. Daqduq was directed to return to Iraq and report on the training and operations of the JAM Special Groups and provide assessments on their training in mortars and rockets, use of IEDs (particularly EFPs) and kidnapping operations.

2176. As MNF–I investigators later learned, Mr. Daqduq not only provided training to AAH cells and advised them on terrorist operations, he also helped plan operations and had final

approval over them. Mr. Daqduq reported to Mr. Hashim, and the latter reported to Hezbollah's Muhammad Kawtharani and General Shahlai.

2177. Mr. Daqduq conducted multiple visits to Iraq to undertake training needs assessments, survey the operational environment, and obtain feedback from JAM Special Groups members in Iraq on their needs. This was intended to ensure that the training being designed and staffed by Hezbollah instructors would provide the greatest benefit to their students.

2178. In addition, Mr. Daqduq's assessments provided informed feedback to the IRGC–QF logisticians on the armaments the JAM Special Groups fighters needed to meet their needs and improve their operational performance.

2179. In early 2007, in his capacity as a senior Hezbollah commander, Mr. Daqduq planned, authorized, and directed an attack on U.S. service members in the PJCC in Karbala.

2180. On January 20, 2007, pursuant to Mr. Daduq's direction, a team of at least twelve AAH gunmen, disguised as U.S. soldiers, infiltrated the PJCC in Karbala. In the well-planned attack, they killed one U.S. soldier and abducted four others, whom they later executed.

2181. Two months later, when Coalition Special Forces captured Qais al-Khazali, his brother Layth al-Khazali, who led the attack, and Mr. Daqduq in Basra, the documents, computers, and media recovered from capture, as well as the subsequent interrogations of these men, significantly supplemented the U.S. military's understanding of Hezbollah's operational role in Iraq and the IRGC–QF's central role in supporting and enabling the JAM Special Groups.

2182. Among the documents recovered was a 22-page memorandum written by Mr. Daqduq that "detailed the planning, preparation, approval process and conduct of the [Karbala] operation," as well as Mr. Daqduq's role in overseeing other Special Groups operations.

2183. As noted in a Memorandum for Commander, Multi-National Force–Iraq, dated May 31, 2007:

> [Daqduq] has knowledge of Iranian surrogate networks operating in Iraq and has admitted to meeting Iranian Revolutionary Guard Corps–Quds Force (IRGC–QF) personalities on multiple occasions including Hajj Yusif, who is assessed to be Abdul Reza Shahlai, the Department 9000 (Lethal Aid) Deputy Commander.

2184. According to U.S. military officials, both Mr. Daqduq and Qais Khazali admitted that senior leadership within the IRGC–QF knew of and helped plan the attack on the Karbala PJCC, and Mr. Daqduq served as the liaison between the IRGC–QF, Hezbollah, and AAH.

2185. For example, a May 22, 2009, MNF–I memorandum summarizing the interrogations of Mr. Daqduq noted the following about his relationship with the IRGC–QF:

> [Daqduq] is a Lebanese Hezbollah Commander and was an advisor to AAH leadership. [Daqduq] was involved in the planning of the Karbala PJCC attack in January 2007 and the reconnaissance of various CF bases and ports. [Daqduq] took his direction from IRGC–QF Officer Hajji Yusif [General Shahlai] and LH [Lebanese Hezbollah] Unit 2800 Commander Yusif Hashim.

2186. An August 13, 2007, MNF–I memorandum recounted the data retrieved from the Basra location of the March raid:

> The hard drives contained numerous insurgent related documents and photographs, including a journal detailing upcoming operations or meetings; 'how to' manuals on operating arms/munitions systems—including various missiles and RPG launchers; old US military training materials; photographs of MNF equipment and resources; Google Earth aerial photographs of regions and cities in Iraq; photographs of U.S. service members performing their jobs; photographs of destroyed U.S. military equipment; photographs of an unknown shipyard; photographs of a destroyed MNF dining facility; and, propaganda videos by ISI showing missile testing, dead bodies, and destroyed vehicles. Of note, photographs were also found of items from the wallet of [3.5(c)] a U.S. soldier killed in a complex attack on the Provincial Joint Coordination Cell in Karbala on 20 Jan 07—including his SSA card, credit cards, identification cards, and family photographs. Documents seized include: spreadsheets detailing weapons and targets; step-by-step instructions for operations/attacks; and numerous letters equivalent to after-action reports detailing attacks.

2187.   An October 5, 2008, MNF–I memorandum further noted the following about Mr.

Daqduq:

> [Daqduq] admitted to being Lebanese Hezbollah and admitted to an active
> role in Iraq as an agent of Iranian state-sponsored terrorism. [Daqduq]
> admitted that Abdul Reza Shahlai, Iranian Revolutionary Guard Corps–
> Quds Force (IRGC–QF) Department 9000 (Lethal Aid) Deputy Chief
> facilitated [Daqduq]'s illegal entry into Iraq on four separate occasions.
> IRGC–QF is one of the primary agents of Iranian state sponsored terrorism.
> [Daqduq] admitted that his role was to arrange for training of Shi'a
> extremist groups, facilitating training and weapons procurement for Special
> Groups. Special Groups have conducted numerous AIF [Anti-Iraqi Forces]
> and ACF [Anti-Coalition Forces] attacks throughout Iraq. [Daqduq]
> admitted to a significant operational planning role in the abduction and
> murder of 5 U.S. Service Members.

2188.   Mr. Khazali described Mr. Daqduq as the "designer of the Special Groups."[213]

2189.   The exploitation of a computer that was captured during the raid revealed contents

that confirmed the training and evaluation role that Mr. Daqduq performed. "Documents seized

include: spreadsheets detailing weapons and targets, step-by-step instructions for

operations/attacks; and numerous letters equivalent to after-action reports detailing attacks,

including, for example: an ambush and IED attack on a MNF convoy in Karbala resulting in 4 X

MNF KIA; an IED attack on a British patrol which destroyed two Land Rovers and killed the

occupants; and a sniper attack on a British patrol which killed a British soldier."

2190.   For example, Mr. Daqduq was found in possession of training manuals on tactics

for launching rocket attacks.

---

[213]   Ali Musa Daqduq was held in U.S. detention until November 2011 with the goal of extraditing him to the
U.S. for trial. The Iraqi Government denied the request, and he was transferred to Iraqi custody on December 18,
2011. The charges that the U.S. had brought against him were summarily rejected by an Iraqi Court in May 2012 as
lacking evidence and he was released from confinement, later returning to Lebanon.

2191.   In his personal journal, Mr. Daqduq recorded: "Met with the brothers the observers of Diyalah province and I listened regarding operations…. We conducted eight explosive charge operations on both sides."

2192.   U.S. intelligence also learned about Hezbollah's series of 30-day training courses held for Iraqi Special Groups. These included:

- Engineering: This is a demolitions course, focusing on the construction and emplacement of EFPs, including the use of Passive Infra-Red devices or "Magic Eye."
- Artillery: This course teaches the use of indirect fire weapons, including 60mm and 120mm mortars, and 107mm, 122mm, and 240mm rockets.
- Intelligence: This class covers basic source operations and collection, observations, etc. to derive intelligence that is used at the tactical level.

2193.   According to U.S. intelligence, Hezbollah also conducted "mini-courses" and "refresher training" at a camp near Tehran and also taught a course for JAM Special Groups on how to improve their "kidnapping capability."

2194.   According to U.S. intelligence estimates, following Daqduq's 2007 arrest, the IRGC–QF provided Hezbollah and Daqduq up to $3 million in U.S. currency every month to run JAM Special Groups in Iraq.

2195.   Ultimately, the U.S. military concluded that Daqduq's mandate was "to reorganize the Special Groups into an organization that mirrored Lebanese Hizbollah."

2196.   On November 19, 2012, the U.S. Department of Treasury designated Mr. Daqduq an SDGT pursuant to E.O. 13224, and noted:

Daqduq is a senior Hezbollah commander responsible for numerous attacks against Coalition Forces in Iraq, including planning an attack on the Karbala Joint Provincial Coordination Center (JPCC) on January 20, 2007, which resulted in the deaths of five U.S. soldiers.

On March 20, 2007, Coalition Forces in southern Iraq captured Daqduq, who falsely claimed to be a deaf mute at the time and produced a number of false identity cards using a variety of aliases. From January 2009 until

December 2011, U.S. military forces held Daqduq in Iraq under the terms of the 2008 "Agreement Between the United States of America and the Republic of Iraq on the Withdrawal of United States Forces from Iraq and the Organization of Their Activities during Their Temporary Presence in Iraq" (the Security Agreement). In December 2011, the United States transferred Daqduq to Iraq's custody in accordance with our obligations under the Security Agreement. He was subsequently tried in Iraq on terrorism and other charges. On May 7, 2012, an Iraqi court dismissed terrorism and false documents charges against him. Daqduq remained in Iraqi custody until last week when the Iraqi government determined that it no longer had a legal basis to hold him, and he was released Friday.

6. **The IRGC Funded the Design and Production of Explosively Formed Penetrators ("EFPs") Used to Kill or Maim Coalition Forces, Including Plaintiffs**

2197. As noted above, the EFPs deployed by the IRGC and Hezbollah in Iraq were not truly "improvised" explosive devices but professionally manufactured and specifically designed to target U.S. and Coalition Forces' armor.

2198. EFPs constitute "weapons of mass destruction" as that term is defined in 18 U.S.C. § 2332a(2)(A).

2199. First used by Hezbollah against Israeli armor in Lebanon, EFPs are categorized by the U.S. military as a type of shaped-charge weapon. They are usually made by placing a precision-manufactured concave copper disk in front of high-explosives that have been packed into a steel tube with a cap welded to one end.

2200. In Iraq, EFPs were often triggered by a passive-infra-red devices that ultimately set off an explosion within the steel casing of the EFP, forcing the copper disk forward, and turning it into a high-velocity molten slug that could pierce the military-grade armor of most U.S. vehicles deployed in Iraq.

2201. To produce these weapons, copper sheets are often loaded onto a punch press to yield copper discs. These discs are annealed in a furnace to soften the copper. The discs are then loaded into a large hydraulic press and formed into the disk-like final shape.

2202. This munitions manufacturing process is critical to the design and concomitant lethality of the EFP weapon.

2203. Unlike homemade explosive devices such as traditional IEDs, EFPs are far more sophisticated and are specifically designed to target vehicles such as armored patrols and supply convoys, though the IRGC and Hezbollah and its Iraqi proxies also deployed them against U.S. and Iraqi civilians as well.

2204. Because the IRGC propagated its specialized weapons knowledge up and down its network of terror proxies in Iraq, the U.S. Department of State's *Country Reports on Terrorism 2006* further documented the IRGC's specific efforts to provide terrorists with lethal EFPs to ambush and murder U.S. and other Coalition Forces:

> Iran provided guidance and training to select Iraqi Shia political groups, and weapons and training to Shia militant groups to enable anti-Coalition attacks. Iranian government forces have been responsible for at least some of the increasing lethality of anti-Coalition attacks by providing Shia militants with the capability to build IEDs with explosively formed projectiles similar to those developed by Iran and Lebanese Hezbollah. The Iranian Revolutionary Guard was linked to armor-piercing explosives that resulted in the deaths of Coalition Forces. The Revolutionary Guard, along with Lebanese Hezbollah, implemented training programs for Iraqi militants in the construction and use of sophisticated IED technology. *These individuals then passed on this training to additional militants in Iraq.* (Emphasis added.)

2205. Also, in 2006, Brig. Gen. Michael Barbero, Deputy Chief of Staff for Strategic Operations of MNF–I stated: "Iran is definitely a destabilizing force in Iraq. I think it's irrefutable that Iran is responsible for training, funding and equipping some of these Shi'a extremist groups and also providing advanced IED technology to them, and there's clear evidence of that."

2206. That same year, the Deputy Chief of Staff for Intelligence with the MNF–I, U.S. Army Major General ("Maj. Gen.") Richard Zahner, declared that:

> Labels on weapons stocks seized inside and outside Iraq point to Iranian government complicity in arming Shiite militias in Iraq […] Iran is

funneling millions of dollars for military goods into Iraq […] You'll find a red label on the C-4 [explosive] printed in English and will tell you the lot number and name of the manufacturer.

2207. Maj. Gen. Zahner further added:

[T]he control of military-grade explosives in Iran is controlled through the state apparatus and is not committed through rogue elements right there. It is a deliberate decision on the part of elements associated with the Iranian government to affect this type of activities.

2208. Brig. Gen. Bergner commented on the IRGC's funding of Hezbollah operatives in Iraq:

Actions against these Iraqi groups have allowed coalition intelligence officials to piece together the Iranian connection to terrorism in Iraq […] Iran's Quds Force, a special branch of Iran's Revolutionary Guards, is training, funding and arming the Iraqi groups. […] It shows how Iranian operatives are using Lebanese surrogates to create Hezbollah-like capabilities. And it paints a picture of the level of effort in funding and arming extremist groups in Iraq.

2209. Brig. Gen. Bergner further noted that the groups "receive arms—including explosively formed penetrators, the most deadly form of improvised explosive device—and funding from Iran. They also have received planning help and orders from Iran."

2210. In May 2007, the Commander of the Multi-National Division–Center, U.S. Army Maj. Gen. Richard Lynch, stated that:

Most of our casualties have come from improvised explosive devices. That's still the primary threat to our soldiers—IEDs. And we have an aggressive campaign to counter those IEDs, but they still are taking a toll on our soldiers: 13 killed, 39 soldiers wounded. *What we're finding is that the technology and the financing and the training of the explosively formed penetrators are coming from Iran.* The EFPs are killing our soldiers, and we can trace that back to Iran. [Emphasis added.]

2211. According to the U.S. State Department's *Country Reports on Terrorism 2007*:

Despite its pledge to support the stabilization of Iraq, Iranian authorities continued to provide lethal support, including weapons, training, funding, and guidance, to some Iraqi militant groups that target Coalition and Iraqi security forces and Iraqi civilians. In this way, Iranian government forces

have been responsible for attacks on Coalition forces. The Islamic Revolutionary Guard Corps (IRGC)–Qods Force, continued to provide Iraqi militants with Iranian-produced advanced rockets, sniper rifles, automatic weapons, mortars that have killed thousands of Coalition and Iraqi Forces, and explosively formed projectiles (EFPs) that have a higher lethality rate than other types of improvised explosive devices (IEDs), and are specially designed to defeat armored vehicles used by Coalition Forces. The Qods Force, in concert with Lebanese Hezbollah, provided training outside Iraq for Iraqi militants in the construction and use of sophisticated IED technology and other advanced weaponry. These individuals then passed on this training to additional militants inside Iraq, a "train-the-trainer" program. In addition, the Qods Force and Hezbollah have also provided training inside Iraq. In fact, Coalition Forces captured a Lebanese Hezbollah operative in Iraq in 2007.

2212. Other U.S. Government reports, such as the Department of Defense's 2007 *Measuring Stability and Security in Iraq* quarterly report to Congress, similarly concluded that:

> The Iranian regime's primary tool for exercising clandestine influence in Iraq is the Islamic Revolutionary Guard Corps' (IRGC) Qods Force (QF), which provides arms, intelligence, funds, training, and propaganda support to Iraqi Shi'a militants targeting and killing Coalition and Iraqi forces, as well as Iraqi civilians. The QF seeks to increase long-term Iranian strategic influence in Iraq and the withdrawal of U.S. forces. Among the weapons it provides to Iraqi militants are improvised explosive devices (IEDs), advanced IED technologies (including explosively formed projectiles (EFPs)), and rockets and mortars used for indirect fire attacks.

2213. The U.S. government's observations of Iran's campaign of state-sponsored terrorism continued in 2008.

2214. According to the U.S. Department of State's *Country Reports on Terrorism 2008*:

> Despite its pledge to support the stabilization of Iraq, Iranian authorities continued to provide lethal support, including weapons, training, funding, and guidance, to Iraqi militant groups that targeted Coalition and Iraqi forces and killed innocent Iraqi civilians. Iran's Qods Force continued to provide Iraqi militants with Iranian-produced advanced rockets, sniper rifles, automatic weapons, and mortars that have killed Iraqi and Coalition Forces as well as civilians. Tehran was responsible for some of the lethality of anti-Coalition attacks by providing militants with the capability to assemble improvised explosive devices (IEDs) with explosively formed projectiles (EFPs) that were specially designed to defeat armored vehicles.

The Qods Force, in concert with Lebanese Hezbollah, provided training both inside and outside of Iraq for Iraqi militants in the construction and use of sophisticated IED technology and other advanced weaponry.

2215. Another way in which the IRGC provided "militants with the capability to assemble improvised explosive devices (IEDs) with explosively formed projectiles (EFPs) that were specially designed to defeat armored vehicles" included providing them with manufacturing supplies such as copper and steel, as well as machinery—including hydraulic presses used to form copper into the shape of disks used in EFPs.

2216. The U.S. Department of State's *Country Reports on Terrorism 2011* reported the following about the IRGC's operations in Iraq:

> Despite its pledge to support the stabilization of Iraq, Iran continued to provide lethal support, including weapons, training, funding, and guidance, to Iraqi Shia militant groups targeting U.S. and Iraqi forces, as well as civilians. Iran was responsible for the increase of lethal attacks on U.S. forces and provided militants with the capability to assemble explosives designed to defeat armored vehicles. The IRGC–QF [Islamic Revolutionary Guard Corps–Quds Force], in concert with Lebanese Hezbollah, provided training outside of Iraq as well as advisors inside Iraq for Shia militants in the construction and use of sophisticated improvised explosive device technology and other advanced weaponry.

2217. Similarly, in 2011, the U.S. Ambassador to Iraq, James F. Jeffrey, was quoted as saying:

> [F]resh forensic testing on weapons used in the latest deadly attacks in the country bolsters assertions by U.S. officials that Iran is supporting Iraqi insurgents with new weapons and training. […] We're not talking about a smoking pistol. There is no doubt this is Iranian.

2218. The IRGC's and Hezbollah's orchestrated attacks on Coalition Forces and Iraqi civilians during the Relevant Period was financed and facilitated, in substantial part, by illicit funds transfers initiated at the IRGC's direction as part of the conspiracy set forth in detail herein and with the knowing, culpable and substantial assistance of Defendants.

### D. ALL OF THE ATTACKS AT ISSUE IN THIS COMPLAINT WERE ACTS OF INTERNATIONAL TERRORISM

2219.   At no time relevant to this Action did the United States declare war or enact an Authorization for the Use of Military Force against Iran.

2220.   At no time relevant to this Action did the United States engage in an armed conflict with the military forces of Iran, or Iran's military forces or their agents engaged in lawful acts of war against Coalition Forces.

2221.   At no time relevant to this action did Hezbollah's and the IRGC's proxies in Iraq who killed and injured Coalition Forces and civilians carry fixed distinctive signs recognizable at a distance, carry arms openly, conduct their operations in accordance with the laws and customs of war, or enjoy any form of combatant immunity for their acts.

2222.   The specific attacks alleged herein were all committed by Hezbollah and the IRGC through their Iraqi proxy groups, not by armed forces of recognized governments or military forces.

2223.   The deaths and injuries Plaintiffs sustained were not the result of, nor did they occur in the course of, a declared war with Iran, or an armed conflict between the United States and Iran.

2224.   The IRGC's and Hezbollah's conduct violated the laws of armed conflict (including, e.g., AAH operatives masquerading as members of U.S. armed forces and executing defenseless prisoners), and the attacks upon Iraqi and other civilians constituted a substantial, rather than an incidental, part of their objectives and conduct.

2225.   The acts committed jointly by the IRGC and Hezbollah that injured Plaintiffs were acts of international terrorism within the meaning of 18 U.S.C. § 2331, involving violent acts intended to influence the United States by coercion (by coercing the withdrawal of Coalition Forces from Iraq) and to intimidate and coerce the Iraqi population, and were also acts constituting

terrorist activities within the meaning of 8 U.S.C. § 1182(a)(3)(B)(iii)–(iv), and/or engaging in terrorism within the meaning of 22 U.S.C. § 2656f.

## VIII. THE PLAINTIFFS

### 1. The January 20, 2007, Attack–Karbala

2226. In the early evening of January 20, 2007, Iran launched a coordinated terrorist attack against the Provincial Joint Coordination Center ("PJCC") in Karbala, about thirty miles south of Baghdad.

2227. The attack on the PJCC was largely planned by Hezbollah, under the direction of Ali Musa Daqduq, and carried out by Hezbollah's agents: Asa'ib Ahl al-Haq ("AAH") operatives led by Qais al-Khazali.

2228. Just after nightfall, a five-car convoy of black GMC Suburban sport-utility vehicles ("SUVs")–the type frequently used by the U.S. government in Iraq–made its way through three checkpoints on the access road approaching the PJCC.

2229. The vehicles contained at least a dozen AAH operatives dressed in U.S. military-style fatigues, carrying American-type weapons.

2230. After they entered the PJCC compound, the five vehicles split up, with some parking in front, and others waiting at the Iraqi Police checkpoints along the southern approach to the PJCC compound.

2231. After exiting their vehicles, the AAH terrorists greeted in fluent English the two U.S. soldiers guarding the PJCC's western entrance before launching a surprise attack.

2232. The AAH operatives shot and wounded the two U.S. soldiers outside the PJCC's main building and opened fire on the PJCC compound with automatic rifles, while two small teams quickly moved inside the main building and assaulted the Communications Room with small arms fire.

2233.   One U.S. soldier, Johnathon M. Millican, fell on a grenade that was thrown into the Communications Room, while other soldiers prevented the attackers from overrunning their position.

2234.   Although Millican was killed, and several other U.S. soldiers injured, his selfless act provided his fellow soldiers in the PJCC's main building a few extra moments to recover and begin returning fire.

2235.   For his act of bravery, Johnathon M. Millican was posthumously awarded the Silver Star medal for valor by the U.S. Army.

2236.   While AAH terrorists were attacking the PJCC's main building, other AAH operatives conducted a coordinated attack on the compound's barracks and back gate, before abducting four U.S. soldiers (the two wounded soldiers and two officers from inside the main building) and fleeing the compound.

2237.   Five of the AAH getaway vehicles drove east, crossed the Euphrates River, and then turned north. The other three vehicles departed in the opposite direction to confuse any pursuing forces.

2238.   After over an hour of travel on the main roads, the five SUVs were stopped at a checkpoint in Mahawil following a radio alert regarding put out by MNF–I about the abducted soldiers

2239.   The AAH terrorists then abandoned the main road for back roads, and the Iraqi Police and Iraqi Army forces at the Mahawil checkpoint gave chase.

2240.   Realizing the likelihood of escaping with their captives was low, and darkness making back road navigation all but impossible, the AAH operatives murdered the four Americans

they had just kidnapped and abandoned their bodies and the vehicles near the town of Mahawil. Three of the four Americans died at the scene.

2241.   When rescuers arrived on site, only one of the four abducted U.S. soldiers, Brian S. Freeman, was still alive.

2242.   Two of the soldiers were found in the back of one of the SUVs, handcuffed together and shot dead. A third soldier was found dead on the ground, near the abandoned vehicles. Brian S. Freeman had also been shot in the head and died on the way to the hospital.

2243.   AAH, the Iraqi terrorist group that planned and executed the PJCC attac was trained and armed by Iran's IRGC with Hezbollah's assistance.

2244.   On March 20, 2007, two months after the attack was perpetrated, Hezbollah operative Ali Musa Daqduq ("Daqduq") and AAH leader Qais al-Khazali and his brother Laith al-Khazali were captured by Coalition Forces in southern Iraq.

2245.   The United States government charged them with responsibility for the Karbala PJCC attack.

2246.   Documents captured with Qais al-Khazali showed that the IRGC–QF had gathered detailed information on "soldiers' activities, shift changes and defenses" at the PJCC "and this information was shared with the attackers."

2247.   A 22-page memorandum found with Mr. Daqduq "detailed the planning, preparation, approval process and conduct of the [Karbala] operation," among others. Other documents discussed tactics to attack Iraqi and Coalition Forces.

2248.   Mr. Daqduq also had a personal journal that noted his having met with Special Groups members who were targeting other Iraqis and Coalition Forces in the Diyala province using Improvised Explosive Devices ("IEDs"), as well as small-arms fire.

2249.  According to U.S. military officials, both Messrs. Daqduq and al-Khazali admitted that senior leadership within the IRGC–QF knew of and helped plan the Karbala attack.

2250.  *Aviation Week & Space Technology* magazine later reported that U.S. spy satellites spotted a full-scale mockup of the Karbala PJCC at the IRGC–QF's Farj Garrison in the city of Ahwaz, Iran.

2251.  Analysis of the satellite imagery indicated that the IRGC had duplicated the PJCC's layout to specifically train the AAH operatives for the attack.

2252.  The terror attack on the PJCC was commanded by Azhar al-Dulaymi. He was trained by Hezbollah operatives, including Mr. Daqduq, near the city of Qom, Iran, where he and his AAH operatives trained to execute military-style, precision kidnappings.

2253.  Although Mr. al-Dulaymi commanded the attack, Mr. Daqduq, a longtime Hezbollah commander, masterminded it, authorized it and directed its execution down to the minor details.

2254.  Mr. Daqduq advised AAH commanders Mr. al-Dulaymi and Qais al-Khazali and served as a liaison between the IRGC–QF and Qais al-Khazali, who along with his brother Laith al-Khazali, oversaw the attack.

2255.  The U.S. Department of Treasury's November 19, 2012, press release announcing Mr. Daqduq's designation as an SDGT stated, in part:

> Daqduq is a senior Hezbollah commander responsible for numerous attacks against Coalition Forces in Iraq, including planning an attack on the Karbala [Provincial Joint] Coordination Center ([[PJ]CC) on January 20, 2007, which resulted in the deaths of five U.S. soldiers.[214]

---

[214]    Press Release, *Treasury Designates Hizballah Commander Responsible for American Deaths in Iraq*, U.S. DEP'T OF TREASURY (Nov. 19, 2012), https://home.treasury.gov/news/press-releases/tg1775.

2256. Mr. Daqduq is Lebanese-born and served in Hezbollah for twenty-four years prior to the attack on the Karbala PJCC.

2257. Mr. Daqduq served as a bodyguard for Hezbollah leader Hassan Nasrallah and he also led Hezbollah operations in large areas of Lebanon.

2258. According to the U.S. government, Mr. Daqduq "was in Iraq working as a surrogate for Iranian Revolutionary Guards Corps Quds Force operatives involved with special groups."

2259. In 2005, Mr. Daqduq was directed by senior Lebanese Hezbollah leadership to go to Iran and work with the IRGC–QF to train Iran's proxies in Iraq.

2260. According to the U.S. government: "In May 2006, [Daqduq] traveled to Tehran with Yussef Hashim, a fellow Lebanese Hezbollah and head of their operations in Iraq. There they met with the commander and deputy commander of the Iranian Quds Force special external operations."

2261. Mr. Daqduq was ordered to Iraq to report on the training and operations of the Iraqi Special Groups.

2262. In the year prior to his capture in 2007, Mr. Daqduq made four trips to Iraq where he monitored and reported on the training and arming of the Special Groups in mortars and rockets, manufacturing, and employment of IEDs, and kidnapping operations.

2263. Most significantly, Mr. Daqduq was tasked with organizing the Special Groups in ways that mirrored how Hezbollah was organized in Lebanon.

2264. Mr. Daqduq also helped the IRGC train Iraqis at multiple sites in Iran.

2265. Using training groups of approximately twenty to sixty Iraqis at a time, Mr. Daqduq instructed his trainees on how to use EFPs, mortars and rockets, as well as intelligence, sniper, and kidnapping operations.

2266. The IRGC then provided operational, intelligence and logistical support to insert the terrorist trainees back into various Iraqi cities where they rejoined their respective Special Groups.

2267. The IRGC also supplied the Special Groups with weapons and a funding stream ranging from an estimated $750,000 to $3 million U.S. dollars per month.

2268. On April 26, 2007, the Commander of the Multi-National Force–Iraq, Gen. David Petraeus, gave a briefing in which he stated:

> The Iranian involvement has really become much clearer to us and brought into much more focus during the interrogation of the members—the heads of the Khazali network and some of the key members of that network that have been in detention now for a month or more. This is the head of the secret cell network, the extremist secret cells. They were provided substantial funding, training on Iranian soil, advanced explosive munitions and technologies as well as run of the mill arms and ammunition, in some cases advice and in some cases even a degree of direction. When we captured these individuals—the initial capture, and then there have been a number of others since then—we discovered, for example, a 22-page memorandum on a computer that detailed the planning, preparation, approval process and conduct of the operation that resulted in five of our soldiers being killed in Karbala. It also detailed—there are numerous documents which detailed a number of different attacks on coalition forces, and our sense is that these records were kept so that they could be handed in to whoever it is that is financing them. And there's no question, again, that Iranian financing is taking place through the Quds force of the Iranian Republican Guards Corps.

2269. The Americans killed during the Karbala attack included Brian S. Freeman, Johnathon M. Millican, Shawn P. Falter, and Johnathan B. Chism. The Americans injured during the Karbala attack included Billy Wallace, Evan Kirby, Johnny Washburn, and Marvin Thornsberry.

### a) The Freeman Family

2270. Brian S. Freeman was a citizen of the United States and domiciled in the State of California when he was killed in Iraq.

2271.  Plaintiff Kathaleen Freeman is a citizen of the United States and domiciled in the State of California. She is the stepmother of Brian S. Freeman.

2272.  Plaintiff Albert Snyder is a citizen of the United States and domiciled in the State of Utah. He is the stepfather of Brian S. Freeman.

2273.  Plaintiff Richard Lee is a citizen of the United States and domiciled in the State of California. He is the stepbrother of Brian S. Freeman.

2274.  As a result of the attack, and the death of Brian S. Freeman, Plaintiffs Kathaleen Freeman, Albert Snyder, and Richard Lee have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice, and counsel.

### b) The Kirby Family

2275.  Evan Kirby is a citizen of the United States and domiciled in the State of Ohio.

2276.  Mr. Kirby was wounded during the attack on the PJCC's barracks.

2277.  As a result of an explosion that occurred during the attack, Mr. Kirby was thrown into the air and sustained injuries to his back and spine.

2278.  Mr. Kirby aforementioned injuries have caused him great pain.

2279.  Plaintiff Marcia Kirby is a citizen of the United States and domiciled in the State of Ohio. She is the mother of Evan Kirby.

2280.  Plaintiff Steven Kirby is a citizen of the United States and domiciled in the State of Ohio. He is the father of Evan Kirby.

2281.  As a result of the attack and the injuries Evan Kirby suffered, Plaintiffs Marcia Kirby and Steven Kirby have experienced severe mental anguish and extreme emotional pain and suffering.

### 2. The January 12, 2004, Attack–Baghdad

#### a) The Crockett Family

2282.   Ricky Leon Crockett was a citizen of the United States and domiciled in the State of Georgia.

2283.   On January 12, 2004, Ricky Leon Crockett, then 37, was serving in the U.S. military in Iraq when an IED emplaced by JAM terror operatives detonated near the vehicle.

2284.   Ricky Leon Crockett died from penetrating shrapnel injuries he sustained in the explosion.

2285.   The Iraqi JAM terror cell that emplaced the IED that killed Ricky Leon Crockett was trained by Hezbollah and funded and armed by the IRGC–QF.

2286.   Plaintiff Maxine E. Crockett is a citizen of the United States and domiciled in the State of North Carolina. She is the widow of Ricky Leon Crockett.

2287.   Plaintiff Maxine E. Crockett brings an action individually and on behalf of the Estate of Ricky Leon Crockett, as its legal representative.

2288.   Plaintiff Marvise L. Crockett is a citizen of the United States and domiciled in the State of North Carolina. She is the daughter of Ricky Leon Crockett.

2289.   As a result of the attack, and the death of Ricky Leon Crockett, Plaintiffs Maxine E. Crockett and Marvise L. Crockett have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice, and counsel.

### 3. The April 4, 2004, Attack–Baghdad

#### a) The Arsiaga Family

2290.   Robert R. Arsiaga was a citizen of the United States and domiciled in the State of Texas when he was killed in Iraq.

2291. On April 4, 2004, Robert R. Arsiaga, aged 25, was serving in the United States military in Iraq when his unit was attacked by JAM terror operatives with rocket-propelled grenades and small-arms fire.

2292. Robert R. Arsiaga was killed in the attack.

2293. The Iraqi JAM terror cell that emplaced the IED that killed Robert R. Arsiaga was trained by Hezbollah and funded and armed by the IRGC–QF.

2294. Tracie Arsiaga is a citizen of the United States and domiciled in the State of Texas. She is the widow of Robert R. Arsiaga.

2295. Tracie Arsiaga brings an action on behalf of the Estate of Robert R. Arsiaga, as its legal representative, for his death and any suffering and/ or economic loss he/his Estate sustained as a result of the attack.

### b) The Greenwood Family

2296. Plaintiff Steven Greenwood is a citizen of the United States and domiciled in the State of Texas.

2297. On April 4, 2004, Steven Greenwood, then 20, was serving in the United States military in Iraq when his unit was attacked by JAM terror operatives with rocket-propelled grenades and small-arms fire.

2298. The Iraqi JAM terror cell that emplaced the IED that injured Steven Greenwood was trained by Hezbollah and funded and armed by the IRGC–QF.

2299. As a result of the attack, Mr. Greenwood suffered shrapnel wounds to his wrist which caused nerve damage.

2300. He was initially treated in Iraq for his injuries, but the nerve damage could not be treated there. Approximately one week after the attack, he was sent to Landstuhl, Germany where he was further treated for his wounds.

2301.   He was then sent back to the U.S. where he had surgery to remove the shrapnel.

2302.   He also suffers from Post-Traumatic Stress Disorder ("PTSD") and depression.

2303.   He has sought treatment for his wounds, PTSD and depression.

2304.   As a result of the attack, and the injuries he suffered, Plaintiff Steven Greenwood has experienced severe physical and mental anguish and extreme emotional pain and suffering.

### c)  The Hiller Family

2305.   Stephen Dustin Hiller was a citizen of the United States and domiciled in the State of Alabama.

2306.   On April 4, 2004, Stephen Dustin Hiller, aged 25, was serving in the U.S. military in Iraq when his unit was engaged in small arms fire with members of JAM in Sadr City, Iraq.

2307.   Stephen Dustin Hiller was killed by JAM rocket-propelled grenade ("RPG") fire while engaged in the exchange of gunfire with members of JAM.

2308.   The Iraqi JAM terror cell that fired at Stephen Dustin Hiller was trained by Hezbollah and funded and armed by the IRGC–QF.

2309.   Plaintiff Stephen W. Hiller is a citizen of the United States and domiciled in the State of Alabama. He is the father of Stephen Dustin Hiller.

2310.   Plaintiff Stephen W. Hiller brings an action individually and behalf of the Estate of Stephen Dustin Hiller, as its legal representative.

2311.   As a result of the attack, and the death of Stephen Dustin Hiller, Plaintiff Stephen W. Hiller has experienced severe mental anguish, extreme emotional pain and suffering, and loss of his son's society, companionship, comfort, advice, and counsel.

4. **The April 9, 2004, Attack–Baghdad**

   *a) The Church Family*

2312.   Plaintiff Jeremy Church is a citizen of the United States and domiciled in the State of Missouri.

2313.   On April 9, 2004, Jeremy Church, then 26, was serving in the U.S. military in Iraq when his unit was attacked by JAM terror operatives with rocket-propelled grenades and small-arms fire.

2314.   He was driving in a convoy when an IED and an RPG struck his vehicle.

2315.   The Iraqi JAM terror cell that executed the attack in which Jeremy Church was injured was trained by Hezbollah and funded and armed by the IRGC–QF.

2316.   Mr. Church suffers from hearing issues as a result of the rocket fire and detonation of the IED. He continues to experience ringing in his ears.

2317.   He has experienced severe headaches.

2318.   Mr. Church has been diagnosed with PTSD.

2319.   He has sought treatment, including counseling.

2320.   He has been prescribed anti-anxiety medications, anti-depressants, and medication to address sleep-related issues.

2321.   As a result of the attack, and the injuries he suffered, Plaintiff Jeremy Church has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2322.   Plaintiff Sandra Hankins is a citizen of the United States and domiciled in the State of Texas. She is the mother of Jeremy Church.

2323.   As a result of the attack, and the injuries Jeremy Church suffered, Plaintiff Sandra Hankins has experienced severe mental anguish and extreme emotional pain and suffering.

### b) The Fisher Family

2324.   Steven Scott Fisher was a citizen of the United States and domiciled in the State of Virginia when he was killed in Iraq.

2325.   On April 9, 2004, Steven Scott Fisher, aged 43, was serving as a civilian contractor in Iraq when the convoy in which he was traveling was attacked by JAM terror operatives with rocket-propelled grenades and small-arms fire.

2326.   Steven Scott Fisher was killed in the attack.

2327.   The Iraqi JAM terror cell that executed the attack in which Steven Scott Fisher was killed was trained by Hezbollah and funded and armed by the IRGC–QF.

2328.   Plaintiff Ingrid Fisher is a citizen of the United States and domiciled in the State of Virginia. She is the widow of Steven Scott Fisher.

2329.   Plaintiff Ingrid Fisher brings an action individually and on behalf of the Estate of Steven Scott Fisher, as its legal representative.

2330.   Plaintiff Kristin Walker is a citizen of the United States and domiciled in the State of Virginia. She is the daughter of Steven Scott Fisher.

2331.   Plaintiff Steven T. Fisher is a citizen of the United States and domiciled in the State of Virginia. He is the son of Steven Scott Fisher.

2332.   Plaintiff Kathleen Gramkowski is a citizen of the United States and domiciled in the State of Virginia. She is the daughter of Steven Scott Fisher.

2333.   As a result of the attack, and the death of Steven Scott Fisher, Plaintiffs Ingrid Fisher, Kristin Walker, Steven T. Fisher, and Kathleen Gramkowski have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice, and counsel.

**5.     The June 4, 2004, Attack–Baghdad**

   *a)  The Carvill Family*

2334.   Frank T. Carvill was a citizen of the United States and domiciled in the State of New Jersey when he was killed in Iraq.

2335.   On June 4, 2004, Frank T. Carvill, aged 51, was serving in the United States military in Iraq when his unit was attacked by JAM terror operatives with rocket-propelled grenades and IEDs in Baghdad.

2336.   Frank T. Carvill was killed in the attack.

2337.   The Iraqi JAM terror cell that executed the attack in which Frank T. Carvill was killed was trained by Hezbollah and funded and armed by the IRGC–QF.

2338.   Plaintiff Mary Carvill is a citizen of the United States and domiciled in the State of New Jersey. She is the mother of Frank T. Carvill.

2339.   Plaintiff Peggy Carvill-Liguori is a citizen of the United States and domiciled in the State of New Jersey. She is the sister of Frank T. Carvill.

2340.   Plaintiff Peggy Carvill-Liguori brings this action individually and on behalf of the Estate of Frank T. Carvill, as its legal representative.

2341.   Plaintiff Daniel Carvill is a citizen of the United States and domiciled in the State of New Jersey. He is the brother of Frank T. Carvill.

2342.   As a result of the attack, and the death of Frank T. Carvill, Plaintiffs Mary Carvill, Peggy Carvill-Liguori and Daniel Carvill have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice, and counsel.

6. **The June 29, 2004, Attack–Baghdad**

   *a) The Adle Family*

2343. Patrick Adle was a citizen of the United States and domiciled in the State of Maryland when he was killed in Iraq.

2344. On June 29, 2004, Patrick Adle, aged 21, was serving in the U.S. military in Iraq when a roadside bomb emplaced by JAM terror operatives detonated near the vehicle in which he was traveling in Baghdad.

2345. Patrick Adle was killed in the attack.

2346. The Iraqi JAM terror cell that emplaced the roadside bomb that killed Patrick Adle was trained by Hezbollah and funded and armed by the IRGC–QF.

2347. Plaintiff Pamela Adle-Watts is a citizen of the United States and domiciled in the State of Maryland. She is the mother of Patrick Adle.

2348. Plaintiff Pamela Adle-Watts brings this action individually and on behalf of the Estate of Patrick Adle, as its legal representative.

2349. Plaintiff John Watts is a citizen of the United States and domiciled in the State of Maryland. He is the stepfather of Patrick Adle.

2350. As a result of the attack, and the death of Patrick Adle, Plaintiffs Pamela Adle-Watts and John Watts have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's society, companionship, comfort, advice, and counsel.

7. **The July 27, 2004, Attack–Balad Ruz**

   *a) The Talbert Family*

2351. DeForest L. Talbert was a citizen of the United States and domiciled in the State of West Virginia.

2352.    On July 27, 2004, DeForest L. Talbert, then 24, was serving in the U.S. military in Iraq and traveling in an M998 Humvee in the vicinity of Balad Ruz close to the Iranian border and IRGC–QF smuggling routes when his vehicle was struck with an IED.

2353.    DeForest L. Talbert was killed in the attack.

2354.    The Iraqi Special Groups terror cell that emplaced the IED that killed DeForest L. Talbert was trained by Hezbollah and funded by the IRGC–QF.

2355.    Plaintiff Gloria Nesbitt is a citizen of the United States and domiciled in the State of Virginia. She is the mother of DeForest L. Talbert.

2356.    Plaintiff Gloria Nesbitt brings an action individually and on behalf of the Estate of DeForest L. Talbert, as its legal representative.

2357.    Plaintiff Deontae James Hamilett is a citizen of the United States and domiciled in the State of West Virginia. He is the son of DeForest L. Talbert.

2358.    Plaintiff Chiquita Talbert is a citizen of the United States and domiciled in the State of Virginia. She is the sister of DeForest L. Talbert.

2359.    Plaintiff Tawanna Talbert Darring is a citizen of the United States and domiciled in the State of Maryland. She is the sister of DeForest L. Talbert.

2360.    Plaintiff Latasha Marble is a citizen of the United States and domiciled in the State of Virginia. She is the sister of DeForest L. Talbert.

2361.    Plaintiff James Talbert is a citizen of the United States and domiciled in the State of Virginia. He is the brother of DeForest L. Talbert.

2362.    As a result of the attack, and the death of DeForest L. Talbert, Plaintiffs Gloria Nesbitt, Deontae James Hamilett, Chiquita Talbert, Tawanna Talbert Darring, Latasha Marble and

James Talbert have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/father's/brother's society companionship, comfort, advice, and counsel.

### 8. The August 5, 2004, Attack–Najaf

#### a) The Rocha Family

2363. Moses Rocha was a citizen of the United States and domiciled in the State of New Mexico when he was killed in Iraq.

2364. On August 5, 2004, Moses Rocha, aged 33, was serving in the U.S. military in Iraq when his unit was attacked by JAM terror operatives with rocket-propelled grenades and small-arms fire.

2365. Moses Rocha was killed in the attack.

2366. The Iraqi JAM terror cell that executed the attack in which Moses Rocha was killed was trained by Hezbollah and funded and armed by the IRGC–QF.

2367. Plaintiff Miranda Pruitt is a citizen of the United States and domiciled in the State of Texas. She is the daughter of Moses Rocha.

2368. Plaintiff Velina Sanchez is a citizen of the United States and domiciled in the State of New Mexico. She is the mother of Moses Rocha.

2369. Plaintiff Velina Sanchez brings an action individually and on behalf of the Estate of Moses Rocha, as its legal representative.

2370. Plaintiff Aloysius Sanchez, Sr. is a citizen of the United States and domiciled in the State of New Mexico. He is the stepfather of Moses Rocha.

2371. Plaintiff Rommel Rocha is a citizen of the United States and domiciled in the State of New Mexico. He is the brother of Moses Rocha.

2372. Plaintiff Phillip Sanchez is a citizen of the United States and domiciled in the State of New Mexico. He is the brother of Moses Rocha.

2373.   Plaintiff Aloysius Sanchez, Jr. is a citizen of the United States and domiciled in the State of New Mexico. He is the brother of Moses Rocha.

2374.   As a result of the attack, and the death of Moses Rocha, Plaintiffs Miranda Pruitt, Velina Sanchez, Aloysius Sanchez, Sr., Rommel Rocha, Phillip Sanchez, and Aloysius Sanchez, Jr. have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their father's/son's/brother's society, companionship, comfort, advice, and counsel.

### b) *The Reynoso Family*

2375.   Yadir G. Reynoso was a citizen of the United States and domiciled in the State of Washington.

2376.   On August 5, 2004, Yadir G. Reynoso, aged 27, was serving in the U.S. military in Iraq when his unit was engaged in small arms fire with JAM terror operatives in Najaf, Iraq.

2377.   Yadir G. Reynoso was killed in the exchange of gunfire with JAM terror operatives.

2378.   The Iraqi JAM terror cell that fired at Yadir G. Reynoso was trained by Hezbollah and funded and armed by the IRGC–QF.

2379.   Plaintiff Gloria P. Reynoso is a citizen of the United States and domiciled in the State of Washington. She is the mother of Yadir G. Reynoso.

2380.   Plaintiff Gloria P. Reynoso brings an action individually and on behalf of the Estate of Yadir G. Reynoso, as its legal representative.

2381.   Plaintiff Jasmin Reynoso is a citizen of the United States and domiciled in the State of Washington. She is the sister of Yadir G. Reynoso.

2382.   Plaintiff Patricia Reynoso is a citizen of the United States and domiciled in the State of Washington. She is the sister of Yadir G. Reynoso.

2383.   Plaintiff Jose Reynoso is a citizen of the United States and domiciled in the State of Washington. He is the brother of Yadir G. Reynoso.

2384.   As a result of the attack, and the death of Yadir G. Reynoso, Plaintiffs Gloria P. Reynoso, Jasmin Reynoso, Patricia Reynoso, and Jose Reynoso have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice, and counsel.

### 9.   The August 6, 2004, Attack–Najaf

#### a)   The Wells Family

2385.   Larry Lloyd Wells was a citizen of the United States and domiciled in the State of Louisiana.

2386.   On August 6, 2004, Larry Lloyd Wells, aged 22, was serving in the U.S. military in Iraq when his unit was engaged in small arms fire with JAM terror operatives in the Wadi al-Salam Cemetery in Najaf, Iraq.

2387.   Larry Lloyd Wells was killed by sniper fire from JAM terror operatives.

2388.   The Iraqi JAM terror cell that fired at Larry Lloyd Wells was trained by Hezbollah and funded and armed by the IRGC–QF.

2389.   Plaintiff Ashley Wells Simpson is a citizen of the United States and domiciled in the State of Louisiana. She is the sister of Larry Lloyd Wells.

2390.   Plaintiff Ashley Wells Simpson brings an action individually and on behalf of the Estate of Larry Lloyd Wells, as its legal representative.

2391.   Plaintiff Chad Wells is a citizen of the United States and domiciled in the State of Louisiana. He is the brother of Larry Lloyd Wells.

2392.   Plaintiff Crystal Stewart is a citizen of the United States and domiciled in the State of Louisiana. She is the sister of Larry Lloyd Wells.

2393.   Plaintiff Chasity Wells-George is a citizen of the United States and domiciled in the State of Louisiana. She is the sister of Larry Lloyd Wells.

2394.  Plaintiff Candice Machella is a citizen of the United States and domiciled in the State of Louisiana. She is the sister of Larry Lloyd Wells.

2395.  Plaintiff Billy Doal Wells is a citizen of the United States and domiciled in the State of Tennessee. He is the brother of Larry Lloyd Wells.

2396.  As a result of the attack, and the death of Larry Lloyd Wells, Plaintiffs Ashley Wells Simpson, Chad Wells, Crystal Stewart, Chasity Wells-George, Candice Machella, and Billy Doal Wells have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their brother's society, companionship, comfort, advice, and counsel.

### 10.     The August 15, 2004, Attack–Najaf

#### a)  The Sapp Family

2397.  Brandon Robert Sapp was a citizen of the United States and domiciled in the State of Florida.

2398.  On August 15, 2004, Brandon Robert Sapp, then 21, was serving in the U.S. military in Najaf, Iraq when the M2 Bradley Fighting Vehicle he was operating rolled over a 500-pound IED emplaced by JAM terror operatives that sent the Bradley and Brandon Robert Sapp airborne, killing him.

2399.  The Iraqi JAM terror cell that emplaced the IED that killed Brandon Robert Sapp was trained by Hezbollah and funded and armed by the IRGC–QF.

2400.  Plaintiff Hope Elizabeth Veverka is a citizen of the United States and domiciled in the State of New Mexico. She is the mother of Brandon Robert Sapp.

2401.  As a result of the attack, and the death of Brandon Robert Sapp, Plaintiff Hope Elizabeth Veverka has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her son's society, companionship, comfort, advice, and counsel.

11. **The August 16, 2004, Attack–Sadr City**

   *a)  The Heath Family*

2402.   David Michael Heath was a citizen of the United States and domiciled in the State of Indiana.

2403.   On August 16, 2004, David Michael Heath, aged 30, was serving in the U.S. military in Iraq when an IED emplaced by JAM terror operatives detonated near his vehicle followed by smalls arms fire and a subsequent RPG attack in Sadr City.

2404.   David Michael Heath was killed in the attack by a gunshot wound to his head by JAM terror operatives.

2405.   The Iraqi JAM terror cell that fired at David Michael Heath was trained by Hezbollah and funded and armed by the IRGC–QF.

2406.   Plaintiff Donna Jean Heath is a citizen of the United States and domiciled in the State of Indiana. She is the wife of David Michael Heath.

2407.   Plaintiff Donna Jean Heath brings an action individually and on behalf of the Estate of David Michael Heath, as its legal representative.

2408.   Plaintiff Lola Jean Modjeska is a citizen of the United States and domiciled in the State of Indiana. She is the mother of David Michael Heath.

2409.   Plaintiff John David Heath is a citizen of the United States and domiciled in the State of Florida. He is the father of David Michael Heath.

2410.   As a result of the attack, and the death of David Michael Heath, Plaintiffs Donna Jean Heath, Lola Jean Modjeska, and John David Heath have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/son's society, companionship, comfort, advice, and counsel.

12.    **The August 18, 2004, Attack–Sadr City**

   *a)  The Martir Family*

2411.   Jacob David Martir was a citizen of the United States and domiciled in the State of Connecticut.

2412.   On August 18, 2004, Jacob David Martir, aged 21, was serving in the U.S. military in Iraq when his unit was engaged in small arms fire with JAM terror operatives in Sadr City.

2413.   Jacob David Martir was shot and killed by JAM terror operatives while engaged in the exchange of gunfire.

2414.   The Iraqi JAM terror cell that fired at Jacob David Martir was trained by Hezbollah and funded and armed by the IRGC–QF.

2415.   Plaintiff Olga Lydia Gutierrez is a citizen of the United States and domiciled in the State of Connecticut. She is the mother of Jacob David Martir.

2416.   Plaintiff Olga Lydia Gutierrez brings an action individually and on behalf of the Estate of Jacob David Martir, as its legal representative.

2417.   Plaintiff Ismael Martir is a citizen of the United States and domiciled in the State of Florida. He is the brother of Jacob David Martir.

2418.   As a result of the attack, and the death of Jacob David Martir, Plaintiffs Olga Lydia Gutierrez and Ismael Martir have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice, and counsel.

13.    **The August 25, 2004, Attack–Najaf**

   *a)  The Arredondo Family*

2419.   Alexander Scott Arredondo was a citizen of the United States and domiciled in the State of Massachusetts.

2420. On August 25, 2004, Alexander Scott Arredondo, aged 20, was serving in the U.S. military in Iraq when his unit was engaged in small arms fire with JAM terror operatives in Najaf, Iraq.

2421. Alexander Scott Arredondo was killed by sniper fire from JAM terror operatives.

2422. The Iraqi JAM terror cell that fired at Alexander Scott Arredondo was trained by Hezbollah and funded and armed by the IRGC–QF.

2423. Plaintiff Victoria M. Foley is a citizen of the United States and domiciled in the State of Massachusetts. She is the mother of Alexander Scott Arredondo.

2424. Plaintiff Victoria M. Foley brings an action individually and on behalf of the Estate of Alexander Scott Arredondo, as its legal representative.

2425. Plaintiff Nathaniel Foley is a citizen of the United States and domiciled in the State of Massachusetts. He is the brother of Alexander Scott Arredondo.

2426. As a result of the attack, and the death of Alexander Scott Arredondo, Plaintiffs Victoria M. Foley and Nathaniel Foley have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice, and counsel.

### 14. The August 26, 2004, Attack–Najaf

#### a) The DeWilde Family

2427. Plaintiff Michael Scott DeWilde is a citizen of the United States and domiciled in the State of Texas.

2428. On August 26, 2004, Michael Scott DeWilde, then 37, was serving in the U.S. military in Iraq.

2429. On August 26, 2004, Michael Scott DeWilde was seriously injured when he came under fire from a rocket-propelled grenade fired by JAM terror operatives.

420

2430.   The Iraqi JAM terror cell that executed the attack in which Michael Scott DeWilde was injured was trained by Hezbollah and funded and armed by the IRGC–QF.

2431.   As a result of the attack, Michael Scott DeWilde sustained shrapnel injuries to his arm requiring him to be medevaced from the scene and treated at the nearest Forward Operating Base.

2432.   As a result of the attack, and the injuries he suffered, Plaintiff Michael Scott DeWilde has experienced severe physical and mental anguish and extreme emotional pain and suffering.

**15.      The February 10, 2005, Attack–Baghdad**

*a)  The Morris Family*

2433.   Plaintiff Steven Morris is a citizen of the United States and domiciled in the State of North Carolina.

2434.   Steven Morris served in the U.S. military in Iraq on multiple rotations from March 2003 through 2011 as a member of a Special Operations Unit.

2435.   On February 10, 2005, Mr. Morris sustained a traumatic brain injury ("TBI") as well as neck and shoulder injuries when he was knocked from his armored vehicle en route to an operation against JAM Special Forces north of the Sab' Abkar section of Baghdad.

2436.   On a separate occasion, he sustained an additional TBI from the blast wave of an Iranian 122mm rocket launched by JAM Special Groups.

2437.   As a result of the attack, and the injuries he suffered, Plaintiff Steven Morris has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2438.   Plaintiff Danielle Dechaine-Morris is a citizen of the United States and domiciled in the State of North Carolina. She was the wife of Steven Morris.

2439.   Plaintiff Nicholas Morris is a citizen of the United States and domiciled in the State of North Carolina. He is the son of Steven Morris.

2440.   Plaintiff Kevin Morris is a citizen of the United States and domiciled in the State of North Carolina. He is the son of Steven Morris.

2441.   As a result of the attack, and the injuries Steven Morris suffered, Plaintiffs Danielle Dechaine-Morris, Nicholas Morris and Kevin Morris have experienced severe mental anguish and extreme emotional pain and suffering.

**16.      The June 8, 2005, Attack–Baghdad**

*a) The Arizola Family*

2442.   Roberto Arizola, Jr. was a citizen of the United States and domiciled in the State of Texas when he was killed in Iraq.

2443.   On June 8, 2005, Roberto Arizola, Jr., aged 31, was serving in the U.S. military near Rustimaya when an IED emplaced by JAM Special Groups terror operatives detonated near his vehicle.

2444.   Roberto Arizola, Jr. was killed in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC–QF and Hezbollah.

2445.   Plaintiff Monica Arizola is a citizen of the United States and domiciled in the State of Texas. She is the widow of Roberto Arizola, Jr.

2446.   Plaintiff Roberto Aaron Arizola is a citizen of the United States and domiciled in the State of Texas. He is the son of Roberto Arizola, Jr.

2447.   Plaintiff Roberto Arizola, Sr. is a citizen of the United States and domiciled in the State of Texas. He is the father of Roberto Arizola, Jr.

2448.   Plaintiff Cecilia Arizola is a citizen of the United States and domiciled in the State of Texas. She is the mother of Roberto Arizola, Jr.

2449. Plaintiff Danny Arizola is a citizen of the United States and domiciled in the State of Texas. He is the brother of Roberto Arizola, Jr.

2450. Plaintiff Ricardo Arizola is a citizen of the United States and domiciled in the State of Texas. He is the brother of Roberto Arizola, Jr.

2451. As a result of the attack, and the death of Roberto Arizola, Jr., Plaintiffs Monica Arizola, Roberto Aaron Arizola, Roberto Arizola, Sr., Cecilia Arizola, Danny Arizola and Ricardo Arizola have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's/son's brother's society, companionship, comfort, advice, and counsel.

### 17. The June 27, 2005 Attack–Baghdad

#### a) The Klecker Family

2452. Deborah Klecker was a citizen of the United States and domiciled in the State of Oregon when she was killed in Iraq.

2453. On June 27, 2005, Deborah Klecker, aged 51, was working as a civilian contractor providing mentoring and training to Iraqi police officers when she was killed by an IED planted and detonated near her vehicle by JAM Special Groups.

2454. Deborah Klecker was killed in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC–QF and Hezbollah.

2455. Plaintiff Greg Klecker is a citizen of the United States and domiciled in the State of Oregon. He is the brother of Deborah Klecker.

2456. As a result of the attack, and the death of Deborah Klecker, Plaintiff Greg Klecker has experienced severe mental anguish, extreme emotional pain and suffering, and loss of his sister's society, companionship, comfort, advice, and counsel.

**18.    The August 7, 2005, Attack–Baghdad**

*a)  The Kalladeen Family*

2457.    Anthony N. Kalladeen was a citizen of the United States and domiciled in the State of New York when he was killed in Iraq.

2458.    On August 7, 2005, Anthony N. Kalladeen, aged 26, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2459.    Anthony N. Kalladeen died on August 8, 2005 as a result of the injuries he sustained in the attack.

2460.    The weapon used to kill Anthony N. Kalladeen was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2461.    Plaintiff Maria Vidal is a citizen of the United States and domiciled in the State of Pennsylvania. She is the mother of Anthony N. Kalladeen.

2462.    As a result of the attack, and the death of Anthony N. Kalladeen, Plaintiff Maria Vidal has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her son's society, companionship, comfort, advice, and counsel.

**19.    The September 2, 2005 Attack–Baghdad**

*a)  The Hassler Family*

2463.    Plaintiff Tamara Hassler is a citizen of the United States and domiciled in the State of North Carolina.

2464.    On September 2, 2005, Tamara Hassler, then 36, was serving as a civilian contractor for DynCorp International in Iraq when an EFP emplaced by Special Groups detonated near the vehicle in which she was traveling in Baghdad.

2465.   The weapon used to injure Tamara Hassler was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2466.   As a result of the attack, Ms. Hassler suffered bruising in her sacroiliac joint, soft tissue damage to her piriformis muscle, and injuries to her right hip.

2467.   Ms. Hassler also suffered from three bulging discs in her lower back as a result of the attack, as well as atrophied discs in her neck.

2468.   Ms. Hassler was also diagnosed with hearing loss, PTSD, and a TBI.

2469.   Ms. Hassler has been treated by numerous doctors and physical therapists for her injuries and has been prescribed medication to treat her symptoms.

2470.   As a result of the attack, and the injuries she suffered, Plaintiff Tamara Hassler has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2471.   Plaintiff Richard E. Hassler is a citizen of the United States and domiciled in the State of North Carolina. He is the father of Tamara Hassler.

2472.   Plaintiff Joanne Sue Hassler is a citizen of the United States and domiciled in the State of North Carolina. She is the mother of Tamara Hassler.

2473.   As a result of the attack, and the injuries Tamara Hassler has suffered, Plaintiffs Richard E. Hassler and Joanne Sue Hassler have experienced severe mental anguish and extreme emotional pain and suffering.

### b)  The Huckfeldt Family

2474.   Plaintiff Scott Huckfeldt is a citizen of the United States and domiciled in the State of Arizona.

2475.   On September 2, 2005, Scott Huckfeldt, then 37, was serving as a civilian contractor for DynCorp International in Iraq when an EFP emplaced by Special Groups detonated near the vehicle in which he was traveling in Baghdad.

2476.   The weapon used to injure Scott Huckfeldt was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2477.   As a result of the attack, Scott Huckfeldt suffered injuries to his left knee.

2478.   Mr. Huckfeldt was also diagnosed with PTSD.

2479.   As a result of the attack, and the injuries he suffered, Plaintiff Scott Huckfeldt has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2480.   Plaintiff Kathryn Huckfeldt is a citizen of the United States and domiciled in the State of Arizona. She is the wife of Scott Huckfeldt.

2481.   Plaintiff Alisha Huckfeldt is a citizen of the United States and domiciled in the State of Arizona. She is the daughter of Scott Huckfeldt.

2482.   Plaintiff Matthew Huckfeldt is a citizen of the United States and domiciled in the State of Arizona. He is the son of Scott Huckfeldt.

2483.   As a result of the attack, and the injuries Scott Huckfeldt has suffered, Plaintiffs Kathryn Huckfeldt, Alisha Huckfeldt and Matthew Huckfeldt have experienced severe mental anguish and extreme emotional pain and suffering.

### c)  The Newman Family

2484.   Plaintiff Timothy Newman is a citizen of the United States and domiciled in the State of South Carolina.

2485.   On September 2, 2005, Timothy Newman, then 41, was serving as a civilian contractor for DynCorp International in Iraq when an EFP emplaced by Special Groups detonated near the vehicle in which he was traveling in Baghdad.

2486.   The weapon used to injure Timothy Newman was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2487.   As a result of the attack, Mr. Newman's legs were injured, and his right leg had to be amputated above the knee.

2488.   Mr. Newman's left hand was injured, and it had to be partially amputated at the wrist.

2489.   Mr. Newman received a penetrating wound to his chest and abdomen and suffered a broken spine and various broken bones.

2490.   Mr. Newman was also diagnosed with PTSD and a TBI.

2491.   As a result of the attack, and the injuries he suffered, Plaintiff Timothy Newman has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2492.   Plaintiff Padraic J. Newman is a citizen of the United States and domiciled in the State of South Carolina. He is the son of Timothy Newman.

2493.   As a result of the attack, and the injuries Timothy Newman has suffered, Plaintiff Padraic J. Newman has experienced severe mental anguish and extreme emotional pain and suffering.

**20.      The September 6, 2005, Attack–Baghdad**

*a)  The Jonaus Family*

2494.   Jude Jonaus was a citizen of the United States and domiciled in the State of Florida when he was killed in Iraq.

2495.   On September 6, 2005, Jude Jonaus, aged 27, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near his HMMWV in Baghdad.

2496.   Jude Jonaus was killed in the attack.

2497.   The weapon used to kill Jude Jonaus was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2498.   Plaintiff Amenia Jonaus is a citizen of the United States and domiciled in the State of Florida. She is the mother of Jude Jonaus.

2499.   Plaintiff Amenia Jonaus brings this action individually and on behalf of the Estate of Jude Jonaus, as its legal representative.

2500.   Plaintiff Gernessoit Jonaus is a citizen of the United States and domiciled in the State of Florida. He is the father of Jude Jonaus.

2501.   Plaintiff Daphnie Jonaus Martin is a citizen of the United States and domiciled in the State of Florida. She is the sister of Jude Jonaus.

2502.   Plaintiff Ricky Jonaus is a citizen of the United States and domiciled in the State of South Carolina. He is the brother of Jude Jonaus.

2503.   Plaintiff Marckendy Jonaus is a citizen of the United States and domiciled in the State of Florida. He is the brother of Jude Jonaus.

2504.   Plaintiff Claire Jonaus is a citizen of the United States and domiciled in the State of Florida. She is the sister of Jude Jonaus.

2505.   Plaintiff Sharen Jonaus Martin is a citizen of the United States and domiciled in the State of Florida. She is the sister of Jude Jonaus.

2506. As a result of the attack, and the death of Jude Jonaus, Plaintiffs Amenia Jonaus, Gernessoit Jonaus, Daphnie Jonaus Martin, Ricky Jonaus, Marckendy Jonaus, Claire Jonaus and Sharen Jonaus Martin have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice, and counsel.

### 21. The September 26, 2005, Attack–Baghdad

#### a) The Tuliau Family

2507. Tulsa T. Tuliau was a citizen of the United States and domiciled in the State of New York when he was killed in Iraq.

2508. On September 26, 2005, Tulsa T. Tuliau, aged 33, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2509. Tulsa T. Tuliau was killed in the attack.

2510. The weapon used to kill Tulsa T. Tuliau was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2511. Plaintiff Masina Tuliau is a citizen of the United States and domiciled in the State of Washington. She is the mother of Tulsa T. Tuliau.

2512. As a result of the attack, and the death of Tulsa T. Tuliau, Plaintiff Masina Tuliau has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her son's society, companionship, comfort, advice, and counsel.

### 22. The September 28, 2005, Attack–Umm Qasr

#### a) The Morin Family

2513. Steve Morin, Jr. was a citizen of the United States and domiciled in the State of Texas when he was killed in Iraq.

2514. On September 28, 2005, Steve Morin, Jr., aged 34, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2515. Steve Morin, Jr. was killed in the attack.

2516. The weapon used to kill Steve Morin, Jr. was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2517. Plaintiff Brianna Renee Navejas is a citizen of the United States and domiciled in the State of Texas. She is the stepdaughter of Steve Morin, Jr.

2518. As a result of the attack, and the death of Steve Morin, Jr., Plaintiff Brianna Renee Navejas has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her father's society, companionship, comfort, advice, and counsel.

### b) The Martinez Family

2519. Plaintiff Margarito A. Martinez, Jr. is a citizen of the United States and domiciled in the State of Texas.

2520. On September 28, 2005, Margarito Martinez, then 36, was serving in the U.S. military in Iraq.

2521. He was driving in a convoy when an EFP emplaced by Special Groups struck the lead vehicle.

2522. The weapon used to injure Margarito Martinez was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2523. After the lead vehicle was stuck by an EFP, Margarito got out of his vehicle to check on the occupants of the vehicle that had been struck. He saw that Steve Morin had been hit in the back of the skull and appeared to be dead.

2524.   He then checked on Elizabeth Jacobson who had been in Steve Morin's HMMWV and observed that she had been decapitated.

2525.   Finally, he checked on Andy Martinez who was the gunner in the HMMWV. Andy was standing in the turret and could not hear or see anything. Margarito got on top of the vehicle and pulled Andy out. He cut off some of Andy's clothing to start an IV line for him.

2526.   As a result of the attack, Margarito Martinez suffers from PTSD.

2527.   As a result of the attack, and the injuries he suffered, Plaintiff Margarito Martinez, Jr. has experienced severe physical and mental anguish and extreme emotional pain and suffering.

### 23.   The October 6, 2005, Attack–Baghdad

#### a)   The Burns Family

2528.   Plaintiff Alvis Burns is a citizen of the United States and domiciled in the State of Arizona.

2529.   On October 6, 2005, Alvis Burns, then 41, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2530.   The weapon used to injure Alvis Burns was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2531.   As a result of the blast, Alvis Burns's skull was cracked and shrapnel was lodged in his brain.

2532.   Mr. Burns experienced brain swelling, and he underwent brain surgery. He has been diagnosed with a TBI.

2533.   Mr. Burns suffered shrapnel in his face and throughout his left arm. He also sustained hearing loss as a result of the blast.

2534.   Mr. Burns fell in and out of comas and was, at times, in a vegetative state for long periods. He was fed through a feeding tube.

2535.   As a result of the injuries sustained in the attack and following his many procedures, Mr. Burns has had to relearn how to swallow, eat, speak, and walk.

2536.   He experiences pain in his legs and feet and currently uses an electric wheelchair and at times, a walker.

2537.   As a result of the attack, and the injuries he suffered, Plaintiff Alvis Burns has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2538.   Plaintiff JoDee Johnson is a citizen of the United States and domiciled in the State of Arizona. She is the sister of Alvis Burns.

2539.   Plaintiff James Higgins is a citizen of the United States and domiciled in the State of Arizona. He is the brother of Alvis Burns.

2540.   Plaintiff Wendy Coleman is a citizen of the United States and domiciled in the State of Washington. She is the sister of Alvis Burns.

2541.   As a result of the attack, and the injuries Alvis Burns has suffered, Plaintiffs JoDee Johnson, James Higgins, and Wendy Coleman have experienced severe mental anguish, and extreme emotional pain and suffering.

### b)  The Radke Family

2542.   Plaintiff Brian Radke is a citizen of the United States and domiciled in the State of Washington.

2543.   On October 6, 2005, Brian Radke, then 30, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2544.   The weapon used to injure Brian Radke was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2545.   As a result of the attack, Brian Radke sustained shrapnel to his body, including a piece that clipped his carotid artery.

2546.   He also sustained shrapnel in his right leg, and he has undergone reconstructive knee surgery.

2547.   His jaw was fractured in multiple locations, and he lost his right finger.

2548.   His left arm was fractured in two locations, and his median nerve was severed.

2549.   He has undergone numerous surgical procedures, including those to address the severed nerve and to emplace rods and to apply skin grafts in his left arm.

2550.   He was in a coma, during which time he was fed by a feeding tube and breathed through a trach tube.

2551.   Mr. Radke still has pieces of shrapnel in his body, including some fragments lodged in his brain.

2552.   Mr. Radke's injuries have required physical therapy and occupational therapy.

2553.   Mr. Radke has been diagnosed with PTSD and has received treatment and counseling. He has been prescribed medication to address both the pain and emotional impact of the attack.

2554.   As a result of the attack, and the injuries he suffered, Plaintiff Brian Radke has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2555.   Plaintiff Nova Radke is a citizen of the United States and domiciled in the State of Arizona. She is the wife of Brian Radke.

2556.   As a result of the attack, and the injuries Brian Radke has suffered, Plaintiff Nova Radke has experienced severe mental anguish, and extreme emotional pain and suffering.

### c) *The Vernier Family*

2557.   Plaintiff Steven Vernier, Jr. is a citizen of the United States and domiciled in the State of Tennessee.

2558.   On October 6, 2005, Steven Vernier, Jr., then 26, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2559.   The weapon used to injure Steven Vernier, Jr. was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2560.   As a result of the blast, Steven Vernier, Jr. sustained shrapnel to his face, neck, right shoulder, right wrist, and his thighs.

2561.   He also sustained first degree burns.

2562.   He has experienced and continues to experience hearing loss in both ears.

2563.   He has undergone procedures to remove the shrapnel.

2564.   The injuries he sustained resulted in a loss of range of motion in his right shoulder and right wrist.

2565.   He has been prescribed medication for pain. The pain continues to the present day.

2566.   Mr. Vernier has experienced flashbacks, nightmares, and extreme survivor's guilt.

2567.   He has been diagnosed with PTSD and has sought counseling.

2568.   As a result of the attack, and the injuries he suffered, Plaintiff Steven Vernier, Jr. has experienced severe physical and mental anguish and extreme emotional pain and suffering.

### 24. The December 8, 2005, Attack–Baghdad

#### a) The Smith Family

2569. Kevin J. Smith was a citizen of the United States and domiciled in the State of Florida when he was killed in Iraq.

2570. On December 8, 2005, Kevin J. Smith, aged 28, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2571. Kevin J. Smith was killed in the attack.

2572. The weapon used to kill Kevin J. Smith was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2573. Plaintiff Clifford L. Smith, Jr. is a citizen of the United States and domiciled in the State of Florida. He is the father of Kevin J. Smith.

2574. Plaintiff Clifford L. Smith, Jr. brings an action individually and on behalf of the Estate of Kevin J. Smith, as its legal representative.

2575. Plaintiff Georgianna Stephens-Smith is a citizen of the United States and domiciled in the State of North Carolina. She is the mother of Kevin J. Smith.

2576. Plaintiff Corena Martin is a citizen of the United States and domiciled in the State of Florida. She is the sister of Kevin J. Smith.

2577. As a result of the attack, and the death of Kevin J. Smith, Plaintiffs Clifford L. Smith, Jr., Georgianna Stephens-Smith, and Corena Martin have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice, and counsel.

### b) The Mattis Family

2578.   Plaintiff Adam Mattis is a citizen of the United States and domiciled in the State of Texas.

2579.   On December 8, 2005, Adam Mattis, then 23, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2580.   The weapon used to injure Adam Mattis was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2581.   Mr. Mattis was driving a HMMWV, the second vehicle in a five-vehicle convoy, when his vehicle was hit by an EFP.

2582.   Mr. Mattis was hit by shrapnel in his right arm. The shrapnel hit his bicep and went into his shoulder. The shrapnel cut and cauterized an artery.

2583.   Following the attack, he was medevaced to a combat support hospital in Iraq for initial treatment. He was not allowed to leave Iraq for further treatment to his wounds until the end of his deployment in January 2006 which resulted in Methicillin-resistant Staphylococcus aureus (MRSA), a secondary infection.

2584.   After his deployment ended in January 2006, he initially sought treatment at a civilian hospital in Savannah, Georgia and then at Fort Stewart.

2585.   Mr. Mattis has also sought treatment at the VA.

2586.   He has been diagnosed with a TBI and PTSD.

2587.   As a result of the attack, and the injuries he suffered, Plaintiff Adam Mattis has experienced severe physical and mental anguish and extreme emotional pain and suffering.

### c) The Peterson Family

2588.   Plaintiff Terrance Peterson, III is a citizen of the United States and domiciled in the State of Arizona.

2589.   On March 23, 2008, Terrance Peterson, then 25, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2590.   The weapon used to injure Terrance Peterson was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2591.   Mr. Peterson was an occupant in the second vehicle traveling in a five-vehicle convoy, when his vehicle was hit by an EFP.

2592.   Mr. Peterson was hit by shrapnel in his right foot, both knees and his left arm. He had multiple fractures and tissue damage. The brachial artery in his right arm was severed.

2593.   Following the attack, Mr. Peterson was taken to FOB Loyalty to stabilize him and was then taken to Balad for surgery to repair the brachial artery. From there he was transferred to Landstuhl, Germany and then to Walter Reed Army Medical Center where he spent the next 9 months. Ultimately, he was sent to Wynn Army Hospital at Fort Stewart where he finished out his military service.

2594.   Mr. Peterson has undergone 33 surgeries as a result of the attack.

2595.   As a result of the attack, and the injuries he suffered, Plaintiff Terrance Peterson, III has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2596.   Plaintiff Petra Spialek is a citizen of the United States and domiciled in the State of Illinois. She is the mother of Terrance Peterson, III.

2597. As a result of the attack, and the injuries Terrance Peterson, III has suffered, Plaintiff Petra Spialek has experienced severe mental anguish, and extreme emotional pain and suffering.

### 25. The December 25, 2005 Attack–Baghdad

#### a) The Cardinal Family

2598. Anthony Cardinal was a citizen of the United States and domiciled in the State of Michigan when he was killed in Iraq.

2599. On December 25, 2005, Anthony Cardinal, aged 20, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2600. Anthony Cardinal was killed in the attack.

2601. The weapon used to kill Anthony Cardinal was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2602. Plaintiff David G. Cardinal, Jr. is a citizen of the United States and domiciled in the State of North Carolina. He is the father of Anthony Cardinal.

2603. Plaintiff David G. Cardinal, Jr. brings an action individually and on behalf of the Estate of Anthony Cardinal, as its legal representative.

2604. As a result of the attack, and the death of Anthony Cardinal, Plaintiff David G. Cardinal, Jr. has experienced severe mental anguish, extreme emotional pain and suffering, and loss of his son's society, companionship, comfort, advice, and counsel.

### 26. The January 5, 2006, Attack–Najaf

#### a) The Hecker Family

2605. William F. Hecker, III was a citizen of the United States and domiciled in the State of Missouri when he was killed in Iraq.

2606.   On January 5, 2006, William F. Hecker, III, aged 37, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2607.   William F. Hecker, III was killed in the attack.

2608.   The weapon used to kill William F. Hecker, III was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2609.   Plaintiff Richelle Hecker is a citizen of the United States and domiciled in the State of Colorado. She is the widow of William F. Hecker, III.

2610.   Plaintiff Richelle Hecker brings an action individually and on behalf of the Estate of William F. Hecker, III, as its legal representative.

2611.   Plaintiff Victoria Hecker is a citizen of the United States and domiciled in the State of Colorado. She is the daughter of William F. Hecker, III.

2612.   Plaintiff William Hecker, IV is a citizen of the United States and domiciled in the State of Colorado. He is the son of William F. Hecker, III.

2613.   Plaintiff Cornelius Hecker is a citizen of the United States and domiciled in the State of Colorado. He is the son of William F. Hecker, III.

2614.   Plaintiff William F. Hecker, Jr. is a citizen of the United States and domiciled in State of Colorado. He is the father of William F. Hecker, III.

2615.   Plaintiff Nancy Hecker is a citizen of the United States and domiciled in the State of Colorado. She is the mother of William F. Hecker, III.

2616.   Plaintiff John D. Hecker is a citizen of the United States and domiciled in the State of New York. He is the brother of William F. Hecker, III.

2617.   As a result of the attack, and the death of William F. Hecker, III, Plaintiffs Richelle Hecker, Victoria Hecker, William Hecker, IV, Cornelius Hecker, William F. Hecker, Jr., Nancy Hecker and John D. Hecker have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's/son's/brother's society, companionship, comfort, advice, and counsel.

### b)  The Mariano Family

2618.   Robbie M. Mariano was a citizen of the United States and domiciled in the State of California when he was killed in Iraq.

2619.   On January 5, 2006, Robbie M. Mariano, aged 21, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2620.   Robbie M. Mariano was killed in the attack.

2621.   The weapon used to kill Robbie M. Mariano was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2622.   Plaintiff Robert F. Mariano is a citizen of the United States and domiciled in State of California. He is the father of Robbie M. Mariano.

2623.   Plaintiff Robert F. Mariano brings an action individually and on behalf of the Estate of Robbie M. Mariano, as its legal representative.

2624.   Plaintiff Debra Mariano is a citizen of the United States and domiciled in the State of California. She is the mother of Robbie M. Mariano.

2625.   Plaintiff Bobbie D. Mariano is a citizen of the United States and domiciled in the State of California. He is the brother of Robbie M. Mariano.

2626.   As a result of the attack, and the death of Robbie M. Mariano, Plaintiffs Robert F. Mariano, Debra Mariano and Bobbie D. Mariano have experienced severe mental anguish, extreme

emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice, and counsel.

### c) The White Family

2627.   Stephen J. White was a citizen of the United States and domiciled in the State of Alabama when he was killed in Iraq.

2628.   On January 5, 2006, Stephen J. White, aged 39, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2629.   Stephen J. White was killed in the attack.

2630.   The weapon used to kill Stephen J. White was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2631.   Plaintiff Vickie Michay White is a citizen of the United States and domiciled in the State of Texas. She is the widow of Stephen J. White.

2632.   Plaintiff Vickie Michay White brings an action individually and on behalf of the Estate of Stephen J. White, as its legal representative.

2633.   As a result of the attack, and the death of Stephen J. White, Plaintiff Vickie Michay White has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her husband's society, companionship, comfort, advice, and counsel.

### 27.    The January 5, 2006, Attack–Baghdad

### a) The Lopez Reyes Family

2634.   Jason Lopez Reyes was a citizen of the United States and domiciled in the Puerto Rico.

2635.   On January 5, 2006, Jason Lopez Reyes, then 29, was serving in the U.S. military in Iraq when a dual-array EFP emplaced by Special Groups detonated near his vehicle.

2636.   Jason Lopez Reyes was killed in the attack.

2637.   The weapon used to kill Jason Lopez Reyes was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2638.   Plaintiff Gladys E. Reyes Centeno is a citizen of the United States and domiciled in Puerto Rico. She is the mother of Jason Lopez Reyes.

2639.   Plaintiff Veronica Lopez Reyes is a citizen of the United States and domiciled in Puerto Rico. She is the sister of Jason Lopez Reyes.

2640.   Plaintiff Veronica Lopez Reyes brings an action individually and on behalf of the Estate of Jason Lopez Reyes, as its legal representative.

2641.   Plaintiff Zoraima Lopez is a citizen of the United States and domiciled in the State of Texas. She is the sister of Jason Lopez Reyes.

2642.   As a result of the attack, and the death of Jason Lopez Reyes, Plaintiffs Gladys E. Reyes Centeno, Veronica Lopez Reyes, and Zoraima Lopez have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice, and counsel.

### 28.     The January 18, 2006, Attack–Basra

#### a)  The Hickman Family

2643.   Richard Thomas "Rick" Hickman was a citizen of the United States and domiciled in the State of Georgia, when he was killed in Iraq.

2644.   On January 18, 2006, Richard Hickman, aged 52, a former soldier in the U.S. military, was serving as a civilian contractor in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2645.   Richard Hickman was killed in the attack.

2646.   The weapon used to kill Richard Hickman was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2647.   Plaintiff Jennifer Link is a citizen of the United States and domiciled in the State of Florida. She is the daughter of Richard Hickman.

2648.   Plaintiff Sharon Johnston is a citizen of the United States and domiciled in the State of Florida. She is the sister of Richard Hickman.

2649.   As a result of the attack, and the death of Richard Hickman, Plaintiffs Jennifer Link and Sharon Johnston have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their father's/brother's society, companionship, comfort, advice, and counsel.

### 29.    The February 17, 2006 Attack–Baghdad

#### a)  The Lee Family

2650.   Plaintiff Kenny Lee is a citizen of the United States and domiciled in the State of Virginia.

2651.   On February 17, 2006, Kenny Lee, then 26, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2652.   The weapon used to injure Kenny Lee was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2653.   As a result of the attack, Kenny Lee was stunned and incapacitated by the force of the concussive blast and shrapnel that entered his body in his buttocks region and partially exited from his back. Because the M1114 remained operational after the detonation, Mr. Lee remained in shock and did not realize he had been hit with copper shrapnel from the EFP until he noticed that the back of his uniform was completely bloodstained. A few days after the explosion, he

discovered a concussive bruise approximately ten inches in diameter on his chest as a result of the explosion. Mr. Lee has lost flexibility due to the scarring from his injuries in addition to suffering back pain and sciatic pain.

2654.    As a result of the attack, and the injuries he suffered, Plaintiff Kenny Lee has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2655.    Plaintiff Tom B. Lee is a citizen of the United States and domiciled in the State of Connecticut. He is the father of Kenny Lee.

2656.    Plaintiff Ling P. Lee is a citizen of the United States and domiciled in the State of Connecticut. She is the mother of Kenny Lee.

2657.    As a result of the attack, and the injuries Kenny Lee suffered, Plaintiffs Tom B. Lee and Ling P. Lee have experienced severe mental anguish and extreme emotional pain and suffering.

### 30.    The February 20, 2006, Attack –Hindiyah

#### a) *The Collado Family*

2658.    Jay T. Collado was a citizen of the United States and domiciled in the State of South Carolina when he was killed in Iraq.

2659.    On February 20, 2006, Jay T. Collado, aged 31, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2660.    Jay T. Collado was killed in the attack.

2661.    The weapon used to kill Jay T. Collado was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2662.    Plaintiff Judy Collado is a citizen of the United States and domiciled in the State of California. She is the widow of Jay T. Collado.

2663.   Plaintiff Kaiya Collado is a citizen of the United States and domiciled in the State of California. She is the daughter of Jay T. Collado.

2664.   As a result of the attack, and the death of Jay T. Collado, Plaintiffs Judy Collado and Kaiya Collado have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice, and counsel.

### b)  The Waldeck Family

2665.   Plaintiff Justin Waldeck is a citizen of the United States and domiciled in the State of Illinois.

2666.   On February 20, 2006, Justin Waldeck was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2667.   The weapon used to injure Justin Waldeck was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2668.   As a result of the attack, Mr. Waldeck sustained shrapnel injuries to his right knee and significant injuries to his left hand. The metacarpal bones in his left hand had to be fused and he suffered nerve damage to his left pinky.

2669.   As a result of the attack, and the injuries he suffered, Plaintiff Justin Waldeck has experienced severe physical and mental anguish and extreme emotional pain and suffering.

### 31.    The February 20, 2006, Attack–Baghdad

### a)  The Kuhlmeier Family

2670.   Daniel Kuhlmeier was a citizen of the United States and domiciled in the State of Virginia when he was killed in Iraq.

2671.   On February 20, 2006, Daniel Kuhlmeier, aged 30, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2672. Daniel Kuhlmeier was killed in the attack.

2673. The weapon used to kill Daniel Kuhlmeier was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2674. Plaintiff Tanja Kuhlmeier is a citizen of the United States and domiciled in the State of Virginia. She is the widow of Daniel Kuhlmeier.

2675. Plaintiff Tanja Kuhlmeier brings an action individually and on behalf of the Estate of Daniel Kuhlmeier, as its legal representative.

2676. Plaintiff Kaya Kuhlmeier is a citizen of the United States and domiciled in the State of Virginia. She is the daughter of Daniel Kuhlmeier.

2677. Plaintiff Robert J. Kuhlmeier is a citizen of the United States and domiciled in the State of Pennsylvania. He is the father of Daniel Kuhlmeier.

2678. Plaintiff Theresa A. Kuhlmeier is a citizen of the United States and domiciled in the State of Pennsylvania. She is the mother of Daniel Kuhlmeier.

2679. Plaintiff Theresa Ann Kuhlmeier is a citizen of the United States and domiciled in the State of Pennsylvania. She is the sister of Daniel Kuhlmeier.

2680. Plaintiff Edward Kuhlmeier is a citizen of the United States and domiciled in the State of Pennsylvania. He is the brother of Daniel Kuhlmeier.

2681. Plaintiff Thomas Kuhlmeier is a citizen of the United States and domiciled in the State of Pennsylvania. He is the brother of Daniel Kuhlmeier.

2682. Plaintiff John Kuhlmeier is a citizen of the United States and domiciled in the State of Pennsylvania resident. He is the brother of Daniel Kuhlmeier.

2683.  Plaintiff Robert W. Kuhlmeier is a citizen of the United States and domiciled in the State of Pennsylvania. He is the brother of Daniel Kuhlmeier.

2684.  As a result of the attack, and the death of Daniel Kuhlmeier, Plaintiffs Tanja Kuhlmeier, Kaya Kuhlmeier, Robert J. Kuhlmeier, Theresa A. Kuhlmeier, Theresa Ann Kuhlmeier, Edward Kuhlmeier, Thomas Kuhlmeier, John Kuhlmeier, and Robert W. Kuhlmeier have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's/son's/brother's society, companionship, comfort, advice, and counsel.

### 32.  The March 26, 2006, Attack–Baghdad

#### a)  *The Bershefsky Family*

2685.  Plaintiff Christopher Anthony Bershefsky is a citizen of the United States and domiciled in the State of Pennsylvania.

2686.  On March 26, 2006, Christopher Anthony Bershefsky, then 32, was a private contractor with Erinys International, a British security company, in Iraq. He had been in Iraq for approximately three months during this assignment. He had also previously served in the United States Marine Corps for six years with his discharge having taken place in 1998.

2687.  Mr. Bershefsky was driving an armored Ford F350 vehicle en route to his base after completing a mission a few miles outside the international zone in Baghdad. He was approximately two miles from Gate 2 to enter the international zone when his vehicle was struck by an EFP emplaced by Special Groups. The force of the blast blew through Mr. Bershefsky's door.

2688.  The weapon used to injure Mr. Bershefsky was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2689.  As a result of the attack, Mr. Bershefsky sustained a fractured pelvis, damaged sciatic nerve, muscle tissue loss due to debridement in his left leg, damages to his left foot which

was rendered mostly inoperable, a torn urethra, and additional shrapnel injuries that have caused him to have a colostomy bag and suffer from urological deficits. In addition to the physical injuries he sustained, Mr. Bershefsky also suffers from severe depression, anxiety, and Post-Traumatic Stress Disorder.

2690.   As a result of the attack, and the injuries he suffered, Plaintiff Christopher Anthony Bershefsky has experienced severe physical and mental anguish and extreme emotional pain and suffering.

### 33.    The April 1, 2006, Attack–Baghdad

#### a)  The Devora-Garcia Family

2691.   Israel Devora-Garcia was domiciled in the State of Texas when he was killed in Iraq. He became a citizen of the United States posthumously.

2692.   On April 1, 2006, Israel Devora-Garcia, aged 23, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated while he was conducting a dismounted patrol.

2693.   Israel Devora-Garcia was killed in the attack.

2694.   The weapon used to kill Israel Devora-Garcia was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2695.   Plaintiff Adrian Sandoval is a citizen of the United States and domiciled in the State of Texas. He is the brother of Israel Devora-Garcia.

2696.   Plaintiff Rosa Esther Sandoval is a citizen of the United States and domiciled in the State of Kentucky. She is the sister of Israel Devora-Garcia.

2697.   As a result of the attack, and the death of Israel Devora-Garcia, Plaintiffs Adrian Sandoval and Rosa Esther Sandoval have experienced severe mental anguish, extreme emotional

pain and suffering, and loss of their brother's society, companionship, comfort, advice, and counsel.

### 34. The April 12, 2006, Attack–Misiab

#### a) The Bandhold Family

2698. Scott Bandhold was a citizen of the United States and domiciled in the State of New York when he was killed in Iraq.

2699. On April 12, 2006, Scott Bandhold, aged 37, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2700. Scott Bandhold was killed in the attack.

2701. The weapon used to kill Scott Bandhold was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2702. Plaintiff Henry J. Bandhold, Sr. is a citizen of the United States and domiciled in the State of Florida. He is the father of Scott Bandhold.

2703. Plaintiff Henry J. Bandhold, Sr. brings this action individually and on behalf of the Estate of Scott Bandhold, as its legal representative.

2704. Plaintiff Afonso Bandhold is a citizen of the United States and domiciled in Portugal. He is the son of Scott Bandhold.

2705. Plaintiff Mariana Bandhold is a citizen of the United States and domiciled in the State of California. She is the daughter of Scott Bandhold.

2706. As a result of the attack, and the death of Scott Bandhold, Plaintiffs Henry J. Bandhold, Sr., Afonso Bandhold, and Mariana Bandhold have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/father's society, companionship, comfort, advice, and counsel.

### 35. The April 16, 2006, Attack–Bawb Ash-Sham

#### a) The Stein Family

2707. Plaintiff Joshua P. Stein is a citizen of the United States and domiciled in the State of Texas.

2708. On April 16, 2006, Joshua P. Stein, then 22, was serving in the U.S. military in Iraq. He was traveling in a convoy from the Iraqi Police compound conducting route clearance when the vehicle he was driving, a Bradley Fighting Vehicle that was the second in the convoy, was hit with a dual-array EFP emplaced by Special Groups on the left side of the vehicle on ASR Dover in the Bawb Ash-Sham village north of Baghdad.

2709. The weapon used to injure Joshua P. Stein was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2710. As a result of the attack, Mr. Stein sustained double above-the-knee amputations, two broken forearms, elbow replacement in his left arm, fasciotomy on his right arm, nerve and muscle damage to both forearms causing him to lose feeling in both of his forearms, and a TBI. Mr. Stein was in a coma for nearly a month following the attack and awoke from the coma in a military hospital in Texas after having been airlifted to Balad, Iraq, and Landstuhl, Germany.

2711. Joshua P. Stein has received extensive medical treatment at various hospitals including various surgeries and prosthetic fittings where he has spent years in treatment. He has been unable to utilize prosthetics because his right leg was not long enough after the amputation, so he is wheelchair-bound for ambulation.

2712. As a result of the attack, and the injuries he suffered, Plaintiff Joshua P. Stein has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2713. Plaintiff Nicole B. Stein is a citizen of the United States and domiciled in the State of Texas. She is the wife of Joshua P. Stein.

2714. Plaintiff Rachel Stein is a citizen of the United States and domiciled in the State of Texas. She is the daughter of Joshua P. Stein.

2715. Plaintiff J.S.S., a minor, represented by her legal guardian Joshua P. Stein, is a citizen of the United States and domiciled in the State of Texas. She is the daughter of Joshua P. Stein.

2716. Plaintiff Jesse P. Stein is a citizen of the United States and domiciled in the State of North Carolina. He is the father of Joshua P. Stein.

2717. As a result of the attack, and the injuries Joshua P. Stein suffered, Plaintiffs Nicole B. Stein, Rachel Stein, J.S.S., and Jesse P. Stein have experienced severe mental anguish and extreme emotional pain and suffering.

### b) The Shelswell Family

2718. Plaintiff Michael Paul Alan Shelswell is a citizen of the United States and domiciled in the State of Colorado.

2719. On April 16, 2006, Michael Paul Alan Shelswell, then 23, was serving in the U.S. military in Iraq. He was sitting in the rear of a Bradley Fighting Vehicle traveling in a convoy from the Iraqi Police compound conducting route clearance when the Bradley was hit with a dual-array EFP emplaced by Special Groups on the left side of the vehicle on ASR Dover in the Bawb Ash-Sham village north of Baghdad.

2720. The weapon used to injure Michael Paul Alan Shelswell was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2721. As a result of the attack, Michael Paul Alan Shelswell was hit with the concussive blast in his face causing a TBI in addition to sustaining chemical burns to his face and upper body as the Bradley caught on fire as a result of the EFP detonation. He continues to suffer from vision and hearing difficulties, sustained memory loss memory loss, suffered a stroke in 2009 related to his injuries, and suffers from severe PTSD that has caused him to suffer from suicidal ideation in the past and makes it impossible for him to be in confined spaces.

2722. As a result of the attack, and the injuries he suffered, Plaintiff Michael Paul Alan Shelswell has experienced severe physical and mental anguish and extreme emotional pain and suffering.

**36.     The April 25, 2006, Attack–Sadr City**

*a)  The Murphy Family*

2723. Plaintiff Luke Murphy is a citizen of the United States and domiciled in the State of Florida.

2724. On April 25, 2006, Luke, then 24, was serving in the U.S. military in Iraq.

2725. He was driving in a convoy when an EFP emplaced by Special Groups struck his vehicle.

2726. The weapon used to injure Mr. Murphy was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2727. The explosive charge passed through Mr. Murphy's right leg, amputating it. Portions of his left leg muscles were destroyed, and he sustained a compound fracture of his left tibia and fibula, rendering his left leg useless. Smoke began filling the inside of the vehicle.

2728. The vehicle ultimately crashed into a wall and Mr. Murphy eventually found a way to exit the vehicle. He crawled on the ground, dragging the remaining stump of his right leg and injured left leg while he continued to experience significant blood loss.

2729. Mr. Murphy has undergone over 30 procedures to address the injuries sustained in the attack, including those involving the additional shortening of the stump of his right leg and issues involving the problems that have developed with his left leg and foot.

2730. Mr. Murphy has been prescribed anti-depressants and medication to assist with sleep issues.

2731. As a result of the attack, and the injuries he suffered, Plaintiff Luke Murphy has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2732. Plaintiff Willette Murphy is a citizen of the United States and domiciled in the State of Florida. She is the mother of Luke Murphy.

2733. As a result of the attack, and the injuries Luke Murphy suffered, Plaintiff Willette Murphy has experienced severe mental anguish and extreme emotional pain and suffering.

### b) The Irwin Family

2734. Plaintiff Shane Irwin is a citizen of the United States and domiciled in the State of Florida.

2735. On April 25, 2006, Shane Irwin, then 23, was serving in the U.S. military in Iraq.

2736. He was driving in a convoy when an EFP emplaced by Special Groups struck his vehicle.

2737. The weapon used to injure Mr. Irwin was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2738.  As a result of the attack, Mr. Irwin suffered lacerations, smoke inhalation and ruptured ear drums. He also suffers from a TBI and PTSD.

2739.  As a result of the attack, and the injuries he suffered, Plaintiff Shane Irwin has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2740.  Plaintiff T.R., a minor represented by her legal guardian, Shane Irwin, is a citizen of the United States and domiciled in the State of Florida. She is the daughter of Shane Irwin.

2741.  Plaintiff Helen Marguerite Irwin is a citizen of the United States and domiciled in the State of Florida. She is the mother of Shane Irwin.

2742.  Plaintiff Nicole Irwin is a citizen of the United States and domiciled in the State of Florida. She is the sister of Shane Irwin.

2743.  As a result of the attack, and the injuries Shane Irwin suffered, Plaintiffs T.R., Helen Marguerite Irwin and Nicole Irwin have experienced severe mental anguish and extreme emotional pain and suffering.

**37.  The April 28, 2006 Attack–Baghdad**

*a)  The Gomez Family*

2744.  Jose Gomez was a citizen of the United States and domiciled in the State of New York when he was killed in Iraq.

2745.  On April 28, 2006, Jose Gomez, aged 23, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2746.  Jose Gomez was killed in the attack.

2747.  The weapon used to kill Jose Gomez was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2748.   Plaintiff Maria Gomez is a citizen of the United States and domiciled in the State of New York. She is the mother of Jose Gomez.

2749.   Plaintiff Maria Gomez brings an action individually and on behalf of the Estate of Jose Gomez, as its legal representative.

2750.   As a result of the attack, and the death of Jose Gomez, Plaintiff Maria Gomez has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her son's society, companionship, comfort, advice, and counsel.

**38.    The May 2, 2006, Attack–Baghdad**

*a)  The Greer Family*

2751.   Plaintiff John Dana Greer is a citizen of the United States and domiciled in the State of Texas.

2752.   On May 2, 2006, John Dana Greer, then 49, was a civilian contractor with Blackwater Security Consulting in Iraq.

2753.   Mr. Greer was driving a South African Mamba vehicle in a four-vehicle caravan en route to the Iraqi Ministry of Finance when the vehicle he was driving was struck by five EFPs emplaced by Special Groups.

2754.   The weapon used to injure Mr. Greer was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2755.   As a result of the attack, Mr. Greer lost his right hand from above the wrist and sustained third-degree burns on his upper chest.

2756.   He also suffered trauma to his back that necessitated a later L4 to S1 fusion.

2757.   Mr. Greer sustained a TBI injury that has impacted his short- and long-term memory.

2758. He has been diagnosed with PTSD.

2759. Mr. Greer received extensive medical treatment and has undergone various surgeries and prosthetic fittings.

2760. As a result of the attack, and the injuries he suffered, Plaintiff John Dana Greer has experienced severe physical pain and mental anguish and extreme emotional pain and suffering.

2761. Plaintiff Stephanie C. Sander is a citizen of the United States and domiciled in the State of California. She is the daughter of John Dana Greer.

2762. Plaintiff Christopher D. Greer is a citizen of the United States and domiciled in the State of Georgia. He is the son of John Dana Greer.

2763. Plaintiff Joseph L. Greer is a citizen of the United States and domiciled in the State of Arizona. He is the brother of John Dana Greer.

2764. Plaintiff Carl K. Greer is a citizen of the United States and domiciled in the State of Arizona. He is the brother of John Dana Greer.

2765. As a result of the attack, and the injuries John Dana Greer suffered, Plaintiffs Stephanie Sander, Christopher D. Greer, Joseph L. Greer, and Carl K. Greer have experienced severe mental anguish and extreme emotional pain and suffering.

### b) The Joyner Family

2766. Plaintiff Christopher Joyner is a citizen of the United States and domiciled in the State of North Carolina.

2767. On May 2, 2006, Christopher Joyner, then 37, was a civilian contractor with Blackwater Security Consulting in Iraq.

2768. Mr. Joyner was the Vehicle Commander riding in the passenger seat of the South African Mamba that was the fourth vehicle in a four-vehicle caravan en route to the Iraqi Ministry

of Finance when the vehicle he was riding in was struck by an EFP array emplaced by Special Groups.

2769.   The weapon used to injure Mr. Joyner was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2770.   As a result of the attack, Mr. Joyner suffered multiple fragment wounds to his face and the globe of his right eye. He also sustained shrapnel wounds to his right upper extremity and left lower extremity.

2771.   The severity of the injuries to his right eye resulted in the loss of use of the eye, and the eye had to be surgically removed.

2772.   He also sustained sinus fractures, loss of teeth, and a large wound to his right jaw.

2773.   Mr. Joyner continues to have shrapnel lodged in his right forearm and his face.

2774.   Mr. Joyner has been diagnosed as having cognitive deficits as a result of the attack that impair his short-term memory and his ability to engage in abstract thinking and remaining on topic in conversation.

2775.   He has also received psychological treatment and counseling following the attack and was diagnosed with Acute Stress Disorder.

2776.   As a result of the attack, and the injuries he suffered, Plaintiff Christopher Joyner has experienced severe physical pain and mental anguish and extreme emotional pain and suffering.

2777.   Plaintiff Anne P. "Poppy" Joyner is a citizen of the United States and domiciled in the State of North Carolina. She is the wife of Christopher Joyner.

2778.   Plaintiff Necole Dunlow Smith is a citizen of the United States and domiciled in the State of North Carolina. She is the stepsister of Christopher Joyner.

2779.   As a result of the attack, and the injuries Christopher Joyner suffered, Plaintiffs Anne P. "Poppy" Joyner and Necole Dunlow Smith have experienced severe mental anguish and extreme emotional pain and suffering.

### c) The Mills Family

2780.   Plaintiff Michael R. Mills is a citizen of the United States and domiciled in the State of West Virginia.

2781.   On May 2, 2006, Michael Mills, then 37, was a civilian contractor with Blackwater Security Consulting in Iraq.

2782.   Mr. Mills was one of two gunners riding in an armored vehicle that was struck by a multiple EFP array emplaced by Special Groups.

2783.   The weapon used to injure Mr. Mills was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2784.   As a result of the attack, Mr. Mills sustained blast and shrapnel injuries to his face, shoulder, and torso. It also caused a torn meniscus in his left knee.

2785.   Mr. Mills received extensive medical treatment and underwent various surgeries over a number of years.

2786.   As a result of the attack, and the injuries he suffered, Plaintiff Michael Mills has experienced severe physical pain and mental anguish and extreme emotional pain and suffering.

2787.   Plaintiff Manuel Raymond Mills is a citizen of the United States and domiciled in the State of New Jersey. He is the son of Michael Mills.

2788.   Plaintiff Michael Raleigh Mills is a citizen of the United States and domiciled in the State of New Jersey. He is the son of Michael Mills.

2789.   As a result of the attack, and the injuries Michael Mills suffered, Plaintiffs Manuel Raymond Mills and Michael Raleigh Mills have experienced severe mental anguish and extreme emotional pain and suffering.

### 39.     The May 3, 2006, Attack–Nasiriyah

#### *a)  The Palinsky Family*

2790.   Jerry A. Palinsky, Jr. was a citizen of the United States and domiciled in the State of Washington when he was killed in Iraq.

2791.   On May 3, 2006, Jerry A. Palinsky, Jr., aged 42, was working as a civilian contractor with EODT in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2792.   Jerry A. Palinsky, Jr. was killed in the attack.

2793.   The weapon used to kill Jerry A. Palinsky, Jr. was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2794.   Plaintiff Eddie Jo Palinsky is a citizen of the United States and domiciled in the State of Washington. She is the widow of Jerry A. Palinsky, Jr.

2795.   Plaintiff Eddie Jo Palinsky brings an action individually and on behalf of the Estate of Jerry A. Palinsky, Jr., as its legal representative.

2796.   Plaintiff Jerry A. Palinsky, II is a citizen of the United States and domiciled in the State of Oregon. He is the son of Jerry A. Palinsky, Jr.

2797.   Plaintiff Adina Palinsky is a citizen of the United States and domiciled in the State of Washington. She is the daughter of Jerry A. Palinsky, Jr.

2798.   Plaintiff Jerry A. Palinsky, Sr. is a citizen of the United States and domiciled in the State of Washington. He is the father of Jerry A. Palinsky, Jr.

2799.   Plaintiff Kathleen Hoke is a citizen of the United States and domiciled in the State of Oregon. She is the mother of Jerry A. Palinsky, Jr.

2800.   Plaintiff Joel Palinsky is a citizen of the United States and domiciled in the State of Washington. He is the brother of Jerry A. Palinsky, Jr.

2801.   Plaintiff Karaleen Herb is a citizen of the United States and domiciled in the State of Oregon. She is the sister of Jerry A. Palinsky, Jr.

2802.   As a result of the attack, and the death of Jerry A. Palinsky, Jr., Plaintiffs Eddie Jo Palinsky, Jerry A. Palinsky, II, Adina Palinsky, Jerry A. Palinsky, Sr., Kathleen Hoke, Joel Palinsky and Karaleen Herb have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's/son's/brother's society, companionship, comfort, advice, and counsel.

### b)  The Stoneking Family

2803.   Plaintiff Eric Brandon Stoneking is a citizen of the United States and domiciled in the State of Virginia.

2804.   On May 3, 2006, Eric Brandon Stoneking, then 26, was working as a civilian contractor with EODT in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2805.   The weapon used to injure Eric Brandon Stoneking was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2806.   As a result of the attack, Mr. Stoneking sustained a TBI, the loss of two tendons in his right arm, major facial trauma on the left side to his upper mandible and lower jaw, and shrapnel

and burns to the face, left shoulder, and torso. Additionally, Mr. Stoneking has suffered from PTSD.

2807.   Mr. Stoneking has received extensive medical treatment at various hospitals for the extensive injuries he sustained on May 3, 2006.

2808.   As a result of the attack, and the injuries he suffered, Plaintiff Eric Brandon Stoneking has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2809.   Plaintiff Carrie Sue Stoneking is a citizen of the United States and domiciled in Germany. She is the mother of Eric Brandon Stoneking.

2810.   Plaintiff Faith Renee Stoneking is a citizen of the United States and domiciled in Germany. She is the sister of Eric Brandon Stoneking.

2811.   As a result of the attack, and the injuries Eric Brandon Stoneking suffered, Plaintiffs Carrie Sue Stoneking and Faith Renee Stoneking have experienced severe mental anguish and extreme emotional pain and suffering.

### 40.   The May 5, 2006, Attack–Baghdad

#### a)  The Saenz Family

2812.   Carlos N. Saenz was a citizen of the United States and domiciled in the State of Nevada when he was killed in Iraq.

2813.   On May 5, 2006, Carlos N. Saenz, aged 46, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2814.   Carlos N. Saenz was killed in the attack.

2815.   The weapon used to kill Carlos N. Saenz was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2816.   Plaintiff Joaquina Saenz Chorens is a legal resident of the United States and domiciled in the State of Nevada. She is the mother of Carlos N. Saenz.

2817.   Plaintiff Luz Maria Estrada-Pulido is a citizen of the United States and domiciled in the State of Nevada. She is the sister of Carlos N. Saenz.

2818.   Plaintiff Frances Catherine Castro is a citizen of the United States and domiciled in the State of Nevada. She is the sister of Carlos N. Saenz.

2819.   Plaintiff Elva Espinoza is a citizen of the United States and domiciled in the State of Nevada. She is the sister of Carlos N. Saenz.

2820.   As a result of the attack, and the death of Carlos N. Saenz, Plaintiffs Joaquina Saenz Chorens, Luz Maria Estrada-Pulido, Frances Catherine Castro and Elva Espinoza have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice, and counsel.

### b)  The Vacho Family

2821.   Nathan J. Vacho was a citizen of the United States and domiciled in the State of Wisconsin when he was killed in Iraq.

2822.   On May 5, 2006, Nathan J. Vacho, aged 29, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2823.   Nathan J. Vacho was killed in the attack.

2824.   The weapon used to kill Nathan J. Vacho was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2825.   Plaintiff Emma Vacho is a citizen of the United States and domiciled in the State of Wisconsin. She is the daughter of Nathan J. Vacho.

2826. Plaintiff Bayli Vacho is a citizen of the United States and domiciled in the State of Wisconsin. She is the daughter of Nathan J. Vacho.

2827. As a result of the attack, and the death of Nathan J. Vacho, Plaintiffs Emma Vacho and Bayli Vacho have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their father's society, companionship, comfort, advice, and counsel.

### 41. The May 6, 2006, Attack–Diwaniyah

#### a) The Veverka Family

2828. David M. Veverka was a citizen of the United States and domiciled in the State of Pennsylvania when he was killed in Iraq.

2829. On May 6, 2006, David M. Veverka, aged 25, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2830. David M. Veverka was killed in the attack.

2831. The weapon used to kill David M. Veverka was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2832. Plaintiff Ronald Veverka is a citizen of the United States and domiciled in the State of Pennsylvania. He is the father of David M. Veverka.

2833. Plaintiff Carol Polley is a citizen of the United States and domiciled in the State of Pennsylvania. She is the mother of David M. Veverka.

2834. Plaintiff Keith Veverka is a citizen of the United States and domiciled in the State of Pennsylvania. He is the brother of David M. Veverka.

2835. Plaintiff Douglas Veverka is a citizen of the United States and domiciled in the State of Pennsylvania. He is the brother of David M. Veverka.

2836.   Plaintiff Sandra Soliday is a citizen of the United States and domiciled in the State of Pennsylvania. She is the sister of David M. Veverka.

2837.   As a result of the attack, and the death of David M. Veverka, Plaintiffs Ronald Veverka, Carol Polley, Keith Veverka, Douglas Veverka and Sandra Soliday have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice, and counsel.

### 42.    The May 21, 2006, Attack–Mosul

#### a)  The Shumate Family

2838.   Plaintiff Shannon Shumate is a citizen of the United States and domiciled in the State of Missouri.

2839.   On May 21, 2006, Shannon Shumate, was serving as a civilian contractor in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2840.   The weapon used to injure Mr. Shumate was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2841.   As a result of the attack, Shannon Shumate sustained injuries to his head and back and suffered hearing loss. He also suffers from PTSD.

2842.   Mr. Shumate continues to experience pain in his back as well as ringing in his ears and hearing loss. He continues to suffer from PTSD and has flash backs when he drives at night.

2843.   As a result of the attack, and the injuries he suffered, Plaintiff Shannon Shumate has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2844.   Plaintiff Lauren Shumate is a citizen of the United States and domiciled in the State of Kansas. She is the daughter of Shannon Shumate.

2845. Plaintiff Lacey Shumate is a citizen of the United States and domiciled in the State of Missouri. She is the daughter of Shannon Shumate.

2846. Plaintiff Logan Shumate is a citizen of the United States and domiciled in the State of Missouri. He is the son of Shannon Shumate.

2847. As a result of the attack, and the injuries Shannon Shumate has suffered, Plaintiffs Lauren Shumate, Lacey Shumate and Logan Shumate have experienced severe mental anguish and extreme emotional pain and suffering.

### 43. The May 25, 2006, Attack–Baghdad

#### a) The DiCenzo Family

2848. Douglas Andrew DiCenzo was a citizen of the United States and domiciled in the State of New Hampshire.

2849. On May 25, 2006, Douglas Andrew DiCenzo, then 30, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2850. Douglas Andrew DiCenzo was killed in the attack.

2851. The weapon used to kill Douglas Andrew DiCenzo was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2852. Plaintiff Nicole DiCenzo is a citizen of the United States and domiciled in the State of Georgia. She is the wife of Douglas Andrew DiCenzo.

2853. Plaintiff Nicole DiCenzo brings an action individually and on behalf of the Estate of Douglas Andrew DiCenzo, as its legal representative.

2854. Plaintiff Dakin DiCenzo is a citizen of the United States and domiciled in the State of Georgia. He is the son of Douglas Andrew DiCenzo.

2855.   Plaintiff Larry DiCenzo is a citizen of the United States and domiciled in the State of Florida. He is the father of Douglas Andrew DiCenzo.

2856.   Plaintiff Kathy Crane is a citizen of the United States and domiciled in the State of New Hampshire. She is the mother of Douglas Andrew DiCenzo.

2857.   As a result of the attack, and the death of Douglas Andrew DiCenzo, Plaintiffs Nicole DiCenzo, Dakin DiCenzo, Larry DiCenzo, and Kathy Crane have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's/son's society, companionship, comfort, advice, and counsel.

### b)  The Blair Family

2858.   Robert Edward Blair was a citizen of the United States and domiciled in the State of Florida.

2859.   On May 25, 2006, Robert Edward Blair, then 22, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2860.   Robert Edward Blair was killed in the attack.

2861.   The weapon used to kill Robert Edward Blair was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2862.   Plaintiff Johnny Allen Blair is a citizen of the United States and domiciled in the State of Montana. He is the father of Robert Edward Blair.

2863.   Plaintiff Johnny Allen Blair brings an action individually and on behalf of the Estate of Robert Edward Blair, as its legal representative.

2864.   Plaintiff Charlee Blair Webb is a citizen of the United States and domiciled in the State of Florida. She is the sister of Robert Edward Blair.

2865.   As a result of the attack, and the death of Robert Edward Blair, Plaintiffs Johnny Allen Blair and Charlee Blair Webb have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice, and counsel.

### 44.     The June 5, 2006, Attack–Baghdad

#### a)  The Eastlund Family

2866.   Plaintiff Arne Eastlund is a citizen of the United States and domiciled in the State of California.

2867.   On June 5, 2006, Arne Eastlund, age 45, was serving in the U.S. military in Iraq, when his vehicle was struck by an EFP emplaced by Special Groups.

2868.   The weapon used to injure Mr. Eastlund was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2869.   Following the attack, pieces of one of the occupants on the vehicle, Isaac Lawson, landed on Mr. Eastlund's lap.

2870.   As a result of the attack, Mr. Eastlund sustained significant injuries to his back.

2871.   He also sustained burns to his body and has suffered hearing loss.

2872.   He has undergone multiple surgeries and procedures to address the injuries to his back. He continues to seek treatment for his back and neck.

2873.   Mr. Eastlund has been diagnosed with a TBI and PTSD.

2874.   As a result of the attack, and the injuries he suffered, Plaintiff Arne Eastlund has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2875.   Plaintiff Tina Eastlund is a citizen of the United States and domiciled in the State of California. She is the wife of Arne Eastlund.

2876.   Plaintiff Sven Eastlund is a citizen of the United States and domiciled in the State of California. He is the son of Arne Eastlund.

2877.   Plaintiff Taylor Eastlund is a citizen of the United States and domiciled in the State of California. She is the stepdaughter of Arne Eastlund.

2878.   Plaintiff Elizabeth Jo Eastlund is a citizen of the United States and domiciled in the State of California. She is the mother of Arne Eastlund.

2879.   As a result of the attack, and the injuries Arne Eastlund suffered, Plaintiffs Tina Eastlund, Sven Eastlund, Taylor Eastlund, and Elizabeth Jo Eastlund have experienced severe mental anguish and extreme emotional pain and suffering.

### b) The Adamson Family

2880.   Plaintiff Matthew Adamson is a citizen of the United States and domiciled in the State of Oklahoma.

2881.   On June 5, 2006, Matthew Adamson, age 21, was serving in the U.S. military in Iraq. He was the gunner in a vehicle ("the Adamson vehicle") traveling in the same convoy as Arne Eastlund when Arne Eastlund's vehicle was struck by an EFP emplaced by Special Groups.

2882.   As a result of the explosion, Mr. Adamson was thrown back, injuring his head.

2883.   The weapon used to injure Mr. Adamson was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2884.   Mr. Adamson has experienced frequent and severe headaches. He also experiences memory loss.

2885.   Mr. Adamson has been diagnosed with a modified TBI.

2886.   He has also been diagnosed with PTSD.

2887.  Mr. Adamson has sought counseling and has been prescribed medication, including anti-depressants, to treat his condition.

2888.  As a result of the attack, and the injuries he suffered, Plaintiff Matthew Adamson has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2889.  Plaintiff R.A., a minor represented by his legal guardian Matthew Adamson, is a citizen of the United States and domiciled in the State of Oklahoma. He is the son of Matthew Adamson.

2890.  Plaintiff Kathy Adamson is a citizen of the United States and domiciled in the State of Oklahoma. She is the mother of Matthew Adamson.

2891.  Plaintiff Richard Adamson is a citizen of the United States and domiciled in the State of Oklahoma. He is the father of Matthew Adamson.

2892.  Plaintiff Christopher Adamson is a citizen of the United States and domiciled in the State of Oklahoma. He is the brother of Matthew Adamson.

2893.  Plaintiff Jeffrey Adamson is a citizen of the United States and domiciled in the State of Oklahoma. He is the brother of Matthew Adamson.

2894.  Plaintiff Justin Adamson is a citizen of the United States and domiciled in the State of Oklahoma. He is the brother of Matthew Adamson.

2895.  As a result of the attack, and the injuries Matthew Adamson suffered, Plaintiffs R.A., Kathy Adamson, Richard Adamson, Christopher Adamson, Jeffrey Adamson, and Justin Adamson have experienced severe mental anguish and extreme emotional pain and suffering.

### c)  The Shepard Family

2896.  Plaintiff James Shepard is a citizen of the United States and domiciled in the State of Oklahoma.

2897.   On June 5, 2006, James Shepard, age 32, was serving in the U.S. military in Iraq. He was the Truck Commander of the Adamson vehicle, traveling in the same convoy as Arne Eastlund when Arne Eastlund's vehicle was struck by an EFP emplaced by Special Groups.

2898.   The weapon used to injure Mr. Shepard was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2899.   Following the attack, the Adamson vehicle traveled towards the location where Arne Eastlund's vehicle had stopped.

2900.   After exiting his vehicle, James Shepard went to the vehicle and opened the door. There, he saw Isaac Lawson moving, despite the fact that there were pieces of Lawson's face or neck visible in the interior of the vehicle.

2901.   James Shepard helped remove Isaac Lawson from the vehicle.

2902.   James Shepard continues to vividly recall the attack and his actions as well as what he witnessed following the attack.

2903.   Mr. Shepard has experienced extreme survivor's guilt.

2904.   He has been diagnosed with PTSD and has sought counseling.

2905.   As a result of the attack, and the injuries he suffered, Plaintiff James Shepard has experienced severe mental anguish and extreme emotional pain and suffering.

### d)  The Sklaney Family

2906.   Plaintiff John P. Sklaney, III is a citizen of the United States and domiciled in the State of Oklahoma.

2907.   On June 5, 2006, John Sklaney, age 35, was serving in the U.S. military in Iraq. He was the driver of the Adamson vehicle, traveling in the same convoy as Arne Eastlund when Arne Eastlund's vehicle was struck by an EFP emplaced by Special Groups.

2908. The weapon used to injure Mr. Sklaney was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2909. Following the attack, the Adamson vehicle traveled towards the location where Arne Eastlund's vehicle had stopped.

2910. After exiting his vehicle, John P. Sklaney, III went to Arne Eastlund's vehicle. He saw Isaac Lawson, including the fact that Isaac Lawson's leg had been severed.

2911. Together with James Shepard, John P. Sklaney, III removed Isaac Lawson from the vehicle. Mr. Sklaney helped to place Isaac Lawson on a stretcher.

2912. Mr. Sklaney has experienced survivor's guilt.

2913. He has experienced memory loss and has been diagnosed with PTSD.

2914. Mr. Sklaney has sought counseling and has been prescribed medication to treat depression.

2915. As a result of the attack, and the injuries he suffered, Plaintiff John P. Sklaney, III has experienced severe mental anguish and extreme emotional pain and suffering.

**45.    The June 10, 2006, Attack–Rustamiyah**

*a)  The Friedrich Family*

2916. Plaintiff Steven J. Friedrich is a citizen of the United States and domiciled in the State of Florida.

2917. On June 10, 2006, Mr. Friedrich, then 24, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2918. The weapon used to injure Mr. Friedrich was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2919.   As a result of the attack, Mr. Friedrich sustained bilateral eardrum perforations and shrapnel injuries to his left forehead, right shoulder, and right leg.

2920.   He has undergone multiple surgeries on his ears and suffers from tinnitus.

2921.   As a result of the attack, and the injuries he suffered, Plaintiff Steven J. Friedrich has experienced severe physical pain and mental anguish and extreme emotional pain and suffering.

2922.   Plaintiff Alyssa Friedrich is a citizen of the United States and domiciled in the State of Texas. She is the daughter of Steven J. Friedrich.

2923.   As a result of the attack, and the injuries Steven J. Friedrich suffered, Plaintiff Alyssa Friedrich has experienced severe mental anguish and extreme emotional pain and suffering.

46.     **The July 11, 2006, Attack–Karbala**

        *a)  The Derise Family*

2924.   Plaintiff Philip Alan Derise is a citizen of the United States and domiciled in the State of Washington.

2925.   On July 11, 2006, Philip Alan Derise, then 26, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near the vehicle in which he was traveling outside of Karbala.

2926.   The weapon used to injure Philip Alan Derise was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2927.   As a result of the attack, Mr. Derise suffered a loss of hearing and eyesight.

2928.   Mr. Derise was also diagnosed with a concussion, a TBI, and PTSD.

2929.   As a result of the attack, and the injuries he suffered, Plaintiff Philip Alan Derise has experienced severe physical and mental anguish and extreme emotional pain and suffering.

### 47. The July 15, 2006, Attack–Baghdad

#### a) The Contreras Family

2930.    Andres J. Contreras was a citizen of the United States and domiciled in the State of California when he was killed in Iraq.

2931.    On July 15, 2006, Andres J. Contreras, aged 23, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2932.    Andres J. Contreras was killed in the attack.

2933.    The weapon used to kill Andres J. Contreras was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2934.    Plaintiff Norma Alicia Contreras is a citizen of the United States and domiciled in the State of California. She is the mother of Andres J. Contreras.

2935.    Plaintiff Jonathan Contreras, Sr. is a citizen of the United States and domiciled in the State of California. He is the father of Andres J. Contreras.

2936.    Plaintiff Carlos Contreras is a citizen of the United States and domiciled in the State of California. He is the brother of Andres J. Contreras.

2937.    Plaintiff Cesar Contreras is a citizen of the United States and domiciled in the State of California. He is the brother of Andres J. Contreras.

2938.    Plaintiff Hernan Contreras is a citizen of the United States and domiciled in the State of California. He is the brother of Andres J. Contreras.

2939.    Plaintiff Noel Contreras is a citizen of the United States and domiciled in the State of California. He is the brother of Andres J. Contreras.

2940.    Plaintiff Dannyel Contreras is a citizen of the United States and domiciled in the State of California. He is the brother of Andres J. Contreras.

2941.  As a result of the attack, and the death of Andres J. Contreras, Plaintiffs Norma Alicia Contreras, Jonathan Contreras, Sr., Carlos Contreras, Cesar Contreras, Hernan Contreras, Noel Contreras, and Dannyel Contreras have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice, and counsel.

### 48.      The July 17, 2006, Attack–Baghdad

#### a)  *The Pugh Family*

2942.  Kenneth Irving Pugh was a citizen of the United States and domiciled in the State of Texas.

2943.  On July 17, 2006, Kenneth Irving Pugh, then 39, was serving in the U.S. military in Iraq when his checkpoint in southeast Baghdad came under sniper fire from JAM Special Groups.

2944.  Kenneth Irving Pugh was killed in the attack from a gunshot wound to his head.

2945.  The Iraqi Special Groups terror cell operatives that fired at Kenneth Irving Pugh were trained by Hezbollah and funded and armed by the IRGC–QF and they launched the attack at the direction of both Hezbollah and the IRGC–QF, as their proxy.

2946.  Plaintiff Sharon M. Pugh is a citizen of the United States and domiciled in the State of Kentucky. She is the widow of Kenneth Irving Pugh.

2947.  Plaintiff Sharon M. Pugh brings an action individually and on behalf of the Estate of Kenneth Irving Pugh, as its legal representative.

2948.  Plaintiff Britney E. Carter is a citizen of the United States and domiciled in the State of Kentucky. She is the stepdaughter of Kenneth Irving Pugh.

2949.  Plaintiff Alicia Pearson is a citizen of the United States and domiciled in the State of Kentucky. She is the stepdaughter of Kenneth Irving Pugh.

2950.    As a result of the attack, and the death of Kenneth Irving Pugh, Plaintiffs Sharon M. Pugh, Britney E. Carter, and Alicia Pearson have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice, and counsel.

**49.    The July 22, 2006, Attack–Sadr City**

*a)  The Evans Family*

2951.    Plaintiff Daniel J. Evans is a citizen of the United States and domiciled in the State of Texas.

2952.    On July 22, 2006, Daniel J. Evans, then 19, was serving in the U.S. military in Iraq. He was riding in the second vehicle of a four-vehicle convoy in the north-bound lane of Route Pluto en route to providing assistance to another unit involved in a previous IED attack in the vicinity of Sadr City when the M1114 vehicle in which he was riding in the rear passenger-side seat was hit by an EFP emplaced by Special Groups from the right side of the vehicle.

2953.    The weapon used to injure Daniel J. Evans was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2954.    As a result of the attack, Daniel P. Evans sustained a TBI, having been rendered unconscious from the blast for approximately 16 hours. He also suffered from a collapsed left lung and injuries to his left shoulder. He was also diagnosed with PTSD.

2955.    As a result of the attack, and the injuries he suffered, Plaintiff Daniel J. Evans has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2956.    Plaintiff Justin Evans is a citizen of the United States and domiciled in the State of North Carolina. He is the brother of Daniel J. Evans.

2957.   As a result of the attack, and the injuries Daniel J. Evans suffered, Plaintiff Justin Evans has experienced severe mental anguish and extreme emotional pain and suffering.

**50.      The July 25, 2006, Attack–Baghdad**

  *a)  The Graves Family*

2958.   Joseph A. Graves was a citizen of the United States and domiciled in the State of California when he was killed in Iraq.

2959.   On July 25, 2006, Joseph A. Graves, aged 21, was serving in the U.S. military in Iraq when the convoy he was travelling came under RPG and small arms fire from JAM Special Groups operatives.

2960.   Joseph A. Graves was killed in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC–QF and Hezbollah.

2961.   Plaintiff Kevin Graves is a citizen of the United States and domiciled in the State of California. He is the father of Joseph A. Graves.

2962.   As a result of the attack, and the death of Joseph A. Graves, Plaintiff Kevin Graves has experienced severe mental anguish, extreme emotional pain and suffering, and loss of his son's society, companionship, comfort, advice, and counsel.

**51.      The August 26, 2008, Attack–Sadr City**

  *a)  The Koulchar Family*

2963.   Plaintiff Nicholas Gene Koulchar is a citizen of the United States and domiciled in the State of Michigan.

2964.   On August 26, 2008, Nicholas Gene Koulchar, then 26, was serving in the U.S. military in Iraq as the gunner in an RG-33 armored vehicle that was the lead vehicle in a convoy conducting route-clearing in the vicinity of Route Grizzlies and Route Gold in Sadr City. Nicholas

Gene Koulchar's vehicle was struck by an EFP emplaced by Special Groups that had been mounted at a height of 86 inches in a shack near the side of the road.

2965.   The weapon used to injure Nicholas Gene Koulchar was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2966.   As a result of the attack, Mr. Koulchar sustained traumatic bilateral above-knee amputations, scarring on his lower body and back, genital trauma, facial scars, ulnar neuropathy and dysesthesia in his right hand, tinnitus, and PTSD. He was transported to a Medical Aid Station in Sadr City and then to central Baghdad where he was stabilized following multiple surgeries and then airlifted to Landstuhl, Germany and then to Walter Reed Army Medical Center in Washington, DC.

2967.   Nicholas Gene Koulchar has received extensive medical treatment at various hospitals including various surgeries and prosthetic fittings where he has spent years in treatment.

2968.   As a result of the attack, and the injuries he suffered, Nicholas Gene Koulchar has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2969.   Plaintiff Michael Koulchar is a citizen of the United States and domiciled in the State of Michigan. He is the brother of Nicholas Gene Koulchar.

2970.   As a result of the attack, and the injuries Nicholas Gene Koulchar suffered, Plaintiff Michael Koulchar has experienced severe mental anguish and extreme emotional pain and suffering.

**52.      The August 26, 2006, Attack–Jisr Diyala**

*a)  The Zayas Family*

2971.   Edgardo Zayas was a citizen of the United States and domiciled in the State of Massachusetts.

2972. On August 26, 2006, Edgardo Zayas, then 30, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle. Edgardo Zayas was in a five-vehicle convoy with and was serving as the driver in the lead M1114 in the convoy.

2973. Edgardo Zayas was killed in the attack.

2974. The weapon used to injure Edgardo Zayas was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2975. Plaintiff Suheil Campbell is a citizen of the United States and domiciled in the State of Massachusetts. She is the widow of Edgardo Zayas.

2976. Plaintiff Suheil Campbell brings an action individually and on behalf of the Estate of Edgardo Zayas, as its legal representative.

2977. Plaintiff Alexander Zayas is a citizen of the United States and domiciled in the State of Massachusetts. He is the son of Edgardo Zayas.

2978. Plaintiff Alexa Zayas is a citizen of the United States and domiciled in the State of Massachusetts. She is the daughter of Edgardo Zayas.

2979. As a result of the attack, and the death of Edgardo Zayas, Plaintiffs Suheil Campbell, Alexander Zayas, and Alexa Zayas have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice, and counsel.

### 53. The September 3, 2006, Attack–Baghdad

#### a) The Andino Family

2980. Edwin A. Andino, Jr. was a citizen of the United States and domiciled in the State of Virginia when he was killed in Iraq.

2981.   On September 3, 2006, Edwin A. Andino, Jr., aged 23, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2982.   Edwin A. Andino, Jr. was killed in the attack.

2983.   The weapon used to kill Edwin A. Andino, Jr. was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2984.   Plaintiff Cathy Andino is a citizen of the United States and domiciled in the State of Virginia. She is the mother of Edwin A. Andino, Jr.

2985.   Plaintiff Cathy Andino brings an action individually and on behalf of the Estate of Edwin A. Andino, Jr., as its legal representative.

2986.   As a result of the attack, and the death of Edwin A. Andino, Jr., Plaintiff Cathy Andino has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her son's society, companionship, comfort, advice, and counsel.

**54.     The September 20, 2006, Attack–Baghdad**

*a)  The Puertas Family*

2987.   Plaintiff Luis Junior Puertas is a citizen of the United States and domiciled in the State of Florida.

2988.   On September 20, 2006, Luis Junior Puertas, then 20, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle. He was the driver of the lead vehicle in a four-vehicle convoy traveling north on Route Gold adjacent to the Khansa neighborhood in the eastern portion of Baghdad when a multiple-array EFP planted inside the bottom of a newly constructed light pole detonated next to the vehicle.

2989.   The weapon used to injure Luis Junior Puertas was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2990.   As a result of the attack, Mr. Puertas lost his left foot as a result of a penetrator entering the vehicle and sustained significant damage to his right leg as well. He underwent above-the-knee amputations on both legs as a result of the damages inflicted by the EFP. He also sustained a loss of equilibrium due to damage sustained to his ears.

2991.   Mr. Puertas has received extensive medical treatment at various hospitals including various surgeries and prosthetic fittings where he has spent months in treatment.

2992.   As a result of the attack, and the injuries he suffered, Plaintiff Luis Junior Puertas has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2993.   Plaintiff Lidia Sullivan is a citizen of the United States and domiciled in the State of Florida. She is the mother of Luis Junior Puertas.

2994.   Plaintiff Gabriela D. Puertas Vergara-Donoso is a citizen of the United States and domiciled in the State of Florida. She is the sister of Luis Junior Puertas.

2995.   As a result of the attack, and the injuries Luis Junior Puertas suffered, Plaintiffs Lidia Sullivan and Gabriela D. Puertas Vergara-Donoso have experienced severe mental anguish and extreme emotional pain and suffering.

**55.     The September 30, 2006, Attack–Baghdad**

*a)  The Melendez Family*

2996.   Plaintiff Christopher Michael Melendez is a citizen of the United States and domiciled in the State of Florida.

2997.   On September 30, 2006, Christopher Michael Melendez, then 19 years old, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his

vehicle. Christopher Michael Melendez was a gunner in an M1114 vehicle on a routine patrol on Route Florida in the Mashtal neighborhood of Baghdad when his vehicle was disabled by a direct hit from an EFP on the driver's side of the vehicle.

2998.   The weapon used to injure Christopher Michael Melendez was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2999.   As a result of the attack, Mr. Melendez's left leg was amputated above the knee, he sustained a TBI, an injury to his brachial plexus causing weakness in his dominant hand, tinnitus, jaw fractures, post-traumatic headaches, facial and hand nerve damage, disfiguring head and facial scarring, burns, and additional shrapnel injuries.

3000.   Mr. Melendez has received extensive medical treatment at various hospitals including various surgeries and prosthetic fittings where he has spent months in treatment.

3001.   As a result of the attack, and the injuries he suffered, Plaintiff Christopher Michael Melendez has experienced severe physical and mental anguish and extreme emotional pain and suffering.

3002.   Plaintiff Narciso Melendez is a citizen of the United States and domiciled in the State of New York. He is the father of Christopher Michael Melendez.

3003.   Plaintiff Christina Melendez is a citizen of the United States and domiciled in the State of Georgia. She is the sister of Christopher Michael Melendez.

3004.   As a result of the attack, and the injuries Christopher Michael Melendez suffered, Plaintiffs Narciso Melendez and Christina Melendez have experienced severe mental anguish and extreme emotional pain and suffering.

56. **The October 4, 2006, Attack–Baghdad**

   *a) The Barattieri Family*

3005.   Guy Barattieri was a citizen of the United States and domiciled in the State of Washington when he was killed in Iraq.

3006.   On October 4, 2006, Guy Barattieri, aged 36, was serving as a civilian contractor with Falcon Security in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3007.   Guy Barattieri was killed in the attack.

3008.   The weapon used to kill Guy Barattieri was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3009.   Plaintiff Laurel Barattieri is a citizen of the United States and domiciled in the State of Washington. She is the widow of Guy Barattieri.

3010.   Plaintiff Laurel Barattieri brings an action individually and on behalf of the Estate of Guy Barattieri, as its legal representative.

3011.   Plaintiff Patricia Wheatley is a citizen of the United States and domiciled in the State of Ohio. She is the mother of Guy Barattieri.

3012.   Plaintiff Rebecca Barattieri is a citizen of the United States and domiciled in the State of Washington. She is the sister of Guy Barattieri.

3013.   Plaintiff Nicole Barattieri is a citizen of the United States and domiciled in the State of Kentucky. She is the sister of Guy Barattieri.

3014.   Plaintiff Gina Tesnar is a citizen of the United States and domiciled in the State of Kentucky. She is the sister of Guy Barattieri.

3015.   As a result of the attack, and the death of Guy Barattieri, Plaintiffs Laurel Barattieri, Patricia Wheatley, Rebecca Barattieri, Nicole Barattieri and Gina Tesnar have experienced severe

mental anguish, extreme emotional pain and suffering, and loss of their husband's/son's/brother's society, companionship, comfort, advice, and counsel.

57.   **The October 13, 2006, Attack–Baghdad**

*a)  The Stanton Family*

3016.   Kenny Frances Stanton, Jr. was a citizen of the United States and domiciled in the State of California.

3017.   On October 13, 2006, Kenny Frances Stanton, Jr., then 20, was serving in the U.S. military in Iraq when his unit was struck by an IED emplaced by JAM Special Groups terror operatives in the Sholeh neighborhood in northwest Baghdad.

3018.   Kenny Frances Stanton, Jr. was killed in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC–QF and Hezbollah.

3019.   Plaintiff Gloria L. Magana is a citizen of the United States and domiciled in the State of California. She is the mother of Kenny Frances Stanton, Jr.

3020.   Plaintiff Gloria L. Magana brings an action individually and on behalf of the Estate of Kenny Frances Stanton, Jr., as its legal representative.

3021.   Plaintiff Mario Stanton is a citizen of the United States and domiciled in the State of California. He is the brother of Kenny Frances Stanton, Jr.

3022.   Plaintiff Brandie Stanton is a citizen of the United States and domiciled in the State of California. She is the sister of Kenny Frances Stanton, Jr.

3023.   Plaintiff Terrymarie Stanton is a citizen of the United States and domiciled in the State of California. She is the sister of Kenny Frances Stanton, Jr.

3024.   As a result of the attack, and the death of Kenny Frances Stanton, Jr., Plaintiffs Gloria L. Magana, Mario Stanton, Brandie Stanton, and Terrymarie Stanton have experienced

severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice, and counsel.

**58.     The October 17, 2006, Attack–Baqubah**

*a) The Haupt Family*

3025.    Ryan Haupt was a citizen of the United States and domiciled in the State of Arizona when he was killed in Iraq.

3026.    On October 17, 2006, Ryan Haupt, aged 24, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3027.    Ryan Haupt was killed in the attack.

3028.    The weapon used to kill Ryan Haupt was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3029.    Plaintiff Nannette Bryne-Haupt is a citizen of the United States and domiciled in the State of Colorado. She is the widow of Ryan Haupt.

3030.    Lynn Forehand is a citizen of the United States and domiciled in the State of Tennessee. She is the mother of Ryan Haupt.

3031.    Lynn Forehand brings an action on behalf of the Estate of Ryan Haupt, as its legal representative, for his death and any suffering and/or economic loss he/his Estate sustained as a result of the attack.

3032.    As a result of the attack, and the death of Ryan Haupt, Plaintiff Nannette Bryne-Haupt has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her husband's society, companionship, comfort, advice, and counsel.

**59.    The October 20, 2006, Attack–Baghdad**

   *a) The Witte Family*

3033.    Kevin M. Witte was a citizen of the United States and domiciled in the State of Oregon when he was killed in Iraq.

3034.    On October 20, 2006, Kevin M. Witte, aged 27, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3035.    Kevin M. Witte was killed in the attack.

3036.    The weapon used to kill Kevin M. Witte was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3037.    Plaintiff William Witte is a citizen of the United States and domiciled in the State of Oregon. He is the brother of Kevin M. Witte.

3038.    Plaintiff William Witte brings an action individually and on behalf of the Estate of Kevin M. Witte, as its legal representative.

3039.    As a result of the attack, and the death of Kevin M. Witte, Plaintiff William Witte has experienced severe mental anguish, extreme emotional pain and suffering, and loss of his brother's society, companionship, comfort, advice, and counsel.

**60.    The October 22, 2006, Attack–Baghdad**

   *a) The Mock Family*

3040.    Willsun Mock was a citizen of the United States and domiciled in the State of Kansas when he was killed in Iraq.

3041.    On October 22, 2006, Willsun Mock, aged 23, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3042.    Willsun Mock was killed in the attack.

3043. The weapon used to kill Willsun Mock was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3044. Plaintiff Michael Mock is a citizen of the United States and domiciled in the State of Kansas. He is the father of Willsun Mock.

3045. Plaintiff Tammy Dorsey is a citizen of the United States and domiciled in the State of Kansas. She is the sister of Willsun Mock.

3046. Plaintiff Eric Phye is a citizen of the United States and domiciled in the State of Arizona. He is the brother of Willsun Mock.

3047. As a result of the attack, and the death of Willsun Mock, Plaintiffs Michael Mock, Tammy Dorsey and Eric Phye have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice, and counsel.

### b) The Gmachowski Family

3048. Plaintiff James Gmachowski is a citizen of the United States and domiciled in the State of California.

3049. On October 22, 2006, James Gmachowski, then 19, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near the vehicle.

3050. The weapon used to injure James Gmachowski was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3051. As a result of the blast, a golf-ball-sized piece of copper was lodged in James Gmachowski's back which required invasive surgery to remove. The wound took roughly five months to heal. Mr. Gmachowski was also diagnosed with a TBI and PTSD.

3052.   As a result of the attack, and the injuries he suffered, Plaintiff James Gmachowski has experienced severe physical and mental anguish and extreme emotional pain and suffering.

**61.      The October 22, 2006, Attack–Baghdad**

*c)  The Brian Family*

3053.   Brian Brian was a citizen of the United States and domiciled in the State of Arkansas when he was killed in Iraq.

3054.   On October 22, 2006, Brian Brian, then 58, was serving as a civilian contractor for DynCorp International in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3055.   The weapon used to kill Brian Brian was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3056.   Plaintiff Constance Brian is a citizen of the United States and domiciled in the State of Arkansas. She is the widow of Brian Brian.

3057.   Plaintiff Constance Brian brings an action individually and on behalf of the Estate of Brian Brian, as its legal representative.

3058.   Plaintiff Amber Hensley is a citizen of the United States and domiciled in the State of North Dakota. She is the daughter of Brian Brian.

3059.   As a result of the attack, and the death of Brian Brian, Plaintiffs Constance Brian and Amber Hensley experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice, and counsel.

62. **The October 22, 2006, Attack–Baghdad**

### a) *The Alabsawi Family*

3060.   Plaintiff Karar Alabsawi is a citizen of the United States and domiciled in the State of Pennsylvania.

3061.   On October 22, 2006, Karar Alabsawi was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3062.   The weapon used to injure Karar Alabsawi was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3063.   As a result of the attack, Mr. Alabsawi lost his left leg. He also suffered significant injuries to his left arm which he is unable to use as well as shrapnel wounds and burns on his body.

3064.   As a result of the attack, and the injuries he suffered, Plaintiff Karar Alabsawi has experienced severe physical and mental anguish and extreme emotional pain and suffering.

### b) *The Taylor Family*

3065.   David G. Taylor was a citizen of the United States and domiciled in the State of North Carolina when he was killed in Iraq.

3066.   On October 22, 2006, David G. Taylor, aged 37, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3067.   David G. Taylor was killed in the attack.

3068.   The weapon used to kill David G. Taylor was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3069.   Plaintiff Michelle Taylor is a citizen of the United States and domiciled in the State of Florida. She is the widow of David G. Taylor.

3070.   Plaintiff Michelle Taylor brings an action individually and on behalf of the Estate of David G. Taylor as its legal representative.

3071.   Plaintiff J.T., a minor represented by his legal guardian, Michelle Taylor, is a citizen of the United States and domiciled in the State of Florida. He is the son of David G. Taylor.

3072.   Plaintiff Phyllis Taylor is a citizen of the United States and domiciled in the State of Florida. She is the mother of David G. Taylor.

3073.   Plaintiff John Taylor is a citizen of the United States. He is the brother of David G. Taylor.

3074.   As a result of the attack, and the death of David G. Taylor, Plaintiffs Michelle Taylor, J.T., Phyllis Taylor and John Taylor have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's/son's/brother's society, companionship, comfort, advice, and counsel.

### c) The Taylor Family

3075.   Plaintiff Brian G. Taylor is a citizen of the United States and domiciled in the State of Florida.

3076.   On October 22, 2006, Brian G. Taylor was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3077.   The weapon used to injure Brian G. Taylor was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3078.   As a result of the attack, Mr. Taylor lost his right leg. He also suffered injuries to his right thigh, loss of muscle, skin and part of his femur, a dislocated knee, a damaged femoral artery, and compartment syndrome.

3079.   As a result of the attack, and the injuries he suffered, Plaintiff Brian G. Taylor has experienced severe physical and mental anguish and extreme emotional pain and suffering.

### d)  The Recendez Family

3080.   Plaintiff Judas Recendez is a citizen of the United States and domiciled in the State of California.

3081.   On October 22, 2006, Judas Recendez was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3082.   The weapon used to injure Mr. Recendez was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3083.   As a result of the attack, both of Mr. Recendez's legs were amputated below the knee. He also sustained shrapnel injuries to the lower part of his body from the waist down, hearing and vision damage, and nerve damage in his left hand.

3084.   As a result of the attack, and the injuries he suffered, Plaintiff Judas Recendez has experienced severe physical and mental anguish and extreme emotional pain and suffering.

### 63.   The October 22, 2006, Attack–Sadr City

### a)  The Norager Family

3085.   Plaintiff Tyler Norager is a citizen of the United States and domiciled in the State of Utah.

3086.   On October 22, 2006, Tyler Norager was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3087.   The weapon used to injure Mr. Norager was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3088.  As a result of the attack, Mr. Norager sustained shrapnel wounds to the face, the right side of his body, and the top of his spine. His injuries have caused him long-term, permanent back pain.

3089.  As a result of the attack, and the injuries he suffered, Plaintiff Tyler Norager has experienced severe physical and mental anguish and extreme emotional pain and suffering.

3090.  Plaintiff Shalee Norager is a citizen of the United States and domiciled in the State of Utah. She is the wife of Tyler Norager.

3091.  Plaintiff M.N., a minor resented by her legal guardian, Tyler Norager, is a citizen of the United States and domiciled in the State of Utah.

3092.  As a result of the attack, and the injuries suffered by Tyler Norager, Plaintiffs Shalee Norager and M.N. have experienced severe mental anguish, and extreme emotional pain and suffering.

### 64.  The November 2, 2006, Attack–Baghdad

#### a) The Kruger Family

3093.  Eric Kruger was a citizen of the United States and domiciled in the State of Texas when he was killed in Iraq.

3094.  On November 2, 2006, Eric Kruger, aged 44, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3095.  Eric Kruger was killed in the attack.

3096.  The weapon used to kill Eric Kruger was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3097.  Lawrence Kruger is a citizen of the United States and domiciled in the State of Texas. He is the father of Eric Kruger.

3098. Lawrence Kruger brings an action on behalf of the Estate of Eric Kruger, as its legal representative, for his death and any suffering and/ or economic loss he/his Estate sustained as a result of the attack.

3099. Plaintiff Christian Krugeris a citizen of the United States and domiciled in the State of Colorado. He is the son of Eric Kruger.

3100. Plaintiff Elise Kruger is a citizen of the United States and domiciled in the State of Colorado. She is the daughter of Eric Kruger.

3101. As a result of the attack, and the death of Eric Kruger, Plaintiffs Christian Kruger and Elise Kruger have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their father's society, companionship, comfort, advice, and counsel.

### b) The Finken Family

3102. Paul Finken was a citizen of the United States and domiciled in the State of Iowa when he was killed in Iraq.

3103. On November 2, 2006, Paul Finken, aged 40, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3104. Paul Finken was killed in the attack.

3105. The weapon used to kill Paul Finken was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3106. Plaintiff Jackie Farrar-Finken is a citizen of the United States and domiciled in the State of Virginia. She is the widow of Paul Finken.

3107. Plaintiff Jackie Farrar-Finken brings an action individually and on behalf of the Estate of Paul Finken, as its legal representative.

3108.   Plaintiff Emilie Finken is a citizen of the United States and domiciled in the State of Virginia. She is the daughter of Paul Finken.

3109.   Plaintiff Caroline Finken is a citizen of the United States and domiciled in the State of Virginia. She is the daughter of Paul Finken.

3110.   Plaintiff Julia Finken is a citizen of the United States and domiciled in the State of Virginia. She is the daughter of Paul Finken.

3111.   Plaintiff Stephen Finken is a citizen of the United States and domiciled in the State of Iowa. He is the brother of Paul Finken.

3112.   Plaintiff Alan Finken is a citizen of the United States and domiciled in the State of Colorado. He is the brother of Paul Finken.

3113.   Plaintiff Richard Finken is a citizen of the United States and domiciled in the State of Iowa. He is the brother of Paul Finken.

3114.   Plaintiff David Finken is a citizen of the United States and domiciled in the State of Iowa. He is the brother of Paul Finken.

3115.   Plaintiff Mark Finken is a citizen of the United States and domiciled in the State of Iowa. He is the brother of Paul Finken.

3116.   Plaintiff Peter Finken is a citizen of the United States and domiciled in the State of Connecticut. He is the brother of Paul Finken.

3117.   Plaintiff Jean Pruitt is a citizen of the United States and domiciled in the State of Iowa. She is the sister of Paul Finken.

3118.   Plaintiff Joan Henscheid is a citizen of the United States and domiciled in the State of Iowa. She is the sister of Paul Finken.

3119.    As a result of the attack, and the death of Paul Finken, Jackie Farrar-Finken, Emilie Finken, Caroline Finken, Julia Finken, Stephen Finken, Alan Finken, Richard Finken, David Finken, Mark Finken, Peter Finken, Jean Pruitt and Joan Henscheid have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's/brother's society, companionship, comfort, advice, and counsel.

**65.    The November 9, 2006, Attack–Baghdad**

   *a)  The McCoy Family*

3120.    Gregory McCoy was a citizen of the United States and domiciled in the State of Michigan when he was killed in Iraq.

3121.    On November 2, 2006, Gregory McCoy, aged 26, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3122.    Gregory McCoy was killed in the attack.

3123.    The weapon used to kill Gregory McCoy was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3124.    Plaintiff Lori Ann McCoy is a citizen of the United States and domiciled in the State of Colorado. She is the widow of Gregory McCoy.

3125.    Plaintiff Lori Ann McCoy brings an action individually and on behalf of the Estate of Gregory McCoy, as its legal representative.

3126.    Plaintiff Logan McCoy is a citizen of the United States and domiciled in the State of Colorado. He is the son of Gregory McCoy.

3127.    Plaintiff Tyler McCoy is a citizen of the United States and domiciled in the State of Colorado. He is the son of Gregory McCoy.

3128.   As a result of the attack, and the death of Gregory McCoy, Lori Ann McCoy, Logan McCoy and Tyler McCoy have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice, and counsel.

### b)  The Cox Family

3129.   Plaintiff Glenn Michael Cox is a citizen of the United States and domiciled in the State of Florida.

3130.   On November 9, 2006, Glenn Michael Cox, then 45, was serving as a civilian contractor for DynCorp International in Iraq when an EFP emplaced by Special Groups detonated near the vehicle in which he was traveling in Baghdad.

3131.   The weapon used to injure Glenn Michael Cox was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3132.   As a result of the attack, Mr. Cox received multiple shrapnel injuries to his right side.

3133.   Mr. Cox's right ulna was shattered, as were most of the bones in his right hand. As a result, Mr. Cox has an artificial knuckle in his right hand. Shrapnel severed a nerve in his right forearm, and he still has a large amount of scarring on his arm and hand.

3134.   Mr. Cox also suffers from hearing loss as a result of the attack.

3135.   As a result of the attack, and the injuries he suffered, Plaintiff Glenn Michael Cox has experienced severe physical and mental anguish and extreme emotional pain and suffering.

### 66.  The November 13, 2006, Attack–Baghdad

#### a)  *The Lamb Family*

3136.  Plaintiff Kurtiss Lamb is a citizen of the United States and domiciled in the State of Tennessee.

3137.  On November 13, 2006, Kurtiss Lamb, then 24, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near the vehicle.

3138.  The weapon used to injure Kurtiss Lamb was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3139.  As a result of the blast, Kurtiss Lamb suffered partial paralysis to his arm and bulging disks in his lumbar spine. Mr. Lamb was also diagnosed with a TBI.

3140.  As a result of the attack, and the injuries he suffered, Plaintiff Kurtiss Lamb has experienced severe physical and mental anguish and extreme emotional pain and suffering.

### 67.  The November 16, 2006, Attack–Basra

#### a)  *The Coté Family*

3141.  Jonathon M. Coté was a citizen of the United States and domiciled in the State of New York, when he was kidnapped and killed in Iraq.

3142.  On November 16, 2006, Jonathon Coté was serving as a civilian contractor for Crescent Security near Basra, Iraq when he was kidnapped, held hostage, tortured, and ultimately murdered by JAM Special Groups.

3143.  Mr. Coté's remains were mutilated after he was executed. On April 23, 2008, the FBI announced that it had identified the remains of Mr. Coté–which were recovered four days prior–and made arrangements to return Mr. Coté's remains to his family.

3144.   Jonathon M. Coté was killed in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC–QF and Hezbollah.

3145.   Plaintiff Francis L. Coté is a citizen of the United States and domiciled in the State of New York. He is the father of Jonathon Coté.

3146.   Plaintiff Nancy Coté is a citizen of the United States and domiciled in the State of New York. She is the stepmother of Jonathon Coté.

3147.   Plaintiff Christopher Coté is a citizen of the United States and domiciled in the State of New York. He is the brother of Jonathon Coté.

3148.   Plaintiff Samantha Dunford is a citizen of the United States and domiciled in the State of New York. She is the stepsister of Jonathon Coté.

3149.   Plaintiff Maximillian Shroyer is a citizen of the United States and domiciled in the Ohio. He is the stepbrother of Jonathon Coté.

3150.   As a result of the November 16, 2006 attack, and the subsequent kidnapping and execution of Jonathon Coté, Plaintiffs Francis L. Coté, Nancy Coté, Christopher Coté, Samantha Dunford and Maxilillian Shroyer have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice, and counsel.

### b)  The Johnson-Reuben Family

3151.   Paul Johnson-Reuben was a citizen of the United States and domiciled in the State of Minnesota, when he was kidnapped and killed in Iraq.

3152.   On November 16, 2006, Paul Johnson-Reuben was serving as a civilian contractor for Crescent Security near Basra, Iraq when he was kidnapped, held hostage, tortured, and ultimately murdered by JAM Special Groups.

3153.  Mr. Johnson-Reuben's remains were mutilated after he was executed. In April 2008, Mr. Johnson-Reuben's remains were returned to his family.

3154.  Paul Johnson-Reuben was killed in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC–QF and Hezbollah.

3155.  Plaintiff Casey Reuben a citizen of the United States and domiciled in the State of Minnesota. She is the daughter of Paul Johnson-Reuben.

3156.  Plaintiff Bree Reuben a citizen of the United States and domiciled in the State of Minnesota. She is the daughter of Paul Johnson-Reuben.

3157.  Plaintiff Patrick Reuben a citizen of the United States and domiciled in the State of Wisconsin. He is the twin brother of Paul Johnson-Reuben.

3158.  As a result of the attack, and the death of Paul Johnson-Reuben, Plaintiffs Casey Reuben, Bree Reuben and Patrick Reuben have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their father's/brother's society, companionship, comfort, advice, and counsel.

### c)  The Munns Family

3159.  Joshua Munns was a citizen of the United States and domiciled in the State of California, when he was kidnapped and killed in Iraq.

3160.  On November 16, 2006, Joshua Munns was serving as a civilian contractor for Crescent Security near Basra, Iraq when he was kidnapped, held hostage, tortured, and ultimately murdered by JAM Special Groups.

3161.  Mr. Munn's remains were mutilated after he was executed. In April 2008, Mr. Munn's remains were returned to his family.

3162.  Joshua Munns was killed in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC–QF and Hezbollah.

3163.   Plaintiff Jackie Stewart is a citizen of the United States and domiciled in the State of California. She is the mother of Joshua Munns.

3164.   Plaintiff Mark Munns is a citizen of the United States and domiciled in the State of California. He is the father of Joshua Munns.

3165.   Plaintiff Crista Munns is a citizen of the United States and domiciled in the State of California. She is the stepmother of Joshua Munns.

3166.   As a result of the attack, and the death of Joshua Munns, Plaintiffs Jackie Stewart, Mark Munns and Crista Munns have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's society, companionship, comfort, advice, and counsel.

### d) *The Young Family*

3167.   John Young was a citizen of the United States and domiciled in the State of Missouri, when he was kidnapped and killed in Iraq.

3168.   On November 16, 2006, John Young, aged 44, was serving as a civilian contractor for Crescent Security near Basra, Iraq when he was kidnapped, held hostage, tortured, and ultimately murdered by JAM Special Groups.

3169.   Mr. Young's remains were mutilated after he was executed. In March 2008, Mr. Young's remains were returned to his family.

3170.   John Young was killed in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC–QF and Hezbollah.

3171.   Plaintiff Sharon DeBrabander is a citizen of the United States and domiciled in the State of Arizona. She is the mother of John Young.

3172.   Plaintiff Dennis DeBrabander is a citizen of the United States and domiciled in the State of Arizona. He is the stepfather of John Young.

3173.   Plaintiff Nicole DeBrabander is a citizen of the United States and domiciled in the State of Arizona. She is the sister of John Young.

3174.   Plaintiff Joella Pratt is a citizen of the United States and domiciled in the State of Missouri. She is the sister of John Young.

3175.   As a result of the attack, and the death of John Young, Plaintiffs Sharon DeBrabander, Dennis DeBrabander, Nicole DeBrabander, and Joella Pratt have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice, and counsel.

**68.     The December 3, 2006, Attack–Baghdad**

*a)  The Starkey Family*

3176.   Plaintiff Joshua Starkey is a citizen of the United States and domiciled in the State of Georgia.

3177.   On December 3, 2006, Joshua Starkey, then 23, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3178.   The weapon used to injure Joshua Starkey was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3179.   As a result of the attack, shrapnel impacted Joshua Starkey's body on his right shoulder and right side of his face. He also sustained burns to his face and shoulder.

3180.   Joshua Starkey has been diagnosed with PTSD. He has sought out counseling and has been prescribed medication to address related issues.

3181.   As a result of the attack, and the injuries he suffered, Plaintiff Joshua Starkey has experienced severe physical and mental anguish and extreme emotional pain and suffering.

69. **The December 4, 2006, Attack–Baghdad**

   *a)  The Hinson Family*

3182.   Plaintiff Brent Hinson is a citizen of the United States and domiciled in the State of Florida.

3183.   On December 4, 2006, Brent Hinson, then 19, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3184.   The weapon used to injure Brent Hinson was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3185.   As a result of the attack, Brent Hinson suffered shrapnel injuries and was unable to walk for two weeks following the attack. He also required physical therapy.

3186.   As a result of the attack, and the injuries he suffered, Plaintiff Brent Hinson has experienced severe physical and mental anguish and extreme emotional pain and suffering.

3187.   Plaintiff William Hinson is a citizen of the United States and domiciled in the State of Florida. He is the father of Brent Hinson.

3188.   Plaintiff Fran Hinson is a citizen of the United States and domiciled in the State of Florida. She is the mother of Brent Hinson.

3189.   Plaintiff Hilary Westerberg is a citizen of the United States and domiciled in the State of New Hampshire. She is the sister of Brent Hinson.

3190.   As a result of the attack, and the injuries suffered by Brent Hinson, Plaintiffs William Hinson, Fran Hinson and Hilary Westerberg have experienced severe mental anguish, and extreme emotional pain and suffering.

70. **The December 20, 2006, Attack–Baghdad**

   *a) The Little Family*

3191. Plaintiff William Ronald Little is a citizen of the United States and domiciled in the State of Florida.

3192. On December 20, 2006, William Ronald Little, then 43, and a former soldier in the U.S. military, was serving as a civilian contractor in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3193. Mr. Little was injured in the attack.

3194. The weapon used to injure Mr. Little was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3195. As a result of the attack, Mr. Little sustained shrapnel to his right eye socket necessitating the placement of a metal plate under his right eye. Shrapnel also impacted the right side of his face and his arm.

3196. He lost a portion of muscle tissue in his back and shoulder area and part of his right tricep muscle was detached. He no longer has full range of motion in his right arm.

3197. He sustained nerve damage to his right cheek, sinus area, and his upper lip. He has undergone rhinoplasty and other procedures to address the injuries to these areas.

3198. As a result of the attack, and the injuries he suffered, Plaintiff William Ronald Little has experienced severe physical and mental anguish and extreme emotional pain and suffering.

3199. Plaintiff Brenda Little is a citizen of the United States and domiciled in the State of Florida. She is the wife of William Ronald Little.

3200. Plaintiff Kira Sikes is a citizen of the United States and domiciled in the State of Florida. She is the daughter of William Ronald Little and Brenda Little.

3201.    Plaintiff William Ronald Little, Jr. is a citizen of the United States and domiciled in the State of Florida. He is the son of William Ronald Little and Brenda Little.

3202.    Brenda Little brings this action individually and on behalf of William Ronald Little, Jr. as his power of attorney.

3203.    As a result of the attack, and the injuries William Ronald Little has suffered, Plaintiffs Brenda Little, Kira Sikes and William Ronald Little, Jr. have experienced severe mental anguish, and extreme emotional pain and suffering.

### b)  The Denman Family

3204.    Plaintiff Joshua Denman is a citizen of the United States and domiciled in the State of Florida.

3205.    On December 20, 2008, Joshua Denman, then 21, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3206.    Joshua Denman was injured in the attack.

3207.    The weapon used to injure Joshua Denman was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3208.    As a result of the attack, Plaintiff Joshua Denman sustained shrapnel in his right arm and right hand. He has undergone surgery and procedures to address the removal of shrapnel and scar tissue.

3209.    As a result of the attack, and the injuries he suffered, Plaintiff Joshua Denman has experienced physical and mental anguish and extreme emotional pain and suffering.

**71.** **The December 22, 2006, Attack—Baghdad**

  *a) The Nantz Family*

3210. Plaintiff Randolph Delbert Nantz is a citizen of the United States and domiciled in the State of Texas.

3211. On December 22, 2006, Randolph Delbert Nantz, then 38, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3212. The weapon used to injure Randolph Delbert Nantz was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3213. As a result of the blast, Randolph Delbert Nantz suffered serious injuries, including nerve damage, burns on 23 percent of his body, and the amputation of his left leg below the knee.

3214. As a result of the attack, and the injuries he suffered, Plaintiff Randolph Delbert Nantz has experienced severe physical and mental anguish and extreme emotional pain and suffering.

3215. Plaintiff Joshua Ryan Nantz is a citizen of the United States and domiciled in the State of Texas. He is the son of Randolph Delbert Nantz.

3216. As a result of the attack, and the injuries suffered by Randolph Delbert Nantz, Plaintiff Joshua Ryan Nantz has experienced severe mental anguish, and extreme emotional pain and suffering.

**72.** **The December 27, 2006, Attack–Baghdad**

  *a) The McCormick Family*

3217. Clinton McCormick was a citizen of the United States and domiciled in the State of Florida when he was killed in Iraq.

3218. On December 27, 2006, Clinton McCormick, aged 20, was serving in the United States military in Iraq when IED emplaced by JAM Special Groups detonated near his vehicle.

3219. Clinton McCormick was killed in the attack.

3220. Clinton McCormick was killed in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC–QF and Hezbollah.

3221. Plaintiff Lori Ann McCormick is a citizen of the United States and domiciled in the State of Florida. She is the mother of Clinton McCormick.

3222. Plaintiff Lori Ann McCormick brings an action individually and on behalf of the Estate of Clinton McCormick, as its legal representative.

3223. As a result of the attack, and the death of Clinton McCormick, Lori Ann McCormick has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her son's society, companionship, comfort, advice, and counsel.

### 73. The December 31, 2006, Attack–Baghdad

#### a) The Blohm Family

3224. Alan R. Blohm was a citizen of the United States and domiciled in the State of Alaska when he was killed in Iraq.

3225. On December 31, 2006, Alan R. Blohm, aged 21, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3226. Alan R. Blohm was killed in the attack.

3227. The weapon used to kill Alan R. Blohm was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3228. Denise Vennix is a citizen of the United States and domiciled in the State of Michigan. She is the mother of Alan R. Blohm.

3229.   Denise Vennix brings an action on behalf of the Estate of Alan R. Blohm, as its legal representative, for his death and any suffering and/ or economic loss he/his Estate sustained as a result of the attack.

**74.   The January 14, 2007, Attack–Baghdad**

*a)  The Vaccaro Family*

3230.   Plaintiff Robert Vaccaro is a citizen of the United States and domiciled in the State of Rhode Island.

3231.   On January 14, 2007, Robert Vaccaro, then 23, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near the vehicle in which he was traveling in Baghdad.

3232.   The weapon used to injure Robert Vaccaro was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3233.   Mr. Vaccaro was in a coma for three weeks following the attack and endured several surgeries.

3234.   As a result of the attack, Mr. Vaccaro was diagnosed with a TBI, which caused him to suffer from seizures.

3235.   Mr. Vaccaro has had speech therapy, occupational therapy, and physical therapy for his injuries.

3236.   Robert Vaccaro has also been diagnosed with PTSD.

3237.   Robert Vaccaro has been prescribed medication to treat his injuries.

3238.   As a result of the attack, and the injuries he suffered, Plaintiff Robert Vaccaro has experienced severe physical and mental anguish and extreme emotional pain and suffering.

506

### 75. The January 22, 2007, Attack–Baghdad

#### a) *The Stout Family*

3239.   Brandon L. Stout was a citizen of the United States and domiciled in the State of Michigan when he was killed in Iraq.

3240.   On January 22, 2007, Brandon L. Stout, aged 23, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3241.   Brandon L. Stout was killed in the attack.

3242.   The weapon used to kill Brandon L. Stout was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3243.   Plaintiff Andrew Jeffrey Anderson is a citizen of the United States and domiciled in the State of Michigan. He is the brother of Brandon L. Stout.

3244.   Plaintiff Elizabeth Lynn Islas is a citizen of the United States and domiciled in the State of Michigan. She is the sister of Brandon L. Stout.

3245.   As a result of the attack, and the death of Brandon L. Stout, Plaintiffs Andrew Jeffrey Anderson and Elizabeth Lynn Islas have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their brother's society, companionship, comfort, advice, and counsel.

### 76. The January 25, 2007, Attack–Baghdad

#### a) *The Balsley Family*

3246.   Michael C. Balsley was a citizen of the United States and domiciled in the State of California when he was killed in Iraq.

3247.   On January 25, 2007, Michael C. Balsley, aged 23, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3248. Michael C. Balsley was killed in the attack.

3249. The weapon used to kill Michael C. Balsley was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3250. Plaintiff Samantha Balsley is a citizen of the United States and domiciled in the State of Virginia. She is the widow of Michael C. Balsley.

3251. Plaintiff Samantha Balsley brings an action individually and on behalf of the Estate of Michael C. Balsley, as its legal representative.

3252. Plaintiff Logan Rogers-Wall is a citizen of the United States and domiciled in the State of Virginia. He is the son of Michael C. Balsley.

3253. As a result of the attack, and the death of Michael C. Balsley, Plaintiffs Samantha Balsley and Logan Rogers-Wall have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice, and counsel.

### 77. The January 27, 2007, Attack–Baghdad

#### a) The Hobson Family

3254. Plaintiff Heath Damon Hobson is a citizen of the United States and domiciled in the State of Massachusetts.

3255. On January 27, 2007, Heath Damon Hobson, then 34, was serving in the U.S. military in Iraq.

3256. Heath Damon Hobson was in the motor pool at Camp Travis in the U.S. Embassy compound in Baghdad when multiple rockets were fired by Special Groups operatives at the compound and landed in his proximity.

3257.   Heath Damon Hobson was injured in the attack perpetrated by Hezbollah-trained Special Groups under the control and direction of the IRGC–QF and Hezbollah.

3258.   As a result of the attack, Heath Damon Hobson sustained a shrapnel-induced open leg fracture and an arterial tear and significant blood loss. He was evacuated to a Combat Support Hospital where he underwent an arterial graft to salvage his leg and received external fixation to stabilize his leg. He was then flown to Balad, Iraq and then to Germany finally arriving at Walter Reed Army Hospital in Washington, DC to be treated for his injuries. To this day, he has a loss of the use of his right foot and ankle, bone and soft-tissue loss, nerve damage, vascular damage, disfigurement, and PTSD.

3259.   Mr. Hobson has received extensive medical treatment at various hospitals to address the injuries he sustained in the attack.

3260.   As a result of the attack, and the injuries he suffered, Plaintiff Heath Damon Hobson has experienced severe physical and mental anguish and extreme emotional pain and suffering.

3261.   Plaintiff Jodi Michelle Hobson is a citizen of the United States and domiciled in the State of Massachusetts. She is the wife of Heath Damon Hobson.

3262.   Plaintiff Michael Damon Hobson is a citizen of the United States and domiciled in the State of Massachusetts. He is the son of Heath Damon Hobson.

3263.   As a result of the attack, and the injuries Heath Damon Hobson suffered, Plaintiffs Jodi Michelle Hobson and Michael Damon Hobson have experienced severe mental anguish and extreme emotional pain and suffering.

### 78.   The January 27, 2007, Attack–Taji

#### a)  The Garrigus Family

3264.   Mickel D. Garrigus was a citizen of the United States and domiciled in the State of Washington when he was killed in Iraq.

3265.   On January 27, 2007, Mickel D. Garrigus, aged 24, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3266.   Mickel D. Garrigus was killed in the attack.

3267.   The weapon used to kill Mickel D. Garrigus was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3268.   Natasha Garrigus, Mickel D. Garrigus's widow, brings an action on behalf of the Estate of Mickel D. Garrigus, as its legal representative.

3269.   Plaintiff Deadra Garrigus is a citizen of the United States and domiciled in the State of Washington. She is the mother of Mickel D. Garrigus.

3270.   Plaintiff David Garrigus is a citizen of the United States and domiciled in the State of Washington. He is the stepfather of Mickel D. Garrigus.

3271.   Plaintiff Nichole Garrigus was a citizen of the United States and domiciled in the State of Washington. She is the sister of Mickel D. Garrigus. Nichole Garrigus died on July 19, 2020.

3272.   Plaintiff Kyla Ostenson is a citizen of the United States and domiciled in the State of Washington. She is the sister of Mickel D. Garrigus.

3273.   Plaintiff Matthew Garrigus is a citizen of the United States and domiciled in the State of Washington. He is the brother of Mickel D. Garrigus. He brings his claims individually and on behalf of the Estate of Nichole Garrigus, as its legal representative.

3274.   As a result of the attack, and the death of Mickel D. Garrigus, Plaintiffs Deadra Garrigus, David Garrigus, Nichole Garrigus, Kyla Ostenson and Matthew Garrigus, individually and on behalf of the Estate of Nichole Garrigus, have experienced severe mental anguish, extreme

emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice, and counsel.

### 79. The February 1, 2007, Attack–Baghdad

#### a) The Ryan Family

3275. Plaintiff Shawn Ryan is a citizen of the United States and domiciled in the State of Texas.

3276. On February 1, 2007, Shawn Ryan was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3277. The weapon used to injure Shawn Ryan was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3278. As a result of the attack, Mr. Ryan sustained shrapnel injuries that left him permanently disabled.

3279. As a result of the attack, and the injuries he suffered, Plaintiff Shawn Ryan has experienced severe physical and mental anguish and extreme emotional pain and suffering.

### 80. The February 2, 2007, Attack–Mahmudiyah

#### a) The Dunn Family

3280. Terrence Dunn was a citizen of the United States and domiciled in the State of Texas when he was killed in Iraq.

3281. On February 2, 2007, Terrence Dunn, aged 38, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3282. Terrence Dunn was killed in the attack.

3283. The weapon used to kill Terrence Dunn was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3284. Plaintiff Sharon Y. Dunn Smith is a citizen of the United States and domiciled in the State of Texas. She is the sister of Terrence Dunn.

3285. Plaintiff Sharon Y. Dunn Smith brings an action individually and on behalf of the Estate of Terrence Dunn, as its legal representative.

3286. Plaintiff Dennis Dunn is a citizen of the United States and domiciled in the State of New Mexico. He is the brother of Terrence Dunn.

3287. As a result of the attack, and the death of Terrence Dunn, Plaintiffs Sharon Y. Dunn Smith and Dennis Dunn have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their brother's society, companionship, comfort, advice, and counsel.

### b) The Landeck Family

3288. Kevin C. Landeck was a citizen of the United States and domiciled in the State of Illinois when he was killed in Iraq.

3289. On February 2, 2007, Kevin C. Landeck, aged 26, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3290. Kevin C. Landeck was killed in the attack.

3291. The weapon used to kill Kevin C. Landeck was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3292. Plaintiff Richard Landeck is a citizen of the United States and domiciled in the State of Illinois. He is the father of Kevin C. Landeck.

3293.   Plaintiff Victoria Landeck is a citizen of the United States and domiciled in the State of Illinois. She is the mother of Kevin C. Landeck.

3294.   As a result of the attack, and the death of Kevin C. Landeck, Plaintiffs Richard Landeck and Victoria Landeck have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's society, companionship, comfort, advice, and counsel.

### 81.   The February 26, 2007, Attack–Diwaniyah

#### a)  *The Beardsley Family*

3295.   William J. Beardsley was a citizen of the United States and domiciled in the State of Minnesota when he was killed in Iraq.

3296.   On February 26, 2007, William J. Beardsley, aged 25, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3297.   William J. Beardsley was killed in the attack.

3298.   The weapon used to kill William J. Beardsley was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3299.   Plaintiff Lavonna Harper is a citizen of the United States and domiciled in the State of Oklahoma. She is the mother of William J. Beardsley.

3300.   As a result of the attack, and the death of William J. Beardsley, Plaintiff Lavonna Harper has experienced the loss of her son's society, companionship, comfort, advice, and counsel.

### 82.   The March 20, 2007, Attack–Baghdad

#### a)  *The Glawson Family*

3301.   Curtis E. Glawson was a citizen of the United States and domiciled in the State of Alabama when he was killed in Iraq.

3302. On March 20, 2007, Curtis E. Glawson, aged 24, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3303. Curtis E. Glawson was killed in the attack.

3304. The weapon used to kill Curtis E. Glawson was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3305. Hyunjung Glawson is domiciled in the State of Florida. She is the widow of Curtis E. Glawson.

3306. Hyunjung Glawson brings an action on behalf of the Estate of Curtis E. Glawson, as its legal representative, for his death and any suffering and/ or economic loss he/his Estate sustained as a result of the attack.

3307. Plaintiff Jazmon Reyna is a citizen of the United States and domiciled in the State of Arizona. She is the sister of Curtis E. Glawson.

3308. As a result of the attack, and the death of Curtis E. Glawson, Plaintiff Jazmon Reyna has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her brother's society, companionship, comfort, advice, and counsel.

**83. The March 27, 2007, Attack–Baghdad**

   *a) The Thomas Family*

3309. Sean M. Thomas was a citizen of the United States and domiciled in the State of Pennsylvania when he was killed in Iraq.

3310. On March 27, 2007, Sean M. Thomas, aged 33, was serving in the U.S. military when he was killed in a 107mm rocket attack perpetrated by JAM Special Groups operatives.

3311. Sean M. Thomas was killed in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC–QF and Hezbollah.

3312.   Plaintiff Carrie Thompson is a citizen of the United States and domiciled in the State of Pennsylvania. She is the widow of Sean M. Thomas.

3313.   Plaintiff Carrie Thompson brings a claim individually and on behalf of the Estate of Sean M. Thomas, as its legal representative.

3314.   Plaintiff A.T., a minor represented by her legal guardian, Carrie Thompson, is a citizen of the United States and domiciled in the State of Pennsylvania. She is the daughter of Sean M. Thomas.

3315.   Plaintiff Daniel Thomas, Sr. is a citizen of the United States and domiciled in the State of Pennsylvania. He is the father of Sean M. Thomas.

3316.   Plaintiff Diana Thomas is a citizen of the United States and domiciled in the State of Pennsylvania. She is the mother of Sean M. Thomas.

3317.   Plaintiff Daniel Thomas, Jr. is a citizen of the United States and domiciled in the State of Pennsylvania. He is the brother of Sean M. Thomas.

3318.   Plaintiff Kelly Gillis is a citizen of the United States and domiciled in the State of Pennsylvania. She is the sister of Sean M. Thomas.

3319.   Plaintiff Melinda Flick is a citizen of the United States and domiciled in the State of Pennsylvania. She is the sister of Sean M. Thomas.

3320.   As a result of the attack, and the death of Sean M. Thomas, Plaintiffs Carrie Thompson, A.T., Daniel Thomas Sr., Diana Thomas, Daniel Thomas Jr., Kelly Gillis and Melinda Flick have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's/son's/brother's society, companionship, comfort, advice, and counsel.

84. **The April 4, 2007, Attack–Nasiriyah**

   *a) The Sabinish Family*

3321.   Plaintiff Ryan Sabinish is a citizen of the United States and domiciled in the State of Minnesota.

3322.   On April 4, 2007, Ryan Sabinish, then 25, was serving in the U.S. military in Iraq.

3323.   Mr. Sabinish was driving the third vehicle of a convoy when an EFP emplaced by Special Groups detonated near the first vehicle. During the attack, a secondary IED detonated, striking an Iraqi civilian vehicle.

3324.   The weapon used in the attack was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3325.   Mr. Sabinish dismounted his vehicle to pull security and would not allow the civilian vehicle to drive away from the scene. He witnessed a wounded child inside the vehicle die.

3326.   Mr. Sabinish was subsequently diagnosed with PTSD and has experienced suicidal ideation. He has been hospitalized for his emotional injuries and has sought mental health treatment as an outpatient.

3327.   Mr. Sabinish continues to seek treatment, including counseling, and has been prescribed anti-anxiety medications, anti-depressants, and medication to address sleep-related issues. He continues to take medication to treat his emotional injuries.

3328.   As a result of the attack, and the injuries he suffered, Ryan Sabinish has experienced severe physical and mental anguish and extreme emotional pain and suffering.

3329.   Plaintiff R.J.S., a minor represented by her legal guardian Ryan Sabinish, is a citizen of the United States and domiciled in the State of Minnesota. She is the daughter of Ryan Sabinish.

3330.   Plaintiff S.J.S., a minor represented by her legal guardian Ryan Sabinish, is a citizen of the United States and domiciled in the State of Minnesota. She is the daughter of Ryan Sabinish.

3331.   As a result of the attack, and the injuries suffered by Ryan Sabinish, Plaintiffs R.J.S. and S.J.S. have experienced severe mental anguish, and extreme emotional pain and suffering.

**85.    The April 6, 2007, Attack–Baghdad**

*a)  The Fuentes Family*

3332.   Daniel A. Fuentes was a citizen of the United States and domiciled in the State of New York when he was killed in Iraq.

3333.   On April 6, 2007, Daniel A. Fuentes, aged 19, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3334.   Daniel A. Fuentes was killed in the attack.

3335.   The weapon used to kill Daniel A. Fuentes was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3336.   Plaintiff Emma McGarry is a citizen of the United States and domiciled in the State of New York. She was the fiancée of Daniel A. Fuentes.

3337.   As a result of the attack, and the death of Daniel A. Fuentes, Plaintiff Emma McGarry has experienced the loss of her fiancée's society, companionship, comfort, advice, and counsel.

**86.    The April 6, 2007, Attack–Sadr City**

     *a)  The Kirby Family*

3338.    Plaintiff John Kirby is a citizen of the United States and domiciled in the State of Texas.

3339.    On April 6, 2007, John Kirby, then 31, was serving in the U.S. military in Iraq when both an EFP and an ambulance rigged with explosives detonated near his vehicle.

3340.    The weapon used to injure John Kirby was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3341.    As a result of the attack, Mr. Kirby suffered burns on his upper back. He also suffers from TBI and PTSD.

3342.    As a result of the attack, and the injuries he suffered, Plaintiff John Kirby has experienced severe physical and mental anguish and extreme emotional pain and suffering.

**87.    The April 7, 2007, Attack–Baghdad**

     *a)  The Murphy-Sweet Family*

3343.    Philip A. Murphy-Sweet was a citizen of the United States and domiciled in the State of Idaho when he was killed in Iraq.

3344.    On April 7, 2007, Philip A. Murphy-Sweet, aged 42 was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3345.    Philip A. Murphy-Sweet was killed in the attack.

3346.    The weapon used to kill Philip A. Murphy-Sweet was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3347.   Plaintiff Michael Murphy-Sweet is a citizen of the United States and domiciled in the State of Idaho. He is the brother of Philip A. Murphy-Sweet.

3348.   Plaintiff Elizabeth Murphy-Sweet is a citizen of the United States and domiciled in the State of Idaho. She is the sister of Philip A. Murphy-Sweet.

3349.   Plaintiff Anona Gonelli is a citizen of the United States and domiciled in the State of Idaho. She is the sister of Philip A. Murphy-Sweet.

3350.   As a result of the attack, and the death of Philip A. Murphy-Sweet, Plaintiffs Michael Murphy-Sweet, Elizabeth Murphy-Sweet and Anona Gonelli have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their brother's society, companionship, comfort, advice, and counsel.

### 88.    The April 9, 2007, Attack–Baghdad

#### a)  The Walton Family

3351.   Brett A. Walton was a citizen of the United States and domiciled in the State of Oregon when he was killed in Iraq.

3352.   On April 9, 2007, Brett A. Walton, aged 37, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3353.   Brett A. Walton was killed in the attack.

3354.   The weapon used to kill Brett A. Walton was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3355.   Plaintiff Lindsay Young is a citizen of the United States and domiciled in the State of Oregon. She is the widow of Brett A. Walton.

3356.   Richard Strange brings an action on behalf of the Estate of Brett A. Walton, as its legal representative.

3357. Plaintiff Sydney Walton is a citizen of the United States and domiciled in the State of Oregon. She is the daughter of Brett A. Walton.

3358. As a result of the attack, and the death of Brett A. Walton, Plaintiffs Lindsay Young and Sydney Walton have experienced the loss of their husband's/father's society, companionship, comfort, advice, and counsel.

### b) The Holden Family

3359. Brian L. Holden was a citizen of the United States and domiciled in the State of North Carolina when he was killed in Iraq.

3360. On April 9, 2007, Brian L. Holden, aged 20, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near his HMMWV in Baghdad.

3361. Brian L. Holden was killed in the attack.

3362. The weapon used to kill Brian L. Holden was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3363. Plaintiff Leasa Dollar is a citizen of the United States and domiciled in the State of North Carolina. She is the mother of Brian L. Holden.

3364. Plaintiff Eugene DeLozier is a citizen of the United States and domiciled in the State of Washington. He is the stepfather of Brian L. Holden.

3365. As a result of the attack, and the death of Brian L. Holden, Plaintiffs Leasa Dollar and Eugene DeLozier have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's society, companionship, comfort, advice, and counsel.

**89.    The April 28, 2007, Attack–Baghdad**

   *a) The Stevens Family*

3366.    Plaintiff Jared S. Stevens is a citizen of the United States and domiciled in the State of Maryland.

3367.    On April 28, 2007, Jared S. Stevens was serving in the U.S. military in Iraq when he came under sniper fire by JAM Special Groups.

3368.    Jared S. Stevens was injured in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC–QF and Hezbollah.

3369.    As a result of the attack, Mr. Stevens was shot in the lip, lacerating it.

3370.    As a result of the attack, and the injuries he suffered, Plaintiff Jared S. Stevens has experienced severe physical and mental anguish and extreme emotional pain and suffering.

**90.    The April 28, 2007, Attack–Salman Pak**

   *a) The Hicks Family*

3371.    Glenn Dale Hicks, Jr. was a citizen of the United States and domiciled in the State of Texas.

3372.    On April 28, 2007, Glenn Dale Hicks, Jr., then 24, was serving in the U.S. military in Iraq when an IED emplaced by Special Groups detonated the near his vehicle. His unit was on a routine patrol heading southwest on Route Kelp in the vicinity of Salman Pak, Iraq when the M1151 in which he was traveling was struck by an IED and subsequent small arms fire.

3373.    Glenn Dale Hicks, Jr. was killed in the attack from blast injuries.

3374.    The Iraqi Special Groups terror cell operatives that emplaced the IED that killed Glenn Dale Hicks, Jr. were trained by Hezbollah and funded and supplied by the IRGC–QF and they launched the attack at the direction of both Hezbollah and the IRGC–QF, as their proxy.

3375.   Plaintiff Susan Maria Doskocil Hicks is a citizen of the United States and domiciled in the State of Texas. She is the mother of Glenn Dale Hicks, Jr.

3376.   Plaintiff Susan Maria Doskocil Hicks brings an action individually and on behalf of the Estate of Glenn Dale Hicks, Jr., as its legal representative.

3377.   Plaintiff Glenn Dale Hicks, Sr. is a citizen of the United States and domiciled in the State of Texas. He is the father of Glenn Dale Hicks, Jr.

3378.   Plaintiff David James Hicks is a citizen of the United States and domiciled in the State of Texas. He is the brother of Glenn Dale Hicks, Jr.

3379.   Plaintiff John Christopher Hicks is a citizen of the United States and domiciled in the State of Texas. He is the brother of Glenn Dale Hicks, Jr.

3380.   Plaintiff Samuel Lee Hicks is a citizen of the United States and domiciled in the State of Texas. He is the brother of Glenn Dale Hicks, Jr.

3381.   As a result of the attack, and the death of Glenn Dale Hicks, Jr., Plaintiffs Susan Maria Doskocil Hicks, Glenn Dale Hicks, Sr., David James Hicks, John Christopher Hicks, and Samuel Lee Hicks have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice, and counsel.

**91.     The April 29, 2007, Attack–Baghdad**

*a) The Martin Family*

3382.   Jay E. Martin was a citizen of the United States and domiciled in the State of Maryland when he was killed in Iraq.

3383.   On April 29, 2007, Jay E. Martin, aged 29, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his unit.

3384.   Jay E. Martin was killed in the attack.

3385. The weapon used to kill Jay E. Martin was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3386. Plaintiff Dwight Martin is a citizen of the United States and domiciled in the State of Maryland. He is the father of Jay E. Martin.

3387. Plaintiff Dwight Martin brings an action individually and on behalf of the Estate of Jay E. Martin, as its legal representative.

3388. Plaintiff Dove Deanna Adams is a citizen of the United States and domiciled in the State of Maryland. She is the sister of Jay E. Martin.

3389. Plaintiff Raven Adams is a citizen of the United States and domiciled in the State of Maryland. She is the sister of Jay E. Martin.

3390. Plaintiff Lark Adams is a citizen of the United States and domiciled in the State of Maryland. She is the sister of Jay E. Martin.

3391. As a result of the attack, and the death of Jay E. Martin, Plaintiffs Dwight Martin, Dove Deanna Adams, Raven Adams and Lark Adams have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their brother's/son's society, companionship, comfort, advice, and counsel.

**92.    The May 3, 2007, Attack–Musayyib**

*a) The Umbrell Family*

3392. Colby J. Umbrell was a citizen of the United States and domiciled in the State of Pennsylvania when he was killed in Iraq.

3393. On May 3, 2007, Colby J. Umbrell aged 26, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3394. Colby J. Umbrell was killed in the attack.

3395.   The weapon used to kill Colby J. Umbrell was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3396.   Plaintiff Casey Boehmer is a citizen of the United States and domiciled in the State of Maryland. She is the sister of Colby J. Umbrell.

3397.   As a result of the attack, and the death of Colby J. Umbrell, Plaintiff Casey Boehmer has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her brother's society, companionship, comfort, advice, and counsel.

**93.    The May 5, 2007, Attack–Kamaliyah**

   *a)  The Smith Family*

3398.   Plaintiff Jeremy D. Smith is a citizen of the United States and domiciled in the State of North Carolina.

3399.   On May 5, 2007, Jeremy D. Smith was serving in the U.S. military in COP Bushmaster in Kamaliyah, Iraq when he was injured in a mortar attack perpetrated by JAM Special Groups operatives.

3400.   Jeremy D. Smith was injured in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC–QF and Hezbollah.

3401.   As a result of the attack, Jeremy Smith suffered shrapnel injuries to his right arm and right leg. He also suffered a damaged a ligament in his right ankle.

3402.   As a result of the attack, and the injuries he suffered, Plaintiff Jeremy D. Smith has experienced severe physical and mental anguish and extreme emotional pain and suffering.

94. **The May 6, 2007, Attack–Baghdad**

   *a) The Dixon Family*

3403.   Robert J. Dixon was a citizen of the United States and domiciled in the State of Minnesota when he was killed in Iraq.

3404.   On May 6, 2007, Robert J. Dixon aged 27, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3405.   Robert J. Dixon was killed in the attack.

3406.   The weapon used to kill Robert J. Dixon was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3407.   Plaintiff Michael Rice is a citizen of the United States and domiciled in the State of Michigan. He is the son of Robert J. Dixon.

3408.   Plaintiff Logan Rice is a citizen of the United States and domiciled in the State of Michigan. He is the son of Robert J. Dixon.

3409.   Plaintiff David Dixon is a citizen of the United States and domiciled in the State of Michigan. He is the brother of Robert J. Dixon.

3410.   Plaintiff Daniel Austin Dixon is a citizen of the United States and domiciled in the State of Michigan. He is the brother of Robert J. Dixon.

3411.   Plaintiff Gretchen Lang is a citizen of the United States and domiciled in the State of Michigan. She is the sister of Robert J. Dixon.

3412.   As a result of the attack, and the death of Robert J. Dixon, Plaintiffs Michael Rice, Logan Rice, David Dixon, Daniel Austin Dixon and Gretchen Lang have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their father's/brother's society, companionship, comfort, advice, and counsel.

### 95. The May 9, 2007, Attack–Al-Hillah

#### a) The Conner Family

3413. Bradly D. Conner was a citizen of the United States and domiciled in the State of Idaho when he was killed in Iraq.

3414. On May 9, 2007, Bradly D. Conner, aged 41, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3415. Bradly D. Conner was killed in the attack.

3416. The weapon used to kill Bradly D. Conner was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3417. Plaintiff Cynthia Conner is a citizen of the United States and domiciled in the State of Alabama. She is the widow of Bradly D. Conner.

3418. As a result of the attack, and the death of Bradly D. Conner, Plaintiff Cynthia Conner has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her husband's companionship, comfort, advice, and counsel.

### 96. The May 14, 2007, Attack–Baghdad

#### a) The Brooks Family

3419. Plaintiff Joshua Brooks is a citizen of the United States and domiciled in the State of Tennessee.

3420. On May 14, 2007, Joshua Brooks, then 21, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups hit the HMMWV in which he was traveling in Baghdad.

3421. The weapon used to injure Joshua Brooks was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3422.   The blast shattered Mr. Brooks' left fibula.

3423.   Mr. Brooks also suffered tissue loss in his left leg, nerve and tendon damage in his left foot and ankle and scarring on his left foot.

3424.   Mr. Brooks has undergone over twenty surgeries to treat his injuries. His injuries have also necessitated extensive physical therapy.

3425.   Mr. Brooks was diagnosed with PTSD and a TBI. He has been prescribed medication and has sought counseling to treat the emotional impact of the attack.

3426.   As a result of the attack, and the injuries he suffered, Plaintiff Joshua Brooks has experienced severe physical and mental anguish and extreme emotional pain and suffering.

3427.   Plaintiff Joyce Brooks is a citizen of the United States and domiciled in the State of Kentucky. She is the mother of Joshua Brooks.

3428.   Plaintiff Danny Brooks is a citizen of the United States and domiciled in the State of Kentucky. He is the father of Joshua Brooks.

3429.   Plaintiff Daniel Tyler Brooks is a citizen of the United States and domiciled in the State of Kentucky. He is the brother of Joshua Brooks.

3430.   As a result of the attack, and the injuries Joshua Brooks has suffered, Plaintiffs Joyce Brooks, Danny Brooks and Daniel Tyler Brooks have experienced severe mental anguish and extreme emotional pain and suffering.

## 97.   The May 18, 2007, Attack–Baghdad

### a)  The Brown Family

3431.   Scott J. Brown was a citizen of the United States and domiciled in the State of Colorado when he was killed in Iraq.

3432.   On May 18, 2007, Scott J. Brown, aged 33, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3433.   Scott J. Brown was killed in the attack.

3434.   The weapon used to kill Scott J. Brown was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3435.   Plaintiff Delilah Brown is a citizen of the United States and domiciled in the State of Tennessee. She is the widow of Scott J. Brown.

3436.   Plaintiff Delilah Brown brings an action individually and on behalf of the Estate of Scott J. Brown, as its legal representative.

3437.   As a result of the attack, and the death of Scott J. Brown, Plaintiff Delilah Brown has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her husband's society, companionship, comfort, advice, and counsel.

**98.     The May 29, 2007, Attack–Sadr City**

*a)  The Kirby Family*

3438.   Plaintiff John Kirby is a citizen of the United States and domiciled in the State of Texas.

3439.   On May 29, 2007, John Kirby, then 31, was serving in the U.S. military in Iraq when he came under sniper fire by JAM Special Groups.

3440.   John Kirby was injured in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC–QF and Hezbollah.

3441.   As a result of the attack, Mr. Kirby was shot in the arm breaking his humerus in three places and later requiring an implant.

3442.   As a result of the attack, and the injuries he suffered, Plaintiff John Kirby has experienced severe physical and mental anguish and extreme emotional pain and suffering.

99.   **The June 2, 2007, Attack–Baghdad**

   a) *The Dressler Family*

3443.   Shawn E. Dressler was a citizen of the United States and domiciled in the State of California when he was killed in Iraq.

3444.   On June 2, 2007, Shawn E. Dressler, aged 22, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3445.   Shawn E. Dressler was killed in the attack.

3446.   The weapon used to kill Shawn E. Dressler was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3447.   Plaintiff Tanya Suzzette Dressler is a citizen of the United States and domiciled in the State of Arizona. She is the sister of Shawn E. Dressler.

3448.   Plaintiff Daniel Dressler is a citizen of the United States and domiciled in the State of Virginia. He is the brother of Shawn E. Dressler.

3449.   Plaintiff James Dressler is a citizen of the United States and domiciled in the State of Virginia. He is the brother of Shawn E. Dressler.

3450.   As a result of the attack, and the death of Shawn E. Dressler, Plaintiffs Tanya Suzzette Dressler, Daniel Dressler and James Dressler have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their brother's society, companionship, comfort, advice, and counsel.

100.   **The June 6, 2007, Attack–Baghdad**

   a) *The Gajdos Family*

3451.   Shawn D. Gajdos was a citizen of the United States and domiciled in the State of Michigan when he was killed in Iraq.

3452.   On June 6, 2007, Shawn D. Gajdos, aged 25, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3453.   Shawn D. Gajdos was killed in the attack.

3454.   The weapon used to kill Shawn D. Gajdos was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3455.   Plaintiff Derek Gajdos is a citizen of the United States and domiciled in the State of Michigan. He is the brother of Shawn D. Gajdos.

3456.   Plaintiff Tammie DenBoer is a citizen of the United States and domiciled in the State of Michigan. She is the sister of Shawn D. Gajdos.

3457.   As a result of the attack, and the death of Shawn D. Gajdos, Plaintiffs Derek Gajdos and Tammy DenBoer have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their brother's society, companionship, comfort, advice, and counsel.

**101.   The June 8, 2007, Attack–Baghdad**

   *a)  The Campbell Family*

3458.   Plaintiff Brandeaux Campbell is a citizen of the United States and domiciled in the State of Texas.

3459.   On June 8, 2007, Brandeaux Campbell, then 20, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near the vehicle.

3460.   The weapon used to injure Mr. Campbell was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3461.   Brandeaux Campbell was severely wounded in the attack resulting in a concussion, slicing open his forehead, mouth, and tongue, and lodging shrapnel in both his shoulder and leg.

3462.   As a result of the attack, and the injuries he suffered, Plaintiff Brandeaux Campbell has experienced severe physical and mental anguish and extreme emotional pain and suffering.

### b) The Wilson Family

3463.   Plaintiff Ryan Wilson is a citizen of the United States and domiciled in the State of Florida.

3464.   On June 8, 2007, Ryan Wilson was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near the vehicle.

3465.   The weapon used to injure Mr. Wilson was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3466.   Ryan Wilson was severely wounded in the attack resulting in shrapnel wounds to his right arm.

3467.   As a result of the attack, and the injuries he suffered, Plaintiff Ryan Wilson has experienced severe physical and mental anguish and extreme emotional pain and suffering.

3468.   Plaintiff Jami Lin Wilson is a citizen of the United States and domiciled in the State of Florida. She is the wife of Ryan Wilson.

3469.   As a result of the attack, and the injuries Ryan Wilson has suffered, Plaintiff Jami Lin Wilson has experienced severe mental anguish and extreme emotional pain and suffering.

### 102.   The June 10, 2007, Attack–Baghdad

### a) The Lammers Family

3470.   Plaintiff Matthew Lammers is a citizen of the United States and domiciled in the State of North Carolina.

3471.   On June 10, 2007, Matthew Lammers, then 25, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3472.    Matthew Lammers was injured in the attack.

3473.    The weapon used to injure Matthew Lammers was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3474.    As a result of the attack, Matthew Lammers' left hand was completely severed. Both of his legs were nearly severed below his kneecaps.

3475.    His femoral arteries had been cut and he lost a significant amount of blood.

3476.    After the attack he began to asphyxiate due to his lungs filling with bodily fluids. Mr. Lammers remained conscious while this occurred.

3477.    Mr. Lammers' injuries necessitated that he undergo surgery to fully amputate both of his legs below the knees. He has been rendered a triple amputee.

3478.    He underwent multiple procedures and frequent wound cleanings. His treatment included debridement of muscle tissue.

3479.    Mr. Lammers has prosthetics to assist with the use of his left hand. He must use a wheelchair to ambulate.

3480.    He has experienced and continues to experience severe phantom limb pain and pain in his back.

3481.    He has undergone extensive physical therapy.

3482.    He has been diagnosed with a TBI.

3483.    Mr. Lammers has also been diagnosed with PTSD and depression and has received treatment and counseling. He has been prescribed medication to address both the pain and emotional impact of the attack.

3484. Mr. Lammers continues to experience pain and emotional distress each day and he receives continuing treatment for his injuries.

3485. As a result of the attack, and the injuries he suffered, Plaintiff Matthew Lammers has experienced severe physical and mental anguish and extreme emotional pain and suffering.

3486. Plaintiff Alicia Lammers is a citizen of the United States and domiciled in the state of North Carolina. She is the wife of Matthew Lammers.

3487. Plaintiff Barbara Lammers is a citizen of the United States and domiciled in the state of Kansas. She is the mother of Matthew Lammers.

3488. Plaintiff Gary Lammers is a citizen of the United States and domiciled in the state of Kansas. He is the father of Matthew Lammers.

3489. Plaintiff Stacy Pate is a citizen of the United States and domiciled in the state of Kansas. She is the sister of Matthew Lammers.

3490. As a result of the attack, and the injuries Matthew Lammers has suffered, Plaintiffs Alicia Lammers, Barbara Lammers, Gary Lammers and Stacy Pate have experienced severe mental anguish and extreme emotional pain and suffering.

### b) The Gomez Family

3491. Plaintiff Angel Gomez is a citizen of the United States and domiciled in the State of Texas.

3492. On June 10, 2007, Angel Gomez, then 20, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near the vehicle in which he was traveling in Baghdad.

3493. The weapon used to injure Angel Gomez was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3494.   The blast injured Mr. Gomez's right leg, necessitating its amputation below the knee.

3495.   Angel Gomez sustained shrapnel to his back, which resulted in complete muscle atrophy in his back.

3496.   Angel Gomez was wearing Interceptor Body Armor ("IBA"), which included ballistic plates to protect his abdomen. The shrapnel hit the IBA plates, which slit Mr. Gomez's abdomen open and caused internal injuries.

3497.   Mr. Gomez was also diagnosed with a concussion, a TBI, and PTSD.

3498.   Mr. Gomez lived in a hospital for a year and a half while receiving treatment and undergoing numerous surgeries. He has been prescribed medication to treat his injuries.

3499.   As a result of the attack, and the injuries he suffered, Plaintiff Angel Gomez has experienced severe physical and mental anguish and extreme emotional pain and suffering.

**103.   The June 11, 2007, Attack–Baghdad**

*a)   The Payne Family*

3500.   Cameron K. Payne was a citizen of the United States and domiciled in the State of California when he was killed in Iraq.

3501.   On June 11, 2007, Cameron K. Payne, aged 22, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3502.   Cameron K. Payne was killed in the attack.

3503.   The weapon used to kill Cameron K. Payne was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3504.   Plaintiff Denise Jackson is a citizen of the United States and domiciled in the State of California. She is the mother of Cameron K. Payne.

3505. As a result of the attack, and the death of Cameron K. Payne, Plaintiff Denise Jackson has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her son's society, companionship, comfort, advice, and counsel.

**104. The June 14, 2007, Attack–Scania**

*a) The Moores Family*

3506. Plaintiff Andrew Moores is a citizen of the United States and domiciled in the State of Maine.

3507. On June 14, 2007, Andrew Moores, then 23, was serving in the United States military in Iraq. Mr. Moores was the truck commander in a gun truck that was part of a convoy tasked with escorting military vehicles between Kuwait and Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3508. The weapon used to injure Andrew Moores was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3509. As a result of the attack, Andrew Moores took shrapnel in his left hand and suffered injury to his right shoulder, which necessitated surgery and physical therapy. He experiences limitations on his shoulder movement to this day.

3510. Mr. Moores also injured his neck as a result of the attack and takes medication for pain.

3511. Andrew Moores was diagnosed with PTSD, for which he sought counseling. He takes medication for his PTSD, as well as medication for the sleep issues he experiences stemming from the attack.

3512. As a result of the attack, and the injuries he suffered, Plaintiff Andrew Moores has experienced severe physical and mental anguish and extreme emotional pain and suffering.

**105. The June 17, 2007 Attack–Baghdad**

*a) The Tracy Family*

3513.   Jacob Tracy was a citizen of the United States and domiciled in the State of Illinois when he was killed in Iraq.

3514.   On June 17, 2007, Jacob Tracy, aged 20, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near the vehicle in which he was traveling in Baghdad.

3515.   Jacob Tracy was injured in the attack and died on June 18, 2007 from the injuries he sustained in the attack.

3516.   The weapon used to kill Jacob Tracy was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3517.   Plaintiff Sheila Tracy is a citizen of the United States and domiciled in the State of Illinois. She is the mother of Jacob Tracy.

3518.   Plaintiff Sheila Tracy brings an action individually and on behalf of the Estate of Jacob Tracy, as its legal representative.

3519.   Plaintiff Donald Tracy is a citizen of the United States and domiciled in the State of Illinois. He is the father of Jacob Tracy.

3520.   Plaintiff Nichole Sweeney is a citizen of the United States and domiciled in the State of Illinois. She is the sister of Jacob Tracy.

3521.   Plaintiff Christina Sheridan is a citizen of the United States and domiciled in the State of Illinois. She is the sister of Jacob Tracy.

3522.   As a result of the attack, and the death of Jacob Tracy, Plaintiffs Sheila Tracy, Donald Tracy, Nichole Sweeney, and Christina Sheridan have experienced severe mental anguish,

extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice, and counsel.

### b) The Benson Family

3523.   Plaintiff Matthew Benson is a citizen of the United States and domiciled in the State of Arizona.

3524.   On June 17, 2007, Matthew Benson, then 28, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near the vehicle in which he was traveling in Baghdad.

3525.   The weapon used to injure Matthew Benson was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3526.   As a result of the attack, Matthew Benson sustained a skull fracture.

3527.   Copper shavings were embedded in Matthew Benson's body.

3528.   Mr. Benson also sustained burns and bruising on his back as well as lacerations to his hands, face, and head.

3529.   Mr. Benson has experienced severe headaches.

3530.   Mr. Benson has been diagnosed with PTSD.

3531.   As a result of the attack, and the injuries he suffered, Plaintiff Matthew Benson has experienced severe physical and mental anguish and extreme emotional pain and suffering.

3532.   Plaintiff Melissa Benson is a citizen of the United States and domiciled in the State of Arizona. She is the wife of Matthew Benson.

3533.   Plaintiff C.B., a minor represented by his legal guardian, Matthew Benson, is a citizen of the United States and domiciled in the State of Arizona. He is the son of Matthew Benson.

3534. Plaintiff Brock Benson is a citizen of the United States and domiciled in the State of Arizona. He is the son of Matthew Benson.

3535. Plaintiff Daniel P. Benson is a citizen of the United States and domiciled in the State of Kansas. He is the father of Matthew Benson.

3536. Plaintiff Carol Benson is a citizen of the United States and domiciled in the State of Kansas. She is the mother of Matthew Benson.

3537. Plaintiff Daniel R. Benson is a citizen of the United States and domiciled in the State of Kansas. He is the brother of Matthew Benson.

3538. As a result of the attack, and the injuries Matthew Benson has suffered, Plaintiffs Melissa Benson, C.B., Brock Benson, Daniel P. Benson, Carol Benson and Daniel R. Benson have experienced severe mental anguish, and extreme emotional pain and suffering.

**106. The June 23, 2007, Attack–Baghdad**

*a) The Moody Family*

3539. Michael Dean Moody, Jr. was a citizen of the United States and domiciled in the State of Virginia.

3540. On June 23, 2007, Michael Dean Moody, Jr., then 21, was serving in the U.S. military in Iraq when an IED emplaced by JAM Special Groups detonated near his vehicle while patrolling south of Sadr City. The IED strike was followed by small arms fire in the vicinity of the explosion.

3541. Michael Dean Moody, Jr. was killed in the attack.

3542. Michael Dean Moody, Jr. was killed in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC–QF and Hezbollah.

3543. Plaintiff Michael Dean Moody, Sr. is a citizen of the United States and domiciled in the State of Virginia. He is the father of Michael Dean Moody, Jr.

3544.   Plaintiff Michael Dean Moody, Sr. brings an action individually and on behalf of the Estate of Michael Dean Moody, Jr., as its legal representative.

3545.   Plaintiff Connie Moody is a citizen of the United States and domiciled in the State of Virginia. She is the mother of Michael Dean Moody, Jr.

3546.   Plaintiff Kedrick Dante Moody is a citizen of the United States and domiciled in the State of Virginia. He is the brother of Michael Dean Moody, Jr.

3547.   As a result of the attack, and the death of Michael Dean Moody, Jr., Plaintiffs Michael Dean Moody, Sr., Connie Moody, and Kedrick Dante Moody have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice, and counsel.

### 107.   The June 25, 2007, Attack–Baghdad

#### a)   The Edwards Family

3548.   Plaintiff Drew Edwards is a citizen of the United States and domiciled in the State of Missouri.

3549.   On June 25, 2007, Drew Edwards, then 22, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near the vehicle in which he was traveling in Baghdad.

3550.   The weapon used to injure Drew Edwards was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3551.   As a result of the attack, Drew Edwards suffered an injury to his neck.

3552.   Mr. Edwards has been diagnosed with a TBI.

3553.   Mr. Edwards was also diagnosed with PTSD. He has been prescribed medication to address the emotional impact of the attack.

3554.    As a result of the attack, and the injuries he suffered, Plaintiff Drew Edwards has experienced physical pain, severe mental anguish and extreme emotional pain and suffering.

3555.    Plaintiff Donielle Edwards is a citizen of the United States and domiciled in the State of Missouri. She is the wife of Drew Edwards.

3556.    As a result of the attack, and the injuries Drew Edwards has suffered, Plaintiff Donielle Edwards has experienced severe mental anguish and extreme emotional pain and suffering.

### b)  The Craig Family

3557.    Andre Craig, Jr. was a citizen of the United States and domiciled in the State of Connecticut when he was killed in Iraq.

3558.    On June 25, 2007, Andre Craig, Jr., aged 24, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3559.    Andre Craig, Jr. was killed in the attack.

3560.    The weapon used to kill Andre Craig, Jr. was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3561.    Plaintiff Arifah Hardy is a citizen of the United States and domiciled in the State of Connecticut. She was the fiancée of Andre Craig, Jr.

3562.    Plaintiff T.C., a minor represented by her legal guardian, Arifah Hardy, is a citizen of the United States and domiciled in the State of Connecticut. She is the daughter of Andre Craig, Jr.

3563.    Plaintiff Aundra Craig is a citizen of the United States and domiciled in the State of Connecticut. He is the father of Andre Craig, Jr.

3564.   Plaintiff Joyce Craig is a citizen of the United States and domiciled in the State of Connecticut. She is the mother of Andre Craig, Jr.

3565.   Plaintiff Debra Cook-Russell is a citizen of the United States and domiciled in the State of Connecticut. She is the sister of Andre Craig, Jr.

3566.   Plaintiff Nashima Williams Craig is a citizen of the United States and domiciled in the State of Connecticut. She is the sister of Andre Craig, Jr.

3567.   Plaintiff Matthew Craig is a citizen of the United States and domiciled in the State of Connecticut. He is the brother of Andre Craig, Jr.

3568.   Plaintiff Jonathan Craig is a citizen of the United States and domiciled in the State of Connecticut. He is the brother of Andre Craig, Jr.

3569.   Plaintiff Andre Brown is a citizen of the United States and domiciled in the State of Connecticut. He is the brother of Andre Craig, Jr.

3570.   Plaintiff Michael Cook is a citizen of the United States and domiciled in the State of Connecticut. He is the brother of Andre Craig, Jr.

3571.   Plaintiff Valencia Cook is a citizen of the United States and domiciled in the State of Connecticut. She is the sister of Andre Craig, Jr.

3572.   As a result of the attack, and the death of Andre Craig, Jr., Plaintiffs Arifah Hardy, T.C., Aundra Craig, Joyce Craig, Debra Cook-Russell, Nashima Williams Craig, Matthew Craig, Jonathan Craig, Andre Brown, Michael Cook and Valencia Cook have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their fiancée's/father's/son's/brother's society, companionship, comfort, advice, and counsel.

**108.    The June 28, 2007, Attack–Baghdad**

### a)  The Crow Family

3573.    William J. Crow was a citizen of the United States and domiciled in the State of Kansas when he was killed in Iraq.

3574.    On June 28, 2007, William J. Crow, aged 28, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3575.    William J. Crow died on June 28, 2007 as a result of injuries sustained in the attack.

3576.    The weapon used to kill William J. Crow was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3577.    Plaintiff Katherine M. Crow is a citizen of the United States and domiciled in the State of Texas. She is the widow of William J. Crow.

3578.    Plaintiff Katherine M. Crow brings an action individually and on behalf of the Estate of William J. Crow, as its legal representative.

3579.    Plaintiff Katherine Alexis Crow is a citizen of the United States and domiciled in the State of Texas. She is the daughter of William J. Crow.

3580.    Plaintiff Kayla Elizabeth Crow is a citizen of the United States and domiciled in the State of Texas. She is the daughter of William J. Crow.

3581.    Plaintiff Candace Cathryn Hudson is a citizen of the United States and domiciled in the State of Florida. She is the sister of William J. Crow.

3582.    Kathryn Ann Mondini was a citizen of the United States at the time of the death of William J. Crow. She was the mother of William J. Crow. She died on April 18, 2014.

3583.    Plaintiff Candace Cathryn Hudson brings an action individually and on behalf of the Estate of Kathryn Ann Mondini, as its legal representative.

3584.   As a result of the attack, and the death of William J. Crow, the late Kathryn Ann Mondini experienced, and Plaintiffs Katherine M. Crow, Katherine Alexis Crow, Kayla Elizabeth Crow and Candace Cathryn Hudson have experienced and continue to experience severe mental anguish, extreme emotional pain and suffering, and loss of their son's/husband's/father's/brother's society, companionship, comfort, advice, and counsel.

### 109.   The June 30, 2007, Attack–Baghdad

#### a)  The Tutwiler Family

3585.   Plaintiff Patrick Tutwiler is a citizen of the United States and domiciled in the State of Tennessee.

3586.   On June 30, 2007, Patrick Tutwiler was serving in the U.S. military in Iraq when he came under sniper fire by JAM Special Groups terror operatives.

3587.   As a result of the attack, Mr. Tutwiler was shot through the face and neck.

3588.   Patrick Tutwiler was injured in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC–QF and Hezbollah.

3589.   As a result of the attack, and the injuries he suffered, Plaintiff Patrick Tutwiler has experienced severe physical and mental anguish and extreme emotional pain and suffering.

3590.   Plaintiff Crystal Tutwiler is a citizen of the United States and domiciled in the State of Tennessee. She is the wife Patrick Tutwiler.

3591.   As a result of the attack, and the injuries suffered by Patrick Tutwiler, Plaintiff Crystal Tutwiler has experienced severe mental anguish, and extreme emotional pain and suffering.

110.    **The July 5, 2007, Attack–Baghdad**

    *a)  The Ring Family*

3592.    Michelle R. Ring was a citizen of the United States and was domiciled in the State of Oregon when she was killed in Iraq.

3593.    On July 5, 2007, Michelle R. Ring, aged 26, was serving in the U.S. military when she was killed in a mortar attack perpetrated by JAM Special Groups terror operatives.

3594.    Michelle R. Ring was killed in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC–QF and Hezbollah.

3595.    Plaintiff Shirley Stearns is a citizen of the United States and is domiciled in the State of Oregon. She is the mother of Michelle R. Ring.

3596.    Plaintiff John Stearns is a citizen of the United States and is domiciled in the State of Oregon. He is the father of Michelle R. Ring.

3597.    Plaintiffs Shirley Stearns and John Stearns bring an action individually and on behalf of the Estate of Michelle R. Ring, as its legal representatives.

3598.    Plaintiff Karen Hall is a citizen of the United States and is domiciled in the State of Alaska. She is the sister of Michelle R. Ring.

3599.    Plaintiff Marilyn Haybeck is a citizen of the United States and is domiciled in the State of Oregon. She is the sister of Michelle R. Ring.

3600.    Plaintiff Marc Stearns is a citizen of the United States and is domiciled in the State of Oregon. He is the son of Michelle R. Ring.

3601.    Plaintiff Brandon Cole is a citizen of the United States and is domiciled in the State of Tennessee. He is the son of Michelle R. Ring.

3602.    As a result of the attack, and the death of Michelle R. Ring, Plaintiffs Shirley Stearns, John Stearns, Karen Hall, Marilyn Haybeck, Marc Stearns and Brandon Cole have

experienced severe mental anguish, extreme emotional pain and suffering, and loss of their daughter's/sister's/mother's society, companionship, comfort, advice, and counsel.

### 111. The July 6, 2007, Attack–Baghdad

#### a) The McRill Family

3603.   Robert McRill was a citizen of the United States and domiciled in the State of Virginia when he was killed in Iraq.

3604.   On July 6, 2007, Robert McRill, aged 42, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3605.   Robert McRill was killed in the attack.

3606.   The weapon used to kill Robert McRill was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3607.   Katherine McRill-Fellini is a citizen of the United States and domiciled in the State of Virginia. She is the widow of Robert McRill.

3608.   Katherine McRill-Fellini brings an action on behalf of the Estate of Robert McRill, as its legal representative, for his death and any suffering and/ or economic loss he/his Estate sustained as a result of the attack.

3609.   Plaintiff Ronald McRill is a citizen of the United States and domiciled in the State of California. He is the brother of Robert McRill.

3610.   As a result of the attack, and the death of Robert McRill, Plaintiff Ronald McRill has experienced severe mental anguish, extreme emotional pain and suffering, and loss of his brother's society, companionship, comfort, advice, and counsel.

**112.    The July 6, 2007, Attack–Baghdad**

*a)  The Mergele Family*

3611.    Plaintiff Matthew L. Mergele is a citizen of the United States and domiciled in the State of Tennessee.

3612.    On July 6, 2007, Matthew L. Mergele was serving in the U.S. military in Iraq when an IED emplaced by JAM Special Groups terror operatives detonated while he was on a dismounted patrol near Rustimaya.

3613.    Matthew L. Mergele was injured in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC–QF and Hezbollah.

3614.    As a result of the attack, Mr. Mergele was blown back by the blast. He suffered difficulty hearing in his left ear, ringing in his ears and headaches.

3615.    As a result of the attack, and the injuries he suffered, Plaintiff Matthew L. Mergele has experienced severe physical and mental anguish and extreme emotional pain and suffering.

**113.    The July 7, 2007, Attack–Baghdad**

*a)  The Miller Family*

3616.    Mikeal Miller was a citizen of the United States and domiciled in the State of Oregon when he was injured in Iraq.

3617.    On July 7, 2007, Mikeal Miller, aged 21, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3618.    Mikeal Miller was severely injured in the attack when shrapnel went through his left eye and lodged in the back of his head.

3619.    Mikeal never regained consciousness after the attack.

3620.    Mikeal remained in a coma and died on January 27, 2008.

3621. The weapon used to kill Mikeal Miller was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3622. Plaintiff Rene Pool is a citizen of the United States and domiciled in the State of Oregon. She is the mother of Mikeal Miller.

3623. As a result of the attack, and the death of Mikeal Miller, Plaintiff Rene Pool has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her son's society, companionship, comfort, advice, and counsel.

**114. The July 11, 2007, Attack–Baghdad**

### a) The Hollcroft Family

3624. Plaintiff Derek Allen Hollcroft is a citizen of the United States and domiciled in the State of Florida.

3625. On July 11, 2007, Derek Allen Hollcroft, then 21, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle

3626. The weapon used to injure Derek Allen Hollcroft was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3627. As a result of the attack, Derek Allen Hollcroft sustained a TBI and post-concussion syndrome that has caused frequent chronic headaches and migraines and affected his memory.

3628. As a result of the attack, and the injuries he suffered, Derek Allen Hollcroft has experienced severe physical and mental anguish and extreme emotional pain and suffering.

115.    **The July 17, 2007, Attack–Baghdad**

   *a) The Joshua Family*

3629.   Ron J. Joshua, Jr. was a citizen of the United States and domiciled in the State of Texas when he was killed in Iraq.

3630.   On July 17, 2007, Ron J. Joshua, Jr., aged 19, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3631.   Ron J. Joshua, Jr. was killed in the attack.

3632.   The weapon used to kill Ron J. Joshua, Jr. was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3633.   Ursula Ann Joshua is a citizen of the United States and domiciled in the State of New Mexico. She is the mother of Ron J. Joshua, Jr.

3634.   Ursula Ann Joshua brings an action on behalf of the Estate of Ron J. Joshua as its legal representative, for his death and any suffering and/ or economic loss he/his Estate sustained as a result of the attack.

116.    **The July 17, 2007, Attack–Sadr City**

   *a) The Harrelson Family*

3635.   James J. Harrelson was a citizen of the United States and domiciled in the State of Alabama when he was killed in Iraq.

3636.   On July 17, 2007, James J. Harrelson, aged 19, was serving in the United States military in Iraq when JAM-Special Groups detonated an IED near his vehicle in Sadr City, Baghdad.

3637.   James J. Harrelson was killed in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC–QF and Hezbollah.

3638.   Plaintiff Tammy Kinney is a citizen of the United States and domiciled in the State of Alabama. She is the mother of James J. Harrelson.

3639.   As a result of the attack, and the death of James J. Harrelson's, Plaintiff Tammy Kinney has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her son's society, companionship, comfort, advice, and counsel.

### b)  The Price Family

3640.   Plaintiff Daniel Price is a citizen of the United States and domiciled in the State of Illinois.

3641.   On July 17, 2007, Daniel Price, aged 20, was serving in the United States military in Iraq when JAM-Special Groups detonated an IED near his vehicle in Sadr City, Baghdad.

3642.   Daniel Price was injured in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC–QF and Hezbollah.

3643.   As a result of the attack, Mr. Price suffered shrapnel wounds to his face which cut his tear duct and also suffered a fractured leg.

3644.   Mr. Price also suffers from a TBI and PTSD.

3645.   As a result of the attack, and the injuries he suffered, Plaintiff Daniel Price has experienced severe physical and mental anguish and extreme emotional pain and suffering.

3646.   Plaintiff Steven Price a citizen of the United States and domiciled in the State of Tennessee. He is the brother of Daniel Price.

3647.   As a result of the attack and the injuries Daniel Price suffered, Plaintiff Steven Price has experienced severe mental anguish and extreme emotional pain and suffering.

### c)  The Aieti Family

3648.   Plaintiff Tausolo Aieti is a citizen of the United States and domiciled in the State of Nevada.

3649. On July 17, 2007, Tausolo Aieti, aged 20, was serving in the United States military in Iraq when JAM-Special Groups detonated an IED near his vehicle in Sadr City, Baghdad.

3650. Tausolo Aieti was injured in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC–QF and Hezbollah.

3651. As a result of the attack, Mr. Aieti suffered a broken leg.

3652. Mr. Aieti also suffers from a TBI and PTSD.

3653. As a result of the attack, and the injuries he suffered, Plaintiff Tausolo Aieti has experienced severe physical and mental anguish and extreme emotional pain and suffering.

3654. Plaintiff Imo Aieti is a citizen of the United States and domiciled in the State of Texas. He is the brother of Tausolo Aieti.

3655. Plaintiff Lisi Aieti is a citizen of the United States and domiciled in the State of Utah. She is the sister of Tausolo Aieti.

3656. Plaintiff Poloka Aieti is a citizen of the United States and domiciled in the State of Utah. He is the brother of Tausolo Aieti.

3657. As a result of the attack, and the injuries suffered by Tausolo Aieti, Plaintiffs Imo Aieti, Lisi Aieti and Poloka Aieti have experienced severe mental anguish, and extreme emotional pain and suffering.

### 117. The July 17, 2007, Attack–Baghdad

#### a) The Bouten Family

3658. Plaintiff Christopher Bouten is a citizen of the United States and domiciled in the State of Kentucky.

3659. On July 17, 2007, Christopher Bouten was serving in the United States military in Iraq when he was injured during a mortar attack launched by JAM Special Groups terror operatives in the Kamaliyah neighborhood in eastern Baghdad.

3660. Christopher Bouten was injured in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC–QF and Hezbollah.

3661. As a result of the attack, Mr. Bouten suffered shrapnel wounds to his back, neck and leg.

3662. As a result of the attack, and the injuries he suffered, Plaintiff Christopher Bouten has experienced severe physical and mental anguish and extreme emotional pain and suffering.

3663. Plaintiff Erin Bouten is a citizen of the United States and domiciled in the State of Kentucky. She is the wife of Christopher Bouten.

3664. As a result of the attack and the injuries Christopher Bouten suffered, Plaintiff Erin Bouten has experienced severe mental anguish and extreme emotional pain and suffering.

### 118. The July 19, 2007, Attack–Husseinyah

#### a) The Dudek Family

3665. Plaintiff Daniel Dudek is a citizen of the United States and domiciled in the State of Washington.

3666. On July 19, 2007, Daniel Dudek was serving in the U.S. military in Iraq.

3667. Mr. Dudek was in a convoy when an EFP emplaced by Special Groups struck his vehicle.

3668. The weapon used to injure Mr. Dudek was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3669. As a result of the attack, Mr. Dudek suffers from limited paralysis in his hips and legs, and complete paralysis in both of his ankles and feet. He also has a Lumbar 3/4 cauda equina with no glute muscles and no ability to move the muscles in his calf/ankles/feet and has reduced

feeling in his legs down to his ankles. He also has a deep shrapnel hole in his back and pieces of fragmentation all throughout his left arm, hips, and buttocks area.

3670.   As a result of the attack, and the injuries he suffered, Plaintiff Daniel Dudek has experienced severe physical and mental anguish and extreme emotional pain and suffering.

3671.   Plaintiff Margaret Dudek is a citizen of the United States and domiciled in the State of North Carolina. She is the mother of Daniel Dudek.

3672.   Plaintiff Katie Woodard is a citizen of the United States and domiciled in the State of North Carolina. She is the sister of Daniel Dudek.

3673.   Plaintiff Sarah Dudek is a citizen of the United States and domiciled in the State of North Carolina. She is the sister of Daniel Dudek.

3674.   Plaintiff Andrew Dudek is a citizen of the United States and domiciled in the State of North Carolina. He is the brother of Daniel Dudek.

3675.   As a result of the attack, and the injuries suffered by Daniel Dudek, Plaintiffs Margaret Dudek, Katie Woodard, Sarah Dudek and Andrew Dudek have experienced severe mental anguish, and extreme emotional pain and suffering.

**119.   The July 23, 2007, Attack–Baghdad**

*a)  The Florexil Family*

3676.   Camy Florexil was a citizen of the United States and domiciled in the State of Pennsylvania when he was injured in Iraq.

3677.   On July 23, 2007, Camy Florexil, aged 20, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3678.   Camy Florexil was injured in the attack and died on July 24, 2007 from the injuries he sustained in the attack.

3679.   The weapon used to kill Camy Florexil was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3680.   Plaintiff Emanuela Florexil is a citizen of the United States and domiciled in the State of Pennsylvania. She is the sister of Camy Florexil.

3681.   Plaintiff Emanuela Florexil brings an action individually and on behalf of the Estate of Camy Florexil, as its legal representative.

3682.   As a result of the attack, and the death of Camy Florexil, Plaintiff Emanuela Florexil has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her brother's society, companionship, comfort, advice, and counsel.

**120.   The 2007, Attack–Baghdad**

*a)  The Miller Family*

3683.   Plaintiff Joseph T. Miller is a citizen of the Unites States and domiciled in the State of Ohio.

3684.   In 2007, Joseph T. Miller was serving was serving in the U.S. military in Iraq.

3685.   Mr. Miller was in a convoy when an EFP emplaced by Special Groups struck his vehicle.

3686.   The weapon used to injure Mr. Miller was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3687.   As a result of the attack, Mr. Miller suffered a ruptured left ear drum, TBI and post-concussive syndrome.

3688.   As a result of the attack, and the injuries he suffered, Plaintiff Joseph T. Miller has experienced severe physical and mental anguish and extreme emotional pain and suffering.

### 121. The July 24, 2007, Attack–Umm Qasr

#### a) The Harrington Family

3689.    Plaintiff Sean Harrington is a citizen of the United States and domiciled in the State of Pennsylvania.

3690.    On July 24, 2007, Sean Harrington, then 22, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near the vehicle in which he was traveling outside of Umm Qasr.

3691.    The weapon used to injure Sean Harrington was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3692.    Shrapnel from the EFP struck Sean Harrington's head and face, and copper from the EFP's liner remains fused to his face.

3693.    The impacting shrapnel has resulted in a partial loss of sight in his right eye and most of his hearing in his right ear.

3694.    Mr. Harrington has been diagnosed with a TBI. Medication has been prescribed to address this condition. He continues to endure migraines as a result of the attack.

3695.    Mr. Harrington was also diagnosed with PTSD a result of the attack, for which he has received treatment.

3696.    As a result of the attack, and the injuries he suffered, Plaintiff Sean Harrington has experienced severe physical and mental anguish and extreme emotional pain and suffering.

### 122. The July 31, 2007, Attack–Baghdad

#### a) The Heinlein Family

3697.    Charles T. Heinlein, Jr. was a citizen of the United States and domiciled in the State of Michigan when he was killed in Iraq.

3698.   On July 31, 2007, Charles T. Heinlein, Jr., aged 23, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3699.   Charles T. Heinlein, Jr. was killed in the attack.

3700.   The weapon used to kill Charles T. Heinlein, Jr. was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3701.   Plaintiff Jessica Heinlein is a citizen of the United States and domiciled in the State of Washington. She is the widow of Charles T. Heinlein, Jr.

3702.   Plaintiff Jessica Heinlein brings an action individually and on behalf of the Estate of Charles T. Heinlein, Jr., as its legal representative.

3703.   Plaintiff Charles Heinlein, Sr. is a citizen of the United States and domiciled in the State of Michigan. He is the father of Charles T. Heinlein, Jr.

3704.   Plaintiff Jody Lyn Heinlein is a citizen of the United States and domiciled in the State of Texas. She is the sister of Charles T. Heinlein, Jr.

3705.   As a result of the attack, and the death of Charles T. Heinlein, Jr., Plaintiffs Jessica Heinlein, Charles Heinlein, Sr. and Jody Lyn Heinlein have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/son's/brother's society, companionship, comfort, advice, and counsel.

### b)  The Jairala Family

3706.   Alfred H. Jairala was a citizen of the United States and domiciled in the State of Florida when he was killed in Iraq.

3707.   On July 31, 2007, Alfred H. Jairala, aged 29, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near the vehicle in which he was traveling in Baghdad.

3708.   Alfred H. Jairala was killed in the attack.

3709.   The weapon used to kill Alfred H. Jairala was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3710.   Plaintiff Margarita Aristizabal is a citizen of the United States and domiciled in the State of Florida. She is the widow of Alfred H. Jairala.

3711.   Plaintiff Margarita Aristizabal brings an action individually and on behalf of the Estate of Alfred H. Jairala, as its legal representative.

3712.   Plaintiff J.J., a minor represented by her legal guardian, Margarita Aristizabal, is a citizen of the United States and domiciled in the State of Florida. She is the daughter of Alfred H. Jairala.

3713.   Plaintiff Sebastian Niuman is a citizen of the United States and domiciled in the State of Florida. He is the stepson of Alfred H. Jairala.

3714.   As a result of the attack, and the death of Alfred H. Jairala, Plaintiffs Margarita Aristizabal, J.J., and Sebastian Niuman have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice, and counsel.

### 123.   The August 14, 2007, Attack–Baghdad

#### a)  The Casey Family

3715.   Plaintiff Brian J. Casey is a citizen of the United States and domiciled in the State of Montana.

3716.   On August 14, 2007, Brian J. Casey was serving in the U.S. military in Iraq when he came under sniper fire by JAM Special Groups terror operatives.

3717. Brian J. Casey was injured in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC–QF and Hezbollah.

3718. As a result of the attack, Mr. Casey suffered a collapsed lung and fractured ribs.

3719. As a result of the attack, and the injuries he suffered, Plaintiff Brian J. Casey has experienced severe physical and mental anguish and extreme emotional pain and suffering.

3720. Plaintiff Brittany Hogan is a citizen of the United States and domiciled in the State of Montana. She was the wife of Brian J. Casey.

3721. Plaintiff Shelley Ann Casey is a citizen of the United States and domiciled in the State of North Carolina. She is mother of Brian J. Casey.

3722. Plaintiff Richard Casey is a citizen of the United States and domiciled in the State of North Carolina. He is the father of Brian J. Casey.

3723. As a result of the attack, and the injuries suffered by Brian J. Casey, Plaintiffs Brittany Hogan, Shelley Ann Casey and Richard Casey have experienced severe mental anguish, and extreme emotional pain and suffering.

**124. The August 17, 2007, Attack–Basra**

*a) The Chand Family*

3724. Michael Chand, Sr. was a citizen of the United States and domiciled in the State of California when he was kidnapped and killed in Iraq.

3725. Michael Chand, Sr. worked in southeast Iraq as a civilian contractor who provided security relating to road construction projects.

3726. On August 17, 2007, Mr. Chand's convoy was ambushed by roughly 300 JAM fighters near the JAM stronghold of Amarah, northwest of Basra. Mr. Chand suffered a gunshot wound in the ambush and was kidnapped by JAM.

3727. He was held in captivity by JAM for several years afterwards and was tortured in captivity. He was 52 years old at the time of his kidnapping.

3728. On or about March 13, 2010, his body was returned to the U.S. government. The autopsy report revealed that Mr. Chand was killed by multiple gunshot wounds to the head and body, and his injuries were consistent with the conclusion that he had been tortured.

3729. Initial reports of the August 17, 2007 attack suggested that Mr. Chand had been killed in the attack.

3730. On August 24, 2007, the U.S. State Department officially informed Mr. Chand's wife that he was dead.

3731. On October 31, 2007, the State Department reversed course and informed his wife, Mrs. Sally Chand, that, according to eyewitnesses, Mr. Chand was actually alive and being held in captivity. However, efforts to secure his release over the next several years failed, and, on or about March 13, 2010, the Chand family learned that Jaysh al-Mahdi had tortured and executed Mr. Chand while he was being held in captivity.

3732. The Iraqi JAM terror cell that kidnapped and murdered Michael Chand was trained by Hezbollah and funded and armed by the IRGC–QF.

3733. Plaintiff Sally Chand is a citizen of the United States and domiciled in the State of California. She is the widow of Michael Chand, Sr.

3734. Plaintiff Sally Chand brings an action individually and on behalf of the Estate Michael Chand, as its legal representative.

3735. Plaintiff Michael Chand, Jr. is a citizen of the United States and domiciled in the State of California. He is the son of Michael Chand, Sr.

3736. Plaintiff Christina Mahon is a citizen of the United States and domiciled in the State of California. She is the daughter of Michael Chand, Sr.

3737. Plaintiff Ryan Chand is a citizen of the United States and domiciled in the State of California. He is the son of Michael Chand, Sr.

3738. Plaintiff Brenda Chand is a citizen of the United States and domiciled in the State of California. She is the daughter of Michael Chand, Sr.

3739. As a result of the August 17, 2007 attack, and the subsequent kidnapping and execution of Michael Chand, Sr., Plaintiffs Sally Chand, Michael Chand, Jr., Christina Mahon, Ryan Chand and Brenda Chand have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice, and counsel.

**125. The August 23, 2007, Attack–Baghdad**

*a) The Bowen Family*

3740. Plaintiff Mario Bowen is a citizen of the United States and domiciled in the State of Tennessee.

3741. On August 23, 2007, Mario Bowen was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3742. The weapon used to injure Mario Bowen was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3743. As a result of the attack, Mr. Bowen was rendered unconscious. He suffers from TBI, memory loss, headaches and speech issues.

3744. As a result of the attack, and the injuries he suffered, Plaintiff Mario Bowen has experienced severe physical and mental anguish and extreme emotional pain and suffering.

126. **The August 23, 2007, Attack–Aziziyah**

### a) The Hochstetler Family

3745. Plaintiff James David Hochstetler is a citizen of the United States and domiciled in the State of Tennessee.

3746. On August 23, 2007, James David Hochstetler, then 29, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3747. The weapon used to injure James David Hochstetler was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3748. As a result of the blast, James David Hochstetler suffered serious injuries, including severe injuries to his hand and face.

3749. As a result of the attack, and the injuries he suffered, Plaintiff James David Hochstetler has experienced severe physical and mental anguish and extreme emotional pain and suffering.

3750. Plaintiff Leanne Lizabeth Hochstetler is a citizen of the United States and domiciled in the State of Tennessee. She is the wife of James David Hochstetler.

3751. Plaintiff James David Hochstetler II is a citizen of the United States and domiciled in the State of Tennessee. He is the son of James David Hochstetler.

3752. Plaintiff P.H., a minor represented by her legal guardian, Leanne Lizabeth Hochstetler, is a citizen of the United States and domiciled in the State of Tennessee. She is the daughter of James David Hochstetler.

3753. Plaintiff Kyle Austin Marshall is a citizen of the United States and domiciled in the State of Tennessee. He is the son of James David Hochstetler.

3754.   As a result of the attack, and the injuries suffered by James David Hochstetler, Plaintiffs Leanne Lizabeth Hochstetler, James David Hochstetler II, P.H. and Kyle Austin Marshall have experienced severe mental anguish, and extreme emotional pain and suffering.

### b) The Tully Family

3755.   Michael Tully was a citizen of the United States and domiciled in the State of Pennsylvania when he was killed in Iraq.

3756.   On August 23, 2007, Michael Tully, aged 33, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3757.   Michael Tully was killed in the attack.

3758.   The weapon used to kill Michael Tully was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3759.   Plaintiff John Richard Tully is a citizen of the United States and domiciled in the State of Pennsylvania. He is the father of Michael Tully.

3760.   Plaintiff John Richard Tully brings an action individually and on behalf of the Estate of Michael Tully, as its legal representative.

3761.   Plaintiff Marilyn Louise Tully is a citizen of the United States and domiciled in the State of Pennsylvania. She is the mother of Michael Tully.

3762.   Plaintiff Slade Victor Tully is a citizen of the United States and domiciled in the State of Pennsylvania. He is the son of Michael Tully.

3763.   Plaintiff John Richard Tully II is a citizen of the United States and domiciled in the State of Arizona. He is the brother of Michael Tully.

3764.   Plaintiff Heather Ann Farkas is a citizen of the United States and domiciled in the State of Pennsylvania. She is the sister of Michael Tully.

3765.   As a result of the attack, and the death of Michael Tully, Plaintiffs John Richard Tully, Marilyn Louise Tully, Slade Victor Tully, John Richard Tully II and Heather Ann Farkas have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/father's/brother's society, companionship, comfort, advice, and counsel.

### c)  The Hunt Family

3766.   Plaintiff Robert James Hunt is a citizen of the United States and domiciled in the State of Washington.

3767.   On August 23, 2007, Robert James Hunt, then 37, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3768.   The weapon used to injure Robert James Hunt was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3769.   As a result of the blast, Robert James Hunt suffered lacerations to his neck and head. He also suffered shrapnel wounds to the left side of his head, upper torso, right arm and right hand.

3770.   As a result of the attack, and the injuries he suffered, Plaintiff Robert James Hunt has experienced severe physical and mental anguish and extreme emotional pain and suffering.

3771.   Plaintiff M.A.H., a minor represented by his legal guardian, Robert James Hunt, is a citizen of the United States and domiciled in the State of Washington. He is the son of Robert James Hunt.

3772.   Plaintiff A.M.H., a minor represented by her legal guardian, Robert James Hunt, is a citizen of the United States and domiciled in the State of Washington. She is the daughter of Robert James Hunt.

3773. Plaintiff Boonchob "Lynn" Prudhome is a citizen of the United States and domiciled in the State of Texas. She is the mother of Robert James Hunt.

3774. As a result of the attack, and the injuries suffered by Robert James Hunt, Plaintiffs M.A.H., A.M.H. and Boonchob "Lynn" Prudhome have experienced severe mental anguish, and extreme emotional pain and suffering.

**127. The September 2, 2007, Attack–Baghdad**

*a) The White Family*

3775. Delmar White was a citizen of the United States and domiciled in the State of Kentucky when he was killed in Iraq.

3776. On September 2, 2007, Delmar White, aged 37, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated by his vehicle.

3777. Delmar White was killed in the attack.

3778. The weapon used to kill Delmar White was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3779. Plaintiff Michele White is a citizen of the United States and domiciled in the State of Kentucky. She is the widow of Delmar White.

3780. Plaintiff Michele White brings an action individually and on behalf of the Estate of Delmar White, as its legal representative.

3781. Plaintiff Seth White is a citizen of the United States and domiciled in the State of Kentucky. He is the son of Delmar White.

3782. Plaintiff Shelby White is a citizen of the United States and domiciled in the State of Kentucky. She is the daughter of Delmar White.

3783.    Plaintiff Perry White is a citizen of the United States and domiciled in the State of Kentucky. He is the brother of Delmar White.

3784.    Plaintiff Robert White is a citizen of the United States and domiciled in the State of Ohio. He is the brother of Delmar White.

3785.    As a result of the attack, and the death of Delmar White, Plaintiffs Michele White, Seth White, Shelby White, Perry White and Robert White have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's/brother's companionship, comfort, advice, and counsel.

### 128.    The September 2, 2007, Attack–Rustamiyah

####    a)  The Wold Family

3786.    Plaintiff Joshua P.G. Wold is a citizen of the United States and domiciled in the State of Oregon.

3787.    On September 2, 2007, Joshua P.G. Wold was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle. The convoy he was travelling in also came under small arms fire.

3788.    The weapon used to injure Joshua P.G. Wold was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3789.    As a result of the attack and the injuries sustained in the attack, Mr. Wold required partial amputation of his right foot.

3790.    As a result of the attack, and the injuries he suffered, Plaintiff Joshua P.G. Wold has experienced severe physical and mental anguish and extreme emotional pain and suffering.

3791.    Plaintiff Emeliah Wold is a citizen of the United States and domiciled in the State of Oregon. She is the daughter of Joshua P.G. Wold.

3792.   Plaintiff Presley Alexander is a citizen of the United States and domiciled in the State of Oregon. She is the stepdaughter of Joshua P.G. Wold.

3793.   Plaintiff Celeste Yantis is a citizen of the United States and domiciled in the State of Washington. She was the wife of Joshua P.G. Wold.

3794.   As a result of the attack, and the injuries suffered by Joshua P.G. Wold, Plaintiffs Emeliah Wold, Presley Alexander and Celeste Yantis have experienced severe mental anguish, and extreme emotional pain and suffering.

### 129.   The September 4, 2007, Attack–Baghdad

#### a)  The Murray Family

3795.   Joel L. Murray was a citizen of the United States and domiciled in the State of Missouri when he was killed in Iraq.

3796.   On September 4, 2007, Joel L. Murray, aged 26, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3797.   Joel L. Murray was killed in the attack.

3798.   The weapon used to kill Joel L. Murray was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3799.   Plaintiff Maricel Murray is a citizen of the United States and domiciled in the State of Kansas. She is the widow of Joel L. Murray.

3800.   Plaintiff Maricel Murray brings an action individually and on behalf of the Estate of Joel L. Murray, as its legal representative.

3801.   Plaintiff Jerry Murray is a citizen of the United States and domiciled in the State of Kansas. He is the son of Joel L. Murray.

3802.   As a result of the attack, and the death of Joel L. Murray, Plaintiffs Maricel Murray and Jerry Murray have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice, and counsel.

### b) The Shelton Family

3803.   Randol S. Shelton was a citizen of the United States and domiciled in the State of Illinois when he was killed in Iraq.

3804.   On September 4, 2007, Randol S. Shelton, aged 22, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3805.   Randol S. Shelton was killed in the attack.

3806.   The weapon used to kill Randol S. Shelton was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3807.   Plaintiff Bryan S. Shelton is a citizen of the United States and domiciled in the State of Illinois. He is the father of Randol S. Shelton.

3808.   Plaintiff Bryan S. Shelton brings an action individually and on behalf of the Estate of Randol S. Shelton, as its legal representative.

3809.   Plaintiff Darlene Shelton is a citizen of the United States and domiciled in the State of Illinois. She is the mother of Randol S. Shelton

3810.   Plaintiff Amanda Shelton is a citizen of the United States and domiciled in the State of Illinois. She is the sister of Randol S. Shelton.

3811.   Plaintiff Bryan T. Shelton is a citizen of the United States and domiciled in the State of Illinois. He is the brother of Randol S. Shelton.

3812.   As a result of the attack, and the death of Randol S. Shelton, Plaintiffs Bryan S. Shelton, Darlene Shelton, Amanda Shelton and Bryan T. Shelton have experienced severe mental

anguish, extreme emotional pain and suffering and loss of their son's/brother's society, companionship, comfort, advice, and counsel.

**130.  The September 12, 2007, Attack–Baghdad**

*a)  The Laird Family*

3813.  Plaintiff Dan Laird is a citizen of the United States and domiciled in the State of Florida.

3814.  On September 12, 2007, Mr. Laird, then 32, was a civilian contractor with Blackwater Worldwide in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3815.  The weapon used to injure Dan Laird was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC

3816.  As a result of the blast, Dan Laird suffered a concussion and nerve damage in his right leg, a level 5 AC separation which required him to undergo surgery on his right shoulder.

3817.  He also sustained emotional injuries, including panic attacks and anxiety, for which he has sought counseling.

3818.  As a result of the attack, and the injuries he suffered, Plaintiff Dan Laird has experienced severe physical and mental anguish and extreme emotional pain and suffering.

3819.  Plaintiff Angela M. Laird is a citizen of the United States and domiciled in the State of Florida. She is the wife of Dan Laird.

3820.  Plaintiff Jordan M. Laird is a citizen of the United States and domiciled in the State of Florida. He is the son of Dan Laird.

3821.  Plaintiff Hunter L. Laird is a citizen of the United States and domiciled in the State of Florida. She is the daughter of Dan Laird.

3822.   Plaintiff Chase Laird is a citizen of the United States and domiciled in the State of Florida. He is the son of Dan Laird.

3823.   As a result of the attack, and the injuries Dan Laird has suffered, Plaintiffs Angela M. Laird, Jordan M. Laird, Hunter L. Laird and Chase Laird have experienced severe mental anguish, and extreme emotional pain and suffering.

### 131.   The September 26, 2007, Attack–Baghdad

#### a)  *The Lee Family*

3824.   Plaintiff William Lee is a citizen of the United States and domiciled in the State of Virginia.

3825.   On September 26, 2007, William Lee, then 44, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle. William Lee was seated behind the driver in an up-armored M1151 vehicle traveling southwest on Route Raiders in the Saidiya neighborhood of Iraq when the vehicle in which he was traveling was struck by an EFP.

3826.   The weapon used to injure William Lee was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3827.   As a result of the attack, Mr. Lee sustained shrapnel injuries to his face including above his right eye and to various other parts of his body. One piece of shrapnel became lodged in his right medial sinus cavity while another piece of shrapnel impacted the subcutaneous nerve network in his right thigh which has caused intermittent shooting pain in his right leg which continues to a lesser degree even today. He has been informed that there is a likely piece of shrapnel from the EFP also lodged in his right anterior cruciate ligament. He has also suffered from PTSD.

3828.   As a result of the attack, and the injuries he suffered, Plaintiff William Lee has experienced severe physical and mental anguish and extreme emotional pain and suffering.

3829.   Plaintiff Alexandria L. Lee is a citizen of the United States and domiciled in the State of Virginia. She is the daughter of William Lee.

3830.   Plaintiff William J. Lee is a citizen of the United States and domiciled in the State of Virginia. He is the son of William Lee.

3831.   Plaintiff Lillie Lai Lee is a citizen of the United States and domiciled in the State of Virginia. She is the ex-wife of William Lee. They were married at the time of the attack in which William Lee was injured and did not obtain a divorce until December 2018. The marital discord resulting in divorce was caused in significant part by the PTSD that William Lee has battled since he was injured in the EFP attack.

3832.   As a result of the attack, and the injuries William Lee suffered, Plaintiffs Alexandria L. Lee, William J. Lee, and Lillie Lai Lee have experienced severe mental anguish and extreme emotional pain and suffering.

### b)  The Hunt Family

3833.   Plaintiff Jennifer Lynn Hunt is a citizen of the United States and domiciled in the State of Maryland.

3834.   On September 26, 2007, Jennifer Lynn Hunt, then 23, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near her vehicle. Jennifer Lynn Hunt was the driver in an up-armored M1151 vehicle traveling southwest on Route Raiders in the Saidiya neighborhood of Iraq when the vehicle that she was driving was struck by an EFP.

3835.   The weapon used to injure Jennifer Lynn Hunt was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3836.  As a result of the attack, Jennifer Lynn Hunt sustained shrapnel wounds to her face and to both of her arms, nerve damage to her dominant hand, burn injuries to her back, scarring, and PTSD.

3837.  As a result of the attack, and the injuries she suffered, Plaintiff Jennifer Lynn Hunt has experienced severe physical and mental anguish and extreme emotional pain and suffering.

**132.  The September 29, 2007, Attack–Baghdad**

*a)  The Golembe Family*

3838.  Plaintiff Christopher Golembe is a citizen of the United States and domiciled in the State of West Virginia.

3839.  On September 29, 2007, Christopher Golembe, then 22, was serving in the U.S. military in Iraq, when his vehicle was struck by an EFP emplaced by Special Groups.

3840.  The weapon used to injure Christopher Golembe was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3841.  Mr. Golembe sustained a concussion as a result of the attack.

3842.  He has nightmares and has experienced survivor's guilt.

3843.  He has been diagnosed with PTSD and has sought counseling.

3844.  Mr. Golembe has suffered memory loss since the attack and has difficulty recalling information.

3845.  As a result of the attack, and the injuries he suffered, Plaintiff Christopher Golembe has experienced severe physical and mental anguish and extreme emotional pain and suffering.

3846.  Plaintiff Kathryn Head is a citizen of the United States and domiciled in the State of Virginia. She is the of mother of Christopher Golembe.

3847. As a result of the attack, and the injuries Christopher Golembe suffered, Plaintiff Kathryn Head has experienced severe mental anguish and extreme emotional pain and suffering.

### b) The Watts Family

3848. Plaintiff Christopher Watts is a citizen of the United States and domiciled in the State of Texas.

3849. On September 29, 2007, Christopher Watts, then 22, was serving in the U.S. military in Iraq, when his vehicle was struck by an EFP emplaced by Special Groups.

3850. The weapon used to injure Christopher Watts was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3851. Mr. Watts sustained a concussion as a result of the attack. He has been diagnosed with a TBI.

3852. He experiences memory loss and at times his speech is slurred.

3853. He has been prescribed anti-depressants and medication to address sleep-related issues.

3854. As a result of the attack, and the injuries he suffered, Plaintiff Christopher Watts has experienced severe physical and mental anguish and extreme emotional pain and suffering.

### 133. The September 30, 2007, Attack–Baghdad

### a) The Olguin Family

3855. Randell Olguin was a citizen of the United States and domiciled in the State of Texas when he was killed in Iraq.

3856. On September 30, 2007, Randell Olguin, aged 24, was serving in the U.S. military in Iraq when his unit came under sniper fire by JAM Special Groups terror operatives.

3857.   Randell Olguin was killed in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC–QF and Hezbollah.

3858.   Randell Olguin was killed in the attack.

3859.   Plaintiff Janet L. Rios is a citizen of the United States and domiciled in the State of Texas. She is the sister of Randell Olguin.

3860.   Plaintiff Anita Baker is a citizen of the United States and domiciled in the State of Texas. She is the sister of Randell Olguin.

3861.   Plaintiff Jennie L. Morin is a citizen of the United States and domiciled in the State of Texas. She is the sister of Randell Olguin.

3862.   As a result of the attack, and the death of Randell Olguin, Plaintiffs Janet L. Rios, Anita Baker and Jennie L. Morin have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their brother's society, companionship, comfort, advice, and counsel.

### 134.   The October 18, 2007, Attack–Baghdad

#### a)  *The Geiger Family*

3863.   Wayne M. Geiger was a citizen of the United States and domiciled in the State of California when he was killed in Iraq.

3864.   On October 18, 2007, Wayne M. Geiger, aged 23, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near the vehicle in which he was traveling in Baghdad.

3865.   Wayne M. Geiger was killed in the attack.

3866.   The weapon used to kill Wayne M. Geiger was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3867.   Plaintiff Randall Geiger is a citizen of the United States and domiciled in the State of California. He is the father of Wayne M. Geiger.

3868.   Plaintiff Randall Geiger brings an action individually and on behalf of the Estate of Wayne M. Geiger, as its legal representative.

3869.   Plaintiff Kimberly Geiger is a citizen of the United States and domiciled in the State of California. She is the mother of Wayne M. Geiger.

3870.   Plaintiff Jesseca Lyn Tsosie is a citizen of the United States and domiciled in the State of California. She is the sister of Wayne M. Geiger.

3871.   As a result of the attack, and the death of Wayne M. Geiger, Plaintiffs Randall Geiger, Kimberly Geiger and Jesseca Lyn Tsosie have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's companionship, comfort, advice, and counsel.

### 135.   The October 21, 2007, Attack–Iskandariyah

#### a)  The Donoho Family

3872.   Plaintiff Eric Donoho is a citizen of the United States and domiciled in the State of Indiana.

3873.   On October 21, 2007, Eric Donoho, then 29, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near the vehicle in which he was traveling in Iskandariyah.

3874.   The weapon used to injure Eric Donoho was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3875.   Mr. Donoho suffered a concussion as a result of the blast.

3876. Mr. Donoho was also diagnosed with a TBI and PTSD. He has been prescribed daily medication to address these conditions.

3877. Mr. Donoho continues to endure migraines as a result of the attack.

3878. As a result of the attack, and the injuries he suffered, Plaintiff Eric Donoho has experienced severe physical and mental anguish and extreme emotional pain and suffering.

### 136. The October 29, 2007, Attack–Umm Qasr

#### a) The Ginavan Family

3879. Plaintiff Tyler Ginavan is a citizen of the United States and domiciled in the State of Kansas.

3880. On October 29, 2007, Tyler Ginavan, then 26, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near the vehicle in which he was traveling in Umm Qasr.

3881. The weapon used to injure Mr. Ginavan was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3882. As a result of the attack, copper from the EFP lodged in Mr. Ginavan's face, neck, knee, and calf. Copper from the EFP remains fused to Mr. Ginavan's jawline.

3883. Tyler Ginavan has been diagnosed with PTSD, and he has received treatment and counseling. He has been prescribed medication to address both the physical pain and emotional impact of the attack.

3884. As a result of the attack, and the injuries he suffered, Plaintiff Tyler Ginavan has experienced severe physical and mental anguish and extreme emotional pain and suffering.

### 137.    The November 7, 2007, Attack–Baghdad

#### a)  The Tiffner Family

3885.    Benjamin David Tiffner was a citizen of the United States and domiciled in the State of West Virginia when he was killed in Iraq.

3886.    On November 7, 2007, Benjamin David Tiffner, aged 31, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle in Baghdad.

3887.    Benjamin David Tiffner was killed in the attack.

3888.    The weapon used to kill Benjamin David Tiffner was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3889.    Plaintiff Timothy Tiffner is a citizen of the United States and domiciled in the State of Tennessee. He is the father of Benjamin David Tiffner.

3890.    Plaintiff Timothy Tiffner brings a claim individually and on behalf of the Estate of Benjamin David Tiffner, as its legal representative.

3891.    Plaintiff Judith Tiffner is a citizen of the United States and domiciled in the State of Tennessee. She is the mother of Benjamin David Tiffner.

3892.    Plaintiff Joshua Tiffner is a citizen of the United States and domiciled in the State of Utah. He is the brother of Benjamin David Tiffner.

3893.    Plaintiff Seth Tiffner is a citizen of the United States and domiciled in the State of Alabama. He is the brother of Benjamin David Tiffner.

3894.    Plaintiff Sarah Crosby is a citizen of the United States and domiciled in the State of Alaska. She is the sister of Benjamin David Tiffner.

3895.  As a result of the attack, and the death of Benjamin David Tiffner, Plaintiffs Timothy Tiffner, Judith Tiffner, Joshua Tiffner, Seth Tiffner and Sarah Crosby have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice, and counsel.

**138.  The November 14, 2007, Attack–Baghdad**

*a) The Burks Family*

3896.  Peter Burks was a citizen of the United States and domiciled in the State of Texas when he was killed in Iraq.

3897.  On November 14, 2007, Peter Burks, aged 26, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle in Baghdad.

3898.  Peter Burks was killed in the attack.

3899.  The weapon used to kill Peter Burks was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3900.  Plaintiff Alan Burks is a citizen of the United States and domiciled in the State of Texas. He is the father of Peter Burkes.

3901.  Plaintiff Alan Burks brings a claim individually and on behalf of the Estate of Peter Burks, as its legal representative.

3902.  Plaintiff Jackie Merck Hlastan is a citizen of the United States and domiciled in the State of Texas. She is the mother of Peter Burks.

3903.  Plaintiff G.B., a minor represented by her legal guardian, Alan Burks, is a citizen of the United States and domiciled in the State of New Jersey. She is the sister of Peter Burks.

3904.  Plaintiff Alison Burks McRuiz is a citizen of the United States and domiciled in the State of Texas. She is the sister of Peter Burks.

3905.   Plaintiff Sarah Phillips is a citizen of the United States and domiciled in the State of Texas. She is the sister of Peter Burks.

3906.   Plaintiff Zachary Burks is a citizen of the United States and domiciled in the State of Alabama. He is the brother of Peter Burks.

3907.   As a result of the attack, and the death of Peter Burks, Plaintiffs Alan Burks, Jackie Merck Hlastan, G.B., Alison Burks McRuiz, Sarah Phillips and Zachary Burks have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice, and counsel.

### 139.   The November 26, 2007, Attack–Aziziyah

#### a)  The Juneau Family

3908.   William ("Bill") Juneau was a citizen of the Unites States and domiciled in the State of Minnesota when he was killed in Iraq.

3909.   On November 26, 2007, William Juneau, aged 36, was serving as a civilian contractor in southern Iraq when an IED emplaced by JAM Special Groups terror operatives detonated near his vehicle.

3910.   William Juneau was killed in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC–QF and Hezbollah.

3911.   Plaintiff Bridget Juneau is a citizen of the United States and domiciled in the State of Minnesota. She is the twin sister of William Juneau.

3912.   Plaintiff Bridget Juneau brings an action individually and on behalf of the Estate of William Juneau, as its legal representative.

3913.   Plaintiff Stephanie Juneau is a citizen of the United States and domiciled in the State of Montana. She is the sister of William Juneau.

3914.   As a result of the attack, and the death of William Juneau, Plaintiffs Bridget Juneau and Stephanie Juneau have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their brother's society, companionship, comfort, advice, and counsel.

**140.   The December 9, 2007, Attack–Az Zubaydiyah**

   *a) The Shaw Family*

3915.   Micah Shaw was a citizen of the United States and domiciled in the State of Washington when he was killed in Iraq.

3916.   On December 9, 2007, Micah Shaw, aged 32, was serving as a civilian contractor in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3917.   Micah Shaw was killed in the attack.

3918.   The weapon used to kill Micah Shaw was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3919.   Plaintiff Elena Shaw is a citizen of the United States and domiciled in the State of New Hampshire. She is the widow of Micah Shaw.

3920.   Plaintiff Casey Shaw is a citizen of the United States and domiciled in the State of New Hampshire. He is the son of Micah Shaw.

3921.   Plaintiff Lilly-Bean Shaw is a citizen of the United States and domiciled in the State of New Hampshire. She is the daughter of Micah Shaw.

3922.   Plaintiff Emily Shaw is a citizen of the United States and domiciled in the State of Pennsylvania. She is the daughter of Micah Shaw.

3923.   As a result of the attack, and the death of Micah Shaw, Plaintiffs Elena Shaw, Casey Shaw, Lilly-Bean Shaw and Emily Shaw have experienced severe mental anguish, extreme

emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice, and counsel.

### b) The Doheny Family

3924. Michael Doheny was a citizen of the United States and domiciled in the State of Nebraska when he was killed in Iraq.

3925. On December 9, 2007, Michael Doheny, aged 30, was serving as a civilian contractor in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3926. Michael Doheny was killed in the attack.

3927. The weapon used to kill Michael Doheny was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3928. Plaintiff Melissa Doheny is a citizen of the United States and domiciled in the State of Nebraska. She is the widow of Michael Doheny.

3929. Plaintiff Melissa Doheny brings a claim individually and on behalf of the Estate of Michael Doheny, as its legal representative.

3930. Plaintiff Kathy Kugler is a citizen of the United States and domiciled in the State of Nebraska. She is the mother of Michael Doheny.

3931. Plaintiff Robert Kugler is a citizen of the United States and domiciled in the State of Oregon. He is the brother of Michael Doheny.

3932. As a result of the attack, and the death of Michael Doheny, Plaintiffs Melissa Doheny, Kathy Kugler and Robert Kugler have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/son's/brother's society, companionship, comfort, advice, and counsel.

### c) The Evrard Family

3933.   Steven Evrard was a citizen of the United States and domiciled in the State of Texas when he was killed in Iraq.

3934.   On December 9, 2007, Steven Evrard, aged 36, was serving as a civilian contractor in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3935.   Steven Evrard was killed in the attack.

3936.   The weapon used to kill Steven Evrard was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3937.   Plaintiff Tanya Evrard is a citizen of the United States and domiciled in the State of Texas. She is the widow of Steven Evrard.

3938.   As a result of the attack, and the death of Steven Evrard, Plaintiff Tanya Evrard has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her husband's companionship, comfort, advice, and counsel.

### d) The Johnson Family

3939.   Plaintiff Billy Johnson is a citizen of the United States and domiciled in the State of Tennessee.

3940.   On December 9, 2007, Billy Johnson was serving as a civilian contractor in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3941.   The weapon used to injure Billy Johnson was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3942.   As a result of the attack, Mr. Johnson's right leg was amputated below the knee. He also required multiple surgical implants in his left leg and left arm. In addition, Mr. Johnson

suffered amputation of one finger on his left hand and partial amputation of a finger on his right hand.

3943.   Mr. Johnson has endured more than fifty surgical procedures including multiple skin grafts. He also sustained a TBI and suffers from PTSD.

3944.   As a result of the attack, and the injuries he suffered, Plaintiff Billy Johnson has experienced severe physical and mental anguish and extreme emotional pain and suffering.

### 141.   The January 6, 2008, Attack–Baghdad

#### a) The Gudridge Family

3945.   James D. Gudridge was a citizen of the United States and domiciled in the State of New York when he was killed in Iraq.

3946.   On January 6, 2008, James D. Gudridge, aged 20, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3947.   James D. Gudridge was killed in the attack.

3948.   The weapon used to kill James D. Gudridge was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3949.   Plaintiff Judy Hoffman is a citizen of the United States and domiciled in the State of Florida. She is the mother of James D. Gudridge.

3950.   As a result of the attack, and the death of James D. Gudridge, Plaintiff Judy Hoffman has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her son's society, companionship, comfort, advice, and counsel.

#### b) The Schichtl Family

3951.   Plaintiff Joshua Schichtl is a citizen of the United States and domiciled in the State of Florida.

3952.   On January 6, 2008, Joshua Schichtl, then 40, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3953.   The weapon used to injure Joshua Schichtl was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3954.   As a result of the attack, Joshua Schichtl sustained shrapnel to his body, impacting his left eye, face and bicep. He also lost the use of his right eye.

3955.   As a result of the blast, his cheekbone and roof of his mouth were shattered, and he lost several of his teeth. His lower jawbone was broken in 19 locations and he has had pins placed in the area to attempt to provide some stability. He is still unable to open his mouth as wide as necessary and chewing continues to be difficult.

3956.   Joshua Schichtl received medical treatment both as an in-patient and resident for approximately five years.

3957.   He has undergone multiple surgeries including bone and skin grafts, many of which have involved the reconstruction of his mouth.

3958.   Significant scarring is apparent on his face.

3959.   Joshua Schichtl has been diagnosed with a TBI and an anxiety disorder and has sought and continues to seek counseling.

3960.   He still experiences frequent pain.

3961.   As a result of the attack, and the injuries he suffered, Plaintiff Joshua Schichtl has experienced severe physical and mental anguish and extreme emotional pain and suffering.

3962.   Plaintiff Mark Schichtl is a citizen of the United States and domiciled in the State of Arkansas. He is the father of Joshua Schichtl.

3963.   Plaintiff Katherine Prowse is a citizen of the United States and domiciled in the State of Arkansas. She is the sister of Joshua Schichtl.

3964.   Plaintiff Nicholas Prowse is a citizen of the United States and domiciled in the State of Arkansas. He is the brother of Joshua Schichtl.

3965.   Plaintiff H.S., a minor represented by his legal guardian, Joshua Schichtl, is a citizen of the United States and domiciled in the State of Florida. He is the son of Joshua Schichtl.

3966.   Plaintiff S.S., a minor represented by his legal guardian, Joshua Schichtl, is a citizen of the United States and domiciled in the State of Florida. He is the son of Joshua Schichtl.

3967.   Plaintiff C.S., a minor represented by his legal guardian, Joshua Schichtl, is a citizen of the United States and domiciled in the State of Florida. He is the son of Joshua Schichtl.

3968.   Plaintiff A.S., a minor represented by his legal guardian, Joshua Schichtl, is a citizen of the United States and domiciled in the State of Florida. He is the son of Joshua Schichtl.

3969.   As a result of the attack, and the injuries Joshua Schichtl has suffered, Plaintiffs Mark Schichtl, Katherine Prowse, Nicholas Prowse, H.S., S.S., C.S. and A.S. have experienced severe mental anguish, and extreme emotional pain and suffering.

### c)  The Wadleigh Family

3970.   Plaintiff Steve Wadleigh is a citizen of the United States and domiciled in the State of Washington.

3971.   On January 6, 2008, Steve Wadleigh, then 25, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3972.   The weapon used to injure Steve Wadleigh was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3973.   As a result of the attack, Steve Wadleigh sustained shrapnel to his face, neck, and shoulder. Shrapnel was imbedded in his jawbone, necessitating both facial surgery oral surgeries.

3974.   The impact of the blast caused his head to be thrown into the window of the vehicle. Mr. Wadleigh sustained a concussion and has been diagnosed with a TBI.

3975.   In addition, his ear drum was perforated, and his tooth was broken.

3976.   The vision in his left eye has been diminished and he continues to experience pain in his shoulder and hip.

3977.   He has been diagnosed with PTSD and he has sought counseling. He has experienced night terrors and has been prescribed medication to address them and other sleep-related issues.

3978.   The effects of the PTSD, along with the TBI, impact his daily living.

3979.   As a result of the attack, and the injuries he suffered, Plaintiff Steve Wadleigh has experienced severe physical and mental anguish and extreme emotional pain and suffering.

3980.   Plaintiff Lea-Ann Wadleigh is a citizen of the United States and domiciled in the State of Washington. She is the wife of Steve Wadleigh.

3981.   As a result of the attack, and the injuries Steve Wadleigh has suffered, Plaintiff Lea-Ann Wadleigh has experienced severe mental anguish, and extreme emotional pain and suffering.

**142.   The January 30, 2008, Attack–Baghdad**

*a)  The Lukow Family*

3982.   Plaintiff Michael Lukow is a citizen of the United States and domiciled in the State of Utah.

3983.   On January 30, 2008, Michael Lukow was serving in the U.S. military in Iraq.

3984.   Mr. Lukow was in a convoy when an EFP emplaced by Special Groups struck his vehicle.

3985. The weapon used to injure Mr. Lukow was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3986. As a result of the attack, Mr. Lukow's foot was amputated.

3987. As a result of the attack, and the injuries he suffered, Plaintiff Michael Lukow has experienced severe physical and mental anguish and extreme emotional pain and suffering.

3988. Plaintiff Rikki Lukow is a citizen of the United States and domiciled in the State of Colorado. She is the mother of Michael Lukow.

3989. Plaintiff Bruce Lukow is a citizen of the United States and domiciled in the State of Colorado. He is the father of Michael Lukow.

3990. Plaintiff Joseph Lukow is a citizen of the United States and domiciled in the State of Colorado. He is the brother of Michael Lukow.

3991. Plaintiff Andrew Lukow is a citizen of the United States and domiciled in the State of Wisconsin. He is the brother of Michael Lukow.

3992. Plaintiff Kristen Kelley is a citizen of the United States and domiciled in the State of Colorado. She is the sister of Michael Lukow.

3993. As a result of the attack and the injuries Michael Lukow suffered, Plaintiff Rikki Lukow, Bruce Lukow, Joseph Lukow, Andrew Lukow and Kristen Kelley have experienced severe mental anguish and extreme emotional pain and suffering.

### 143.  The February 19, 2008, Attack–Baghdad

#### a) The Alvarez Family

3994. Conrad Alvarez was a citizen of the United States and domiciled in the State of Texas when he was killed in Iraq.

3995.   On February 19, 2008, Conrad Alvarez, aged 22, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3996.   Conrad Alvarez was injured in the attack and died on February 20, 2008 from the injuries he sustained in the attack.

3997.   The weapon used to kill Conrad Alvarez was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3998.   Plaintiff Maira Alvarez is a citizen of the United States and domiciled in the State of Texas. She is the widow of Conrad Alvarez.

3999.   Plaintiff Maira Alvarez brings a claim individually and on behalf of the Estate of Conrad Alvarez, as its legal representative.

4000.   Plaintiff K.A., a minor represented by his legal guardian, Maira Alvarez, is a citizen of the United States and domiciled in the State of Texas. He is the son of Conrad Alvarez.

4001.   Plaintiff Alyssa Alvarez is a citizen of the United States and domiciled in the State of California. She is the daughter of Conrad Alvarez.

4002.   Angela Alvarez is a citizen of the United States and domiciled in the State of California. She is the ex-wife of Conrad Alvarez and is the legal guardian of Plaintiff C.A. Angela Alvarez brings this action solely on behalf of Plaintiff C.A., a minor.

4003.   Plaintiff C.A., a minor represented by her legal guardian, Angela Alvarez, is a citizen of the United States and domiciled in the State of California. She is the daughter of Conrad Alvarez.

4004.   Plaintiff Belinda Garcia is a citizen of the United States and domiciled in the State of Texas. She is the mother of Conrad Alvarez.

4005. As a result of the attack, and the death of Conrad Alvarez, Plaintiffs Maira Alvarez, K.A., Alyssa Alvarez, C.A. and Belinda Garcia have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's/son's society, companionship, comfort, advice, and counsel.

### b) The Whitehorse Family

4006. Plaintiff Jason Whitehorse is a citizen of the United States and domiciled in the State of New Mexico.

4007. On February 19, 2008, Jason Whitehorse, then 22, was serving in the U.S. military in Iraq.

4008. Mr. Whitehorse was on a routine patrol in Baghdad when his vehicle was struck by an EFP emplaced by Special Groups.

4009. The weapon used to injure Mr. Whitehorse was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4010. As a result of the attack, he sustained injuries due to the impact of shrapnel impacting his body. This has resulted in scarring.

4011. Apart from the shrapnel-related injuries he also sustained burns to his skin. This has also resulted in scarring.

4012. Mr. Whitehorse has been diagnosed with PTSD and major depression and has received treatment and counseling.

4013. Mr. Whitehorse continues to experience emotional distress, depression and survivor's guilt.

4014. As a result of the attack, and the injuries he suffered, Plaintiff Jason Whitehorse has experienced severe mental anguish and extreme emotional pain and suffering.

### 144. The February 19, 2008, Attack–Baghdad

#### a) The Mann Family

4015. Plaintiff Jeffrey C. Mann is a citizen of the United States and domiciled in the State of North Carolina.

4016. On February 19, 2008, Jeffrey C. Mann, then 25, was serving in the U.S. military in Iraq.

4017. Jeffrey C. Mann was inside a building at Forward Operating Base Rustamiyah in the southeast portion of Baghdad when the base was hit with a barrage of Improvised Rocket-Assisted Munitions ("IRAMs") fired from a dump truck in close proximity to the base.

4018. One of the rockets caused a fuel tank on the base to explode which destroyed part of the building in which Jeffrey C. Mann was standing.

4019. KH operatives fired the IRAMs at the base. Those operatives were trained by Hezbollah and funded and supplied by the IRGC–QF and they launched the attack at the direction of both Hezbollah and the IRGC–QF as their proxy.

4020. The concussive blast of the explosion threw Jeffrey C. Mann backward, and he hit his head causing him to lose consciousness.

4021. As a result of the attack, Jeffrey C. Mann suffered a TBI that has impeded his ability to concentrate or work. He also suffers from migraines and difficulty in completing tasks. The injuries he sustained have also caused him impaired vision and loss of feeling in part of his face in addition to tinnitus and hearing loss. He also suffered injuries to his back which now require him to walk with a cane when walking for any extended period of time while also suffering pain and numbness in his legs. He also suffers from PTSD.

4022. As a result of the attack, and the injuries he suffered, Jeffrey C. Mann has experienced severe physical and mental anguish and extreme emotional pain and suffering.

**145.    The March 11, 2008, Attack–Babil Province**

> *a)  The West Family*

4023.    Laurent J. West was a citizen of the United States and domiciled in the State of North Carolina when he was killed in Iraq.

4024.    On March 11, 2008, Laurent J. West, aged 32, was serving in the U.S. military in Iraq when an IED (likely an EFP) was emplaced and detonated near his vehicle by JAM Special Groups.

4025.    Laurent J. West was killed in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC–QF and Hezbollah.

4026.    Plaintiff Michelle West is a citizen of the United States and domiciled in the State of New Mexico. She is the widow of Laurent J. West.

4027.    As a result of the attack, and the death of Laurent J. West, Plaintiff Michelle West has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her husband's society, companionship, comfort, advice, and counsel.

**146.    The March 12, 2008, Attack–Camp Adder**

> *a)  The Samten Family*

4028.    Tenzin Lobsang Samten was a citizen of the United States and domiciled in the State of Arizona.

4029.    On March 12, 2008, Tenzin Lobsang Samten, then 33, was serving in the U.S. military in Iraq near the city of An-Nasiriyah when his vehicle was struck by mortar fire launched by JAM Special Groups terror operatives.

4030.    Tenzin Lobsang Samten was killed in the attack.

4031. The attack that killed Tenzin Lobsang Samten was carried out by JAM Special Groups operatives working at the behest of Hezbollah and the IRGC–QF, using weapons supplied by the IRGC–QF and employing tactics taught to them by Hezbollah.

4032. Plaintiff Rebecca L. Samten–Finch is a citizen of the United States and domiciled in the State of North Carolina. She is the wife of Tenzin Lobsang Samten.

4033. Plaintiff Rebecca L. Samten–Finch brings an action individually and on behalf of the Estate of Tenzin Lobsang Samten, as its legal representative.

4034. Plaintiff Dharma Amelia Samten is a citizen of the United States and domiciled in the State of North Carolina. She is the daughter of Tenzin Lobsang Samten.

4035. Plaintiff Michael Bodhi Samten is a citizen of the United States and domiciled in the State of North Carolina. He is the son of Tenzin Lobsang Samten.

4036. As a result of the attack, and the death of Tenzin Lobsang Samten, Plaintiffs Rebecca L. Samten–Finch, Dharma Amelia Samten, and Michael Bodhi Samten have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice, and counsel.

### b) The Bradley Family

4037. Juantrea Tyrone Bradley was a citizen of the United States and domiciled in the State of North Carolina.

4038. On March 12, 2008, Juantrea Tyrone Bradley, then 28, was serving in the U.S. military in Ira near the city of An-Nasiriyah when his vehicle was struck by mortar fire launched by JAM Special Groups terror operatives.

4039. Juantrea Tyrone Bradley was killed in the attack.

4040.   The attack that killed Juantrea Tyrone Bradley was carried out by JAM Special Groups operatives working at the behest of Hezbollah and the IRGC–QF, using weapons supplied by the IRGC–QF and employing tactics taught to them by Hezbollah.

4041.   Plaintiff Ava Lanette Bradley is a citizen of the United States and domiciled in the State of North Carolina. She is the widow of Juantrea Tyrone Bradley.

4042.   Plaintiff Ava Lanette Bradley brings an action individually and on behalf of the Estate of Juantrea Tyrone Bradley, as its legal representative.

4043.   Plaintiff Asia Dabrea Bradley is a citizen of the United States and domiciled in the State of North Carolina. She is the daughter of Juantrea Tyrone Bradley.

4044.   Plaintiff Trevon Tyrone Bradley is a citizen of the United States and domiciled in the State of North Carolina. He is the son of Juantrea Tyrone Bradley.

4045.   Plaintiff Juantrea Tyrone Bradley Jr. is a citizen of the United States and domiciled in the State of North Carolina. He is the son of Juantrea Tyrone Bradley.

4046.   Plaintiff Anthony Hudson is a citizen of the United States and domiciled in the State of North Carolina. He is the stepson of Juantrea Tyrone Bradley.

4047.   As a result of the attack, and the death of Juantrea Tyrone Bradley, Plaintiffs Ava Lanette Bradley, Asia Dabrea Bradley, Trevon Tyrone Bradley, Juantrea Tyrone Bradley Jr., and Anthony Hudson have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice, and counsel.

### 147.   The March 14, 2008, Attack–Musayyib

#### a)  The Bewley Family

4048.   Plaintiff Austin Bewley is a citizen of the United States and domiciled in the State of Oregon.

4049. On March 14, 2008, Austin Bewley, then 20, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near the vehicle in which he was traveling on the way to Baghdad.

4050. The weapon used to injure Austin Bewley was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4051. Mr. Bewley suffered shrapnel wounds in his left leg, right hand, and face.

4052. Mr. Bewley was also diagnosed with PTSD.

4053. Mr. Bewley was prescribed pain medication and medication to regrow the nerve in his leg. He was also prescribed medication to treat the symptoms of his PTSD.

4054. As a result of the attack, and the injuries he suffered, Plaintiff Austin Bewley has experienced severe physical and mental anguish and extreme emotional pain and suffering.

**148. The March 17, 2008, Attack–Baghdad**

*a) The Simpson Family*

4055. Christopher Simpson was a citizen of the United States and domiciled in the State of Virginia when he was killed in Iraq.

4056. On March 17, 2008, Christopher Simpson, aged 23, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

4057. Christopher Simpson was killed in the attack.

4058. The weapon used to kill Christopher Simpson was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4059. Plaintiff Mary Catherine McLaughlin is a citizen of the United States and domiciled in the State of New York. She is the mother of Christopher Simpson.

4060.    As a result of the attack, and the death of Christopher Simpson, Plaintiff Mary Catherine McLaughlin has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her son's society, companionship, comfort, advice, and counsel.

**149.    The March 23, 2008, Attack–Baghdad**

### a) The Habsieger Family

4061.    Andrew J. Habsieger was a citizen of the United States and domiciled in the State of Missouri when he was killed in Iraq.

4062.    On March 23, 2008, Andrew J. Habsieger, aged 22, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

4063.    Andrew J. Habsieger was killed in the attack.

4064.    The weapon used to kill Andrew J. Habsieger was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4065.    Brenda Habsieger is a citizen of the United States and domiciled in the State of Missouri. She is the mother of Andrew J. Habsieger.

4066.    Brenda Habsieger brings an action on behalf of the Estate of Andrew J. Habsieger, as its legal representative, for his death and any suffering and/ or economic loss he/his Estate sustained as a result of the attack.

### b) The Hake Family

4067.    Christopher M. Hake was a citizen of the United States and domiciled in the State of Oklahoma when he was killed in Iraq.

4068.    On March 23, 2008, Christopher M. Hake, aged 26, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

4069.    Christopher M. Hake was killed in the attack.

4070. The weapon used to kill Christopher M. Hake was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4071. Plaintiff Jennifer Renee York is a citizen of the United States and domiciled in the State of Oklahoma. She is the stepsister of Christopher M. Hake.

4072. Plaintiff Jason York is a citizen of the United States and domiciled in the State of Oklahoma. He is the stepbrother of Christopher M. Hake.

4073. As a result of the attack, and the death of Christopher M. Hake, Plaintiffs Jennifer Renee York and Jason York have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their brother's society, companionship, comfort, advice, and counsel.

### c) The Fieser Family

4074. Plaintiff Matthew Fieser is a citizen of the United States and domiciled in the State of Washington.

4075. On March 23, 2008, Matthew Fieser, then 25, was serving in the U.S. military in Iraq.

4076. He was an occupant in a vehicle traveling in the same convoy when an EFP emplaced by Special Groups detonated near the lead vehicle, resulting in the deaths of four soldiers that day and the death of Steve A. McCoy, who subsequently died as a result of his injuries.

4077. The weapon that caused the deaths of the soldiers who had been traveling in the lead vehicle was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4078. Following the blast, the lead vehicle began to burn, eventually burning uncontrollably.

4079.   Steve A. McCoy, the truck commander of the lead vehicle exited the vehicle, his body and clothes on fire. Nearly all his clothes had been burned off.

4080.   After the vehicle in which Mr. Fieser was traveling approached the disabled vehicle he dismounted. While engulfed in flames, Steve A. McCoy began running towards Mr. Fieser, screaming and crying out to him.

4081.   Although severely burned all over his body, Steve A. McCoy remained conscious following the attack. After a period of time, Mr. Fieser helped to move Mr. McCoy onto a support to prepare him for transport.

4082.   Mr. Fieser traveled alongside Steve A. McCoy and continued to talk to him he was transported to the hospital. Throughout this period, Steve A. McCoy continued to scream with pain and cough up a foamy substance.

4083.   After arriving at the hospital Mr. Fieser learned that the other occupants of the lead vehicle had been severely burned, could not be extricated from their vehicle, and did not survive.

4084.   Mr. Fieser has been diagnosed with PTSD and has experienced nightmares.

4085.   Mr. Fieser has sought counseling and has been prescribed medication, including anti-depressants, to treat his condition.

4086.   As a result of the attack, and the injuries he suffered, Plaintiff Matthew Fieser has experienced severe physical and mental anguish and extreme emotional pain and suffering.

### d)  The Carrington Family

4087.   Plaintiff Benjamin Daniel Carrington is a citizen of the United States and domiciled in the State of Georgia.

4088.   On March 23, 2008, Benjamin Daniel Carrington, then 22, was serving in the U.S. military in Iraq.

4089.  Mr. Carrington was the driver of the vehicle in which Plaintiff Matthew Fieser was traveling when an EFP emplaced by Special Groups detonated near the lead vehicle in the convoy, resulting in the deaths of four soldiers that day and the death of Steve A. McCoy, who subsequently died as a result of his injuries.

4090.  The weapon that caused the deaths of the soldiers who had been traveling in the lead vehicle was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4091.  Mr. Carrington witnessed the attack scene and the aftermath, including the soldier who was engulfed in flames.

4092.  He has been diagnosed with PTSD.

4093.  Mr. Carrington has sought counseling and has been prescribed medication to treat his condition.

4094.  As a result of the attack, and the injuries he suffered, Plaintiff Benjamin Daniel Carrington has experienced severe physical and mental anguish and extreme emotional pain and suffering.

### e)  The Heslop Family

4095.  Plaintiff Jonathan Heslop is a citizen of the United States and domiciled in the State of Ohio.

4096.  On March 23, 2008, Jonathan Heslop, then 23, was serving in the U.S. military in Iraq.

4097.  Jonathan Heslop was the gunner of the vehicle that Benjamin Carrington was driving and was traveling in the same convoy when an EFP emplaced by Special Groups detonated

near the lead vehicle, resulting in the deaths of four soldiers that day and the death of Steve A. McCoy, who subsequently died as a result of his injuries.

4098. The weapon that caused the deaths of the soldiers who had been traveling in the lead vehicle was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4099. Mr. Heslop witnessed the attack scene and the aftermath, including seeing Mr. McCoy when he was engulfed in flames.

4100. Jonathan Heslop has been diagnosed with PTSD.

4101. Mr. Heslop has sought counseling to address the PTSD and the impact that the attack has had upon him. He has been prescribed medication to treat this condition.

4102. As a result of the attack, and the injuries he suffered, Plaintiff Jonathan Heslop has experienced severe physical and mental anguish and extreme emotional pain and suffering.

### f)  The Mason Family

4103. Plaintiff Russell Mason is a citizen of the United States and domiciled in the State of Maryland.

4104. On March 23, 2008, Russell Mason, then 23, was serving in the U.S. military in Iraq.

4105. Russell Mason was the commander of the convey and was an occupant in the vehicle being driven by Benjamin Carrington traveling in the same convoy when an EFP emplaced by Special Groups detonated near the lead vehicle, resulting in the deaths of four soldiers that day and the death of Steve A. McCoy, who subsequently died as a result of his injuries.

4106. The weapon that caused the deaths of the soldiers who had been traveling in the lead vehicle was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of

Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4107. Following the blast, the lead vehicle began to burn, eventually burning uncontrollably.

4108. Steve A. McCoy, the truck commander of the lead vehicle exited the vehicle, his body and clothes on fire. Nearly all his clothes had been burned off.

4109. After the vehicle in which Mr. Mason was traveling approached the disabled vehicle he dismounted. While engulfed in flames, Steve A. McCoy began running towards Mr. Fieser, screaming and crying out to him.

4110. While trying to help Steve A. McCoy, they came under fire from the ground floor and a second-floor window positions south of where the convey had been attacked.

4111. He suffers from PTSD and has experienced survivor's guilt. He has received treatment and counseling for these issues.

4112. As a result of the attack, and the injuries he suffered, Plaintiff Russell Mason has experienced severe physical and mental anguish and extreme emotional pain and suffering.

### g) The Pool Family

4113. Plaintiff Andy Pool is a citizen of the United States and domiciled in the State of Arkansas.

4114. On March 23, 2008, Andy Pool, then 26, was serving in the U.S. military in Iraq.

4115. Andy Pool was an occupant of the vehicle that Benjamin Carrington was driving when an EFP emplaced by Special Groups detonated near the lead vehicle in the convoy, resulting in the deaths of four soldiers that day and the subsequent death of Steve A. McCoy.

4116. The weapon that caused the deaths of the soldiers who had been traveling in the lead vehicle was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of

Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4117.   Mr. Pool witnessed the attack scene and the aftermath, including seeing Steve A. McCoy when he was engulfed in flames. Although essentially unrecognizable, Mr. Pool realized it was Steve A. McCoy solely from his tattoo that was somewhat visible.

4118.   Mr. Pool traveled alongside Steve A. McCoy and continued to talk to him as he was transported to the hospital. Throughout this period, Steve A. McCoy continued to scream with pain. While en route to the hospital, Steve A. McCoy asked Andy Pool to tell his wife and children that he loved them.

4119.   Andy Pool endures extreme survivor's guilt. He has also experienced nightmares and sleep issues.

4120.   He has been diagnosed with PTSD.

4121.   Mr. Pool has sought counseling to address the PTSD and the impact that the attack has had upon him. He has been prescribed medication to treat this condition and the sleep issues that have developed since the attack.

4122.   As a result of the attack, and the injuries he suffered, Plaintiff Andy Pool has experienced severe physical and mental anguish and extreme emotional pain and suffering.

**150.   The March 23, 2008, Attack–Baghdad**

*a)  The Converse Family*

4123.   Paul R. Converse was a citizen of the United States and domiciled in the State of Washington.

4124.   On March 23, 2008, Paul R. Converse, then 56, was a civilian working as an auditor for the Special Inspector General for Iraq Reconstruction ("SIGIR") in Baghdad.

4125.   On March 23, 2008, a barrage of six 107mm rockets were fired by JAM Special Groups into the Green Zone in Baghdad where Paul R. Converse was working on Easter Sunday.

4126.   Paul R. Converse was mortally wounded in the rocket attack and succumbed to his wounds the following day.

4127.   The JAM Special Groups terror operatives that murdered Paul R. Converse were trained by Hezbollah and funded and armed by the IRGC–QF and they launched the attack at the direction of both Hezbollah and the IRGC–QF, as their proxy

4128.   Plaintiff Frank L. Converse is a citizen of the United States and domiciled in the State of Washington. He is the brother of Paul R. Converse.

4129.   Plaintiff Frank L. Converse brings an action individually and on behalf of the Estate of Paul R. Converse, as its legal representative.

4130.   As a result of the attack, and the death of Paul R. Converse, Plaintiff Frank L. Converse has experienced severe mental anguish, extreme emotional pain and suffering, and loss of his brother's society, companionship, comfort, advice, and counsel.

**151.   The March 27, 2008, Attack–Sadr City**

*a)  The Gerber Family*

4131.   Plaintiff Anthony M. Gerber is a citizen of the United States and domiciled in the State of Washington.

4132.   On March 27, 2008, Anthony M. Gerber was serving in the U.S. military in Iraq.

4133.   Mr. Gerber was in a convoy when an EFP emplaced by Special Groups struck the vehicle immediately in front of his.

4134.   The weapon used to injure Mr. Gerber was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4135.   Additionally, Mr. Gerber was also involved in additional attacks involving JAM during the Battle of Sadr City. He was involved in several counter-offensives against JAM terrorists. He was the target of regular ambushes by JAM that relied on the use of women and children as human shields and RPG and sniper attacks. Mr. Gerber was also part of: the fight surrounding the construction of the wall on Route Gold; the battle involving Chris Kyle depicted in American Sniper; the fighting to interdict JAM attempts to resupply Sadr City and/or counter JAM attempts to overwhelm the Americans on the flanks of Sadr City during the Battle of Sadr City.

4136.   As a result of this attack and the additional combat Mr. Geber was involved in, he suffered multiple concussions and suffers from PTSD, TBI, chronic back pain and tinnitus.

4137.   As a result of the attack, and the injuries he suffered, Plaintiff Anthony M. Gerber has experienced severe physical and mental anguish and extreme emotional pain and suffering.

### b)  The Gregston Family

4138.   Plaintiff Charles B. Gregston served in Iraq as part of the 1-2 Stryker Calvary Regiment. He is a citizen of the United States and domiciled in the State of California.

4139.   During 2007 and 2008, Charles B. Gregston was deployed in and/or near Sadr City, Iraq for 15 months. For the entire Battle of Sadr City, Charles B. Gregston was either directly in Sadr City or doing patrols on the outskirts of the area. Charles B. Gregston's second and final deployment was from November 2009 to December 2010, when he was stationed on the outskirts of Baghdad.

4140.   During both deployments in Iraq, Charles B. Gregston's unit confronted JAM Special Groups. Charles B. Gregston was an immediate responder during the JAM Special Groups sniper attack that killed Randell Olguin on September 30, 2007, and the JAM Special Groups EFP attack that killed Joshua A. Molina and injured Plaintiff Anthony M. Gerber on March 27, 2008.

Charles B. Gregston was exposed to multiple roadside bombs while his unit patrolled JAM Special Groups strongholds.

4141.  The weapon used to kill Joshua A. Molina was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4142.  The attacks described herein were perpetrated by JAM Special Groups operatives working at the direction of Hezbollah and the IRGC–QF, using weapons supplied by the IRGC–QF and employing training provided by Hezbollah.

4143.  Due to his multiple encounters with JAM, JAM Special Groups and exposure to multiple blasts from JAM and JAM Special Groups devices, Charles B. Gregston sustained a number of injuries, including PTSD, TBIs, and tinnitus, resulting in, among other things, permanent hearing loss. Due to his injuries, Charles B. Gregston received a 100 percent disability rating from the VA.

4144.  As a result of the JAM and JAM Special Groups attacks, Charles B. Gregston has experienced severe physical and mental anguish and extreme emotional pain and suffering.

**152.  The March 29, 2008, Attack–Baghdad**

*a)  The Reiher Family*

4145.  Plaintiff Carl Reiher is a citizen of the United States and domiciled in the State of Arkansas.

4146.  On March 29, 2008, Carl Reiher was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

4147.  The weapon used to injure Carl Reiher was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4148.   As a result of the attack, Mr. Reiher's left arm was amputated. He also sustained multiple burns injuries.

4149.   As a result of the attack, and the injuries he suffered, Plaintiff Carl Reiher has experienced severe physical and mental anguish and extreme emotional pain and suffering.

### 153.   The April 3, 2008, Attack–Sadr City

#### a)  The Robinson Family

4150.   Plaintiff Jason Robinson is a citizen of the United States and domiciled in the State of Virginia.

4151.   On April 3, 2008, Jason Robinson was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

4152.   The weapon used to injure Jason Robinson was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4153.   As a result of the attack, Jason Robinson's sustained shrapnel wounds to his face, neck and shoulder. The blast also dislocated two lumbar disks and ruptured both of his eardrums.

4154.   As a result of the attack, and the injuries he suffered, Plaintiff Jason Robinson has experienced severe physical and mental anguish and extreme emotional pain and suffering.

4155.   Plaintiff Frances Robinson is a citizen of the United States and domiciled in the State of Virginia. She is the wife of Jason Robinson.

4156.   Plaintiff Emily Robinson is a citizen of the United States and domiciled in the State of Virginia. She is the daughter of Jason Robinson.

4157.   Plaintiff William Justin Weatherly is a citizen of the United States and domiciled in the State of Virginia. He is the stepson of Jason Robinson.

4158.   Plaintiff Michael Weatherly is a citizen of the United States and domiciled in the State of Texas. He is the stepson of Jason Robinson.

4159.   As a result of the attack, and the injuries suffered by Jason Robinson, Plaintiffs Frances Robinson, Emily Robinson, William Justin Weatherly and Michael Weatherly have experienced severe mental anguish, and extreme emotional pain and suffering.

## 154.   The April 6, 2008, Attack–Baghdad

### a)  The Wolfer Family

4160.   Stuart Wolfer was a citizen of the United States and domiciled in the State of Idaho when he was killed in Iraq.

4161.   On April 6, 2008, Stuart Wolfer, aged 36, was serving in the United States military in Iraq when JAM Special Groups terror operatives attacked his unit.

4162.   Stuart Wolfer was killed as a result of injuries sustained in the attack.

4163.   The attack was perpetrated by JAM Special Groups terror operatives working at the direction of Hezbollah and the IRGC–QF, using weapons supplied by the IRGC–QF and employing training provided by Hezbollah.

4164.   Plaintiff Lee Wolfer is a citizen of the United States and domiciled in the State of Iowa. She is the widow of Scott Wolfer.

4165.   Plaintiff Lee Wolfer brings an action individually and on behalf of the Estate of Stuart Wolfer, as its legal representative.

4166.   Plaintiff Lillian Wolfer is a citizen of the United States and domiciled in the State of Iowa. She is the daughter of Scott Wolfer.

4167.   Plaintiff Melissa Wolfer is a citizen of the United States and domiciled in the State of Iowa. She is the daughter of Scott Wolfer.

4168.   Plaintiff I.W., a minor represented by her legal guardian, Lee Wolfer, is a citizen of the United States and domiciled in the State of Iowa. She is the daughter of Scott Wolfer.

4169.   Plaintiff Beverly Wolfer is a citizen of the United States and domiciled in the State of New York. She is the sister of Stuart Wolfer.

4170.   As a result of the attack, and the death of Stuart Wolfer, Plaintiffs Leonard Wolfer, Esther Wolfer, Lee Wolfer, Lillian Wolfer, Melissa Wolfer, I.W., and Beverly Wolfer have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/husband's/father's/son's/brother's society, companionship, comfort, advice, and counsel.

**155.   The April 7, 2008, Attack–Baghdad**

   *a) The Vaughn Family*

4171.   Richard A. Vaughn was a citizen of the United States and domiciled in the State of California when he was killed in Iraq.

4172.   On April 7, 2008, Richard A. Vaughn, aged 22, was serving in the U.S. military in Iraq when a vehicle in his unit, 1st Battalion, 66th Armor Regiment, 1st Brigade Combat Team, 4th Infantry Division, was struck by an EFP emplaced by Special Groups and Vaugh and his unit came under attack by RPGs and small arms fire.

4173.   Richard A. Vaughn was killed in the attack.

4174.   The weapon used in the attack that killed Richard A. Vaughn was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4175.   Plaintiff Rachelle Idol is a citizen of the United States and domiciled in the State of North Carolina. She is the widow of Richard A. Vaughn.

4176.   Plaintiff James Vaughn is a citizen of the United States and domiciled in the State of Arizona. He is the father of Richard A. Vaughn.

4177.   Plaintiff Jeannine Vaughn is a citizen of the United States and domiciled in the State of Arizona. She is the mother of Richard A. Vaughn.

4178.   Plaintiff Clifford Vaughn is a citizen of the United States and domiciled in the State of Arizona. He is the brother of Richard A. Vaughn.

4179.   As a result of the attack, and the death of Richard A. Vaughn, Plaintiffs Rachelle Idol, James Vaughn, Jeannine Vaughn and Clifford Vaughn have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/son's/brother's society, companionship, comfort, advice, and counsel.

### 156.   The April 8, 2008, Attack–Kharguliah

#### a)  The Hartley Family

4180.   Jeffery Hartley was a citizen of the United States and domiciled in the State of Texas when he was killed in Iraq.

4181.   On April 8, 2008, Jeffery Hartley, aged 25, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

4182.   Jeffery Hartley was killed in the attack.

4183.   The weapon used to kill Jeffery Hartley was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4184.   Plaintiff David Wayne Hartley is a citizen of the United States and domiciled in the State of Texas. He is the brother of Jeffrey Hartley.

4185.   Plaintiff Kaylie Hartley is a citizen of the United States and domiciled in the State of Texas. She is the sister of Jeffery Hartley.

4186.   Plaintiff Lisa Duncan is a citizen of the United States and domiciled in the State of Texas. She is the sister of Jeffery Hartley.

4187.   As a result of the attack, and the death of Jeffery Hartley, Plaintiffs David Wayne Hartley, Kaylie Hartley and Lisa Duncan have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their brother's society, companionship, comfort, advice, and counsel.

### 157.   The April 9, 2008, Attack–Sadr City

#### a)  The Ault Family

4188.   Jesse A. Ault was a citizen of the United States and domiciled in the State of Virginia when he was killed in Iraq.

4189.   On April 9, 2008, Jesse A. Ault, aged 28, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

4190.   Jesse A. Ault was killed in the attack.

4191.   The weapon used to kill Jesse A. Ault was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4192.   Plaintiff Virginia Billiter is a citizen of the United States and domiciled in the State of West Virginia. She is the mother of Jesse A. Ault.

4193.   Plaintiff Eric Billiter is a citizen of the United States and domiciled in the State of West Virginia. He is the stepfather of Jesse A. Ault.

4194.   Plaintiff Adrianne Kidd is a citizen of the United States and domiciled in the State of North Carolina. She is the stepsister of Jesse A. Ault.

4195.   As a result of the attack, and the death of Jesse A. Ault, Plaintiffs Virginia Billiter, Eric Billiter and Adrianne Kidd have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice, and counsel.

158. **The April 12, 2008, Attack–Baghdad**

    *a) The Allmon Family*

4196.   William E. Allmon was a citizen of the United States and domiciled in the State of Oklahoma when he was killed in Iraq.

4197.   On April 12, 2008, William E. Allmon, aged 25, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

4198.   William E. Allmon was killed in the attack.

4199.   The weapon used to kill William E. Allmon was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4200.   Plaintiff William Allmon is a citizen of the United States and domiciled in the State of Georgia. He is the father of William E. Allmon.

4201.   Plaintiff William Allmon brings an action individually and on behalf of the Estate of William E. Allmon, as its legal representative.

4202.   As a result of the attack, and the death of William E. Allmon, Plaintiff William Allmon has experienced severe mental anguish, extreme emotional pain and suffering and loss of his son's society, companionship, comfort, advice, and counsel.

159. **The April 17, 2008, Attack–Sadr City**

    *a) The Sloan Family*

4203.   Plaintiff Ronald Sloan is a citizen of the United States and domiciled in the State of Tennessee.

4204.   On April 17, 2008, Ronald Sloan, age 32, was serving in the U.S. military in Iraq.

4205.   Mr. Sloan was on patrol in Sadr City when the Abrams tank he was in was struck by an EFP emplaced by Special Groups.

4206.   The weapon used to injure Mr. Sloan was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4207.   As a result of the attack, Mr. Sloan was struck by shrapnel on the right side of his face and neck.

4208.   He was medevaced to the 86th combat support hospital for treatment of his wounds. He was then sent to the Green Zone for further evaluation.

4209.   Mr. Sloan also suffers from PTSD as a result of the attack.

4210.   As a result of the attack, and the injuries he suffered, Plaintiff Ronald Sloan has experienced severe physical and mental anguish and extreme emotional pain and suffering.

### 160.   The April 21, 2008, Attack–Sadr City

#### a)   The Thomsen Family

4211.   Plaintiff Mark E. Thomsen is a citizen of the Unites States and domiciled in the State of Arkansas.

4212.   On April 21, 2008, Mark E. Thomsen was serving in the U.S. military in Iraq when his unit was attacked with an IRAM.

4213.   The attack was perpetrated by Hezbollah-trained and IRGC–QF-supplied operatives of the JAM and KH Special Groups acting as agents and proxies of Hezbollah and the IRGC–QF.

4214.   As a result of the attack, Mark E. Thomsen suffered a concussion. He also suffers from TBI and PTSD.

4215.   As a result of the attack, and the injuries he suffered, Plaintiff Mark E. Thomsen has experienced severe physical and mental anguish and extreme emotional pain and suffering.

4216.   Plaintiff Ardell Thomsen is a citizen of the United States and domiciled in the State of Arkansas. She is the mother of Mark E. Thomsen.

4217.   Plaintiff Ralph Thomsen is a citizen of the United States and domiciled in the State of Arkansas. He is the father of Mark E. Thomsen.

4218.   As a result of the attack, and the injuries suffered by Mark E. Thomsen, Plaintiffs Ardell Thomsen and Ralph Thomsen have experienced severe mental anguish, and extreme emotional pain and suffering.

### 161.   The April 21, 2008, Attack–Baghdad

#### a)  The Bogart Family

4219.   Plaintiff Evan D. Bogart is a citizen of the Unites States and domiciled in the State of Arizona.

4220.   On April 21, 2008, Evan Bogart was serving was serving in the U.S. military in Iraq.

4221.   Mr. Bogart was in a convoy when an EFP emplaced by Special Groups struck his vehicle.

4222.   The weapon used to injure Mr. Bogart was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4223.   As a result of the attack, Mr. Bogart sustained burns and blast injuries to his face as well as a shrapnel injury to his left shoulder. He also suffers from PTSD and tinnitus.

4224.   As a result of the attack, and the injuries he suffered, Plaintiff Evan D. Bogart has experienced severe physical and mental anguish and extreme emotional pain and suffering.

4225.   Plaintiff Lani D. Bogart is a citizen of the Unites States and domiciled in the State of Arizona. She is the mother of Evan D. Bogart.

4226. Plaintiff Douglas R. Bogart is a citizen of the Unites States and domiciled in the State of Arizona. He is the brother of Evan D. Bogart.

4227. Plaintiff Christopher Bogart is a citizen of the Unites States and domiciled in the State of Arizona. He is the brother of Evan D. Bogart.

4228. Plaintiff Cana Hickman is a citizen of the Unites States and domiciled in the State of Texas. She is the sister of Evan D. Bogart.

4229. As a result of the attack, and the injuries suffered by Evan D. Bogart, Plaintiffs Lani D. Bogart, Douglas R. Bogart, Christopher Bogart and Cana Hickman have experienced severe mental anguish, and extreme emotional pain and suffering.

## 162. The April 21, 2008, Attack–Sadr City

### a) *The Rosa-Valentin Family*

4230. Plaintiff Luis Rosa-Valentin is a citizen of the United States and domiciled in the State of Maryland.

4231. On April 21, 2008, Luis Rosa-Valentin, then 24, was serving in the U.S. military in Iraq.

4232. Mr. Rosa-Valentin was on foot patrol in the Al Amin neighborhood of Baghdad when he was struck by an EFP emplaced by Special Groups.

4233. The weapon used to injure Mr. Rosa-Valentin was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4234. As a result of the attack, Mr. Rosa-Valentin lost both of his legs and his left arm. He also suffered blindness in one eye, lost his hearing, and broke every bone in his face.

4235. He has also been diagnosed with a TBI and PTSD.

4236.   As a result of the attack, and the injuries he suffered, Plaintiff Luis Rosa-Valentin has experienced severe physical and mental anguish and extreme emotional pain and suffering.

4237.   Plaintiff Milinda Rosa is a citizen of the United States and domiciled in the State of Maryland. She is the daughter of Luis Rosa-Valentin.

4238.   Plaintiff Iliana M. Rosa-Valentin is a citizen of the Unites States and domiciled in the State of Maryland. She is the sister of Luis Rosa Valentin.

4239.   As a result of the attack, and the injuries suffered by Luis Rosa-Valentin, Plaintiffs Milinda Rosa and Iliana M. Rosa-Valentin have experienced severe mental anguish, and extreme emotional pain and suffering.

### 163.   The April 28, 2008, Attack–Baghdad

#### a)  The Sloan Family

4240.   Plaintiff Ronald Sloan is a citizen of the United States and domiciled in the State of Tennessee.

4241.   On April 28, 2008, Ronald Sloan, age 32, was serving in the U.S. military in Iraq when his unit was attacked with IRAMs by Hezbollah-trained and IRGC–QF-supplied operatives of the KH Special Groups acting as agents and proxies of Hezbollah and the IRGC–QF.

4242.   As a result of the attack, Mr. Sloan was knocked unconscious. He also suffered ear pain and general discomfort.

4243.   Mr. Sloan has subsequently been diagnosed as suffering from a TBI and PTSD.

4244.   As a result of the attack, and the injuries he suffered, Plaintiff Ronald Sloan has experienced severe physical and mental anguish and extreme emotional pain and suffering.

### 164.  The April 28, 2008, Attack–Baghdad

#### a)  The Kaplan Family

4245.   Plaintiff Preston Charles Kaplan is a citizen of the United States and domiciled in the State of Texas.

4246.   On April 28, 2008, Preston Charles Kaplan, then 23, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle. He was the turret gunner in an M1114 up-armored Humvee that was hit with an EFP on the front passenger-side door while traveling in the Kadhimiya neighborhood of Baghdad.

4247.   The weapon used to injure Preston Charles Kaplan was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4248.   As a result of the attack, Preston Charles Kaplan sustained a penetrating wound to his right leg including blast injuries to his tibial shaft. Shrapnel lacerated his popliteal artery and injured his peroneal nerve. He also sustained a TBI, bilateral hearing loss, tinnitus, scarring, sleep apnea, GERD, and PTSD. After numerous attempts to save his right leg below the knee, he underwent a below-the-knee amputation 19 months after the attack and suffered additional infections following the amputations that required significant additional surgeries.

4249.   Mr. Kaplan has received extensive medical treatment at various hospitals including various surgeries and prosthetic fittings where he has spent years in treatment.

4250.   As a result of the attack, and the injuries he suffered, Preston Charles Kaplan has experienced severe physical and mental anguish and extreme emotional pain and suffering.

4251.   Plaintiff Nicole A. Kaplan is a citizen of the United States and domiciled in the State of Texas. She is the wife of Preston Charles Kaplan.

4252. Plaintiff Noni Kaplan is a citizen of the United States and domiciled in the State of California. She is the mother of Preston Charles Kaplan.

4253. Plaintiff David Kaplan is a citizen of the United States and domiciled in the State of California. He is the father of Preston Charles Kaplan.

4254. Plaintiff Jaime Zarcone is a citizen of the United States and domiciled in the State of California. She is the sister of Preston Charles Kaplan.

4255. Plaintiff Jessalyn Holt is a citizen of the United States and domiciled in the State of California. She is the sister of Preston Charles Kaplan.

4256. As a result of the attack, and the injuries Preston Charles Kaplan suffered, Plaintiffs Nicole A. Kaplan, Noni Kaplan, David Kaplan, Jaime Zarcone, and Jessalyn Holt have experienced severe mental anguish and extreme emotional pain and suffering.

### 165. The April 28, 2008, Attack–Sadr City

#### a) The Woodard Family

4257. Plaintiff David Woodard is a citizen of the United States and domiciled in the State of Georgia.

4258. On April 28, 2008, David Woodard, then 34, was serving in the U.S. military in Iraq.

4259. Mr. Woodard was in a convoy when an EFP emplaced by Special Groups struck his vehicle.

4260. The weapon used to injure Mr. Woodard was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4261. As a result of the attack, a large fragment from the EFP struck Mr. Woodard's right leg and blew out four inches of his leg bone. Two large shrapnel fragments entered his left calf,

removing approximately 25 percent of the calf muscle and another fragment entered near his Achilles tendon.

4262.  As a result of the attack, and the injuries he suffered, Plaintiff David Woodard has experienced severe physical and mental anguish and extreme emotional pain and suffering.

4263.  Plaintiff D.M.W., a minor represented by his legal guardian David Woodard, is a citizen of the United States and domiciled in the State of Georgia. He is the son of David Woodard.

4264.  As a result of the attack, and the injuries suffered by David Woodard, Plaintiff D.W.M. has experienced severe mental anguish, and extreme emotional pain and suffering.

### 166.  The April 28, 2008, Attack–Sadr City

#### a)  The Magers Family

4265.  Plaintiff Adam Magers is a citizen of the United States and domiciled in the State of Missouri.

4266.  On April 28, 2008, Adam Magers was serving was serving in the U.S. military in Iraq and was at Joint Security Station Thawra in Sadr City when it was attacked with IRAMs by Hezbollah-trained and IRGC–QF-supplied operatives of the KH Special Groups acting as agents and proxies of Hezbollah and the IRGC–QF.

4267.  As a result of the attack, Mr. Magers suffered lacerations on his left arm, hands, and right ear and small cuts on the back of his neck. He also sustained injuries to his shoulder which ultimately required surgery.

4268.  As a result of the attack, and the injuries he suffered, Plaintiff Adam Magers has experienced severe physical and mental anguish and extreme emotional pain and suffering.

**167. The April 29, 2008, Attack–Sadr City**

*a) The Garza Family*

4269.    Plaintiff Luis Garza is a citizen of the United States and domiciled in the State of Florida.

4270.    On April 29, 2008, Luis Garza, then 22, was serving in the U.S. military in Iraq.

4271.    Mr. Garza was in a convoy when an EFP emplaced by Special Groups struck his vehicle.

4272.    The weapon used to injure Mr. Garza was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4273.    As a result of the attack, Mr. Garza suffered shrapnel injuries to his face. He also suffers from PTSD and sleep apnea. Eventually, part of his kidney had to be removed as a result of the wounds he suffered.

4274.    As a result of the attack, and the injuries he suffered, Plaintiff Luis Garza has experienced severe physical and mental anguish and extreme emotional pain and suffering.

**168. The April 30, 2008, Attack–Baghdad**

*a) The Tucker Family*

4275.    Ronald J. Tucker was a citizen of the Unites States and domiciled in the State of Colorado when he was killed in Iraq.

4276.    On April 30, 2008, Ronald J. Tucker, aged 21, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near his HMMWV in Baghdad.

4277.    Ronald J. Tucker was killed in the attack.

4278.  The weapon used to kill Ronald J. Tucker was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4279.  Plaintiff Susan Arnold is a citizen of the United States and domiciled in the State of Colorado. She is the mother of Ronald J. Tucker.

4280.  Plaintiff Susan Arnold brings an action individually and on behalf of the Estate of Ronald J. Tucker, as its legal representative.

4281.  Plaintiff David Arnold is a citizen of the United States and domiciled in the State of Colorado. He is the stepfather of Ronald J. Tucker.

4282.  Plaintiff Samantha Tucker is a citizen of the United States and domiciled in the State of Ohio. She is the sister of Ronald J. Tucker.

4283.  Plaintiff Brandon Arnold is a citizen of the United States and domiciled in the State of Colorado. He is the brother of Ronald J. Tucker.

4284.  Plaintiff Daisy Tucker is a citizen of the United States and domiciled in the State of Ohio. She is the sister of Ronald J. Tucker.

4285.  As a result of the attack, and the death of Ronald J. Tucker, Plaintiffs Susan Arnold, David Arnold, Samantha Tucker, Brandon Arnold and Daisy Tucker have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice, and counsel.

### 169.  The May 1, 2008, Attack–Sadr City

#### a)  The Daggett Family

4286.  John K. Daggett was a citizen of the United States and domiciled in the State of Arizona when he was injured in Iraq.

4287.    On May 1, 2008, John K. Daggett, aged 21, was serving in the U.S. military in Iraq when a rocket propelled grenade fired by a JAM Special Groups terror operative hit the vehicle in which he was travelling.

4288.    John K. Daggett was injured in the attack, and he died on May 15, 2008 from the injuries he sustained in the attack.

4289.    John K. Daggett was killed in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC–QF and Hezbollah.

4290.    Plaintiff John Daggett is a citizen of the United States and domiciled in the State of Arizona. He is the father of John K. Daggett.

4291.    Plaintiff Colleen Czaplicki is a citizen of the United States and domiciled in the State of Arizona. She is the mother of John K. Daggett.

4292.    As a result of the attack, and the death of John K. Daggett, Plaintiffs John Daggett and Colleen Czaplicki have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's society, companionship, comfort, advice, and counsel.

### 170.    The May 2, 2008, Attack–Baghdad

#### a)    The Hicks Family

4293.    Corey L. Hicks was a citizen of the United States and domiciled in the State of Arizona when he was killed in Iraq.

4294.    On May 2, 2008, Corey L. Hicks, aged 22, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

4295.    Corey L. Hicks was killed in the attack.

4296.    The weapon used to kill Corey L. Hicks was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4297.    Plaintiff Russel Hicks, Sr. is a citizen of the United States and domiciled in the State of Wyoming. He is the father of Corey L. Hicks.

4298.    Plaintiff Russel Hicks, Jr. is a citizen of the United States and domiciled in the State of Arizona. He is the brother of Corey L. Hicks.

4299.    As a result of the attack, and the death of Corey L. Hicks, Plaintiffs Russel Hicks, Sr. and Russel Hicks, Jr. have experienced severe mental anguish, extreme emotional pain and suffering and loss of their son's/brother's society, companionship, comfort, advice, and counsel.

### 171.    The May 9, 2008, Attack–Baghdad

#### a)  The Williamson Family

4300.    Wesley Williamson is a citizen of the United States and domiciled in the State of Texas.

4301.    On May 9, 2008, Wesley Williamson, then 23, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

4302.    The weapon used to injure Mr. Williamson was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4303.    As a result of the attack, Mr. Williamson's right ulna and radius were completely shattered, and his posterior interosseous nerve was severed.

4304.    Shrapnel also penetrated his body.

4305.    Mr. Williamson received medical treatment in Iraq, Germany, Washington D.C., and Brooke Army Medical Center in San Antonio, Texas.

4306.    He has undergone multiple procedures to stabilize his condition and address his injuries.

4307. In an attempt to regain functionality of his right arm and hand, Mr. Williamson underwent multiple surgeries.

4308. These surgeries included the installation of plates and 16 screws in his right arm and tendon transfer surgery.

4309. Mr. Williamson underwent occupational therapy for approximately 18 months. During that time, he was prescribed medications to manage the pain that he experienced.

4310. The injury to his hand has resulted in a loss of dexterity to his fingers. This has forced Mr. Williamson to re-learn simple everyday tasks such as typing.

4311. He experiences pain and limitations of movement daily.

4312. Mr. Williamson has suffered memory loss since the attack and has difficulty recalling information.

4313. He has been diagnosed with PTSD and TBI and has sought counseling and been prescribed medication to treat those conditions.

4314. Plaintiff Jesse Williamson is a citizen of the United States and domiciled in the State of New Mexico. He is the brother of Wesley Williamson.

4315. As a result of the attack, and the injuries Wesley Williamson has suffered, Plaintiff Jesse Williamson has experienced severe mental anguish, and extreme emotional pain and suffering.

**172. The May 9, 2008, Attack–Sadr City**

    *a) The Garza Family*

4316. Plaintiff Luis Garza is a citizen of the United States and domiciled in the State of Florida.

4317. On May 9, 2008, Luis Garza, then 22, was serving in the U.S. military in Iraq.

4318.   Mr. Garza was in a convoy when an EFP emplaced by Special Groups struck his vehicle.

4319.   The weapon used to injure Mr. Garza was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4320.   As a result of the attack, Mr. Garza suffered shrapnel injuries to his face. He also suffers from PTSD and sleep apnea. Eventually, part of his kidney had to be removed as a result of the wounds he suffered.

4321.   As a result of the attack, and the injuries he suffered, Plaintiff Luis Garza has experienced severe physical and mental anguish and extreme emotional pain and suffering.

### 173.   The May 9, 2008, Attack–Sadr City

#### a) The Magers Family

4322.   Plaintiff Adam Magers is a citizen of the United States and domiciled in the State of Missouri.

4323.   On May 9, 2008, Adam Magers was serving in the U.S. military in Iraq.

4324.   Mr. Magers was in a convoy when four separate EFPs emplaced by Special Groups struck the convoy in which he was traveling.

4325.   The weapon used to injure Mr. Magers was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4326.   As a result of the attack, Mr. Magers suffers from TBI.

4327.   As a result of the attack, and the injuries he suffered, Plaintiff Adam Magers has experienced severe physical and mental anguish and extreme emotional pain and suffering.

174. **The May 11, 2008, Attack–Baghdad**

    *a) The O'Neill Family*

4328.    Plaintiff Patrick O'Neill is a citizen of the United States and domiciled in the State of Virginia.

4329.    On May 11, 2008, Patrick O'Neill, then 18, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

4330.    Patrick O'Neill was injured in the attack.

4331.    The weapon used to injure Patrick O'Neill was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4332.    As a result of the attack, Patrick O'Neill was rendered unconscious.

4333.    He had sustained shrapnel in his back, buttock, and right shoulder and had also suffered injuries to his neck and face.

4334.    His shoulder had been fractured and his right ear was severed in multiple places.

4335.    Shrapnel had also pierced through Mr. O'Neill's body, causing his right lung to collapse.

4336.    He continues to experience pain in his chest and shoulder.

4337.    Mr. O'Neill was diagnosed with PTSD and has sought counseling. He continues to have nightmares stemming from the attack.

4338.    As a result of the attack, and the injuries he suffered, Plaintiff Patrick O'Neill has experienced physical and mental anguish and extreme emotional pain and suffering.

4339.    Plaintiff John O'Neill is a citizen of the United States and domiciled in the State of Virginia. He is the father of Patrick O'Neill.

4340. Plaintiff Dianne O'Neill is a citizen of the United States and domiciled in the State of Virginia. She is the mother of Patrick O'Neill.

4341. As a result of the attack, and the injuries Patrick O'Neill has suffered, Plaintiffs John O'Neill and Dianne O'Neill have experienced severe mental anguish, and extreme emotional pain and suffering.

### 175. The May 11, 2008, Attack–Balad

#### a) The Luckett Family

4342. Plaintiff Daniel Luckett is a citizen of the United States and domiciled in the State of Kentucky.

4343. On May 11, 2008, Daniel Luckett, then 24, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

4344. The weapon used to injure Daniel Luckett was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4345. As a result of the attack, Daniel Luckett's left foot was sheared off above the ankle and his right foot was cut off above the toes.

4346. As a result of the attack, and the injuries he suffered, Plaintiff Daniel Luckett has experienced severe physical and mental anguish and extreme emotional pain and suffering.

### 176. The May 25, 2008, Attack–An-Najaf

#### a) The Gasper Family

4347. Frank J. Gasper was a citizen of the United States and domiciled in the State of Colorado when he was killed in Iraq.

4348.  On May 25, 2008, Frank J. Gasper, aged 25, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near the vehicle in which he was traveling in Najaf.

4349.  Frank J. Gasper was killed in the attack.

4350.  The weapon used to kill Frank J. Gasper was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4351.  Plaintiff Breanna Lynn Gasper is a citizen of the United States and domiciled in the State of Georgia. She is the widow of Frank J. Gasper.

4352.  Plaintiff Breanna Lynn Gasper brings an action individually and on behalf of the Estate of Frank J. Gasper, as its legal representative.

4353.  Plaintiff Jamie Barnes is a citizen of the United States and domiciled in the State of California. She is the sister of Frank J. Gasper.

4354.  As a result of the attack, and the death of Frank J. Gasper, Plaintiffs Breanna Lynn Gasper and Jamie Barnes have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/brother's society, companionship, comfort, advice, and counsel.

**177.  The June 7, 2008, Attack–Baghdad**

*a)  The Hurst Family*

4355.  David R. Hurst was a citizen of the United States and domiciled in the State of Louisiana when he was killed in Iraq.

4356.  On June 7, 2008, David R. Hurst, aged 31, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

4357.  David R. Hurst was killed in the attack.

4358.   The weapon used to kill David R. Hurst was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4359.   Plaintiff Max W. Hurst is a citizen of the United States and domiciled in the State of Louisiana. He is the father of David R. Hurst.

4360.   Plaintiff Max W. Hurst brings an action individually and on behalf of the Estate of David R. Hurst, as its legal representative.

4361.   Plaintiff Lillian Hurst is a citizen of the United States and domiciled in the State of Louisiana. She is the stepmother of David R. Hurst.

4362.   Plaintiff Christopher Hurst is a citizen of the United States and domiciled in the State of Louisiana. He is the brother of David R. Hurst.

4363.   Plaintiff Mark Hurst is a citizen of the United States and domiciled in the State of Louisiana. He is the brother of David R. Hurst.

4364.   As a result of the attack, and the death of David R. Hurst, Plaintiffs Max W. Hurst, Lillian Hurst, Christopher Hurst and Mark Hurst have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice, and counsel.

### 178.   The June 24, 2008, Attack–Baghdad

#### a) The Farley Family

4365.   Steven L. Farley was a citizen of the United States and domiciled in the State of Oklahoma when he was killed in Iraq.

4366.   Steven L. Farley worked in Iraq under the auspices of the U.S. Department of State as a member of a Provincial Reconstruction Team ("PRT") in eastern Baghdad in 2008.

4367. On June 24, 2008, a JAM-Special Groups cell executed a sophisticated assassination bombing in a local government office in Sadr City that targeted Americans and local government officials who were not Sadr followers. The bomb killed eleven people, including Mr. Farley and three other Americans.

4368. The attack was perpetrated by JAM Special Groups operatives working at the direction of Hezbollah and the IRGC–QF, using weapons supplied by the IRGC–QF and employing training provided by Hezbollah.

4369. Plaintiff Donna Farley is a citizen of the United States and domiciled in the State of Oklahoma. She is the widow of Steven Farley.

4370. Plaintiff Noel J. Farley, Sr. is a citizen of the United States and domiciled in the State of Oklahoma. He is the father of Steven Farley.

4371. Plaintiff Barbara Farley is a citizen of the United States and domiciled in the State of Oklahoma. She is the mother of Steven Farley.

4372. Plaintiff Brett Farley is a citizen of the United States and domiciled in the State of Oklahoma. He is the son of Steven Farley.

4373. Plaintiff Cameron Farley is a citizen of the United States and domiciled in the State of Oklahoma. He is the son of Steven Farley.

4374. Plaintiff Chris Farley is a citizen of the United States and domiciled in the State of Oklahoma. He is the son of Steven Farley.

4375. Plaintiff Vickie McHone is a citizen of the United States and domiciled in the State of Oklahoma. She is the sister of Steven Farley.

4376. Plaintiff Noel S. Farley is a citizen of the United States and domiciled in the State of Oklahoma. He is the brother of Steven Farley.

4377.  As a result of the June 24, 2008 attack, and the death of Steven Farley, Plaintiffs Donna Farley, Noel J. Farley, Sr., Barbara Farley, Brett Farley, Cameron Farley, Chris Farley, Vickie McHone and Noel S. Farley have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's/son's/brother's society, companionship, comfort, advice, and counsel.

### b)  The Suveges Family

4378.  Nicole Suveges was a citizen of the United States and domiciled in the State of Illinois when she was killed in Iraq.

4379.  Nicole Suveges was a political scientist who worked for BAE Systems in the Human Terrain System (HTS) program in eastern Bagdad in 2008. The HTS program was designed to promote cultural understanding between U.S. military and Iraqis.

4380.  On June 24, 2008, a JAM-Special Groups cell executed a sophisticated assassination bombing in a local government office in Sadr City that targeted Americans and local government officials who were not Sadr followers. The bomb killed eleven people, including Ms. Suveges and three other Americans.

4381.  The attack was perpetrated by JAM Special Groups operatives working at the direction of Hezbollah and the IRGC–QF, using weapons supplied by the IRGC–QF and employing training provided by Hezbollah.

4382.  Plaintiff David C. Iverson is a citizen of the United States and domiciled in the State of Maryland. He is the widower of Nicole Suveges.

4383.  As a result of the attack, and the death of Nicole Suveges, Plaintiff David C. Iverson has experienced severe mental anguish, extreme emotional pain and suffering, and loss of his wife's society, companionship, comfort, advice, and counsel.

### 179. The August 4, 2008, Attack–Baghdad

#### a) The Menke Family

4384.    Jonathan D. Menke was a citizen of the United States and domiciled in the State of Indiana when he was killed in Iraq.

4385.    On August 4, 2008, Jonathan D. Menke, aged 22, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

4386.    Jonathan D. Menke was killed in the attack.

4387.    The weapon used to kill Jonathan D. Menke was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4388.    Daniel Menke is a citizen of the United States and domiciled in the State of Indiana. He is the father of Jonathan D. Menke.

4389.    Daniel Menke brings an action on behalf of the Estate of Jonathan D. Menke, as its legal representative, for his death and any suffering and/ or economic loss he/his Estate sustained as a result of the attack.

### 180. The August 13, 2008, Attack–Baghdad

#### a) The Hale Family

4390.    James M. Hale was a citizen of the United States and domiciled in the State of Illinois when he was killed in Iraq.

4391.    On August 13, 2008, James M. Hale, aged 23, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

4392.    James M. Hale was killed in the attack.

4393. The weapon used to kill James M. Hale was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4394. Plaintiff Jessica H. Williams is a citizen of the United States and domiciled in the State of Texas. She is the widow of James M. Hale.

4395. Plaintiff Jessica H. Williams brings an action individually and on behalf of the Estate of James M. Hale, as its legal representative.

4396. Plaintiff Jaden Myron Hale is a citizen of the United States and domiciled in the State of Texas. He is the son of James M. Hale.

4397. Plaintiff Jesse James Hale is a citizen of the United States and domiciled in the State of Texas. He is the son of James M. Hale.

4398. Plaintiff J.H., a minor represented by her legal guardian, Jessica H. Williams, is a citizen of the United States and domiciled in the State of Texas. She is the daughter of James M. Hale.

4399. As a result of the attack, and the death of James M. Hale, Plaintiffs Jessica H. Williams, Jaden Myron Hale, Jesse James Hale and J.H. have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice, and counsel.

**181.   The August 26, 2008, Attack–Sadr City**

*a)  The Latham Family*

4400. Plaintiff Tyler Latham is a citizen of the United States and domiciled in the State of Michigan.

4401. On August 26, 2008, Tyler Latham, age 22, was serving in the U.S. military in Iraq, when his vehicle was struck by an EFP emplaced by Special Groups.

4402. The weapon used to injure Tyler Latham was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4403. As a result of the attack, Mr. Latham sustained significant injuries to his left hand. This required complex surgery to reconnect tendons and ligaments in that hand.

4404. The damage to his hand has necessitated extensive physical therapy.

4405. He also sustained significant injuries due to the impact of multiple pieces of shrapnel in his face, legs, and arm. This necessitated surgery and treatment.

4406. He continues to experience limitations in strength and mobility of his left hand.

4407. He suffers with chronic pain in his left hand and arm.

4408. In addition, Mr. Latham has been diagnosed with a TBI.

4409. As a result of the attack, and the injuries he suffered, Plaintiff Tyler Latham has experienced severe physical and mental anguish and extreme emotional pain and suffering.

**182. The October 5, 2008, Attack–Musayyib**

*a) The Bearfield Family*

4410. Plaintiff Bryant Bearfield is a citizen of the United States and domiciled in the State of New York.

4411. On October 5, 2008, Bryant Bearfield, then 23, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near the vehicle in which he was traveling on Route Cleveland.

4412. The weapon used to injure Bryant Bearfield was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4413.   As a result of the blast, Bryant Bearfield suffered shrapnel wounds to his head, and a concussion. Mr. Bearfield was also diagnosed with anxiety as a result of the attack.

4414.   As a result of the attack, and the injuries he suffered, Plaintiff Bryant Bearfield has experienced severe physical and mental anguish and extreme emotional pain and suffering.

### 183.   The December 28, 2008, Attack–Sadr City

#### a) The Paul Family

4415.   Plaintiff Carllie Paul is a citizen of the United States and domiciled in the State of Florida.

4416.   On December 28, 2008, Carllie Paul, then 22, was serving in the U.S. military in Iraq when his M1151 vehicle was attacked with grenades and small arms fire by JAM Special Groups terror operatives.

4417.   Carllie Paul was injured in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC–QF and Hezbollah.

4418.   As a result of the attack, Carllie Paul sustained burns to both of his arms resulting in lasting scars and injuries to his back. He was airlifted to Landstuhl, Germany where he stayed for approximately two weeks after which he was transferred to Fort Bliss, Texas. He also suffered from severe PTSD. He has difficulty sleeping, experiences nightmares, and suffers from depression, anxiety, and suicidal ideation.

4419.   As a result of the attack, and the injuries he suffered, Carllie Paul has experienced severe physical and mental anguish and extreme emotional pain and suffering.

### 184.   The January 10, 2009, Attack–Baghdad

#### a) The Bauer Family

4420.   Justin Bauer was a citizen of the United States and domiciled in the State of Colorado when he was killed in Iraq.

4421.   On January 10, 2009, Justin Bauer, aged 24, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

4422.   Justin Bauer was killed in the attack.

4423.   The weapon used to kill Justin Bauer was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4424.   Kari Carosella is a citizen of the United States and domiciled in the State of Colorado. She is the widow of Justin Bauer.

4425.   Kari Carosella brings an action on behalf of the Estate of Justin Bauer, as its legal representative, for his death and any suffering and/ or economic loss he/his Estate sustained as a result of the attack.

4426.   Plaintiff Connie Haddock is a citizen of the United States and domiciled in the State of Colorado. She is the mother of Justin Bauer.

4427.   Plaintiff Jacob Bauer is a citizen of the United States and domiciled in the State of Colorado. He is the brother of Justin Bauer.

4428.   Plaintiff Jeremy Bauer is a citizen of the United States and domiciled in the State of Colorado. He is the brother of Justin Bauer.

4429.   As a result of the attack, and the death of Justin Bauer, Plaintiffs Connie Haddock, Jacob Bauer and Jeremy Bauer have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice, and counsel.

### b)  The Bradley Family

4430.   Plaintiff Andrew Bradley is a citizen of the United States and domiciled in the State of Texas.

4431.   On January 10, 2009, Andrew Bradley, then 20, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

4432.   The weapon used to injure Andrew Bradley was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4433.   As a result of the attack, Mr. Bradley lost part of his right leg, rendering him a below-the-knee amputee.

4434.   He also sustained burns on his left foot and has experienced nerve damage in that foot.

4435.   Apart from treatment in Iraq and Germany, Mr. Bradley received in-patient treatment at Brooke Army Medical Center for over one year.

4436.   Surgeons performed bone reconstruction to retain as much of his joint area as possible.

4437.   He also underwent multiple procedures to address infections in his wounds.

4438.   He has received physical therapy and has been prescribed medications to address pain resulting from his injuries.

4439.   Mr. Bradley has also required treatment for medical conditions that developed from issues involving his prosthetics.

4440.   Mr. Bradley continues to experience pain and emotional distress each day, and he receives treatment for his injuries as necessary.

4441.   As a result of the attack, and the injuries he suffered, Plaintiff Andrew Bradley has experienced severe physical and mental anguish and extreme emotional pain and suffering.

4442.   Plaintiff Julie Salhus is a citizen of the United States and domiciled in the State of Texas. She is the mother of Andrew Bradley.

4443.   Plaintiff Kristen Galen is a citizen of the United States and domiciled in the State of Texas. She is the sister of Andrew Bradley.

4444.   As a result of the attack, and the injuries Andrew Bradley suffered, Plaintiffs Julie Salhus and Kristen Galen have experienced severe mental anguish and extreme emotional pain and suffering.

### c)  The Ward Family

4445.   Plaintiff Patrick Ward is a citizen of the United States and domiciled in the State of Pennsylvania.

4446.   On January 10, 2009, Patrick Ward, then aged 36, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

4447.   Mr. Ward was an occupant in the third vehicle traveling in a four-vehicle convoy, when the lead vehicle was hit by an EFP.

4448.   The EFP used to injure Patrick Ward was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC

4449.   After the EFP impacted the lead vehicle. Mr. Ward got out of his vehicle and went to check on the occupants of the lead vehicle. He observed that the back of Justin Bauer's legs had been blown off and that he appeared to be dead. He assisted the medic in extricating Andrew Bradley, whose right leg had been severed, out of the HMMWV.

4450.   Following the explosion of the EFP, the convoy was attacked by a sniper on a nearby roof.

4451.   As a result of the attack, Mr. Ward was diagnosed with PTSD. He sought counseling once he came back to the U.S.

4452.   As a result of the attack, Plaintiff Patrick Ward has experienced severe mental anguish and extreme emotional pain and suffering.

4453.   Plaintiff Jarrett Ward is a citizen of the United States and domiciled in the State of Pennsylvania. He is the son of Patrick Ward.

4454.   As a result of the attack, and the injuries Patrick Ward suffered, Plaintiff Jarrett Ward has experienced severe mental anguish and extreme emotional pain and suffering.

**185.   The January 18, 2009 Attack–Baghdad**

   *a)  The Andrade Family*

4455.   Roberto Andrade, Jr. was a citizen of the United States and domiciled in the State of Illinois when he was killed in Iraq.

4456.   On January 18, 2009, Roberto Andrade, Jr., aged 26, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

4457.   Roberto Andrade, Jr. was killed in the attack.

4458.   The weapon used to kill Roberto Andrade, Jr. was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4459.   Roberto Andrade, Sr. is a citizen of the United States and domiciled in the State of Arizona. He is the father of Roberto Andrade, Jr.

4460.   Roberto Andrade, Sr. brings an action on behalf of the Estate of Roberto Andrade, Jr., as its legal representative, for his death and any suffering and/ or economic loss he/his Estate sustained as a result of the attack.

4461.   Plaintiff Sandra Valencia is a citizen of the United States and domiciled in the State of Arizona. She is the mother of Roberto Andrade, Jr.

4462.   As a result of the attack, and the death of Roberto Andrade, Jr., Plaintiff Sandra Valencia has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her son's society, companionship, comfort, advice, and counsel.

### 186.   The February 26, 2009, Attack–Adhamiyah

#### a)  The Connelly Family

4463.   Brian Connelly was a citizen of the United States and domiciled in the State of New Jersey when he was killed in Iraq.

4464.   On February 26, 2009, Brian Connelly, aged 26, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle in the Adhamiyah District in eastern Baghdad.

4465.   Brian Connelly was killed in the attack.

4466.   The weapon used to kill Brian Connelly was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4467.   Plaintiff Kara Connelly is a citizen of the United States and domiciled in the State of New Jersey. She is the widow of Brian Connelly.

4468.   Plaintiff Jean Dammann is a citizen of the United States and domiciled in the State of Ohio. She is the mother of Brian Connelly.

4469.   Plaintiff Mark Dammann is a citizen of the United States and domiciled in the State of Ohio. He is the father of Brian Connelly.

4470.   Plaintiff Kevin Connelly is a citizen of the United States and domiciled in the State of New Jersey. He is the brother of Brian Connelly.

4471.    As a result of the attack, and the death of Brian Connelly, Plaintiffs Kara Connelly, Jean Dammann, Mark Dammann and Kevin Connelly have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/son's/brother's society, companionship, comfort, advice, and counsel.

### 187.    The May 16, 2009, Attack–Basra

#### a) The Schaefer Family

4472.    David Schaefer was a citizen of the United States and domiciled in the State of Illinois, County of St. Clair, when he was killed in Iraq.

4473.    On May 16, 2009, David Schaefer, aged 27, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

4474.    David Schaefer was killed in the attack.

4475.    The weapon used to kill David Schaefer was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4476.    Plaintiff Rhonda Kemper is a citizen of the United States and domiciled in the State of Kentucky. She is the mother of David Schaefer.

4477.    As a result of the attack, and the death of David Schaefer, Plaintiff Rhonda Kemper has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her son's society, companionship, comfort, advice, and counsel.

### 188.    The May 17, 2009, Attack–Baghdad

#### a) The Canine Family

4478.    Robert Canine is a citizen of the United States and domiciled in the State of Missouri.

4479.    On May 17, 2009, Robert Canine, age 29, was serving in the U.S. military in Iraq.

4480.  Mr. Canine was on a routine patrol in northwest Baghdad when his vehicle was struck by an EFP emplaced by Special Groups.

4481.  The weapon used to injure Mr. Canine was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4482.  As a result of the attack, he sustained significant injuries due to the impact of shrapnel and portions of the explosive device impacting his body.

4483.  Mr. Canine's injuries included significant damage to his right leg and foot and the essential removal of the toes of his left foot as well as the loss of a great deal of blood.

4484.  The injuries necessitated the amputation of his right leg and left foot.

4485.  Apart from the injuries to his legs and feet, he also sustained a large laceration that ran from his buttocks to the back of his knee. It was determined that muscle and tissue was removed in these areas due to the blast.

4486.  Mr. Canine has suffered infections that have required treatment and assessment.

4487.  Apart from medical treatment while in Iraq, Mr. Canine received treatment and rehabilitation at Walter Reed Hospital for approximately 18 months.

4488.  Mr. Canine has been diagnosed with PTSD and has received treatment and counseling. He has been prescribed medication to address both the pain and emotional impact of the attack.

4489.  Mr. Canine continues to experience pain and emotional distress each day, and he receives treatment for his injuries.

4490.  Plaintiff Sebastian Canine is a citizen of the United States and domiciled in the State of Missouri. He is the son of Robert Canine.

4491.   Plaintiff Jennifer Roose is a citizen of the United States and domiciled in the State of Ohio. She is the sister of Robert Canine.

4492.   As a result of the attack, and the injuries Robert Canine suffered, Plaintiffs Sebastian Canine and Jennifer Roose have experienced severe mental anguish and extreme emotional pain and suffering.

### b)  The Murphy Family

4493.   Plaintiff Rhett Murphy is a citizen of the United States and domiciled in the State of Minnesota.

4494.   On May 17, 2009, Rhett Murphy, then 30, was serving in the U.S. military in Iraq.

4495.   Mr. Murphy was on a routine patrol in northwest Baghdad when his vehicle was struck by an EFP.

4496.   The weapon used to injure Mr. Murphy was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4497.   As a result of the attack, he sustained significant injuries due to the impact of shrapnel impacting his body. This has resulted in scarring.

4498.   Apart from the shrapnel-related injuries he also sustained injuries to the tendons in his left hand and a fracture of his finger. These have necessitated various surgical procedures.

4499.   Mr. Murphy has been diagnosed with PTSD and major depression and has received treatment and counseling. He has been prescribed medication to address both the pain and emotional impact of the attack.

4500.   Mr. Murphy continues emotional distress and he receives treatment for his injuries.

4501.   As a result of the attack, and the injuries he suffered, Plaintiff Rhett Murphy has experienced severe physical and mental anguish and extreme emotional pain and suffering.

### c) The Landtiser Family

4502. Plaintiff Roady Landtiser is a citizen of the United States and domiciled in the State of Oklahoma.

4503. On May 17, 2009, Roady Landtiser, then 21, was serving in the U.S. military in Iraq.

4504. Mr. Landtiser was on a routine patrol in northwest Baghdad when his vehicle was struck by an EFP.

4505. The weapon used to injure Mr. Landtiser was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4506. As a result of the attack, he sustained a concussion and was rendered unconscious.

4507. He developed tinnitus in his right ear and this condition continues to the present day.

4508. Mr. Landtiser has experienced flashbacks and night terrors.

4509. He has been diagnosed with PTSD. He has received treatment, has been prescribed medication, and sought counseling for these issues.

4510. As a result of the attack, and the injuries he suffered, Plaintiff Roady Landtiser has experienced severe mental anguish and extreme emotional pain and suffering.

### d) The Richards Family

4511. Plaintiff Nathan Richards is a citizen of the United States and domiciled in the State of Florida.

4512. On May 17, 2009, Nathan Richards, then 22, was serving in the U.S. military in Iraq.

4513.   Mr. Richards was on a routine patrol in northwest Baghdad when his vehicle was struck by an EFP.

4514.   The weapon used to injure Mr. Richards was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4515.   As a result of the attack, he sustained a concussion and was knocked unconscious. His eardrum was also ruptured as a result of the blast.

4516.   Mr. Richards has developed vertigo and has experienced migraines.

4517.   He has been diagnosed with a TBI and has dealt with long-term and short-term memory loss.

4518.   He has been diagnosed with PTSD and has had nightmares and flashbacks as well as experienced survivor's guilt. He has received treatment and counseling for these issues.

4519.   As a result of the attack, and the injuries he suffered, Plaintiff Nathan Richards has experienced severe mental anguish and extreme emotional pain and suffering.

4520.   Plaintiff Steven Richards is a citizen of the United States and domiciled in the State of Massachusetts. He is the father of Nathan Richards.

4521.   As a result of the attack, and the injuries suffered by Nathan Richards, Plaintiff Steven Richards has experienced severe mental anguish, and extreme emotional pain and suffering.

### 189.   The June 14, 2009, Attack–Balad

#### a)  The Songer Family

4522.   Plaintiff Christopher Songer is a citizen of the United States and domiciled in the State of Washington.

4523.   On June 14, 2009, Christopher Songer, then 36, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

4524.   The weapon used to injure Christopher Songer was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4525.   As a result of the attack, Christopher Songer suffered a broken middle finger, deep lacerations on both hands requiring reconstructive surgery, shrapnel throughout his body, burns to hands, arms, face and legs, a large shoulder wound and multiple bone fractures. He also suffered from smoke inhalation which damaged his lungs, nerve damage and hearing loss. He also suffers from TBI.

4526.   As a result of the attack, and the injuries he suffered, Plaintiff Christopher Songer has experienced severe physical and mental anguish and extreme emotional pain and suffering.

4527.   Plaintiff Kimberly Songer is a citizen of the United States and domiciled in the State of Washington. She is the wife of Christopher Songer.

4528.   Plaintiff C.S., a minor represented by his legal guardian, Kimberly Songer, is a citizen of the United States and domiciled in the State of Washington. He is the son of Christopher Songer.

4529.   As a result of the attack, and the injuries suffered by Christopher Songer, Plaintiffs Kimberly Songer and C.S. have experienced severe mental anguish, and extreme emotional pain and suffering.

**190.   The September 8, 2009, Attack–Baghdad**

*a)  The Helton Family*

4530.   Joseph D. Helton, Jr. was a citizen of the United States and domiciled in the State of Georgia when he was killed in Iraq.

4531.   On September 8, 2009, Joseph D. Helton, Jr., aged 24, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

4532.   Joseph D. Helton Jr. was killed in the attack.

4533.   The weapon used to kill Joseph D. Helton, Jr. was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4534.   Plaintiff Joseph Helton, Sr. is a citizen of the United States and domiciled in the State of Washington. He is the father of Joseph D. Helton, Jr.

4535.   Jennifer Sarver brings an action on behalf of the Estate of Joseph D. Helton, Jr., as its legal representative.

4536.   Plaintiff Jessica Cabot is a citizen of the United States and domiciled in the State of California. She is the sister of Joseph D. Helton, Jr.

4537.   Plaintiff Jeanne Rhea McManus is a citizen of the United States and domiciled in the State of Pennsylvania. She is the sister of Joseph D. Helton, Jr.

4538.   As a result of the attack, and the death of Joseph D. Helton, Jr., Plaintiffs Joseph Helton, Sr., Jessica Cabot, and Jeanne Rhea McManus have experienced severe mental anguish, extreme emotional pain and suffering and loss of their son's/brother's society, companionship, comfort, advice, and counsel.

### b)  The Wise Family

4539.   Plaintiff Victor Ray Wise, II is a citizen of the United States and domiciled in the State of Kentucky.

4540.   On September 8, 2009, Victor Ray Wise, II, then 22, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

4541.   The weapon used to injure Victor Ray Wise, II was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4542.   Mr. Wise was in the gunner's hatch when the EFP hit the vehicle he was in.

4543.   He was extricated from the vehicle and tourniquets were placed on his legs and he was initially treated at Camp Falcon. He was then taken to a hospital up north for surgery.

4544.   He was subsequently taken to Landstuhl, Germany and then Walter Reed Army Medical Center where he spent six months. He has undergone eleven surgeries. After six months at Walter Reed Army Medical Center, Mr. Wise was sent to Omaha Offutt Air Force Base, where he was treated at the base hospital.

4545.   The EFP hit Mr. Wise's legs. He had to have some of his toes amputated. He also sustained nerve damage to his legs and is missing muscles in legs, some of which had to be amputated.

4546.   Mr. Wise was diagnosed with PTSD as a result of the attack.

4547.   As a result of the attack, and the injuries he suffered, Plaintiff Victor Ray Wise, II has experienced severe physical and mental anguish and extreme emotional pain and suffering.

## 191.   The January 18, 2010, Attack–Baghdad

### a)  The Lester Family

4548.   Plaintiff Theodore Lester is a citizen of the United States and domiciled in the State of Texas.

4549.   On January 18, 2010, Theodore Lester, then 32, and a former soldier in the U.S. military, was serving as a civilian contractor in Baghdad, Iraq when his camp was attacked with Katyusha rockets deployed by JAM Special Groups.

4550. While running for cover from the Katyusha rockets, Mr. Lester was injured in the attack when he stepped into an existing mortar impact hole. Mr. Lester fell to the ground and was forced to crawl to cover.

4551. The rocket attack was perpetrated by JAM Special Groups terror operatives working at the direction of Hezbollah and the IRGC–QF, using weapons supplied by the IRGC–QF and employing training provided by Hezbollah.

4552. Mr. Lester was only able to obtain an X-ray of his foot a day later, which revealed that he had fractured three bones in his left foot. Mr. Lester still experiences pain in his left leg and foot from his injuries.

4553. Mr. Lester was subsequently diagnosed with, and treated for, PTSD.

4554. As a result of the attack, and the injuries he suffered, Plaintiff Theodore Lester has experienced severe physical and mental anguish and extreme emotional pain and suffering.

**192. The April 27, 2010, Attack–Khalis**

*a) The Coe Family*

4555. Keith Coe was a citizen of the United States and domiciled in the State of Florida when he was killed in Iraq.

4556. On April 27, 2010, Keith Coe, aged 30, was serving in the U.S. military in Iraq.

4557. Mr. Coe was north of his base in Iraq when his vehicle was struck by an EFP emplaced by Special Groups.

4558. The weapon used to kill Mr. Coe was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4559. Plaintiff Katrina Coe is a citizen of the United States and domiciled in the State of Tennessee. She is the widow of Keith Coe.

4560.   Plaintiff Katrina Coe brings an action individually and on behalf of the Estate of Keith Coe, as its legal representative.

4561.   Plaintiff Keith Coe Jr. is a citizen of the United States and domiciled in the State of Tennessee. He is the son of Keith Coe.

4562.   Plaintiff K.A.C., a minor represented by his legal guardian, Katrina Coe, is a citizen of the United States and domiciled in the State of Tennessee. He is the son of Keith Coe.

4563.   Plaintiff K.A.C., a minor represented by her legal guardian, Katrina Coe, is a citizen of the United States and domiciled in the State of Tennessee. She is the daughter of Keith Coe.

4564.   Plaintiff Rhonda Smith is a citizen of the United States and domiciled in the State of Florida. She is the mother of Keith Coe.

4565.   Plaintiff Matthew Coe is a citizen of the United States and domiciled in the State of Florida. He is the brother of Keith Coe.

4566.   Plaintiff Sabrina Chapman is a citizen of the United States and domiciled in the State of Florida. She is the sister of Keith Coe.

4567.   As a result of the attack, and the death of Keith Coe, Plaintiffs Katrina Coe, Keith Coe Jr., K.A.C., K.A.C., Rhonda Smith, Matthew Coe and Sabrina Chapman have experienced severe physical and mental anguish and extreme emotional pain and suffering and loss of their husband's/father's/son's/brother's society, companionship, comfort, advice, and counsel.

### 193.   The March 10, 2011, Attack–Baghdad

#### a)  The Kinsey Family

4568.   Plaintiff James Kinsey is a citizen of the United States and domiciled in the State of Arkansas.

4569.   On March 10, 2011, James Kinsey, then 34, was serving in the U.S. military in Iraq when his base came under indirect fire by JAM Special Groups terror operatives working at the

direction of Hezbollah and the IRGC–QF, using weapons supplied by the IRGC–QF and employing training provided by Hezbollah.

4570.   An Iranian-made 240mm rocket exploded within the base perimeter, approximately 50 meters from where Mr. Kinsey was standing.

4571.   The resulting blast threw Mr. Kinsey into a barrier wall, and he suffered a severe concussion.

4572.   Mr. Kinsey was later diagnosed with a TBI and PTSD from the attack.

4573.   As a result of the attack, and the injuries he suffered, Plaintiff James Kinsey has experienced severe mental anguish and extreme emotional pain and suffering.

**194.   The April 22, 2011, Attack–Numaniyah**

*a) The Stiggins Family*

4574.   Antonio Stiggins was a citizen of the United States and domiciled in the State of New Mexico when he was killed in Iraq.

4575.   On April 22, 2011, Antonio Stiggins, aged 25, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

4576.   Antonio Stiggins was killed in the attack.

4577.   The weapon used to kill Antonio Stiggins was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4578.   Plaintiff Angel Mayes is a citizen of the United States and domiciled in the State of New Mexico. She is the mother of Antonio Stiggins.

4579.   Plaintiff Angel Mayes brings an action individually and on behalf of the Estate of Antonio Stiggins, as its legal representative.

4580.   Plaintiff Luke Stiggins is a citizen of the United States and domiciled in the State of New Mexico. He is the father of Antonio Stiggins.

4581.   Plaintiff Donald Mayes is a citizen of the United States and domiciled in the State of New Mexico. He is the stepfather of Antonio Stiggins.

4582.   As a result of the attack, and the death of Antonio Stiggins, Plaintiffs Angel Mayes, Luke Stiggins, and Donald Mayes have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's society, companionship, comfort, advice, and counsel.

### 195.   The May 22, 2011, Attack–Baghdad

#### a)  The Beattie Family

4583.   Clifford Beattie was a citizen of the United States and domiciled in the State of Washington when he was killed in Iraq.

4584.   On May 22, 2011, Clifford Beattie, aged 37, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

4585.   Clifford Beattie was killed in the attack.

4586.   The weapon used to kill Clifford Beattie was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4587.   Plaintiff Rhonda Beattie is a citizen of the United States and domiciled in the State of Ohio. She is the mother of Clifford Beattie.

4588.   Plaintiff Rhonda Beattie brings an action individually and on behalf of the Estate of Clifford Beattie, as its legal representative.

4589.   Plaintiff Jaydean Hamilton is a citizen of the United States and domiciled in the State of Washington. She is the daughter of Clifford Beattie.

4590.   As a result of the attack, and the death of Clifford Beattie, Plaintiffs Rhonda Beattie and Jaydean Hamilton have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/father's society, companionship, comfort, advice, and counsel.

### 196.   The June 6, 2011, Attack–Baghdad

#### a) The Fishbeck Family

4591.   Christopher Brook Fishbeck was a citizen of the United States and domiciled in the State of California.

4592.   On June 6, 2011, Christopher Brook Fishbeck, then 24 was serving in the U.S. military in Iraq when the base he was at, Forward Operating Base Loyalty in Baghdad, came under attack by IRAMs.

4593.   Christopher Brook Fishbeck was killed in the attack.

4594.   KH operatives fired the IRAMs at the base. Those operatives were trained by Hezbollah and funded and supplied by the IRGC–QF and they launched the attack at the direction of both Hezbollah and the IRGC–QF as their proxy. Specifically, KH claimed responsibility for the attack that killed Christopher Brook Fishbeck.

4595.   Plaintiff Stephanie Kidder is a citizen of the United States and domiciled in the State of California. She is the wife of Christopher Brook Fishbeck.

4596.   As a result of the attack, and the death of Christopher Brook Fishbeck, Plaintiff Stephanie Kidder has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her husband's society, companionship, comfort, advice, and counsel.

### 197.   The June 29, 2011, Attack–Wasit Province

#### a) The Field Family

4597.   Plaintiff Donald Field is a citizen of the United States and domiciled in the State of Texas.

4598.   On June 29, 2011, Donald Field, then 42, was serving in the U.S. military in Iraq when his unit was attacked with IRAMs fired by KH Special Groups terror operatives.

4599.   Those operatives were trained by Hezbollah and funded and supplied by the IRGC–QF and they launched the attack at the direction of both Hezbollah and the IRGC–QF as their proxy.

4600.   One of the many explosions caused a concrete retaining wall to fall, portions of which landed on Donald Field, rendering him unconscious.

4601.   When he came to, he was able to extricate himself from the debris and noticed much of his clothing had been burned and torn.

4602.   Both lower lobes of Donald Field's lungs had collapsed due to the force of the blast and the concrete wall having landed on him.

4603.   He sustained injuries to his back, primarily to his lower vertebrae, requiring surgery. He has limited motion.

4604.   He has been prescribed medication to address the pain he experiences on a daily basis.

4605.   As a result of the blast, Mr. Field also suffered first and second-degree burns on his head, neck, and the back of his arms.

4606.   Mr. Field also injured the right side of his head and right ear. He has experienced and continues to deal with short-term cognitive and memory issues. He has undergone multiple surgeries to address the injuries to his head and ear.

4607.   Mr. Field has been diagnosed with a TBI.

4608.   He has sought counseling and continues to seek treatment with a psychiatrist. He has been prescribed medication for anxiety and mood-related issues.

4609.   As a result of the attack, and the injuries he suffered, Plaintiff Donald Field has experienced severe physical and mental anguish and extreme emotional pain and suffering.

4610.   Plaintiff Angelica Field is a citizen of the United States and domiciled in the State of Texas. She is the wife of Donald Field.

4611.   Plaintiff Senovia Field is a citizen of the United States and domiciled in the State of Texas. She is the daughter of Donald Field.

4612.   Plaintiff Selicia Field is a citizen of the United States and domiciled in the State of Texas. She is the daughter of Donald Field.

4613.   As a result of the attack, and the injuries Donald suffered, Plaintiffs Angelica Field, Senovia Field and Selicia Field have experienced severe mental anguish and extreme emotional pain and suffering.

**198.   The July 10, 2011, Attack–Maysan Province**

*a)  The Kenney Family*

4614.   Plaintiff Daniel Kenney is a citizen of the United States and domiciled in the State of New York.

4615.   On July 10, 2011, Daniel Kenny, then 29, was serving in the U.S. military in Iraq when his Contingency Forward Operating Base came under attack from 107 mm rockets.

4616.   The attack was perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC–QF and Hezbollah.

4617.   As Mr. Kenney was running for cover, a rocket landed within approximately 15 of his location, throwing him to the ground and concussing him.

4618.   As a result of the attack, Mr. Kenney suffers from depression, anxiety and PTSD.

4619.    As a result of the attack, and the injuries he suffered, Plaintiff Daniel Kenney has experienced mental anguish and extreme emotional pain and suffering.

4620.   Plaintiff Brooke Kenney is a citizen of the United States and domiciled in the State of New York. She is the wife of Daniel Kenney.

4621.   Plaintiff J.K., a minor, represented by his legal guardians Daniel Kenney and Brooke Kenney, is a citizen of the United States and domiciled in the State of New York. He is the son of Daniel and Brooke Kenney.

4622.   Plaintiff H.K., a minor, represented by her legal guardians Daniel Kenney and Brooke Kenney, is a citizen of the United States and domiciled in the State of New York. She is the daughter of Daniel and Brooke Kenney.

4623.   As a result of the attack, and the injuries suffered by Daniel Kenney, Plaintiffs Brooke Kenney, J.K. and H.K. have each experienced severe mental anguish and extreme emotional pain and suffering.

### 199.   The July 15, 2011, Attack–Basra

#### a)  The Elliott Family

4624.   Daniel L. Elliott was a citizen of the United States and domiciled in the state of North Carolina when he was killed in Iraq.

4625.   On July 15, 2011, Daniel L. Elliott, aged 21, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

4626.   Daniel L. Elliott was killed in the attack.

4627.   The weapon used to kill Daniel L. Elliott was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC–QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4628.   Plaintiff Ed Elliott is a citizen of the United States and domiciled in the State of North Carolina. He is the father of Daniel L. Elliott.

4629.   As a result of the attack, and the death of Daniel L. Elliott, Plaintiff Ed Elliott has experienced severe mental anguish, extreme emotional pain and suffering, and loss of his son's society, companionship, comfort, advice, and counsel.

**200.   The April 13, 2009, Attack**

*a)  The Bowman Family*

4630.   Plaintiff Ryan Bowman is a citizen of the United States and domiciled in the State of Pennsylvania.

4631.   On April 13, 2009, Ryan Bowman, then 23, was serving in the U.S. military in Iraq when the Chinook helicopter he was traveling in was attacked with an RPG–29 fired by Special Groups terror operatives.

4632.   Those operatives were trained by Hezbollah and funded and supplied by the IRGCQF and they launched the attack at the direction of both Hezbollah and the IRGC–QF as their proxy.

4633.   At the time of the attack, Ryan Bowman was not clipped into the Chinook helicopter. When the pilot of the Chinook helicopter took evasive actions to avoid the RGP–29, Mr. Bowman bounced around the helicopter suffering a TBI and permanent injury to his back.

4634.   Mr. Bowman has been determined to be 100 percent disabled by the Veterans Administration. As a result of the attack, and the injuries he suffered, Plaintiff Ryan Bowman has experienced severe physical and mental anguish and extreme emotional pain and suffering.

4635.   Plaintiff Sandra Bowman is a citizen of the United States and domiciled in the State of Pennsylvania. She is the mother of Ryan Bowman.

4636.   As a result of the attack and the injuries to Ryan Bowman, Plaintiff Sandra Bowman has experienced severe mental anguish and extreme emotional pain and suffering.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

## CIVIL LIABILITY UNDER 18 U.S.C. § 2333(a) AGAINST ALL DEFENDANTS FOR VIOLATIONS OF 18 U.S.C. § 2339A CONSTITUTING ACTS OF INTERNATIONAL TERRORISM

4637.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

4638.   Defendants provided material support or resources and concealed and disguised the nature, location, and ownership of material support or resources to the IRGC and its agents in an illegal manner knowing that the material support or resources are to be used in preparation for, or in carrying out, a violation of any of 18 U.S.C. §§ 844(f), 1114, 1203, 1361, 2332, 2332(a), 2332(b), 2332a, and/or 2332f.

4639.   Providing material support and concealing material support for the use in preparing and carrying out acts of international terrorism itself as well as the acts of international terrorism that injured the Plaintiffs constitute acts of international terrorism under 18 U.S.C. § 2331 and constitute "engaging in terrorist activity" under 8 U.S.C. § 1182(a)(3)(B)(iii)-(iv), and/or "engaging in terrorism" under 22 U.S.C. § 2656f.

4640.   Defendants provided material support and concealed material support in the form of transferring more than two hundred billion dollars through the United States in a manner designed to purposefully circumvent U.S. counterterror financing sanctions and law enforcement agencies; facilitating the transfer of hundreds of millions of dollars from Iranian banks, through New York, to Hezbollah, the IRGC and other terrorist organizations (including their Iraqi proxies) actively engaged in murdering and maiming U.S. nationals in Iraq and facilitating Iran's acquisition of dual-use, export controlled items.

4641.   At the time each Defendant knowingly agreed to provide Iran material support in an illegal manner, each Defendant knew that (1) the United States had formally designated Iran as a State Sponsor of Terrorism; (2) the United States had formally designated the IRGC's Lebanese proxy, Hezbollah, as an FTO; (3) Iran used the IRGC and its Lebanese proxy, Hezbollah, as primary mechanisms to cultivate, support and perpetrate terrorism; (4) the sanctions Defendants, the IRGC, and Hezbollah evaded were designed to prevent the IRGC and its Lebanese proxy, Hezbollah, from financing and committing acts of terrorism; and (5) the IRGC was seeking to evade those sanctions for the specific purpose of financing and committing acts of terrorism.

4642.   Defendants knew that Iran used its banks, including the CBI, Bank Saderat, and Bank Melli, in financing terrorism.

4643.   Defendants knew—including because of specific warnings from the U.S. government—that assisting Iran, the IRGC, and Hezbollah circumvent counterterror financing sanctions would help the IRGC and Hezbollah finance and commit acts of terrorism; yet Defendants affirmatively did so anyway, often innovating new ways to violate U.S. criminal laws to assist the IRGC and Hezbollah in their efforts.

4644.   Among other things, and as documented in the U.S. State Department's 2013 Country Reports on Terrorism, between 2004 and 2011 the IRGC, in concert with Hezbollah, provided training outside of Iraq, as well as sending advisors to Iraq, to assist, train, supply and guide Special Groups in the construction and use of EFPs and other advanced weaponry, devices that constitute "weapons of mass destruction" as defined in 18 U.S.C. § 2332a, incorporating the definition of "destructive devices" set forth in 18 U.S.C. § 924(4)(A)-(C).

4645.   Each Defendant knew or was deliberately indifferent to the fact that the IRGC, Hezbollah, and their Iraqi proxies engaged or engages in terrorist activity (8 U.S.C. §

1182(a)((3)(B)(iii)-(iv)), terrorism (22 U.S.C § 2656f), and acts of international terrorism (18 U.S.C. § 2331), including facilitating, funding, preparing for, and supporting terrorist activity by their Iraqi proxies.

4646. Providing the IRGC and Hezbollah with billions of dollars in circumvention of counterterror financing sanctions foreseeably facilitated acts of international terrorism, terrorist activities, and terrorism, including homicides, attempted homicides, or conspiracies to commit homicide against U.S. nationals by the IRGC, Hezbollah and their Iraqi proxies (including KH, JAM and AAH), as well as attacks conducted by weapons of mass destruction, such as EFPs, and bombings, attempted bombings, or conspiracies to bomb places of public use, state or government facilities, public transportation systems, or infrastructure facilities by the IRGC, Hezbollah, and their Iraqi proxies.

4647. The material support that Defendants knowingly provided to the IRGC and its agents, including concealing or disguising the nature, location, source, or ownership of material support or resources, provided foreseeable, substantial assistance to the IRGC, Hezbollah and their Iraqi proxies, thereby preparing and facilitating acts of terrorism in violation of 18 U.S.C. §§ 844(f), 1114, 1203, 1361, 2332, 2332(a), 2332(b), 2332a, and/or 2332fthat caused Plaintiffs' injuries.

4648. The material support that Defendants knowingly provided, and knowingly concealed and disguised the provision of, to the IRGC and its agents included facilitating tens of millions of dollars in illicit transactions on behalf of IRGC-controlled NIOC, NITC, IRISL, and Mahan Air as well as Iranian banks acting under the direction of the IRGC, including the CBI, Bank Saderat and Bank Melli, to enable numerous violations of the U.S. trade embargo against Iran, concealing the IRGC's efforts to evade U.S. sanctions and enabling its acquisition from the

United States of goods and technologies prohibited by U.S. law to be sold or transferred to Iran, including components of IEDs deployed against Coalition Forces in Iraq.

4649.   Each Defendant knew that the U.S. sanctions and regulations it helped the IRGC and its agents violate were enacted specifically to prevent Iran's ability to finance, support, prepare for, plan, or carry out acts of international terrorism, including the types of acts that injured the Plaintiffs.

4650.   The Defendants' provision of material support and concealment of material support for the IRGC and Hezbollah in a manner expressly designed to evade counterterror financing sanctions involved acts that were dangerous to human life, by their nature, and as further evidenced by their consequences.

4651.   The Defendants' acts either occurred primarily outside the territorial jurisdiction of the United States or transcended national boundaries in terms of the means by which they were accomplished.

4652.   Defendants' provision of material support and concealment of material support for the IRGC and Hezbollah was foreseeably used in order to carry out or prepare for violations of, *inter alia*, 18 U.S.C. §§ 2332(a)-(c), 2332a, and § 2332f by the IRGC, Hezbollah and their Iraqi proxies.

4653.   Because Defendants provided material support to and concealed the provision of material support for Iran, the IRGC, and Hezbollah, *knowing* that they were to be used in order to carry out or prepare for violations of, *inter alia*, 18 U.S.C. §§ 2332(a)-(c), 2332a, and § 2332f by the IRGC, Hezbollah and their Iraqi proxies, that provision and concealment objectively appeared to have been intended to: (a) intimidate or coerce the civilian population of the United States and other nations, (b) influence the policy of the governments of the United States and other nations

by intimidation or coercion, and/or (c) affect the conduct of the governments of the United States and other nations by facilitating the IRGC, Hezbollah and their Iraqi proxies' abilities to prepare for, support, fund, train, initiate, and/or carry out mass destruction, murder, and kidnapping.

4654.   Thus, Defendants' provision of material support and concealment of material support for the IRGC and Hezbollah were themselves acts of international terrorism.

4655.   Each Defendant's conduct was a substantial cause in fact and a significant factor in the chain of events leading to the Plaintiffs' injuries, and foreseeably and substantially enhanced the IRGC, Hezbollah and their Iraqi proxies' ability to engage in terrorist activity (8 U.S.C. § 1182(a)(3)(B)(iii)-(iv)), terrorism (22 U.S.C. § 2656f), and/or commit acts of international terrorism (18 U.S.C. § 2331) (including violations of 18 U.S.C. §§ 844(f), 1114, 1203, 1361, 2332, 2332(a), 2332(b), 2332a, and/or 2332f and 2339A). Each Defendant's conduct was thus also a substantial, foreseeable factor in bringing about the Plaintiffs' injuries.

4656.   Each Plaintiff's injuries constitute a harm falling within the foreseeable risk contemplated by each Defendant's violations. Injuries resulting from terrorist attacks (including attacks launched by the IRGC, Hezbollah and their Iraqi proxies) that were planned, supported by, funded, or assisted by Iran are precisely the risks contemplated by Executive Orders, statutes and regulations (including, without limitation, designations under Executive Orders specifically concerning the IRGC, Defendant Bank Saderat Plc, and IRISL) enacted specifically to ensure that Iran had restricted access to U.S. dollars and financial services under conditions of maximum transparency, that such dollars were used only for legitimate agencies, operations, and programs and not by or for the benefit of SDNs, and not for Iran's efforts to acquire, develop, and distribute Weapons of Mass Destruction (including weapons such as EFPs directed at Coalition Forces), and to ensure that any funds Iran did receive that touched U.S. depository institutions could be

monitored by U.S. regulators and law enforcement agencies.

4657. Through its conduct as described above, each Defendant committed acts of international terrorism and is civilly liable for damages to each Plaintiff for their injuries pursuant to 18 U.S.C. § 2333(a).

**SECOND CLAIM FOR RELIEF**

**CIVIL LIABILITY UNDER 18 U.S.C. § 2333(a) AGAINST ALL DEFENDANTS FOR VIOLATIONS OF 18 U.S.C. § 2339B CONSTITUTING ACTS OF INTERNATIONAL TERRORISM**

4658. Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

4659. In providing material support or resources and concealing and disguising the nature, location, and ownership of material support or resources to Foreign Terrorist Organizations (FTOs), including Hezbollah and Kata'ib Hezbollah, each Defendant violated § 2339B.

4660. The Defendants herein purposefully transferred (collectively) hundreds of billions of dollars through the United States in a manner expressly designed to circumvent monitoring by U.S. regulators and law enforcement agencies and evade U.S. sanctions; minimize the transparency of their financial activities; and knowingly, or with deliberate indifference, facilitated the transfer of tens of millions of dollars in payments to Hezbollah through the international financial system. In doing so, the Defendants violated 18 U.S.C. § 2339B.

4661. At the time each Defendant knowingly provided material support or resources and concealed and disguised the nature, location, and ownership of material support to Iran, each Defendants knew that Iran had, since 1984, been officially designated by the United States as a State Sponsor of Terrorism, subject to various U.S. sanctions, and knew that such designation was based in part on Iran's sponsorship and patronage of Hezbollah and other FTOs, and that Iran's

IRGC used Hezbollah as a primary mechanism to enable it to cultivate and support terrorism.

4662. Each Defendant knew, or was deliberately indifferent to the fact that, Hezbollah was designated an FTO at all times relevant to this action. Each Defendant also knew that Hezbollah engaged in terrorist activities (8 U.S.C. § 1183(a)(3)(B)(iii)-(iv)), terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989), terrorism (22 U.S.C. § 2656f), and acts of international terrorism (18 U.S.C. § 2331).

4663. Providing material support and concealing material support for the use in preparing and carrying out acts of international terrorism constitute acts of international terrorism under 18 U.S.C. § 2331, and constitute "engaging in terrorist activity" under 8 U.S.C. § 1182(a)(3)(B)(iv), and/or "engaging in terrorism" under 22 U.S.C. § 2656f.

4664. At the time each Defendant knowingly agreed to provide Iran material support in an illegal manner, each Defendant knew that (1) the United States had designated Iran as a State Sponsor of Terrorism; (2) the United States had designated the IRGC's Lebanese proxy, Hezbollah, an FTO; (3) the IRGC used FTOs—principally its Lebanese proxy, Hezbollah—as primary mechanisms to cultivate, support and perpetrate terrorism; (4) the sanctions they evaded were designed to prevent the IRGC, and Hezbollah from financing and committing acts of terrorism; and (5) Iran was seeking to evade those sanctions for the specific purpose of financing and committing acts of terrorism.

4665. Defendants knew that the IRGC used its banks, including the CBI, Bank Saderat, and Bank Melli, in financing terrorism.

4666. Defendants knew—including because of specific warnings from the U.S. government—that assisting the IRGC and Hezbollah circumvent counterterror financing sanctions would help the IRGC and Hezbollah finance and commit acts of terrorism; yet Defendants did so

anyway.

4667.  The material support that each Defendant knowingly, or with deliberate indifference, provided to Hezbollah, constituted substantial assistance to Hezbollah, thereby facilitating acts of terrorism in violation of §§ 844(f), 1114, 1203, 1361, 2332, 2332(a), 2332(b), 2332a, and/or 2332f, and that have caused injuries to Plaintiffs.

4668.  The Defendants' contravention of U.S. laws designed to prevent Iran – a known and designated State Sponsor of Terrorism – from providing material support to FTOs, and the resultant, purposeful transfer of billions of U.S. dollars through the United States in a manner expressly designed to ensure that the funds could be transferred without being monitored by U.S. regulators and law enforcement agencies, involved acts that were dangerous to human life, by their nature, and as further evidenced by their consequences.

4669.  The Defendants' acts either occurred primarily outside the territorial jurisdiction of the United States or transcended national boundaries in terms of the means by which they were accomplished.

4670.  The Defendants' transfer (collectively) of billions of dollars on behalf of NIOC, NITC, IRISL, Mahan Air and Iranian banks acting under the direction of the IRGC, including the CBI, Bank Saderat and Bank Melli – all counterparties closely identified with a State Sponsor of Terrorism (that publicly relied on FTOs like Hezbollah as terror proxies) through the United States in a manner designed to purposefully evade counterterror financing sanctions, objectively appeared to have been intended to: (a) intimidate or coerce the civilian population of the United States and other nations, (b) influence the policy of the governments of the United States and other nations by intimidation or coercion (in part to cause them to withdraw Coalition Forces from Iraq), and/or (c) affect the conduct of the governments of the United States and other nations by

facilitating Hezbollah's role in killing, kidnapping and injuring hundreds of American nationals in Iraq (including by mass destruction).

4671.  Thus, Defendants' provision of material support and concealment of material support for the IRGC and Hezbollah were themselves acts of international terrorism.

4672.  Each Defendant's conduct was a substantial cause in fact and a significant factor in the chain of events leading to the Plaintiffs' injuries, and foreseeably, substantially accelerated and multiplied Hezbollah's ability to engage in terrorist activity (8 U.S.C. § 1182(a)(3)(B)(iii)-(iv)), terrorism (22 U.S.C. § 2656f), and acts of international terrorism under the definition set forth in 18 U.S.C. § 2331. Each Defendant's conduct was thus also a substantial, foreseeable factor in bringing about the Plaintiffs' injuries.

4673.  Each Plaintiff's injuries constitute a harm falling within the risk contemplated by each Defendant's violations. Those injuries resulted from terrorist attacks planned, designed, assisted, funded, initiated, and overseen by Hezbollah and the IRGC are precisely the risks contemplated by statutes, regulations and Executive Orders designed to ensure that Hezbollah's sponsor and principal – Iran's IRGC – had restricted access to U.S. dollars and financial services, and that any funds it did receive that touched U.S. depository institutions were transparent and could be blocked if warranted.

4674.  Through its conduct as described above, each Defendant committed acts of international terrorism and is civilly liable for damages to each Plaintiff for their injuries pursuant to 18 U.S.C. § 2333(a).

## THIRD CLAIM FOR RELIEF

## CIVIL LIABILITY AGAINST HSBC BANK USA, N.A. UNDER 18 U.S.C. § 2333(a) FOR VIOLATIONS OF 18 U.S.C. § 2332d CONSTITUTING ACTS OF INTERNATIONAL TERRORISM

4675.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

4676.    Defendant HSBC–US is a juridical person organized under the laws of the United States pursuant to 18 U.S.C. § 2332d(b)(2)(C) and is also a person within the United States pursuant to 18 U.S.C. § 2332d(b)(2)(D).

4677.    As alleged above, at all relevant times HSBC–US knew that Iran was a country designated by the United States under section 6(j) of the Export Administration Act of 1979 (50 App. U.S.C. 2405) as a country supporting international terrorism, yet HSBC–US nevertheless engaged in thousands of financial transactions with Iran in violation of 18 U.S.C. § 2332d.

4678.    Defendant HSBC–US also knew, or was deliberately indifferent to the fact, that Hezbollah had been designated an FTO.

4679.    Defendant HSBC–US also knew, or was deliberately indifferent to the fact, that the IRGC–QF had been designated an SDGT.

4680.    Defendant HSBC–US also knew, or was deliberately indifferent to the fact, that Bank Saderat (including Defendant Bank Saderat Plc) had been designated an SDGT.

4681.    Defendant HSBC–US also knew, or was deliberately indifferent to the fact, that the IRGC had been designated an SDN.

4682.    Defendant HSBC–US also knew or was deliberately indifferent to the fact that Bank Melli (including Melli Bank Plc), Bank Saderat (including Defendant Bank Saderat Plc), Bank Mellat, and Bank Sepah had been designated SDNs before November 2008, and, as such,

were excluded from accessing the U-Turn exemption in the Iranian Transaction Regulations.

4683. Defendant HSBC–US also knew or was deliberately indifferent to the fact that the IRISL and multiple IRISL entities had been designated SDNs.

4684. As alleged above, HSBC–US knowingly conducted illegal financial transactions on behalf of Iran through Bank Melli and other Iranian counter-parties that did not fall within the safe harbor provisions of the regulations issued by the U.S. Department of Treasury —regulations passed for the specific purposes of mitigating the risk that funds transfers to Iran could be used to: engage in terrorist activity under 8 U.S.C. § 1182(a)(3)(B)(iii)-(iv), terrorism under 22 U.S.C. § 2656f, or acts of international terrorism under 18 U.S.C. § 2331.

4685. In fact, the transactions at issue (including at least the $183 million HSBC–US facilitated on behalf of sanctioned entities in Iran that were identified in HSBC–US's December 11, 2012 Deferred Prosecution Agreement with DOJ) explicitly violated 31 C.F.R 535.701(a)(2) and 31 C.F.R 560.203.

4686. Defendant HSBC–US knew that Defendants HSBC–Europe and HSBC–Middle East were deliberately altering and omitting information in funds transfer payment order messages being processed through HSBC–US, thereby evading U.S. laws and regulations whose express purpose was (and is) to ensure that only a very limited class of payments could be facilitated to Iran, and that payment order messages for such funds transfers required transparency in order to ensure that the transfers qualified for the limited exceptions and exemptions, and did not result in U.S. depository institutions processing transactions for the benefit of SDNs.

4687. As alleged in detail above, throughout the relevant time period, HSBC–US knew that other HSBC Defendants such as HSBC–London and HSBC–Middle East were providing material support to Iran in a manner violating U.S. laws and regulations, and HSBC–US also knew

its own systems and networks were being used to facilitate the HSBC Defendants' illegal conduct.

4688.  Defendant HSBC–US also thus knew or was deliberately indifferent to the fact that Iran, the IRGC, IRISL, Hezbollah, and Defendant Bank Saderat Plc all engaged in terrorist activity under 8 U.S.C. § 1182(a)(3)(B)(iii)-(iv), terrorism under 22 U.S.C. § 2656f, and acts of international terrorism under 18 U.S.C. § 2331 (including violations of 18 U.S.C. §§ 844(f), 1114, 1203, 1361, 2332, 2332(a), 2332(b), 2332a, and/or 2332f), and that Iran provided massive support and sponsorship for violations of all these statutes, while also providing support for other acts of international terrorism, such as those planned, attempted, and perpetrated by their Iraqi proxies.

4689.  Knowing that Defendants HSBC–London and HSBC–Middle East were moving billions of sanctions-evading Iranian U.S. dollars through HSBC–US's offices with the specific intent of defeating HSBC–US's OFAC filters and violating HSBC–US reporting requirements, it was reasonably foreseeable that HSBC–US's conduct would aid Iran and Iran's agents, proxies, and strategic partners (including Hezbollah, the IRGC, and Special Groups) to engage in terrorist activity under 8 U.S.C. § 1182(a)(3)(B)(iii)-(iv), terrorism under 22 U.S.C. § 2656f, and acts of international terrorism under 18 U.S.C. § 2331.

4690.  Because Defendant HSBC–US is a financial institution operating in the United States, at all times relevant to the Amended Complaint, it is deemed by law to be aware of all designations made to the SDN list, including without limitation designations for Iran, Hezbollah, the IRGC, the IRGC–QF, Bank Saderat (including Defendant Bank Saderat Plc), Bank Melli, Bank Mellat, Bank Sepah, IRISL (and multiple IRISL entities).

4691.  Defendant HSBC–US thus also knew or was deliberately indifferent to the fact that Bank Melli (including Melli Bank Plc), Bank Saderat (including Defendant Bank Saderat Plc)

Bank Mellat, and Bank Sepah had been designated SDNs before November 2008, and, as such, were excluded from accessing the U-Turn exemption in the Iranian Transaction Regulations.

4692.  Defendant HSBC–US's conduct foreseeably and substantially enhanced Hezbollah's, the IRGC's and their Iraqi proxies' and other Iranian-sponsored terrorists' ability to engage in terrorist activity, including preparing and facilitating acts of terrorism in violation of 18 U.S.C. §§ 844(f), 1114, 1203, 1361, 2332, 2332(a), 2332(b), 2332a, and/or 2332f that caused Plaintiffs' injuries, and thus HSBC–US's conduct was also a substantial, foreseeable factor in bringing about the Plaintiffs' injuries.

4693.  Defendant HSBC–US's knowing or deliberately indifferent provision of illegal financial services to Iran, enabled Iran to move billions of U.S. dollars through the United States without those funds being monitored by U.S. regulators and law enforcement agencies and therefore involved acts that were dangerous to human life, by their nature and as evidenced by their consequences.

4694.  Defendant HSBC–US's acts transcended national boundaries in terms of the means by which they were accomplished.

4695.  Defendant HSBC–US's conduct itself constitutes an act of international terrorism because it either was, or objectively appears to have been intended to: (a) intimidate or coerce the civilian population of the United States and other nations, (b) influence the policy of the governments of the United States and other nations by intimidation or coercion, and/or (c) affect the conduct of the governments of the United States and other nations by facilitating Iran's ability to prepare for and/or carry out mass destruction and murder.

4696.  Furthermore, each Plaintiff's injuries constitute a harm falling within the risk contemplated by Defendant HSBC–US's violations, including its knowing provision of  illegal

services to Iran. Injuries resulting from terrorist attacks (including attacks launched by Hezbollah through its proxies) that were planned, supported by, funded, or assisted by the IRGC and/or Hezbollah are precisely the risks contemplated by Executive Orders, statutes and regulations designed to ensure that Iran had restricted access to U.S. dollars and financial services, and that any funds it did receive that touched U.S. depository institutions could be monitored by U.S. regulators and law enforcement agencies, and that the transactions were not for the benefit of SDNs.

4697.  Through its conduct as described above, by violating § 2332d in the manner and with the state of mind alleged above, HSBC–US committed acts of international terrorism, and is civilly liable for damages to each Plaintiff for their injuries pursuant to 18 U.S.C. § 2333(a).

### FOURTH CLAIM FOR RELIEF

### CIVIL LIABILITY UNDER 18 U.S.C. § 2333(a) AGAINST SCB, ROYAL BANK OF SCOTLAND NV AND COMMERZBANK FOR VIOLATIONS OF 18 USC § 2332d CONSTITUTING ACTS OF INTERNATIONAL TERRORISM

4698.  Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

4699.  Defendants SCB, ABN Amro (RBS NV), and Commerzbank each utilized their respective New York branches in connection with their provision of material support and concealment of material support to Iran, and each of those respective New York branches is a "person in the United States" within the scope of 18 U.S.C. § 2332d(b)(2)(D).

4700.  As set forth above, each of the above-referenced Defendants knew or was deliberately indifferent to the fact that Iran was designated under section 6(j) of the Export Administration Act of 1979 (50 App. U.S.C. 2405) as a country supporting international terrorism and nonetheless knowingly engaged in thousands of illegal financial transactions with the

government of Iran through their U.S. operations.

4701.   The New York branch of each of the above-referenced Defendants also knew, or was deliberately indifferent to the fact, that Hezbollah had been designated an FTO, that the IRGC–QF and Bank Saderat (including Defendant Bank Saderat Plc) had each been designated an SDGT, and that multiple other Iranian actors and agents (including the IRGC, Bank Melli, and IRISL entities) had been designated SDNs.

4702.   The New York branches of the above-referenced Defendants also knew or were deliberately indifferent to the fact that Bank Melli (including Melli Bank Plc), Bank Saderat (including Defendant Bank Saderat Plc), and Bank Mellat had been designated SDNs before November 2008, and, as such, were excluded from accessing the U-Turn exemption in the Iranian Transaction Regulations.

4703.   As set forth above, the illegal transactions knowingly facilitated through New York by the respective New York branches of the above-referenced Defendants thus did not fall within the safe harbor provisions of the regulations issued by the U.S. Department of Treasury for U-Turn exemption transactions, and therefore violated the criminal provisions of 18 U.S.C § 2332d(a).

4704.   In fact, the transactions at issue explicitly violated 31 C.F.R 535.701(a)(2) and 31 C.F.R 560.203.

4705.   Each of the above-referenced Defendants' New York branch's acts transcended national boundaries in terms of the means by which they were accomplished.

4706.   Each of the above-referenced Defendants' New York branch's conduct foreseeably and substantially enhanced Hezbollah's, the IRGC's and their Iraqi proxies' ability to engage in terrorist activity, including preparing and facilitating acts of terrorism in violation of 18 U.S.C. §§ 844(f), 1114, 1203, 1361, 2332, 2332(a), 2332(b), 2332a, and/or 2332f that caused Plaintiffs'

injuries, and thus each of the above Defendants' New York branch's conduct was also a substantial, foreseeable factor in bringing about the Plaintiffs' injuries.

4707.   Each of the above-referenced Defendant's New York branch knowingly, or with deliberate indifference, provided financial services to Iran in the United States, knowing that its conduct enabled Iran to move millions (or in some cases, billions) of U.S. dollars through the United States without those funds being monitored by U.S. regulators and law enforcement agencies. That conduct involved acts that were dangerous to human life, by their nature and as evidenced by their consequences.

4708.   Each of the above-referenced Defendant's conduct itself constitutes an act of international terrorism because it either was, or objectively appears to have been intended to: (a) intimidate or coerce the civilian population of the United States and other nations, (b) influence the policy of the governments of the United States and other nations by intimidation or coercion, and/or (c) affect the conduct of the governments of the United States and other nations by facilitating Iran's ability to prepare for and/or carry out mass destruction and murder.

4709.   Furthermore, each Plaintiff's injuries constitute a harm falling within the risk contemplated by each of the above-referenced Defendants' New York branch's unlawful conduct, including their knowing provision of illegal services to Iran. Injuries resulting from terrorist attacks committed, planned, or authorized by Hezbollah and the IRGC and their Iraqi proxies are precisely the risks contemplated by Executive Orders, statutes and regulations designed to ensure that Iranian entities had restricted access to U.S. dollars and financial services, and that any funds it did receive that touched U.S. depository institutions could be monitored by U.S. regulators and law enforcement agencies.

4710.   Each of the above-referenced Defendants' criminal violations of the provisions of

18 U.S.C. § 2332d(a) was a sufficient cause of Plaintiffs' injuries, and, for the reasons alleged in Plaintiffs' Third Claim for Relief against Defendant HSBC–US, constitutes an act of international terrorism rendering each of the above Defendants civilly liable for damages to each Plaintiff for their injuries pursuant to 18 U.S.C. § 2333(a).

## FIFTH CLAIM FOR RELIEF

## CIVIL LIABILITY AGAINST COMMERZBANK AG UNDER 18 U.S.C. § 2333(a) FOR VIOLATIONS OF 18 U.S.C. § 2339A CONSTITUTING ACTS OF INTERNATIONAL TERRORISM

4711.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

4712.   IRISL was designated an SDN for Weapons of Mass Destruction-related activities that included arms shipments, including shipments destined for Hezbollah and other terrorist proxies.

4713.   Defendant Commerzbank knowingly provided material support to the IRGC's agent, IRISL, and thereby violated § 2339A, and concealed and disguised the nature, location, source, and ownership of material support it provided to IRISL, knowing or deliberately indifferent to the fact that the IRGC would use that support in preparation for, or in carrying out acts of international terrorism, including violations of 18 U.S.C. §§ 844(f), 1114, 1203, 1361, 2332, 2332(a), 2332(b), 2332a, and/or 2332f.

4714.   Defendant Commerzbank knew or was deliberately indifferent that to the fact that the IRISL had been designated an SDN.

4715.   Defendant Commerzbank's conduct was a substantial cause in fact and a significant factor in the chain of events leading to the Plaintiffs' injuries, and substantially accelerated and multiplied the IRGC's ability to engage in terrorist activity (8 U.S.C § 1182(a)(3)(B)(iii)-(iv)),

terrorism (22 U.S.C. § 2656f), and/or commit acts of international terrorism as that terms is defined in 18 U.S.C. § 2331.

4716.   The material support that Commerzbank knowingly and illegally provided to the IRISL provided foreseeable, substantial assistance to the IRGC, Hezbollah and their Iraqi proxies, thereby preparing and facilitating acts of terrorism in violation of 18 U.S.C. §§ 844(f), 1114, 1203, 1361, 2332, 2332(a), 2332(b), 2332a, and/or 2332f that caused Plaintiffs' injuries, and thus Commerzbank's conduct was also a substantial, foreseeable factor in bringing about the Plaintiffs' injuries.

4717.   Commerzbank's illegal conduct transcended national boundaries in terms of the means by which it was accomplished.

4718.   Commerzbank's knowing or deliberately indifferent provision of illegal financial services to the IRGC through IRISL involved acts that were dangerous to human life, by their nature and as evidenced by their consequences.

4719.   Commerzbank's conduct itself constitutes an act of international terrorism because it either was, or objectively appears to have been intended to: (a) intimidate or coerce the civilian population of the United States and other nations, (b) influence the policy of the governments of the United States and other nations by intimidation or coercion, and/or (c) affect the conduct of the governments of the United States and other nations by facilitating Iran's ability to prepare for and/or carry out mass destruction and murder.

4720.   Furthermore, each Plaintiff's injuries constitute a harm falling within the risk contemplated by Commerzbank's material support to the IRGC through IRISL. Injuries resulting from terrorist attacks perpetrated, planned, supported by, funded, or assisted by Iran and Hezbollah are precisely the risks contemplated by statutes and regulations designed to ensure that the IRGC,

IRISL and other Iranian entities had restricted access to U.S. dollars and financial services, and that any funds they did receive that touched U.S. depository institutions were transparent and could be blocked if warranted, and did not benefit an SDN.

4721.    Through its conduct as described above, by knowingly or with deliberate indifference, providing material support to the IRGC through IRISL, and thereby violating 18 U.S.C. § 2339A in the manner and with the state of mind alleged above, Commerzbank is civilly liable for damages to each Plaintiff for their injuries pursuant to 18 U.S.C. § 2333(a).

<u>**SIXTH CLAIM FOR RELIEF**</u>

<u>**CIVIL LIABILITY AGAINST COMMERZBANK AG UNDER 18 U.S.C. § 2333(a) FOR VIOLATIONS OF 18 U.S.C. § 2339B CONSTITUTING ACTS OF INTERNATIONAL TERRORISM**</u>

4722.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

4723.    Defendant Commerzbank violated § 2339B by providing material support to the Hezbollah through Commerzbank's acts on behalf of its customer Waisenkinderprojekt Libanon e.V. (Orphans Project Lebanon e.V.).

4724.    Commerzbank knew, or was deliberately indifferent to the fact, that Orphans Project Lebanon e.V. was transferring funds through Commerzbank to FTO Hezbollah and that Hezbollah would use that support in preparation for, or in carrying out, acts of international terrorism, including violations of 18 U.S.C. §§ 844(f), 1114, 1203, 1361, 2332, 2332(a), 2332(b), 2332a, and/or 2332f.

4725.    Defendant Commerzbank's conduct was a substantial cause in fact and a significant factor in the chain of events leading to the Plaintiffs' injuries, and substantially accelerated and multiplied Hezbollah's ability to engage in terrorist activity (8 U.S.C § 1182(a)(3)(B)(iii)-(iv)),

terrorism (22 U.S.C. § 2656f), and acts of international terrorism as that terms is defined in 18 U.S.C. § 2331.

4726. The material support that Commerzbank knowingly and illegally provided to the Orphans Project Lebanon e.V. and hence to Hezbollah, provided foreseeable, substantial assistance to the Hezbollah and its Iraqi proxies, thereby preparing and facilitating acts of terrorism in violation of 18 U.S.C. §§ 844(f), 1114, 1203, 1361, 2332, 2332(a), 2332(b), 2332a, and/or 2332f that caused Plaintiffs' injuries, and thus Commerzbank's conduct was also a substantial, foreseeable factor in bringing about the Plaintiffs' injuries.

4727. Commerzbank's illegal conduct transcended national boundaries in terms of the means by which it was accomplished.

4728. Commerzbank's knowing or deliberately indifferent provision of illegal financial services to Hezbollah involved acts that were dangerous to human life, by their nature and as evidenced by their consequences.

4729. Commerzbank's conduct itself constitutes an act of international terrorism because it either was, or objectively appears to have been intended to: (a) intimidate or coerce the civilian population of the United States and other nations, (b) influence the policy of the governments of the United States and other nations by intimidation or coercion, and/or (c) affect the conduct of the governments of the United States and other nations by facilitating Iran's ability to prepare for and/or carry out mass destruction and murder.

4730. Furthermore, each Plaintiff's injuries constitute a harm falling within the risk contemplated by Commerzbank's material support to Hezbollah.

4731. Through its conduct as described above, by knowingly or with deliberate indifference, providing material support to Hezbollah, and thereby violating 18 U.S.C. § 2339B in

the manner and with the state of mind alleged above, Commerzbank is civilly liable for damages to each Plaintiff for their injuries pursuant to 18 U.S.C. § 2333(a).

<u>**SEVENTH CLAIM FOR RELIEF**</u>

<u>**CIVIL LIABILITY AGAINST SCB UNDER 18 U.S.C. § 2333(a) FOR VIOLATIONS OF 18 U.S.C. § 2339A CONSTITUTING ACTS OF INTERNATIONAL TERRORISM**</u>

4732.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

4733.   Defendant SCB provided material support to the IRGC-controlled NIOC, NITC, Mahan Air and other entities identified *supra* in violation of § 2339A, and concealed and disguised the nature, location, source, and ownership of material support it provided to the IRGC through NIOC, NITC, Mahan Air, and other entities identified *supra*, knowing or deliberately indifferent to the fact that the IRGC would use that support in preparation for, or in carrying out, acts of international terrorism, including violations of 18 U.S.C. §§ 844(f), 1114, 1203, 1361, 2332, 2332(a), 2332(b), 2332a, and/or 2332f.

4734.   Defendant SCB knew or was deliberately indifferent to the fact that entities controlled by the IRGC, including NIOC and Mahan Air, and other entities identified *supra* were utilizing Letters of Credit knowingly stripped by SCB to evade U.S. sanctions and acquire materials used, *inter alia*, to effectuate arms shipments, transport weapons, personnel and technology to the IRGC–QF and Hezbollah.

4735.   Mahan Air did, in fact, transport weapons, personnel and technology into Iraq on behalf of the IRGC–QF and Hezbollah and did, in fact, transport modules used to control and activate IEDs and EFPs deployed against Coalition Forces in Iraq.

4736.   The IRGC could not have successfully evaded U.S. sanctions and obtained raw materials and manufacturing equipment prohibited by the International Traffic in Arms

Regulations ("ITARs"), Export Administration Regulations ("EARs"), and Iran Trade Regulations ("ITRs") simply by establishing front companies in foreign jurisdictions like Malaysia, Singapore or Dubai because those front companies could not have negotiated international payments without being able to provide U.S. and other suppliers with letters of credit drawn on Western banks with established correspondent accounts with U.S. clearing banks.

4737.  Nor could the front companies that participated in Iran's clandestine supply chain have succeeded in their efforts had they been forced to rely solely on financing by Iranian banks because those banks could not have provided financing directly since they could not maintain correspondent accounts with U.S. clearing banks and most of them were blacklisted at one point in time or another and frozen out of the US dollar-clearing system.

4738.  For example, no legitimate U.S. manufacturer would have agreed to transport materials subject to the ITARs, EARs or ITRs to an unknown company in Singapore or Dubai based on a letter of credit issued by Bank Saderat or Bank Melli.

4739.  The linchpin of Iran's illegal and clandestine supply chain was the cooperation of SCB and the other Defendants that concealed both the role of Iranian banks in providing the credit necessary to finance the transactions (at the IRGC's direction) and the identities of the Iranian military and IRGC sub-agencies that were actually purchasing the raw materials and manufacturing equipment (invariably being transported to Iran by IRISL, Mahan Air or Iran Air).

4740.  Defendant SCB knew, or was deliberately indifferent to the fact, that the IRGC's agents NIOC, Mahan Air, MODAFL and other entities identified *supra* were utilizing Letters of Credit facilitated by SCB to evade U.S. sanctions and acquire materials used, *inter alia*, to effectuate arms shipments, transport weapons, personnel and technology to the IRGC–QF and Hezbollah.

4741. The IRGC's Mahan Air did, in fact, transport weapons, personnel and technology into Iraq on behalf of the IRGC–QF and Hezbollah and did, in fact, transport modules used to control and activate IEDs and EFPs deployed against Coalition Forces in Iraq.

4742. With the necessary assistance of SCB and the other Defendants, MODAFL did in fact acquire spare parts for various military aircraft.

4743. With the necessary assistance of SCB and the other Defendants, Iranian front companies did purchase hydraulic press components of the kind used to manufacture EFPs and did purchase steel and copper and other materials necessary for the manufacturing of EFPs and other weapons deployed against Coalition Forces in Iraq.

4744. Defendant SCB knowingly provided substantial assistance to the IRGC that made it possible for the IRGC to procure the radio frequency modules, metals, and hydraulic presses used to manufacture the copper plates and steel cylinders necessary to manufacture the EFPs and other Iranian weapons used in the attacks on the Plaintiffs, as well Iran's transport of weapons, supplies, and IRGC and Hezbollah operatives (who conducted, supervised, and trained the perpetrators of those attacks).

4745. Defendant SCB's conduct was a substantial cause in fact and a significant factor in the chain of events leading to the Plaintiffs' injuries, and substantially accelerated and multiplied the IRGC's and Hezbollah's ability to engage in terrorist activity (8 U.S.C § 1182(a)(3)(B)(iii)-(iv)), terrorism (22 U.S.C. § 2656f), and commit acts of international terrorism as that terms is defined in 18 U.S.C. § 2331.

4746. The material support that SCB knowingly and illegally provided to the IRGC's agent NIOC, Mahan Air, MODAFL and other entities identified *supra* provided foreseeable, substantial assistance to the IRGC, Hezbollah and their Iraqi proxies, thereby preparing for and

facilitating acts of terrorism in violation of 18 U.S.C. §§ 844(f), 1114, 1203, 1361, 2332, 2332(a), 2332(b), 2332a, and/or 2332f that caused Plaintiffs' injuries, and thus SCB's conduct was also a substantial, foreseeable factor in bringing about the Plaintiffs' injuries.

4747. SCB's illegal conduct transcended national boundaries in terms of the means by which it was accomplished.

4748. SCB's knowing or deliberately indifferent provision of illegal financial services to the IRGC, the IRGC's agents, NIOC, Mahan Air, MODAFL and other entities identified *supra*, involved acts that were dangerous to human life, by their nature and as evidenced by their consequences.

4749. SCB's conduct itself constitutes an act of international terrorism because it either was, or objectively appears to have been intended to: (a) intimidate or coerce the civilian population of the United States and other nations, (b) influence the policy of the governments of the United States and other nations by intimidation or coercion, and/or (c) affect the conduct of the governments of the United States and other nations by facilitating Iran's ability to prepare for and/or carry out mass destruction and murder.

4750. Furthermore, each Plaintiff's injuries constitute a harm falling within the risk contemplated by SCB's material support to the IRGC, the IRGC's agent, NIOC, Mahan Air, MODAFL and other entities identified *supra*. Injuries resulting from terrorist attacks perpetrated, planned, supported by, funded, or assisted by Iran and Hezbollah are precisely the risks contemplated by statutes and regulations designed to ensure that Iran had restricted access to U.S. dollars and financial services, and that any funds they did receive that touched U.S. depository institutions were transparent and could be blocked if warranted, and did not benefit an SDN.

4751. Through its conduct as described above, by knowingly or with deliberate

indifference, providing material support to Iran, the IRGC, the IRGC's agent, NIOC, Mahan Air, MODAFL and other entities identified *supra*, and thereby violating 18 U.S.C. § 2339A in the manner and with the state of mind alleged above, SCB is civilly liable for damages to each Plaintiff for their injuries pursuant to 18 U.S.C. § 2333(a).

## EIGHTH CLAIM FOR RELIEF

## CIVIL LIABILITY FOR CONSPIRACY IN VIOLATION OF 18 U.S.C. § 2333(d)(2) (JASTA)

4752. Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

4753. Each attack alleged herein was an act of international terrorism as defined by 18 U.S.C. § 2331(1).

4754. Hezbollah was designated as a Foreign Terrorist Organization on October 8, 1997, and was so designated as of the date each attack alleged herein was committed.

4755. The IRGC was designated as a Foreign Terrorist Organization on April 15, 2019, in part for "engag[ing] in terrorist activity since its inception 40 years ago," its "support for terrorism [that] is foundational and institutional," and its killing of U.S. citizens, including many in the attacks at issue.

4756. The IRGC and its Lebanese proxy, Hezbollah, provided the Hezbollah-designed EFPs, IRAMs, and other explosive devices used in the attacks against Coalition Forces that injured Plaintiffs and killed their decedents.

4757. The IRGC and Hezbollah funded, trained, equipped, guided, directed and controlled the cells and individuals who emplaced and activated the EFPs, IRAMs and other explosive devices and/or, shot, kidnapped and/or tortured Plaintiffs and their decedents.

4758. The IRGC and Hezbollah together with their Iraqi proxies jointly committed,

planned and authorized each attack.

4759.   Defendants joined the IRGC and Hezbollah's conspiracy, whose objective was to wage terror a campaign U.S. and Coalition Forces in Iraq.

4760.   In order to advance the objectives of the conspiracy, the IRGC and Hezbollah needed to conceal and disguise both the sources and destinations of their illicit revenue streams used to finance the procurement of weapons, the supplying and training of their proxies in Iraq, and the payments made to support those proxies during the course of the terror campaign.

4761.   To that end, the IRGC and Hezbollah enlisted and directed various Iranian state-controlled banks, including the CBI, Bank Melli and Bank Saderat (as well as other Iranian banks), to help recruit Western banks willing to launder money and evade counterterror sanctions on their behalf.

4762.   Defendants agreed to enter into the conspiracy to launder billions of dollars clandestinely on behalf of Iranian banks that were working at the IRGC's direction and other Iranian entities controlled by the IRGC, and to conceal illicit Iranian transactions through the United States from U.S. regulators, law enforcement and counter-terrorist financing authorities.

4763.   Defendants agreed to enter into the conspiracy knowing that Iranian state institutions controlled or directed by the IRGC, which they knew, at a minimum, were nominally owned by the world's most notorious (and U.S.-designated) State Sponsor of Terrorism, and actively helped them evade the world's most comprehensive set of counter-terror financing sanctions, which were designed to prevent the IRGC from financing and committing acts of terrorism. Defendants thus knew they were joining a conspiracy (the financing component) and actively assisting the IRGC to wage its terror campaigns.

4764.   Defendants, the Iranian state-controlled banks (acting at the IRGC's direction), the

IRGC and Hezbollah and their respective agents, worked together to facilitate the financing of the financing component of the conspiracy.

4765.  Defendants agreed to enter into this conspiracy, which included the IRGC (FTO) and Hezbollah (FTO) and their agents and proxies, who were the persons (within the meaning of 18 U.S.C. § 2333(d)(1) and 1 U.S.C. § 1) that committed the acts of international terrorism set forth herein.

4766.  Each Defendant provided its Iranian counterparties with unusual and unlawful banking services under unusual circumstances by working closely and interactively with them to maintain the scheme of disguise and concealment, including exchanging secret communications in order to develop and constantly refine unusual and unlawful methods for circumventing U.S. counter-terrorist financing controls.

4767.  Each Defendant was aware of the role of other, similar banks (i.e., the other Defendants) in providing similar services for the IRGC and Hezbollah, and their agents, as part of the conspiracy. In some cases, Defendants communicated with each other in furtherance of the conspiracy.

4768.  Each Defendant was aware of the role of IRGC-controlled and/or entities in the conspiracy that sought to evade U.S. sanctions intended to prevent IRGC terror financing and weapons proliferation.

4769.  The reasonably foreseeable consequences, and foreseeable risk, of entering into the conspiracy to launder billions of dollars on behalf of and for the benefit of the IRGC and Hezbollah, knowing they were illegally assisting entities belonging to a State Sponsor of Terrorism to clandestinely move money through the United States (in order to conceal these activities from

U.S. regulators, law enforcement and counter-terrorist financing authorities) included the IRGC and Hezbollah carrying out of numerous terrorist attacks against U.S. nationals in Iraq.

4770.   Plaintiffs' injuries were proximately caused by the IRGC's and Hezbollah's acts of international terrorism, which were the object and the foreseeable consequences of the conspiracy and overt acts done pursuant to and in furtherance of the conspiracy's aim of funding and conducting terror campaigns, including driving U.S. forces out of Iraq.

## NINTH CLAIM FOR RELIEF

## CIVIL LIABILITY FOR AIDING AND ABETTING IN VIOLATION OF 18 U.S.C. § 2333(d)(2) (JASTA)

4771.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

4772.   Each attack alleged herein was an act of international terrorism as defined by 18 U.S.C. § 2331(1).

4773.   Hezbollah was designated as a Foreign Terrorist Organization on October 8, 1997, and was so designated as of the date each attack alleged herein was committed.

4774.   The IRGC was designated as a Foreign Terrorist Organization on April 15, 2019, in part for "engag[ing] in terrorist activity since its inception 40 years ago," its "support for terrorism [that] is foundational and institutional," and its killing of U.S. citizens, including many in the attacks at issue.

4775.   The IRGC and Hezbollah together with their Iraqi agents and proxies, including the Special Groups, committed, planned and authorized each attack alleged herein.

4776.   The IRGC and Hezbollah provided the Hezbollah-designed EFPs, IRAMs, and other explosive devices used in the attacks against Coalition Forces that injured Plaintiffs and killed their decedents.

4777. The IRGC and Hezbollah funded, trained, equipped, guided, directed and controlled the cells and individuals who emplaced and activated the EFPs, IRAMs and other explosive devices and/or, shot, kidnapped and/or tortured Plaintiffs and their decedents.

4778. The IRGC and Hezbollah together with their Iraqi agents and proxies, including the Special Groups, jointly committed, planned or authorized each attack.

4779. Defendants aided and abetted the IRGC and its Lebanese proxy, Hezbollah, in the commission of their acts of terrorism by knowingly and systemically providing vast amounts of funds and materials to them (and their agents and proxies acting in concert with them and at their direction), who were the persons (within the meaning of 18 U.S.C. § 2333(d)(1) and 1 U.S.C. §1) that committed the acts of international terrorism set forth herein.

4780. Defendants knowingly provided substantial assistance, directly or indirectly, to the IRGC and its agents (including NIOC, NITC, IRISL, Mahan Air and MODAFL,) and Hezbollah. They did so in thousands upon thousands of illegal transactions.

4781. Indeed, they did so pervasively and systemically over the course of many years through (cumulatively) hundreds of thousands of illicit transactions totaling more than two hundred *billion* dollars, easily including the amount the IRGC and Hezbollah spent on terrorism throughout the Relevant Period. That is, the success of the IRGC's terror campaign, including the attacks against Plaintiffs, depending in significant part on Defendants' role in providing the IRGC and Hezbollah with laundered funds, financing for weapons components and weapons transport that enabled them to carry out the acts of terrorism that injured the Plaintiffs.

4782. Each Defendant was generally aware of its role in the overall illegal activity of laundering billions of dollars clandestinely on behalf of a State Sponsor of Terrorism, state-owned (or controlled) banks acting at the IRGC's direction, designated Iranian entities and agents of the

IRGC, to conceal illicit Iranian transactions through the United States from U.S. regulators, law enforcement and counter-terrorist financing authorities.

4783.   Each Defendant was generally aware that its acts provided these entities, directly or indirectly, concealed access to the U.S. financial system that enabled the IRGC and Hezbollah to facilitate its support and preparation for, and carrying out of, acts of international terrorism.

4784.   Each Defendant was generally aware that the IRGC and Hezbollah were committed terrorist attacks against Americans in Iraq.

4785.   The nature of the act assisted was a terror campaign dependent on systemic money laundering to evade sanctions intended to prevent the IRGC and Hezbollah from financing that very terrorism. Financing that terror campaign depended on the active and systemic cooperation of Defendants, which were among the largest dollar-clearing banks in the world.

4786.   Each Defendant had a continuing and long-term banking relationship with its IRGC-directed or controlled Iranian counterparties necessary to the assistance they provided— blinding American counter-terrorist-financing authorities to Iran's access to the financial system for the purpose of facilitating material support for terrorism. Each Defendant provided its Iranian counterparties unusual and unlawful banking services under unusual circumstances by working closely and interactively with them to maintain the scheme of disguise and concealment, including exchanging secret communications in order to develop and constantly refine unusual and unlawful methods for circumventing U.S. counter-terrorist financing controls. Nothing about each of the Defendant's conduct could be described as engaging in "routine banking transactions." These were illegal, collusive, and clandestine relationships with counterparties that were closely intertwined with the IRGC's and/or Hezbollah's violent activities.

4787. Each Defendant knew, or knew of the substantial certainty, that some of the funds it disguised and concealed from counterterrorism officials would be used by the IRGC, and Hezbollah, and their agents and proxies to support and commit acts of international terrorism, and yet continued to provide that assistance.

4788. Each Defendant knew that Hezbollah was not only an FTO, but among the most dangerous terrorist groups in the world, and that providing illegal access to the U.S. financial system would foreseeably aid Hezbollah in committing acts of international terrorism, including terrorism in Iraq.

4789. Each Defendant aided and abetted Hezbollah in its commission of the acts of international terrorism that injured Plaintiffs, by culpably and consciously providing substantial and vital assistance to Hezbollah and its IJO during the Relevant Period and transferring significant sums of money through the U.S. financial system for its benefit.

4790. Hezbollah and its IJO depended on Defendants to move vast amounts of money from its worldwide operations, including money laundering involving narcotics, gold and conflict diamonds.

4791. For example, allegations in the public record include money laundering schemes that moved massive amounts of money for the benefit of Hezbollah and the IRGC through accounts Defendants maintained for currency exchanges houses and gold traders in the UAE.

4792. Each Defendant understood its role in helping fuel Hezbollah's illicit activities, was generally aware that by providing substantial assistance to Hezbollah it was aiding and abetting Hezbollah's terrorist and criminal activities, including terrorist attacks, and nonetheless continually assisted Hezbollah in its efforts.

4793.   Each Defendant provided assistance to customers that belonged to Hezbollah's BAC that were closely intertwined with Hezbollah's violent activities, including the exchange houses and gold traders Hezbollah used to collect cash it generated from its worldwide criminal operations (including narcotics and weapons trafficking), and other components of its money global laundering scheme.

4794.   Each Defendant provided substantial assistance to the IRGC and Hezbollah for at least several years.

4795.   Each Defendant's assistance was therefore deliberate and long-term, not a passing fancy or impetuous act.

4796.   Funding of the IRGC and Hezbollah and the terrorist attacks that they and their agents and proxies committed were the natural and foreseeable consequences, and foreseeable risk, of laundering billions of dollars clandestinely through the United States on behalf of a State Sponsor of Terrorism in order to conceal these activities from U.S. regulators, law enforcement and counter-terrorist financing authorities.

4797.   Plaintiffs' injuries were proximately caused by the IRGC's and Hezbollah's acts of international terrorism.

## TENTH CLAIM FOR RELIEF

## COMMERZBANK'S CIVIL LIABILITY FOR AIDING AND ABETTING IN VIOLATION OF 18 U.S.C. § 2333(d)(2) (JASTA)

4798.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

4799.   Defendant Commerzbank knowingly provided substantial assistance to Hezbollah through Hezbollah's Martyrs Foundation in Lebanon.

4800. Defendant Commerzbank was generally aware that by providing material support to Hezbollah through the Martyrs Foundation, it played a role in giving Hezbollah, directly or indirectly, access to the international financial system that allowed the terrorist organization to effectively raise funds from donors outside of Lebanon.

4801. The nature of the act assisted, illegally laundering material support for the Martyrs Foundation through the United States, heavily depended on the active and sustained cooperation of Defendant Commerzbank, which was one of the largest dollar-clearing banks in the world.

4802. The assistance Defendant Commerzbank provided was not just substantial, but it was pervasive and systemic, providing assistance to a Hezbollah fundraiser and one of Hezbollah's principal terror financing centers (the Martyrs Foundation) in many transactions over time.

4803. Defendant Commerzbank knew or was deliberately indifferent to Hezbollah's unlawful acts (acts of international terrorism, which are particularly offensive acts), and yet continued to provide it assistance.

4804. Defendant Commerzbank assisted Hezbollah for several years.

4805. Terrorist attacks were the natural and foreseeable consequences, and foreseeable risk of Defendant Commerzbank's substantial assistance to Hezbollah.

## ELEVENTH CLAIM FOR RELIEF

## BANK SADERAT PLC'S CIVIL LIABILITY FOR AIDING AND ABETTING IN VIOLATION OF 18 U.S.C. § 2333(d)(2) (JASTA)

4806. Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

4807. Defendant Bank Saderat Plc substantially assisted Hezbollah by knowingly providing it material support. Indeed, it provided that support in a pervasive and systemic manner, acting as a key financial institution for Hezbollah.

4808.   Defendant Bank Saderat Plc knew that, or exhibited deliberate indifference as to whether, providing material support to Hezbollah raised a substantial probability that the funds it provided, and the sources of material support which it concealed and disguised, would be used to benefit Hezbollah and its agents and increase Hezbollah's capacity to engage in terrorist activities and acts of international terrorism.

4809.   Defendant Bank Saderat Plc was generally aware that by providing, and concealing and disguising the source of, material support for Hezbollah, it played a role in giving Hezbollah, directly or indirectly, access to the U.S. and international financial system that allowed the terrorist organization to fund its terrorist activities.

4810.   The acts assisted, —both funding Hezbollah and Hezbollah's acts of international terrorism, including providing weapons for and directing attacks on American service members, aid workers, private contractors and journalists and the attacks themselves — benefited from and required concealed  access to vast amounts of U.S. dollars.

4811.   The amount of assistance Defendant Bank Saderat Plc systemically provided during the relevant period—millions of dollars illegally transferred to Hezbollah and access to the U.S. financial system while blinding U.S. counter-terror finance authorities—was integral to the acts of terrorism at issue.

4812.   Defendant Bank Saderat Plc had an extremely close relationship with, and was a fundraising conduit of, Hezbollah.

4813.   Defendant Bank Saderat Plc knew or was deliberately indifferent to Hezbollah's unlawful acts (acts of international terrorism, which are particularly offensive acts), and yet continued to provide it assistance.

4814.   Defendant Bank Saderat Plc assisted Hezbollah for several years.

4815. Terrorist attacks were the natural and foreseeable consequences, and foreseeable risk, of Defendant Bank Saderat Plc's substantial assistance to Hezbollah.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

(a)     Accept jurisdiction over this action;

(b)     Enter judgment against Defendants and in favor of Plaintiffs for compensatory damages in amounts to be determined at trial;

(c)     Enter judgment against Defendants and in favor of Plaintiffs for treble damages pursuant to 18 U.S.C. § 2333(a);

(d)     Enter judgment against Defendants and in favor of Plaintiffs for any and all costs sustained in connection with the prosecution of this action, including attorneys' fees, pursuant to 18 U.S.C. § 2333(a);

(e)     Enter an Order declaring that Defendants have violated the Anti-Terrorism Act, 18 U.S.C. § 2331 *et seq*.; and

(f)     Grant such other and further relief as justice requires.

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Dated: March 28, 2025

By      /s/ Gary M. Osen
       Gary M. Osen
       Peter Raven-Hansen, Of Counsel
       Ari Ungar
       Cindy T. Schlanger
       Michael Radine
       Dina Gielchinsky
       Aaron Schlanger
       **OSEN LLC**
       190 Moore Street, Suite 272
       Hackensack, NJ 07601
       (201) 265-6400
       (201) 265-0303 Fax

       1441 Broadway
       New York, New York 10018
       (212) 354-0111

       **TURNER & ASSOCIATES, P.A.**
       C. Tab Turner
       4705 Somers Avenue, Suite 100
       North Little Rock, AR 72116
       (501) 791-2277

       **MOTLEY RICE LLC**
       John Eubanks
       28 Bridgeside Blvd.
       Mt. Pleasant, SC 29464
       (843) 216- 9218

       Attorneys for Plaintiffs