
March 27, 2026

<u>**VIA ECF**</u>
Honorable Pamela K. Chen
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re:  *Freeman, et al. v. HSBC Holdings plc, et al.*, **18-cv-7359 (PKC) (PCG)**

Dear Judge Chen:

Plaintiffs write in response to Defendants' letter, ECF Nos. 158, 159, raising a recent dismissal of a JASTA complaint in *Troell v. Binance Holdings Ltd.*, No. 24-cv-7136 (JAV), 2026 U.S. Dist. LEXIS 46899 (S.D.N.Y. Mar. 6, 2026).

As Defendants admit, the *Troell* decision concluded that the plaintiffs only alleged that the defendants (collectively, "Binance") "generally permitted and solicited illicit actors of all ilks to use its platform." Ltr. at 2-3 (quoting *Troell*, at *79-80). Thus, according to the *Troell* court, Binance provided assistance more similar to the defendants in *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023), than did Defendants here, who allegedly worked *directly* with IRGC- and Hezbollah-controlled entities and individuals to create *bespoke* money laundering tools just for them—with the knowledge that they were assisting the IRGC/Hezbollah terror financing campaign that U.S. sanctions were imposed to prevent.

The *Troell* decision conducts a fact-intensive analysis of a very different set of allegations that are of little relevance to the case at bar. Thus, more important than how a fellow district court assessed a completely different set of factual allegations is how Defendants' letter reflects a material distortion of binding law on JASTA.

**A. Defendants Mischaracterize Controlling Law.**

In their letter, Defendants argue that JASTA requires showings far beyond what the statute and controlling law states. Defendants argue that Plaintiffs must allege their "*intent to aid* terrorist attacks." Ltr. at 2 (emphasis in original). *See also id.* at 2-3 (arguing plaintiffs must show they "intended to assist" and "intended to support a specific FTO [or] any terrorist attack"). Defendants suggest their motivation matters, and that *Kaplan v. Lebanese Canadian Bank SAL*, 999 F.3d 842 (2d Cir. 2021), required a showing that the defendant bank "supported Hezbollah's anti-Israel program." Ltr. at 3. Thus, according to Defendants, willingly working closely with entities it knew were controlled by terrorist organizations to launder *hundreds of billions of dollars* in evasion of sanctions meant to "deny Iran the ability to support international acts of terrorism" against

Americans is beyond JASTA's reach if the banks did not specifically *intend* to kill Americans. *See* Pls.' Opp. to Mot. to Dismiss TAC, ECF No. 147, at 1.[1]

This flatly misstates the legal standard.

JASTA is a *civil* aiding and abetting statute. It requires "conscious and culpable" participation in "wrongdoing" from which terrorism is foreseeable, but not *an intent to assist terrorist attacks*. *Twitter*, 598 U.S. at 496. Civil aiding and abetting is premised on "foreseeability," not the intent to see the underlying offense succeed—that's *criminal* aiding and abetting. As the Second Circuit has consistently explained since JASTA was enacted, JASTA does not "require proof of the specific intent demanded for *criminal* aiding and abetting culpability, *i.e.*, defendant's intent to participate in a criminal scheme as 'something that he wishes to bring about and seek by his action to make it succeed.'" *Linde v. Arab Bank, PLC*, 882 F.3d 314, 329 (2d Cir. 2018) (emphasis added) (quoting *Rosemond v. United States*, 572 U.S. 65 (2014)). Thus, the argument "that a JASTA aiding-and-abetting plaintiff must plead and prove the defendant's intent to participate in international terrorism"—as Defendants argue in their letter—is "merit[less]." *Kaplan*, 999 F.3d at 858.

