UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------x
KATHALEEN FREEMAN, *et al.*,

                        Plaintiffs,

          - against -

HSBC HOLDINGS PLC, *et al.*,

                        Defendants.

---------------------------------------------------------x

                                              **MEMORANDUM & ORDER**
                                         18-CV-7359 (PKC) (PCG)

PAMELA K. CHEN, United States District Judge:

      This case involves allegations brought by Plaintiffs under the Antiterrorism Act (the "ATA"), 18 U.S.C. § 2333, as amended by the Justice Against State Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 114-222, 130 Stat. 852 (2016). Plaintiffs bring these claims against ten banking institutions[1] and John Does 1–50. Presently before the Court is Defendants' motion to dismiss Plaintiffs' Third Amended Complaint ("TAC"). (Defs.' Mot. to Dismiss ("MTD"), Dkt. 143; Defs.' Mem. Supp. MTD ("Mem."),[2] Dkt. 144; TAC, Dkt. 137.) For the reasons set forth herein, the Court dismisses the First through Ninth Claims as to Defendants for failure to state a claim under Federal Rule of Civil Procedure ("Rule") 12(b)(6) and the Sixth Claim against

---

[1] The ten banking institutions are HSBC Holdings PLC, HSBC Bank Middle East Ltd., and HSBC Bank USA, N.A. (collectively, "HSBC"); Barclays Bank PLC; Standard Chartered Bank ("SCB"); Royal Bank of Scotland, N.V. ("RBS"); Credit Suisse AG; Bank Saderat PLC ("Bank Saderat"); and Commerzbank AG ("Commerzbank") (collectively, except Bank Saderat, "Defendants"). Bank Saderat has "failed to appear or otherwise defend this action." (Entry of Default, Dkt. 52.) On January 7, 2021, the Court awarded Plaintiffs default judgment against Bank Saderat on some, but not all, of Plaintiffs' claims. (Mem. & Order, Dkt. 90.) Default judgment has been issued as to Bank Saderat, (*see id.*), and thus all references to "Defendants" in this Memorandum & Order do not include Bank Saderat.

[2] SCB and Commerzbank also filed separate supplemental memoranda of law in support of Defendants' Motion. (*See* SCB Suppl. Mem. Supp. MTD, Dkt. 145; Commerzbank. Suppl. Mem. Supp. MTD, Dkt. 146.)

Commerzbank for lack of personal jurisdiction pursuant to Rule 12(b)(2), but denies Commerzbank's motion to dismiss the Tenth Claim.

## BACKGROUND

The Court assumes the parties' familiarity with the background of this case, *see generally Freeman v. HSBC Holdings PLC*, 413 F. Supp. 3d 67 (E.D.N.Y. 2019), *aff'd on other grounds*, 57 F.4th 66 (2d Cir. 2023) ("*Freeman I Dismissal*"); *Freeman v. HSBC Holdings PLC*, 465 F. Supp. 3d 220 (E.D.N.Y. 2020) ("*Freeman II Dismissal*"), and therefore sets forth only the factual and procedural background relevant to the instant motion.

## I.    Factual Background

Plaintiffs are American citizens killed or injured by terrorist attacks in Iraq between 2004 and 2011, and/or their families.  (*See* TAC, Dkt. 137, ¶¶ 2226–4636 (describing 200 attacks and their effect on Plaintiffs and/or families).)  Plaintiffs allege a wide-ranging conspiracy between Defendants, Bank Saderat, the Government of Iran, and various designated Foreign Terrorist Organizations ("FTOs"), namely Hezbollah, the Islamic Revolutionary Guard Corps ("IRGC"), and the IRGC Qods Force ("IRGC-QF").  (*Id.* ¶ 1.)[3]  Plaintiffs' central allegations relating to the conspiracy are that: (1) Defendants and Bank Saderat "worked individually . . . to benefit the IRGC and Hezbollah by knowingly, actively, and deliberately providing them with: (a) unusual, illegal, and substantial banking and payment services (including, among others, removing incriminating content from banking records, exploiting secure financial messaging networks, and manipulating internal bank audit controls); (b) multi-currency foreign exchange trading,

---

[3] According to the TAC, Hezbollah has been an FTO since 1997, (TAC, Dkt. 137, ¶ 1 n.2), and the IRGC and IRGC-QF have been designated as FTOs since 2019, (*id.* ¶ 1 nn. 3–4).  The IRGC-QF was previously designated as a Specially Designated Global Terrorist ("SDGT") from 2007 to 2019.  (*Id.* at ¶ 1, n.4.)

2

processing, and settlement; and ([c]) facilitating massive trade-based money laundering (including helping convert bulk cash from trafficking in conflict diamonds,[4] gold, and narcotics) on behalf of notorious customers publicly linked to terrorism," (*id.* ¶ 7); (2) Defendants "knowingly assisted Hezbollah and the IRGC (including, hereinafter, the IRGC–QF[] . . . ) by converting the proceeds Hezbollah derived from its various illicit activities, including trafficking in conflict diamonds, gold, narcotics, weapons (involving sums of bulk-cash, gold, and other precious metals), and conducting illicit oil sales," (*id.* ¶ 9); (3) "Defendants then moved those proceeds around the world, including through currency exchange houses in the Middle East and Hezbollah's unofficial bank in Lebanon, al-Qard al-Hassan ('AQAH'), at the direction of Hezbollah's and the IRGC's agents," (*id.*); and (4) the IRGC and Hezbollah then used that financing to "establish, recruit, train, fund, arm, and direct Iraqi Shia proxies [('Iraqi Proxies')[5]], including FTO[s] . . . , to attack U.S. and other peacekeeping forces that were supporting Operation Iraqi Freedom (2003–2008) and Operation New Dawn (2009–2011)," (*see id.* ¶¶ 3, 5).

## II.    Procedural Background

In November 2014, some of the current Plaintiffs filed suit in this District against Defendants[6] alleging claims under the ATA ("*Freeman I*"). *Freeman v. HSBC Holdings PLC*, 350 F.R.D. 210, 213 (E.D.N.Y. 2025) ("*Freeman I Reconsideration*"). The *Freeman I* plaintiffs

---

[4] The TAC defines "conflict diamonds" as diamonds sourced through "the illegal trade in diamonds with African countries where violent conflicts have taken place between armed militias and African government forces." (TAC, Dkt. 137, ¶ 649 n.86.)

[5] Plaintiffs identify the Iraqi Proxies as including "Badr Corps (Badr Organization), Jaysh al-Mahdi ('JAM' or the 'Mahdi Army') including the Promised Day Brigades, Asa'ib Ahl Al-Haq ('AAH' or the 'League of the Righteous'), and Kataib Hezbollah ('KH') (designated an FTO in 2009)." (TAC, Dkt. 137, ¶ 1915.)

[6] The *Freeman I* defendants are the same entities that are Defendants in the instant action. *See Freeman I Dismissal*, 413 F. Supp. 3d 67 (E.D.N.Y. 2019).

amended their complaint twice. *Id.* While Defendants' motion to dismiss the second amended complaint in *Freeman I* was pending, the *Freeman I* plaintiffs "filed their omnibus response . . . in which they pointed to the newly passed JASTA as providing 'an alternative legal basis for Plaintiffs' conspiracy claims.'" *Id.* (citation omitted). Defendants' motion to dismiss in *Freeman I* was referred to the Honorable Cheryl L. Pollak, Magistrate Judge, who issued her report and recommendation ("R&R") in July 2018. *Id.* at 213. In October 2018, over Defendants' objections and "while [their] objections to the R&R were pending, [the *Freeman I* plaintiffs] requested leave from Judge Pollak to 'join' over 400 new plaintiffs who had retained or were expected to retain Plaintiffs' counsel since the filing of the [*Freeman I* second amended complaint] and whose claims would soon be barred by the statute of limitations." *Id.* at 214 (citation omitted). In December 2018, the *Freeman I* plaintiffs changed course and "notified Judge Pollak that they had 'decided to file a related case rather than to amend the [*Freeman I* second amended complaint].'" *Id.* (citation omitted).

On December 26, 2018, Plaintiffs filed the instant action, *Freeman II*, on behalf of the additional plaintiffs proposed in *Freeman I*. (Compl., Dkt. 1.) On April 11, 2019, Plaintiffs' counsel filed an additional action in this District, *Bowman et al. v. HSBC Holdings PLC et al.*, No. 19-CV-2146 (PKC) (CLP) (E.D.N.Y.) ("*Bowman*"), against the same defendants, though on behalf of different plaintiffs.[7] Compl., *Bowman*, Dkt. 1; *see also Freeman I Reconsideration*, 350

---

[7] On January 1, 2019, Plaintiffs filed another action in this district against a different group of defendants, Compl., *Bartlett v. Société Generale de Banque au Liban SAL*, No. 19-CV-0007 (CBA) (TAM) (E.D.N.Y. Jan. 1, 2019) ("*Bartlett*"), Dkt. 1, "proceed[ing] on different theories of liability than the causes of action brought" in the *Freeman* actions, Mem. & Order at 1–2, *Bartlett*, Dkt. 368. "[A]ll but approximately 50 of the 1,212 plaintiffs in the Freeman cases [were] also Plaintiffs in Bartlett." *Id.* at 1.

F.R.D. at 214.[8]  In addition to reiterating the ATA claims asserted in *Freeman I*, both *Freeman II* and *Bowman* asserted conspiracy and aiding-and-abetting claims under JASTA.  (Compl., Dkt. 1, at ¶¶ 3683–777); Compl, *Bowman*, Dkt. 1, at ¶¶ 1291–385.

Plaintiffs first amended their *Freeman II* Complaint in December 2019.  (Am. Compl., Dkt. 72.)  Defendants sought to dismiss the *Freeman II* Amended Complaint in January 2020 pursuant to Rule 12(b)(6).  (Ltr. Mot. to Dismiss, Dkt. 75.)  The Court granted Defendants' motion, dismissing ten of Plaintiffs' twelve claims for failing to state a claim under Rule 12(b)(6), and dismissing one claim, which was against Defendant Commerzbank only, for lack of personal jurisdiction pursuant to Rule 12(b)(2).  *Freeman II Dismissal*, 465 F. Supp. 3d at 235.[9]  In January 2021, the Court ruled on Plaintiffs' motion for default judgment against Bank Saderat and scheduled an inquest on Plaintiffs' damages for April 2021.  (Mem. & Order, Dkt. 90.)

In parallel to the *Freeman II* and *Bowman* proceedings, on September 16, 2019, the Court dismissed the second amended complaint in *Freeman I*.  *See Freeman I Dismissal*, 413 F. Supp. 3d at 99.  Because the *Freeman I Dismissal* preceded the *Freeman II Dismissal*, and because the ATA and JASTA conspiracy claims were "materially the same" in both cases, the Court's dismissal of the ATA and JASTA conspiracy claims in *Freeman I* served as the basis for the Court's dismissal of the same claims in *Freeman II*.  *See Freeman II Dismissal*, 465 F. Supp. 3d at 225.  After plaintiffs filed a motion for partial reconsideration in *Freeman I*, which the Court

---

[8] Although *Freeman I* and *II* were originally assigned to the Honorable Dora L. Irizarry, as of May 18, 2019, both cases, along with *Bowman*, were assigned to the undersigned.  *See* 5/8/2019 Dkt. Order, *Freeman I*; 4/16/2019 Dkt. Order, *Bowman*; (5/8/2019 Dkt. Order).

[9] The remaining claim was against Bank Saderat only and thus was not part of Defendants' motion to dismiss.  *See Freeman II Dismissal*, 465 F. Supp. 3d at 235 n.15.

denied,[10] the *Freeman I* parties and the Court discussed the potential consolidation of *Freeman I, Freeman II*, and *Bowman* "in order to facilitate one Notice of Appeal."  *See Freeman I Reconsideration*, 350 F.R.D. at 217.  The parties were unable to reach an agreement regarding a consolidated approach to *Freeman I*, *Freeman II*, and *Bowman*, and the *Freeman I* plaintiffs noticed their appeal of the dismissal in that case on November 25, 2019.  *Id*.