JASTA's governing framework, set forth in *Halberstam v. Welch*, 705 F.2d 472 (1983), *see* JASTA § 2(a)(5), makes clear civil aiding and abetting contains no such requirement. As the Second Circuit explained, the "absence of proof of intent is not fatal to the aiding-and-abetting claim *because intent is not itself a Halberstam element*." *Kaplan*, 999 F.3d at 860 (citing *Halberstam v. Welch*, 705 F.2d 472 (1983)) (emphasis added). *See also Ashley v. Deutsche Bank AG*, 144 F.4th 420, 439 n.13 (2d Cir. 2025) (reaffirming its holding in *Kaplan* that "absence of proof of intent is not fatal"). The defendant in *Halberstam* did not "intend" to "bring about" the decedent's **unplanned** **murder**—she was assisting "some type of personal property crime at night." *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 496 (2d Cir. 2021) (quoting 705 F.2d at 488). *See also id.* at 499 ("As the analysis in *Halberstam* reveals, the 'principal violation' must be foreseeable from the illegal activity that the defendant assisted; *knowing and substantial assistance to the actual injury-causing act ... is unnecessary*.") (emphasis added). The Supreme Court agreed: "The [*Halberstam*] court therefore concluded that Hamilton substantially helped Welch commit personal property crimes and was liable for Halberstam's death, which was a foreseeable result of such crimes." *Twitter*, 598 U.S. at 487.

Moreover, *Twitter*, like *Halberstam*, cites approvingly to *Grim*, where a defendant was "held liable for aiding and abetting the burning of a building … he intentionally helped others break into … at night," because, "unknown to him, the others lit torches to guide them through the dark and accidentally started a fire." *Id.* at 495-96 (quoting *Am. Fam. Mut. Ins. Co. v. Grim*, 201 Kan. 340, 345-347 (Kan. 1968)). That is, the defendant's scienter mattered as to his participation **in the** **break-in**, as he did not intend to set fire to the church—no one did. He did not even know his companions had *torches*. 201 Kan. at 344. Showing that defendants knowingly worked with

---

[1]     Although Defendants repeat their assertion that "militia groups … allegedly committed the attacks," Ltr. at 1, this Court already found that Plaintiffs sufficiently alleged that "Hezbollah and … the IRGC … are the entities responsible for committing the acts of international terrorism that injured Plaintiffs," *Freeman v. HSBC Holdings plc*, 413 F. Supp. 3d 67, 97-98 (E.D.N.Y. 2019), as did the court in *Bartlett v. Société Générale de Banque au Liban SAL*, No. 19-cv-00007 (CBA) (TAM), 2024 U.S. Dist. LEXIS 241810, at *56-58 (E.D.N.Y. Sep. 18, 2024), and in *Troell* itself, 2026 U.S. Dist. LEXIS 46899, at *13-14.

terrorist organizations to **commit terror financing** offenses is enough to establish a JASTA claim as to the foreseeably (indeed, inevitably) resulting terrorist attacks.

The D.C. Circuit recently explained how the Supreme Court's decision in *Twitter* comports with traditional principles of civil aiding and abetting law—explicitly relying on Judge Learned Hand's seminal aiding and abetting decision in the Second Circuit:

> [C]ourts considering common law aiding-and-abetting claims have long distinguished the intent necessary to establish *criminal* aiding and abetting from the less stringent state-of-mind requirement for *civil* aiding and abetting. The Second Circuit, for instance, has held that a vendor is **criminally** liable for aiding and abetting only if he "participate[d] in [the wrongful activity] as in **something that he wishe[d] to bring about**, that he [sought] by his action to make it succeed," but the vendor may be civilly liable for aiding and abetting a crime that is merely "a natural consequence" of his sale. *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938) (Hand, J.). Other courts have similarly concluded that "borrow[ing] ... from definitions of aiding and abetting in the criminal field, where criminal intent is stressed because the abettor is a criminal principal, is entirely inappropriate" in the context of a statute that is "basically a remedial, not a criminal one."

*Atchley v. Astrazeneca UK Ltd.*, 165 F.4th 592, 609 (D.C. Cir. 2026) (italics original, bold added) (citing *inter alia*, *Monsen v. Consol. Dressed Beef Co.*, 579 F.2d 793, 802-03 (3d Cir. 1978), relied on in *Twitter*, 598 U.S. at 491).