In the instant case, on January 28, 2021, "[a]t the request of Plaintiffs, the Court stayed [*Freeman II*] pending the Second Circuit's decision in *Freeman I*" and adjourned the damages inquest as to Bank Saderat *sine die.* (1/28/2021 Min. Entry.) On August 11, 2021, Plaintiffs sought leave to file a second amended complaint in *Freeman II*, which the Court deferred ruling on until the Second Circuit issued a decision in *Freeman I.* (*See* Mot. to Amend, Dkt. 95; 8/16/2021 Dkt. Order.)  On January 5, 2023, the Second Circuit affirmed the *Freeman I Dismissal.  See Freeman v. HSBC Holdings PLC*, 57 F.4th 66, 72 (2d Cir. 2023) ("*Freeman I Appeal*").  However, the *Freeman II* parties once again requested, and the Court granted, a stay "pending the Supreme Court's decision in *Twitter*[*, Inc.*] *v. Taamneh*, [598 U.S. 471 (2023)]." (2/16/2023 Dkt. Order.) On June 27, 2023, while the stay was still in effect, the Court held a status conference at which it granted Plaintiffs leave to amend their complaints in *Freeman II* and *Bowman*, and gave Defendants 30 days to object to the consolidation of *Freeman II* and *Bowman*.  (6/27/2023 Min. Entry.)  The Court simultaneously set a briefing schedule for Defendants' anticipated motion to dismiss the second amended complaint in *Freeman II*.  (*Id.*)  On July 13, 2023, *Bowman* and *Freeman II* were consolidated and *Freeman II* became the lead case.  (7/13/2023 Order Consolidating Cases.)

_____

[10] The *Freeman I Reconsideration* includes a lengthy overview of *Freeman I*'s procedural posture, which the Court declines to review here.  *See* 350 F.R.D. at 215–17.

In September 2023, Plaintiffs sought permission to use, in their anticipated second amended complaint in *Freeman II*, discovery material that their *counsel* had received through discovery in another case their counsel was involved in, *Bartlett*. (*See* Ltr. Mot. for Disc., Dkt. 113, at 1.) Because Plaintiffs' counsel already had the materials, Plaintiffs characterized the request as "[i]n essence, . . . seek[ing] leave to 'subpoena' themselves." (*Id.*) As Plaintiffs conceded, however, the material was covered by a protective order in *Bartlett* that restricted its use. (*Id.*) After the Court denied Plaintiffs' request to use the *Bartlett* discovery material in their planned second amended complaint, (*see* 9/21/2023 Dkt. Order), on December 27, 2023, Plaintiffs filed a Second Amended Complaint that purportedly referenced, and redacted, the *Bartlett* discovery material, (*see* Dkt. 117, ¶ 8 n.5),[11] and twelve days later, renewed their request to use those materials in the Second Amended Complaint, (*see* Dkt. 120, at 2 (seeking to renew Plaintiffs' motion for "[c]onstructive [d]iscovery of [r]ecords in Plaintiffs' [p]ossession")). On February 6, 2024, the Court "lifted the stay of discovery in *Freeman II*/*Bowman* for the limited purpose of permitting the *Freeman II*/*Bowman* Plaintiffs to subpoena Defendant [SCB] and non-party KBC Bank for the information obtained in *Bartlett*." (2/6/2024 Min. Entry.) On February 29, 2024, Defendants moved to quash Plaintiffs' discovery requests, (Mot. to Quash, Dkt. 125), which the Court granted on February 26, 2025, (Mem. & Order, Dkt. 136).[12] Finally, the Court ordered Plaintiff to file the TAC without the *Bartlett* discovery material, (*id.*), which Plaintiffs did on

---

[11] Plaintiffs filed their Second Amended Complaint on December 27, 2023, (Dkt. 117), and then filed the same Second Amended Complaint, but "with [a] [f]ull [c]aption listing [a]ll Plaintiffs," on December 28, 2023, (Dkt. 118).

[12] The Court's decision to grant Defendants' motion to quash was based in part on the intervening decision in *Bartlett* affirming that the protective order in that case precluded discovery efforts in other cases "based on 'arguments grounded on' or 'gleaned from' *Bartlett* Discovery Material." (Mem. & Order Granting Motion to Quash, Dkt. 136, at 11 (quoting Appeal Mem. & Order at 11, *Bartlett*, Dkt. 453).)

March 28, 2025, (TAC, Dkt. 137).  Defendants' motion to dismiss the TAC was fully briefed on July 16, 2025.[13]  (*See* Dkts. 143–51.)

## LEGAL STANDARD

"A complaint survives a motion to dismiss under Rule 12(b)(6) when, accepting its non-conclusory allegations as true, the complaint plausibly supports a claim for relief."  *Ashley v. Deutsche Bank Aktiengesellschaft*, 144 F.4th 420, 434–35 (2d Cir. 2025) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (quoting same).  "That burden is not met where a pleading offers only 'labels and conclusions,' 'a formulaic recitation of the elements of a cause of action,' or 'naked assertions devoid of further factual enhancement.'"  *Id.* (quoting same).

## DISCUSSION

Plaintiffs assert eleven claims against various combinations of Defendants in the TAC.  The Court groups and addresses these claims as follows: the primary liability ATA claims pursuant to 18 U.S.C. § 2333(a) (Claims (1)–(7)); the JASTA conspiracy claim pursuant to 18 U.S.C. § 2333(d)(2) (Claim (8)); and the JASTA aiding-and-abetting claims pursuant to 18 U.S.C. § 2333(d)(2) (Claims (9)–(11)).

### I.    Plaintiffs' ATA Claims

As in *Freeman I*,[14] the TAC in this case contains seven ATA claims, all asserting civil liability against Defendants under 18 U.S.C. § 2333(a) for allegedly engaging in acts of

---

[13] Thereafter, Plaintiffs and Defendants also filed letters regarding supplemental authority. (*See* Dkts. 154–60.)

[14] The Amended Complaint in this case also contained seven ATA claims, which the Court summarily dismissed in the *Freeman II Dismissal* because they were "materially the same as those asserted [and dismissed] in *Freeman I*."  *Freeman Dismissal II*, 465 F. Supp. 3d at 225.  The Court

international terrorism.[15]   The TAC's ATA claims allege violations of the same terrorism statutes as in *Freeman I,* but the TAC now: (1) directly asserts in several counts that Defendants "provided material support" to FTOs, as opposed to merely conspiring to do so, (*see, e.g.*, Dkt. 137, ¶¶ 4638, 4661, 4713, 4733); (2) adds allegations that Defendants' assistance facilitated acts of terrorism in violation of 18 U.S.C. 844(f),[16] (*see, e.g.*, *id.* ¶ 4667); and (3) adds approximately 200 pages of factual allegations, (*see generally* Dkt. 137).   As discussed, Plaintiffs' ATA claims were all dismissed in both the *Freeman I* and *Freeman II Dismissals.*[17]   There has been no intervening change in the law—nor do Plaintiffs argue one—and so the Court's analysis is primarily a factual

therefore only discusses the *Freeman I* ATA claims in determining whether the TAC's ATA claims should be dismissed.

[15] Counts 1–7 of the TAC allege civil liability under 18 U.S.C. § 2333(a) based on alleged violations of various terrorism statutes: (1) against all Defendants for violations of 18 U.S.C. § 2339A, (TAC, Dkt. 137, ¶¶ 4637–57); (2) against all Defendants for violations of 18 U.S.C. § 2339B, (*id.* ¶¶ 4658–74); (3) against HSBC Bank USA, N.A. for violations of 18 U.S.C. § 2332d, (*id.* ¶¶ 4675–97); (4) against RBS and Commerzbank for violations of 18 U.S.C. § 2332d, (*id.* ¶¶ 4698–710); (5) against Commerzbank for violations of 18 U.S.C. § 2339A, (*id.* ¶¶ 4711–21); (6) against Commerzbank for violations of 18 U.S.C. § 2339B, (*id.* ¶¶ 4722–31); and (7) against SCB for violations of 18 U.S.C. § 2339A, (*id.* ¶¶ 4732–51).   The Court does not discuss the elements of the alleged violations of the international terrorism statutes because, as discussed below, Counts 1–7 all fail to establish a fundamental element of primary liability under Section 2333(a).

[16] Section 844(f) prohibits the malicious destruction or attempted destruction, "by means of fire or an explosive, any building, vehicle, or other personal or real property in whole or in part owned or possessed by, or leased to, the United States."   18 U.S.C. § 844(f).   The Amended Complaint alleged acts of terrorism in violation of Section 844(f) in the First Claim only.   (*See* Am. Compl., Dkt. 72, ¶ 3608.)

[17] In dismissing Plaintiffs' ATA claims in the *Freeman II Dismissal*, the Court "relie[d] on, and incorporate[d] by reference, its *Freeman I* decision." *Freeman II Dismissal*, 465 F. Supp. 3d. at 225.   The *Freeman I* plaintiffs did not challenge the dismissal of their ATA claims on appeal, and thus the Court's *Freeman I* ATA analysis was left undisturbed by the Second Circuit.   *See Freeman I Appeal*, 57 F.4th at 74 n.5.

one, that is: do the TAC's additional factual allegations cure the deficiencies with Plaintiffs' previous ATA claims?  The answer is no.

As the Court explained in *Freeman I*, "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs," may bring only primary liability claims against "the principal perpetrators of acts of international terrorism" pursuant to 18 U.S.C. § 2333(a).  *See Freeman I Dismissal*, 413 F. Supp. 3d at 81–82 (alteration in original) (first quoting 18 U.S.C. § 2333(a); then citing *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 118, 123 (2d Cir. 2013); *Linde v. Arab Bank*, PLC, 882 F.3d 314, 319 (2d Cir. 2018); and then quoting *Lelchook v. Islamic Republic of Iran*, 393 F. Supp. 3d 261, 265 (E.D.N.Y. 2019)).  "To state a claim for primary liability, a plaintiff must allege: '(1) an injury to a U.S. national, (2) an act of international terrorism, and (3) causation.'"  *Id.* at 82 (quoting *O'Sullivan v. Deutsche Bank AG*, No. 17-CV-8709 (LTS) (GWG), 2019 WL 1409446, at *4 (S.D.N.Y. Mar. 28, 2019)).  Primary liability does not extend to "secondary actors who facilitate[] such acts by others."  *See id.* (alteration in original) (quoting *Lelchook*, 393 F. Supp. 3d at 265); *Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217, 222 (2d Cir. 2019) ("In its original form, the ATA afforded relief only against the perpetrators of the terrorist attacks, not against secondary, supporting actors.").  Thus, plaintiffs suing under the ATA must plausibly allege that "[d]efendants' actions were, themselves, acts of international terrorism" as defined in 18 U.S.C. § 2331(1) ("Section 2331").[18]  *See Freeman I Dismissal*, 413 F. Supp. 3d at 82.[19]

---

[18] The ATA incorporates Section 2331's definition of an "act of international terrorism."

[19] Plaintiffs challenge the applicability of *Siegel*, 933 F.3d 217, and *O'Sullivan*, 2019 WL 1409446, given developments in the aiding-and-abetting case law since each was decided. (*See* Pls.' Mem. Opp'n MTD, Dkt. 147, at 36–38, 56.)  Plaintiffs' challenges are irrelevant to the cases' ATA analysis, which remains good law.