In sum, the Second Circuit has repeatedly rejected Defendants' suggestion that money laundering for terrorist organizations is generally permissible under JASTA: "In *Kaplan*, we held that the plaintiffs sufficiently stated a claim premised on the bank's role in money laundering." *Ashley*, 144 F.4th at 445-46. *See also Atchley*, 165 F.4th at 606 ("the Supreme Court suggests that funding-based claims may require *less* of a nexus") (emphasis added). There, the defendant allegedly provided financial services to five "Hizbollah affiliates"—a charitable organization called Martyrs Foundation, two financial entities, and two of those entities' officers.[2]

Here, the scope of wrongdoing—*hundreds of billions of dollars*—and the level of bespoke services—including *employee manuals*—dwarfs the illicit conduct alleged in *Kaplan*.

### B. *Troell* Is Unhelpful to Defendants.

The *Troell* court found that the plaintiffs failed to satisfy the third *Halberstam* element of civil aiding and abetting—knowing and substantial assistance. *See* 2026 U.S. Dist. LEXIS 46899, at *61-81.[3] According to the *Troell* decision, the plaintiffs only alleged that Binance was "*permitting* Iranian customers to conduct business on the Binance exchange, notwithstanding U.S.

---

[2]    Obviously, terrorist organizations do their banking through fronts and agents. These fronts "do not themselves need to be 'engaged in ... violent or terrorist acts.'" *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 499 n.15 (2d Cir. 2021). Additionally, Commerzbank's customer The Orphans Project Lebanon "was, until its closure in 2014, the German branch of Hezbollah's Martyrs Foundation and responsible for collecting donations in Germany and transferring those funds to Hezbollah in Lebanon." Third Am. Compl. ("TAC," ECF No. 137) ¶ 1649-80.

[3]    The *Troell* court found the attacks and general awareness, the first and second elements of *Halberstam*, satisfied. *Id.* at *58.

sanctions laws and the known link between Iran and terrorism"—that is, Binance "generally permitted and solicited illicit actors of all ilks to use its platforms." *Id.* at *79-80 (emphasis added).

Such conduct is clearly far below what's alleged in *Kaplan*, and here. Indeed, the *Troell* court specifically distinguishes *Kaplan*:

> In contrast to *Kaplan*, the Amended Complaint does not identify the persons or entities who held the wallets at issue. It does not explain the nature of their connection to the IRGC. It does not provide any facts from which it could be inferred that the nature of the wallet owners' affiliation with the IRGC should have been known to Defendants. And it does not indicate that Defendants gave any special treatment to the owners of the wallets in question.

*Id.* at *66-67. *See also id.* at *72 (finding that the Al-Qaeda allegations suffered the "same deficiencies as the allegations regarding IRGC wallets"); *id.* at *70-71 (finding that the plaintiffs did not allege "that Binance facilitated any Hezbollah-related transactions prior to" the 2023 attack); *id.* at *73-75 (finding as to alleged ISIS attacks, the complaint lacked "information regarding the timing of the transactions").

Defendants do admit that the *Troell* court distinguished *Kaplan*, but only "because the defendant—knowing that '[its customers] were integral parts of Hezbollah'—dismissed a U.N. report 'accus[ing] [the bank] of money laundering for Hezbollah' … and "increased the credit limits available to those customers….'" Ltr. at 2-3 (quoting *Troell*, 2026 U.S. Dist. LEXIS 46899, at *65-66). That is, dismissing a single report about and increasing the credit limits of a Hezbollah facilitator *who was not even one of the customers at issue*—was sufficient to plead LCB's scienter.

Suggesting that the allegations here do not rise to the level of culpability alleged in *Kaplan* is unsupportable. Defendants *admitted* to moving hundreds of billions of dollars for terror-sanctioned entities (SCB alone processed over $250 billion, TAC ¶ 1157; HSBC processed another $19.4 billion, *id.* ¶ 1515). Plaintiffs allege that Defendants worked *directly* and *intensively* with IRGC-controlled entities (and Hezbollah persons and entities)—to, among other things, design *bespoke* sanctions evasion protocols that were so complex and customized that Defendants created *employee manuals* to help bank staff administer them. *See* Pls. Ltr., ECF No. 156 at 2-3 (providing TAC citations to exemplar allegations). *See Bartlett*, 2024 U.S. Dist. LEXIS 241810, at *55-56 (denying dismissal where "Defendants made efforts to help Hezbollah hide funds from American sanctions," such as "[t]he bespoke servicing of a bank account, including the facilitation of payment transfers [and] evasion of counter-terrorism sanctions."). *See also, e.g.*, TAC ¶¶ 1410-59 (SCB's knowing assistance to Hezbollah); ¶¶ 1649-80 (Commerzbank's knowing assistance to Hezbollah).