The Court dismissed the *Freeman I* ATA claims because it found that plaintiffs had not sufficiently alleged the second and third elements of primary liability, i.e., an act of international terrorism (as defined by Section 2331) and causation. *Id.* at 82–85. Regarding the second element, the Court found that, while "[c]riminal violations of 18 U.S.C. § 2332d, 18 U.S.C. § 2339A, and 18 U.S.C. § 2339B can, under some circumstances, satisfy [Section 2331's] definition of an act of international terrorism," *id.* at 82–83 (first citing *Boim v. Holy Land Found. for Relief & Dev.* ("*Boim III*"), 549 F.3d 685, 689–94 (7th Cir. 2008) (*en banc*); then citing *Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202, 209 (2d Cir. 2014)), Defendants' alleged "provision of banking services to members of a terrorist organization" did not "satisfy that definition standing alone," *id.* at 83 (citing *Linde*, 882 F.3d at 325–26), because this conduct did not "*also* involve violence or endanger human life" nor "appear to be intended to intimidate or coerce a civilian population or to influence or affect a government," *id.* (quoting *Linde*, 882 F.3d at 326).[20] Regarding the third element, the Court found that the plaintiffs had not "plausibly allege[d] that the defendant[s'] actions were a 'substantial factor in the sequence of responsible causation'

---

[20] Recent in-Circuit case law has only reinforced the threshold nature of Section 2331 vis-à-vis ATA primary liability claims. *See Goldman v. Lafarge S.A.*, No. 24-CV-1043 (NGG) (PK), --- F. Supp. 3d ---, 2026 WL 451616, at *3 (E.D.N.Y. Feb. 18, 2026) (dismissing ATA claims where plaintiffs "failed to allege that the payments to ISIS were directed at a specifically identifiable violent or dangerous act" (internal quotation marks and citation omitted)); *Raanan v. Binance Holdings Ltd.*, No. 24-CV-0697 (JGK), 2025 WL 605594, at *15 (S.D.N.Y. Feb. 25, 2025) (dismissing ATA claims where plaintiffs' allegations that "defendants enabled customers associated with [FTOs] to engage in cryptocurrency transactions" failed to support conclusion that defendants committed a terrorist attack and collecting cases); *King v. Habib Bank Ltd.*, No. 20-CV-4322 (LGS), 2022 WL 4537849, at *5 (S.D.N.Y. Sep. 28, 2022) (dismissing ATA claims where plaintiffs failed to allege the "kind of direct connection to violence or endangerment of human life that would render such financial services 'acts of international terrorism' themselves"); *Bartlett v. Société Générale de Banque Au Liban SAL*, No. 19-CV-0007 (CBA) (VMS), 2020 WL 7089448, at *8 (E.D.N.Y. Nov. 25, 2020) ("[A]lleging that defendants provided financial services is different than alleging '[d]efendant's own actions . . . involved violence or endangered human life.'" (citation omitted)).

leading to the plaintiff[s'] injur[ies] and that the plaintiff[s'] injuries were 'reasonably foreseeable' or 'anticipated as a natural consequence' of those actions." *Id*. at 84 (quoting *Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013)).

Here, despite Plaintiffs bulking up the TAC with 200 pages of additional factual allegations and despite Plaintiffs directly accusing Defendants of providing material support to FTOs (rather than simply agreeing to do so), the TAC still fails to sufficiently plead the second and third elements of primary liability under Section 2333(a). In their opposition, Plaintiffs argue only that "Defendants' knowing provision of material support to Iran's terror apparatus and their vast efforts to assist it qualify as acts of international terrorism." (Opp'n, Dkt. 147, at 58; *see also* TAC, Dkt. 137, ¶ 1134 (describing SCB as "committed to assisting Iran's terror apparatus"); *id.* ¶ 1544 (alleging HSBC was aware of risk of payments being "connected to terrorism"); *id.* ¶ 1700 ("Credit Suisse eventually became a central player in the IRGC's scheme to finance terrorism."); *id.* ¶ 1767 (alleging RBS saw its sanctions-evading business with Iran as an "opportunity"); *id.* ¶ 1872 ("Barclays knew . . . that Barclays was facilitating unlawful payments on behalf of Iran to assist its terror apparatus").) [21] Though more rhetorically pointed than their predecessors, these claims remain conclusory and thus insufficient. *See Ashley*, 144 F.4th at 434–35 (reiterating that plaintiff's burden to "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged" "is not met where a pleading offers only

---

[21] Plaintiffs devote only two paragraphs of their 59-page opposition to Defendants' MTD to their ATA claims and make no effort to identify factual allegations in the TAC that establish primary liability. (Opp'n, Dkt. 147, at 56–58.) Though the Court has attempted to identify allegations in the TAC that might support Plaintiffs' ATA claims, it is not the Court's responsibility to scour the 689-page TAC to find them.

'labels and conclusions,' 'a formulaic recitation of the elements of a cause of action,' or 'naked assertions devoid of further factual enhancement'" (quoting *Iqbal*, 556 U.S. at 678)).[22]

Thus, because Plaintiffs have again failed to allege sufficient facts from which to infer that Defendants were the "principal perpetrators" of the terrorist acts detailed in the TAC, their ATA claims must be dismissed. *See Freeman I Dismissal*, 413 F. Supp. 3d at 82; *see also id.* ("In order to state a primary liability claim under the ATA, Plaintiffs must plausibly allege that Defendants' actions were, themselves, acts of international terrorism in order to give rise to primary liability under § 2333(a)."); *Siegel*, 933 F.3d at 222 ("[T]he ATA afforded relief only against the perpetrators of the terrorist attacks, not against secondary, supporting actors."); *cf. Twitter*, 598 U.S. at 483 ("[T]hose injured by an act of international terrorism can sue the relevant terrorists directly under § 2333(a).").

\*    \*    \*

Accordingly, Plaintiffs' First through Seventh Claims of the TAC are dismissed for failure to state a claim.[23]

---

[22] Plaintiffs' primary legal support for their ATA claims is *Schansman v. Sberbank of Russia PJSC*, 565 F. Supp. 3d 405, 416 (S.D.N.Y. 2021). (*See* Opp'n, Dkt. 147, at 58.) But *Schansman* is an outlier in this Circuit and "relied on 'outdated [and out of Circuit] law from [*Boim III*, 549 F.3d at 691].'" *See Goldman*, 2026 WL 451616, at \*4 n.5 (citation omitted). Indeed, "[t]he Second Circuit explicitly stated . . . that [*Boim III*]'s holding regarding '*primary* liability under the ATA' was 'inapposite.'" *Id*. (quoting *Honickman*, 6 F.4th at 499 n.14).

[23] Commerzbank also seeks to dismiss the Sixth Claim for lack of personal jurisdiction. (*See* Commerzbank Suppl. Mem. Supp. MTD, Dkt. 145, at 2 ("[T]he Sixth . . . Claim[] should also be dismissed for lack of personal jurisdiction because the TAC alleges no nexus between [it] and the United States.").) The Court grants Commerzbank's motion as to Sixth Claim as an additional basis for dismissing that claim.

## II.    JASTA Conspiracy Claims

Plaintiffs' Eighth Claim alleges that "Defendants agreed to enter into [a] conspiracy, which included the IRGC (FTO) and Hezbollah (FTO) and their agents and proxies" to commit acts of international terrorism, in violation of JASTA.  (TAC, Dkt. 137, ¶¶ 4752–70.)  The Amended Complaint in this case also included a JASTA conspiracy claim, which the Court dismissed based on the *Freeman I Dismissal*.  *Freeman II Dismissal*, 465 F. Supp. 3d at 226 ("Because all but the aiding and abetting claims in *Freeman II* and *Bowman* are materially the same as those asserted in *Freeman I*, the Court relies on, and incorporates by reference, its *Freeman I* decision.").  That dismissal, however, preceded the Second Circuit's decision in *Freeman I*, in which the Second Circuit disagreed with the Court's "primary reason for dismissing the [p]laintiffs' JASTA conspiracy claims,"[24] while still affirming the dismissal based on the Circuit's own finding that the plaintiffs had "failed to adequately allege that the Banks[25] conspired – either directly or indirectly – with the terrorist groups, or that the terrorist attacks that killed or injured the service members were in furtherance of the conspiracy to circumvent U.S. sanctions." *Freeman I Appeal*, 57 F.4th at 72.  The Court now applies the Circuit's analysis from the *Freeman I Appeal* to the TAC, and for the same reasons explained in that decision, finds that the TAC fails to allege that Defendants entered into a criminal conspiracy with any FTO to commit international acts of terrorism in violation of JASTA.

As the Circuit explained in the *Freeman I Appeal*, in 2016, Congress added secondary liability provisions to the ATA through JASTA, codified at 18 U.S.C. § 2333(d)(2).  *Id.* at 75.

---

[24] The Circuit found that the Court erred in interpretating the JASTA conspiracy statute as "requiring [p]laintiffs to allege a 'direct' connection between the Banks and the [FTOs] that perpetrated the acts of violence in question." *Freeman I Appeal*, 57 F. 4th at 79.

[25] The defendant "Banks" in *Freeman I* are the same defendants as here.  *See supra* n.1.

Section 2333(d)(2) provides that, where there has been "an injury arising from an act of international terrorism, . . . liability may be asserted as to any person[26] who . . . conspires with the person who committed such an act of international terrorism." *Id.* at 75–76 (quoting 18 U.S.C. § 2333(d)(2)). Thus, in contrast to an ATA primary liability claim, a plaintiff alleging a JASTA conspiracy claim need not show that the defendant committed an act of international terrorism as defined in Section 2331, i.e., that the defendant's actions "involve[d] violence or endanger[ed] human life" and "appear[ed] to be intended to intimidate or coerce a civilian population or to influence or affect a government." *Freeman I Dismissal*, 413 F. Supp. 3d at 83 (quoting *Linde*, 882 F.3d at 326). Rather, "to assert a conspiracy claim under JASTA, a plaintiff must plead an *agreement* between two or more persons" to "pursu[e] the same object" and an "injury caused by an unlawful overt act performed by one of the parties to the *agreement*." *Freeman I Appeal*, 57 F.4th at 79 (quoting *Halberstam*, 705 F.2d at 477). The overt act causing injury "must further the objects of [the] conspiracy for another coconspirator to be held civilly liable for that act." *Id.* at 82 (citing same).

Here, as in *Freeman I*, and despite the infusion of hundreds of pages of factual allegations, Plaintiffs fail to plead both a common object between Defendants and their terrorist-affiliated clients and an overt act in furtherance of that common object. Like the second amended complaint in *Freeman I*, "the [T]AC only alleges, albeit in significant and compelling detail, a conspiracy to help Iranian financial and commercial entities evade American [financial] sanctions." *Freeman I Dismissal*, 413 F. Supp. 3d at 88. Near the end of the TAC, Plaintiffs assert, in a single conclusory

---

[26] The definition of "person" under Section 2333(d)(2) "include[s] corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals." *Freeman I Appeal*, 57 F.4th at 76 (first citing 1 U.S.C. § 1; then citing 18 U.S.C. § 2333(d)(1)).

sentence, that "Defendants joined the IRGC and Hezbollah's conspiracy, whose objective was to wage terror a [sic] campaign U.S. and Coalition Forces in Iraq." (TAC, Dkt. 137, ¶ 4759.) But across the preceding almost 700 pages of the TAC, Plaintiffs uniformly allege only a "*sanctions evasion* conspiracy." (*See, e.g.*, *id.* ¶¶ 1314, 1321 (discussing SCB facilitation of transactions that involved monetary payments to a procurement company for Hezbollah); *id.* ¶¶ 1526, 1529–34 (discussing HBSC's awareness of the "IRGC sanctions evasion conspiracy" and HSBC's participation in this conspiracy to "remove, omit, or falsify essential information" to evade "sanctions screening filters"); *id.* ¶¶ 1599–1621 (discussing Commerzbank's "procedures for facilitating the IRGC's sanctions evasion conspiracy"); *id.* ¶¶ 1760–1831 (discussing RBS's involvement in helping "the IRGC evade U.S. counterterror financing sanctions").) As in *Freeman I*, "[n]owhere in the [TAC] . . . do Plaintiffs plead that the Banks intended to kill or injure U.S. service members in Iraq." *Freeman I Appeal*, 57 F.4th at 80. Nor, for that matter, do Plaintiffs allege that "the terrorist groups agreed to help the Banks and Iranian entities evade U.S. sanctions." *Id.*

To the extent Plaintiffs attempt to equate Defendants' agreement to evade sanctions to agreeing to finance terrorism and connect Defendants to the terrorist groups at issue, Plaintiffs' allegations are conclusory and misleading. For example, Plaintiffs assert that "Defendants . . . knew they were joining a conspiracy (the financing component) *and* actively assisting the IRGC to wage its terror campaigns." (*See* TAC, Dkt. 137, ¶ 4763 (emphasis added).) Plaintiffs thus deploy ambiguous grammar to suggest Defendants "knew" that they were "actively assisting the IRGC to wage its terror campaigns." (*See id.*) Yet the TAC is devoid of factual allegations to support that inferential leap.