Defendants here did not "just" tolerate criminal customers on their ledgers—they worked directly with them to assist their illegal conduct. As Plaintiffs described in the TAC, many of these customers were not just sanctioned—they were (and are) working on the IRGC's behalf. For example, Defendants assisted the National Iranian Oil Company, a designated "agent or affiliate of the" IRGC, evade counterterror sanctions and move billions of dollars. TAC ¶¶ 370-371, 1198. According to the U.S. government, NIOC "helps to finance Iran's [IRGC-QF] *and its terrorist proxies*." *Id.* ¶ 362 (emphasis added). During the relevant period, Defendants knew that NIOC needed to evade counter*terror* sanctions for a reason—its involvement in terrorism. They received warnings from Treasury Department officials "barnstorming" Europe about Iran's sanctions

evasion for the purpose of terror financing. *Id.* ¶ 347. HSBC was even listed as a tenant in "NIOC House," NIOC's London headquarters and "the command center of Iran's multibillion-dollar campaign to acquire American-made weapons and military supplies." *Id.* ¶¶ 314-20, 330. *See also id.* ¶¶ 335-66 (detailing public reporting on IRGC's control of NIOC and Iran's oil sector generally).

Far more than a "U.N. report," Defendants were entirely aware they were facilitating the financing of terrorism—*that was the point of crafting the money laundering systems*. SCB worried about the risk of "catastrophic" damage it was taking if caught. *Id.* ¶ 1181. HSBC executives admitted their customers were "involve[d] in terrorist funding," *id.* ¶ 1575, and worried about the "legal penalties" if any of the payments it processed "turns out to be connected to terrorism." *Id.* ¶ 1544. Other Defendants justified helping IRGC entities engage in terror financing by calling U.S. sanctions "politically motivated." *Id.* ¶ 1806. Knowledge is not seriously at issue—and terror financing is *not* immunized because a defendant is motivated by greed rather than the ascendency of Iran's Shi'a caliphate or some other religio-political motive.

Finally, the suggestion that crimes of this scale committed over many years, dedicated to moving *hundreds of billions of dollars* for Iran's terror apparatus, are not "pervasive and systemic," Ltr. at 3, is nonsensical.

***

The letter comes at a time when the United States is engaged in an armed conflict with Iran's regime and the IRGC, its terror apparatus. Public discussions once again center around how the regime and its capacity to terrorize its neighbors is dependent on its illicit sale of oil, the IRGC's illicit banking channels, and its "shadow fleets." In short, Iran's strikes against civilian targets throughout the region, its use of proxy forces to attack U.S. installations in Iraq, and its reported deployment of terror cells in Europe are all foreseeable consequences of Defendants' decades-long willing and illegal provision of assistance to the IRGC and Hezbollah, the very conduct the U.S. government sought to prevent.

Given "the sheer scale of … and the unusual and corrupt means by which" Defendants worked with the IRGC and Hezbollah to save their terror campaigns from U.S. sanctions, *Atchley*, 165 F.4th at 608, Defendants committed one of the largest financial crimes anywhere, ever. *See* ECF No. 156 at 2 (describing billions in fines paid). As the Second Circuit's decision in *Kaplan* makes clear, Defendants' undisputed conduct is not only reprehensible from moral and policy perspectives, it is also clearly actionable under JASTA. Indeed, it constitutes the very sort of assistance that JASTA was intended to reach; Defendants' defense of their conduct only highlights the absurdity of their motion to dismiss.

Respectfully submitted,

/s/ Michael J. Radine

cc:     All Counsel