16

Using a similar sleight of hand, Plaintiffs also attempt to suggest that Defendants agreed to finance terrorism by alleging that Defendants "facilitated" letters of credit ("LCs")[27] for entities "controlled by, and an agent of, the IRGC," (*see, e.g.*, *id.* ¶¶ 1192, 1198).  These LCs allegedly were used to purchase "materials used, *inter alia*, to effectuate arms shipments, transport weapons, personnel and technology to the IRGC–QF and Hezbollah," (*id.* ¶ 4740; *see also id.* ¶ 1193 (alleging that LCs were "issued for the benefit of Iran's military/terror apparatus, facilitating and financing the IRGC's, MODAFL's and Hezbollah's illegal acquisitions of materials and technologies, including materials unlawfully obtained from the United States and components for IEDs and EFPs used against Coalition Forces in Iraq").)  But Plaintiffs never allege that Defendants *issued* these LCs, or that when Defendants "facilitated" these LCs, they were aware of the nature of the underlying transactions or that the goods sought to be purchased via these LCs could or would be used to carry out of acts of terrorism in Iraq.  Rather, Plaintiffs allege that Defendants stripped country- and applicant-information from the LCs so that these LCs could be processed through the U.S. banking system and avoid U.S. sanctions against Iran.[28]

---

[27] "A Letter of Credit is a contractual commitment by the foreign buyer's bank to pay once the exporter ships the goods and presents the required documentation to the exporter's bank as proof."  Dep't of Com. Int'l Trade Admin., *Letters of Credit*, https://www.trade.gov/letter-credit (last visited March 31, 2026); (*see* TAC, Dkt. 137, ¶¶ 250, 252 (generally describing LCs as forms issued by a bank to a purchaser of goods, which are often used to guarantee payment "in international transactions" where goods sometimes must travel significant distances, the goods' provider and receiver are located in countries with different laws, and the parties are operating at arms' length).)

[28] The TAC alleges various forms of "facilitation" by Defendants.  (*See, e.g.,* TAC, Dkt. 137, ¶¶ 1201 ("SCB–Dubai processed, cleared, and settled dozens of transactions . . . ."); *id.* ¶ 1212 ("SCB–New York served as the clearing bank for these LCs."); *id.* 1215 ("Credit Suisse in Zurich facilitated the payment on the LC [on behalf of Mahan Air] . . . ."); *id.* ¶ 1231 ("SCB illegally facilitated . . . transactions on behalf of . . . MODAFL sub-agencies . . . ."); *id.* ¶¶ 1236, 1257, 1282 (noting SCB entities serving as negotiating and clearing banks for LCs); *id.* ¶ 1688 (alleging Credit Suisse acted as "clearing and settlement bank[]").)  The closest Plaintiffs come to alleging more than "facilitation" is an allegation that RBS "reissued" a letter of credit originally issued by Bank Melli by removing references to Iran, (*see id.* ¶ 1813), and that "SCB–Dubai acted

Thus, "[i]n the absence of any allegation that [Defendants] and the terrorist groups 'engaged in a common pursuit,' . . . [the Court] cannot identify 'an[y] agreement' that could form the basis of a JASTA conspiracy between [Defendants] and the terrorist groups." *Freeman I Appeal*, 57 F.4th at 80 (second alteration in original) (quoting *Halberstam*, 705 F.2d at 477, 481); *see also Bernhardt v. Islamic Republic of Iran*, 47 F.4th 856, 873 (D.C. Cir. 2022) (holding that plaintiff's "conspiracy claim [against HSBC] is inadequate" because "[t]he complaint states that HSBC was trying to make substantial profits by evading sanctions, whereas al-Qaeda sought to terrorize the U.S. into retreating from the world stage" (internal quotation marks omitted)).

Even if Plaintiffs had alleged the existence of an agreement between Defendants and the terrorist organizations regarding "the evasion of U.S. sanctions against Iran," Plaintiffs have also not adequately alleged, nor can the Court discern, "how the terrorist attacks 'advance[d] the overall object of [this sanctions evasion] conspiracy.'" *Freeman I Appeal*, 57 F.4th at 80 (quoting *Halberstam*, 705 F.2d at 487). As in *Freeman I*, the TAC frames the attacks as overt acts of the conspiracy based on the attacks' alleged foreseeability to Defendants. (*See* TAC, Dkt. 137, ¶ 2218 (alleging that the terrorist attacks were "financed and facilitated, in substantial part, by illicit funds transfers initiated at the IRGC's direction as part of the conspiracy set forth in detail herein and with the knowing, culpable and substantial assistance of Defendants"); *id*. ¶ 33 ("Each act of international terrorism at issue here was a foreseeable consequence of Defendants' pervasive and systemic assistance to the IRGC and Hezbollah, particularly by assisting their terror financing and procurement of dual-use items."); *see also id.* ¶ 4769 ("The reasonably foreseeable consequences, and foreseeable risk, of entering into the conspiracy to launder billions of dollars on behalf of and

---

as the Advising Bank" for its customer, MAPNA International, which had ties to sanctioned individuals and entities, (*see id.* ¶ 1307–13 (describing 2010/2011 sanctions designations of MAPNA affiliates)).

for the benefit of the IRGC and Hezbollah, . . . included the IRGC and Hezbollah carrying out . . . numerous terrorist attacks against U.S. nationals in Iraq.").)  But, as the Circuit made clear in *Freeman I*, foreseeability is "not enough to meet the in-furtherance-of requirement at the heart of a conspiracy claim."  *Freeman I Appeal*, 57 F.4th at 82 (citing *Halberstam*, 705 F.2d at 488).[29] In the absence of allegations that the attacks themselves were specifically done in pursuance of the sanctions conspiracy—or plausible allegations that Defendants *intended* to kill or injure service members in Iraq and thus join a *terrorism* conspiracy—Plaintiffs' JASTA conspiracy claim fails. *See Bernhardt*, 47 F.4th at 873 (holding that Bernhardt "fail[ed] to allege an overt act in furtherance of a conspiracy," as "HSBC's sanctions evasion . . . is not . . . an overt act of international terrorism or the source of Bernhardt's injury").

Accordingly, Plaintiffs' Eighth Claim is dismissed.

## III.   JASTA Aiding and Abetting Claims

Finally, Plaintiffs allege three JASTA aiding-and-abetting claims: their Ninth, Tenth, and Eleventh claims in the TAC.  (*See* TAC, Dkt. 137, ¶¶ 4771–815.)  In addition to conspiracy liability, Section 2333(d)(2) also provides for aiding-and-abetting liability as to "anyone 'who aids and abets, by knowingly providing substantial assistance, . . . [to] the person who committed . . . an act of international terrorism.'"  *Twitter*, 598 U.S. at 483 (quoting 18 U.S.C. § 2333(d)(2)).  The act of terrorism must be "committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization."  18 U.S.C. § 2333(d)(2).  While the Court previously dismissed Plaintiffs' ATA and JASTA conspiracy claims in this case by "rel[ying] on, and incorporat[ing] by reference, its *Freeman I* decision," the Court fully analyzed

---

[29] Notably, Plaintiffs devote only a page-and-a-half of the 59-page opposition to their JASTA conspiracy claim, and fail to acknowledge the inadequacy of foreseeability allegations to meet the overt-acts element in light of the Circuit's decision in *Freeman I*.

and dismissed Plaintiffs' JASTA aiding-and-abetting claims.  *See Freeman II Dismissal*, 465 F. Supp. 3d at 225–26 ("The Court . . . addresses Defendants' motion to dismiss with respect to the only claims not alleged in *Freeman I*, Plaintiffs' JASTA aiding-and-abetting claims.")  The aiding-and-abetting case law has been refined in the nearly seven years since the *Freeman II Dismissal*, *see, e.g.*, *Twitter*, 598 U.S. 471, and thus the Court does not rely on its prior analysis but instead begins anew.

### A.      Plaintiffs' Ninth Claim Against All Defendants

In the Ninth Count of the TAC, Plaintiffs broadly allege that Defendants worked "hand in glove" with "IRGC-directed or controlled Iranian counterparties"[30] ("Iranian Counterparties"), and that the IRGC in turn directed a "terror campaign" in Iraq through its Iraqi Proxies[31] that resulted in the attacks that injured Plaintiffs.  (*See, e.g.*, TAC, Dkt. 137, ¶¶ 1681, 1914.)  More specifically, Plaintiffs allege that "Defendants aided and abetted the IRGC and its Lebanese proxy, Hezbollah, in the commission of their acts of terrorism by knowingly and systemically providing vast amounts of funds and materials to them (and their agents and proxies acting in concert with them and at their direction), who were the persons . . . that committed the acts of international terrorism set forth herein."  (*Id.* ¶ 4779; *see also id.* ¶ 204, 243, 358–59 (documenting "the IRGC's efforts to finance Hezbollah and its other Shi'a proxies in Iraq"); *id.* ¶ 368 (discussing "the symbiotic relationship between Hezbollah and the IRGC and their deep coordination in both financial and operational matters").)  Plaintiffs further allege that "Defendants knowingly provided substantial assistance, directly or indirectly, to the IRGC and its agents (including NIOC, NITC,

---

[30] According to Plaintiffs, these "counterparties" are "agents" of the IRGC, (TAC, Dkt. 137, ¶¶ 18, 224, 4670), and include NIOC, NITC, IRISL, and Mahan Air, (*see id.* ¶ 4648).

[31] As noted, Plaintiffs identify the Iraqi Proxies as including Badr Corps, JAM, AAH, and KH.  (TAC, Dkt. 137, ¶ 1915.)

IRISL, Mahan Air and MODAFL[]) and Hezbollah[,] . . . [and] did so in thousands upon thousands of illegal transactions." (*Id.* ¶ 4780.)[32]

To properly plead aiding and abetting under JASTA, Plaintiffs must adequately allege that: (1) Defendants aided an FTO that "committed, planned, or authorized" an act of international terrorism; (2) "[Defendants were] generally aware of [their] role as part of an overall illegal or tortious activity at the time that [they] provide[d] the assistance"; and (3) Defendants "knowingly and substantially assist[ed]" the act of terrorism. *See Twitter*, 598 U.S. at 484, 486 (citation omitted) (discussing aiding-and-abetting secondary liability for "an act of international terrorism"); *Ashley*, 144 F.4th at 437 (quoting *Halberstam*, 705 F.2d at 477) (applying these standards where alleged wrongful act was act of international terrorism). Ultimately, the question is whether Defendants "consciously and culpably 'participate[d]' in a wrongful act so as to help 'make [it] succeed.'" *Id.* at 439 (first alteration in original) (quoting *Twitter*, 598 U.S. at 493). The Court finds that Plaintiffs have failed to allege that Defendants "consciously and culpably" participated in the alleged acts of international terrorism, and thus their JASTA aiding-and-abetting claim must be dismissed.

### 1.    FTO Performed a Wrongful Act that Caused Injury

Under JASTA, the principal that "committed, planned, or authorized" the act of international terrorism must have "been designated as [an FTO] under [8 U.S.C. § 1189] as of the date on which such act of international terrorism was committed, planned, or authorized." *Twitter*, 598 U.S. at 484 (last alteration in original) (quoting 18 U.S.C. § 2333(d)(2)). Plaintiffs can satisfy

---

[32] Plaintiffs do not allege that Defendants aided and abetted the violation of any specific terrorism statute, instead claiming that Defendants aided and abetted each of the attacks detailed in the TAC and that these acts constitute acts of international terrorism as defined by Section 2331. (*See* TAC, Dkt. 137, ¶¶ 4771–72.)

this first element by alleging that defendants aided the FTO performing the act of international terrorism either "directly or indirectly."  *See Honickman*, 6 F.4th at 495–96 (finding element satisfied "'where [Defendants'] relevant substantial assistance was given to an intermediary' of the principal" rather than the principal themselves (quoting *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 856 (2d Cir. 2021)); *cf. Freeman I Dismissal*, 413 F. Supp. 3d at 97 ("Where Congress has expressed an intent to create a broad form of liability through JASTA and provided an expansive definition of the term 'person,' it would make little sense to relieve a financial institution of liability for conspiring with an FTO that happened to use agents or an alter ego to engage in acts of terrorism.")

In so far as Plaintiffs allege that Defendants aided and abetted "the IRGC's terror campaign," (*see, e.g.*, TAC, Dkt. 137, ¶ 4781), such allegations would fail to state a JASTA aiding-and-abetting claim.  The IRGC was not designated an FTO until 2019, as Plaintiffs concede, (*see id.* at ¶ 1 n.3), which was nearly a decade after the attacks that injured Plaintiffs had subsided, (*see id.* ¶ 1 n.1).[33]  And Plaintiffs' allegations regarding the IRGC's Iranian Counterparties are, as Defendants argue, "conclusory" at best.  (*See* Mem., Dkt. 144, at 28).  For example, NIOC was found to be "'an agent or affiliate of the' IRGC" in 2012, (*see id.* ¶ 370), which is *after* the attacks at issue in the TAC, (*see id.* at ¶ 1 n.1 (defining relevant period as 2001 to 2011)).  While the other entities were designated at some point as Specially Designated Nationals ("SDNs"[34]) (IRISL

---

[33] Plaintiffs seem to suggest that the timing of the IRGC's FTO designation is legally irrelevant, given it was designated "in part for engag[ing] in terrorist activity since its inception 40 years ago." (*See* TAC, Dkt. 137, ¶ 4774 (internal quotation marks omitted).) But the statute clearly requires a contemporary FTO designation.  *See* 18 U.S.C. § 2333(d)(2).  The IRGC's alleged reputation for terrorism is more relevant to the *Halberstam* general awareness discussion, *infra*.

[34] SDNs are "individuals and companies owned or controlled by, or acting for or on behalf of, targeted countries."  Off. of Foreign Assets Control, *Specially Designated Nationals (SDNs)*

in 2008, (*id.* ¶ 508)) or SDGTs (Mahan Air in 2011, (*id.* ¶ 532), NITC and NIOC in 2020, (*id.* ¶ 365)), they were not FTOs, nor were they agents or affiliates of an FTO. *Contra King*, 2022 WL 4537849, at *6 (finding allegations that FTO and non-FTO "function[ed] more or less as a single entity" sufficient). Plaintiffs' allegations with regard to entities located in Dubai are even more vague and would seemingly seek to indict the entire global financial industry. (*See, e.g.*, TAC, Dkt. 137, ¶ 797 (alleging that Dubai serves as a major conduit for terrorist money).) Had Plaintiffs' aiding-and-abetting allegations ended here, they would have failed.

But Plaintiffs also allege the participation of other FTOs, including Hezbollah and at least one Iraqi proxy militia, in the terrorist attacks that allegedly injured Plaintiffs and their relatives. Specifically, Plaintiffs allege that Hezbollah was designated as an FTO in 1997, (*id.* ¶ 4773), and that it, alongside the IRGC, "committed, planned and authorized each attack"; "provided the Hezbollah-designed EFPs, IRAMs, and other explosive devices used in the attacks against Coalition Forces that injured Plaintiffs and killed their decedents"; and "funded, trained, equipped, guided, directed and controlled the cells and individuals who emplaced and activated the EFPs, IRAMs and other explosive devices and/or, shot, kidnapped and/or tortured Plaintiffs and their decedents." (*See id.* ¶¶ 4773–77; *see also id.* ¶ 3 ("[T]he IRGC–QF *and Hezbollah*, under the IRGC's direction, worked together to establish, recruit, train, fund, arm, and direct Iraqi Shia proxies, including [KH] and [AAH], to attack U.S. and other peacekeeping forces that were supporting Operation Iraqi Freedom (2003–2008) and Operation New Dawn (2009–2011)." (emphasis added)).) As the Court also found in *Freeman I*, "Plaintiffs' allegations, . . . taken as a whole, describe Hezbollah as deeply involved in supporting and coordinating an extensive

---

*and the SDN List*, U.S. Dep't Treasury, https://perma.cc/X63M-NLDT (last accessed Mar. 29, 2026).

campaign of terrorist activity against American citizens in Iraq." *Freeman I Dismissal*, 413 F. Supp. 3d at 96–97. Again, here, "[d]rawing all reasonable inferences in Plaintiffs' favor, the Court may reasonably infer that a designated FTO, namely Hezbollah, was responsible for committing, planning, or, at the very least, authorizing the attacks that injured Plaintiffs." *Freeman I Dismissal*, 413 F. Supp. 3d at 97 (citing *Chase Grp. Alliance LLC v. N.Y.C. Dep't of Fin.*, 620 F.3d 146, 150 (2d Cir. 2010)).[35]

Thus, because Plaintiffs have adequately alleged FTO Hezbollah's involvement in the alleged acts of international terrorism, Plaintiffs have sufficiently alleged the first element of their aiding-and-abetting claim. Despite Plaintiffs' efforts to conflate the IRGC, Iranian Counterparties, and Hezbollah, the Court only construes allegations regarding the IRGC and the Iranian Counterparties to be allegations of their role as *intermediaries* for Hezbollah since, as discussed, none were designated as FTOs at the time of the attacks.

2.      General Awareness

Second, the Court must determine whether Defendants were generally aware, at the time they were providing the financial services in question, that the entities to which they were providing these services were "so closely intertwined" with the attacks such that Hezbollah's acts of international terrorism were foreseeable. *See Ashley*, 144 F.4th at 437 (noting in "cases involving banks," "the general awareness inquiry focuses on (1) whether the bank was aware of the customers' connections with the terrorist organization before the relevant attacks; and (2)

---

[35] The Court also finds that the TAC sufficiently alleges that at least one other FTO, KH, committed at least one of the attacks that injured Plaintiffs. (*See, e.g.*, TAC, Dkt. 137, ¶¶ 4015–22 (describing KH attack that injured Plaintiff Jeffrey C. Mann); *id.* ¶ 1915 (alleging that KH was designated as an FTO in 2009).) Plaintiffs also allege that AAH is an FTO, (*see id.* ¶ 3), but do not include any allegations regarding when AAH was designated. Given this and the fact that KH is only alleged to have orchestrated one attack, the Court focuses its analysis on Hezbollah.

whether the customers 'were so closely intertwined with' the terrorist organization's 'violent terrorist activities that one can reasonably infer' that the bank 'was generally aware of its role in unlawful activities from which the attacks were foreseeable while it was providing financial services' to those customers." (quoting *Honickman*, 6 F.4th at 501)); *Troell v. Binance Holdings Ltd.*, No. 24-CV-7136 (JAV), 2026 WL 636849, at *16 (S.D.N.Y. Mar. 6, 2026) ("As applied in the JASTA context, a defendant must be generally aware that it was playing a role in international terrorism, . . . even if it is unaware of its role in the specific terrorist attack that caused the plaintiff's injury." (internal quotation marks and citations omitted)); *Bartlett*, 2024 WL 5497906, at *3 ("The general awareness element of aiding-and-abetting liability requires 'the secondary actor to be aware that, by assisting the principal, it is itself assuming a role in terrorist activities.'" (quoting *Linde*, 882 F.3d at 329)).  The standard is not an exacting one.  *See Twitter*, 598 U.S. at 497 (stating that the plaintiffs satisfied this requirement by alleging that the defendants "knew they were playing some sort of role in ISIS'[s] enterprise"); *Raanan*, 2025 WL 605594, at *19 ("General awareness denotes 'something less than full, or fully focused, recognition,' and does not require showing that the defendant '<u>knowingly</u> and <u>intentionally</u> supported' the FTO in carrying out an attack." (quoting *Kaplan*, 999 F.3d at 863)); *cf Kaplan*, 999 F.3d at 863 ("JASTA aiding-and-abetting liability, using *Halberstam*'s general awareness standard, does not require proof that the defendant had a specific intent.").

Here, Plaintiffs allege that Defendants were "generally aware" that they were providing "unusual and unlawful banking services" to Iranian Counterparties[36] and other banks allegedly working with the IRGC and Hezbollah in support of a "terror campaign" that included the attacks

---

[36] As previously noted, according to Plaintiffs, these "counterparties" are "agents" of the IRGC, (TAC, Dkt. 137, ¶¶ 18, 224, 4670), and include NIOC, NITC, IRISL, and Mahan Air, (*see id.* ¶ 4648).

on Plaintiffs. (*See* TAC, Dkt. 137, ¶¶ 4781, 4784–86; *see also, e.g., id.* ¶¶ 427–77 (citing to news reports, diplomatic cables, congressional activity, and press releases documenting the ties of Defendants' customers CBI and Bank Saderat[37] to terrorist activity, particularly Hezbollah); *id.* ¶¶ 1575–80 (excerpting HSBC communications regarding Bank Saderat's ties to Hezbollah).) Plaintiffs attempt to show Defendants' "general awareness" that the Iranian Counterparties Defendants were dealing with were linked to terrorism by alleging that Defendants "were aware of the strict economic sanctions programs imposed by the United States on Iran and its terror proxies and that the U.S. Sanctions Regime is and was intended to prevent Hezbollah and the IRGC (among other terrorist organizations) from conducting banking activities, including electronic funds transfers, and thereby limit their ability to operate and to carry out terrorist attacks."[38] (*Id.* ¶¶ 59, 95, 115, 127, 147, 162 (alleging awareness of same for HSBC, SCB, Commerzbank, Credit Suisse, RBS, Barclays); *id.* ¶ 4768 ("Each Defendant was aware of the role of IRGC-controlled and/or entities in the conspiracy that sought to evade U.S. sanctions intended to prevent IRGC terror financing and weapons proliferation."); *id.* ¶ 4784 ("Each Defendant was generally aware that the IRGC and Hezbollah were committ[ing] terrorist attacks against

---

[37] Plaintiffs allege numerous dealings between Defendants, on the one hand, and CBI and Bank Saderat, on the other. (*See, e.g.*, TAC, Dkt. 137, ¶ 787 ("Barclays–Dubai's DIFC branch and its other branches in the UAE processed [UAE dirham-denominated] checks . . . for . . . Bank Saderat . . . ."); *id.* ¶ 1127 ("[SCB] served as the primary banker of the CBI . . . ."); *id.* ¶¶ 1487, 1489 (alleging that "[i]n February 2000, HSBC–Middle East signed several trade finance and project development agreements with the CBI" and "entered into a ten-year, $500 million project finance agreement with six Iranian commercial banks [including] Bank Saderat Iran"); *id.* ¶ 1608 ("Since 2002, Commerzbank also appears to have engaged in various illegal gold transactions on behalf of the CBI, including trading orders through its New York branch while disguising the Iranian source of the trades."); *id.* ¶ 1763 ("[RBS] held accounts for and worked *directly* with the CBI to evade U.S. counterterrorism sanctions . . . .").)

[38] The Court again notes that the IRGC was not designated as an FTO at the time of the attacks, and thus cannot be the principal for purposes of Plaintiffs' aiding-and-abetting claim. *See supra* Section III.A(1).

Americans in Iraq.").)[39] But the most that Plaintiffs have alleged with regard to Defendants' specific knowledge of terrorism is that "the HSBC Defendants were aware that some of the transactions they were illegally processing *may be* 'connected to terrorism.'" (*See id.* ¶ 1474 (emphasis added).)[40]

Plaintiffs' allegations fall somewhere between "the detailed, numerous sources that sufficed in *Kaplan*" and other recent cases, *see Honickman*, 6 F.4th at 502 (citing *Kaplan*, 999 F.3d at 864), and those dismissed in *Siegel*, 933 F.3d at 220, 225–26 (affirming district court's dismissal of aiding-and-abetting claim). The *Kaplan* complaint alleged that defendant Lebanese Canadian Bank, SAL had provided financial services directly to three identified customers whom the bank knew "were integral constituent parts of [Hezbollah]." *Kaplan*, 999 F.3d at 849–50. The bank allegedly knew this because Hezbollah had "openly, publicly, and repeatedly acknowledged the fact that [the bank's customers] were integral constituent parts of [Hezbollah]" through specific, public statements made by senior Hezbollah officials. *Id.* at 864 (internal quotation marks and citation omitted). The *Kaplan* court also considered the fact that both the bank and Hezbollah were headquartered in Lebanon in finding that there was a plausible "inference that LCB had knowledge of the [Hezbollah]-acknowledged relationships on the ground." *Id.* at 864–65.

---

[39] Plaintiffs seek to extrapolate general knowledge from the various enforcement actions against Defendants. (*See, e.g.*, Pls.'s Letter of Suppl. Authority, Dkt. 156, at 3 (discussing enforcement actions against HSBC and SCB).) But such an argument "misapprehends the purpose of the general awareness test." *See Troell*, 2026 WL 636849, at *7, *16 (finding defendants' guilty pleas to, *inter alia*, Bank Secrecy Act and U.S. sanctions violations not dispositive of whether defendants were generally aware "that [they were] playing a role in international terrorism").

[40] The Court has not identified any similarly direct allegations with regard to the other Defendants across the nearly 700 pages of the TAC. However, it is not the Court's responsibility to do so. To quote the Honorable Jeannette A. Vargas, "[w]hile the allegations in this case are weighty, and the subject matter complex, . . . . [r]equiring the Court to parse through hundreds of paragraphs to find specific allegations regarding the key issues . . . did not [necessarily] serve [p]laintiffs." *Troell*, 2026 WL 636849, at *11.

27

Similarly, in *Raanan*, defendant Binance "knew that it was providing services to terrorist groups such as Hamas and [Palestinian Islamic Jihad ("PIJ")]," both of which had "executed thousands of transactions on Binance" and had "publicized [their] use of Binance" to solicit donations. *Raanan*, 2025 WL 605594, at *20.[41]

In contrast, in *Siegel*, the district court dismissed the plaintiffs' aiding-and-abetting claim where defendant HSBC-US provided banking services to "Saudi Arabia's largest private bank," ARB, which in turn "was believed . . . to have links to [al-Qaeda] and other terrorist organizations." 933 F.3d at 220, 224. While "the plaintiffs did allege that HSBC provided hundreds of millions of dollars to ARB, . . . they did not advance any non-conclusory allegation that [al-Qaeda] received any of those funds or that HSBC knew or intended that [al-Qaeda] would receive the funds." *Id.* at 225. Ultimately, HSBC was found to have "only provided routine banking services," *id.* at 223, to customers that appeared to have "legitimate business purposes and without any direct link to terrorist organizations beyond the plaintiff's conclusory allegations." *Moses v. BNP Paribas, S.A.*, 802 F. Supp. 3d 567, 585 (S.D.N.Y. 2025) (compiling cases).

Here, Plaintiffs allege that "[e]ach Defendant understood its role in helping fuel Hezbollah's . . . terrorist and criminal activities, *including terrorist attacks*, and nonetheless continually assisted Hezbollah in its efforts." (*See* TAC, Dkt. 137, ¶ 4792 (emphasis added).) The TAC alleges, at length and in detail, the IRGC's, Hezbollah's, and their various intermediaries' diverse and widespread criminality. (*See, e.g.*, TAC, Dkt. 137, ¶ 687 (discussing "Hezbollah's integration of several different criminal networks[,] ranging from conflict diamond dealers,

---

[41] Similarly, the plaintiffs in *Troell*, *King*, and *Finan* alleged accounts held by, or payments made directly to, FTOs or their founders. *See Troell*, 2026 WL 636849, at *16; *King*, 2022 WL 4537849, at *7; *Finan v. Lafarge S.A.*, No. 22-CV-7831 (NGG) (PK), 2025 WL 2504317, at *18 (E.D.N.Y. Aug. 29, 2025), *mot. to certify appeal denied*, 2025 WL 2961469 (E.D.N.Y. Oct. 20, 2025), *recons. denied*, 2025 WL 3017793 (E.D.N.Y. Oct. 29, 2025).

28

counterfeiters, gold traders, narcotics traffickers, weapons traffickers, and trade-based money launderers"); *id.* ¶¶ 980, 1460–70, 1594–98 (discussing entity Tajco's role as Hezbollah's conduit for purchasing land, and for which SCB and HSBC maintained accounts).)[42]  Plaintiffs have also effectively alleged Defendants' general understanding of their role in these "criminal schemes." (*See, e.g.*, *id.* ¶¶ 877–881, 1593 (discussing SCB, Credit Suisse, HSBC, and RBS engagement with Kaloti Jewelry Group, which allegedly laundered money for Hezbollah).)  Further, Plaintiffs allege public reports and government warnings connecting Defendants' customers to terrorism-related entities.  (*See, e.g.*, *id*. ¶¶ 427–48 (citing to public reports documenting CBI's connection to the IRGC and Hezbollah); *see also id.* Sections VI.A(3) and VI.B(3) (detailing SCB and HSBC dealings with known Hezbollah affiliates).)  Finally, Defendants are "sophisticated business[es] with corporate security groups doing due diligence" and thus "underst[and] the nature of the market[s]" they operate in.  *See Zobay v. MTN Grp. Ltd.*, 695 F. Supp. 3d 301, 343 (E.D.N.Y. 2023) (finding general awareness alleged where plaintiffs alleged defendant was a sophisticated entity who would have been generally aware of the nature of its partners, and where plaintiffs alleged publicly available information that would lead defendant to be aware of FTO's "commercial fronts to support" its proxies).  Based on these allegations, it can be plausibly inferred that Defendants were "aware of the[ir] customers' connections with the terrorist organization before the relevant attacks" such that the attacks were reasonably foreseeable to Defendants, *see Ashley*, 144 F.4th at 438.

---

[42] Indeed, the TAC paints a comprehensive picture of Hezbollah's highly diversified criminal enterprise across nearly 100 pages. (*See* TAC, Dkt. 137, at 115–203 (alleging, *inter alia*, Hezbollah money laundering, arms dealing, and trade in conflict diamonds and other commodities).)

### 3. Knowing and Substantial Assistance

The final element—and the one upon which much of the recent case law has expounded—is whether Plaintiffs have adequately alleged that "[D]efendants gave such knowing and substantial assistance[43] to [the FTOs] that they culpably participated in the [attacks]." *See Twitter*, 598 U.S. at 497. More specifically, Plaintiffs must allege that "defendants culpably 'associated themselves with' the [attacks], 'participated in [them] as something that they wished to bring about,' or sought 'by their action to make [these] succeed.'" *Id.* at 498 (citation omitted) (cleaned up). "[T]his determination involves a balancing act, considering 'the nature and amount of assistance on the one hand, and the defendant's scienter on the other.'" *Bartlett*, 2024 WL 5497906, at *4 (quoting *Twitter*, 598 U.S. at 492–93). "That is, 'less substantial assistance require[s] more scienter before a court could infer conscious and culpable assistance,' whereas 'if the assistance were direct and extraordinary, then a court might more readily infer conscious participation in the underlying tort.'" *Id.* (quoting *Twitter*, 598 U.S. at 492).

As with many of its sister courts, the Court begins its "analysis of culpability . . . by 'recall[ing] the basic ways' that Defendants allegedly assisted Hezbollah." *Bartlett*, 2024 WL 5497906, at *4 (alteration in original) (quoting *Twitter*, 598 U.S. at 498). Here, Plaintiffs allege that Defendants provided financial services that, through at least two intermediaries, facilitated the terrorist attacks. (*See, e.g.*, TAC, Dkt. 137, ¶ 1129.) "Each Defendant knew, or

---

[43] The six *Halberstam* substantiality factors are: "(1) the nature of the act encouraged, (2) the amount of assistance given by defendant, (3) defendant's presence or absence at the time of the tort, (4) defendant's relation to the principal, (5) defendant's state of mind, and (6) the period of defendant's assistance." *Linde*, 882 F.3d at 329 (citing *Halberstam*, 705 F.2d at 483–84); *see Twitter*, 598 U.S. at 497 (directing that the *Halberstam* substantiality factors "be understood in light of the common law and applied as a framework designed to hold defendants liable when they consciously and culpably 'participate[d] in' a tortious act in such a way as to help 'make it succeed.'" (alteration in original) (quoting *Nye & Nissen v. United States*, 336 U.S. 613, 619 (1949))).

knew of the substantial certainty, that some of the funds it disguised and concealed from counterterrorism officials would be used by the IRGC, and Hezbollah, and their agents and proxies to support and commit acts of international terrorism, and yet continued to provide that assistance." (*Id.* ¶ 4787.)  And each Defendant allegedly knew that the "terrorist attacks that [the IRGC and Hezbollah] and their agents and proxies committed," which injured Plaintiffs, "were the natural and foreseeable consequences, and foreseeable risk" of Defendants' financial services.  (*See id.* ¶ 4796.)

The Court next considers the "nexus between the alleged assistance and the terrorist act." *Bartlett*, 2024 WL 5497906, at *5 (quoting *Twitter*, 598 U.S. at 497).  "[I]t is not enough . . . that a defendant ha[s] given substantial assistance to a transcendent 'enterprise' separate from and floating above all the actionable wrongs that constitute it.  Rather, a defendant must have aided and abetted (by knowingly providing substantial assistance) another person in the commission of . . . an act of international terrorism." *Twitter*, 598 U.S. at 495; *see also Ashley*, 144 F.4th at 444 ("[I]t is not enough to say that [Defendants] assisted the terrorist organization's 'activities in general.'" (quoting *Twitter*, 598 U.S. at 503)).

Notably, Plaintiffs here have not "link[ed] Defendants' payments directly to" the alleged attacks.  *Compare Murad v. Lafarge S.A.*, No. 23-CV-9186 (NGG) (PK), 2026 WL 270651, at *9 (E.D.N.Y. Jan. 30, 2026) (explaining that providing FTOs with instruments to circumvent regulatory controls was not a direct nexus (citing *Raanan*, 2025 WL 605594, at *23)), *with Atchley v. AstraZeneca UK Ltd.*, 165 F.4th 592, 596, 605–08 (D.C. Cir. 2026) (identifying a "plainly discernable nexus" where defendants "paid illegal cash bribes directly to [Hezbollah affiliate] and supplied extra, off-the-books batches of valuable medical goods that [Hezbollah affiliate] monetized on the black market to fund its terrorist operations against Americans").  Nor have

31

Plaintiffs alleged that Defendants procured specific goods used by the FTOs in their commission of the wrongful acts. *See Zobay*, 695 F. Supp. 3d at 346–47 (finding a sufficiently concrete nexus where defendant was a "business partner" of alleged IRGC fronts "directing procurement of specific goods"). While the "amount" of Defendants' aid to the wider Iranian network here is significantly more than the amount at issue in *Bartlett*, *compare* (Opp'n, Dkt. 147, at 33 ("Defendants worked with components of the IRGC and Hezbollah, including several SDGTs, to launder *billions of dollars* through New York by evading sanctions explicitly designed to curb Iranian-sponsored terrorism.")), *with Bartlett*, 2024 WL 5497906, at *5 ("Plaintiffs allege that Defendants were facilitating millions of dollars in transactions to organizations whose only objectives were to support terrorism."), Defendants' alleged assistance to Hezbollah—the FTO at issue here—is equally less direct.

The Court recognizes that "[l]iability is not limited only to defendants who 'directly' aid and abet, with a 'strict nexus' between the assistance and the specific attack." *See Bonacasa v. Standard Chartered PLC*, No. 22-CV-3320 (ER), 2023 WL 7110774, at *7 (S.D.N.Y. Oct. 27, 2023). "But, the more attenuated the nexus, the more courts should demand that plaintiffs show culpable participation through intentional aid that substantially furthered the tort." *Twitter*, 598 U.S. at 506. And if, as here, "a plaintiff's theory would hold a defendant liable for all the torts of an enterprise, then a showing of pervasive and systemic aid is required to ensure that defendants actually aided and abetted each tort of that enterprise." *Id.*; *accord Bonacasa*, 2023 WL 7110774, at *7; *Finan*, 2025 WL 2504317, at *20. Otherwise, "mostly passive actors like banks [may] become liable for all of their customers' crimes by virtue of carrying out routine transactions." *Twitter*, 598 U.S. at 491. The Court thus turns next to whether Defendants provided "pervasive and systemic aid" such that, despite the significant attenuation between Defendants' provision of

32

financial services to the Iranian Counterparties and banks and the attacks that injured Plaintiffs, Defendants may be found sufficiently culpable under JASTA.

While the relevant case law on this issue points in different directions, the provision of "routine services . . . in an unusual way" might "justify holding a secondary defendant liable for all of the [terrorist] group's actions or perhaps some definable subset of terrorist acts." *Twitter*, 598 U.S. at 502.[44]  For example, in *Bartlett*, the Honorable Carol B. Amon found that the plaintiffs' allegations that the defendant bank, who "opened and serviced accounts for individuals and organizations known to be linked to Hezbollah," employed managers who served as facilitators for Hezbollah, and "made efforts to help Hezbollah hide funds from American sanctions," was a sufficiently unusual provision of services to plead "systemic and pervasive assistance."  *See Bartlett*, 2024 WL 5497906, at *5.  In *Zobay*, Judge Amon similarly found that the defendant telecommunications operator engaged in "intentional evasion of U.S. sanctions" to "procure embargoed American technology for an IRGC front" such that it had provided "pervasive and systemic aid."  *Zobay*, 695 F. Supp. 3d at 347–48.  Finally, in *Raanan*, the Honorable John G. Koeltl held that "defendants' alleged widespread, intentional circumvention of anti-terror financing regulations, considered with [d]efendants' purported knowledge that Hamas and PIJ were transacting on the Binance platform, support[ed] the inference that [d]efendants' assistance was knowing."  *Raanan*, 2025 WL 605594, at *23.

---

[44] *Twitter* involved allegations that social media operators, through their platforms, had aided and abetted someone affiliated with the Islamic State of Syria and Iraq ("ISIS"), an FTO, who perpetrated a terrorist attack in Istanbul, Turkey.  *See Twitter*, 598 U.S. at 478–79.  Justice Thomas, writing for the majority, based much of his analysis on the finding that Plaintiffs' claim rested "on an alleged failure to stop ISIS from using [defendants'] platforms," i.e., "passive nonfeasance."  *See id.* at 500–03.

Here, Defendants clearly provided non-routine banking services to Iranian entities that were allegedly connected to or controlled by the IRGC, including, *inter alia*, manual workarounds to ensure that the entities' financial transactions would not be flagged under U.S. sanctions regulations. (*See, e.g.*, TAC, Dkt. 137, ¶¶ 1492–95 (detailing HSBC's process to remove "all references to Iranian-sanctioned entities from the SWIFT messages associated with each transaction").) Defendants also "allegedly had an independent duty to act that was not present in *Twitter*." *Raanan*, 2025 WL 605594, at *21. "[B]anking regulations require banks"—like Defendants—"to know their customers." *Kaplan*, 999 F.3d at 865. Plaintiffs allege that each Defendant bank used know-your-customer ("KYC") services, which were intended to identify and profile high risk individuals and companies. (TAC, Dkt. 137, ¶ 65 (alleging HSCB "used the services of World-Check, a compliance service that purported to identify and profile 'High risk individuals, companies and organizations'[45] and provide '[KYC ] and [Politically-Exposed-Persons][46] Checking before account opening.'"); *id.* ¶¶ 105–08 (describing SCB's KYC program); *id.* ¶¶ 132–38 (detailing Credit Suisse's use of World-Check and other KYC programs); *id.* ¶ 154 (alleging RBS used World-Check); *id.* ¶ 165 (alleging Barclays used World-Check).) Such duties *can* support a finding of sufficient knowledge of a connection to an FTO or terrorist activity. *Compare Est. of Henkin v. Kuveyt Turk Katilim Bankasi A.S.*, No. 19-CV-5394 (BMC), 2025 WL 622546, at *3 (E.D.N.Y. Feb. 26, 2025) (finding sufficient knowledge given defendant bank's due diligence and reporting duties), *and Raanan*, 2025 WL 605594, at *21 (noting defendants' "independent duty" to, *inter alia*, perform due diligence on its customers), *with Twitter*, 598 U.S.

_____

[45] The TAC notes that "World-Check described 'High Risk' as 'money launderers, arms dealers, terrorists, drug, fraud[, w]ar crimes etc.'" (TAC, Dkt. 137, ¶ 65 n.20.)

[46] These are defined by World-Check as "Politicians, their families, companies linked & business associates." (TAC, Dkt. 137, ¶ 65 n.21.)

at 501 ("[P]laintiffs identify no duty that would require defendants or other communication-providing services to terminate customers after discovering that the customers were using the service for illicit ends.")

But Plaintiffs' allegations here differ from the case law in two key respects. First, Defendants' actual connections with Hezbollah are significantly more attenuated than in the aforementioned cases. In *Bartlett*, defendants were alleged to have (1) "Hezbollah liaisons *within their institutions* who facilitated the transactions for those terrorist affiliates," *Bartlett*, 2024 WL 5497906, at *4 (emphasis added); (2) facilitated "millions of dollars in transactions to organizations whose *only* objectives were to support terrorism," *id.* (emphasis added); and (3) "opened and serviced accounts for individuals and organizations *known* to be linked to Hezbollah," *id.* at 4 (emphasis added). In *Zobay*, "the second floor of [defendant's] Iran offices was allegedly populated by military intelligence officials," and defendant "allegedly invested in a venture with two shareholder entities with significant connections to the IRGC[47] and provided embargoed U.S. goods important to the IRGC's aims to the venture to help make it succeed." *Zobay*, 695 F. Supp. 3d at 346–47. The *Raanan* court credited allegations that "defendants knew in real-time that terrorists were transacting on the platform." *Raanan*, 2025 WL 605594 at *21. And in *Henkin*, the court emphasized the defendant bank's "close relationship" with known Hamas affiliates, which encompassed effectuating transfers "at the direction of a Hamas minister." *Henkin*, 2025 WL 622546, at *4 (citation omitted). There are no such insider allegations in the TAC, nor allegations that the funds Defendants provided were used *solely for terrorist activities*.

---

[47] At the time of at least one of the attacks alleged in *Zobay*, the IRGC had been designated as an FTO. *See Zobay*, 695 F. Supp. 3d at 315, 320.

Second, Defendants' provision of financial services is too widespread to impart the requisite intent to aid the specific terrorist acts at issue. In *Kaplan*, the defendant granted "its known [Hezbollah]-affiliated Customers 'special exceptions'" that allowed deposits far and beyond the bank's limits. *See Kaplan*, 999 F.3d at 858. In *Raanan*, "defendants intentionally engaged in a scheme to evade anti-terror financing regulations in order to retain illicit actors on the platform, . . . launched a customer due diligence program that 'by design still contained massive gaps to allow criminal activity to take place,' . . . [a]nd on one occasion, . . . allegedly went out of its way to <u>protect</u> a user associated with Hamas." *Raanan*, 2025 WL 605594, at *21. And in *Bonacasa*, defendants "carefully tailored financial instruments to fund production of a known IED ingredient known to be sold to terrorist groups known to be attacking U.S. service members." *Bonacasa*, 2023 WL 7110774, at *11. In contrast, the financial services Defendants provided suggest a general desire to obtain the business of *any* sanctioned entity, Iranian or otherwise, rather than the desire to "form a near-common enterprise" with *Hezbollah*-affiliated entities, such as the IRGC. *See Ashley*, 144 F.4th at 445; (*see, e.g.*, TAC, Dkt. 137, ¶¶ 1805–06 (exhibiting broader RBS effort to find a "solution" for range of (non-Iranian) clients who may find themselves subject to sanctions); *id.* ¶¶ 1841–45, 1850 (detailing Bank Melli-triggered instructions "on how to process payments for *both sanctioned and non-sanctioned banks* with which Barclays had correspondent relationships" (emphasis added)); *id.* ¶¶ 1705, 1708, 1730–31 (noting SCB's non-routine banking practices for all Iranian banks, as far back as 1990s); *id.* ¶¶ 1535, 1552 (discussing HSBC's interest in "business opportunities" in Iran despite risks); *id.* ¶ 1549 (discussing payments originating from financial institutions "domiciled in . . . an [Office of Foreign Assets Control-sanctioned] country," e.g. "Cuba[], Iran[]").)

Ultimately, even construing all allegations as true, Plaintiffs' "allegations here at most indicate that Defendants generally permitted and solicited illicit actors of all ilks to use [their] platforms." *See Troell*, 2026 WL 636849, at *22; *see also Ashley*, 144 F.4th at 445 ("The Banks are alleged to have culpably executed financially suspect transactions writ large, not in a manner that actively sought to 'associate[ ] themselves' with the Syndicate's 'operations' or to form 'a near-common enterprise' with the Syndicate." (alteration in original) (citing *Twitter*, 598 U.S. at 502)); *cf. Twitter*, 598 U.S. at 500 ("[D]efendants' relationship with ISIS and its supporters appears to have been the same as their relationship with their billion-plus other users."). Thus, "[e]ven assuming [Defendants'] aid was pervasive and systemic, the [TAC] does not support the inference that [their] money laundering operations were designed or performed with the *intent* to aid [Hezbollah]." *See Ashley*, 144 F.4th at 445 (emphasis added); *see also Troell*, 2026 WL 636849, at *17–19 (rejecting aiding-and-abetting claims "premised on the allegation that individuals and entities with terrorist affiliations were permitted to transact on" defendant's exchange platform, where plaintiffs failed to plead that the defendants "*intended* to assist IRGC in committing terrorist attacks" (emphasis added)). This is all the more so given Defendants' workarounds were designed for sanctioned customers, rather than Hezbollah or even *other* Iranian customers. Without more, Defendants cannot be culpable under JASTA "for engaging in money laundering on behalf of an individual or entity with connections to terrorists." *Troell*, 2026 WL 636849, at *20 (citing *Ashley*, 144 F.4th at 443–44); *id*. at *18 ("Courts have routinely found allegations that financial institutions intentionally and knowingly facilitated transactions by sanctioned entities insufficient to establish the nexus required to render a defendant secondarily liable for specific terrorist attacks.").

37

Ultimately, Plaintiffs "posit a theory based on money's fungibility: because Defendants engaged in widespread money laundering for individuals and entities with an apparent or possible connection to terrorists, some of the money must have gone to the terrorists' violent activities." *Ashley*, 144 F.4th at 444. But the Circuit has already rejected this type of "fungibility theory." *See id.* at 444–46 (compiling cases); *see also Honickman*, 6 F.4th at 498–99 (finding that plaintiffs' "fungibility argument" would "evade *Halberstam*'s foreseeability standard"); *Troell*, 2026 WL 636849, at *20 (explaining that the Second Circuit "rejected the notion that a defendant bank could be culpable under JASTA for engaging in money laundering on behalf of an individual or entity with connections to terrorists, without more, as such a theory of liability depends upon money's fungibility" (citing *Ashley*, 144 F.4th at 443–44)).

While Defendants' sanctions-evading conduct might be "reprehensible from moral and policy perspectives," (*see* Pls.' Letter, Dkt. 160, at 5), it does not satisfy the intent requirement for an aiding-and-abetting claim under JASTA. Because Plaintiffs have failed to sufficiently allege that Defendants had the requisite "intent to further [an FTO's] terrorist activities,"[48] *see Ashley*, 144 F.4th at 444 (quoting *Linde*, 882 F.3d at 330); *see id.* at 437 (noting "*Twitter*'s command that aiding-and-abetting liability [be] reserved 'to cases of truly culpable conduct'" (citing *Twitter*, 598 U.S. at 489)), the Court dismisses Plaintiffs' Ninth Claim.

### B.    Plaintiffs' Tenth Claim Against Commerzbank[49]

Plaintiffs separately allege that Commerzbank aided and abetted Hezbollah's commission of terrorist activities by providing "material support to Hezbollah through [its proxy,] the Martyrs

---

[48] Having determined that Plaintiffs' Ninth Claim must be dismissed on this basis, the Court declines to assess the *Halberstam* substantiality factors.

[49] Whereas Plaintiffs' Ninth Claim against all Defendants, including Commerzbank, is based on Defendants' alleged collaboration with Iranian Counterparties, their links to the IRGC, and the IRGC's links to Hezbollah, (*see* TAC, Dkt. 137, ¶¶ 4771–97), Plaintiffs' Tenth Claim

Foundation," in Lebanon.  (TAC, Dkt. 137, ¶¶ 4799–800.)  The TAC more specifically alleges that the Waisenkinderprojekt Libanon e.V., or the "Orphans Project Lebanon," "was, until its closure in 2014, the German branch of Hezbollah's Martyrs Foundation and [was] responsible for collecting donations in Germany and transferring those funds to Hezbollah in Lebanon."  (*Id.* ¶ 1649.)  Plaintiffs allege that during the relevant period, the Orphans Project Lebanon "transferred several million dollars to Hezbollah's Martyrs Foundation in Lebanon through Commerzbank." (*Id.* ¶ 1650.)

Commerzbank seeks to dismiss this claim for failure to state a claim and for lack of personal jurisdiction.  (*See* Commerzbank Suppl. Mem. Supp. MTD, Dkt. 145, at 4 (arguing that Tenth Claim fails to state a claim); *id.* at 9 ("The Court should also dismiss [the Tenth Claim] for the independent reason that the Court lacks personal jurisdiction over Commerzbank to adjudicate [this claim].").)  The Court finds that this claim should not be dismissed for either reason.

### 1. Personal Jurisdiction

Commerzbank's personal jurisdiction argument is raised for the first time in this action. *See Freeman II Dismissal*, 465 F. Supp. 3d at 226 n.8 (noting that "the Court had dismissed the [JASTA] conspiracy claim against Commerzbank for lack of personal jurisdiction" in *Freeman I*, and that "Commerzbank [did] not move[] to dismiss the Tenth Claim [alleging aiding and abetting] for lack of personal jurisdiction under FRCP 12(b)(2)" in *Freeman II*).  "[L]ongstanding Second Circuit precedent hold[s] that 'the Rule 12 defense[ ] of lack of personal jurisdiction, . . . if waived by defendant's failure to raise [that] objection[ ] in response to the original complaint, may not be resurrected merely because a plaintiff has amended the complaint." *Perez v. Escobar Constr., Inc.*,

---

against Commerzbank is based on Commerzbank's separate and direct dealings with a Hezbollah affiliate, (*see id.* ¶¶ 4799–805).

No. 20-CV-8010 (LTS) (GWG), 2025 WL 2732861, at *4 (S.D.N.Y. Sep. 25, 2025) (quoting *Gilmore v. Shearson/Am. Exp. Inc.*, 811 F.2d 108, 112 (2d Cir. 1987)); *see also Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) (holding that failure to raise personal jurisdiction in the first responsive pleading results in "irrevocabl[e]" waiver).  Commerzbank argues that it would be "manifest injustice" to find that it waived this defense, because the Tenth Claim was previously "dismissed 'with prejudice'" and the Court "previously noted that Commerzbank did not face prejudice from not having the Tenth Claim dismissed for lack of personal jurisdiction." (Commerzbank Suppl. Reply Supp. MTD, Dkt. 150, at 6 (citation omitted).)  But in the Court's prior dismissal, it "deem[ed] Commerzbank as having consented to the Court's jurisdiction for the purposes of the Tenth Claim" because "Commerzbank has appeared and not moved to dismiss the Tenth Claim of the Complaints for lack of personal jurisdiction."  *See Freeman II Dismissal*, 465 F. Supp. 3d at 226 n.8; *see also Freeman v. HSBC Holdings PLC,* No. 18-CV-7359 (PKC) (CLP), 2020 WL 4481944, at *4 (E.D.N.Y. Aug. 4, 2020) (denying Commerzbank's motion for reconsideration of its personal jurisdiction finding for the Tenth Claim).  The subsequent dismissal with prejudice has no bearing on the fact that Commerzbank had consented to jurisdiction.  The Court thus assesses the merits of Commerzbank's motion to dismiss the Tenth Claim in the TAC.

### 2.  The Orphans Project Lebanon

Plaintiffs allege that, through its provision of financial services to the Orphans Project Lebanon, Commerzbank aided and abetted Hezbollah's terrorist attacks, including those that injured Plaintiffs.  (*See* TAC, Dkt. 137, ¶¶ 4798–4805.)  Plaintiffs allege that the Orphans Project Lebanon's association with Hezbollah was widely known, including in Germany.  (*See id.* ¶ 1673 ("In January 2008, the German newspaper *Die Welt* reported that Orphans Project Lebanon e.V. collected donations in Germany and belonged to the Lebanese 'Al-Shahid (The Martyr) Association,' which in turn is affiliated with Hezbollah."); *id.* ¶ 1676 ("[T]he 2003 report publicly

40

issued by the Baden–Württemberg State Office for Protection of the Constitution (one of the security services for the German states) found: 'Hezbollah' has an extensive network of charitable institutions in which not only Shiites find support . . . .  Funding is also done through donations made by certain organizations who collect funds from abroad.  This includes, for example, the 'Orphans Project Lebanon e.V.' which is active in Baden–Württemberg.").)  This association was also publicly announced by the Orphan Project Lebanon on its website.  (*See id.* ¶ 1654 ("[A]s of 2002, Orphans Project Lebanon's website stated its affiliation with the Martyrs Foundation, declaring: '[W]e work closely with the Aschahid [i.e., al-Shahid or Martyrs] Association in Beirut.'").)  "Commerzbank maintained account number ending in 1688[50] for the Orphans Project Lebanon and transferred millions of dollars on its behalf, knowing that it was Hezbollah's fundraising organization in Germany," despite these public notices "identifying [the Orphans Project Lebanon] as a Hezbollah fundraising organization," and "despite the fact that the primary recipient of funds donated from the account—Hezbollah's Martyrs Foundation—was designated by the United States as an SDGT on July 24, 2007."  (*See id.* ¶¶ 1674–75.)

As previously discussed, the three elements of an aiding-and-abetting claim under JASTA are: (1) the party whom the defendant aided performed a wrongful act that caused injury; (2) the defendant was generally aware of its role as part of the illegal or tortious activity when it provided the assistance; and (3) the defendant knowingly and substantially assisted the principal violation. *Ashley*, 144 F.4th at 437.  The aiding-and-abetting claim against Commerzbank differs materially

---

[50] Plaintiffs do not identify specific years during which Commerzbank allegedly "maintained account number ending in 1688 for the Orphans Project Lebanon and transferred millions of dollars on its behalf, knowing that it was Hezbollah's fundraising organization in Germany," alleging only that these financial services occurred "[d]uring this same time period when Orphans Project Lebanon was proudly proclaiming its affiliation with the Martyrs Foundation on its website," which appears to be around 2008.  (*See* TAC, Dkt. 137, ¶¶ 1672–74.)

from the one against Defendants in the Ninth Claim, which the Court is dismissing for failure to state a claim.

### a) FTO's Performance of a Wrongful Act that Caused Injury

The Court finds that the TAC adequately alleges that Hezbollah, an FTO, was both a recipient of Commerzbank's assistance and a principal in the attacks that allegedly injured Plaintiffs. (*See* TAC, Dkt. 137, ¶¶ 1649–80, 1959–79.) In contrast to Plaintiffs' aiding-and-abetting claim against all Defendants in the Ninth Claim, here there was no chain of intermediaries, such as the IRGC or its purported proxies or agents, between Commerzbank and Hezbollah. Rather, Commerzbank dealt directly with a well-known fundraising arm of Hezbollah. Thus, the connection between Commerzbank and the relevant FTO is far less attenuated than the one between Defendants and any FTO in the Ninth Claim.

### b) General Awareness

Plaintiffs' allegations regarding Commerzbank's general awareness of its role in the illegal or tortious activity are also stronger here than in Plaintiffs' Ninth Claim. Commerzbank argues that Plaintiffs' failure to adequately plead Commerzbank's specific knowledge of the public material tying Commerzbank's client to an FTO dooms this claim. (*See* Commerzbank Suppl. Mem. Supp. MTD, Dkt. 145, at 5–6.) But Commerzbank misreads the applicable case law. Plaintiffs need not specifically allege that Commerzbank had "read or was aware of [public] sources" tying its customers to Hezbollah. *See Kaplan*, 999 F.3d at 864–65 (overturning district court's "reject[ion of plaintiffs'] allegations as insufficient to permit an inference that [defendant] had knowledge of the [Hezbollah]-acknowledged relationships [because] the SAC 'nowhere allege[d] . . . that [defendant] read or was aware of such sources'"); *Raanan*, 2025 WL 605594, at *20 ("A plaintiff may rely on media articles and publications, for example, and need not allege

42

at the pleading stage that the defendant 'knew or should have known of the public sources.'" (quoting *Honickman*, 6 F.4th at 501)).  As previously discussed, the general awareness standard is "permissive."  *See King*, 2022 WL 4537849, at *7 (finding general awareness when defendant provided extensive banking services to "well-known 'al-Qaeda front'" and associated individuals, "despite their being placed on the U.S. government's [SDN] and Blocked Persons list or designated as [SDGT]s").  Plaintiffs have sufficiently alleged Commerzbank's general awareness here.

### c)  Knowing and Substantial Assistance

Finally, Plaintiffs allege that the transfers facilitated by Commerzbank enabled "terrorism-incentive payments to Hezbollah operatives or their families upon their deaths." (Opp'n, Dkt. 147, at 25 (citing TAC, Dkt. 137, ¶ 1660).)  The nexus between Commerzbank's assistance and the terrorist attacks at issue is thus significantly stronger than in the Ninth Claim.  Overall, the facts alleged by Plaintiffs most closely mirror those in *Bartlett*, in which Judge Amon found this element sufficiently pled based plaintiffs' allegation that the defendant bank had "provided Hezbollah with pervasive, substantial assistance constituting hundreds of millions of dollars of funding and crucial access to Lebanese and international financial networks through Hezbollah's proxies." *Bartlett*, 2024 WL 5497906, at *5.  So too here, the Court finds that Plaintiffs have sufficiently alleged that Commerzbank provided knowing and substantial assistance to Hezbollah.

Accordingly, the Court denies Commerzbank's motion to dismiss the TAC's Ninth Claim, which alleges aiding-and-abetting under JASTA, for failure to state a claim under Rule 12(b)(6).

### CONCLUSION

For the reasons stated herein, the Court dismisses the First through Ninth Claims as to the Defendants[51] for failure to state a claim under Rule 12(b)(6).  The Court also dismisses the Sixth

---

[51] As previously discussed, Bank Saderat has defaulted in this case.

43

Claim against Commerzbank for lack of personal jurisdiction pursuant to Rule 12(b)(2).  The Court denies Commerzbank's motion to dismiss the Tenth Claim.  Lastly, the Court directs Plaintiffs to file a letter indicating whether they plan to seek damages against Bank Saderat, in accordance with the Court's Memorandum & Order granting default judgment against Bank Saderat for the Ninth and Eleventh Claims,[52] (*see* Mem. & Order, Dkt. 90), within fourteen (14) days of this Memorandum & Order.

SO ORDERED.

/s/ Pamela K. Chen
Pamela K. Chen
United States District Judge

Dated: March 31, 2026
      Brooklyn, New York

---

[52] The Eleventh Claim is against Bank Saderat only.